Theodore H. Frank (SBN 196332)
Adam E. Schulman (*pro hac vice* forthcoming)
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street NW, Suite 300
Washington, DC 20006
Voice: 703-203-3848
Email: ted.frank@hlli.org

*Attorney for Plaintiff Christopher Kohls*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

|  |  |
|---|---|
| CHRISTOPHER KOHLS, | Case No. 24-cv-_____ |
| *Plaintiff,* | **VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| *v.* | |
| ROB BONTA, in his official capacity as Attorney General of the State of California, and SHIRLEY N. WEBER, in her official capacity as California Secretary of State, | |
| *Defendant.* | |

Plaintiff Christopher Kohls, by and through his counsel, brings this Complaint against the above-named Defendants, and their employees, agents, and successors in office, and alleges the following upon information and belief:

1.      On July 26, 2024, Elon Musk shared a parody Kamala Harris campaign video on his platform X (commonly known as Twitter). Plaintiff Christopher Kohls created the video, which lampoons Kamala Harris's mannerisms and talking points with a computer-generated voiceover where, among other things, "Harris" called herself a "diversity hire" and makes other outlandish statements that would never actually be included in a campaign advertisement.

2.      Nevertheless, two days later, California Governor Gavin Newsom tweeted: "Manipulating a voice in an 'ad' like this one should be illegal. I'll be signing a bill in a matter of weeks to make sure it is." As promised, Newsom today signed two bills designed to make computer-generated parody illegal.

3.      Political satire is a fundamental First Amendment right. Plaintiff Kohls brings this suit to defend all Americans' right to satirize politicians.

## INTRODUCTION

4.      Christopher Kohls creates humorous content commenting on and satirizing political figures on his popular YouTube, Facebook, and X channels under the screenname "Mr Reagan." In his own words, "My mission is to spread reason and rationality throughout the world. I don't believe in petty motivations, envy, hate, resentment, or greed. I believe in rational solutions to real problems. I believe that we have an obligation to help the less fortunate where they already live. And I believe in judgment, not based on the color of one's skin, but by the content of one's character."

5.      On July 26, 2024, Kohls posted a video parodying candidate Kamala Harris's first presidential campaign ad. The humorous YouTube video ("the July 26 video") is labeled "parody" and acknowledges "Sound or visuals were significantly edited or digitally generated."[1]

6.      The July 26 video features AI-generated cuts of a voice sounding like Vice President Harris narrating why she should be President. In the video "Harris" announces she is the "Democrat candidate for President because Joe Biden"—her prior running mate, current boss, and the President—"finally exposed his senility at the" infamous presidential debate with former President Trump on June 27, 2024. The video's voiceover closely resembles Harris's voice and the production itself mirrors the aesthetic of a real campaign ad—using clips from Harris's own campaign videos—but the comedic effect of the video becomes increasingly clear with over-the-top assertions parodying political talking points about Harris and her

_____

[1] *See* https://www.youtube.com/watch?v=sVspeqNnoWM (last visited September 17, 2024).

mannerisms. "She" claims to have been "selected because [she is] the ultimate diversity hire and a person of color, so if you criticize anything [she] say[s], you're both sexist and racist." The "Harris" narrator claims that "exploring the significance of the insignificant is in itself significant," before the video cuts to a clip of the real Harris making similarly incomprehensible remarks about "significance."

7.      Kohls, who is ideologically opposed to Harris' political agenda, created this content to comment about Harris's candidacy in humorous fashion.

8.      Elon Musk was impressed by the video, calling it "amazing," and reposted it on X, where his post garnered over 100 million views.[2]

9.      In response, on July 28, Gov. Newsom posted a photo of a news story discussing Musk's retweet of the video, asserting that what Kohls and Musk did "should be illegal" and promising to sign "a bill in a matter of weeks to make sure it is." A true and correct copy of Newsom's tweet is attached as Exhibit A.

10.      But Governor Newsom is wrong. Political speech like Kohls' is protected by the First Amendment, and he brings this suit for injunctive and declaratory relief to vindicate his free speech rights, and the rights of others, against an unconstitutional law.

11.      In fact, California's legislature shepherded not one, but two bills to restrict Kohls' political speech. The Acts at issue are AB 2655, the Orwellian-named "Defending Democracy from Deepfake Deception Act of 2024," and AB 2839, more prosaically titled "Elections: deceptive media in advertisements." Governor Newsom signed both bills on September 17, 2024, issuing a press release bragging that the acts would "remove deceptive content from large online platforms."[3]

---

[2] *See* https://x.com/elonmusk/status/1816974609637417112 (last visited August 22, 2024).

[3] *See* Gov. Gavin Newsom, *Governor Newsom signs bills to combat deepfake election content* gov.ca.gov (Sep. 17, 2024), https://www.gov.ca.gov/2024/09/17/governor-newsom-signs-bills-to-combat-deepfake-election-content/ (last visited September 17, 2024).

12.     AB 2655 seeks to regulate and ban "disinformation powered by generative AI" because of "California's compelling interest in protecting its free and fair elections." It requires large social media companies, including X and YouTube, to "block[] and "prevent" AI-generated parody videos of candidates and election videos that could "harm the reputation or electoral prospects of a candidate" or "falsely undermine confidence in the outcome of one or more election contests."

13.     AB 2839 opens with a jeremiad that "disinformation powered by generative AI will pollute our information ecosystems like never before" and purports "to provide consumers with factual information about the inauthenticity of particular images, audio, video, or text content in order to prevent consumer deception." Although the bill claims to concern "advertising," AB 2839 extends much further, to all "Election communication," which covers all speech concerning a "candidate for office"—not just advertising or campaign-generated works—including speech distributed "through the internet."

14.     California flagrantly uses state power to force private social media companies to censor private citizens' speech by purging election-related AI-generated content with AB 2655. And AB 2839 provides candidates or *any* listener a cause of action against "misleading" satirical political content they dislike. It is black letter law that statutes like this—that regulate political speech, crack down on satire, and that offshore the enforcement to private entities—are unconstitutional.

15.     For his part, Plaintiff responded to Governor Newsom's threat of legal and regulatory action as anyone should against a bully—he punched back, posting another AI-generated, Harris-mocking video.[4] But now that AB 2839 is immediately in effect by its status as an "urgent" bill (and AB 2655 is set to go into effect on January 1), he is powerless to keep

---

[4]     *See* @MrReaganUSA, "Kamala   Ad   2   PARODY" (July   31,   2024), https://tinyurl.com/4njbnrcx (X); Mr Reagan, "Kamala Harris Ad PARODY 2" (July 31, 2024), https://tinyurl.com/5n7bzbxw (YouTube).

these videos up and continue to use social media sites to post this commentary—which has cumulatively drawn millions of views—unless this Court grants relief.

16.     Accordingly, Plaintiff files this Complaint against Defendants to ask the Court to enjoin the enforcement of both bills and declare them unconstitutional in violation of both the First and Fourteenth Amendments of the United States Constitution and Article I, § 2 of the California Constitution.

## PARTIES

17.     Plaintiff Christopher Kohls is the owner of the @MrReaganUSA X account and "Mr Reagan" YouTube and Facebook accounts, where he regularly publishes political content from a conservative perspective. He has roughly 80,000 followers on X and 360,000 subscribers on YouTube who regularly see his content. Plaintiff is a U.S. citizen and was most recently domiciled in Los Angeles, but over the last year has lived as a nomadic YouTube and Twitter/X star, traveling as a tourist from one international locale to another. He is in Bali as of this Complaint's filing, but has not changed his domicile from California.

18.     Defendant Robert Bonta is the Attorney General of California. As the chief law enforcement officer of the State, he is responsible for enforcing AB 2655 against the social media companies charged with preventing AI-generated content like Plaintiff's from being posted and shared on his accounts.

19.     Defendant Shirley N. Weber is the California Secretary of State, and as such is responsible for implementing the California Elections Code, including the sections added by both AB 2655 and AB 2839. Additionally, AB 2839 defines the Secretary of State as among the "elections officials" who "may seek injunctive or other equitable relief prohibiting the distribution of the materially deceptive content in violation of this section." Cal. Elec. Code § 20012(d) & (f)(6).

20.     Defendants, at all times relevant to this suit, are acting under color of law.

## JURISDICTION AND VENUE

21.     Plaintiff brings this action under Section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, for violations of the First and Fourteenth Amendments to the United States Constitution and under California law for violating Article I, § 2 of the California Constitution. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a), and supplemental jurisdiction over the state-law claim under 28 U.S.C. § 1367.

22.     Plaintiff's claims for declaratory and injunctive relief are authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, implemented through Rule 57 of the Federal Rules of Civil Procedure, and to issue the injunctive relief requested by Plaintiff under Rule 65 of the Federal Rules of Civil Procedure; the requested injunctive relief under 28 U.S.C. § 1343(3); and attorneys' fees and costs under 42 U.S.C. § 1988 and/or Cal. Civ. Code § 52.1(i).

23.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events that gave rise to Plaintiff's claims occurred in this district. Both Defendants maintain offices in Sacramento County.

## STATEMENT OF FACTS

**Vice President Harris Ascends to Lead the 2024 Democratic Presidential Ticket**

24.     Early this summer, President Joe Biden—the elected Democratic President in 2020—was well on his way to winning the 2024 Democratic nomination, having won the vast majority of delegates. President Biden won every Democratic primary and caucus election (except in the territory of American Samoa) and faced only token opposition to his renomination.

25.     But President Biden was trailing in the polls to former President Trump, the Republican nominee, and his odds of winning reelection looked bleak. There were serious concerns about his age, cognitive ability, and acuity that bore out in polling. Seeking to change the conventional wisdom in Washington that he was dead in the water, Biden made the unusual move to challenge former President Trump to a one-on-one debate in June—the earliest

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

presidential debate between the (presumptive) nominees from two parties in modern American history.

26.      Biden's performance in that debate did little to calm concerns about his ability to lead. It led to an immediate crisis of confidence. Democratic elites decided to overrule the will of their primary voters and force a change at the top of the ticket. They pled with the President to quit the race, they cut off donations, they leaked damaging stories, they threatened Biden's legacy, and they launched gossip campaigns against the President with cooperative media. Eventually Biden relented and withdrew from the race. On his way out he endorsed Vice President Harris for the Democratic nomination (interestingly, via X).

27.      Vice President Harris was quickly endorsed by a smorgasbord of Democratic politicians and elites, and the Democratic delegates elected by Biden's voters quickly fell in line—Harris is now the presidential nominee for the Democratic ticket.

**Online Right-Wing Humorists Pivot from Poking Fun at Biden to Mocking Harris**

28.      Making fun of presidential candidates and other public figures is an American pastime. "Despite their sometimes caustic nature, from the early cartoon portraying George Washington as an ass down to the present day, graphic depictions and satirical cartoons have played a prominent role in public and political debate." *Hustler Magazine v. Falwell*, 485 U.S. 46, 54 (1988). Vaughn Meader won a Grammy for Album of the Year in 1963 for *The First Family*, at the time the fastest-selling album in history, featuring his impersonations of President John F. Kennedy. AI-generated commentary, though a new mode of speech, falls squarely within this tradition.

29.      There is a significant presence of commentators online who made memes, videos, and posts about President Biden when he was the presumptive nominee for the Democratic Party. Plaintiff is one of them. Other commentators online made, and continue to make, memes, videos, and posts about Harris's Republican opponent, former president Donald Trump. Videos created with the use or assistance of generative artificial intelligence is one of the tools these satirists use to poke fun at various politicians and personalities.

30.     When Biden withdrew from the presidential race, much of that attention and commentary shifted to Harris, now the Democratic nominee.

31.     In accordance with his longtime track record satirizing Democratic politicians, Plaintiff posted the video which Governor Newsom took issue with on July 26, 2024.

32.     Plaintiff's video is approximately one minute and fifty-three seconds long. It plays various video clips of Kamala Harris with an AI-generated voiceover imitating Harris's voice and is designed to mimic a campaign ad. Harris never actually said the words in the video; instead, a computer algorithm uses audio clips of her voice to mimic it and read aloud text provided by Plaintiff in her voice.

33.     "Harris's" speech in the video reads as follows:

> I, Kamala Harris, am your Democrat candidate for president because Joe Biden finally exposed his senility at the debate. Thanks Joe. I was selected because I am the ultimate diversity hire. I'm both a woman and a person of color. So if you criticize anything I say, you're both sexist and racist.

> I may not know the first thing about running the country, but remember, that's a good thing if you're a deep state puppet. I had four years under the tutelage of the ultimate deep state puppet; a wonderful mentor, Joe Biden. Joe taught me rule number one: carefully hide your total incompetence.

> I take insignificant things and I discuss them as if they're significant. And I believe that exploring the significance of the insignificant is itself significant.

The video then features video and audio from a real Harris speech.[5] In the clip Harris says "Talking about the significance of the passage of time, right? The significance of the passage of time. So when you think about it, there is great significance to the passage of time,"

---

[5] The clip comes from a speech Harris gave on March 20, 2022 in Sunset, Louisiana concerning rural broadband access. https://www.katc.com/news/st-landry-parish/vice-president-kamala-harris-to-visit-st-landry-parish-monday (last visited August 30, 2024) (remarks about the "significance to the passage of time" at 8:32).

cutting the real video with a "swish" sound effect to conclude: "and there is such great significance to the passage of time." The narration by "Harris" then continues:

> Another trick is trying to sound black. I pretend to celebrate Kwanzaa, and in my speeches, I always do my best Barack Obama impression.

The video again excerpts a real Harris speech:[6] "So hear me when I say, I know Donald Trump's type." The narration by "Harris" continues:

> And okay, look, maybe my work addressing the root causes of the border crisis were catastrophic, but my knowledge of international politics is truly shocking.

Again, the video illustrates the fake voiceover with a real speech,[7] where Harris said: "The United States ["swish" cut] shares a very important relationship, which is an alliance with the Republic of North Korea. ["swish" cut] It is an alliance that is strong and enduring." The "Harris" narration concludes:

> And just remember, when voting this November, it is important to see what can be unburdened by what has been. And by what has been, I mean Joe Biden.

> You think the country went to [beeped out expletive] over the past four years? You ain't seen nothing yet. [Cackles].

34.    While the obviously far-fetched and over-the-top content of the video make its satirical nature clear, Plaintiff entitled the video "Kamala Harris Campaign Ad PARODY."

35.    This wasn't enough for Governor Newsom. Two days after Plaintiff published the video and Newsom discovered it on Musk's X page, the Governor posted his commentary:

---

[6] Susan Davis, Ben Giles, *Harris says, as a former prosecutor, 'I know Donald Trump's type'*, NPR (Jul. 22, 2024) https://www.npr.org/2024/07/22/g-s1-12690/democrats-rally-behind-vice-president-harris (last visited August 30, 2024).

[7] *Remarks by Vice President Harris After Tour of the Korean Demilitarized Zone*, THE WHITE HOUSE (Sep. 29, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/09/29/remarks-by-vice-president-harris-after-tour-of-the-korean-demilitarized-zone/ (striking through erroneous mention of "North" Korea).

"Manipulating a voice in an 'ad' like this one should be illegal. I'll be signing a bill in a matter of weeks to make sure it is." He wasn't kidding—AB 2655 and AB 2839, which had been in the works for months, *infra*, were soon passed by the California legislature and signed by the Governor.

36.     Newsom's tweet drew significant pushback from free speech advocates and one of the very social media companies—X—which would soon be required to remove Plaintiff's post under AB 2655.

37.     Elon Musk, the owner of X and a free speech advocate himself, replied to Newsom on X that "I checked with renowned world authority, Professor Suggon Deeznutz, and he said parody is legal in America." (For Governor Newsom and anyone else who cannot tell, Mr. Musk is being facetious here even though his underlying point on the law is accurate).

**AB 2655's Legislative History**

38.     AB 2655's primary sponsors are Assemblymembers Marc Berman, Gail Pellerin, and Sabrina Cervantes. The bill was also cosponsored by Assemblyman Steve Bennett. It was introduced and first read by the Assembly on February 14, 2024. AB 2655's official name is the "Defending Democracy from Deepfake Deception Act of 2024." *See* Ex. B.

39.     On March 21, 2024, the bill was referred to the Assembly's Judiciary and Elections Committees. The Elections Committee Chair directed the sponsors to amend and re-refer to the Committee, and that directive was completed on April 1. *See* Ex. B.

40.     The Elections Committee marked and considered the bill and then passed it and referred it for consideration by the Judiciary Committee by a 6-to-1 vote on April 10. *See* Ex. B. The Judiciary Committee then marked and considered the bill for the next thirteen days, before voting unanimously on April 23 to pass it and refer the bill to the Appropriations Committee. *See* Ex. B.

41.     Commenting on the legislation, the Assembly Judiciary Committee believed that it would only have to demonstrate a compelling government interest to resolve First Amendment concerns, comparing Plaintiff's video to yelling "fire!" in a crowded movie theater.

*See* Ex. C, Comments on Defending Democracy from Deepfake Deception Act of 2024, Assembly Judiciary Committee (Apr. 23, 2024), p. 10–11. (Of course, the fire-in-a-crowded-theater cliché is a notorious example of fallacious legal reasoning. *E.g.*, Ken White, Popehat, *Three Generations of a Hackneyed Apologia for Censorship Are Enough* (Sep. 19, 2012).[8]) The Committee also noted the ACLU's concerns with AB 2655's infringement on speech, remarking "ACLU believes that the provisions of AB 2655, as currently drafted, threaten to intrude on those rights and deter that vital speech." *Id.* at 16–17 (internal quotations omitted). But the Committee did not actually respond to ACLU's arguments in its comments.

42.     The bill was read for a second time to the Assembly and amended on April 24. Then the Appropriations Committee marked the bill and held a hearing, before voting 11-to-1 to approve the bill and move it to a full vote before the Assembly. *See* Ex. B.

43.     On May 22, the Assembly voted 55-to-1 to pass the bill and refer it to the Senate for further consideration. *See* Ex. B.

44.     At the Senate level, the bill was read for the first time on May 23, and then referred by the Senate Rules committee to the Senate Judiciary and Elections & Constitutional Amendments Committees. *See* Ex. B. The Elections & Constitutional Amendment Committee marked up and amended the bill before voting 6-to-1 to approve it and refer it to the Judiciary Committee on June 18. *See* Ex. B.

45.     Commenting on the legislation, the Elections & Constitutional Amendment Committee raised its own First Amendment concerns about the bill's regulation of online and political speech—but claimed that a court's decision as to its legality hinged on whether AB 2655 is appropriately tailored to meet the ends of the legislation. *See* Ex. D, Comments on Defending Democracy from Deepfake Deception Act of 2024, Senate Elections and Constitutional Amendment Committee (June 11, 2024), p.5.

---

[8] Available at https://web.archive.org/web/20240116140756/https://www.popehat.com/2012/09/19/three-generations-of-a-hackneyed-apologia-for-censorship-are-enough/ (last accessed August 22, 2024).

46.     Then on July 3, the Judiciary Committee made amendments to the bill, passed it as amended and referred it to the Appropriations Committee by a vote of 9-to-2.

47.     Commenting on the legislation, the Judiciary Committee noted the many First Amendment issues with this bill, including its application to political speech, satire/untruths, and internet speech. The Committee remarked that earlier inspections of the bill concluded it could survive legal challenge because of (1) "a malice requirement" on the creator and (2) that liability attaches to the social media companies hosting content implicated by the law rather than creators. *See* Ex. E, Comments on Defending Democracy from Deepfake Deception Act of 2024, Senate Judiciary Committee (July 11, 2024), p.17. But in response to various additional concerns, the Judiciary Committee noted the bill's authors made "amendments that remove the provision that applies this malice standard to the creators of the content and instead more closely hews the platform's basis for liability to the malice standard, holding the large online platform liable only if it knows that the materially deceptive content meets the requirements of the bill or acts with a reckless disregard for the truth." *Id.* at 18–19.

48.     Finally, the Judiciary Committee also remarked that "especially in the more political [*sic*] charged federal judiciary of the day, it is inherently difficult to predict whether this law will be struck down for violating the protections of the First Amendment. However, it is safe to say it will likely face legal challenge and arguably be vulnerable thereto." *Id.* at 20.

49.     Both Senate Committees recognized the First Amendment issues with this bill and, unlike the Assembly Judiciary Committee, at least acknowledged the State would have to overcome strict scrutiny to preserve it in Court.

50.     Until Governor Newsom's tweet, the bill—while still unconstitutional—was undergoing the regular legislative process. But the Governor's intervention changed the calculus of AB 2655. Now there was political urgency to pass the legislation, and get it through the Assembly on his timeline.

51.     When the Senate Appropriations Committee returned to session on August 5, they ensured the bill was marked up and referred to the Senate so that it could pass this legislative session. *See* Ex. B.

52.     The Appropriations Committee, by a vote of 5-to-2, referred the Legislation to the full Senate after adding its amendments on August 15. *See* Ex. B. On August 23, the full Senate amended the bill yet again after its second reading. Now it was ready for passage in the Senate. *See* Ex. B. On August 27, the full Senate then approved the its version of the bill by a vote of 31-to-9, and referred it back to the Assembly for final passage. *See* Ex. B. The Assembly concurred in the Senate version of the bill by a vote of 59-to-8. *See* Ex. B.

53.     Governor Gavin Newsom signed the bill on September 17, 2024, and it goes into effect on January 1.[9]

## AB 2655's Plain Text and Intended Effects

54.     The general framework of AB 2655 is that it forces large social media companies doing business in California to create a reporting system for AI-generated election-related content, which these companies are then required to take off their sites upon receiving a report of violative content.

55.     In AB 2655's legislative purpose section, the Legislature "finds and declares" that "disinformation powered by generative AI will pollute our information ecosystems like never before," and voters "will not know what [media] they can trust." Cal. Elec. Code § 20511. AB 2655 justifies its passage "[i]n order to ensure California elections are free and fair," which it does by "prevent[ing] the use of deepfakes and disinformation meant to prevent voters from voting and to deceive voters based on fraudulent content" "for a limited time before and after elections." *Id.*

56.     The Act regulates "deepfakes" shared on "[l]arge online platform[s]," which "means a public-facing internet website, web application, or digital application, including a social network, media platform as defined in Section 22675 of the Business and Professions Code, video sharing platform, advertising network, or search engine that had at least 1,000,000

---

[9] Sec. 4 and Sec. 5 contemplate alternative amendments to the California Code of Civil Procedure that would become effective if *both* AB 2655 and AB 2839 became into effective before January 1, 2025, but only AB 2839 was passed with an urgency clause vote.

California users during the preceding 12 months." *Id.* § 20512. X and YouTube, both of which have Plaintiff's video posted currently, qualify as large online platforms under the Act.

57.    The law specifically targets election-related "materially deceptive content," which "means audio or visual media that is digitally created or modified, and that includes, but is not limited to, deepfakes and the output of chatbots, such that it would falsely appear to a reasonable person to be an authentic record of the content depicted in the media." *Id.* § 20512.

58.    The "materially deceptive content" that is implicated by this legislation is that (a) which is posted within 120 days of an election until 60 days *after* the election; (b) which is reported by a California resident to the pertinent social media site, *infra*; and, (c) in which a "candidate for elective office portrayed as doing or saying something that the candidate did not do or say and that is reasonably likely to harm the reputation or electoral prospects of a candidate" or an "elections official portrayed as doing or saying something in connection with the performance of their elections-related duties that the elections official did not do or say and that is reasonably likely to falsely undermine confidence in the outcome of one or more election contests" or an "elected official portrayed as doing or saying something that influences the election that the elected official did not do or say and that is reasonably likely to falsely undermine confidence in the outcome of one or more election contests." § 20513.

59.    If materially deceptive content is directed at a candidate, the bar only applies if the candidate is running for "a voter-nominated office as defined in Section 359.5, any person running for the office of President or Vice President of the United States, and any person running for the office of Superintendent of Public Instruction." *Id.* § 20512. Further, the bar only applies to public referenda that are "statewide." *Id.* § 20512.

60.    Notably, the bar on materially deceptive content "does not apply to a candidate for elective office who" creates AI-generated election content about themselves; if a candidate is willing to comply with the Act's "labeling" policy, then he is free to use AI-generated election related content in support of his own campaign. *Id.* § 20513.

61.    The Act carves out an exception for "[m]aterially deceptive content that constitutes satire or parody." *Id.* § 20519. But that does not preserve AB 2655's

constitutionality. Ignoring the law's other constitutional issues, AB 2655's framework puts the onus on Plaintiff to demonstrate his speech is satire or parody. Content regulators—especially on YouTube—are likely to take the content offline before Plaintiff has the opportunity to demonstrate his content is satirical, to avoid liability under the law. The Act also does not define satire or parody, which gives the enforcing entity—either the company or the State—the benefit of unfettered discretion as to what AI-generated content is proscribed by the Act.

62.     Governor Gavin Newsom has also made clear already, through his tweet about Kohls's work, that at least the two Harris videos at issue, in his view as chief executive of the State, do not fall under AB 2655's satire exception.

63.     To identify illicit content, large online platforms must first "provide an easily accessible way for California residents to report" "materially deceptive content" to them, *id.* § 20515, and then "remove" it from their sites. *Id.* § 20513. Thus, AB 2655 enlists an army of online commissars to get content taken offline. Social media sites shall respond to the person who made the report, "within 36 hours of the report, describing any action taken or not taken by the large online platform with respect to the content." *Id.* § 20515. This public pressure incentivizes social media companies to take content arguably within the statute—or even falling way outside it—to take the content down.

64.     AB 2655 flips the First Amendment default to put the burden on *Plaintiff* to prove his content falls outside the statute. Newsom's jeering at Plaintiff's tweet puts added pressure on both companies to act on Plaintiff's content—California's most famous resident has already informally reported the speech through his public tweet and online interactions with Plaintiff and Musk.

65.     AB 2655 tasks Defendant Bonta, the Attorney General of California, with enforcement of this law. *Id.* § 20516.

66.     Absent enforcement of AB 2655 by the State, there is no risk to Plaintiff's content being taken off his Twitter account. Twitter owner Elon Musk has made that clear, promising that Twitter would adhere to a free speech environment and clarifying that "[b]y free speech, I

simply mean that which matches the law." Clare Duffy, *Elon Musk says Twitter has 'no actual choice' about government censorship requests*, CNN (May 29, 2023); *see also supra* ¶ 29.

### AB 2839's Legislative History

67.    AB 2839's primary sponsors are the same as AB 2655's: Assemblymembers Marc Berman, Gail Pellerin, and Sabrina Cervantes. It was introduced and first read by the Assembly on February 15, 2024. AB 2839's official name is "Elections: deceptive media in advertisements." *See* Ex. F.

68.    On March 21, 2024, the bill was referred to the Assembly's Judiciary and Elections Committees. The Elections Committee passed it and referred it for consideration by the Judiciary Committee by a 6-to-1 vote on April 10. *See* Ex. F.

69.    The Judiciary Committee amended and passed the bill on May 1, referring it to the Appropriations Committee. *See* Ex. F.

70.    In the Assembly Elections Committee report, the Committee briefly identified the First Amendment issues presented by AB 2839 but noted these constitutional questions "fall[] more squarely within the jurisdiction of the Assembly Judiciary Committee." *See* Ex. G, Comments on Elections: deceptive media in advertisements, Assembly Elections Committee (April 9, 2024), p.12.

71.    In the Judiciary Committee's report, it noted that "By limiting the dissemination of speech related to elections, this measure implicates the First Amendment and the broad protections it provides to political speech." *See* Ex. H, Comments on Elections: deceptive media in advertisements, Assembly Judiciary Committee (April 25, 2024), p.10. It conceded that AB 2839 "would be subject to strict scrutiny" if it passed, *id.* at 11, and acknowledged that the "constitutional questions posed by this bill present an exceedingly difficult decision." *Id.* at 12. Beyond general statements about the bill's clear constitutional flaws, the Committee did little (in terms of amendments) to strengthen its likelihood of survival. The report did include, however, a baseless rebuke of the Supreme Court's First Amendment jurisprudence, when it

observed "the current Supreme Court has demonstrated a willingness to greatly expand the scope of speech rights, especially when the speaker's views align with the court's majority." *Id.*

72.     The bill was read for a second time to the Assembly and amended on May 2. Then the Appropriations Committee voted 11-to-3 to approve the bill and move it to a full vote before the Assembly. *See* Ex. F. On May 22, the Assembly voted 59-to-4 to pass the bill and refer it to the Senate for further consideration. *See* Ex. F.

73.     At the Senate level, the bill was read for the first time on May 23, and then referred by the Senate Rules committee to the Senate Judiciary and Elections & Constitutional Amendments Committees. *See* Ex. F. The Judiciary Committee unanimously passed the bill on June 18, but the bill was re-referred following authors amendments on June 24. *See* Ex. F.

74.     In its report, the Judiciary Committee noted that "hyperbole, distortion, invective, and tirades are as much a part of American politics as kissing babies and distributing bumper stickers and pot holders." *See* Ex. I, Comments on Elections: deceptive media in advertisements, Senate Judiciary Committee (June 28, 2024), p.11. It also acknowledged "the extraordinary protection afforded to political speech" which "does not end where the truth of the speech does." *Id.* However, the Committee nevertheless justified AB 2839's regulation of AI-generated content because the "use of calculated falsehood … put[s] a different cast on the constitutional question." *Id.* at 12. It also held that AB 2839 was narrowly tailored because (a) "materially deceptive content" requires that it was intentionally created or altered such that the content falsely appears to be authentic; and, (b) "the bill requires the person [] to knowingly distribute such material with malice," meaning "knowing the materially deceptive content was false or with a reckless disregard for the truth." *Id.* at 13.

75.     Then on July 3, the Judiciary Committee made its amendments to the bill, passed it as amended and referred it to the Appropriations Committee by a vote of 10-to-1.

76.     The Appropriations Committee reported that the bill "would not have a fiscal impact to the Secretary of State." The main fiscal effect from AB 2839 would be "significant cost pressures to the courts" due to increased claims under the law. *See* Ex. J, Comments on

Elections: deceptive media in advertisements, Senate Appropriations Committee (August 2, 2024), p.2.

77.   Until Governor Newsom's tweet, the bill—while still unconstitutional—was undergoing the regular legislative process. But the Governor's intervention changed the calculus of AB 2839. Now there was political urgency to pass the legislation, and get it through the Assembly on his timeline so that Plaintiff's parody video and other similar content would be "illegal" under California law.

78.   When the Senate Appropriations Committee returned to session on August 5, they ensured the bill was marked up and referred to the Senate so that it could pass this legislative session. The Appropriations Committee, by a vote of 5-to-2, referred the Legislation to the full Senate after adding its amendments on August 15. *See* Ex. F.

79.   On August 23, the full Senate amended the bill yet again after its second reading. Now it was ready for passage in the Senate. *See* Ex. F. Consistent with Governor Newsom's tweet, this amendment **struck** language that previously stated: "This section does not apply to materially deceptive content that constitutes satire or parody."

80.   Instead, the statute adds a narrow and technocratic safe harbor, which requires speakers to expressly label Constitutionally-protected political satire with a precisely-worded disclaimer. The bill's co-sponsor Pellerin later explained that "We've worked with the Governor's office on Senate amendments that require deep fake parody material to be labeled as being digitally manipulated for those purposes … Additionally, recent amendments add an urgency clause—that was a great idea—so the bill can take effect before the November 5, 2024 general election."[10] For videos, "the disclosure shall appear for the duration of the video" and must be in a font size "no smaller than the largest font size of other text appearing in the visual media." Cal. Elec. Code § 20012(b)(2)(B)(i). Failure to include this precise disclosure risks a lawsuit from any listener, depicted political candidate, or California elections official. The labelling requirement added by the August 23 amendment reads:

_____

[10] Remarks in support of Concurrence with Senate Amendments, Aug. 30, 2024.

(3) Notwithstanding paragraph (1), this section does not apply to an advertisement or other election communication containing materially deceptive content that constitutes satire or parody if the communication includes a disclosure stating "This _____ has been manipulated for purposes of satire or parody." The disclosure shall comply with the requirements set forth in subparagraphs (A) and (B) of paragraph (2).

(4) (A) A person, committee, or other entity shall not, during the time period set forth in subdivision (c), do either of the following:

(i) Remove any disclosure required by paragraph (2) or (3).

(ii) Knowingly republish any content subject to paragraph (2) or (3) without the required disclosure.

(B) A violation of subparagraph (A) is evidence of intent to knowingly distribute an advertisement or other election communication containing materially deceptive content, as prohibited by paragraph (1).

81.     On August 29, the full Senate then approved its version of the bill by a vote of 32-to-5 (satisfying the supermajority required for "urgency"), and referred it back to the Assembly for concurrence and final passage. *See* Ex. F.

82.     On August 30, the last day of the legislative term, the Assembly concurred in the Senate version of the bill by a vote of 63-to-8. *See* Ex. B.

83.     In successfully passing AB 2839 with a declaration of urgency via two supermajority votes, AB 2839 would take effect immediately upon the Governor's signature.

84.     Governor Gavin Newsom signed the bill on September 17, 2024, and it is now in effect.

### AB 2839's Plain Text and Intended Effects

85.     The general framework of AB 2839 is that recipients of election-related AI-generated content in California may sue the distributors of that content (including original creators and disseminators) for injunctive relief to remove the content, and general or specific damages, including attorneys' fees.

86.     Similar to AB 2655, AB 2839's legislative purpose is to "to ensure California elections are free and fair" by "prevent[ing] the use of deepfakes and disinformation meant to prevent voters from voting and deceive voters based on fraudulent content." Cal. Elec. Code § 20512(a)(4). It observes that in the "lead-up to the 2024 presidential elections, candidates and parties are already creating and distributing deepfake" content, and then groundlessly claims this content "skew[s] election results." *Id.* at (a)(3).

87.     To address this alleged issue, AB 2839 bars a person—within 120 days of an election—from "with malice, knowingly distribut[ing] an advertisement or other election communication containing materially deceptive content" which:

    i.   Regarding "a candidate for any federal, state, or local elected office in California," portrays him as "doing or saying something that the candidate did not do or say" so that the portrayal is "reasonably likely to harm the reputation or electoral prospects of a candidate";

    ii.   Regarding "an elections official," portrays him "as doing or saying something in connection with an election in California that the elections official did not do or say" so that the portrayal "is reasonably likely to falsely undermine confidence in the outcome" of an election;

    iii.   Regarding "an elected official," portrays him as "doing or saying something in connection with an election in California that the elected official did not do or say" so that the portrayal "is reasonably likely to harm the reputation or electoral prospects of a candidate or is reasonably likely to falsely undermine confidence in the outcome" of an election;

    iv.   Regarding a "voting machine, ballot, voting site, or other property or equipment related to an election in California," portrays it "in a materially false way" so that the portrayal "is reasonably likely to falsely undermine confidence in the outcome" of an election. *Id.*

88.     Like AB 2655, AB 2839 exempts actual candidates from using AI in their own favor. The Act "does not apply to a candidate portraying themself" so long as the content "includes a disclosure stating[:] This _____ has been manipulated." *Id.*

89.     AB 2839 contains a narrow safe harbor for parody and satire that satisfies onerous labeling requirements: It states "this section does not apply to an advertisement or other election communication containing materially deceptive content that constitutes satire or parody if the communication includes a disclosure stating 'This _____ has been manipulated for purposes of satire or parody.' The disclosure shall comply with the requirements set forth in subparagraphs (A) and (B) of paragraph (2)." *Id.* at (b)(2)(3). These requirements in turn require that "(i) For visual media, the text of the disclosure shall appear in a size that is easily readable by the average viewer and no smaller than the largest font size of other text appearing in the visual media. … For visual media that is video, the disclosure shall appear for the duration of the video. (ii) If the media consists of audio only, the disclosure shall be read in a clearly spoken manner and in a pitch that can be easily heard by the average listener, at the beginning of the audio, at the end of the audio, and, if the audio is greater than two minutes in length, interspersed within the audio at intervals of not greater than two minutes each." *Id.* at (b)(2)(B).

90.     Much enforcement of AB 2839 is offloaded to third parties like in AB 2655, but this time to *recipients* of AI-generated election-related content, rather than social media companies. *Id* at (d). Recipients of such content may sue for injunctive relief to remove the content, and general or specific damages, including attorneys' fees for successful plaintiffs (but not successful defendant-creators or defendant-retweeters). *Id.*

91.     AB 2839 contains an "urgency" clause, meaning it went into effect upon the Governor signing it "[i]n order to … safeguard the upcoming November 5, 2024 general election against disinformation propagated by AI and deepfake media." *Id.*

**Plaintiff and Other Speakers are Irreparably Harmed by AB 2655 and AB 2839**

92.     Plaintiff intends to keep his Kamala Harris videos posted on his Twitter and YouTube pages. He also intends to make other similar content using the likenesses of other political candidates in a way that violates a reasonable reading of the statutes

93.     AB 2839's damages provisions immediately put him at financial risk for keeping existing Harris videos on his social media pages. That Governor Newsom called these videos out as specifically illegal makes Plaintiff's content ripe for suit by third-party activists or elections officials like Defendant Weber, or her successors. And even if suits against Plaintiff are unsuccessful, they put the burden on Plaintiff to fund his defense and thus serve as a deterrent to speech even in victory. This cost chills future content production from Plaintiff, too.

94.     As a result of AB 2655's enforcement, major social media companies—including X and YouTube, where Plaintiff's Harris videos are posted—must block and remove such content or face liability under the Act. AB 2655 forces private industry to regulate and permit only the State's preferred and sanctioned election commentary.

95.     Plaintiff's existing content is the target of AB 2839. The Governor who championed the very legislation at issue did so by personally targeting Plaintiff and his videos before millions of online followers on X, while simultaneously working with its sponsors to obliterate the carveout for parody and satire.

96.     Plaintiff's existing videos are already actionable under AB 2839. The labelling requirement, which acts as a narrow safe harbor for categorically protected political speech, is impossible for the Plaintiff to comply with without fundamentally altering the nature of his message. AB 2839 applies to every "person … or other entity" that "knowingly distribute[s] … election communication containing materially deceptive content of … [a] candidate for any federal, state, or local elected office in California portrayed as doing or saying something that the candidate did not do or say if the content is reasonably likely to harm the reputation or electoral prospects of a candidate." AB 2839 employs a broad definition of "election

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

communication," which covers "any general or public communication" not covered by "advertisement," specifically including speech "distributed through the internet." Likewise, the statute employes a broad definition for "materially deceptive content," which "means audio or visual media that is intentionally digitally created or modified, which includes, but is not limited to, deepfakes, such that the content would falsely appear to a reasonable person to be an authentic record of the content depicted in the media." The definition excepts "media that contains only minor modifications that do not significantly change the perceived contents or meaning of the content." While the statute requires "malice," this term does not require any particular ill-intent, but instead redundantly defines malice to mean "knowing the materially deceptive content was false or with a reckless disregard for the truth."

97.    Plaintiff literally does all this. For example, he created the "Harris" narration in the July 26 video, which to a reasonable person sounds strikingly similar to the Vice President's voice. The parody voiceover exaggerates real political talking points and mannerisms, which the Plaintiff hopes reduced the chance of Harris winning the 2024 presidential election. There is nothing wrong with this: Plaintiff has an absolute Constitutional right to lampoon politicians he believes should not be elected. Plaintiff knows the voiceover of Harris bragging about being a "diversity hire" is false; he created it. That's the entire point of parody!

[INTENTIONALLY LEFT BLANK]

98.     The only possible defense for the Plaintiff under AB 2839—the labeling safe harbor—only applies when the disclosure text "appear[s] for the duration of the video" using a font size "no smaller than the largest font size of other text appearing in the visual media." Even if Kohls were willing to submit to California's attempt to compel his speech (he's not), it would be literally impossible to include such a disclaimer in the video demonized by Gov. Newsom. The text Kohls included in the video—necessary to allow followers to enjoy his video from their cellphones even without sound—would require the disclaimer text to be so large that it could not fit on the screen.




**Figs. 1 & 2:** A still image from Plaintiff's video and an illustrative effort to include the mandatory labelling.

(See figures at right, illustrating a futile attempt to incorporate the absurdly large label that AB 2839 requires.)

99.     Because Plaintiffs' video—and dozens of others—violate AB 2839, unless this Court enjoins the statute, the Plaintiff may be sued by any depicted candidate, any California elections official (including the Secretary of State), and any *recipient* of the parody videos.

100.    Even if Plaintiff could be assured that no random viewer of his videos would sue him under the statute, AB 2655 independently stifles his ability to speak. Plaintiff's existing content is likely to soon be removed from his social media because the companies with which he has such accounts—X and YouTube—are required to follow California law because of their business operations there. By the Governor's admission, as currently written AB 2655 is designed to make content like Plaintiff's "illegal" and force social media companies to remove it from their sites.

101.    Although Plaintiff intends for his videos, like the Kamala Harris ones, to constitute political parody and satire, neither AB 2655's "satire or parody" exemptions, nor AB

2839's onerous labeling requirement offer more than cold comfort. The ultimate classification of his videos as parody, satire or not will depend on the subjective perceptions of others, because many individuals, including Governor Newsom, have expressed offense at his videos already. Moreover, the structure of AB 2655 encourages social media platforms to err on the side of blocking content rather than allowing it, even if it potentially falls within the satire/parody exemption.

102.    Plaintiff and other speakers are chilled from continuing to post current content and from making similar future content because both X and YouTube could deplatform him for this conduct as a breach of their terms of service. This is especially an issue for Plaintiff, because he was specifically targeted by the Governor of California.

103.    YouTube allows its users to report "[c]ontent … violating … the law" for removal by its employees in content moderation. YouTube Terms of Service (dated December 15, 2023). Supporters of Governor Newsom, especially, are likely to report Plaintiff's parody videos and get them taken down on that site for violating AB 2655 even if YouTube's employees do not do so on their own.

104.    Plaintiff's speech is chilled on YouTube, as "access and use [of] the Service" is contingent on Plaintiff "comply[ing] with … applicable law." *See* YouTube Terms of Service. Thus, if he leaves existing parody videos on his YouTube page or posts new, similar ones of Harris or other Democratic politicians, he risks being considered in breach of his YouTube service agreement and losing revenue from YouTube. Even without AB 2655, the content is at risk under YouTube's terms of service as unlawful under AB 2839—and thus also eligible for removal under YouTube's terms.

105.    On X, Plaintiff is chilled from producing similar future content because he has to abide by the terms of service, which make him "responsible for … any Content [he] provides, including compliance with applicable laws, rules, and regulations." Twitter Terms of Service.[11] AB 2655 is such an applicable law. If Plaintiff continues to post such content in violation of

---

[11] *See* https://x.com/en/tos (accessed August 3, 2024).

AB 2655, he risks disciplinary action or other sanctions from X, which may include temporary bans or removal of his account. Even without AB 2655, the content is at risk under X's terms of service as unlawful under AB 2839—and thus also eligible for removal under X's terms.

106.    Plaintiff's livelihood is materially harmed by AB 2655 and AB 2839. The chilling effect and enforcement of the laws will preclude him from earning a living, which he currently does via monetization of his content on YouTube and X.

107.    Independently, Plaintiff wishes to see and consume other video creators' political deepfake content that would be available absent AB 2655 and AB 2839. He is prejudiced as a listener to the extent others curtail their political speech, satire or not, in the face of California's laws.

108.    Plaintiff's ability to engage in protected political speech is hamstrung by both AB 2839 and AB 2655.

## PARTIES

### Count I – Facial Violation of the First Amendment by AB 2655
### (42 U.S.C. § 1983 – Free Speech Clause – Facial)

109.    Plaintiff reasserts and realleges paragraphs 1 through 108 as if fully set forth therein.

110.    According to the First Amendment to the United States Constitution, "Congress shall make no law … abridging the freedom of speech." The First Amendment is incorporated to apply to the states through the Fourteenth Amendment.

111.    AB 2655 constitutes an impermissible and unreasonable restriction of protected speech because it burdens substantially more speech than is necessary to further the government's legitimate interests in ensuring fair and free elections.

112.    AB 2655 bars and chills speech based on content and viewpoint. It charges social media companies—which are currently themselves the subject of multiple lawsuits for censorious conduct—with enforcement of speech codes under the Act. By outsourcing

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

enforcement to third parties, the Act puts content creators like Plaintiff at the mercy of their viewpoint as to what AI-generated election speech is lawful.

113.   AB 2655 is not content-neutral because it targets only AI-generated election-related speech, and only a certain subset of that. Specifically, it targets speech that is "reasonably likely to harm the reputation or electoral prospects of a candidate" and speech that is "reasonably likely to falsely undermine confidence in the outcome of one or more election contests." Moreover, AB 2655 is also not content-neutral because it only regulates AI-generated speech directed at specific public offices and referenda, not all elections.

114.   AB 2655 is substantially overbroad because it does not adequately define various material terms in the statute, including "deep fake," "materially deceptive content," "harm the reputation or electoral prospects of a candidate," and, "falsely undermine confidence in the outcome of one or more election contests." It also vests unfettered discretion in social media employees to define these terms and enforce the Act in accordance with their own subjective ends for election regulations.

115.   AB 2655 is not narrowly tailored to any government interest. The state has no significant legitimate interest in regulating truth. This is a timeless constitutional principle. *See, e.g., Whitney v. California*, 274 U.S. 357, 377 (1927) ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence").

116.   To the extent that AB 2655 is constitutional in any of its applications, it is nonetheless substantially overbroad in relation to any legitimate sweep and is facially unconstitutional for that reason.

117.   42 U.S.C. §§ 1983, 1988, and Cal. Civ. Code § 52.1(c) entitle Plaintiff to declaratory relief and preliminary and permanent injunctive relief invalidating and restraining enforcement of AB 2655. Unless Defendant Bonta is enjoined from enforcing AB 2655, Plaintiff will suffer irreparable harm that cannot fully be compensated by an award of monetary damages.

118.   Plaintiff found it necessary to engage the services of private counsel to vindicate his rights under the law. Plaintiff is therefore entitled to an award of attorneys' fees under 42 U.S.C. § 1988 and Cal. Civ. Code § 52.1(i).

**Count II –Violation of the First Amendment by AB 2655 as Applied to Plaintiff**
**(42 U.S.C. § 1983 – Free Speech Clause – As Applied)**

119.   Plaintiff reasserts and realleges paragraphs 1 through 118 as if fully set forth therein.

120.   AB 2655 is unconstitutional as applied specifically to Plaintiff.

121.   AB 2655 will be enforced against Plaintiff's content by forcing X and YouTube to remove his content from his respective social media accounts.

122.   The law is particularly unconstitutional as applied to Plaintiff because of Governor Newsom's targeted focus on Plaintiff's content and the Legislature's decision to pass AB 2655 with urgency in reaction to Newsom and Plaintiff's public exchange on X.

123.   42 U.S.C. §§ 1983 and 1988 entitles Plaintiff to declaratory relief and preliminary and permanent injunctive relief invalidating and restraining enforcement of AB 2655. Unless Defendant Bonta is enjoined from enforcing AB 2655, Plaintiff will suffer irreparable harm that cannot fully be compensated by an award of monetary damages.

124.   Plaintiff found it necessary to engage the services of private counsel to vindicate his rights under the law. Plaintiff is therefore entitled to an award of attorneys' fees, as well as reasonable costs of suit, under 42 U.S.C. § 1988 and Cal. Civ. Code § 52.1(i).

**Count III –Violation of the Fourteenth Amendment by AB 2655**
**(42 U.S.C. § 1983 – Due Process Vagueness)**

125.   Plaintiff reasserts and realleges paragraphs 1 through 124 as if fully set forth therein.

126.   The Fourteenth Amendment provides "… nor shall any State deprive any person of life, liberty or property, without due process of law."

127.    Due process requires that people of ordinary intelligence be able to understand what conduct a given statute, rule or regulation prohibits.

128.    Statutes, rules, or regulations that fail to provide this fair notice and clear guidance are void for vagueness.

129.    Statutes, rules, or regulations that authorize or even encourage arbitrary or viewpoint discriminatory enforcement are void for vagueness.

130.    Statues, rules, or regulations implicating and jeopardizing First Amendment rights are required to be especially precise.

131.    AB 2655 chills and restrains political humorists, subjecting them to censorship and other punitive sanction from platforms that host their speech.

132.    People of ordinary intelligence cannot understand what AB 2655 requires.

133.    Kohls cannot understand or reasonably discern what AB 2655 requires.

134.    AB 2655 does not provide fair notice of what it prohibits.

135.    AB 2655 authorizes and encourages discriminatory enforcement

136.    AB 2655's use of the phrase "falsely appear to a reasonable person to be an authentic record of the content depicted in the media" is unconstitutionally vague.

137.    AB 2655's use of the phrase "minor modifications that do not significantly change the perceived contents or meaning of the content" is unconstitutionally vague.

138.    AB 2655's use of the phrase "reasonably likely to harm the reputation or electoral prospects of a candidate" is unconstitutionally vague.

139.    AB 2655's use of the phrase "in connection with the performance of their elections-relate duties" is unconstitutionally vague.

140.    AB 2655's uses of the phrase "reasonably likely to falsely undermine confidence in the outcome of one or more election contests" is unconstitutionally vague.

141.    AB 2655's use of the phrase "something that influences the election" is unconstitutionally vague.

142.    AB 2655's use of the phrase "satire or parody" is unconstitutionally vague.

143.   AB 2655 violates the Due Process Clause of the Fourteenth Amendment and so is void for vagueness.

144.   The vagueness of AB 2655 chills protected speech and thereby also violates the First Amendment.

### Count IV – Facial Violation of the First Amendment by AB 2839
### (42 U.S.C. § 1983 – Free Speech Clause – Facial)

145.   Plaintiff reasserts and realleges paragraphs 1 through 144 as if fully set forth therein.

146.   According to the First Amendment to the United States Constitution, "Congress shall make no law … abridging the freedom of speech."

147.   The First Amendment is incorporated to apply to the states through the Fourteenth Amendment.

148.   AB 2839 constitutes an impermissible and unreasonable restriction of protected speech because it burdens substantially more speech than is necessary to further the government's legitimate interests in ensuring fair and free elections.

149.   AB 2839 bars and chills speech based on content, viewpoint, and speaker. It charges recipients of certain election-related AI-generated content with enforcement of speech codes under the Act, through the use of civil lawsuits. Content creators and even content sharers are on the hook to defend these lawsuits financially, and they also must devote valuable time and other resources to proving their content does not violate the law in such suits. By outsourcing enforcement to third parties, the Act puts content creators like Plaintiff at the mercy of their viewpoint as to what AI-generated election speech is lawful—even if Plaintiff wins the case, since he'll bear the cost of litigation.

150.   AB 2839 is not content-neutral because it targets only AI-generated election-related speech. Specifically, speech that is "reasonably likely to harm the reputation or electoral prospects of a candidate" and speech that is "reasonably likely to falsely undermine confidence in the outcome of one or more election contests."

151.    AB 2839 is not speaker-neutral because it exempts actual candidates from using AI in their own favor if they include a disclaimer in their content.

152.    AB 2839 contains no exemption for parody and satire, but only provides a narrow safe harbor for parody and satire that also contains a specific disclaimer that hypothetically could permit Plaintiff to post certain election-related satire videos generated by AI. But Plaintiff does not want to have to use AB 2839's specific disclaimer language, and he certainly does not want to employ the onerous required disclaimer that requires the disclaimer to be no smaller than the largest text visible in the video and for the entire duration of such video.

153.    The required disclaimer would be impossible to implement on many of Plaintiff's existing creations, including the July 26 video, which include text optimized for viewing on a small cellphone screen. Given the large size of the text, the required disclaimer could not even fit on the screen of videos like the July 26 video. AB 2839 thus entirely bans the parodic message that Plaintiff intends to convey in many of his videos.

154.    AB 2839 is substantially overbroad because it does not adequately define various material terms in the statute, including "deep fake," "materially deceptive content," "harm the reputation or electoral prospects of a candidate," and "falsely undermine confidence in the outcome of one or more election contests." It also vests unfettered discretion in third party litigants to define these terms and enforce the Act in accordance with their own subjective ends.

155.    AB 2839 is not narrowly tailored to any government interest. The state has no significant legitimate interest in regulating truth. This is a timeless constitutional principle. *See*, *e.g.*, *Whitney*, 274 U.S. at 377 ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence").

156.    To the extent that AB 2839 is constitutional in any of its applications, it is nonetheless substantially overbroad in relation to any legitimate sweep and is facially unconstitutional for that reason.

157. 42 U.S.C. §§ 1983, 1988, and Cal. Civ. Code § 52.1(c) entitle Plaintiff to declaratory relief and preliminary and permanent injunctive relief invalidating and restraining enforcement of AB 2839. Unless Defendant Weber is enjoined from enforcing AB 2839 Plaintiff will suffer irreparable harm that cannot fully be compensated by an award of monetary damages.

158. Plaintiff found it necessary to engage the services of private counsel to vindicate his rights under the law. Plaintiff is therefore entitled to an award of attorneys' fees under 42 U.S.C. § 1988 and Cal. Civ. Code § 52.1(i).

**Count V –Violation of the First Amendment by AB 2839 as Applied to Plaintiff**
**(42 U.S.C. § 1983 – Free Speech Clause – As Applied)**

159. Plaintiff reasserts and realleges paragraphs 1 through 158 as if fully set forth therein.

160. AB 2839 is unconstitutional as applied specifically to Plaintiff.

161. AB 2839 puts Plaintiff at immense financial risk for his current AI-generated election content by permitting lawsuits against him for the content which he will be forced to defend in Court.

162. The law is particularly unconstitutional as applied to Plaintiff because of Governor Newsom's targeted focus on Plaintiff's content and the Legislature's decision to pass AB 2839 with urgency in reaction to Newsom and Plaintiff's public exchange on X.

163. AB 2839 deters Plaintiff from generating similar content in the future because of the financial risk posed by the law.

164. 42 U.S.C. §§ 1983 and 1988 entitles Plaintiff to declaratory relief and preliminary and permanent injunctive relief invalidating and restraining enforcement of AB 2839. Unless Defendant Weber is enjoined from enforcing AB 2839, Plaintiff will suffer irreparable harm that cannot fully be compensated by an award of monetary damages.

165. Plaintiff found it necessary to engage the services of private counsel to vindicate his rights under the law. Plaintiff is therefore entitled to an award of attorneys' fees, as well as reasonable costs of suit, under 42 U.S.C. § 1988 and Cal. Civ. Code § 52.1(i).

## Count VI –Violation of the Fourteenth Amendment by AB 2839
### (42 U.S.C. § 1983 – Due Process Vagueness)

166.    Plaintiff reasserts and realleges paragraphs 1 through 165 as if fully set forth therein.

167.    The Fourteenth Amendment provides "… nor shall any State deprive any person of life, liberty or property, without due process of law."

168.    Due process requires that people of ordinary intelligence be able to understand what conduct a given statute, rule or regulation prohibits.

169.    Statutes, rules, or regulations that fail to provide this fair notice and clear guidance are void for vagueness.

170.    Statutes, rules, or regulations that authorize or even encourage arbitrary or viewpoint discriminatory enforcement are void for vagueness.

171.    Statues, rules, or regulations implicating and jeopardizing First Amendment rights are required to be especially precise.

172.    AB 2839 chills and restrains political humorists, subjecting them to censorship and other punitive sanction from platforms that host their speech.

173.    People of ordinary intelligence cannot understand what AB 2839 requires.

174.    Kohls cannot understand or reasonably discern what AB 2839 requires.

175.    AB 2839 does not provide fair notice of what it prohibits.

176.    AB 2839 authorizes and encourages discriminatory enforcement.

177.    AB 2839's use of the phrase "falsely appear to a reasonable person to be an authentic record of the content depicted in the media" is unconstitutionally vague.

178.    AB 2839's use of the phrase "minor modifications that do not significantly change the perceived contents or meaning of the content" is unconstitutionally vague.

179.    AB 2839's use of the phrase "reasonably likely to harm the reputation or electoral prospects of a candidate" is unconstitutionally vague.

180.    AB 2839's uses of the phrase "reasonably likely to falsely undermine confidence in the outcome of one or more election contests" is unconstitutionally vague.

181.   AB 2839 violates the Due Process Clause of the Fourteenth Amendment and so is void for vagueness.

182.   The vagueness of AB 2839 chills protected speech and thereby also violates the First Amendment.

### Count VII –Violation of the First Amendment by AB 2839
### (42 U.S.C. § 1983 – Compelled Speech)

183.   Plaintiff reasserts and realleges paragraphs 1 through 182 as if fully set forth therein.

184.   The First Amendment protects both the right to speak and the right to refrain from speaking.

185.   AB 2839 violates the First Amendment rights of parodists like Plaintiff to refrain from including disclaimers at all, as these interfere with the parodic or satirical message of the work. Disclaimers tend to spoil the joke and initialize the audience. This is why Kohls chooses to announce his parody videos from the title, allowing the entire real estate of the video itself to resemble the sorts of political ads he lampoons. The humor comes from the juxtaposition of over-the-top statements by the AI generated "narrator," contrasted with the seemingly earnest style of the video as if it were a genuine campaign ad.

186.   AB 2839 violates the First Amendment because it requires a disclaimer of such conspicuous size that it undermines parodists' ability to convey a parody in a manner that transmits their chosen message across platforms. In particular, the requirement that a disclaimer appear for the entire "duration of the video" with a font size "no smaller than the largest font size of other text appearing in the visual media" makes it impossible to create a convincing parody which necessitates incorporating media or candidate logos as they are ordinarily displayed, because such text triggers an obligation to include equally large disclaimer text within the video itself. The required text may be of such large size that it would monopolize most viewable space in the video, hopelessly distracting from the parodic or satirical effect of the video.

187.   For example, Plaintiff's July 26 video, which inspired amendments to AB 2839 from Gov. Newsom's office could not be rendered to comply with the law, because the on-screen text of the narration and concluding Harris campaign logo would require a disclaimer over the duration of the video so large that it could not actually fit on the screen. Should Plaintiff attempt to make a video to comply with AB 2839, he would have to eliminate or greatly reduce the text, making the video less suitable for display on a cell phone, and it would be impossible to include a campaign or media logo in the style of the videos Kohls parodies.

188.   Many manifestly constitutionally-protected videos have this problem. For example, consider a Saturday Night Live skit that opens with a media logo such as an inter-title from C-SPAN or a news network. Satirical videos in this style made with the assistance of AI would require an overwhelmingly large on-screen disclaimer for entire duration of the video, either making the parody impossible to lawfully disseminate, or of such large size that it greatly dilutes the effectiveness and comprehensibility of the underlying parody. In short, the compelled disclaimer requirement not only force creators to broadcast a message they do not agree with—it makes *any* effective parody difficult if not impossible to create without risking lawsuit by politically-motivated private plaintiffs.

189.   The onerous disclaimer safe harbor is not narrowly tailored to serve any compelling government interest.

190.   AB 2839's compelled disclosure requirements thus violate the First Amendment rights of speakers.

**Count VIII – Violation of Article I, Section 2(a) of California State Constitution (California Civil Code § 52.1)**

191.   Plaintiff reasserts and realleges paragraph 1 through 190 as if fully set forth therein.

192.   Defendants deprive Plaintiff of the rights secured to him by the California Constitution. Specifically, Defendants' enforcement of AB 2655 and AB 2839 violates Plaintiff's right to freedom of speech under Article I, Section 2 of the California Constitution. This was and is a violation of Cal. Civ. Code § 52.1.

193.    Unless enjoined by this Court, Defendants' enforcement of AB 2655 and AB 2839 will infringe Plaintiff's rights under the California and United States Constitutions and thereby cause irreparable injury for which no adequate remedy of law exists.

194.    Plaintiff found it necessary to engage the services of private counsel to vindicate his rights under the law. Plaintiff is therefore entitled to an award of attorneys' fees, as well as reasonable costs of suit, under Cal. Civ. Code § 52.1(i).

## PRAYER FOR RELIEF

195.    Therefore, Christopher Kohls respectfully requests the following relief:

196.    A declaratory judgment that AB 2655 and AB 2839 violate First and Fourteenth Amendments to the United States Constitution and Article I. Section 2(a) of the California Constitution, facially and as-applied;

197.    A permanent injunction prohibiting Defendants and their agents from enforcing AB 2655 and AB 2839;

198.    An award of attorneys' fees, costs, and expenses in this action; and

199.    Any other legal or equitable relief to which Plaintiff may show himself to be justly entitled.


Dated: September 17, 2024          Respectfully submitted,

*/s/ Theodore H. Frank*
Theodore H. Frank (SBN 196332)
Adam E. Schulman (*pro hac vice* forthcoming)
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street NW, Suite 300
Washington, DC 20006
Voice: 703-203-3848
Email: ted.frank@hlli.org

*Attorney for Christopher Kohls*

1

**VERIFICATION**

2      I, Christopher Kohls, have personal knowledge of the matters alleged in the foregoing

3  Verified Complaint concerning myself, my activities and my intentions. I verify under penalty

4  of perjury under the laws of the United States of America that the statements made therein are

5  true and correct. 28 U.S.C. § 1746.

6

7

8                                    Christopher Kohls

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28