Theodore H. Frank (SBN 196332)
    Email: ted.frank@hlli.org
Adam E. Schulman (*pro hac vice* pending)
    Email: adam.schulman@hlli.org
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street NW, Suite 300
Washington, DC 20006
Voice: 703-203-3848

*Attorneys for Plaintiff Christopher Kohls*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

| | |
|---|---|
| CHRISTOPHER KOHLS,<br><br>    *Plaintiff*,<br><br>    v.<br><br>ROB BONTA, in his official capacity as Attorney General of the State of California, and SHIRLEY N. WEBER, in her official capacity as California Secretary of State,<br><br>    *Defendant*. | Case No. 24-cv-02527-JAM-CKD<br><br>**THEODORE H. FRANK'S DECLARATION OF IRREPARABLE HARM AND NOTICE IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>DATE: September 30, 2024<br>TIME: 1:00 PM<br>JUDGE: Hon. John A. Mendez |

# DECLARATION OF THEODORE H. FRANK

I, Theodore H. Frank, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am the attorney for Plaintiff Christopher Kohls in this case. I am the Director of the Hamilton Lincoln Law Institute (HLLI). Should a hearing on Kohls's motion for preliminary injunction occur, it will most likely be argued by my colleague Adam Schulman.

2. I provide this declaration to (1) lay out facts concerning the question of irreparable injury as LR 231(d)(2)(ii) requires, and (2) outline our efforts to notice, meet, and confer with defendants in this case.

## Irreparable Harm

3. AB 2839, signed by Governor Newsom on September 17, 2024, includes an urgency clause that stipulates that it will be effective immediately upon signing and chaptering. The bill was chaptered no later than last night at 11:06 pm, when I received an email notice from lc.ca.gov, the legislature's bill tracking service, which advised the status of AB 2839 had been altered to add "Chaptered by Secretary of State - Chapter 262, Statutes of 2024."

4. Section 3 of AB 2839 adds a new section to the California Elections Code, § 20012.[1] The section adds a new cause of action, which can be brought by any "recipient of materially deceptive content distributed in violation of this section, candidate or committee participating in the election, or elections official." § 20012(d). Election officials specifically include the "Secretary of State and their staff." § 20012(f)(6)(ii). The statue defines "material deceptive content" as "audio or visual media that is intentionally digitally created or modified, which includes, but is not limited to, deepfakes, such that the content would falsely appear to a reasonable person to be an authentic record of the content depicted in the media" excluding only "minor modifications that do not significantly change the perceived contents or meaning of the content" such as altering the contrast or background of an image. § 20012(f)(8).

---

[1] The entire text of the now-chaptered bill can be read on legislature.ca.gov: https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202320240AB2839.

Actionable "materially deceptive content" includes "election communication" of, among other things, "A candidate for any federal, state, or local elected office in California portrayed as doing or saying something that the candidate did not do or say if the content is reasonably likely to harm the reputation or electoral prospects of a candidate." § 20012(b)(1)(A). "'Election communication' means any general or public communication not covered under 'advertisement' that is broadcast by or through television, radio, telephone, or text, distributed through the internet, or disseminated by print media, including billboards, video billboards or screens, and other similar types of communications, that concerns any of the following: (A) A candidate for office or ballot measure. (B) Voting or refraining from voting in an election. (C) The canvass of the vote." § 20012(f)(5).

5. Satire and parody is not excluded from the bill. Instead, AB 2839 provides only a narrow safe harbor for parody and satire that satisfies onerous labeling requirements: It states "this section does not apply to an advertisement or other election communication containing materially deceptive content that constitutes satire or parody if the communication includes a disclosure stating 'This ____ has been manipulated for purposes of satire or parody.' The disclosure shall comply with the requirements set forth in subparagraphs (A) and (B) of paragraph (2)." § 20012(b)(2)(3). These requirements in turn require that "(i) For visual media, the text of the disclosure shall appear in a size that is easily readable by the average viewer and no smaller than the largest font size of other text appearing in the visual media. … For visual media that is video, the disclosure shall appear for the duration of the video. (ii) If the media consists of audio only, the disclosure shall be read in a clearly spoken manner and in a pitch that can be easily heard by the average listener, at the beginning of the audio, at the end of the audio, and, if the audio is greater than two minutes in length, interspersed within the audio at intervals of not greater than two minutes each." § 20012(b)(2)(B). As detailed in the complaint and discussed below, complying with the disclosure requirement would entail creating a new video that consists entirely of the disclosure text.

### A. Chilling Plaintiff Kohls's Speech Labelled "Illegal" by the Governor

6. Plaintiff Christopher Kohls is the owner of the "@MrReaganUSA" account on X and "Mr Reagan" account on YouTube, where he posts political satire videos created in part with AI-generated voiceovers. His content is viewed hundreds of thousands of times, and Kohls is paid by both social media platforms for user engagement with this videos.

7. These videos send a political message about Vice President Harris's politics: that she will serve not the country well if elected President, these AI-generated ads send a message to other voters throughout the country that they should not vote for her in the 2024 Presidential election.

8. On July 26, 2024, Kohls posted his first Harris-inspired AI-generated video to X and YouTube, where it was an immediate hit, drawing attention from Elon Musk (the owner of X).

9. While this video (the "July 26 video") is the primary of the focus of the discussion below, plaintiff Kohls has produced at least 5 videos that are colorably actionable under AB 2839: The July 26 video,[2] "Kamala Harris Ad PARODY 2,"[3] "Kamala / Tim Walz Phone Call PARODY,"[4] "Kamala Harris Ad PARODY 3,"[5] and "Kamala Harris Ad PARODY 4."[6] Each video uses AI technology to simulate the voice of Kamala Harris and/or Tim Walz, who are candidates for federal election in California. While the Kohls uploaded each video with "parody" in the title, none of the videos includes the disclaimer required by AB 2839 for the entire duration of each short video.

---

[2] https://www.youtube.com/watch?v=sVspeqNnoWM.
[3] https://www.youtube.com/watch?v=RIjoPqIcyaw.
[4] https://www.youtube.com/watch?v=TEg7yY_Cv60.
[5] https://www.youtube.com/watch?v=XMcPVQAA3rc.
[6] https://www.youtube.com/watch?v=Zwj6Gy8lno0.

10. All of Kohls videos are available on the YouTube and/or X platforms and continue to be disseminated as they are available to residents in California and views of these videos must include California residents.

11. Kohls bears significant risk of action by the Secretary of State and numerous "recipients" of his content under AB 2839, which the Governor of California has repeatedly singled out as content made illegal by the bill he signed.

12. In response to July 26 video and Musk's repost of it, on July 27, 2024, Gov. Gavin Newsom posted on X and said to his more than two million followers that "manipulating a voice in an 'ad' like this one should be illegal. I'll be signing a bill in a matter of weeks to make sure it is." *See* Ex. A to Verified Complaint.

13. Subsequently, the governor evidently worked with the sponsors of AB 2839 to incorporate amendments *deleting* a prior exception for parody and satire, drafting instead onerous disclosure requirements, and adding an urgency clause so that the statute becomes effective immediately. Rep. Gail Pellerin confirmed Gov. Newsom's direct involvement in amending the bill. She said: "We've worked with the Governor's office on Senate amendments that require deep fake parody material to be labeled as being digitally manipulated for those purposes … Additionally, recent amendments add an urgency clause—that was a great idea—so the bill can take effect before the November 5, 2024 general election."[7]

14. The result of his and the California Legislature's effort is AB 2839, signed into law on September 17, which Kohls is suing to enjoin enforcement of.

15. Within hours of the signing, Newsom reposted his earlier tweet targeting Kohls's video, this time declaring, "I just signed a bill to make this illegal in the state of California."[8]

---

[7] Remarks in support of Concurrence with Senate Amendments, Aug. 30, 2024, https://www.assembly.ca.gov/media/assembly-floor-session-20240830?time[media-element-3753]=16064.105438.

[8] https://x.com/GavinNewsom/status/1836188721663873324 [archive.ph/uYbdp].

16.     Before AB 2839 was passed and signed by the Governor, Kohls continued to post several new videos similar to the one targeted by Governor Newsom.

17.     After the passage, Kohls's Harris video again went viral and he republished the content himself by retweeing a post by Elon Musk that incorporates his July 26 video.[9] Kohls credits Governor Newsom for "unintentionally" causing the video to go viral again.[10] Internet users often respond to perceived censorship by spreading the targeted content even more widely, which is called the Streisand effect, after Barbara Streisand's 2003 counterproductive effort to suppress the photograph of her Malibu residence. While the internet's resistance to censorship is admirable, it doesn't pay the bills or substitute for the right to speak freely in the future on political issues.

18.     As a result of AB 2839, Kohls is irreparably harmed: he is at immediate risk of being subject to a lawsuit that carries liability for damages, injunctive relief, equitable relief, and attorneys' fees, in retaliation for exercising his First Amendment right to distribute his video.

19.     He is immediately subject to an unconstitutional speech compulsion through the law's disclosure requirement.

20.      He is also at immediate risk that his content will be determined to be in violation of the new law, and so either removed from the platforms, or demonetized, or otherwise retaliated against.

21.     This creates an objective chilling effect that the First Amendment does not permit. Under the specter of AB 2839, Kohls is better off making "safe" content that is more likely to stay posted rather than post videos similar to his original Harris ads.

---

[9] The retweet is currently visible by scrolling down on Kohls's X profile page, https://x.com/MrReaganUSA. Musk's tweet is available at: https://x.com/elonmusk/status/1836265669631053838 [archive.ph/kuJfZ].

[10] https://x.com/MrReaganUSA/status/1836281763431346578 [archive.ph/mZIAQ].

22. If Kohls posts similar AI-generated content, he risks violating the terms of service for YouTube, which requires that he post lawful content, especially given that the Governor of California has accused his content of being illegal under AB 2839.

23. If Kohls posts similar AI-generated content, he risks sanctions (such as de-platforming, temporary suspension, or shadow-banning) from YouTube that will reduce his viewership, revenue, and ability to spread his political message.

24. As to his current AI-generated content that is already posted, such as the July 26 video targeted by Governor Newsom, he is irreparably harmed because, as his content remains posted, it remains subject to a threat of a lawsuit that risks monetary and non-monetary liability.

25. Also, his political content is likely to be reported and/or taken down as a result of AB 2839 and the Governor's tweets. This will similarly result in his political speech being blocked, and risk violating terms of service with and/or sanctions from YouTube.

### B. AB 2839's Attempt to Compel Speech Provides Kohls No Safe Harbor

26. Kohls has informed his attorneys and I believe that he does not wish to re-upload the videos to include the required disclaimers. In the first place, adding the disclaimers would mar his intended speech, which aims toward satire in the style of a realistic campaign video. He does not agree to allow California to compel his speech in this manner. Moreover, editing and re-uploading each video in this fashion would take hours of work.

27. Finally, and significantly for a content creator who earns a living by creating media like plaintiff Kohls, deleting and re-uploading videos results in losing all of the past interactions, likes, views, and metrics on the video, which negatively impacts future viewership and therefore revenue. While the algorithms of these platforms are proprietary, they are known to reward past engagement with particular pieces of content by recommending popular videos to additional users who might enjoy it. Deleting and re-uploading videos destroys the past weight of user interaction and may even reflect negatively on a creator's channel generally in terms of

algorithmic recommendations.[11] X and YouTube allows only limited edits like cutting parts of a video (used to resolve copyright demands).[12] In order to add the required disclaimer, the screen content of the video must be changed, and a revised video like this requires a new upload. Additionally, YouTube's policy and algorithms discourage uploads of near-identical videos because it interprets them as an attempt to "spam" notifications to subscribers. YouTube warns its creators to "Not be duplicative or repetitive," and skirting this rule can result in outright demonetization (where YouTube ceases to pay for content created).[13]

28. For most or all of the videos, including the July 26 video, it would be impossible to fit the disclaimer on the screen even if Kohls were to remove and re-upload such videos to include a disclaimer. This is because text in each video is so large, that the required disclosure—which cannot be any smaller than the largest text that appears in the video—could not fit on the screen.

29. Thus, even if Kohls were willing to have his speech compelled at the behest of lawmakers, which itself infringes his First Amendment rights, it would significantly harm him financially and be completely impossible for him to do with the viral July 26 video.

**C.   Conclusion**

30. Plaintiff Kohl's ability to monetize his political content is irreparably harmed due to AB 2839, because AB 2839 will create a chilling effect on other people reposting and sharing his videos.

31. AB 2839 not only infringes the First Amendment rights of Kohls, it infringes the rights of content creators and consumers nationwide.

---

[11] *See* The Marketing Heaven, *Is It OK to Delete and Reupload YouTube Video?* (Feb. 29, 2024) https://themarketingheaven.com/is-it-ok-to-delete-and-reupload-youtube-video/.

[12] *See* X Help Center, *Media Studio Live Cut Producer*, https://help.x.com/en/using-x/live-producer-faq; YouTube Help, *Trim your videos*, https://support.google.com/youtube/answer/9057455?hl=en

[13] *YouTube channel monetization policies*, support.google.com/youtube/answer/1311392.

### Notice

32. Especially because neither defendant has formally appeared in this case, I should explain how my colleagues and I have endeavored to follow this Court's directive to "contact opposing counsel to discuss thoroughly… the substance of the contemplated motion and any potential resolution." Dkt. 4-2.

33. In the past three years, HLLI has filed three pre-enforcement challenges to recently-enacted California laws that our clients pleaded infringe upon the First Amendment's freedom of speech. This is the third.

34. In *Gupta v. Bonta*, 3:21-cv-09045 (N.D. Cal.), HLLI represented an individual (a minor at the time of filing his complaint through his father, who served as next friend) who wished to spread pro-vaccine speech outside of a neighborhood pharmacy even though a recently-passed law, SB 742, purported to criminalize approaching any person in order to "leaflet, display a sign, protest, educate, or counsel" when within 100 feet of any vaccination site, which includes most grocery stores and pharmacies in the state. Ultimately, defendant Rob Bonta agreed to extend as permanent a preliminary injunction that other plaintiffs won prohibiting enforcement of objectionable elements of the law, and Bonta stipulated that our client was the prevailing party. *See id.*, Dkt. 74. In *Couris v. Lawson*, 22-cv-1922 (S.D. Cal.), HLLI represented two conscientious doctors (not anti-vaxxers) who wished to convey accurate information about risks and benefits of COVID-19 vaccines to their patients without fear of reprisal from AB 2098, a newly-passed bill that provided vague rules and harsh penalties against "misinformation." After the district court refused to rule on our motion for preliminary injunction, we appealed the constructive denial to the Ninth Circuit, where my colleague Adam Schulman ably argued. The panel seemed deeply skeptical of the law. In the months following the argument, the legislature amended a must-pass bill to repeal AB 2098, thus mooting our appeal. The legislature had not earlier discussed repealing the bill, and I took the late-session amendment as a sign that the state recognized the Ninth Circuit would soon opine that AB 2089 infringed upon the First Amendment.

35. In both matters, the state attorney representing Attorney General Rob Bonta was Kristin Liska. We have a cordial relationship as adversaries.

36. Because Ms. Liska apparently represents the Attorney General in First Amendment cases, about one hour after I filed the complaint on September 17, at 5:44 pm, I emailed attorney Liska a copy of the complaint, civil cover sheet, and—in a separate email—exhibits to the complaint. I informed her in the message: "The temporary case number is 2:24-at-1196, and Adam [Schulman] or I will email you again once we have the formal case number."

37. The email containing complaint exhibits bounced back, which was consistent with my experience: the Attorney General's office seems to have a size limitation on incoming emails, and the exhibits as filed exceeded 20 MB altogether. I subsequently sent these, which my colleague M. Frank Bednarz compressed, at 4:12 pm on September 18. I also then sent all filings I hadn't previously emailed to attorney Liska (including the *pro hac vice* motion).

38. In the morning of September 18, after the case was assigned a permanent docket number, I emailed Ms. Liska again on September 18 at 9:50 am, replying to my 5:44 pm email so as to include my previous message. I advised "We will be moving for a TRO as soon as we have a hearing date from the court." I also inquired whether she would be representing the Secretary of State.

39. After sending this email, and after having previously reviewed the Court's webpage, which requires that parties should contact the courtroom deputy for available dates for hearing any motion, I sent the courtroom deputy an email at 9:58 am. I stated our intention to apply for a TRO and asked whether Tuesday, September 24 would be available "or would the court prefer a different date and time?"

40. At 11:54 am today, Ms. Liska replied to my 9:50 am email, thanking me for the message and inquiring when the TRO would be heard and whether it would concern only AB 2839 or both bills we challenge, given that AB 2655 will not be effective until January 1. She advised in this message "I don't yet have an answer regarding representation of the

Secretary or waiving service on her behalf; we are willing to waive service as to the Attorney General."

41. Separately, I endeavored to serve both defendants with the complaint, summons, the court's orders, and a cover letter advising in large (24-point) print "We intend to file for TRO enjoining enforcement of AB 2839 **today**; please contact me **immediately**." (emphasis in original). My colleague Frank Bednarz arranged for service through a process server, OneLegal. Upon learning that attorney Liska would waive service as to the Attorney General, Bednarz asked the server to proceed to serve only Secretary of State Weber.

42. At 2:12 pm, after a telephone conversation with the courtroom deputy, I received an email from her that read:

> Judge Mendez has directed me to give you a briefing schedule for a Motion for Preliminary Injunction as follows:
>
> - The Motion for Preliminary Injunction shall be filed by today, Wednesday, September 18, 2024;
>
> - Opposition due by Monday, September 23, 2024; and if any,
>
> - Reply due by Thursday, September 26, 2024, whereupon the motion will be submitted.
>
> If the Court subsequently concludes that oral argument is necessary, a hearing on the Motion for Preliminary Injunction will be specially set for Monday, September 30, 2024.
>
> **As to the filing of a TRO:**
>
> Please determine how you should proceed. Counsel may file any pleading counsel thinks is appropriate for the Court's consideration. Either counsel decides to file a TRO or a Moton for Preliminary Injunction, please make sure to follow the Local Rules.

43. While Kohls's motion is urgent and poses a real risk of irreparable harm to his speech rights—chilling Constitutionally-protected speech almost always presents irreparable injury, as explained in the next section—I believe this schedule to be adequate and it conserves private and judicial resources by avoiding a separate hearing for preliminary injunction upon

conclusion of a time-limited TRO. Therefore, I instructed my colleagues to adapt the drafted TRO papers into a motion for preliminary injunction.

44. I forwarded this email to Ms. Liska at 2:18 pm. My message agreed with Liska that we would only seek injunctive relief for AB 2839 "(reserving rights to seek PI on 2655 at a later date) against Weber, with the attached briefing schedule." I asked who would be counsel for the Secretary of State and also asked Ms. Liska to complete the waiver of service form for defendant Bonta.

45. At 4:10 pm, I again emailed Ms. Liska to advise "We are proceeding with service to the Secretary of State today with a cover letter asking any representative to immediately contact us, and I will let you know if I hear anything."

46. At 5:16 pm, Ms. Liska replied that "I can also let you know that our office will be representing the Secretary of State as well, and we can accept service on her behalf. I can fill out the form you sent along earlier to that effect as well."

47. Additionally, with the filing of this affidavit, I will have filed the Motion, its accompanying Memorandum for Preliminary Injunction, and all other required documents under Local Rule 231 using the CM/ECF filing system thus effectuating service of such filing on all ECF registered attorneys in this case. The filings will be publicly available to any others who wish to review them. Following the filing, I will also email Ms. Liska with copies of all filed papers.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 18, 2024 in Houston, Texas.

*/s/ Theodore H. Frank*
Theodore H. Frank