ROB BONTA
Attorney General of California
ANYA M. BINSACCA, State Bar No. 189613
Supervising Deputy Attorney General
ANNA FERRARI, State Bar No. 261579
KRISTIN A. LISKA, State Bar No. 315994
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3916
 Fax:  (415) 703-5480
 E-mail:  Kristin.Liska@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **CHRISTOPHER KOHLS,**<br><br>                                    Plaintiff,<br><br>**v.**<br><br>**ROB BONTA, in His Official Capacity as Attorney General of the State of California, and SHIRLEY N. WEBER, in Her Official Capacity as California Secretary of State,**<br><br>                                    Defendants. | Case No. 2:24-cv-02527-JAM-CKD<br><br>**OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date:            September 30, 2024<br>Dept:           6<br>Judge:          The Honorable John A. Mendez<br>Trial Date:    Not scheduled<br>Action Filed:  9/17/2024 |

1

## TABLE OF CONTENTS

2

**Page**

3 Introduction ................................................................................................................ 1

Background ................................................................................................................ 2

4

    A.    Deepfakes Circulate Online ..................................................... 2

5

    B.    AB 2839 ............................................................................... 4

6

    C.    Procedural History ................................................................. 7

7 Legal Standard ........................................................................................................... 8

Argument ................................................................................................................... 8

8

    I.    Plaintiff Is Not Likely to Succeed on His Challenges to AB 2839 ...................... 8

9

    A.    AB 2839 Is Not Invalid Under the First Amendment ................................ 8

10

        1.    AB 2839's limitations on distributing materially deceptive content are constitutional as a prohibition on knowing falsehoods that cause tangible harm ............................................. 9

11

12

        2.    AB 2839's prohibitions on distributing materially deceptive content withstand strict scrutiny .................................................. 12

13

            a.    AB 2839 furthers compelling state interests in electoral integrity and preventing fraud ........................... 12

14

            b.    AB 2839 is narrowly tailored to further these compelling interests ....................................... 16

15

        3.    AB 2839's safe harbor for parody or satire that is materially deceptive content does not violate the First Amendment ............ 20

16

    B.    AB 2839 Is Not Unconstitutionally Vague ............................................. 21

17

    II.    The Other Factors Do Not Weigh in Favor of Injunctive Relief ........................ 23

18

    III.    While No Order Is Warranted, This Court Should Narrowly Tailor Any Relief Granted .................................................................................... 24

19

Conclusion ................................................................................................................ 26

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Page**

3

CASES

4

*281 Care Comm. v. Arneson*
   766 F.3d 774 (8th Cir. 2014) ............................................................................. 15, 18

5

6

*Animal Legal Defense Fund v. Wasden*
   878 F.3d 1184 (9th Cir. 2018) ..................................................................... 8, 9, 10, 11

7

*Berger v. City of Seattle*
   569 F.3d 1029 (9th Cir. 2009) ........................................................................... 15

8

9

*Buckley v. Valeo*
   424 U.S. 1 (1976) ...................................................................................... 19

10

*Burson v. Freeman*
   504 U.S. 191 (1992) ................................................................................. 13, 14

11

12

*Cal. Teachers Ass'n v. State Bd. of Educ.*
   271 F.3d 1141 (9th Cir. 2001) ........................................................................... 21

13

14

*City of Austin v. Reagan Nat'l Advertising of Austin, LLC*
   596 U.S. 61 (2022) ...................................................................................... 9

15

16

*Counterman v. Colorado*
   600 U.S. 66 (2023) .................................................................................... 10

17

*Drakes Bay Oyster Co. v. Jewell*
   747 F.3d 1073 (9th Cir. 2014) ........................................................................... 24

18

19

*Edge v. City of Everett*
   929 F.3d 657 (9th Cir. 2019) ......................................................................... 8, 24

20

21

*Eu v. S.F. Cnty. Democratic Cent. Comm.*
   489 U.S. 214 (1989) .................................................................................... 13

22

*FCC v. Fox Tel. Stations, Inc.*
   567 U.S. 239 (2012) .................................................................................... 21

23

24

*FEC v. Ted Cruz for Senate*
   596 U.S. 289 (2022) ................................................................................. 14, 15

25

26

*First Nat'l Bank of Boston v. Bellotti*
   435 U.S. 765 (1978) ................................................................................. 11, 20

27

*First Resort, Inc. v. Herrera*
   860 F.3d 1263 (9th Cir. 2017) ........................................................................... 22

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Garcia v. Google. Inc.*
786 F.3d 733 (9th Cir. 2015)................................................................. 8

*Hill v. Colorado*
530 U.S. 703 (2000) ............................................................................. 21

*Illinois ex rel. Madigan v. Telemarking Assocs., Inc.*
538 U.S. 600 (2003) ............................................................................. 11

*John Doe No. 1 v. Reed*
561 U.S. 186 (2010) ............................................................................. 13

*Klein v. City of San Clemente*
584 F.3d 1196 (9th Cir. 2009)................................................................ 8

*Maryland v. King*
567 U.S. 1301 (2013) ........................................................................... 24

*Mazurek v. Armstrong*
520 U.S. 968 (1997) .............................................................................. 8

*McIntyre v. Ohio Elections Comm'n*
514 U.S. 334 (1995)......................................................................... 13, 14

*Mecinas v. Hobbs*
30 F.4th 890 (9th Cir. 2022).................................................................. 11

*Melendres v. Arpaio*
695 F.3d 990 (9th Cir. 2012)................................................................. 23

*Minn. Voters Alliance v. Ellison*
-- F. Supp. 3d --, 2024 WL 4222829 (D. Minn. Sept. 17, 2024) .......................... 18

*N.Y. Times v. Sullivan*
376 U.S. 254 (1964)............................................................................. 18

*Smith v. Helzer*
95 F.4th 1207 (9th Cir. 2024)................................................................ 20

*Stormans, Inc. v. Selecky*
586 F.3d 1109 (9th Cir. 2009)................................................................ 25

*Susan B. Anthony List v. Driehaus*
814 F.3d 466 (6th Cir. 2016)............................................................ 14, 18

iii

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Taniguchi v. Kan Pac. Saipan, Ltd.*
    566 U.S. 560 (2012) ........................................................................................................ 21

*Twitter, Inc. v. Garland*
    61 F.4th 686 (9th Cir. 2023) ............................................................................................. 9

*United States v. Alvarez*
    567 U.S. 709 (2012) .................................................................................... 9, 10, 11, 19

*United States v. Dupree*
    57 F.4th 1269 (11th Cir. 2023) ....................................................................................... 14

*United States v. Swisher*
    811 F.3d 229 (9th Cir. 2016) ........................................................................................... 9

*Victory Processing, LLC v. Fox*
    937 F.3d 1218 (9th Cir. 2019) ....................................................................................... 16

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*
    455 U.S. 489 (1982) ................................................................................................. 22, 23

*Vivid Ent., LCC v. Fielding*
    774 F.3d 566 (9th Cir. 2014) ......................................................................................... 25

*Weaver v. Bonner*
    309 F.3d 1312 (11th Cir. 2002) ............................................................................... 15, 18

*Williams-Yulee v. Florida Bar*
    575 U.S. 433 (2015) ....................................................................................................... 19

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ...................................................................................................... 8, 24

*Winter v. Wolnitzek*
    834 F.3d 681 (6th Cir. 2016) ......................................................................................... 18

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    First Amendment ............................................................................................... *passim*
    Fourteenth Amendment ............................................................................................ 2, 7, 21

# TABLE OF AUTHORITIES
### (continued)

**Page**

**STATUTES**

2024 Cal. Stats., Chapter 262 (AB 2839) ......................................................... *passim*
    § 6 ........................................................................................................... 7

California Elections Code
    § 20012(a)(1) ............................................................................................. 4
    § 20012(a)(2) ................................................................................... 4, 12, 15
    § 20012(a)(3) ..................................................................................... *passim*
    § 20012(a)(4) ....................................................................................... 4, 5, 12
    § 20012(a)(5) ............................................................................................. 5
    § 20012(b)(1) ..................................................................................... *passim*
    § 20012(b)(1)(A) ................................................................................ 10, 23
    § 20012(b)(1)(A)(i) ................................................................................... 5
    § 20012(b)(1)(B) ..................................................................................... 11
    § 20012(b)(1)(C) ..................................................................................... 11
    § 20012(b)(1)(D) ..................................................................................... 11.
    § 20012(b)(2) ............................................................................................. 6
    § 20012(b)(3) ............................................................................................. 6
    § 20012(b)(4) ............................................................................................. 6
    § 20012(c) ................................................................................................. 5.
    § 20012(c)(1) ........................................................................................... 19
    § 20012(c)(2) ........................................................................................... 19
    § 20012(d)(1) ...................................................................................... 6, 23
    § 20012(d)(2) ...................................................................................... 6, 23
    § 20012(d)(3) ...................................................................................... 7, 23
    § 20012(e) ................................................................................................. 6
    § 20012(f)(1) ....................................................................................... 5, 16
    § 20012(f)(4) ............................................................................................. 2
    § 20012(f)(5) ...................................................................................... 6, 16.
    § 20012(f)(7) ....................................................................................... 9, 17
    § 20012(f)(8) ....................................................................................... 9, 16
    § 20012(f)(8)(A) ................................................................................. 6, 22
    § 20012(f)(8)(B) ................................................................................. 6, 22
    § 20012(f)(9) ............................................................................................. 6.
    § 20012(h) ............................................................................................... 25

**OTHER AUTHORITIES**

Ali Swenson, *A Parody Ad Shared by Elon Musk Clones Kamala Harris' Voice*,
    AP (July 29, 2024), https://apnews.com/article/parody-ad-ai-harris-musk-x-
    misleading-3a5df582f911a808d34f68b766aa3b8e# .............................................. 21

v

## TABLE OF AUTHORITIES
### (continued)

**Page**

Andrea Azzo, *Tracking Political Deepfakes: New Database Aims to Inform, Inspire Policy Solutions*, Center for Advancing Safety of Machine Intelligence (Jan. 26, 2024), https://casmi.northwestern.edu/news/articles/2024/tracking-political-deepfakes-new-database-aims-to-inform-inspire-policy-solutions.html ................... 4

Ashley Parker, *2020 Election: Trump and Allies Accused of Ramping Up Efforts to Spread Disinformation and Fake News*, The Independent (Sept. 7, 2020), https://www.independent.co.uk/news/world/americas/us-election-2020/trump-us-election-fake-news-biden-twitter-deep-fake-videos-b404815.html ................................... 3

Benjamin A. Lyons & Kaitlyn S. Workman, *Research Note: Explicit Voter Fraud Conspiracy Cues Increase Belief Among Co-Partisans*, Harvard Kennedy School Misinformation Review (June 7, 2022), https://misinforeview.hks.harvard.edu/article/research-note-explicit-voter-fraud-conspiracy-cues-increase-belief-among-co-partisans-but-have-broader-spillover-effects-on-confidence-in-elections/ .......................................................... 12

David Mack, *This PSA About Fake News from Barack Obama Is Not What It Appears*, Buzzfeed News (April 17, 2018), https://www.buzzfeednews.com/article/davidmack/obama-fake-news-jordan-peele-psa-video-buzzfeed#.gcxNolpGL .............................................................. 3

David Shepardson, *US Political Consultant Indicted over AI-Generated Biden Robocalls*, Reuters (May 23, 2024), https://www.reuters.com/world/us/us-political-consultant-indicted-over-ai-generated-biden-robocalls-2024-05-23/ ........................ 4

*Defamation*, Black's Law Dictionary (12th ed. 2024) ............................................... 23

Don Louallen, *Fake Biden Robocall Prompts State Probe, Ratchets up Concerns About AI in 2024 Election*, USA Today (Jan. 24, 2024), https://www.usatoday.com/story/news/politics/2024/01/24/fake-biden-robocall-investigation/72343944007/ ................................................................... 1

Em Steck & Andrew Kaczynski, *Fake Joe Biden Robocall Urges New Hampshire Voters Not to Vote in Tuesday's Democratic Primary*, CNN.com (Jan. 22, 2024), https://www.cnn.com/2024/01/22/politics/fake-joe-biden-robocall/index.html ................................................................................................... 1

Ian Sample, *What Are Deepfakes—and Can You Spot Them?*, The Guardian (Jan. 13, 2020), https://www.theguardian.com/technology/2020/jan/13/what-are-deepfakes-and-how-can-you-spot-them .............................................................. 3

Kayleen Devlin & Joshua Cheetham, *Fake Trump Arrest Photos: How to Spot an AI-Generated Image*, BBC (March 24, 2023), https://www.bbc.com/news/world-us-canada-65069316 ............................................. 3

## TABLE OF AUTHORITIES
### (continued)

**Page**

Matt Shuham, *DeSantis Campaign Ad Features AI Fakes of Trump Hugging Fauci*, Huffington Post (June 8, 2023), https://www.huffpost.com/entry/desantis-trump-fauci-fake-ai-ad_n_64822436e4b025003edc3c8b ........................................................................... 4

Meredith Somers, *Deepfakes, Explained*, Ideas Made to Matter (July 21, 2020), https://mitsloan.mit.edu/ideas-made-to-matter/deepfakes-explained ...................................... 2

Mikael Thalen, *"Legitimate Use of Deepfakes": AI-Generated Video of Biden Declaring World War 3, Bringing Back Draft Splits Experts*, Daily Dot (March 2, 2023), https://www.dailydot.com/debug/biden-deepfake-wwiii/ ..................................... 3

Nicolas Berlinski et al., *The Effects of Unsubstantiated Claims of Voter Fraud on Confidence in Elections*, 10 J. Experimental Pol. Sci. 34 (2023) ........................................... 12

Olivier Bergeron-Boutin et al., *Communicating with Voters to Build Trust in the U.S. Election System*, MIT Election Data & Science Lab, *available at* https://electionlab.mit.edu/sites/default/files/2023-10/voter-trust.pdf ................................... 11

Rebecca Klar, *Fake Biden Robocall 'Tip of the Iceberg' for AI Election Misinformation*, The Hill (Jan. 24, 2024), https://thehill.com/policy/technology/4424803-fake-biden-robocall-tip-of-the-iceberg-for-ai-election-misinformation/..................................................................................... 1

Shannon Bond, *It Takes A Few Dollars and 8 Minutes to Create a Deepfake*, NPR Morning Edition (March 23, 2023), https://www.npr.org/2023/03/23/1165146797/it-takes-a-few-dollars-and-8-minutes-to-create-a-deepfake-and-thats-only-the-sta ................................................................ 3

Siwei Lyu, *Deepfakes and the New AI-Generated Fake Media Creation-Detection Arms Race*, Scientific American (July 20, 2020), https://www.scientificamerican.com/article/detecting-deepfakes1/ ......................................... 3

## INTRODUCTION

In January 2024, shortly before the Democratic primary, thousands of voters in New Hampshire received a surprising call: President Joe Biden urged them not to vote in the primary.[1] The call appeared to come from a local New Hampshire number belonging to the former New Hampshire Democratic Party chair.[2]  But the call was not from President Biden.  Rather, it was a deepfake—a digitally created audio file imitating President Biden's voice—paid for by a political consultant.[3]  The incident garnered national attention and generated concerns about the impact of deepfakes and digitally created media on elections.[4]  And this incident is but one example of the many deepfakes that have circulated in the lead-up to the 2024 presidential election.

Motivated by concerns over such deepfakes and their threat to electoral integrity, the California Legislature enacted AB 2839.  The statute prohibits the knowing distribution, with malice, of materially deceptive content depicting specific subjects and that might cause specific harms, namely content that: (1) depicts a candidate doing or saying something that the candidate did not do or say and that is reasonably likely to harm the candidate's reputation or electoral prospects, (2) depicts an elected official or elections official doing or saying something in connection with an election in California that the official did not do or say and that is reasonably likely to falsely undermine confidence in electoral outcomes, or (3) depicts election equipment in a materially false way that is reasonably likely to falsely undermine confidence in electoral outcomes.  Thus AB 2839 focuses on a specific subset of knowing falsehoods that pose a greater risk to electoral integrity.  And it limits its prohibitions to 120 days before an election and, for content other than that depicting a candidate, to 60 days after an election.  The Legislature

---

[1] *See, e.g.*, Em Steck & Andrew Kaczynski, *Fake Joe Biden Robocall Urges New Hampshire Voters Not to Vote in Tuesday's Democratic Primary*, CNN.com (Jan. 22, 2024), https://www.cnn.com/2024/01/22/politics/fake-joe-biden-robocall/index.html (last accessed Sept. 22, 2024).

[2] *Id.*

[3] *Id.*

[4] *See, e.g.*, Don Louallen, *Fake Biden Robocall Prompts State Probe, Ratchets up Concerns About AI in 2024 Election*, USA Today (Jan. 24, 2024), https://www.usatoday.com/story/news/politics/2024/01/24/fake-biden-robocall-investigation/72343944007/ ) (last accessed Sept. 22, 2024); Rebecca Klar, *Fake Biden Robocall 'Tip of the Iceberg' for AI Election Misinformation*, The Hill (Jan. 24, 2024), https://thehill.com/policy/technology/4424803-fake-biden-robocall-tip-of-the-iceberg-for-ai-election-misinformation/ (last accessed Sept. 22, 2024).

1

1   concluded that these prohibitions are narrowly tailored to further the State's compelling interest in

2   free and fair elections.  It included an urgency clause giving the statute immediate effect out of

3   concern over the impact of deepfakes on the upcoming November 5, 2024 presidential election.

4       Plaintiff Christopher Kohls brought suit challenging AB 2839.  Kohls creates digital

5   content about political figures online and wishes to continue making videos that he considers

6   parody or satire.  He contends that AB 2839 violates his First and Fourteenth Amendment rights

7   and seeks a preliminary injunction of the statute.  The court should deny the motion, for plaintiff

8   has failed to establish his entitlement to such relief.

9       Throughout his complaint and motion, plaintiff contends that this case is about

10  "misinformation."  But AB 2839 is not about misinformation.  It is about specific kinds of

11  demonstrably false, intentionally created digital content—distributed with malice—that can pose

12  tangible harms to electoral integrity by hurting a candidate's reputation or falsely undermining

13  confidence in electoral outcomes.  In other words, it is about media that is *meant to deceive and*

14  *manipulate voters* by showing them false depictions of allegedly true events.  While the First

15  Amendment provides some protection for falsity, both the Supreme Court and the Ninth Circuit

16  have long recognized that it does not protect all lies.  Rather, States may permissibly regulate

17  specific intentional falsehoods that cause specific tangible harms, which AB 2839 does.

18                           **BACKGROUND**

19      **A.    Deepfakes Circulate Online**

20      A "deepfake" is a manipulated piece of media where a person's likeness, image, or voice is

21  digitally created or swapped with another person's.[5]  The term originated in 2017 from the name

22  of an online user who created a space to share pornographic videos made with face-swapping

23  technology; users would swap the face of a celebrity (such as actress Jennifer Lawrence or singer

24  Taylor Swift) onto the body of a performing adult film star.[6]  Deepfakes subsequently spread

25  beyond their initial context, catching general attention in 2018 when comedian Jordan Peele

26  _____
        [5] *See, e.g.*, Cal. Elec. Code § 20012(f)(4) (defining "deepfake" as "audio or visual media
27  that is digitally created or modified such that it would falsely appear to a reasonable person to be
    an authentic record of the actual speech or conduct of the individual depicted in the media").
        [6] *See, e.g.*, Meredith Somers, *Deepfakes, Explained*, Ideas Made to Matter (July 21, 2020),
28  https://mitsloan.mit.edu/ideas-made-to-matter/deepfakes-explained (last accessed Sept. 22, 2024).

created a deepfake video purporting to show former President Barack Obama uttering profanity, as part of an attempt to show the potential dangers of deepfakes.[7]  Since then, deepfakes have become easier to make and more difficult to detect.  In 2018, researchers found that people in deepfake videos did not blink normally; news media reported this as a method to detect deepfakes; shortly thereafter, deepfakes began blinking normally.[8]  As a 2020 opinion piece by one of the researchers who first discovered the blinking discrepancy explained, "[t]he competition between the making and detection of deepfakes will not end in the foreseeable future.  We will see deepfakes that are easier to make, more realistic and harder to distinguish."[9]  This observation was prescient: a professor in 2023 was able to make a deepfake of himself for $11 in 8 minutes.[10]

Unsurprisingly, deepfakes soon entered the political realm.  During the 2020 election, newspapers reported on doctored videos of President Joe Biden that seemed to show him falling asleep or making false statements.[11]  In 2023, a political commentator posted a digitally created video of President Biden allegedly announcing the beginning of World War III and the return of the draft; at least one viewer asked whether the video was real or fake.[12]  That same year, deepfake images of former President Donald Trump being arrested circulated online.[13]  In the 2024 Republican primary election, the campaign for presidential candidate Ron DeSantis posted

---

[7] David Mack, *This PSA About Fake News from Barack Obama Is Not What It Appears*, Buzzfeed News (April 17, 2018), https://www.buzzfeednews.com/article/davidmack/obama-fake-news-jordan-peele-psa-video-buzzfeed#.gcxNolpGL (last accessed Sept. 22, 2024).
[8] *See, e.g.*, Ian Sample, *What Are Deepfakes—and Can You Spot Them?*, The Guardian (Jan. 13, 2020), https://www.theguardian.com/technology/2020/jan/13/what-are-deepfakes-and-how-can-you-spot-them (last accessed Sept. 22, 2024).
[9] Siwei Lyu, *Deepfakes and the New AI-Generated Fake Media Creation-Detection Arms Race*, Scientific American (July 20, 2020), https://www.scientificamerican.com/article/detecting-deepfakes1/ (last accessed Sept. 22, 2024).
[10] Shannon Bond, *It Takes A Few Dollars and 8 Minutes to Create a Deepfake*, NPR Morning Edition (March 23, 2023), https://www.npr.org/2023/03/23/1165146797/it-takes-a-few-dollars-and-8-minutes-to-create-a-deepfake-and-thats-only-the-sta (last accessed Sept. 22, 2024).
[11] *See, e.g.*, Ashley Parker, *2020 Election: Trump and Allies Accused of Ramping Up Efforts to Spread Disinformation and Fake News*, The Independent (Sept. 7, 2020), https://www.independent.co.uk/news/world/americas/us-election-2020/trump-us-election-fake-news-biden-twitter-deep-fake-videos-b404815.html (last accessed Sept. 22, 2024).
[12] *See, e.g.*, Mikael Thalen, *"Legitimate Use of Deepfakes": AI-Generated Video of Biden Declaring World War 3, Bringing Back Draft Splits Experts*, Daily Dot (March 2, 2023), https://www.dailydot.com/debug/biden-deepfake-wwiii/ (last accessed Sept. 22, 2024).
[13] *See, e.g.*, Kayleen Devlin & Joshua Cheetham, *Fake Trump Arrest Photos: How to Spot an AI-Generated Image*, BBC (March 24, 2023), https://www.bbc.com/news/world-us-canada-65069316 (last accessed Sept. 22, 2024).

3

1  deepfake images that allegedly showed former President Trump embracing Dr. Anthony Fauci.[14]

2  And shortly before the 2024 New Hampshire primary, a political consultant paid to have

3  robocalls made to Democratic primary voters that claimed to be from President Biden and sought

4  to dissuade voters from casting ballots in the primary election.[15]  As of January 26, 2024, a

5  database created by researchers to track reports of political deepfakes listed 114 deepfake

6  incidents worldwide; as of September 22, 2024, the database listed over 400 incidents.[16]

7     **B.    AB 2839**

8          In response to concerns about the growth of deepfakes in the political realm and their

9  potential impact on elections, the California Legislature enacted AB 2839.  The Legislature found

10  that "California is entering its first-ever artificial intelligence (AI) election."  Cal. Elec. Code

11  § 20012(a)(1).  With modern technology, "bad actors now have the power to create a false image

12  of a candidate accepting a bribe, or a fake video of an elections official 'caught on tape' saying

13  that voting machines are not secure, or generate an artificial robocall in the Governor's voice

14  telling millions of Californians their voting site has changed."  *Id.* § 20012(a)(2).  Indeed, the

15  Legislature found, "candidates and parties are already creating and distributing deepfake images

16  and audio and video content."  *Id.* § 20012(a)(3).  And "[v]oters will not know what images,

17  audio, or video they can trust."  *Id.* § 20012(a)(1).  As examples, the legislative history referenced

18  the doctored images of former President Trump and Dr. Fauci and the robocalls purporting to be

19  from President Biden, among others.  Liska Decl., Ex. 1, p. 7; *id.*, Ex. 5, p. 7-8.

20          The Legislature stated that California has a "compelling interest in protecting free and fair

21  elections."  Cal. Elec. Code § 20012(a)(4).  It found that "[i]n order to ensure California elections

---

[14] *See, e.g.*, Matt Shuham, *DeSantis Campaign Ad Features AI Fakes of Trump Hugging Fauci*, Huffington Post (June 8, 2023), https://www.huffpost.com/entry/desantis-trump-fauci-fake-ai-ad_n_64822436e4b025003edc3c8b (last accessed Sept. 22, 2024).
[15] *See, e.g.*, David Shepardson, *US Political Consultant Indicted over AI-Generated Biden Robocalls*, Reuters (May 23, 2024), https://www.reuters.com/world/us/us-political-consultant-indicted-over-ai-generated-biden-robocalls-2024-05-23/ (last accessed Sept. 22, 2024).
[16] Andrea Azzo, *Tracking Political Deepfakes: New Database Aims to Inform, Inspire Policy Solutions*, Center for Advancing Safety of Machine Intelligence (Jan. 26, 2024), https://casmi.northwestern.edu/news/articles/2024/tracking-political-deepfakes-new-database-aims-to-inform-inspire-policy-solutions.html (last accessed Sept. 22, 2024).  The full database can be found at https://airtable.com/appOU03dlKuBdbmty/shrEkrIYINbrcKQ3z/tbleGYjNLn2D4Xfzs.

4

are free and fair, California must, for a limited time before and after elections, prevent the use of deepfakes and disinformation meant to prevent voters from voting and deceive voters based on fraudulent content." *Id.* Deepfakes and similar deceptive media "can skew election results . . . and undermine trust in the ballot counting process." *Id.* § 20012(a)(3). Thus, the Legislature concluded that the regulations of AB 2839 were narrowly tailored to prevent deception and further the State's compelling interest in free and fair elections. *Id.* § 20012(a)(4), (5).

AB 2839 provides that "[a] person, committee, or other entity shall not . . . with malice, knowingly distribute an advertisement or other election communication containing materially deceptive content" of: (1) "[a] candidate for any federal, state, or local elected office in California portrayed as doing or saying something that the candidate did not do or say if the content is reasonably likely to harm the reputation or electoral prospects of a candidate";[17] (2) "[a]n elections official portrayed as doing or saying something in connection with an election in California that the elections official did not do or say if the content is reasonably likely to falsely undermine confidence in the outcome of one or more election contests"; (3) "[a]n elected official portrayed as doing or saying something in connection with an election in California that the elected official did not do or say if the content is reasonably likely to falsely undermine confidence in the outcome of one or more election contests"; or (4) "[a] voting machine, ballot, voting site, or other property or equipment related to an election in California portrayed in a materially false way if the content is reasonably likely to falsely undermine confidence in the outcome of one or more election contests." Cal. Elec. Code § 20012(b)(1). This restriction applies for the 120 days before any election in California and, except for depictions of a candidate, for 60 days after the election. *Id.* § 20012(c).

The statute defines an "advertisement" as "any general or public communication that is authorized or paid for the purpose of supporting or opposing a candidate for elective office in California or a ballot measure that appears on a ballot issued in California." Cal. Elec. Code

---

[17] AB 2839 clarifies that a "candidate for any federal, state, or local elected office in California" "includes any person running for the office of President of the United States or Vice President of the United States who seeks to or will appear on a ballot in California." Cal. Elec. Code § 20012(3)(1)(A)(i).

5

§ 20012(f)(1).  In turn, an "election communication" is defined as "any general or public communication not covered under 'advertisement' . . . that concerns" either (1) "[a] candidate for office or ballot measure," (2) "[v]oting or refraining from voting in an election," or (3) "[t]he canvass of the vote."  *Id.* § 20012(f)(5).  And "materially deceptive content" is defined as "audio or visual media that is intentionally digitally created or modified . . . such that the content would falsely appear to a reasonable person to be an authentic record of the content depicted in the media."  *Id.* § 20012(f)(8)(A).  Such content, however, "does not include any audio or visual media that contains only minor modifications that do not significantly change the perceived contents or meaning of the content" such as "changes to brightness or contrast of images" or "removal of background noise in audio."  *Id.* § 20012(f)(8)(B).

AB 2839 includes three safe harbors from its prohibition on the distribution of materially deceptive content.  First, the prohibition "does not apply to a candidate portraying themselves as doing or saying something that the candidate did not do or say if the content includes a disclosure."  Cal. Elec. Code § 20012(b)(2).  Second, the prohibition does not apply to material "that constitutes satire or parody if the communication includes a disclosure."  *Id.* § 20012(b)(3).  Third, the prohibition does not apply to broadcasting stations, newspapers, magazines, or similar periodicals that distribute the material with a disclosure as part of news reporting or publishing.  *Id.* § 20012(e).  For materially deceptive content falling within one of these safe harbors, AB 2839 separately prohibits any person, committee, or other entity from removing the required disclosure or knowingly republishing the content without the disclosure.  *Id.* § 20012(b)(4).

The statute permits a "recipient of materially deceptive content distributed in violation of this [statute], candidate, or committee participating in the election, or elections official" to bring suit seeking injunctive relief prohibiting distribution of the materially deceptive content.  Cal. Elec. Code § 20012(d)(1).  Such a suit may also seek general or special damages against the person, committee, or entity that distributed or republished the materially deceptive content.  *Id.* § 20012(d)(2).  A "recipient" is defined to include "a person who views, hears, or otherwise perceives an image or audio or video file that was initially distributed in violation" of the statute.  *Id.* § 20012(f)(9).  In any civil action to enforce AB 2839, "the plaintiff shall bear the burden of

6

1     establishing the violation through clear and convincing evidence." *Id.* § 20012(d)(3).

2         Finally, the Legislature determined that AB 2839 "is an urgency statute necessary for the

3 immediate preservation of the public peace, health, or safety . . . and shall go into immediate

4 effect." 2024 Cal. Stats., ch. 262, § 6. It found that "[i]n order to implement the provisions of

5 this act and safeguard the upcoming November 5, 2024, general election against disinformation

6 propagated by AI and deepfake media, it is necessary for this act to take effect immediately." *Id.*

7     **C.   Procedural History**

8         According to his verified complaint, plaintiff Christopher Kohls "creates humorous content

9 commenting on and satirizing political figures" under the screenname "Mr. Reagan." Compl.

10 ¶¶ 4, 17. On July 26, 2024, the complaint alleges, Kohls posted a video "parodying candidate

11 Kamala Harris's first presidential campaign ad." *Id.* ¶ 5. The complaint states that the video was

12 labeled as a parody and acknowledges that "[s]ounds or visuals were significantly edited or

13 digitally generated." *Id.* ¶ 5. The video contained digitally created audio purporting to be Vice

14 President Harris interspersed with actual audio of speeches given by the Vice President. *Id.* ¶¶ 6,

15 32-33. The digitally created audio includes the Vice President stating that she is "the ultimate

16 diversity hire," had spent "four years under the tutelage of the ultimate deep state puppet," and

17 had learned to "carefully hide [her] incompetence." *Id.* ¶ 33. The digitally created audio

18 concludes: "You think the country went to [beeped out expletive] over the past four years? You

19 ain't seen nothing yet." *Id.* ¶ 33. Per the complaint, Kohls's video attracted widespread attention

20 when it was reposted by Elon Musk and received over 100 million views. *Id.* ¶ 8.

21         On September 17, 2024—the day that AB 2839 was signed by the Governor—plaintiff filed

22 this suit challenging AB 2839 along with a companion bill, AB 2655.[18] The complaint names

23 Attorney General Rob Bonta and Secretary of State Shirley N. Weber in their official capacities.

24 Compl. ¶¶ 18-19. It contends that AB 2839 and AB 2655 violate the First and Fourteenth

25 Amendment both facially and as applied, specifically that the statutes infringe on plaintiff's right

26 to free speech and are unconstitutionally vague. *Id.* ¶¶ 109-194. Plaintiff seeks a permanent

27  

28        [18] Since AB 2655 does not have an urgency clause, it will not take effect until January 1, 2025. Plaintiff has therefore not sought to enjoin that statute at this time.

1  injunction of both statutes as well as declaratory relief. *Id.* ¶¶ 195-197. The pending motion for a

2  preliminary injunction seeking to enjoin enforcement of AB 2839 followed shortly thereafter.

3                                          **LEGAL STANDARD**

4       "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v.*

5  *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The party seeking a preliminary injunction

6  must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer

7  irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4)

8  an injunction is in the public interest. *Id.* at 20. If a movant fails to establish a likelihood of

9  success, the court generally need not consider the other factors. *Garcia v. Google. Inc.*, 786 F.3d

10  733, 740 (9th Cir. 2015) (en banc). For claims of constitutional violations, showing a likelihood

11  of success on the merit typically suffices to meet the remaining elements. *E.g.*, *Edge v. City of*

12  *Everett*, 929 F.3d 657, 663 (9th Cir. 2019). Plaintiff, as the movant here, bears the burden of

13  proving each element. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009). He

14  must do so by a "clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

15                                            **ARGUMENT**

16  **I.     PLAINTIFF IS NOT LIKELY TO SUCCEED ON HIS CHALLENGES TO AB 2839**

17       First and foremost, plaintiff has not demonstrated a likelihood of success. Plaintiff

18  contends that AB 2839 violates the First Amendment and is unconstitutionally vague. But his

19  arguments are unavailing. First, AB 2839 is constitutional under the First Amendment as a

20  restriction on knowing falsehoods that cause tangible harm. Second, even if AB 2839 were

21  subject to strict scrutiny, it meets that standard. Third, AB 2839's safe harbor for parody and

22  satire is constitutional. And fourth, AB 2839 is not unconstitutionally vague.

23       **A.     AB 2839 Is Not Invalid Under the First Amendment**

24       The First Amendment provides that the government "shall make no law . . . abridging the

25  freedom of speech." U.S. Const., amend. I. When analyzing the constitutionality of a law

26  regulating speech, the court's "first task is to determine whether" the regulated speech

27  "constitute[s] speech protected by the First Amendment." *Animal Legal Defense Fund v.*

28  *Wasden*, 878 F.3d 1184, 1193-1194 (9th Cir. 2018). "If the government's actions do not

                                                   8

1    implicate speech protected by the First Amendment, we 'need go no further.'" *Id.* at 1194

2    (citation omitted).  If the law does regulate protected speech, the next question is "whether the

3    enactment is content-based or content-neutral." *United States v. Swisher*, 811 F.3d 229, 311 (9th

4    Cir. 2016) (en banc).  A law is content-based if it "'applies to particular speech because of the

5    topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advertising of*

6    *Austin, LLC*, 596 U.S. 61, 69 (2022) (citation omitted).  A content-based law is subject to strict

7    scrutiny and "is justified only if the government demonstrates that [the law] is narrowly tailored

8    to serve a compelling state interest." *Twitter, Inc. v. Garland*, 61 F.4th 686, 698 (9th Cir. 2023).

9             **1.    AB 2839's limitations on distributing materially deceptive content**
                      **are constitutional as a prohibition on knowing falsehoods that cause**
10                    **tangible harm**

11           At its core, AB 2839 is a restriction on the distribution of knowing falsehoods.  Its

12   restriction on distributing materially deceptive content is limited to content that shows a

13   candidate, elections official, or elected official "doing or saying something" that they "did not do

14   or say" or that shows election property or equipment "in a materially false way." Cal. Elec. Code

15   § 20012(b)(1).  Furthermore, "materially deceptive content" is defined as content that has been

16   "digitally created or modified" such that it "would falsely appear to a reasonable person to be an

17   authentic record of the content depicted in the media." *Id.* § 20012(f)(8).  Finally, AB 2839

18   requires that the distributor act knowingly and "with malice," that is, "knowing the materially

19   deceptive content was false or with a reckless disregard for the truth." *Id.* § 20012(b)(1), (f)(7).

20           The Supreme Court addressed the protected status of false speech in *United States v.*

21   *Alvarez*, 567 U.S. 709 (2012).  In *Alvarez*, the Court considered the constitutionality of a statute

22   that criminalized false claims about having received the Congressional Medal of Honor.  *See*

23   *Animal Legal Defense Fund*, 878 F.3d at 1194.  "In deciding that lying about receiving the Medal

24   of Honor, without more, is protected speech, the plurality and concurrence 'reject[ed] the notion

25   that false speech should be in a general category that is presumptively unprotected'" by the First

26   Amendment. *Id.* (quoting *Alvarez*, 567 U.S. at 722 (plurality op.)) (alteration in original).  But

27   "neither the plurality nor the concurrence in *Alvarez* held that false statements are *always*

28   protected under the First Amendment." *Id.* (emphasis in original).  Rather, falsehoods can be

                                                      9

1  permissibly regulated "if made 'for the purpose of material gain' or 'material advantage,' or if

2  such speech inflicts a 'legally cognizable harm.'"  *Id.* (quoting *Alvarez*, 567 U.S. at 723 (plurality

3  op.)).  Indeed, the plurality in *Alvarez* was clear that its opinion "does not imply" that "targeted

4  prohibitions" of falsehoods—such as longstanding regulations of fraudulent or defamatory

5  statements made with malice—"are somehow vulnerable" to challenge under the First

6  Amendment.  567 U.S. at 721; *see also id.* at 734-735 (Breyer, J., concurring) (distinguishing

7  statutes that prohibit knowing falsehoods "where specific harm is more likely to occur").

8        The Ninth Circuit has thus held that "a false statement made in association with legally

9  cognizable harm or for the purpose of material gain is not protected" by the First Amendment.

10  *Animal Legal Defense Fund*, 878 F.3d at 1199.  In *Animal Legal Defense Fund*, the Ninth Circuit

11  upheld an Idaho statute that criminalized obtaining records from an agricultural facility by

12  misrepresentation and knowingly obtaining employment at an agricultural production facility by

13  misrepresentation with the intent to cause injury to the facility.  *Id.* at 1199-1201.  With respect to

14  the first prohibition, "false statements made to actually acquire agricultural production facility

15  records inflict a property harm upon the owner, and may also bestow a material gain on the

16  acquirer."  *Id.* at 1199.  The court held that the section therefore "does not regulate

17  constitutionally protected speech, and does not run afoul of the First Amendment."  *Id.* at 1200.

18  With respect to the second prohibition, the court explained that the statute prohibited "lie[s] made

19  for material gain," and similarly fell within the scope of falsehoods that *Alvarez* held that states

20  could permissibly regulate.  *Id.* at 1201.

21        As with the Idaho statute upheld in *Animal Legal Defense Fund*, AB 2839 is targeted at

22  falsehoods, distributed with malice, that cause a tangible harm.  Starting with content depicting

23  candidates, AB 2839 only restricts distribution of materially deceptive content depicting a

24  candidate doing or saying something the candidate did not do or say if such content is

25  "reasonably likely to harm the reputation or electoral prospects of a candidate."  Cal. Elec. Code

26  § 20012(b)(1)(A).  In other words, AB 2839 only applies to content that is akin to defamatory

27  content—which can be restricted under the First Amendment when the defamatory claim is made

28  with malice, which AB 2839 requires, *see, e.g.*, *Counterman v. Colorado*, 600 U.S. 66, 73

(2023)—in that the prohibited content must be likely to harm the candidate's reputation or their ability to obtain electoral victory.  There is no doubt that harm to reputation is a "legally cognizable harm," *Animal Legal Defense Fund*, 878 F.3d at 1194 (citation omitted), as the large body of defamation law recognizes.  And impairing a candidate's ability to prevail in an election is similarly a "tangible harm to others" caused by a knowing falsehood, *Alvarez*, 567 U.S. at 734 (Breyer, J., concurring).  *Cf. Mecinas v. Hobbs*, 30 F.4th 890, 898 (9th Cir. 2022) (candidate or party suffers injury sufficient for standing when "an allegedly unlawful election regulation makes the competitive landscape worse for a candidate or that candidate's party").

The same is true of AB 2839's restrictions on knowingly distributing materially deceptive content that depicts an elections official or elected official doing or saying something in connection with an election that the official did not do or say.  AB 2839 applies to such content only if the content is "reasonably likely to falsely undermine confidence in the outcome of one or more election contests."  Cal. Elec. Code § 20012(b)(1)(B), (C).  Similarly, the prohibition on distributing materially deceptive content depicting election equipment in a materially false way is limited to content that is "reasonably likely to falsely undermine confidence in the outcome of one or more election contests."  *Id.* § 20012(b)(1)(D).

Such statements are analogous to fraudulent statements—false statements meant to induce a person to act a certain way contrary to their own detriment—which the Supreme Court has long recognized can be permissibly prohibited under the First Amendment, *see, e.g.*, *Illinois ex rel. Madigan v. Telemarking Assocs., Inc.*, 538 U.S. 600, 612 (2003).  It hardly needs stating that the public's confidence in electoral outcomes is critical for the stability and health of a democracy.  *See, e.g.*, *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 789 (1978) ("Preserving the integrity of the electoral process [and] preventing corruption . . . are interests of the highest importance.  Preservation of the individual citizen's confidence in government is equally important." (cleaned up)). Researchers have indicated that messaging claiming an election's outcome is fraudulent or untrustworthy impacts public confidence in electoral outcomes.[19]  It is

---

[19] Olivier Bergeron-Boutin et al., *Communicating with Voters to Build Trust in the U.S. Election System*, MIT Election Data & Science Lab, *available at*

(continued…)

1    undeniably against the public's interest to doubt the outcomes of elections that were administered

2    fairly on the basis of intentional falsehoods, let alone to take actions on the basis of those beliefs.

3    While transparency and questioning of course play an important role in helping to ensure

4    confidence in electoral outcomes, knowingly fraudulent and false content likely to undermine that

5    confidence only causes tangible harms to society.  It does not violate the First Amendment for the

6    State to seek to restrict the distribution of such content.

7            **2.      AB 2839's prohibitions on distributing materially deceptive content
                        withstand strict scrutiny**
8
         While AB 2839 is constitutional as a restriction on knowing falsehoods that cause tangible
9
     harm, it nonetheless would survive strict scrutiny if subject to it.
10
                **a.      AB 2839 furthers compelling state interests in electoral
11                        integrity and preventing fraud**

12           AB 2839 clearly delineates the interests it seeks to serve.  The Legislature stated that the

13   State has a "compelling interest in protecting free and fair elections."  Cal. Elec. Code

14   § 20012(a)(4).  It found that fake images or audio or video content undermine this interest: they

15   "can skew election results" and "undermine trust in the ballot counting process."  *Id.*

16   § 20012(a)(3).  With current available technology, "[v]oters will not know what images, audio, or

17   video they can trust" and may be deceived by content created by "bad actors," such as "a false

18   image of a candidate accepting a bribe, or a fake video of an elections official 'caught on tape'

19   saying that voting machines are not secure."  *Id.* § 20012(a)(2).  Such manipulated content can

20   "prevent voters from voting and deceive voters based on fraudulent content."  *Id.* § 20012(a)(4).

21   https://electionlab.mit.edu/sites/default/files/2023-10/voter-trust.pdf (last accessed Sept. 22, 2024)
22   (noting the "influence of elite messaging in creating partisan distrust of elections and the
     challenges of overcoming it," including that "some efforts to promote public trust may be
     counterproductive"; Nicolas Berlinski et al., *The Effects of Unsubstantiated Claims of Voter*
23   *Fraud on Confidence in Elections*, 10 J. Experimental Pol. Sci. 34, 36 (2023) (concluding that
     "exposure to unsubstantiated claims of voter fraud . . . reduces confidence in elections" while
24   "exposure to fact-checks that show these claims to be unfounded does not measurably reduce the
     damage from these accusations"); Benjamin A. Lyons & Kaitlyn S. Workman, *Research Note:*
25   *Explicit Voter Fraud Conspiracy Cues Increase Belief Among Co-Partisans*, Harvard Kennedy
     School Misinformation Review (June 7, 2022), https://misinforeview.hks.harvard.edu/article
26   /research-note-explicit-voter-fraud-conspiracy-cues-increase-belief-among-co-partisans-but-have-
     broader-spillover-effects-on-confidence-in-elections/ (last accessed Sept. 22, 2024) (concluding
27   that "explicitly stated partisan conspiracy theories increased conspiracy beliefs among co-
     partisans and decreased confidence in elections regardless of their agreement with the
28   respondent's partisanship").

                                                    12

The legislative history echoes these legislative findings: the purposes behind AB 2839 are to protect electoral integrity and prevent fraudulent voter deception.  For instance, the analysis for the Assembly Committee on Elections states that the bill "targets deceptive content that could undermine trust in elections" and focuses on "communications posing the greatest threat to election integrity."  Liska Decl., Ex. 1, p. 7; *see also id.*, Ex. 2, p. 8; *id.*, Ex. 3, p. 2.  The analysis for the Senate Committee on Elections and Constitutional Amendments similarly notes that the statute "targets deceptive content that could undermine trust in elections, prevent voters from voting, and distort the electoral process."  Liska Decl., Ex. 4, p. 5; *see also id.*, Ex. 6, p. 7.  And the legislative history references actual examples of deepfakes that could have deceived voters and impaired free and fair elections, such as the robocalls allegedly from President Biden before the 2024 New Hampshire primary that explicitly encouraged voters not to go to the polls.  Liska Decl., Ex. 1, p. 7; *id.*, Ex. 2, p. 7; *id.*, Ex. 5, p. 7.

These interests in safeguarding free and fair elections and preventing voter deception through fraud are indeed compelling.  The U.S. Supreme Court has recognized that "[a] State indisputably has a compelling interest in preserving the integrity of its election process."  *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989).  And "a State has a compelling interesting in protecting voters from confusion and undue influence."  *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality op.).  "In other words, [the Court] has recognized that a State has a compelling interest in ensuring that an individual's right to vote is not undermined by fraud in the election process."  *Id.*  Indeed, as the Supreme Court has explained, the "state interest in preventing fraud and libel" "carries special weight during election campaigns when false statements, if credited, may have serious adverse consequences for the public at large."  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 349 (1995); *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 197 (2010) ("The State's interest is particularly strong with respect to efforts to root out fraud, which not only may produce fraudulent outcomes, but has a systemic effect as well: It 'drives honest citizens out of the democratic process and breeds distrust of our government.'" (citation omitted)); *McIntyre*, 514 U.S. at 379 (Scalia, J., dissenting) ("No justification for regulation is more compelling than protection of the electoral process.  Other rights, even the

13

1    most basic, are illusory if the right to vote is undermined." (cleaned up)).

2           Thus, plaintiff's contention that the State "has no interest in preventing AI-generated

3    political content about politicians or elections," is erroneous.  Pl.'s Mem. Supp. Mot. Prelim. Inj.

4    (Mem.) at 12.  Plaintiff argues that "[t]he Supreme Court 'has recognized only one permissible

5    ground for restriction [of] political speech: the prevention of '*quid pro quo*' corruption or its

6    appearance.'"  *Id.* (quoting *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 305 (2022).)  But as

7    explained above, the Supreme Court *has* recognized that States have a compelling interest in

8    ensuring electoral integrity, maintaining free and fair elections, and preventing fraud from

9    interfering with a voter's right to choose the candidate of their choice that can justify regulation

10   of political speech.  After all, a plurality of the Court in *Burson* upheld the constitutionality of a

11   limitation on speech near polling places on the basis that it furthered the State's "compelling

12   interest in securing the right to vote freely and effectively"—not in preventing corruption.

13   *Burson*, 504 U.S. at 208 (plurality op.); *see also McIntyre*, 514 U.S. at 749 (Scalia, J., dissenting)

14   ("So significant have we found the interest in protecting the electoral process to be that we have

15   approved the prohibition of political speech *entirely* in areas that would impede that process.").

16          Instead, the language that plaintiff cites from *Cruz* is best understood in the context of that

17   case: as a discussion of what interest is sufficient for a State to regulate *campaign financing*.  *See,*

18   *e.g.*, 596 U.S. at 305 (explaining that the Court has held interests in "reduc[ing] the amount of

19   money in politics" or "limit[ing] the general influence a contributor may have over an elected

20   official" are insufficient).  Nothing in *Cruz* suggests the Court intended to overturn its prior cases

21   recognizing the compelling nature of the State's interest in ensuring electoral integrity and

22   preserving free and fair elections.  *See United States v. Dupree*, 57 F.4th 1269, 1276 (11th Cir.

23   2023) ("The Supreme Court doesn't upend decades of precedent through silence.").

24          Nor do the other cases that plaintiff cites (at 13), support his contention that the State's

25   interest in protecting the electoral process "has no application to political speech that does not

26   affect the mechanics of the election," Mem. at 12.  Indeed, two of the cases that plaintiff cites

27   instead *recognize* that the State has a compelling interest in safeguarding elections that could

28   justify regulations on speech.  *See Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir.

14

1    2016) ("Ohio's interests in preserving the integrity of its elections . . . are compelling."); *Weaver*

2    *v. Bonner*, 309 F.3d 1312, 1319 (11th Cir. 2002) ("Although Georgia's asserted interests may be

3    compelling, [the law] is not narrowly tailored to serve those interests."); *accord Berger v. City of*

4    *Seattle*, 569 F.3d 1029, 1052 (9th Cir. 2009) (reducing election fraud and protecting electoral

5    integrity are interests "the Supreme Court has found compelling in a First Amendment context").

6    And the third case that plaintiff cites declined to resolve whether the State's interest was

7    compelling "on these facts," since it held, as in the other two decisions, that the statute ultimately

8    failed the tailoring requirement of strict scrutiny.  *281 Care Comm. v. Arneson*, 766 F.3d 774, 787

9    (8th Cir. 2014).  None of the three cases held that the State had no compelling interest, let alone

10   *no* interest, in regulating political speech that could undermine free and fair elections by injecting

11   fraud or undue influence into the electoral process.

12           The State's interests in preserving electoral integrity, ensuring free and fair elections, and

13   preventing voter fraud and deception are compelling interests actually furthered by AB 2839.  As

14   even a cursory online search reveals, the problem of political deepfakes is far from "an

15   anticipated harm" or "'mere conjecture,'" *Cruz*, 596 U.S. at 307 (citation omitted).  The

16   Legislature expressly found that "bad actors now have the power to create" deepfakes, and that

17   "[i]n the lead-up to the 2024 presidential election, candidates and parties are already creating and

18   distributing deepfake images and audio and video content."  Cal. Elec. Code § 20012(a)(2), (3).

19   It recounted specific examples of such deepfakes in the legislative history, including the robocalls

20   purporting to be from President Biden encouraging registered voters not to vote.  *See supra* at 1-

21   4, 13.  Nor is it conjecture to conclude that such deepfakes could be misleading to voters in ways

22   that have tangible, detrimental impacts on electoral integrity and free and fair elections.  A voter

23   who decides not to show up to the polls because they received a fake call allegedly from former

24   President Trump or Vice President Harris telling them not to vote can hardly be said to have

25   freely and knowingly exercised their right to vote.  So, too, the voter who changes their mind

26   about which candidate to vote for because of a deepfake video purporting to show former

27   President Trump or Vice President Harris accepting a bribe or committing a heinous crime.  And

28   the knowledge that such fraudulent content is manipulating voters can "undermine trust in the

                                                    15

1   ballot counting process," Cal. Elec. Code § 20012(a)(3)—especially if the fraudulent content is a

2   government official allegedly telling voters to doubt electoral outcomes.  The current existence of

3   deepfakes with such potential to tangibly harm electoral integrity, *see supra* at 1-4, 13, illustrates

4   that AB 2839 indeed serves the State's compelling interest in safeguarding the electoral process.

5               **b.    AB 2839 is narrowly tailored to further these compelling**
                         **interests**
6

7   AB 2839 is narrowly tailored to further these compelling interests as well.  "'A statute is

8   narrowly tailored if it targets and eliminates no more than the exact source of the evil it seeks to

9   remedy.'"  *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1227 (9th Cir. 2019) (citation

    omitted).  AB 2839 meets this standard.
10

11  AB 2839 imposes a narrow restriction on speech by targeting specific falsehoods that are

12  likely to inflict specific tangible harms to electoral integrity.  This limitation on its scope flows

13  from the statutory text.  To fall within the ambit of AB 2839, the speech must first qualify as an

14  "advertisement or other election communication."  Cal. Elec. Code § 20012(b)(1).  This means

    the speech must either be for the "purpose of supporting or opposing a candidate for elective
15
    office in California or a ballot measure that appears on a ballot issued in California" (to be an
16
    "advertisement") or must concern a candidate, ballot measure, "[v]oting or refraining from
17
    voting," or "[t]he canvass of the vote" (to be an "election communication").  *Id.* § 20012(f)(1),
18
    (5).  Thus, AB 2839 does not reach all political speech concerning elections, including statements
19
    made by candidates themselves that are not on the enumerated topics.
20

21  Nor does AB 2839 reach all advertisements or election communications.  Rather, to fall

22  within AB 2839's scope, the advertisement or election communication must contain "materially

23  deceptive content."  Cal. Elec. Code § 20012(b)(1).  That is, it must contain audio or visual media

    that has been (1) *intentionally* digitally created or modified such that (2) "the content would
24
    falsely appear to a reasonable person to be an authentic record of the content depicted in the
25
    media."  *Id.* § 20012(b)(1), (f)(8).  In other words, a reasonable person would believe it accurately
26
    depicts something that actually occurred—that it is an "authentic record" of the events its content
27
    depicts.  Thus, AB 2839 has no impact on content that is not digitally created or modified—such
28

                                                    16

as letters to the editors or other posts written by a person, videos of interviews or events that have

minor or no modifications, or photographs with minor or no modifications.  And it would not

include content that a reasonable person would *not* believe depicts something that actually

occurred—such as a video swapping former President Trump's or Vice President Harris's face

onto the body of Superman in movie clip, a digitally created painting of former President Trump

or Vice President Harris crossing the Delaware River in George Washington's place, or an edited

video of former President Trump or Vice President Harris taking the first step on the moon in

Neil Armstrong's place.  A reasonable person would not believe that either candidate is actually

Superman, actually crossed the Delaware River during the Revolutionary War, or actually took

the first step on the moon—meaning no reasonable viewer would believe that such modified

content is an "authentic record" of what it depicts as having occurred.

And AB 2839 is yet further circumscribed in the speech that it restricts.  For not only must

the speech be (1) an advertisement or election communication, (2) that contains materially

deceptive content, but it also must be one that (3) contains content depicting a specific falsehood

causing a specific kind of harm: (a) a candidate saying or doing something that the candidate did

not say or do and that is reasonably likely to harm the candidate's reputation or electoral

prospects, (b) an elections official or elected official saying or doing something in connection

with an election that the official did not say or do and that is reasonably likely to falsely

undermine confidence in the outcome of an election, or (c) voting equipment portrayed in a

materially false way that is reasonably likely to falsely undermine confidence in the outcome of

an election. Cal. Elec. Code § 20012(b)(1).  Any truthful content—such as content that only

depicts a candidate doing or saying something they in fact did or said—is outside of AB 2839's

scope.  And even many lies are likewise outside the scope of AB 2839.

Finally, AB 2839 is even further circumscribed by its mens rea requirement.  To fall within

AB 2839's prohibitions, a person must knowingly distribute the relevant materially deceptive

content *and* they must do so with malice—that is, with knowledge of falsity or reckless disregard

for the truth. Cal. Elec. Code § 20012(f)(7).  The malice requirement under AB 2839 tracks the

requirement that the Supreme Court has found the First Amendment imposes on regulations of

1   defamatory content involving public figures.  *See N.Y. Times v. Sullivan*, 376 U.S. 254, 279-280

2   (1964).  Thus, a person who shares materially deceptive content accidentally, negligently, or

3   unintentionally faces no liability under AB 2839.  The statute only covers those who are aware of

4   the falsehoods they spread.  In sum, AB 2839 only applies when a person has (1) knowingly; (2)

5   with malice; (3) distributed content regarding a candidate, ballot measure, voting or refraining

6   from voting, or the canvass of the vote; (4) that has been intentionally digitally created or

7   manipulated; (5) that would falsely appear to a reasonable person to be an authentic record of the

8   events it claims to depict; (6) that includes a candidate, elections official, or elected official doing

9   or saying something they did not do or say or depicts election equipment in a materially false

10  manner; and (7) that would be reasonably likely to cause specified harms to electoral integrity.

11      In this way, AB 2839 is a far cry from the statutes struck down in the cases that plaintiff

12  cites.  The decisions in *Weaver*, *Susan B. Anthony List*, and *281 Care Committee* all involved

13  general prohibitions on false or misleading statements made by candidates or about the election.

14  For instance, in *Weaver*, the statute prohibited "false statements negligently made and *true*

15  *statements* that are misleading or deceptive or contain a material misrepresentation or omit a

16  material fact or create an unjustified expectation about results."  309 F.3d at 1320 (emphasis

17  added).  AB 2839 does not reach negligent false statements, let alone any *true* statements—it

18  requires that the materially deceptive content be false and distributed with malice.  Similarly, in

19  *Susan B. Anthony List*, the statute reached "*all* false statements, including non-material

20  statements."  814 F.3d at 475.  AB 2839, in contrast, only reaches false statements on specific

21  topics that are reasonably likely to cause specific kinds of harms.  Indeed, the Sixth Circuit

22  distinguished the ruling in *Susan B. Anthony List* when upholding a different prohibition on false

23  statements by judicial candidates precisely because the statute challenged in *Susan B. Anthony

24  List* "swept more broadly" than the upheld statute.  *Winter v. Wolnitzek*, 834 F.3d 681, 693 (6th

25  Cir. 2016); *see also Minn. Voters Alliance v. Ellison*, -- F. Supp. 3d --, 2024 WL 4222829, at *5

26  (D. Minn. Sept. 17, 2024).  Unlike statutes that have been struck down, AB 2839 precisely targets

27  a narrow swath of speech that is likely to cause the harms the statute seeks to avoid: a specific set

28  of intentional falsehoods that are particularly likely to undermine electoral integrity.

1    Furthermore, unlike other types of false statements, for which "counterspeech" might be an

2    effective remedy, *see Alvarez*, 567 U.S. at 726-727, the very nature of deepfakes makes them

3    difficult to undo through more speech; indeed, some researcher has suggested that counterspeech

4    seeking to fact check deepfakes can be ineffective or even counterproductive.[20]

5         AB 2839 also circumscribes its impact temporally.  The statute only prohibits distribution

6    of materially deceptive content regarding candidates during the 120-day period before an election.

7    Cal. Elec. Code § 20012(c)(1).  This period of time is extended to include the 60 days after an

8    election only for materially deceptive content that depicts elections officials, elected officials, or

9    election equipment.  *Id.* § 20012(c)(2).  Thus, contrary to plaintiff's contentions, he is free to post

10   whatever content regarding a *candidate* he wishes after the election.  Such a temporal limitation

11   further supports AB 2839's narrow tailoring.

12        Finally, contrary to plaintiff's contention (at 14, 20), AB 2839 is not improperly tailored

13   because of the law's safe harbors or because it limits its scope to media depicting candidates

14   themselves rather than others speaking about candidates.  As the Supreme Court has recognized,

15   "[a] State need not address all aspects of a problem in one fell swoop; policymakers may focus on

16   their most pressing concerns." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015).  Courts

17   have "accordingly upheld laws—even under strict scrutiny—that conceivably could have

18   restricted even greater amounts of speech in service of their stated interests." *Id.*  The Legislature

19   could have reasonably chosen to focus on AB 2839's specific subject matter—candidates,

20   elections officials or elected officials addressing elections, and elections equipment—because it

21   felt such content posed the greatest risk of harm or because it wished to minimize the impact of

22   the law on political speech.

23        Moreover, the exemptions for candidates and news media are consistent with existing case

24   law and do not undermine the Legislature's compelling interests.  Campaign finance law, for

25   instance, already allows candidates greater political speech in the form of unlimited contributions

26   to their own campaigns while voters have contribution limits.  *See Buckley v. Valeo*, 424 U.S. 1,

27   54 (1976) (striking down limits on a candidate's own contributions but upholding limits on

28   ───────────────────
     [20] *See supra at* n.19.

others' contributions).  And First Amendment case law also recognizes the importance of the freedom of the press.  *See, e.g.*, *First Nat'l Bank*, 435 U.S. at 781 (acknowledging the press's "special and constitutionally recognized role" under the First Amendment).  Indeed, allowing news media to report on materially deceptive content—by distributing that content with a disclosure noting the content has been modified—may help mitigate the damage from prohibited falsehoods by alerting voters to the fact that the content has been manipulated.

In all, AB 2839 seeks to address a very specific set of intentional falsehoods reasonably likely to cause specific kinds of harms to electoral integrity.  It further hews to existing First Amendment limitations by requiring distribution with malice.  Thus, it is narrowly tailored to further the State's compelling interests in ensuring the integrity of its elections.

### 3.   AB 2839's safe harbor for parody or satire that is materially deceptive content does not violate the First Amendment

Plaintiff further contends that AB 2839's safe harbor for satire and parody violates the First Amendment.  Mem. at 18.  He contends that because this safe harbor compels speech outside the commercial context, it is "not subject to the lessened standard for a commercial speech labeling requirement."  *Id.*  However, the Ninth Circuit has held that "'regulations directed only at the disclosure of political speech' . . . are subject to exacting scrutiny, which is a 'somewhat less rigorous judicial review' than strict scrutiny."  *Smith v. Helzer*, 95 F.4th 1207, 1214 (9th Cir. 2024) (citation omitted), *petition for cert. filed* (No. 23-1316).  This standard requires "that the government show that it has (1) a sufficiently important interest (2) to which the challenged regulations are substantially related and narrowly tailored."  *Id.*  "Unlike strict scrutiny, however, 'exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends.'"  *Id.* at 1215 (citation omitted).  Rather, it requires "'a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.'"  *Id.* (citation omitted).  AB 2839's safe harbor for satire or parody meets this standard.

First, as discussed more above, AB 2839's prohibitions serve interests that are important—indeed, compelling.  *See supra* at 12-16.  Its safe harbor for parody and satire serves the same

interest: ensuring that voters are aware that content has been manipulated, thereby avoiding the risk of voters believing the content depicts actual events that occurred.  This helps maintain electoral integrity and prevent fraud from influencing electoral outcomes.  *See supra* at 12-16.

Second, the safe harbor is substantially related and narrowly tailored to this interest. Indeed, plaintiff's own July video demonstrates this.  While plaintiff makes much of the fact that the video was titled as a "parody," Elon Musk's post sharing the video *nowhere* mentioned that it was parody or had been digitally altered.[21]  A voter who encountered the video from Elon Musk's post would have had no express notice that the video was supposed to be a parody—and could have concluded, as at least one expert warned viewers might, that it was real.[22]  In contrast, had there been a disclosure on the video itself, a post sharing the video would have included that disclosure, thereby ensuring that voters who encountered the video in shared posts were similarly informed of its parody nature and that the content had been manipulated.  Ultimately, requiring that a parody or satire that falls within the scope of AB 2839 include a noncontroversial and factual statement—that its content has been manipulated—is properly tailored to further the State's compelling interests in electoral integrity and in free and fair elections.

## B.   AB 2839 Is Not Unconstitutionally Vague

A statute is unconstitutionally vague in violation of the Due Process Clause only if it "'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *FCC v. Fox Tel. Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted).  Mere "uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes 'in the majority of its intended applications.'"  *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001) (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)).  When a statute uses a term that it does not define, words are given their ordinary meaning.  *See, e.g.*, *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012).

---

[21] Ali Swenson, *A Parody Ad Shared by Elon Musk Clones Kamala Harris' Voice*, AP (July 29, 2024), https://apnews.com/article/parody-ad-ai-harris-musk-x-misleading-3a5df582f911a808d34f68b766aa3b8e# (last accessed Sept. 23, 2024).
[22] *Id.*

21

1    AB 2839 gives fair notice of what it proscribes.  It restricts the knowing and malicious

2    distribution of certain election advertisements or communications that contain materially

3    deceptive content with specific falsehoods likely to cause specific tangible harms.  Far from

4    sweeping in "as much political speech as possible," Mem. at 16, AB 2389 narrowly limits the

5    subject matter of communications and advertisements falling withing its bounds.  *See supra* at 16-

6    18 (discussing limitations on scope of AB 2839).  AB 2839's requirement that manipulated

7    content can only violate the statute if distributed "knowingly" and "with malice," Cal. Elec. Code

8    § 20012(b)(1), further mitigates any risk of vagueness—"especially with respect to the adequacy

9    of notice to the complainant that his conduct is proscribed." *Village of Hoffman Estates v.*

10   *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

11       Plaintiff quibbles with the statute's definition of "materially deceptive content" as

12   impermissibly vague.  Mem. at 16.  But the main prong of this definition—content that "would

13   falsely appear to a reasonable person to be an authentic record of the content depicted in the

14   media," Cal. Elec. Code § 20012(f)(8)(A)—has a clear meaning that is not open to wholly

15   subjective interpretation in the manner of other language found to be unconstitutionally vague.

16   As explained above, it requires only that a reasonable person would believe the content is an

17   accurate depiction of the events it depicts. *See supra* at 16-17.  And the Ninth Circuit has held

18   more than once that statutes restricting "false" statements or "false" advertisements are not

19   impermissibly vague.  *See, e.g.*, *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1274-1275 (9th Cir.

20   2017) (rejecting vagueness challenge to ordinance prohibiting false or misleading advertising by

21   limited services pregnancy centers).

22       The meaning of the attendant carve-out from the definition of "materially deceptive

23   content" for "minor modifications that do not significantly change the perceived contents or

24   meaning of the content," Cal. Elec. Code § 20012(f)(8)(B); *see* Mem. at 16, is similarly apparent.

25   It clarifies that small changes to an image or audio or video file that do not alter its substantive

26   meaning—such as to brightness, contrast, or the volume of background noise—do not qualify as

27   materially deceptive.  Cal. Elec. Code § 20012(f)(8)(B).  These specific examples, each cited in

28   the statute, help to elucidate the boundaries of the definition of "materially deceptive content" so

22

1    that persons of common intelligence do not have to guess at its meaning.

2           Plaintiff also contends that AB 2839's restrictions on digitally created content that is

3    "reasonably likely to harm the reputation or electoral prospects of a candidate" is impermissibly

4    vague. Mem. at 16 (quoting Cal. Elec. Code § 20012(b)(1)(A)). This standard incorporates the

5    legal definition of defamation—which is well-established, *see, e.g.*, *Defamation*, Black's Law

6    Dictionary (12th ed. 2024) (defining "defamation" as a "false written or oral statement that

7    damages another's reputation). Contrary to plaintiff's argument (at 16-17), it is unnecessary to

8    speculate as to the political persuasion of the proverbial reasonable person to determine whether

9    harm to reputation or electoral prospects is reasonably likely to ensue.

10          Finally, plaintiff claims that, in authorizing elections officials and private actors to bring a

11   civil suit seeking damages or injunctive relief prohibiting the distribution of materially deceptive

12   content, AB 2839 extends such unfettered discretion to potential plaintiffs so as to create a risk of

13   discriminatory enforcement. Mem. at 17. But a plaintiff would need to meet the requirements of

14   standing to bring an action in state or federal court, in contrast to a statute that permits any person

15   to file an administrative complaint. Additionally, the plaintiff bears the burden of establishing

16   any violation under the heightened "clear and convincing" evidentiary showing. Cal. Elec. Code

17   § 20012(d)(3). And a prevailing plaintiff would be limited to civil remedies. *Id.*, § 20012(d)(1),

18   (2). This, too, mitigates against potential vagueness because "the consequences of imprecision

19   are qualitatively less severe" than when a statute imposes criminal penalties. *Village of Hoffman*

20   *Estates*, 455 U.S. at 499. For these reasons, AB 2839 is not unduly vague.

21   **II.    THE OTHER FACTORS DO NOT WEIGH IN FAVOR OF INJUNCTIVE RELIEF**

22          In addition to failing to establish a likelihood of success, plaintiff has likewise failed to

23   establish the other requirements for injunctive relief. First, plaintiff has not demonstrated any

24   irreparable harm. If plaintiff had demonstrated that AB 2839 likely violated his constitutional

25   rights, that would constitute irreparable harm. *E.g.*, *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th

26   Cir. 2012). However, as explained above, AB 2839 is constitutional. *See supra* at 9-23.

27          Second, the balance of equities and public interest do not favor injunctive relief. Where, as

28   here, the government is the opposing party, the last two factors of the preliminary injunction

analysis—the balance of equities and public interest—merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  To analyze these factors, a court "balance[s] the competing claims of injury" and "consider[s] the effect of granting or withholding the requested relief," paying "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted).  As with irreparable harm, had plaintiff shown a likely constitutional violation, this factor would have been met. *E.g.*, *Edge*, 929 F.3d at 663.  But since he has not, the remaining factors weigh against injunctive relief.

Even as a general matter, a State "suffers a form of irreparable injury" when it is "enjoined . . . from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2013) (internal quotation marks omitted).  But here, there is also a specific and serious type of harm: a threat to electoral integrity.  As discussed above, AB 2839 serves to protect electoral integrity and free and fair elections by restricting specific kinds of knowing falsehoods that are likely to impact voters' choices or undermine confidence in electoral outcomes.  Allowing deepfakes to spread without check could threaten voters' autonomy in their electoral choices, inject fraud into the electoral process, discourage voting altogether, and undermine the public's faith in the electoral process.  In contrast, any actual burden on plaintiff under AB 2839 is minimal.  Plaintiff primarily seeks to distribute parody and satire videos.  Compl. ¶¶ 4, 92-93, 96-97.  To the extent such content meets the definition of "materially deceptive content," plaintiff may still post it as parody or satire if it includes a disclosure that the content has been modified.  Requiring plaintiff to include a noncontroversial, factual statement—that he has manipulated the content of his videos—is a minimal burden on speech, especially compared to the importance of preventing voters from being intentionally misled and safeguarding electoral integrity.

### III.  WHILE NO ORDER IS WARRANTED, THIS COURT SHOULD NARROWLY TAILOR ANY RELIEF GRANTED

Even if injunctive relief were warranted here (which it is not), any relief would have to be narrowly tailored solely to enjoin the portions of AB 2839 that are likely unconstitutional and that impact plaintiff's desired activity.  As the Ninth Circuit has recognized, any injunctive relief

24

1  "must be tailored to remedy the specific harm alleged." *Stormans, Inc. v. Selecky*, 586 F.3d 1109,

2  1140 (9th Cir. 2009) (citation omitted).  Such narrow tailoring is particularly appropriate given

3  that AB 2839 contains a severability clause.  Cal. Elec. Code § 20012(h).  In performing

4  severability analysis, the Court applies California law.  *Vivid Ent., LCC v. Fielding*, 774 F.3d 566,

5  574 (9th Cir. 2014).  Under California law, courts look to three criteria to determine whether a

6  provision is severable.  *Id*.  A severable provision "'must be grammatically, functionally, and

7  volitionally separable.'"  *Id.* (citation omitted).  A provision is grammatically separable if "the

8  invalid parts can be removed as a whole without affecting the wording or coherence of what

9  remains."  *Id.* at 576 (citation omitted).  It is functionally separable if "'the remainder of the

10  statute is complete in itself.'"  *Id.* (citation omitted).  And it is volitionally separable if "the

11  remainder 'would have been adopted by the legislative body had the [body] foreseen the partial

12  invalidation of the statute.'"  *Id.* (citation omitted).  The existence of a severability clause creates

13  a presumption of severability.  *Id.* at 574.

14      Plaintiff primarily seeks to distribute parody content about candidates.  Compl. ¶¶ 4, 92-93,

15  96-97.  It is thus unclear whether he is even impacted by the other prohibitions in SB 2839—

16  those as to content depicting elected officials, elections officials, or election equipment.

17  Moreover, to the extent that plaintiff only desires to distribute parody, AB 2839 solely requires

18  that he include a disclosure that his content has been manipulated—if such content even falls

19  within AB 2839's scope as "materially deceptive content."  Thus, to the extent that the Court

20  believes the parts of AB 2839 that impact plaintiff are likely unconstitutional, it should tailor

21  injunctive relief to solely enjoin those sections.  The provisions of AB 2839 concerning content

22  depicting candidates could be addressed in a preliminary injunction without impacting the other

23  types of prohibited content.  The same is true of the safe harbor for parody and satire.  And the

24  existence of the severability clause, *see* Cal. Elec. Code § 20012(h), shows the Legislature

25  intended to sever and preserve intact any portions of the statute that it could.  *See Vivid Ent.*, 774

26  F.3d at 574.  Thus, given the nature of what plaintiff seeks to do, any warranted relief (though

27  none is) should be tailored solely to the provisions of AB 2839 that impact plaintiff's desired

28  activity rather than enjoining the statute as a whole.

1

**CONCLUSION**

2      For the foregoing reasons, plaintiff's motion for a preliminary injunction should be denied.

3

4   Dated:  September 23, 2024                    Respectfully submitted,

5                                                 ROB BONTA
                                                  Attorney General of California
6                                                 ANYA M. BINSACCA
                                                  Supervising Deputy Attorney General
7                                                 ANNA FERRARI
                                                  Deputy Attorney General
8

9

10                                                */s/ Kristin Liska*

11
                                                  KRISTIN A. LISKA
12                                                Deputy Attorney General
                                                  *Attorneys for Defendants*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26

# CERTIFICATE OF SERVICE

Case Name:  ***Kohls, Christopher v. Rob Bonta, et al.***
Case No.:   **2:24-cv-02527-JAM-CKD**

I hereby certify that on <u>September 23, 2024</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1. **OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

2. **DECLARATION OF KRISTIN A. LISKA IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION (with Exhibits 1-7)**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished electronically by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

This declaration was executed on <u>September 23, 2024</u>, at San Francisco, California.

_____          _____
          Vanessa Jordan                                    *Vanessa Jordan*
            Declarant                                          Signature