John Langford (Cal. Bar No. 353647)
    Email: john.langford@protectdemocracy.org
Nicole Schneidman (Cal. Bar. No. 319511)*
    Email: nicole.schneidman@protectdemocracy.org
PROTECT DEMOCRACY PROJECT
82 Nassau St., #601
New York, NY 10038
Telephone: (202) 579-4582
Facsimile: (202) 942-5999
*Pro hac vice application forthcoming

*Attorney for Amicus Curiae | Additional Attorney for Amicus Listed Below*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| CHRISTOPHER KOHLS,<br><br>*Plaintiff,*<br><br>v.<br><br>ROB BONTA, *et al.*,<br><br>*Defendants.* | No. 24-cv-02527-JAM-CKD<br><br>**[PROPOSED]** *AMICUS CURIAE* **PROTECT DEMOCRACY PROJECT'S BRIEF IN SUPPORT OF NEITHER PARTY ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date:       September 30, 2024<br>Dept:       6<br>Judge:      Hon. John A. Mendez<br>Trial Date: Not Scheduled<br>Filed:      9/17/2024 |

Kenneth Parreno*
    Email: kenneth.parreno@protectdemocracy.org
THE PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
Telephone: (202) 579-4582
Facsimile: (202) 942-5999
*Pro hac vice application forthcoming

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................ II

INTRODUCTION .................................................................................. 1

ARGUMENT ...................................................................................... 4

    I.     MR.  KOHLS  CHOSE  TO  BRING  A  FACIAL CHALLENGE, WHICH MEANS THE COURT MUST LOOK BEYOND HIM .......................................................... 5

    II.   MANY COMPELLING GOVERNMENTAL INTERESTS CAN    JUSTIFY   REASONABLE   DISCLOSURE REQUIREMENTS   FOR   DECEPTIVE   POLITICAL DEEPFAKES .......................................................................... 6

        A.    Numerous Compelling Governmental Interests in the Electoral  Context  Can  Justify  Content-Based Regulations of Political Speech, Including Disclosure Requirements .............................................................. 6

        B.    Additional  Compelling  Governmental  Interests Outside  the  Electoral  Context  Can  Also  Justify Disclosure Laws for Political Deepfakes ..................... 9

    III.  MANY     POLITICAL    DEEPFAKES    ARE UNPROTECTED SPEECH ................................................... 12

CONCLUSION ................................................................................. 14

1
2

# **TABLE OF AUTHORITIES**

## **Cases**

*Americans for Prosperity Found. v. Bonta*,
     594 U.S. 595 (2021)...........................................................................8

*Balla v. Hall*,
     59 Cal. App. 5th 652 (2021) ...........................................................13

*Barker v. Fox & Assocs.*,
     240 Cal. App. 4th 333 (2015) .........................................................13

*Buckley v. Valeo*,
     424 U.S. 1 (1976)..........................................................................8, 9

*Burson v. Freeman*,
     504 U.S. 191 (1992)......................................................................6, 7

*Citizens United v. Fed. Election Comm'n*,
     558 U.S. 310 (2010)......................................................................8, 9

*Counterman v. Colorado*,
     600 U.S. 66 (2023).........................................................................14

*Eu v. San Francisco Cnty. Democratic Cent. Comm.*,
     489 U.S. 214 (1989)......................................................................6, 7

*Ex parte Bradshaw*,
     501 S.W.3d 665 (Tex. App. 2016)..................................................11

*FEC v. Ted Cruz for Senate*,
     596 U.S. 289 (2022).........................................................................8

*Gertz v. Robert Welch, Inc.*,
     418 U.S. 323 (1974).......................................................................11

*Golb v. Att'y Gen. of the State of New York*,
     870 F.3d 89 (2d Cir. 2017).............................................................11

*Hustler Magazine, Inc. v. Falwell*,
     485 U.S. 46 (1988).........................................................................13

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*,
    538 U.S. 600 (2003) ......................................................................................12

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010) ........................................................................................8

*League of Women Voters of New Hampshire v. Kramer*,
    No. 24-cv-73 (D.N.H. Mar. 14, 2024) ............................................................2

*McConnell v. Fed. Election Comm'n*,
    540 U.S. 93 (2003) ..........................................................................................8

*Meese v. Keene*,
    481 U.S. 465 (1987) ........................................................................................8

*Minnesota Voters Alliance v. Mansky*,
    585 U.S. 1 (2018) ............................................................................................7

*Moody v. NetChoice, LLC*,
    144 S. Ct. 2383 (2024) ...........................................................................5, 6, 14

*Munro v. Socialist Workers Party*,
    479 U.S. 189 (1986) ........................................................................................7

*Nat'l Coal. on Black Civic Participation v. Wohl*,
    661 F. Supp. 3d 78 (S.D.N.Y. 2023) ............................................................12

*NetChoice, LLC v. Bonta*,
    113 F.4th 1101 (9th Cir. 2024) ......................................................................5

*New State Ice Co. v. Liebmann*,
    285 U.S. 262 (1932) (Brandeis, J., dissenting) ..............................................1

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ......................................................................................13

*Oregon v. Ice*,
    555 U.S. 160 (2009) ........................................................................................1

*Reed v. Town of Gilbert, Ariz.*,
    567 U.S. 155 (2015) ......................................................................................10

iii

*Rosenblatt v. Baer*,
   383 U.S. 75 (1966) (Stewart, J., concurring) .................................................11

*United States v. Alvarez*,
   567 U.S. 709 (2012).......................................................................................14

*United States v. Harriss*,
   347 U.S. 612 (1954)........................................................................................8

*United States v. Lepowitch*,
   318 U.S. 702 (1943)......................................................................................10

*Virginia v. Black*,
   538 U.S. 343 (2003)......................................................................................12

*Wolfson v. Concannon*,
   811 F.3d 1176 (9th Cir. 2016)........................................................................6

**<u>Statutes</u>**

18 U.S.C. § 709 ..............................................................................................10

18 U.S.C. § 712 ..............................................................................................10

18 U.S.C. § 912 ..............................................................................................10

Cal. Civ. Code § 45a ......................................................................................13

Cal. Civ. Code § 46 ........................................................................................13

Cal. Elec. Code § 20012 ......................................................................... *passim*

Cal. Penal Code § 529 ....................................................................................11

N.Y. Penal Law § 190.25 ...............................................................................11

Tex. Penal Code Ann. § 33.07 .......................................................................11

**<u>Other Authorities</u>**

Daniel Zuidijk, *Deepfakes in Slovakia Preview How AI Will Change the Face
   of Elections*, Bloomberg (Oct. 4, 2023),
   https://www.bloomberg.com/news/newsletters/2023-10-04/deepfakes-
   in-slovakia-preview-how-ai-will-change-the-face-of-elections.....................3

Danielle K. Citron & Robert Chesney, *Deep Fakes: A Looming Challenge for
   Privacy, Democracy, and National Security*, 107 Cal. L. Rev. 1753
   (2019).............................................................................................................1

*Increasing Threats of Deepfake Identities*, Dep't of Homeland Sec. (2019), https://www.dhs.gov/sites/default/files/publications/increasing_threats_of_deepfake_identities_addendum_0.pdf .......................................................1

Donald J. Trump (@realDonaldTrump), Truth (Jan. 9, 2024, 11:19 AM), https://truthsocial.com/@realDonaldTrump/posts/111727606183781019 .....2

*Private Industry Notification: Malicious Actors Almost Certainly Will Leverage Synthetic Content for Cyber and Foreign Influence Operation*, FBI (Mar. 10, 2021), https://s3.documentcloud.org/documents/20514502/fbipin-3102021.pdf ......1

Ivana Saric, *Half of U.S. States Seek to Crack Down on AI in Elections*, Axios (Sept. 16, 2024), https://www.axios.com/2024/09/22/ai-regulation-election-laws-map ...........................................................................3

Josh Margolin & Sasha Pezenik, *DHS Warns of Threats to Election Posed by Artificial Intelligence*, ABC News (May 20, 2024), https://abcnews.go.com/Politics/dhs-warns-threats-election-posed-ai/story?id=110567438..........................................................................1

Katie Polglase, *'My Identity is Stolen': Photos of European Influencers Used to Push Pro-Trump Propaganda on Fake X Accounts*, CNN (Aug. 28, 2024 11:19 AM), https://www.cnn.com/2024/08/28/europe/fake-maga-accounts-x-european-influencers-intl-cmd/index.html ...................................3

*Deepfakes, Explained*, MIT Sloan (July 21, 2020), https://mitsloan.mit.edu/ideas-made-to-matter/deepfakes-explained .............1

Morgan Meaker, *Slovakia's Election Deepfakes Show AI Is a Danger to Democracy*, Wired (Oct. 3, 2023), https://www.wired.com/story/slovakias-election-deepfakes-show-ai-is-a-danger-to-democracy/ .................................................................3

*Contextualizing Deepfake Threats to Organizations*, Nat'l Sec. Agency et al. (Sept. 2023), https://media.defense.gov/2023/Sep/12/2003298925/-1/-1/0/CSI-DEEPFAKE-THREATS.PDF ............................................................1

*Public Citizen Calls on Presidential Candidates, Parties to Pledge Not to Use Dangerous, Manipulative Deepfakes*, Public Citizen (May 16, 2023), https://www.citizen.org/news/public-citizen-calls-on-presidential-candidates-parties-to-pledge-not-to-use-dangerous-manipulative-deepfakes/.....................................................................................2

*Tracker: State Legislation on Deepfakes in Elections*, Public Citizen (last updated Sept. 18, 2024), https://www.citizen.org/article/tracker-legislation-on-deepfakes-in-elections/ .........................................................3

Rebecca Green, *Counterfeit Campaign Speech*, 70 Hastings L.J. 1445 (2019)......10

Richard L. Hasen, *Deep Fakes, Bots, and Siloed Justices: American Election Law in a "Post-Truth" World*, 64 St. Louis Univ. L. Rev. 535 (2020)..........1

v

Sara Dorns, *Trump Calls For AI Controls After Mark Ruffalo Posts Fake Photos Of Him With Young Girls On 'Epstein' Planes*, Forbes (Jan. 9, 2024), https://www.forbes.com/sites/saradorn/2024/01/09/trump-calls-for-ai-controls-after-mark-ruffalo-posts-fake-photos-of-him-with-young-girls-on-epstein-plane/ ........................................................................ 2

Timothy M. Persons, *Science & Tech Spotlight: Deepfakes*, GAO-20-379SP, Gov't Accountability Office (Feb. 2020), https://www.gao.gov/assets/gao-20-379sp.pdf ................................................ 1

**<u>Bills</u>**

S. 2770, 118th Cong. (2024) ........................................................................ 3

vi

**INTRODUCTION**

The Supreme Court has long recognized the role of the states "as laboratories for devising solutions to difficult" and "novel" legal problems. *Oregon v. Ice*, 555 U.S. 160, 171 (2009); *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). Today, few problems are as novel or difficult as what to do about deceptive political "deepfakes."[1]

Since the advent of deepfakes in 2017,[2] law enforcement agencies,[3] scholars,[4]

---

[1] Deepfakes are typically defined as media content that has been intentionally manipulated by artificial intelligence in ways that deceive the recipient. *E.g.*, Timothy M. Persons, *Science & Tech Spotlight: Deepfakes*, GAO-20-379SP, Gov't Accountability Office (Feb. 2020), https://www.gao.gov/assets/gao-20-379sp.pdf; *Deepfakes, Explained*, MIT Sloan (July 21, 2020), https://mitsloan.mit.edu/ideas-made-to-matter/deepfakes-explained. California's AB 2839 defines both "deepfakes" and "materially deceptive content." Cal. Elec. Code § 20012(f)(4), (8). *Amicus* Protect Democracy Project is concerned about content that is intentionally digitally created or modified such that the content would falsely appear to a reasonable person to be an authentic record of the content depicted in the media, and refer to that content throughout as "deepfakes."

[2] *Increasing Threats of Deepfake Identities*, Dep't of Homeland Sec. (2019), https://www.dhs.gov/sites/default/files/publications/increasing_threats_of_deepfake_identities_addendum_0.pdf.

[3] *E.g.*, *id.*; *Private Industry Notification: Malicious Actors Almost Certainly Will Leverage Synthetic Content for Cyber and Foreign Influence Operation*, FBI (Mar. 10, 2021), https://s3.documentcloud.org/documents/20514502/fbipin-3102021.pdf; *Contextualizing Deepfake Threats to Organizations*, Nat'l Sec. Agency et al. (Sept. 2023), https://media.defense.gov/2023/Sep/12/2003298925/-1/-1/0/CSI-DEEPFAKE-THREATS.PDF; Josh Margolin & Sasha Pezenik, *DHS Warns of Threats to Election Posed by Artificial Intelligence*, ABC News (May 20, 2024), https://abcnews.go.com/Politics/dhs-warns-threats-election-posed-ai/story?id=110367438.

[4] *E.g.*, Danielle K. Citron & Robert Chesney, *Deep Fakes: A Looming Challenge for Privacy, Democracy, and National Security*, 107 Cal. L. Rev. 1753 (2019); Richard L. Hasen, *Deep Fakes, Bots, and Siloed Justices: American Election Law in a "Post-Truth" World*, 64 St. Louis Univ. L. Rev. 535 (2020).

and advocates[5] have sounded alarm bells about the looming threat of malicious deepfakes for our elections and our democracy more broadly. But it is only in the last year or so that the widespread accessibility of advanced generative artificial intelligence has realized the threat.

This year, deepfakes have impacted candidates across the political spectrum, resulting in bipartisan calls for regulation. On January 9, former President Trump called for "Strong Laws . . . against AI" after fake images manipulated by artificial intelligence circulated widely, appearing to show former President Trump mingling with Jeffrey Epstein and young women on Epstein's plane.[6] On January 21, thousands of likely Democratic voters in New Hampshire received a robocall featuring a voice generated by artificial intelligence impersonating President Joe Biden, telling the voters not to bother voting in the primary.[7] In August, CNN and the Centre for Information Resilience identified fifty-six fake accounts on X using manipulated images of real European influencers (all women) suggesting they supported former President Trump and his campaign in what appeared to be a coordinated effort.[8]

---

[5] *E.g.*, *Public Citizen Calls on Presidential Candidates, Parties to Pledge Not to Use Dangerous, Manipulative Deepfakes*, Public Citizen (May 16, 2023), https://www.citizen.org/news/public-citizen-calls-on-presidential-candidates-parties-to-pledge-not-to-use-dangerous-manipulative-deepfakes/.

[6] Donald J. Trump (@realDonaldTrump), Truth (Jan. 9, 2024, 11:19 AM), https://truthsocial.com/@realDonaldTrump/posts/111727606183781019; Sara Dorns, *Trump Calls For AI Controls After Mark Ruffalo Posts Fake Photos Of Him With Young Girls On 'Epstein' Planes*, Forbes (Jan. 9, 2024), https://www.forbes.com/sites/saradorn/2024/01/09/trump-calls-for-ai-controls-after-mark-ruffalo-posts-fake-photos-of-him-with-young-girls-on-epstein-plane/.

[7] *See* Compl., *League of Women Voters of New Hampshire v. Kramer*, No. 24-cv-73 (D.N.H. Mar. 14, 2024), ECF No. 1, *available at* https://freespeechforpeople.org/wp-content/uploads/2024/03/ecf-1-complaint-03-14-24-1.pdf.

[8] Katie Polglase, *'My Identity is Stolen': Photos of European Influencers Used to Push Pro-Trump Propaganda on Fake X Accounts*, CNN (Aug. 28, 2024 11:19
(continued...)

Overseas, a late-breaking deepfake caused disruption in a European national election late last year, possibly impacting its outcome.[9]

Responding to the tangible threat of election-related deepfakes, nineteen states, including California, have enacted legislation aimed at protecting the integrity of elections through a mix of disclosure requirements and prohibitions.[10] Other states are actively considering similar legislation.[11] Congress, too, is vetting a suite of legislation aimed at stopping deepfakes from upending elections, including the Protect Elections from Deceptive AI Act, introduced by Senators Klobuchar (D-Minn.), Hawley (R-Mo.), Coons (D-Del.), and Collins (R-Me.).[12]

In short, there is widespread recognition up and down our federal system and across the political spectrum about the urgent need to ensure that deceptive political deepfakes do not disrupt elections. Many of the great laboratories of our democracy are presently hard at work searching for practical solutions that can safeguard our elections by protecting the ability of the citizenry to make informed choices among candidates for office and preventing malicious actors from undermining confidence in the integrity of our elections without running afoul of the First Amendment.

---

AM), https://www.cnn.com/2024/08/28/europe/fake-maga-accounts-x-european-influencers-intl-cmd/index.html.

[9] Daniel Zuidijk, *Deepfakes in Slovakia Preview How AI Will Change the Face of Elections*, Bloomberg (Oct. 4, 2023), https://www.bloomberg.com/news/newsletters/2023-10-04/deepfakes-in-slovakia-preview-how-ai-will-change-the-face-of-elections; Morgan Meaker, *Slovakia's Election Deepfakes Show AI Is a Danger to Democracy*, Wired (Oct. 3, 2023), https://www.wired.com/story/slovakias-election-deepfakes-show-ai-is-a-danger-to-democracy/.

[10] *See Tracker: State Legislation on Deepfakes in Elections*, Public Citizen (last updated Sept. 18, 2024), https://www.citizen.org/article/tracker-legislation-on-deepfakes-in-elections/.

[11] *Id.*; *see also* Ivana Saric, *Half of U.S. States Seek to Crack Down on AI in Elections*, Axios (Sept. 16, 2024), https://www.axios.com/2024/09/22/ai-regulation-election-laws-map.

[12] S. 2770, 118th Cong. (2024).

3

It is against this backdrop that Mr. Kohls pursues his facial challenge to AB 2839,[13] California's latest effort to ensure that deceptive political deepfakes are labeled. The Court will find few guideposts directly on point. However it rules, its ruling will be clarifying for legislators in California and around the country. *Amicus* submits this brief in support of neither party to assist the Court and the parties in resolving this novel challenge.

## **ARGUMENT**

Mr. Kohls argues that AB 2839 could not withstand Constitutional scrutiny were it ever enforced against him and held to proscribe his parody videos. But that is not the question before the Court.

Mr. Kohls chose to bring a facial challenge and now seeks to enjoin defendants from enforcing AB 2839 against anyone, upping the ante for himself, Californians, and the development of the law more broadly. The ultimate question before the Court is not whether AB 2839 would violate the First Amendment if applied to Mr. Kohls' parody videos; the question is whether the full set of the law's unconstitutional applications, if any, substantially outweigh the full set of its constitutional applications, if any. It is in that context that *Amicus* submits this brief to underscore two additional narrow points in the hope that, however the Court rules, it does not short-circuit the ongoing development of common-sense and constitutionally-permissible regulations of deepfakes that have the potential to upend elections.

*First*, myriad compelling governmental interests can justify narrowly-tailored, content-based disclosure requirements for political deepfakes otherwise protected by the First Amendment. Mr. Kohls' contention that the *only* legitimate governmental interest in this context is the prevention of *quid pro quo* corruption or its appearance is clearly wrong and controverted by many lines of Supreme Court precedent.

---

[13] Codified at California Election Code § 20012 (throughout, "AB 2839").

4

Erroneously holding otherwise would severely hamstring California and other states in their efforts to mitigate pernicious deepfakes aimed at deceiving the electorate.

*Second*, many political deepfakes are not protected by the First Amendment. Applying AB 2839 to those deepfakes raises no First Amendment concerns whatsoever. Because AB 2839 likely has at least some legitimate sweep, the Court will have to determine whether any unconstitutional applications substantially outweigh the constitutional applications in resolving Mr. Kohls' facial challenge.

## I.   MR. KOHLS CHOSE TO BRING A FACIAL CHALLENGE, WHICH MEANS THE COURT MUST LOOK BEYOND HIM

Mr. Kohls "chose to litigate [this case] as [a] facial challenge[], and that decision comes at a cost." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024). In a facial challenge, the ultimate question before the Court is "whether a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* The Court must determine "[w]hat activities, by what actors, . . . the law[] prohibit[s] or otherwise regulate[s]," and "which of the law['s] applications violate the First Amendment, to measure them against the rest." *Id.* at 2398. In other words, the cost to Mr. Kohls is that his case is not primarily about him.

Here, AB 2839 likely reaches many deepfakes in ways that do not violate the First Amendment. *See infra* Sections II–III. Because AB 2839 likely has at least some plainly legitimate sweep (and possibly a substantial legitimate sweep), the Court will have to determine whether "the law's unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 144 S. Ct. at 2397; *see also NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1124 (9th Cir. 2024) (a district court's failure to consider the facial nature of a challenge renders appellate review "practically impossible" and requires vacating a preliminary injunction).

In making that determination, there is a thumb on the scale against Mr. Kohls. *Moody*, 144 S. Ct. at 2397. "Claims of facial invalidity often rest on speculation about the law's coverage and its future enforcement;" they also "threaten to short circuit the

5

democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Id.* Those concerns loom particularly large here, given the rapid development of artificial intelligence and the importance of protecting the integrity of elections.

## II.    MANY COMPELLING GOVERNMENTAL INTERESTS CAN JUSTIFY REASONABLE DISCLOSURE REQUIREMENTS FOR DECEPTIVE POLITICAL DEEPFAKES

However the Court rules, Mr. Kohls' contention that "[b]ecause AB 2839 regulates political speech but not for avoiding corruption, it is unconstitutional" is just wrong. ECF No. 6-1 at 12. That proposition flies in the face of Supreme Court precedent recognizing that there are many compelling governmental interests that could justify narrowly tailored disclosure requirements for political deepfakes, even though they are content based. Adopting Mr. Kohls' argument would severely hamstring legislators confronting an urgent threat to the political marketplace.

### A.    Numerous Compelling Governmental Interests in the Electoral Context Can Justify Content-Based Regulations of Political Speech, Including Disclosure Requirements

In the election context, "a State has a compelling interest in protecting voters from confusion and undue influence." *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (citing *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 228 (1989)). Closely related, a "State has a legitimate interest in fostering an informed electorate." *Eu*, 489 U.S. at 228–29. And as Mr. Kohls necessarily concedes, ECF No. 6-1 at 20, "a State 'indisputably has a compelling interest in preserving the integrity of its election process,'" *Burson*, 504 U.S. at 199 (quoting *Eu*, 489 U.S. at 23).

When a state regulates to protect these vital interests, regulations need not be "perfectly tailored" to survive First Amendment scrutiny. *Burson*, 504 U.S. at 209; *Wolfson v. Concannon*, 811 F.3d 1176, 1185 (9th Cir. 2016). "[B]ecause a government has such a compelling interest in securing the right to vote freely and effectively, [the Supreme] Court never has held a State 'to the burden of demonstrating empirically the

objective effects on political stability that [are] produced' by the voting regulation in question." *Burson*, 504 U.S. at 208 (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986)). This lowered scrutiny is justified by three common-sense propositions: (1) "[e]lections vary from year to year, and place to place," rendering it uniquely "difficult to make specific findings about the effects of a voting regulation"; (2) there is no effective *post hoc* remedy for a tainted election, as rerunning an election would have a "negative impact on voter turnout"; and (3) "a State's political system [need not] sustain some level of damage before the legislature [may] take corrective action," so long as regulations do not "significantly impinge on constitutionally protected speech." *Id.* at 209.

Together and assessed under this lessened scrutiny, a state's interests in preventing voter confusion, fostering an informed electorate, and protecting the integrity of elections are sufficient to justify even content-based regulations necessary to prevent "fraud" and "undue influence" in the election process. *Burson*, 504 U.S. at 199; *see also Eu*, 489 U.S. at 228–29 (observing that "a State may regulate the flow of information between political associations and their members when necessary to prevent fraud"). In *Burson*, for example, the Supreme Court upheld a ban on "the solicitation of votes and the display or distribution of campaign materials within 100 feet of the entrance to a polling place." 504 U.S. at 193. In *Burson*, the Court also recognized that the same interests generally permit restrictions aimed at preventing voter intimidation. *Id.* at 206. In *Minnesota Voters Alliance v. Mansky*, the Supreme Court made clear that "a State may prohibit messages intended to mislead voters about voting requirements and procedures." 585 U.S. 1, 18 n.4 (2018).[14]

Most on point, the Supreme Court has held that the compelling  governmental

---

[14] The Ninth Circuit and Supreme Court also cited these interests in upholding a public records statute requiring disclosure of referendum petition signers. *Doe v. Reed*, 586 F.3d 671, 679–81 (9th Cir. 2009), *aff'd sub nom. John Doe No. 1 v. Reed*, 561 U.S. 186 (2010).

7

interest in providing information to the electorate "alone" justifies disclosure requirements about the provenance of political speech. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 368–69 (2010); *see also McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 196 (2003); *Buckley v. Valeo*, 424 U.S. 1, 66–67 (1976). Those disclosure requirements are not subject to strict scrutiny in its strongest form, but to what has been termed "exacting scrutiny." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021). That standard "requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010) (quoting *Citizens United*, 558 U.S. at 366).

Applying exacting scrutiny, the Supreme Court has upheld disclosure requirements about core political speech in the electoral context in part because they *serve* the First Amendment interests of *voters*. In *Citizens United*, the Supreme Court upheld disclosure requirements for corporate campaign contributions. *Id.* at 367–71. It explained that disclosure about the provenance of political speech "permits citizens and shareholders to react to the speech of corporate entities in a proper way" and "[t]his transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages." *Id.* at 370; *see also McConnell*, 540 U.S. at 197 (recognizing that although disclosure requirements in the electoral context can burden the speech of those to whom they apply, they also serve "the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace"). For similar reasons, the Supreme Court has likewise upheld disclosure requirements for lobbying activities, *United States v. Harriss*, 347 U.S. 612, 625 (1954), and "political propaganda" published by agents of foreign powers, *Meese v. Keene*, 481 U.S. 465, 480 (1987).[15]

---

[15] *FEC v. Ted Cruz for Senate*, on which Mr. Kohls primarily relies, was not a case about disclosure requirements. 596 U.S. 289 (2022). There, Senator Cruz challenged a provision of federal law barring campaigns from using more than

(continued...)

In the electoral context, the compelling governmental interests recognized by the Supreme Court reflect a fundamental truth about democracy: "In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential." *Citizens United*, 558 U.S. at 339. Precisely because "the public has an interest in knowing who is speaking about a candidate shortly before an election," the government's "informational interest alone" can often justify disclosure laws about the provenance of political speech that "help viewers make informed choices in the political marketplace." *Id.* at 369.

These compelling interests can clearly justify appropriately tailored disclosure requirements for political deepfakes. Like disclosures about the source of campaign contributions, political deepfake disclosure laws "'insure that the voters are fully informed' about the person or group who is speaking" and "enable[] the electorate to make informed decisions and give proper weight to different speakers and messages." *Citizens United*, 558 U.S. at 368–69 (quoting *Buckley*, 424 U.S. at 76).

**B.     Additional Compelling Governmental Interests Outside the Electoral Context Can Also Justify Disclosure Laws for Political Deepfakes**

Beyond the electoral context, there are still other compelling governmental interests that can justify disclosure requirements for deepfakes about candidates and election officials.

There is a compelling governmental interest in protecting the integrity of government processes and preventing the fraudulent impersonation of government officials and agencies. For example, various provisions of the United States Code

---

$250,000 of funds raised after election day to repay a candidate's personal loans. *Id.* at 293. It is clear in context that the Supreme Court's reference to "restricting political speech" was intended to refer to restrictions in the nature of caps on election-related spending. *Id.* at 305. In contrast, disclosure laws, like AB 2839, are "a less restrictive alternative" to laws "that impose[] a ceiling on" political speech. *Citizens United*, 558 U.S. at 369.

9

prohibit impersonating federal officials and the federal government itself. *See, e.g.*, 18 U.S.C. §§ 709, 712, 912. Many states have their own versions of these prohibitions.[16] In *United States v. Alvarez*, the Supreme Court explained that these kinds of statutes do not run afoul of the First Amendment because they serve to "protect the integrity of Government processes" or otherwise "implicate fraud or speech integral to criminal conduct," two categories of speech historically carved out from First Amendment protection. 567 U.S. 709, 721 (2012); *see United States v. Lepowitch*, 318 U.S. 702, 704 (1943) (holding that the purpose of 18 U.S.C. § 912 is to "maintain the general good repute and dignity of the (government) service itself").[17, 18]

---

[16] Rebecca Green, *Counterfeit Campaign Speech*, 70 Hastings L.J. 1445, 1474 & nn. 155–58 (2019) (collecting state prohibitions on impersonating state officials).

[17] Notably, just this week, it was reported that Senator Ben Cardin (D-Md.), the Democratic chair of the Senate Foreign Relations Committee, was the target of an advanced deepfake operation that aim of which was to apparently elicit admissions dangerous to the national security. Dan Merica, *Sophistication of AI-Backed Operation Targeting Senator Points to Future of Deepfake Schemes*, Assoc. Press (Sept. 26, 2024), https://apnews.com/article/deepfake-cardin-ai-artificial-intelligence-879a6c2ca816c71d9af52a101dedb7ff.

[18] AB 2839 differs from the 18 U.S.C. § 912 prohibition on impersonating federal officials in that it goes beyond mere impersonation to specify that only specific impersonating content is unlawful—namely, impersonations that convey messages likely to harm the reputation of candidates and officials or undermine confidence in election results. *Cf.* Cal. Elec. Code § 20012(b)(1); 18 U.S.C. § 912. If the set of candidate and election official impersonations targeted by AB 2839 are essentially a kind of proscribable fraud or defamation, the content-based distinction of AB 2839 is constitutional, so long "the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992); *see id.* (explaining why the government may specifically criminalize threats of violence against the President). Alternatively, if the speech covered is protected, the further content-based discrimination would be constitutional, so long as it is appropriately (though not necessarily perfectly) tailored to serve the government's compelling interests. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *see supra* Section II.A. Either way, AB 2839 is ultimately narrower than the general prohibition on impersonation in 18 U.S.C. § 912.

10

There is also a compelling governmental interest in preventing the harmful impersonation of private individuals, and California and other states have criminalized impersonating another private individual with intent to obtain a benefit or to injure or defraud that person or anyone else. *E.g.*, Cal. Penal Code § 529; N.Y. Penal Law § 190.25; Tex. Penal Code Ann. § 33.07(a). When these statutes have been facially challenged—including on the grounds that they might unconstitutionally reach protected parody—courts have upheld them, concluding they are supported by compelling governmental interests in preventing the malicious, nonconsensual usage of someone else's name and protecting private individuals' reputations; and those courts have made clear that in the rare case protected parody is prosecuted, an as-applied defense will suffice. *See, e.g.*, *Golb v. Att'y Gen. of the State of New York*, 870 F.3d 89, 101–03 (2d Cir. 2017); *Ex parte Bradshaw*, 501 S.W.3d 665, 674–77 (Tex. App. 2016).[19]

The Supreme Court, too, recognized the compelling governmental interest in protecting individuals' reputations when it explained why there is no absolute protection for news media from state libel law. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974). "We would not lightly require the State to abandon" its interest in protecting individuals' reputations, the Court wrote, "for, as Mr. Justice Stewart has reminded us, the individual's right to the protection of his own good name 'reflects no more than our basic concept of the essential dignity and worth of every human being—

---

[19] In *Golb v. Attorney General of the State of New York*, the Second Circuit offered a narrowing construction of New York's impersonation statute that might be useful to this Court, explaining that "[p]arody . . . differs from 'impersonat[ion]'" because "[w]hile it is true that a parody enjoys First Amendment protection notwithstanding that not everybody will get the joke, it is also true that parody depends on *somebody* getting the joke; parody succeeds only by its recognition as parody. An author who intends to fool everyone may be pulling a prank or perpetrating a hoax, but the result is not a parody." 870 F.3d 89, 102 (2d Cir. 2017).

11

a concept at the root of any decent system of ordered liberty.'" *Id.* (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966) (Stewart, J., concurring)).

Each of these compelling governmental interests could justify appropriately tailored disclosure laws for deceptive political deepfakes. Indeed, disclosure laws for deepfake impersonations of candidates and election officials that mislead voters, harm the reputations of candidates or officials, or undermine the functioning of elections may often be the least restrictive means of protecting the government's compelling interests in protecting the integrity of government processes, preventing fraud, and protecting individuals' reputations in this context.

## III. MANY POLITICAL DEEPFAKES ARE UNPROTECTED SPEECH

While many political deepfakes are fully protected under the First Amendment, many others are not. Applying AB 2839 to deepfakes that fall fully outside the protection of the First Amendment raises no First Amendment concerns. Consider three examples.

***Fraud.*** A deepfake of a candidate for Vice President of the United States urges viewers to donate to their campaign using a certain link, but the link routes funds to the opposing campaign instead. That is fraud, and "the First Amendment does not shield fraud." *Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003). As applied to fraudulent-solicitation deepfakes, AB 2839 gives rise to no First Amendment concerns.

***True Threats.*** A deepfake of a candidate for President portrays the candidate as saying in-person voters will be mandatorily vaccinated. That is a true threat, *Nat'l Coal. on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 119–20 (S.D.N.Y. 2023), and unprotected by the First Amendment, *Virginia v. Black*, 538 U.S. 343, 359 (2003). As applied to true-threat deepfakes, AB 2839 gives rise to no First Amendment concerns.

**Defamation.** A deepfake of an election official shows the official confessing to throwing away ballots reflecting votes for one party's candidate in order to swing the election, and the publisher knows the official did not confess to committing any such crime. That is defamation *per se*. Cal. Civ. Code §§ 45a, 46; *see also Barker v. Fox & Assocs.*, 240 Cal. App. 4th 333, 351 (2015). Even in the context of "political speech" about politicians and high-level government officials, defamation is unprotected by the First Amendment when published with knowledge of falsity or reckless disregard for the truth. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964); *see also Balla v. Hall*, 59 Cal. App. 5th 652, 659 (2021) ("Although political speech is appropriately accorded wide latitude, especially in election campaigns, calculated or reckless falsehoods can still amount to defamation even in that context."). AB 2839 reaches only deepfakes published by someone with knowledge the content is "false or with a reckless disregard for the truth." Cal. Elec. Code § 20012(f)(7). Accordingly as applied to defamatory deepfakes, AB 2839 gives rise to no First Amendment concerns.[20]

---

[20] As for parody, the Supreme Court's treatment of parody in the defamation context illustrates well how AB 2839, even without an explicit carveout provision and even setting aside the safe harbor labeling provision, might still carve parody videos out from its coverage and how someone like Mr. Kohls could raise an as-applied parody defense. In *Hustler Magazine, Inc. v. Falwell*, the Supreme Court made clear that the First Amendment protects parody and explained that someone cannot be sued for defamation for a parody so long as it cannot "reasonably be understood as describing actual facts about" the person depicted or is "not reasonably believable." 485 U.S. 46, 57 (1988). That dovetails neatly with AB 2839's requirements that actionable "materially deceptive content" must "appear to a reasonable person to be an authentic record of the actual speech or conduct of the individual depicted in the media," and be "reasonably likely" to either harm someone's reputation or falsely undermine confidence in the outcome of an election. Cal. Elec. Code § 20012(b)(1), (f)(7). Should Mr. Kohls ever be sued, he would have two ready responses. First, he could argue that no one could reasonably believe his parody videos to be authentic, such that AB 2839 doesn't reach his videos as a matter of statutory construction. Second, if AB 2839 does require that he label his videos, he could raise an as-applied parody defense to the labeling requirements.

13

These are just three examples, but the same analysis goes for deepfakes that consist of other historically unprotected categories of speech, including incitement, obscenity, fighting words, speech integral to criminal conduct, and so forth. *See Counterman v. Colorado*, 600 U.S. 66, 74 (2023); *United States v. Alvarez*, 567 U.S. 709, 717 (2012).

Because AB 2839 reaches unprotected deepfakes and thus, at a minimum, has some plainly legitimate sweep, the Court must determine whether "the law's unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 144 S. Ct. at 2397.

## CONCLUSION

For the reasons above, however the Court rules on Mr. Kohls' facial challenge to AB 2839, *Amicus* urges the Court not to undercount the many compelling governmental interests that can support appropriately tailored disclosure laws or rely on an overly broad reading of the First Amendment's protection for deceptive political deepfakes. To do so would short-circuit good faith efforts around the country to enact sensible regulations of deceptive political deepfakes.

Dated: September 27, 2024                    Respectfully submitted,

By: _____

John Langford (Cal. Bar No. 353647)
Nicole Schneidman (Cal. Bar No. 319511)[*]
PROTECT DEMOCRACY PROJECT
82 Nassau St., #601
New York, NY 10038
Telephone: (202) 579-4584
Facsimile: (202) 942-5999
john.langford@protectdemocracy.org
nicole.schneidman@protectdemocracy.org

14

Kenneth Parreno[*]
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
Telephone: (202) 579-4582
Facsimile: (202) 942-5999
kenneth.parreno@protectdemocracy.org

[*]*Pro hac vice* applications forthcoming


*Attorneys for Amicus Curiae*

AMICUS BRIEF IN SUPPORT OF NEITHER PARTY ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION