1  David A. Shaneyfelt (CA Bar No. 240777)*
2  DShaneyfelt@alvarezfirm.com
   **The Alvarez Firm**
3  24005 Ventura Blvd.
4  Calabasas, CA 91302
   Telephone: (818) 224-7077
5  Facsimile: (818) 224-1380

6
7  Jonathan A. Scruggs (AZ Bar No. 030505)**
   jscruggs@ADFlegal.org
8  Bryan D. Neihart (AZ Bar No. 035937)**
   bneihart@ADFlegal.org
9  **Alliance Defending Freedom**
10 15100 N. 90th Street
   Scottsdale, AZ 85260
11 Telephone: (480) 444-0020
12 Facsimile: (480) 444-0028

13
14 *Counsel for Plaintiffs The Babylon Bee, LLC*
   *and Kelly Chang Rickert*
15
16 * *Local Counsel*
   ***Pro hac vice application forthcoming*
17

18
19           **UNITED STATES DISTRICT COURT**
           **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
20

21 **The Babylon Bee, LLC** and **Kelly**        Civil No. 2:24-cv-08377
22 **Chang Rickert**,
                                              **VERIFIED COMPLAINT FOR**
23           *Plaintiffs*,                     **DECLARATORY AND**
                                              **INJUNCTIVE RELIEF**
24
           v.                                ACTION SEEKING STATEWIDE
25                                                    RELIEF
26 **Rob Bonta**, in his official capacity
   as Attorney General of the State of
27 California, **Shirley N. Weber**, in
28 her official capacity as California

Secretary of State, **George Gascón**, in his official capacity as District Attorney for Los Angeles County, and **Hydee Soto**, in her official capacity as the Los Angeles City Attorney,

  *Defendants.*

**INTRODUCTION**

1.     The Babylon Bee is a well-known Florida company that publishes online political satire seen by millions of Americans. Kelly Chang Rickert is a California attorney who regularly engages in online political debate on her blog and social media accounts. They each use humor and satire to entertain, communicate truth, and critique the powerful. Their political commentary rests at the core of the First Amendment.[1]

2.     But California recently passed two laws that punish speakers like them for posting certain political commentary online. In July, California Governor Gavin Newsom tweeted that a parody video of Kamala Harris should be "illegal." The legislature heard the call and passed two laws that forbid political expression under the label of "materially deceptive content." One law (AB 2839) bans people from distributing content California deems "materially deceptive" about candidates, elected officials, and elections, allowing various officials and anyone else who sees the content to sue, have posts removed, and get attorneys' fees. The law also forces The Bee and Rickert to include a label on their satire that makes the satire so obvious that it defeats the point of posting it. The second law (AB 2655) converts social media platforms into California state snitches by requiring them to field reports about user posts with "materially deceptive content" and then remove or label them. Newsom eventually signed the bills, proudly tweeting

---

[1] This Court has jurisdiction over Plaintiffs' claims. *See infra* ¶¶ 7–9.

1

that the laws now outlawed the political parody video that upset him earlier. For Newsom, it was mission accomplished.

3.     But Newsom and the legislature forgot about the First Amendment. Their laws regulating "materially deceptive content" forbid anyone from posting or reposting content that harms a candidate's "reputation" or "electoral prospects," "influences an election in California," undermines "confidence in" an election's "outcome," and more. These subjective terms are codewords that allow government officials and political opponents to sue over content they dislike. These broad and vague laws will chill speech and debate that criticizes politicians and their platforms.

4.     Such censorship threatens the heart of public discourse. When debating controversial political ideas, candidates, and views, it is often hard to separate fact from opinion, truth from lies, exaggerations from malicious deceptions, humor from ill will. That's why the First Amendment gives breathing room for political ideas to air and ventilate—even ideas that are wrong or deceptive. The First Amendment protects this freedom because it trusts the American people to be able to think and decide for themselves in the context of debating political candidates and issues.

5.     California officials don't share that trust. They want to be the arbiters of political truth online. So California passed AB 2839 and AB 2655 to censor speech based on their officials' perception of truth. But on this, government officials don't get the benefit of the doubt. That's First Amendment 101. We don't trust the government to decide what is true in our online political debates.

6.     AB 2839 and AB 2655 violate that foundational First Amendment principle. As such, these laws should be facially enjoined—and at a minimum enjoined as applied to the Babylon Bee and Rickert—so that open political debate is returned to the people of California.

## JURISDICTION AND VENUE

7.     This action arises under the First and Fourteenth Amendments to the United States Constitution. This Court has subject-matter jurisdiction pursuant to the Civil Rights Act, 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331 and 1343.

8.     This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201–02 and Fed. R. Civ. P. 57; injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorney fees under 42 U.S.C. § 1988 and Fed. R. Civ. P. 54.

9.     Venue lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events that give rise to this lawsuit occurred in this district and the California government and its agencies are citizens of every district in California.

## PARTIES

*Plaintiffs*

10.     Plaintiff The Babylon Bee, LLC ("The Bee") is a Florida limited liability company with a principal place of business in Florida. The Bee is registered to do business in California as a Limited Liability Company-Out of State, maintains an office in California, employs people who reside in California—including its editor-in-chief who reviews and personally

3

approves almost all of the content The Bee produces—directs advertising into California, has many paying subscribers who reside in California, and films nearly all its satirical sketches, videos, and podcasts in California.

11.  The Bee publishes satirical news articles, photographs, and videos on its website (www.babylonbee.com) which averages more than 20 million viewers per month, including viewers in California.

12.  The Bee also publishes satirical articles, photographs, and videos on social media cites including X (formerly known as Twitter), Facebook, Instagram, and YouTube. The Bee has millions of followers and subscribers across these social media platforms, including followers and subscribers in California.

13.  Plaintiff Kelly Chang Rickert is a United States Citizen and resides in Los Angeles County, California. Rickert regularly posts on topics including politics, elections, and culture on a blog that she alone controls, owns, operates, and curates as well as on her public social media accounts on X and Instagram and her private account on Facebook.

### Defendants

14.  Defendant Robert Bonta is the Attorney General of the State of California and is authorized to enforce California's laws, including AB 2839 and AB 2655. Cal. Const. art. V, § 13; Cal. Elec. Code § 20516.

15.  Defendant Shirley N. Weber is the California Secretary of State. She has authority to administer, enforce, and implement California's Elections Code, including AB 2839 and AB 2655. Cal. Gov't Code § 12172.5.

16.     Defendant George Gascón is the District Attorney for Los Angeles County with the authority to "initiate … all prosecutions for public offenses," including violations of AB 2839 and 2655. Cal. Gov't Code § 26500; Cal. Elec. Code § 20516.

17.     Defendant Hydee Soto is the Los Angeles City Attorney with the authority to enforce AB 2839 and AB 2655. Cal. Elec. Code § 20516.

18.     Defendant Soto's office has authority to "bring[] civil enforcement actions in the name of the People of the State of California." *See* https://perma.cc/N946-4LHJ.

19.     Under AB 2839, the Attorney General, the District Attorney, and the City Attorney are "elections official[s]" because they have the authority to "perform another duty related to administering the provisions of the Elections Code." Cal. Elec. Code §§ 20012(f)(6)(iv). They have that authority by virtue of AB 2655. *See* Cal. Elec. Code § 20516.

20.     Under AB 2839 and AB 2655, the Secretary of State is an "elections official" with the same enforcement authority as the laws give to "elections official[s]." Cal. Elec. Code §§ 20012(f)(6)(ii), 20512(g)(2).

21.     Defendants Bonta, Weber, Gascón, and Soto "may seek injunctive or other equitable relief prohibiting the distribution of the materially deceptive content," "bring an action for general or special damages," seek attorney's fees and costs as "election official[s]" for violations of AB 2839. Cal. Elec. Code § 20012(d).

5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

22.    Defendants Bonta, Weber, Gascón, and Soto "may seek injunctive or other equitable relief" to compel the removal of "materially deceptive content" for violations of AB 2655. Cal. Elec. Code §§ 20515(b), 20516.

23.    All defendants are named in their official capacities.

**FACTUAL BACKGROUND**

**I.    Satire has a rich and important history, including in America.**

24.    Satire is a distinct type of literature with a history that stretches back to Ancient Rome. Gilbert Highet, *Anatomy of Satire* 24 (1962).

25.    As a genre, satire focuses on topical content or individuals, speaks to particular moments, and generally "deals with actual cases, mentions real people by name or describes them unmistakably (and often unflatteringly)." *Id.* at 5, 13, 16.

26.    Parody is a form of satire that takes original content, imitates it, and then makes the original look absurd through various devices. *Id.* at 13.

27.    The end of satire is often to criticize or mock an idea, event, or person for the purpose of correction and improvement.

28.    Figures such as Horace, Plato (*Menexenus*), Miguel de Cervantes (*Don Quixote*), Voltaire (*Candide*), Jonathan Swift (*Gulliver's Travels*), and George Orwell (*Animal Farm*) have used satire to provide social commentary in order to expose underlying truths.

29.    Satirists "intend[] to shock" their audience "[b]y compelling them to look at a sight they had missed or shunned" and help their audience to "realize the truth, and then move[] … to feelings of protest." *Id.* at 20.

6

30.   In short, satirists "tell the truth with a smile, so that [they] will not repel [people] but cure them of th[eir] ignorance which is their worst fault." *Id.* at 235.

31.   In these ways, satire and parody make audiences do a double-take by believing that they are seeing a serious rendering of an original, and then allowing them to laugh at their own gullibility when they realize that they are really viewing satire or parody.

32.   Through this technique, satirists intend to prompt thought, internal reflection, and public dialogue about the subject of the satire.

33.   To do this effectively, satire and parody leverage the expectations that are created in an audience when they see something in a particular form and juxtapose that realism with the satirical form.

34.   Satire and parody generate their most rhetorical power by leveraging the mimicry of a particular form, event, idea, or person against the heightened dissonance created by the form of satire.

35.   This power comes from satire's and parody's proximity to the original.

36.   As the Supreme Court recognized in another context, "[p]arody needs to mimic an original to make its point." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580–81 (1994).

37.    Because of its effectiveness and appeal, satire and parody have been used throughout American history to express matters of current interest—especially matters of politics and politicians.

38.     From lampooning George Washington and Thomas Jefferson to Donald Trump and Kamala Harris, satire has been used to "tear[] down facades, deflate[] stuffed shirts, and unmask[] hypocrisy" with such consistency that "[n]othing is more thoroughly democratic than to have the high-and-mighty lampooned and spoofed." *Falwell v. Flynt*, 805 F.2d 484, 487 (4th Cir. 1986) (Wilkinson, J., dissenting from denial of rehearing).

## II.     The Babylon Bee is a satirical news source that posts "Fake news you can trust."

39.     The Bee fits well within this longstanding tradition of using satire and parody to speak the truth, expose bad ideas, and encourage societal change.

40.     The Bee's tagline is "Fake news you can trust."

41.     The Bee runs and controls a website that exposes foolishness, mocks absurdity, and highlights hypocrisy in faith, politics, and culture through satire, humor, and parody. *See* The Babylon Bee, https://babylonbee.com.

42.     Millions of people view The Bee's website each month, and California is the Bee's third largest state in terms of audience reach.

43.     The Bee has accounts on social media platforms like X, Facebook, Instagram, and YouTube where it republishes its articles, posts videos, and republishes third-party content.[2]

---

[2] *See* The Babylon Bee, X, https://bit.ly/3N3apJ7; The Babylon Bee, Facebook, https://bit.ly/3XLkpfj; The Babylon Bee, YouTube, https://bit.ly/3XLztcy; The Babylon Bee, Instagram, https://bit.ly/3TLjPgq.

44.    The Bee currently has four million followers on X, two million followers on Instagram, over one and a half million followers on Facebook, and over one and a half million subscribers on YouTube.

45.    The Bee's articles generate millions of "impressions"—i.e., instances when a user sees its web page or social media post.

46.    The Bee's articles also generate tens of thousands of "likes" and "reposts" on social media.

47.    As one example, The Bee posted an article entitled "The Babylon Bee has obtained this exclusive, official, 100% real Gavin Newsom election ad" on X on September 18, 2024.[3] The Babylon Bee (@TheBabylonBee), X (Sept. 18, 2024), https://perma.cc/5886-HDTJ.

48.    As of September 25, 2024, the post had accumulated over thirty-six million views, one hundred and forty thousand likes, forty-seven thousand reposts, and seven thousand quotes.

49.    The Bee posts between six to eight articles on its website during the workweek and three to five articles during the weekends and then republishes those articles on X, Facebook, and Instagram.

50.    The Bee also publishes videos that it creates on YouTube.

---

[3] For some permanently linked multimedia content such as videos, audio, or images, the viewer may need to click on the "View the live page" icon at the top right of the page to view the content.

9

51. The Bee posts about various topics, including the economy, California, fall traditions, government censorship, and much else.[4]









52. The Bee regularly posts about politics, elections, and politicians.

---

[4] *Fast-Food Meal Costs Family $100 After They Idle In Drive-Thru For Ten Minutes*, Babylon Bee (Mar. 15, 2022), https://perma.cc/L2ZL-48QR; *Residents Become Chief Export Of California*, Babylon Bee (Aug. 30, 2022), https://perma.cc/RRP8-DT69; *Ohio Restaurant Unveils New Pumpkin Spice Cat,* Babylon Bee (Sept. 21, 2024)*, https://perma.cc/CX62-KUVH. Governor Abbott Declares Texas Sanctuary State for Memers*, Babylon Bee (Sept. 19, 2024), https://perma.cc/29ZD-LJS5.

53.     For example, before September 17, 2024, The Bee posted articles about Presidential candidates Donald Trump and Kamala Harris, Vice Presidential candidates J.D. Vance and Time Walz, and voting in California.

54.     Screenshots of these headlines are included in Exhibit 1 and the posts are viewable here:

- *Kamala Responds to Criticism Over Lack of Policies by Posting Another Truck Stop Junk Food Video*, Babylon Bee (Sept. 6, 2024), https://perma.cc/L7X6-DFY3.

- *Trump Team Reveals Debate Strategy: Trump Will Cede All His Time To Kamala And Then Quietly Play With His Tamagotchi*, Babylon Bee (Sept. 10, 2024), https://perma.cc/S7HM-BFDP.

- *In Brief Moment Of Lucidity, Biden Endorses Trump*, Babylon Bee (Sept. 11, 2024), https://perma.cc/P5VZ-TUF8.

- *Trump Prepares For Debate Against Kamala By Going To Bar And Arguing With Drunks*, Babylon Bee (Sept. 5, 2024), https://perma.cc/C7J6-47BX.

- *Kamala Harris Unveils New Economic Platform 'We Must Seize the Means of Production and Execute the Bourgeoisie'*, Babylon Bee (Aug. 18, 2024), https://perma.cc/8TTE-33H8.

- *Tim Walz Asks Guy Guarding Tomb Of The Unknown Soldier Why He Doesn't Just Desert Him*, Babylon Bee (Aug. 10, 2024), https://perma.cc/5KT6-76YS.

- *Vance Dons Helmet And Body Armor In Preparation To Run With Trump*, Babylon Bee (July 15, 2024), https://perma.cc/7PWK-2F7E.
- *Trump Adds A Kennedy In Hopes He Will Draw All The Sniper Fire*, Babylon Bee (Aug. 23, 2024), https://perma.cc/A62V-97C8.
- *Democrat Governors Promise They Will Do Everything In Their Power To Make Elections Appear Legitimate*, Babylon Bee (Apr. 12, 2024), https://perma.cc/5Y27-ZZ9W.
- *Democrats Concerned California Wildfires May Burn Up Their Stock of Prefilled Kamala Harris Ballots*, Babylon Bee (Sept. 12, 2024), https://perma.cc/PX7S-MKC7.
- *Newsom Issues Ban on Legal-Citizen Voting*, Babylon Bee (May 23, 2024), https://perma.cc/XNL7-SPMF.
- *California Passes Law Requiring People Fail A U.S. Civics Exam To Be Eligible To Vote*, Babylon Bee (Aug. 12, 2024), https://perma.cc/36T6-3ECQ.

55.    The Bee intentionally digitally created or modified some of the images contained in the bullet points above.

56.    Before September 17, 2024, The Bee also posted articles about President Biden and COVID-19, Vice President Harris and Hillary Clinton, President Biden and elections, and Donald Trump.

57.    Screenshots of these headlines are included in Exhibit 2 and some of the posts are viewable here:

12

- *New White House Doctor Sadly Informs Biden Only Cure For COVID Is Euthanasia*, Babylon Bee (July 18, 2024), https://perma.cc/DW4A-5N69.

- *Hillary Clinton Meets With Kamala To Help Her Improve Her Black Accent*, Babylon Bee (Aug. 1, 2024), https://perma.cc/LVN7-AL4R.

- *In Victory Speech, Biden Assures Americans Elections Were 'Mostly Legitimate'*, Babylon Bee (Nov. 9, 2020), https://perma.cc/DCB6-4VNF.

- *Biden Unveils Official Campaign Slogan 'Death To America'*, Babylon Bee (Apr. 17, 2024), https://perma.cc/48GW-TW9W.

58.    The Bee intentionally digitally created or modified the image contained in bullet point one above.

59.    Since September 17, 2024, The Bee has posted articles about Governor Newsom's new law (that, coincidentally, is the basis of this lawsuit) and Vice-Presidential candidate Tim Walz.

60.    Screenshots of these headlines are included in Exhibit 3 and the posts are viewable here:

- *'We Can't Afford Another Four Years Of This!' Shouts Running Mate Of Candidate Who Has Been Leading Country for Four Years*, Babylon Bee (Sept. 21, 2024), https://perma.cc/4LVU-UGXM.

- *Furious Gavin Newsom Bans A.I. Images After Getting Tricked Into Thinking Pic of Trump As A Mer-Man Was Real*, Babylon Bee (Sept. 18, 2024), https://perma.cc/35Q7-ZNDD.

- *Here Are 9 AI-generated Deep Fakes Of Gavin Newsom That Are Illegal To Share In California*, Babylon Bee (Sept. 18, 2024), https://perma.cc/38CA-XSEV.

- The Babylon Bee (@TheBabylonBee), X (Sept. 17, 2024), https://perma.cc/74L2-ENAR.

61.   The Bee intentionally digitally created or modified some of the images contained in the bullet points above.

62.   The Bee intends to continue to create and post content on its own website, X, Facebook, Instagram, and YouTube materially similar to the content referenced in paragraphs 52–61, meaning the Bee will post digitally created or modified satire and parody about politicians, including Donald Trump, Kamala Harris, Gavin Newsom, presidential and vice presidential candidates for office who appear on the ballot in California, other candidates who appear on the ballot in California, elected officials saying or doing something in connection to an election in California, and ballots, voting machines, and voting sites related to an election in California.

63.   The Bee also intends to continue to create and post digitally created or modified content on its own website, X, Facebook, Instagram, and YouTube materially similar to the content referenced in paragraphs 52–62 that violate or arguably violate AB 2839 and 2655.

14

64.    As with satire and parody more generally, the Bee intends to and desires to have these posts expose bad ideas, cause viewers to reflect on the consequences of those ideas, and prompt viewers to take appropriate action to remedy the consequences of those ideas. *See supra* ¶¶ 24–38.

65.    The Bee created the content identified in paragraphs 52–61 and creates and will create materially similar content that is intentionally digitally created or modified, knowing that the content is not literally true.

66.    Indeed, the purpose of The Bee's satire and parody—like other satire and parody—is to create content that is not literally true in all respects, and so The Bee knows that at least some of that content is literally false or acts without regard to that literal truth, but The Bee does so anyway to prove a broader point.

67.    The Bee thus follows the traditional path for satire and parody by mimicking the original for maximum effect. *See supra* ¶¶ 24–38.

68.    Ironically, some of The Bee's satirical headlines have become actual news stories in time.

69.    To date, over one hundred of the Bee's satirical headlines have later become actual headlines to date. *Cf.* Kassy Dillon, *When satire becomes reality: Nearly 100 Babylon Bee joke stories have come true*, Fox News ( Mar. 26, 2023), https://perma.cc/PJF9-7DEN.

1        70.   Here are two examples, with the satire on the left and the real

2 articles on the right.[5]







71.   The Bee's critics have denounced its approach.

---

[5] *Compare Xi Jinping Criticizes Trudeau's Heavy-Handed Approach*, Babylon Bee (Feb. 15, 2022), https://perma.cc/3N7P-4DQS *and 9 Reasons Not To Worry About The Tanking Economy*, Babylon Bee (Sept. 26, 2022), https://babylonbee.com/news/9-reasons-not-to-worry-about-the-tanking-economy/ *with China slams Canada over Hong Kong, Ottawa protests*, India Blooms (Feb. 23, 2022), https://perma.cc/FA4M-ZGUN *and* Michelle Singletary, *7 ways a recession could be good for you financially*, Wash. Post (Sept. 29, 2022), https://perma.cc/B76H-Y9KF.

72.     One critic maintained that "even if the Babylon Bee's satire itself should not be considered misinformation, its satire draws on and reinforces actual misinformation and conspiracy." Parker J. Bach, *Can the Right Make Good Satire Without Collapsing Due to Fake News?*, Slate (June 22, 2021), https://perma.cc/FB2X-6KMS.

73.     One article accused The Bee and other satirical sites of "Helping [to] spread misinformation on social media." Peter Suciu, *Not Fake News—Satire Is Helping Spread Misinformation On Social Media*, Forbes (Feb. 2, 2024), https://perma.cc/QL9L-QYNV.

74.     One reporter accused The Bee of being a "far-right misinformation site[.]" *New York Times: Far-Right misinformation site The Babylon Bee uses "satire" claim to Protect its presence on Facebook*, Twitchy (Mar. 22, 2021), https://tinyurl.com/yc6ck5sv.

75.     Another reporter called The Bee "dangerous." Libby Emmons, *CNN reporter claims The Babylon Bee is dangerous but The Onion is hilarious*, The Post Millennial (Jan. 7, 2020), https://tinyurl.com/khbcbbax.

76.     Some of The Bee's satirical articles have been mistaken for real news articles.

77.     For example, Donald Trump once presumed a satirical article written by The Bee was a real news article and retweeted it. The article was entitled, "Twitter Shuts Down Entire Network to Slow Spread Of Negative Biden News." David Jackson, *Trump retweets satirical news story about Joe Biden and Twitter*, USA Today (Oct. 16, 2020, 9:45am), https://perma.cc/83LJ-Z5XT.

78.   Fact-checking sites have reviewed The Bee's satirical posts for factual accuracy to determine if the posts are, indeed, satire.

79.   Snopes is one such fact-checker.

80.   Snopes is "the oldest and largest fact-checking site online, widely regarded by journalists, folklorists, and readers as an invaluable research companion." Snopes, About Us, https://perma.cc/LL39-5BKW.

81.   Snopes fact checks and provides "original investigative reporting" "[w]hen misinformation obscures the truth." *Id.*

82.   Snopes has fact-checked dozens of satirical articles posted by The Bee, including articles posted as recently as August 2024. Snopes, https://perma.cc/E7BB-26SX.

83.   For example, The Bee posted the following three articles.[6]





_____

[6] *CNN Purchases Industrial-Sized Washing Machine To Spin News Before Publication*, Babylon Bee (Mar. 1, 2018), https://perma.cc/G4EKF9VS; *Ocasio-Cortez Appears On 'The Price Is Right,' Guesses Everything Is Free*, Babylon Bee (Apr. 12, 2019), https://perma.cc/3MXWJ6Q6; and *Ninth Circuit Overturns Death Of Ruth Bader Ginsburg*, Babylon Bee (Sept. 21, 2020), https://perma.cc/9TBH-6HUX.



84.    Under the guise of preventing "misinformation," Snopes and the newspaper USA Today initially reviewed these articles for accuracy, rated them as "false," and even suggested they were intentionally misleading.

85.    Later, Snopes and USA Today changed course and confirmed that the articles were satire.[7]

86.    USA Today verified the article about Justice Ginsburg after consulting fifteen different sources.

87.    The Bee has also experienced censorship by social media platforms because of the content of their posts.

88.    For example, during Justice Barrett's confirmation hearing, Facebook determined that The Bee "incit[ed] violence" by posting a Monty

---

[7] David Mikkelson, *Did CNN Purchase an Industrial-Sized Washing Machine to Spin News?*, Snopes (Mar. 1, 2018), https://perma.cc/BN6Q-3YBP; *Dan Evon, Did U.S. Rep. Ocasio-Cortez Repeatedly Guess 'Free' on TV Show 'The Price is Right?'*, Snopes (Apr. 15, 2019), https://perma.cc/NM62-NXSS; Chelsey Cox, *Fact check: Satirical claim that the 9th Circuit Court of Appeals overturned Ginsburg's death*, USA Today (Sept. 27, 2020), https://perma.cc/93Y9-PZZY.

Python-inspired satire piece entitled, "Senator Hirono Demands ACB Be Weighed Against a Duck to See If She Is a Witch." When challenged, Facebook refused to change its determination. *See AGAIN! Facebook censors and penalizes The Babylon Bee for the most ridiculous article ever*, Not the Bee (Oct. 20, 2020), perma.cc/7FG5-GENV.

89.    Instagram determined that The Bee's CEO violated Instagram's community guidelines against "harmful false information" and "hate speech or symbols" for sharing a Slate article entitled, "It's About Time for Us to Stop Wearing Masks Outside," along with the comment, "Sane people never did this." *See Babylon Bee CEO posted this to Instagram and they're now threatening to ban him for "harmful false information" and "hate speech." WHAT??*, Not the Bee (Apr. 18, 2021), perma.cc/4WUV-5AYY.

90.    YouTube flagged The Bee as a "violent criminal organization[]" and removed its video titled "If the LEAKED Nashville Shooter Manifesto is legit, what does it say about censorship in the US?" Seth Dillon (@SethDillion), X (Nov. 8, 2023, 6:44 AM), perma.cc/ZCJ6-4WJ7. Even after appealing the mischaracterization of the content, YouTube held to its determination that the video violated its violent criminal organization policy. Seth Dillon (@SethDillion), X (Nov. 8, 2023, 10:48 AM), perma.cc/FMF9-R8MY.

91.    Twitter also suspended The Bee's account for "hateful conduct" under its content moderation policies after it named U.S. Assistant Secretary for Health Dr. Rachel Levine the site's "Man of the Year." Seth Dillon (@SethDillion), X (Mar. 20, 2022, 5:52 PM), perma.cc/7M3L-XJGZ.

20

92.   Twitter refused to reinstate The Bee unless it agreed to delete the tweet.

93.   Because The Bee refused to do so on principle, Twitter did not reinstate The Bee's account.

94.   This incident, among other considerations, culminated in Elon Musk purchasing Twitter to restore free speech on the platform.

95.   Had Twitter not been sold to Musk, The Bee would have remained banned from the platform unless and until they censored themselves by deleting the violative tweet. Gabriel Hays, *The Babylon Bee's Twitter account reinstated by Elon Musk after suspension for transgender joke: 'We're back,'* Fox News (Nov. 18, 2022), perma.cc/TU3A-8NGD.

96.   After Musk purchased Twitter (now X), he reinstated The Bee's account almost immediately.

97.   X has not suspended, removed, or taken any adverse action against The Bee's X account since Musk purchased the platform.

98.   Musk significantly amended X's content moderation policy that had been the basis for Twitter's suspension of The Bee's account, and The Bee's content does not violate X's current content moderation policy.

## III.   Rickert actively engages in political expression with the public.

99.   Rickert immigrated to the United States from Taiwan.

100.   She is an attorney who practices law in California.

101.   Rickert has served as a legal expert for media outlets such as CBS News, MTV, People Magazine, US Weekly, and others.

102.   Rickert recently joined a public-interest law firm in California that focuses on issues involving religious freedom, free speech, election integrity, parental rights, and the rights of children.

103.   Rickert has owned and operated her own law firm since 2005—the Law and Mediation Offices of Kelly Chang ("law firm").

104.   Rickert's law firm has its own blog that she alone operates and controls. *See* Blog, https://purposedrivenlawyers.com/blog/ (last visited Sept. 26, 2024).

105.   Rickert has final editorial control over the content posted on the law firm's blog and therefore considers it to be her personal blog.

106.   No one has the authority to post on this blog except for her and no one has posted on this blog except for her.

107.   No third parties can post comments to the blog because Rickert disabled the comment section and has no present intention of re-engaging the comment feature.

108.   Rickert curates the content on the blog by selecting which blogs to post consistent with the types of expression she desires to communicate and to reflect the law firm's values.

109.   Over the last year, Rickert has written, created, and posted over seventy posts for the blog.

110.   Rickert has written posts about abortion, gender ideology, Gavin Newsom, California bills, parental rights, elections, politicians, and other topics.

22

111.   Several hundred people subscribe to her blog, including subscribers in California, and countless more view it on her website, including other California residents.

112.   Rickert also has personal accounts on social media sites, including X, Facebook, Instagram, and TikTok.

113.   Rickert's X and Instagram accounts are public; she currently has over 1,600 followers on X, over 25,000 followers on Instagram, and nearly 400,000 followers on TikTok, including many followers in California.

114.   Rickert's Facebook account is private, but she has 7,400 followers on Facebook.

115.   Rickert regularly posts on these accounts on issues related to politics, elections, and culture.

116.   For example, before September 17, 2024, Rickert posted or reposted about quotes she attributed to Kamala Harris, Tim Walz, politics, society, and cultural and moral issues.

117.   Screenshots of these posts are included in Exhibit 4.

118.   Since September 17, 2024, Rickert has desired to post or repost additional content on her blog and her social media accounts, but she has refrained from doing so because of AB 2839 and AB 2655.

119.   For example, Rickert would like to post a parody video that was intentionally digitally created by a conservative political commentator of Presidential candidate Kamala Harris ("Harris Parody Video").

120.   The Harris Parody Video is available on X. *See* @MrReaganUSA, *Kamala Ad 2 PARODY*, X (July 26, 2024, 6:23am), https://perma.cc/M45N-G9BW.

121.   Below is a still screenshot of the Harris Parody Video posted on X.



122.   Rickert desires to post similar satirical videos created by the same commentator.

123.   Those videos are available at

- @MrReaganUSA, Kamala Harris Ad PARODY, YouTube (July 2024), https://perma.cc/AM2V-RMCK.

- @MrReaganUSA, Kamala Harris Ad PARODY 2, YouTube (July 2024), https://www.youtube.com/watch?v=RIjoPqIcyaw.

- @MrReaganUSA, Kamala Harris Ad PARODY 3, YouTube (Aug. 2024), https://www.youtube.com/watch?v=XMcPVQAA3rc.

124.  Rickert would like to post the Harris Parody Video and comparable videos because she thinks they are funny and creative and believes that the laughter generated by the videos will be good for people and that the statements in the videos will cause people to think carefully about certain aspects of Harris's candidacy.

125.  Rickert learned about the Harris Parody Video on September 17, 2024, after viewing Governor Newsom's post on X that he passed a law banning that content. *See infra* ¶¶ 157–60.

126.  If not for AB 2839 and AB 2655, Rickert would have immediately posted the Harris Parody Video, and the other videos referenced above in paragraphs 119–124.

127.  In addition to the Harris Parody Video and other similar videos, Rickert has refrained from posting other content, including intentionally digitally modified videos and images of Kamala Harris asking illegal immigrants to vote, appearing in a Seinfeld episode, wearing communist attire, wearing a "Make USA Great Again" hat, and speaking to a communist gathering, and a digitally altered video of Governor Newsom endorsing Donald Trump.

128.  Rickert has refrained from posting content included in Exhibit 5 and that content is viewable here:

- Defiant World (@DefiantWorld), X (Sept. 20, 2024, 8:20 AM), https://perma.cc/U8YP-22SE.

- Charlie Kirk (@charliekirk11), X (Sept. 7, 2024, 11:37 PM), https://x.com/charliekirk11/status/1832624311573663988.

- Elon Musk (@elonmusk), X (Sept. 2, 2024, 1:18 PM), https://perma.cc/J92B-HYPC.

- Drew Hernandez (@DrewHLive), X (Aug. 31, 2024, 6:40 PM), https://perma.cc/AU5Z-BEQK.

- Donald J. Trump (@realDonaldTrump), X (Aug. 18, 2024, 7:50 AM), https://perma.cc/KF9Q-3U75.

- Brenden Dilley (@Warlord Dilley), X (Sept. 18, 2024, 5:35 AM), https://perma.cc/3HT4-TT8N.

129.  But for AB 2839 and AB 2655, Rickert would immediately post and repost the content identified in paragraphs 127–128 on her blog or her social media accounts.

130.  She would also post content on her blog or X, Facebook, or Instagram materially similar to the content referenced in paragraphs 118–128, meaning Rickert would post intentionally digitally created or modified content—including satire or parody—about politicians, including Kamala Harris, Gavin Newsom, future presidential and vice presidential candidates for office who appear on the ballot in California, other candidates who appear on the ballot in California, elected officials saying or doing something in connection to an election in California, and ballots, voting machines, and voting sites related to an election in California.

131.  In addition to the content identified in paragraphs 118–128, Rickert would like to, but has refrained from posting, the following images on her social media accounts.

 



132.  The three above images been digitally modified to depict Presidential candidate Donald Trump doing something that he did not do.

133.  Rickert desires to caption the post containing these images as: "This is the strategy to get Kamala Harris elected—political retaliation" or something materially similar.

134.  Rickert has refrained from posting the content identified in paragraphs 131–133 on her social media platforms because of AB 2839 and AB 2655.

135.  But for AB 2839 and AB 2655, Rickert would immediately post the images and text identified in paragraphs 131–133 on at least one of her social media accounts, including X, Facebook, or Instagram.

136.  Rickert has posted and will republish satire or parody that she knows is not literally true in all respects, meaning she knows at least some of that content is literally false or acts without regard to that literal truth.

137.  Rickert has also posted and will republish other content that is not satire or parody that she knows is not literally true, meaning she knows some of that content is false or acts without regard to that literal truth.

138.  Rickert has posted and desires to post such content, like that identified in paragraphs 118–133 and materially similar content, even though she knows it is not literally true because she believes such content helps to make certain political arguments that cannot be made with the literal truth.

139.  Rickert has been subjected to past instances of censorship or threatened censorship because of her posts on social media for posts that were materially different than the posts identified in paragraphs 118–133.

140.  For example, Facebook, Instagram, and TikTok have removed content from her account between ten and twenty times.

141.  Likewise, the State Bar of California improperly began to investigate Rickert in 2022 for a TikTok video that she created which

28

commented on abortion and a then-pending California law regarding abortion.

142.   The post generated many reactions on TikTok, and several users commented about how to file complaints with the State Bar of California.

143.   After conducting a month-long investigation, the State Bar of California closed the investigation.

144.   But this investigation caused Rickert to rarely post on TikTok to avoid future complaints related to her bar license.

**IV.    California accelerates passage of AB 2839 and AB 2655 to confront conservative political commentary.**

145.   California began considering the bills for AB 2655 and AB 2839 in February 2024.

146.   The bills were proceeding through the regular, slow legislative process.

147.   But, in July 2024, a conservative political commentator created the Harris Parody Video.

148.   The video used an AI-generated voiceover to mimic Harris's voice and was designed to mimic a campaign ad.

149.   The commentator entitled the video "Kamala Harris Campaign Ad PARODY" and posted the video on X.

150.   That same day, Elon Musk reposted the Harris Parody Video on X, where it gained over 100 million views. Elon Musk (@elonmusk), X (July 26, 2024), https://perma.cc/PL28-7QGE.

151.   Two days later, Governor Newsom posted a photo of a news story discussing Musk's retweet of the Harris Parody Video, asserting that the video "should be illegal" and promising to sign "a bill in a matter of weeks to make sure it is." Gavin Newsom (@GavinNewsom), X (July 28, 2024), https://perma.cc/V6C7-R2H3.

152.   The passage of AB 2655 and AB 2839 took off from there.

153.   After Governor Newsom's tweet, the California legislature accelerated steps to ensure that AB 2655 and AB 2839 would pass during its current legislative session.

154.   The bills passed through the California legislature in August, only about one month after Governor Newsom's promise to make parody videos like the Harris Parody Video "illegal."

155.   Governor Newsom signed both bills on September 17, 2024.

156.   On that same day, Governor Newsom posted another tweet declaring that he had "just signed a bill to make this illegal in the state of California." Gavin Newsom (@GavinNewsom), X (Sept. 17, 2024, 4:41 PM), https://perma.cc/J3RC-X9NA.

157.   Below is a screenshot of the Governor Newsom's post.

30



158.  By "this," and as read in context, Governor Newsom meant the Harris Parody Video.

159.  Also on September 17, 2024, the creator of the Harris Parody Video filed a lawsuit challenging the laws. *See Kohls v. Bonta*, Case No. 24-cv-02527 (E.D. Cal. Sept. 17, 2024), ECF No. 1.

160.  California is defending the laws, claims they are constitutional, never disagrees that AB 2839 prohibits the video and others like it, and

never disavows enforcing the laws. *See* Opp'n to Pls.' Mot. for Prelim. Inj., *Kohls v. Bonta*, Case No. 24-cv-02527 (E.D. Cal. Sept. 23, 2024), ECF No. 9.

## V. California acknowledges that AB 2839 restricts core political speech.

161. California acknowledged throughout the legislative process that AB 2839 imposed serious burdens on speech.

162. For example, in April 2024, the Assembly Committee on Judiciary reaffirmed that the bill covered "the right to speak about elections," "the right to receive information regarding them," and "political speech" and would be subject to "strict scrutiny." *See* Exhibit 6 (with report excerpts). The Committee recognized that "[t]he use of questionable tactics to win an election are as old as America's democracy." The Committee acknowledged that the bill "implicates both the right to speak about elections, as well as the right to receive information regarding them"; implicates "political speech" subjecting it to "the most exacting legal review"; and acts "as a prior restriction on speech … subject to strict scrutiny."

163. The Committee moved the bill forward even though it could not "ignore the longstanding preference of the courts to protect all forms of speech" or how "the current Supreme Court has demonstrated a willingness to greatly expand the scope of speech rights, especially when the speaker's views align with the court's majority."

164. In the end, the Committee concluded that "[t]he constitutional questions posed by this bill present an exceedingly difficult decision." And, the Committee said, "while this bill is certainly designed to provide the

greatest chance of withstanding constitutional review, it is almost guaranteed to be the subject of litigation."

165.   The Committee anticipated that the bill "will almost certainly be the target of immediate litigation."

166.   Then, in June 2024, the Senate Judiciary Committee published a report noting that AB 2839 "prohibits certain forms of speech" and "implicates the protections of the First Amendment." As before, the Committee thought "this bill may face legal challenge" as "most restrictions on political speech" had. But the Committee felt the bill was "arguably narrowly tailored." *See* Exhibit 7 (with report excerpts).

167.   Later in August—after Governor Newsom's tweet condemning the Harris Parody Video—the full Senate amended the bill.

168.   The Senate's amendment struck language that had previously stated: "This section does not apply to materially deceptive content that constitutes satire or parody." *See* Exhibit 8 (indicating changes between August 15, 2024 and September 17, 2024 with additions in *blue italics* and deletions in ~~red strikeout~~).

169.   The bill's co-sponsor later explained that "[w]e've worked with the Governor's office on Senate amendments that require deep fake parody material to be labeled as being digitally manipulated for those purposes … Additionally, recent amendments add an urgency clause—that was a great

33

idea—so the bill can take effect before the November 5, 2024 general election."[8]

170.  AB 2839 passed the California legislature with a declaration of urgency via two supermajority votes and AB 2839 took effect immediately upon the Governor's signature.

171.  Governor Gavin Newsom signed the bill on September 17, 2024, so it is now in effect.

## VI.  AB 2839 targets political expression, especially satire and parody.

172.  AB 2839 applies to a "person, committee, or other entity." Cal. Elec. Code § 20012(b).

173.  AB 2839 targets "materially deceptive content," defined as "audio or visual media that is digitally created or modified, and that includes, but is not limited to, deepfakes, such that it would falsely appear to a reasonable person to be an authentic record of the content depicted in the media." Cal. Elec. Code § 20012(f)(8)(A)–(B).

174.  AB 2839 applies to "materially deceptive content" communicated through an "advertisement or other election communication." Cal. Elec. Code § 20012(b)(1).

175.  "Election communication" is "any general or public communication not covered under 'advertisement' that is broadcast by or

---

[8] Remarks in support of Concurrence with Senate Amendments, Aug. 30, 2024, 4:27:44–28:06, https://www.assembly.ca.gov/media/assembly-floor-session-20240830?time[media-element3753]=16064.105438.
.

34

through television, radio, telephone, or text, distributed through the internet, or disseminated by print media, … and other similar types of communications, that concerns any of the following." Cal. Elec. Code § 20012(f)(5).

176.  "Election communication" covers communications, including those about "[a] candidate for office or ballot measure." Cal. Elec. Code § 20012(f)(5)(A).

177.  AB 2839 bans any person or entity from knowingly distributing with malice "an advertisement or other election communication containing materially deceptive content of"

- a "candidate for any federal, state, or local elected office in California portrayed as doing or saying something that the candidate did not do or say if the content is reasonably likely to harm the reputation or electoral prospects of a candidate";

- "[a]n elections official portrayed as doing or saying something in connection with an election in California that the elections official did not do or say if the content is reasonably likely to falsely undermine confidence in the outcome of one or more election contests";

- "[a]n elected official portrayed as doing or saying something in connection with an election in California that the elected official did not do or say if the content is reasonably likely to harm the reputation or electoral prospects of a candidate or is

35

reasonably likely to falsely undermine confidence in the outcome of one or more election contests;" or

- "[a] voting machine, ballot, voting site, or other property or equipment related to an election in California portrayed in a materially false way if the content is reasonably likely to falsely undermine confidence in the outcome of one or more election contests." Cal. Elec. Code § 20012(b)(1).

178.  AB 2839 defines "malice" as "knowing the materially deceptive content was false or with a reckless disregard for the truth." Cal. Elec. Code § 20012(f)(7).

179.  AB 2839 compels and restricts satire or parody related to subjects governed by the law.

180.  AB 2839 requires that any person or entity who posts "satire or parody" label the post with a disclosure saying, "This ____ has been manipulated for purposes of satire or parody." Cal. Elec. Code § 20012(b)(3).

181.  AB 2839 forbids any person or entity from republishing any "satire or parody" without a disclosure saying, "This ____ has been manipulated for purposes of satire or parody." Cal. Elec. Code § 20012(b)(3)–(4).

182.  Refusing to include the required label on republished content "is evidence of intent to knowingly distribute" election communications "containing materially deceptive content." Cal. Elec. Code § 20012(b)(4)(B).

183.  AB 2839's label must be "easily readable by the average viewer" and "no smaller than the largest font size of other text [if any] appearing" in the content. Cal. Elec. Code § 20012(b)(2)(B), (3).

184.  For a video, the text must appear throughout the duration of the video, and while for audio, "a clearly spoken" disclosure must be repeated during several intervals. Cal. Elec. Code § 20012(b)(2)(B), (3).

185.  AB 2839 begins to apply one hundred and twenty days before any election in California and stops applying either the day of the election or sixty days after the election depending on the subject matter of the content. Cal. Elec. Code § 20012(c).

186.  The Attorney General, Secretary of State, District Attorney, and City Attorney have the authority to "seek injunctive or other equitable relief prohibiting the distribution of the materially deceptive content" and are entitled to attorneys' fees and costs for the action. Cal. Elec. Code § 20012(d)(1).

187.  The Attorney General, Secretary of State, District Attorney, and City Attorney also have authority to "bring an action for general or special damage against" a person or entity who "distributed or republished the materially deceptive content" and are entitled to reasonable attorney's fees and costs. Cal. Elec. Code § 20012(d)(2)(A).

188.  AB 2839 has many exemptions.

189.  For example, AB 2839 does not apply to "materially deceptive content" in a broadcasting station's "bona fide" news if the station includes a disclosure. Cal. Elec. Code § 20012(e)(1).

190.   AB 2839 does not apply to a broadcasting station that is paid to broadcast "materially deceptive content" if certain conditions are met. Cal. Elec. Code § 20012(e)(2).

191.   AB 2839 does not apply to certain broadcasters, online newspapers, magazines, or periodicals that publish "materially deceptive content" if they include a disclosure. Cal. Elec. Code § 20012(e).

192.   The disclosure requirement for broadcasters, newspapers, magazines, or periodicals is not subjected to the same size regulations as the label for as satire or parody. Cal. Elec. Code § 20012(e)(2)–(3).

193.   AB 2839 also exempts broadcasting stations and internet websites from special damages for distributing materially deceptive content if they "did not create the content." Cal. Elec. Code § 20012(d)(2).

194.   AB 2839 does not apply to "an interactive computer service, as defined in Section 230(f)(2)" of the Communications Decency Act.[9] Cal. Elec. Code § 20012(e)(4).

195.   Nor does AB 2839 apply to "candidate[s] for elective office" who "portray" themselves "as doing or saying something that the candidate did not do or say" if the content is labeled. Cal. Elec. Code § 20012(b)(2), (F)(1).

---

[9] The Communications Decency Act defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C.A. § 230(f)(2).

38

**VII.  California recognizes that AB 2655 restricts core political speech.**

196.  California acknowledged throughout the legislative process that AB 2655 imposes serious burdens on speech and would be "vulnerable" to a constitutional challenge.

197.  For example, the Assembly Committee on Judiciary published a report in April 2024 acknowledging that the law "would interfere with both the expression and reception of information based upon its content." The Committee recognized this was "potentially problematic" because the bill singled "out particular content" that "relates to political candidates and elections," which normally receives full constitutional protection. The Committee admitted "[i]t is difficult to imagine any content more related to 'political expression' and 'discussion of public issues' than content about candidates and elections." The Committee also acknowledged that "opponents of this bill"—including "the industry groups and the ACLU"— "believe that with no sure means to determine what is 'materially deceptive,' the platforms will err on the side of blocking content, thus burdening more speech than is necessary." *See* Exhibit 9 (with report excerpts).

198.  The Committee acknowledged that opponents claimed the bill was not narrowly tailored and that "it will be a court – not the findings and declarations of the bill – that will determine whether the bill is narrowly tailored. The court may consider, for example, if there are other less restrictive and more effective means of protecting election integrity."

199.  When surveying cases pending before the Supreme Court (as of April 2024), the Committee stated that "there is no obvious or certain answer as to whether this bill violates the First Amendment."

200.  Several months later, in a June 2024 Senate Judiciary Committee report, California admitted that "[h]yperbole, distortion, invective, and tirades are as much a part of American politics as kissing babies and distributing bumper stickers and pot holders." California recognized "the extraordinary protection afforded to political speech" under the First Amendment—including "false statements of fact." *See* Exhibit 10 (with report excerpts).

201.  The Senate Judiciary Committee also understood that the bill "could be found to implicate the First Amendment rights of platforms in their editorial discretion."

202.  The Senate Judiciary Committee ultimately concluded that "it is inherently difficult to predict whether this law will be struck down for violating the protections of the First Amendment," especially "in the more politically charged federal judiciary of the day." But, the Committee believed, "it is safe to say [AB 2655] will likely face legal challenge and arguably be vulnerable thereto."

203.  In the final Assembly Floor Analysis in August 2024—just weeks before the bill became law—the California legislature still acknowledged the law may be unconstitutional. That analysis recognized the law "burdens core political speech," would be subject to strict scrutiny under the First

1    Amendment, and might not be "adequately protect[ed] … against a

2    constitutional challenge." *See* Exhibit 11.

3        204.  The California legislature passed AB 2655.

4        205.  Governor Gavin Newsom signed the bill on September 17, 2024,

5

6    and AB 2655 goes into effect on January 1, 2025.

7    **VIII. AB 2655 targets political expression.**

8        206.  AB 2655 applies to "large online platform[s]." Cal. Elec. Code

9

10   § 20512(h).

11       207.  Large online platforms are defined as "a public-facing internet

12   website, web application, or digital application, including a social media

13   platform … video sharing platform, advertising network, or search engine

14   that had at least 1,000,000 California users during the preceding 12

15   months." Cal. Elec. Code § 20512(h).

16

17       208.  The law targets "materially deceptive content," which "means

18   audio or visual media that is digitally created or modified, and that includes,

19   but is not limited to, deepfakes and the output of chatbots, such that it

20   would falsely appear to a reasonable person to be an authentic record of the

21   content depicted in the media." Cal. Elec. Code § 20512(i)(1).

22       209.  "[M]aterially deceptive content" prohibited by the law includes a

23

24        • "candidate for elective office portrayed as doing or saying

25          something that the candidate did not do or say and that is

26          reasonably likely to harm the reputation or electoral prospects

27          of a candidate";

28

41

- "elections official portrayed as doing or saying something in connection with the performance of their elections-related duties that the elections official did not do or say and that is reasonably likely to falsely undermine confidence in the outcome of one or more election contests";

- "elected official portrayed as doing or saying something that influences the election that the elected official did not do or say and that is reasonably likely to falsely undermine confidence in the outcome of one or more election contests;" or

- "voting machine, ballot, voting site, or other property or equipment related to an election in California portrayed in a materially false way if the content is reasonably likely to falsely undermine confidence in the outcome of one or more election contests. Cal. Elec. Code § 20513.

210. AB 2655 starts to apply to "materially deceptive content" beginning 120 days before an election in California and ending the day of the election or sixty days after the election depending on the content. Cal. Elec. Code § 20513(e)(1)–(2).

211. AB 2655 requires large online platforms to take three actions with respect to materially deceptive content.

212. *First*, AB 2655 requires large online platforms to "provide an easily accessible way for California residents to report that" content should be removed or labeled as "manipulated" and "not authentic." Cal. Elec. Code § 20515(a). This is the "Reporting Requirement."

42

213.   Large online platforms must also respond to the person reporting the content within 36 hours "describing any action taken or not taken … with respect to the content." Cal. Elec. Code § 20515(a).

214.   *Second*, AB 2655 demands that large online platforms "develop and implement procedures for the use of state-of-the-art techniques to identify and remove materially deceptive content if" four criteria are met. Cal. Elec. Code § 20513(a). This is the "Removal Requirement."

215.   The criteria are: (1) the content has been reported under the Reporting Requirement; (2) the content is "materially deceptive content"; (3) the content is posted within the applicable timeframe; and (4) the large online platform "knows or acts with reckless disregard of the fact that the content meets the" prior three requirements. Cal. Elec. Code § 20513(a).

216.   Large online platforms must remove the content within 72 hours. Cal. Elec. Code § 20513(b).

217.   Large online platforms must also remove "any identical or substantially similar materially deceptive content" that they had previously removed upon discovery that the content has been reposted. Cal. Elec. Code § 20513(c).

218.   *Third*, AB 2655 requires large online platforms to "develop and implement procedures for the use of state-of-the-art techniques to identify materially deceptive content" and label it if three criteria are met. This is the "Labeling Requirement."

219.   The criteria are: (1) the content has been reported under the Reporting Requirement; (2) the content is either "materially deceptive

content" regardless of when it is posted or the content is "materially deceptive content" and appears in an "advertisement" or "election communication"; and (3) the large online platform "knows or acts with reckless disregard for the fact that the content meets the" prior two requirements. Cal. Elec. Code § 20514(a).

220.   The Labeling Requirement forces large online platforms to label the content within 72 hours of discovery or receipt of a report; that label must state: "This [image, audio, or video] has been manipulated and is not authentic." Cal. Elec. Code § 20514(b)–(c).

221.   The Labeling Requirement also forces large online platforms to "permit users to click or tap on [the label] for additional explanation about the materially deceptive content in an easy-to-understand format." Cal. Elec. Code § 20514(d).

222.   Any person—including the Secretary of State—who has filed a report with a large online platform "may seek injunctive or other equitable relief" to enforce the Reporting Requirement, the Removal Requirement, or the Labeling Requirement. Cal. Elec. Code § 20515(b).

223.   Likewise, the Attorney General, District Attorney, or City Attorney "may seek injunctive or other equitable relief" to enforce the Reporting, Removal, or Labeling Requirements. Cal. Elec. Code § 20516.

224.   By authorizing the government to coerce large online platforms to remove and label content through a reporting process, AB 2655 uses governmental authority and the threat of punishment to coerce private

44

parties into punishing or suppressing speech based on its content and viewpoint.

225.  Though AB 2655 applies to large online platforms in these ways, the law makes many exceptions.

226.  For example, AB 2655 does not apply to certain online newspapers, magazines, or periodicals that publish "materially deceptive content" if the publisher includes a disclosure. Cal. Elec. Code § 20519(a).

227.  AB 2655 does not apply to a "broadcasting station that broadcasts any materially deceptive content" if the station includes a disclosure. Cal. Elec. Code § 20519(b)(1).

228.  AB 2655 does not apply to a broadcasting station that is paid to broadcast "materially deceptive content" in some situations. Cal. Elec. Code § 20519(b).

229.  AB 2655 does not apply to "materially deceptive content that constitutes satire or parody." Cal. Elec. Code § 20519(c).

230.  AB 2655 applies only to "materially deceptive content" concerning certain candidates—i.e., to persons running for a voter-nominated office as defined in Cal. Elec. Code § 359.5(a), persons running for President or Vice President of the United States, and persons running for the office of Superintendent of Public Instruction. Cal. Elec. Code § 20512(c).

231.  "Materially deceptive content" about candidates who do not meet these criteria is not prohibited.

232.  AB 2655 defines "election in California" to mean "any election where a candidate … is on the ballot, and any election where a statewide

initiative or statewide referendum measure is on the ballot." Cal. Elec. Code § 20512(f).

233.  And AB 2655's removal requirement does not apply to "candidate[s] for elective office" who "portray" themselves "as doing or saying something that the candidate did not do or say" if the content is labeled. Cal. Elec. Code § 20513(d).

## IX.  AB 2839 and 2655 impose overwhelming burdens on The Bee and Rickert, compelling and restricting their speech.

234.  AB 2839 and AB 2655 have imposed and will continue to impose significant pressures and burdens on The Bee's and Rickert's expression.

235.  AB 2839 and AB 2655 use vague and overbroad terms that grant California unbridled enforcement discretion, including but not limited to phrases like "falsely appear to a reasonable person," "reasonably likely to harm the reputation or electoral prospects of a candidate," "undermine confidence in the outcome of [an] … election contest[]," and others.

236.  Whether expression falls into these vague and overbroad categories depends on the subjective perceptions of others, including state enforcement officials.

237.  For example, The Bee once posted an article about U.S. Representative Ocasio-Cortez guessing everything was free on the gameshow "Price is Right." *See supra* ¶¶ 83–86.

238.  The article generated enough attention from viewers—i.e., the presumptively "reasonable person"—that Snopes deemed it necessary to fact-check the article to determine that it was satirical. *See supra* ¶¶ 79–86.

46

239.  Snopes, USA Today, and others have mistaken The Bee's satirical articles for real news in the past, and that is likely to continue to happen in the future. *See supra* ¶¶ 69–86.

240.  Whether content "harm[s] the reputation … of a candidate" is inherently subjective, vague, and overbroad and depends on others' perception of the effect of the content.

241.  And whether content "harms" the "electoral prospects of a candidate" is inherently subjective, vague, and overbroad because it depends on others' perception of the effect of the content.

242.  AB 2655's exemption for "satire or parody" is also problematic because persons often disagree over whether something is or is not satire.

243.  For example, the Harris Parody Video was clearly marked as a parody. *See, e.g.*, *supra* ¶¶ 119–21.

244.  But Governor Newsom still tweeted that the video should be "illegal." *See supra* ¶¶ 151–57.

245.  Because of the vagueness and overbreadth of AB 2839 and 2655 and their discretionary terms, it is unclear if the following content— including content from a social media account attributed to the Harris presidential campaign that has been accused of "repeatedly deceiv[ing]" viewers "with misleading edits and captions"—would violate those laws:

- Republican Nat'l Comm., *12 Minutes of Democrats Denying Election Results,* (June 23, 2022), https://gop.com/video/12-minutes-of-democrats-denying-election-results/.

47

- Daniel Dale, *Fact Check: Harris campaign social media has repeatedly deceived with misleading edits and captions*, CNN (Sept. 14, 2024, 2:57 PM), https://perma.cc/KUZ2-AMEY.

246. The example in bullet point two above is in Exhibit 12.

247. It is likewise unclear if the digitally altered image below, which depicts Taylor Swift endorsing Donald Trump, violates AB 2839 or AB 2655 by harming a candidate's "electoral prospects," undermining "confidence" in the election, or violating some other clause.



248. As applied here, AB 2839 threatens The Bee and Rickert with attorneys' fees, injunctions, and other forms of punishment for creating, posting, or reposting content they desire to create, post, or repost.

249.   The Bee and Rickert are direct objects of AB 2839 because they each operate their own websites and social media accounts where they regularly post political content—including content that is satire or parody—that is or is arguably regulated by AB 2839 and they distribute that content over the internet.

250.   The Bee posts satirical articles on its website and social media accounts every day.

251.   The Bee has and will continue to post satirical articles on its website and social media accounts containing content that is or is arguably regulated by AB 2839, including intentionally digitally created or modified content portraying candidates in California, elected officials saying something in connection with an election in California, ballots, and voting sites as stated in paragraphs 52–61 above.

252.   The Bee faces a substantial risk that many of its existing articles and social media posts are already actionable under AB 2839.

253.   Meanwhile, Rickert desires to create blog posts and posts on her social media accounts with content that has been intentionally digitally created or modified that would be actionable under AB 2839.

254.   For example, Rickert desires to repost on her blog and social media accounts the Harris Parody Video as stated in paragraphs 118–133 above.

255.   This is the same video that Governor Newsom found to be "illegal" under AB 2839, and therefore posting this video would violate AB 2839.

49

256.  Rickert desires to post on her blog and social media accounts other content that faces a substantial risk of being actionable under AB 2839—intentionally digitally created or modified content portraying candidates in California, elected officials saying something in connection with a candidate in California, ballots, and voting sites as stated in paragraphs 118–133 above.

257.  Rickert has refrained from posting the content identified in paragraphs 118–133 above on her own blog and social media accounts to avoid being subject to liability under AB 2839.

258.  Rickert would immediately post the content identified in paragraphs 118–133 above or materially similar content but for AB 2839.

259.  The Bee and Rickert also desire to post satirical or parodical content that has been intentionally digitally created or modified on their social media accounts hosted by large online platforms or republish to those accounts such content created by others.

260.  The only way for The Bee and Rickert to publish or republish satire or parody on their own websites or on their social media accounts without violating AB 2839 is by labeling the content ("This ____ has been manipulated for purposes of satire or parody") in a size that complies with AB 2839.

261.  This disclaimer alters the content of the messages The Bee and Rickert want to express by alerting the viewer to the satirical or parodical nature of the communication and thereby depriving the expression of its rhetorical force.

50

262.   This disclaimer also alters the content of the messages The Bee and Rickert desire to express by forcing them to incorporate California's desired messages into their satire or parody.

263.   Neither The Bee nor Rickert are willing to post satire or parody with this label because they do not want this disclaimer to alter their messages and because AB 2839 size requirements ruin the communicative impact of satire or parody.

264.   For example, AB 2839 requires The Bee to alter its headlines or video identified above by stamping the following disclaimer on its content:





51

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

265.  And AB 2839 requires Rickert to alter the Harris Parody Video by post the following disclaimer throughout the video:



266.  The Bee has continued to post satirical and parodical content without the disclaimer despite the substantial risk of harm imposed by AB 2839 because The Bee is unwilling to include the disclaimer and unwilling to chill its own speech.

267.  By contrast, Rickert has refrained from posting the content identified in paragraphs 118–133 because she is unwilling to include the disclaimer and unwilling to risk liability under AB 2839.

268.  AB 2839 harms The Bee and Rickert by threatening them, their websites, and their social media accounts for posting content California defines as "materially deceptive content."

269.  AB 2839 likewise harms The Bee and Rickert by conditioning their freedom to post or republish satire or parody on their willingness to include a large disclaimer.

52

270. If The Bee or Rickert declines to include the disclaimer, California officials threaten them with lawsuits and penalties.

271. AB 2655 independently and in conjunction with AB 2839 stifles and burdens The Bee's and Rickert's expression.

272. AB 2655 requires large online platforms to accept reports of "materially deceptive content" and remove or label that content beginning January 1, 2025.

273. AB 2655's structure encourages large online platforms to err on the side of removing or labeling content rather than allowing it, even if the content arguably falls within the "satire or parody" exemption of AB 2655.

274. The Bee posts content on X, Instagram, Facebook, and YouTube, all of which qualify as large online platforms under AB 2655.

275. Despite these threats, The Bee has and will continue to post intentionally digitally created or modified content on large online platforms that is materially similar to content that it has posted in the past as identified in paragraphs 52–61 above, even if AB 2655 threatens to coerce large online platforms into removing that content.

276. Material that is similar to content The Bee has posted in the past includes the content identified in paragraphs 52–61 above and other intentionally digitally created or modified content about Donald Trump, Kamala Harris, Gavin Newsom, future presidential and vice presidential candidates for office who appear on the ballot in California, other candidates who appear on the ballot in California, elected officials saying or doing something in connection to an election in California.

277.   Meanwhile, Rickert has accounts with X, Facebook, and Instagram.

278.   Rickert has refrained from posting certain content on her social media accounts because of AB 2655 as described in paragraphs 118–133 above.

279.   For example, Rickert would like to post the Harris Parody Video.

280.   But she has specifically refrained from reposting the Harris Parody Video because Governor Newsom said that AB 2655 makes the video "illegal" and therefore forces social media companies to remove it.

281.   The Bee's and Rickert's posts identified in paragraphs 52–61 and 118–133 above that have been posted have not been removed or labeled by X, Instagram, Facebook, or YouTube, and because this content arguably violates AB 2655, these large online platforms will arguably violate AB 2655 for not removing the content when that law goes into effect.

282.   The Bee and Rickert face a substantial risk that AB 2839 and AB 2655 will cause their content to be removed or labeled by these large online platforms.

283.   X, Facebook, Instagram, and YouTube have certain content moderation policies that govern what content may be uploaded to those platforms.

284.   These platforms' internal policies give them discretion to determine whether particular content violates their policies.

285.   But AB 2839 and AB 2655 impose different content moderation requirements than these platforms' current policies and threaten to impose

54

those requirements under the authority of California and the threat of penalties and damages.

286.  And because these platforms reference applicable state law in their terms of service agreements, AB 2839 and AB 2655 require these platforms to moderate content in ways that they otherwise would not under their existing policies.

287.  For that reason, The Bee, Rickert, and other speakers risk being deplatformed for posting content that violates or arguably violates AB 2839 and AB 2655.

288.   If The Bee continues to post or if Rickert begins posting content that violates AB 2839 or AB 2655, they risk disciplinary action or other sanctions from X, Facebook, Instagram, or YouTube, which may include temporary bans or removal of their accounts.

289.  The Bee's and Rickert's substantial risk of being deplatformed or otherwise punished by these large online platforms for posting their desired content causes them material harm because of content that they have posted in the past as identified in paragraphs 52–61 and 118–133 above or content that they wish to post in the future as identified in these paragraphs.

290.  The Bee's revenue, access to followers and subscribers, and access to a platform of its choice are materially harmed by AB 2839 and AB 2655.

291.  Because of AB 2839 and AB 2655, The Bee faces a substantial risk that the enforcement of these laws will cause it to be removed from these platforms or cause these platforms to label its content if that content is

materially similar to content it has posted in the past as described in paragraphs 52–61 above.

292.  Such removal would impair The Bee's revenue and reputation, cause it to lose access to one or more large platforms to proclaim its messages, and cause it to lose access to the millions of followers and subscribers it has attracted across X, Facebook, Instagram, and YouTube.

293.  Likewise, the risk of being deplatformed for posting content is substantial and would significantly burden Rickert.

294.  If Rickert posted the content she desires to post in violation of AB 2839 and AB 2655 as identified in paragraphs 118–133 above, she risks disciplinary action or other sanctions from the platforms, which may include temporary bans or removal of her account.

295.  These sanctions would harm her reputation among her followers, cause her to lose access to platforms to communicate her preferred messages, views, and opinions, and cause her to lose access to the tens of thousands of followers that she has acquired over X, Facebook, and Instagram.

296.  If not for AB 2839 and AB 2655, Rickert would immediately publish the content listed in paragraphs 118–133 above and would publish materially similar content as described in paragraphs 118–133 above.

297.  AB 2839 and AB 2655 also harm The Bee and Rickert because they wish to view other content creators' content that would be available absent AB 2839 and AB 2655.

298.  They are prejudiced, as viewers of this content, to the extent that AB 2839 and AB 2655 curtail others' protected speech.

299.  The Bee and Rickert's freedom to engage in their desired expression is burdened by AB 2839 and AB 2655.

## ALLEGATIONS OF LAW

300.  Plaintiffs publish, distribute, republish, and circulate content that is subject to AB 2839 and AB 2655.

301.  AB 2839 and AB 2655 violate Plaintiffs' constitutional rights, and chill and deter them from exercising their constitutional rights.

302.  As a direct and proximate result of Defendants' violations of Plaintiffs' constitutional rights, Plaintiffs have suffered and will suffer ongoing irreparable harm, entitling Plaintiffs to declaratory and injunctive relief.

303.  Plaintiffs do not have an adequate monetary or legal remedy for the loss of their constitutional rights.

304.  Unless Defendants are enjoined, Plaintiffs will continue to suffer irreparable harm.

## FIRST CAUSE OF ACTION

### Violation of the First Amendment's Free Speech and Free Press Clauses by AB 2839

305.  Plaintiffs repeat and reallege each allegation contained in paragraphs 1–304 of this complaint.

306.  The First Amendment's Free Speech and Free Press Clauses protect Plaintiffs' ability to create, publish, and distribute their speech.

307.  The First Amendment also protects Plaintiffs' right to be free from content, viewpoint, and speaker-based discrimination, overbroad

57

restrictions on speech, and vague laws allowing unbridled discretion by enforcement officials.

308.   Plaintiffs engage in activities protected by the First Amendment when they create, publish, or distribute their own speech or republish the speech of others or view others' speech.

309.   AB 2839 uses governmental authority and the threat of punishment to coerce private parties into punishing or suppressing Plaintiffs' speech that Defendants disfavor.

310.   AB 2839 constitutes an impermissible and unreasonable restriction of protected speech because it burdens substantially more speech than is necessary to further any governmental interest.

311.   As applied and facially, AB 2839 bars and chills speech based on content and viewpoint.

312.   As applied and facially, AB 2839 is not content-neutral because it targets only "materially deceptive content," and only a certain subset of that kind of speech. Specifically, it targets speech that is "reasonably likely to harm the reputation or electoral prospects of a candidate" and speech that is "reasonably likely to falsely undermine confidence in the outcome of one or more election contests."

313.   AB 2839 is not content- or viewpoint-neutral because it singles out "satire or parody" by restricting that content unless the "satire or parody" includes a disclaimer.

58

314.   As applied and facially, AB 2839 is not speaker-neutral because it exempts actual candidates from making "materially deceptive content" if they include a disclaimer in their content.

315.   AB 2839 is unconstitutional as applied to Plaintiffs' speech because AB 2839 is a content-, viewpoint-, and speaker-based regulation that bans, chills, and burdens Plaintiffs' desired speech.

316.   As applied to Plaintiffs, AB 2839 compels speech Plaintiffs object to, interferes with their editorial judgment, and compels them to publish and disseminate speech they object to.

317.   As applied to Plaintiffs, AB 2839 is vague and allows Defendants unbridled discretion to evaluate Plaintiffs' speech and then discriminate against it based on content and viewpoint in determining whether to apply AB 2839.

318.   AB 2839 punishes Plaintiffs for publishing speech Defendants deems to be "materially deceptive content."

319.   AB 2839 prohibits Plaintiffs from publishing their own "satire or parody" without a disclaimer.

320.   AB 2839 compels Plaintiffs to publish a disclaimer as a condition of publishing "satire or parody."

321.   AB 2839 prohibits Plaintiffs from re-publishing third-parties' "satire or parody" without a disclaimer.

322.   AB 2839 compels Plaintiffs to publish a disclaimer as a condition of re-publishing third-parties' "satire or parody."

323.  AB 2839 is substantially overbroad in relation to any legitimate sweep and is facially unconstitutional for that reason.

324.  AB 2839 is substantially overbroad because it does not adequately define various material terms in the statute, including but not limited to "deep fake," "materially deceptive content," "harm the reputation or electoral prospects of a candidate," and "falsely undermine confidence in the outcome of one or more election contests."

325.  AB 2839 also vests unfettered discretion in state officials to define these terms and remove content in accordance with their own subjective ends for election regulations.

326.  Plaintiff Rickert has not and will not engage in certain protected speech because of AB 2839.

327.  If not for AB 2839, Plaintiff Rickert would immediately begin to engage in this protected speech.

328.  AB 2839 imposes a substantial risk of harm on Plaintiff The Babylon Bee because it has posted and will continue to post content that violates or at least arguably violates AB 2839.

329.  Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing on Plaintiffs' free speech and free press rights.

330.  Accordingly, facially and as applied to Plaintiffs, AB 2839 violates the First Amendment's protections for free speech and free press.

## SECOND CAUSE OF ACTION

## Violation of the Fourteenth Amendment by AB 2839

331.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1–304 of this complaint.

332.   The Fourteenth Amendment's Due Process Clause prohibits the government from censoring speech using vague standards that grant unbridled discretion to government officials to arbitrarily prohibit some speech and that fail to give speakers sufficient notice regarding whether their desired speech violates AB 2839.

333.   Due process requires that people of ordinary intelligence be able to understand what conduct a given statute or regulation prohibits.

334.   Statutes or regulations that fail to provide this fair notice and clear guidance are void for vagueness.

335.   Statutes, rules, or regulations that authorize or even encourage arbitrary or viewpoint-discriminatory enforcement are void for vagueness.

336.   Plaintiffs, Defendants, and third parties of ordinary intelligence cannot know what content is prohibited by AB 2839.

337.   AB 2839 chills and restrains satirists, political humorists, and other original content-creators, subjecting them to censorship and other punitive sanctions for their speech.

338.   AB 2839 chills and restrains the speech of those wishing to republish certain content prohibited by AB 2839 by subjecting that content to censorship and other punitive sanctions.

339.   AB 2839 does not provide fair notice of what it prohibits.

340.  AB 2839 authorizes and encourages discriminatory enforcement.

341.  AB 2839 uses unconstitutionally vague phrases, including but not limited to "falsely appear to a reasonable person to be an authentic record of the content depicted in the media"; "reasonably likely to harm the reputation or electoral prospects of a candidate"; "reasonably likely to falsely undermine confidence in the outcome of one or more election contests"; and "satire or parody."

342.  Defendants can use this vagueness, and the unbridled discretion it provides, to apply AB 2839 in a way that discriminates against content, viewpoints, and actions Defendants disfavor.

343.  Accordingly, facially and as applied to Plaintiffs, AB 2839 violates the Fourteenth Amendment's Due Process Clause and chills protected speech.

### THIRD CAUSE OF ACTION

### Violation of the First Amendment's Free Speech and Free Press Clauses by AB 2655

344.  Plaintiffs repeat and reallege each allegation contained in paragraphs 1–304 of this complaint.

345.  The First Amendment's Free Speech and Free Press Clauses protect Plaintiffs' ability to speak and to publish and distribute their speech.

346.  The First Amendment also protects Plaintiffs' right to be free from content-, viewpoint-, and speaker-based discrimination, overbroad restrictions on speech, and vague laws allowing unbridled discretion by enforcement officials.

347.   Plaintiffs engage in activities protected by the First Amendment when they create, publish, or distribute their own speech, including when they publish it on third-party online platforms, and view others' speech.

348.   AB 2655 uses governmental authority and the threat of punishment to coerce private parties into punishing or suppressing Plaintiffs' speech that Defendants disfavor.

349.   AB 2655 constitutes an impermissible and unreasonable restriction of protected speech because it burdens substantially more speech than is necessary to further any governmental interest.

350.   As applied and facially, AB 2655 bars and chills speech based on content and viewpoint.

351.   As applied and facially, AB 2655 is not content-neutral because it targets only "materially deceptive content," and only a certain subset of that kind of speech. Specifically, it targets speech that is "reasonably likely to harm the reputation or electoral prospects of a candidate" and speech that is "reasonably likely to falsely undermine confidence in the outcome of one or more election contests."

352.   As applied and facially, AB 2655 is also not content-neutral because it only regulates "materially deceptive content" directed at specific public offices and referenda, not all elections.

353.   AB 2655 is unconstitutional as applied to Plaintiffs' speech because AB 2655 is a content-, viewpoint-, and speaker-based regulation that bans, chills, and burdens Plaintiffs' desired speech (and the publication

of that speech) on large online platforms where they desire to publish and have previously published their speech.

354.  As applied to Plaintiffs, AB 2655 is vague and allows Defendants unbridled discretion to coerce large online platforms to report, remove, and label speech and then discriminate based on content and viewpoint in determining whether to apply AB 2655.

355.  AB 2655 forces large online platforms where Plaintiffs publish their speech to either create a mechanism where viewers can report Plaintiffs' posts or risk prosecution for not providing that mechanism.

356.  AB 2655 uses governmental authority and the threat of punishment to coerce private large online platforms into punishing or suppressing Plaintiffs' speech that Defendants disfavor.

357. AB 2655 forces large online platforms where Plaintiffs publish their speech to either remove "materially deceptive content" as defined by California or risk prosecution for not removing that content.

358.  AB 2655 coerces large online platforms to remove any of Plaintiffs' speech published on those platforms deemed "materially deceptive content" as defined by Defendants.

359.  AB 2655 forces large online platforms where Plaintiffs publish their speech to label "materially deceptive content" that is not otherwise removable with a label or risk prosecution for not labeling that content.

360.  AB 2655 coerces large online platforms where Plaintiffs publish their speech to either label Plaintiffs' speech that is deemed to be "materially

deceptive content" and otherwise fits the criteria for the Labeling Require-
ment or risk prosecution for not labeling that content.

361.  AB 2655 is substantially overbroad in relation to any legitimate
sweep and is facially unconstitutional for that reason.

362.  AB 2655 is substantially overbroad because it does not
adequately define various material terms in the statute, including but not
limited to "deep fake," "materially deceptive content," "harm the reputation
or electoral prospects of a candidate," "falsely undermine confidence in the
outcome of one or more election contests," "something that influences the
election," and "satire or parody."

363.  AB 2655 also vests unfettered discretion in state officials to
define these terms and coerce large online platforms to remove content in
accordance with the officials' own subjective ends for election regulations.

364.  AB 2655 imposes a substantial risk of harm on Plaintiff Babylon
Bee because it has posted and will continue to post content that violates or
at least arguably violates AB 2655.

365.  Plaintiff Rickert has not and will not engage in certain protected
speech because of AB 2655.

366.  If not for AB 2655, Plaintiff Rickert would immediately begin to
engage in this protected speech.

367.  Defendants do not serve any compelling or even valid interest in
a narrowly tailored way by infringing on Plaintiffs' free speech and free
press rights.

368.  Accordingly, facially and as applied, AB 2655 violates the First Amendment's protections for free speech and free press.

## FOURTH CAUSE OF ACTION

### Violation of the Fourteenth Amendment by AB 2655

369.  Plaintiffs repeat and reallege each allegation contained in paragraphs 1–304 of this complaint.

370.  The Fourteenth Amendment's Due Process Clause prohibits the government from censoring speech using vague standards that grant unbridled discretion to government officials to arbitrarily prohibit some speech and that fail to give speakers sufficient notice regarding whether their desired speech violates California's law.

371.  Due process requires that people of ordinary intelligence be able to understand what conduct a given statute or regulation prohibits.

372.  Statutes or regulations that fail to provide this fair notice and clear guidance are void for vagueness.

373.  Statutes or regulations that authorize or even encourage arbitrary or viewpoint discriminatory enforcement are void for vagueness.

374.  Plaintiffs, Defendants, and third parties of ordinary intelligence cannot know what content is prohibited by AB 2655.

375.  AB 2655 does not provide fair notice of what it prohibits.

376.  AB 2655 authorizes and encourages discriminatory enforcement.

377.  AB 2655 uses unconstitutionally vague phrases including but not limited to "falsely appear to a reasonable person to be an authentic record of the content depicted in the media"; "reasonably likely to harm the reputation

66

or electoral prospects of a candidate"; "in connection with the performance of their elections-relate duties"; "reasonably likely to falsely undermine confidence in the outcome of one or more election contests"; "something that influences the election"; and "satire or parody."

378.  Defendants can use this vagueness, and the unbridled discretion it provides, to apply the AB 2655 in a way that discriminates against content, viewpoints, and actions Defendants disfavor.

379.  Accordingly, facially and as applied to Plaintiffs, AB 2655 violates the Fourteenth Amendment's Due Process Clause and chills protected speech.

## PRAYER FOR RELIEF

Plaintiffs respectfully ask this Court to enter judgment against Defendants and provide the following relief:

1.   An expedited preliminary injunction and a permanent injunction to stop Defendants and any person acting in concert with them from:

    a.   enforcing AB 2839 and AB 2655 as applied to Plaintiffs' constitutionally protected speech and press;

    b.   enforcing AB 2839 and AB 2655 as applied to other similarly speakers engaging in similarly situated speech as Plaintiffs;

    c.   enforcing AB 2839 and AB 2655 facially.

2.   A declaration that AB 2839 and AB 2655, as applied to Plaintiffs and similarly situated speakers, have violated and continue to violate their

First Amendment Rights under the United States Constitution to engage in speech and press;

3.     A declaration that AB 2839 and AB 2655 facially violate the First Amendment protections for speech and press and the Fourteenth Amendment protections for due process;

4.     A ruling concerning the rights and other legal relations of the parties to the subject matter here in controversy that ensures these declarations shall have the force and effect of a final judgment;

5.     An order retaining jurisdiction of this matter for the purpose of enforcing the Court's orders;

6.     An award of Plaintiffs' costs and expenses in this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988;

7.     The requested injunctive relief without a condition of bond or other security required of Plaintiffs; and

8.     Any other relief that the Court deems equitable and just in the circumstances.


DATED:     September 30, 2024


                              */s/ David A. Shaneyfelt*
                              David A. Shaneyfelt
                              *Counsel for Plaintiffs*

68

1

**DECLARATION UNDER PENALTY OF PERJURY**

2    I, Seth Dillon, have reviewed the complaint and declare under penalty

3  of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct

4  to the best of my personal knowledge as to the policies, practices, posts,

5  statistics, articles, intentions, and other factual statements that relate to

6
7  The Babylon Bee.

8    Executed this 28th day of September, 2024, at ███████████████

9  Jupiter, Florida.

10

11

12    Seth Dillon

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION UNDER PENALTY OF PERJURY

I, Kelly Chang Rickert, have reviewed the complaint and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my personal knowledge as to the practices, posts, statistics, articles, intentions, and other factual statements that relate to Kelly Chang Rickert.

Executed this 27th day of September, 2024, at Los Angeles, California.

_____
Kelly Chang Rickert

70

## INDEX OF EXHIBITS TO VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

| Exhibit No. | Description |
|:---:|:---:|
| 1 | Screenshots of The Babylon Bee's articles and posts before September 17, 2024 Part I |
| 2 | Screenshots of The Babylon Bee's articles and posts before September 17, 2024 Part II |
| 3 | Screenshots of The Babylon Bee's articles and posts after September 17, 2024 |
| 4 | Screenshots of Kelly Chang Rickert's social media posts before September 17, 2024 |
| 5 | Screenshots of Kelly Chang Rickert's social media posts that she has refrained from posting since September 17, 2024 |
| 6 | April 2024 Assembly Committee on Judiciary excerpts for AB 2839 |
| 7 | June 2024 Senate Judiciary Committee excerpts for AB 2839 |
| 8 | Senate Amendments to AB 2839 |
| 9 | April 2024 Assembly Committee on Judiciary excerpts for AB 2655 |
| 10 | June 2024 Senate Judiciary Committee excerpts for AB 2655 |
| 11 | August 2024 Concurrence in Senate Amendments for AB 2655 |
| 12 | CNN report on Harris campaign's use of misleading edits and captions |

# EXHIBIT 1

# Kamala Responds To Criticism Over Lack Of Policies By Posting Another Truck Stop Junk Food Video

POLITICS · Sep 6, 2024 · BabylonBee.com

<u>Click here</u> to view this article with reduced ads.  ⎘



# Trump Team Reveals Debate Strategy: Trump Will Cede All His Time To Kamala And Then Quietly Play With His Tamagotchi

POLITICS · Sep 10, 2024 · BabylonBee.com
Click here to view this article with reduced ads.  ⬀



# In Brief Moment Of Lucidity, Biden Endorses Trump

POLITICS · Sep 11, 2024 · BabylonBee.com

Click here to view this article with reduced ads.  ↗



# Trump Prepares For Debate Against Kamala By Going To Bar And Arguing With Drunks

POLITICS · Sep 5, 2024 · BabylonBee.com

Click here to view this article with reduced ads. ↗



# Kamala Harris Unveils New Economic Platform 'We Must Seize The Means Of Production And Execute The Bourgeoisie'

POLITICS · Aug 18, 2024 · BabylonBee.com

Click here to view this article with reduced ads. ⧉



# Tim Walz Asks Guy Guarding Tomb Of Unknown Soldier Why He Doesn't Just Desert Him

POLITICS · Aug 10, 2024 · BabylonBee.com

Click here to view this article with reduced ads. 



# Vance Dons Helmet And Body Armor In Preparation To Run With Trump

POLITICS · Jul 15, 2024 · BabylonBee.com

Click here to view this article with reduced ads. ↗



# Trump Adds A Kennedy In Hopes He Will Draw All The Sniper Fire

POLITICS · Aug 23, 2024 · BabylonBee.com

Click here to view this article with reduced ads. ⤤



# Democrat Governors Promise They Will Do Everything In Their Power To Make Elections Appear Legitimate

POLITICS · Apr 12, 2024 · BabylonBee.com

Click here to view this article with reduced ads. ☑



# Democrats Concerned California Wildfires May Burn Up Their Stock Of Prefilled Kamala Harris Ballots

U.S. · Sep 12, 2024 · BabylonBee.com

Click here to view this article with reduced ads. 🔗



# Newsom Issues Ban On Legal–Citizen Voting

POLITICS · May 23, 2024 · BabylonBee.com

Click here to view this article with reduced ads.



# California Passes Law Requiring People Fail A U.S. Civics Exam To Be Eligible To Vote

U.S. · Aug 12, 2024 · BabylonBee.com
Click here to view this article with reduced ads.



# EXHIBIT 2

# New White House Doctor Sadly Informs Biden Only Cure For COVID Is Euthanasia

POLITICS · Jul 18, 2024 · BabylonBee.com

Click here to view this article with reduced ads. ⧉



# Hillary Clinton Meets With Kamala To Help Her Improve Her Black Accent

POLITICS · Aug 1, 2024 · BabylonBee.com

<u>Click here</u> to view this article with reduced ads. ↗



# In Victory Speech, Biden Assures Americans Elections Were 'Mostly Legitimate'

POLITICS · Nov 9, 2020 · BabylonBee.com

Click here to view this article with reduced ads.  ⬏



# Biden Unveils Official Campaign Slogan 'Death To America'

POLITICS · Apr 17, 2024 · BabylonBee.com

Click here to view this article with reduced ads.



# CNN: 'Clumsy Trump Hits Head On Bullet'

MEDIA · Jul 13, 2024 · BabylonBee.com

Click here to view this article with reduced ads. ☐



# EXHIBIT 3

# 'We Can't Afford Another Four Years Of This!' Shouts Running Mate Of Candidate Who Has Been Leading Country For Four Years

POLITICS · Sep 21, 2024 · BabylonBee.com

<u>Click here</u> to view this article with reduced ads. ⌇



# Furious Gavin Newsom Bans A.I. Images After Getting Tricked Into Thinking Pic Of Trump As A Mer-Man Was Real

MEDIA · Sep 18, 2024 · BabylonBee.com

Click here to view this article with reduced ads.  ⬈



# Here Are 9 AI-Generated Deep Fakes Of Gavin Newsom That Are Illegal To Share In California

SPONSORED · Sep 18, 2024 · BabylonBee.com



1. **A shocking image of Governor Newsom preparing a family's beloved cat for dinner:**



2. **A damning depiction of Newsom using a flamethrower to ignite California's devastating wildfires:**



3. It would be a shame if too many people saw this image of Newsom losing badly to Donald Trump in a game of Catan:



4. The public might view the governor in a different (even more gay) way when they see him enjoying a Bud Light:



5. Ah, Gavin enjoying a lovely, romantic candlelit dinner with his "Pooh Bear" Xi:



6. Newsom will be sure to jail anyone who dares to share this image of him proudly attending a Trump rally:



7. Shame on anyone who laughed at this picture of Gavin Newsom wearing his underwear on the outside of his pants:



8. As lifelike and totally believable as this image is, no one should be led to believe Gavin Newsom picks his nose. Disgusting!



9. Here's an embarrassing picture of Gavin Newsom dining out at a French restaurant after ordering everyone else in the state to stay in their homes:



Oops — that last one was totally real. Sorry, Gavin! Don't worry, nobody's laughing at you. Please don't put us in jail. Yet.



# EXHIBIT 4















# EXHIBIT 5













# EXHIBIT 6

Date of Hearing:  April 30, 2024

ASSEMBLY COMMITTEE ON JUDICIARY
Ash Kalra, Chair
AB 2839 (Pellerin) – As Amended April 11, 2024

As Proposed to be Amended

**SUBJECT**:  ELECTIONS:  DECEPTIVE MEDIA IN ADVERTISEMENTS

**KEY ISSUE**:  SHOULD CALIFORNIA PROHIBIT THE DISTRIBUTION OF CAMPAIGN ADVERTISEMENTS THAT CONTAIN MATERIALLY DECEPTIVE AND FAKE IMAGES, AUDIO, AND VIDEO?

**SYNOPSIS**

*Artificial intelligence technology presents a myriad of opportunities to better humanity. From predictive analytics in healthcare settings, to making workplaces more efficient, to making travel safer for all Americans, the benefits of artificial intelligence seem endless. However, there is a dark side to these technological advancements. Artificial intelligence can now produce lifelike, yet fake, images, video, and audio. Particularly troubling these fake images, video, and audio can be manipulated to influence American elections by portraying candidates as saying things they did not, impugning the credibility of election officials, and generally undermining public faith in the electoral process.*

*This bill seeks to protect the integrity of California's electoral process by prohibiting the distribution of campaign advertisements and other election communications that contain materially deceptive and digitally altered or created images, audio, and video within specified time periods surrounding an election. The measure would limit the prohibition to content that was intentionally manipulated then disseminated by a person who knew it was false or recklessly ignored the veracity of the content. The bill exempts from its prohibitions media companies who republish the content, so long as the republication is conducted in a limited manner and subject to various disclaimers. The measure also clarifies that the prohibition only applies 120 days in advance of an election and concludes 60 days after Election Day.*

*This bill is sponsored by the California Initiative for Technology & Democracy and is supported by a coalition of labor, legal aid and environmental organizations. The proponents of this bill highlight the growing use of and threat posed by disinformation related to elections. They note that fake content developed utilizing artificial technology can generate exceedingly lifelike content that average users may not be able to deem fake. This measure is opposed by the Electronic Frontier Foundation who question the measure's constitutionality, especially provisions related to the republication of content. This measure was previously heard and approved by the Committee on Elections by a vote of 6-1.*

**SUMMARY**: Prohibits the distribution of campaign advertisements and other election communications that contain materially deceptive and digitally altered or created images, audio, and video within specified time periods surrounding an election. Specifically, **this bill**:

1) Prohibits a person, committee, or other entity from knowingly distributing, with the intent to influence an election or solicit funds for a candidate or campaign, an advertisement or other

lawfully conducted, or with the voters lawfully exercising their rights of voting at an election, is punishable by imprisonment for 16 months or two or three years. (Elections Code Section 18502.)

9) Prohibits the following conduct within 100 feet of the entrance to a building that contains a polling place or an outdoor site, including a curbside voting area, at which a voter may cast or drop off a ballot:

   a)  Soliciting a vote or speaking to a voter on the subject of marking the voter's ballot;

   b)  Placing a sign relating to voters' qualifications or speak to a voter on the subject of the voter's qualifications, except as specified;

   c)  Photographing, video recording, or otherwise recording a voter entering or exiting a polling place; or

   d)  Obstructing ingress, egress, or parking. (Elections Code Section 18541.)

**FISCAL EFFECT**:  As currently in print this bill is keyed non-fiscal.

**COMMENTS**: As more Americans turn away from traditional news sources, the market for online election-related content is growing. Unfortunately, without traditional media outlets serving as gatekeepers of information, the amount of blatantly false or misleading election-related content appearing on the internet is growing significantly. Given American's propensity to dabble in conspiracy theories and take at face value information provided on the internet, this fake election-related content can have profound and troubling impacts on our democracy. Seeking to protect California voters from the proliferation of fake election content, this bill would prohibit the distribution of campaign advertisements and other election communications that contain materially deceptive and digitally altered or created images, audio, and video within specified time periods surrounding an election. In support of this measure, the author states:

> Those trying to influence elections—conspiracy theorists, foreign states, online trolls, and even campaigns themselves—have already started creating and distributing deepfake images, audio, and video content in the United States and around the world. This generative AI-fueled disinformation can affect voter behavior and undermine faith in our elections.

> Entering the 2024 election, millions of voters will not know what images, audio, or video they can trust, and their faith in election integrity and our democracy will be significantly diminished. AB 2839 will protect our democracy by limiting the spread of harmful disinformation and deepfakes used in political campaign ads including mailers, television, radio, and robocalls.

***The risk of false information in electioneering is as old as American democracy.*** The use of questionable tactics to win an election are as old as America's democracy. The election of 1800 between John Adams and Thomas Jefferson features a panoply of disgusting and unfounded attacks traded between the two candidates. Indeed, paraphrasing the actual terms used by each side, Jefferson's camp accused Adams of being a woman while Adams camp accused Jefferson of being non-white. (Kerwin Stewart, *Founding Fathers' dirty campaign,* CNN (2008) available at: https://www.cnn.com/2008/LIVING/wayoflife/08/22/mf.campaign.slurs.slogans/.) Indeed, some of the handbills containing these attacks were so believable it is reported that America's

first First Lady, Martha Washington, once said of Jefferson that he was, "one of the most detestable of mankind." (*Ibid*.) As technology has improved so have the attacks and the tactics used to disseminate campaign-related falsehoods.

In the highly contested election of 1876 between Rutherford B. Hayes and Samuel J. Tilden, campaign operatives worked with friendly newspapers to accuse each side of "stealing" the election. (Ronald G. Shafer, *The ugliest presidential election in history: Fraud, voter intimidation and a backroom deal,* The Washington Post (Nov. 24, 2020) available at: https://www.washingtonpost.com/history/2020/11/24/rutherford-hayes-fraud-election-trump/.) The television era made spreading falsehoods much easier. It's been determined that in the contentious election of 1960, President Kennedy knowingly spread falsehoods about the state of America's missile deterrence systems. (Daniel Bush, *The history of lies on the campaign trail*, PBS Newshour (Dec. 4, 2015) available at: https://www.pbs.org/newshour/politics/the-history-of-lies-on-the-campaign-trail.) Notoriously, Richard Nixon utilized television and attacks on the press to hide his involvement in the Watergate break-in in the lead up to the 1972 Presidential campaign. (*Ibid.*) Perhaps most confounding of all the historic election mistruths broadcast by candidates, Gerald Ford, at the height of the Cold War, once tried to contend that the Soviet Union did not have significant influence in Eastern Europe in a bid to "win" a televised debate with Jimmy Carter. (*Ibid.*)

With the social media-driven misinformation campaign surrounding the 2016 election, and the outright lies about the integrity of the 2020 election, fear about the use of technology to manipulate elections is growing and legitimate. In fact, signs of manipulation are already evidence in the 2024 Presidential election. During the recent New Hampshire Presidential Primary, one study suggested that between 5,000 and 20,000 New Hampshire residents received artificially generated phone calls, impersonating President Biden, that told them not to vote in the state's primary. (Adam Edelman, *States turn their attention to regulating AI and deepfakes as 2024 kicks off*, NBC News, (Jan. 22, 2024) available at: www.nbcnews.com/politics/states-turn-attention-regulating-ai-deepfakes-2024-rcna135122.) As the United States faces an incredibly contentious rematch between President Joe Biden and Donald Trump, one can only imagine that the threat of fake online content designed to influence the election will grow.

***California's historic efforts to maintain election integrity.*** Dating back to California's founding, state law has sought to protect election integrity. The First Session of the California State Legislature created penalties for election misconduct, including for "deceiving [an elector] and causing him to vote for a different person for any office than such elector desired or intended to vote for" (Chap. 38, Stats. 1850). Modern election law recognizes the myriad of tools parties can utilize to impact elections. State law already prohibits the distribution or dissemination of misleading information about election logistics including polling places and the date of elections. Additionally, the law prohibits misusing government seals on election information, coercing peoples vote, electioneering within a set distance of polling places, maliciously distributing fake election materials.

***This bill*** recognizes the significant threat that emerging technologies and misinformation pose to the integrity of future elections. To that end, this bill prohibits the distribution of campaign advertisements and other election communications that contain materially deceptive and digitally altered or created images, audio, and video 120 days before and 60 days after an election. The bill generally limits the prohibition to the distribution of fake video, audio, or imagines of candidates, election officials, elected officials, or election machinery, as specified. Most notably,

the bill is limited only to false election information that is disseminated in the form of materially deceptive and digitally modified or created image or audio or video files. This term is defined as, "a file that is intentionally manipulated in a manner such that a reasonable person would believe the image, video, or audio to be authentic and that the information was distributed with the knowledge of the files inaccuracy or reckless disregard for the truth underlying the accuracy of the image, video, or audio files." The measure, generally, exempts from the prohibition of this bill news media that republish the false content for the purpose of a newsworthy story on the false image, video or audio. Finally, the measure adopts numerous definitions and makes various findings and declarations.

***By limiting the dissemination of speech related to elections, this measure implicates the First Amendment and the broad protections it provides to political speech.*** By prohibiting the dissemination of false election information this measure represents a government-imposed restriction on speech, thus implicating the First Amendment to the United States Constitution. The First Amendment provides that "Congress shall make no law . . . prohibiting the freedom of speech." As interpreted by the courts and incorporated against the states by the due process clause of the 14th Amendment, the First Amendment prevents any government entity (not just Congress) from enacting any law or adopting any policy that burdens freedom of speech. In addition, Article I, Section 2 of the California Constitution guarantees to every person the freedom to "speak, write, and publish his or her sentiments on all subjects, being responsible for the abuse of this right." Moreover, the First Amendment not only protects the right to speak, as a logical corollary it protects the "right to receive information and ideas." (*Stanley v Georgia* (1969) 394 U.S. 557, 564.)

This bill implicates both the right to speak about elections, as well as the right to receive information regarding them. Furthermore, given that this bill implicates political speech, it is almost certainly going to be subject to the most exacting legal review afforded to restrictions on speech. Indeed, the First Amendment affords the "broadest protection" to the "discussion of public issues" and "political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." (*McIntyre v Ohio Election Commission* (1997) 514 U.S. 334.) It is difficult to imagine any content more related to "political expression" and "discussion of public issues" than content about candidates and elections. Notably, however, the Supreme Court has also held that there is "no constitutional value in false statements of fact." (*Gertz v. Robert Welch, Inc*. (1974) 418 U.S. 323.) Nonetheless, while false statements have little constitutional value, the modern Supreme Court has argued that the remedy for false speech is more true speech, and false speech tends to call forth true speech. (*United States v Alvarez* (2012) 567 U.S. 709.)

This bill firmly falls somewhere in this constitutional spectrum. Looking at the case law, it is clear that this measure, as a prior restriction on speech, would be subject to strict scrutiny. (See, e.g. *Frisby v. Schultz* (1988) 487 U.S. 474.) To overcome this level of scrutiny, the government must demonstrate that it has a *compelling interest* in regulating the speech and its restrictions are *narrowly tailored* to meet that goal. It would appear obvious, especially in light of the fact that California has regulated the integrity of elections since its inception, that the government has a compelling interest in protecting election integrity. Thus, it must be determined whether this bill is sufficiently narrowly tailored. Proponents of this bill argue that this measure is narrowly tailored in that its prohibitions are limited to 120 days prior to and 60 days after an election. Further, the proponents note that the bill specifically targets artificially doctored images, audio, and video of specific figures integral to the election process. They argue, for example, that any

person would still be free to post a video of themselves speaking falsehoods about candidates so long as the video were not altered in any way. Furthermore, the proponents of this bill note that it mirrors the holding in *New York Times v. Sullivan*, which authorized some prior restraints.

When examining this bill in light of the *New York Times v. Sullivan* holding, several key aspects of that decision are notable. First, the court held that, "even a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error.'" (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279 *internal citations omitted.*) However, that decision also provided fewer speech protections to falsehoods, even those about public officials, made with *actual malice*. (*Ibid.*) The proponents of this measure contend that it meets the *New York Times v. Sullivan* standard because it is limited only to false statements that are intentionally made, "knowing the portrayal of the candidate for elective office, the elected official, the elections official, or the voting machine, ballot, voting site, or other elections property or equipment was false or with a reckless disregard for the true portrayal of the candidate, the elected official, the elections official, or the voting machine, ballot, voting site, or other elections property or equipment." Finally, it should be noted that the enforcement provisions of this bill adopt a "clear and convincing evidence" standard which is a higher standard of proof than typically applies to civil actions like the one proposed by this measure.

The constitutional questions posed by this bill present an exceedingly difficult decision for this Committee. It does appear that the prohibitions proposed by this bill, at least as applied to the original content creator, are as narrowly tailored as possible and certainly implicate a compelling government interest. Furthermore, the adoption of the malice-like intent standard further narrows the bill. However, the Committee cannot ignore the longstanding preference of the courts to protect all forms of speech. Moreover, the current Supreme Court has demonstrated a willingness to greatly expand the scope of speech rights, especially when the speaker's views align with the court's majority. (See, e.g. *Citizens United v. Federal Election Commission* (2010) 558 U.S. 310.) Thus, while this bill is certainly designed to provide the greatest chance of withstanding constitutional review, it is almost guaranteed to be the subject of litigation.

***Proposed amendments seek to make this bill as narrowly tailored as possible.*** As noted above, this measure will almost certainly be the target of immediate litigation should it be signed into law. Seeking to further buttress this measure, to bring terminology into alignment with other bills involving artificial intelligence technology, and clarify various terms, the author is proposing several amendments. First, the author wishes to make findings to indicate that this bill is designed to be as narrowly tailored as possible. Those amendments would amend the findings section of the bill to read:

> (4) In order to ensure California elections are free and fair, California must, for a limited time before and after elections, prevent the use of deepfakes and disinformation meant to prevent voters from voting and deceive voters based on fraudulent content. ***The provisions of this bill are narrowly tailored to advance California's compelling interest in protecting free and fair elections.***

It should be noted that while these findings are helpful, a court is not compelled to following the Legislature's judgment on this matter.

Secondly, the author proposes to further refine the definition of "materially deceptive and digitally modified or created image or audio or video file." Accordingly, that rather lengthy and detailed definition will now read:

> "Materially deceptive and digitally modified or created image or audio or video file" means an image or an audio or video file that has been intentionally manipulated in a manner such that all of the following conditions are met:

> (i) The image or audio or video file is the product of digital manipulation, artificial intelligence, ~~or machine learning, including deep learning techniques, that merges, combines, replaces, or superimposes content onto an image or an audio or video file, creating an image or an audio or video~~ file that appears authentic, ***that appears authentic, but contains a false portrayal of any of the following:***
> ***(I)A candidate for elective office,***
> ***(II) An elected official,***
> ***(III) Elections official,***
> ***(IV) Voting machine,***
> ***(V) Ballots,***
> ***(VI) Voting sites,***
> ***(VII) Other property or equipment related to an election, or elections process***. ~~or generates an inauthentic image or an audio or video file that appears authentic.~~
> ~~(ii) (I) The image or audio or video file represents a false portrayal of a candidate for elective office, an elected official, an elections official, or a voting machine, ballot, voting site, or other elections property or equipment.~~
> *(ii)* ~~(II)~~ For the purposes of this clause, "a false portrayal of the candidate for elective office, an elected official, an elections official, or a voting machine, ballot, voting site, or other elections property or equipment" means the image or audio or video file would cause a reasonable person ***to believe that the content is authentic and*** to have a fundamentally different understanding or impression of the expressive content of the image or audio or video file than that person would have if the person were hearing or seeing the ***authentic*** ~~unaltered, original~~ version of the image or audio or video file.
> (iii) The person, committee, or other entity distributed the image or audio or video file knowing the portrayal of the candidate for elective office, the elected official, the elections official, or the voting machine, ballot, voting site, or other elections property or equipment was false or with a reckless disregard for the true portrayal of the candidate, the elected official, the elections official, or the voting machine, ballot, voting site, or other elections property or equipment. This clause is presumed when an image or audio or video file has been intentionally manipulated to represent a false portrayal of the candidate for elective office, the elected official, the elections official, or the voting machine, ballot, voting site, or other elections property or equipment, but may be rebutted.

Finally, in consultation with the Committee on Privacy and Consumer Protection, the author is proposing to add the Privacy Committee's new standard definition of artificial intelligence to this bill to promote consistency in the codes. That definition will now read:

> ***(2) "Artificial intelligence" means an engineered or machine-based system that varies in its level of autonomy and that can, for explicit or implicit objectives, infer from the input it receives how to generate outputs that can influence physical or virtual environments.***

***Additional policy considerations.*** Should this measure advance, the author and the proponents may wish to consider three additional policy considerations. First, in opposition to this measure the Electronic Frontier Foundation objects to the restriction on media outlets republishing the false information. *The author may wish to consider working with the opposition to see if this section can be further narrowed or refined* to avoid potential litigation and further defend the bill against First Amendment scrutiny. Secondly, the bill applies to false images, audio, and video of elected officials, candidates, and election officials but omits *former* elected officials. Thus, for example, should an artificially generated video of former President Barack Obama speaking poorly of his Vice President, now-President Joe Biden, be created it would not be covered by this measure. While this omission would arguably expand a bill seeking to be as narrowly tailored as possible, it may be a worthwhile type of false speech to regulate. Finally, the author may wish to consider expanding the 60-day post-election timeline. For example, the 2024 election is set for Tuesday November 5, 2024. Should Congress meet on January 6, 2025 to certify the election that date would be *outside* the 60-day window. Thus, a bad actor would have several days to flood the internet with artificially generated content related to the election. Furthermore, the President will not be inaugurated until January 20, 2025. The author may wish to consider expanding the post-election prohibitions until all elected officials are sworn into office.

***ARGUMENTS IN SUPPORT****:* This bill is sponsored by the California Initiative for Technology & Democracy and is supported by a coalition of labor, legal aid and environmental organizations. In support of this bill the California Initiative for Technology & Democracy writes:

> California is entering its first-ever generative artificial intelligence (AI) election, in which disinformation powered by generative AI and social media will pollute our information ecosystems like never before. In a few clicks, bad actors such as conspiracy theorists, foreign states, online trolls, and unscrupulous campaigns have the power to create false images, video, and audio to deceive and manipulate voters.

> These deepfakes could include depictions of a candidate accepting a bribe, a fake video of an elections official "caught on tape" saying that voting machines are not secure, or an artificial robocall in the Governor's voice incorrectly telling millions of Californians their voting site has changed. The technology is widely available, provided for little to no cost, and rapidly improving in its ability to produce realistic deepfakes. This AI-fueled disinformation can skew specific election results by deceiving voters or impacting voter turnout, call results into question, and more generally undermine faith in our elections, their security, and democratic systems.

> This problem is not a hypothetical future but a real and present danger to democracy. Generative AI has been used in various ways – most of them deeply deceptive – to influence national elections in Slovakia, Bangladesh, Argentina, Pakistan, and elsewhere, including in our own country. In New Hampshire's 2024 presidential primary election, an AI-generated deepfake robocall of President Biden was used to dissuade voters from voting in the primary. Just this month, a supporter of former President Trump created a deepfake image depicting Trump with Black Americans, trying to influence Black voters to support Trump.

> In order to help ensure California elections are free and fair, AB 2839 would prevent the use of the most potentially harmful offline deepfakes close to an election. Specifically, the bill would ban the distribution of specified digitally generated or manipulated communications

that portray a candidate, an elected official, or elections official as doing or saying something that they did not do or say, or specified election equipment and voting sites in a materially false way, within 120 days before an election and, for those regarding election officials or voting systems, within 60 days after the election through offline means such as robocalls, mailers, television advertisements. AB 2839 would address significant deficiencies of current law by removing potential disinformation from the information ecosystem and expanding coverage to additional key election-related subjects beyond just candidates. In short, AB 2839 ensures deepfake-free campaigning close to Election Day, when voter attention is highest.

***ARGUMENTS IN OPPOSITION***: This measure is opposed by the Electronic Frontier Foundation. They note:

> We respectfully oppose A.B. 2839, which not only bans the distribution of materially deceptive or altered content in relation to an election, but also places burdens on those unconnected to the creation of the content but who distribute it (internet websites, newspapers, etc.) regardless of whether they know of the prohibited manipulation. We recognize the complex issues raised by potentially harmful artificially generated election content. However, this bill's "exceptions" for only some types of republishers, and by requiring them to publish a disclaimer, does not reflect the full First Amendment protection due the republication of speech pertaining to matters of public interest by those not connected with the creation of the offending material.

> The First Amendment requires this distinction between those who create synthetic media and those not directly involved in it. The Fourth Circuit relied on this distinction in striking down a Maryland law that extended the reach of campaign finance law to include 'online platforms,' thus imposing disclosure requirements on them when they ran online ads.12 AB 2389, as written, suffers from the same constitutional defect.

> By extending beyond the direct publishers of the content and toward re-publishers, A.B. 2839 burdens and holding liable re-publishers of content in a manner that has been found unconstitutional. For these reason, we must oppose A.B. 2839.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

AFSCME AFL-CIO
Asian Americans Advancing Justice - Asian Law Caucus
Asian Americans and Pacific Islanders for Civic Empowerment
Asian Law Alliance
Bay Rising
California Clean Money Campaign
California Initiative for Technology & Democracy, a Project of California Common CAUSE
Campaign Legal Center
Chinese Progressive Association
Courage California
Disability Rights California
Hmong Innovating Politics
Indivisible CA Statestrong

Inland Empire United
League of Women Voters of California
NextGen California
Partnership for The Advancement of New Americans
SEIU California
TechEquity Collaborative
The Partnership for The Advancement of New Americans
Verified Voting
Voices for Progress Education Fund

**Support If Amended**

California Chamber of Commerce
Computer and Communications Industry Association
Software & Information Industry Association
TechNet

**Oppose**

Electronic Frontier Foundation

**Analysis Prepared by**:  Nicholas Liedtke / JUD. / (916) 319-2334

# EXHIBIT 7

**SENATE JUDICIARY COMMITTEE**
**Senator Thomas Umberg, Chair**
**2023-2024  Regular  Session**

AB 2839 (Pellerin)
Version: June 24, 2024
Hearing Date: July 2, 2024
Fiscal: No
Urgency: No
CK

## SUBJECT

Elections:  deceptive media in advertisements

## DIGEST

This bill prohibits a person, committee, or other entity from knowingly distributing an advertisement or other election communication that contains materially deceptive content, as defined and specified, with malice, except as provided, within 120 days of a California election, and in specified cases, 60 days thereafter.

## EXECUTIVE SUMMARY

Certain forms of media – audio recordings, video recordings, and still images – can be powerful evidence of what truly took place. While such media have always been susceptible to some degree of manipulation, until recently, fakes were relatively easy to detect. The rapid advancement of AI technology, specifically the wide-scale introduction of generative AI models, has made it drastically cheaper and easier to produce synthetic content – audio, images, text, and video recordings that are not real, but that are so realistic that they are virtually impossible to distinguish from authentic content, including so-called "deepfakes." In the context of election campaigns, such deepfakes can be weaponized to deceive voters into thinking that a candidate said or did something which the candidate did not. A series of bills currently pending before this Committee attempt to address these issues. In an attempt to prevent deepfakes and other materially deceptive content from altering elections, this bill prohibits the knowing distribution, with malice, of advertisements containing material deceptive content of specified material, including specified portrayals of candidates, elections officials, and elections property or equipment.

Supporters of the bill include the League of Women Voters of California and the California Broadcasters Association. It is opposed by several groups, including the Electronic Frontier Foundation and the Motion Picture Association. The bill passed out of the Senate Elections and Constitutional Amendments Committee on a 6 to 0 vote.

deepfakes used in political campaign ads including mailers, television, radio, and robocalls.

3.   Constitutional implications

As the bill prohibits certain forms of speech, it implicates the protections of the First Amendment of the United States Constitution, applied to the states by the Fourteenth Amendment. The First Amendment provides that "Congress shall make no law . . . prohibiting the freedom of speech." As interpreted by the courts, the First Amendment prevents the government from enacting any law or adopting any policy that burdens freedom of speech. In addition, Article I, Section 2 of the California Constitution guarantees to every person the freedom to "speak, write, and publish his or her sentiments on all subjects, being responsible for the abuse of this right." Moreover, the First Amendment not only protects the right to speak, as a logical corollary it protects the "right to receive information and ideas."[9] California courts have been clear that political expression in the context of campaigns of any manner should be given wide latitude:

> Hyperbole, distortion, invective, and tirades are as much a part of American politics as kissing babies and distributing bumper stickers and pot holders. Political mischief has been part of the American political scene since, at least, 1800.

> In any election, public calumny of candidates is all too common. "Once an individual decides to enter the political wars, he subjects himself to this kind of treatment. . . . [D]eeply ingrained in our political history is a tradition of free-wheeling, irresponsible, bare knuckled, Pier 6, political brawls." To endure the animadversion, brickbats and skullduggery of a given campaign, a politician must be possessed with the skin of a rhinoceros. Harry Truman cautioned would-be solons with sage advice about the heat in the kitchen.

> Nevertheless, political campaigns are one of the most exhilarating phenomena of our democracy. They bring out the best and the worst in us. They allow candidates and their supporters to express the most noble and, lamentably, the most vile sentiments. They can be fractious and unruly, but what they yield is invaluable: an opportunity to criticize and comment upon government and the issues of the day.

> The candidate who finds himself or herself the victim of misconduct is not without a remedy. Those campaign tactics which go beyond the pale are sanctionable under FPPC laws.

---

[9] *Stanley v Georgia* (1969) 394 U.S. 557, 564. Internal citations omitted

> It is abhorrent that many political campaigns are mean-spirited affairs that
> shower the voters with invective instead of insight. The elimination from
> political campaigns of opprobrium, deception and exaggeration would
> shed more light on the substantive issues, resulting in a more informed
> electorate. It would encourage more able people to seek public office. But
> to ensure the preservation of a citizen's right of free expression, we must
> allow wide latitude.[10]

The United States Supreme Court has emphasized the extraordinary protection
afforded to political speech:

> Discussion of public issues and debate on the qualifications of candidates
> are integral to the operation of the system of government established by
> our Constitution. The First Amendment affords the broadest protection to
> such political expression in order "to assure [the] unfettered interchange
> of ideas for the bringing about of political and social changes desired by
> the people." Although First Amendment protections are not confined to
> "the exposition of ideas," "there is practically universal agreement that a
> major purpose of that Amendment was to protect the free discussion of
> governmental affairs,… of course includ[ing] discussions of
> candidates…." This no more than reflects our "profound national
> commitment to the principle that debate on public issues should be
> uninhibited, robust, and wide-open." In a republic where the people are
> sovereign, the ability of the citizenry to make informed choices among
> candidates for office is essential, for the identities of those who are elected
> will inevitably shape the course that we follow as a nation. As the Court
> observed in *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971), "it can
> hardly be doubted that the constitutional guarantee has its fullest and
> most urgent application precisely to the conduct of campaigns for political
> office."[11]

This protection does not end where the truth of the speech does. "Although false
statements of fact, by themselves, have no constitutional value, constitutional protection
is not withheld from all such statements."[12] For instance, in the seminal opinion in *New
York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279-80, the court found the Constitution
requires a rule that "prohibits a public official from recovering damages for a
defamatory falsehood relating to his official conduct unless he proves that the statement
was made  with 'actual malice' -- that is, with knowledge that it was false or with
reckless disregard of whether it was false or not. The Supreme Court has expounded on
this principle, providing nuance based on the knowledge of the speaker:

---

[10] *Beilenson v. Superior Court* (1996) 44 Cal. App. 4th 944, 954-55. Internal citations omitted.

[11] *Buckley v. Valeo* (1976) 424 U.S. 1, 14-15. Internal citations omitted.

[12] *People v. Stanistreet* (2002) 29 Cal. 4th 497, 505.

Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned. And since ". . . erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive' . . . ," only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions. For speech concerning public affairs is more than self-expression; it is the essence of self-government. The First and Fourteenth Amendments embody our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."

The use of calculated falsehood, however, would put a different cast on the constitutional question. Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity. At the time the First Amendment was adopted, as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration. That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . ." Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.[13]

This bill implicates both the right to speak about elections, as well as the right to receive information regarding them. "Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."[14] However, this bill's language narrowly tailors the prohibitions in the bill to that speech afforded the least constitutional protection. "Materially deceptive content" requires that

[13] *Garrison v. Louisiana* (1964) 379 U.S. 64, 74-75. Internal citations omitted.
[14] *Citizens United v. FEC* (2010) 558 U.S. 310, 340. Internal citations omitted. It should be noted that while not controversial for the principle cited herein, this opinion is widely criticized for further tilting political influence toward wealthy donors and corporations.

it was intentionally created or altered such that the content falsely appears to be authentic. The bill requires the person, committee, or entity to knowingly distribute such material with malice, which means the person, committee, or other entity distributed the content knowing the materially deceptive content was false or with a reckless disregard for the truth. This mirrors the test laid out in *New York Times v. Sullivan*. In addition, many of the relevant cases stress that the level of burden placed on a defendant to defend their political speech is a factor to consider. For instance, the following was stated in *New York Times v. Sullivan*:

> A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions -- and to do so on pain of libel judgments virtually unlimited in amount -- leads to a comparable "self-censorship." Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars.[15]

Responsive to this consideration, the bill requires a plaintiff bringing a claim pursuant to this bill, to prove the above factors by clear and convincing evidence.

Ultimately, this bill prohibits the knowing distribution of deceptive content with malice only at key points in the election cycle with an extremely compelling goal of safeguarding our democracy. Although, as with most restrictions on political speech, this bill may face legal challenge, it is arguably narrowly tailored to serve this compelling government interest to avoid improperly impinging on the constitutional guarantees of the First Amendment.

4. <u>Stakeholder positions</u>

A coalition of groups in support, including SEIU California and NextGen California, write:

> California is entering its first-ever generative artificial intelligence (AI) election, in which disinformation powered by generative AI will pollute our information ecosystems like never before. In a few clicks, using current technology, bad actors now have the power to create a false image of a candidate accepting a bribe, a fake video of an elections official "caught on tape" saying that voting machines are not secure, or a robocall of "Governor Newsom" incorrectly telling millions of Californians their voting site has changed. . . .

---

[15] *N.Y. Times Co. v. Sullivan*, at 279.

AB 2839 seeks to solve these problems by preventing the use of deepfakes and disinformation -- targeting candidates, elected officials, and elections officials -- in political communications, and does so in a narrowly tailored way that is consistent with the First Amendment.

Writing in an oppose position, the Electronic Frontier Foundation argues the bill should be narrowed to focus on the direct publishers:

> We respectfully oppose your bill A.B. 2839, which not only bans the distribution of materially deceptive or altered content in relation to an election, but also places burdens on those unconnected to the creation of the content but who distribute it (internet websites, newspapers, etc.) regardless of whether they know of the prohibited manipulation. We recognize the complex issues raised by potentially harmful artificially generated election content. However, this bill's "exceptions" for only some types of republishers, and by requiring them to publish a disclaimer, does not reflect the full First Amendment protection due the republication of speech pertaining to matters of public interest by those not connected with the creation of the offending material.

> The First Amendment requires this distinction between those who create synthetic media and those not directly involved in it. The Fourth Circuit relied on this distinction in striking down a Maryland law that extended the reach of campaign finance law to include 'online platforms,' thus imposing disclosure requirements on them when they ran online ads. AB 2389, as written, suffers from the same constitutional defect.

> By extending beyond the direct publishers of the content and toward re-publishers, A.B. 2839 burdens and holding liable re-publishers of content in a manner that has been found unconstitutional.

## SUPPORT

AFSCME California
Bay Rising
California Broadcasters Association
Catalyst California
Center for Countering Digital Hate
Chinese Progressive Association
City and County of San Francisco Board of Supervisors
Disability Rights California
Indivisible CA Statestrong
League of Women Voters of California
Move (mobilize, Organize, Vote, Empower) the Valley

AB 2839 (Pellerin)
Page 15 of 16

NextGen California
Northern California Recycling Association
Partnership for the Advancement of New Americans
SEIU California
Youth Power Project

## OPPOSITION

Directv Group, INC.
Dish Network, LLC
Electronic Frontier Foundation
Motion Picture Association
Streaming Innovation Alliance

## RELATED LEGISLATION

Pending Legislation:

SB 942 (Becker, 2024) establishes the California AI Transparency Act, requiring covered providers to create and make freely available an AI detection tool to detect content as AI-generated and to include disclosures in content generated by the provider's system. SB 942 is currently in the Assembly Judiciary Committee.

SB 970 (Ashby, 2024) ensures that media manipulated or generated by artificial intelligence (AI) technology is incorporated into the right of publicity law and criminal false impersonation statutes. The bill requires those providing access to such technology to provide a warning to consumers about liability for misuse. SB 970 was held on suspense in the Senate Appropriations Committee.

AB 2355 (Wendy Carrillo, 2024) requires committees that create, publish, or distribute a political advertisement that contains any image, audio, or video that is generated or substantially altered using artificial intelligence to include a disclosure in the advertisement disclosing that the content has been so altered. AB 2355 is currently in this Committee.

AB 2655 (Berman, 2024) establishes the Defending Democracy from Deepfake Deception Act of 2024, which requires a large online platform to block the posting or sending of materially deceptive and digitally modified or created content related to elections, during specified periods before and after an election. It requires these platforms to label certain additional content inauthentic, fake, or false during specified periods before and after an election and to provide mechanisms to report content. AB 2655 is currently in this Committee.

AB 2839 (Pellerin)
Page 16 of 16

AB 2930 (Bauer-Kahan, 2024) requires, among other things, a deployer and a developer of an automated decision tool to perform an impact assessment for any automated decision tool the deployer uses that includes, among other things, a statement of the purpose of the automated decision tool and its intended benefits, uses, and deployment contexts. AB 2930 requires a deployer to, at or before the time an automated decision tool is used to make a consequential decision, notify any natural person that is the subject of the consequential decision that an automated decision tool is being used to make, or be a substantial factor in making, the consequential decision and to provide that person with, among other things, a statement of the purpose of the automated decision tool. AB 2930 is currently in this Committee.

AB 3211 (Wicks, 2024) establishes the California Provenance, Authenticity and Watermarking Standards Act, which requires a generative AI system provider to take certain actions to assist in the disclosure of provenance data to mitigate harms caused by inauthentic content, including placing imperceptible and maximally indelible watermarks containing provenance data into content created by an AI system that the generative AI system provider makes available. AB 3211 also requires a large online platform, as defined, to, among other things, use labels to prominently disclose the provenance data found in watermarks or digital signatures in content distributed to users on its platforms, as specified. AB 3211 is currently in the Senate Appropriations Committee.

<u>Prior Legislation</u>: AB 730 (Berman, Ch. 493, Stats. 2019) prohibited the use of deepfakes depicting a candidate for office within 60 days of the election unless the deepfake is accompanied by a prominent notice that the content of the audio, video, or image has been manipulated. Additionally, AB 730 authorized a candidate who was falsely depicted in a deepfake to seek rapid injunctive relief against further publication and distribution of the deepfake.

## **PRIOR VOTES:**

Senate Elections and Constitutional Amendments Committee (Ayes 6, Noes 0)
Assembly Floor (Ayes 59, Noes 4)
Assembly Appropriations Committee (Ayes 11, Noes 3)
Assembly Judiciary Committee (Ayes 8, Noes 2)
Assembly Elections Committee (Ayes 6, Noes 1)
**************

# EXHIBIT 8

9/26/24, 5:20 PM        Compare Versions - AB-2839 Elections: deceptive media in advertisements. Elections: deceptive media in advertisements.

Case 2:24-cv-02527-JAM-CKD   Document 21   Filed 09/30/24   Page 138 of 182

California
LEGISLATIVE INFORMATION

| Home | Bill Information | California Law | Publications | Other Resources | My Subscriptions | My Favorites |

## AB-2839 Elections: deceptive media in advertisements.  (2023-2024)

**Current Version:** 09/17/24 - Chaptered **Compared to Version:** [ 08/15/24 - Amended Senate ▾ ]  [ Compare Versions ]  ⓘ

**SECTION 1.** Section 35 of the Code of Civil Procedure, as amended by Section 1 of Chapter 343 of the Statutes of 2023, is amended to read:

**35.** (a) Proceedings in cases involving the registration or denial of registration of voters, the certification or denial of certification of candidates, the certification or denial of certification of ballot measures, election contests, actions under Section 20010 or 20012 of the Elections Code, and actions under Chapter 2 (commencing with Section 21100) of Division 21 of the Elections Code shall be placed on the calendar in the order of their date of filing and shall be given precedence.

(b) This section shall remain in effect only until January 1, 2027, and as of that date is repealed, unless a later enacted statute, that is enacted before January 1, 2027, deletes or extends that date.

*SEC. 1.5. Section 35 of the Code of Civil Procedure, as amended by Section 1 of Chapter 343 of the Statutes of 2023, is amended to read:*

*35. (a) Proceedings in cases involving the registration or denial of registration of voters, the certification or denial of certification of candidates, the certification or denial of certification of ballot measures, election contests, actions under Section 20010 or 20012 of the Elections Code, actions under Chapter 7 (commencing with Section 20510) of Division 20 of the Elections Code, and actions under Chapter 2 (commencing with Section 21100) of Division 21 of the Elections Code shall be placed on the calendar in the order of their date of filing and shall be given precedence.*

*(b) This section shall remain in effect only until January 1, 2027, and as of that date is repealed, unless a later enacted statute, that is enacted before January 1, 2027, deletes or extends that date.*

**SEC. 2.** Section 35 of the Code of Civil Procedure, as amended by Section 2 of Chapter 343 of the Statutes of 2023, is amended to read:

**35.** (a) Proceedings in cases involving the registration or denial of registration of voters, the certification or denial of certification of candidates, the certification or denial of certification of ballot measures, election contests, actions under Section 20012 of the Elections Code, and actions under Chapter 2 (commencing with Section 21100) of Division 21 of the Elections Code shall be placed on the calendar in the order of their date of filing and shall be given precedence.

(b) This section shall become operative January 1, 2027.

*SEC. 2.5. Section 35 of the Code of Civil Procedure, as amended by Section 2 of Chapter 343 of the Statutes of 2023, is amended to read:*

*35. (a) Proceedings in cases involving the registration or denial of registration of voters, the certification or denial of certification of candidates, the certification or denial of certification of ballot measures, election contests, actions under Section 20012 of the Elections Code, actions under Chapter 7 (commencing with Section 20510) of Division 20 of the Elections Code, and actions under Chapter 2 (commencing with Section 21100) of Division 21 of the Elections Code shall be placed on the calendar in the order of their date of filing and shall be given precedence.*

Verified Complaint Exhibit 8
057

*(b) This section shall become operative on January 1, 2025.*

**SEC. 3.** Section 20012 is added to the Elections Code, to read:

**20012.** (a) The Legislature finds and declares as follows:

(1) California is entering its first-ever artificial intelligence (AI) election, in which disinformation powered by generative AI will pollute our information ecosystems like never before. Voters will not know what images, audio, or video they can trust.

(2) In a few clicks, using current technology, bad actors now have the power to create a false image of a candidate accepting a bribe, or a fake video of an elections official "caught on tape" saying that voting machines are not secure, or generate an artificial robocall in the Governor's voice telling millions of Californians their voting site has changed.

(3) In the lead-up to the 2024 presidential elections, candidates and parties are already creating and distributing deepfake images and audio and video content. These fake images or files can skew election results, even if they use older methods of distribution, such as mail, television, telephone, and text, and undermine trust in the ballot counting process.

(4) In order to ensure California elections are free and fair, California must, for a limited time before and after elections, prevent the use of deepfakes and disinformation meant to prevent voters from voting and deceive voters based on fraudulent content. The provisions of this bill are narrowly tailored to advance California's compelling interest in protecting free and fair elections.

(5) The labeling information required by this bill is narrowly tailored to provide consumers with factual information about the inauthenticity of particular images, audio, video, or text content in order to prevent consumer deception.

(b) (1) A person, committee, or other entity shall not, during the time period set forth in subdivision (c), with malice, knowingly distribute an advertisement or other election communication containing materially deceptive content of any of the following:

(A) A candidate for any federal, state, or local elected office in California portrayed as doing or saying something that the candidate did not do or say if the content is reasonably likely to harm the reputation or electoral prospects of a candidate.

(i) For purposes of subparagraph (A), "candidate for any federal, state, or local elected office" includes any person running for the office of President of the United States or Vice President of the United States who seeks to or will appear on a ballot issued in California.

(B) An elections official portrayed as doing or saying something in connection with an election in California that the elections official did not do or say if the content is reasonably likely to falsely undermine confidence in the outcome of one or more election contests.

(C) An elected official portrayed as doing or saying something in connection with an election in California that the elected official did not do or say if the content is reasonably likely to harm the reputation or electoral prospects of a candidate or is reasonably likely to falsely undermine confidence in the outcome of one or more election contests.

(D) A voting machine, ballot, voting site, or other property or equipment related to an election in California portrayed in a materially false way if the content is reasonably likely to falsely undermine confidence in the outcome of one or more election contests.

(2) Notwithstanding subparagraph (A) of paragraph (1), this section does not apply to a candidate portraying themself as doing or saying something that the candidate did not do or say if the content includes a disclosure stating "This _____ has been manipulated." and complies with the following requirements:

(A) The blank in the disclosure required by paragraph (2) shall be filled with whichever of the following terms most accurately describes the media:

(i) Image.

(ii) Audio.

(iii) Video.

Verified Complaint Exhibit 8
058

9/26/24, 5:20 PM        Compare Versions - AB-2839 Elections: deceptive media in advertisements. Elections: deceptive media in advertisements.

Case 2:24-cv-02527-JAM-CKD   Document 21   Filed 09/30/24   Page 140 of 182

(B) Appear in a manner that can be easily read by the average viewer and no smaller than the largest font size of other text appearing in the visual media. If the visual media does not include any other text, the disclosure shall appear in a size that is easily readable by the average viewer. For visual media that is video, the disclosure shall appear for the duration of the video.

(ii) If the media consists of audio only, the disclosure shall be read in a clearly spoken manner and in a pitch that can be easily heard by the average listener, at the beginning of the audio, at the end of the audio, and, if the audio is greater than two minutes in length, interspersed within the audio at intervals of not greater than two minutes each.

*(3) Notwithstanding paragraph (1), this section does not apply to an advertisement or other election communication containing materially deceptive content that constitutes satire or parody if the communication includes a disclosure stating "This _____ has been manipulated for purposes of satire or parody." The disclosure shall comply with the requirements set forth in subparagraphs (A) and (B) of paragraph (2).*

*(4) (A) A person, committee, or other entity shall not, during the time period set forth in subdivision (c), do either of the following:*

*(i) Remove any disclosure required by paragraph (2) or (3).*

*(ii) Knowingly republish any content subject to paragraph (2) or (3) without the required disclosure.*

*(B) A violation of subparagraph (A) is evidence of intent to knowingly distribute an advertisement or other election communication containing materially deceptive content, as prohibited by paragraph (1).*

(c) The prohibition in subdivision (b) applies only during the following time periods:

(1) One hundred twenty days before any election in California.

(2) For people and items set forth in subparagraphs (B) and (D) of paragraph (1) of subdivision (b), 120 days before any election in California through 60 days after the election, inclusive.

(d) (1) A recipient of materially deceptive content distributed in violation of this section, candidate or committee participating in the election, or elections official may seek injunctive or other equitable relief prohibiting the distribution of the materially deceptive content in violation of this section. The court shall also award a prevailing plaintiff reasonable attorney's fees and costs. An action under this paragraph shall be entitled to precedence in accordance with Section 35 of the Code of Civil Procedure.

(2) ~~(i)~~ *(A)* A recipient of materially deceptive content distributed in violation of this section, candidate or committee participating in the election, or elections official may bring an action for general or special damages against the person, committee, or other entity that distributed *or republished* the materially deceptive content in violation of this section. The court shall also award a prevailing party reasonable attorney's fees and costs. This subdivision shall not be construed to limit or preclude a plaintiff from securing or recovering any other available remedy at law or equity.

~~(ii)~~ *(B)* This paragraph does not apply to a broadcasting station *or internet website* that distributed the materially deceptive content if the broadcasting station *or internet website* did not create the content.

(3) In any civil action alleging a violation of this section, the plaintiff shall bear the burden of establishing the violation through clear and convincing evidence.

(e) (1) This section does not apply to a broadcasting station that broadcasts any materially deceptive content prohibited by this section as part of a bona fide newscast, news interview, news documentary, commentary of general interest, or on-the-spot coverage of bona fide news events, if the broadcast clearly acknowledges through content or a disclosure, in a manner that can be easily heard or read by the average listener or viewer, that the materially deceptive content does not accurately represent any actual event, occurrence, appearance, speech, or expressive conduct.

(2) This section does not apply to a broadcasting station when it is paid to broadcast materially deceptive content and either of the following circumstances exist:

(A) The broadcasting station can show that it has prohibition and disclaimer requirements that are consistent with the requirements in this section and that it has provided those prohibition and disclaimer requirements to each person or entity that purchased the advertisement.

(B) Federal law requires the station to broadcast a legally qualified candidate's advertisement without censorship, or prohibits the broadcasting station from censoring or altering the message.

(3) This section does not apply to a regularly published newspaper, magazine, or other periodical of general circulation, including an internet or electronic publication, that routinely carries news and commentary of general interest, and that publishes any materially deceptive content prohibited by this section, if the publication clearly states that the materially deceptive content does not accurately represent any actual event, occurrence, appearance, speech, or expressive conduct.

(4) This section does not ~~apply to materially deceptive content that constitutes satire or parody.~~ *impose liability on an interactive computer service, as defined in Section 230(f)(2) of Title 47 of the United States Code.*

(f) For purposes of this section, the following definitions apply:

(1) "Advertisement" means any general or public communication that is authorized or paid for the purpose of supporting or opposing a candidate for elective office in California or a ballot measure that appears on a ballot issued in California and that is broadcast by or through television, radio, telephone, or text, *distributed through the internet,* or disseminated by print media, including billboards, video billboards or screens, and other similar types of advertising.

(2) "Broadcasting station" means a radio or television broadcasting station, including any of the following:

(i) Cable operator, programmer, or producer.

(ii) Streaming service operator, programmer, or producer.

(iii) Direct-to-home satellite television operator, programmer, or producer.

(3) "Committee" means a committee as defined in Section 82013 of the Government Code.

(4) "Deepfake" means audio or visual media that is digitally created or modified such that it would falsely appear to a reasonable person to be an authentic record of the actual speech or conduct of the individual depicted in the media.

(5) "Election communication" means any general or public communication not covered under "advertisement" that is broadcast by or through television, radio, telephone, or text, *distributed through the internet,* or disseminated by print media, including billboards, video billboards or screens, and other similar types of communications, that concerns any of the following:

(A) A candidate for office or ballot measure.

(B) Voting or refraining from voting in an election.

(C) The canvass of the vote.

(6) "Elections official" means any of the following persons, but only in their capacity as a person charged with holding or conducting an election, conducting a canvass, assisting with the holding or conducting of an election or a canvass, or performing another duty related to administering the provisions of the Elections Code:

(i) An elections official as defined in Section 320.

(ii) The Secretary of State and their staff.

(iii) A temporary worker, poll worker, or member of a precinct board.

(iv) Any other person charged with holding or conducting an election, conducting a canvass, assisting with the holding or conducting of an election or a canvass, or performing another duty related to administering the provisions of the Elections Code.

(7) "Malice" means the person, committee, or other entity distributed the audio or visual media knowing the materially deceptive content was false or with a reckless disregard for the truth.

(8) (A) "Materially deceptive content" means audio or visual media that is intentionally digitally created or modified, which includes, but is not limited to, deepfakes, such that the content would falsely appear to a reasonable person to be an authentic record of the content depicted in the media.

Case 2:24-cv-02527-JAM-CKD   Document 21   Filed 09/30/24   Page 142 of 182

(B) "Generally accepted" means the advertisement or solicitation contains only minor modifications that do not significantly change the perceived contents or meaning of the content. Minor changes include changes to brightness or contrast of images, removal of background noise in audio, and other minor changes that do not impact the content of the audio or visual media.

(9) "Recipient" includes a person who views, hears, or otherwise perceives an image or audio or video file that was initially distributed in violation of this section.

(g) The provisions of this section apply regardless of the language used in the advertisement or solicitation. If the language used is not English, the disclosure required by paragraph (2) of subdivision (b) shall appear in the language used in the advertisement or solicitation.

(h) The provisions of this section are severable. If any provision of this section or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

*SEC. 4. Section 1.5 of this bill incorporates amendments to Section 35 of the Code of Civil Procedure proposed by both this bill and Assembly Bill 2655. That section of this bill shall only become operative if (1) both bills are enacted and become effective on or before January 1, 2025, but this bill becomes operative first, (2) each bill amends Section 35 of the Code of Civil Procedure, as amended by Section 1 of Chapter 343 of the Statutes of 2023, and (3) this bill is enacted after Assembly Bill 2655, in which case Section 35 of the Code of Civil Procedure, as amended by Section 1 of this bill, shall remain operative only until the operative date of Assembly Bill 2655, at which time Section 1.5 of this bill shall become operative.*

*SEC. 5. Section 2.5 of this bill incorporates amendments to Section 35 of the Code of Civil Procedure proposed by both this bill and Assembly Bill 2655. That section of this bill shall only become operative if (1) both bills are enacted and become effective on or before January 1, 2025, but this bill becomes operative first, (2) each bill amends Section 35 of the Code of Civil Procedure, as amended by Section 2 of Chapter 343 of the Statutes of 2023, and (3) this bill is enacted after Assembly Bill 2655, in which case Section 35 of the Code of Civil Procedure, as amended by Section 2 of this bill, shall remain operative only until the operative date of Assembly Bill 2655, at which time Section 2.5 of this bill shall become operative.*

*SEC. 6. This act is an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the California Constitution and shall go into immediate effect. The facts constituting the necessity are:*

*California is approaching its first election influenced by artificial intelligence ("AI"), where disinformation generated by AI can distort voter awareness and perception of candidates, elections officials, elected officials, and voting apparatuses. In the lead-up to the 2024 presidential election, candidates and bad actors are already creating and distributing deepfake images and audio and video content. In order to implement the provisions of this act and safeguard the upcoming November 5, 2024, general election against disinformation propagated by AI and deepfake media, it is necessary for this act to take effect immediately.*

# EXHIBIT 9

Date of Hearing:  April 23, 2024

ASSEMBLY COMMITTEE ON JUDICIARY
Ash Kalra, Chair
AB 2655 (Berman) – As Amended April 1, 2024

As Proposed to be Amended

**SUBJECT**:  DEFENDING DEMOCRACY FROM DEEPFAKE DECEPTION ACT OF 2024

**KEY ISSUE**:  SHOULD LARGE ONLINE PLATFORMS BE REQUIRED TO BLOCK (OR
IN SOME CASES LABEL) MATERIALLY DECEPTIVE AND DIGITALLY MODIFIED OR
CREATED CONTENT RELATED TO AN ELECTION OR ELECTION PROCESS, DURING
A PRESCRIBED PERIOD OF TIME BEFORE OR AFTER AN ELECTION?

## SYNOPSIS

*According to the author, disinformation powered by Artificial Intelligence (AI), which can be
distributed to millions of social media users in an instant, poses a serious threat to our political
discourse, our elections, and indeed our democracy. For example, "deepfakes" can generate
false sounds and images that could lead to the most discerning viewer to falsely conclude that a
candidate, elected official, or election worker said or did something they did not do. Such
disinformation not only distorts the truth, it has the potential to undermine people's confidence
in our political institutions. While disinformation can threaten political discourse at any time,
the author believes that it is especially harmful during an election season, when uncorrected
disinformation may influence an election result or create false concerns about the legitimacy of
an election in its immediate aftermath.*

*This bill, therefore, would require a large online platform to block "materially deceptive and
digitally modified or created" content that portrays any candidate, elected official, or elections
official doing or saying something they did not do or say; it would also require them to block
deceptive material that concerns voting machines, ballots, voting sites, or other procedures or
equipment related to an election. In addition, deceptive material about broader "elections
processes," that are not subject to blocking requirement, would need to contain a label that they
are materially deceptive and digitally modified. The bill would allow any resident of California
to inform the platform that covered material had not been properly blocked or labeled, and if the
platform does not respond within 36 hours, or if the reporting resident does not agree with the
response, the resident may bring an action for injunctive relief. The bill would also allow the
Attorney General, or any district attorney or city attorney, to also seek injunctive relief.*

*This bill passed out of the Assembly Elections Committee on a 6-1 vote. It is sponsored by the
California Initiative for Technology and Democracy, a project of California Common Cause,
and supported by several political reform groups and labor organizations, among others. The
bill is opposed by groups representing the information and technology industry and by ACLU
Action California. The opposition argues that the bill would be ineffective, unconstitutional, and
preempted by federal law. The author will take several definitional amendments in this
Committee, which are reflected in the Summary, below, and discussed in the analysis.*

    b)  A picture or photograph of a candidate for public office into which the image of another person or persons is superimposed. (Elections Code Section 20010.)

**FISCAL EFFECT**:  As currently in print this bill is keyed fiscal.

**COMMENTS**:  According to the author:

> AB 2655 will ensure that online platforms restrict the spread of election-related deceptive deepfakes meant to prevent voters from voting or to deceive them based on fraudulent content. Deepfakes are a powerful and dangerous tool in the arsenal of those that want to wage disinformation campaigns, and they have the potential to wreak havoc on our democracy by attributing speech and conduct to a person that is false or that never happened. Advances in AI make it easy for practically anyone to generate this deceptive content, making it that much more important that we identify and restrict its spread before it has the chance to deceive voters and undermine our democracy.

> Therefore, in order to ensure California elections are free and fair, online platforms must prevent the online spread of election-related deceptive deepfakes and disinformation meant to prevent voters from voting or to deceive them based on fraudulent content.

***Existing laws maintaining "election integrity."***  As aptly noted in the analysis of this bill by the Assembly Elections Committee, the "use of false and deceptive information in campaigns to influence election outcomes is not a new phenomenon," nor are the laws "aimed at curbing such practices" new. Indeed, in 1850, the First Session of the California State Legislature created penalties for "deceiving [an elector] and causing him to vote for a different person for any office than such elector desired or intended to vote for." (Chapter 38, Statutes of 1850.) Existing California law has greatly elaborated on these initial legislative efforts. For example, provisions in the Elections Code prohibit the distribution of false and misleading information about qualifications to vote or about the days, dates, times, and places where voting may occur; prohibit the misleading use of government seals in campaign literature (Elections Code Section 18304); and prohibit coercing or deceiving people into voting in a way that is inconsistent with the person's intent (Elections Code Sections 18302, 18304, 18573 and 18573.5).

In the last five years, the Legislature has turned its attention to "materially deceptive" audio and visual materials that portray a candidate. For example, AB 730 (Chap. 493, Stats. 2019) responded to reports that so-called "deepfake" technology, a software that allows someone to produce audios and videos that look and appear remarkably real to even the most discerning person. For example, in 2018, BuzzFeed and the film director Jordan Peele published a very realistic-looking deepfake showing former President Obama calling then-President Donald Trump a "total and complete dipshit." Obama did not say that. Peele and BuzzFeed did not use the video to try to influence a political election – indeed halfway through the video the ruse was revealed – but to show the potential for abuse of deepfake technology. Responding to this and similar reports, AB 730 prohibited the distribution of materially deceptive audio or visual media with the intent to injure the candidate's reputation or to deceive a voter into voting for or against a candidate.

AB 730 was itself an amendment to California's "Truth in Political Advertising Act" of 1998, which had prohibited campaign material that deceptively altered a picture of a candidate (for example by superimposing one person's image upon another) unless the picture contained a disclaimer. This 1998 bill was introduced in response to the use of technologies like "photo

shopping," which now seem quaint compared to deepfakes, including deepfakes generated by artificial intelligence. The bill now before the Committee, like AB 730 before it, is apparently an effort to stay one step ahead of evolving technologies, which not only create more realistic-looking deceptions, but make it possible to quickly create, alter, and distribute fake images to millions of people in the blink of an eye (or the click of a mouse).

***This bill and existing law: who?*** AB 2655 elaborates upon and modifies existing law in a variety of ways. Most significant, existing law prohibits *a person, committee, or other entity* from distributing, with actual malice, "materially deceptive" audio or visual media of a candidate with the intent to injure the candidate's reputation or to deceive a voter into voting for or against the candidate. Existing law prohibits the distribution of such material within 60 days of the election in which the targeted candidate is running for office. The prohibitions in AB 2655, on the other hand, do not apply to the person or entity that created the materially deceptive material, but to the "large online platform" on which it is posted. AB 2655 requires the online platform to develop and implement procedures to block or prevent the posting of the covered content.

***This bill and existing law: what?*** This bill also differs from existing law in terms of covered content. Existing law applies only to manipulated material that misrepresents the "candidate" saying or doing something the candidate did not do or say. This bill similarly applies to content deceptively depicting the candidate, but also applies to images portraying an "elections official" doing or saying something they did not do or say, as well as images depicting a voting machine, ballot, voting site, or voting equipment in a materially false way. In addition, this bill would require the platform to label (but not necessarily block) materially deceptive content about "election processes" (as opposed to a specific candidate, election official, or voting site). Although the distinction between what material must be blocked versus what material must be labeled is not entirely clear, the intent of the author and sponsor is that the more the material singles out a particular candidate or election official, the more it must be blocked; whereas material that deals with "election processes" more generally need only be labeled. *The author has agreed to work with the Committee as the bill moves forward to clarify the distinction between the blocking and labeling requirements.*

***This bill and existing law: when?*** AB 2655 also expands and modifies the relevant time period that prohibitions are in force. Existing law prohibits someone from distributing deceptive material during the 60-day period before an election. This bill, however, requires the platform to block covered material a period beginning 120 days before the election and through the day of the election. However, if the deceptive material pertains to an election official, or deceptively depicts a voting machine, ballot, voting site, or property or equipment related to an election, the platform must also block the content for 60 days *after* the election. Presumably, this post-election period is intended to prevent false claims – similar to those made in 2020 – that the election process was irregular or otherwise "rigged." The labeling requirement covers an even larger time frame; it applies during the period beginning *one year* before the "election." The bill also requires labeling for the period beginning one year before an "election process." "Election processes" – as opposed to an "election" – is defined to include any government process "related" to an election, "including, but not limited to," elections, candidates, vote counting, redistricting, and proceedings or processes of the electoral college." Because an "election" has a known date, it should be fairly easy for the platform to figure out when the year-long labeling period starts. However, if the platform must also label one year prior to an "election process," when does a process like "redistricting" start? Does it start with each new census? Does it start when the legislative body (or in some states a commission) meet to draw up new district lines?

Moreover, the definition of "election process" is not limited to the items listed, expressly stating "including, but is not limited to,' those items. *As discussed above, the author has agreed to work with the Committee as the bill moves forward to clarify the distinction between materials that the platform is required to "block" and those it is required to "label."*

**This bill and existing law: how enforced?**   In addition to differences as to who, what, and when, this bill also differs in how violations would be enforced. Existing law permits only the "candidate" whose voice or likeness appears in the deceptive material to bring an action for injunctive relief, general or special damages, and reasonable attorney's fee and cost. However, under existing law the candidate bears the burden of establishing a violation by "clear and convincing evidence." Enforcement provisions in this bill are much different. The bill allows any "California resident" to report to the platform that content was not blocked or labeled as required. If the platform does not respond within 36 hours, *or if the resident disagrees with the response,* the resident may seek injunctive relief to compel compliance and, if the resident prevails, shall be awarded reasonable attorney's fees and costs. Thus, not only can any California resident – not just a person depicted or otherwise affected – seek injunctive relief, they apparently do not have the burden of proving a violation by clear and convincing evidence. If they "disagree" with the platform's response, that's enough; they can seek injunctive relief and a court would decide to issue on the likelihood of success on merits, the general rule for injunctive relief.  *The author may wish to consider, as the bill moves forward, increasing the standard of proof to the higher clear and convincing evidence; and limiting who may seek relief.*

**First Amendment concerns**. Because this bill imposes a *government* mandate that online platforms must block expressive material based upon its content, it implicates the First Amendment. The First Amendment provides that "Congress shall make no law . . . prohibiting the freedom of speech." As interpreted by the courts and incorporated against the states by the due process clause of the 14th Amendment, the First Amendment prevents any government entity (not just Congress) from enacting any law or adopting any policy that burdens freedom of speech. In addition, Article I, Section 2 of the California Constitution guarantees to every person the freedom to "speak, write, and publish his or her sentiments on all subjects, being responsible for the abuse of this right." Moreover, the First Amendment not only protects the right to speak, as a logical corollary it protects the "right to receive information and ideas." (*Stanley v Georgia* (1969) 394 U.S. 557, 564.) This bill would interfere with both the expression and reception of information based upon its content. Moreover, not only does this bill single out particular content, the content relates to political candidates and elections. This is potentially problematic because the First Amendment affords the "broadest protection" to the "discussion of public issues" and "political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." (*McIntyre v Ohio Election Commission* (1997) 514 U.S. 334.) It is difficult to imagine any content more related to "political expression" and "discussion of public issues" than content about candidates and elections. The fact that the bill restricts speech that is "materially deceptive" or "false" does not matter, for the U.S. Supreme Court has been unequivocal that the First Amendment protects even "false" speech. The remedy for false speech is more true speech, and false speech tends to call forth true speech. (*United States v Alvarez* (2012) 567 U.S. 709.)

**The bill will likely meet the "compelling interest" threshold, if not the "narrowly tailored" threshold.** The right to free speech is not absolute. As Justice Holmes noted in a dissenting opinion over a century ago, the First Amendment does not protect a right to falsely cry fire in a crowded theater. (*Schenck v. United States* (1919) 249 U.S. 47.) The proponents of this bill may,

not unreasonably, think that pervasive disinformation about candidates and elections, especially during an election season, is just as dangerous. In reviewing the law, the Court would apply strict scrutiny. This means that government can impose even content-based restrictions on protected speech *if* they have a "compelling government interest" *and* they use "narrowly tailored means" to achieve that interest.

Even the opponents of this bill appear to concede that maintaining "election integrity" is a "weighty" and, presumably, "compelling" government interest. Therefore, it seems likely that if this bill is enacted and subsequently challenged, a court will accept that there is a "compelling interest" but still need to consider whether the "means" are "narrowly tailored." The opponents of this measure claim that it is *not* narrowly tailored. They contend that while covered platforms may have state-of-the-art tools that allow them to identify content that has been "digitally modified," there is no technology to determine if content is "materially deceptive." The bill defines "materially deceptive," in relevant part, to mean content that is "intentionally manipulated" so that it appears "authentic" but contains a "false portrayal" of a candidate, elected official, elections official, voting machine, ballot, voting site, other property or equipment related to an election, or elections process. The purpose of narrow tailoring is to ensure that no more speech is infringed or burdened than is necessary. However, the opponents of this bill – both the industry groups and the ACLU – believe that with no sure means to determine what is "materially deceptive," the platforms will err on the side of blocking content, thus burdening more speech than is necessary.

The findings and declarations in the bill state that the "labeling information required by this bill is narrowly tailored to provide consumers with factual information about the inauthenticity of particular images, audio, video, or text content in order to prevent consumer deception." Tellingly, there is no similar claim about the blocking requirement being narrowly tailored. In any event, it will be a court – not the findings and declarations of the bill – that will determine whether the bill is narrowly tailored. The court may consider, for example, if there are other less restrictive and more effective means of protecting election integrity.

***Section 230 concerns and "editorial discretion*.**" In addition to implicating the First Amendment, this bill may also be preempted by Section 230 of the federal Communications Decency Act. In relevant part, Section 230 provides two express protections for online platforms and their ability to moderate online content. First, Section 230 declares that an online platform cannot be held liable for content posted by third parties. The rationale for this immunity is premised on the idea that online platforms, unlike newspapers, do not exercise editorial discretion; rather, like telephone companies or "common carriers" they are merely a conduit for the expression of ideas by others. Those others, not the platform, are liable for any harm caused by the content. Second, somewhat in tension with this immunity, Section 230 expressly provides that online platforms are not liable if they block or remove material because they disapprove of its content. While it is important to remember that the First Amendment is distinct from Section 230, this protection flows from First Amendment principles. First, because the online platform is not a government actor, it cannot violate the First Amendment. Second, as a private actor, the platform has its own First Amendment right not to be associated with speech it finds objectionable. Some scholars have noted that the two protections in Section 230 are based on contrary premises. Immunity from liability from postings by third parties assumes that platforms *do not* exercise editorial discretion. Their right to remove content without liability, and their own free speech claims, on the other hand, assume that they *do* exercise editorial discretion. [For a concise overview of Section 230 and its intersection with the First Amendment, see Bollinger

and Stone, *Social Media, Freedom of Speech, and the Future of our Democracy* (Oxford University Press, 2022), especially pp. xxiii-xl; on efforts to reform Section 230, see pp.103-120.] Whatever the merits or demerits of Section 230 may be, it is federal law and appears to grant social media platforms the right to moderate content on their platforms and immunizes them from liability for content posted by the third party.

***Cases pending before the U.S. Supreme Court.*** In February of this year, the U.S. Supreme Court heard arguments about two state laws that may have far-reaching consequences for both First Amendment case law and the status of Section 230.  Largely in response to social media platforms barring former President Donald Trump from their platforms in the wake of the January 6 riots, both Texas and Florida enacted laws that limited the ability of social media platforms to control content on their platforms. The Florida law fines platforms if they ban a candidate for office in their state, and requires platforms to disclose information about their moderation policies. The Texas law prohibits platforms from removing content based on its "viewpoint." Both of these laws directly challenge the provision in Section 230 that expressly allows platforms to remove content. Both laws also raise First Amendment concerns about the platforms' right not to be associated with views with which they disagree. Both laws provide an interesting point of comparison with the bill under review: Texas and Florida *prohibit* a platform from denying access to certain people or blocking content on certain topics, while this bill would *require* the platforms to remove content. The Court is expected to issue a ruling in June of this year. How that ruling would affect this bill is unclear, especially given that this bill moves in the opposite direction of the Florida and Texas laws. However, if the Court decides in favor of the platforms – which many commentators think they will, at least in part – it might suggest that the Court believes that platforms should be given more freedom to self-moderate content without state interference. (*See* David McCabe, "Social media companies are bracing for Supreme Court arguments on Monday that could fundamentally alter how the platforms police their sites," *New York Times,* February 25, 2024; and Adam Liptak, "The Supreme Court seemed skeptical on laws in Florida and Texas," *Id.* February 26, 2024.)

Like constitutional and preemption questions, there is no obvious or certain answer as to whether this bill violates the First Amendment or Section 230. The Court may provide some insight soon enough.

***Proposed Author Amendments***. The author will take the following amendments to the definitions section of the bill:

(a) ***"Artificial intelligence" means an engineered or machine-based system that varies in its level of autonomy and that can, for explicit or implicit objectives, infer from the input it receives how to generate outputs that can influence physical or virtual environments***.

(*b*) (1) "Elections official" means any of the following persons, but only in their capacity as a person charged with holding or conducting an election, conducting a canvass, assisting with the holding or conducting of an election or a canvas, or performing another duty related to administering the provisions of this code:

(A) An elections official as defined in Section 320.

(B) The Secretary of State and their staff.

(C) A temporary worker, poll worker, or member of a precinct board.

(D) Any other person charged with holding or conducting an election, conducting a canvass, assisting with the holding or conducting of an election or a canvas, or performing another duty related to administering the provisions of this code.

(2) The requirements of this chapter relating to content portraying an elections official apply only if the large online platform knows or should know that the person is an elections official.

*(c)* ~~(b)~~ "Election processes" means any government process related to an election, including, but not limited to, elections, candidates, vote counting, redistricting, and proceedings or processes of the electoral college.

*(d)* ~~(c)~~ (1) "Materially deceptive and digitally modified or created content" means an image or an audio or video recording or other digital content, including a chatbot, that has been intentionally manipulated such that all of the following conditions are met:

(A) (i) The digital content is the product of digital manipulation, ***including, but not limited to, artificial intelligence***, ~~artificial intelligence, or machine learning, including deep learning techniques, that merges, combines, replaces, or superimposes content onto an image or an audio or video recording, creating an image or an audio or video recording that appears authentic, or that otherwise generates an inauthentic image or an audio or video recording~~ that appears authentic, ~~and that~~ ***but*** contains a false portrayal of any of the following: a candidate for elective office, elected official, elections official, voting machine, ballot, voting site, other property or equipment related to an election, or elections process.

(ii) For purposes of this subdivision, "false portrayal" means the content would cause a reasonable person to have a fundamentally different understanding or impression of the content than the person would have if they were hearing or seeing ~~the unaltered, original~~ ***an authentic*** version of the content.

(B) The person or entity who attempted to post or send, or who did post or send, the content did so knowing the portrayal was false, or did so with reckless disregard for whether the portrayal was false. If the content is intentionally manipulated and contains a false portrayal as specified in subparagraph (A), there shall be a rebuttable presumption that the person or entity knew the portrayal was false or that they acted with reckless disregard for whether the portrayal was false.

(2) "Materially deceptive and digitally modified or created content" does not include any image or audio or video recording that contains only minor modifications that do not lead to significant changes to the perceived contents or meaning of the content. Minor changes include changes to the brightness or contrast of images, removal of background noise in audio, and other minor changes that do not impact the content of the image or audio or video recording.

*(e)* ~~(d)~~ "Large online platform" means a public-facing internet website, web application, or digital application, including a social network, video sharing platform, advertising network, or search engine that had at least 1,000,000 California users during the preceding 12 months.

***ARGUMENTS IN SUPPORT****:*  The sponsor of this bill – The California Initiative for Technology and Democracy (CITED) – writes in support of AB 2655:

> California and the nation are entering the first-ever generative artificial intelligence (AI) election, in which disinformation powered by generative AI will pollute our information ecosystems like never before. . . Those trying to influence campaigns – conspiracy theorists, foreign states, online trolls, and candidates themselves – are already creating and distributing election-threatening deepfake images, audio, and video content in the US and around the world. . . Examples of this occurring in U.S. elections include Ron Desantis using AI-generated images to attack his opponent in his presidential run, foreign states caught attempting to influence American politics through social media, and just this month, a supporter of former President Trump creating a deepfake image of Trump with Black Americans designed to persuade Black voters to support Trump. These examples demonstrate the power of generative AI-fueled disinformation to skew election results and weaken our faith in our democracy.

> AB 2655 strikes the right balance by seeking to ban, for a strictly limited time before and after elections, the online spread of the worst deepfakes and disinformation maliciously intended to prevent voters from voting or getting them to vote erroneously based on fraudulent content. . . AB 2655's approach is narrowly tailored and does not extend the law to hot button controversies or inflammatory claims – it does not ask social media platforms to adjudicate controversial opinions post by post. It simply stops the use of obviously, demonstrably untrue and provably false content meant to impermissibly influence our elections at peak election times.

***ARGUMENTS IN OPPOSITION****:* Opponents of AB 2655 contend that the bill is unnecessary, unwise, unconstitutional, or some combination thereof. A coalition of groups representing the technology and information industry (industry opponents) contend that responsible digital service providers already "take aggressive steps to moderate dangerous and illegal content, consistent with their terms of service. The companies deliver on the commitments made to their user communities with a mix of automated tools and human review." For example, industry opponents point to the several online businesses that voluntarily participate in "the Digital Trust & Safety Partnership (DTSP) to develop and implement best practices to ensure a safer and more trustworthy internet, and have recently reported on the efforts to implement these commitments."

Industry opponents believe that AB 2655 falsely assumes that online platforms "definitively know whether any particular piece of content has been manipulated in such a way that is defined under the bill. While digital services may employ tools to identify and detect these materials with some degree of certainty, it is an evolving and imperfect science in its current form. AB 2655 also presumes that online platforms are an appropriate arbiter of deciding what constitutes accurate election information. However, most digital services are not equipped with the tools or expertise to make such judgments."

In addition to these practical and operational concerns, industry opponents also question the effectiveness of the bill's approach. For example, they point out that the bill only applies to the largest online platforms, specifically those with at least one million California users. Therefore the bill would not include platforms like Truth Social or Parler (which may relaunch this year) even though they are the ones that produce most of the concern. Opponents also point to the "sweeping" enforcement provisions, most notably the provision that allows "any California

resident" to notify the platform of content that, in the resident's opinion, should have been blocked or labeled. The bill, opponents note, would allow this resident "to bring a civil action against a large online platform if the platform has not responded within 36 hours or if the reporting resident disagrees with the platform's response." Confronted with such a restricted timeline and the threat of a civil action, the opponents contend, platforms will "remove significantly more content, including content that has *accurate* election information and content that is not materially deceptive."

While industry opponents concentrate on problems of implementation and effectiveness, ACLU California Action focuses on the bill's constitutional problems. ACLU agrees that protecting "election integrity is a weighty governmental interest," but under the First Amendment, "that interest may be accomplished . . . only by means that are narrowly tailored." ACLU points to ample First Amendment case law holding that discussion "of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." Quoting *Buckley v. Valeo* (1976), ACLU writes that the First Amendment affords "the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people," and, quoting *New York Times v Sullivan* (1964), ACLU notes that debate on public issues must remain "uninhibited, robust, and wide-open." Moreover, ACLU notes, the First Amendment affords protection "to even allegedly false statements about public officials and public figures." ACLU fears that faced with "the prospect of vetting millions of different posts to determine if they are 'materially deceptive and digitally modified or created,' many platforms may instead choose to aggressively censor or prohibit speech out of caution, including speech by candidates or relating to entire political topics." Citing *Brown v. Entertainment Merchants Association* (2011) and *Burstyn v Wilson* (1952), ACLU concludes that however much the technology may change, "the basic principles of freedom of speech and the press" do not vary with each new medium of communication. ACLU believes that the provisions of AB 2655, as currently drafted, "threaten to intrude on those rights and deter that vital speech."

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

California Initiative for Technology & Democracy (sponsor)
AFSCME California
Asian Americans Advancing Justice - Asian Law Caucus
Asian Americans and Pacific Islanders for Civic Empowerment
Asian Law Alliance
Bay Rising
California Clean Money Campaign
California Initiative for Technology & Democracy, a Project of California Common CAUSE
California State Sheriffs' Association
California Voter Foundation
Chinese Progressive Association
Courage California
Disability Rights California
Hmong Innovating Politics
Indivisible CA Statestrong
Inland Empire United
League of Women Voters of California

Partnership for the Advancement of New Americans
SEIU California
The Partnership for the Advancement of New Americans
Verified Voting

**Opposition**

ACLU California Action
Chamber of Progress
Computer and Communications Industry Association
Electronic Frontier Foundation
Internet.Works
NetChoice
Software & Information Industry Association
TechNet

**Opposition unless amended**

Oakland Privacy

**Analysis Prepared by**:  Tom Clark / JUD. / (916) 319-2334

# EXHIBIT 10

**SENATE JUDICIARY COMMITTEE**
**Senator Thomas Umberg, Chair**
**2023-2024  Regular  Session**

AB 2655 (Berman)
Version: June 11, 2024
Hearing Date: July 2, 2024
Fiscal: Yes
Urgency: No
CK

## SUBJECT

Defending Democracy from Deepfake Deception Act of 2024

## DIGEST

This bill establishes the Defending Democracy from Deepfake Deception Act of 2024, which requires a large online platform to block the posting or sending of materially deceptive and digitally modified or created content related to elections, during specified periods before and after an election. It requires these platforms to label certain additional content inauthentic, fake, or false during specified periods before and after an election and to provide mechanisms to report such content.

## EXECUTIVE SUMMARY

The rapid advancement of AI technology, specifically the wide-scale introduction of generative AI models, has made it drastically cheaper and easier to produce synthetic content – audio, images, text, and video recordings that are not real, but that are so realistic that they are virtually impossible to distinguish from authentic content, including so-called "deepfakes." In the context of election campaigns, such deepfakes can be weaponized to deceive voters into thinking that a candidate said or did something which the candidate did not, or otherwise falsely call election results into question. A series of bills currently pending before this Committee attempt to address these issues by restricting or labeling AI-altered or –generated content. However, this bill specifically targets social media platforms and such materially deceptive content on their platforms, requiring platforms to block and prevent it, label it, and provide mechanisms for reporting it.

The bill is sponsored by the California Initiative for Technology & Democracy. It is supported by various organizations, including the League of Women Voters of California and Disability Rights California. It is opposed by Oakland Privacy and various industry associations, including TechNet. The bill passed out of the Senate Elections and Constitutional Amendments Committee on a 6 to 1 vote.

AB 2655 (Berman)
Page 12 of 25

  e.  *Enforcement*

The bill provides standing to candidates, elected officials, or elections officials who have made reports but who have either not received a timely response or who disagree with it to bring an action for injunctive and other equitable relief. The Attorney General, district attorneys, and city attorneys are also so authorized. A prevailing plaintiff is entitled to attorneys' fees and costs. Such actions are given precedence in the courts.

However, plaintiffs in such actions are required to establish a violation by clear and convincing evidence.

  3.  Legal concerns

Concerns have been raised about whether the bill runs afoul of federal statutory and constitutional law. Namely, whether the bill is preempted by Section 230 of the Communications Decency Act, 47 U.S.C. § 230 and the First Amendment to the United States Constitution.

  a.  *Section 230*

Section 230 does not apply to the *users* of social media (or the internet generally), but rather applies to the *platforms themselves*. In the early 1990s, prior to the enactment of Section 230, two trial court orders—one in the United States District Court for the Southern District of New York, and New York state court—suggested that internet platforms could be held liable for allegedly defamatory statements made by the platforms' users if the platforms engaged in any sort of content moderation (e.g., filtering out offensive material).[10] In response, two federal legislators and members of the burgeoning internet industry crafted a law that would give internet platforms immunity from liability for users' statements, even if they might have reason to know that statements might be false, defamatory, or otherwise actionable.[11] The result— Section 230—was relatively uncontroversial at the time, in part because of the relative novelty of the internet and in part because Section 230 was incorporated into a much more controversial internet regulation scheme that was the subject of greater debate.[12]

---

[10] *See Cubby, Inc. v. Compuserve, Inc.* (S.D.N.Y. 1991) 776 F.Supp. 135, 141; *Stratton Oakmont v. Prodigy Servs. Co.* (N.Y. Sup. Ct., May 26, 1995) 1995 N.Y. Misc. LEXIS 229, *10-14. These opinions relied on case law developed in the context of other media, such as whether bookstores and libraries could be held liable for distributing defamatory material when they had no reason to know the material was defamatory. (*See Cubby, Inc.*, 776 F. Supp. at p. 139; *Smith v. California* (1959) 361 U.S. 147, 152-153.)
[11] Kosseff, The Twenty-Six Words That Created The Internet (2019) pp. 57-65.
[12] *Id.* at pp. 68-73. Section 230 was added to the Communications Decency Act of 1996 (title 5 of the Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56), which would have imposed criminal liability on internet platforms if they did not take steps to prevent minors from obtaining "obscene or indecent" material online. The Supreme Court invalidated the CDA, except for Section 230, on the basis that it violated the First Amendment. (*See Reno v. ACLU* (1997) 521 U.S. 844, 874.)

AB 2655 (Berman)
Page 13 of 25

The crux of Section 230 is laid out in two parts. The first provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."[13] The second provides a safe harbor for content moderation, by stating that no provider or user shall be held liable because of good-faith efforts to restrict access to material that is "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected."[14]

Together, these two provisions give platforms immunity from any civil or criminal liability that could be incurred by user statements, while explicitly authorizing platforms to engage in their own content moderation without risking that immunity. Section 230 specifies that "[n]o cause of action may be brought and no liability may be imposed under any State law that is inconsistent with this section."[15] Courts have applied Section 230 in a vast range of cases to immunize internet platforms from "virtually all suits arising from third-party content."[16]

This bill provides for the potential liability of platforms for failing to block and prevent certain content from being posted or shared by users. If a user's content qualifies as materially deceptive, and other conditions are met, then the platform can be held liable for it.

Supporters point to the fact that monetary damages are not available and injunctive relief is essentially the only remedy available. The bill does allow for attorneys' fees and costs, which could be considered the type of liability that triggers Section 230's preemptive effect. The author has agreed to amendments that remove these remedies, leaving only injunctive relief. While courts, including the California Supreme Court, have found Section 230 immunity can extend to liability for solely injunctive relief, it is far from settled law in the country.[17]

In addition, the bill provide that if the platform engages in content moderation that restricts access to a candidate's deceptive portrayal of themselves (with the required disclosure and during the applicable time period), the platform can be held liable for that content moderation decision, regardless of the justification. As discussed below, the author has agreed to an amendment that removes this provision.

Ultimately, the bill is likely to face challenge on these grounds but these amendments work toward insulating the bill from such a challenge.

---

[13] *Id.*, § 230(c)(1).

[14] *Id.*, § 230(c)(1) & (2).

[15] *Id.*, § 230(e)(1) & (3).

[16] Kosseff, *supra*, fn. 13, at pp. 94-95; *see, e.g., Doe v. MySpace Inc.* (5th Cir. 2008) 528 F.3d 413, 421-422; *Carfano v. Metrospalsh.com, Inc.* (9th Cir. 2003) 339 F.3d 1119, 1125; *Zeran v. America Online, Inc.* (4th Cir. 1997) 129 F.3d 327, 333-334.

[17] *Hassell v. Bird* (2018) 5 Cal. 5th 522, 547.

### b. First Amendment

The First Amendment, as applied to the states through the Fourteenth Amendment, prohibits Congress or the states from passing any law "abridging the freedom of speech."[18] "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."[19] However, while the amendment is written in absolute terms, the courts have created a handful of narrow exceptions to the First Amendment's protections, including "true threats,"[20] "fighting words,"[21] incitement to imminent lawless action,[22] defamation,[23] and obscenity.[24] Moreover, the First Amendment not only protects the right to speak, as a logical corollary it protects the "right to receive information and ideas."[25] Expression on the internet is given the same measure of protection granted to in-person speech or statements published in a physical medium.[26]

"Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."[27] Content-based restrictions subject to strict scrutiny are "presumptively unconstitutional."[28] California courts have been clear that political expression in the context of campaigns of any manner should be given wide latitude:

> Hyperbole, distortion, invective, and tirades are as much a part of American politics as kissing babies and distributing bumper stickers and pot holders. Political mischief has been part of the American political scene since, at least, 1800.
>
> In any election, public calumny of candidates is all too common. "Once an individual decides to enter the political wars, he subjects himself to this kind of treatment. . . . [D]eeply ingrained in our political history is a tradition of free-wheeling, irresponsible, bare knuckled, Pier 6, political brawls." To endure the animadversion, brickbats and skullduggery of a given campaign, a politician must be possessed with the skin of a

---

[18] U.S. Const., 1st & 14th amends.
[19] *Ashcroft v. American Civil Liberties Union* (2002) 535 U.S. 564, 573.
[20] *Snyder v. Phelps* (2011) 562 U.S. 443, 452.
[21] *Cohen v. California* (1971) 403 U.S. 15, 20.
[22] *Virginia v. Black* (2003) 538 U.S. 343, 359.
[23] *R.A.V. v. St. Paul* (1992) 505 U.S. 377, 383.
[24] *Ibid.*
[25] *Stanley v Georgia* (1969) 394 U.S. 557, 564. Internal citations omitted
[26] *Reno v. ACLU* (1997) 521 U.S. 844, 870.
[27] *Citizens United v. FEC* (2010) 558 U.S. 310, 340. Internal citations omitted. It should be noted that while not controversial for the principle cited herein, this opinion is widely criticized for further tilting political influence toward wealthy donors and corporations.
[28] *Reed v. Town of Gilbert* (2015) 135 S.Ct. 2218, 2226 (*Reed*).

rhinoceros. Harry Truman cautioned would-be solons with sage advice about the heat in the kitchen.

Nevertheless, political campaigns are one of the most exhilarating phenomena of our democracy. They bring out the best and the worst in us. They allow candidates and their supporters to express the most noble and, lamentably, the most vile sentiments. They can be fractious and unruly, but what they yield is invaluable: an opportunity to criticize and comment upon government and the issues of the day.

The candidate who finds himself or herself the victim of misconduct is not without a remedy. Those campaign tactics which go beyond the pale are sanctionable under FPPC laws.

It is abhorrent that many political campaigns are mean-spirited affairs that shower the voters with invective instead of insight. The elimination from political campaigns of opprobrium, deception and exaggeration would shed more light on the substantive issues, resulting in a more informed electorate. It would encourage more able people to seek public office. But to ensure the preservation of a citizen's right of free expression, we must allow wide latitude.[29]

The United States Supreme Court has emphasized the extraordinary protection afforded to political speech:

Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Although First Amendment protections are not confined to "the exposition of ideas," "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs,… of course includ[ing] discussions of candidates…." This no more than reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. As the Court observed in *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971), "it can hardly be doubted that the constitutional guarantee has its fullest and

---

[29] *Beilenson v. Superior Court* (1996) 44 Cal. App. 4th 944, 954-55. Internal citations omitted.

most urgent application precisely to the conduct of campaigns for political office."[30]

This protection does not end where the truth of the speech does. "Although false statements of fact, by themselves, have no constitutional value, constitutional protection is not withheld from all such statements."[31] For instance, in the seminal opinion in *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279-80, the court found the Constitution requires a rule that "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made  with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not. The Supreme Court has expounded on this principle, providing nuance based on the knowledge of the speaker:

> Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned. And since ". . . erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive' . . . ," only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions. For speech concerning public affairs is more than self-expression; it is the essence of self-government. The First and Fourteenth Amendments embody our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."

> The use of calculated falsehood, however, would put a different cast on the constitutional question. Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity. At the time the First Amendment was adopted, as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration. That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which "are no essential part of any exposition of ideas, and are

---

[30] *Buckley v. Valeo* (1976) 424 U.S. 1, 14-15. Internal citations omitted.
[31] *People v. Stanistreet* (2002) 29 Cal. 4th 497, 505.

> of such slight social value as a step to truth that any benefit that may be
> derived from them is clearly outweighed by the social interest in order
> and morality. . . ." Hence the knowingly false statement and the false
> statement made with reckless disregard of the truth, do not enjoy
> constitutional protection.[32]

As stated, a restriction can survive strict scrutiny only if it uses the least-restrictive
means available to achieve a compelling government purpose.[33] This bill implicates
both the right to speak about elections, as well as the right to receive information
regarding them. The bill is aimed at protecting the integrity of our elections, arguably a
clearly compelling governmental interest. The question is whether the bill sufficiently
tailors its provisions to effectuating that goal.

The bill seeks to prevent "materially deceptive content," which is audio or visual media
that is digitally created or modified, and that includes, but is not limited to, deepfakes
and chatbots, such that it would falsely appear to a reasonable person to be an authentic
record of the content depicted in the media, when it portrays candidates or elections
officials doing or saying something they did not do or say. However, it does not target
the person creating, posting, or sharing such content, but the platforms that host it. The
bill attempts to tailor itself to the boundaries sketched out above. For instance, it
imposes liability on the platforms only where they knew or should have known the
content qualified as "materially deceptive content." However, this falls short of the
malice standard set forth in *Sullivan*, establishing something akin to a negligence
standard instead.

The bill does impose a malice requirement but on the person or entity who created the
content, requiring that they created it knowing it was false or with reckless disregard
for the truth. However, liability is not imposed on the creator, nor even the one posting
or sharing the content, but the social media platform allowing it on their platform.
Further undercutting this element, there is a rebuttable presumption that the person
who created it acted with malice if the content causes "a reasonable person to have a
fundamentally different understanding or impression of the content than the person
would have if hearing or seeing an authentic version of the content." Therefore, the bill
puts the onus on the platform to establish that the creator of the content, a person or
entity the platform may not even have a relationship with or know, did not act with
malice. Many of the relevant cases stress that the level of burden placed on a defendant
to defend their political speech is a factor to consider. For instance, the following was
stated in *Sullivan*:

> A rule compelling the critic of official conduct to guarantee the truth of all
> his factual assertions -- and to do so on pain of libel judgments virtually

---

[32] *Garrison v. Louisiana* (1964) 379 U.S. 64, 74-75. Internal citations omitted.
[33] *United States v. Playboy Entertainment Group* (2000) 529 U.S. 803, 813.

unlimited in amount -- leads to a comparable "self-censorship." Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars.[34]

While the plaintiff is required to prove their case by clear and convincing evidence, the standards above place a burden on platforms to establish facts potentially well outside their bounds of knowing.

The California Initiative for Technology & Democracy (CITED), the sponsor of the bill, argues the case:

> AB 2655's approach is narrowly tailored and does not extend the law to hot button controversies or inflammatory claims – it does not ask social media platforms to adjudicate controversial opinions post by post. It simply stops the use of obviously, demonstrably untrue and provably false content meant to impermissibly influence our elections at peak election times. It is therefore respectful of the protections of the First Amendment and avoids concerns based on Section 230 of the Communications Decency Act.

Writing in opposition, ACLU California Action assesses the issue:

> Digitally modified content or content created using artificial intelligence (AI) tools is also entitled to [First Amendment] protections, unless the content falls within recognized First Amendment exceptions such as libel or fraud. The "novelty of deepfake technology and the speed with which it is improving" do not justify relaxing the stringent protections afforded to political speech by the First Amendment. The Supreme Court has held that "whatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears."
>
> The law has long made clear that the First Amendment was intended to create a wide berth for political speech because it is the core of our democracy. The First Amendment provides robust protection for speech of all kinds. Speech that is false, confusing, or which presents content that some find abhorrent, nevertheless maintains its constitutional protections as a driver of free discourse. This remains so no matter what the

---

[34] *N.Y. Times Co. v. Sullivan*, at 279.

technology used to speak. Unfortunately, the provisions of AB 2655 as currently drafted threaten to intrude on those rights and deter that vital speech.

In response to these concerns, the author has agreed to amendments that remove the provision that applies this malice standard to the creators of the content and instead more closely hews the platform's basis for liability to the malice standard, holding the large online platform liable only if it knows that the materially deceptive content meets the requirements of the bill or acts with a reckless disregard for the truth.[35]

As the bill also requires platforms to allow certain potentially misleading content to be posted, the bill could be found to implicate the First Amendment rights of platforms in their editorial discretion. Two laws in Florida and Texas that similarly seek to prevent platforms from taking down certain content have been challenged. The consolidated case has been argued before the United States Supreme Court and an opinion is forthcoming. The 11th Circuit Court of Appeals laid out its assessment of the First Amendment implications of such laws:

> Social-media platforms like Facebook, Twitter, YouTube, and TikTok are private companies with First Amendment rights and when they (like other entities) "disclos[e]," "publish[]," or "disseminat[e]" information, they engage in "speech within the meaning of the First Amendment." More particularly, when a platform removes or deprioritizes a user or post, it makes a judgment about whether and to what extent it will publish information to its users—a judgment rooted in the platform's own views about the sorts of content and viewpoints that are valuable and appropriate for dissemination on its site. As the officials who sponsored and signed S.B. 7072 [the challenged Florida law] recognized when alleging that "Big Tech" companies harbor a "leftist" bias against "conservative" perspectives, the companies that operate social-media platforms express themselves (for better or worse) through their content-moderation decisions. When a platform selectively removes what it perceives to be incendiary political rhetoric, pornographic content, or public-health misinformation, it conveys a message and thereby engages in "speech" within the meaning of the First Amendment.

> Laws that restrict platforms' ability to speak through content moderation therefore trigger First Amendment scrutiny.[36]

---

[35] This amendment includes corresponding changes in the labeling section of the bill.
[36] *NetChoice, LLC v. AG, Fla.* (11th Cir. 2022) 34 F.4th 1196, 1210. Internal citations and quotations omitted.

As constitutional analysis is subject to changing norms and interpretations, especially in the more political charged federal judiciary of the day, it is inherently difficult to predict whether this law will be struck down for violating the protections of the First Amendment. However, it is safe to say it will likely face legal challenge and arguably be vulnerable thereto.

In order to insulate the bill from such challenge, the author has agreed to an amendment that simply provides that the bill does not apply to a candidate's portrayal of themselves doing or saying something that the candidate did not do or say, where it includes the required disclosure.

  c.  *Additional concerns*

The bill raises a few additional concerns. First, the bill requires platforms to retain all content they have prevented or blocked or labeled pursuant to the bill. This forced retention of information raises some thorny legal issues and may interfere with existing consumer rights. For instance, the CCPA, as amended by the CPRA, grants a series of rights to consumers, including the right to delete information held by businesses. In addition, given that the retention provision is essentially a government mandate on private businesses to seize certain information of private individuals, Fourth Amendment issues arguably arise. Furthermore, the bill requires platforms to hand over the content to specified government entities and even "researchers," upon request. There is no limitation that there be evidence of a crime or some other justification and no probable cause necessary to be provided the information. In response, the author has agreed to an amendment to remove this retention requirement.

In addition, it is unclear what exactly is required by the bill's requirement to block or prevent the *sending* of materially deceptive content. This could be read to apply to private messaging features of these platforms, essentially requiring platforms to scan private communications. This would raise serious privacy concerns. In response, the author has agreed to amendments that remove the "sending" element of the bill.

In addition, groups in opposition raise concerns that the bill presupposes a level of sophistication for technology that can detect AI-generated or manipulated content that simply does not exist. A coalition of industry associations, including NetChoice writes in opposition:

> AB 2655 appears to be based on the false assumption that online platforms definitively know whether any particular piece of content has been manipulated in such a way that is defined under the bill. While digital services may employ tools to identify and detect these materials with some degree of certainty, it is an evolving and imperfect science in its current form. AB 2655 also presumes that online platforms are an appropriate arbiter of deciding what constitutes accurate election

AB 2655 (Berman)
Page 21 of 25

information. However, most digital services are not equipped with the tools or expertise to make such judgments.

Oakland Privacy writes in opposition:

> The bill language offers that a technology company should be the judge, jury and executioner, although it may be unclear if the content is or is not generative AI-created and what role generative AI played in the content. It is unclear to us how any technology platform can be expected to know everything that every candidate in every city, county, state and federal election said and everywhere they went. Not to mention every other elected official in the state. If this is the basis for the removal of content by a technology platform, it is highly speculative and largely dependent on reports to the platform, which may be inaccurate, politically motivated, or malicious.
> We appreciate amendments to raise the bar for the knowledge level of online platforms. But we continue to have concerns on the other side of the spectrum: the removal of content that should not be removed and may well impact election results.
>
> In other words, the bill language is relying on two imprecise measures: technically scanning content for synthetic material with highly inaccurate tools, and real-life reports from the public, candidates and election officials and campaigns or chaos actors to power a broad censorship regime of blocking content. We cannot support that, even under the guise of defending democracy.

The opposition coalition also takes issue with the enforcement mechanism:

> [B]ecause AB 2655 is focused on enforcement against covered platforms and not the actors who are intentionally seeking to materially deceive other consumers, it is unlikely to meaningfully reduce the amount of election mis- and disinformation hosted online. While the June 11 amendments appear to attempt to address this issue, we do not believe the new language effectively resolves our concerns. For example, the bill now allows for a "rebuttable presumption" but still fails to effectively address and hold accountable the purveyors of deceptive content.

4. <u>Support</u>

CITED, the sponsor of the bill, writes:

> Those trying to influence campaigns – conspiracy theorists, foreign states, online trolls, and candidates themselves – are already creating and

distributing election-threatening deepfake images, audio, and video content in the US and around the world. This threat is not imaginary: generative AI has been used in various ways – most of them deeply deceptive – to influence the national elections in Slovakia, Bangladesh, Argentina, Pakistan, and elsewhere, including in our own country. Examples of this occurring in U.S. elections include Ron Desantis using AI-generated images to attack his opponent in his presidential run, foreign states caught attempting to influence American politics through social media, and just this month, a supporter of former President Trump creating a deepfake image of Trump with Black Americans designed to persuade Black voters to support Trump.

These examples demonstrate the power of generative AI-fueled disinformation to skew election results and weaken our faith in our democracy. We cannot let it undermine our elections here in California, and we are grateful you are leading the effort to try to stop it.

AB 2655 strikes the right balance by seeking to ban, for a strictly limited time before and after elections, the online spread of the worst deepfakes and disinformation maliciously intended to prevent voters from voting or getting them to vote erroneously based on fraudulent content. The bill also requires that other fake online content related to elections and elections processes (such as redistricting), which is also designed to undermine election procedures and democratic institutions, must be labeled as fake, again just for a limited time. The bill only applies to the largest online platforms with the greatest reach of potential election disinformation, and we believe it is fully implementable today based on tools these companies already possess. The companies covered by the bill's requirements are all already subject to similar requirements under the European Union's Digital Services Act, which is designed to, among other things, crack down on election interference.

A coalition of groups in support, including the American Federation of State, County, and Municipal Employees (AFSCME) and NextGen CA, write:

AB 2655 seeks to solve these problems by, for a limited time before and after elections, banning the online spread of the worst of the deepfakes and disinformation meant to prevent voters from voting or to deceive them based on fraudulent content, and requiring that other fake content to be labeled as such. The approach leans heavily on increasing transparency, with bans used at only the highest-leverage moments, making it narrowly tailored. Additionally, it does not extend the law to hot button controversies or inflammatory claims – just the depiction of demonstrably untrue and provably false content meant to impermissibly

influence our elections, at peak times – and is therefore implementable and respectful of the protections of the First Amendment.

Writing in support, the Northern California Recycling Association explains the need for the bill:

> California is entering its first-ever generative Artificial Intelligence (AI) election, in which disinformation powered by generative AI would and will pollute our information ecosystems like never before. Deepfakes are a powerful and dangerous tool in the arsenal of those that want to wage disinformation campaigns, and they have the potential to wreak havoc on our democracy by attributing speech and conduct to a person that is false or that never happened. Advances in AI make it easy for practically anyone to generate this deceptive content, making it that much more important that we identify and restrict its spread before it has the chance to deceive voters and undermine our democracy.

## **SUPPORT**

California Initiative on Technology and Democracy (sponsor)
AFSCME California
Asian Americans Advancing Justice - Asian Law Caucus
Asian Americans and Pacific Islanders for Civic Empowerment
Asian Law Alliance
Bay Rising
Board of Supervisors for the City and County of San Francisco
California Clean Money Campaign
California Environmental Voters
California State Sheriff's Association
California Voter Foundation
Center for Countering Digital Hate
Chinese Progressive Association
City and County of San Francisco Board of Supervisors
Courage California
Disability Rights California
Hmong Innovating Politics
Inland Empire United
League of Women Voters of California
Move (mobilize, Organize, Vote, Empower) the Valley
Nextgen California
Northern California Recycling Association
Partnership for the Advancement of New Americans
SEIU California
Techequity Action

AB 2655 (Berman)
Page 24 of 25

Verified Voting
Young People's Alliance
Youth Power Project

**OPPOSITION**

ACLU California Action
California Chamber of Commerce
Computer & Communications Industry Association
Electronic Frontier Foundation
Internet Works
Netchoice
Oakland Privacy
Software & Information Industry Association
Technet

**RELATED LEGISLATION**

Pending Legislation:

SB 942 (Becker, 2024) establishes the California AI Transparency Act, requiring covered providers to create and make freely available an AI detection tool to detect content as AI-generated and to include disclosures in content generated by the provider's system. SB 942 is currently in the Assembly Judiciary Committee.

SB 970 (Ashby, 2024) ensures that media manipulated or generated by artificial intelligence (AI) technology is incorporated into the right of publicity law and criminal false impersonation statutes. The bill requires those providing access to such technology to provide a warning to consumers about liability for misuse. SB 970 was held on suspense in the Senate Appropriations Committee.

AB 2355 (Wendy Carrillo, 2024) requires committees that create, publish, or distribute a political advertisement that contains any image, audio, or video that is generated or substantially altered using artificial intelligence to include a disclosure in the advertisement disclosing that the content has been so altered. AB 2355 is currently in this Committee.

AB 2839 (Pellerin, 2024) prohibits a person, committee, or other entity from knowingly distributing an advertisement or other election communication that contains materially deceptive content, as defined and specified, with malice, except as provided, within 120 days of a California election, and in specified cases, 60 days thereafter. AB 2839 is currently in this Committee.

AB 2930 (Bauer-Kahan, 2024) requires, among other things, a deployer and a developer of an automated decision tool to perform an impact assessment for any automated

AB 2655 (Berman)
Page 25 of 25

decision tool the deployer uses that includes, among other things, a statement of the purpose of the automated decision tool and its intended benefits, uses, and deployment contexts. AB 2930 requires a deployer to, at or before the time an automated decision tool is used to make a consequential decision, notify any natural person that is the subject of the consequential decision that an automated decision tool is being used to make, or be a substantial factor in making, the consequential decision and to provide that person with, among other things, a statement of the purpose of the automated decision tool. AB 2930 is currently in this Committee.

AB 3211 (Wicks, 2024) establishes the California Provenance, Authenticity and Watermarking Standards Act, which requires a generative AI system provider to take certain actions to assist in the disclosure of provenance data to mitigate harms caused by inauthentic content, including placing imperceptible and maximally indelible watermarks containing provenance data into content created by an AI system that the generative AI system provider makes available. AB 3211 also requires a large online platform, as defined, to, among other things, use labels to prominently disclose the provenance data found in watermarks or digital signatures in content distributed to users on its platforms, as specified. AB 3211 is currently in the Senate Appropriations Committee.

Prior Legislation: AB 730 (Berman, Ch. 493, Stats. 2019) prohibited the use of deepfakes depicting a candidate for office within 60 days of the election unless the deepfake is accompanied by a prominent notice that the content of the audio, video, or image has been manipulated. Additionally, AB 730 authorized a candidate who was falsely depicted in a deepfake to seek rapid injunctive relief against further publication and distribution of the deepfake.

## PRIOR VOTES:

Senate Elections and Constitutional Amendments Committee (Ayes 6, Noes 1)
Assembly Floor (Ayes 56, Noes 1)
Assembly Appropriations Committee (Ayes 11, Noes 1)
Assembly Judiciary Committee (Ayes 9, Noes 0)
Assembly Elections Committee (Ayes 6, Noes 1)
**************

# EXHIBIT 11

CONCURRENCE IN SENATE AMENDMENTS
AB 2655 (Berman and Pellerin)
As Amended  August 23, 2024
Majority vote

## SUMMARY

Requires large online platforms, as defined, to remove materially deceptive and digitally modified or created content related to elections, or to label that content, during specified periods before and after an election, if the content is reported to the platform, as specified.

**Senate Amendments**

1) Provide that a large online platform is required to remove or label content only if that content is first reported to the platform by a California resident as being content that is covered by the provisions of this bill. Require the platform to remove or label the content no later than 72 hours after it is reported.

2) Limit the bill's applicability to content related to elections in California, and to candidates for President and Vice President, statewide office, Board of Equalization, state Legislature, and United States (US) House of Representatives.

3) Reduce the period of time during which materially deceptive content must be labeled such that the period begins six months before an election in California, instead of beginning one year before an election as was provided in the Assembly-approved version of this bill.

4) Specify that the bill does not apply to a broadcasting station in either of the following circumstances:

   a) When it distributes deceptively-altered media as part of its news coverage, as specified, if the media includes a clear acknowledgement that it is not accurately representative.

   b) When it is paid to broadcast materially deceptive content if federal law requires the station to air the advertisement or if the station has its own prohibition and disclaimer requirements that are generally consistent with the requirements of this bill, as specified.

5) Delete provisions of the bill that would have allowed a court to award reasonable attorney's fees and costs to a prevailing plaintiff party in an action brought under this bill.

6) Delete a provision of the bill that would have required a platform to maintain a copy of any content that it blocks or labels under this bill for at least five years.

7) Delete provisions of the bill that would have made it applicable to deceptive and digitally modified or created content related to redistricting.

8) Recast various provisions of the bill to improve clarity, and make other clarifying, technical, and conforming changes.

9) Add double-jointing language to avoid chaptering problems with AB 2839 (Pellerin) of the current legislative session.

## COMMENTS

The use of false and deceptive information in campaigns to influence election outcomes is not a new phenomenon. Laws aimed at curbing such practices and preserving the integrity of elections have a long history in California. In 1850, the First Session of the California State Legislature created penalties for election misconduct, including for "deceiving [an elector] and causing him to vote for a different person for any office than such elector desired or intended to vote for" (Chapter 38, Statutes of 1850).

Advancements in technology have made it increasingly simple to produce false and misleading media that closely resembles authentic content. Moreover, platforms like social media have facilitated the rapid dissemination of deceptive media to large audiences at minimal cost. Given these developments, the potential threat posed by manipulated media to future elections' integrity may be more significant than in the past.

Past legislative efforts have addressed concerns about manipulated media's use to deceive voters during elections. Those laws, however, are limited, and are designed primarily to target the harms to *candidates* that may result from the distribution of manipulated media of those candidates. In contrast, this bill aims to regulate materially deceptive and digitally altered media depicting not only candidates, but also elections officials and elected officials who are not candidates. Additionally, this bill targets media that portrays elections materials and equipment in materially deceptive ways. The author and supporters of this bill believe that these provisions will safeguard voters against deceitful media that could undermine trust in the electoral process.

The Legislature is considering a number of bills this year that seek to address deceptive and digitally altered elections-related content in an effort to protect the integrity of elections in California. While other legislation related to this topic applies broadly to the distribution of such content through various mediums, this bill specifically targets the distribution of deceptive content through online platforms, including social media. Recognizing that those online platforms can facilitate the rapid spread of deceptive content, this bill seeks to minimize that potential by obligating large online platforms to remove or label offending content.

In recognition that the regulation of the distribution of content can create free speech concerns, this bill contains various provisions that tailor the content to which it applies, such that it targets content that has the highest likelihood of deceiving voters and undermining electoral integrity. While that tailoring does limit the content that online platforms would be required to remove or label, it also adds additional factors that platforms must consider in order to identify content that is required to be removed or labeled under this bill.

Along with other limitations, this bill applies only to content that 1) is distributed during specified time periods around elections and election processes, 2) includes media relating to elections or the electoral process in specified ways, 3) that was intentionally manipulated digitally to be materially deceptive, and 4) that is not satire or parody. Each of these limitations adds additional factors that online platforms would need to consider when determining whether a specific communication must be removed or labeled by this bill. Given the number of elections and candidates in California at any given time, making the determinations at scale about which content must be removed or labeled will be considerably more challenging than making those determinations on a case-by-case basis in a court of law. Senate amendments, however, eliminated the requirements for platforms to proactively remove or label such content, and

instead impose an obligation on platforms to act only after a report has been made. Those amendments likely will reduce the burden that this bill creates on platforms to some degree.

A question could be raised about whether this bill is consistent with the right to freedom of speech that is guaranteed by the US and California constitutions. The US Supreme Court has ruled that even false statements are protected by the First Amendment (*United States v. Alvarez* (2012), 567 U.S. 709). When a law burdens core political speech, the restrictions on speech generally must be "narrowly tailored to serve an overriding state interest," *McIntyre v. Ohio Elections Commission* (1995), 514 US 334.

This bill targets deceptive content that could undermine trust in elections, prevent voters from voting, and distort the electoral process. The US Supreme Court generally has found that the protection of the integrity of elections is an overriding (or compelling) government interest (*Id.* at 349; *Burson v. Freeman* (1992) 504 U.S. 191, 199). A challenge of this bill on First Amendment grounds, then, likely would hinge on whether the court found this bill's provisions to be narrowly tailored. This bill includes provisions to limit its scope to communications posing the greatest threat to election integrity in an effort to tailor its provisions. Whether these limitations adequately protect this bill from a potential constitutional challenge is unclear. However, while these limitations may help protect the bill against a constitutional challenge, they may also make it harder for the bill to achieve its aims of limiting the spread of materially deceptive communications that have the potential to undermine election integrity.

The Senate amendments eliminate the requirement for platforms to proactively block or label deceptive content, and instead require platforms to address deceptive content only upon receiving reports from users about that content. The Senate amendments additionally make various changes in response to opposition concerns including narrowing the bill's applicability to broadcast stations and limiting the types of elections and candidates to which the bill applies, among other changes.

Please see the policy committee analysis for a full discussion of this bill.

**According to the Author**
"AB 2655 will ensure that online platforms restrict the spread of election-related deceptive deepfakes meant to prevent voters from voting or to deceive them based on fraudulent content. Deepfakes are a powerful and dangerous tool in the arsenal of those that want to wage disinformation campaigns, and they have the potential to wreak havoc on our democracy by attributing speech and conduct to a person that is false or that never happened. Advances in AI make it easy for practically anyone to generate this deceptive content, making it that much more important that we identify and restrict its spread before it has the chance to deceive voters and undermine our democracy."

**Arguments in Support**
The sponsor of this bill, the California Initiative for Technology & Democracy, writes in support, "Those trying to influence campaigns – conspiracy theorists, foreign states, online trolls, and candidates themselves – are already creating and distributing election-threatening deepfake images, audio, and video content in the US and around the world… AB 2655 strikes the right balance by seeking to ban, for a strictly limited time before and after elections, the online spread of the worst deepfakes and disinformation maliciously intended to prevent voters from voting or getting them to vote erroneously based on fraudulent content. The bill also requires that other fake online content related to elections and elections processes…which is also designed to

undermine election procedures and democratic institutions, must be labeled as fake, again just for a limited time. The bill only applies to the largest online platforms with the greatest reach of potential election disinformation, and we believe it is fully implementable today based on tools these companies already possess… AB 2655's approach is narrowly tailored and does not extend the law to hot button controversies or inflammatory claims…It simply stops the use of obviously, demonstrably untrue and provably false content meant to impermissibly influence our elections at peak election times. It is therefore respectful of the protections of the First Amendment and avoids concerns based on Section 230 of the Communications Decency Act."

**Arguments in Opposition**
A coalition of business and technology industry associations writes in opposition, "AB 2655 appears to be based on the false assumption that online platforms definitively know whether any particular piece of content has been manipulated in such a way that is defined under the bill. While digital services may employ tools to identify and detect these materials with some degree of certainty, it is an evolving and imperfect science in its current form. AB 2655 also presumes that online platforms are an appropriate arbiter of deciding what constitutes accurate election information. However, most digital services are not equipped with the tools or expertise to make such judgments. Because covered platforms are not privy to the intent and context behind each piece of content, they may inadvertently over-block or over-label material. This could lead to user frustration and the suppression of political speech. Political speech is fundamental to the First Amendment's purpose. Therefore, AB 2655 raises concerns about how its provisions could have a chilling effect on online speech and whether it can withstand constitutional scrutiny."

## FISCAL COMMENTS

According to the Senate Appropriations Committee:

1) The Department of Justice (DOJ) indicates that it would incur costs of $911,000 in 2024-25, $1.4 million each in 2025-26 and 2026-27, $1.2 million in 2027-28, and $1 million annually thereafter, to implement the provisions of the bill (General Fund).

2) By authorizing a claim by specified parties against a large online platform for failing to block or label specified content, this bill could result in an increased number of civil actions. Consequently, the bill could result in potentially significant cost pressures to the courts; the magnitude is unknown (Trial Court Trust Fund (TCTF)). The specific number of new actions that could be filed under the bill also is unknown; however, it generally costs about $1,000 to operate a courtroom for one hour. Courts are not funded on the basis of workload, and increased pressure on TCTF may create a need for increased funding for courts from the General Fund. The enacted 2024-25 budget includes $37 million in ongoing support from the General Fund to continue to backfill TCTF for revenue declines.

## VOTES:

**ASM ELECTIONS: 6-1-1**
**YES:** Pellerin, Bennett, Berman, Cervantes, Low, Weber
**NO:** Essayli
**ABS, ABST OR NV:** Lackey

**ASM JUDICIARY: 9-0-3**
**YES:** Kalra, Bauer-Kahan, Bryan, Connolly, Haney, Maienschein, McKinnor, Pacheco, Reyes

**ABS, ABST OR NV:** Dixon, Sanchez, Waldron

**ASM APPROPRIATIONS: 11-1-3**
**YES:** Wicks, Arambula, Bryan, Calderon, Wendy Carrillo, Mike Fong, Grayson, Haney, Hart, Pellerin, Villapudua
**NO:** Dixon
**ABS, ABST OR NV:** Sanchez, Jim Patterson, Ta

**ASSEMBLY FLOOR: 56-1-23**
**YES:** Addis, Aguiar-Curry, Alvarez, Arambula, Bains, Bauer-Kahan, Bennett, Berman, Boerner, Bonta, Bryan, Juan Carrillo, Wendy Carrillo, Connolly, Mike Fong, Gabriel, Garcia, Gipson, Grayson, Haney, Hart, Irwin, Jackson, Jones-Sawyer, Kalra, Lee, Low, Lowenthal, Maienschein, McCarty, McKinnor, Muratsuchi, Stephanie Nguyen, Ortega, Pacheco, Papan, Pellerin, Petrie-Norris, Quirk-Silva, Ramos, Rendon, Reyes, Rodriguez, Blanca Rubio, Santiago, Schiavo, Soria, Ting, Valencia, Ward, Weber, Wicks, Wilson, Wood, Zbur, Robert Rivas
**NO:** Dixon
**ABS, ABST OR NV:** Alanis, Calderon, Cervantes, Chen, Megan Dahle, Davies, Essayli, Flora, Vince Fong, Friedman, Gallagher, Holden, Hoover, Lackey, Mathis, Jim Patterson, Joe Patterson, Luz Rivas, Sanchez, Ta, Villapudua, Waldron, Wallis

**SENATE FLOOR: 31-9-0**
**YES:** Allen, Archuleta, Ashby, Atkins, Becker, Blakespear, Bradford, Caballero, Cortese, Dodd, Durazo, Eggman, Glazer, Gonzalez, Hurtado, Laird, Limón, McGuire, Menjivar, Min, Newman, Padilla, Portantino, Roth, Rubio, Skinner, Smallwood-Cuevas, Stern, Umberg, Wahab, Wiener
**NO:** Alvarado-Gil, Dahle, Grove, Jones, Nguyen, Niello, Ochoa Bogh, Seyarto, Wilk

**UPDATED**

VERSION: August 23, 2024

CONSULTANT: Ethan Jones / ELECTIONS / (916) 319-2094                 FN: 0004820

# EXHIBIT 12

9/27/24, 9:28 AM　　　　Fact check: Harris campaign social media account has repeatedly deceived with misleading edits and captions | CNN Politics

Case 2:24-cv-02527-JAM-CKD　Document 21　Filed 09/30/24　Page 177 of 182

Fact check: Harris campaign social media account has repeatedly deceived with misleading edits and captions

 By Daniel Dale, CNN

12 minute read　Updated 2:57 PM EDT, Sat September 14, 2024



Vice President Kamala Harris' campaign headquarters in Wilmington, Delaware, on July 22. Erin Schaff/Pool/Getty Images

**Washington CNN —** A social media account run by Vice President Kamala Harris' campaign has been repeatedly deceptive.

The @KamalaHQ account, which has more than 1.3 million followers on the X social media platform formerly known as Twitter, has made a habit of misleadingly clipping and inaccurately captioning video clips to attack former President Donald Trump.

The Harris campaign deploys @KamalaHQ as a kind of irreverent attack dog, using jocular posts to draw attention to controversial, incorrect, or dubious comments by Trump and his allies. But the account, which the Harris campaign calls its "official rapid response page," has itself made inaccurate comments on multiple occasions.

Below are eight examples of false or misleading video posts from the account since mid-August, including three from the latter part of this week. All of them have previously been highlighted by an anonymous rebuttal account called @KamalaHQLies, which itself has more than 268,000 followers.

Verified Complaint Exhibit 12
092



Video Ad Feedback

'The algorithm plays a huge part.' Meet the Gen Z creator making TikToks for Trump

02:39 - Source: CNN

### Misleadingly describing a Trump comment about his supporters

An August 17 post from @KamalaHQ strongly suggested Trump had gotten confused about what state he was in during an event in Wilkes-Barre, Pennsylvania. The post said, "Trump: Would that be okay, North Carolina? (He is in Pennsylvania)." It included a six-second video clip in which Trump said, while pointing to his left, "Would that be okay, North Carolina? I don't think so, right."

The Harris campaign was explicit about its intentions in the version of the post it made on the Instagram @KamalaHQ account, saying, "Donald Trump is lost and confused."

But Trump was not lost or confused.

The full video of the rally shows that earlier in the speech, Trump had pointed to the same spot on his left to acknowledge and then speak to a group of ardent supporters from North Carolina, eventually saying, "Thank you very much. North Carolina!" Later, in the moment shown by @KamalaHQ, he pointed to these supporters again and referred to them as "North Carolina." He had not forgotten he was speaking in Pennsylvania.

The Harris campaign declined to comment on this @KamalaHQ post.

### Deceptively clipping and misleadingly describing a Trump comment about immigration

On Thursday, the @KamalaHQ account made a new attempt to suggest that Trump was confused about his location. Its post said, "Trump: 'Pennsylvania, remember this when you have to go to vote' (He is in Arizona)." It included an eight-second clip of Trump saying in a Tucson speech, "So Pennsylvania, remember this when you have to go to vote, okay, just remember this: 2,000% increase. This is a small —…"

The Instagram post of this remark, too, was more explicit than the X post; on Instagram, the Harris campaign added text over top the video that read, "Trump forgets which state he is in (again)."

But Trump, again, had not forgotten which state he was in.

The extended footage shows that the Harris campaign clipped out critical context: Trump was talking about immigration, a key topic in Arizona, and had just read a part of his prepared text about how a small Pennsylvania town has "experienced a 2,000% increase in the population of Haitian migrants under Kamala Harris." He then added, "So Pennsylvania, remember this when you have to go to vote, okay, just remember this: 2,000% increase, this is a small town; of all a sudden they got thousands of people."

One could try to argue it's odd for Trump to make a direct appeal to Pennsylvanians while speaking in Arizona. But Trump's remarks anywhere in the country are broadcast to voters everywhere, and, regardless, @KamalaHQ eliminated the context that would allow people to develop an informed opinion on this remark.

The Harris campaign declined to comment on this @KamalaHQ post.

Verified Complaint Exhibit 12
093



Video Ad Feedback

CNN visits Ohio town where Trump falsely claimed migrants are eating pets. Here's what we found

03:13 - Source: CNN

---

**Deceptively clipping and misleadingly describing a Trump comment about his 2017 Charlottesville remark**

A Friday post from @KamalaHQ said, "Trump says 'nothing was done wrong' in Charlottesville in 2017 when neo-Nazis chanted 'Jews will not replace us' and killed an innocent woman." The post included a 10-second clip of Trump telling reporters at a Friday event in California, "…like on Project 2025, I have no idea about — had nothing to do with me, he didn't correct her, he knew that. Charlottesville — nothing was done wrong."

But the full video of Trump's California comments shows that the Harris campaign deceptively cut the clip right before Trump made clear he was not claiming that neo-Nazis in Charlottesville did nothing wrong or that the murder of innocent Charlottesville counterprotester Heather Heyer was not wrong.

Rather, the full video shows, he was arguing that *he* did nothing wrong with his "very fine people, on both sides" comment in 2017 about the events in Charlottesville, which he has repeatedly insisted was not about white nationalists.

Specifically, Trump was complaining that a moderator of the presidential debate on Tuesday, David Muir of ABC News, did not challenge how Harris described Trump's 2017 comments. We say Harris' debate description of the 2017 comments was fair, but regardless, Trump was not defending murder on Friday.

Here is Trump's full Friday remark, in which he invoked various Fox News hosts: "I think he (Muir) corrected me 11 times. Of the 11 times, I don't think he had the right to correct me at all. Didn't correct her once. Like on Project 2025, I have no idea about — had nothing to do with me, he didn't correct her, he knew that. Charlottesville — nothing was done wrong. All you had to do is read my statement one more sentence and you would've seen that. Sean Hannity, Laura Ingraham, Jesse (Watters), all of them, they — Greg Gutfeld — they all took that and they corrected it many times. But they keep coming with the same lies."

Defending the @KamalaHQ post, the Harris campaign said in an email: "He's saying he did 'nothing wrong' in relation to him saying 'very fine people' who did what is described in the tweet."

There are two problems with this. The post itself did not acknowledge that Trump's "nothing wrong" comment was about his own previous remark. And while there's a solid case that this 2017 "very fine people" comment was about some white nationalists, there's no basis for claiming it was about Heyer's murderer in particular — much less that Trump's "nothing wrong" comment on Friday was about this murderer.

**Deceptively clipping and inaccurately quoting a JD Vance quote about veterans' health care**

On Thursday, the @KamalaHQ account posted a nine-second video clip of Sen. JD Vance, Trump's running mate, speaking in an interview. The account wrote: "Q: Would you consider privatizing veterans health care? Vance: I think I'd consider it."

actually said "I think I'd consider — and…" And because @KamalaHQ clipped out the critical comments he made after the "and," the Harris campaign didn't allow people to immediately learn just what Vance said he would consider.

The extended Vance quote shows he said he would consider giving veterans greater flexibility to use private health care but that he does not want to eliminate federal health care provided by the Department of Veterans Affairs (VA). A public-private combination for veterans' care was the general approach taken by President Barack Obama and then by Trump; it's certainly not without critics, but it's much less contentious than the idea of a total privatization.

Here's the full Vance quote:

"I think I'd consider — and Donald Trump was really good at this, doesn't get enough credit for this particular innovation — giving veterans more choice. Right? So let's say you're in a rural hospital. Your closest VA is 120 miles away. Why force a veteran to drive two-and-a-half hours to that VA facility when he can get cheaper and good care right in his backyard? Right? So I do think that we ought to open up choice and optionality for veterans. You know, I think that there is areas where the VA actually works very well, so I wouldn't say get rid of the whole thing. I would say give people more choice, I think you'll save money in the process, you'll also give veterans a lot more optionality."

The Harris campaign defended the @KamalaHQ post. It argued in its email, "Vance is suggesting he would consider privatizing VA functions. This is not misleading. Our caption does not say 'the whole VA health system.'"

But the Harris campaign did not address the caption's "consider it" misquote or explain why it cut the clip before people could hear Vance explain what he would "consider." And if the Harris campaign wanted to claim Vance was talking about possibly privatizing certain VA "functions," as it said in the email, it could have said that in the post rather than at very least leaving open the impression he was talking about privatizing the whole VA.

Vance spokesperson William Martin said the Harris campaign is "lying" about what Vance said. Martin said Vance "personally relied on the VA for years after leaving the Marine Corps," that Vance does not even want to privatize VA "functions," and that giving veterans more options to voluntarily choose private care cannot be fairly described as privatizing even parts of the VA. Martin said: "In the full exchange, Senator Vance clearly says he would not privatize the Department of Veterans Affairs."



The facts behind Vance and Walz's military record

Video Ad Feedback

03:13 - Source: CNN

**Deceptively clipping and falsely describing a Trump quote about penalties for damaging monuments**

The @KamalaHQ account frequently invokes Project 2025, the Heritage Foundation think tank's right-wing policy proposals for the next Republican administration. Project 2025 is not Trump's initiative, and he has said he disagrees with some of its proposals, but he has extensive ties to the initiative; you can read more here.

An August 30 post from @KamalaHQ said, "Trump says he plans to bring back laws from 100+ years ago, echoing Project 2025: 'We don't pass laws like that. They are tough.'" The post

9/27/24, 9:28 AM                    Fact check: Harris campaign social media account has repeatedly deceived with misleading edits and captions | CNN Politics

Case 2:24-cv-02527-sAM-dKD Document 24 inFiled 09/30/24    Page 181 of 182

But the full video of the rally shows Trump was not even talking about Project 2025 or his future plans.

Rather, Trump was telling his usual tale about how he supposedly "signed" a century-old law to give automatic 10-year prison sentences to people who were damaging monuments. Trump's story is false — he didn't actually sign any law on monument-damage penalties or impose automatic 10-year sentences — but it's also false that he was "echoing Project 2025" or announcing some plan for a next Trump administration.

The Harris campaign defended this @KamalaHQ post by arguing that "Trump's entire platform is about embracing 'tough' policy of the past" on various subjects.

That's another thin defense. The post made a specific claim about what Trump was supposedly saying in a specific video included in the post, and Trump wasn't actually saying that.

**Deceptively clipping and misleadingly describing a Trump comment about taxes**

A September 5 post from @KamalaHQ said, "Trump tells his wealthy donors he is going to make his tax handouts for the ultra-wealthy 'permanent' and cut their taxes 'even more.'" It included a 13-second clip of Trump saying, "The fifth pillar of my plan is to make the Trump tax cuts permanent — they are massive tax cuts, biggest ever, permanent — and to cut taxes even more."

But the full video of the speech shows the @KamalaHQ post cut the video clip right before Trump elaborated on what he meant by cutting taxes "even more." The first two policies he mentioned were eliminating taxes on tips and eliminating taxes on Social Security benefits — policies that, whatever their merits or flaws, would certainly benefit people who are not wealthy. (So did his 2017 tax cuts, which produced gains on average for people of all income levels although the wealthy gained most.)

Also, this was not a speech to wealthy Trump donors alone. It was a speech to the nonpartisan Economic Club of New York, whose members include a broad array of business executives from the area; some attendees were wealthy Trump donors, but others were not. The very next day, the Harris campaign used the @KamalaHQ account to tout her own popularity among chief executives.

The Harris campaign defended the post in question in part by noting that wealthy Trump donors were in attendance and in part by saying that one of the biggest policy announcements Trump made in speech was that he plans to try to lower the corporate tax rate from 21% to 15% (a reduction Trump said would be "solely for companies that make their product in America"). The Harris campaign said that "no tax on tips and Social Security were not new."

New or not, though, the @KamalaHQ clip clipped out those important words — making Trump's comments on tax cuts sound more focused on the wealthy than they were.

**Cutting out critical words from a Vance comment about unions**

An August 29 post from @KamalaHQ said, "Vance: Democrats want to attack Republicans as being anti-union and sometimes the shoe fits." It included a five-second clip of Vance saying those words.

But the full video of Vance's speech to the International Association of Fire Fighters union shows that the Harris account clipped out the critical remark Vance made next, arguably in the very same sentence. His full comment: "A lot of Democrats want to attack Republicans as being anti-union and sometimes the shoe fits — but not me, and not Donald Trump." He went on to outline actions he had taken to support firefighters.

The Harris campaign said that this @KamalaHQ post was a "direct quote of JD Vance"; the campaign said the post is "clearly meant to convey that Vance acknowledges Republicans have a history of being anti-union." But even "direct" quotes can be made misleading if they exclude the contextualizing words that came before or after the quote.

If, for example, movie critic Sally Smith wrote, "This director has a long history of making great films, but this one is awful," it would be a "direct" quote if an ad for the new movie said, "Smith: 'This director has a long history of making great films.'" But that would also be deceptive.

**Falsely describing a comment from a Trump ally**

An August 28 post from @KamalaHQ said: "Trump operative on Project 2025: If you have principles without power, it's meaningless. We must wield power. We must seize power." The post included a 12-second clip of far-right activist and Trump ally Jack Posobiec saying in an interview, "Now if you have all power and no principle you're a tyrant. But if you have principles without power, it's meaningless, it's completely meaningless. You must wield power. You must seize power."

But as Posobiec accurately noted in response to the @KamalaHQ post, he never even mentioned Project 2025 in these comments. The words Project 2025 do not appear at all in a transcript of the full interview.

The Harris campaign defended the @KamalaHQ post with a confusing stretch — claiming Posobiec's comment is "part of" a "larger" Trump-Project 2025 agenda to fire civil servants who

Header overlapping text.

9/27/24, 9:28 AM                    Fact check: Harris campaign social media account has repeatedly deceived with misleading edits and captions | CNN Politics

Case 2:24-cv-02527-JAM-DKD   Document 1-21   Filed 09/30/24   Page 182 of 182

regardless, the post made a specific claim that Posobiec was talking about Project 2025, which he was not.

Verified Complaint Exhibit 12
097