Brian R. Chavez-Ochoa (CA Bar No. 190289)*
brianr@chavezochoalaw.com
**Chavez-Ochoa Law Offices, Inc.**
4 Jean Street, Suite 4
Valley Springs, CA 95252
Telephone: (209) 772-3013

Philip A. Sechler (VA Bar No. 99761)**
psechler@ADFlegal.org
Mathew W. Hoffmann (VA Bar No. 100102)**
mhoffmann@ADFlegal.org
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4656

Mercer Martin (AZ Bar No. 038138)**
mmartin@ADFlegal.org
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
Facsimile: (480) 444-0028

*Counsel for Plaintiffs*

* *Local Counsel*
***Pro hac vice application filed simultaneously*

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Rumble Inc.**, and **Rumble Canada Inc.**, <br><br> *Plaintiffs,* <br><br> v. <br><br> **Rob Bonta**, in his official capacity as Attorney General of the State of California, and **Shirley N. Weber**, in her official capacity as California Secretary of State, <br><br> *Defendants.* | Civil No. _____ <br><br><br><br> **COMPLAINT** |

**JURISDICTION**

1.     California's new law, AB 2655, imposes liability on Plaintiffs Rumble Canada Inc. and Rumble Inc. for curating and publishing speech. It therefore violates the First and Fourteenth Amendments to the United States Constitution, as well as Article VI's Supremacy Clause because it is preempted by Section 230 of the Communications Decency Act of 1996. This Court has subject-matter jurisdiction pursuant to the Civil Rights Act, 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331 and 1343.

**INTRODUCTION**

2.     Rumble Canada Inc., an indirect subsidiary of Rumble Inc., operates Rumble.com (collectively "Rumble"), a large video-sharing platform that curates and publishes a variety of content, including political commentary. Rumble exists to foster a free and open internet, and it does not remove content unless the content violates its terms and conditions.

3.     But now, California deputizes Rumble to restrict its users' speech, even if that speech does not violate Rumble's terms and conditions. At the same time, California requires Rumble to alter the content and viewpoint of its own speech and compel it to communicate the State's message.

4.     California's new law, AB 2655, mandates that Rumble remove and label content California officials consider "reasonably likely to harm the reputation or electoral prospects" of candidates or "reasonably likely to falsely undermine confidence" in an election.

5.     The law forces Rumble to undertake the impossible task of training its team to recognize and then remove and label content based on inherently vague and subjective terms on which even pollsters and government officials cannot agree, such as what content may be "likely to harm" electoral prospects or may likely undermine confidence in an election.

6.     And when Rumble inevitably is not able to comply to the satisfaction of everyone, AB 2655 authorizes individuals to file suits against it for equitable relief.

1    7.    Neither the Constitution nor Section 230 of the Communications Decency

2  Act allows California to alter and compel Rumble's speech while also mandating that it

3  censor its users' speech. As such, this Court should enjoin AB 2655 and declare it

4  unlawful.

5                                    **VENUE**

6    8.    Venue lies in this district and division pursuant to 28 U.S.C. § 1391 because

7  a substantial part of the events that give rise to this lawsuit occurred in this district and

8  division and the California government and its agencies are citizens of every district in

9  California.

10                                   **PARTIES**

11  *Plaintiffs*

12    9.    Plaintiff Rumble Canada Inc., headquartered in Toronto, Canada, is a

13  wholly owned indirect subsidiary of Plaintiff Rumble Inc., which is headquartered in

14  Longboat Key, Florida. Rumble Canada Inc. is the owner and operator of the Rumble

15  video-sharing platform.

16    10.    Rumble is a video-sharing platform where users can upload, view, and

17  comment on videos. Rumble is accessible from California. For the past 12 months,

18  Rumble has had over one million monthly active users in California.

19  *Defendants*

20    11.    Defendant Robert Bonta is the Attorney General of the State of California

21  and is authorized to enforce California's laws, including AB 2655. Cal. Const. art. V, § 13;

22  Cal. Elec. Code § 20516.

23    12.    Defendant Shirley N. Weber is the California Secretary of State. She has

24  authority to administer, enforce, and implement California's Elections Code, including

25  AB 2655. Cal. Gov't Code § 12172.5.

26    13.    Under AB 2655, the Secretary of State is an "elections official." Cal. Elec.

27  Code § 20512(g)(2).

28

                                    Complaint 2

14. Defendants Bonta and Weber "may seek injunctive or other equitable relief" for violations of AB 2655. Cal. Elec. Code §§ 20515(b), 20516.

15. All defendants are named in their official capacities.

## FACTUAL BACKGROUND

**I. Rumble.com is a video-sharing platform that exercises editorial discretion over political speech by its users.**

16. Rumble's mission is to protect a free and open internet.

17. In 2013, Chris Pavlovski (now Rumble's Chairman and CEO) founded Rumble.

18. Rumble sought to empower small content creators and give them a platform to express themselves.

19. Rumble allows video content creators to upload their videos to the Rumble platform. Anyone with an internet connection can view videos on Rumble's platform. Rumble requires an account for a person to upload a video to its platform, to comment on videos, or to participate in live chats. Any person can make a free Rumble account. When this Complaint refers to Rumble "users," it includes any person who engages on the Rumble platform, such as people who view videos on Rumble, people who upload content to Rumble, and Rumble accountholders.

20. Rumble currently hosts millions of hours of publicly available video on its platform, rumble.com.

21. Although Rumble promotes and seeks to protect free speech, it also has a robust content moderation policy that it enforces aggressively, removing from its platform content that violates that policy and banning users who repeatedly post content that violates its policy.

22. Rumble manages its video-sharing service through its terms and conditions. A true, accurate, and complete copy of its current Terms and Conditions of Use is attached as Exhibit 1.

23. To create an account, a user must agree to abide by these terms and conditions.

24. Under the terms and conditions, Rumble retains "the absolute right (but not the obligation) to prohibit, refuse, delete, move and edit Content and material for any reason, in any manner, at any time, without notice" to the content creator. Ex. 1 at 7 (https://rumble.com/s/terms).

25. The terms and conditions prohibit the following, among other categories:

- "Content or material that is pornographic, obscene, or of an adult or sexual nature";

- "Content or material that is grossly offensive to the online community, including but not limited to, racism, anti-semitism and hatred";

- Content or material that "[p]romotes, supports, or incites violence or unlawful acts";

- "Content or material that exploits children under the age of 18 or posts or discloses any personally identifying information about any person at any age, including but not limited to personally identifying information about children under the age of 18"; and

- "Any other Content or material that Rumble in its sole, unfettered, and arbitrary discretion, determines is undesirable on the Rumble Service." Ex. 1 at 6.

26. Rumble does not restrict political speech unless it violates a provision of its terms and conditions.

27. Numerous content creators generate a substantial volume of digitally created or digitally altered content that pervades the internet. Such content exists on a wide variety of platforms, including video-sharing platforms like YouTube and Rumble, among others. Rumble does not possess the technology to automatically identify digitally altered images or audio shared by users and would have to incur significant expense to develop or acquire such technology. Even then, it is unlikely that Rumble would be able

to identify all content that might arguably violate AB 2655, particularly given the law's vagueness. Therefore, Rumble would be subject to litigation to defend itself against meritless claims.

## II.    California lawmakers recognized that AB 2655 restricts core political speech and faces serious challenges.

28.    Committees in both chambers of the California legislature acknowledged that AB 2655: (1) imposes serious burdens on speech and would be "vulnerable" to a constitutional challenge; (2) would face legal challenge under Section 230 of the Communications Decency Act; and (3) places onerous burdens on certain platforms.

29.    As originally proposed, AB 2655 contained an exception for entities protected by Section 230. But legislators soon deleted that language from the bill.

30.    In April 2024, the Assembly Committee on Judiciary published a report conceding that the law "would interfere with both the expression and reception of information based upon its content." Ex. 2 at 4. A true and accurate copy of excerpts of this report is Exhibit 2.

31.    The Committee recognized this was "potentially problematic" because the bill "single[d] out particular content" that "relates to political candidates and elections," which normally receives full constitutional protection. *Id*. The Committee admitted that "[i]t is difficult to imagine any content more related to 'political expression' and 'discussion of public issues' than content about candidates and elections." *Id*. The Committee also acknowledged that "opponents of this bill"—including "the industry groups and the ACLU"—"believe that with no sure means to determine what is 'materially deceptive,' the platforms will err on the side of blocking content, thus burdening more speech than is necessary." *Id*.

32.    The Committee recognized that opponents claimed the bill was not narrowly tailored and that "it will be a court – not the findings and declarations of the bill – that will determine whether the bill is narrowly tailored. The court may consider, for example,

if there are other less restrictive and more effective means of protecting election integrity." *Id.* at 5.

33.     When surveying cases pending before the United States Supreme Court (as of April 2024), the Committee stated that "there is no obvious or certain answer as to whether this bill violates the First Amendment." *Id.* And the Committee understood that the proper "remedy for false speech is more true speech, and false speech tends to call forth true speech." *Id.* at 4.

34.     The Committee concluded that "this bill may also be preempted by Section 230 of the federal Communications Decency Act." *Id.* That's because Section 230 grants "platforms the right to moderate content on their platforms and immunizes them from liability for content posted by the third party." *Id.* at 6.

35.     Finally, the Committee noted that industry groups criticized AB 2655 for assuming that online platforms "definitively know whether any particular piece of content has been manipulated in such a way that is defined under the bill" and have the tools and expertise to make that judgment. *Id.* at 8.

36.     It also observed the ACLU's fears that given "the prospect of vetting millions of different posts to determine if they are 'materially deceptive and digitally modified or created,'" large online platforms will "instead choose to aggressively censor or prohibit speech out of caution." *Id.* at 9.

37.     In June 2024, the Senate Judiciary Committee published a report concluding that "it is inherently difficult to predict whether this law will be struck down for violating the protections of the First Amendment," especially "in the more politically charged federal judiciary of the day." *Id.* at 10. But, the Committee believed, "it is safe to say [AB 2655] will likely face legal challenge and arguably be vulnerable thereto." Ex. 3 at 9. A true and accurate copy of excerpts of this report is Exhibit 3.

38.     The Committee also acknowledged that AB 2655 would "likely" face a preemption challenge under Section 230. *Id.* It conceded that AB 2655 "provides for the potential liability of platforms for failing to block and prevent certain content from being

posted or shared by users" even though Section 230 "immunize[s] internet platforms from virtually all suits arising from third-party content." *Id*. at 3 (cleaned up).

39. Finally, the Committee noted "concerns that the bill presupposes a level of sophistication for technology that can detect AI-generated or manipulated content that simply does not exist." *Id*. at 10.

40. In the final Assembly Floor Analysis in August 2024—shortly before the bill became law—the California legislature still acknowledged the law may be unconstitutional. That analysis recognized the law "burdens core political speech," would be subject to strict scrutiny under the First Amendment, and might not be "adequately protect[ed] … against a constitutional challenge." Ex. 4 at 3. A true, accurate, and complete copy of the Assembly Floor Analysis is Exhibit 4.

41. Yet the California legislature still passed AB 2655 with supermajorities in both chambers.

42. Governor Gavin Newsom signed the bill on September 17, 2024, and AB 2655 goes into effect on January 1, 2025.

**III.   AB 2655 applies to Rumble.**

43. AB 2655 applies to "large online platform[s]." Cal. Elec. Code § 20512(h).

44. A large online platform is defined as "a public-facing internet website, web application, or digital application, including a social media platform[,] … video sharing platform, advertising network, or search engine that had at least 1,000,000 California users during the preceding 12 months." Cal. Elec. Code § 20512(h).

45. Rumble qualifies as a "large online platform" under AB 2655.

46. The law targets "materially deceptive content," which "means audio or visual media that is digitally created or modified, and that includes, but is not limited to, deepfakes and the output of chatbots, such that it would falsely appear to a reasonable person to be an authentic record of the content depicted in the media." Cal. Elec. Code § 20512(i)(1).

47.    AB 2655 requires large online platforms to take three actions with respect to "materially deceptive content."

48.    *First*, AB 2655 requires large online platforms to "provide an easily accessible way for California residents to report" that content should be removed or labeled as "manipulated" and "not authentic." Cal. Elec. Code §§ 20515(a), 20514(c). This is the "Reporting Requirement."

49.    Large online platforms must also respond to the person reporting the content within 36 hours "describing any action taken or not taken … with respect to the content." Cal. Elec. Code § 20515(a).

50.    *Second*, AB 2655 demands that large online platforms "develop and implement procedures for the use of state-of-the-art techniques to identify and remove materially deceptive content if" four criteria are met. Cal. Elec. Code § 20513(a). This is the "Removal Requirement."

51.    The criteria are: (1) the content has been reported under the Reporting Requirement; (2) the content falls within one of three categories of "materially deceptive content"; (3) the content is posted within the applicable timeframe; and (4) the large online platform "knows or acts with reckless disregard of the fact that the content meets the" prior three requirements. Cal. Elec. Code § 20513(a)(4).

52.    The three categories of "materially deceptive content" prohibited by the Removal Requirement are

    a.    "A candidate for elective office portrayed as doing or saying something that the candidate did not do or say and that is reasonably likely to harm the reputation or electoral prospects of a candidate";

    b.    "An elections official portrayed as doing or saying something in connection with the performance of their elections-related duties that the elections official did not do or say and that is reasonably likely to falsely undermine confidence in the outcome of one or more election contests"; or

c. "An elected official portrayed as doing or saying something that influences the election that the elected official did not do or say and that is reasonably likely to falsely undermine confidence in the outcome of one or more election contests." Cal. Elec. Code § 20513(a)(2).

53.    Large online platforms must remove the content within 72 hours of receiving a report. Cal. Elec. Code § 20513(b).

54.    Large online platforms must also identify, "using state-of-the-art techniques," and remove "any identical or substantially similar materially deceptive content" that they had previously removed upon discovery that the content has been reposted. Cal. Elec. Code § 20513(c).

55.    The Removal Requirement's applicable timeframe runs from "120 days before an election in California and through the day of the election." Cal. Elec. Code § 20513(e)(1). But if the content "pertains to elections officials" the timeframe extends from 120 days before an election to 60 days after. Cal. Elec. Code § 20513(e)(2).

56.    *Third*, AB 2655 requires large online platforms to "develop and implement procedures for the use of state-of-the-art techniques to identify materially deceptive content" and label it if three criteria are met. This is the "Labeling Requirement."

57.    The criteria are: (1) the content has been reported under the Reporting Requirement; (2) the content is either (i) "materially deceptive content" under the Removal Requirement but posted outside that Requirement's timeframe, or (ii) the content is "materially deceptive content" and appears in an "advertisement" or "election communication" that is not subject to the Removal Requirement; and (3) the large online platform "knows or acts with reckless disregard for the fact that the content meets the" prior two requirements. Cal. Elec. Code § 20514(a).

58.    AB 2655 defines "advertisement" as a "communication that a large online platform knows is authorized or paid for with the purpose of supporting or opposing a candidate for elective office." Cal. Elec. Code § 20512(a).

59. An "election communication" is a "communication" that is not an "advertisement" but "concerns" a "candidate for elective office," voting in California, the canvass of the vote in California, equipment related to a California election, or electoral college proceedings in California. Cal. Elec. Code § 20512(e).

60. Because the Labeling Requirement applies to "materially deceptive content" that appears in an "advertisement" or "election communication" that is not subject to the Removal Requirement, it applies to content that is not reasonably likely to harm the reputation of a candidate or falsely undermine the confidence in the outcome of an election. Cal. Elec. Code § 20514(a)(2).

61. The Labeling Requirement forces large online platforms to label the content within 72 hours of discovery or receipt of a report; that label must state: "This [image, audio, or video] has been manipulated and is not authentic." Cal. Elec. Code § 20514(b)–(c).

62. The Labeling Requirement also forces large online platforms to "permit users to click or tap on [the label] for additional explanation about the materially deceptive content in an easy-to-understand format." Cal. Elec. Code § 20514(d).

63. The Labeling Requirement applies "regardless of the language used in the content" and mandates that large online platforms label the content both in English and the language used. Cal. Elec. Code § 20517.

64. The Labeling Requirement's timeframe runs from "six months before an election in California and through the day of the election." Cal. Elec. Code § 20514(e)(1). If the "content depicts or pertains to elections officials, the electoral college process, a voting machine, ballot, voting site, or other equipment related to an election, or the canvass of the vote," the timeframe extends from six months before an election to 60 days after the election. Cal. Elec. Code § 20514(e)(2).

65. "A candidate for elective office, elected official, or elections official"— including the Secretary of State—who has filed a report with a large online platform

"may seek injunctive or other equitable relief" to enforce the Reporting Requirement, the Removal Requirement, or the Labeling Requirement. Cal. Elec. Code § 20515(b).

66. Likewise, the Attorney General, District Attorney, or City Attorney "may seek injunctive or other equitable relief" to enforce the Reporting, Removal, or Labeling Requirements. Cal. Elec. Code § 20516.

67. By authorizing the government to coerce large online platforms to remove and label content through a reporting process, AB 2655 uses governmental authority and the threat of punishment to coerce private parties like Rumble into punishing or suppressing speech based on its content and viewpoint.

68. Though AB 2655 applies to large online platforms in these ways, the law makes many exceptions.

69. For example, AB 2655 does not apply to online platforms with fewer than 1,000,000 California users during the preceding 12 months.

70. AB 2655 also does not apply to certain online newspapers, magazines, or periodicals that publish "materially deceptive content" if the publisher includes a disclosure. Cal. Elec. Code § 20519(a).

71. AB 2655 does not apply to a "broadcasting station that broadcasts any materially deceptive content" if the station includes a disclosure. Cal. Elec. Code § 20519(b)(1).

72. AB 2655 does not apply to a broadcasting station that is paid to broadcast "materially deceptive content" in some situations. Cal. Elec. Code § 20519(b).

73. AB 2655 does not apply to "[m]aterially deceptive content that constitutes satire or parody." Cal. Elec. Code § 20519(c). But it does not define the terms "satire" or "parody."

74. The Removal Requirement does not apply to "candidate[s] for elective office" who "portray[ ]" themselves "as doing or saying something that the candidate did not do or say" if the content is labeled as "manipulated." Cal. Elec. Code § 20513(d).

75.    AB 2655 applies only to "materially deceptive content" concerning certain candidates—i.e., to persons running for a voter-nominated office as defined in Cal. Elec. Code § 359.5(a), persons running for President or Vice President of the United States, and persons running for the office of Superintendent of Public Instruction. Cal. Elec. Code § 20512(c).

76.    "Materially deceptive content" about candidates who do not meet these criteria is not prohibited.

77.    AB 2655 defines "[e]lection in California" to mean "any election where a candidate … is on the ballot, and any election where a statewide initiative or statewide referendum measure is on the ballot." Cal. Elec. Code § 20512(f).

## IV.    Section 230 of the Communications Decency Act already regulates content moderation.

78.    Long before California passed AB 2655, in 1996, Congress enacted Section 230 of the Communications Decency Act. Both statutes regulate a large online platform's liability for content displayed on its site.

79.    Section 230 regulates "provider[s]" of an "interactive computer service." It defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2).

80.    Section 230 states that no "provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by" a content creator or commenter. 47 U.S.C. § 230(c)(1).

81.    Rumble is an "interactive computer service" under Section 230, and Plaintiffs Rumble, Inc. and Rumble Canada Inc. are "provider[s]" of an "interactive computer service."

82. The Ninth Circuit has stated that "[t]he act of publication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Est. of Bride ex rel. Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1176 (9th Cir. 2024) (cleaned up). It accordingly held that "Section 230 prohibits holding companies responsible for moderating or failing to moderate content." *Id.* at 1182.

83. Thus, while AB 2655 imposes liability on a platform for failing to moderate certain third-party content, the Ninth Circuit recognizes that Section 230 immunizes a platform for its decision to allow or not allow third-party content.

84. Section 230 expressly preempts conflicting state laws. It states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

**V.    AB 2655 imposes significant burdens on Rumble and its users, both compelling and restricting speech and forcing Rumble to police its users' speech.**

85. AB 2655 imposes significant restrictions on Rumble's right to exercise its editorial discretion over the content on its webpage and compels its speech while at the same time forcing it to censor and compel its users' speech.

86. Rumble exists to foster a free and open internet. Its content moderation policies and editorial discretion reflect that intent, which is why Rumble does not remove content unless it otherwise falls into a category of specifically prohibited content under Rumble's terms and conditions.

87. As applied here, AB 2655 threatens Rumble with lawsuits and injunctions for displaying certain content on its platform it desires to display and refusing to label certain content it desires not to label.

88. Rumble does not currently possess the tools to implement the censoring requirements of AB 2655, and creating those tools will be a substantial burden and cost to Rumble.

89. Rumble enforces its terms and conditions through a complaint mechanism and through manual and technical review of content by independent contractors.

90. Any person may email moderation@rumble.com to report content that the person believes violates Rumble's terms and conditions.

91. Rumble reviews every report that it receives and a person on Rumble's content-moderation team will review the content to determine if it violates Rumble's terms and conditions.

92. Rumble does not have any tools that allow it to identify or remove "materially deceptive content" (whatever that means in practice) targeted by AB 2655 without it being reviewed by a person.

93. Rumble makes all content removal decisions after review by someone on Rumble's content-moderation team.

94. Rumble lacks the tools to determine if media on its platform is "digitally created or modified" or if content is "identical or substantially similar" to media targeted by AB 2655.

95. Rumble uses people on its content-moderation team to enforce its content-moderation policies, and it is often difficult if not impossible for a person to know if media is digitally altered or is identical or substantially similar to other media.

96. Rumble has no way of "identify[ing]" content covered by AB 2655 without manual review of potentially millions of minutes of video or the development or acquisition of new technical tools, all of which would impose a cost-prohibitive burden on Rumble, and even then it would be extremely difficult if not impossible for Rumble to identify and then remove all content that third parties might consider to violate AB 2655 and demand that it be removed by Rumble, even if it did not violate Rumble's terms and conditions.

97. AB 2655's Reporting Requirement will increase the number of complaints Rumble receives. Rumble will have to hire more employees or contractors to review and respond to the complaints.

98.    AB 2655 will require Rumble to undertake the impossible task of training its content-moderation team on how to detect content that fits the inherently vague and subjective definition of "materially deceptive." Rumble will have to instruct its content-moderation team on how to make judgment calls about what content "would falsely appear to a reasonable person to be an authentic record of the content depicted"; is "reasonably likely to harm the reputation or electoral prospectives of a candidate"; is "reasonably likely to falsely undermine confidence in the outcome" of elections; or constitutes "satire or parody." Because these terms are subjective and vague, Rumble would need to be overly restrictive in its censorship to avoid meritless enforcement actions and litigation, further harming Rumble and its users.

99.    It would also be costly and burdensome for Rumble to build or purchase technical tools to review content under AB 2655's subjective and vague definitions. Rumble would have to spend enormous amounts of time and resources developing "state-of-the-art techniques" (a term undefined by AB 2655) to identify, remove, and label digitally altered content targeted by AB 2655 as required by the statute.

100.    And Rumble is unaware of any technical tools currently available that can effectively detect the content targeted by AB 2655.

101.    Whether expression falls into these vague and overbroad categories depends on the subjective perceptions of others, including state enforcement officials.

102.    AB 2655's exemption for "satire or parody" is also vague and difficult to apply because individuals often disagree over whether something is or is not satire.

**ALLEGATIONS OF LAW**

103.    As a "large online platform," Rumble hosts, curates, and publishes content that is subject to AB 2655.

104.    AB 2655 violates Rumble's constitutional and statutory rights.

105.    As a direct and proximate result of Defendants' violations of Rumble's constitutional and statutory rights, Rumble has suffered and will suffer ongoing irreparable harm, entitling it to declaratory and injunctive relief.

106.    Rumble does not have an adequate monetary or legal remedy for the loss of its constitutional and statutory rights.

107.    Unless Defendants are enjoined, Rumble will continue to suffer irreparable harm.

108.    In enforcing AB 2655, Defendants, their agents, and persons under their control act under the color and pretense of the law, statutes, ordinances, regulations, customs, usages, or policies of the State of California.

**CLAIMS**

**COUNT ONE**

**Violation of the First Amendment's Free Speech Clause and Free Press Clause**

109.    Rumble repeats and realleges each allegation contained in paragraphs 1–108 of this Complaint.

110.    The First Amendment's Free Speech Clause and Free Press Clause protect Rumble's ability to speak, including through its moderation of content on its website and its editorial discretion in choosing what content to display on its website. The Fourteenth Amendment incorporates the First Amendment against the States.

111.    The First Amendment protects Rumble's right to be free from content-, viewpoint-, and speaker-based discrimination, overbroad restrictions on speech, compelled speech, and vague laws allowing unbridled discretion by enforcement officials.

112.    The First Amendment also protects against a state government forcing Rumble to violate the free-speech rights of its users.

113.    As a "large online platform" that hosts, curates, and publishes third-party speech, Rumble has standing to assert the rights of its users who seek to use Rumble to engage in expressive activity and whose First Amendment rights are infringed by AB 2655.

114.    Rumble engages in activities protected by the First Amendment when it employs its editorial discretion and curates or moderates the content displayed on its platform.

Complaint 16

115.   The First Amendment protects against a state government deputizing Rumble to violate the free speech rights of its users.

116.   AB 2655 uses governmental authority and the threat of punishment to coerce Rumble into punishing or suppressing its users' speech that Defendants disfavor.

117.   AB 2655 constitutes an impermissible and unreasonable restriction of protected speech because it burdens substantially more speech than is necessary to further any governmental interest.

118.   As applied and facially, AB 2655 bars and chills speech based on content and viewpoint.

119.   As applied and facially, AB 2655 is not content-neutral because it targets only "materially deceptive content," and only a certain subset of that kind of speech. Specifically, it targets speech that is "reasonably likely to harm the reputation or electoral prospects of a candidate" and speech that is "reasonably likely to falsely undermine confidence in the outcome of one or more election contests."

120.   As applied and facially, AB 2655 is also not content-neutral because it only regulates "materially deceptive content" directed at specific public offices and referenda, not all elections.

121.   AB 2655 is unconstitutional as applied to Rumble's speech and facially because AB 2655 is a content-, viewpoint-, and speaker-based regulation that bans, chills, and burdens Rumble's desired speech and requires Rumble to ban, chill, and burden its users' constitutionally protected speech.

122.   As applied and facially, AB 2655 compels speech by requiring large online platforms to create and display a label for certain content.

123.   As applied to Rumble, AB 2655 is vague and allows Defendants unbridled discretion to coerce Rumble to report, remove, and label speech and then discriminate based on content and viewpoint in determining whether to apply AB 2655.

124.   AB 2655 forces Rumble to either create a mechanism where viewers can report any user's posts or risk prosecution for not providing that mechanism.

125.    AB 2655 uses governmental authority and the threat of punishment to coerce Rumble and other large online platforms into punishing or suppressing their users' speech that Defendants disfavor.

126.    AB 2655 forces Rumble and other large online platforms to either remove "materially deceptive content" as vaguely and ambiguously defined by California or risk prosecution for not removing that content.

127.    AB 2655 forces Rumble to label "materially deceptive content" that is not otherwise removable with a label or risk prosecution for not labeling that content.

128.    AB 2655 is substantially overbroad in relation to any legitimate sweep and is facially unconstitutional for that reason.

129.    AB 2655 is substantially overbroad because it does not adequately define various material terms in the statute, including but not limited to "deepfake," "materially deceptive content," "harm the reputation or electoral prospects of a candidate," "falsely undermine confidence in the outcome of one or more election contests," "something that influences the election," and "satire or parody."

130.    AB 2655 also vests unfettered discretion in state officials to define these terms and coerce large online platforms to remove content in accordance with the officials' own subjective ends for election regulations.

131.    Accordingly, facially and as applied to Rumble and its users, AB 2655 violates the First Amendment.

## COUNT TWO

### Violation of the Fourteenth Amendment

132.    Rumble repeats and realleges each allegation contained in paragraphs 1–108 of this Complaint.

133.    The Fourteenth Amendment's Due Process Clause prohibits the government from censoring speech using vague standards that grant unbridled discretion to government officials to arbitrarily prohibit some speech and that fail to give speakers sufficient notice regarding whether their desired speech violates California's law.

134. Due process requires that people of ordinary intelligence be able to understand what conduct a given statute or regulation prohibits.

135. Statutes or regulations that fail to provide this fair notice and clear guidance are void for vagueness.

136. Statutes or regulations that authorize or even encourage arbitrary or viewpoint discriminatory enforcement are void for vagueness.

137. Rumble, its users, Defendants, and third parties of ordinary intelligence cannot know with certainty what content is prohibited by AB 2655.

138. AB 2655 does not provide fair notice of what it prohibits.

139. AB 2655 authorizes and encourages discriminatory enforcement.

140. AB 2655 uses unconstitutionally vague phrases including but not limited to "falsely appear to a reasonable person to be an authentic record of the content depicted in the media," "reasonably likely to harm the reputation or electoral prospects of a candidate," "in connection with the performance of their elections-relate duties," "reasonably likely to falsely undermine confidence in the outcome of one or more election contests," "something that influences the election," and "satire or parody."

141. Defendants can use that vagueness, and the unbridled discretion it provides, to apply AB 2655 in a way that discriminates against content, viewpoints, and actions Defendants disfavor.

142. Accordingly, facially and as applied to Rumble and its users, AB 2655 violates the Fourteenth Amendment's Due Process Clause and chills free speech.

## COUNT THREE

### Article VI Supremacy Clause, Section 230 preemption

143. Rumble repeats and realleges each allegation contained in paragraphs 1–108 of this Complaint.

144. Article VI of the United States Constitution establishes "the Laws of the United States" as "the supreme Law of the Land." U.S. Const. art. VI.

145.    Under Article VI, Congress may enact statutes that expressly preempt state laws. Federal law that otherwise conflicts with a state law also can preempt that state law.

146.    Congress enacted Section 230 of the Communications Decency Act (47 U.S.C. § 230) to protect providers of "interactive computer services" from liability for their role as a publisher or speaker of third-party content.

147.    Section 230 defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet." 47 U.S.C. § 230(f)(2).

148.    The Rumble platform is an "interactive computer service" under Section 230, and Plaintiffs Rumble Inc. and Rumble Canada Inc. are "provider[s]" of an "interactive computer service."

149.    The Communications Decency Act states that a "provider" of an "interactive computer service" shall not "be treated as the publisher or speaker of any information provided by" a content creator or commenter. 47 U.S.C. § 230(c)(1).

150.    The Act also expressly preempts inconsistent state laws and prevents the imposition of liability on an interactive computer service provider for its role as a publisher or speaker of third-party content. 47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.").

151.    The Ninth Circuit has held that because the role of a publisher includes "deciding whether to publish or to withdraw from publication third-party content, … Section 230 prohibits holding companies responsible for moderating or failing to moderate content." *Est. of Bride*, 112 F.4th at 1176, 1182 (cleaned up).

152.    AB 2655 requires Rumble to moderate its content by forcing it to remove and label "materially deceptive content." Because Section 230 prohibits state laws from

imposing liability on interactive computer service providers for their content-moderation decisions, Section 230 preempts AB 2655.

## PRAYER FOR RELIEF

Plaintiffs respectfully ask this Court to enter judgment against Defendants and provide the following relief:

1. A preliminary injunction and a permanent injunction to stop Defendants and any person acting in concert with them from enforcing AB 2655 facially and as applied;

2. A declaration that AB 2655 facially and as applied violates the First and Fourteenth Amendments;

3. A declaration that Section 230 of the Communications Decency Act preempts AB 2655;

4. An award of Plaintiffs' costs and expenses in this action, including reasonable attorney's fees, in accordance with 42 U.S.C. § 1988;

5. The requested injunctive relief without a condition of bond or other security required of Plaintiffs; and

6. Any other relief that the Court deems equitable and just in the circumstances.

DATED:    November 27, 2024

*/s/Brian R. Chavez-Ochoa*
Brian R. Chavez-Ochoa
*Counsel for Plaintiffs*

Complaint 21

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Rumble Inc. and Rumble Canada Inc. | Attorney General of the State of California, Rob Bonta, in his official capacity (see attachment) |

**(b)** County of Residence of First Listed Plaintiff **Manatee County, FL**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attachment.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. Section 1983; 47 U.S.C. Section 230

Brief description of cause:
First and Fourteenth Amendment free speech and due process violations and Section 230 preemption.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE Senior District Judge John A. Mendez    DOCKET NUMBER 2:24-cv-02787-JAM-CKD

DATE 11/27/2024

SIGNATURE OF ATTORNEY OF RECORD
s/ Brian R. Chavez-Ochoa

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

**Rumble Inc.**, and **Rumble Canada Inc.**;

**Plaintiffs,**

v.

**Rob Bonta**, in his official capacity as Attorney General of the State of California; and **Shirley N. Weber**, in her official capacity as California Secretary of State;

***Defendants.***

<u>Attorneys of Record for Plaintiffs</u>

Brian R. Chavez-Ochoa
brianr@chavezochoalaw.com
**Chavez-Ochoa Law Offices, Inc.**
4 Jean Street, Suite 4
Valley Springs, CA 95252
Telephone: (209) 772-3013

Philip A. Sechler
psechler@ADFlegal.org
Mathew W. Hoffmann
mhoffmann@ADFlegal.org
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655

Mercer Martin
mmartin@ADFlegal.org
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020

## INDEX OF EXHIBITS TO COMPLAINT

| Exhibit No. | Description |
|:---:|:---:|
| 1 | Rumble's Terms and Conditions of Use |
| 2 | April 2024 Assembly Committee on Judiciary Excerpts for AB 2655 |
| 3 | June 2024 Senate Judiciary Committee Excerpts for AB 2655 |
| 4 | August 2024 Concurrence in Senate Amendments for AB 2655 |

# EXHIBIT 1

# Website Terms and Conditions of Use and Agency Agreement

 rumble.com/s/terms

Last modified September 2, 2024 [See Changes]

## TERMS AND CONDITIONS OF USE OF WEB SITE

This web site, Rumble.com (the "Rumble Site"), is operated by Rumble Canada Inc. ("Rumble"). Rumble is a user-generated video content agency that provides a video exchange, video hosting platform and video player. Rumble provides access to user-generated videos and other content ("Content") via the Rumble Site, via the Rumble video player application (the "Rumble Player") and otherwise, including through mobile apps and syndication (collectively, the "Rumble Service" or "Platform"), under certain terms and conditions as set forth below.

## ACCEPTANCE OF THESE TERMS AND CONDITIONS THROUGH USE

By using the Rumble Service, you signify your agreement to all terms, conditions, and notices contained or referenced herein (the "Terms of Use"). Rumble reserves the right, in its discretion, to update or revise the Terms of Use. Please check the Terms of Use periodically for changes. Your use of the Rumble Service subsequent to the posting of any change(s) to the Terms of Use will be deemed your acceptance of such change(s).

## RESTRICTION ON USE OF THE CREATORS COMMENTS, LIVE CHAT & FORUM

Rumble may from time to time offer an online forum, live chat and comments for "Creator Discussions" (the "Forum") where users of the Rumble Service and creators of Content may discuss matters pertaining to the Content and/or the Rumble Service. Your participation in Comments or the Forum is entirely voluntary. As participation may occur in real time and therefore you or others may post something to comments or the Forum that has not been edited, censored or otherwise controlled by Rumble. Notwithstanding the foregoing, Rumble reserves the right to monitor messages on Comments and the Forum and to remove messages which Rumble in its sole discretion determines to be undesirable, inciting violence, harmful, offensive or otherwise in violation of these Terms of Use. Rumble is not responsible nor liable for any failure or delay in removing such messages, or for the removal of any messages it deems inappropriate for any reason at its sole discretion.

The following additional rules apply to the Forum:

1. You may not post or transmit any message which is libelous, defamatory or which discloses private or personal matters concerning any person or entity. You may not post or transmit any message, file, image or program which is indecent, obscene or pornographic.

2. You may not post or transmit any message that would violate the rights of others, including but not limited to the unauthorized use, publication or disclosure of copyrighted materials, trade secrets or other confidential or proprietary information.

3. You may not post anything that uses trade marks or service marks in an infringing fashion.

4. You may not interfere with another user's use or the functionality of the Forum.

5. You may not post or transmit any message which is abusive, inciting violence, harassing, harmful, hateful, anti-semitic, racist or threatening.

6. You may not post or transmit any messages pertaining to charity requests, petitions for signatures, requesting donations, relating to pyramid schemes, or pertaining to the manipulation of the Rumble Service.

7. You may not post or transmit any advertising or any other solicitation of other users of the Forum for goods or services other than the Rumble Service.

8. You may not use the Forum to conduct or solicit the performance of any illegal activity or other activity which infringes the rights of others.

You also agree that you will not harvest or collect information about users of the Forum or use such information for the purpose of transmitting or facilitating transmission of unsolicited bulk electronic e-mail or communications. Without limiting the generality of the foregoing, you further agree that you will not knowingly solicit or collect personal information from a child 18 years old or younger.

## LINKS AND THIRD-PARTY SITES

The Rumble Service may provide third-party search facilities, such as Google searches, and thereby produce third party advertisements and/or third party search results., The Rumble Services and/or Content may otherwise link to third-party sites on the Internet that are not operated or controlled by Rumble ("Third-Party Site(s)"). Rumble is not responsible for the content of Third-Party Sites. Products and services on Third-Party Sites are the sole responsibility of each individual vendor or operator of such Third-Party Site. The inclusion and/or availability of such links to Third-Party Sites does not imply endorsement of such Third-Party Sites or any content, information, material, products or services provided on such Third-Party Sites, nor does it imply any association with the operators of such Third-Party Sites. Third-Party Sites may contain information or material that some people may find inappropriate or offensive. You will need to make your own independent judgment regarding your interaction with Third-Party Sites. Rumble makes no representations or warranties whatsoever concerning;

1. the information, software or other material appearing on, or accessible through, any Third-Party Site (including without limitation, any advertisement for products or services on any Third-Party Site);
2. the performance or operation of any Third-Party Site (including, without limitation, any transactions initiated or conducted through any Third-Party Site, any taxes associated therewith and any use by third-parties of user credit card information);
3. any products or services advertised or sold on or through any Third-Party Site (including, without limitation, the quality, safety and legality of such products or services or the sale thereof);
4. the sellers of any products or services advertised or sold on or through any Third-Party Site; or
5. the accuracy, copyright compliance, legality, decency, or any other aspect of the content of such Third-Party Sites.

If you decide to access any of the Third-Party Sites, you do so entirely at your own risk. If you are accessing a Third-Party Site through a link via the Rumble Service, you are advised to read any terms of use and privacy policy of such Third-Party Site before you use such Third-Party Site.

You understand, acknowledge, and agree that where the Rumble Player is licensed for use by a third-party, such third-party may be using the Rumble Player for certain purposes or to display certain content, that is not content owned, controlled, distributed, authorized or endorsed by Rumble.

## ACKNOWLEDGEMENT OF THIRD-PARTY TERMS

Some Rumble applications may include a feature that integrates streaming capabilities with YouTube and other platforms such as Meta/Facebook, X (formerly known as Twitter), and Twitch. If you stream your content directly to YouTube, you are agreeing to be bound by the YouTube Terms of Service, available at https://youtube.com/t/terms. Access to the YouTube streaming integration feature is conditional upon your acceptance of the YouTube Terms of Service. If you stream your content directly to Facebook, you are agreeing to be bound by the Meta/Facebook Terms and Policies, available at https://www.facebook.com/policies_center/. Other platform terms and conditions may likewise apply. Please refer to those platforms' terms of service for details.

## PROPRIETARY RIGHTS AND RESTRICTIONS

You acknowledge and agree that all Content and materials available on the Rumble Site and/or available through the Rumble Service are protected by one or more of intellectual property rights: copyrights, trademarks, service marks, patents, trade secrets, and/or other proprietary rights, and that t their use is restricted by the terms of this Agreement and applicable statutory and common laws.

Rumble, Rumble.com, the Rumble Player, and Rumble product and service names are trademarks and/or service marks of Rumble Canada Inc. (the "Rumble Marks") and are owned exclusively by Rumble. You will not display or use the Rumble Marks, in any manner that would constitute infringement of Rumble's rights, without Rumble's prior permission.

Except as expressly authorized by Rumble, you agree not to sell, resell, exploit for any commercial purposes, license, rent, modify, distribute, copy, reproduce, duplicate, transmit, publicly display, publicly perform, publish, adapt, edit, or create derivative works from any portion of any Content, including but not limited to video, images, sounds, and text appearing on or via the Rumble Service. Systematic retrieval of data or Content from the Rumble Service to create or compile, directly or indirectly, a collection, compilation, library, database or directory without prior written permission from Rumble is prohibited. The use of Content or materials appearing on or via the Rumble Service for any purpose not expressly permitted in these Terms of Use is prohibited.

## GENERAL RUMBLE PLAYER LICENSE TERMS

Use of the Rumble Player is subject to any applicable license agreements for use of the Rumble Player.

Subject to any applicable license agreements which replace and/or supersede these general license terms with respect to the use of the Rumble Player, the following terms and conditions apply to use of the Rumble Player.

## GRANT OF LICENSE

Rumble hereby grants you a non-exclusive license to use the Rumble Player subject to the following terms:

You may:

1. use the Rumble Player on any single computer;
2. use the Rumble Player on a second computer so long as the first and second computers are not used simultaneously; and
3. copy the Rumble Player for back-up and archival purposes provided any copy must contain all of the original Rumble Player's proprietary notices.

You may not:

1. permit other individuals to use the Rumble Player on your computer(s) except under the terms listed above;
2. modify, translate, reverse engineer, decompile, disassemble (except to the extent that this restriction is expressly prohibited by law) or create derivative works based upon the Rumble Player or Rumble Player documentation ("Documentation");

3. copy the Rumble Player or Documentation (except for back-up purposes);
4. resell, rent, lease, transfer, or otherwise transfer rights to the Rumble Player or Documentation; or
5. remove any proprietary notices or labels on the Rumble Player or Documentation.

This license does not grant you any right to any enhancement or update, and any right to grant sublicences, to the Rumble Player.

Title, ownership rights, and intellectual property rights in and to the Rumble Player and Documentation shall remain with Rumble. The Rumble Player is protected by the copyright laws of Canada, the United States and internationally by copyright treaty. Title, ownership rights and intellectual property rights in and to the Content accessed through the Rumble Player including any Content contained in the Rumble Player media demonstration files is the property of the applicable content owner and is protected by applicable copyright or other law. This license gives you no rights to publish, disseminate or otherwise use such Content.

## DISCLAIMER OF WARRANTY

THE RUMBLE PLAYER AND DOCUMENTATION ARE PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, RUMBLE FURTHER DISCLAIMS ALL WARRANTIES, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NONINFRINGEMENT. THE ENTIRE RISK ARISING OUT OF THE USE OR PERFORMANCE OF THE RUMBLE PLAYER AND DOCUMENTATION REMAINS WITH YOU. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL RUMBLE OR ITS SUPPLIERS BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, DIRECT, INDIRECT, SPECIAL, PUNITIVE, OR OTHER DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, OR OTHER PECUNIARY LOSS) ARISING OUT OF THIS AGREEMENT OR THE USE OF OR INABILITY TO USE THE PRODUCT, EVEN IF RUMBLE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. BECAUSE SOME STATES/JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, THE ABOVE LIMITATION MAY NOT APPLY TO YOU.

## RUMBLE CONTENT POLICIES

Rumble enables creators of Content to submit Content to the Rumble Service in accordance with the Agency Options set forth below. Under no circumstances shall the following be submitted to the Rumble Service:

Complaint Exhibit 1
005

1. Content or material which was created by a person other than you, or subject to copyright by a person other than you, without that person's express written authorization;

2. Content or material which includes, in whole or in part, audio, video, text, or images that are subject to copyright by another person unless such inclusion is subject to applicable laws concerning fair use or is otherwise expressly authorized by the copyright holder;

3. Content or material that is subject to any third-party contractual provisions or limitations, including but not limited to license restrictions;

4. Content or material which displays the trademarks of another person without that person's authorization, subject to applicable laws concerning fair use;

5. Content or material that is pornographic, obscene, or of an adult or sexual nature;

6. Content or material that is grossly offensive to the online community, including but not limited to, racism, anti-semitism and hatred;

7. Content or material that;
   1. Promotes, supports, or incites violence or unlawful acts;
   2. Promotes, supports or incites individuals and/or groups which engage in violence or unlawful acts, including but not limited to Antifa groups and persons affiliated with Antifa, the KKK and white supremacist groups and or persons affiliated with these groups; and/or
   3. Promotes or supports entities and/or persons designated by either the Canadian or United States government as terrorists or terrorist organizations.

8. Content or material that exploits children under the age of 18 or posts or discloses any personally identifying information about any person at any age, including but not limited to personally identifying information about children under the age of 18;

9. Content or material promoting or providing instructional information about illegal activities, promoting harm or injury to any group, individual or cruelty to animals including, but not limited to:
   1. Disseminating personal information about another individual for malevolent purposes, including libel, slander, "doxxing", defamation or violation of an individual's right to privacy.

10. Content or material that infringes or encroaches on the rights of others, including, but not limited to, infringement of privacy, publicity rights, and harm to reputation;

11. Any Content or material that contains links to another website where any of the above-described prohibited Content or material is accessible.

12. Any other Content or material that Rumble in its sole, unfettered, and arbitrary discretion, determines is undesirable on the Rumble Service.

Rumble has the sole discretion to decide whether Content or material is permitted on the Rumble Service and any materials submitted to the Rumble Service may be, but is not necessarily, examined by Rumble before it is made available on the Rumble Service. You

acknowledge that Rumble has the absolute right (but not the obligation) to prohibit, refuse, delete, move and edit Content and material for any reason, in any manner, at any time, without notice to you.

You should also know that in visiting the Rumble Site or viewing Content via the Rumble Player or otherwise, you may be exposed to materials which you consider to be offensive or inappropriate and you assume the risk and sole responsibility for your exposure to any such Content or material.

To report content that violates our policies, please email moderation email

## COMPLAINT PROCEDURE

To report Content you believe violates Rumble's policies, please email moderation email. Please use the word "Complaint" in the subject line, and include the following information in your email:

1. Your name, email address and, if you are a registered user, your user ID.
2. The basis of your complaint (provide as much detail as possible).
3. If your complaint concerns the activities of other users/visitors on the Rumble Site, identify the specific type of inappropriate or offensive behavior engaged in and, insofar as possible, the identity of the offending person.
4. If your complaint concerns particular Content, please provide the URL for the video that is the subject of your complaint, timestamps within the video where the alleged violative Content appears, and the reason for your Complaint.

A customer service representative will endeavour to respond to your email and if, in Rumble's determination, your complaint is a valid one, Rumble will take appropriate actions in its sole discretion, and has no responsibility to at any time report to you as to the status or outcome of its investigation or any actions Rumble has taken as a result.

## AGENCY AGREEMENT

If you are a creator of Content submitted to the Rumble Service through your Rumble account, the relationship between you and Rumble is one of principal and agent ("Agency") and is subject to the terms and conditions set out herein which specifically govern this relationship (the "Agency Agreement").

**Appointment of Agent.** You, as the principal (the "Principal" or "you"), may submit video Content to be published and managed by Rumble as your agent ("Agent") for the purposes of same. By submitting Content to Rumble and by Rumble accepting such Content on the Rumble Service pursuant to either Agency Option "A" or Agency Option "B", as defined below, you are appointing and do hereby appoint Rumble as your exclusive, worldwide, perpetual Agent for such Content, and grant Rumble the exclusive right to distribute, display,

reproduce, license, rent, sell, monetize, and otherwise exploit the Content in any medium, on any kind of display device, worldwide, for the duration of the "Term of Agency" as defined below (the "Agency Rights"). As discussed in more detail below, the Agency Rights will also include Rumble's right to bring suit in its own name as plaintiff for infringement or other inappropriate or illegal use of the Content and to seek in such suit all damages or other relief available under law and equity to which you and/or Rumble are entitled. By appointing Rumble as your Agent and granting Rumble the Agency Rights, you agree that you shall not distribute, display, reproduce, license, rent, sell, monetize, and otherwise exploit the Content in any medium, on any kind of display device, worldwide, for the duration of the Agency Term, as defined below. The Agency Term means a 50 (fifty) year period commencing as of the date you enter into this Agreement. The Agency Term shall automatically renew for additional consecutive renewal terms of 50 (fifty) years each, unless either party gives written notice of its intent not to renew the Agency Term, ninety (90) days prior to the expiration of the then expiring Agency Term.

There are four (4) types of "Agency Option(s)" offered and governed by this Agreement, as described below, namely, Agency Option "A", Agency Option "B", Agency Option "C", and Agency Option "D". You must select a single Agency Option during the Content submission process, and that selected Option cannot thereafter be changed without Rumble express written permission. If you select any of Options "A" or "B," you cannot remove the video from the Rumble Player for the duration of our Agency agreement.

1. **Video Management Option (Option "A")**
   You will receive Creator Earnings (as defined in and calculated in accordance with the section below entitled "Collection of Earnings").

2. **Video Management (Excluding YouTube) Option ("Option B")**
   You will receive Creator Earnings. Rumble shall not publish your Content to YouTube.com and publication of your Content shall be limited to all media and channels except YouTube.com which is specifically excluded.

3. **Rumble Only Option (Option "C")**
   Rumble will publish your Content through the Rumble Player and will act as your Agent only in respect of publication via this channel. All other media and channels are specifically excluded from Rumble's Agency.

   You will receive Creator Earnings. If you select this Option, and notwithstanding any provision in this Agreement to the contrary, you shall be entitled to remove Content from the Rumble Player at any time.

4. **Personal Use Option (Option "D")**
Rumble shall only publish your Content on Rumble's Video Player or Rumble-owned websites.

Rumble shall not monetize your Content. No Creator Earnings will be payable to you. If you select this Option, and notwithstanding any provision in this Agreement to the contrary, you shall be entitled to remove Content from the Rumble Player at any time.

## TERMS APPLICABLE TO RUMBLE'S CUSTOM VIDEO PLAYER SERVICE

If you have elected to subscribe to Rumble's Custom Video Player Service (the "Custom Player Service" or "CPS Subscription") or participate in an available trial CPS Subscription, the following specific terms and conditions shall apply in addition to all other applicable terms and conditions pursuant to the Terms of Use on the Rumble Site.

### Selection of a CPS Subscription

By selecting a CPS Subscription as offered by Rumble from time to time the terms, features, and pricing of your selected CPS Subscription will be as described during the CPS Subscription selection procedure through the Rumble Site (the "CPS Features and Pricing"). All CPS Subscriptions terms are monthly and are automatically renewed for successive months until terminated.

Rumble reserves the right to change any terms, features, or pricing of CPS Subscriptions at any time with all such changes having effect upon thirty (30) days' notice or as otherwise notified to you by Rumble.

### Payment

By selecting a CPS Subscription you are agreeing to pay the associated fees (the "CPS Subscription Fee") for the CPS Subscription and hereby authorize Rumble to charge or debit your agreed payment method on a monthly basis for the CPS Subscription Fee and any other applicable charges. All CPS Subscription Fees are payable in advance and charged monthly, subject to the Upgraded Plan provisions set out below.

### Bandwidth Usage

Each CPS Subscription provides for a certain maximum allotted amount of bandwidth (the "Maximum Allotted Bandwidth") which may be used by you throughout each monthly CPS Subscription period ("Monthly Subscription Period"), commencing at the start-date of your CPS Subscription ("Subscription Start Date") and ending at the monthly anniversary date of your Subscription Start Date ("Subscription Anniversary Date"). Any portion of the Maximum Allotted Bandwidth that you do not use during any particular Monthly Subscription Period will not "roll over" and may not be used or applied to a subsequent Monthly Subscription period.

It is your responsibility to monitor and manage bandwidth usage, available via the Rumble dashboard, during the Monthly Subscription Period. Rumble may but is not obliged to notify you if you have expended or are likely to expend your Maximum Allotted Bandwidth.

## Bandwidth Overage Procedure

Unless otherwise specified in the CPS Features and Pricing applicable to your CPS Subscription, once you use the Maximum Allotted Bandwidth, and absent a duly received Notice of Overage Disablement (as defined below), your CPS Subscription will automatically and immediately (the "New Subscription Start Date") be upgraded to the next superior CPS Subscription plan available and as described in Subscription Features and Pricing on the Rumble Site ("Upgraded Plan"). Your Subscription Anniversary Date shall be immediately and automatically reset with all features and pricing of the Upgraded Plan becoming effective and applicable to your CPS Subscription as of the New Subscription Start Date. This Bandwidth Overage Procedure will continue to apply to each Upgraded Plan so that your CPS Subscription is automatically and immediately upgraded to the next superior plan each time you reach the Maximum Allotted Bandwidth, including but not limited to an already Upgraded Plan. You hereby agree to the automatic implementation of your Upgraded Plan upon reaching the Maximum Allotted Bandwidth for your original or any subsequent Upgraded Plan pursuant to the Bandwidth Overage Procedure, and hereby authorize Rumble to charge or debit your agreed payment method for the applicable CPS Subscription Fee in respect of the Upgraded Plan commencing upon the new Subscription Start Date in respect of each applicable Upgraded Plan.

If you do not wish to use or be upgraded to an Upgraded Plan pursuant to the Bandwidth Overage Procedure, you are required to notify Rumble in writing via rumble billing email prior to any Bandwidth Overage, of your intention to disable any Bandwidth Overage in connection with your CPS Subscription effective as of the point that you reach the Maximum Allotted Bandwidth ("Overage Disablement") for your current CPS Subscription ("Notice of Overage Disablement"). Your Notice of Overage Disablement shall only apply to your then current Monthly Subscription Period and you will be required to notify Rumble again in respect of any requested Overage Disablement for any subsequently Monthly Subscription Period. In the absence of a duly received receipt of Notice of Overage Disablement in accordance with these provisions, you will be automatically upgraded to the Upgraded Plan once you use the Maximum Allotted Bandwidth in accordance with these provisions.

## Refunds and Cancellation

No refunds are available in respect of any fees to Rumble. In order to cancel, contact rumble billing email at least five days prior to your Subscription Anniversary Date or New Subscription Start Date in order to ensure that you will no longer be billed.

## Upgrading a Subscription on Your Own

If you decide on your own to upgrade your CPS Subscription to an Upgraded Plan that provides additional bandwidth, you may do so via the Rumble dashboard available on the Rumble Site. By selecting an Upgraded Plan as described in the CPS Features and Pricing, you acknowledge that the selected Upgraded Plan will commence immediately thereby constituting a New Subscription Start Date and your Subscription Anniversary Date will be adjusted accordingly. Your Upgraded Plan will continue to be subject to the Bandwidth Overage Procedure.

**Free Trials**

Rumble may from time to time offer a "Free Trial" of a CPS Subscription pursuant to the description of any such "Free Trial" on the Rumble Site. You acknowledge and agree that all Free Trials are of a maximum duration of 30 days unless otherwise specified by Rumble, and shall be automatically converted to a CPS Subscription requiring payment of CPS Subscription Fees in accordance with the applicable CPS Features and Pricing upon the expiry of the initial 30-day Free Trial period. You also acknowledge that all terms and conditions applicable to Free Trials, including but not limited the Bandwidth Overage Procedure, shall apply to Free Trials, both before and after the expiry of the initial 30-day Free Trial period. You hereby authorize Rumble to charge or debit your agreed payment method on a monthly basis for the applicable CPS Subscription Fee commencing as of the expiry of the initial 30-day Free Trial period unless at least five days prior to such expiry you notify Rumble of your intent to cancel at rumble billing email.

**Payment Methods**

Rumble may from time to time offer certain payment methods in respect of CPS Subscription Fees. In the event that a credit card or debit card is permitted as a payment method and the applicable CPS Subscription Fees are not chargeable or debitable to such payment method, you acknowledge and agree that if the credit card or debit card does not work, either because of expiry or otherwise, then upon expiry of any paid portion of your CPS Subscription period, all CPS Subscription services may be deactivated without notice to you. You are solely responsible for ensuring that all permitted payment methods are up-to-date and are able to cover all applicable CPS Subscription Fees, including but not limited to all CPS Subscription Fees payable for Upgraded Plans.

**Content and Advertisements for CPS Subscription Service**

You acknowledge and agree that when you monetize your Content on the Rumble Site or perform activity as a Rumble Publisher, as outlined in the Terms of Use, all provisions applicable with the Rumble Player as otherwise set out in the Terms of Use shall apply.

In the event that your CPS Subscription contains Content and/or advertising provided by you, you acknowledge and agree that you are solely responsible and/or liable for all such Content and/or advertising and that you indemnify and hold Rumble harmless in accordance with all

indemnification provisions otherwise set out in the Terms of Use.

## PUBLISHING AND DISTRIBUTION OF CONTENT VIA THE RUMBLE SERVICE

Rumble may, but is not obliged to, have your Content published and displayed through various media channels and in various formats via the Rumble Service, in its sole commercial discretion based upon the Agency Option which you select. Rumble reserves the right to decline or reject any Content submitted to the Rumble Service.

## INTELLECTUAL PROPERTY

You affirm, represent, and warrant that you have the legal right to submit the Content to the Rumble Service, that you have all necessary right and authority to appoint Rumble as your Agent in accordance with the selected Agency Option as described herein, and that you are legally entitled to enter into the Agency Agreement.

You further represent and warrant that any Content submitted does not contain third party copyrighted material, or material that is subject to other third party proprietary, intellectual property or contractual rights or interests, unless you have express written permission from the rights holder of the Content to enter into this Agreement. In the event you claim to have been granted such rights from a third party, you agree to furnish evidence of same in writing forthwith upon request by Rumble. You are required to obtain such written permission before submitting such Content to the Rumble Service. Such written permission must not be limited in any way, shall be exclusive, and shall remain in effect for the duration of this Agreement.

Any infringement or other violation of a third party's rights with respect to the Content submitted by you to the Rumble Service and which has been identified as such by Rumble or by a third party, may immediately and without notice to you result in the removal of such Content. It is Rumble's strict policy to comply with all applicable intellectual property laws and regulations of which it is aware. You hereby agree to defend, indemnify and hold harmless Rumble, its agents, employees, contractors, directors, officers, and shareholders, as to any allegations, demands, claims, investigations or disputes arising from your submission of Content to Rumble and/or monetization of your Content, insofar as it relates to any infringement or violation of the intellectual property rights, proprietary rights, contractual rights, or other rights of a third party.

You acknowledge and agree that except for the Assignment Option discussed below, this Agency Agreement does not assign ownership of any copyright for or in the Content to Rumble, and that all payments made to you pursuant to this Agreement are amounts earned by you from the monetization of your Content, less expenses and Rumble's Agency Fees (as defined below) and are not royalties or license fees. If you receive payments from Rumble as

the person authorized by the creator or rightsholder to retain Rumble as Agent, you indemnify and hold harmless Rumble from and against any claim by the creator or rightsholder in respect of your receipt of such payments and in respect of Rumble's Agency.

## Monetization and Rights Applicable Under Option "A" and "B"

In the case where you have chosen either Option "A" or Option "B", in order to monetize your Content, Rumble may in its sole unfettered commercial discretion, on your behalf, grant, sell and enter into License(s) (as defined below) to the Content with you being the Licensor, subject to Rumble being your attorney in fact for effecting such License(s) with the Licensee, as defined below, and you further authorize such Licensee to use such licensed Content in any media for any purpose including but not limited to use in advertising, promotion, marketing and packaging for any product or service, worldwide. For the purposes of this paragraph, a "License" means any contractual arrangement arranged between Rumble as your sole and exclusive Agent, and a third party (a "Licensee") in respect of the Licensee's use of your Content. In the event that Rumble desires, in its sole discretion, to enter into a License for your Content only, and/or to include Content from other creators with your Content in a single License, you hereby authorize and grant to Rumble the actual authority, permission and right: i) to do so; ii) to do so without seeking your further consent and without providing notice to you; and iii) to do so in its own name. In that event Rumble, acting as your Agent, will be listed as the sole nominative "licensor" in that License You (and any other creator whose Content is included in the License) will each be an Undisclosed Principal in that License. It is further understood and agreed that you (and any other Content creator whose Content is included in the License) are each the real party-in-interest Licensor, and to the extent any compensation or other consideration is paid by the licensee, it will not be deemed licensee fees or royalties to Rumble. You also hereby grant to Rumble the actual authority, permission and right at its discretion to disclose or not to disclose your name as a real-party-in-interest Licensor. You also hereby grant to Rumble the actual authority, permission and right to prosecute in its own name any claims against the other party to the License or to defend claims asserted by the other party to the License ("Litigation") without seeking further consent from you or providing notice to you. Rumble will control all aspects of the Litigation, will be responsible for all costs and attorneys' fees, and will be entitled to seek, recover and retain any damages or other compensation, consideration, or other relief or recovery from the other party to the License in the Litigation, without providing any notice or accounting to you. Rumble will defend and indemnify you with respect to any claims made against you by the other party to any License entered into by Rumble in which you are an Undisclosed Principal as to any asserted breach by you of the License unless you are alleged to have committed the act or acts that are alleged to constitute the breach. In that instance, Rumble reserves the right to demand that you defend and indemnify it as to such claims, which you hereby agree to do.

In the case where you have chosen either Option "A" or Option "B", by submitting Content to Rumble, you are irrevocably agreeing to appoint Rumble as your sole, worldwide, exclusive and perpetual Agent with respect to the Content and all rights pertaining thereto, including without limitation, all rights enumerated in United States Code, Title 17, § 106, and you herein authorize and grant Rumble the exclusive authority to make all decisions and take all actions Rumble deems reasonably appropriate with respect to the management, commercial and non-commercial monetization of the Content under the terms of this Agreement.

You specifically authorize Rumble as your Agent to combine the Content with other images, text, graphics, file, audio, audio-visual works; and alter, modify and crop the Content at Rumble's sole discretion, and hereby waive any reservation of moral rights in and to the Content.

In the case where you have chosen either Option "A" or Option "B", as your Agent in respect of the Content, Rumble may choose in its exclusive and absolute unfettered and/or arbitrary commercial discretion, to, register copyrights in any jurisdiction or jurisdictions worldwide on your behalf, with you (or the party which has expressly provided you with authorization to enter this Agreement and is the rightsholder) listed as the copyright claimant, author, or similar, and to record Rumble as your sole and exclusive Agent therein for the purposes of administering all rights and permissions thereto. Rumble shall not be liable to you or any third party for any delay or defect in it attempt to register the copyright in any Content, or if Rumble does not attempt to register such Copyright.

In the case where you have chosen either Option "A" or Option "B", as your Agent in respect of the Content, Rumble may choose in its exclusive and absolute unfettered and/or arbitrary commercial discretion to pursue any legal remedies available in order to, as your Agent, assert or enforce your (or if you are entering into this Agreement under authority of a third party rights holder, that third party's) copyright or other intellectual property rights in and to the Content, including but not limited to making a claim or commencing legal proceedings with respect to all payments owing to you by third parties with respect to infringement of the Content, and you agree to fully cooperate in same (or if you are entering into this Agreement under authority of a third party rights holder, you agree to procure the cooperation of such third party). Notwithstanding the foregoing, you acknowledge and agree that Rumble shall at no time and in no manner be obliged to make any efforts as your Agent pursuant to this provision. You hereby appoint Rumble as your (or if you are entering into this Agreement under authority of a third-party rights holder, that third-party's) attorney in fact for executing any instrument or document or taking any step in furtherance of the rights granted herein.

Where Rumble as Agent takes steps to enforce the copyright in your Content or breach of a license agreement on your behalf as Principal, or where the law allows Rumble (as an agent having a pecuniary interest in the subject matter and outcome of the suit) to file suit in its own name as your agent), or whether directly by way of the Assignment Option, as defined below, or otherwise, Rumble shall have sole control and decision-making power over any

demand, claim, proceeding or settlement. If required by applicable law that you be a named plaintiff in any such enforcement action relating to your Content, you hereby so consent to be so named. In that instance, Rumble will continue to have sole control of the action as described above, will continue to pay all fees and costs incurred in that action, and you agree to cooperate with Rumble with respect to such action.

It is understood and agreed that any C-Suite officer (CEO, COO, CTO, CFO) of Rumble may execute documents pursuant to, and exercise for Rumble, any power of attorney you have granted to Rumble herein.

### Recovery Through Copyright Enforcement

You, or if you are entering into this Agreement under authority of a third party rightsholder, that third party, shall not issue any demand, or commence any claim or proceedings to enforce any rights in any Content submitted to Rumble under Agency Option "A" or Agency Option "B", except with Rumble's express authorization which may be denied in the event that Rumble elects to assume carriage and control of such enforcement measures, and in such event Rumble shall indemnify and hold you (or the applicable third party rightsholder) harmless from and against any damages, legal fees and costs, directly attributable to such enforcement measures. If, however, Rumble authorizes you to take enforcement action, then you will be solely responsible for all fees, costs, damages or other expenses in that action.

### Recovery by Rumble as Agent

In the event that any claim or demand is made by Rumble or if legal proceedings are commenced by Rumble on your behalf and in your name as your Agent (as opposed to Rumble being the copyright owner pursuant to the Assignment Option as set out below) and such claim, demand, or proceeding results in a payment from a third party to Rumble, Rumble shall be entitled to deduct from such proceeds: a) all associated legal fees and expenses incurred or payable by Rumble; and b) if the payment amount exceeds the subsection (a) amount by at least USD $1,000.00, a management and enforcement fee equal to the remainder of the proceeds less the sum of USD $1,000.00, meaning that the maximum that you can receive in such event is USD $1,000.00.

## RUMBLE'S OPTION TO ACQUIRE CONTENT COPYRIGHT VIA ASSIGNMENT UNDER OPTION "A" or OPTION "B"

Notwithstanding any provision in this Agreement to the contrary, in the case where you have chosen either Option "A" or Option "B" only, if Rumble determines that it requires your copyright to be assigned to Rumble along with all related claims and causes of action (collectively, "Copyrights"), so as to enable Rumble to have standing to enforce the Copyrights against a third party, then Rumble shall have the option at any time, in consideration of the Copyright Assignment Fee (as defined below) to cause and consummate such assignment of Copyrights to Rumble, and this Agreement shall be your

written instrument effecting same (the "Assignment Option"). Alternatively, if you are entering into this Agreement under authority of a third party rightsholder as may be permitted herein, you represent and warrant that you have authority herein to agree to same on behalf of such third-party rights holder.

If you have chosen either Option "A" or Option "B" only, you hereby appoint Rumble as your Attorney in Fact as to any such Assignment, and grant to Rumble the actual authority, right and permission, as your Attorney in Fact, the execute a separate Assignment document in the following form:

```
"For Value Received, the sufficiency of which is acknowledged, [your name], an
individual residing in the state of [your state of residence] ("Assignor") hereby
assigns all copyright in [description of the Content being assigned] (the "Content")
to Rumble, Inc. ("Assignee"). Assignor represents and warrants that a copyright
exists in the Content, that Assignor owns all right, title and interest in and to
that copyright, that the copyright has not been previously assigned or licensed, that
Assignor has the right to assign the copyright in the Content to Assignee, that there
is no dispute or potential dispute of which Assignor is aware regarding the copyright
in the Content or Assignor's ownership thereof and right to assign to Assignor; and
that Assignee may hereafter register the copyright in Assignee's name. This
Assignment includes assigning to Assignee the sole right to seek, recover and retain
any and all damages (and related forms of recovery and relief) for past, present and
future infringement of the assigned copyright, without notice or accounting to
Assignor.


                    Executed this __ day of _____, 20__, at Toronto,
Canada.


          By: _____
                    Name: _____
                    Title: Rumble _____
                    Attorney in Fact for [your name].
```

In the case where you have chosen either Option "A" or Option "B", and if Rumble so requests, you shall cooperate in executing any additional instruments or assignments of Copyrights (and related claims) reasonably required to give effect to the assignment, transfer and enforcement of the Copyrights in the Content (or if you are entering into this Agreement under authority of a third party rights holder, you agree to procure the cooperation of such third party). In the case where you have chosen either Option "A" or Option "B", you hereby appoint Rumble as your (or if you are entering into this Agreement under authority of a third party rights holder, that third party's) attorney in fact for executing on your or their behalf any instrument or assignment reasonably required to give effect to this provision and to effect the assignment and transfer of Copyrights.

The Copyright Assignment Fee payable by Rumble to you shall be the combination of:

1. the maximum publicly available licensing fee for your Content as displayed in the Rumble catalogue, to a maximum of USD $500; and
2. an additional USD $500.00 in consideration of the assignment.

Upon assignment of Copyright in accordance with these provisions, all right, title, interest, and goodwill, together with the right to pursue and collect damages for all past, present, and future claims and causes of action in relation to enforcing intellectual property rights in and to the Content, including but not limited to Rumble's exclusive right to seek, recover and retain all past, present and future damages, attorneys' fees, enhanced or punitive damages, license fees, and/or royalties related to the Content, shall be transferred to Rumble.

## COLLECTION OF EARNINGS

As Agent, Rumble is authorized to collect any applicable earnings ("Earnings") derived from the publication, licensing, display and/or other use (collectively, the "Use") of your Content on your behalf pursuant to this Agreement. The Earnings payable to you after deducting applicable amounts are referred to herein and defined as the "Creator Earnings".

Creator Earnings are calculated by applying the applicable Agency Fee (see table below) to the Earnings and then deducting any applicable third-party processing fees, administrative fees, and/or any amounts that may be due to a Rumble publisher/syndication partner, hosting costs, taxes, defensive litigation costs, exchanges rates, and/or any other direct costs (collectively "Other Fees and Costs"). Notwithstanding, Rumble reserves the right to apply the Agency Fee and/or abstain from deducting Other Fees and Costs in a manner that it determines is appropriate in its sole discretion, but in any case not in a manner that reduces the amount of Creator Earnings payable to you as currently set forth herein.

Agency Fees:

| Revenue Stream | Rumble Agency Fee |
| --- | --- |
| Programmatic Advertisement | Forty percent (40%) |
| Sponsorship (incl. Host-Read) Advertisement | Forty percent (40%) |
| Licensing | Forty percent (40%) |
| Tipping/Donation | Twenty percent (20%) |
| Pay-Per-View | Twenty percent (20%) |

As used herein:

Programmatic Advertisement revenue stream means advertising revenues generated from users watching video Content on the Platform.

Sponsorship (including Host-Read) Advertisement revenue stream means advertising revenue generated from a Content creator performing an advertisement placement within their Content.

Licensing revenue stream means revenue generated when exclusivity has been authorized to Rumble to license Content to other platforms.

Tipping/Donation revenue stream means revenue generated from users contributing a fixed dollar amount in return for their message being promoted by a creator during the creator's Content stream.

Pay-Per-View revenue stream means revenue generated by Content creators making available pay-per-view video Content for viewing by their audience for a limited time or on a one-time basis.

You understand that, from time to time, Rumble may change and/or add additional revenue streams and change and/or add additional Agency Fees. In the event of any such changes, this Agreement will be updated accordingly, and the most recent version of this Agreement will apply to Rumble's Use of your Content and the collection and payment of any Earnings hereunder.

All payments to you of Creator Earnings will normally be remitted to your Rumble account thirty (30) days after the month in which Rumble receives payment on your behalf from third parties for the Use of your Content.

If an upfront payment amount is provided for under this Agreement, the entire amount indicated will be issued to your Rumble account. Your future Creator Earnings, will be applied against this upfront payment until the upfront payment amount is fully utilized.

The first month for which payment is to be made shall: (a) begin on the first day of the month following the month of execution of this Agreement; and (b) include the portion of the month of execution following the Effective Date (unless this Agreement was executed on the first day of a month, in which case the month shall be deemed to begin on the first day of such month).

Under certain circumstances, third parties may make payments to Rumble that do not associate Earnings with the Use of specific Content. In this event, Rumble will make commercially reasonable efforts to identify the Creator Earnings due to you for the Use of your Content. If, after 24 months from the date of payment by a third party, Rumble has not been able to identify Earnings to the Use of specific Content, Rumble reserves the right to retain all such payments.

For the avoidance of doubt, no Creator Earnings are payable in relation to Rumble Premium Subscriptions, as defined below.

## EARNING PAYMENT REDUCTIONS / SET-OFFS

Payments may be subject to reduction to offset bad debts, refunds and other charge-backs relating to Use of your Content within sixty (60) days of the payment to which the bad debt, chargeback or refund relates.

## LIABILITY

Rumble does not in any way endorse any Content submitted, including any opinion, recommendation, claims, advice or position expressed therein, and Rumble expressly disclaims all liability in connection with the Content and its publication. For the purposes of the Digital Millennium Copyright Act or similar legislation or regulations, all Content is considered user-generated content and Rumble's capacity as Agent is not Content owned by Rumble (unless expressly assigned to Rumble under the terms of this Agreement) or uploaded by Rumble.

In order to submit Content to Rumble you acknowledge that you are solely responsible for what is submitted and indemnify and hold Rumble harmless from any and all claims arising from a breach of your representations, warranties, and covenants as set out in this Agreement, and also indemnify and hold Rumble harmless from and against all third party claims with respect to the Content and acting as Agent in respect of the Content.

## RUMBLE PUBLISHER ACCOUNT

If your account qualifies for a Rumble Publisher account, any activity on the Rumble Player using the Monetized Embed Code will apply to your account as follows: as used herein, "Net Advertising Revenues" means aggregate amounts collected by Rumble arising from the license or sale of the pre-roll, mid-roll, post roll or overlay advertisements included within the Rumble Player less any amounts due for hosting, taxes, litigation costs, exchange rates, and any other direct costs. Rumble shall retain all amounts derived from all other advertisements, promotions, links, pointers and similar services or rights. Rumble Publisher is entitled to the Net Advertising Revenue less an Agency fee equal to 50% payable to Rumble, within thirty (30) days following the end of each month whenever a Rumble Publisher uses the Rumble Monetized Embed Code. Analytics will be directly reported into the Publisher Dashboard within your Rumble account.

## Procedure for Reporting Claims of Copyright Infringement

To file a copyright infringement notification with us relating to Content on the Rumble Player, you will need to send a written communication that includes substantially the following (please consult your legal counsel or see Section 512(c)(3) of the Digital Millennium Copyright Act to confirm these requirements):

- A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.
- Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.
- Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material. Providing URLs in the body of an email is the best way to help us locate content quickly.
- Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.
- A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.
- A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

To expedite our ability to process your request, such written notice should be sent to our designated agent as follows:

```
Service Provider(s): Rumble Canada Inc.
Name of Agent: Claudio R.
Address: Rumble Canada Inc.,
  218 Adelaide Street West, Suite 400,
  Toronto, Ontario, M5H 1W7
  Email: our email
```

If there are many videos to be removed, or you expect to have an ongoing need to remove potentially infringing content from Rumble, we suggest that you email us at our email with the subject as "ONGOING DMCA" where we increase the speed at which we are able to remove any infringing content on Rumble and also offer industry-leading content identification tools and personal management for your requests.

Please note that under Section 512(f) any person who knowingly materially misrepresents that material or activity is infringing may be subject to liability for damages. **Don't make false claims!**

Please also note that the information provided in this legal notice may be forwarded to the person who provided the allegedly infringing content.

Claimant information will be published on the Rumble site at anytime.

Complaint Exhibit 1
020

## Counter Notification

If you believe that material you posted has been removed in error, you should send to our Copyright Agent, using the contact information listed above, a counter notice that includes the following:

- Your physical or electronic signature.
- Identification of the material that has been removed or to which access has been disabled and the location at which the material appeared before it was removed or access to it was disabled.
- A statement under penalty of perjury that you have a good faith belief that the material was removed or disabled as a result of mistake or misidentification.
- Your name, address, and telephone number, and a statement that you consent to the jurisdiction of, at Rumble's discretion, in the Ontario Superior Court of Justice at Toronto or the United States Federal District Court for the judicial district in which your address is located, or if your address is outside of the United States, for any judicial district in the United States and that you will accept service of process by mail from the person who provided notification of copyright infringement, or an agent of such person.

Please note that under Section 512(f) of the Copyright Act, any person who knowingly materially misrepresents that material or activity was removed or disabled by mistake or misidentification may be subject to liability.

Please also be advised that we enforce a policy that provides for the termination in appropriate circumstances of subscribers who are repeat infringers.

## PROCEDURE FOR REPORTING VIOLATIONS OF RIGHTS OF PRIVACY OR PUBLICITY

If you believe that your privacy rights or publicity rights have been violated by information or material that is accessible on the Rumble site, you may notify Rumble.com. Please email us so we can investigate the matter further.

## DISCLAIMER OF WARRANTIES

ALL MATERIALS, INFORMATION, SOFTWARE, PRODUCTS, AND SERVICES INCLUDED IN OR AVAILABLE THROUGH THIS SITE (THE "CONTENT") ARE PROVIDED "AS IS" AND "AS AVAILABLE" FOR YOUR USE. THE CONTENT IS PROVIDED WITHOUT WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT. RUMBLE, ITS SUBSIDIARIES, AND ITS LICENSORS DO NOT WARRANT THAT THE CONTENT IS ACCURATE, RELIABLE OR CORRECT; THAT THIS SITE WILL BE AVAILABLE AT ANY PARTICULAR TIME OR LOCATION; THAT ANY DEFECTS OR ERRORS WILL BE CORRECTED; OR THAT THE

CONTENT IS FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. YOUR USE OF THIS SITE IS SOLELY AT YOUR RISK. ANY MATERIAL VIEWED, DOWNLOADED OR OTHERWISE OBTAINED THROUGH THE USE OF THIS SITE IS DONE SOLELY AT YOUR OWN DISCRETION AND RISK, AND YOU WILL BE SOLELY RESPONSIBLE FOR ANY DAMAGE, INCLUDING WITHOUT LIMITATION PERSONAL INJURY OR DISTRESS, DAMAGE TO YOUR COMPUTER SYSTEM, OR LOSS OF DATA, THAT RESULTS FROM THE VIEWING OR DOWNLOAD OF ANY SUCH MATERIAL. BECAUSE SOME JURISDICTIONS DO NOT PERMIT THE EXCLUSION OF CERTAIN WARRANTIES, THESE EXCLUSIONS MAY NOT APPLY TO YOU.

## LIMITATION OF LIABILITY

UNDER NO CIRCUMSTANCES SHALL RUMBLE, ITS SUBSIDIARIES, MEMBERS OR EMPLOYEES BE LIABLE FOR ANY DIRECT, INDIRECT, PUNITIVE, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES THAT RESULT FROM THE USE OF, OR INABILITY TO USE, THIS SITE. THIS LIMITATION APPLIES WHETHER THE ALLEGED LIABILITY IS BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR ANY OTHER BASIS, EVEN IF RUMBLE.COM HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. BECAUSE SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, RUMBLE'S LIABILITY IN SUCH JURISDICTIONS SHALL BE LIMITED TO THE EXTENT PERMITTED BY LAW.

## INDEMNIFICATION

You agree to indemnify and hold Rumble, and its parent, subsidiaries and affiliates and their respective officers, directors, agents, co-branders and other partners, contractors, and employees, harmless from and against any and all claims, expenses, and demands, including attorneys' fees, made by any third party due to, arising out of, or asserted in connection with your use or misuse of this Site, including claims relating to content you submit, post to or transmit through this site, and your connection to and use of this Site. Rumble reserves the right to have control of any defense and control of any matter otherwise subject to indemnification by you. You agree to cooperate with Rumble in asserting any available defenses.

## COMPLIANCE WITH APPLICABLE LAW

You agree to comply with all applicable laws with respect to your use of the Rumble Service. Without limiting the foregoing, you acknowledge and agree that Rumble makes no representation that materials on this Site or accessible via the Rumble Service are appropriate or available for use in any particular locations, and accessing them from territories where their contents are illegal is prohibited. Those who choose to access the Site or the Rumble Service from any location do so on their own initiative, at their own risk, and

are responsible for compliance with local laws. If you use the Rumble Service in a jurisdiction that prohibits or restricts such use, your use will be subject to, without limitation, any other provision of the Terms of Use, and Rumble shall not have any liability with respect to such use.

You further agree to comply with all state, provincial and/or federal regulations with respect to the Content you upload to Rumble, including those regulations related to accessibility (e.g., closed captioning of Content where required by law).

## CHOICE OF LAW AND FORUM

These Terms of Use and the Agency Agreement, shall be governed by and construed in accordance with the laws of the Province of Ontario or, at Rumble's discretion, the federal laws of the United States, excluding its conflicts of law rules. You expressly agree that the exclusive jurisdiction for any claim or action arising out of or relating to these Terms of Use, the Agency Agreement, or your use of the Rumble Services, shall lie only in the Ontario Superior Court of Justice at Toronto, or at Rumble's discretion, in the United States Federal District Court for the judicial district in which your address is located, or if your address is outside of the United States, for any judicial district in the United States, and you further agree to and submit to the exercise of personal jurisdiction of such courts for the purpose of litigating any such claim or action.

## SEVERABILITY AND INTEGRATION

Unless otherwise specified herein, this agreement constitutes the entire agreement between you and Rumble with respect to this site and supersedes all prior or contemporaneous communications and proposals (whether oral, written, or electronic) between you and Rumble with respect to the Rumble Service or the Agency Agreement. If any part of these Terms of Use or Agency Agreement is held invalid or unenforceable, that portion shall be construed in a manner consistent with applicable law to reflect, as nearly as possible, the original intentions of the parties. Or if that portion is not susceptible to such construction, it shall be replaced with a provision that is consistent with applicable law and which reflects, as nearly as possible, the original intentions of the parties. In either event, the remaining portions remain in full force and effect.

## TERMINATION

Rumble reserves the right, in its sole discretion, to terminate your access to the Rumble Service, with or without notice, for any reason, including, without limitation, if Rumble believes that you have violated or acted inconsistently with the letter or spirit of these Terms of Use or the Agency Agreement. This includes Rumble's right to terminate your ability to upload videos, post comments, collect revenue or any function available via the Rumble Service.

Rumble has a zero tolerance for any violation of Content Policies and/or Conduct outlined in these Terms, especially, but not limited to copyright infringement. If a user is found in violation, the account may be suspended and/or terminated. The determination of suspension or termination is at the sole discretion of Rumble.

You acknowledge and agree that Rumble shall not be liable to you or any third party for any termination or suspension of your access to the Rumble Services.

## HOST-READ ADVERTISEMENTS

Without limiting anything else contained herein, if you, or a service provider working for or with you, read host-read advertisements ("Host-Read Ads") during the performance of the Content you stream and/or upload to the Rumble Site, you agree to comply with, and as applicable, to cause the service provider to comply with, the following additional terms and conditions:

1. The content and script of the Host-Read Ad(s) shall be determined by the advertiser.
2. You are obligated to read a Host-Read Ad in the form, manner, frequency, and schedule as determined and agreed between Rumble and the advertiser and notified to you in writing ("Host-Read Ad Requirements").
3. Rumble may review your performance of the Host-Read Ads to confirm that they have been performed in accordance with the Host-Read Ad Requirements. It is in Rumble's sole discretion to decide if the Host-Read Ad Requirements have been met. To the extent any Host-Read Ads have not been performed in accordance with the Host-Read Ad Requirements, as determined by Rumble in its sole discretion, without limiting any other rights of Rumble hereunder or at law, Rumble may (i) withhold funds otherwise payable to you on a pro-rata basis or in their entirety and/or (ii) seek a refund of funds previously paid to you to the extent the advertiser seeks a refund from Rumble for any such non-conforming Host-Read Ads.
4. You shall adhere to and comply with all applicable laws, rules, regulations, statutes, and ordinances in your performance of Host-Read Ads. Without limiting the foregoing, you agree to adhere to and comply with all applicable requirements of the United States Federal Trade Commission's ("FTC") advertising regulations governing endorsements, testimonials, and disclosures of material connections. For the avoidance of doubt, if applicable, you will include FTC-compliant disclosures in or around the Content in relation to any material connection with an advertiser. Further, you will not endorse any product or service in violation of the FTC regulations, including providing endorsements that suggest you use a product or service that is the subject of the Host-Read Ad if in fact you do not use any such product or service.
5. You represent and warrant to Rumble that you have the right to perform the Host-Read Ads contemplated by these Terms of Use and that in doing so you will not be in violation of any other agreement with any other party.

6. Rumble shall not be liable or responsible for anything said in the Host-Read Ad(s) or any action or in-action taken by any third party in response thereto. In addition, you understand and agree that all Host-Read Ad(s) are provided on an "AS IS" or "AS AVAILABLE" basis and Rumble makes no warranty or representation that such Host-Read Ad(s) will be available, delivered, or work properly.

7. Rumble makes no promise, guarantee, representation, or warranty as to the revenues that will be generated by the Host-Read Ad(s) or as to Creator Earnings that you may be entitled to receive in relation thereto.

8. You agree to indemnify, defend and hold Rumble, its agents, advertisers, affiliates, subsidiaries, directors, officers, employees, and applicable third parties (e.g. syndication partners, licensors, licensees, consultants and contractors) (collectively "Indemnified Person(s)") harmless from and against any and all third party claims, liability, loss, demand for payment, and expense (including damage awards, settlement amounts, and reasonable legal fees), brought against any Indemnified Person(s), arising out of, related to, or which may arise from (i) your, or, if applicable, the service provider's performance or non-performance of the Host-Read As(s) and/or (ii) your, or the services provider's breach of any term hereof.

## RUMBLE PREMIUM SUBSCRIPTIONS

Rumble offers a monthly or annual premium subscription (collectively the "Rumble Premium Subscriptions"). Without limiting anything else contained herein, the following additional terms and conditions apply to the Rumble Premium Subscriptions:

1. Rumble Premium Subscriptions allow you to watch programmatic advertisement-free Content on the Rumble Service (i.e., website and mobile app). Content viewed with a Rumble Premium Subscription may still contain live read advertisements.

2. In addition to the terms and conditions contained in this Agreement, the terms and conditions of the applicable mobile app store apply to Rumble Premium Subscriptions purchased through the Rumble mobile app.

3. Rumble Premium Subscriptions are non-refundable.

4. Rumble Premium Subscriptions will automatically renew unless you cancel prior to the renewal date.

## CONSIDERATION AND AGREEMENT

You agree:

1. that there is legally sufficient consideration for this Agreement and for the rights granted and obligations undertaken by the parties herein;

2. that this Agreement is a legally binding contract between you and Rumble;

3. that you are entering into this Agreement knowingly and willingly, and

4. that your submission of this Agency Agreement to Rumble electronically constitutes your electronic agreement, such that this Agency Agreement becomes binding upon submission.

# EXHIBIT 2

Date of Hearing:  April 23, 2024

ASSEMBLY COMMITTEE ON JUDICIARY
Ash Kalra, Chair
AB 2655 (Berman) – As Amended April 1, 2024

As Proposed to be Amended

**SUBJECT**:  DEFENDING DEMOCRACY FROM DEEPFAKE DECEPTION ACT OF 2024

**KEY ISSUE**:  SHOULD LARGE ONLINE PLATFORMS BE REQUIRED TO BLOCK (OR IN SOME CASES LABEL) MATERIALLY DECEPTIVE AND DIGITALLY MODIFIED OR CREATED CONTENT RELATED TO AN ELECTION OR ELECTION PROCESS, DURING A PRESCRIBED PERIOD OF TIME BEFORE OR AFTER AN ELECTION?

**SYNOPSIS**

*According to the author, disinformation powered by Artificial Intelligence (AI), which can be distributed to millions of social media users in an instant, poses a serious threat to our political discourse, our elections, and indeed our democracy. For example, "deepfakes" can generate false sounds and images that could lead to the most discerning viewer to falsely conclude that a candidate, elected official, or election worker said or did something they did not do. Such disinformation not only distorts the truth, it has the potential to undermine people's confidence in our political institutions. While disinformation can threaten political discourse at any time, the author believes that it is especially harmful during an election season, when uncorrected disinformation may influence an election result or create false concerns about the legitimacy of an election in its immediate aftermath.*

*This bill, therefore, would require a large online platform to block "materially deceptive and digitally modified or created" content that portrays any candidate, elected official, or elections official doing or saying something they did not do or say; it would also require them to block deceptive material that concerns voting machines, ballots, voting sites, or other procedures or equipment related to an election. In addition, deceptive material about broader "elections processes," that are not subject to blocking requirement, would need to contain a label that they are materially deceptive and digitally modified. The bill would allow any resident of California to inform the platform that covered material had not been properly blocked or labeled, and if the platform does not respond within 36 hours, or if the reporting resident does not agree with the response, the resident may bring an action for injunctive relief. The bill would also allow the Attorney General, or any district attorney or city attorney, to also seek injunctive relief.*

*This bill passed out of the Assembly Elections Committee on a 6-1 vote. It is sponsored by the California Initiative for Technology and Democracy, a project of California Common Cause, and supported by several political reform groups and labor organizations, among others. The bill is opposed by groups representing the information and technology industry and by ACLU Action California. The opposition argues that the bill would be ineffective, unconstitutional, and preempted by federal law. The author will take several definitional amendments in this Committee, which are reflected in the Summary, below, and discussed in the analysis.*

b)  A picture or photograph of a candidate for public office into which the image of another person or persons is superimposed. (Elections Code Section 20010.)

**FISCAL EFFECT**:  As currently in print this bill is keyed fiscal.

**COMMENTS**:  According to the author:

> AB 2655 will ensure that online platforms restrict the spread of election-related deceptive deepfakes meant to prevent voters from voting or to deceive them based on fraudulent content. Deepfakes are a powerful and dangerous tool in the arsenal of those that want to wage disinformation campaigns, and they have the potential to wreak havoc on our democracy by attributing speech and conduct to a person that is false or that never happened. Advances in AI make it easy for practically anyone to generate this deceptive content, making it that much more important that we identify and restrict its spread before it has the chance to deceive voters and undermine our democracy.

> Therefore, in order to ensure California elections are free and fair, online platforms must prevent the online spread of election-related deceptive deepfakes and disinformation meant to prevent voters from voting or to deceive them based on fraudulent content.

***Existing laws maintaining "election integrity."***  As aptly noted in the analysis of this bill by the Assembly Elections Committee, the "use of false and deceptive information in campaigns to influence election outcomes is not a new phenomenon," nor are the laws "aimed at curbing such practices" new. Indeed, in 1850, the First Session of the California State Legislature created penalties for "deceiving [an elector] and causing him to vote for a different person for any office than such elector desired or intended to vote for." (Chapter 38, Statutes of 1850.) Existing California law has greatly elaborated on these initial legislative efforts. For example, provisions in the Elections Code prohibit the distribution of false and misleading information about qualifications to vote or about the days, dates, times, and places where voting may occur; prohibit the misleading use of government seals in campaign literature (Elections Code Section 18304); and prohibit coercing or deceiving people into voting in a way that is inconsistent with the person's intent (Elections Code Sections 18302, 18304, 18573 and 18573.5).

In the last five years, the Legislature has turned its attention to "materially deceptive" audio and visual materials that portray a candidate. For example, AB 730 (Chap. 493, Stats. 2019) responded to reports that so-called "deepfake" technology, a software that allows someone to produce audios and videos that look and appear remarkably real to even the most discerning person. For example, in 2018, BuzzFeed and the film director Jordan Peele published a very realistic-looking deepfake showing former President Obama calling then-President Donald Trump a "total and complete dipshit." Obama did not say that. Peele and BuzzFeed did not use the video to try to influence a political election – indeed halfway through the video the ruse was revealed – but to show the potential for abuse of deepfake technology. Responding to this and similar reports, AB 730 prohibited the distribution of materially deceptive audio or visual media with the intent to injure the candidate's reputation or to deceive a voter into voting for or against a candidate.

AB 730 was itself an amendment to California's "Truth in Political Advertising Act" of 1998, which had prohibited campaign material that deceptively altered a picture of a candidate (for example by superimposing one person's image upon another) unless the picture contained a disclaimer. This 1998 bill was introduced in response to the use of technologies like "photo

shopping," which now seem quaint compared to deepfakes, including deepfakes generated by artificial intelligence. The bill now before the Committee, like AB 730 before it, is apparently an effort to stay one step ahead of evolving technologies, which not only create more realistic-looking deceptions, but make it possible to quickly create, alter, and distribute fake images to millions of people in the blink of an eye (or the click of a mouse).

***This bill and existing law: who?*** AB 2655 elaborates upon and modifies existing law in a variety of ways. Most significant, existing law prohibits *a person, committee, or other entity* from distributing, with actual malice, "materially deceptive" audio or visual media of a candidate with the intent to injure the candidate's reputation or to deceive a voter into voting for or against the candidate. Existing law prohibits the distribution of such material within 60 days of the election in which the targeted candidate is running for office. The prohibitions in AB 2655, on the other hand, do not apply to the person or entity that created the materially deceptive material, but to the "large online platform" on which it is posted. AB 2655 requires the online platform to develop and implement procedures to block or prevent the posting of the covered content.

***This bill and existing law: what?*** This bill also differs from existing law in terms of covered content. Existing law applies only to manipulated material that misrepresents the "candidate" saying or doing something the candidate did not do or say. This bill similarly applies to content deceptively depicting the candidate, but also applies to images portraying an "elections official" doing or saying something they did not do or say, as well as images depicting a voting machine, ballot, voting site, or voting equipment in a materially false way. In addition, this bill would require the platform to label (but not necessarily block) materially deceptive content about "election processes" (as opposed to a specific candidate, election official, or voting site). Although the distinction between what material must be blocked versus what material must be labeled is not entirely clear, the intent of the author and sponsor is that the more the material singles out a particular candidate or election official, the more it must be blocked; whereas material that deals with "election processes" more generally need only be labeled. *The author has agreed to work with the Committee as the bill moves forward to clarify the distinction between the blocking and labeling requirements.*

***This bill and existing law: when?*** AB 2655 also expands and modifies the relevant time period that prohibitions are in force. Existing law prohibits someone from distributing deceptive material during the 60-day period before an election. This bill, however, requires the platform to block covered material a period beginning 120 days before the election and through the day of the election. However, if the deceptive material pertains to an election official, or deceptively depicts a voting machine, ballot, voting site, or property or equipment related to an election, the platform must also block the content for 60 days *after* the election. Presumably, this post-election period is intended to prevent false claims – similar to those made in 2020 – that the election process was irregular or otherwise "rigged." The labeling requirement covers an even larger time frame; it applies during the period beginning *one year* before the "election." The bill also requires labeling for the period beginning one year before an "election process." "Election processes" – as opposed to an "election" – is defined to include any government process "related" to an election, "including, but not limited to," elections, candidates, vote counting, redistricting, and proceedings or processes of the electoral college." Because an "election" has a known date, it should be fairly easy for the platform to figure out when the year-long labeling period starts. However, if the platform must also label one year prior to an "election process," when does a process like "redistricting" start? Does it start with each new census? Does it start when the legislative body (or in some states a commission) meet to draw up new district lines?

Moreover, the definition of "election process" is not limited to the items listed, expressly stating "including, but is not limited to,' those items. *As discussed above, the author has agreed to work with the Committee as the bill moves forward to clarify the distinction between materials that the platform is required to "block" and those it is required to "label."*

***This bill and existing law: how enforced?*** In addition to differences as to who, what, and when, this bill also differs in how violations would be enforced. Existing law permits only the "candidate" whose voice or likeness appears in the deceptive material to bring an action for injunctive relief, general or special damages, and reasonable attorney's fee and cost. However, under existing law the candidate bears the burden of establishing a violation by "clear and convincing evidence." Enforcement provisions in this bill are much different. The bill allows any "California resident" to report to the platform that content was not blocked or labeled as required. If the platform does not respond within 36 hours, *or if the resident disagrees with the response,* the resident may seek injunctive relief to compel compliance and, if the resident prevails, shall be awarded reasonable attorney's fees and costs. Thus, not only can any California resident – not just a person depicted or otherwise affected – seek injunctive relief, they apparently do not have the burden of proving a violation by clear and convincing evidence. If they "disagree" with the platform's response, that's enough; they can seek injunctive relief and a court would decide to issue on the likelihood of success on merits, the general rule for injunctive relief. *The author may wish to consider, as the bill moves forward, increasing the standard of proof to the higher clear and convincing evidence; and limiting who may seek relief.*

***First Amendment concerns****.* Because this bill imposes a *government* mandate that online platforms must block expressive material based upon its content, it implicates the First Amendment. The First Amendment provides that "Congress shall make no law . . . prohibiting the freedom of speech." As interpreted by the courts and incorporated against the states by the due process clause of the 14th Amendment, the First Amendment prevents any government entity (not just Congress) from enacting any law or adopting any policy that burdens freedom of speech. In addition, Article I, Section 2 of the California Constitution guarantees to every person the freedom to "speak, write, and publish his or her sentiments on all subjects, being responsible for the abuse of this right." Moreover, the First Amendment not only protects the right to speak, as a logical corollary it protects the "right to receive information and ideas." (*Stanley v Georgia* (1969) 394 U.S. 557, 564.) This bill would interfere with both the expression and reception of information based upon its content. Moreover, not only does this bill single out particular content, the content relates to political candidates and elections. This is potentially problematic because the First Amendment affords the "broadest protection" to the "discussion of public issues" and "political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." (*McIntyre v Ohio Election Commission* (1997) 514 U.S. 334.) It is difficult to imagine any content more related to "political expression" and "discussion of public issues" than content about candidates and elections. The fact that the bill restricts speech that is "materially deceptive" or "false" does not matter, for the U.S. Supreme Court has been unequivocal that the First Amendment protects even "false" speech. The remedy for false speech is more true speech, and false speech tends to call forth true speech. (*United States v Alvarez* (2012) 567 U.S. 709.)

***The bill will likely meet the "compelling interest" threshold, if not the "narrowly tailored" threshold.*** The right to free speech is not absolute. As Justice Holmes noted in a dissenting opinion over a century ago, the First Amendment does not protect a right to falsely cry fire in a crowded theater. (*Schenck v. United States* (1919) 249 U.S. 47.) The proponents of this bill may,

not unreasonably, think that pervasive disinformation about candidates and elections, especially during an election season, is just as dangerous. In reviewing the law, the Court would apply strict scrutiny. This means that government can impose even content-based restrictions on protected speech *if* they have a "compelling government interest" *and* they use "narrowly tailored means" to achieve that interest.

Even the opponents of this bill appear to concede that maintaining "election integrity" is a "weighty" and, presumably, "compelling" government interest. Therefore, it seems likely that if this bill is enacted and subsequently challenged, a court will accept that there is a "compelling interest" but still need to consider whether the "means" are "narrowly tailored." The opponents of this measure claim that it is *not* narrowly tailored. They contend that while covered platforms may have state-of-the-art tools that allow them to identify content that has been "digitally modified," there is no technology to determine if content is "materially deceptive." The bill defines "materially deceptive," in relevant part, to mean content that is "intentionally manipulated" so that it appears "authentic" but contains a "false portrayal" of a candidate, elected official, elections official, voting machine, ballot, voting site, other property or equipment related to an election, or elections process. The purpose of narrow tailoring is to ensure that no more speech is infringed or burdened than is necessary. However, the opponents of this bill – both the industry groups and the ACLU – believe that with no sure means to determine what is "materially deceptive," the platforms will err on the side of blocking content, thus burdening more speech than is necessary.

The findings and declarations in the bill state that the "labeling information required by this bill is narrowly tailored to provide consumers with factual information about the inauthenticity of particular images, audio, video, or text content in order to prevent consumer deception." Tellingly, there is no similar claim about the blocking requirement being narrowly tailored. In any event, it will be a court – not the findings and declarations of the bill – that will determine whether the bill is narrowly tailored. The court may consider, for example, if there are other less restrictive and more effective means of protecting election integrity.

***Section 230 concerns and "editorial discretion***." In addition to implicating the First Amendment, this bill may also be preempted by Section 230 of the federal Communications Decency Act. In relevant part, Section 230 provides two express protections for online platforms and their ability to moderate online content. First, Section 230 declares that an online platform cannot be held liable for content posted by third parties. The rationale for this immunity is premised on the idea that online platforms, unlike newspapers, do not exercise editorial discretion; rather, like telephone companies or "common carriers" they are merely a conduit for the expression of ideas by others. Those others, not the platform, are liable for any harm caused by the content. Second, somewhat in tension with this immunity, Section 230 expressly provides that online platforms are not liable if they block or remove material because they disapprove of its content. While it is important to remember that the First Amendment is distinct from Section 230, this protection flows from First Amendment principles. First, because the online platform is not a government actor, it cannot violate the First Amendment. Second, as a private actor, the platform has its own First Amendment right not to be associated with speech it finds objectionable. Some scholars have noted that the two protections in Section 230 are based on contrary premises. Immunity from liability from postings by third parties assumes that platforms *do not* exercise editorial discretion. Their right to remove content without liability, and their own free speech claims, on the other hand, assume that they *do* exercise editorial discretion. [For a concise overview of Section 230 and its intersection with the First Amendment, see Bollinger

and Stone, *Social Media, Freedom of Speech, and the Future of our Democracy* (Oxford University Press, 2022), especially pp. xxiii-xl; on efforts to reform Section 230, see pp.103-120.] Whatever the merits or demerits of Section 230 may be, it is federal law and appears to grant social media platforms the right to moderate content on their platforms and immunizes them from liability for content posted by the third party.

***Cases pending before the U.S. Supreme Court.*** In February of this year, the U.S. Supreme Court heard arguments about two state laws that may have far-reaching consequences for both First Amendment case law and the status of Section 230.  Largely in response to social media platforms barring former President Donald Trump from their platforms in the wake of the January 6 riots, both Texas and Florida enacted laws that limited the ability of social media platforms to control content on their platforms. The Florida law fines platforms if they ban a candidate for office in their state, and requires platforms to disclose information about their moderation policies. The Texas law prohibits platforms from removing content based on its "viewpoint." Both of these laws directly challenge the provision in Section 230 that expressly allows platforms to remove content. Both laws also raise First Amendment concerns about the platforms' right not to be associated with views with which they disagree. Both laws provide an interesting point of comparison with the bill under review: Texas and Florida *prohibit* a platform from denying access to certain people or blocking content on certain topics, while this bill would *require* the platforms to remove content. The Court is expected to issue a ruling in June of this year. How that ruling would affect this bill is unclear, especially given that this bill moves in the opposite direction of the Florida and Texas laws. However, if the Court decides in favor of the platforms – which many commentators think they will, at least in part – it might suggest that the Court believes that platforms should be given more freedom to self-moderate content without state interference. (*See* David McCabe, "Social media companies are bracing for Supreme Court arguments on Monday that could fundamentally alter how the platforms police their sites," *New York Times,* February 25, 2024; and Adam Liptak, "The Supreme Court seemed skeptical on laws in Florida and Texas," *Id.* February 26, 2024.)

Like constitutional and preemption questions, there is no obvious or certain answer as to whether this bill violates the First Amendment or Section 230. The Court may provide some insight soon enough.

***Proposed Author Amendments***. The author will take the following amendments to the definitions section of the bill:

> (a) ***"Artificial intelligence" means an engineered or machine-based system that varies in its level of autonomy and that can, for explicit or implicit objectives, infer from the input it receives how to generate outputs that can influence physical or virtual environments***.

> *(b)* (1) "Elections official" means any of the following persons, but only in their capacity as a person charged with holding or conducting an election, conducting a canvass, assisting with the holding or conducting of an election or a canvas, or performing another duty related to administering the provisions of this code:

> (A) An elections official as defined in Section 320.

> (B) The Secretary of State and their staff.

> (C) A temporary worker, poll worker, or member of a precinct board.

(D) Any other person charged with holding or conducting an election, conducting a canvass, assisting with the holding or conducting of an election or a canvas, or performing another duty related to administering the provisions of this code.

(2) The requirements of this chapter relating to content portraying an elections official apply only if the large online platform knows or should know that the person is an elections official.

*(c)* ~~(b)~~ "Election processes" means any government process related to an election, including, but not limited to, elections, candidates, vote counting, redistricting, and proceedings or processes of the electoral college.

*(d)* ~~(c)~~ (1) "Materially deceptive and digitally modified or created content" means an image or an audio or video recording or other digital content, including a chatbot, that has been intentionally manipulated such that all of the following conditions are met:

(A) (i) The digital content is the product of digital manipulation, ***including, but not limited to, artificial intelligence***, ~~artificial intelligence, or machine learning, including deep learning techniques, that merges, combines, replaces, or superimposes content onto an image or an audio or video recording, creating an image or an audio or video recording that appears authentic, or that otherwise generates an inauthentic image or an audio or video recording~~ that appears authentic, ~~and that~~ ***but*** contains a false portrayal of any of the following: a candidate for elective office, elected official, elections official, voting machine, ballot, voting site, other property or equipment related to an election, or elections process.

(ii) For purposes of this subdivision, "false portrayal" means the content would cause a reasonable person to have a fundamentally different understanding or impression of the content than the person would have if they were hearing or seeing ~~the unaltered, original~~ ***an authentic*** version of the content.

(B) The person or entity who attempted to post or send, or who did post or send, the content did so knowing the portrayal was false, or did so with reckless disregard for whether the portrayal was false. If the content is intentionally manipulated and contains a false portrayal as specified in subparagraph (A), there shall be a rebuttable presumption that the person or entity knew the portrayal was false or that they acted with reckless disregard for whether the portrayal was false.

(2) "Materially deceptive and digitally modified or created content" does not include any image or audio or video recording that contains only minor modifications that do not lead to significant changes to the perceived contents or meaning of the content. Minor changes include changes to the brightness or contrast of images, removal of background noise in audio, and other minor changes that do not impact the content of the image or audio or video recording.

*(e)* ~~(d)~~ "Large online platform" means a public-facing internet website, web application, or digital application, including a social network, video sharing platform, advertising network, or search engine that had at least 1,000,000 California users during the preceding 12 months.

***ARGUMENTS IN SUPPORT****:* The sponsor of this bill – The California Initiative for Technology and Democracy (CITED) – writes in support of AB 2655:

> California and the nation are entering the first-ever generative artificial intelligence (AI) election, in which disinformation powered by generative AI will pollute our information ecosystems like never before. . . Those trying to influence campaigns – conspiracy theorists, foreign states, online trolls, and candidates themselves – are already creating and distributing election-threatening deepfake images, audio, and video content in the US and around the world. . . Examples of this occurring in U.S. elections include Ron Desantis using AI-generated images to attack his opponent in his presidential run, foreign states caught attempting to influence American politics through social media, and just this month, a supporter of former President Trump creating a deepfake image of Trump with Black Americans designed to persuade Black voters to support Trump. These examples demonstrate the power of generative AI-fueled disinformation to skew election results and weaken our faith in our democracy.

> AB 2655 strikes the right balance by seeking to ban, for a strictly limited time before and after elections, the online spread of the worst deepfakes and disinformation maliciously intended to prevent voters from voting or getting them to vote erroneously based on fraudulent content. . . AB 2655's approach is narrowly tailored and does not extend the law to hot button controversies or inflammatory claims – it does not ask social media platforms to adjudicate controversial opinions post by post. It simply stops the use of obviously, demonstrably untrue and provably false content meant to impermissibly influence our elections at peak election times.

***ARGUMENTS IN OPPOSITION****:* Opponents of AB 2655 contend that the bill is unnecessary, unwise, unconstitutional, or some combination thereof. A coalition of groups representing the technology and information industry (industry opponents) contend that responsible digital service providers already "take aggressive steps to moderate dangerous and illegal content, consistent with their terms of service. The companies deliver on the commitments made to their user communities with a mix of automated tools and human review." For example, industry opponents point to the several online businesses that voluntarily participate in "the Digital Trust & Safety Partnership (DTSP) to develop and implement best practices to ensure a safer and more trustworthy internet, and have recently reported on the efforts to implement these commitments."

Industry opponents believe that AB 2655 falsely assumes that online platforms "definitively know whether any particular piece of content has been manipulated in such a way that is defined under the bill. While digital services may employ tools to identify and detect these materials with some degree of certainty, it is an evolving and imperfect science in its current form. AB 2655 also presumes that online platforms are an appropriate arbiter of deciding what constitutes accurate election information. However, most digital services are not equipped with the tools or expertise to make such judgments."

In addition to these practical and operational concerns, industry opponents also question the effectiveness of the bill's approach. For example, they point out that the bill only applies to the largest online platforms, specifically those with at least one million California users. Therefore the bill would not include platforms like Truth Social or Parler (which may relaunch this year) even though they are the ones that produce most of the concern. Opponents also point to the "sweeping" enforcement provisions, most notably the provision that allows "any California

resident" to notify the platform of content that, in the resident's opinion, should have been blocked or labeled. The bill, opponents note, would allow this resident "to bring a civil action against a large online platform if the platform has not responded within 36 hours or if the reporting resident disagrees with the platform's response." Confronted with such a restricted timeline and the threat of a civil action, the opponents contend, platforms will "remove significantly more content, including content that has *accurate* election information and content that is not materially deceptive."

While industry opponents concentrate on problems of implementation and effectiveness, ACLU California Action focuses on the bill's constitutional problems. ACLU agrees that protecting "election integrity is a weighty governmental interest," but under the First Amendment, "that interest may be accomplished . . . only by means that are narrowly tailored." ACLU points to ample First Amendment case law holding that discussion "of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." Quoting *Buckley v. Valeo* (1976), ACLU writes that the First Amendment affords "the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people," and, quoting *New York Times v Sullivan* (1964), ACLU notes that debate on public issues must remain "uninhibited, robust, and wide-open." Moreover, ACLU notes, the First Amendment affords protection "to even allegedly false statements about public officials and public figures." ACLU fears that faced with "the prospect of vetting millions of different posts to determine if they are 'materially deceptive and digitally modified or created,' many platforms may instead choose to aggressively censor or prohibit speech out of caution, including speech by candidates or relating to entire political topics." Citing *Brown v. Entertainment Merchants Association* (2011) and *Burstyn v Wilson* (1952), ACLU concludes that however much the technology may change, "the basic principles of freedom of speech and the press" do not vary with each new medium of communication. ACLU believes that the provisions of AB 2655, as currently drafted, "threaten to intrude on those rights and deter that vital speech."

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

California Initiative for Technology & Democracy (sponsor)
AFSCME California
Asian Americans Advancing Justice - Asian Law Caucus
Asian Americans and Pacific Islanders for Civic Empowerment
Asian Law Alliance
Bay Rising
California Clean Money Campaign
California Initiative for Technology & Democracy, a Project of California Common CAUSE
California State Sheriffs' Association
California Voter Foundation
Chinese Progressive Association
Courage California
Disability Rights California
Hmong Innovating Politics
Indivisible CA Statestrong
Inland Empire United
League of Women Voters of California

Partnership for the Advancement of New Americans
SEIU California
The Partnership for the Advancement of New Americans
Verified Voting

**Opposition**

ACLU California Action
Chamber of Progress
Computer and Communications Industry Association
Electronic Frontier Foundation
Internet.Works
NetChoice
Software & Information Industry Association
TechNet

**Opposition unless amended**

Oakland Privacy

**Analysis Prepared by**:  Tom Clark / JUD. / (916) 319-2334

# EXHIBIT 3

**SENATE JUDICIARY COMMITTEE**
**Senator Thomas Umberg, Chair**
**2023-2024  Regular  Session**

AB 2655 (Berman)
Version: June 11, 2024
Hearing Date: July 2, 2024
Fiscal: Yes
Urgency: No
CK

## SUBJECT

Defending Democracy from Deepfake Deception Act of 2024

## DIGEST

This bill establishes the Defending Democracy from Deepfake Deception Act of 2024, which requires a large online platform to block the posting or sending of materially deceptive and digitally modified or created content related to elections, during specified periods before and after an election. It requires these platforms to label certain additional content inauthentic, fake, or false during specified periods before and after an election and to provide mechanisms to report such content.

## EXECUTIVE SUMMARY

The rapid advancement of AI technology, specifically the wide-scale introduction of generative AI models, has made it drastically cheaper and easier to produce synthetic content – audio, images, text, and video recordings that are not real, but that are so realistic that they are virtually impossible to distinguish from authentic content, including so-called "deepfakes." In the context of election campaigns, such deepfakes can be weaponized to deceive voters into thinking that a candidate said or did something which the candidate did not, or otherwise falsely call election results into question. A series of bills currently pending before this Committee attempt to address these issues by restricting or labeling AI-altered or –generated content. However, this bill specifically targets social media platforms and such materially deceptive content on their platforms, requiring platforms to block and prevent it, label it, and provide mechanisms for reporting it.

The bill is sponsored by the California Initiative for Technology & Democracy. It is supported by various organizations, including the League of Women Voters of California and Disability Rights California. It is opposed by Oakland Privacy and various industry associations, including TechNet. The bill passed out of the Senate Elections and Constitutional Amendments Committee on a 6 to 1 vote.

*e. Enforcement*

The bill provides standing to candidates, elected officials, or elections officials who have made reports but who have either not received a timely response or who disagree with it to bring an action for injunctive and other equitable relief. The Attorney General, district attorneys, and city attorneys are also so authorized. A prevailing plaintiff is entitled to attorneys' fees and costs. Such actions are given precedence in the courts.

However, plaintiffs in such actions are required to establish a violation by clear and convincing evidence.

3. Legal concerns

Concerns have been raised about whether the bill runs afoul of federal statutory and constitutional law. Namely, whether the bill is preempted by Section 230 of the Communications Decency Act, 47 U.S.C. § 230 and the First Amendment to the United States Constitution.

*a. Section 230*

Section 230 does not apply to the *users* of social media (or the internet generally), but rather applies to the *platforms themselves*. In the early 1990s, prior to the enactment of Section 230, two trial court orders—one in the United States District Court for the Southern District of New York, and New York state court—suggested that internet platforms could be held liable for allegedly defamatory statements made by the platforms' users if the platforms engaged in any sort of content moderation (e.g., filtering out offensive material).[10] In response, two federal legislators and members of the burgeoning internet industry crafted a law that would give internet platforms immunity from liability for users' statements, even if they might have reason to know that statements might be false, defamatory, or otherwise actionable.[11] The result—Section 230—was relatively uncontroversial at the time, in part because of the relative novelty of the internet and in part because Section 230 was incorporated into a much more controversial internet regulation scheme that was the subject of greater debate.[12]

---

[10] *See Cubby, Inc. v. Compuserve, Inc.* (S.D.N.Y. 1991) 776 F.Supp. 135, 141; *Stratton Oakmont v. Prodigy Servs. Co.* (N.Y. Sup. Ct., May 26, 1995) 1995 N.Y. Misc. LEXIS 229, *10-14. These opinions relied on case law developed in the context of other media, such as whether bookstores and libraries could be held liable for distributing defamatory material when they had no reason to know the material was defamatory. (*See Cubby, Inc.*, 776 F. Supp. at p. 139; *Smith v. California* (1959) 361 U.S. 147, 152-153.)

[11] Kosseff, The Twenty-Six Words That Created The Internet (2019) pp. 57-65.

[12] *Id.* at pp. 68-73. Section 230 was added to the Communications Decency Act of 1996 (title 5 of the Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56), which would have imposed criminal liability on internet platforms if they did not take steps to prevent minors from obtaining "obscene or indecent" material online. The Supreme Court invalidated the CDA, except for Section 230, on the basis that it violated the First Amendment. (*See Reno v. ACLU* (1997) 521 U.S. 844, 874.)

AB 2655 (Berman)
Page 13 of 25

The crux of Section 230 is laid out in two parts. The first provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."[13] The second provides a safe harbor for content moderation, by stating that no provider or user shall be held liable because of good-faith efforts to restrict access to material that is "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected."[14]

Together, these two provisions give platforms immunity from any civil or criminal liability that could be incurred by user statements, while explicitly authorizing platforms to engage in their own content moderation without risking that immunity. Section 230 specifies that "[n]o cause of action may be brought and no liability may be imposed under any State law that is inconsistent with this section."[15] Courts have applied Section 230 in a vast range of cases to immunize internet platforms from "virtually all suits arising from third-party content."[16]

This bill provides for the potential liability of platforms for failing to block and prevent certain content from being posted or shared by users. If a user's content qualifies as materially deceptive, and other conditions are met, then the platform can be held liable for it.

Supporters point to the fact that monetary damages are not available and injunctive relief is essentially the only remedy available. The bill does allow for attorneys' fees and costs, which could be considered the type of liability that triggers Section 230's preemptive effect. The author has agreed to amendments that remove these remedies, leaving only injunctive relief. While courts, including the California Supreme Court, have found Section 230 immunity can extend to liability for solely injunctive relief, it is far from settled law in the country.[17]

In addition, the bill provide that if the platform engages in content moderation that restricts access to a candidate's deceptive portrayal of themselves (with the required disclosure and during the applicable time period), the platform can be held liable for that content moderation decision, regardless of the justification. As discussed below, the author has agreed to an amendment that removes this provision.

Ultimately, the bill is likely to face challenge on these grounds but these amendments work toward insulating the bill from such a challenge.

---

[13] *Id.*, § 230(c)(1).
[14] *Id.*, § 230(c)(1) & (2).
[15] *Id.*, § 230(e)(1) & (3).
[16] Kosseff, *supra*, fn. 13, at pp. 94-95; *see, e.g., Doe v. MySpace Inc.* (5th Cir. 2008) 528 F.3d 413, 421-422; *Carfano v. Metrospalsh.com, Inc.* (9th Cir. 2003) 339 F.3d 1119, 1125; *Zeran v. America Online, Inc.* (4th Cir. 1997) 129 F.3d 327, 333-334.
[17] *Hassell v. Bird* (2018) 5 Cal. 5th 522, 547.

### b. First Amendment

The First Amendment, as applied to the states through the Fourteenth Amendment, prohibits Congress or the states from passing any law "abridging the freedom of speech."[18] "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."[19] However, while the amendment is written in absolute terms, the courts have created a handful of narrow exceptions to the First Amendment's protections, including "true threats,"[20] "fighting words,"[21] incitement to imminent lawless action,[22] defamation,[23] and obscenity.[24] Moreover, the First Amendment not only protects the right to speak, as a logical corollary it protects the "right to receive information and ideas."[25] Expression on the internet is given the same measure of protection granted to in-person speech or statements published in a physical medium.[26]

"Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."[27] Content-based restrictions subject to strict scrutiny are "presumptively unconstitutional."[28] California courts have been clear that political expression in the context of campaigns of any manner should be given wide latitude:

> Hyperbole, distortion, invective, and tirades are as much a part of American politics as kissing babies and distributing bumper stickers and pot holders. Political mischief has been part of the American political scene since, at least, 1800.
>
> In any election, public calumny of candidates is all too common. "Once an individual decides to enter the political wars, he subjects himself to this kind of treatment. . . . [D]eeply ingrained in our political history is a tradition of free-wheeling, irresponsible, bare knuckled, Pier 6, political brawls." To endure the animadversion, brickbats and skullduggery of a given campaign, a politician must be possessed with the skin of a

---

[18] U.S. Const., 1st & 14th amends.
[19] *Ashcroft v. American Civil Liberties Union* (2002) 535 U.S. 564, 573.
[20] *Snyder v. Phelps* (2011) 562 U.S. 443, 452.
[21] *Cohen v. California* (1971) 403 U.S. 15, 20.
[22] *Virginia v. Black* (2003) 538 U.S. 343, 359.
[23] *R.A.V. v. St. Paul* (1992) 505 U.S. 377, 383.
[24] *Ibid.*
[25] *Stanley v Georgia* (1969) 394 U.S. 557, 564. Internal citations omitted
[26] *Reno v. ACLU* (1997) 521 U.S. 844, 870.
[27] *Citizens United v. FEC* (2010) 558 U.S. 310, 340. Internal citations omitted. It should be noted that while not controversial for the principle cited herein, this opinion is widely criticized for further tilting political influence toward wealthy donors and corporations.
[28] *Reed v. Town of Gilbert* (2015) 135 S.Ct. 2218, 2226 (*Reed*).

rhinoceros. Harry Truman cautioned would-be solons with sage advice about the heat in the kitchen.

Nevertheless, political campaigns are one of the most exhilarating phenomena of our democracy. They bring out the best and the worst in us. They allow candidates and their supporters to express the most noble and, lamentably, the most vile sentiments. They can be fractious and unruly, but what they yield is invaluable: an opportunity to criticize and comment upon government and the issues of the day.

The candidate who finds himself or herself the victim of misconduct is not without a remedy. Those campaign tactics which go beyond the pale are sanctionable under FPPC laws.

It is abhorrent that many political campaigns are mean-spirited affairs that shower the voters with invective instead of insight. The elimination from political campaigns of opprobrium, deception and exaggeration would shed more light on the substantive issues, resulting in a more informed electorate. It would encourage more able people to seek public office. But to ensure the preservation of a citizen's right of free expression, we must allow wide latitude.[29]

The United States Supreme Court has emphasized the extraordinary protection afforded to political speech:

Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Although First Amendment protections are not confined to "the exposition of ideas," "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs,… of course includ[ing] discussions of candidates…." This no more than reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. As the Court observed in *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971), "it can hardly be doubted that the constitutional guarantee has its fullest and

---

[29] *Beilenson v. Superior Court* (1996) 44 Cal. App. 4th 944, 954-55. Internal citations omitted.

AB 2655 (Berman)
Page 16 of 25

most urgent application precisely to the conduct of campaigns for political office."[30]

This protection does not end where the truth of the speech does. "Although false statements of fact, by themselves, have no constitutional value, constitutional protection is not withheld from all such statements."[31] For instance, in the seminal opinion in *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279-80, the court found the Constitution requires a rule that "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not. The Supreme Court has expounded on this principle, providing nuance based on the knowledge of the speaker:

> Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned. And since ". . . erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive' . . . ," only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions. For speech concerning public affairs is more than self-expression; it is the essence of self-government. The First and Fourteenth Amendments embody our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."
>
> The use of calculated falsehood, however, would put a different cast on the constitutional question. Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity. At the time the First Amendment was adopted, as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration. That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which "are no essential part of any exposition of ideas, and are

---

[30] *Buckley v. Valeo* (1976) 424 U.S. 1, 14-15. Internal citations omitted.
[31] *People v. Stanistreet* (2002) 29 Cal. 4th 497, 505.

of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . ." Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.[32]

As stated, a restriction can survive strict scrutiny only if it uses the least-restrictive means available to achieve a compelling government purpose.[33] This bill implicates both the right to speak about elections, as well as the right to receive information regarding them. The bill is aimed at protecting the integrity of our elections, arguably a clearly compelling governmental interest. The question is whether the bill sufficiently tailors its provisions to effectuating that goal.

The bill seeks to prevent "materially deceptive content," which is audio or visual media that is digitally created or modified, and that includes, but is not limited to, deepfakes and chatbots, such that it would falsely appear to a reasonable person to be an authentic record of the content depicted in the media, when it portrays candidates or elections officials doing or saying something they did not do or say. However, it does not target the person creating, posting, or sharing such content, but the platforms that host it. The bill attempts to tailor itself to the boundaries sketched out above. For instance, it imposes liability on the platforms only where they knew or should have known the content qualified as "materially deceptive content." However, this falls short of the malice standard set forth in *Sullivan*, establishing something akin to a negligence standard instead.

The bill does impose a malice requirement but on the person or entity who created the content, requiring that they created it knowing it was false or with reckless disregard for the truth. However, liability is not imposed on the creator, nor even the one posting or sharing the content, but the social media platform allowing it on their platform. Further undercutting this element, there is a rebuttable presumption that the person who created it acted with malice if the content causes "a reasonable person to have a fundamentally different understanding or impression of the content than the person would have if hearing or seeing an authentic version of the content." Therefore, the bill puts the onus on the platform to establish that the creator of the content, a person or entity the platform may not even have a relationship with or know, did not act with malice. Many of the relevant cases stress that the level of burden placed on a defendant to defend their political speech is a factor to consider. For instance, the following was stated in *Sullivan*:

A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions -- and to do so on pain of libel judgments virtually

---

[32] *Garrison v. Louisiana* (1964) 379 U.S. 64, 74-75. Internal citations omitted.
[33] *United States v. Playboy Entertainment Group* (2000) 529 U.S. 803, 813.

unlimited in amount -- leads to a comparable "self-censorship." Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars.[34]

While the plaintiff is required to prove their case by clear and convincing evidence, the standards above place a burden on platforms to establish facts potentially well outside their bounds of knowing.

The California Initiative for Technology & Democracy (CITED), the sponsor of the bill, argues the case:

> AB 2655's approach is narrowly tailored and does not extend the law to hot button controversies or inflammatory claims – it does not ask social media platforms to adjudicate controversial opinions post by post. It simply stops the use of obviously, demonstrably untrue and provably false content meant to impermissibly influence our elections at peak election times. It is therefore respectful of the protections of the First Amendment and avoids concerns based on Section 230 of the Communications Decency Act.

Writing in opposition, ACLU California Action assesses the issue:

> Digitally modified content or content created using artificial intelligence (AI) tools is also entitled to [First Amendment] protections, unless the content falls within recognized First Amendment exceptions such as libel or fraud. The "novelty of deepfake technology and the speed with which it is improving" do not justify relaxing the stringent protections afforded to political speech by the First Amendment. The Supreme Court has held that "whatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears."
>
> The law has long made clear that the First Amendment was intended to create a wide berth for political speech because it is the core of our democracy. The First Amendment provides robust protection for speech of all kinds. Speech that is false, confusing, or which presents content that some find abhorrent, nevertheless maintains its constitutional protections as a driver of free discourse. This remains so no matter what the

---

[34] *N.Y. Times Co. v. Sullivan*, at 279.

technology used to speak. Unfortunately, the provisions of AB 2655 as currently drafted threaten to intrude on those rights and deter that vital speech.

In response to these concerns, the author has agreed to amendments that remove the provision that applies this malice standard to the creators of the content and instead more closely hews the platform's basis for liability to the malice standard, holding the large online platform liable only if it knows that the materially deceptive content meets the requirements of the bill or acts with a reckless disregard for the truth.[35]

As the bill also requires platforms to allow certain potentially misleading content to be posted, the bill could be found to implicate the First Amendment rights of platforms in their editorial discretion. Two laws in Florida and Texas that similarly seek to prevent platforms from taking down certain content have been challenged. The consolidated case has been argued before the United States Supreme Court and an opinion is forthcoming. The 11th Circuit Court of Appeals laid out its assessment of the First Amendment implications of such laws:

> Social-media platforms like Facebook, Twitter, YouTube, and TikTok are private companies with First Amendment rights and when they (like other entities) "disclos[e]," "publish[]," or "disseminat[e]" information, they engage in "speech within the meaning of the First Amendment." More particularly, when a platform removes or deprioritizes a user or post, it makes a judgment about whether and to what extent it will publish information to its users—a judgment rooted in the platform's own views about the sorts of content and viewpoints that are valuable and appropriate for dissemination on its site. As the officials who sponsored and signed S.B. 7072 [the challenged Florida law] recognized when alleging that "Big Tech" companies harbor a "leftist" bias against "conservative" perspectives, the companies that operate social-media platforms express themselves (for better or worse) through their content-moderation decisions. When a platform selectively removes what it perceives to be incendiary political rhetoric, pornographic content, or public-health misinformation, it conveys a message and thereby engages in "speech" within the meaning of the First Amendment.
>
> Laws that restrict platforms' ability to speak through content moderation therefore trigger First Amendment scrutiny.[36]

---

[35] This amendment includes corresponding changes in the labeling section of the bill.
[36] *NetChoice, LLC v. AG, Fla.* (11th Cir. 2022) 34 F.4th 1196, 1210. Internal citations and quotations omitted.

As constitutional analysis is subject to changing norms and interpretations, especially in the more political charged federal judiciary of the day, it is inherently difficult to predict whether this law will be struck down for violating the protections of the First Amendment. However, it is safe to say it will likely face legal challenge and arguably be vulnerable thereto.

In order to insulate the bill from such challenge, the author has agreed to an amendment that simply provides that the bill does not apply to a candidate's portrayal of themselves doing or saying something that the candidate did not do or say, where it includes the required disclosure.

c.  *Additional concerns*

The bill raises a few additional concerns. First, the bill requires platforms to retain all content they have prevented or blocked or labeled pursuant to the bill. This forced retention of information raises some thorny legal issues and may interfere with existing consumer rights. For instance, the CCPA, as amended by the CPRA, grants a series of rights to consumers, including the right to delete information held by businesses. In addition, given that the retention provision is essentially a government mandate on private businesses to seize certain information of private individuals, Fourth Amendment issues arguably arise. Furthermore, the bill requires platforms to hand over the content to specified government entities and even "researchers," upon request. There is no limitation that there be evidence of a crime or some other justification and no probable cause necessary to be provided the information. In response, the author has agreed to an amendment to remove this retention requirement.

In addition, it is unclear what exactly is required by the bill's requirement to block or prevent the *sending* of materially deceptive content. This could be read to apply to private messaging features of these platforms, essentially requiring platforms to scan private communications. This would raise serious privacy concerns. In response, the author has agreed to amendments that remove the "sending" element of the bill.

In addition, groups in opposition raise concerns that the bill presupposes a level of sophistication for technology that can detect AI-generated or manipulated content that simply does not exist. A coalition of industry associations, including NetChoice writes in opposition:

> AB 2655 appears to be based on the false assumption that online platforms definitively know whether any particular piece of content has been manipulated in such a way that is defined under the bill. While digital services may employ tools to identify and detect these materials with some degree of certainty, it is an evolving and imperfect science in its current form. AB 2655 also presumes that online platforms are an appropriate arbiter of deciding what constitutes accurate election

information. However, most digital services are not equipped with the tools or expertise to make such judgments.

Oakland Privacy writes in opposition:

> The bill language offers that a technology company should be the judge, jury and executioner, although it may be unclear if the content is or is not generative AI-created and what role generative AI played in the content. It is unclear to us how any technology platform can be expected to know everything that every candidate in every city, county, state and federal election said and everywhere they went. Not to mention every other elected official in the state. If this is the basis for the removal of content by a technology platform, it is highly speculative and largely dependent on reports to the platform, which may be inaccurate, politically motivated, or malicious.
> We appreciate amendments to raise the bar for the knowledge level of online platforms. But we continue to have concerns on the other side of the spectrum: the removal of content that should not be removed and may well impact election results.
>
> In other words, the bill language is relying on two imprecise measures: technically scanning content for synthetic material with highly inaccurate tools, and real-life reports from the public, candidates and election officials and campaigns or chaos actors to power a broad censorship regime of blocking content. We cannot support that, even under the guise of defending democracy.

The opposition coalition also takes issue with the enforcement mechanism:

> [B]ecause AB 2655 is focused on enforcement against covered platforms and not the actors who are intentionally seeking to materially deceive other consumers, it is unlikely to meaningfully reduce the amount of election mis- and disinformation hosted online. While the June 11 amendments appear to attempt to address this issue, we do not believe the new language effectively resolves our concerns. For example, the bill now allows for a "rebuttable presumption" but still fails to effectively address and hold accountable the purveyors of deceptive content.

4. <u>Support</u>

CITED, the sponsor of the bill, writes:

> Those trying to influence campaigns – conspiracy theorists, foreign states, online trolls, and candidates themselves – are already creating and

distributing election-threatening deepfake images, audio, and video content in the US and around the world. This threat is not imaginary: generative AI has been used in various ways – most of them deeply deceptive – to influence the national elections in Slovakia, Bangladesh, Argentina, Pakistan, and elsewhere, including in our own country. Examples of this occurring in U.S. elections include Ron Desantis using AI-generated images to attack his opponent in his presidential run, foreign states caught attempting to influence American politics through social media, and just this month, a supporter of former President Trump creating a deepfake image of Trump with Black Americans designed to persuade Black voters to support Trump.

These examples demonstrate the power of generative AI-fueled disinformation to skew election results and weaken our faith in our democracy. We cannot let it undermine our elections here in California, and we are grateful you are leading the effort to try to stop it.

AB 2655 strikes the right balance by seeking to ban, for a strictly limited time before and after elections, the online spread of the worst deepfakes and disinformation maliciously intended to prevent voters from voting or getting them to vote erroneously based on fraudulent content. The bill also requires that other fake online content related to elections and elections processes (such as redistricting), which is also designed to undermine election procedures and democratic institutions, must be labeled as fake, again just for a limited time. The bill only applies to the largest online platforms with the greatest reach of potential election disinformation, and we believe it is fully implementable today based on tools these companies already possess. The companies covered by the bill's requirements are all already subject to similar requirements under the European Union's Digital Services Act, which is designed to, among other things, crack down on election interference.

A coalition of groups in support, including the American Federation of State, County, and Municipal Employees (AFSCME) and NextGen CA, write:

AB 2655 seeks to solve these problems by, for a limited time before and after elections, banning the online spread of the worst of the deepfakes and disinformation meant to prevent voters from voting or to deceive them based on fraudulent content, and requiring that other fake content to be labeled as such. The approach leans heavily on increasing transparency, with bans used at only the highest-leverage moments, making it narrowly tailored. Additionally, it does not extend the law to hot button controversies or inflammatory claims – just the depiction of demonstrably untrue and provably false content meant to impermissibly

influence our elections, at peak times – and is therefore implementable and respectful of the protections of the First Amendment.

Writing in support, the Northern California Recycling Association explains the need for the bill:

> California is entering its first-ever generative Artificial Intelligence (AI) election, in which disinformation powered by generative AI would and will pollute our information ecosystems like never before. Deepfakes are a powerful and dangerous tool in the arsenal of those that want to wage disinformation campaigns, and they have the potential to wreak havoc on our democracy by attributing speech and conduct to a person that is false or that never happened. Advances in AI make it easy for practically anyone to generate this deceptive content, making it that much more important that we identify and restrict its spread before it has the chance to deceive voters and undermine our democracy.

### **SUPPORT**

California Initiative on Technology and Democracy (sponsor)
AFSCME California
Asian Americans Advancing Justice - Asian Law Caucus
Asian Americans and Pacific Islanders for Civic Empowerment
Asian Law Alliance
Bay Rising
Board of Supervisors for the City and County of San Francisco
California Clean Money Campaign
California Environmental Voters
California State Sheriff's Association
California Voter Foundation
Center for Countering Digital Hate
Chinese Progressive Association
City and County of San Francisco Board of Supervisors
Courage California
Disability Rights California
Hmong Innovating Politics
Inland Empire United
League of Women Voters of California
Move (mobilize, Organize, Vote, Empower) the Valley
Nextgen California
Northern California Recycling Association
Partnership for the Advancement of New Americans
SEIU California
Techequity Action

Verified Voting
Young People's Alliance
Youth Power Project

## OPPOSITION

ACLU California Action
California Chamber of Commerce
Computer & Communications Industry Association
Electronic Frontier Foundation
Internet Works
Netchoice
Oakland Privacy
Software & Information Industry Association
Technet

## RELATED LEGISLATION

Pending Legislation:

SB 942 (Becker, 2024) establishes the California AI Transparency Act, requiring covered providers to create and make freely available an AI detection tool to detect content as AI-generated and to include disclosures in content generated by the provider's system. SB 942 is currently in the Assembly Judiciary Committee.

SB 970 (Ashby, 2024) ensures that media manipulated or generated by artificial intelligence (AI) technology is incorporated into the right of publicity law and criminal false impersonation statutes. The bill requires those providing access to such technology to provide a warning to consumers about liability for misuse. SB 970 was held on suspense in the Senate Appropriations Committee.

AB 2355 (Wendy Carrillo, 2024) requires committees that create, publish, or distribute a political advertisement that contains any image, audio, or video that is generated or substantially altered using artificial intelligence to include a disclosure in the advertisement disclosing that the content has been so altered. AB 2355 is currently in this Committee.

AB 2839 (Pellerin, 2024) prohibits a person, committee, or other entity from knowingly distributing an advertisement or other election communication that contains materially deceptive content, as defined and specified, with malice, except as provided, within 120 days of a California election, and in specified cases, 60 days thereafter. AB 2839 is currently in this Committee.

AB 2930 (Bauer-Kahan, 2024) requires, among other things, a deployer and a developer of an automated decision tool to perform an impact assessment for any automated

AB 2655 (Berman)
Page 25 of 25

decision tool the deployer uses that includes, among other things, a statement of the purpose of the automated decision tool and its intended benefits, uses, and deployment contexts. AB 2930 requires a deployer to, at or before the time an automated decision tool is used to make a consequential decision, notify any natural person that is the subject of the consequential decision that an automated decision tool is being used to make, or be a substantial factor in making, the consequential decision and to provide that person with, among other things, a statement of the purpose of the automated decision tool. AB 2930 is currently in this Committee.

AB 3211 (Wicks, 2024) establishes the California Provenance, Authenticity and Watermarking Standards Act, which requires a generative AI system provider to take certain actions to assist in the disclosure of provenance data to mitigate harms caused by inauthentic content, including placing imperceptible and maximally indelible watermarks containing provenance data into content created by an AI system that the generative AI system provider makes available. AB 3211 also requires a large online platform, as defined, to, among other things, use labels to prominently disclose the provenance data found in watermarks or digital signatures in content distributed to users on its platforms, as specified. AB 3211 is currently in the Senate Appropriations Committee.

<u>Prior Legislation</u>: AB 730 (Berman, Ch. 493, Stats. 2019) prohibited the use of deepfakes depicting a candidate for office within 60 days of the election unless the deepfake is accompanied by a prominent notice that the content of the audio, video, or image has been manipulated. Additionally, AB 730 authorized a candidate who was falsely depicted in a deepfake to seek rapid injunctive relief against further publication and distribution of the deepfake.

**<u>PRIOR VOTES:</u>**

Senate Elections and Constitutional Amendments Committee (Ayes 6, Noes 1)
Assembly Floor (Ayes 56, Noes 1)
Assembly Appropriations Committee (Ayes 11, Noes 1)
Assembly Judiciary Committee (Ayes 9, Noes 0)
Assembly Elections Committee (Ayes 6, Noes 1)
**************

# EXHIBIT 4

CONCURRENCE IN SENATE AMENDMENTS
AB 2655 (Berman and Pellerin)
As Amended  August 23, 2024
Majority vote

## SUMMARY

Requires large online platforms, as defined, to remove materially deceptive and digitally modified or created content related to elections, or to label that content, during specified periods before and after an election, if the content is reported to the platform, as specified.

**Senate Amendments**

1)  Provide that a large online platform is required to remove or label content only if that content is first reported to the platform by a California resident as being content that is covered by the provisions of this bill. Require the platform to remove or label the content no later than 72 hours after it is reported.

2)  Limit the bill's applicability to content related to elections in California, and to candidates for President and Vice President, statewide office, Board of Equalization, state Legislature, and United States (US) House of Representatives.

3)  Reduce the period of time during which materially deceptive content must be labeled such that the period begins six months before an election in California, instead of beginning one year before an election as was provided in the Assembly-approved version of this bill.

4)  Specify that the bill does not apply to a broadcasting station in either of the following circumstances:

    a)  When it distributes deceptively-altered media as part of its news coverage, as specified, if the media includes a clear acknowledgement that it is not accurately representative.

    b)  When it is paid to broadcast materially deceptive content if federal law requires the station to air the advertisement or if the station has its own prohibition and disclaimer requirements that are generally consistent with the requirements of this bill, as specified.

5)  Delete provisions of the bill that would have allowed a court to award reasonable attorney's fees and costs to a prevailing plaintiff party in an action brought under this bill.

6)  Delete a provision of the bill that would have required a platform to maintain a copy of any content that it blocks or labels under this bill for at least five years.

7)  Delete provisions of the bill that would have made it applicable to deceptive and digitally modified or created content related to redistricting.

8)  Recast various provisions of the bill to improve clarity, and make other clarifying, technical, and conforming changes.

9)  Add double-jointing language to avoid chaptering problems with AB 2839 (Pellerin) of the current legislative session.

## COMMENTS

The use of false and deceptive information in campaigns to influence election outcomes is not a new phenomenon. Laws aimed at curbing such practices and preserving the integrity of elections have a long history in California. In 1850, the First Session of the California State Legislature created penalties for election misconduct, including for "deceiving [an elector] and causing him to vote for a different person for any office than such elector desired or intended to vote for" (Chapter 38, Statutes of 1850).

Advancements in technology have made it increasingly simple to produce false and misleading media that closely resembles authentic content. Moreover, platforms like social media have facilitated the rapid dissemination of deceptive media to large audiences at minimal cost. Given these developments, the potential threat posed by manipulated media to future elections' integrity may be more significant than in the past.

Past legislative efforts have addressed concerns about manipulated media's use to deceive voters during elections. Those laws, however, are limited, and are designed primarily to target the harms to *candidates* that may result from the distribution of manipulated media of those candidates. In contrast, this bill aims to regulate materially deceptive and digitally altered media depicting not only candidates, but also elections officials and elected officials who are not candidates. Additionally, this bill targets media that portrays elections materials and equipment in materially deceptive ways. The author and supporters of this bill believe that these provisions will safeguard voters against deceitful media that could undermine trust in the electoral process.

The Legislature is considering a number of bills this year that seek to address deceptive and digitally altered elections-related content in an effort to protect the integrity of elections in California. While other legislation related to this topic applies broadly to the distribution of such content through various mediums, this bill specifically targets the distribution of deceptive content through online platforms, including social media. Recognizing that those online platforms can facilitate the rapid spread of deceptive content, this bill seeks to minimize that potential by obligating large online platforms to remove or label offending content.

In recognition that the regulation of the distribution of content can create free speech concerns, this bill contains various provisions that tailor the content to which it applies, such that it targets content that has the highest likelihood of deceiving voters and undermining electoral integrity. While that tailoring does limit the content that online platforms would be required to remove or label, it also adds additional factors that platforms must consider in order to identify content that is required to be removed or labeled under this bill.

Along with other limitations, this bill applies only to content that 1) is distributed during specified time periods around elections and election processes, 2) includes media relating to elections or the electoral process in specified ways, 3) that was intentionally manipulated digitally to be materially deceptive, and 4) that is not satire or parody. Each of these limitations adds additional factors that online platforms would need to consider when determining whether a specific communication must be removed or labeled by this bill. Given the number of elections and candidates in California at any given time, making the determinations at scale about which content must be removed or labeled will be considerably more challenging than making those determinations on a case-by-case basis in a court of law. Senate amendments, however, eliminated the requirements for platforms to proactively remove or label such content, and

instead impose an obligation on platforms to act only after a report has been made. Those amendments likely will reduce the burden that this bill creates on platforms to some degree.

A question could be raised about whether this bill is consistent with the right to freedom of speech that is guaranteed by the US and California constitutions. The US Supreme Court has ruled that even false statements are protected by the First Amendment (*United States v. Alvarez* (2012), 567 U.S. 709). When a law burdens core political speech, the restrictions on speech generally must be "narrowly tailored to serve an overriding state interest," *McIntyre v. Ohio Elections Commission* (1995), 514 US 334.

This bill targets deceptive content that could undermine trust in elections, prevent voters from voting, and distort the electoral process. The US Supreme Court generally has found that the protection of the integrity of elections is an overriding (or compelling) government interest (*Id.* at 349; *Burson v. Freeman* (1992) 504 U.S. 191, 199). A challenge of this bill on First Amendment grounds, then, likely would hinge on whether the court found this bill's provisions to be narrowly tailored. This bill includes provisions to limit its scope to communications posing the greatest threat to election integrity in an effort to tailor its provisions. Whether these limitations adequately protect this bill from a potential constitutional challenge is unclear. However, while these limitations may help protect the bill against a constitutional challenge, they may also make it harder for the bill to achieve its aims of limiting the spread of materially deceptive communications that have the potential to undermine election integrity.

The Senate amendments eliminate the requirement for platforms to proactively block or label deceptive content, and instead require platforms to address deceptive content only upon receiving reports from users about that content. The Senate amendments additionally make various changes in response to opposition concerns including narrowing the bill's applicability to broadcast stations and limiting the types of elections and candidates to which the bill applies, among other changes.

Please see the policy committee analysis for a full discussion of this bill.

**According to the Author**
"AB 2655 will ensure that online platforms restrict the spread of election-related deceptive deepfakes meant to prevent voters from voting or to deceive them based on fraudulent content. Deepfakes are a powerful and dangerous tool in the arsenal of those that want to wage disinformation campaigns, and they have the potential to wreak havoc on our democracy by attributing speech and conduct to a person that is false or that never happened. Advances in AI make it easy for practically anyone to generate this deceptive content, making it that much more important that we identify and restrict its spread before it has the chance to deceive voters and undermine our democracy."

**Arguments in Support**
The sponsor of this bill, the California Initiative for Technology & Democracy, writes in support, "Those trying to influence campaigns – conspiracy theorists, foreign states, online trolls, and candidates themselves – are already creating and distributing election-threatening deepfake images, audio, and video content in the US and around the world… AB 2655 strikes the right balance by seeking to ban, for a strictly limited time before and after elections, the online spread of the worst deepfakes and disinformation maliciously intended to prevent voters from voting or getting them to vote erroneously based on fraudulent content. The bill also requires that other fake online content related to elections and elections processes…which is also designed to

undermine election procedures and democratic institutions, must be labeled as fake, again just for a limited time. The bill only applies to the largest online platforms with the greatest reach of potential election disinformation, and we believe it is fully implementable today based on tools these companies already possess… AB 2655's approach is narrowly tailored and does not extend the law to hot button controversies or inflammatory claims…It simply stops the use of obviously, demonstrably untrue and provably false content meant to impermissibly influence our elections at peak election times. It is therefore respectful of the protections of the First Amendment and avoids concerns based on Section 230 of the Communications Decency Act."

**Arguments in Opposition**
A coalition of business and technology industry associations writes in opposition, "AB 2655 appears to be based on the false assumption that online platforms definitively know whether any particular piece of content has been manipulated in such a way that is defined under the bill. While digital services may employ tools to identify and detect these materials with some degree of certainty, it is an evolving and imperfect science in its current form. AB 2655 also presumes that online platforms are an appropriate arbiter of deciding what constitutes accurate election information. However, most digital services are not equipped with the tools or expertise to make such judgments. Because covered platforms are not privy to the intent and context behind each piece of content, they may inadvertently over-block or over-label material. This could lead to user frustration and the suppression of political speech. Political speech is fundamental to the First Amendment's purpose. Therefore, AB 2655 raises concerns about how its provisions could have a chilling effect on online speech and whether it can withstand constitutional scrutiny."

## FISCAL COMMENTS

According to the Senate Appropriations Committee:

1)  The Department of Justice (DOJ) indicates that it would incur costs of $911,000 in 2024-25, $1.4 million each in 2025-26 and 2026-27, $1.2 million in 2027-28, and $1 million annually thereafter, to implement the provisions of the bill (General Fund).

2)  By authorizing a claim by specified parties against a large online platform for failing to block or label specified content, this bill could result in an increased number of civil actions. Consequently, the bill could result in potentially significant cost pressures to the courts; the magnitude is unknown (Trial Court Trust Fund (TCTF)). The specific number of new actions that could be filed under the bill also is unknown; however, it generally costs about $1,000 to operate a courtroom for one hour. Courts are not funded on the basis of workload, and increased pressure on TCTF may create a need for increased funding for courts from the General Fund. The enacted 2024-25 budget includes $37 million in ongoing support from the General Fund to continue to backfill TCTF for revenue declines.

## VOTES:

**ASM ELECTIONS:  6-1-1**
**YES:**  Pellerin, Bennett, Berman, Cervantes, Low, Weber
**NO:**  Essayli
**ABS, ABST OR NV:**  Lackey

**ASM JUDICIARY:  9-0-3**
**YES:**  Kalra, Bauer-Kahan, Bryan, Connolly, Haney, Maienschein, McKinnor, Pacheco, Reyes

**ABS, ABST OR NV:** Dixon, Sanchez, Waldron

**ASM APPROPRIATIONS: 11-1-3**
**YES:** Wicks, Arambula, Bryan, Calderon, Wendy Carrillo, Mike Fong, Grayson, Haney, Hart, Pellerin, Villapudua
**NO:** Dixon
**ABS, ABST OR NV:** Sanchez, Jim Patterson, Ta

**ASSEMBLY FLOOR: 56-1-23**
**YES:** Addis, Aguiar-Curry, Alvarez, Arambula, Bains, Bauer-Kahan, Bennett, Berman, Boerner, Bonta, Bryan, Juan Carrillo, Wendy Carrillo, Connolly, Mike Fong, Gabriel, Garcia, Gipson, Grayson, Haney, Hart, Irwin, Jackson, Jones-Sawyer, Kalra, Lee, Low, Lowenthal, Maienschein, McCarty, McKinnor, Muratsuchi, Stephanie Nguyen, Ortega, Pacheco, Papan, Pellerin, Petrie-Norris, Quirk-Silva, Ramos, Rendon, Reyes, Rodriguez, Blanca Rubio, Santiago, Schiavo, Soria, Ting, Valencia, Ward, Weber, Wicks, Wilson, Wood, Zbur, Robert Rivas
**NO:** Dixon
**ABS, ABST OR NV:** Alanis, Calderon, Cervantes, Chen, Megan Dahle, Davies, Essayli, Flora, Vince Fong, Friedman, Gallagher, Holden, Hoover, Lackey, Mathis, Jim Patterson, Joe Patterson, Luz Rivas, Sanchez, Ta, Villapudua, Waldron, Wallis

**SENATE FLOOR: 31-9-0**
**YES:** Allen, Archuleta, Ashby, Atkins, Becker, Blakespear, Bradford, Caballero, Cortese, Dodd, Durazo, Eggman, Glazer, Gonzalez, Hurtado, Laird, Limón, McGuire, Menjivar, Min, Newman, Padilla, Portantino, Roth, Rubio, Skinner, Smallwood-Cuevas, Stern, Umberg, Wahab, Wiener
**NO:** Alvarado-Gil, Dahle, Grove, Jones, Nguyen, Niello, Ochoa Bogh, Seyarto, Wilk

**UPDATED**

VERSION: August 23, 2024

CONSULTANT: Ethan Jones / ELECTIONS / (916) 319-2094                FN: 0004820