1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA

3          SACRAMENTO DIVISION

4

| | |
|---|---|
| CHRISTOPHER KOHLS, | Case No. 2:24-cv-02527-JAM-CKD |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST AB 2655** |
| v. | |
| ROBERT A. BONTA, et al., | **EXTENDED ORAL ARGUMENT REQUESTED** |
| Defendants. | |

**Date**: August 5, 2025
**Time**: 1:00 p.m.
**Crtrm**: 6, 14th floor
**Judge:** John A. Mendez

| |
|---|
| THE BABYLON BEE, LLC, et al., |
| Plaintiffs, |
| v. |
| ROBERT A. BONTA, et al., |
| Defendants. |

| |
|---|
| RUMBLE, INC., et al., |
| Plaintiffs, |
| v. |
| ROBERT A. BONTA, et al., |
| Defendants. |

| |
|---|
| X CORP., |
| Plaintiff, |
| v. |
| ROBERT A. BONTA, et al., |
| Defendants. |

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................... 7

I.      AB 2655's Statutory Scheme and its Application to Plaintiffs................................ 7

        a.      The Removal Requirement ............................................................ 8

        b.      The Labeling Requirement............................................................. 9

        c.      The Reporting Requirement ........................................................ 10

        d.      The Enforcement Provisions ....................................................... 10

        e.      Exemptions................................................................................... 10

II.     AB 2655's Legislative History Acknowledges that the Statute Poses Numerous
        First Amendment and Section 230 Problems.......................................................... 11

III.    The Impact of AB 2655's Vague Terms and One-Sided Enforcement Regime..... 12

IV.     The Covered Platforms' Current Policies and Features Already Address Potentially
        Problematic Content in a Less Speech-Restrictive way........................................ 20

LEGAL STANDARD....................................................................................................... 23

ARGUMENT .................................................................................................................... 23

I.      AB 2655 Violates the First Amendment to the U.S. Constitution and Article 1,
        Section 2, of the California Constitution. .............................................................. 23

        a.      AB 2655 Impermissibly Interferes with the Content-Moderation Decisions
                of Covered Platforms while also Compelling their Speech. ...................... 24

        b.      Strict Scrutiny Applies because AB 2655 is a Content-, Viewpoint-, and
                Speaker-Based Speech Regulation.............................................................. 28

        c.      AB 2655 Fails Strict Scrutiny. ................................................................... 30

        d.      AB 2655 is a Prior Restraint on Speech..................................................... 33

        e.      AB 2655 Violates the Free Press Clause..................................................... 34

II.     AB 2655 Violates and is Preempted by 47 U.S.C. §§ 230(c)(1) and 230(c)(2)..... 35

        a.      AB 2655 Violates Section 230(c)(1).......................................................... 36

        b.      AB 2655 Violates Section 230(c)(2).......................................................... 38

III.    AB 2655 Violates the First and Fourteenth Amendments to the U.S. Constitution on Overbreadth and Vagueness Grounds. ................................................................. 39

IV.    Plaintiffs Satisfy the Remaining Factors for a Permanent Injunction. .................... 44

CONCLUSION ................................................................................................................. 44

1

## TABLE OF AUTHORITIES

2

3

**Page(s)**

4

**Cases**

5

*303 Creative LLC* v. *Elenis*,
   600 U.S. 570 (2023)............................................................................................................. 28

6

7

*Am. Trucking Associations, Inc.* v. *City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009)............................................................................................. 44

8

9

*Americans for Prosperity Found.* v. *Bonta*,
   594 U.S. 595 (2021)............................................................................................................. 32

10

*Anderson* v. *Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)............................................................................................................. 23

11

12

*In re Apple Inc. App Store Simulated Casino-Style Games Litig.*,
   625 F. Supp. 3d 971 (N.D. Cal. 2022), *appeal dismissed on other grounds and*

13

   *remanded sub nom., In re Facebook Simulated Casino-Style Games Litig.*,
   2024 WL 2287200 (9th Cir. May 21, 2024), *appeal dismissed*, 2024 WL

14

   2287200 (9th Cir. May 21, 2024)......................................................................................... 36

15

*Barnes* v. *Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009)............................................................................................. 37

16

17

*Berger* v. *City of Seattle*,
   569 F.3d 1029 (9th Cir. 2009)............................................................................................. 43

18

19

*Brown* v. *Entm't Merchants Ass'n*,
   564 U.S. 786 (2011)............................................................................................................. 27

20

*Bullfrog Films, Inc.* v. *Wick*,
   847 F.2d 502 (9th Cir. 1988)............................................................................................... 40

21

22

*Calise* v. *Meta Platforms, Inc.*,
   103 F.4th 732 (9th Cir. 2024)............................................................................................... 37

23

24

*City of Montebello* v. *Vasquez*,
   1 Cal. 5th 409 (2016) ......................................................................................................... 23n

25

*Com.* v. *Lucas*,
   34 N.E.3d 1242 (Mass. 2015) .............................................................................................. 43

26

27

*Delano Farms Co.* v. *Cal. Table Grape Com.*,
   4 Cal. 5th 1204 (2018) .................................................................................................. 23–24n

28

*Enigma Software Grp. USA, LLC* v. *Malwarebytes, Inc.*,
  946 F.3d 1040 (9th Cir. 2019)................................................................................................. 38

*Epic Games, Inc.* v. *Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023)................................................................................................... 43

*Fed. Commc'n Comm'n* v. *Fox Television Stations, Inc.*,
  567 U.S. 239 (2012)................................................................................................................ 40

*Flomo* v. *Firestone Nat. Rubber Co., LLC*,
  643 F.3d 1013 (7th Cir. 2011)................................................................................................ 41

*Garcia* v. *Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015)............................................................................................. 5, 33

*Gentile* v. *State Bar of Nev.*,
  501 U.S. 1030 (1991).............................................................................................................. 41

*Grimmett* v. *Freeman*,
  59 F.4th 689 (4th Cir. 2023)................................................................................................... 31

*Hassell* v. *Bird*,
  5 Cal. 5th 522 (2018) ............................................................................................................. 36

*Hunt* v. *City of Los Angeles*,
  638 F.3d 703 (9th Cir. 2011)....................................................................................... 39, 40, 42

*Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995).......................................................................................................... 24, 28

*Hustler Magazine, Inc.* v. *Falwell*,
  485 U.S. 46 (1988).................................................................................................................... 3

*Iancu* v. *Brunetti*,
  588 U.S. 388 (2019).......................................................................................................... 29, 30

*IMDb.com, Inc.* v. *Becerra*,
  962 F.3d 1111 (9th Cir. 2020)................................................................................................ 30

*Indus. Truck Ass'n, Inc.* v. *Henry*,
  125 F.3d 1305 (9th Cir. 1997)................................................................................................ 35

*Isaksen* v. *Mazu Publ'g Co.*,
  2005 WL 8176605 (E.D. Cal. Mar. 29, 2005) .................................................................... 5, 33

*Junior Sports Mags. Inc.* v. *Bonta*,
  80 F.4th 1109 (9th Cir. 2023)................................................................................................. 29

*Kaahumanu* v. *Haw.*,
  682 F.3d 789 (9th Cir. 2012).................................................................................................. 42

*Koala* v. *Khosla*,
931 F.3d 887 (9th Cir. 2019)..................................................................................................34

*Kohls* v. *Bonta*,
2024 WL 4374134 (E.D. Cal. Oct. 2, 2024) .....................................................................*passim*

*Living Vehicle, Inc.* v. *Kelley*,
2023 WL 2347442 (C.D. Cal. Jan. 20, 2023) ........................................................................33

*McIntyre* v. *Ohio Elections Comm'n*,
514 U.S. 334 (1995).........................................................................................................31, 33

*Minn. Voters All.* v. *Mansky*,
585 U.S. 1 (2018)..........................................................................................................42, 43

*Minneapolis Star & Trib. Co.* v. *Minn. Com'r of Revenue*,
460 U.S. 575 (1983)................................................................................................................34

*Moody* v. *NetChoice, LLC*,
603 U.S. 707 (2024)........................................................................................................*passim*

*N.Y. State Rifle & Pistol Ass'n* v. *Bruen*,
597 U.S. 1 (2022)....................................................................................................................34

*NAACP* v. *Button*,
371 U.S. 415 (1963)..........................................................................................................39, 43

*Nat'l Inst. of Fam. & Life Advocs.* v. *Becerra ("NIFLA")*,
585 U.S. 755 (2018).......................................................................................................26, 29, 30

*National Rifle Association* v. *Vullo*,
602 U.S. 175 (2024)................................................................................................................27

*Neb. Press Ass'n* v. *Stuart*,
427 U.S. 539 (1976)............................................................................................................5, 33

*New York Times* v. *Sullivan*,
376 U.S. 254 (1964)............................................................................................................1–2, 4

*Packingham* v. *North Carolina*,
582 U.S. 98 (2017)............................................................................................................5, 33

*PC Drivers Headquarters, LP* v. *Malwarebytes Inc.*,
371 F. Supp. 3d 652 (N.D. Cal. 2019) ...................................................................................38

*Radici* v. *Associated Ins. Companies*,
217 F.3d 737 (9th Cir. 2000)..............................................................................................35, 36

*Reed* v. *Town of Gilbert, Ariz.*,
576 U.S. 155 (2015)................................................................................................................29

*Republican Nat'l Comm.* v. *Google, Inc.*,
2023 WL 5487311 (E.D. Cal. Aug. 24, 2023) ......................................................................... 36

*Rickert* v. *State*,
168 P.3d 826 (Wash. 2007) ...................................................................................................... 31

*Riley* v. *Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
487 U.S. 781 (1988) .................................................................................................................... 2

*S. Cal. Darts Ass'n* v. *Zaffina*,
762 F.3d 921 (9th Cir. 2014) .................................................................................................... 23

*Sackett* v. *EPA*,
598 U.S. 651 (2023) .................................................................................................................. 41

*Smith* v. *California*
*361 U.S. 147, 154 (1959)* ........................................................................................................ 27

*SolarPark Korea Co.* v. *Solaria Corp.*,
2023 WL 4983159 (N.D. Cal. Aug. 2, 2023), *appeal dismissed*, 2023 WL
9860831 (9th Cir. Sept. 28, 2023).................................................................................... 33–34

*Sorrell* v. *IMS Health Inc.*,
564 U.S. 552 (2011) ............................................................................................................ 30, 31

*Ex parte Stafford*,
2024 WL 4031614 (Tex. Crim. App. Sept. 4, 2024) ............................................................... 31

*Tucson Woman's Clinic* v. *Eden*,
379 F.3d 531 (9th Cir. 2004), *abrogated on other grounds*, *Dobbs* v. *Jackson*
*Women's Health Org.*, 597 U.S. 215 (2022).......................................................................... 43

*United States* v. *Alvarez*,
567 U.S. 709 (2012) ...................................................................................................... 26, 27, 31

*United States* v. *Hansen*,
599 U.S. 762 (2023) .................................................................................................................. 39

*United States* v. *Stevens*,
559 U.S. 460 (2010) ............................................................................................................ 26, 27

*Village of Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982) .................................................................................................................. 39

*Washington Post* v. *McManus*,
944 F.3d 506 (4th Cir. 2019) ............................................................................................... 32, 33

*Williams-Yulee* v. *Fla. Bar*,
575 U.S. 433 (2015) .................................................................................................................. 31

*Wilton* v. *Seven Falls Co.*,
515 U.S. 277 (1995)..............................................................................................................44

*Wooley* v. *Maynard*,
430 U.S. 705 (1977)........................................................................................................24, 29

*X Corp.* v. *Bonta*,
116 F.4th 888 (9th Cir. 2024)..................................................................25, 28, 29, 30, 44

*Zango, Inc.* v. *Kaspersky Lab, Inc.*,
568 F.3d 1169 (9th Cir. 2009)..............................................................................................38

*Zarate* v. *Younglove*,
86 F.R.D. 80 (C.D. Cal. 1980)............................................................................................27

**Statutes**

17 U.S.C. § 512.........................................................................................................................19

47 U.S.C. § 230...................................................................................................................*passim*

Cal. Elec. Code § 320..............................................................................................................8n

Cal. Elec. Code §§ 20510–20520...................................................................................*passim*

Cal. Elec. Code § 359.5............................................................................................................8n

Fed. R. Civ. P. 56.....................................................................................................................23

U.S. Const. art. VI, cl. 2..........................................................................................................35

1

## **INTRODUCTION**

2

Plaintiffs X Corp.; Rumble Inc. and Rumble Canada Inc. (collectively, "Rumble");

3

Christopher Kohls; The Babylon Bee ("The Bee"); and Kelly Chang Rickert bring this action

4

challenging the constitutionality and legal validity of California Assembly Bill No. 2655 ("AB

5

2655"), which is codified in law at Sections 20510–20520 of the California Election Code.[1]

6

AB 2655 requires large online platforms, like X and Rumble (collectively, the "covered

7

platforms"), to remove and alter (with a label)—and to create a reporting mechanism to facilitate

8

the removal and alteration of—certain content about candidates for elective office, elections

9

officials, and elected officials, of which the State of California disapproves and deems to be

10

"materially deceptive."[2]  It impermissibly replaces the judgments of covered platforms about what

11

content belongs on their platforms with the judgments of the State.  And it imposes liability on the

12

covered platforms if their judgments about content moderation contradict those imposed by the

13

State.  As such, AB 2655 violates the First and Fourteenth Amendments of the United States

14

Constitution; the free speech protections of Article I, Section 2, of the California Constitution; and

15

the immunity provided to "interactive computer services" under Section 230 of the

16

Communications Decency Act, 47 U.S.C. § 230(c).

17

Taken as a whole, AB 2655 creates an enforcement system that incentivizes covered

18

platforms to err on the side of removing and/or labeling any content that presents even a close call

19

as to whether it is "materially deceptive" and otherwise meets the statute's requirements.  This

20

system will inevitably result in the censorship of wide swaths of valuable political speech and

21

commentary—such as the content that Kohls, The Bee, and Rickert have disseminated through

22

social media—and will limit the type of "uninhibited, robust, and wide-open" "debate on public

23

issues" that core First Amendment protections are designed to ensure.  *New York Times* v. *Sullivan*,

24

---

25

[1] All statutory references (e.g., "Section _") are to sections of the California Election Code, unless specified otherwise.

26

For the convenience of the Court, AB 2655 is provided as Exhibit 1 to the Declaration of Joel Kurtzberg in Support of Plaintiffs' Motions for Summary Judgment Against AB 2839 and AB 2655, dated March 7, 2025 ("Kurtzberg Decl.").

[2] The statute defines "materially deceptive content" as "audio or visual media that is digitally created or modified, and

27

that includes, but is not limited to, deepfakes and the output of chatbots, such that it would falsely appear to a reasonable person to be an authentic record of the content depicted in the media."  § 20512(i)(1).

28

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

376 U.S. 254, 270 (1964).  As the United States Supreme Court has recognized, our First Amendment makes a "profound national commitment" to protecting such debate, even if it often "include[s] vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."  *Id.*

AB 2655's problematic enforcement system provides expedited causes of action for injunctive and other equitable relief to the California Attorney General, every California district attorney, every California city attorney, candidates for elective office, elections officials, and elected officials, to force covered platforms to remove or label certain "materially deceptive content" and comply with the statute's reporting requirement.  Even if the covered platform has a robust process for investigating reported content, it will be subject to suit for "injunctive or other equitable" relief if it does not provide a detailed response to takedown or labeling requests within 36 hours or remove or label the reported content within 72 hours.  *See* §§ 20515(b), 20516.  Covered platforms may be sued under the statute if governmental officials or candidates think they have not censored or labeled enough content; but not if they have arguably censored or labeled too much content.  The result is a system that highly incentivizes platforms to remove or label any content that presents a close call to avoid lawsuits altogether.

AB 2655 suffers from a compendium of serious First Amendment infirmities.  AB 2655 both discriminates based on content and compels speech—something that the Supreme Court has long and unequivocally condemned.  *Riley* v. *Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 790–91 (1988).  And as the Supreme Court recently held, in no uncertain terms, online platforms' content-presentation decisions are themselves "protected speech."  *Moody* v. *NetChoice, LLC*, 603 U.S. 707, 744 (2024).  As this Court previously recognized, "[w]hatever the challenges of applying the Constitution to ever-advancing technology," the "the basic principles of the First Amendment do not vary."  *Kohls* v. *Bonta*, 2024 WL 4374134, at \*8 (E.D. Cal. Oct. 2, 2024).[3] Because AB 2655 impermissibly replaces the judgments of the covered platforms about what speech may be permitted on their platforms with those of the government, it cannot be reconciled

---

[3] Unless otherwise indicated, emphases in quotes are added and internal citations and quotations are omitted.

1    with the Supreme Court's decision in *Moody*.

2    AB 2655 is facially inconsistent with numerous significant First Amendment holdings by

3    the Supreme Court in *Moody*—specifically, (i) it is not a "valid, let alone substantial" interest for a

4    state to seek "to correct the mix of speech" that "social-media platforms present," 603 U.S. at 740;

5    (ii) a "State 'cannot advance some points of view by burdening the expression of others,'" *id.* at

6    742 (quoting *Pac. Gas & Elec. Co.* v. *Pub. Utilities Comm'n of California*, 475 U.S. 1, 20 (1986));

7    (iii) the "government may not, in supposed pursuit of better expressive balance, alter a private

8    speaker's own editorial choices about the mix of speech it wants to convey," *id.* at 734; (iv) "it is

9    no job for government to decide what counts as the right balance of private expression—to 'un-

10   bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences,"

11   which is a "principle [that] works for social-media platforms as it does for others," *id.* at 719; and

12   (v) "[h]owever imperfect the private marketplace of ideas," a "worse proposal" is "the government

13   itself deciding when speech [is] imbalanced, and then coercing speakers to provide more of some

14   views or less of others," *id.* at 733.

15   At its core, AB 2655 contravenes the First Amendment's staunch protection of core political

16   speech. By imposing wholesale prohibitions on a specific category of speech under threat of

17   enormous liability, AB 2655 "acts as a hammer instead of a scalpel," *Kohls*, 2024 WL 4374134, at

18   *8, greatly incentivizing covered platforms to censor ***all*** content that could even arguably fall within

19   the statute's purview, including the political content of Kohls, The Bee, and Rickert, to avoid

20   substantial enforcement costs. This will, if allowed to go into effect, severely chill important

21   political speech—specifically, the use of exaggerated or unfavorable visual means to undermine

22   and combat political opponents, a mode of expression ingrained in the historical fabric of U.S.

23   political commentary and subject to the strongest of First Amendment protections. *See Hustler*

24   *Magazine, Inc.* v. *Falwell*, 485 U.S. 46, 54–55 (1988) ("it is clear that our political discourse would

25   have been considerably poorer without" the "graphic depictions and satirical cartoons [that] have

26   played a prominent role in public and political debate"); *see Kohls*, 2024 WL 4374134, at *5

27   (recognizing that "YouTube videos, Facebook posts, and X tweets are the newspaper

28   advertisements and political cartoons of today, and the First Amendment protects an individual's

1  right to speak regardless of the new medium these critiques may take").

2  There is a long history of the strongest of First Amendment protections for speech critical

3  of government officials and candidates for public office that includes tolerance for potentially false

4  speech made in the context of such criticisms.  And there is a long history of skepticism of any

5  governmental attempts to regulate such content, no matter how well-intentioned they may be.  The

6  First Amendment "presupposes that right conclusions are more likely to be gathered out of a

7  multitude of tongues, than through any kind of authoritative selection.  To many this is, and always

8  will be, folly; but we have staked upon it our all." *Sullivan*, 376 U.S. at 270 (quoting *United States*

9  v. *Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (Hand, J.)).  AB 2655 runs counter to

10  these principles by attempting to impose by "authoritative selection" the permissible content on

11  covered platforms, rather than allowing the "multitude of tongues" engaging in political debate and

12  commentary on those platforms, such as those of Kohls, The Bee, and Rickert, to do so.

13  AB 2655 imposes further unconstitutional content-, viewpoint-, and speaker-based speech

14  restrictions.  Its requirements apply to specific content (only the election-related "materially

15  deceptive content" targeted by the statute), viewpoints (only content about candidates for office

16  that is negative), and speakers (only covered platforms, but not smaller platforms, broadcasting

17  stations, online newspapers, and magazines)—and no exception applies here to the longstanding

18  rule that such regulations trigger strict scrutiny, or in the case of viewpoint-based restrictions, *per*

19  *se* invalidity.

20  Yet California cannot show, as is its burden, that the statute is narrowly tailored to its

21  purpose "in protecting [] free and fair elections," *see* § 20511(e), or that no less-speech-restrictive

22  alternatives would serve that purpose.  Indeed, X Corp. already provides one such alternative—X's

23  "Community Notes" feature—as legislators opposed to AB 2655 have already recognized.

24  Plaintiffs' Statement of Undisputed Facts ("PSUF") ¶¶ 116–22 (Declaration of X Corp.'s Strategy

25  and Operations Team in Support of Plaintiffs' Motion for Summary Judgment Against AB 2655

26  ("X Corp. S&O Decl."), dated March 7, 2025, ¶¶ 19–21; Kurtzberg Decl. Ex. 2 (*Defending*

27  *Democracy from Deepfake Deception Act of 2024: Hearing on AB 2655 Before the Assemb.*

28  *Standing Comm. on Elections*, 2023–2024 Reg. Sess. (Cal. Apr. 10, 2024)) at 7–8 (statements of

MEMORANDUM OF POINTS AND                    4
AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

Bill Essayli, Assemb. Member)). And Meta has recently announced that it will be adopting a similar approach to content moderation as well. *See* PSUF ¶ 123 (X Corp. S&O Decl. Ex. 10) (covered platform Meta announcing that it will begin providing a Community Notes feature).

AB 2655 also imposes a system of prior restraint on speech in cyberspace, "the most serious and the least tolerable infringement on First Amendment rights" in "the most important place[] for the exchange of views, today." *Neb. Press Ass'n* v. *Stuart*, 427 U.S. 539, 559 (1976); *Packingham* v. *North Carolina*, 582 U.S. 98, 104 (2017). The statute mandates the creation of a system designed to allow for expedited "takedowns" of speech that the State has targeted for removal from covered platforms before publication. *See Garcia* v. *Google, Inc.*, 786 F.3d 733, 747 (9th Cir. 2015) (forcing Google through a "takedown order" to remove content previously published on YouTube before a final determination that the content was unprotected amounted to a "classic prior restraint on speech"). The government is involved in every step of that system: it dictates the rules for reporting, defining, and identifying the speech targeted for removal; it authorizes state officials (including Defendants here) to sue for removal; and, through the courts, it makes the ultimate determination of what speech is permissible. Rather than allow covered platforms to make their own moderation decisions, it authorizes the government to substitute its judgment for those of the platforms. Accordingly, through the expedited causes of action authorized under Sections 20515(b) and 20516, political speech can be enjoined before even a "final judicial determination" that the "speech is unprotected." *Isaksen* v. *Mazu Publ'g Co.*, 2005 WL 8176605, at *3 (E.D. Cal. Mar. 29, 2005) (citing *Vance* v. *Universal Amusement Co.*, 445 U.S. 308 (1980)) (denying motion for preliminary injunction to remove already published speech because it would have constituted a prior restraint).

So too does AB 2655 violate the Free Press Clause of the United States Constitution, by imposing burdens on covered platforms that it does not impose on other platforms and press outlets. AB 2655 thus triggers strict scrutiny under the Free Press Clause, which it cannot withstand.

AB 2655 also directly contravenes the immunity provided to the covered platforms by 47 U.S.C. §§ 230(c)(1) and 230(c)(2), which prohibits (i) treating interactive computer service providers as the "publisher or speaker of any information provided by another information content

1   provider," *id.* § 230(c)(1), and (ii) holding interactive computer service providers liable "on

2   account" of "any action taken to enable or make available to information content providers or

3   others the technical means to restrict access to [objectionable] material," *id.* § 230(c)(2)(B).

4          *First*, in violation of Section 230(c)(1), by providing causes of action for "injunctive or

5   other equitable relief against" the covered platform to remove or (by adding a label) to alter certain

6   content posted on the platform by its users (*see* §§ 20515(b), 20516), AB 2655 imposes liability on

7   covered platforms by holding them responsible for the users' content on their platforms.  It requires

8   removal and labeling of content that the State disfavors (*i.e.*, certain "materially deceptive content")

9   and requires removal and labeling of such content if the covered platforms fail to comply.  AB 2655

10  thus treats covered platforms "as the publisher or speaker of information provided by another

11  information content provider," in contravention of the immunity afforded by 47 U.S.C. § 230(c)(1).

12         *Second*, in violation of Section 230(c)(2)(B)'s prohibition on liability for "action[s] taken

13  to enable or make available to information content providers or others the technical means to

14  restrict access to [objectionable] material," AB 2655 provides causes of action against covered

15  platforms that, despite attempting to comply with the reporting requirement, do not, in the

16  government's view, satisfy "subdivision (a) of Section 20515."  § 20516.  In other words,

17  attempting to comply with the statute's reporting requirement (*i.e.*, by creating a reporting

18  requirement for users to report content covered by the statute) *is* an action immunized by Section

19  230(c)(2)(B).  Violating that immunity, AB 2655 imposes liability on any covered platform that

20  takes such action in a manner deemed insufficient by the state.

21         AB 2655 also violates the First and Fourteenth Amendments of the U.S. Constitution on

22  overbreadth and vagueness grounds.  AB 2655's requirements are so vague and unintelligible that

23  covered platforms and content creators cannot understand how to comply with them, and covered

24  platforms will thus over-censor speech, such as that of Kohls, The Bee, and Rickert, to avoid costly

25  litigation over countless judgment calls surrounding whether the statute prohibits particular pieces

26  of content.  In addition, the statute's vagueness would allow any politically driven enforcers to

27  apply the law in a manner that discriminates against core political speech based on its content and

28  viewpoint.

For these reasons, as well as those set forth below, AB 2655 violates the First and Fourteenth Amendments of the United States Constitution and Article 1, Section 2, of the California Constitution, and directly conflicts with, and is thus preempted by, the immunity afforded by 47 U.S.C. §§ 230(c)(1) and 230(c)(2). Plaintiffs respectfully ask this Court grant their motion for summary judgment, declare AB 2655 unconstitutional, and permanently enjoin its enforcement.

## STATEMENT OF FACTS

### I.  AB 2655's Statutory Scheme and its Application to Plaintiffs.

AB 2655 covers "large online platform[s]," including "public-facing internet website[s]," "web application[s]," "digital application[s]," "video sharing platform[s]," "advertising network[s]," "search engine[s]," or "social media platform[s] as defined in Section 22675 of the Business and Professions Code" that "had at least 1,000,000 California users during the preceding 12 months." § 20512(h). X Corp. owns and operates the X platform, and Rumble Inc., which wholly owns Rumble Canada Inc., owns and operates the Rumble video sharing platform. PSUF ¶¶ 107–08 (X Corp. S&O Decl. ¶ 3; Rumble Declaration in Support of Plaintiffs' Motion for Summary Judgment Against AB 2655 ("Rumble Decl."), dated March 7, 2025, ¶ 3). X qualifies as a "social media platform" (as defined in Section 22675 of the Business and Professions Code) and "video sharing platform, and Rumble qualifies as a "video sharing platform." PSUF ¶¶ 111– 12 (X Corp. S&O Decl. ¶¶ 3–4; Rumble Decl. ¶ 14). Both X and Rumble are "public-facing internet website[s]" and "web application[s]." *Id*. Kohls, The Bee, and Rickert use these and other covered platforms to speak. PSUF ¶¶ 17, 61, 77 (Declaration of Seth Dillon In Support of Plaintiffs' Motions for Summary Judgment Against AB 2839 and AB 2655 ("Dillon Decl."), dated March 7, 2025, ¶ 24; Declaration of Christopher Kohls in Support of Plaintiffs' Motions for Summary Judgment Against AB 2839 and AB 2655 ("Kohls Decl."), dated March 5, 2025, ¶ 92; Declaration of Kelly Chang Rickert in Support of Plaintiffs' Motions for Summary Judgment Against AB 2839 and AB 2655("Rickert Decl."), dated March 6, 2025, ¶ 15).

AB 2655 has five main components: (i) a **Removal Requirement**, whereby covered platforms must identify and remove certain "materially deceptive content" about "candidate[s] for

1  elective office,"[4] "elections official[s],"[5] and "elected official[s],"[6] § 20513; (ii) a **Labeling**

2  **Requirement**, whereby covered platforms must label certain "materially deceptive content,"

3  § 20514; (iii) a **Reporting Requirement**, whereby covered platforms must provide a mechanism

4  to report content for such removal or labeling, and must respond to the report within 36 hours,

5  § 20515(a); (iv) **Enforcement Provisions**, whereby such persons and California government

6  officials under certain conditions may sue the covered platforms to comply with the Removal and/or

7  Labeling Requirements, §§ 20515(b), 20516; and (v) **Exemptions** for certain entities and content,

8  §§ 20513(d), 20519. The law defines "materially deceptive content" as "digitally created or

9  modified" media that "would falsely appear to a reasonable person to be an authentic record."

10  § 20512(i)(1). But "materially deceptive content" doesn't include "only minor modifications that

11  do not significantly change the perceived contents or meaning of the content." § 20512(i)(2).

12               a.  The Removal Requirement

13       AB 2655's Removal Requirement mandates that covered platforms "develop and

14  implement procedures" that "use state-of-the-art techniques to identify and remove materially

15  deceptive content if *all* of the following conditions are met," **§ 20513(a)**:

16  • "The content is reported pursuant to [Section 20515(a)]," **§ 20513(a)(1)**;

17  • The "materially deceptive content is any of the following:"

18          o  "A candidate for elective office portrayed as doing or saying something that the

19             candidate did not do or say and that is reasonably likely to harm the reputation or

20             electoral prospects of a candidate[,]" **§ 20513(a)(2)(A)**;

21

---

22  [4] While AB 2655 does not define "elective office," "[c]andidate" means any person running for President or Vice

23  President of the United States, any person running for the office of Superintendent of Public Instruction, or any person running for a voter-nominated office as defined in Cal. Elec. Code § 359.5 (*see* § 20512(c)), which means a "congressional or state elective office for which a candidate may choose to have his or her party preference or lack of

24  party preference indicated upon the ballot" and includes a Governor, Lieutenant Governor, Secretary of State, Controller, Treasurer, Attorney General, Insurance Commissioner, Member of the State Board of Equalization, United

25  States Senator, Member of the United States House of Representatives, State Senator, and Member of the Assembly.

26  [5] "Elections official" means (i) the California Secretary of State or (ii) an elections official as defined by Cal. Elec. Code § 320 (§ 20512(g)), which is a (a) "clerk or any person who is charged with the duty of conducting an election,"

27  or (b) "county clerk, city clerk, registrar of voters, or elections supervisor having jurisdiction over elections within any county, city, or district within the state."

28  [6] AB 2655 does not define "elected official."

  o "An elections official portrayed as doing or saying something in connection with the performance of their elections-related duties that the elections official did not do or say and that is reasonably likely to falsely undermine confidence in the outcome of one or more election contests[,]" **§ 20513(a)(2)(B)**; or

  o "An elected official portrayed as doing or saying something that influences an election in California that the elected official did not do or say and that is reasonably likely to falsely undermine confidence in the outcome of one or more election contests[,]" **§ 20513(a)(2)(C)**;

- The content is posted during the 120 days leading up to an election and through the election day, and—for certain content—also through the 60th day following the election, **§§ 20513(a)(3), 20513(e)**; and

- The covered platform "knows or acts with reckless disregard for the fact that the content meets" Section 20513's requirements, **§ 20513(a)(4)**.

  If content "is determined" to meet Section 20513(a)'s requirements, the covered platform must remove the content immediately and no later than 72 hours following the report. **§ 20513(b)**.

    b. The Labeling Requirement

  AB 2655's Labeling Requirement mandates that covered platforms develop and implement procedures using state-of-the-art techniques to identify materially deceptive content and for labeling such content if *all* of the following conditions are met, **§ 20514(a)**:

- The content is reported pursuant to Section 20515(a), **§ 20514(a)(1)**;

- The materially deceptive content is either (i) encompassed by Section 20513(a), but is posted outside Section 20513(e)'s applicable time periods or (ii) appears within an advertisement or election communication (*see* §§ 20512(a), 20512(e)) and is not subject to Section 20513, **§ 20514(a)(2)**; and

- The covered platform knows or acts with reckless disregard for the fact that the materially deceptive content meets Section 20514's requirements, **§ 20514(a)(3)**.

  If content "is determined" to meet Section 20514(a)'s requirements, the covered platform must label the content immediately and no later than 72 hours following a report. **§ 20514(b)**. The

1  label must contain the language set forth in Section 20514(c) and must provide users with

2  "additional explanation" about the content.  **§§ 20514(c)–(d)**.  The Labeling Requirement applies

3  during the period beginning six months before the election and through the election, and—for

4  certain content—also through the 60th day following the election.  **§ 20514(e)**.

### c.  The Reporting Requirement

6     AB 2655's Reporting Requirement mandates that covered platforms provide an "easily

7  accessible way" for California residents to report content subject to the Removal and Labeling

8  Requirements, and that platforms must respond to the report within 36 hours, describing "any action

9  taken or not taken" by the platform.  **§ 20515(a)**.

### d.  The Enforcement Provisions

11     AB 2655 authorizes candidates for elective office, elected officials, and elections officials

12  to seek injunctive or other equitable relief against covered platforms—if those persons make a

13  report pursuant to Section 20515(a) and (i) do not receive a response within 36 hours, (ii) disagree

14  with the platform's response or action taken, or (iii) the platform does not act within 72 hours—to

15  compel (a) removal of content under Section 20513, (b) labeling of content under Section 20514,

16  or (c) compliance with the Reporting Requirement.  **§ 20515(b)**.

17     AB 2655 also authorizes the California Attorney General, any California district attorney,

18  and any California city attorney to seek injunctive or other equitable relief against covered

19  platforms to compel (i) removal of content under Section 20513, (ii) labeling of content under

20  Section 20514, or (iii) compliance with the Reporting Requirement.  **§ 20516**.  The statute does not

21  authorize anyone to seek injunctive or other equitable relief against covered platforms to remedy

22  improper takedown or labeling decisions.  *See* **§§ 20515(b), 20516**.  Enforcement actions will be

23  "entitled to precedence" under Section 35 of the California Code of Civil Procedure.  **§§ 20515(b),**

24  **20516**.

### e.  Exemptions

26     AB 2655 does not apply to (i) certain regularly published online newspapers, magazines,

27  broadcasting stations, or other periodicals of general circulation that routinely carry news and

28  commentary of general interest, if the publication contains certain disclosures, **§§ 20519(a), (b)(1)**;

(ii) materially deceptive content that constitutes "satire or parody" (terms that the statute does not define), **§ 20519(c)**; and (iii) candidates for elective office who "portray[] themsel[ves]" as doing or saying something that the candidate did not do or say, if the content includes certain disclosures, **§ 20513(d)**.

## II. AB 2655's Legislative History Acknowledges that the Statute Poses Numerous First Amendment and Section 230 Problems.

The legislative history of AB 2655 catalogues the statute's serious First Amendment deficiencies. As the legislative history acknowledges, by explicitly targeting derogatory political speech about candidates, AB 2655 imposes a content-based speech restriction. For instance, the Assembly Committee on Judiciary's April 22, 2024 analysis acknowledges that:

"[AB 2655] would *interfere with both the expression and reception of information based upon its content*. . . . *not only does this bill single out particular content, the content relates to political candidates and elections*," to which "*the First Amendment affords the 'broadest protection'* . . . *The fact that the bill restricts speech that is 'materially deceptive' or 'false' does not matter* . . . *The remedy for false speech is more true speech, and false speech tends to call forth true speech*."

PSUF ¶ 166 (Kurtzberg Decl. Ex. 3 (Assemb. Standing Comm. on Judiciary, Analysis of Assemb. Bill No. 2655, 2023–2024 Reg. Sess. (Cal. Apr. 22, 2024)) at 7). In addition:

- The Senate Judiciary Committee's June 28, 2024 analysis states that "[l]aws that burden political speech are subject to strict scrutiny . . . California courts have been clear that political expression in the context of campaigns of any manner should be given wide latitude[.]" PSUF ¶ 167 (Kurtzberg Decl. Ex. 4 (S. Comm. on Judiciary, Analysis of Assemb. Bill No. 2655, 2023–2024 Reg. Sess. (Cal. June 28, 2024)) at 14);

- The Assembly Committee on Judiciary's April 22, 2024 analysis recognizes that "*[i]n reviewing the law, the Court would apply strict scrutiny*." PSUF ¶ 168 (Kurtzberg Decl. Ex. 3 at 8); and

- California State Assembly member Rebecca Bauer-Kahan, who supported AB 2655, stated, "*I think we all agree that strict scrutiny would be applied*." PSUF ¶ 169 (Kurtzberg Decl. Ex. 5

(Defending Democracy from Deepfake Deception Act of 2024: Hearing on AB 2655 Before the Assemb. Standing Comm. on Judiciary, 2023–2024 Reg. Sess. (Cal. Apr. 23, 2024)) at 6 (statements of Rebecca Bauer-Kahan, Assemb. Member)).

And finally, The American Civil Liberties Union, which opposed AB 2655, explained that:

> The *"'novelty of deepfake technology and the speed with which it is improving' do not justify relaxing the stringent protections afforded to political speech by the First Amendment.* . . . The Supreme Court has held that "whatever the challenges of applying the Constitution to ever advancing technology, *'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears."* . . . *Unfortunately, the provisions of AB 2655 as currently drafted threaten to intrude on those rights and deter that vital speech.*" PSUF ¶ 170 (Kurtzberg Decl. Ex. 4 at 18–19).

The Senate Judiciary Committee also acknowledged that AB 2655 would "likely" face a preemption challenge under Section 230. PSUF ¶ 171 (Kurtzberg Decl. Ex. 4 at 13). It conceded that AB 2655 "provides for the potential liability of platforms for failing to block and prevent certain content from being posted or shared by users," even though Section 230 "immunize[s] internet platforms from virtually all suits arising from third-party content." *Id.* Even so, the California legislature passed AB 2655 with supermajorities in both chambers. PSUF ¶ 172 (Kurtzberg Decl. Ex. 4 at 25).

**III.    The Impact of AB 2655's Vague Terms and One-Sided Enforcement Regime.**

Because AB 2655 (i) has an expansive application, (ii) uses undefined terms that render it next-to-impossible for platforms to have any assurance that they are complying with the statute, (iii) sets unreasonably tight compliance deadlines, and (iv) has a one-way ratchet enforcement regime that incentivizes covered platforms to censor too much, covered platforms will feel immense pressure to censor any content that could even arguably be covered by the statute, as both real-world examples and legislative history demonstrate.

***First***, AB 2655 requires covered platforms to assess the speech of a vast array of candidates and officials. For instance, under the statute, platforms must determine whether content portrays

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

12

candidates for elective office, elections officials, and elected officials "doing or saying something" that they "did not do or say." *See* §§ 20513(a)(2), 20514(a)(2)(A). Given the range of persons that are "candidate[s] for elective office,"[7] "elections official[s]," and "elected official[s],"[8] this will often be incredibly difficult to do, *see* PSUF ¶¶ 175–77 (X Corp. S&O Decl. ¶ 7 n.2), as the April 8, 2024 analysis of the Assembly Committee on Elections acknowledges:

> "[I]n order to determine whether it must block content that ***portrays a candidate for election as doing or saying something that the candidate did not do or say***,[9] the platform would need to know not only that the person portrayed in the content was a candidate for office, but also the date (or dates) of the election when the candidate will appear on the ballot. Similarly, it would need to determine whether the candidate had actually said or done the thing that the candidate is portrayed as doing. While some of that information will be widely available and well known in some cases (e.g., the identity of major party candidates for President of the United States in presidential general elections and the dates of federal elections), it will be more arcane in other situations. ***Given the number of elections*** (including standalone local and special elections) and candidates (including write-in candidates and candidates for local elections in smaller jurisdictions) in California at any given time, ***making the determinations at scale about which content must be blocked or labeled likely will be considerably more challenging than making those determinations on a case-by-case basis in a court of law***."

---

[7] For the 2026 election cycle, there will be at least 866 people qualifying as "candidate[s]" under Section 20512(c). There will be at least two candidates for each the offices of governor, lieutenant governor, attorney general, secretary of state, treasurer, controller, insurance commissioner, and superintendent of public instruction (at least sixteen total); eight candidates for the Board of Equalization; 104 candidates for the federal House of Representatives; 40 candidates for state senate; 160 candidates for state assembly; 57 county clerks; and 482 city clerks. PSUF ¶ 176 (X Corp. S&O Decl. ¶ 7 n.2).

[8] Because AB 2655 does not define "elected official," it is unclear how far the term reaches. But even if it only covered elected officials in California—and the law provides no indication that the term is so limited—it would cover at least 120 individuals, and has the potential to cover many more, given that California has 58 counties and 480 cities, each presumably with elected officials. *See* PSUF ¶ 177 (X Corp. S&O Decl. Ex. 1 (*Elected Officials*, California State Assembly) ("The California State Assembly has 80 Members" and the "California State Senate has 40 members[.]"))); *id.* Ex. 2 (*Cities in California*, BallotPedia) (there are 57 counties and 482 cities, towns, and villages in California, according to a 2022 study from the U.S. Census Bureau)). If the term applies to all officials in the United States, there could be several hundreds of thousands of "elected officials," or even more. *See id.* ("The California State Assembly has 80 Members" and the "California State Senate has 40 members[.]").

[9] Emphasis in original.

1  PSUF ¶ 179 (Kurtzberg Decl. Ex. 6 (Assemb. Standing Comm. on Elections, Analysis of Assemb.

2  Bill No. 2655, 2023–2024 Reg. Sess., at 8 (Cal. Apr. 8, 2024) at 8))).  Similarly, Tracy Rosenberg

3  of Oakland Privacy, which opposed AB 2655, explained that "***technology platform[s] can[not] be***

4  ***expected to know everything that every candidate running for office [has said]***."  PSUF ¶ 180

5  (Kurtzberg Decl. Ex. 2 at 6 (statements of Tracy Rosenberg, Oakland Privacy)).

6         ***Second***, whether content triggers AB 2655's requirements and prohibitions depends on

7  vague terms that will be subject to reasonable disagreement.  AB 2655's reach extends beyond

8  prohibiting actually false speech to speech that merely "falsely appear[s] to a reasonable person to

9  be an authentic record."  § 20512(i)(1).  AB 2655 also forbids speech that state officials view as

10  "reasonably likely to harm the reputation or electoral prospects of a candidate" and that "is

11  reasonably likely to falsely undermine confidence in the outcome of" an election.  § 20513(a)(2).

12  And it purports to exempt "[m]aterially deceptive content that constitutes satire or parody,"

13  § 20519(c), but does not define "satire or parody."  This puts platforms in the position of needing

14  to make individualized assessments of whether speakers' statements are intended earnestly or

15  satirically in deciding whether to remove content on the platform, at scale—a burdensome exercise

16  that would risk censoring lawful, valuable speech, such as that of Kohls, The Bee, Rickert, and

17  other content creators.  AB 2655 thus requires X Corp. and Rumble to train their manual content

18  reviewers both on the relevant candidates and officials and how to make judgment calls about what

19  is satire or parody, what "would falsely appear to a reasonable person" to be authentic, and what is

20  "reasonably likely" to harm reputation or electoral prospects or undermine confidence in an

21  election.  PSUF ¶ 181 (Rumble Decl. ¶¶ 44–45; X Corp. S&O Decl. ¶¶ 6–9).

22         ***Third***, AB 2655 imposes an extremely compressed timeframe for making and acting on

23  these determinations.  Covered platforms must respond to requests to remove content under the

24  statute "within 36 hours of the report, describing any action taken or not taken [] with respect to the

25  content," § 20515(a), and remove or label any such content "no later than 72 hours after a report is

26  made," §§ 20513(b), 20514(b).  These compressed timeframes will be difficult to meet in practice,

27  *see* PSUF ¶ 183–188 (X Corp. S&O Decl. ¶¶ 6–9, 14; Rumble Decl. ¶¶ 13–14, 47–48), and

28  enforcement actions may be filed against the covered platforms if they are not, *see* §§ 20515(b),

1   20516.  The Enforcement Provisions, once triggered, provide for causes of action seeking to require

2   the covered platforms to remove or label "materially deceptive content" covered by the statute, but

3   do ***not*** provide for any consequences for improperly removing or labeling content that should not

4   have been removed or labeled.  §§ 20515(b), 20516.  Put another way, enforcement actions can be

5   brought for censoring too little, but not for censoring too much.  §§ 20515(b), 20516.

6       ***Fourth***, all of the above shows how AB 2655 will inevitably pressure covered platforms to

7   over-censor content, such as that of Kohls, The Bee, and Rickert, as both real-world examples and

8   the statute's legislative history make clear.  For instance, on April 25, 2023, the official Republican

9   National Committee YouTube channel posted a video titled "Beat Biden" that, using artificial

10  intelligence, imagined various scenarios that would occur during a second presidential term under

11  Joe Biden, including that "international tensions [will] escalate," "financial systems [will]

12  crumble," and "crime [will] worsen[]."  PSUF ¶ 210 (Kurtzberg Decl. Ex. 7 (GOP, *Beat Biden*,

13  YouTube (Apr. 25, 2023))).  As shown below, the video's description states that it is "[a]n AI-

14  generated look into the country's possible future if Joe Biden is re-elected in 2024."



25      Does this video portray President Biden "doing or saying something that" he "did not do or

26  say," and would it have been "reasonably likely" that the video would have "harm[ed] [his]

27  reputation or electoral prospects"?  Perhaps not, but this video was cited in AB 2655's legislative

1    history as an example of how "generative AI can spread misinformation regarding elections with

2    ease," *see* PSUF ¶ 211 (Kurtzberg Decl. Ex. 4 at 7, 9), seemingly indicating that at least some of

3    the drafters think it would be prohibited under the statute.  Given that the video asks "what if the

4    weakest president we've ever had were re-elected," would the video fall within Section 20519(c)'s

5    exemption for satire or parody?  That is also unclear.  What is clear is that the statute puts at risk

6    harsh, but surely First Amendment-protected, speech that has been common to political campaigns

7    throughout the history of our nation.

8         Adding to the confusion is that the video's caption clearly states that the video was "AI-

9    generated," but this would not bring the video within Section 20513(d)'s exemption, because it was

10   posted by someone other than President Biden.  *See* § 20513(d) (self-portrayal exemption).

11        Another example further illustrates the point.  In March 2023, an X user named Eliot

12   Higgins (@EliotHiggins) used artificial intelligence to create a photo depicting Donald Trump

13   being forcefully arrested.  PSUF ¶ 212 (Kurtzberg Decl. Ex. 8 (Eliot Higgins (@EliotHiggins), X

14   (Mar. 20, 2023, 5:22 PM))).  The same questions arise.  Do these photos portray Donald Trump

15   "doing or saying something that" he "did not do or say," and would it be "reasonably likely" that

16   the photos would "harm [his] reputation or electoral prospects"?  Would these photos be exempted

17   as satire or parody under Section 20519(c)?  If colorable arguments can be made that this type of

18   political commentary is encompassed by the statute, covered platforms will face the choice of

19   removing and/or labeling such content (which would ensure no liability for them) or risking costly

20   enforcement actions.  That is why, "because of . . . AB 2655, Rickert refrained from posting" these

21   images on her X, Facebook, and Instagram accounts.  PSUF ¶ 213 (Rickert Decl. ¶¶ 21, 31–32, 35;

22   Verified Complaint for Declaratory and Injunctive Relief, *Kohls* v. *Bonta*, No. 2:24-cv-02527-

23   JAM-CDK (E.D. Cal. Sept. 17, 2024), ECF 1 ("Kohls V. Compl.") ¶ 135).

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15      Another example: on August 29, 2024, the X user Kamala HQ (@KamalaHQ) posted a

16  five-second video on X where Vice Presidential candidate JD Vance says, "Democrats want to

17  attack Republicans as being anti-union and sometimes the shoe fits."  PSUF ¶ 214 (Kurtzberg Decl.

18  Ex. 9 (Kamala HQ (@KamalaHQ), X (Aug. 29, 2024, 12:57 PM))).  The clip cuts out right before

19  Vance says "but not me and not Donald Trump."  *Id.* (Kurtzberg Decl. Ex. 10 (The International

20  Association of Fire Fighters, *57th IAFF Convention: Sen. JD Vance*, YouTube (Aug. 29, 2024))).

21  How would the statute treat this edited snippet, which arguably misleadingly changes the ***meaning***,

22  but not the literal words, of what JD Vance actually said?  AB 2655 defines "materially deceptive

23  content" as "audio or visual media that is digitally created ***or modified*** . . . such that it would falsely

24  appear to a reasonable person to be an authentic record of the content depicted in the media."  §

25  20512(i)(1).

26      Consider also the video posted by Kohls, who goes by the name Mr. Reagan on X, titled

27  *Kamala Harris Ad PARODY*, that was reposted on X by Elon Musk.  PSUF ¶ 56 (Kurtzberg Decl.

28  Ex. 11 (Mr Reagan, *Kamala Harris Ad PARODY*, YouTube (July 26, 2024); Kohls V. Compl. ¶ 8).

MEMORANDUM OF POINTS AND          17
AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

1    The video uses AI to create an "advertisement" by Vice President Harris with her saying things that

2    she would never actually say.  While some would reasonably consider the video to be satire or

3    parody—including because, in the video, "Harris" states that she is a "diversity hire," who "may

4    not know the first thing about running the country" and is a "deep state puppet"—public statements

5    made by Governor Newsom indicate that he believes that the statute would require the video to be

6    removed from any covered platform.  *See* PSUF ¶ 151 (Kurtzberg Decl. Ex. 13 (Gavin Newsom

7    (@GavinNewsom), X (July 28, 2024, 11:47 PM; Sept. 17, 2024, 7:41 PM) (stating that Mr

8    Reagan's *Kamala Harris Ad PARODY* video "should be illegal" and declaring, the same day that

9    AB 2655 was passed, that he "just signed a bill to make this illegal in the state of California");

10    Kohls V. Compl. ¶ 9).  "If not for [] AB 2655, Rickert would have immediately posted" this video

11    from her social media accounts.  PSUF ¶ 87 (Rickert Decl. ¶ 29; Kohls V. Compl. ¶ 126).

12            And The Bee's satire and parody often trigger fact checks by those who may think it true.

13    PSUF ¶¶ 33, 35, 38 (Dillion Decl. ¶¶ 58–62, 64–65, 67).  Over one hundred of The Bee's satirical

14    headlines have become, or closely foreshadowed, actual news stories and headlines.  PSUF ¶ 30

15    (Dillon Decl. ¶ 54).  Outlets like Snopes, *USA Today*, and Reuters have "factchecked" The Bee's

16    articles, including those related to elections.  PSUF ¶ 35 (Dillion Decl. ¶ 64).  For example, in

17    March 2024, Reuters concluded that "no evidence" existed to support The Bee's article title "Ballot

18    Drop Boxes Installed Along Border Wall."  PSUF ¶ 39 (Dillion Decl. ¶ 68).

19            In addition, AB 2655's legislative history acknowledges that, given AB 2655's vague and

20    often debatable requirements and one-sided Enforcement Provisions, the statute will heavily

21    incentivize the censorship of such content, rather than let it exist in an uninhibited marketplace of

22    ideas and political commentary.  For instance:

23    •    The Assembly Committee on Judiciary's April 22, 2024 analysis acknowledges the view that,

24         "[c]onfronted with such a restricted timeline and the threat of a civil action . . . *platforms will*

25         *'remove significantly more content, including content that has accurate election information*

26         *and content that is not materially deceptive.'*"  PSUF ¶ 216 (Kurtzberg Decl. Ex. 3 at 12);

27

28

- That analysis also recognizes that "with no sure means to determine what is 'materially deceptive,' the *platforms will err on the side of blocking content, thus burdening more speech than is necessary*."  PSUF ¶ 217 (Kurtzberg Decl. Ex. 3 at 8);

- Jose Torres Casillas of TechNet, which opposed AB 2655, explained that AB 2655:

  "requires online platforms to make determinations about truth and falsity in an *impossible way*. . . . A platform cannot accurately adjudicate reports on those types of content and will instead *resort to over removing information in order to avoid liability and the penalties in this bill*. Removing information that is only suspected of being false is clearly not a good outcome."  PSUF ¶ 218 (Kurtzberg Decl. Ex. 5 at 5 (statements of Jose Torres Casillas, TechNet)); and

- Khara Boender of the Computer Communications Industry Association ("CCIA"), which also opposed AB 2655, similarly explained that the content-moderation "tools that are currently available [to platforms] are not always reliable or accurate," and inevitably covered platforms will:

  "*inadvertently over block or over label content.* This could result in user frustration and suppression of political speech. . . . *Faced with individual users seeking injunctive relief merely if they disagree with a covered platform's decision regarding reported content, a service may choose to prohibit all digitally altered content, cutting off many valuable and helpful uses*."  PSUF ¶ 219 (Kurtzberg Decl. Ex. 5 at 4–5 (statements of Khara Boender, CCIA)).

Boender further explained that AB 2655 will resemble the takedown regime under the Digital Millennium Copyright Act ("DMCA"), which, like AB 2655, provides immunity from liability if material is taken down but potential liability if it is not.  PSUF ¶ 220 (Kurtzberg Decl. Ex. 14 (*Defending Democracy from Deepfake Deception Act of 2024: Hearing on AB 2655 Before the S. Standing Comm. on Elections and Constitutional Amends.*, 2023–2024 Reg. Sess. (Cal. June 18, 2024)) at 5 (statements of Khara Boender, CCIA)); *see* 17 U.S.C. § 512(c)(1).  As Boender correctly pointed out, AB 2655 could "*result in platforms being required to block content almost constantly in order to ensure compliance*," which has been the outcome under the DMCA, where platforms

"err in taking down the content lest they face[] liability." *Id*.[10]

## IV.    The Covered Platforms' Current Policies and Features Already Address Potentially Problematic Content in a Less Speech-Restrictive way.

X, Rumble, and the other covered platforms maintain policies and features that address what they view as problematic content.   X maintains policies and features to combat potentially misleading content enhanced or created by artificial intelligence.   For instance, the X platform has a feature called "Community Notes" that allows users to flag content that they believe needs context, which could include "materially deceptive content" covered by the statute.   PSUF ¶ 116 (X Corp. S&O Decl. ¶ 21).   Through Community Notes, users may provide additional context or information about content that will appear along with the content if enough of the community's "contributors," who otherwise hold diverse viewpoints, deem the additional commentary to be helpful.   PSUF ¶ 117 (X Corp. S&O Decl. ¶ 21).   And, in recognition of the fast-paced nature of social media, X has accelerated Community Notes with "Lightning Notes" that start appearing on posts within an hour of being proposed, or within an hour of the post itself going live.   PSUF ¶ 118 (X Corp. S&O Decl. ¶ 21).   Any user can become a Community Notes "contributor," so long as they (i) have no recent X rule violations, (ii) joined X at least six months ago, and (iii) provide a phone number.   PSUF ¶ 119 (X Corp. S&O Decl. ¶ 21).   X provides contributors with alias profiles that are not linked to their main X profile, and X Corp. does not write or edit these notes.   PSUF ¶ 120 (X Corp. S&O Decl. ¶ 21).   Any X user may comment on posted content, providing additional

---

[10] Substantial empirical evidence supports the view that such enforcement regimes lead to takedowns of a significant amount of protected material.   *See* PSUF ¶ 220 n.5 (Kurtzberg Decl. Ex. 15 (Wendy Seltzer, *Free Speech Unmoored in Copyright's Safe Harbor: Chilling Effects of the DMCA on the First Amendment*, 24 Harv. J.L. & Tech. 171 (2010) (asserting that the DCMA encourages internet service providers to respond to copyright complaints by removing content to ensure immunity from liability, leading to the censorship of protected speech)); *id.* (Kurtzberg Decl. Ex. 16 (Jennifer M. Urban, et al., *Notice and Takedown in Everyday Practice* (2016) at 41 (finding, based on a survey of online service providers, that "[m]ost [online service providers] reported acting conservatively in order to avoid liability, opting to take down content even when they are uncertain about the strength of the underlying claim")); *id.* (Kurtzberg Decl. Ex. 17 (Jennifer M. Urban & Laura Quilter, *Efficient Process or "Chilling Effects"? Takedown Notices Under Section 512 of the Digital Millennium Copyright Act*, 22 Santa Clara Comput. & High Tech. L.J. 621, 638, 687 (2006) (finding, based on an empirical study of sample DMCA takedown requests, a "surprising number of questionable takedowns" and noting that "§ 512 gives [online service providers] strong incentives to maintain their safe harbor and few incentives to question takedown")); *id.* (Kurtzberg Decl. Ex. 18 (Alfred C. Yen, *Internet Service Provider Liability for Subscriber Copyright Infringement, Enterprise Liability, and the First Amendment*, 88 Geo. L.J. 1833, 1888 (2000) (arguing that the DMCA safe harbor scheme creates a First Amendment issue by incentivizing risk averse internet service providers to remove content even where copyright infringement is unclear)).

context in the comments section, if they deem it necessary. *Id.* Those who disagree with the comment can comment further, thus letting the marketplace of ideas work to identify "materially deceptive content" of the type targeted by AB 2655 here. *See* PSUF ¶ 121 (showing examples of Community Notes working to inform X users of the false or augmented nature of certain posts). Meta has recently announced that it will employ a similar system on Facebook, Instagram, and Threads. *See* PSUF ¶ 123 (X Corp. S&O Decl. Ex. 10).

In fact, California Assembly Member Bill Essayli suggested that these methods used by X (and soon, also by Meta) would be a less-restrictive alternative to AB 2655's conscription of "private companies [as] the enforcer." *See* PSUF ¶ 124 (Kurtzberg Decl. Ex. 2 at 7–8 (statements of Bill Essayli, Assemb. Member)). Specifically, Essayli explained that he favored the "Twitter model," which uses the "community" to "regulate information"—that is, "***it's the public, it's the crowd sourcing . . . doing the moderating,*" rather than "*making an individual, company, or person the arbiter of [] what's disinformation.***" *Id.* The legislature did not address why the use of such features was insufficient to flag the type of "materially deceptive content" covered by AB 2655, let alone why the government regulatory system imposed by AB 2655 would be superior to a solution such as Community Notes.

Second, in addition to Community Notes and user comments, X also has its own policy for regulating "synthetic" or "manipulated media" on its platform. That policy differs from the system set up by the government under AB 2655. PSUF ¶ 125 (X Corp. S&O Decl. ¶ 15). Under X's "Authenticity" Policy, which covers "Synthetic and Manipulated Media" users "may not share inauthentic media, including, manipulated, or out-of-context media that may result in widespread confusion on public issues, impact public safety, or cause harm ('misleading media')." PSUF ¶ 126 (X Corp. S&O Decl. ¶ 16; Ex. 4 at 9 (*Authenticity Policy*, X)); *see also id.* ¶ 127 (S&O Decl. ¶ 16) (from August 5, 2024 to February 3, 2025, X labeled 3,700 posts under the Authenticity Policy (as well as its predecessor version)). Under X's policy—which is publicly available to all users of the platform and to the public generally—X considers, e.g., the following in determining whether to remove and/or label content: (a) whether the media is "significantly and deceptively altered, manipulated, or fabricated in a way that fundamentally changes its meaning and can result

1  in widespread confusion on public issues, impact public safety, or cause serious harm"; and (b)

2  whether the media is "shared in a deceptive manner or out-of-context or with intent to deceive

3  people about the nature or origin of the content and can result in widespread confusion on public

4  issues, impact public safety, or cause serious harm[.]"  PSUF ¶ 128 (X Corp. S&O Decl. ¶ 17; Ex.

5  4 at 10).  X's policy also makes clear that "[s]haring manipulated or out-of-context media in non-

6  deceptive ways" is "[a]llowed under the policy."  PSUF ¶ 129 (X Corp. S&O Decl. ¶ 18; Ex. 4 at

7  11).

8        Rumble's mission is to promote and protect a free and open internet.  PSUF ¶ 109 (Rumble

9  Decl. ¶¶ 7–10).  It seeks to empower small and large content creators and give them a place to

10  express themselves openly.  *Id*.  But Rumble also enforces a content moderation policy while

11  steadfastly protecting its users' freedom of expression.  PSUF ¶¶ 109, 114, 133–134.  For example,

12  Rumble's terms and conditions prohibit content that "promotes, supports, or incites violence or

13  unlawful acts."  PSUF ¶ 134(c).  The terms and conditions also ban "obscene" and "pornographic"

14  content and content that exploits children or reveals their personally identifying information.  PSUF

15  ¶ 134(a).  Rumble removes content from its platform that violates its terms and conditions and bans

16  users who repeatedly violate those terms.  PSUF ¶ 201.  But Rumble does not restrict political

17  speech unless it violates a provision of its terms and conditions, which is an approach that is central

18  to Rumble's mission.  PSUF ¶ 135.

19        Other covered platforms (e.g., Meta, YouTube, TikTok, Snapchat, and Google Search) all

20  have their own policies designed to address false, misleading, and/or manipulated media:

21  •  *See* PSUF ¶ 147(a) (X Corp. S&O Decl. Ex. 13 (*How to Identify AI Content on Meta Products*,

22     Meta) at 3) ("Meta requires an AI label when content has photorealistic video or realistic-

23     sounding audio that was digitally created, modified or altered, including with AI.");

24  •  *See* PSUF ¶ 147(b) (X Corp. S&O Decl. Ex. 14 (*Disclosing Use of Altered or Synthetic Content*,

25     YouTube) at 1) ("To help keep viewers informed about the content they're viewing, we require

26     creators to disclose content that is meaningfully altered or synthetically generated when it seems

27     realistic.");

28

MEMORANDUM OF POINTS AND          22
AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

- *See* PSUF ¶ 147(c) (X Corp. S&O Decl. Ex. 15 (*About AI-generated Content*, TikTok) at 5) ("We also require creators to label all AI-generated content that contains realistic images, audio, and video, as explained in our Community Guidelines.");

- *See* PSUF ¶ 147(d) (X Corp. S&O Decl. Ex. 16 (*Generative AI on Snapchat*, Snapchat) at 1) ("We may indicate that a feature in Snapchat is powered by generative AI in a number of ways . . . When you see these contextual symbols or other indicators in Snapchat, you should know that you are . . . viewing content that has been produced using AI and does not depict real world scenarios."); and

- *See* PSUF ¶ 147(e) (X Corp. S&O Decl. Ex. 17 (*Google Search's Guidance about AI-generated Content*, Google Search) at 2) ("Using automation—including AI—to generate content with the primary purpose of manipulating ranking in search results is a violation of our spam policies.").

Each platform takes a different approach to these content-moderation decisions. AB 2655's approach to content moderation differs from those taken by all of the covered platforms.

## LEGAL STANDARD

Summary judgment is appropriate when, as here, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord S. Cal. Darts Ass'n* v. *Zaffina*, 762 F.3d 921, 925 (9th Cir. 2014).

## ARGUMENT

**I.    AB 2655 Violates the First Amendment to the U.S. Constitution and Article 1, Section 2, of the California Constitution.**

AB 2655 violates the First Amendment of the U.S. Constitution and Article I, Section 2,[11]

---

[11] AB 2655 violates Article I, Section 2, of the California Constitution for all of the same reasons that it violates the First Amendment of the United States Constitution. *See, e.g.*, *Kohls*, 2024 WL 4374134, at *6 ("Under current case law, the California state right to freedom of speech is at least as protective as its federal counterpart."); *City of Montebello* v. *Vasquez*, 1 Cal. 5th 409, 421 n.11 (2016) ("[T]he California liberty of speech clause is broader and more protective than the free speech clause of the First Amendment."); *Delano Farms Co.* v. *Cal. Table Grape Com.*, 4 Cal.

of the California Constitution because it (a) infringes the constitutionally protected content-moderation speech rights of covered platforms, like X and Rumble, thereby pressuring them to censor speech of content creators, such as Kohls, The Bee, and Rickert, leading to self-censorship all while compelling the covered platforms' speech; (b) regulates speech based on content, viewpoint, and the identity of the speaker; (c) is not the least restrictive means to any compelling government interest; (d) imposes a prior restraint on constitutionally protected speech of which the State of California disapproves; and (e) violates the Free Press Clause of the U.S. Constitution.

> a. AB 2655 Impermissibly Interferes with the Content-Moderation Decisions of Covered Platforms while also Compelling their Speech.

AB 2655 regulates the constitutionally protected speech of covered platforms, such as X and Rumble, by interfering with their ability to "present[] a curated and 'edited compilation of [third party] speech,'" which is "is itself protected speech." *Moody*, 603 U.S. at 744 (quoting *Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995)). The Labeling and Reporting Requirements also compel their speech in violation of the First Amendment. *Wooley* v. *Maynard*, 430 U.S. 705, 714 (1977) (The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all.").

Covered platforms collect "third-party content into a single speech product (the operators' 'repertoire' of programming)," and that act "is itself expressive," such that AB 2655's "intrusion into that activity must be specially justified under the First Amendment." *Moody*, 603 U.S. at 729–30. "The choice of material," "decisions [about] content," and "the treatment of public issues—whether fair or unfair," "constitute the exercise of editorial control and judgment. . . . *For a paper, and for a platform too*." *Id.* at 738 (quoting *Miami Herald Pub. Co.* v. *Tornillo*, 418 U.S. 241, 258 (1974)).

X has its own policies and procedures designed to address "synthetic and manipulated" media and to encourage users—through comments and Community Notes—to identify false and manipulated speech where appropriate. *See* PSUF ¶ 125 (X Corp. S&O Decl. ¶ 15). Rumble, too,

_____

5th 1204, 1221 (2018) ("[O]ur case law interpreting California's free speech clause has given respectful consideration to First Amendment case law for its persuasive value.").

has a content-moderation policy that it enforces to prohibit "grossly offensive" and obscene content, among other categories. PSUF ¶ 134(b) (Rumble Decl. ¶ 19). But it doesn't police and censor political speech the way California would like it to. Other covered platforms have their own policies as well, each of which differs from AB 2655's requirements. PSUF ¶ 147 (X Corp. S&O Decl. ¶¶ 25–26).

Content-moderation decisions about what constitutes "materially misleading content," "synthetic and manipulated," or "grossly offensive" media are controversial and involve judgment calls that, under *Moody*, each platform is entitled to make free of governmental interference. *See X Corp.* v. *Bonta*, 116 F.4th 888, 901 (9th Cir. 2024) (state-mandated reporting categories including misinformation and disinformation involved "controversial" opinions). Because AB 2655 impermissibly replaces the judgments of the covered platforms about what speech may be permitted on their platforms with those of the government, *see* PSUF ¶ 125, 182 (X Corp. S&O Decl. ¶¶ 6, 15, 19, 27, 31; Rumble Decl. ¶¶ 45, 51), it cannot be reconciled with the Supreme Court's decision in *Moody*, and therefore triggers heightened First Amendment protection. *See also, e.g.*, *Moody*, 603 U.S. at 742 (quoting *Pac. Gas & Elec. Co.*, 475 U.S. at 20) (the "State 'cannot advance some points of view by burdening the expression of others'"); *id.* at 734 (the "government may not, in supposed pursuit of better expressive balance, alter a private speaker's own editorial choices about the mix of speech it wants to convey"); *id.* at 719 ("it is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences. That principle works for social-media platforms as it does for others."); *id.* at 733 ("[h]owever imperfect the private marketplace of ideas," a "worse proposal" is "the government itself deciding when speech [is] imbalanced, and then coercing speakers to provide more of some views or less of others").

In addition, the content that AB 2655 targets—i.e., the content delineated in Sections 20513(a) and 20514(a)—is itself constitutionally protected. Any attempt by Defendants to "analogize AB [2655] to a restriction on defamatory statements" should be rejected, just as it was for AB 2839. *Kohls*, 2024 WL 4374134, at *3. AB 2655 "does not use the word 'defamation' and by its own definition, extends beyond the legal standard for defamation to include any false or

materially deceptive content that is 'reasonably likely' to harm the 'reputation **or** electoral prospects of a candidate.'" *Id.* (quoting § 20012(b)) (emphasis in original). The statute thus extends beyond potentially defamatory statements, because it "does not require actual harm and sanctions any digitally manipulated content that is 'reasonably likely' to 'harm' the amorphous 'electoral prospects' of a candidate or elected official." *Id.* (quoting §§ 20012(b)(1)(A), (C)). Accordingly, AB 2655 is not merely a "restriction on knowing falsehoods that fall outside of the category of false speech protected by the First Amendment as articulated in" *United States* v. *Alvarez*, 567 U.S. 709 (2012). *Id.*

Nor does AB 2655 "fall[] into the possible exceptions recognized in *Alvarez* for lies that involve 'some . . . legally cognizable harm.'" *Id.* at \*4 (quoting *Alvarez*, 567 U.S. at 719). Defendants may claim that *Alvarez* encompasses "tangible harms to electoral integrity," but that argument likewise fails because the "potentially unprotected lies *Alvarez* cognized" were limited to (i) "invasion of privacy or the costs of vexatious litigation;" (ii) "false statements made to Government officials, in communications concerning official matters;" (iii) and "lies that are 'integral to criminal conduct,'" such as "falsely representing that one is speaking on behalf of the Government," or "impersonating a Government officer." *Id.* (quoting *Alvarez*, 567 U.S. at 719– 22). Like AB 2839, AB 2655 implicates none of these harms and "thereby unconstitutionally suppresses broader areas of false but protected speech." *Id.*

To the extent that Defendants argue that AB 2655 (which, unlike AB 2839, has a carve out for satire and parody) creates a new category of speech unprotected by the First Amendment, that argument fares no better. Under longstanding precedent, the First Amendment follows a categorical historical approach, not one in which legislatures have "freewheeling authority to declare new categories of speech outside the scope of the First Amendment." *United States* v. *Stevens*, 559 U.S. 460, 472 (2010); *see also Nat'l Inst. of Fam. & Life Advocs.* v. *Becerra ("NIFLA")*, 585 U.S. 755, 767 (2018) ("This Court's precedents do not permit governments to impose content-based restrictions on speech without 'persuasive evidence . . . of a long (if heretofore unrecognized) tradition' to that effect.").

Nor does AB 2655's carve out for satire and parody change the analysis. In *Stevens*, for

example, Congress attempted to ban "animal crush videos" while excluding from the ban "any depiction that has serious religious, political, scientific, educational, journalistic, historical, or artistic value." 585 U.S. at 465. The Supreme Court held that Congress could not "use[]" that one class of protected speech "as a general precondition to protecting *other* types of speech in the first place." *Id.* at 479 (emphasis in original). A year later, it told the California legislature the same thing: "appending a saving clause" to an unconstitutional statute prohibiting the sale of "violent video games" to minors "does not suffice" to salvage the statute. *Brown* v. *Entm't Merchants Ass'n*, 564 U.S. 786, 792 (2011). And in *Alvarez*, as Justice Alito's dissent points out, the Stolen Valor Act there was struck down even though it did "not reach dramatic performances, satire, parody, hyperbole, or the like." 567 U.S.at 740. Since the majority still found the law unconstitutional, a carveout for satire and parody alone was insufficient to satisfy the First Amendment. The same is true here. At bottom, the satire and parody carveout "simply exchanges [some] overbreadth for [more] vagueness." *Zarate* v. *Younglove*, 86 F.R.D. 80, 104 (C.D. Cal. 1980) (quoting Professor Lawrence Tribe, American Constitutional Law § 12-26); *see infra* Argument Sec. III.

At its core, the First Amendment protects against creation of a governmental regime that *incentivizes* speech gatekeepers to censor speech that the government disfavors—as AB 2655 does here. Courts have routinely struck down such statutes on First Amendment grounds. For example, in *Smith* v. *California*, the U.S. Supreme Court struck down a Los Angeles municipal ordinance that imposed strict liability on booksellers for selling obscene books, because a law imposing such liability would "tend to restrict the *public's* access to forms of the printed word which the State could not constitutionally suppress directly." 361 U.S. 147, 154 (1959). In other words, the creation of a system that encourages "self-censorship" by booksellers violates the First Amendment because it results in censorship "compelled by the State," that "would be a *censorship affecting the whole public*, hardly less virulent for being privately administered," and would "impede[]" the "distribution of *all books, both obscene and not obscene*." *Id.* "[A] government official cannot do indirectly what she is barred from doing directly[.]" *National Rifle Association* v. *Vullo*, 602 U.S. 175, 190 (2024). AB 2655's enforcement regime would incentivize covered platforms to censor speech disfavored by the State, leading to the self-censorship of content creators, such as

1  Kohls, The Bee, and Rickert. PSUF ¶¶ 206, 208 (Rickert Decl. ¶¶ 21, 31–32, 35). It therefore

2  impermissibly substitutes the government's judgments about content-moderation decisions for

3  those of the covered platforms in violation of the First Amendment.

4      Not only does AB 2655 interfere with platforms' protected content moderation, it also

5  compels their speech. The state compels speech when it requires someone to say something that

6  affects the speaker's message. *303 Creative LLC* v. *Elenis*, 600 U.S. 570, 586 (2023); *Hurley*, 515

7  U.S. at 572–73. And a speaker's right to choose her own message applies "equally to statements

8  of fact the speaker would rather avoid[.]" *Hurley*, 515 U.S. at 573. Forced disclaimers are a form

9  of compelled speech. Requiring social media platforms to publish information about their content-

10  moderation practices, for instance, compels speech. *X Corp.*, 116 F.4th at 894, 901.

11      AB 2655's Labeling and Reporting Requirements similarly compel speech. Under the

12  Labeling Requirement, covered platforms must "label" content with the words: "This ___ has been

13  manipulated and is not authentic." § 20514(c). To compound the violation (and vagueness),

14  covered platforms must also "permit users to click or tap on" that label "for additional explanation

15  about the materially deceptive content in an easy-to-understand format." § 20514(d). The

16  Reporting Requirement also doubly compels speech. It mandates that covered platforms "provide"

17  on their platforms "an easily accessible way for California residents" to report content. § 20515(a).

18  And it also requires the platform to "respond to the person who made the report . . . describing any

19  action taken or not taken[.]" *Id.*

20      AB 2655 thus forces covered platforms to say things they don't want to—and otherwise

21  would not—say. Laws that compel speech necessary discriminate based on content and are thus

22  "subject to strict scrutiny." *X. Corp.*, 116 F.4th at 903.

23          b.  Strict Scrutiny Applies because AB 2655 is a Content-, Viewpoint-, and

24              Speaker-Based Speech Regulation.

25      Strict scrutiny applies because—as the legislative history of AB 2655 itself repeatedly

26  recognizes—AB 2655 imposes content-, viewpoint-, and speaker-based speech restrictions, and no

27  exception applies here to the longstanding rule that such regulations trigger strict scrutiny. In fact,

28  because AB 2655 discriminates based on viewpoint, it is *per se* invalid.

**First**, AB 2655 is a content-based speech regulation. By forcing covered platforms to remove or modify particular speech that they may not otherwise remove or modify—i.e., certain election-related "materially deceptive content"—and to create a reporting requirement to facilitate such removal and modification, AB 2655 forces covered platforms to "'speak a particular message' that they would not otherwise speak, which constitutes compelled speech that dilutes their message." *Kohls*, 2024 WL 4374134, at \*5 (citing *NIFLA*, 585 U.S. at 766; *X Corp.*, 116 F.4th at 900); *see also Wooley*, 430 U.S. at 714. AB 2655 also impermissibly substitutes the judgment of the government for that of covered platforms as to what constitutes "materially deceptive content" covered by the statute and whether it should remain on their platforms. *See* PSUF ¶ 125, 182 (X Corp. S&O Decl. ¶¶ 6, 15, 19, 27, 31; Rumble Decl. ¶¶ 45, 51).

AB 2655 is thus a content-based law—that is, it "target[s] speech based on its communicative content," *Reed* v. *Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)—and no exception applies here to the longstanding rule that such regulations trigger strict scrutiny. *NIFLA*, 585 U.S. at 767. By "specifically target[ing] speech within political or electoral content pertaining to candidates, electoral officials, and other election communication," AB 2655 "delineates acceptable and unacceptable content based on its purported truth or falsity and is an archetypal content-based regulation that our constitution considers dubious and subject to strict scrutiny." *Kohls*, 2024 WL 4374134, at \*4.

**Second**, within that category of content, AB 2655 discriminates against a particular viewpoint. It permits election-related content that is "'positive' about a person," while restricting such content if it is "derogatory." *Iancu* v. *Brunetti*, 588 U.S. 388, 393 (2019) (quoting *Matal* v. *Tam*, 582 U.S. 218, 249 (2017) (Kennedy, J., concurring) (explaining that such differential treatment "reflects the Government's disapproval of a subset of messages it finds offensive" and is the "essence of viewpoint discrimination")). AB 2655 prohibits content "likely to harm the reputation or electoral prospects of a candidate" but not content likely to help. *See* § 20513(a)(2)(A). It similarly targets content "likely to falsely undermine confidence in the outcome" of an election, but not content likely to help. *See* §§ 20513(a)(2)(B), (C). Viewpoint-based restrictions are "*per se* invalid." *E.g.*, *Junior Sports Mags. Inc.* v. *Bonta,* 80 F.4th 1109, 1124

1  (9th Cir. 2023) (VanDyke, J., concurring) (collecting cases).  At the very least, such "poison to a

2  free society" is subject to the strictest form of strict scrutiny.  *Iancu*, 588 U.S. at 399 (Alito, J.,

3  concurring).

4  **Third**, AB 2655 also triggers strict scrutiny because it discriminates based on the identity

5  of the speaker.  The statute applies only to certain speakers (i.e., to covered platforms such as X

6  and Rumble), while exempting others (e.g., smaller platforms, certain broadcasting stations, online

7  newspapers, and magazines, *see* § 25019).  This also violates the First Amendment.  *See, e.g.*,

8  *Sorrell* v. *IMS Health Inc.*, 564 U.S. 552, 571 (2011) (laws that interfere with the speech rights of

9  only certain speakers "justify application of heightened scrutiny" particularly when aimed at

10  specific content).

11        c.   AB 2655 Fails Strict Scrutiny.

12  AB 2655 fails strict scrutiny because the State cannot meet its burden of proving that the

13  statute is "narrowly tailored to serve compelling state interests," *NIFLA*, 585 U.S. at 766 (quoting

14  *Reed*, 576 U.S. at 163), and that no "less restrictive alternative would serve the [g]overnment's

15  purpose," *X Corp.*, 116 F.4th at 903 (quoting *United States* v. *Playboy Entm't Grp., Inc.*, 529 U.S.

16  803, 813 (2000)).  It is not a "valid, let alone substantial" interest for a state to seek "to correct the

17  mix of speech" that "social-media platforms present."  *Moody*, 603 U.S. at 740; *see also id.* at 734

18  (the "government may not, in supposed pursuit of better expressive balance, alter a private

19  speaker's own editorial choices about the mix of speech it wants to convey").  And even if AB 2655

20  can be read as attempting to further a compelling interest in protecting free and fair elections, AB

21  2655 is not the "least restrictive means available for advancing [that] interest," *Kohls*, 2024 WL

22  4374134, at *4 (quoting *NetChoice, LLC* v. *Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024)).  The

23  "First Amendment does not 'permit speech-restrictive measures when the state may remedy the

24  problem by implementing or enforcing laws that do not infringe on speech,'" *Id.* at *4 (quoting

25  *IMDb.com, Inc.* v. *Becerra*, 962 F.3d 1111, 1125 (9th Cir. 2020)).

26  Here, for instance, existing statutory causes of action, including "privacy torts, copyright

27  infringement, or defamation already provide recourse to public figures or private individuals whose

28  reputations may be afflicted by artificially altered depictions peddled by satirists or opportunists on

the internet." *Id.* at \*5; *see IMDb.com, Inc.*, 962 F.3d at 1126 ("Because the State 'has various other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech,' it fails to show that the law is the least restrictive means to protect its compelling interest. That failure alone dooms [the law]."); *Ex parte Stafford*, 2024 WL 4031614, at \*4–6 (Tex. Crim. App. Sept. 4, 2024) (applying strict scrutiny and striking down on First Amendment grounds Texas statute prohibiting "knowingly represent[ing] in a campaign communication that the communication emanates from a source other than its true source" because there were "narrower means of achieving the State interests," including enforcing an existing statute). Or California could have recognized that "the ordinary course in a free society" is to remedy false speech with "speech that is true." *Alvarez*, 567 U.S. at 727. "Especially as to political speech, counter speech is the tried and true buffer and elixir[.]" *Kohls*, 2024 WL 4374134, at \*1.

AB 2655 is also underinclusive, showing that it "does not actually advance a compelling interest." *Williams-Yulee* v. *Fla. Bar*, 575 U.S. 433, 449 (2015). Because the content-moderation decisions of platforms receive no less First Amendment protection than that received by newspapers and broadcasters, there is no principled basis for AB 2655's exemptions. *See Moody*, 603 U.S. at 719, 738. California targeted content on online platforms while leaving the same content on other large platforms untouched.

The exemption for candidates' otherwise covered speech about themselves further shows underinclusivity. *See* § 20513(d)(1). But politicians promoting "self-aggrandizing falsehoods" are just as, or perhaps even more likely, to undermine elections as citizens posting similar content. *Grimmett* v. *Freeman*, 59 F.4th 689, 696 n.9 (4th Cir. 2023); *accord Rickert* v. *State*, 168 P.3d 826, 831–32 (Wash. 2007). President Trump, for example, has over 100 million followers on his X account. PSUF ¶ 78 n.1 (Kurtzberg Decl. Ex. 19 (Donald J. Trump (@realDonaldTrump), X). Rickert has far less; she has about 25,000 followers on Instagram and less than 2,000 on X. PSUF ¶ 78 (Rickert Decl. ¶ 16). Allowing politicians greater speech rights than independent commentators is speaker-based discrimination and gets the First Amendment backwards. *See Sorrell*, 564 U.S. at 571; *McIntyre* v. *Ohio Elections Comm'n*, 514 U.S. 334, 351 (1995).

Moreover, the X platform already maintains robust features that, in practice, inform users

whether particular pieces of content are false and/or generated using artificial intelligence and are potentially misleading.     The first is Community Notes—a specially enabled form of counterspeech—(as well as the general post and reply features on X), *see* PSUF ¶ 121 (X Corp. S&O Decl. ¶ 22) (stating that Community Notes were utilized in connection with tens of thousands of posts suspected of being created or enhanced with artificial intelligence, and that the quantity of such Community Notes is expected to increase going forward); *id.* (X Corp. S&O Decl. ¶ 23; Ex. 11 (Lord Bebo (@MyLordBebo), X (Apr. 27, 2024, 11:21 AM)); *id.* (X Corp. S&O Decl. ¶ 23; Ex. 12 (Peter Symons#NHSLove (@brookebay21), X (Apr. 27, 2024, 9:24 AM)) (showing examples of Community Notes working in practice to inform users of the false or augmented nature of certain posts), and it was the government's burden to show that this less-speech-restrictive alternative would not further its goal.[12]

Second, as noted above, X and the other covered platforms already maintain platform policies that provide for the identification of the type of content that is arguably delineated as "materially deceptive" under Sections 20513 and 20514.  *See* PSUF ¶ 114 (X Corp. S&O Decl. ¶¶ 15–18, 21, 25–26; Rumble Decl. ¶¶ 16–19); ¶ 115 (X Corp. S&O Decl. ¶¶ 15–18, 21); ¶ 147 (X Corp. S&O Decl. Exs. 13–17).  As with Community Notes, it was the State's burden to demonstrate that these less-speech-restrictive alternatives would not further its goal in preserving California's free and fair elections.  It has come nowhere close.  The policies and practices of these other covered platforms demonstrate that AB 2655 is facially invalid under the First Amendment because "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Americans for Prosperity Found.* v. *Bonta*, 594 U.S. 595, 615 (2021).

This Court should follow the lead of the Fourth Circuit, which struck down a similar law. *See Washington Post* v. *McManus*, 944 F.3d 506 (4th Cir. 2019).  There, the law required, in an

---

[12] *See also* PSUF ¶ 122 (X Corp. S&O Decl. Ex. 5 (Matthew R. Allen, et al., *Characteristics of X (Formerly Twitter) Community Notes Addressing COVID-19 Vaccine Misinformation*, 331 J. Am. Med. Ass'n 1670 (2024)); *id.* (X Corp. S&O Decl. Ex. 6 (Mary Whitfill Roeloffs, *X's Community Notes Accurately Corrected Vaccine Misinformation 97% Of The Time Last Year, Study Says*, Forbes (Apr. 24, 2024, 11:00 AM); *id.* (X Corp. S&O Decl. Ex. 7 (Thomas Renault, et al., *Collaboratively Adding Context to Social Media Posts Reduces the Sharing of False News* (2024)); *id.* (X Corp. S&O Decl. Ex. 8 (Yuwei Chuai, et al., *Community notes reduce the spread of misleading posts on X* (2024)); *id.* (X Corp. S&O Decl. Ex. 9 (Chiara Patricia Drolsbach, et al., *Community notes increase trust in fact-checking on social media*, 3 PNAS Nexus 1 (2024)).

effort to address foreign interference in U.S. elections, "online platforms," within "48 hours of an ad being purchased," to "display somewhere on their site the identity of the purchaser, the individuals exercising control over the purchaser, and the total amount paid for the ad." *Id.* at 511. The Fourth Circuit declared the law "a compendium of traditional First Amendment infirmities" that would "chill speech" because "each banner feature of the Act—the fact that it is content-based, targets political expression, and compels certain speech—posed a real risk of either chilling speech or manipulating the marketplace of ideas." *See id.* at 513, 515, 519; *see also id.* at 517 ("when the onus is placed on platforms, we hazard giving government the ability to accomplish indirectly" what "it cannot do through direct regulation"). And, to be sure, the issues articulated by the Fourth Circuit in *McManus* apply now with even more force in the wake of the Supreme Court's decision in *Moody*.

### d. AB 2655 is a Prior Restraint on Speech.

AB 2655 imposes a prior restraint on speech, which is the "most serious and the least tolerable infringement on First Amendment rights." *Stuart*, 427 U.S. at 559. Even worse, AB 2655's prior restraint censors speech about "public issues and debate on the *qualifications* of candidates," to which the "First Amendment affords the *broadest protection*" to ensure the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *McIntyre*, 514 U.S. at 346. And it does so on social media platforms, the very cornerstone of those debates. *Packingham*, 582 U.S. at 104. AB 2655 imposes a prior restraint on speech because it provides, pursuant to Sections 20515(b) and 20516, expedited causes of action under Section 35 of the California Code of Civil Procedure through which political speech will be enjoined before there occurs a "final judicial determination" that the "speech is unprotected." *Isaksen*, 2005 WL 8176605, at *3 (citing *Vance*, 445 U.S. 308) (denying motion for preliminary injunction to remove already published speech because it would have constituted a prior restraint). Under Ninth Circuit law, orders requiring takedowns of currently published speech on the internet constitute "classic prior restraint[s]." *See, e.g., Garcia*, 786 F.3d at 747; *Living Vehicle, Inc.* v. *Kelley*, 2023 WL 2347442, at *9 (C.D. Cal. Jan. 20, 2023) (citing *Alexander* v. *United States*, 509 U.S. 544, 550 (1993); *Garcia*, 786 F.3d at 746–47) (prior restraints "refer either to injunctions that

1    restrict future speech or require takedowns of currently-published speech"); *SolarPark Korea Co.*

2    v. *Solaria Corp.*, 2023 WL 4983159, at *11 (N.D. Cal. Aug. 2, 2023), *appeal dismissed*, 2023 WL

3    9860831 (9th Cir. Sept. 28, 2023) (same).

4    Three other features of AB 2655 also independently impose a prior restraint on speech.

5    First, AB 2655 allows the enjoinment of speech through a temporary restraining order or

6    preliminary injunction alternative to or in addition to expedited suits.  Second, AB 2655 mandates

7    the immediate removal of speech, without a determination that it is constitutionally unprotected, so

8    long as it is "substantially similar" to speech "previously removed" under the statute, § 20513(c).

9    Third, the statute imposes a government system of censorship designed to eliminate or disfavor

10   certain speech on social media platforms that incentivizes platforms to block or label such speech

11   within 72 hours, by providing complete immunity for platforms that proactively censor any content

12   that arguably falls within the statute's purview and potential lawsuits for those who fail to do so.

13       e.   AB 2655 Violates the Free Press Clause.

14   The founders recognized the "critical" role the press played "in mobilizing sentiment in

15   favor of independence" during the Revolution."  *Minneapolis Star & Trib. Co.* v. *Minn. Com'r of*

16   *Revenue*, 460 U.S. 575, 584–85 (1983).  So, at the urging of the Anti-Federalists, the Bill of Rights

17   included the Free Press Clause.  *Id.* at 585.  That clause protects the press because "an untrammeled

18   press is a vital source of public information, and an informed public is the essence of working

19   democracy."  *Id.* (cleaned up).  Any state regulation on the press must be consistent with the text

20   and history of that clause.  *Cf. N.Y. State Rifle & Pistol Ass'n* v. *Bruen*, 597 U.S. 1, 22 (2022).  And

21   the First Amendment prohibits both government regulation "with the intent to burden the press,"

22   *Koala* v. *Khosla*, 931 F.3d 887, 897 (9th Cir. 2019), and "differential treatment, unless justified by

23   some special characteristics of the press, *Minneapolis Star*, 460 U.S. at 585.  Differential treatment

24   "is presumptively unconstitutional . . . unless the State asserts a counterbalancing interest of

25   compelling importance that it cannot achieve" otherwise.  *Id.*

26   AB 2655 has the intent of burdening online platforms and treats covered platforms

27   differently than other platforms and press outlets.  AB 2655 explicitly imposes additional burdens

28   on covered platforms, i.e., "large online platform[s]."  *E.g.*, § 20513(a).  But it doesn't impose the

MEMORANDUM OF POINTS AND                 34
AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT

1  same on platforms with fewer than 1 million California users or on other press outlets, like a

2  "regularly published online newspaper, magazine, or other periodical" or "broadcasting station."

3  §§ 20512(h), 20519. Neither can California show a historical tradition of imposing such onerous

4  requirements on the press. AB 2655 thus triggers (and can't meet) strict scrutiny under the Free

5  Press Clause. *See generally* Floyd Abrams, et al., *The Press Clause: The Forgotten First*

6  *Amendment*, 5 J. FREE SPEECH L. 561 (2024).

7  **II.    AB 2655 Violates and is Preempted by 47 U.S.C. §§ 230(c)(1) and 230(c)(2).**

8  AB 2655 directly conflicts with, and is thus preempted by, the immunity afforded by Section

9  230 of the Communications Decency Act (47 U.S.C. §§ 230(c)(1) and 230(c)(2)), which prohibits

10  (i) treating interactive computer service providers[13] as the "publisher or speaker of any information

11  provided by another information content provider," *id.* § 230(c)(1), and (ii) holding interactive

12  computer service providers liable "on account of" "any action" "taken to enable or make available

13  to information content providers or others the technical means to restrict access to [objectionable]

14  material," *id.* § 230(c)(2)(B). The lawsuits authorized by Sections 20515(b) and 20516 do both.

15  The Supremacy Clause provides that "the Laws of the United States . . . shall be the supreme

16  Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary

17  notwithstanding." U.S. Const. art. VI, cl. 2. Congress has the power under the Supremacy Clause

18  to preempt state law when there exists a "conflict" between federal and state law—that is, "where

19  it is impossible to comply with both state and federal requirements, or where state law stands as an

20  obstacle to the accomplishment and execution of the full purpose and objectives of Congress."

21  *Indus. Truck Ass'n, Inc.* v. *Henry*, 125 F.3d 1305, 1309 (9th Cir. 1997) (defining "conflict

22  preemption"). A state law is also preempted by federal law based on "express preemption" when

23  "Congress explicitly defines the extent to which its enactments preempt state law." *Id.* Whether a

24  law is preempted is "almost entirely a question of Congressional intent." *Radici* v. *Associated Ins.*

---

25
26  [13] X Corp. and Rumble are interactive computer service providers because they are the providers of the X and Rumble platforms, respectively, which are "interactive computer service[s]" under Section 230. *See* PSUF ¶ 113 (X Corp. S&O Decl. ¶ 5; Rumble Decl. ¶¶ 12–14); 47 U.S.C. § 230(f)(2) ("The term 'interactive computer service' means any
27  information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems
28  operated or services offered by libraries or educational institutions.").

1  *Companies*, 217 F.3d 737, 741 (9th Cir. 2000). The Communications Decency Act expressly

2  preempts contrary State law: "No cause of action may be brought and no liability may be imposed

3  under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

4  Any "liability imposed under" AB 2655 would be "inconsistent" with Section 230(e)(3),

5  because such "liability" includes being subjected to the kind of injunctive and other equitable relief

6  authorized by AB 2655's Enforcement Provisions. *See, e.g.*, *Hassell* v. *Bird*, 5 Cal. 5th 522, 544–

7  45 (2018) (finding that Section 230 barred "cause[s] of action" directing Yelp to remove

8  defamatory consumer reviews). "Section 230 must be construed to protect defendants 'not merely

9  from ultimate liability, but from having to fight costly and protracted legal battles.'" *Republican*

10 *Nat'l Comm.* v. *Google, Inc.*, 2023 WL 5487311, at *3 (E.D. Cal. Aug. 24, 2023) (quoting *Fair*

11 *Hous. Council of San Fernando Valley* v. *Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir.

12 2008) (en banc)).

13 AB 2655 imposes its own content-moderation principles on covered platforms with a

14 looming threat of costly, expedited litigation if they do not sufficiently comply. This is entirely

15 antithetical to the objectives set forth by Congress in enacting Section 230, which were to encourage

16 self-regulation unfettered by the types of threats of liability that AB 2655 effects and encourages.

17 *See Republican Nat'l Comm.*, 2023 WL 5487311, at *7 (quoting *Carafano* v. *Metrosplash.com,*

18 *Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003)) (Congress enacted Section 230 "to encourage **voluntary**

19 monitoring for offensive or obscene material."); *In re Apple Inc. App Store Simulated Casino-Style*

20 *Games Litig.*, 625 F. Supp. 3d 971, 979 (N.D. Cal. 2022) ("The legislative history . . . makes clear

21 that Congress enacted [S]ection 230 to remove the disincentives to **self-regulation**[.]"), *appeal*

22 *dismissed on other grounds and remanded sub nom., In re Facebook Simulated Casino-Style*

23 *Games Litig.*, 2024 WL 2287200 (9th Cir. May 21, 2024), *appeal dismissed*, 2024 WL 2287200

24 (9th Cir. May 21, 2024). Applying Section 230's broad immunity here would thus comport with

25 "Congressional intent." *Radici*, 217 F.3d at 741.

26  a. AB 2655 Violates Section 230(c)(1).

27 AB 2655's Enforcement Provisions violate, and are thus preempted by, Section 230(c)(1)

28 because they provide causes of action for "injunctive or other equitable relief against" X, Rumble,

1    and the other covered platforms on account of content posted on their platforms *by users*. *See*

2    §§ 20515(b), 20516.    The statute imposes liability on covered platforms by holding them

3    responsible for the content of what is on their platforms, as if they were the publishers of that

4    content.    It requires removal and labeling of content that the State disfavors (i.e., "materially

5    deceptive content" that is otherwise covered by the statute) and requires removal and labeling of

6    such content if the covered platforms fail to comply. *See* §§ 20513–201516.

7        Section 230(c)(1) bars such liability where, as here, the alleged duty violated derives from

8    an entity's conduct as a "publisher," including "reviewing, editing, and deciding whether to publish

9    or withdraw from publication third-party content." *Barnes* v. *Yahoo!, Inc.*, 570 F.3d 1096, 1102

10   (9th Cir. 2009). That is exactly what AB 2655 does to the covered platforms here. For instance, if

11   a platform does not remove content proscribed by the statute within 72 hours after it is reported,

12   then the platform may be sued. But "removing content is something that publishers do," so AB

13   2655's imposition of "liability on the basis of such conduct necessarily involves treating the

14   [covered platform] as a publisher of the content it failed to remove." *Id.* at 1102–03 (finding that

15   no "intellectual gymnastics" were needed to conclude that Yahoo! was entitled to immunity under

16   Section 230(c)(1) from claims concerning its failure to remove an offending profile), *as amended*

17   (Sept. 28, 2009).

18       The Ninth Circuit's recent decision in *Calise* v. *Meta Platforms, Inc*., 103 F.4th 732, 744

19   (9th Cir. 2024), further supports Section 230(c)(1)'s application here. There, Meta users sued Meta,

20   asserting that they were harmed by fraudulent third-party advertisements posted on Meta's website

21   in violation of its terms of service. *Id.* at 736. But because Meta would have "need[ed] to actively

22   vet and evaluate third party ads" to "avoid liability," Section 230(c)(1) barred the plaintiffs' claim.

23   *Id.* at 744. The Ninth Circuit again made clear that Section 230(c)(1) immunizes interactive

24   computer service providers from liability for "fail[ing] to remove" content. *See id.* That is exactly

25   the type of regime that AB 2655 sets forth. Accordingly, by providing expedited suits for injunctive

26   or other equitable relief against covered platforms that fail to remove or alter content in a manner

27   and timeframe to the State's liking, AB 2655 violates Section 230(c)(1).

28

b.    AB 2655 Violates Section 230(c)(2).

Section 20516 of AB 2655's Enforcement Provisions also violates, and is thus preempted by, Section 230(c)(2)(B).  The immunity provided by Section 230(c)(2)(B) is "broad"—it covers "any action" "taken to enable or make available to information content providers or others the technical means to restrict access to [objectionable] material."  *See PC Drivers Headquarters, LP* v. *Malwarebytes Inc.*, 371 F. Supp. 3d 652, 660 (N.D. Cal. 2019).  Section 20516 violates Section 230(c)(2)(B) because it provides causes of action for "injunctive or other equitable relief against" covered platforms that attempt to comply with the Reporting Requirement (by creating a mechanism for users to report the "materially deceptive content" targeted by the statute), but not to the satisfaction of the government.  *See* § 20516.

In other words, a covered platform's attempt to comply with the Reporting Requirement *is* an action to make available the technical means to restrict access to objectionable content, as contemplated by Section 230(c)(2)(B).  *See Zango, Inc.* v. *Kaspersky Lab, Inc.*, 568 F.3d 1169, 1176 (9th Cir. 2009) (immunizing the provision of anti-malware software to users under Section 230(c)(2)(B)); Brief of Techfreedom as *Amicus Curiae* in Support of Petitioner, *Malwarebytes, Inc.* v. *Enigma Software Grp. USA, LLC*, 141 S. Ct. 13 (2020) (No. 19-1284), 2020 WL 3316788, at *10 n.7 (asserting that YouTube's "'Trusted Flagger' program," which provides "tools" to users to "notify[] YouTube of content that violates [its] Community Guidelines," is "covered by Subsection 230(c)(2)(B)"); *cf. Enigma Software Grp. USA, LLC* v. *Malwarebytes, Inc.*, 946 F.3d 1040, 1052 (9th Cir. 2019) (limiting *Zango* and barring Section 230(c)(2)(B) immunity where the anti-malware software was used "for anticompetitive reasons").  As such, given that covered platforms will face enforcement if the reporting mechanism they implement does not—in the view of the government enforcers—satisfy the Reporting Requirement, Section 20516 directly contravenes Section 230(c)(2)(B).

**III.    AB 2655 Violates the First and Fourteenth Amendments to the U.S. Constitution on Overbreadth and Vagueness Grounds.**

AB 2655's expansive reach and vague terms render it unconstitutional under the First and Fourteenth Amendments.  When a statute regulates speech, the Supreme Court has "lowered [the] very high bar" to facial challenges.  *Moody*, 603 U.S. at 723.  If a "statute prohibits a substantial amount of protected speech relative to its plainly legitimate sweep, then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid."  *United States* v. *Hansen*, 599 U.S. 762, 770 (2023).

In all its applications, AB 2655 applies to speech.  It requires covered platforms like X and Rumble to remove speech they otherwise would not and compels those platforms' speech.  And AB 2655 does not target unprotected speech, like defamation or copyright infringement. *See supra*, at 31.  Instead, using terms nearly identical to those in AB 2839, it "implicat[es] vast amounts of politically and constitutionally protected speech," like Kohls' videos and Rickert's memes. *See Kohls*, 2024 WL 4374134, at \*3.  Online posts and videos "are the newspaper advertisements and political cartoons of today[.]"  *Id.* at \*5.  Yet AB 2655 requires covered platforms to remove or label that highly protected political speech.  Any "legitimate sweep" from AB 2655 "pales in comparison to the substantial number of its applications . . . which are plainly unconstitutional." *Id.*

AB 2655 is also void for vagueness under the First and Fourteenth Amendments to the U.S. Constitution.  The statute's requirements and prohibitions are so unintelligible that X, Rumble, the other covered platforms, as well as content creators such as Kohls, The Bee, and Rickert, cannot understand what the law prohibits.  AB 2655 fails to provide "a reasonable opportunity to know what" the statute "prohibit[s]."  *Hunt* v. *City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011).  So too does AB 2655 "impermissibly delegate[] basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application[.]"  *Id.*  Laws that "interfere[] with the right of free speech or of association" must pass a "stringent vagueness test."  *Village of Hoffman Estates* v. *Flipside,*

*Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *see also, e.g.*, *NAACP* v. *Button*, 371 U.S. 415, 432 (1963) (holding that the "standards of permissible statutory vagueness are strict in the area of free expression").

AB 2655 fails to meaningfully define five key terms and phrases. First, the statute requires large online platforms to develop "state-of-the-art" techniques to identify and remove certain "materially deceptive content." § 20513(a). However, it provides no clarity as to what kinds of techniques are "state-of-the-art."

Second, its definition of "materially deceptive content" doesn't target false content as such. Rather, the definition hinges on an unclear description of whether content would "falsely appear to a reasonable person to be an authentic record of the content depicted in the media." § 20512(i)(1). That means large online platforms and content creators "must necessarily guess at" what types of political satire and parody appear authentic enough to violate the law. *Fed. Commc'n Comm'n* v. *Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *cf. Bullfrog Films, Inc.* v. *Wick*, 847 F.2d 502, 513 (9th Cir. 1988) (treaty affording favorable treatment to materials deemed "representative," "authentic," and "accurate" was "unquestionably vague"); *see also* PSUF ¶ 182  (X Corp. S&O Decl. ¶¶ 6, 19; Rumble Decl. ¶¶ 45, 51) (discussing the burden of making these subjective "judgment calls" on X's and Rumble's manual content reviewers). Consider that The Bee's satirical posts are regularly fact-checked. PSUF ¶ 33 (Dillion Decl. ¶¶ 58–62). Snopes, for instance, thought it necessary to "fact-check" a satirical post The Bee wrote about United States Representative Alexandria Ocasio-Cortez guessing everything on "The Price Is Right" was free. *Id.* ¶¶ 34–35 (Dillion Decl. ¶¶ 63–64). If websites like Snopes, *USA Today*, and other news organizations believe these articles need a fact-check, an activist or the Secretary of State could easily conclude that this and other similar content violates the law. And even if an action fails on the merits, it will impose substantial costs on covered platforms and content creators, who will be forced to defend such actions.

Third, AB 2655 exempts "materially deceptive content" that "constitutes satire or parody," but similarly provides no guidance as to what constitutes satire or parody. Defining terms like "satire" and "parody" is difficult and often controversial. PSUF ¶ 182 (X Corp. S&O Decl. ¶ 6,

1   19; Rumble Decl. ¶¶ 45, 51).  As the example of the Kamala Harris video made by Mr. Kohls

2   illustrates, *see supra* at 17–18, the government's view of what constitutes "satire" or "parody" will

3   often differ from that of the public, the covered platforms, and of content creators.  These terms are

4   insufficient to provide advance notice of what content is covered by the statute and are thus void

5   for vagueness.  *Hunt*, 638 F.3d at 712.

6        Fourth, AB 2655's prohibition on content "reasonably likely to harm the reputation or

7   electoral prospects of a candidate" and "undermine confidence in the outcome of" an election are

8   also vague.  Whether something is likely to harm or help the electoral prospects of a candidate or

9   confidence in an election remains in the eye of the beholder and each individual voter.  It's

10  something covered platforms can only speculate about.  *See* PSUF ¶ 181 (X Corp. S&O Decl. ¶ 6;

11  Rumble Decl. ¶ 44).  The law thus provides "no principle for determining when" speech will "pass

12  from the safe harbor . . . to the forbidden."  *Gentile* v. *State Bar of Nev.*, 501 U.S. 1030, 1049

13  (1991); *see Flomo* v. *Firestone Nat. Rubber Co., LLC*, 643 F.3d 1013, 1022 (7th Cir. 2011)

14  (observing that law prohibiting practices "likely to harm" was "pretty vague, in part because no

15  threshold of actionable harm is specified").

16       Fifth, the statute also exempts from the definition of "materially deceptive content" any

17  "audio or visual media that contains only minor modifications that do not significantly change the

18  perceived contents or meaning of the content."  § 20512(i)(2).  This "minor modifications"

19  exemption is also vague.  It is no answer to say that they are small changes that "do not alter [the

20  content's] substantive meaning," *see* Defs.' Opp. to Pl.'s Mot. for Preliminary Injunction at 22,

21  *Kohls* v. *Bonta*, No. 2:24-cv-02527-JAM-CDK (E.D. Cal. Sept. 23, 2024), ECF 9, because

22  "substantive meaning" itself is a matter of subjective interpretation, as is whether the modifications

23  "significantly change the perceived contents or meaning of the content."  § 20512(i)(2); *cf. Sackett*

24  v. *EPA*, 598 U.S. 651, 681 (2023) ("the boundary between a 'significant' and an insignificant nexus

25  is far from clear").

26       It will be "next to impossible," moreover, for the covered platforms to make these

27  determinations as to every candidate for elective office, elections official, and elected official,

28  particularly for candidates in lesser-known races (e.g., for Insurance Commissioner, *see*

§ 20512(c)), local elections, and smaller jurisdictions. PSUF ¶¶ 176–77 (X Corp. S&O Decl. ¶¶ 6–7). This difficulty is also exacerbated by (i) the statute's unreasonable time frame for making these difficult content-moderation decisions, under which covered platforms may be sued if they do not respond to a report within 36 hours or take proper action in response to a report within 72 hours, PSUF ¶ 183 (X Corp. S&O Decl. ¶¶ 6–9); (ii) the quantity of election-related content that covered platforms will have to decide whether to remove or label—for example, from November 5–6, 2024, there were 942 million posts on X globally, an all-time global daily record, and in the beginning of 2024, when elections were occurring in the European Union and India, X Corp. received 224,129,805 user reports related to allegedly false content on the platform, PSUF ¶ 184 (X. Corp. S&O Decl. ¶ 14; *id*. Ex. 3 (Global Government Affairs (@GlobalAffairs), X (Nov. 14, 2024, 9:57 AM)); and (iii) the fact that government officials and candidates, who often have a stake in the outcomes of elections, are particularly poorly situated to decide what constitutes "materially deceptive content" about elections in a dispassionate way, since such officials typically make tactical decisions in criticizing the political speech of their political opponents, and AB 2655 would give these officials the ability to impose substantial pressure on covered platforms, like X and Rumble, to censor the speech of their political opponents, by giving politicians and candidates for office discretion as to when to bring costly enforcement actions against covered platforms. *See Hunt*, 638 F.3d at 712.

In addition, the statute's Enforcement Provisions entirely immunize over-censoring and over-labeling content and impose costly, expedited litigation on covered platforms that fail to censor or label enough. AB 2655 effectuates this scheme through unintelligible prohibitions and "acts as a hammer instead of a scalpel," *Kohls*, 2024 WL 4374134, at \*8, the result of which will be that covered platforms will feel immense pressure to censor *all* content that could reasonably fall within the statute's purview to avoid substantial enforcement costs. *See* PSUF ¶¶ 216–20; *see Hunt*, 638 F.3d at 712 ("An ordinance may be void for vagueness because [] it . . . 'abut(s) upon sensitive areas of basic First Amendment freedoms, [] operat[ing] to inhibit the exercise of (those) freedoms.'"). AB 2655 incentivizes X, Rumble, and all other covered platforms to censor the speech of their users, like Kohls, The Bee, and Rickert, that they otherwise would not. That not

only interferes with the platforms' expression, but also the content creators', and the users' who view their posts. *See* PSUF ¶¶ 190–208.

The law's vagueness also violates the content and viewpoint neutrality requirements, making the law facially invalid, because it gives enforcement authorities "unbridled discretion." *Kaahumanu* v. *Haw.*, 682 F.3d 789, 806 (9th Cir. 2012). Simply, "an indeterminate prohibition carries with it the opportunity for abuse." *Minn. Voters All.* v. *Mansky*, 585 U.S. 1, 21 (2018) (cleaned up). Enforcement officials "must be guided by objective, workable standards." *Id.* For example, run-of-the-mill campaign ads attacking "a candidate's voting record" often contain exaggerations. *Com.* v. *Lucas*, 34 N.E.3d 1242, 1256 (Mass. 2015) (explaining that "distinguishing between truth and falsity may prove exceedingly difficult" in this context). If courts (and covered platforms) must undertake an "in-depth analysis of legislative history" to determine the truth or falsity of digitally altered content, that gives enforcement authorities much discretion to determine which posts violate the law. *Id.* Or take the meme of Trump running from police. PSUF ¶ 212 (Kurtzberg Decl. Ex. 8). It's ambiguous whether it is "reasonably likely to harm" his candidacy, because some will view this meme favorably while others will not. Or, it may depend on whether someone somewhere thinks it's "materially deceptive." § 20512(i)(1). Or, it may depend on the poster's "subjective intent." *Berger* v. *City of Seattle*, 569 F.3d 1029, 1047 (9th Cir. 2009). "[T]his myriad of factors lends itself to discriminatory enforcement," where activists and government officials alike "resort to enforcing the [law] only against those messages the officer or the public dislikes." *Id.* at 1048 (cleaned up).

This, the First and Fourteenth Amendments of the U.S. Constitution do not permit. With AB 2655, concerns about vagueness are particularly acute, because the lack of a clearly defined set of rules will permit the politically driven enforcers of the statute to apply it in a manner that discriminates against core political speech based on its content and viewpoint. *See Button*, 371 U.S. at 432–33 ("The objectionable quality of vagueness and overbreadth . . . in the area of First Amendment freedoms" is "the existence of a penal statute susceptible of sweeping and improper application."); *Tucson Woman's Clinic* v. *Eden*, 379 F.3d 531, 555 (9th Cir. 2004) (striking down a regulation on vagueness grounds that "subjected physicians to sanctions based not on their own

1  objective behavior, but on the subjective viewpoint of others"), *abrogated on other grounds*, *Dobbs*

2  v. *Jackson Women's Health Org.*, 597 U.S. 215 (2022).

3  **IV.  Plaintiffs Satisfy the Remaining Factors for a Permanent Injunction.**

4  Plaintiffs satisfy the remaining factors for a permanent injunction, which require a showing

5  of (i) irreparable injury; (ii) that other remedies are inadequate; and that (iii) the balance of

6  hardships and (iv) the public interest favor an injunction. *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th

7  946, 1002 (9th Cir. 2023).  First, Plaintiffs will be irreparably harmed absent injunctive relief

8  because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably

9  constitutes irreparable injury." *Kohls*, 2024 WL 4374134, at \*6.  Second, "constitutional violations

10  cannot be adequately remedied through damages." *Am. Trucking Associations, Inc.* v. *City of Los*

11  *Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009).  Finally, the balance of hardships and the public

12  interest favor an injunction because California's interests here are "minimal when measured against

13  the gravity of First Amendment values at stake," *Kohls*, 2024 WL 4374134, at \*7, and "it is always

14  in the public interest to prevent the violation of a party's constitutional rights," *id*; *X Corp.*, 116

15  F.4th at 904.  And for all the reasons given above, this Court should grant declaratory relief too.

16  *See Wilton* v. *Seven Falls Co.*, 515 U.S. 277, 289–90 (1995) (explaining the court always has

17  discretion to enter declaratory relief).

18  **CONCLUSION**

19  The Court should grant Plaintiffs' motion for summary judgment, declare AB 2655

20  unconstitutional and legally invalid, and permanently enjoin Defendants from enforcing it.

21

22

23

24

25

26

27

28

1    Dated: March 7, 2025

2

     By: /s/ Joel Kurtzberg
3    CAHILL GORDON & REINDEL LLP
     Joel Kurtzberg (admitted *pro hac vice*)
4    Floyd Abrams (admitted *pro hac vice*)
     Jason Rozbruch (admitted *pro hac vice*)
5    32 Old Slip
     New York, NY 10005
6    Phone: 212-701-3120
     Facsimile: 212-269-5420
7    jkurtzberg@cahill.com

8    DOWNEY BRAND LLP
     William R. Warne (SBN 141280)
9    Meghan M. Baker (SBN 243765)
     621 Capitol Mall, 18th Floor
10   Sacramento, CA 95814
     Phone: 916-444-1000
11   Facsimile: 916-520-5910

12   *Attorneys for Plaintiff X Corp.*

13   /s/ Adam E. Schulman
     HAMILTON LINCOLN LAW INSTITUTE
14   Adam E. Schulman (admitted *pro hac vice*)
     Theodore H. Frank (SBN 196332)
15   1629 K Street NW, Suite 300 Washington,
     DC 20006
16   Phone: 610-457-
     0856adam.schulman@hlli.org
17   ted.frank@hlli.org

18   *Attorneys for Plaintiff Christopher Kohls*

19   /s/Johannes Widmalm-Delphonse
     ALLIANCE DEFENDING FREEDOM
20   Johannes Widmalm-Delphonse
     44180 Riverside Parkway
21   Lansdowne, VA 20176
     Phone: 571-707-4655
22   jwidmalmdelphonse@ADFlegal.org

23   ALLIANCE DEFENDING FREEDOM
     Jonathan A. Scruggs
24   15100 N. 90th Street
     Scottsdale, AZ 85260
25

26

27

28

Phone: 480-444-0020
Facsimile: 480-444-0028
jscruggs@ADFlegal.org

CHAVEZ-OCHOA LAW OFFICES, INC.
Brian R. Chavez-Ochoa (SBN 190289)
4 Jean Street, Suite 4
Valley Springs, CA 95252
Phone: 209-772-3013
brianr@chavezochoalaw.com

*Attorneys for Plaintiffs The Babylon Bee,
LLC and Kelly Chang Rickert*

/s/ Mathew W. Hoffmann
ALLIANCE DEFENDING FREEDOM
Mathew W. Hoffmann
Philip A. Sechler
44180 Riverside Parkway
Lansdowne, VA 20176
Phone: 571-707-4655
Facsimile: 571-707-4656
mhoffmann@ADFlegal.org
psechler@ADFlegal.org

ALLIANCE DEFENDING FREEDOM
Mercer Martin
15100 N. 90th Street
Scottsdale, AZ 85260
Phone: 480-444-0020
Facsimile: 480-444-0028
mmartin@ADFlegal.org

CHAVEZ-OCHOA LAW OFFICES, INC.
Brian R. Chavez-Ochoa (SBN 190289)
4 Jean Street, Suite 4
Valley Springs, CA 95252
Phone: 209-772-3013
brianr@chavezochoalaw.com

*Attorneys for Plaintiffs Rumble Inc. and
Rumble Canada Inc.*

## **PROOF OF SERVICE**

I hereby certify that I caused to be filed a true and accurate copy of the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sends an electronic notification to all attorneys of record in this case.

Dated: March 7, 2025

By: /s/ Joel Kurtzberg
CAHILL GORDON & REINDEL LLP
Joel Kurtzberg (admitted *pro hac vice*)
32 Old Slip
New York, NY 10005
Phone: 212-701-3120
Facsimile: 212-269-5420
jkurtzberg@cahill.com

PROOF OF SERVICE