1      UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF CALIFORNIA

3      SACRAMENTO DIVISION

4    CHRISTOPHER KOHLS,                       Case No. 2:24-cv-02527-JAM-CKD

5           Plaintiff,                        **STATEMENT OF UNDISPUTED FACTS
                                              IN SUPPORT OF PLAINTIFFS' MOTIONS**
6      v.                                     **FOR SUMMARY JUDGMENT AGAINST
                                              AB 2839 AND AB 2655**
7    ROBERT A. BONTA, et al.,

8           Defendants.

9

10   THE BABYLON BEE, LLC, et al.,

11          Plaintiffs,

12     v.

13   ROBERT A. BONTA, et al.,

14          Defendants.

15   RUMBLE, INC., et al.,

16          Plaintiffs,

17     v.

18   ROBERT A. BONTA, et al.,

19          Defendants.

20

21   X CORP.,

22          Plaintiff,

23     v.

24   ROBERT A. BONTA, et al.,

25          Defendants.

26

27

28
     PLAINTIFFS' STATEMENT OF
     UNDISPUTED FACTS

**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 260(a), Plaintiffs X Corp., Rumble Inc. and Rumble Canada Inc. (collectively, "Rumble"), Christopher Kohls, The Babylon Bee ("The Bee"), and Kelly Chang Rickert submit this statement of undisputed material facts in support of their Motions for Summary Judgment Against AB 2839 and AB 2655.

**I.    Satire has a rich and important history in the United States.**

1.    Satire is a distinct mode of expression, historically rooted in literature but extending across various media, including theater, visual art, film, television, and digital platforms.  Satire has a history that stretches back to Ancient Rome.  Declaration of Seth Dillon In Support of Plaintiffs' Motions for Summary Judgment Against AB 2839 and AB 2655 ("Dillon Decl."), dated March 7, 2025, ¶ 9.

2.    Satire focuses on topical content or individuals, speaks to particular moments, and generally "deals with actual cases, mentions real people by name or describes them unmistakably (and often unflatteringly)."  *Id.* ¶ 10.

3.    Parody is a form of satire that takes original content, imitates it, and then makes the original look absurd through various devices.  *Id.* ¶ 11.

4.    The end of satire is often to criticize or mock an idea, event, or person for the purpose of correction and improvement.  Sometimes it merely aims to provoke laughter.  Satire uses humor, irony, and exaggeration to expose and critique societal flaws, hypocrisy, and corruption.  *Id.* ¶ 12.

5.    Figures such as Horace, Plato (*Menexenus*), Miguel de Cervantes (*Don Quixote*), Voltaire (*Candide*), Jonathan Swift (*Gulliver's Travels*), and George Orwell (*Animal Farm*) have used satire to provide social commentary to expose underlying truths.  *Id.* ¶ 13.

6.    Satirists "intend[ ] to shock" their audience "[b]y compelling them to look at a sight they had missed or shunned" and help their audience to "realize the truth, and then move[ ] … to feelings of protest."  *Id.* ¶ 14.

7.    In short, satirists "tell the truth with a smile, so that [they] will not repel [people] but cure them of th[eir] ignorance which is their worst fault."  *Id.* ¶ 15.

8.    Through this technique, satirists intend to prompt thought, internal reflection, and public dialogue about the subject of the satire. *Id.* ¶ 17.

9.    To do this effectively, satire and parody leverage the expectations that are created in an audience when they see something in a particular form and juxtapose that realism with the satirical form. *Id.* ¶ 18.

10.    Satire and parody generate their most rhetorical power by mimicking a particular form, event, idea, or person and then inserting something absurd to create dissonance that exposes fault or error. *Id.* ¶ 19.

11.    In these ways, satire and parody make audiences do a double-take by making them believe that they are seeing a serious rendering of an original and then allowing them to laugh at their own gullibility when they realize that they are really viewing satire or parody. *Id.* ¶ 16.

12.    This power comes from satire and parody's proximity to the original. *Id.* ¶ 20.

13.    Because of their effectiveness and appeal, satire and parody have been used throughout American history to express matters of current interest—especially in matters of politics and politicians. *Id.* ¶ 21.

**II.    The Bee is a satirical news source that posts satire and parody related to elections.**

14.    The Bee fits well within this longstanding tradition of using satire and parody to speak the truth, expose bad ideas, and encourage societal change. *Id.* ¶ 22.

15.    The Bee's tagline is "Fake news you can trust." *Id.* ¶ 23.

16.    The Bee runs and controls a website, babylonbee.com, that exposes absurdity, mocks foolishness, and highlights hypocrisy in faith, politics, and culture through satire, humor, and parody. *Id.* ¶ 5.

17.    Millions of people view The Bee's website each month, and California is The Bee's third largest state in terms of audience reach. *Id.* ¶ 24.

18.     The Bee has accounts on online platforms like Rumble, X, Facebook, Instagram, and YouTube, where it republishes its articles, posts videos, and republishes third-party content. *Id.* ¶ 25.

19.     The Bee currently has 4.7 million followers on X, 2 million followers on Instagram, over 1.5 million followers on Facebook, over 1.5 million subscribers on YouTube, and over 475,000 followers on Rumble. *Id.* ¶ 26.

20.     The Bee's articles commonly generate millions of "impressions," and tens of thousands of "likes" and "reposts" on online platforms. *Id.* ¶¶ 27–28.

21.     As one example, The Bee posted an article entitled "The Babylon Bee has obtained this exclusive, official, 100% real Gavin Newsom election ad" with an embedded video on X on September 18, 2024.  The video depicts alternating images of smiling citizens and trash-littered streets, overlaid with an AI-generated version of Governor Newsom's voice making statements that the video contains his "authentically recorded" "100% real message" "without the assistance of any AI whatsoever."  As of March 5, 2025, the post had accumulated over 36 million views, 140,000 thousand likes, and 54,000 reposts. *Id.* ¶¶ 29–30.

22.     The Bee posts between six to eight articles on its website during the workweek and three to five articles during the weekends, and then republishes those articles on X, Facebook, and Instagram. *Id.* ¶ 32.

23.     The Bee also publishes videos that it creates on Rumble and YouTube. *Id.* ¶ 33.

24.     The Bee regularly posts about various topics, including politics, elections, politicians, the economy, California, fall traditions, government censorship, and much else. *Id.* ¶¶ 34–36.

25.     Before, during, and after the 2024 election, The Bee posted articles about Presidential candidates Donald Trump and Kamala Harris, Vice Presidential candidates J.D. Vance and Tim Walz, President Biden, and voting in California, among other topics. *Id.* ¶¶ 37–38, 40–41, 43–44.

26.     Headlines include:

a.     *Awkward: Mourners at Jimmy Carter Funeral Place Flowers on Biden*, Babylon Bee, Jan. 9, 2025. *Id.* ¶ 44.a.

b.     *Biden Honors Kamala Harris with Presidential Medal of Participation*, Babylon Bee, Jan. 5, 2025. *Id.* 44.b.

c.     *"Ok, Who Got Me the MAGA Hat?" Asks Kamala Harris as Jill Biden Stifles Laughter*, Babylon Bee, Dec. 24, 2024. *Id.* ¶ 44.c.

d.     *Adorable: Trump and Musk Debut Matching Christmas Pajamas*, Babylon Bee, Dec. 20, 2024. *Id.* ¶ 44.d.

e.     *Newsom Says with Another $25 Billion He Could Double Homelessness by 2030*, Babylon Bee, Dec. 18, 2024. *Id.* ¶ 44.e.

f.     *Trump Projected to Win in 50-State Landslide After Appearing in Squirrel Costume*, Babylon Bee, Nov. 2, 2024. *Id.* ¶ 38.a.

g.     *New "Kamalexa" Edition of Amazon Echo Will Just Ramble for 10 Minutes Without Ever Answering Your Questions*, Babylon Bee, Oct. 31, 2024. *Id.* ¶ 38.b.

h.     *Kids at Tim Walz's Door Disappointed as He Fills Candy Bags with Tampons*, Babylon Bee, Oct. 31, 2024. *Id.* ¶ 38.c.

i.     *California Man Arrested for Showing I.D. to Vote*, Babylon Bee, Oct. 29, 2024. *Id.* ¶ 38.d.

j.     *"We Can't Afford Another Four Years Of This!" Shouts Running Mate Of Candidate Who Has Been Leading Country for Four Years*, Babylon Bee, Sept. 21, 2024. *Id.* ¶ 44.f.

k.     *Furious Gavin Newsom Bans A.I. Images After Getting Tricked Into Thinking Pic of Trump As A Mer-Man Was Real*, Babylon Bee, Sept. 18, 2024. *Id.* ¶ 44.g.

l.     *Here Are 9 AI-generated Deep Fakes Of Gavin Newsom That Are Illegal To Share In California*, Babylon Bee, Sept. 18, 2024. *Id.* ¶ 44.h.

m.     *BREAKING: The Babylon Bee has obtained this exclusive, official, 100% real Gavin Newsom election ad*, Babylon Bee, Sept. 17, 2024. *Id.* ¶ 44.i; *id.* Ex. A at 16.

n.      *Democrats Concerned California Wildfires May Burn Up Their Stock of Prefilled Kamala Harris Ballots*, Babylon Bee, Sept. 12, 2024.  *Id.* ¶ 38.e.

o.      *In Brief Moment Of Lucidity, Biden Endorses Trump*, Babylon Bee, Sept. 11, 2024.  *Id.* ¶ 38.f.

p.      *Trump Team Reveals Debate Strategy: Trump Will Cede All His Time To Kamala And Then Quietly Play With His Tamagotchi*, Babylon Bee, Sept. 10, 2024.  *Id.* ¶ 38.g.

q.      *Kamala Responds to Criticism Over Lack of Policies by Posting Another Truck Stop Junk Food Video*, Babylon Bee, Sept. 6, 2024.  *Id.* ¶ 38.h.

r.      *Trump Prepares For Debate Against Kamala By Going To Bar And Arguing With Drunks*, Babylon Bee, Sept. 5, 2024.  *Id.* ¶ 38.i.

s.      *Trump Adds A Kennedy In Hopes He Will Draw All The Sniper Fire*, Babylon Bee, Aug. 23, 2024.  *Id.* ¶ 38.j.

t.      *Kamala Harris Unveils New Economic Platform "We Must Seize the Means of Production and Execute the Bourgeoisie,"* Babylon Bee, Aug. 18, 2024.  *Id.* ¶ 38.k.

u.      *California Passes Law Requiring People Fail A U.S. Civics Exam To Be Eligible To Vote*, Babylon Bee, Aug. 12, 2024.  *Id.* ¶ 38.l.

v.      *Tim Walz Asks Guy Guarding Tomb Of The Unknown Soldier Why He Doesn't Just Desert Him*, Babylon Bee, Aug. 10, 2024.  *Id.* ¶ 38.m.

w.    *Hillary Clinton Meets With Kamala To Help Her Improve Her Black Accent*,

Babylon Bee, Aug. 1, 2024, which features the below image. *Id.* ¶ 41.b.



x.    *New White House Doctor Sadly Informs Biden Only Cure For COVID Is Euthanasia*, Babylon Bee, July 18, 2024.  *Id.* ¶ 41.a.

y.    *Vance Dons Helmet And Body Armor In Preparation To Run With Trump*, Babylon Bee, July 15, 2024.  *Id.* ¶ 38.n.

z.    *Newsom Issues Ban on Legal-Citizen Voting*, Babylon Bee, May 23, 2024. *Id.* ¶ 38.o.

aa.    *Biden Unveils Official Campaign Slogan "Death To America,"* Babylon Bee, Apr. 17, 2024, which features the below image. *Id.* ¶ 41.d.



bb.    *Democrat Governors Promise They Will Do Everything In Their Power To Make Elections Appear Legitimate*, Babylon Bee, Apr. 12, 2024.  *Id.* ¶ 38.p.

cc.    *In Victory Speech, Biden Assures Americans Elections Were "Mostly Legitimate,"* Babylon Bee, Nov. 9, 2020.  *Id.* ¶ 41.a.

27.    The Bee intentionally digitally created or modified the images in the articles referenced in subparagraphs a–d, f–i, k–m, p–t, v–y, and aa of the above paragraph.  *Id.* ¶¶ 39, 42, 45.

28.    The Bee's posts identified in paragraph 26 above that have been posted have not been removed or labeled by Rumble, X, Instagram, Facebook, or YouTube.  *Id.* ¶ 46.

29.    For future elections in California, The Bee intends to continue to create and post content on its own website, Rumble, X, Facebook, Instagram, and YouTube, that is materially similar to the content referenced in paragraph 26, meaning:

a.    The Bee intends to create and post materially similar digitally created or modified content that is satire or parody, i.e., content that is not literally true in all respects. *Id.* ¶ 47.

b.    The Bee intends to post materially similar digitally created or modified content about topics covered under AB 2839, including politicians, presidential and vice presidential candidates for office who appear on the ballot in California, other candidates who appear on the ballot in California, elected officials saying or doing something in connection with an election in California, and ballots, voting machines, and voting sites related to an election in California.  *Id.* ¶ 48.

30.    To date, over one hundred of The Bee's satirical headlines have become, or closely foreshadowed, actual news stories and headlines.  *Id.* ¶ 54.

31.    Some of The Bee's satirical articles have been mistaken for real news articles.  *Id.* ¶ 56.

32.    For example, Donald Trump once presumed a satirical article written by The Bee was a real news article and retweeted it.  The article was entitled, "Twitter Shuts Down Entire Network to Slow Spread Of Negative Biden News."  *Id.* ¶ 57.

33.    Fact-checking sites have reviewed The Bee's satirical posts for factual accuracy. This includes Snopes, a website that fact checks and reports on alleged misinformation.  It has fact-checked dozens of satirical articles posted by The Bee, including articles posted as recently as August 2024.  *Id.* ¶¶ 58–62.

34.    For example, The Bee posted three articles: "Ocasio-Cortez Appears on 'Price Is Right,' Guesses Everything is Free"; "CNN Purchases Industrial-Sized Washing Machine To Spin News Before Publication"; and "Ninth Circuit Court Overturns Death of Ruth Bader Ginsburg." *Id.* ¶ 63.









35.   Snopes and the newspaper USA Today initially reviewed these articles for accuracy, rated them as "false," and even suggested they were intentionally misleading.  *Id.* ¶ 64.

36.   Later, Snopes and USA Today changed course and confirmed that the articles were satire.  *Id.* ¶ 65.

37.   USA Today concluded that the "article about the 9th Circuit 'overturning' Supreme Court Justice Ruth Bader Ginsburg's death has no basis in fact," after consulting fifteen different sources.  *Id.* ¶ 66.

38.   Fact checkers have also checked The Bee's articles related to elections.   For example, in March 2024, Reuters fact checked The Bee's February 29, 2024 article titled "Ballot Drop Boxes Installed Along Border Wall."   The article features the below digitally altered image. *Id.* ¶ 67.



39.   Reuters concluded that "no evidence" existed "that ballot drop boxes have been installed along the U.S. border with Mexico."  *Id.* ¶ 68.

40.   Others have argued that The Bee's satirical content is still misinformation. *Id.* ¶ 69.

41.   One critic maintained that "even if the Babylon Bee's satire itself should not be considered misinformation, its satire draws on and reinforces actual misinformation and conspiracy." *Id.* ¶ 70.

42.   One article accused The Bee and other satirical sites of "Helping [to] spread misinformation on social media." *Id.* ¶ 71.

43.     One reporter accused The Bee of being a "far-right misinformation site."  *Id.* ¶ 72.

44.     Another reporter called The Bee "dangerous."  *Id.* ¶ 73.

45.     Facebook, Instagram, YouTube, Twitter, and Bluesky have removed some of The Bee's posts for violating the platforms' content guidelines related to inciting violence, misinformation, and hateful conduct.  *Id.* ¶¶ 75, 77–78, 86.

46.     During U.S. Supreme Court Justice Barrett's confirmation hearing, Facebook determined that The Bee "incit[ed] violence" by posting a Monty Python-inspired satire piece entitled, "Senator Hirono Demands ACB Be Weighed Against a Duck to See If She Is a Witch." When challenged, Facebook refused to change its determination.  *Id.* ¶ 75.

47.     Instagram determined that The Bee's CEO violated Instagram's community guidelines against "harmful false information" and "hate speech or symbols" for sharing a Slate article entitled, "It's About Time for Us to Stop Wearing Masks Outside," along with the comment, "Sane people never did this."  *Id.* ¶ 76.

48.     YouTube flagged The Bee as a "violent criminal organization[]" and removed its video titled "If the LEAKED Nashville Shooter Manifesto is legit, what does it say about censorship in the US?"  The Bee appealed the characterization of its post, but YouTube held to its determination that the video violated its violent criminal organization policy.  *Id.* ¶ 77.

49.     Twitter also suspended The Bee's account for "hateful conduct" under its content-moderation policies after it named U.S. Assistant Secretary for Health Dr. Rachel Levine the site's "Man of the Year."  Twitter refused to reinstate The Bee unless it agreed to delete the tweet.  The Bee refused to do so on principle, and Twitter did not reinstate The Bee's account.  *Id.* ¶¶ 78–80.

50.     The Bee's account on Twitter (now X) was not restored until after Elon Musk purchased Twitter.  X has not suspended, removed, or taken any adverse action against The Bee's X account since Musk purchased the platform.  *Id.* ¶¶ 83–84.

51.     The Bee's content does not violate X's current content-moderation policies, as those policies have been amended following Elon Musk's acquisition of Twitter.  *Id.* ¶ 85.

52.     The Bee has also had content removed on social media platform Bluesky.   In November 2024, The Bee posted its "Man of the Year" article to Bluesky.   Bluesky blocked the post and labeled it "Intolerance."   To see the post, Bluesky users had to click through the "Intolerance" label.   The Bee posted the article four times.   Each time, Bluesky labeled the post as "Intolerance."   *Id.* ¶ 86.

**III.     Christopher Kohls's parody catalyzed the passage of AB 2839 and AB 2655.**

53.     Christopher Kohls creates humorous online content commenting on and satirizing political figures.   Verified Complaint for Declaratory and Injunctive Relief, *Kohls* v. *Bonta*, No. 2:24-cv-02527-JAM-CDK (E.D. Cal. Sept. 17, 2024), ECF 1 ("Kohls V. Compl.") ¶ 4.

54.     Kohls created and operates the "@MrReaganUSA" account on X where he has over 125,000 followers, the "MrReagan" account on Rumble where he has over 10,000 followers, and the "Mr Reagan" account on YouTube where he has about 386,000 subscribers.   He uses these accounts to post political satire videos created in part with AI-generated voiceovers.   His content is viewed hundreds of thousands of times, and Kohls is paid by those online platforms for user engagement with his videos.   *Id.* ¶¶ 17, 106; Declaration of Christopher Kohls in Support of Plaintiffs' Motion for Summary Judgment ("Kohls Decl."), dated March 5, 2025, ¶ 6.

55.     Kohls, who is ideologically opposed to Kamala Harris's political agenda, created videos to comment about and criticize Kamala Harris's candidacy in humorous fashion.   Kohls V. Compl. ¶¶ 6–7, 15; Kohls Decl. ¶¶ 10–12.

56.     On July 26, 2024, Kohls posted his first Kamala Harris-inspired AI-generated video, entitled "Kamala Harris Campaign Ad PARODY" (the "Harris Parody Video"), to X, Rumble, and YouTube.   It went viral, drawing attention from Elon Musk.   Kurtzberg Decl. Ex. 11 (Mr Reagan, *Kamala Harris Ad PARODY*, YouTube (July 26, 2024)); Kohls V. Compl. ¶ 8.

57.     The Harris Parody Video features AI-generated cuts of a voice sounding like Vice President Harris narrating why she should be President.   "Harris's" speech in the video reads as follows:

> I, Kamala Harris, am your Democrat candidate for president because Joe Biden finally exposed his senility at the debate. Thanks Joe. I was selected because I am

1
2

the ultimate diversity hire. I'm both a woman and a person of color. So if you criticize anything I say, you're both sexist and racist.

3
4

I may not know the first thing about running the country, but remember, that's a good thing if you're a deep state puppet. I had four years under the tutelage of the ultimate deep state puppet; a wonderful mentor, Joe Biden. Joe taught me rule number one: carefully hide your total incompetence.

5
6

I take insignificant things and I discuss them as if they're significant. And I believe that exploring the significance of the insignificant is in itself significant.

7

The video then features video and audio from a real Harris speech, in which Harris says,

8

"Talking about the significance of the passage of time, right? The significance of the passage of

9

time. So when you think about it, there is great significance to the passage of time," cutting the

10

real video with a "swish" sound effect to conclude: "and there is such great significance to the

11

passage of time." The narration by "Harris" then continues:

12
13

Another trick is trying to sound black. I pretend to celebrate Kwanzaa, and in my speeches, I always do my best Barack Obama impression.

14

The video again excerpts a real Harris speech, in which she says: "So hear me when I say,

15

I know Donald Trump's type." The AI-generated narration continues:

16
17

And okay, look, maybe my work addressing the root causes of the border crisis were catastrophic, but my knowledge of international politics is truly shocking.

18

Again, the video illustrates the fake voiceover with a real speech, where Kamala Harris said:

19

"The United States ["swish" cut] shares a very important relationship, which is an alliance with the

20

Republic of North Korea. ["swish" cut] It is an alliance that is strong and enduring." The "Harris"

21

narration concludes:

22
23

And just remember, when voting this November, it is important to see what can be unburdened by what has been. And by what has been, I mean Joe Biden.

24

You think the country went to [beeped out expletive] over the past four years? You ain't seen nothing yet. [Cackles].

25

Kohls V. Compl. ¶ 33.

26

58.    Kohls has produced at least 7 videos that are colorably actionable under AB 2839:

27

The Harris Parody Video; "Kamala Harris Ad PARODY 2"; "Kamala Harris Ad PARODY 3";

28

PLAINTIFFS' STATEMENT OF
UNDISPUTED FACTS

13

"Kamala Harris Ad PARODY 4"; "Kamala Harris Ad PARODY 5"; "Kamala Parody Ad 6"; "Friends of Diddy"; and "Kamala/Tim Walz Phone Call PARODY." Each video uses AI technology to simulate the voice of Kamala Harris and/or Tim Walz, who were candidates for the 2024 federal election in California. While Kohls uploaded each video with "parody" in the title, none of the videos includes the disclaimer required by AB 2839. Kohls Decl. ¶ 12.

59. Kohls also posted other AI-generated videos, including one titled "Elizabeth Warren Honest DNC Speech PARODY" in which he used the same technology to mimic the voice of Elizabeth Warren to read commentary that he had written responding to Warren's own speech endorsing Kamala Harris at the August 2024 Democratic National Convention and one of Governor Newsom defending California's attempts to regulate satirical speech. *Id.* ¶ 13.

60. Kohls also published a parody campaign ad on YouTube about Joe Biden, titled "Joe Biden – Honest Ad," containing actual clips of Joe Biden stuttering and mispronouncing words and sentences. *Id.* ¶ 9.

61. All of Kohls's videos are available on X and YouTube. Many of them are available on Rumble. The videos continue to be available to California residents and viewers of these videos include California residents, like Governor Newsom. *Id.* ¶ 92.

62. Kohls is aware that numerous persons, including California Governor Newsom and Rob Weissman, co-president of the advocacy group Public Citizen, claim that his Harris video would deceive reasonable viewers into thinking that Harris actually said the words that he presents her as saying. *Id.* ¶ 17.

63. Multiple outlets issued "fact checks" regarding Kohl's first Harris Parody Video. *Id.* ¶ 18.

64. For future elections in California, Kohls intends to continue making and posting videos of political figures and candidates using this same AI-generative technology during future election seasons. Kohls V. Complaint ¶ 92; Kohls Decl. ¶ 15.

**IV.    Rickert actively engages in political expression.**

65.    Rickert immigrated to the United States from Taiwan.  Declaration of Kelly Chang Rickert in Support of Plaintiffs' Motion for Summary Judgment ("Rickert Decl."), dated March 6, 2025, ¶ 5.

66.    She is an attorney who practices law in California.  *Id.* ¶ 3.

67.    Rickert has served as a legal expert for media outlets such as CBS News, MTV, People Magazine, US Weekly, and others.  *Id.* ¶ 4.

68.    Rickert has owned and operated her own law firm since 2005—the Law and Mediation Offices of Kelly Chang (the "law firm").  *Id.* ¶ 3.

69.    Rickert's law firm has its own blog that she alone operates and controls.  *Id.* ¶ 7.

70.    Rickert has final editorial control over the content posted on the law firm's blog and therefore considers it to be her personal blog.  *Id.* ¶ 8.

71.    No one has the authority to post on this blog except for her and no one has posted on this blog except for her.  *Id.* ¶ 9.

72.    No third parties can post comments to the blog because Rickert disabled the comment section and has no present intention of re-engaging the comment feature.  *Id.* ¶ 10.

73.    Rickert curates the content on the blog by posting blogs with the types of expression she desires to communicate and to reflect the law firm's values.  *Id.* ¶ 11.

74.    Over the last year, Rickert has written, created, and posted over seventy posts for the blog.  *Id.* ¶ 12.

75.    Rickert has written posts about abortion, gender ideology, Gavin Newsom, California bills, parental rights, elections, politicians, and other topics.  *Id.* ¶ 13.

76.    Several hundred people subscribe to her blog, including subscribers in California, and countless more view it on her website, including other California residents.  *Id.* ¶ 14.

77.    Rickert also has personal accounts on online platforms, including X, Facebook, Instagram, and TikTok.  *Id.* ¶ 15.

78.     Rickert's X and Instagram accounts are public; she currently has over 1,600 followers on X, over 25,000 followers on Instagram, and nearly 400,000 followers on TikTok, including many followers in California.  *Id.* ¶ 16.[1]

79.     Rickert's Facebook account is private, but she has 7,400 followers on Facebook.  *Id.* ¶ 17.

80.     Rickert regularly posts on her X, Instagram, and Facebook accounts on issues related to politics, elections, and culture.  *Id.* ¶ 18.

81.     Before September 17, 2024, Rickert posted or reposted about quotes she attributed to Kamala Harris, Tim Walz, politics, society, and cultural and moral issues.  *Id.* ¶¶ 19–20.

82.     After September 17, 2024, Rickert desired to post or repost additional content on her blog and her online accounts, but she refrained from doing so because of AB 2839 and AB 2655.  *Id.* ¶ 21.

83.     Rickert wanted to post the Harris Parody Video on her X account.  *Id.* ¶ 22.

84.     Rickert also desired to post similar satirical videos created by Kohls.  *Id.* ¶ 25.

85.     Those videos are:

a.     @MrReaganUSA, *Kamala Harris Ad PARODY*, YouTube (July 26, 2024);

b.     @MrReaganUSA, *Kamala Harris Ad PARODY 2*, YouTube (July 31, 2024); and

c.     @MrReaganUSA, *Kamala Harris Ad PARODY 3*, YouTube (Aug. 14, 2024).

*Id.* ¶ 26.

86.     Rickert learned about the Harris Parody Video on September 17, 2024, after viewing Governor Newsom's post on X stating that he passed a law banning the video and other videos with similar content.  *Id.* ¶ 28.

[1] President Trump, meanwhile, has over 100 million followers on his X account.  Declaration of Joel Kurtzberg in Support of Plaintiffs' Motions for Summary Judgment ("Kurtzberg Decl."), dated March 7, 2025, Ex. 19 (@realDonaldTrump, X).

87.     If not for AB 2839 and AB 2655, Rickert would have immediately posted the Harris Parody Video, and the other videos referenced above in paragraph 85.  *Id.* ¶ 29.

88.     As a result of AB 2839 and AB 2655, in addition to the Harris Parody Video and other similar videos, Rickert refrained from posting other content, including intentionally digitally modified videos and images of Kamala Harris asking illegal immigrants to vote, appearing in a Seinfeld episode, wearing communist attire, wearing a "Make USA Great Again" hat, and speaking to a communist gathering.  She also would have but refrained from posting a digitally altered video of Governor Newsom endorsing Donald Trump.  *Id.* ¶ 30.

89.     In addition to the content identified in paragraphs 87–88, Rickert refrained from posting an AI-generated image of Donald Trump in a courtroom proceeding and AI-generated images of Donald Trump scuffling with and running from police.  These images depicted then-candidate Donald Trump doing something that he did not do.  *Id.* ¶¶ 31–32.

90.     Rickert desired to caption the post containing these images as: "This is the strategy to get Kamala Harris elected—political retaliation" or something materially similar.  *Id.* ¶ 33.

91.     Rickert refrained from posting the content identified in paragraphs 87–89 on her online accounts because of AB 2839 and AB 2655.  *Id.* ¶ 34.

92.     Rickert has been subjected to past instances of censorship or threatened censorship because of her online posts that were materially different than the posts identified in paragraphs 87–89.  *Id.* ¶ 35.

93.     For example, Facebook, Instagram, and TikTok have removed content from her accounts between ten and twenty times.  *Id.* ¶ 36.

94.     Likewise, the State Bar of California improperly began to investigate Rickert in 2022 for a TikTok video that she created which commented on abortion and a then-pending California bill regarding abortion.  *Id.* ¶ 37.

95.     The post generated many reactions on TikTok, and several users commented about how to file complaints with the State Bar of California.  *Id.* ¶ 38.

96.     After conducting a month-long investigation, the State Bar of California closed the investigation.  *Id.* ¶ 39.

97.     But this investigation caused Rickert to rarely post on TikTok to avoid future complaints related to her bar license.  *Id.* ¶ 40.

98.     For future elections in California, Rickert intends to post materially similar content about candidates in those elections, should AB 2839 and AB 2655 be enjoined or repealed.  Rickert Decl. ¶ 41.

99.     For future elections in California, Rickert intends to post content on her blog, X, Facebook, or Instagram similar to the content referenced in paragraphs 87–89 related to that election.  That means Rickert intends to post intentionally digitally created or modified content— including satire or parody—about politicians, presidential and vice presidential candidates for office who appear on the ballot in California, other candidates who appear on the ballot in California, elected officials saying or doing something in connection with an election in California, and ballots, voting machines, and voting sites related to an election in California.  *Id.*

100.    Rickert has posted and will republish satire or parody that she knows is not literally true in all respects, meaning she knows at least some of the content is literally false or acts without regard to the literal truth.  *Id.* ¶ 42.

101.    Rickert has also posted and will republish other content that is not satire or parody that she knows is not literally true, meaning she knows some of the content is false or acts without regard to the literal truth.  *Id.* ¶ 43.

102.    Rickert has posted and desires to post such content, including content from Kohls, like that identified in paragraph 85 and materially similar content, in future elections in California even though she knows it is not literally true because she believes such content helps to make certain political arguments that cannot be made with the literal truth.  *Id.* ¶ 44.

103.    Since the 2024 election, Rickert has posted content that would be proscribed by AB 2839 and 2655 if she had posted it during the applicable timeframes.  For example:

a.      On January 13, 2025, Rickert reposted on X President Trump's post of a digitally altered video depicting a fake conversation between President Trump and former President Obama at former President Carter's funeral.  *Id.* ¶ 45.b.

b.      On January 9, 2025, Rickert reposted on X The Babylon Bee's article entitled *Gavin Newsom Demands Answers from Whoever's in Charge of California*, which features a digitally altered image of Governor Newsom.  *Id.* ¶ 45.c.

104.    Many people in California, including Rickert, expect Kamala Harris to run for governor in 2026.  Attorney General Rob Bonta recently stated that he would not run for governor and that he would support Harris if she ran.  *Id.* ¶ 46–47.

**V.      AB 2655's statutory scheme, Section 230 of the Communications Decency Act, and their application to X and Rumble.**

105.    California Assembly Bill No. 2655 ("AB 2655") is codified in law at Sections 20510–20520 of the California Election Code.

106.    AB 2655 applies to "large online platform[s]," including "public-facing internet website[s]," "web application[s]," "digital application[s]," "video sharing platform[s]," "advertising network[s]," "search engine[s]," or "social media platform[s] (as defined in Section 22675 of the Business and Professions Code") that "had at least 1,000,000 California users during the preceding 12 months."  § 20512(h).

107.    Plaintiff X Corp. is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Bastrop, Texas.  X Corp. Compl., *Kohls* v. *Bonta*, No. 2:24-cv-02527-JAM-CDK (E.D. Cal. Nov. 14, 2024), ECF 38 ("X Corp. Compl.") ¶ 21.  X Corp. owns and operates the X platform, which was formerly known as Twitter.  Declaration of X Corp.'s Strategy and Operations Team in Support of Plaintiffs' Motion for Summary Judgment Against AB 2655 ("X Corp. S&O Decl."), dated March 7, 2025, ¶ 3.

108.   Plaintiff Rumble Canada Inc., together with its indirect parent company Plaintiff Rumble Inc., operates Rumble.com, a large video-sharing platform that curates and publishes a variety of content, including political commentary.  Rumble Declaration in Support of Plaintiffs' Motion for Summary Judgment Against AB 2655 ("Rumble Decl."), dated March 7, 2025, ¶ 3.

109.   Rumble's mission is to promote and protect a free and open internet.  In 2013, Chris Pavlovski (now Rumble's Chairman and CEO) founded Rumble after he noticed that YouTube had deprioritized small content creators in favor of influencers, corporations, and large brands.  Rumble sought to empower small and large content creators and give them a platform to express themselves. In 2020, other online platforms began aggressively removing and banning content and users based on viewpoint.  But, as Rumble understands, society needs platforms like itself that support diverse opinions, authentic expression, and open dialogue.  *Id.* ¶¶ 7–10.

110.   Rumble operates in the vast majority of countries across the globe, but it does not tolerate government-demanded censorship.  For that reason, China, North Korea, and Russia have banned Rumble.  Rumble stopped operating in Brazil and France because of requests from the government that Rumble censor content that did not violate its content policies.  *Id.* ¶ 11.

111.   X and Rumble are both "large online platform[s]," as defined by AB 2655.  The X and Rumble platforms are both "public-facing internet website[s]" and "video sharing platform[s]" that had at least 1,000,000 California users during the preceding 12 months, and X is also a "web application" and "digital application" that had at least 1,000,000 California users during the preceding 12 months.  X Corp. S&O Decl. ¶ 3; Rumble Decl. ¶ 14.

112.   X is also a "social media platform," as defined by Section 22675 of the Business and Professions Code, because it is a public internet-based service or application with users in California and (i) "[a] substantial function of the service or application is to connect users in order to allow users to interact socially with each other within the service or application" and (ii) it allows its users to (a) "[c]onstruct a public or semipublic profile for purposes of signing into and using the service or application"; (b) "[p]opulate a list of other users with whom an individual shares a social connection within the system"; and (c) "[c]reate or post content viewable by other users, including

but not limited to, on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users."  X Corp. S&O Decl. ¶ 4.

113.    Section 230 of the Communications Decency Act ("Section 230") applies certain protections to providers of an "interactive computer service."  47 U.S.C. § 230.  X Corp. and Rumble are interactive computer service providers, as defined by Section 230, because they are the providers of the X and Rumble platforms, respectively, which are "interactive computer service[s]." *See* 47 U.S.C. § 230(f)(2) ("The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.");  X Corp. S&O Decl. ¶ 5;  Rumble Decl. ¶¶ 12–14.

**VI.    The current policies and features of covered platforms, including X Corp. and Rumble, already adequately address what they view as potentially problematic content in a less speech-restrictive way than AB 2655.**

114.    X, Rumble, and the other large online platforms covered by AB 2655 ("covered platforms") already maintain policies and features that address what they view as problematic content.  X Corp. S&O Decl. ¶¶ 15–18, 21, 25–26; Rumble Decl. ¶¶ 16–19.

115.    X maintains policies and features to combat potentially misleading content enhanced or created by artificial intelligence.  *See* X Corp. S&O Decl. ¶¶ 15–18, 21.

116.    The X platform has a feature called "Community Notes" that allows users to flag content that they believe needs context, which could include "materially deceptive content" covered by the statute.  *Id.* ¶ 21.

117.    Through Community Notes, users of the X platform may provide additional context or information about content that will appear along with the content if enough of the community's "contributors," who otherwise hold diverse viewpoints, deem the additional commentary to be helpful.  *Id*.

118.   In recognition of the fast-paced nature of social media, X has accelerated Community Notes, and now indicates "Lightning Notes" that start appearing on posts within an hour of being proposed, or within an hour of the post itself going live.  *Id*.

119.   Any user can become a Community Notes "contributor," so long as they (i) have no recent X rule violations, (ii) joined X at least six months ago, and (iii) provide a phone number.  *Id*.

120.   X provides contributors with alias profiles that are not linked to their main X profile, and X Corp. does not write or edit these notes.  *Id*.  Any X user may comment on posted content, providing additional context in the comments section, if they deem it necessary.  *See id.* ¶ 22.

121.   In 2023 and 2024, Community Notes were utilized in connection with roughly tens of thousands of posts suspected of being created or enhanced with artificial intelligence.  *Id*.  Two examples of the Community Notes feature being used to identify posts on X containing false or digitally altered content are as follows.  First, on April 27, 2024, the X user @MyLordBebo posted a screenshot of what appeared to be a real *New York Post* article, titled "Congress to Vote on Bill That Would Criminalize Questioning the Events Surrounding 9/11."  Through the Community Notes feature, a description was added to the post stating that "No such article exists from the New York Post."  Second, on April 27, 2024, the X user @brookebay21 posted a photo of a group of individuals carrying Confederate and Nazi flags, along with one individual carrying an Israeli flag. Through the Community Notes feature, a description was added to the post stating that "This image has been digitally altered to include an Israeli flag where none existed in the original[,]" and directing the user to the non-augmented photo.  *Id*. Ex. 11 (Lord Bebo (@MyLordBebo), X (Apr. 27, 2024, 11:21 AM)); *id.* Ex. 12 (Peter Symons#NHSLove (@brookebay21), X (Apr. 27, 2024, 9:24 AM)).

122.   Based on the X's internal data, it is expected that the number of such Community Notes will increase going forward.  *Id*. ¶ 22.[2]

---

[2] *See also* X Corp. S&O Decl. Ex. 5 (Matthew R. Allen et al., *Characteristics of X (Formerly Twitter) Community Notes Addressing COVID-19 Vaccine Misinformation*, 331 J. Am. Med. Ass'n 1670 (2024)); *id.* Ex. 6 (Mary Whitfill Roeloffs, *X's Community Notes Accurately Corrected Vaccine Misinformation 97% Of The Time Last Year, Study Says*, Forbes (Apr. 24, 2024, 11:00 AM)); *id.* Ex. 7 (Thomas Renault et al., *Collaboratively Adding Context to Social Media Posts Reduces the Sharing of False News* (2024)); *id.* Ex. 8 (Yuwei Chuai et al., *Community notes reduce the spread of misleading posts on X* (2024)); *id.* Ex. 9 (Chiara Patricia Drolsbach et al., *Community notes increase trust in*

123.     Meta has recently announced that it will employ a similar system on Facebook, Instagram, and Threads.  *See id.* Ex. 10 (*Community Notes: A New Way to Add Context to Posts*, Meta Transparency Center (Feb. 20, 2025)).

124.     California Assembly Member Bill Essayli testified before the Assembly Standing Committee on Elections that AB 2655's requirements are "a very sticky thing with the First Amendment and also with asking private companies to be the enforcer," and that he instead favored the "***Twitter model where they use the community to sort of regulate information on there.** . . . **where it's the public, it's the crowd sourcing is kind of doing the moderating," rather than "making an individual, company, or person the arbiter of [] what's disinformation.***"  *See* Kurtzberg Decl. Ex. 2 (*Defending Democracy from Deepfake Deception Act of 2024: Hearing on AB 2655 Before the Assemb. Standing Comm. on Elections*, 2023–2024 Reg. Sess. (Cal. Apr. 10, 2024)) at 7–8 (statements of Bill Essayli, Assemb. Member).[3]

125.     In addition to Community Notes and user comments, X also has its own policy for regulating "synthetic" or "manipulated media" on its platform.  That policy differs from the system set up by the government under AB 2655.  *See* X Corp. S&O Decl. ¶ 15.

126.     Under X's "Authenticity" Policy, which covers "Synthetic and Manipulated Media," users "may not share inauthentic media, including, manipulated, or out-of-context media that may result in widespread confusion on public issues, impact public safety, or cause harm ('misleading media')."  *Id.* ¶ 16; Ex. 4 (*Authenticity*, X) at 9.  Moreover, in "situations where [X is] unable to reliably determine if [the content] is misleading media, [X] may not take action."  *Id.* How X enforces its Authenticity Policy "depend[s] on the severity of the violation as well as any previous history of violations."  *Id.* ¶ 16; Ex. 4 at 10.

127.     One such way in which X may "take action" to enforce its policy is to label posts containing misleading media, to help people understand the content's authenticity and to provide additional context.  For example, from August 5, 2024 to February 3, 2025, X labeled 3,700 posts under its Authenticity Policy (as well as its predecessor version).  *Id.* ¶ 16.

---

*fact-checking on social media*, 3 PNAS Nexus 1 (2024)).

[3] Unless otherwise indicated, emphases in quotes are added and internal citations and quotations are omitted.

PLAINTIFFS' STATEMENT OF          23
UNDISPUTED FACTS

128.    Under X's Authenticity Policy—which is publicly available to all users of the platform as well as to the public generally—X considers, e.g., the following in determining whether to remove and/or label content:

a.    Whether the media is "significantly and deceptively altered, manipulated, or fabricated in a way that fundamentally changes its meaning and can result in widespread confusion on public issues, impact public safety, or cause serious harm"; and

b.    Whether the media is "shared in a deceptive manner or out-of-context or with intent to deceive people about the nature or origin of the content and can result in widespread confusion on public issues, impact public safety, or cause serious harm[.]" *Id.* ¶ 17; Ex. 4 at 10.

129.    X's Authenticity Policy also makes clear that "[s]haring manipulated or out-of-context media in non-deceptive ways" is "[a]llowed" under the policy. *Id.* ¶ 18; Ex. 4 at 11.

130.    Rumble enforces a content-moderation policy and removes from its platform content that violates that policy and suspends the accounts of users who repeatedly post content that violates its policy.  Rumble Decl. ¶ 15.

131.    Rumble manages its video-sharing service through its terms and conditions, which contain its content-moderation policy.  *Id.* ¶ 16.

132.    To create an account, a user must agree to abide by the terms and conditions.  *Id.* ¶ 17.

133.    Under the terms and conditions, Rumble retains "the absolute right (but not the obligation) to prohibit, refuse, delete, move and edit Content and material for any reason, in any manner, at any time, without notice" to the content creator.  *Id.* ¶ 18.

134.    The terms and conditions prohibit the following, among other categories:

a.    "Content or material that is pornographic, obscene, or of an adult or sexual nature";

b.    "Content or material that is grossly offensive to the online community, including but not limited to, racism, anti-semitism and hatred";

     c.    Content or material that "[p]romotes, supports, or incites violence or unlawful acts";

     d.    "Content or material that exploits children under the age of 18 or posts or discloses any personally identifying information about any person at any age, including but not limited to personally identifying information about children under the age of 18"; and

     e.    "Any other Content or material that Rumble in its sole, unfettered, and arbitrary discretion, determines is undesirable on the Rumble Service."

*Id.* ¶ 19.

135.    Rumble does not restrict political speech as such, no matter what the topic or viewpoint, unless it violates a specific provision of its terms and conditions.  *Id.* ¶ 20.

136.    Rumble does not restrict digitally generated or modified content as such unless that content violates a specific provision of Rumble's terms and conditions.  *Id.* ¶ 21.

137.    Rumble enforces its terms and conditions through a complaint mechanism and through manual and technical review of content by independent contractors.  *Id.* ¶ 22.

138.    Rumble relies on manual content moderators.  *Id.* ¶ 23.

139.    Rumble's content moderators use their best efforts to enforce Rumble's terms and conditions across the platform.  *Id.* ¶ 24.

140.    Content moderators enforce Rumble's content moderation policy by watching uploaded videos and reviewing comments posted on videos and comparing the content to Rumble's terms and conditions.  *Id.* ¶ 25.

141.    Rumble does not label content because it does not want to express a viewpoint about the content on its platform.  *Id.* ¶ 26.

142.    Any person may email moderation@rumble.com to report content that violates Rumble's terms and conditions.  *Id.* ¶ 27.

143.    Rumble reviews every report that it receives, but it does not always respond to those reports.  A person on Rumble's content-moderation team will review the reported content to see if it violates Rumble's terms and conditions.  *Id.* ¶ 28.

1    144.    Rumble makes all content-removal decisions after review by someone on Rumble's

2    content-moderation team.  If the content violates the terms and conditions, the moderator will

3    remove the content.  *Id.* ¶ 29.

4    145.    Rumble believes it can best express its free speech message by placing guardrails,

5    expressed in its content-moderation policy, to encourage what it believes to be civil discussion.  *Id.*

6    ¶ 30.

7    146.    To remain consistent with its content-moderation policy and preserve its own free

8    speech, Rumble intends to still make content subject to AB 2655 available outside of California.

9    Currently, users of Rumble, no matter in what state or country, all see the same content.  But, should

10   it have to comply with AB 2655, Rumble could geo-block certain content from appearing in

11   California, while allowing users outside of California to view that content.  Implementing that

12   bifurcated program would place significant additional costs on Rumble and harm Rumble's public

13   reputation with creators, advertisers, and users as a platform that works to preserve a free and open

14   internet.  *Id.* ¶ 55.

15   147.    Other covered platforms—e.g., Meta, YouTube, TikTok, Snapchat, and Google

16   Search—have their own policies designed to address false, misleading, and/or manipulated media:

17   a.     *See* X Corp. S&O Decl. Ex. 13 (*How to identify AI content on Meta products*,

18   Meta) at 2 ("Meta requires an AI label when content has photorealistic video or realistic-

19   sounding audio that was digitally created, modified or altered, including with AI.");

20   b.     *See id.* Ex. 14 (*Disclosing use of altered or synthetic content*, YouTube) at 1

21   ("To help keep viewers informed about the content they're viewing, we require creators to

22   disclose content that is meaningfully altered or synthetically generated when it seems

23   realistic.");

24   c.     *See id.* Ex. 15 (*About AI-generated content*, TikTok) at 5 ("We also require

25   creators to label all AI-generated content where it contains realistic images, audio, and

26   video, as explained in our Community Guidelines.");

27

28

d.      *See id.* Ex. 16 (*Generative AI on Snapchat*, Snapchat) at 1 ("We may indicate that a feature in Snapchat is powered by generative AI in a number of ways . . . When you see these contextual symbols or other indicators in Snapchat, you should know that you are . . . viewing content that has been produced using AI and does not depict real world scenarios."); and

e.      *See id.* Ex. 17 (*Google Search's guidance about AI-generated content*, Google Search) at 2 ("Using automation—*including* AI—to generate content with the primary purpose of manipulating ranking in search results is a violation of our spam policies.").

**VII.    California accelerates passage of AB 2839 to confront conservative political commentary.**

148.    The California legislature began considering AB 2839 in February 2024.  Kurtzberg Decl. Ex. 24 (Record of legislative action on Assembly Bill No. 2839, California Legislative Information).

149.    The bill had been proceeding through the regular legislative process.  Kohls V. Compl ¶ 77.

150.    On July 26, 2024, Kohls posted the Harris Parody Video.  That same day, Elon Musk reposted the Harris Parody Video on X, where it gained over 100 million views.  *Id.* ¶¶ 5, 8; Kurtzberg Decl. Ex. 12 (Elon Musk (@elonmusk), X (July 26, 2024, 7:11 PM)).

151.    Two days later, Governor Newsom posted a screenshot of a news story discussing Musk's retweet of the Harris Parody Video, asserting that the video "should be illegal" and promising to sign "a bill in a matter of weeks to make sure it is."  Kohls V. Compl. ¶ 9; Kurtzberg Decl. Ex. 13 (Gavin Newsom (@GavinNewsom), X (July 28, 2024, 11:47 PM; Sept. 17, 2024, 7:41 PM)).

152.    After Governor Newsom's X post, the California legislature accelerated steps to ensure that AB 2839 would pass during its current legislative session.  Kohls V. Compl. ¶¶ 77–78.

153.    The California legislature passed AB 2839 in August, only about one month after Governor Newsom's promise to make parody videos like the Harris Parody Video "illegal." Kurtzberg Decl. Ex. 24.

154.    Governor Newsom signed AB 2839 on September 17, 2024.  It became effective immediately.  *Id.*

155.    On that same day, Governor Newsom made another X post declaring that he had "just signed a bill to make this illegal in the state of California," in which "this" refers to the Harris Parody Video.  The X post continued: "You can no longer knowingly distribute an ad or other election communications that contain materially deceptive content -- including deepfakes." Kurtzberg Decl. Ex. 13.

## VIII.    AB 2839's Legislative History.

156.    Throughout the legislative process, California legislators made statements about AB 2839's impact and burden on speech.  Kurtzberg Decl. Exs. 21–23, 27.

157.    For example, in April 2024, the Assembly Committee on Judiciary reaffirmed that the bill covered "the right to speak about elections," "the right to receive information regarding them," and "political speech" and would be subject to "strict scrutiny."  Kurtzberg Decl. Ex. 21 (Assembly Committee on the Judiciary's Analysis of Assembly Bill No. 2839, 2023–2024 Reg. Sess. (Cal. Apr. 26, 2024)) at 8.  The Committee recognized that "[t]he use of questionable tactics to win an election are as old as America's democracy."  It also thought that "[u]nfortunately, without traditional media outlets serving as gatekeepers of information, the amount of blatantly false or misleading election-related content appearing on the internet is growing significantly."  *Id.* at 6.  The Committee acknowledged that the bill "implicates both the right to speak about elections, as well as the right to receive information regarding them"; implicates "political speech" subjecting it to "the most exacting legal review"; and acts "as a prior restriction on speech … subject to strict scrutiny."  *Id.* at 8.

158.    The Committee moved the bill forward even though it could not "ignore the longstanding preference of the courts to protect all forms of speech" or how "the current Supreme

1   Court has demonstrated a willingness to greatly expand the scope of speech rights, especially when

2   the speaker's views align with the court's majority."  *Id.* at 9.

3       159.    In the end, the Committee concluded that "[t]he constitutional questions posed by

4   this bill present an exceedingly difficult decision."  And, the Committee said, "while this bill is

5   certainly designed to provide the greatest chance of withstanding constitutional review, it is almost

6   guaranteed to be the subject of litigation."  *Id.*

7       160.    The Committee anticipated that the bill "will almost certainly be the target of

8   immediate litigation."  *Id.*

9       161.    Then, in June 2024, the Senate Judiciary Committee published a report noting that

10   AB 2839 "prohibits certain forms of speech" and "implicates the protections of the First

11   Amendment."  Kurtzberg Decl. Ex. 22 (Senate Judiciary Committee's Analysis of Assembly Bill

12   2839, 2023–2024 Reg. Sess. (Cal. June 28, 2024)) at 10.  The Committee wrote that "this bill may

13   face legal challenge" as "most restrictions on political speech" had.  But the Committee thought

14   the bill was "arguably narrowly tailored."  *Id.* at 13.

15       162.    In August—after Governor Newsom's tweet condemning the Harris Parody

16   Video—the full Senate amended the bill.  *Id.* Ex. 24.

17       163.    Consistent with Governor Newsom's post on X, the Senate's amendment struck

18   language that had previously stated: "This section does not apply to materially deceptive content

19   that constitutes satire or parody."  *Id.* Ex. 23 (Senate's August 2024 amendment to Assembly Bill

20   No. 2839, California Legislative Information).

21       164.    AB 2839 passed the California legislature with a declaration of urgency via two

22   supermajority votes, and AB 2839 took effect immediately upon the Governor's signature.  Kohls

23   V. Compl ¶¶ 83–84.

24   **IX.    AB 2655's Legislative History.**

25       165.    The California legislature also began considering AB 2655 in early 2024.  *See, e.g.*,

26   Kurtzberg Decl. Ex. 6 (Assemb. Standing Comm. on Elections, Analysis of Assemb. Bill No. 2655,

27   2023–2024 Reg. Sess. (Cal. Apr. 8, 2024)).

28

166.    The Assembly Committee on Judiciary's April 22, 2024 analysis states that:

[AB 2655] would *interfere with both the expression and reception of information based upon its content*. . . . *not only does this bill single out particular content, the content relates to political candidates and elections*," to which "*the First Amendment affords the 'broadest protection'* . . . *The fact that the bill restricts speech that is 'materially deceptive' or 'false' does not matter* . . . *The remedy for false speech is more true speech, and false speech tends to call forth true speech*.

Kurtzberg Decl. Ex. 3 (Assemb. Standing Comm. on Judiciary, Analysis of Assemb. Bill No. 2655, 2023–2024 Reg. Sess. (Cal. Apr. 22, 2024)) at 7.

167.    The Senate Judiciary Committee's June 28, 2024 analysis states that "*[l]aws that burden political speech are subject to strict scrutiny . . . California courts have been clear that political expression in the context of campaigns of any manner should be given wide latitude*[.]" *Id.* Ex. 4 (S. Comm. on Judiciary, Analysis of Assemb. Bill No. 2655, 2023–2024 Reg. Sess. (Cal. June 28, 2024)) at 14.

168.    The Assembly Committee on Judiciary's April 22, 2024 analysis states that "*[i]n reviewing [AB 2655], the Court would apply strict scrutiny*." *Id.* Ex. 3 at 8.

169.    On April 23, 2024, during a hearing in which AB 2655 was discussed, California State Assembly member Rebecca Bauer-Kahan, who supported AB 2655, stated, "*I think we all agree that strict scrutiny would be applied*." *Id.* Ex. 5 (Defending Democracy from Deepfake Deception Act of 2024: Hearing on AB 2655 Before the Assemb. Standing Comm. on Judiciary, 2023–2024 Reg. Sess. (Cal. Apr. 23, 2024)) at 6 (statements of Rebecca Bauer-Kahan, Assemb. Member).

170.    The June 28, 2024 Senate Committee of the Judiciary Analysis of AB 2655 contains the following statement from The American Civil Liberties Union, which opposed AB 2655:

The "*'novelty of deepfake technology and the speed with which it is improving' do not justify relaxing the stringent protections afforded to political speech by the First Amendment.* . . . The Supreme Court has held that "whatever the challenges of applying the Constitution to ever advancing technology, *'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears."* . . . *Unfortunately, the provisions of AB 2655 as currently drafted threaten to intrude on those rights and deter that vital speech*."

*Id.* Ex. 4 at 18–19.

171.   The Senate Judiciary Committee also acknowledged that AB 2655 would "likely" face a preemption challenge under Section 230. *Id.* at 13. It stated that AB 2655 "provides for the potential liability of platforms for failing to block and prevent certain content from being posted or shared by users" even though Section 230 "immunize[s] internet platforms from virtually all suits arising from third-party content." *Id.*

172.   The California legislature passed AB 2655 with supermajorities in both chambers. *Id.* at 25.

## X.   AB 2655's Burdens and Impact.

173.   Rumble has no technical tools to determine whether something is digitally created or modified. It will often be difficult for a content moderator on Rumble's team to determine whether some content was digitally altered or modified. Without technical tools, making that determination requires a host of reliable contextual information, including what issues are involved in an election campaign, what positions a candidate has taken, who the candidate's opposition is, and what statements a candidate has made. That requires Rumble's content moderation team to consult outside sources for that contextual information. Rumble Decl. ¶ 42.

174.   X does not have, nor is aware of, any tool that could make the determinations required to assess whether particular content is subject to the requirements of AB 2655. X Corp. S&O Decl. ¶ 11.

175.   To determine whether AB 2655's requirements apply to particular content, covered platforms must determine whether content portrays candidates for elective office, elections officials, and elected officials "doing or saying something" that they "did not do or say." *See* §§ 20513(a)(2), 20514(a)(2)(A).

176.   For the 2026 election cycle, there will be at least 866 people qualifying as "candidate[s]" under Section 20512(c). There will be at least two candidates for each the offices of governor, lieutenant governor, attorney general, secretary of state, treasurer, controller, insurance commissioner, and superintendent of public instruction (at least sixteen total); eight candidates for

the Board of Equalization; 104 candidates for the federal House of Representatives; 40 candidates for state senate; 160 candidates for state assembly; 57 county clerks; and 482 city clerks.  X Corp. S&O Decl. ¶ 7 n.2.

177.    While AB 2655 does not define the term "elected official," even if the term only applied to elected officials in California, it would cover at least 120 individuals, and has the potential to cover many more, given that California has 57 counties and 482 cities, each presumably with elected officials.  *Id.* Ex. 1 (*Elected Officials*, California State Assembly) ("The California State Assembly has 80 Members" and the "California State Senate has 40 members[.]"); *id.* Ex. 2 (*Cities in California*, BallotPedia) (there are 57 counties and 482 cities, towns, and villages in California, according to a 2022 study from the U.S. Census Bureau).  If the term applies to all officials in the United States, there could be several hundreds of thousands of "elected officials," or even more.

178.    Rumble's content-moderation team will have to research and find reliable information about the candidates involved in local races, the identities of local government officials conducting elections, and statements that any of those people have made.  Rumble Decl. ¶ 43.  The same is true of X's content-moderation team.  *See* X Corp. S&O Decl. ¶ 7.

179.    Recognizing this difficulty, the April 8, 2024 analysis of the Assembly Committee on Elections states that:

> [I]n order to determine whether it must block content that ***portrays a candidate for election as doing or saying something that the candidate did not do or say***,[4] the platform would need to know not only that the person portrayed in the content was a candidate for office, but also the date (or dates) of the election when the candidate will appear on the ballot. Similarly, it would need to determine whether the candidate had actually said or done the thing that the candidate is portrayed as doing. While some of that information will be widely available and well known in some cases (e.g., the identity of major party candidates for President of the United States in presidential general elections and the dates of federal elections), it will be more arcane in other situations. ***Given the number of elections (including standalone local and special elections) and candidates (including write-in candidates and candidates for local elections in smaller jurisdictions) in California at any given time, making the determinations at scale about which***

---

[4] Emphasis in original.

***content must be blocked or labeled likely will be considerably more challenging than making those determinations on a case-by-case basis in a court of law***.

Kurtzberg Decl. Ex. 6 (Assemb. Standing Comm. on Elections, Analysis of Assemb. Bill No. 2655, 2023–2024 Reg. Sess. (Cal. Apr. 8, 2024)) at 8.

180.    Similarly, on April 10, 2024, Tracy Rosenberg of Oakland Privacy, which opposed AB 2655, testified before the Assembly Standing Committee on Elections that "***technology platform[s] can[not] be expected to know everything that every candidate running for office [has said]***." *Id.* Ex. 2 at 6 (statements of Tracy Rosenberg, Oakland Privacy).

181.    To comply with AB 2655, covered platforms, like X and Rumble, must make a two-step judgment call about whether the content "would falsely appear to a reasonable person to be an authentic record" and, if so, whether it "is reasonably likely to": "harm the reputation or electoral prospects of a candidate" or "falsely undermine confidence in the outcome" of an election.

       a.    Covered platforms must determine whether a reasonable person would view the content to be false, without knowing the information that the hypothetical reasonable person has available to him, especially for local government officials and state legislator elections.

       b.    Covered online platforms must decide whether that content is "reasonably likely" to harm the candidate's reputation or electoral prospects or undermine confidence in the election.

Rumble Decl. ¶¶ 44; X Corp. S&O Decl. ¶¶ 6–9.

182.    AB 2655 also requires large online platforms to make judgment calls about what qualifies as satire or parody. Even assuming large online platforms can accurately determine what is digitally modified, false, and reasonably likely to cause some injury, they then must determine whether the content is satire or parody. But reasonable people can disagree on what constitutes satire or parody. In making those judgment calls, large online platforms will have to speculate as to how the California officials who enforce the law view the content in question and account for

1   their subjective interpretation of AB 2655's terms.  Rumble Decl. ¶ 45; X Corp. S&O Decl. ¶¶ 6,

2   19.

3       183.   AB 2655 requires X, Rumble, and the other covered platforms to make these

4   decisions within the timeframes set forth under AB 2655—that is, to remove content covered by

5   the statute "within 36 hours, describing any action taken or not taken with respect to the incident,"

6   § 20515(a), and to remove any such content "no later than 72 hours after a report is made,"

7   § 20513(b).  *See* X Corp. S&O Decl. ¶¶ 6–9; Rumble Decl. ¶ 46.

8       184.   There are roughly 170 billion posts per year on X.  X Corp S&O Decl. ¶ 14.   From

9   November 5–6, 2024, there were 942 million posts on X globally, which was an all-time global

10   daily record.  *See id.* Ex. 3 (Global Government Affairs (@GlobalAffairs), X (Nov. 14, 2024, 9:57

11   AM)).  In addition, in the first six months of 2024, when elections were occurring in the EU and

12   India, X received 224,129,805 user reports related to content on the platform.  *Id.* ¶ 14.

13       185.   Similarly, Rumble currently hosts millions of hours of publicly available video.

14   Rumble Decl. ¶ 13.  In the second quarter of 2024, users uploaded an average over 12,000 hours of

15   content to Rumble every day.  A significant portion of that content relates to politics.  *Id.* ¶ 14.

16       186.   Rumble will have to hire more employees or contractors to review and respond to

17   the complaints within the timeframes mandated by AB 2655.  *Id.* ¶ 48; X Corp. S&O Decl. ¶ 11.

18       187.   Rumble will have to train its content moderation team to research for the contextual

19   information required to assess whether AB 2655 applies to particular content, which will require

20   time and corporate resources.  Rumble Decl. ¶ 49; X Corp. S&O Decl. ¶ 11.

21       188.   Neither X nor Rumble is aware of any available technical tools that can effectively

22   detect the content targeted by AB 2655.  Rumble Decl. ¶ 50; S&O Decl. ¶ 11.

23       189.   To reduce its reliance on external entities, Rumble has a practice of avoiding use of

24   third-party tools when possible.  But for Rumble to attempt to develop technical tools that are

25   capable of making the complex determinations required of AB 2655, assuming that is even

26   technically feasible, would require a large expenditure of finance and manpower.  *Id.* ¶ 54.

27

28

PLAINTIFFS' STATEMENT OF
UNDISPUTED FACTS

34

1
2

**XI.    AB 2839 and AB 2655 burden the speech of content creators, such as The Bee, Rickert, and Kohls.**

3
4
5
6

190.    If The Bee, Rickert, and Kohls desire to publish or republish satire or parody on their own websites or on their online accounts without violating AB 2839, the law requires them to label the content ("This _____ has been manipulated for purposes of satire or parody") in a size that complies with AB 2839.  Dillon Decl. ¶ 89; Rickert Decl. ¶ 48; Kohls V. Compl. ¶ 98.

7
8
9
10

191.    Neither The Bee, Rickert, nor Kohls are willing to post satire or parody with this label because they do not want this disclaimer to alter their messages and because AB 2839's size requirements ruin the communicative impact of satire or parody by drowning out the author's message.  Dillon Decl. ¶¶ 90–92; Rickert Decl. ¶¶ 49–51; Kohls V. Compl. ¶ 98.

11
12

192.    For example, AB 2839 requires The Bee to alter its headlines and video identified above by stamping the following disclaimer on its content.  Dillon Decl. ¶ 93.

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



193.    AB 2839 requires Rickert to alter the Harris Parody Video by posting a disclaimer like the below throughout the video, shown next to a still from the video.  Rickert Decl. ¶ 52.

194.    AB 2839 requires Kohls to alter his Harris Parody Video by posting a disclaimer like the below throughout the video.  Kohls V. Compl. ¶ 98.



195.    The Bee has continued to post satirical and parodical content without the disclaimer, because The Bee is unwilling to include the disclaimer and is unwilling to chill its own speech. Dillon Decl. ¶¶ 43–44, 92, 98.

196.    Kohls has continued to post satirical and parodical content without the disclaimer, because Kohls is unwilling to include the disclaimer and is unwilling to chill his speech.  Kohls Decl. ¶ 15; Kohls V. Compl. ¶ 152.



197.    The Bee posts content on Rumble, X, Instagram, Facebook, and YouTube.  Dillon Decl. ¶ 95.  Rickert posts content on X, Facebook, and Instagram.  Rickert Decl. ¶ 56.  Kohls posts content on Rumble, X, and YouTube.  Kohls Decl. ¶¶ 6–7, 10, 12.  All of these platforms qualify as covered platforms under AB 2655.  *See* § 20512(h); Dillon Decl. ¶ 95.

198.    AB 2655 requires covered platforms to remove or label The Bee, Rickert, and Kohls's posts that are materially similar to the content they have previously posted, as identified in paragraphs 26, 58, and 81, above.  Such content would include digitally created or modified content about politicians, presidential and vice presidential candidates for office who appear on the ballot in California, other candidates who appear on the ballot in California, elected officials saying or doing something in connection with an election in California, and ballots, voting machines, and voting sites related to an election in California.  Dillon Decl. ¶ 96; Rickert Decl. ¶ 57.

199.    AB 2839 threatens punishment for The Bee, Rickert, and Kohls for continuing to post the content discussed above and for making similar future content because Rumble, X, YouTube, Instagram, and Facebook could deplatform them for this conduct as a breach of their terms of service.  Dillon Decl. ¶¶ 99–105; Rickert Decl. ¶¶ 61–64; Kohls V. Compl. ¶¶ 102–05.

200.    To post on X, The Bee, Rickert, and Kohls must abide X's terms of service, which make them "responsible for … any Content [they] provide[ ], including compliance with applicable laws, rules, and regulations."  AB 2839 is such a law.  Violating that term of service subjects The Bee, Rickert, and Kohls to potential account suspensions or bans from X.  Dillon Decl. ¶ 102; Rickert Decl. ¶ 62; Kohls V. Compl. ¶ 105.

201.    To post on Rumble, The Bee agreed to comply with Rumble's terms of service, which include compliance "with all applicable laws."  AB 2839 is such a law.  Violating that term of service subjects The Bee to potential account suspensions or bans from Rumble.  Dillon Decl. ¶ 101.

202.    YouTube makes "access and use [of] the Service" contingent on "comply[ing] with … applicable law."  AB 2839 is an applicable law.  Violating that term of service subjects The Bee

and Kohls to potential account suspensions or bans from YouTube.  Dillon Decl. ¶ 103; Kohls V. Compl. ¶ 104.

203.    Instagram's terms of use require users to agree not to "do anything unlawful." Violating AB 2839 thus subjects The Bee and Rickert to potential account suspensions or bans from Instagram.  Dillon Decl. ¶ 104; Rickert Decl. ¶ 63.

204.    Facebook's terms of service require users to agree not to "do or share anything … [t]hat is unlawful."  Violating AB 2839 thus subjects The Bee and Rickert to potential account suspensions or bans from Facebook.  Dillon Decl. ¶ 105; Rickert Decl. ¶ 64.

205.    The Bee and Kohls receive payment for their content on X, Rumble, and YouTube. Suspensions or removal of their accounts would cause them financial harm.  Dillon Decl. ¶¶ 106– 07; Kohls Decl. ¶¶ 6, 20; Kohls V. Compl. ¶ 106.

206.    As discussed above, the State Bar of California investigated Rickert after several TikTok users commented about how to file complaints about her content.  The bar investigation caused her to rarely post on TikTok.  AB 2655 has a similar reporting mechanism that could lead to large online platforms suspending or banning her accounts.  Anyone can report any content, even if it doesn't violate AB 2655.  That reporting mechanism will thus cause her to avoid posting political content, even if not covered under AB 2655, on large online platforms.  Rickert Decl. ¶ 66.

207.    The Bee, Rickert, and Kohls also desire to view other creators' content that would be available absent AB 2839 and AB 2655.  Dillon Decl. ¶ 108; Rickert Decl. ¶ 67; Kohls V. Compl. ¶ 107.

208.    The Bee and Kohls also desire to have others reshare their posts and content, which AB 2839 and AB 2655 may deter others from doing.  Kohls Decl. ¶¶ 20–21; Dillon Decl. ¶¶ 27– 28, 107.

209.    AB 2839 and AB 2655 may also apply to other content, including:

a.    A digitally created video posted by the Republican National Committee that contains "12 Minutes of Democrats Denying Election Results," featuring elected

officials denying the legitimacy of 2016 election results because of alleged Russian disinformation. Kurtzberg Decl. Ex. 25 (Republican National Committee video, GOP, *12 Minutes of Democrats Denying Election Results* (June 23, 2022)).

        b.      The below digitally created image of Taylor Swift endorsing Donald Trump.



**XII.   Content Potentially Subject to AB 2655.**

210.    On April 25, 2023, the official Republican National Committee YouTube channel posted a video titled "Beat Biden" that, using artificial intelligence, imagined various scenarios that would occur during a second presidential term under Joe Biden, including that "international tensions [will] escalate," "financial systems [will] crumble," and "crime [will] worsen[]." Kurtzberg Decl. Ex. 7 (GOP, *Beat Biden*, YouTube (Apr. 25, 2023)).  As shown below, the video's description states that it is "[a]n AI-generated look into the country's possible future if Joe Biden is re-elected in 2024."

1

2

3

4

5

6

7

8

9



10

11

12

13    211.    This video was cited in the Senate Committee of the Judiciary's Analysis of

14  Assembly Bill No. 2655 as an example of how "generative AI can spread misinformation regarding

15  elections with ease."  *See* Kurtzberg Decl. Ex. 4 at 7, 9.

16    212.    In March 2023, an X user named Eliot Higgins (@EliotHiggins) used artificial

17  intelligence to create the below photo depicting Donald Trump being forcefully arrested. Kurtzberg

18  Decl. Ex. 8 (Eliot Higgins (@EliotHiggins), X (Mar. 20, 2023, 5:22 PM)).

19

20

21

22

23

24

25

26

27

28

213.    Because of AB 2655, Rickert refrained from posting certain of these images on her X, Facebook, and Instagram accounts.  Rickert Decl. ¶ 30.

214.    On August 29, 2024, the X user Kamala HQ (@KamalaHQ) posted a five-second video on X where Vice Presidential candidate JD Vance says, "Democrats want to attack Republicans as being anti-union and sometimes the shoe fits."  Kurtzberg Decl. Ex. 9 (Kamala HQ (@KamalaHQ), X (Aug. 29, 2024, 12:57 PM)).  The clip cuts out right before Vance says "but not me, and not Donald Trump."  *See* the full video at Kurtzberg Decl. Ex. 10 (The International Association of Fire Fighters, *57th IAFF Convention: Sen. JD Vance*, YouTube (Aug. 29, 2024)).

215.    AB 2655 may require large online platforms to remove or label the content posted by Kohls, The Bee, and Rickert, identified above in paragraphs 193–94, including the Harris Parody Video.

216.    The Assembly Committee on Judiciary's April 22, 2024 analysis states that, "[c]onfronted with such a restricted timeline and the threat of a civil action . . . ***platforms will***

*'remove significantly more content, including content that has accurate election information and content that is not materially deceptive.'*"  Kurtzberg Decl. Ex. 3 at 12.

217.    The Assembly Committee on Judiciary's April 22, 2024 analysis also states that "*with no sure means to determine what is 'materially deceptive,' the platforms will err on the side of blocking content, thus burdening more speech than is necessary.*"  *Id.* at 8.

218.    On April 23, 2024, Jose Torres Casillas of TechNet, which opposed AB 2655, testified before the Assembly Standing Committee on the Judiciary that AB 2655:

> requires online platforms to make determinations about truth and falsity in an *impossible way*. . . . A platform cannot accurately adjudicate reports on those types of content and will instead *resort to over removing information in order to avoid liability and the penalties in this bill*. Removing information that is only suspected of being false is clearly not a good outcome.

Kurtzberg Decl. Ex. 5 at 5 (statements of Jose Torres Casillas, TechNet).

219.    On April 23, 2024, Khara Boender of the Computer Communications Industry Association ("CCIA"), which also opposed AB 2655, testified before the Assembly Standing Committee on the Judiciary that the content-moderation "tools that are currently available [to covered platforms] are not always reliable or accurate," and covered platforms will:

> *inadvertently over block or over label content.* This could result in user frustration and suppression of political speech. . . . *Faced with individual users seeking injunctive relief merely if they disagree with a covered platform's decision regarding reported content, a service may choose to prohibit all digitally altered content, cutting off many valuable and helpful uses*.

*Id.* at 4–5 (statements of Khara Boender, CCIA).

220.    Boender further testified that AB 2655 will have an effect similar to that of the takedown regime under the Digital Millennium Copyright Act (DMCA), because AB 2655 will "*result in platforms being required to block content almost constantly in order to ensure compliance*," which has been the outcome under the DMCA, where platforms "err in taking down the content lest they face[] liability."  Kurtzberg Decl. Ex. 14 (*Defending Democracy from Deepfake Deception Act of 2024: Hearing on AB 2655 Before the S. Standing Comm. on Elections*

*and Constitutional Amends.*, 2023–2024 Reg. Sess. (Cal. June 18, 2024)) at 5 (statements of Khara Boender, CCIA).[5]

221.    Rumble currently curates and hosts content on its platform that would trigger AB 2655's requirements.  Rumble Decl. ¶ 31.

222.    Rumble hosts a wide variety of political speech.  Some of its most viewed content creators are political commentators, including Dan Bongino, Dinesh D'Souza, Ben Shapiro, Charlie Kirk, Russell Brand, and Candace Owens.  It also hosts and curates content created by politicians, including Donald Trump, Robert F. Kennedy Jr., and California politicians such as former Speaker of the House Kevin McCarthy.  And it hosts and curates content posted by The Babylon Bee, an online platform dedicated to satire, and Christopher Kohls.  *Id.* ¶ 32.

223.    Rumble users have historically and continue to frequently upload content depicting candidates for elective office and elected officials.  *Id.* ¶ 33.

224.    Some of that content includes digitally altered images and videos of candidates and elected officials doing or saying something they did not do.  *Id.* ¶ 34.

225.    For example:

a.    On October 23, 2024, a Rumble user uploaded a digitally altered video showing Vice President Harris speaking about the then upcoming election with a crowd in the background shouting, "We want Trump!"  *Id.* ¶ 35.a

---

[5] Substantial empirical evidence supports the view that such enforcement regimes lead to takedowns of a significant amount of protected material.  *See* Kurtzberg Decl. Ex. 15 (Wendy Seltzer, *Free Speech Unmoored in Copyright's Safe Harbor: Chilling Effects of the DMCA on the First Amendment*, 24 Harv. J.L. & Tech. 171 (2010)) (asserting that the DCMA encourages internet service providers to respond to copyright complaints by removing content to ensure immunity from liability, leading to the censorship of protected speech); *id.* Ex. 16 (Jennifer M. Urban, et al., *Notice and Takedown in Everyday Practice* (2016) at 41 (finding, based on a survey of online service providers, that "[m]ost [online service providers] reported acting conservatively in order to avoid liability, opting to take down content even when they are uncertain about the strength of the underlying claim"); *id.* Ex. 17 (Jennifer M. Urban & Laura Quilter, *Efficient Process or "Chilling Effects"? Takedown Notices Under Section 512 of the Digital Millennium Copyright Act*, 22 Santa Clara Comput. & High Tech. L.J. 621, 638, 687 (2006)) (finding, based on an empirical study of sample DMCA takedown requests, a "surprising number of questionable takedowns" and noting that "§ 512 gives [online service providers] strong incentives to maintain their safe harbor and few incentives to question takedown"); *id.* Ex. 18 (Alfred C. Yen, *Internet Service Provider Liability for Subscriber Copyright Infringement, Enterprise Liability, and the First Amendment*, 88 Geo. L.J. 1833, 1888 (2000)) (arguing that the DMCA safe harbor scheme creates a First Amendment issue by incentivizing risk averse internet service providers to remove content even where copyright infringement is unclear).

b.      On October 15, 2024, a Rumble user uploaded an apparently digitally altered video showing Vice Presidential candidate Tim Walz saying, "I know you know this. … It was better under Donald Trump." *Id.* ¶ 35.b

c.      In late September 2024, a Rumble user uploaded a digitally altered video of Presidential candidate Kamala Harris saying something in Spanish that she did not say. *Id.* ¶ 35.c.

226.    The Babylon Bee also shares videos on Rumble that include digitally altered images and videos of candidates and elected officials doing or saying something they did not. *Id.* ¶ 36.

227.    For example:

a.      On October 25, 2024, the Bee uploaded a video containing an intentionally digitally altered image of Presidential candidate Donald Trump in a Pittsburgh Steelers football uniform.  Below is a still screenshot of the video.

b.      On September 19, 2024, the Bee uploaded a video containing a digitally altered image of Presidential candidate Donald Trump fending off an attack by masked figures.  Below is the thumbnail for the video. *Id.* ¶ 37.



228. Users frequently post political content materially similar to the above on Rumble and will likely continue to do so. *Id.* ¶ 38.

229. The above content does not violate Rumble's terms and conditions. *Id.* ¶ 39.

230. For future elections in California, Rumble will very likely curate and host content materially similar to the above on its platform. Rumble will not remove this content unless it violates its terms of service or it finds itself under a valid court order. *Id.* ¶ 40.

DATED:        March 7, 2025

By: /s/ Joel Kurtzberg
CAHILL GORDON & REINDEL LLP
Joel Kurtzberg (admitted *pro hac vice*)
Floyd Abrams (admitted *pro hac vice*)
Jason Rozbruch (admitted *pro hac vice*)
32 Old Slip
New York, NY 10005
Phone: 212-701-3120
Facsimile: 212-269-5420
jkurtzberg@cahill.com

DOWNEY BRAND LLP
William R. Warne (SBN 141280)
Meghan M. Baker (SBN 243765)
621 Capitol Mall, 18th Floor
Sacramento, CA 95814
Phone: 916-444-1000
Facsimile: 916-520-5910

*Attorneys for Plaintiff X Corp.*

/s/ Adam E. Schulman
HAMILTON LINCOLN LAW INSTITUTE
Adam E. Schulman
Theodore H. Frank
1629 K Street NW, Suite 300
Washington, DC 20006
Phone: 610-457-0856
adam.schulman@hlli.org
ted.frank@hlli.org

*Attorneys for Plaintiff Christopher Kohls*

/s/ Mathew W. Hoffmann
ALLIANCE DEFENDING FREEDOM
Mathew W. Hoffmann
Philip A. Sechler
44180 Riverside Parkway
Lansdowne, VA 20176
Phone: 571-707-4655
Facsimile: 571-707-4656
mhoffmann@ADFlegal.org
psechler@ADFlegal.org

/s/Johannes Widmalm-Delphonse
ALLIANCE DEFENDING FREEDOM
Johannes Widmalm-Delphonse
44180 Riverside Parkway
Lansdowne, VA 20176
Phone: 571-707-4655
jwidmalmdelphonse@ADFlegal.org

ALLIANCE DEFENDING FREEDOM
Jonathan A. Scruggs
15100 N. 90th Street
Scottsdale, AZ 85260
Phone: 480-444-0020
Facsimile: 480-444-0028
jscruggs@ADFlegal.org

CHAVEZ-OCHOA LAW OFFICES
Brian R. Chavez-Ochoa (SBN 190289)
4 Jean Street, Suite 4
Valley Springs, CA 95252
Phone: 209-772-3013
brianr@chavezochoalaw.com

*Attorneys for Plaintiffs The Babylon Bee, LLC and Kelly Chang Rickert*

PLAINTIFFS' STATEMENT OF
UNDISPUTED FACTS

46

1   ALLIANCE DEFENDING FREEDOM
    Mercer Martin
2   15100 N. 90th Street
    Scottsdale, AZ 85260
3   Phone: 480-444-0020
    Facsimile: 480-444-0028
4   mmartin@ADFlegal.org

5
    CHAVEZ-OCHOA LAW OFFICES, INC.
6   Brian R. Chavez-Ochoa (SBN 190289)
    4 Jean Street, Suite 4
7   Valley Springs, CA 95252
    Phone: 209-772-3013
8   brianr@chavezochoalaw.com

9
    *Attorneys for Plaintiffs Rumble Inc. and Rumble Canada Inc.*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    PLAINTIFFS' STATEMENT OF          47
    UNDISPUTED FACTS