# EXHIBIT 2






Assembly Standing Committee on Elections
AB 2655

Gail Pellerin: Perfect, perfect. Your second Bill. So you're AB 2655.

Marc Berman: Great. Just give a second for my witnesses, assuming I have witnesses, and I do hello. So five years ago, as some folks who were in the Legislature at that time might remember, I authored the first election related deepfake Bill in the country. I did this after watching Jordan Peele, the actor and director, created a deepfake of President Obama in 2018.

Marc Berman: And it was funny, but it also really set off alarm bells for me as it was clear and easy to see how this promising technology could could be abused by bad actors, especially to influence our elections. However, the potential harm was fairly limited back then as the technology to make a deepfake was very expensive. It wasn't widely available.

Marc Berman: But as we've seen in just a few short years, the technology has gotten better, it's gotten cheaper, and it's gotten much more accessible, making it very easy to make a realistic deepfake in a couple of minutes on your phone. As a result, we're seeing AI used to undermine elections across the world and here in America. As technology changes, so too must our laws.

Marc Berman: Therefore, I'm authoring AB 2655 to protect election integrity by regulating the online spread of AI generated disinformation and deepfakes meant to influence an election. With today's sophisticated deepfakes, voters may not know what images, audio or video they can trust. Imagine if a fake video appeared online of an elected official saying or doing something they neither said nor did, like accepting a bribe or saying that they'd hacked voting machines to ensure their victory.

Marc Berman: This deceptive but hyper realistic content can undermine voters faith in our election integrity. Accordingly, AB 2655 would, for a limited period of time immediately before and after an election, require large online platforms if they know or should know that the content meets the test in the Bill to restrict the distribution of materially deceptive and digitally altered or created images, audio or video meant to influence the election.

Marc Berman: For less harmful yet still materially deceptive and modified content, the Bill would require the platforms to label other AI created or modified election disinformation meant to influence. In both instances, the Bill does not demand perfection. What it says is that platforms must act if they know, or should know, using best available tools, that the content meets the test in the Bill. The Bill doesn't allow platforms to bury their head in the sand, but if they genuinely don't know, then there is no obligation.

Marc Berman: Moreover, the Bill is not trying to address hot button controversies or inflammatory claims, just the depiction of demonstrably untrue and provably false content. Importantly, the Bill does not provide for any monetary penalty against online platforms that fail to comply with the Bill's requirements. Instead, the only

penalty is that a court will order the platforms to do what the Bill requires.

Marc Berman: I realize that this Bill is attempting to legislate in an arena where technology and the law are fast evolving, and that can be challenging on many levels. But I don't believe that we can afford to take a wait and see approach. I've had good conversations with platforms. I've amended the Bill based on feedback, and I'll continue to do so should the Bill move forward today. Therefore, I respectfully ask for an aye vote and I'm joined today by Leora Gershenzon, CITED's Policy Director, and David Evan Harris, a lecturer at UC Berkeley and former tech sector researcher.

Tom Lackey: You may proceed.

Leora Gershenzon: Thank you, Mister Vice Chair and Members, I'm Leora Gershenzon. I'm the Policy Director at the California Initiative for Technology and Democracy, which is a project of California common cause. As elected officials, you are all keenly aware of the threat posed by deepfakes. Consider a deepfake of you hugging the opposing party's presidential candidate that goes viral weeks before an election, or a fake video of you accepting a bribe that's forwarded around your district days before the election.

Leora Gershenzon: While disinformation has been around forever, AI generated deepfakes can now be created virtually instantly, at no cost, and sent to millions in a matter of seconds. Once disinformation spreads, it's nearly impossible to get it out once it's out there, label or not, it's out there. This threat is not imaginary. Generative AI has been used around the world, and even in the United States to impact elections.

Leora Gershenzon: Obviously, the infamous robocall. AB 2655 seeks to strike the right balance by seeking to ban, only for a strictly limited time around elections, the online spread of the worst of the deepfakes. That's the candidate doing or saying something they did not do or say, or an elected official doing or something doing or saying something they did not do. Same thing with an elections official. Again, election officials a day before the election saying you can't vote. All voting machines are hacked.

Leora Gershenzon: This would obviously have a clear impact on an election and is demonstrably false. Assembly Berman has worked diligently to ensure that AB 2655's approach is very narrowly tailored and does not extend to hot punted controversies or things that are not demonstrably false. It's not a matter of opinion. It either happened or it didn't happen. The Bill is respectful of the First Amendment.

Leora Gershenzon: It's narrowly tailored to serve a compelling government interest, and it also understands the reach of Section 230 of the Federal Communications Decency Act. Will this Bill stop all election disinformation? No, but it's part of a multipronged approach to address what clearly is a crisis in our democracy. And the alternative, waiting for perfection, is simply not enough that we should accept to protect our democracy and our free and fair elections. We hope you can support AB 2655. Thank you.

David Harris: Thank you Mister Vice Chair and Members, my name is David Harris and I am a Senior Policy Advisor to CITED. I previously worked for close to five years at Facebook and Meta on the civic integrity, misinformation and responsible AI teams. I am also an advisor to a number of different organizations.

David Harris: Beyond CITED I have advised the European Union on the EU AI Act, I have advised the White House on the White House's Executive Order on AI, and I'm a Member of a NATO task force on AI and disinformation. On Assemblymember Berman's Bill 2655 I am strongly in favor of this Bill. This Bill only applies to the largest online platforms, such as the ones operated by my former employer, that have wonderful resources inside of their companies.

David Harris: To enforce a Bill like this. You only need to look to other categories of currently illegal content, such as child sexual abuse material or terrorist content, which they are able to remove very effectively. And those are not necessarily more easier to remove or simpler than election disinformation. The notion that it's too difficult to remove this is false. Beyond that, I think it's important for us to remember that most of the major AI companies today have already asked for more regulation of AI.

David Harris: And I think that is an important sign that we know that the industry is strongly in favor of putting regulations in place that protect our elections and protect our democracies. When we fail to regulate AI, what we do is we punish the companies that are doing the right thing thing. We punish them because they are going out of their way to spend more money to hire more staff and to build teams and technologies that are able to remove this type of content.

David Harris: Their shareholders who want them to maximize their profits are not pleased if they are the only companies in the space that are spending the money to do the right thing. And it's for that reason that I think we should heed the call of tech companies CEO's calling for regulation of AI, and that I am strongly in support of this Bill.

Tom Lackey: Okay, thank you. Is there anybody that would like to testify in opposition before we move forward with the group opposition. Please come forward to the table here, and you'll have five minutes to express your opposition. You may proceed.

Khara Boender: Thank you. Good morning, Chair Pellerin and Members of the Committee. My name is Khara Boender, testifying on behalf of the Computer and Communications Industry Association in respectful opposition to AB 2655. CCIA is an international, not for profit trade association with about two dozen members from a range of communications and technology firms. CCIA and its members take seriously the impact deceptive content may have on elections.

Khara Boender: Many of our members are working to implement tools to better detect and label AI generated content. And using a combination of AI and human review, they moderate content in violation of their terms or service, including content that is illegal and potentially harmful. But the tools that are currently available are not always reliable, are accurate. Just as spam filters sometimes mislabel legitimate

emails, and while such technology is evolving, so are the means for bad actors to evade such detection.

Khara Boender: I would say that this differs from the examples that were shared earlier regarding CSAM because there are databases that have hashing values that allow platforms to better detect these materials in addition to what they used to detect copyright infringements, which are again based on robust databases of available information. Because covered platforms are not privy to the intent and context for which a piece of content is used, they could inadvertently overblock or over label content. This could result in user frustration and suppression of political speech.

Khara Boender: Political speech was at the core of why our First Amendment was established, and it is critical to maintain those protections. And while the Bill exempts satire and parity, it's unclear who gets to decide what constitutes those uses. Faced with potential liability, covered platforms may choose to prohibit all digitally altered content, cutting off many valuable and helpful uses.

Khara Boender: These tools can be used by campaigns to reach voters with high quality content at lower costs or to translate speech into multiple languages to foster a more accessible democratic process. Further, users may weaponize the required reporting mechanism to suppress speech that they disagree with. For example, under the Digital Millennium Copyright Act, there were studies describing political ad takedowns on both sides of the political spectrum.

Khara Boender: After receiving reports of copyright infringement, many of these cases were ultimately deemed fair use, but platforms were inclined to err in taking down the content lest they face potential liability. Responsibility for labeling AI generated election content and liability for deceptive content should rest with the entity that puts forth such material, the entity that is most aware of the intent and context for which the content was created and shared. On behalf of CCIA, I appreciate your consideration of our comments and I welcome anyone questions.

Tracy Rosenberg: Okay. Hi once again, Committee Tracy with Oakland privacy. We are in respectful opposition to AB 2655. And we wanted to say a couple of things from a civil society, from a civil society perspective. We're not a tech company and we don't work for them or speak for them. I also want to say to Assemblymember Berman, when I was talking about the full spectrum of AI Bills, and that some were extremely complex, I honestly was talking about all the Bills, including algorithms and risk assessments and six different water marking Bills and so on, not simply this Bill. I didn't want you to take that the wrong way. So this Bill charges large online platforms with scanning all content posted to their sites with deepfake detection tools for four months preceding a vote.

Tracy Rosenberg: So if we include primaries, that's probably 60% to 75% of the time. Because we have elections every year, sometimes twice a year. We do think that is a bit of a privacy problem. It's also questionable how well these tools work. Just last week, a prominent disinformation expert said in the New York Times, even using the best tools, you can't be sure. And he was making those tools as he said that so he would know.

Tracy Rosenberg: The Bill's language sort of offers that a technology company should be the judge, jury and executioner, despite no formal training in First Amendment and constitutional law. This stuff is always a sort of, you know, push me, pull you in terms of balancing the equities. And with all due respect, we don't think TikTok or Meta would balance them as well as a judge, and we don't really want you doing that. The Bill is, you know, so fundamental.

Tracy Rosenberg: So fundamentally, the Bill is relying on two imprecise measures, technically, you know, technical scanning programs that don't necessarily work very well in unvetted reports from the public, candidates, officials, campaigns, and even chaos actors. We don't think any technology platform can be expected to know everything that every candidate running for office in every California, city, county, and, you know, across the state where they said and what they went.

Tracy Rosenberg: I mean, there's some obvious examples that were provided, but in a lot of local races, this is going to be something fairly subtle. And we don't, you know, or it can be fairly subtle, and we don't necessarily believe that TikTok, Meta or Instagram will actually know what was said and where candidates were. So basically were using imprecise measures to power a potentially broad censorship regime of blocking content. And we really cant support that even under the guise of defending democracy.

Tracy Rosenberg: So we are recommending that the Committee and the Legislature not go down this particular route. We think there are a lot of things that the Legislature can do that stop somewhat short of a broad censorship regime for online content. Thank you.

Tom Lackey: Thank you. Okay, this is now the opportunity for those in the audience who would like to express support. If you could express your name and organization, we'd love to hear from you.

Louise Miller: Louise Miller, representing the California Clean Money Campaign and Indivisible California State Strong in strong support.

Evan Minton: Hi, Evan Minton with Voices for Progress standing in strong support of this critical Bill.

Obed Franco: Good morning. Obed Franco, on behalf of the Asian Law Caucus, in support.

Tom Lackey: Thank you. Are there any in the audience who would like to express opposition? Please come forward. Express your name and organization.

Dylan Hoffman: Dylan Hoffman, on behalf of TechNet, respectfully opposed. Thanks.

Tom Lackey: Thank you. Okay, we'll now bring it back to Committee. Anybody like to express any points of clarity or - yes.

Bill Essayli: Would this cover, like, if you use chat GPT to rewrite text? Like,

does it cover text, or are we just talking about photos and videos?

Marc Berman: My understanding is it's images, audio, video, but.

Leora Gershenzon: It would cover demonstrably false text that could be told. So again, this is not a Bill that seeks perfection. And text is, I mean, you've pointed out the hardest thing to go, but can you imagine a text that goes out that says, although we don't cover web messaging, that was removed, but some content that goes out that says this person said something false. So you can. Again, it depends.

Bill Essayli: When I say text, I'm not talking about text messages.

Leora Gershenzon: No, no, I understand. You're talking.

Bill Essayli: Yes, written words.

Leora Gershenzon: Yes. But the social media platforms would have to know that it is false. And it is not a perfect science, this figuring out, is it false or is it not. It's kind of this whack a mole thing, as you expressed so well, we are getting much better with tools to determine what's false, and then the bad actors are going to get better. So it's going to go like this. But there are some very good tools, and they continue to get better, and they are getting better at taxpayers. The text is probably the hardest to detect.

Bill Essayli: Okay, so I'm just curious. I mean, if my opponent puts up an ad, it says, Bill Essayli supports insurrection, you know, and they used AI to generate that. And I'm gonna say I've never supported insurrection, but they're making that argument based on. So it's a very, very, very complicated area. So would that be.

Leora Gershenzon: That's tricky, because what does it mean to support insurrection? So I think. I don't think that's demonstrably false. If they have a picture of you with a pitchfork entering the Capitol on January 6, and you were not there, and you didn't do that. That's demonstrably false. That would be covered.

Bill Essayli: But you can see how this is.

Leora Gershenzon: But again, it's not an exact science, but what we're trying to do in the Bill is put very clear guardrails. We understand very well the limits of the First Amendment and the protections of the First Amendment provides. But, so that picture of you, and, you know, maybe it's cartoonish, and it's not obvious that it's you, that's one thing. But if it looks exactly like you and it goes out two days before the election, it's out. There's nothing you can do.

Bill Essayli: I recognize the concern. I do. I just. It's just a very sticky thing with the First Amendment and also with asking private companies to be the enforcer, essentially. And so I'm just going to say, for the record, I like the Twitter model where they use the community to sort of regulate information on there. And so, community notes is something they have where anyone can say, this is false. And I actually see it a lot. Even Elon Musk gets fact checked by his own community. So I tend to like that model where it's the public, it's the crowd sourcing is kind of

doing the moderating, then making an individual, company, or person the arbiter of. Of what's disinformation. So. But I appreciate it. Madam Chair. That's all I had. Thank you.

Gail Pellerin: Thank you. Any other comments? Assemblymember Cervantes.

Sabrina Cervantes: I'm gonna. Excuse me. So I wanna just first start off. By thanking the author and those who provided testimony today. I believe that we do need to have guardrails and strike a balance as best as we can to stop the. Spread of deepfakes and misinformation, disinformation in our elections, and just to protect our democracy. So today, I'll be supporting this Bill.

Marc Berman: Thank you.

Gail Pellerin: Any other comments? Assemblymember Lackey.

Tom Lackey: Yeah. I do clearly believe that deepfakes are a threat to truth. However, what keeps somebody from suing a website or platform in its current situation without this Bill.

Marc Berman: I'm not aware of any legal remedy or process for somebody to be able to do that. So I think that's where this Bill is sort of novel and tries to create an avenue for folks to be able to seek that redress.

Tom Lackey: And just so you know, I'm not in a position to actually support this Bill at this point just because I have my colleague has expressed some concerns that I do share, and I think it's a little too nuanced, and I think it jeopardizes something that we hold very sacred.

Marc Berman: Yeah, no, I'll wait.

Gail Pellerin: Any other comments from. Okay. Seeing no other comments. Seeing no other comments. Assemblymember Berman you may close.

Marc Berman: Yeah, I appreciate the conversation. I also appreciate how complex this is, and I don't by any stretch think that we have the perfect solution today. I think that's something that we're going to hope to try to achieve by the end of the legislative process. And even then, I have no doubt that something like this will probably be litigated in the courts.

Marc Berman: And there's a lot of interesting precedent, different opinions, and it'll be curious to see how, like I mentioned in my opening comments, this is ever evolving. And as technology changes and frankly, as certain Supreme Court Justices change, we don't know how the Supreme Court might opine on the influence of technology and manipulated content and the impact that it has on our elections and what scrutiny they'd apply and all sorts of things.

Marc Berman: So it's a really fascinating Bill, probably one of the more challenging ones I've got this year. And it's something that we're going to keep on having conversations with the opposition to try to make sure that we are addressing the

concerns that we have, or that I have about the impact of this type of content on our elections and on our voters without unintended consequences, and doing it in a way that's as easy as possible for the platforms to implement. So with that respect, we ask for an aye vote.

Gail Pellerin: Thank you so much, and I do appreciate your leadership in this issue. You were out there early on, the first in the nation. I really want to thank you for that foresight. The threat posed to our electoral system and to our democracy by deepfakes and other misleading content is substantial and has been supercharged by tools like artificial intelligence that make it easier and cheaper than ever to create convincingly realistic but deceptive images, audio and video.

Gail Pellerin: And part of the solution for protecting against the deceptive material is to go after those who create and disseminate that material, which is why, which is why you're doing this Bill. So thank you. But another crucial piece of the puzzle is to address the harms that these materials present is to limit the tools that bad actors have for spreading disinformation so rapidly and at such little cost.

Gail Pellerin: So I know that the author takes all this seriously, the constitutional and logistical challenges and regulating in this area, and I'm confident that you're open to continuing to refine the Bill as it moves through the process. So with that, I'm recommending support. Do I have a motion? Motion? Motion by Cervantes, second by me. Madam Secretary, please call the roll

Committee Secretary: On AB 2655 by Berman. The motion is do pass and be rereferred to the Committee on Judiciary. [Roll Call].

Gail Pellerin: We're going to keep that Bill on call and we're going to round up our absent Members. So thank you. We'll now move on to Assemblymember Cervantes and your Bill 1807.