# EXHIBIT 3

Date of Hearing:  April 23, 2024

ASSEMBLY COMMITTEE ON JUDICIARY
Ash Kalra, Chair
AB 2655 (Berman) – As Amended April 1, 2024

As Proposed to be Amended

**SUBJECT**:  DEFENDING DEMOCRACY FROM DEEPFAKE DECEPTION ACT OF 2024

**KEY ISSUE**:  SHOULD LARGE ONLINE PLATFORMS BE REQUIRED TO BLOCK (OR IN SOME CASES LABEL) MATERIALLY DECEPTIVE AND DIGITALLY MODIFIED OR CREATED CONTENT RELATED TO AN ELECTION OR ELECTION PROCESS, DURING A PRESCRIBED PERIOD OF TIME BEFORE OR AFTER AN ELECTION?

**SYNOPSIS**

*According to the author, disinformation powered by Artificial Intelligence (AI), which can be distributed to millions of social media users in an instant, poses a serious threat to our political discourse, our elections, and indeed our democracy. For example, "deepfakes" can generate false sounds and images that could lead to the most discerning viewer to falsely conclude that a candidate, elected official, or election worker said or did something they did not do. Such disinformation not only distorts the truth, it has the potential to undermine people's confidence in our political institutions. While disinformation can threaten political discourse at any time, the author believes that it is especially harmful during an election season, when uncorrected disinformation may influence an election result or create false concerns about the legitimacy of an election in its immediate aftermath.*

*This bill, therefore, would require a large online platform to block "materially deceptive and digitally modified or created" content that portrays any candidate, elected official, or elections official doing or saying something they did not do or say; it would also require them to block deceptive material that concerns voting machines, ballots, voting sites, or other procedures or equipment related to an election. In addition, deceptive material about broader "elections processes," that are not subject to blocking requirement, would need to contain a label that they are materially deceptive and digitally modified. The bill would allow any resident of California to inform the platform that covered material had not been properly blocked or labeled, and if the platform does not respond within 36 hours, or if the reporting resident does not agree with the response, the resident may bring an action for injunctive relief. The bill would also allow the Attorney General, or any district attorney or city attorney, to also seek injunctive relief.*

*This bill passed out of the Assembly Elections Committee on a 6-1 vote. It is sponsored by the California Initiative for Technology and Democracy, a project of California Common Cause, and supported by several political reform groups and labor organizations, among others. The bill is opposed by groups representing the information and technology industry and by ACLU Action California. The opposition argues that the bill would be ineffective, unconstitutional, and preempted by federal law. The author will take several definitional amendments in this Committee, which are reflected in the Summary, below, and discussed in the analysis.*

**AB 2655**
Page  2

**SUMMARY**:  Requires large online platforms, as defined, to block the posting or sending of materially deceptive and digitally modified or created content related to elections, or to label that content, during specified periods before and after an election. Specifically, **this bill**:

1)  Makes findings and declarations about the growing use of generative artificial intelligence (AI), deepfakes, and related technologies to disseminate disinformation that distorts our electoral process and undermines trust in elections.

2)  Requires a large online platform (platform), using state-of-the-art, best available tools to detect digitally modified or created content, to develop procedures for blocking and preventing the posting or sending of materially deceptive and digitally modified or created content, and to block and prevent that content if the platform knows or should know that the content meets the following requirements, during a specified time period, of any of the following:

    a)  A candidate portrayed as doing or saying something that the candidate did not do or say.

    b)  An elections official portrayed as doing or saying something in connection with the performance of their elections-related duties that the official did not do or say.

    c)  An elected official portrayed as doing or saying something that influences the election that the elected official did not do or say.

    d)  A voting machine, ballot, voting site, or other property or equipment related to an election that is portrayed in a materially false way.

3)  Prohibits a platform, notwithstanding the above, from preventing candidates from posting deceptive and manipulated material *about themselves* so long as the content includes a prescribed disclaimer.

4)  Provides that the above prohibitions apply only during the period 120 days before and through election day; however, they apply to content relating to elections officials, voting sites, voting machines, ballots, or related equipment from 120 days before the election to 60 days after the election.

5)  Requires a platform to develop procedures for labeling materially deceptive and digitally modified or created content that pertains to election processes, but that is not subject to the blocking provisions above. Requires the label to indicate that the content is inauthentic, fake, or false if the platform knows or should know as much. Provides that the labeling requirement applies during the period beginning one year before the election or election process, as specified.

6)  Requires the platform to provide a way for Californians to report content that was not blocked or labeled as required, and requires the platform to respond to the report within 36 hours and to describe any actions taken. If the platform does not respond within 36 hours, or if the reporting resident disagrees with the response, the reporting resident may bring an action for injunctive or other equitable relief, and a prevailing plaintiff may recover reasonable attorney's fees and costs. Allows the Attorney General, a district attorney, or a city attorney to similarly seek injunctive relief and obtain fees and costs.

7) Specifies that the provisions of this bill do not apply to a regularly published online newspaper, magazine, or periodical, as specified.

8) Defines the following terms for purposes of the above as follows:

   a) "Elections official" means any of the following: an elections official as defined in Elections Code Section 320; the Secretary of State and their staff; a temporary worker, poll worker, or member of a precinct board; any other person charged with holding or conducting an election, a canvas, or performing another election-related duty.

   b) "Election processes" means any government process related to an election, including, but not limited to, elections, candidates, vote counting, redistricting, and proceedings or processes of the Electoral College.

   c) "Materially deceptive and digitally modified or created content" means an image or an audio or video recording or other digital content, including a chatbot, that has been intentionally manipulated such that all of the following conditions are met:

      i) The digital content is the product of digital manipulation, artificial intelligence, or machine learning, including deep learning techniques, that merges, combines, replaces, or superimposes content onto an image or an audio or video recording, creating an image or an audio or video recording that appears authentic, or that otherwise generates an inauthentic image or an audio or video recording that appears authentic, and that contains a false portrayal of any of the following: a candidate for elective office, elected official, elections official, voting machine, ballot, voting site, other property or equipment related to an election, or elections process; and provides that "false portrayal" means the content would cause a reasonable person to have a fundamentally different understanding or impression of the content than the person would have if they were hearing or seeing the unaltered, original version of the content.

      ii) The person or entity who attempted to post or send, or who did post or send, the content did so knowing the portrayal was false, or did so with reckless disregard for whether the portrayal was false. If the content is intentionally manipulated and contains a false portrayal as specified in subparagraph (A), there shall be a rebuttable presumption that the person or entity knew the portrayal was false or that they acted with reckless disregard for whether the portrayal was false.

   d) Clarifies that "Materially deceptive and digitally modified or created content" does not include any image or audio or video recording that contains only minor modifications that do not lead to significant changes to the perceived contents or meaning of the content. Minor changes include changes to the brightness or contrast of images, removal of background noise in audio, and other minor changes that do not impact the content of the image or audio or video recording.

   e) "Large online platform" means a public-facing internet website, web application, or digital application, including a social network, video sharing platform, advertising network, or search engine that had at least 1 million California users during the preceding 12 months.

f)  "Artificial intelligence" means an engineered or machine-based system that varies in its level of autonomy and that can, for explicit or implicit objectives, infer from the input it receives how to generate outputs that can influence physical or virtual environments.

**EXISTING LAW**:

1)  Prohibits a person, committee, or other entity, until January 1, 2027, from distributing with actual malice, within 60 days of an election at which a candidate for elective office will appear on the ballot, materially deceptive audio or visual media of a candidate with the intent to injure the candidate's reputation or to deceive a voter into voting for or against the candidate.

   a)  Defines "materially deceptive audio or visual media," for these purposes, as an image or an audio or visual recording of a candidate's appearance, speech or conduct that has been intentionally manipulated in a manner that both of the following are true about the image or audio or video recording: (1) It would falsely appear to a reasonable person to be authentic; and (2) it would cause a reasonable person to have a fundamentally different understanding or impression of the expressive content of the image or audio or video recording than the person would have if the person were hearing or seeing the unaltered, original version of the image or audio or video recording.

   b)  Provides that this prohibition does not apply if the audio or visual media includes a disclaimer stating "This (image/video/audio) has been manipulated," and the disclaimer complies with specified requirements.

   c)  Permits a candidate whose voice or likeness appears in deceptive audio or visual media distributed in violation of this provision to seek injunctive relief, as specified, and general or special damages and reasonable attorney's fees and costs, as specified. Specifies that in any civil action brought pursuant to these provisions, the plaintiff bears the burden of establishing the violation through clear and convincing evidence.

   d)  Provides that this prohibition shall not be construed to alter or negate any rights, obligations, or immunities of an interactive service provider under Section 230 of the federal Communications Decency Act.

   e)  Provides that this prohibition does not apply to a radio or television broadcasting station; an internet website; a regularly published newspaper, magazine, or other periodical of general circulation, including an internet or electronic publication; or media that constitute satire or parody. (Elections Code Section 20010.)

2)  Prohibits a person, firm, association, corporation, campaign committee, or organization, beginning January 1, 2027, with actual malice, from producing, distributing, publishing, or broadcasting campaign material, as defined, that contains either of the following types of pictures or photographs, as specified, unless the campaign material includes a disclaimer that the picture is not an accurate representation of fact:

   a)  A picture or photograph of a person or persons into which the image of a candidate for public office is superimposed.

　
b)  A picture or photograph of a candidate for public office into which the image of another person or persons is superimposed. (Elections Code Section 20010.)

**FISCAL EFFECT**:  As currently in print this bill is keyed fiscal.

**COMMENTS**:  According to the author:

AB 2655 will ensure that online platforms restrict the spread of election-related deceptive deepfakes meant to prevent voters from voting or to deceive them based on fraudulent content. Deepfakes are a powerful and dangerous tool in the arsenal of those that want to wage disinformation campaigns, and they have the potential to wreak havoc on our democracy by attributing speech and conduct to a person that is false or that never happened. Advances in AI make it easy for practically anyone to generate this deceptive content, making it that much more important that we identify and restrict its spread before it has the chance to deceive voters and undermine our democracy.

Therefore, in order to ensure California elections are free and fair, online platforms must prevent the online spread of election-related deceptive deepfakes and disinformation meant to prevent voters from voting or to deceive them based on fraudulent content.

***Existing laws maintaining "election integrity."***  As aptly noted in the analysis of this bill by the Assembly Elections Committee, the "use of false and deceptive information in campaigns to influence election outcomes is not a new phenomenon," nor are the laws "aimed at curbing such practices" new. Indeed, in 1850, the First Session of the California State Legislature created penalties for "deceiving [an elector] and causing him to vote for a different person for any office than such elector desired or intended to vote for." (Chapter 38, Statutes of 1850.) Existing California law has greatly elaborated on these initial legislative efforts. For example, provisions in the Elections Code prohibit the distribution of false and misleading information about qualifications to vote or about the days, dates, times, and places where voting may occur; prohibit the misleading use of government seals in campaign literature (Elections Code Section 18304); and prohibit coercing or deceiving people into voting in a way that is inconsistent with the person's intent (Elections Code Sections 18302, 18304, 18573 and 18573.5).

In the last five years, the Legislature has turned its attention to "materially deceptive" audio and visual materials that portray a candidate. For example, AB 730 (Chap. 493, Stats. 2019) responded to reports that so-called "deepfake" technology, a software that allows someone to produce audios and videos that look and appear remarkably real to even the most discerning person. For example, in 2018, BuzzFeed and the film director Jordan Peele published a very realistic-looking deepfake showing former President Obama calling then-President Donald Trump a "total and complete dipshit." Obama did not say that. Peele and BuzzFeed did not use the video to try to influence a political election – indeed halfway through the video the ruse was revealed – but to show the potential for abuse of deepfake technology. Responding to this and similar reports, AB 730 prohibited the distribution of materially deceptive audio or visual media with the intent to injure the candidate's reputation or to deceive a voter into voting for or against a candidate.

AB 730 was itself an amendment to California's "Truth in Political Advertising Act" of 1998, which had prohibited campaign material that deceptively altered a picture of a candidate (for example by superimposing one person's image upon another) unless the picture contained a disclaimer. This 1998 bill was introduced in response to the use of technologies like "photo

shopping," which now seem quaint compared to deepfakes, including deepfakes generated by artificial intelligence. The bill now before the Committee, like AB 730 before it, is apparently an effort to stay one step ahead of evolving technologies, which not only create more realistic-looking deceptions, but make it possible to quickly create, alter, and distribute fake images to millions of people in the blink of an eye (or the click of a mouse).

***This bill and existing law: who?*** AB 2655 elaborates upon and modifies existing law in a variety of ways. Most significant, existing law prohibits *a person, committee, or other entity* from distributing, with actual malice, "materially deceptive" audio or visual media of a candidate with the intent to injure the candidate's reputation or to deceive a voter into voting for or against the candidate. Existing law prohibits the distribution of such material within 60 days of the election in which the targeted candidate is running for office. The prohibitions in AB 2655, on the other hand, do not apply to the person or entity that created the materially deceptive material, but to the "large online platform" on which it is posted. AB 2655 requires the online platform to develop and implement procedures to block or prevent the posting of the covered content.

***This bill and existing law: what?*** This bill also differs from existing law in terms of covered content. Existing law applies only to manipulated material that misrepresents the "candidate" saying or doing something the candidate did not do or say. This bill similarly applies to content deceptively depicting the candidate, but also applies to images portraying an "elections official" doing or saying something they did not do or say, as well as images depicting a voting machine, ballot, voting site, or voting equipment in a materially false way. In addition, this bill would require the platform to label (but not necessarily block) materially deceptive content about "election processes" (as opposed to a specific candidate, election official, or voting site). Although the distinction between what material must be blocked versus what material must be labeled is not entirely clear, the intent of the author and sponsor is that the more the material singles out a particular candidate or election official, the more it must be blocked; whereas material that deals with "election processes" more generally need only be labeled. *The author has agreed to work with the Committee as the bill moves forward to clarify the distinction between the blocking and labeling requirements.*

***This bill and existing law: when?*** AB 2655 also expands and modifies the relevant time period that prohibitions are in force. Existing law prohibits someone from distributing deceptive material during the 60-day period before an election. This bill, however, requires the platform to block covered material a period beginning 120 days before the election and through the day of the election. However, if the deceptive material pertains to an election official, or deceptively depicts a voting machine, ballot, voting site, or property or equipment related to an election, the platform must also block the content for 60 days *after* the election. Presumably, this post-election period is intended to prevent false claims – similar to those made in 2020 – that the election process was irregular or otherwise "rigged." The labeling requirement covers an even larger time frame; it applies during the period beginning *one year* before the "election." The bill also requires labeling for the period beginning one year before an "election process." "Election processes" – as opposed to an "election" – is defined to include any government process "related" to an election, "including, but not limited to," elections, candidates, vote counting, redistricting, and proceedings or processes of the electoral college." Because an "election" has a known date, it should be fairly easy for the platform to figure out when the year-long labeling period starts. However, if the platform must also label one year prior to an "election process," when does a process like "redistricting" start? Does it start with each new census? Does it start when the legislative body (or in some states a commission) meet to draw up new district lines?

Moreover, the definition of "election process" is not limited to the items listed, expressly stating "including, but is not limited to,' those items. *As discussed above, the author has agreed to work with the Committee as the bill moves forward to clarify the distinction between materials that the platform is required to "block" and those it is required to "label."*

***This bill and existing law: how enforced?***  In addition to differences as to who, what, and when, this bill also differs in how violations would be enforced. Existing law permits only the "candidate" whose voice or likeness appears in the deceptive material to bring an action for injunctive relief, general or special damages, and reasonable attorney's fee and cost. However, under existing law the candidate bears the burden of establishing a violation by "clear and convincing evidence." Enforcement provisions in this bill are much different. The bill allows any "California resident" to report to the platform that content was not blocked or labeled as required. If the platform does not respond within 36 hours, *or if the resident disagrees with the response,* the resident may seek injunctive relief to compel compliance and, if the resident prevails, shall be awarded reasonable attorney's fees and costs. Thus, not only can any California resident – not just a person depicted or otherwise affected – seek injunctive relief, they apparently do not have the burden of proving a violation by clear and convincing evidence. If they "disagree" with the platform's response, that's enough; they can seek injunctive relief and a court would decide to issue on the likelihood of success on merits, the general rule for injunctive relief. *The author may wish to consider, as the bill moves forward, increasing the standard of proof to the higher clear and convincing evidence; and limiting who may seek relief.*

***First Amendment concerns***. Because this bill imposes a *government* mandate that online platforms must block expressive material based upon its content, it implicates the First Amendment. The First Amendment provides that "Congress shall make no law . . . prohibiting the freedom of speech." As interpreted by the courts and incorporated against the states by the due process clause of the 14th Amendment, the First Amendment prevents any government entity (not just Congress) from enacting any law or adopting any policy that burdens freedom of speech. In addition, Article I, Section 2 of the California Constitution guarantees to every person the freedom to "speak, write, and publish his or her sentiments on all subjects, being responsible for the abuse of this right." Moreover, the First Amendment not only protects the right to speak, as a logical corollary it protects the "right to receive information and ideas." (*Stanley v Georgia* (1969) 394 U.S. 557, 564.) This bill would interfere with both the expression and reception of information based upon its content. Moreover, not only does this bill single out particular content, the content relates to political candidates and elections. This is potentially problematic because the First Amendment affords the "broadest protection" to the "discussion of public issues" and "political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." (*McIntyre v Ohio Election Commission* (1997) 514 U.S. 334.) It is difficult to imagine any content more related to "political expression" and "discussion of public issues" than content about candidates and elections. The fact that the bill restricts speech that is "materially deceptive" or "false" does not matter, for the U.S. Supreme Court has been unequivocal that the First Amendment protects even "false" speech. The remedy for false speech is more true speech, and false speech tends to call forth true speech. (*United States v Alvarez* (2012) 567 U.S. 709.)

***The bill will likely meet the "compelling interest" threshold, if not the "narrowly tailored" threshold.*** The right to free speech is not absolute. As Justice Holmes noted in a dissenting opinion over a century ago, the First Amendment does not protect a right to falsely cry fire in a crowded theater. (*Schenck v. United States* (1919) 249 U.S. 47.) The proponents of this bill may,

not unreasonably, think that pervasive disinformation about candidates and elections, especially during an election season, is just as dangerous. In reviewing the law, the Court would apply strict scrutiny. This means that government can impose even content-based restrictions on protected speech *if* they have a "compelling government interest" *and* they use "narrowly tailored means" to achieve that interest.

Even the opponents of this bill appear to concede that maintaining "election integrity" is a "weighty" and, presumably, "compelling" government interest. Therefore, it seems likely that if this bill is enacted and subsequently challenged, a court will accept that there is a "compelling interest" but still need to consider whether the "means" are "narrowly tailored." The opponents of this measure claim that it is *not* narrowly tailored. They contend that while covered platforms may have state-of-the-art tools that allow them to identify content that has been "digitally modified," there is no technology to determine if content is "materially deceptive." The bill defines "materially deceptive," in relevant part, to mean content that is "intentionally manipulated" so that it appears "authentic" but contains a "false portrayal" of a candidate, elected official, elections official, voting machine, ballot, voting site, other property or equipment related to an election, or elections process. The purpose of narrow tailoring is to ensure that no more speech is infringed or burdened than is necessary. However, the opponents of this bill – both the industry groups and the ACLU – believe that with no sure means to determine what is "materially deceptive," the platforms will err on the side of blocking content, thus burdening more speech than is necessary.

The findings and declarations in the bill state that the "labeling information required by this bill is narrowly tailored to provide consumers with factual information about the inauthenticity of particular images, audio, video, or text content in order to prevent consumer deception." Tellingly, there is no similar claim about the blocking requirement being narrowly tailored. In any event, it will be a court – not the findings and declarations of the bill – that will determine whether the bill is narrowly tailored. The court may consider, for example, if there are other less restrictive and more effective means of protecting election integrity.

***Section 230 concerns and "editorial discretion*.**" In addition to implicating the First Amendment, this bill may also be preempted by Section 230 of the federal Communications Decency Act. In relevant part, Section 230 provides two express protections for online platforms and their ability to moderate online content. First, Section 230 declares that an online platform cannot be held liable for content posted by third parties. The rationale for this immunity is premised on the idea that online platforms, unlike newspapers, do not exercise editorial discretion; rather, like telephone companies or "common carriers" they are merely a conduit for the expression of ideas by others. Those others, not the platform, are liable for any harm caused by the content. Second, somewhat in tension with this immunity, Section 230 expressly provides that online platforms are not liable if they block or remove material because they disapprove of its content. While it is important to remember that the First Amendment is distinct from Section 230, this protection flows from First Amendment principles. First, because the online platform is not a government actor, it cannot violate the First Amendment. Second, as a private actor, the platform has its own First Amendment right not to be associated with speech it finds objectionable. Some scholars have noted that the two protections in Section 230 are based on contrary premises. Immunity from liability from postings by third parties assumes that platforms *do not* exercise editorial discretion. Their right to remove content without liability, and their own free speech claims, on the other hand, assume that they *do* exercise editorial discretion. [For a concise overview of Section 230 and its intersection with the First Amendment, see Bollinger

and Stone, *Social Media, Freedom of Speech, and the Future of our Democracy* (Oxford University Press, 2022), especially pp. xxiii-xl; on efforts to reform Section 230, see pp.103-120.] Whatever the merits or demerits of Section 230 may be, it is federal law and appears to grant social media platforms the right to moderate content on their platforms and immunizes them from liability for content posted by the third party.

***Cases pending before the U.S. Supreme Court.*** In February of this year, the U.S. Supreme Court heard arguments about two state laws that may have far-reaching consequences for both First Amendment case law and the status of Section 230. Largely in response to social media platforms barring former President Donald Trump from their platforms in the wake of the January 6 riots, both Texas and Florida enacted laws that limited the ability of social media platforms to control content on their platforms. The Florida law fines platforms if they ban a candidate for office in their state, and requires platforms to disclose information about their moderation policies. The Texas law prohibits platforms from removing content based on its "viewpoint." Both of these laws directly challenge the provision in Section 230 that expressly allows platforms to remove content. Both laws also raise First Amendment concerns about the platforms' right not to be associated with views with which they disagree. Both laws provide an interesting point of comparison with the bill under review: Texas and Florida *prohibit* a platform from denying access to certain people or blocking content on certain topics, while this bill would *require* the platforms to remove content. The Court is expected to issue a ruling in June of this year. How that ruling would affect this bill is unclear, especially given that this bill moves in the opposite direction of the Florida and Texas laws. However, if the Court decides in favor of the platforms – which many commentators think they will, at least in part – it might suggest that the Court believes that platforms should be given more freedom to self-moderate content without state interference. (*See* David McCabe, "Social media companies are bracing for Supreme Court arguments on Monday that could fundamentally alter how the platforms police their sites," *New York Times,* February 25, 2024; and Adam Liptak, "The Supreme Court seemed skeptical on laws in Florida and Texas," *Id.* February 26, 2024.)

Like constitutional and preemption questions, there is no obvious or certain answer as to whether this bill violates the First Amendment or Section 230. The Court may provide some insight soon enough.

***Proposed Author Amendments***. The author will take the following amendments to the definitions section of the bill:

    (a) ***"Artificial intelligence" means an engineered or machine-based system that varies in its level of autonomy and that can, for explicit or implicit objectives, infer from the input it receives how to generate outputs that can influence physical or virtual environments***.

    *(b)* (1) "Elections official" means any of the following persons, but only in their capacity as a person charged with holding or conducting an election, conducting a canvass, assisting with the holding or conducting of an election or a canvas, or performing another duty related to administering the provisions of this code:

    (A) An elections official as defined in Section 320.

    (B) The Secretary of State and their staff.

    (C) A temporary worker, poll worker, or member of a precinct board.

(D) Any other person charged with holding or conducting an election, conducting a canvass, assisting with the holding or conducting of an election or a canvas, or performing another duty related to administering the provisions of this code.

(2) The requirements of this chapter relating to content portraying an elections official apply only if the large online platform knows or should know that the person is an elections official.

*(c)* ~~(b)~~ "Election processes" means any government process related to an election, including, but not limited to, elections, candidates, vote counting, redistricting, and proceedings or processes of the electoral college.

*(d)* ~~(c)~~ (1) "Materially deceptive and digitally modified or created content" means an image or an audio or video recording or other digital content, including a chatbot, that has been intentionally manipulated such that all of the following conditions are met:

(A) (i) The digital content is the product of digital manipulation, ***including, but not limited to, artificial intelligence***, ~~artificial intelligence, or machine learning, including deep learning techniques, that merges, combines, replaces, or superimposes content onto an image or an audio or video recording, creating an image or an audio or video recording that appears authentic, or that otherwise generates an inauthentic image or an audio or video recording~~ that appears authentic, ~~and that~~ ***but*** contains a false portrayal of any of the following: a candidate for elective office, elected official, elections official, voting machine, ballot, voting site, other property or equipment related to an election, or elections process.

(ii) For purposes of this subdivision, "false portrayal" means the content would cause a reasonable person to have a fundamentally different understanding or impression of the content than the person would have if they were hearing or seeing ~~the unaltered, original~~ ***an authentic*** version of the content.

(B) The person or entity who attempted to post or send, or who did post or send, the content did so knowing the portrayal was false, or did so with reckless disregard for whether the portrayal was false. If the content is intentionally manipulated and contains a false portrayal as specified in subparagraph (A), there shall be a rebuttable presumption that the person or entity knew the portrayal was false or that they acted with reckless disregard for whether the portrayal was false.

(2) "Materially deceptive and digitally modified or created content" does not include any image or audio or video recording that contains only minor modifications that do not lead to significant changes to the perceived contents or meaning of the content. Minor changes include changes to the brightness or contrast of images, removal of background noise in audio, and other minor changes that do not impact the content of the image or audio or video recording.

*(e)* ~~(d)~~ "Large online platform" means a public-facing internet website, web application, or digital application, including a social network, video sharing platform, advertising network, or search engine that had at least 1,000,000 California users during the preceding 12 months.

***ARGUMENTS IN SUPPORT***:  The sponsor of this bill – The California Initiative for Technology and Democracy (CITED) – writes in support of AB 2655:

> California and the nation are entering the first-ever generative artificial intelligence (AI) election, in which disinformation powered by generative AI will pollute our information ecosystems like never before. . . Those trying to influence campaigns – conspiracy theorists, foreign states, online trolls, and candidates themselves – are already creating and distributing election-threatening deepfake images, audio, and video content in the US and around the world. . . Examples of this occurring in U.S. elections include Ron Desantis using AI-generated images to attack his opponent in his presidential run, foreign states caught attempting to influence American politics through social media, and just this month, a supporter of former President Trump creating a deepfake image of Trump with Black Americans designed to persuade Black voters to support Trump. These examples demonstrate the power of generative AI-fueled disinformation to skew election results and weaken our faith in our democracy.

> AB 2655 strikes the right balance by seeking to ban, for a strictly limited time before and after elections, the online spread of the worst deepfakes and disinformation maliciously intended to prevent voters from voting or getting them to vote erroneously based on fraudulent content. . . AB 2655's approach is narrowly tailored and does not extend the law to hot button controversies or inflammatory claims – it does not ask social media platforms to adjudicate controversial opinions post by post. It simply stops the use of obviously, demonstrably untrue and provably false content meant to impermissibly influence our elections at peak election times.

***ARGUMENTS IN OPPOSITION***: Opponents of AB 2655 contend that the bill is unnecessary, unwise, unconstitutional, or some combination thereof. A coalition of groups representing the technology and information industry (industry opponents) contend that responsible digital service providers already "take aggressive steps to moderate dangerous and illegal content, consistent with their terms of service. The companies deliver on the commitments made to their user communities with a mix of automated tools and human review." For example, industry opponents point to the several online businesses that voluntarily participate in "the Digital Trust & Safety Partnership (DTSP) to develop and implement best practices to ensure a safer and more trustworthy internet, and have recently reported on the efforts to implement these commitments."

Industry opponents believe that AB 2655 falsely assumes that online platforms "definitively know whether any particular piece of content has been manipulated in such a way that is defined under the bill. While digital services may employ tools to identify and detect these materials with some degree of certainty, it is an evolving and imperfect science in its current form. AB 2655 also presumes that online platforms are an appropriate arbiter of deciding what constitutes accurate election information. However, most digital services are not equipped with the tools or expertise to make such judgments."

In addition to these practical and operational concerns, industry opponents also question the effectiveness of the bill's approach. For example, they point out that the bill only applies to the largest online platforms, specifically those with at least one million California users. Therefore the bill would not include platforms like Truth Social or Parler (which may relaunch this year) even though they are the ones that produce most of the concern. Opponents also point to the "sweeping" enforcement provisions, most notably the provision that allows "any California

resident" to notify the platform of content that, in the resident's opinion, should have been blocked or labeled. The bill, opponents note, would allow this resident "to bring a civil action against a large online platform if the platform has not responded within 36 hours or if the reporting resident disagrees with the platform's response." Confronted with such a restricted timeline and the threat of a civil action, the opponents contend, platforms will "remove significantly more content, including content that has *accurate* election information and content that is not materially deceptive."

While industry opponents concentrate on problems of implementation and effectiveness, ACLU California Action focuses on the bill's constitutional problems. ACLU agrees that protecting "election integrity is a weighty governmental interest," but under the First Amendment, "that interest may be accomplished . . . only by means that are narrowly tailored." ACLU points to ample First Amendment case law holding that discussion "of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." Quoting *Buckley v. Valeo* (1976), ACLU writes that the First Amendment affords "the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people," and, quoting *New York Times v Sullivan* (1964), ACLU notes that debate on public issues must remain "uninhibited, robust, and wide-open." Moreover, ACLU notes, the First Amendment affords protection "to even allegedly false statements about public officials and public figures." ACLU fears that faced with "the prospect of vetting millions of different posts to determine if they are 'materially deceptive and digitally modified or created,' many platforms may instead choose to aggressively censor or prohibit speech out of caution, including speech by candidates or relating to entire political topics." Citing *Brown v. Entertainment Merchants Association* (2011) and *Burstyn v Wilson* (1952), ACLU concludes that however much the technology may change, "the basic principles of freedom of speech and the press" do not vary with each new medium of communication. ACLU believes that the provisions of AB 2655, as currently drafted, "threaten to intrude on those rights and deter that vital speech."

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

California Initiative for Technology & Democracy (sponsor)
AFSCME California
Asian Americans Advancing Justice - Asian Law Caucus
Asian Americans and Pacific Islanders for Civic Empowerment
Asian Law Alliance
Bay Rising
California Clean Money Campaign
California Initiative for Technology & Democracy, a Project of California Common CAUSE
California State Sheriffs' Association
California Voter Foundation
Chinese Progressive Association
Courage California
Disability Rights California
Hmong Innovating Politics
Indivisible CA Statestrong
Inland Empire United
League of Women Voters of California

Partnership for the Advancement of New Americans
SEIU California
The Partnership for the Advancement of New Americans
Verified Voting

**Opposition**

ACLU California Action
Chamber of Progress
Computer and Communications Industry Association
Electronic Frontier Foundation
Internet.Works
NetChoice
Software & Information Industry Association
TechNet

**Opposition unless amended**

Oakland Privacy

**Analysis Prepared by**:   Tom Clark / JUD. / (916) 319-2334