# EXHIBIT 5



# DIGITAL DEMOCRACY
## CALMATTERS

Search for bills, hearings, people, and more

Issues  Directories  Legislators  Data & Methodology            Donate

Hearings                                                          Share

# Assembly Standing Committee on Judiciary

April 23, 2024

↻ Return to comment starting point



0:00 / 46:27

Search transcript

| Khara Boender<br>Person | Thank you, Madam Vice Chair, Members of the Committee. My name is Khara Boender, testifying on behalf of the Computer and Communications Industry Association in respectful opposition to AB 2655. CCIA is an international, not for profit trade association with about two dozen members from a range of communications and technology firms. |
| --- | --- |
| Khara Boender<br>Person | CCIA and its members take seriously the impact deceptive content may have on elections, and many of our members are working to implement tools to better detect and label AI generated content. Using a combination of AI and human review, they moderate content in violation of their terms of service, including content that is illegal and potentially harmful. But the tools that are currently available are not always reliable or accurate. |
| Khara Boender<br>Person | Just as spam filters sometimes mislabel legitimate emails. And while such technology is evolving, so are the means for bad actors to evade such detection. Because covered platforms are not privy to the intent and context for which a piece of content is used, they could inadvertently over block or over label content. This could result in user frustration and suppression of political speech. Political speech was at the core of why our First Amendment was established, and it is critical to maintain those protections. |
| Khara Boender<br>Person | Responsibility for labeling AI generated election content and liability for the deceptive content should rest with the entity that puts forth such material, the one that is most aware of the intent and context for which the content was created and shared. We also have concerns about the breadth of the bill. While it establishes defined time periods surrounding elections and election processes for newly established prohibitions and requirements, it |



View Agenda →

**CURRENTLY DISCUSSING**

### Bill AB 2655

Defending Democracy from Deepfake Deception Act of 2024.

View Bill Detail

Download Transcript

COMMITTEE ACTION: PASSED ✓

| FOR | 9 | AGAINST | 0 | NO VOTE | 3 |

Brian Maienschein Ⓓ
Tina McKinnor Ⓓ
Ash Kalra Ⓓ
Rebecca Bauer-Kahan Ⓓ

Show all 9 votes

Next bill discussion: May 22, 2024
Previous bill discussion: April 10, 2024

### Speakers ⓘ

**LEGISLATOR**

Rebecca Bauer-Kahan Ⓓ
Marc Berman Ⓓ
Isaac Bryan Ⓓ
Damon Connolly Ⓓ

**ADVOCATE**

Khara Boender
Chanel Freeman
David Harris
Eric Harris

Show more speakers

---



Journalists backed by artificial intelligence bringing transparency and accountability to California's policy choices.

About Digital Democracy

Data & Methodology

Visit CalMatters

**Support this nonprofit initiative**

Digital Democracy informs Californians, holds officials accountable, and builds a stronger community. Brought to you by the 501(c)(3) nonprofit and nonpartisan CalMatters newsroom.

Support Our Work

**Sign up for news and updates**

Receive updates about Digital Democracy and CalMatters' daily newsletter that brings transparency to state government.

Email                                Sign Up

By signing up, you agree to the terms.



CAL MATTERS
California explained

Copyright © 2024 CalMatters

Terms & Conditions    Privacy Policy

Assembly Standing Committee on Judiciary
AB 2655

Unidentified Speaker: Thank you.

Ash Kalra: Up next, we have item 12. AB 2655, Berman. We have a motion and a second. Before Assembly Member Berman even took a seat. He has a motion in a second.

Marc Berman: Thank you, colleagues. I'd like to start by thanking Committee staff for identifying areas needing work, including greater clarity between when something is blocked versus labeled, better defining election process and raising the bar on citizen suits. I look forward to working with the Committee to address these issues. I'm also happy to take the amendments on pages 9 and 10. And I thank the staff on the Privacy and Consumer Protection Committee for suggesting definitional amendments to align this Bill with others in the AI space.

Marc Berman: Five years ago, I authored the first election deepfake bill in the nation. To be honest, by the time that was signed into law, it was already too weak, and it's only gotten weaker since then. Just a few short years after that Bill passed, the technology is better, cheaper, and widely accessible. As a result, we're seeing deepfakes used to undermine elections across the globe and here in America and California.

Marc Berman: As technology changes, so too must our laws, and there's too much at stake to rely on nonbinding and voluntary agreements to police election deepfakes. Therefore, I'm authoring AB 2655 to protect election integrity by regulating the online spread of disinformation and deepfakes meant to influence an election with today's sophisticated deepfakes, voters may not know what images, audio, or video they can trust. This deceptive and hyper-realistic content can undermine faith in election integrity.

Marc Berman: Accordingly, AB 2655 would, for a limited period of time before and after an election, require large online platforms if they know or should know that the content meets the test in the Bill. To restrict the distribution of materially deceptive and digitally altered or created images, audio, or video meant to influence an election. For less harmful, yet still materially deceptive and modified content, the Bill would require the platforms to label other AI-created or modified election disinformation meant to influence.

Marc Berman: In both instances, the Bill does not demand perfection. What it says is that platforms must act if they know, or should know, using best available tools, that the content meets the test in the Bill. Platforms can't bury their head in the sand, but if they don't know, then there's no obligation. The Bill protects against false speech that has been intentionally manipulated to deceive and done with malice. This is defamation and an exception to the First Amendment.

Marc Berman: Additionally, it is important to note that in order to comply with Section 230 of the Communications Decency Act, the Bill does not provide for any monetary penalty against online platforms. Instead, the only penalty is that a court will order the platforms to do what the Bill requires. I realize that this Bill is

attempting to legislate in an arena where technology and the law are fast evolving, and that can be challenging on many levels.

Marc Berman: I can't promise that the Bill will survive a First Amendment or Section 230 court challenge. I do commit to continuing to make amendments to improve the Bill, to try to guard against that. But the Bill is crafted to give us the best chance to survive a strict scrutiny review. But the reality is that doing nothing isn't an option. Therefore, I respectfully request an aye vote.

Ash Kalra: Thank you.

Leora Gershenzon: Chair and Members. I'm Leora Gershenzon with the California Initiative for Technology and Democracy, a project of California Common Cause. As elected officials, you are all keenly aware of the threats posed by AI-generated election deepfakes. Today's Washington Post there's a headline that reads, AI deepfakes threaten to upend global elections. No one can stop them. We can't just be in that position.

Leora Gershenzon: AB 2655 strikes the right balance by banning, for a strictly limited time around elections, the online spread of the worst deepfakes intended to deceive voters and influence elections. Videos, images, and audio showing candidates, election officials, or voting apparatus doing or saying something they did not do or say. The Bill also requires other fake content regarding elections to be labeled as such, again. for a limited period of time around the elections.

Leora Gershenzon: The Bill only applies to the largest online platforms with the greatest reach of potential election disinformation and the deepest pockets to help find, to help determine what is and isn't AI-generated fake content. Assembly Member Berman has worked diligently to ensure that AB 2655's approach is narrowly tailored and does not extend to opinions or controversial statements. It only seeks at peak elections time to stop the use of demonstrably false content hurled at political leaders in an effort to disrupt our fair elections.

Leora Gershenzon: The Bill is respectful of the First Amendment by serving a compelling government interest, protecting our free and fair elections, and by being narrowly tailored to address that compelling interest in terms of time, subject matter, and requiring malice. It also limits remedies because there are no financial penalties because of Section 230. I would like to end very quickly with a quote from that article in the Washington Post from Senator Klobuchar, which said, let's not stand on the sidelines with our elections while our elections get screwed up.

Leora Gershenzon: This is like a hair-on-fire moment. This is not a let's wait and see. Let's wait three years and see how it goes moment.

Ash Kalra: Thank you.

David Harris: Chair and Members. My name is David Harris and I'm a senior policy advisor to PSYT IT. I'm also a chancellor's public scholar at UC Berkeley, where I've been teaching since 2015. I teach classes including Civic Technology and AI Ethics for Leaders. My students and I go over all of the ways that technology can

play a role in our democracy. I also previously worked for close to five years on civic integrity, social impact, and responsible AI at Facebook and Meta.

David Harris: I have advised the European Union, the White House and NATO on AI and the role that it plays in democracy. This Bill only applies to the largest online platforms with the greatest reach for potential election misinformation, and it is fully implementable today. Based on tools that these companies already possess for dealing with illegal content, such as child sexual abuse material or terrorist content, they could apply the same systems, techniques, procedures, and processes that they use for that type of content to managing deepfakes in elections.

David Harris: This Bill is narrow and in a narrow way makes certain types of content impermissible. Now, some of these companies will suggest that these requirements can't be met, but they are already generally subject to similar requirements under the European Union's Digital Services Act and the recently released guidelines that the EU has released about elections and how that, the Digital Services Act, applies to elections.

David Harris: Furthermore, 20 of the biggest tech companies involved committed at the Munich Security Conference in February to something called the AI elections accord, where they already promised to develop and implement technology to mitigate risks related to deceptive AI election content.

David Harris: The problem is that none of their commitments made in Munich are binding or have any timelines associated with them, and they cannot be held accountable. That's why this Bill, AB 2655 is what we need to assure that the tech companies live up to the promises that they have already made.

Ash Kalra:  Thank you. Is there anyone else here in support of AB 2655?

Chanel Freeman: Chanel Freeman, on behalf of the League of Women Voters of California in strong support.

Bryant Miramontes: Bryant Miramontes with AFSCME California in support.

Eric Harris: Eric Harris, Disability Rights California, in support.

Diane Dixon: Do we have any speakers in opposition? Please come forward.

Khara Boender: Thank you, Madam Vice Chair, Members of the Committee. My name is Khara Boender, testifying on behalf of the Computer and Communications Industry Association in respectful opposition to AB 2655. CCIA is an international, not for profit trade association with about two dozen members from a range of communications and technology firms.

Khara Boender: CCIA and its members take seriously the impact deceptive content may have on elections, and many of our members are working to implement tools to better detect and label AI generated content. Using a combination of AI and human review, they moderate content in violation of their terms of service, including content that is illegal and potentially harmful. But the tools that are currently available are

not always reliable or accurate.

Khara Boender: Just as spam filters sometimes mislabel legitimate emails. And while such technology is evolving, so are the means for bad actors to evade such detection. Because covered platforms are not privy to the intent and context for which a piece of content is used, they could inadvertently over block or over label content. This could result in user frustration and suppression of political speech. Political speech was at the core of why our First Amendment was established, and it is critical to maintain those protections.

Khara Boender: Responsibility for labeling AI generated election content and liability for the deceptive content should rest with the entity that puts forth such material, the one that is most aware of the intent and context for which the content was created and shared. We also have concerns about the breadth of the bill. While it establishes defined time periods surrounding elections and election processes for newly established prohibitions and requirements, it is unclear when an election's process starts. Further, the bill does not specify which elections or where.

Khara Boender: And while the bill exempts satire and parody, it is unclear who gets to decide what constitutes those uses. Faced with individual users seeking injunctive relief merely if they disagree with a covered platform's decision regarding reported content, a service may choose to prohibit all digitally altered content, cutting off many valuable and helpful uses. These tools can be used by campaigns to reach voters with high quality content at lower costs or to translate speech into multiple languages. I'll wrap up there. Appreciate your time today in consideration of our comments, and welcome any questions.

Diane Dixon: Thank you. Go ahead.

Jose Torres Casillas : Thank you. Good morning, Madam Chair, and Mr. Chair, as he walks in. Jose Torres with TechNet. We are respectfully opposed to AB 2655. I echo the concerns of my colleague from CCIA and want to emphasize this bill requires online platforms to make determinations about truth and falsity in an impossible way. Instances where content and or information is clearly true or clearly false are not norm.

Jose Torres Casillas : Far more often, content falls into a middle ground where it requires time and effect intensive investigation to determine whether to determine whether something is true or false. Investigative journalists have challenges with fact checking even the most high profile races or candidates. It is difficult enough for a platform to know whether something is false as it relates to a presidential candidate or a high profile federal race, and this is simply impossible for races lower down on the ticket.

Jose Torres Casillas : A platform cannot accurately adjudicate reports on those types of content and will instead resort to over removing information in order to avoid liability and the penalties in this bill. Removing information that is only suspected of being false is clearly not a good outcome. And then for these reasons, we are respectfully opposed. Thank you.

Ash Kalra: Thank you. Is there anyone else here in opposition to AB 2655?

Cynthia Valencia: Cynthia Valencia with the ACLU California Action in opposition due to First Amendment concerns.

Ash Kalra: Thank you.

Tracy Rosenberg: Tracy Rosenberg on behalf of Oakland Privacy. We still have a couple of concerns. We thank the Committee for the amendments. We'll be checking them out. Thank you.

Ash Kalra: Thank you. All right. We'll bring it back to the Committee. Any questions? Assembly Member Bauer-Kahan.

Rebecca Bauer-Kahan: Hi. I know. So I have to start by saying thank you for your leadership in the elections arena. As we heard earlier about a different subject matter, there's no one I trust more to shepherd a bill of this magnitude through the Legislature. But I do have some questions because I agree, I think we all agree that strict scrutiny would be applied.

Rebecca Bauer-Kahan: I don't think, I know I don't have any question that there is a strong governmental interest, so that we don't need to discuss. So the question then to me is is this narrowly tailored in a sufficient way as to both pass scrutiny and to protect the First Amendment? I am a believer the First Amendment has immense value.

Rebecca Bauer-Kahan: And so one of the things that I actually think was valuable in the analysis was citing two year prior law, and so we could compare some of the differences in the way this was drafted. And there were some changes in the way this was drafted that raised concerns for me. And I'll say the first one is that any California resident can bring this case. I do think when we as candidates challenge speech, there is a, we are held to account by the voters. Right.

Rebecca Bauer-Kahan: We are responsible to them, and they can take it out on us at the ballot box. Whereas if we have sort of a third party out there challenging this, I think it is concerning to me that you would have a lot more spurious challenges and ones potentially that are not intended to go after what is truly deceptive speech. So I was curious about that. Do you want me to do all my questions? Theres quite a few. Okay. Then the question is also on the standard, right.

Rebecca Bauer-Kahan: The analysis talks about having a clear and convincing standard versus just the likelihood of success on the merits for the injunctive relief. I do think the higher standard given, again, that we need to narrowly tailor this to ensure that we are not looking at some case that might win, but instead something where there is clear and convincing evidence that it falls under the statute makes sense. So I don't know if you want to address that.

Rebecca Bauer-Kahan: But then as I looked at the question of what was deceptive material, what would fall under this, I found the definition of that incredibly broad. In the prior statute that you authored, it used a reasonable person standard

to decide whether something was potentially viewed as inauthentic. So the reasonable person that would view it, I have it right here. It said that would have falsely appeared to be a reasonable person, to be inauthentic, would falsely appear to be authentic to a reasonable person.

Rebecca Bauer-Kahan: And here we have, you know, the authenticity question even has, or that otherwise generates an inauthentic image. That is anything that is created using Gen AI. So now anything that is created using Gen AI would have an inauthentic image and would fall under this. And then it says that, you know, that contains a false portrayal of any of the following in candidate. You know, what they said or did, which is what you said.

Rebecca Bauer-Kahan: And I was thinking about that and I thought, well, you know, we have a colleague and some allege that she had tried to allow for infanticide in California. I would argue that's not what she did. She would argue that's not what she did. But it's a fair argument in the public sphere. The First Amendment would protect whether what she did was or was not. I think that is protected First Amendment speech. But arguably somebody could go and say, that's not what I did. And we would be...

Ash Kalra: Oh, no

Marc Berman: It's all right. We're good.

Rebecca Bauer-Kahan: And we would be in a space where we have...

Marc Berman: I have faith.

Ash Kalra: Last call.

Rebecca Bauer-Kahan: I thought it was the, I thought it was the AI shutting us down. David can tell us if that's possible. So I guess my concern is that that is so broadly drafted that ads or communications that are meant to attack things that we arguably did but maybe we think we didn't do, would then be under subject to this 36 hours and taken down. And I just think that there are much stricter standards we could put on this to make sure we are talking about what I think you're actually trying to get at.

Rebecca Bauer-Kahan: Right, which is where people are actually being deceived to believe something, someone said something, a speech that looks authentic and a reasonable person would think that Joe Biden gave that speech, not a communication that is arguably an ad saying we did something using an inauthentic image because AI generated it, which I think is much past the point of what you are trying to regulate here. And I think the definitions don't just capture the stuff we're talking about, which is misinformation, disinformation, but goes beyond that to political speech that I think I would hope all of us would want to protect. So I guess if you want to address that.

Marc Berman: Yeah, no, thank you very much for the points. Thank you for the conversations that we've had in the past 18 hours. Let me first say for the first

two issues that you raised, we are actively investigating what makes sense and actively discussing with stakeholders, with opponents, with the sponsors, with interested legislators, and actively looking at whether or not we should narrow who can bring suit or who can bring a complaint, actively looking at a lot of other components of the bill.

Marc Berman: So needless to say, everything is still very much up for discussion and would love to continue those discussions with you. I'd love to continue those discussions with the opposition to try to make sure that, at the end of the day, if this bill is signed into law, that it is as narrowly tailored as possible. Because like you said, that's critically important to the bill, you know, surviving in the court. I'm going to defer to the experts on some of the specific language and what we still have and what we've changed. But, you know, this is very much a work in progress.

Leora Gershenzon: Yes, we did. We absolutely did not take out the false portrayal. So there's language on page five that says this is under the definition of digitally manipulated speech. False portrayal means the content would cause a reasonable person to have a fundamentally different impression or understanding of the content than if the person would have seen the authentic image. So it still keeps that same provision of false portrayal that was in the original Berman bill.

Rebecca Bauer-Kahan: But isn't that an or? Isn't that one of the options?

Leora Gershenzon: No, no, no. It's a requirement. A. You have to have under two. You have to have that. So false portrayal is a key part of this. So, in fact, we had discussions about taking that out and did not because that's clear. It has to be deceptive. So it has to be false. It has to be digitally manipulated, and it has to be false to, it has to deceive a person. And it isn't just the same like, you, infanticide. You cause this. But if there was a picture of the Member actually murdering a child, that would be, that would fall under this bill. Not just saying this author did a bill that included.

Rebecca Bauer-Kahan: Right. But the reasonable person only has to have a fundamentally different understanding or impression of the content or... It doesn't feel like the reasonable person has to believe that it is authentic. That is not how I read this. Is that how you read it?

Leora Gershenzon: Yes, because it has to appear authentic. We can tighten up the language. I mean, as the Assembly Member said, is this perfect language? It isn't. There's a lot more process to go through and there are definitely ways we can tighten this. But there are key things, which is that it is digitally manipulated. It is false. It is intended to deceive, the person who the original content producer intended to deceive. It does deceive people. And that it's intended falsely to influence the election.

Rebecca Bauer-Kahan: Right. So I see a reasonable person under false betrayal. My problem is you don't have a reasonable person under the authenticity question. That's my issue.

Leora Gershenzon: So you want...

Rebecca Bauer-Kahan: So I want. I think that the reasonable person has to believe this is authentic. Not just that it... Cause there you have an or it otherwise generates an inauthentic image. And so I think that I want someone to be viewing this to believe this is an authentic image. And I think that the way this is drafted with all of those requirements, the false portrayal, again, I think that a lot of the way people portray us, we would argue was false.

Rebecca Bauer-Kahan: I just, I mean, you know, that is what. And we have to accept that. We are public officials. That is part of the First Amendment protections. And so I also think that the image needs to be one such that, again, the viewer believes this is an authentic speech, it's an authentic image, et cetera.

Marc Berman: Totally appreciate the point. Absolutely.

Ash Kalra: Assembly Member Bryan.

Isaac Bryan: I'll be quick. Mr. Berman, when you brought this bill to me, I remember your pitch pretty well.

Marc Berman: I remember your response.

Isaac Bryan: It's supported by the Sheriff, it's opposed by the ACLU, and it may violate the First Amendment, but...

Marc Berman: You're paraphrasing.

Isaac Bryan: But similar to my colleague from the Bay Area, all of your past work in this space, when a bill analysis cites your own past work, it speaks to your dedication to the issue and your willingness and ability to navigate complex policy conversations like this one. And I think this is one of those conversations that needs to continue. So happy to give you a courtesy aye vote today, and looking forward to seeing where you ultimately take this work.

Marc Berman: Appreciate it.

Ash Kalra: All right, do we have a motion in a second? Assembly Member Connolly.

Damon Connolly: A couple quick questions. And yeah, I appreciate that sentiment as well. One question that was raised is why does it only target large platforms?

Marc Berman: I think we're trying to target the biggest risk, and the biggest risk, the biggest risk and the platforms that have the resources and the technological ability to be able to determine what content would apply. So I'll defer... At a high level, that's the reasoning. But defer to the experts to dive into the details a little bit.

Leora Gershenzon: In the ideal world, we would cover every single platform. But again, what we are asking of the platform to do does they've got to use state of the

art tools. The largest platforms have the capacity. The largest platforms also have the largest reach. So if you're trying to stop disinformation, we're never going to fully stop it. And by the way, I'm sorry I didn't mention, we're not trying to stop misinformation. That actually is much more allowable under the First Amendment.

Leora Gershenzon: It's the disinformation, it's the absolutely false context. So we're trying to go where the greatest tools are and not run into... It's impossible for these smaller startups. We are pro-innovation. We don't want to stop the tools that are needed to do this.

David Harris: If I could add, we chose to go for the larger platforms, actually, as a bit of a compromise. We looked at the way that the European Union defined very large online platforms and we actually went lower than that. They were looking at platforms that have more than 45 million, or 10% of the EU population approximately, as users. We went for a 1 million number within California, proportionately smaller. We didn't go lower than that because we do want to recognize that this is work. This has costs associated with it that are incidental to companies that are bringing in billions of dollars each quarter, but that are significant for small startups, and we wanted to acknowledge that.

Damon Connolly: And who decides whether something has been modified? Is it actually like an algorithm that does that, or is it people? What's that rigorous process?

Marc Berman: I'm going to defer to David, but algorithms, and then maybe backed up by people.

David Harris: Yeah, exactly. As is the case with almost all types of content moderation currently, there are two ways that a piece of content that can be enqueued for a moderation decision. One is in an automated fashion where an algorithm or AI system detects that something might contain child sexual abuse material, detects that it might contain a known false statement that has been previously fact checked, or detects that it is repeat of content that has been taken down before of any type.

David Harris: And so that can be done algorithmically. There are situations where an algorithm might also generate a unclear response and queue that automatically for a human reviewer. And then there are also ways that, if content passes through the algorithmic methods, it could still be reported by anyone, yourself included, through any platform's tools for reporting content. And then there's a possibility that you would have an algorithmic assessment or an AI assessment after the human reports. And that could, depending on how it unfolds, go back to a human actual reviewer. And there are in many of the platforms, multiple layers of human review that can be appealed.

Ash Kalra: I was just going to ask if we can start to wrap up. We have a lot of bills going through. So quickly, and quick, quick response, please.

Damon Connolly: Final quick question. So, and following up on that. The way the bill is currently set up is if an individual disagrees, quote unquote, with a platform response, a private lawsuit is possible. So I'm trying to get a sense of, that

sounds like kind of opening the floodgates potentially to litigation. But how is that envisioned? How is that going to play out realistically?

Leora Gershenzon: I mean, the Assembly Member has already discussed looking at ways to limit that, including who may bring the lawsuit and raising the standard from preponderance of the evidence to potentially clear and convincing. The penalty against the platforms. There's our litigation. These are lawsuits. So it's not that they're so easy, but there's no monetary penalties. So because of Section 230, they pay nothing. If they lose, the court will order them to simply do something that they hadn't done. So they will. They are simply ordered to comply with the law. There are no monetary penalties.

Damon Connolly: Well, I'm glad to hear though that there's further discussion about how to refine that.

Marc Berman: There is, absolutely.

Ash Kalra: Thank you. There is a motion already, and so would you like to close Assembly Member Berman?

Marc Berman: Respectful ask for an aye vote. I appreciate the conversation.

Ash Kalra: Thank you.

Committee Secretary: Do passes amended to Appropriations. [Roll Call]

Ash Kalra: All right, that will be placed on call.

Marc Berman: Thank you.

Ash Kalra: All right, so it's another check.

Committee Secretary: We have a vote change. Dixon, no to not voting.

Ash Kalra: Okay. All right. Assembly Member Bauer-Kahan, we have less than an hour to do six bills. If we can. If we can't, we're gonna have to come back either tonight or at some other moment sometime to finish these bills this week.

Rebecca Bauer-Kahan: I won't ask any questions this time, so it'll go faster. Thank you, Mr. Chair and Members, I'm proud to present AB 2930. Oh, and I'll be accepting the Committee amendments. Proud to present AB 2930. I want to thank the Committee for their very thorough analysis. It was incredibly well done. I appreciate it. As noted, it was modeled after President Biden's AI Bill of Rights. And AB 2930 is incredibly, incredibly simple, although the opposition would disagree.