# EXHIBIT 14







Senate Standing Committee on Elections and Constitutional Amendments
AB 2655

Marc Berman: Thank you, Chair Blakespear and Sanders. Five years ago, I authored the first election deepfake Bill in the nation. And as you heard with the presentation of a Bill earlier, just a few short years later, the technology is better, cheaper, and more widely accessible.

Catherine Blakespear: AB 2655.

Marc Berman: And we're seeing deepfakes used to undermine elections across the globe and here in America.

Marc Berman: Therefore, I'm authoring AB 2655 to protect election integrity by requiring large online platforms to, for a limited time, restrict the distribution of materially deceptive content intended to affect the outcome of an election, undermine confidence in election results, or harm the reputation of a candidate for less harmful, yet still materially deceptive content.

Marc Berman: The Bill would require the platforms to label it as election disinformation. With today's sophisticated deepfakes, voters may not know what audio or visual content they can trust, which can undermine election integrity.

Marc Berman: Imagine if a fake video appeared online of an elected official doing or saying something that they did not do or say, like accepting a bribe or saying that they'd hacked voting machines to ensure their own victory. The Bill does not demand perfection. What it says is that platforms must act using the best available tools.

Marc Berman: If they know or should know that the content meets the test in the Bill platforms cannot bury their head in the sand, but if they don't know, then there is no obligation.

Marc Berman: I recognize that this Bill is legislating in an arena where technology and the law are fast evolving, and this can be challenging, but doing nothing is not an option. I respectfully ask for your aye vote. And with me today are Laura Gershenzon and David Harris, both with the California Institute for Technology and Democracy.

Catherine Blakespear: Thank you and welcome. You each have two minutes.

Leora Gershenzon: Thank you. Leora Gershenzon, we're CITED the California Initiative for Technology and Democracy, which is a project of California Common Cause. Imagine two different videos that are going viral online. One is an influencer on TikTok saying, don't vote by mail. It's bad. You may not get your ballot counted. Go in person.

Leora Gershenzon: The other is the election official in your county, a deep fake of them saying don't vote by mail. We throw them all out. They're two fundamentally different things. Both are designed to impact the vote and impact two votes. But one you can counter with more information you can have saying no, come and vote.

Leora Gershenzon: The other one is just so bad, so fundamentally bad, that having it out there, even if it had a line on the bottom that said, this is AI, is simply not enough, that it just shouldn't be in the ecosystem, because once it's out there, it is impossible to take back.

Leora Gershenzon: And this Bill is trying to do that, is trying to say the worst of the worst election Deepfakes.

Leora Gershenzon: Those are the candidate or the elections official or an elected official doing or saying something they didn't do or say with the intent to influence the election that comes up just shouldn't be there for a short time frame around the election. And other things in a longer timeframe should be labeled as such.

Leora Gershenzon: The bottom line is there are just things that cannot be unseen and will impact our democracy and whether people vote or not. And we hope and pray that this is enough to be able to. This Bill and the other bills that you're hearing are enough to protect California's democracy. We urge you to vote aye.

Catherine Blakespear: Thank you very much. Yes, go ahead.

David Harris: Chair Blakespear and Members of the Committee, it's an honor to be here speaking with you. My name is David Harris, and I'm a senior policy advisor to cited the California California Initiative for Technology and Democracy.

David Harris: I am also chancellor's public scholar at UC Berkeley, where I teach classes at the Haas School of Business on topics including AI, ethics for leaders, and civic technology. I previously worked for close to five years at Facebook and Meta on the civic integrity and responsible AI teams.

David Harris: I've also advised the EU, the White House, NATO, and the United nations on artificial intelligence. This Bill only applies to the largest online platforms with the greatest reach of potential election misinformation, and it's fully implementable today based on tools the companies already possess. Illegal content is complex, child sexual abuse material, terrorist content.

David Harris: This Bill is very narrow and makes it impermissible to generate election disinformation. The companies have already shown that they can do it with those other types of content.

David Harris: Some of these companies suggest that the requirements cannot be met, but they already are under similar requirements in Europe due to Europe's Digital Services act, which is designed to, among other things, crack down on election interference. So they are already complying there or trying to.

David Harris: They've also promised to do these same types of reasonable things that the Bill provides. The tech companies made a big commitment in the AI and elections accord at the Munich Security conference this past February.

David Harris: But unfortunately, the commitments that the tech companies have made in places like that are voluntary, have no timelines for implementation, and have no accountability mechanisms associated with them. The good news though is that AI companies and social media companies have been publicly calling for more regulation of their industry.

David Harris: And regulation is great in this field because it creates a level playing field where all the companies have to play by the same rules. Without regulations like this, you punish the companies that are working hard to operate in the interests of society.

David Harris: And I'll close by saying that we should heed the call of tech industry CEO's calling for regulation and promising to do better for democracy and give them what they are asking for with AB 2655.

Catherine Blakespear: Thank you very much for your testimony. Do we have any other support in the room? Please come forward to the microphone.

Dora Rose:  Morning, Dora Rose, League of Women Voters of California in strong support and I have the proxy of Disability Rights California also in strong support. Thank you.

Janice O'Malley: Chair, Members, Janice O'Malley AFSME California in support thank you.

Dylan Elliott: Dylan Elliott, on behalf of the San Francisco Board of Supervisors in support. Thank you.

Evan Minton: Hi, Evan Minton, Voices for Progress in support thank you.

Marquise Mason:  Marquise Mason, California Environment of Voters in support thanks.

Trent Lange: Trent Lange, California Clean Money Campaign in support.

Catherine Blakespear: Okay, thank you very much. Do we have any lead witnesses in opposition.

Catherine Blakespear: Hello. Welcome. Come forward. You may start when ready. You have two minutes.

Khara Boender: Great. Thank you. Madam Chair, Members of the Committee, again, my name is Khara Boender. On behalf of the Computer and Communications Industry Association, in respectful opposition to AB 2655 CCIA and its Members take seriously the impact deceptive content may have on elections.

Khara Boender: Many of our Members, as noted earlier, are working to implement tools to better detect and label AI generated content and using a combination of AI and human review. They moderate content in violation of their terms of service, including content that is illegal and potentially harmful.

Khara Boender: But the tools that are currently available are not always reliable or accurate, and while such technology is evolving, so are the means for bad actors to evade such detection. Because covered platforms are not privy to the intent and context for which a piece of content is used, they could inadvertently overblock or over label content.

Khara Boender: This could result in user frustration and suppression of political speech. Political speech was at the core of why our first amendment was established.

Khara Boender: Therefore, responsibility for labeling AI generated election content and liability for deceptive content should rest with the entity that puts forth such material, the one that is most aware of the intent and context to which the content was created and shared. We also have concerns about the breadth of the Bill.

Khara Boender: While establishes defined time periods surrounding elections and election processes for newly established prohibitions and requirements, the Bill does not specify which elections where. As noted in the Committee analysis, this could result in platforms being required to block content almost constantly in order to ensure compliance.

Khara Boender: We appreciate the recent amendments to limit the PRA to a candidate for elective office, elected official or elections official in lieu of any resident of California. However, we're still concerned that this could still result in the weaponization of political speech that competing candidates disagree with.

Khara Boender: For example, under the Digital Millennium Copyright act, there were studies describing political ad takedowns on both sides of the political spectrum. After receiving reports of copyright infringement. Many of these cases were ultimately deemed fair use, but platforms were inclined to err in taking down the content lest they faced liability.

Khara Boender: For these reasons, we urge a no vote on this legislation. On behalf of CCIA, I appreciate your consideration. Thank you.

Catherine Blakespear: Thank you very much. Any other opposition witnesses in the room?

Ruth Dawson: Good morning. Ruth Dawson with ACLU, California Action and respectful opposition thank you.

Jose Torres Casillas : Jose Torres Casillas, on behalf of Technet and Chamber of Commerce in respect for opposition.

Brandon Knapp: Brandon Knapp, representing Electronic Frontier foundation, respectfully in opposition.

Catherine Blakespear: Thank you very much and we will now bring it back to our Members. And I'd like to ask the author, would you like to respond to any of the opposition witnesses statements?

Marc Berman: Appreciate the concerns. We've been working together, having a lot of conversations with all the stakeholders since the day we introduced the Bill. You know, we believe that we have narrowly tailored the Bill to address a significant government interest. Also believe that we've put language in there to make sure that the platforms aren't held to perfect standard.

Marc Berman: But for the big platforms that the Bill applies to, that they are using best practices that, as one of my witnesses mentioned, they're already using for other users in other parts of the world.

Marc Berman: But at the same time, we'll absolutely continue having conversations with the opposition and looking for ways to address concerns that they have that don't totally undermine or gut the purpose of the Bill. And I'm sure my witnesses, if given the opportunity, might also have some thoughts. But through the chair.

Catherine Blakespear: I mean, if you'd like to, briefly, I just wanted to give you a chance.

Unidentified Speaker: The only thing I would add is the liability under this Bill is just injunctive relief. So all it is is a court telling the platform to take down what they should have already taken down. There is not monetary liability, liability, thanks to Section 230.

Unidentified Speaker: I'd just like to respond respectfully to the point raised by the opposition that the tools are not reliable or accurate.

Unidentified Speaker: There are well established tools for doing this, and that's why when you open up your Facebook, newsfeed, or your Instagram feed, you generally will not find pornography, child sexual abuse, terrorist recruiting content, because they can remove that type of content.

Unidentified Speaker: There's no fundamental difference between that type of content content and this type of content, except that this type of content is not yet illegal, and that's why the companies are not doing it. They will do it if forced to. Elon Musk got rid of about 81% of Twitter's staff after he acquired it.

Unidentified Speaker: Mark Zuckerberg said publicly that he admired what a lean company Elon had been able to make Twitter. And that's because activist investors are saying, cut, cut, cut, make your companies more profitable. Only do what you're legally required to do.

Unidentified Speaker: And it is on us and you Members of the Committee, to make it legally required to address this issue.

Catherine Blakespear: Okay, well, thank you very much. I appreciate that, Senator Newman.

Josh Newman: Thank you. And so I guess I'd like to ask a question. The opposition. So, Miss Punder, you happen to be at the table, so apologies. You're representing all of those nice folks, but would you agree or disagree that this is, in fact, a

fairly urgent matter, given the advances in AI and the prospective threat to our elections.

Khara Boender: That it's important to address the impacts that AI may have on elections. But I believe that is why we are supportive of the other measures that put the responsibility on the people who are producing the content that is in fact deceptive or they know how they have produced it and in what context that they have produced it.

Khara Boender: To back up a little bit on that front, while respectfully, the support witness over here mentioned that the reason why when you open up Facebook and you're not seeing a bunch of CSAM, I would argue that that's a fundamentally different and not apples to apples comparison as CSAM is identified using hashing values that are found at a database, which is not the case for something that may be considered more subjective when we're talking about whether a specific person said or did something.

Khara Boender: And I think that's more difficult for a platform to know definitively whether somebody, you know, across the country, there are over 7000 state legislators in the country, whether that specific candidate did say or in fact do something. So I do think that those are fundamentally different examples that are being shared.

Josh Newman: I appreciate that. But I guess the use case that the author is trying to address, you know, I regard as a real problem and at least visually not hard to identify once identified to the support positions point. It's really a work factor question. Right.

Josh Newman: And so the question at issue here is, you know, what's the willingness of the major platforms to do this work? And in the absence of this legislation, how can we be assured as representatives of the public interest that you're going to do that work?

Josh Newman: So this seems in the absence of an alternative, I'd be interested to hear an alternative solution. Seems like a very reasonable measure. So do you have, is there a better way to do this that gets at the issue? Because I think the issue is fairly clear cut.

Khara Boender: Again, I think it's about going after the people who are producing the material originally.

Josh Newman: Okay. That is a whack a mole Proposition unless we do that at a systems level. Okay. Clay was interested to hear but happy to support the Bill in its current form. Thank you.

Catherine Blakespear: Okay. Thank you. Assembly Member Berman, would you like to close?

Marc Berman: I appreciate the conversation. We'll continue to work with the opposition. Respectfully ask for your aye vote.

Catherine Blakespear: Thank you. Do we have a motion? Okay, Senator Newman, thank you. This is due past two. Judiciary assistant, please call the roll.

Committee Secretary: Senators Blakespear? Blakespear aye. Nguyen. Nguyen no. Allen. Allen aye. Menjivar aye. Newman. Newman aye. Portantino. Umberg.

Catherine Blakespear: It's 41 and we will leave it on call. Thank you.

Marc Berman: Thank you.

Catherine Blakespear: Thank you very much. So now we are on to our last item of the day here for these Elections and Constitutional Amendments Committee. It's ACA 8. We will ask Assembly Member Wilson to come forward. You may proceed when ready.