# EXHIBIT 15

*Harvard Journal of Law & Technology*
Volume 24, Number 1 Fall 2010

# Free Speech Unmoored in Copyright's Safe Harbor: Chilling Effects of the DMCA on the First Amendment

*Wendy Seltzer\**

## Table of Contents

I. Introduction ...................................................................................171

II. DMCA's Chill as "Prior Restraint by Proxy" ...................177
    *A. Error Costs of the DMCA* ......................................................179
    *B. Intermediation* .........................................................................181
    *C. The DMCA and the Economics of Speech* ...............................184

III. First Amendment Problems ...............................................187
    *A. Copyright and the First Amendment* .......................................187
    *B. Prior Restraints on Speech* ......................................................190
    *C. Understanding Chilling Effects* ...............................................193
    *D. Chill, Intermediated* .................................................................197

IV. The Chill Winds of Copyright and DMCA ........................200
    *A. Errors and pressures* ................................................................204
    *B. The Chill in Practice* ................................................................210
    *C. "Repeat Infringers"* .................................................................218
    *D. Limited Warming?* ....................................................................221
    *E. Against Copyright Secondary Liability* ....................................225

V. Reforming Copyright Takedown ..........................................226

## I. Introduction

The 2008 U.S. Presidential race was a multi-media campaign. The candidates organized volunteers and engaged voters online, their partisans created video clips, and the campaigns themselves used numerous existing and new platforms to share the word and get out the

* Fellow, Berkman Center for Internet & Society at Harvard Law School and Silicon Flatirons Center at University of Colorado School of Law. Contact wendy@seltzer.org for the latest version. The author founded and leads the Chilling Effects Clearinghouse, http://www.chillingeffects.org/, from which much of the evidence is drawn. The author thanks participants in Harvard's Berkman Center luncheon series, Silicon Flatirons and the University of Colorado Law School colloquium, and the IP Scholar Works-in-Progress for helpful discussion and comments on earlier drafts, and, particularly, her colleagues and collaborators on the Chilling Effects project.
© 2010 Wendy Seltzer. Reproduction permitted under the Creative Commons Attribution 3.0 License, http://creativecommons.org/licenses/by/3.0/

vote.[1] The McCain-Palin campaign reached out to voters by establishing a "channel" on the YouTube platform,[2] posting video clips where viewers could subscribe to the feed.

But in October, just weeks before the general election, several videos were removed from the McCain campaign's YouTube channel, replaced with the terse advisory: "This video is no longer available due to a copyright claim." The videos in question? Campaign advertisements. The claimants included CBS News, Fox News, the Christian Broadcasting Network, and NBC News, each apparently alleging that the ads infringed their copyrighted television programs.[3] The McCain-Palin campaign wrote an impassioned letter to YouTube:

> We write . . . to alert you to a problem that has already chilled this free and uninhibited discourse . . . . [O]verreaching copyright claims have resulted in the removal of non-infringing campaign videos from YouTube, thus silencing political speech . . . . [O]ur advertisements or web videos have been the subject of [Digital Millennium Copyright Act] takedown notices regarding uses that are clearly privileged under the fair use doctrine. The uses at issue have been the inclusion of fewer than ten seconds of footage from news broadcasts in campaign ads or videos, as a basis for commentary on the issues presented in the news reports, or on the reports themselves.[4]

McCain-Palin's counsel urged YouTube to make an exception for the videos posted by political candidates and campaigns.[5] He suggested that YouTube commit to a legal review of these political videos and decline to remove clearly non-infringing material, rather than taking

---

1. *See* LEE RAINIE & AARON SMITH, PEW RESEARCH CTR., THE INTERNET AND THE 2008 ELECTION (June 15, 2008), http://www.pewinternet.org/Reports/2008/The-Internet-and-the-2008-Election.aspx (reporting that 46% of Americans have used the Internet for political purposes, and 39% of online Americans have used the Internet to gain access to primary political documents and observe campaign events).

2. *McCain Hopes To Attract Young Voters*, CBS NEWS, May 12, 2008, http://www.cbsnews.com/stories/2008/05/12/politics/main4087471.shtml.

3. *See* Nate Anderson, *Fixing DMCA Takedown Problems Through Shaming, Legal Reform*, ARS TECHNICA, http://arstechnica.com/old/content/2008/10/fixing-dmca-takedown-problems-through-shaming-legal-reform.ars (last updated Oct. 20, 2008, 11:35 PM).

4. Letter from Trevor Potter, Gen. Counsel, McCain-Palin 2008, to Chad Hurley, CEO, YouTube, et al. (Oct. 13, 2008), *available at* http://amlawdaily.typepad.com/amlawdaily/files/mccain-letter-20081013.pdf.

5. *Id.* at 2 ("[W]e believe it would consume few resources — and provide enormous benefits — for YouTube to commit to a full legal review of all takedown notices on videos posted from accounts controlled by (at least) political candidates and campaigns.")

down and insisting on a Digital Millennium Copyright Act ("DMCA") waiting period of ten to fourteen business days.[6]

YouTube responded the next day, but said its hands were tied by the DMCA and that it would not play favorites among the many videos posted.[7] YouTube's counsel stated that "YouTube is merely an intermediary in this exchange, and does not have direct access to . . . critical information" regarding copyright ownership and infringement.[8] McCain could counter-notify, sue, and use the court of public opinion to pillory the complainants, but he could not get the videos restored to YouTube before the expiration of the statutory delay — less than a month before November's general election. Senator (or President) McCain could also, YouTube suggested, work to change the law so that others were not ensnared by it in the future.[9]

If there was ever a clear case of non-infringing fair use — speech protected by the First Amendment — this should have been it: a political candidate, seeking to engage in public multimedia debate, used video snippets from the television programs on which the issues were discussed.[10] Following standard DMCA-induced policy,[11] however, YouTube never examined the legal validity of the underlying copyright complaint.[12] So long as the claimant sent notice to YouTube compliant with the statute's formal requirements,[13] YouTube would respond expeditiously to remove the claimed video. Why risk even the remote chance of litigation for someone else's video?

As a result of unreviewed copyright complaints, political speech was removed from the McCain-Palin YouTube channel for more than a week at the height of election season, although "[i]t is well known that the public begins to concentrate on elections only in the weeks immediately before they are held."[14] Nor were the challenges limited to Republicans. The Obama-Biden campaign also lost access to You-

6. *Id.* at 2. *But cf.* Richard A. Posner, *Free Speech in an Economic Perspective*, 20 SUFFOLK U. L. REV. 1, 10 (1986) ("[T]here is no clear demarcation between political speech and other speech, once the purpose of protecting political speech is understood to be the preservation of political competition.").

7. Letter from Zahava Levine, Chief Counsel, YouTube, to Trevor Potter, Gen. Counsel, McCain-Palin 2008, at 2–3 (Oct. 14, 2008), *available at* http://wendy.seltzer.org/media/ youtube-letter-20081014.pdf ("We try to be careful not to favor one category of content on our site over others, and to treat all of our users fairly . . . .").

8. *Id.* at 2.

9. *Id.* at 3.

10. Under the fair-use factors, *see* 17 U.S.C. § 107 (2006), the McCain Nation channel used the clips for commentary in a non-commercial context, used a factual work, took only a small portion of a broadcast, and used the content in a manner that would not affect the broadcasters' market.

11. *See DMCA Policy*, YOUTUBE, http://www.youtube.com/t/dmca_policy (last visited Dec. 21, 2010).

12. *See* Letter from YouTube to McCain-Palin 2008, *supra* note 7, at 2.

13. *See* 17 U.S.C. § 512(c)(3) (2006).

14. Citizens United v. FEC, 130 S. Ct. 876, 895 (2010).

Tube videos[15] and the group Progress Illinois found its channel disabled.[16]

No court would have granted an injunction to suppress McCain's political speech. "The First Amendment does not permit laws that force speakers to retain [an] attorney . . . or seek declaratory rulings before discussing the most salient political issues of our day."[17] Ultimately, therefore, the *Citizens United* Court struck down Congress's attempt to limit the impact of money on politics, holding that a statute banning corporate electioneering (funding speech shortly before an election) violated the First Amendment.[18] As the Court observed, "First Amendment standards . . . 'must give the benefit of any doubt to protecting rather than stifling speech.'"[19]

The government, defending the campaign finance law at issue in *Citizens United,* argued that the law could be limited by FEC interpretation to avoid protected speech. The Court rejected the government's argument, holding that requiring speech to be pre-approved was equivalent to banning it. The Court's denunciation applies equally to censorship effected through the DMCA takedown scheme:

> "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech — harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." Consequently, "the censor's determination may in practice be final."[20]

Thus, rather than "prolong the substantial, nation-wide chilling effect" of the FEC's uncertain restrictions on speech, the Court invalidated the section.[21]

While the McCain-Palin campaign had other avenues than You-Tube for spreading its message — including the campaign's own

---

15. *See* Steve McClellan, *YouTube Pulls Obama Spot*, ADWEEK, Oct. 1, 2008, http://www.adweek.com/aw/content_display/news/agency/e3i226441afd9c0206fb4262e8f1 dec94f7.

16. *See* David Ardia, *Fox Television Forces Shutdown of Progress Illinois' YouTube Channel*, CITIZEN MEDIA LAW PROJECT (Jan. 6, 2009), http://www.citmedialaw.org/blog/ 2009/fox-television-forces-shutdown-progress-illinois-youtube-channel.

17. *Citizens United*, 130 S. Ct. at 889.

18. *See id.* at 913 (holding 2 U.S.C. § 441b facially unconstitutional for prohibiting corporations and unions from using their general treasury funds to make independent expenditures for speech that is an electioneering communication or express advocacy).

19. *Id.* at 891 (quoting FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 469 (2007) (Roberts, C.J.)).

20. *Id.* at 896 (alteration in original) (citations omitted) (quoting, respectively, Virginia v. Hicks, 539 U.S. 113, 119 (2003); Freedman v. Maryland, 380 U.S. 51, 58 (1965))).

21. *Id.* at 894.

website, with possibly stouter-hearted hosting service — most individuals do not have these alternatives. In the face of a DMCA takedown, they would "choose simply to abstain from protected speech."[22] For smaller, less powerful speakers, the initial takedown following a DMCA-backed copyright complaint strikes a final and fatal blow.

Federal law, through copyright and the DMCA, is responsible for this restriction on Internet speech. This is true even though the DMCA relies upon private enforcement, because of the incentive structure the DMCA creates for online intermediaries. As the Court observed in *Citizens United* and in earlier campaign finance cases, depriving speakers of opportunities for publication and dissemination by pressuring distribution points can be tantamount to banning speech: "Were the Court to uphold these [electioneering] restrictions, the Government could repress speech by silencing certain voices at any of the various points in the speech process."[23]

Writing for the Court in *Citizens United*, Justice Kennedy concluded that the election laws — which restricted the financing of speech, and thus the opportunity to speak — functioned "as the equivalent of prior restraint" on speech.[24]

The same reasoning should apply to the barriers that copyright secondary liability and the DMCA pose to speakers. These barriers function as a prior restraint by inducing the necessary service provider[25] to take down speech before, and often in the absence of, a judicial determination of its infringing nature.

Each week, blog posts are redacted, videos deleted, and web pages removed from Internet search results based upon private claims of copyright infringement. The "safe harbor" provision of the DMCA encourages service providers to respond to copyright complaints with content takedowns, which assure the service providers immunity from liability while diminishing the rights of their subscribers and users. The law's shield for service providers becomes, paradoxically, a sword against the public, which depends upon these providers as platforms for speech.

The DMCA provides limited legal process for an accused infringer. The law offers service providers protection from copyright liability if they remove material "expeditiously" in response to unveri-

---

22. *Cf. id.* at 896 (discussing chilling effects from FEC regulation).

23. *Id.* at 898 (citing McConnell v. FEC, 540 U.S. 93, 251 (2003) (Scalia, J., concurring in part and dissenting in part)).

24. *Id.* at 896.

25 As described in Part III, *infra*, the DMCA sets out several categories of "service provider," including providers of hosting, search, and conduit services. *See* 17 U.S.C. § 512(k)(1) (2006) (defining "service provider" to mean a "provider of online services or network access, or the operator of facilities therefor," and including conduit services). I use the generic term "service provider" to refer to any of these actors interchangeably unless a more precise reference is required.

fied complaints of infringement.[26] Even if the accused infringer responds with counter-notification asserting non-infringement, the DMCA requires the service provider seeking protection from liability to keep the material offline for more than a week.[27]

If this takedown procedure took place through the courts, it would trigger First Amendment scrutiny as a prior restraint — silencing speech before an adjudication of unlawfulness. But because DMCA takedowns are privately administered through service providers, they have not received such constitutional scrutiny despite their high risk of error.

I add to prior scholarly analysis of the conflict between copyright and the First Amendment by showing how the copyright notice-and-takedown regime operates in the shadow of the law, silencing speech indirectly through private intermediaries where the government could not do so directly. In the wake of *Citizens United*, why can copyright law remove political videos from public reach when campaign finance law must not?

This Article argues for greater constitutional scrutiny. The DMCA's indirect chilling effect upon speech harms the public no less than if the government wrongly ordered the removal of lawful online material directly. Indeed, because sending a DMCA takedown notification costs copyright claimants less than filing a complaint in federal court and exposes claimants to few risks, it invites more frequent abuse and error than standard copyright adjudications. I describe several cases of error in detail. The indirect nature of the chill on speech should not shield the legal regime from challenge.

When non-infringing speech is taken down, not only does its poster lose an opportunity to reach an audience, the public loses the benefit of hearing that lawful speech in the marketplace of ideas.[28] Because of the DMCA's pressure, the poster's private incentives to counter-notify and the host's incentives to support challenged speech are often insufficient to support an optimal communication environment for the public. Instead, this set of incentives produces a blander but not significantly less copyright-infringing information space.

Copyright claimants assert that the expedited process of the DMCA is critical to suppress infringement in the highly-networked digital world. While many instances of infringement are properly targeted for takedown under the DMCA, I argue that the correctness of some takedowns does not excuse error elsewhere, nor the failure to undertake careful examination of the rate and costs of error. I therefore recommend rebalancing speech protection and copyright to reduce erroneous takedown.

---

26. 17 U.S.C. § 512(c)(1)(C) (2006).

27. *Id.* § 512(g).

28. *See* Abrams v. United States, 250 U.S. 616, 630 (1919).

Part II surveys the legal, economic, and structural sources of the DMCA's chilling effects on speech. Part III examines the First Amendment doctrines that should guide lawmaking, with a critique of copyright's place in speech law. Part IV reviews the history and mechanics of the DMCA and provides examples of chilled speech and a few instances of limited warming. Finally, Part V engages current policy debates and proposes reform to protect online speech better.

## II. DMCA's Chill as "Prior Restraint by Proxy"

The DMCA flips the defaults on speech. Ordinarily, speech remains available until someone files — and wins — a lawsuit or negotiates a settlement.[29] In contrast, a DMCA takedown forces a speaker to act to reassert the lawfulness of his speech through a counter-notification, or if he wants uninterrupted speech, a lawsuit.[30] This added cost operates as censorship. The poster who thinks his quotation is fair use may be willing to post but not to file a sworn counter-notification, just as the claimant for veterans' benefits who thinks he is engaged in loyal criticism may nonetheless object to having his benefits conditioned on a loyalty oath.[31]

The DMCA safe harbors may help the service provider and the copyright claimant, but they hurt the parties who were absent from the copyright bargaining table[32]: the smaller individual and non-profit speakers using the Internet. The threat of secondary liability induces service providers to comply with the DMCA's notice-and-takedown provisions, making it more difficult for speakers to post material that challenges someone who can potentially make a claim to copyright.[33]

Some of the examples of abuse cited below are extreme, but they are not isolated. The frequency of error and its bias against speech represents a structural problem with secondary liability and the

---

29. *See* Thomas I. Emerson, *The Doctrine of Prior Restraint*, 20 LAW & CONTEMP. PROBS. 648, 648 (1955) ("In constitutional terms, the doctrine of prior restraint holds that the First Amendment forbids the Federal Government to impose any system of prior restraint, with certain limited exceptions, in any area of expression that is within the boundaries of that Amendment.").

30. *See infra* Part III (describing the mechanics of the DMCA notice-and-takedown regime).

31. *See* Speiser v. Randall, 357 U.S. 513 (1958) (invalidating as a violation of the First Amendment a loyalty oath requirement on veterans claiming tax exemptions).

32. For the copyright law negotiation as a "bargaining table" from which the general public is excluded, see JESSICA LITMAN, DIGITAL COPYRIGHT 126 (2001). Of course, many of those asserting copyright claims via the DMCA are small or non-commercial entities. But even if claimants were evenly balanced across the size-wealth spectrum, the targets affected by takedowns are disproportionately the poorer speakers who also have fewer alternatives to the Internet to make their voices heard and less influence with their service providers to ward off claims.

33. Secondary liability, or intermediary liability, refers to holding one party (the service provider) liable for the acts of another (the poster/speaker). S*ee infra* Part III.

DMCA: the DMCA makes it too easy for inappropriate claims of copyright to produce takedown of speech. It encourages service providers to take down speech on notice even if the notice is factually questionable or flawed. It encourages copyright owners to use copyright claims as a route to expeditious takedown. The DMCA thus enhances the power of the claimant over the alleged infringer.

First, even good-faith uses of the DMCA are problematic when the underlying law is uncertain. Copyright law and its fair use provisions are far from bright-line. DMCA notices force service providers to confront fact-specific fair use disputes that even courts would be unable to decide on summary judgment. "The task [of fair use analysis] is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis."[34] Because the copyright doctrine is hazy, good-faith complainants may file erroneous DMCA claims against fair uses of their copyrights.

Compounding the problem, the promise of rapid takedown creates an incentive for copyright claimants to file dubious takedown claims. The mechanism is cheap for the claimant, more expensive for the respondent,[35] and if the process stops after the claim stage (as it often does) the complained-of material remains offline. And unless the complaint is so groundless that it can give rise to a lawsuit against the complainant,[36] a non-infringing poster has no legal or practical recourse against bogus claims.

Consequently, the DMCA is systematically susceptible to abusive claims. When the benefits of unlawful activity exceed the risk-

---

34. Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577 (1994). The Supreme Court has ruled on fair use several times in the last two decades alone, on decisions that "were overturned at each level of review." 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.05 n.10 (2010).

35. The respondent who counter-notifies must make "a statement under penalty of perjury that the subscriber has a good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled," and must consent to jurisdiction in United States courts. Moreover, the incremental cost of an additional takedown notice is low for the complainant who has already determined the legal form, prepared a template, and identified the DMCA agent for service, or hired a third-party service to send takedown notices on its behalf. *See Repeat Senders*, CHILLING EFFECTS, http://www.chillingeffects.org/weather.cgi?NewsID=643 (last visited Dec. 21, 2010) (counting the most prolific senders of takedown notices). The targets of notice are more often confronting the process for the first time, since the law calls for policies of "termination" of repeat infringers. 17 U.S.C. § 512(i)(1)(A).

36. Under 17 U.S.C § 512(f) (2006), the complainant can be sued and made to pay the poster's costs and attorneys' fees if shown to have "knowingly materially misrepresent[ed]" the infringing nature of material. Few cases to date have imposed these sanctions. *Compare* Online Policy Group v. Diebold, Inc., 337 F. Supp. 2d 1195 (N.D. Cal. 2004) (granting plaintiff's claim under 17 U.S.C. § 512(f)), *with* Rossi v. Motion Picture Assoc. of Am., 391 F.3d 1000 (9th Cir. 2004) (dismissing plaintiff's tortious intereference claim relating to defendant's filing of a DMCA takedown notice).

weighted penalties for being caught, parties can get away with much borderline or unlawful activity.[37]

Furthermore, the intermediating role of service providers adds a layer of indirection to the operation of the law, and slows access to information that could help market forces correct errors. Several factors complicate individual efforts to protect speech: the divergence of provider incentives from those of any of the parties to the underlying copyright dispute, the parties' differing risk assessments, and the information and monitoring costs of a principal-agent relationship. Legal scholarship has only recently acknowledged the detriments to speech that intermediation and gatekeeper liability may cause. When intermediaries are necessary for speech, pressures on these private relations take on First Amendment significance.

### A. Error Costs of the DMCA

The First Amendment requires courts and legislatures to anticipate error in application of the law, and to err on the side of allowing speech rather than restricting it.[38] As Frederick Schauer argues, the expected error and uncertainty in the legal process combine with this strong First Amendment preference to produce "definitional balances" that intentionally permit some unwanted activity, as in defamation, obscenity, and incitement law.[39] By favoring copyright claimants, the DMCA skews this balance in the wrong direction.

If a copyright-enforcement system worked perfectly, infringement would be detected and stopped rapidly without impairing the creation of and access to non-infringing works.[40] Real-world copyright enforcement can fall short of this ideal in two ways: by failing to stop infringement or by stopping non-infringing speech. Law aims to deal with the tradeoffs between these two types of error, false negatives and false positives.[41]

---

37. *See* Louis Kaplow, *The Value of Accuracy in Adjudication: An Economic Analysis*, 23 J. LEGAL STUD. 307 (1994).

38. *See, e.g.*, New York Times Co. v. Sullivan, 376 U.S. 254, 270–72 (1964) (observing that even factually incorrect statements deserve First Amendment protection lest fear of mistake stifle public debate).

39. Frederick Schauer, *Fear, Risk and the First Amendment: Unraveling the "Chilling Effect,"* 58 B.U. L. REV. 685, 686–87 (1978).

40. The argument regarding optimal enforcement is distinct from the choice between rules and standards, focusing instead on accurate enforcement of whatever rule or standard has been chosen. *See generally* Dan L. Burk, *Muddy Rules for Cyberspace*, 21 CARDOZO L. REV. 121 (1999).

41. *See* Robert G. Bone, *Enforcement Costs and Trademark Puzzles*, 90 VA. L. REV. 2099, 2123 (2004) ("Two different types of error must be considered separately: false positives and false negatives. Generally, a false positive occurs when a party obtains a result he should not have obtained and a false negative occurs when a party fails to obtain a result that he should have obtained."); Alfred C. Yen, *Internet Service Provider Liability for Subscriber Copyright Infringement, Enterprise Liability, and the First Amendment*, 88 GEO. L.J. 1833, 1869–70 (2000). In constitutional jurisprudence, these errors are frequently referred to

Often, trying to eliminate one type of error will exacerbate the other.[42] If law's overriding priority were to stop online infringement — no matter how many innocent, non-infringing users and uses were mistakenly punished — it could reduce the false negatives of uncaught infringers at the expense of catching more non-infringers: more dolphin caught in the fishing nets.[43] A law aimed at this goal might give copyright claimants a free hand to demand takedown of claimed infringements, force service providers to terminate the accounts of users accused of infringement, or hold service providers strictly liable for any infringement occurring on or through their networks. Such a law would exaggerate the false positives and increase the takedown or silencing of non-infringing speech. Strict liability for service providers, in particular, might cut online infringements, but it would substantially reduce non-infringing speech, particularly from individual or non-commercial speakers, as service providers would demand high fees or bonds to indemnify themselves against the possibility of infringement and liability.

If, on the other hand, law were concerned above all with safeguarding non-infringing use and publication of non-infringing works, it would focus on limiting the false positives, minimizing the lawful users caught by copyright complaints and non-infringing posts mistakenly removed. Such a law might immunize service providers from liability for their users' activity, putting the providers under no obligation to respond to copyright complaints based on user-generated content.[44] It might even convert copyright protection from the current property rule — backed by speech-removing injunction — into a liability rule.[45] Such a regime might offer claimants money damages and possible injunction only after a court found infringement, lest pre-

---

as "overbreadth" (or "overinclusion") and "underinclusion." *See* Kenneth W. Simons, *Overinclusion and Underinclusion: A New Model*, 36 UCLA L. Rev. 447, 510 (1989) (categorizing the due process challenges).

42. *See* Bone, *supra* note 41, at 2124. As Bone notes:

> The expected cost of each type of error depends upon two factors: the frequency of the error and the social cost produced by that type of error. The reason to distinguish between the two different types of error is that they may produce different social costs. Many legal rules reduce the frequency of one type of error only to increase the frequency of the other.

*Id.* Both types of error could be reduced if the process were made more accurate, but not without the addition of resources. *See* Kaplow, *supra* note 37, at 308.

43. *See* Dennis Roddy, *The song remains the same*, PITTSBURGH POST-GAZETTE, Sept. 14, 2003, at B1 (quoting RIAA spokesperson Amy Weiss as saying that "[w]hen you fish with a net, you sometimes are going to catch a few dolphin"), *available at* http://www.post-gazette.com/columnists/20030914edroddy0914p1.asp.

44. *Cf.* 47 U.S.C. § 230 (2006) (immunizing service providers from liability for the non-intellectual property activity of their users).

45. *See generally* Guido Calabresi & A. Douglas Melamed, *Property Rules, Liability Rules, and Inalienability: One View of the Cathedral*, 85 HARV. L. REV. 1089 (1972) (describing liability and property rules as means of protecting entitlements).

liminary takedowns or preliminary injunctions disable access to lawfully-posted material. This would probably lead to more un-chilled posting at the cost of an increase in false negatives — infringing posts that were not quickly remedied.

The DMCA's drafters steered clear of those extremes, but the law's tendency toward erroneous removal predominates over its meager mechanisms for correcting these errors.

## B. Intermediation

The DMCA exacerbates the problems of intermediation inherent to secondary liability, thus presenting a species of principal-agent problem.[46] Because the agent-service provider does not share all the benefits of the principal-poster, the agent lacks a similarly strong incentive to take risks in defending posted material in the face of a complaint. Incentives may be misaligned with social interests.[47]

The service provider is a third-party intermediary on the critical path to online speech.[48] Service providers are imperfect agents for their poster-principals.[49] These intermediaries to online speech likely have different incentives and risk sensitivities from their users, and the additional layer they represent increases information costs. The DMCA plays upon these divergences to suppress speech and deprive the public of positive externalities from speech.

First, interests and incentives differ between poster and service provider. A principal-agent relationship poses challenges because

---

46. In this economic analysis, the principal is the one who wants something posted, while the agent is the one who acts on his behalf to accomplish it. *See* Lewis A. Kornhauser, *An Economic Analysis of the Choice Between Enterprise and Personal Liability for Accidents*, 70 CALIF. L. REV. 1345, 1346 (1982) (distinguishing economic from legal agency). This is a weak agency relationship, as the poster's only lever of control is to pay hosting fees or provide eyeball-worthy content. Note that this is the obverse of the vicarious liability assessment, in which the service provider is implied-in-law to be a principal to its poster-agent if it derives financial benefit from and maintains the "right and ability to supervise" the posted material. *Cf.* Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 545 U.S. 913, 931 (2004); A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004 (9th Cir. 2001).

47. *Cf.* Michel van Eeten & Johannes M. Bauer, *Emerging Threats to Internet Security: Incentives, Externalities and Policy Implications*, 17 J. CONTINGENCIES & CRISIS MGMT., 221, 223 (2009) (suggesting that misalignment of private incentives among users, service providers, and software vendors produces too little investment in online security).

48. *See* Wendy Seltzer, Remarks, *The Politics of Internet Control & Delegated Censorship*, 102 AM. SOC'Y INT'L L. PROC. 45, 45 (2008).

49. In particular, the agency relationship is imperfect because many posters get no binding commitment from their service providers. Terms of service give the service provider the option to terminate the relationship at any time. *See* Sandra Braman & Stephanie Roberts, *Advantage ISP: Terms of Service as Media Law*, 5 NEW MEDIA & SOC'Y 422 (2003). Nonetheless, since the poster needs one or more service providers to be heard, he is stuck with these imperfect agents. See sources cited *infra* note 54 for why the market does not provide better alternatives. On the principal-agent problem, see generally PAUL ROBERT MILGROM & JOHN ROBERTS, ECONOMICS, ORGANIZATION & MANAGEMENT (1992); JOHN WINSOR PRATT & RICHARD ZECKHAUSER, PRINCIPALS AND AGENTS (1985).

each of the parties is motivated by his or her own self-interest, however broadly understood, and the principal-poster can only imperfectly direct the agent-service provider.[50] Naturally, the poster is more invested in his or her speech than is the host, for whom it is but one of many posts. Even if the host is charging the subscriber or reaping advertising revenue from pageviews, the two will at best be sharing the value created.[51] Moreover, copyright law encourages providers to be skeptical of a party who is too willing to pay extra for guarantees — the "financial benefit" attributable to that specific activity might be deemed a trigger for vicarious liability,[52] or advertisement of takedown-resistant services may be seen as inducing infringement.[53] In the current market, a provider might fear that offering takedown-resistant services would lead to adverse selection, concentrating in their subscriber base the knowing, intentional infringers since they would most anticipate needing such services and therefore be willing to pay.[54]

Second, the poster-service-provider relationship is prone to information asymmetries: the poster is in a better position to know the copyright status of her work. While an automated scan may be able to identify a match between posted material and known copyright-claimed works,[55] it cannot determine the relevant *copyright* status of the posted work.[56] What appear at first to be wholesale infringements may in fact be postings authorized by the copyright owner,[57] fairly

---

50. Where the hosting fees are cheap or free, the poster-principal has little leverage apart from threatening to take his business elsewhere, which may even look attractive to the service provider if the poster appears prone to incur liabilities for the service provider.

51. Economists speak of the double marginalization problem — namely, that each party in the vertical production or distribution chain claims separate returns — as a prompt to vertical integration. From a speech perspective, however, we would hardly want to force all would-be speakers to become their own service providers.

52. *See* Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 261–64 (9th Cir. 1996) (finding vicarious liability based on the right and ability to control and financial benefit directly connected to the infringing activity). The DMCA imports the *Fonovisa* standard. *See* 17 U.S.C. § 512(c) (2006) ("A service provider shall not be liable for monetary relief . . . if the service provider . . . does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity . . . .").

53. *See* Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 545 U.S. 913 (2005).

54. *See* MILGROM & ROBERTS, *supra* note 49, at 149; George A. Akerloff, *The Market for "Lemons": Qualitative Uncertainty and the Market Mechanism*, 84 Q. J. ECON. 488 (1970).

55. *See, e.g.*, *Content Management,* YOUTUBE, http://www.youtube.com/t/contentid (last visited Dec. 21, 2010).

56. *See* David Abrams, *More Chilling than the DMCA — Automated Takedowns*, CHILLING EFFECTS (March 17, 2010), http://chillingeffects.org/weather.cgi?WeatherID=634 (describing audio fingerprinting and its use in automated content blocking).

57. *See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment at 39–52, Viacom Inc. v. YouTube, Inc., 540 F. Supp. 2d 461 (S.D.N.Y. 2008) (No. 07 Civ. 2103), *available at* http://www.google.com/press/pdf/20100318_google_viacom_youtube_memorandum.pdf.

used excerpts,[58] or even originals from which the claimant's copy was derived.[59] The poster is in a better position to know the facts behind the posting, but will have difficulty convincing the service provider she is telling the truth. Moreover, the DMCA exacerbates the information problem by encouraging service providers not to look at their users' posted content in advance of a notification lest they acquire "actual knowledge" of infringement (or be sued on that claim).[60] A service provider whose every support call costs money is unlikely to investigate copyright ownership, authorization, or potential fair use defenses to an infringement claim rather than simply pulling the complained-of content or link.

Some scholars — and many in the entertainment publishing industry — argue that service providers should act as copyright gatekeepers, either because they deem the host to share some responsibility for the infringement or, more instrumentally, because hosts are positioned to stop infringing activity more rapidly or cheaply.[61] These analyses focus on the property harms of copyright infringement, and they tend to minimize the public costs — in reduced speech and access — of intermediary enforcement.[62] Yet Fred Yen, who succinctly defines the theory of "enterprise liability" as the view

---

58. *See* Lawrence Lessig, *Update on Warner Music (UPDATED) (AGAIN)*, LESSIG (Apr. 30 2009, 4:15 PM), http://www.lessig.org/blog/2009/04/update_on_warner_music.html; Mike Masnick, *Bogus Copyright Claim Silences Yet Another Larry Lessig YouTube Presentation*, TECHDIRT (Mar. 2, 2010, 4:26 AM), http://www.techdirt.com/articles/20100302/0354498358.shtml.

59. *See Disagreement over License for Scrapbook Designs*, CHILLING EFFECTS (Sept. 10, 2009), https://www.chillingeffects.org/derivative/notice.cgi?NoticeID=28439; *Graphic Designer Gets Cease and Desist from Former Client*, CHILLING EFFECTS (Dec. 16, 2009), http://www.chillingeffects.org/copyright/notice.cgi?NoticeID=31515.

60. The DMCA declares the safe harbor available if, inter alia, the service provider "does not have actual knowledge that the material or an activity using the material on the system or network is infringing." 17 U.S.C. § 512(c)(1)(A)(i) (2006).

61. Jonathan Zittrain describes the "gatekeeping" model, derived from Reinier Kraakman's work, without endorsing it. Jonathan Zittrain, *A History of Online Gatekeeping*, 19 HARV. J. LAW & TECH. 253, 256 (2006) ("Such liability asks intermediaries who provide some form of support to wrongdoing to withhold it, and penalizes them if they do not.") (citing Reinier H. Kraakman, *Gatekeepers: The Anatomy of a Third-Party Enforcement Strategy*, 2 J.L. ECON. & ORG. 53, 53–54 (1986)). "These are intermediaries of various kinds — generally those who carry, host, or index others' content — whose natural business models and corresponding technology architectures have permitted regulators to conscript them to eliminate access to objectionable material or to identify wrongdoers in many instances." *Id.* at 253–54.

62. *See* Niva Elkin-Koren, *Making Technology Visible: Liability of Internet Service Providers for Peer-to-Peer Traffic*, 9 N.Y.U. J. LEGIS. & PUB. POL'Y 15, 25 (2006) ("By enabling high quality copying at negligible cost and facilitating mass distribution of copies at the click of a mouse, digital networks elevated piracy to gigantic proportions. The cost of enforcing copyrights increased immensely . . . ."); Assaf Hamdani, *Who's Liable for Cyberwrongs?*, 87 CORNELL L. REV. 901 (2002); Ronald J. Mann & Seth R. Belzey, *The Promise of Internet Intermediary Liability*, 47 WM. & MARY L. REV. 239, 250 (2005) ("[T]he time has come for the Internet to grow up and for Congress and the businesses that rely on the Internet to accept a mature scheme of regulation that limits the social costs of illegal Internet conduct in the most cost-effective manner.").

that "[e]nterprises that create risk should bear the burden of that risk as a cost of doing business,"[63] concludes that such liability should not be applied to service providers because of First Amendment considerations: "a broad application of enterprise liability may be deeply problematic because enterprise liability easily becomes liability without limit."[64] Instead, "proper interpretation of copyright law leaves plenty of weapons available against the individuals who commit clear copyright infringement without dragging [service providers] into the fray."[65]

### C. The DMCA and the Economics of Speech

To the service provider, the DMCA offers the choice between streamlined self-censorship on the one hand, and, on the other, case-by-case determination of the liability risks and costs of defending against a claim. In the ordinary course, risk aversion prevails, especially when the stake is another party's speech. To the public, potentially valuable speech is lost in the shuffle.

Why does the market fail to correct for this error? Much online speech is non-commercial,[66] and its hosting is free or low-margin, without room for insurance.[67] The costs of potential copyright liabil-

---

63. Alfred C. Yen, *Internet Service Provider Liability for Subscriber Copyright Infringement, Enterprise Liability, and the First Amendment*, 88 GEO. L.J. 1833, 1856 (2000) ("Such cost internalization is more than just fair. It encourages risk creators to take precautions against loss, it provides compensation for victims, and it spreads the costs among all who benefit from the risk-creating activity.").

64. *Id.* at 1856.

65. *Id.* at 1893.

66. *See* AMANDA LENHART ET AL., PEW INTERNET & AM. LIFE PROJECT, SOCIAL MEDIA AND YOUNG ADULTS 2, 20, 23 (2010), http://www.pewinternet.org/~/media//Files/Reports/2010/PIP_Social_Media_and_Young_Adults_Report_Final_with_toplines.pdf (as of September 2009, 73% of online American teens used online social network websites; 86% of teen social network users post comments to friends' pages); AMANDA LENHART ET AL., PEW INTERNET & AM. LIFE PROJECT, CONTENT CREATION ONLINE (2004), http://www.pewinternet.org/~/media//Files/Reports/2004/PIP_Content_Creation_Report.pdf .pdf (finding, in a 2003 survey, that "44% of adult Internet users have used the Internet to publish their thoughts, respond to others, post pictures, share files and otherwise contribute to the explosion of content available online. 21% of Internet users say they have posted photographs to Web sites. 13% of Internet users maintain their own Web sites"); SACHA WUNSCH-VINCENT & GRAHAM VICKERY, DIRECTORATE FOR SCI., TECH. & INDUS., OECD, PARTICIPATIVE WEB AND USER-CREATED CONTENT: WEB 2.0, WIKIS AND SOCIAL NETWORKING (2007), http://www.oecd.org/dataoecd/57/14/38393115.pdf.

67. Many popular web hosting service are free to the end-user. *See* Jean-Samuel Beuscart & Kevin Mellet, *Business Models of the Web 2.0: Advertising or the Tale of Two Stories* COMM. & STRATEGIES (SPECIAL ISSUE), November 2008, at 165, *available at* http://ssrn.com/abstract=1374448 (characterizing these services as multi-sided platforms, often selling user traffic to advertisers.). According to Alexa, six of the ten websites with the largest audiences are Web 2.0 sites that permit users to post content at no charge: Facebook.com (2), Youtube.com (3), Blogger.com (7), Wikipedia.com (8), QQ.com (9), and Twitter.com (10). *See Top Sites*, ALEXA, http://www.alexa.com/topsites (last visited Dec. 21, 2010).

ity — statutory damages of $750 to $150,000 per work infringed or higher actual damages[68] — might be more than a service provider is comfortable letting a customer indemnify it against, even if the customer were inclined to purchase "takedown-proof" hosting to support a tolerance for risk higher than the host's.

Moreover, the public benefit from access to speech is an externality or "spillover" whose value is generally not captured by the speaker, nor, therefore, by the hosting costs a speaker is willing to pay.[69] Criticisms and parodies benefit the public, providing value both to their direct readers and to those whose democratic society is shaped for the better as a result of such dialogue.[70] The public at large has no good way to pay into the system to support these speech-derived benefits,[71] but we could subsidize such benefits broadly by diminishing the risks and costs of speech.[72]

Prior to the DMCA, each participant in the chain could at least make independent decisions about copyright compliance and liability risk. The poster might post because she was confident of her legal right or self-censor because of uncertainty or fear of liability; the service provider might make both initial entry decisions (whether to join this market) and subsequent decisions (whether to learn about customer behavior, take down or ignore upon notice); and the copyright claimant might evaluate the copyright claims against antagonists, costs of asserting claims, and risks of wrongful assertion. The poster was, of course, dependent on one or more service providers to allow him to post, link to, or access content, unless he was large enough to

---

68. 17 U.S.C. § 504(c) (2006) (permitting the copyright owner to seek statutory damages of $750 to $30,000 per work infringed, increasing up to $150,000 in cases of willful infringement).

69. *See* Brett M. Frischmann, *Speech, Spillovers, and the First Amendment*, 2008 U. CHI. LEGAL F. 301, 301–02; Brett M. Frischmann & Mark A. Lemley, *Spillovers*, 107 COLUM. L. REV. 257, 258 (2007). Rather than decrying uncaptured external benefits, Frischmann and Lemley celebrate technological spillovers for leaving social value for others to innovate upon. The same is true in the cultural space, where we would not want to see an economic accounting precede every conversation (and stop many).

I am not contending that all speech is valuable. Hate speech and defamation have negative externalities. *See* Danielle Keats Citron & Helen Norton, *Intermediaries and Hate Speech: Fostering Digital Citizenship for the Information Age*, 91 B.U. L. REV. (forthcoming July 2011). On balance, as the First Amendment recognizes, an open speech environment produces more public benefit than the alternative.

70. *See* Jack M. Balkin, *Digital Speech and Democratic Culture: A Theory of Freedom of Expression for the Information Society*, 79 N.Y.U. L. REV. 1, 4–5 (2004); Yochai Benkler, *Free as the Air to Common Use: First Amendment Constraints on Enclosure of the Public Domain*, 74 N.Y.U. L. REV. 354, 356–58 (1999); Neil Weinstock Netanel, *Copyright and a Democratic Civil Society*, 106 YALE L.J. 283, 288–89, 385–86 (1996).

71. Advertisements, micropayments, and tip jars notwithstanding, most of us do not pay for a great deal of the online speech we read and watch.

72. *See* MILGROM & ROBERTS, *supra* note 49, at 145 (describing the public goods problem); Frischmann, *supra* note 69, at 301 (describing subsidies, taxes, and direct payments among the options for compensating externalities).

operate his own backbone peering connection. Concerns of copyright secondary liability were only beginning to hit the mainstream.

Post-DMCA, we see the parties' decision-making processes realigned. While the poster faces a similar choice at posting time, the service provider sees a new set of decision points. At startup, the effect may be positive: the potential service provider may be emboldened by the opportunity of the safe-harbor provisions to offer services that would seem too risky if not for the clearly delineated procedures for avoiding liability.[73] Thus, the new service provider is likely to register a DMCA agent and institute the policies required by § 512(i). On an ongoing basis, however, this preparation invites § 512(c)(3) takedown notices, which put the service provider on notice and compel the "expeditious response" described in § 512(c)(1)(C). Building the system invites its use. The DMCA does not force service providers to avail themselves of its harbor, but shapes their risk assessment so that almost all do, even in cases where, objectively, no harbor appears necessary.

The safe-harbor and takedown regime, moreover, is not even-handed. It distorts the speech environment by excessively removing challenged speech.[74] On balance, this set of incentives produces a blander information space without reducing infringement. The so-called pirates, interested in sharing popular mass-media, will always be able to exploit darknet economies — with so many motivated mice, a few will always remain out of the cat's reach.[75] The posters of non-mass content, by contrast, will be stymied, tripped up by administrative costs and barred from reposting by "repeat infringers" provi-

---

73. Fred von Lohmann argues that the DMCA has had a positive impact in this regard, pointing to the explosion of user-generated content sites launched post-1998, such as You-Tube, Flickr, Blogger, and Vimeo. Von Lohmann argues that sites were able to obtain clearance to launch and attract investment because the DMCA gave them a straightforward way to assert their lawfulness without pre-screening every post against a potentially infinite pool of sources it might infringe. Fred von Lohmann, Senior Staff Attorney, Elec. Frontier Found., Lecture at the University of Colorado Silicon Flatirons: Digital Copyright and Innovation Online: A Little Dose of Optimism (Oct. 13, 2009). We lack the benefit of a controlled experiment, however. If the DMCA's safe-harbor opportunities had not been available at the same point in time, similar sites might have launched nonetheless, asserting they bore no liability as mere carriers of user-posted content. Google Book Search, for example, was launched on generic claims of fair use, but is currently being reshaped by a class action lawsuit and settlement proposal. *See* James Grimmelmann, *D Is for Digitize: An Introduction*, 55 N.Y.L. SCH. L. REV. 11 (2010).

74. This ability to remove content with mere notice makes the DMCA like a forbidden "heckler's veto," whereby anyone who dislikes speech can make it more costly to host. *Cf.* Reno v. ACLU, 521 U.S. 844, 880 (1997) (invalidating the Communications Decency Act, because, among other reasons, the requirement not to communicate indecent speech to "specific persons" "would confer broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of indecent speech").

75. *See* Fred von Lohmann, *Measuring the DMCA Against the Darknet: Implications for the Regulation of Technological Protection Measures*, 24 LOY. L.A. ENT. L. REV. 635, 636–40 (2004).

sions.[76] This means that copies of *The Dark Knight* will spread more easily than transformative commentary on it, and *Saturday Night Live* skits will be more widely available than parodies (or political advertisements) that build upon them.[77] The consequence is a vicious circle, whereby the continued presence of infringing materials increases demand for harsher enforcement, which further increases the costs of hosting challenged material, yet fails to stop the infringement. The tax of DMCA takedowns distorts the speech environment, biasing it against a particular kind of "troublesome" speech.

## III. First Amendment Problems

### A. Copyright and the First Amendment

Describing the "paradox" of copyright's speech regulation in 1970, Professor Melville Nimmer concluded that the conflict between copyright and the First Amendment was more apparent than real.[78] Instead, copyright's "definitional balance," the idea-expression dichotomy, provided sufficient breathing room for free expression.[79] Speakers were properly outside of copyright when they appropriated others' *ideas*, while they could make few First Amendment-relevant claims to merit direct copying of others' *expressions*.[80] Following Nimmer's lead, courts have regularly used the idea-expression dichotomy and copyright's fair use exceptions to explain away First Amendment concerns.[81]

*Harper & Row v. Nation Enterprises* turned on an unusual set of facts: *Time Magazine* had purchased the first publication rights to excerpts from former President Gerald Ford's memoirs and was preparing for its quote-filled article to appear a week before the book's

---

76. *See* 17 U.S.C. § 512(i) (2006) (requiring that a service provider have "adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of . . . repeat infringers" for the safe harbor to apply). Copyright challenges may exaggerate the speech inequalities described by Neil Weinstock Netanel. *See* Neil Weinstock Netanel, *Market Hierarchy and Copyright in Our System of Free Expression,* 53 Vand. L. Rev. 1879, 1899 (2000) ("Copyright fosters speech hierarchy."). The popular get more popular, while the marginal are marginalized further.

77. More technically, we might say that the elasticity of supply of mass-interest works is less than that of niche works, so that original ideas are more likely to be squeezed out by higher risks and costs. *Cf.* Richard A. Posner, *Free Speech in an Economic Perspective*, 20 Suffolk U. L. Rev. 1, 20 (1986) (suggesting that speech taxes or tax-equivalent burdens would drive out the "marginal producer of ideas — as the producer of a new idea will often be").

78. Melville B. Nimmer, *Does Copyright Abridge the First Amendment Guarantees of Free Speech and Press?*, 17 UCLA L. Rev. 1180, 1180–81 (1970).

79. *Id.* at 1190.

80. *Id.*

81. *See* Eldred v. Ashcroft, 537 U.S. 186, 215 (2003); Harper & Row v. Nation Enters., 471 U.S. 539, 560 (1985); Zacchini v. Scripps-Howard Broad. Co., 433 U.S. 562, 577 (1977).

188           *Harvard Journal of Law & Technology*           [Vol. 24

publication when *The Nation*, operating from a purloined manuscript, scooped it. *The Nation*'s 2250-word article quoted 300 to 400 words from the memoir in which Ford described Nixon's resignation and his pardon. *Time* canceled its article and refused to pay the balance it owed to Harper & Row.[82]

Sued for copyright infringement, *The Nation* argued that its use was fair news reporting: "not only the facts contained in Mr. Ford's memoirs, but 'the precise manner in which [he] expressed himself [were] as newsworthy as what he had to say.'"[83]

The Court did not agree. Finding that a "public concern" exception could swallow copyright for public figures' accounts of noteworthy events, the Court fell back upon the bulwark of the idea-expression dichotomy:

> In view of the First Amendment protections already embodied in the Copyright Act's distinction between copyrightable expression and uncopyrightable facts and ideas, and the latitude for scholarship and comment traditionally afforded by fair use, we see no warrant for expanding the doctrine of fair use to create what amounts to a public figure exception to copyright.[84]

*Harper & Row* did not warrant so broad a dictate. The First Amendment issues were not paramount in the case. *Time* and *Harper & Row* were both planning publication, so *The Nation*'s action advanced release of the "news" of Ford's description of events by only a few weeks. The case does not reveal any urgent political debate to which the early release contributed, nor any time-sensitive commentary that *The Nation* could provide only with early quotes. At the same time, *The Nation*'s publication effectively substituted for *Time*'s, sapping the value from the first publication rights Ford's publisher had sold.

Thus, presented with what seemed a minor impingement upon speech but a blow to copyright, the Court acted to preserve copyright. But while the Court's response might have fit the particular circumstances of this case, its broad terms, and its characterization of copyright as "the engine of free expression"[85] led future courts to see copyright as practically immune from First Amendment scrutiny.

Yet even Nimmer was not certain that proper definitions of idea and expression could balance away all expressive interest in copy-

---

82. *Harper & Row*, 471 U.S. at 539.
83. *Id.* at 556.
84. *Id.* at 560.
85. *Id.* at 589.

ing,[86] and since 1970, the countervailing interests have grown. As copyright's expansion and extension put increasing pressure on the fulcrum, scholars have returned to the question and found more substantial conflict.[87] The Court has not yet done so, holding in *Eldred v. Ashcroft* that the definitional balance and the safeguard of fair use protections still sufficed to save term extensions from First Amendment overreach. "[W]hen . . . Congress has not altered the traditional contours of copyright protection, further First Amendment scrutiny is unnecessary."[88]

This debate has tended to focus on the law as properly applied: whether a careful interpretation of the idea-expression dichotomy and proper application of the fair use doctrine prevents copyright from encroaching on the domain of free speech. This is not the only question that must be asked, however. Often, the law is interpreted without this due care, sometimes by individuals censoring themselves to avoid crossing the line, sometimes by claimants mistaken or overeager about their rights, sometimes by courts, and frequently by service providers responding to takedown notices. As I describe in Part IV, *infra*, these errors are all too frequent in the context of online takedown demands. Because copyright's subject matter is speech, the effect of copyright errors silencing protected speech is of constitutional concern.[89]

---

86. Nimmer felt that for news photographs, leeway for the copying of ideas alone did not satisfy the First Amendment balance: "No amount of words describing the 'idea' of the [My Lai] massacre could substitute for the public insight gained through the photographs . . . . It would be intolerable if the public's comprehension of the full meaning of My Lai could be censored by the copyright owner of the photographs." 4-19E Nimmer on Copyright § 19E.03. In today's multimedia environment, Nimmer's nugget of concern takes on greater importance. When news is made in televised speeches, one who wants to comment or criticize needs the immediacy of the footage. Online, one may often link to materials, but also want to save copies in case the originally linked version changes. One may need the original, as in the *Diebold* case discussed below, for its proof of authenticity, not its creative expression.

87. *See* Jack M. Balkin, *Digital Speech and Democratic Culture: A Theory of Freedom of Expression for the Information Society*, 79 N.Y.U. L. Rᴇᴠ. 1, 3 (2004); Mark A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions in Intellectual Property Cases*, 48 Dᴜᴋᴇ L.J. 147, 150–51 (1998); Neil Weinstock Netanel, *Locating Copyright Within the First Amendment Skein*, 54 Sᴛᴀɴ. L. Rᴇᴠ. 1, 2–4, 85–86 (2001); Rebecca Tushnet, *Copy this Essay: How Fair Use Doctrine Harms Free Speech and How Copying Serves It*, 114 Yᴀʟᴇ L.J. 535, 538, 587–90 (2004). Courts' inattention to First Amendment issues is "unfortunate, because most intellectual property rules — copyright law, trademark law, right of publicity law, and trade secret law — are speech restrictions: They keep people from publishing, producing, and performing the speech that they want to publish, produce, and perform." Eugene Volokh, *Freedom of Speech and Intellectual Property: Some Thoughts After Eldred,* 44 Liquormart, *and* Bartnicki, 40 Hᴏᴜs. L. Rᴇᴠ. 697, 698 (2003).

88. Eldred v. Ashcroft, 537 U.S. 186, 215, 221 (2003).

89. There is some speech on the other side of the balance as well, on the argument that copyright's "engine of free expression" depends on the ability to stop infringement, so erroneous underblocking is also speech-impairing. I suggest that this interest is more attenuated, particularly in cases of quotation and derivative work as distinct from wholesale appropriation.

Recent scholarship, drawing upon the wealth of expression fostered by the combination of cheap, powerful multimedia creation and fast connectivity, has pushed the First Amendment envelope even further.[90] Rebecca Tushnet argues for "copying as free speech," arguing that fair use "transformation" is not necessary to make copying socially valuable.[91]

### B. Prior Restraints on Speech

The takedowns resulting from DMCA notifications bear many of the hallmarks of prior restraints on speech[92]: they are imposed to limit speech before any adjudication on the merits of the copyright claims. While takedowns are effected by private actors, service providers are acting "in the shadow of the law,"[93] motivated by the state action that established copyright liability and the DMCA. Government cannot insulate itself from responsibility for this abridgment of free speech by routing its influence through third-party service providers.

"Any system of prior restraints of expression comes to [the] Court bearing a heavy presumption against its constitutional validity."[94] "If it can be said that a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it at least for the time."[95] The prior restraint doctrine's greatest utility is as a bright line, keeping questions of administrative pre-clearance of speech off the table rather than entertaining case-by-case judgments of the restraints' utility.[96] Thus, a libelous or obscene publication may not be enjoined before publication, and only after heightened scrutiny may its publisher be made to pay after-the-fact damages. As Mark Lemley and Eugene Volokh have noted, it is already difficult to square the presumption of

---

90. *See* YOCHAI BENKLER, THE WEALTH OF NETWORKS (2006); JAMES BOYLE, THE PUBLIC DOMAIN (2008); LAWRENCE LESSIG, REMIX (2008) (advancing a view of "Read-Write" culture); Julie E. Cohen, *The Place of the User in Copyright Law*, 74 FORDHAM L. REV. 347, 370 (2005) (describing the "situated user [who] appropriates cultural goods . . . [for] consumption, communication, self-development, and creative play"); William W. Fisher, *Property and Contract on the Internet*, 73 CHI. KENT L. REV. 1203, 1217–18 (1998) (describing "semiotic democracy"); Jennifer Rothman, *Liberating Copyright: Thinking Beyond Free Speech*, 95 CORNELL L.REV. 463 (2010) (identifying a "liberty interest" in copying beyond First Amendment analysis).

91. Tushnet, *supra* note 87, at 540, 562.

92. *See, e.g.*, Near v. Minnesota, 283 U.S. 697, 736, 738 (1931) (invalidating a statute that provided for injunction of a "malicious, scandalous and defamatory" periodical as an unconstitutional restraint on publication).

93. *C.f.* Robert H. Mnookin & Lewis Kornhauser, *Bargaining in the Shadow of the Law: The Case of Divorce*, 88 YALE L.J. 950 (1979).

94. Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963).

95. Neb. Press Ass'n v. Stuart, 427 U.S. 539, 559 (1976).

96. *See* Emerson, *supra* note 29, at 648 ("[T]he doctrine of prior restraint is, in some important respects, more precise in its application than most of the other concepts that have developed out of the First Amendment.").

"irreparable harm" and frequent issuance of preliminary injunctions in copyright cases with this doctrine.[97]

In his early and influential review of prior restraint doctrine, Thomas Emerson outlined the key characteristics distinguishing prior restraint from subsequent punishment: (1) breadth, (2) timing and delay, (3) propensity toward adverse decision, (4) limited procedure, (5) limited opportunity for public appraisal and criticism, (6) the "dynamics of prior restraint," (7) certainty and risk, and (8) effectiveness.[98] These elements contribute to prior restraint's particular threat to free expression. The DMCA notice-and-takedown regime exhibits similar flaws: (1) Overbreadth: facially conformant but erroneous notices routinely prompt takedown; any posted content is potentially susceptible. (2) Delay: the ten-to-fourteen-business-day takedown can be timed strategically, to remove speech at the time of greatest impact to an ongoing debate. (3) Nearly all general-purpose providers take down content almost automatically upon receipt of a conformant notice. (4) The poster generally receives no notice or opportunity to respond until after content is taken down, and may receive few specifics even then; the only opportunity to contest is through counter-notice, which is biased against the poster, or in court. (5) Private actions are even less open to public appraisal than those of government censors; the indirect nature of the regulation diverts criticism.[99] (6) The posting of information regarding DMCA agents and procedures invites their use.[100] (7) The risk involved with filing a counter-notification is made to appear greater than the risk of initial posting. (8) On a case-by-case basis, the takedown scheme is effective. Almost every instance targeted by a notification is removed, and yet, in gross, the system fails to stop infringement of mass content because more targets re-appear from new sources.[101]

Prior restraint doctrine thus inclines us toward procedural safeguards for speech as a curb on administrative censorial discretion, as a motive to get more speech to the "marketplace of ideas," and as a pro-

---

97. Lemley & Volokh, *supra* note 87, at 150. The limitation on preliminary injunctions in patent cases, announced in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), has only begun to erode the presumption of injunctive relief in copyright cases.

98. Emerson, *supra* note 29, at 656–59.

99. *See* LAWRENCE LESSIG, CODE AND OTHER LAWS OF CYBERSPACE 95–98 (2000).

100. *Cf.* John C. Jeffries, Jr., *Rethinking Prior Restraint,* 92 YALE L.J. 409, 422 (1982) ("[A]dministrative preclearance requires a bureaucracy of censorship . . . . [T]here are powerful institutional pressures to justify one's job, and ultimately one's own importance, by exaggerating the evils which suppression seeks to avoid.").

101. *See* von Lohmann*, supra* note 75. For one recent example, a Google search for "Avatar movie download" returns pointers to Fox DMCA takedowns listing more than 3,000 distinct URLs. *See Fox DMCA (Copyright) Complaint to Google*, CHILLING EFFECTS (Jan. 4, 2010), http://www.chillingeffects.org/notice.cgi?sID=17619. It nonetheless remains possible to find the film for unauthorized download.

tection, even if incomplete, from the chill.[102] In particular, it focuses us on what Jeffries terms the "institutional structure" of speech law,[103] or what Lessig calls "architecture."[104] Monaghan identifies in the Supreme Court case law a "First Amendment due process," requiring judicial determination before speech is restrained.[105] "[F]irst [A]mendment rights are fragile and can be destroyed by insensitive procedures; in order to completely fulfill the promise of those cases, courts must thoroughly evaluate every aspect of the procedural system which protects those rights."[106]

Some commentators have expressed skepticism about the prior restraint doctrine's cohesion, or prior restraint's distinction from subsequent punishment.[107] Some argue that subsequent punishment is a more severe restriction on speech than prior restraint, because the would-be speaker loses his opportunity to test his speech before facing criminal sanctions.[108] If an injunction is less painful than a jail term, then a speaker might prefer that a court enjoin him. The First Amendment, therefore, ought to be as concerned with the self-censorship that subsequent punishment induces as it is with the censorship of prior restraint.

This Article need not choose between these positions because the DMCA procedure provides the worst of both. To the poster, the service provider's summary takedown looks like an injunction, but without even the benefit of judicial review. At least a temporary restraining order or preliminary injunction requires a court hearing; DMCA takedowns might get only the review of an overworked paralegal. Unless the poster intervenes with a trip to court, expressive ma-

---

102. *See* Henry P. Monaghan, *First Amendment "Due Process,"* 83 HARV. L. REV. 518, 519 (1969) ("Like the substantive rules themselves, insensitive procedures can 'chill' the right of free expression."); Martin H. Redish, *The Proper Role of the Prior Restraint Doctrine in First Amendment Theory*, 70 VA. L. REV. 53, 58 (1984).

103. *See* Jeffries, *supra* note 100, at 422.

104. Lawrence Lessig, Address at www9: Cyberspace's Architectural Constitution (June 12, 2010), *available at* http://cyber.law.harvard.edu/works/lessig/www9.pdf.

105. *See* Monaghan, *supra* note 102, at 520–22.

106. *Id.* at 551.

107. *See, e.g.*, OWEN M. FISS, LIBERALISM DIVIDED: FREEDOM OF SPEECH AND THE MANY USES OF STATE POWER, 136 (1996) ("The prior restraint doctrine . . . should not be seen as a full or coherent expression of free speech values, but rather as a strategic device capable of effectuating a compromise, the chief value of which is negative — to block a decision against speech."); Stephen R. Barnett, *The Puzzle of Prior Restraints*, 29 STAN. L. REV. 539, 558–60 (1977) (challenging the presumption that prior restraint is more chilling than threat of subsequent punishment); Jeffries, *supra* note 100, at 425 (focusing attention on "the structure of [the law's] administration"); William T. Mayton, *Toward a Theory of First Amendment Process: Injunctions of Speech, Subsequent Punishment, and the Costs of the Prior Restraint Doctrine*, 67 CORNELL L. REV. 245, 245–46 (1982); Martin Scordato, *Distinction Without a Difference: A Reappraisal of the Doctrine of Prior Restraint*, 68 N.C. L. REV. 1 (1989).

108. *See* Ariel L. Bendor, *Prior Restraint, Incommensurability, and the Constitutionalism of Means*, 68 FORDHAM L. REV. 289 (1999); Steven Alan Childress, *The Empty Concept of Self-Censorship*, 70 TUL. L. REV. 1969 (1996); Redish, *supra* note 102, at 71.

terial will be offline or inaccessible for a minimum of ten business days even under the best of counter-notification circumstances. More-over, takedown fails to ensure that the poster will not be sued for in-fringement, because the protective aspects of the safe harbor apply only to the service provider.

Many of these problems arise from the interaction of law and the incentives of the actors. While the DMCA does not force service pro-viders to avail themselves of its harbor, it does shape their risk as-sessment. As a result, almost all service providers take advantage of the safe harbor, even in cases where objectively no harbor appears necessary. The DMCA is at least partially to blame for this inclination on the part of service providers to take advantage of the safe harbor.[109]

Even if the DMCA and secondary copyright liability cannot be invalidated as a classic prior restraint, many of the reasons for disfa-voring prior restraints apply here as well. The DMCA deprives the public of both access to speech that would ultimately be ruled lawful and the judicial certainty that would come from earlier adjudication of many of these disputes. As an interim solution, the public might even prefer a brief, less formal adjudication.[110]

### C. Understanding Chilling Effects

First Amendment law accounts for the likelihood of error in the law's assessment or application through a "chilling effects" analy-sis.[111] The law prohibits states from imposing liability without fault for defamation not because it favors falsehoods, but because it embod-ies the concern that a stricter rule would inhibit truthful reporting. Even when the core of a law's prohibition is unquestionably unpro-tected speech, the chilling effects on protected speech around its edges may give significant reason for invalidating or reining it in further.

As Frederick Schauer explains, the "chilling effect" doctrine de-rives from recognition that the legal process is uncertain and that the First Amendment expresses a preference for errors in favor of speech rather than those that restrict it.[112] "The doctrine flows from the rela-tionship between our recognition of the inevitability of error and our preference for a particular type of error; and it is the existence of this

---

109. The threat of secondary liability underlying the DMCA's effect on the behavior of service providers is not poised to change. The current Court seems unlikely to invalidate secondary liability on First Amendment grounds, given that it has approved more direct governmental pressure on speech, such as government-funded viewpoint control, see *Rust v. Sullivan*, 500 U.S. 173 (1991), and the government-funded censorship of library Internet access, see *United States v. American Library Ass'n*, 539 U.S. 194 (2003).

110. *Cf.* Mark A. Lemley & R. Anthony Reese, *A Quick and Inexpensive System for Re-solving Peer-to-Peer Copyright Disputes*, 29 CARDOZO ARTS & ENT. L.J. 1 (2005) (propos-ing informal adjudication in the context of peer-to-peer infringement cases).

111. *See* Schauer, *supra* note 39.

112. Schauer, *supra* note 39, at 689.

*Harvard Journal of Law & Technology* [Vol. 24

relationship . . . [that] justifies the formulation of substantive rules in this area."[113]

Typically, the chilling effect doctrine is concerned with excessive promotion of self-censorship. An individual may refrain from speech that the law does not intend to target because of fear that the law will adversely affect him. He may do so for several reasons — first, because he fears that he will be found liable though he has done no wrong; second, because he anticipates the cost of defense will be high, even if he trusts the result will ultimately be correct; and third, because he doubts the absolute correctness of his position and he faces high costs if he is found to be incorrect. The law's chilling effect on an individual is thus a function of the likelihood of erroneous enforcement, the costs of litigation, and the magnitude of the harm from punishment.

The chilling effect doctrine has formed part of the Court's analysis against many speech-affecting laws, particularly those challenged for vagueness, overbreadth, and improper burden-shifting. The Court first used the term "chilling effect" in the 1965 case *Dombrowski v. Pfister*, where the concern for "chill" was invoked against an overbroad "subversive activities" law:

> Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights. For free expression — of transcendent value to all society, and not merely to those exercising their rights — might be the loser. . . . By permitting determination of the invalidity of these statutes without regard to the permissibility of some regulation on the facts of particular cases, we have, in effect, avoided making vindication of freedom of expression await the outcome of protracted litigation. Moreover, we have not thought that the improbability of successful prosecution makes the case different. The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure.[114]

Schauer traces the doctrine's origins back to the 1958 case *Speiser v. Randall*,[115] which threw out a requirement that veterans take a loyalty oath in order to receive benefits because it unfairly shifted the burden

---

113. *Id.*
114. 380 U.S. 479, 486–87 (1965) (internal citations omitted).
115. 357 U.S. 513 (1958).

to speakers to justify the lawfulness of their speech.[116] The doctrine recognizes that one cannot be assured that her rights will be vindicated cheaply and quickly by accurate courts:

> There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. . . . Where the transcendent value of speech is involved, due process certainly requires in the circumstances of this case that the State bear the burden of persuasion to show that the appellants engaged in criminal speech.
>
> The vice of the present procedure is that, where particular speech falls close to the line separating the lawful and the unlawful, the possibility of mistaken factfinding — inherent in all litigation — will create the danger that the legitimate utterance will be penalized. The man who knows that he must bring forth proof and persuade another of the lawfulness of his conduct necessarily must steer far wider of the unlawful zone than if the State must bear these burdens. This is especially to be feared when the complexity of the proofs and the generality of the standards applied provide but shifting sands on which the litigant must maintain his position. How can a claimant whose declaration is rejected possibly sustain the burden of proving the negative of these complex factual elements? In practical operation, therefore, this procedural device must necessarily produce a result which the State could not command directly. It can only result in a deterrence of speech which the Constitution makes free.[117]

The Court picks up the concern with both errors and burden-shifting in *New York Times v. Sullivan* by rejecting a libel standard in which the defendant must prove truth:

> A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions — and to do so on pain of libel judgments virtually unlimited in amount — leads to a . . . "self-censorship." Allowance of the defense of truth, with the burden of

---

116. *See* Schauer, *supra* note 39 at 701.
117. 357 U.S. 513, 525–26 (1958) (internal citations omitted).

proving it on the defendant, does not mean that only false speech will be deterred.[118]

In defamation cases, therefore, courts accept the risk of unpunished falsehood. "[E]rroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.'"[119] The false positive of lawful (truthful) speech deterred is worse than the false negative of some erroneous statements remaining unpunished.

Beyond its specific concern with error costs, the Court's "chilling effect" analysis recognizes that the architecture of law can be blamed for its effect on parties beyond the courtroom and the four corners of a statute. The First Amendment places strict limits on those effects, whether direct or incidental. Laurence Tribe compares modern law to the "observer effect" in quantum physics.[120] The presence of background legal doctrine, like the presence of the observer of a quantum particle, changes activity. In cases such as *Sullivan v. New York Times*, *NAACP v. Claiborne Hardware Co.*, and *Hustler Magazine v. Falwell*:

> [T]he Supreme Court held that first amendment principles were violated not by some state official's act of censorship but by the overall shape of the state's body of judge-made rules for awarding damages to people allegedly injured by speeches or publications. . . . [T]he Supreme Court's entire development of the "chilling effect" doctrine over the past several decades . . . reflects a judicial recognition that widespread private behavior, in the form of self-censorship, can be directly traceable not only to particular enforcement actions by specific state officials

---

118. 376 U.S. 254, 279 (1964) (internal citations omitted). The *Sullivan* Court went on to note:

> The fear of damage awards under a rule such as that invoked by the Alabama courts here may be markedly more inhibiting than the fear of prosecution under a criminal statute. . . . Whether or not a newspaper can survive a succession of such judgments, the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive.

*Id.* at 277–78.

119. *Id.* at 271–72 (internal citations omitted, second omission in original); *see also* Gertz v. Robert Welch, 418 U.S. 323, 341 (1974) ("The First Amendment requires that we protect some falsehood in order to protect speech that matters.").

120. Laurence H. Tribe, *The Curvature of Constitutional Space: What Lawyers Can Learn from Modern Physics*, 103 HARV. L. REV. 1 (1989).

> but to the very existence of a set of rules or lines that
> the state stands ready to enforce or to draw.[121]

The intermediation of the service provider, by providing another subject of potential chill, adds to the First Amendment impact of the DMCA.

### D. Chill, Intermediated

As Seth Kreimer says, "The [Supreme] Court was well aware that the coercive effect of indirect sanctions is magnified when deployed against intermediaries who transmit the work of others."[122] Kreimer traces modern First Amendment jurisprudence concerning intermediaries to the McCarthy Era, during which the Court reacted against indirect blacklisting.[123] When the House Un-American Activities Committee publicized lists of "communist sympathizers," it expected and encouraged private actors to fire or shun the "Reds."[124] In the late 1950s and 1960s, the Court held the government accountable for these indirect effects:

> [T]he Court rejected the proposition that the First Amendment constrained only official efforts to criminally punish protected speech and association. Against the backdrop of the indirect sanctions of the McCarthy era, the Court recognized the potentially drastic effects of indirect gambits directed to vulnerable pressure points, and declared that First Amendment freedoms "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference."[125]

Based on its experience with McCarthyism's "subtle governmental interference," the Supreme Court focused its attention on self-censorship, the pressures on intermediaries, and the potential inability of those harmed to bring suit.[126] In response, the Court developed protective doctrines, including proscriptions against overbroad legislation for its "chilling effect" on protected speech and pockets of immunity for truthful expression.[127] The Court broadened its view of First

---

121. *Id.* at 26.
122. Seth F. Kreimer, *Censorship by Proxy: The First Amendment, Internet Intermediaries, and the Problem of the Weakest Link*, 155 U. PA. L. REV. 11, 50 (2006).
123. *Id.* at 44.
124. *See id.* at 44–46.
125. *Id.* at 47 (quoting Bates v. City of Little Rock, 361 U.S. 516, 523 (1960)).
126. *Id.*
127. *Id.* at 47–48.

Amendment standing in order to enable hardier litigants such as associations to step in for weaker individuals.[128] Those safeguards are necessary today against commercially-motivated or malicious interference with expression.

Kreimer follows this thread of judicial concern with *intermediated* government action through defamation, obscenity, and broadcast indecency cases.[129] Throughout these cases, the Court raises the concern that because an intermediary bears the costs of investigating complaints, and its benefit from an individual item may be slight, it will be more averse to risk than the end-producer, viewer, or reader.[130] Thus, the defamation rule of *New York Times v. Sullivan* protects publishers, in order to give room to their speakers.[131] By easing some of publishers' investigative burden and cost-based concerns, the "actual malice" standard enables them to make their presses available to "host" advertisers' speech, such as the "Heed Their Rising Voices" solicitation for Martin Luther King Jr.'s civil rights defense at issue in *New York Times*.[132]

Again in obscenity law, the Court saw intermediaries making arguments on behalf of authors who needed publishers and bookstores through which to speak. "The *Bantam Books* Court observed that orders directed to intermediary distributors had the effect of suppressing the books of publishers who depended on those intermediaries to convey their books to the public"[133] and structurally deterring individuals from challenging the law: "The distributor who is prevented from selling a few titles is not likely to sustain sufficient economic injury to induce him to seek judicial vindication of his rights."[134]

This thread continues through recent cases regarding election speech and financing. In *McConnell v. FEC*, Justice Scalia focuses most directly on intermediation and the role of money in securing intermediaries' services necessary to speech:

---

128. *Id.* at 51. Kreimer went on to note:

> The McCarthy era warped the political culture of the United States by raising the risks of political action. . . . In response to this experience, a cluster of First Amendment doctrines evolved to bar legal mechanisms particularly likely to deter the less committed from political speech and association. These doctrinal structures established safe harbors in which unheroic citizens could still feel free to participate in discourse, to associate, and to facilitate the discourse of others.

*Id.* at 79–80.

129. Kreimer, *supra* note 122.

130. *Id.* at 50–55.

131. *Id.* at 54 (discussing New York Times v. Sullivan, 376 U.S. 254 (1964)).

132. *See Sullivan*, 376 U.S. at 256–57 (1964). The advertisement itself is available from the National Archives, at http://arcweb.archives.gov/arc/action/ExternalDOSearch?searchExpression=2641477.

133. Kreimer*, supra* note 122, at 53.

134. Bantam Books v. Sullivan, 372 U.S. 58, 64 n.6 (1963) (internal citations omitted) (permitting a publisher to challenge a state Morality Commission's advisory to bookstores that that some of the publisher's books were objectionable).

> In any economy operated on even the most rudimentary principles of division of labor, effective public communication requires the speaker to make use of the services of others. An author may write a novel, but he will seldom publish and distribute it himself. A freelance reporter may write a story, but he will rarely edit, print, and deliver it to subscribers. To a government bent on suppressing speech . . . this mode of organization presents opportunities: Control any cog in the machine, and you can halt the whole apparatus. License printers, and it matters little whether authors are still free to write. Restrict the sale of books, and it matters little who prints them. Predictably, repressive regimes have exploited these principles by attacking all levels of the production and dissemination of ideas.[135]

Transposed to the Internet, this same concern applies with great force to "Internet sources, such as blogs and social networking Web sites, [that] will provide citizens with significant information about political candidates and issues"[136] as well as education and entertainment.

Kreimer concludes that Internet "censorship by proxy" is similar to — and equally troubling as — this earlier pressure on intermediaries:

> Analysis of efforts by the government to target weak links in Internet chains of communication thus takes place against the background of the long-standing position, rooted in the lessons of the McCarthy era, that "subtle interferences" and efforts to dissuade transmission by intermediaries constitute cognizable dangers to free expression, no less than threats of direct prosecution of speakers or listeners. The fact that these efforts enlist the cooperation of private parties makes them more, rather than less, dangerous in comparison to direct regulation. Private discretion is often less visible and less procedurally regular than public sanction.[137]

---

135. 540 U.S. 93, 251 (2003) (Scalia, J., concurring in part, dissenting in part). While Scalia was in dissent in this part of *McConnell,* that position and much of its reasoning have now been adopted by the majority in *Citizens United v. FEC,* 130 S. Ct. 876, 913 (overruling *McConnell*).

136. *Citizens United,* 130 S. Ct. at 913.

137. Kreimer, *supra* note 122, at 65.

This concern naturally echoes that animating the prior restraint doctrine.[138] The opacity, procedural irregularity, and indirection of regulation through delegated private censors[139] parallel, if not exceed, those of the administrative censor.

Vulnerable intermediaries leave the speech that depends on them in a precarious state. Weaving together the threads of prior restraint, chilling effect doctrine, and intermediation can guide us to a legal safety net to rescue online speakers by limiting the chilling impact of secondary liability.[140] At the moment, that impact is serious, as is shown through a deeper investigation of the law and its application in practice.

## IV. THE CHILL WINDS OF COPYRIGHT AND DMCA

In the early 1990s, as the Internet was officially opened to commercial activity, government was discussing it as the "National Information Infrastructure," ("NII") a name that belied the government's limited understanding of the phenomenon.[141] As Jessica Litman describes, the intellectual property working group assembled under Patent Commissioner Bruce Lehman felt that commerce needed some prodding, and that only expansive copyright grants and protections to authors would push retailers online.[142] The group's white paper concluded that "the full potential of the NII will not be realized if the education, information and entertainment products protected by intellectual property laws are not protected effectively when disseminated via the NII."[143] Its view was less nuanced than Jane Ginsburg's suggestion that greater control would enable new businesses.[144]

---

138. *See generally* Emerson, *supra* note 29 (discussing the doctrine of prior restraint).

139. *See* Seltzer, *supra* note 48, at 45.

140. See *infra*, Part V.

141. The term "National Information Infrastructure" "encompasse[d] digital, interactive services now available, such as the Internet, as well as those contemplated for the future." BRUCE A. LEHMAN ET AL., INTELLECTUAL PROPERTY AND THE NATIONAL INFORMATION INFRASTRUCTURE: THE REPORT OF THE WORKING GROUP ON INTELLECTUAL PROPERTY RIGHTS 2 n.5 (1995) [hereinafter NII WHITE PAPER]. For a fuller history of the early framing of the copyright question and its effect on the development of law, see LITMAN, *supra* note 32, at 89–110.

142. *See* LITMAN, *supra* note 32, at 93–94.

143. NII WHITE PAPER, *supra* note 141, at 10.

We see the same strategy transposed to the next new technology, digital television broadcasting, in debates over the proposed "broadcast flag." Motion picture companies assert that high-definition digital television will take off only if their "high-value content" is available, and that their high-value content will be available only if it is granted additional protections against copying. Government regulators bought into this argument without fully considering that bowing to today's commercial interests may well stifle even more promising commercial interests of tomorrow. *See* Wendy Seltzer, *The Broadcast Flag: It's Not Just TV*, 57 Fed. Communic. L.J. 209 (2005).

144. *See* Jane C. Ginsburg, *From Having Copies to Experiencing Works: the Development of an Access Right in U.S. Copyright Law*, 50 J. OF THE COPYRIGHT SOC'Y OF THE

The group's white paper identified multiple barriers to commerce in the existing structures of the Net and copyright law. Its interpretation of copyright law made every Internet experience one of multiple copyright "reproductions," which were infringing if not otherwise licensed.[145] Further, according to the white paper, service providers faced potential liability for any of those infringements.[146]

Because of the threat of liability, those in the nascent business of providing Internet service could be brought to the bargaining table to agree to "safe harbors" from these omnipresent liabilities — and to see the safe harbors offered by the DMCA's negotiators as valuable concessions in their favor.

The actual state of affairs was more complex. Service providers were assured neither immunity nor liability in the pre-DMCA world; they could have litigated to fix the bounds and obtain greater certainty. The DMCA was not the only approach to mitigating the risks associated with hosting third-party content.

The DMCA, as ultimately passed, does not incorporate the white paper's apocalyptic view of the necessary scope of copyright.[147] The DMCA does not change the underlying copyright liability of service providers who choose not to avail themselves of its safe harbors, or who try but fail to meet the safe-harbor conditions.[148]

The On-Line Copyright Infringement Liability Limitation Act, codified at Section 512 of the DMCA, defines service providers of several types and sets conditions through which they can avoid secondary copyright liability. The safe harbor has four bays, one each for providers of connectivity, caching, hosting, and "information location" or linking services. Each bay has its own specifics and procedural prerequisites, but the overall structure is similar: service

---

USA 113, 113–14 (2003). Ginsburg acknowledges that the DMCA's changes to copyright create new rights. She argues those rights will promote new and valuable efforts by copyright creators, while refusing to expand copyright would diminish copyright's incentive. *See id.* at 122–23.

145. NII WHITE PAPER, *supra* note 141, at 64–66. Litman argues that this reading was an unwarranted extrapolation from a few questionable decisions, notably *MAI Systems Corp. v. Peak Computer*, 991 F.2d 511 (9th Cir. 1993). LITMAN, *supra* note 32, at 91–95; *see also* Pamela Samuelson, *The Copyright Grab*, WIRED, Jan 1996, http://www.wired.com/wired/archive/4.01/white.paper.html.

146. NII WHITE PAPER, *supra* note 141, at 114–124; *see also* Samuelson, *supra* note 145 ("The white paper asserts that every online service provider is already liable for all copyright infringement committed by its users, regardless of whether the service has reason to know about the infringement or takes reasonable steps to ensure that it won't occur.").

147. *See* Ellison v. Robertson, 357 F.3d 1072, 1076 (9th Cir. 2004) (recounting legislative history of the DMCA).

148. *See* 17 U.S.C. § 512(l) (2006) ("The failure of a service provider's conduct to qualify for limitation of liability under this section shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense."); Ellison v. Robertson, 357 F.3d at 1077 ("Claims against service providers for direct, contributory, or vicarious copyright infringement, therefore, are generally evaluated just as they would be in the non-online world.").

providers who comply with the specified conditions obtain immunity from liability for users' copyright infringement.[149] Service providers are defined in § 512(k)(1):

> (A) As used in subsection (a), the term "service provider" means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received.

> (B) As used in this section, other than subsection (a), the term "service provider" means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A).[150]

The additional conditions and protections applicable to providers in these categories vary from relatively straightforward (the connectivity provider is sheltered for automatic, user-requested transmission of material it does not modify)[151] to Byzantine (it is unclear whether the caching provision has been of use to anyone).[152]

Both the hosting and information-location bays of the safe harbor impose an additional requirement that "upon notification of claimed infringement," the provider "respond[] expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity."[153]

A provider of hosting services wishing to keep its safe harbor options open must designate an agent to receive notifications of claimed infringement, make contact information available on its website, and register the agent with the Copyright Office.[154] Having done that, the service provider is protected by the safe harbor provided that it does not have actual knowledge of the infringement, does not benefit financially from infringing activity that it has the right and ability to control, and responds expeditiously to notifications of claimed infringement that follow the statutory form of § 512(c)(3).[155] Providers

---

149. *See, e.g.*, 17 U.S.C. § 512(c) (2006). All providers are told they must have "a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." *Id.* § 512(i)(1)(A).

150. *Id.* § 512(k)(1).

151 *Id.* § 512(a) ("Transitory digital network communications.").

152 *Id.* § 512(b) ("System caching.").

153. *Id.* § 512(c)(1)(C).

154. *Id.* § 512(c)(2).

155. *Id.* § 512(c)(1).

who take down material pursuant to a copyright notification are immunized from liability.[156]

The DMCA provides for counter-notification and replacement of erroneously removed material,[157] but these provisions do not parallel those of the initial notification. A provider can, consistent with its safe harbor immunity, replace material upon receipt of a counter-notification only after a period of ten to fourteen business days.[158] The subscriber who files a counter-notification must make "[a] statement under penalty of perjury that the subscriber has a good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled."[159] It is unclear whether an assertion that the material is authorized to be posted, or is fair use of another's copyrighted material, satisfies the "mistake or misidentification" provision.[160] Further, the counter-notifier must agree to U.S. jurisdiction,[161] a potential problem for non-U.S. parties. The service provider who accepts counter-notification avoids liability to its subscriber as well as to the copyright claimant.[162] In practice, most service providers have placed clauses in their terms of service to preemptively avoid liability to their subscribers, making their restoration of material in compliance with the counter-notification provisions wholly optional.[163]

Finally, the DMCA provides a remedy for one who is harmed by another who "knowingly materially misrepresents . . . that material or activity is infringing."[164]

As noted, the service provider is free at any time not to take shelter in the safe harbor. Rejecting the safe harbor does not create new liability or increase penalties, but leaves the service provider where it would have been under preexisting copyright law.[165]

The DMCA was a product of its time. This became clear in the RIAA's litigation against Verizon, begun in 2002, just a few years

---

156. *Id.* § 512(g)(1).

157. *Id.* § 512(g).

158. *Id.* § 512(g)(2)(C).

159. *Id.* § 512(g)(3)(C). By contrast, the only statement under penalty of perjury in the initial notification is the assertion "that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed." *Id.* § 512(c)(3)(A)(vi).

160. *See* Jennifer M. Urban & Laura Quilter, *Efficient Process or "Chilling Effects"? Takedown Notices Under Section 512 of the Digital Millennium Copyright Act,* 22 SANTA CLARA COMPUTER & HIGH TECH. L.J. 621, 629–31 (2006). *Compare* Lenz v. Universal Music Corp., No. C 07-3783 JF, 2010 U.S. Dist. LEXIS 16899 (N.D. Cal. Feb. 25, 2010) (finding mistake) *with* Rossi v. Motion Picture Ass'n of Am. Inc., 391 F.3d 1000, 1004–05 (9th Cir. 2004) (finding no knowing misrepresentation).

161. 17 U.S.C. § 512(g)(3)(D) (2006).

162. *Id.* § 512(g)(1).

163. *See* Urban & Quilter, *supra* note 160, at 629.

164. 17 U.S.C. § 512(f).

165. *See* Urban & Quilter, *supra* note 160, at 629–31.

after the DMCA became law.[166] The RIAA invoked the subpoena provisions of § 512(h) of the DMCA in an attempt to obtain the names of Verizon subscribers alleged to have infringed record label copyrights via peer-to-peer filesharing.[167] The D.C. Circuit rejected the subpoenas on statutory grounds, saying § 512(h) applied only to parties who were providing hosting, location, or caching services, not to "mere conduits," as Verizon was in relation to users of peer-to-peer networking.[168] "P2P software was 'not even a glimmer in anyone's eye when the DMCA was enacted,'" the court noted.[169]

### A. Errors and Pressures

In the ideal operation of the DMCA, a copyright holder who discovers her work has been infringed online sends a notice to the agent that the service provider has registered with the Copyright Office. Pursuant to § 512(c)(3)(A), the notice includes: identification of the work claimed to be infringed; identification of the material claimed to be infringing, with "information reasonably sufficient to permit the service provider to locate the material,"; contact information and signature of the complaining party; "a statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law,"; and "a statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed."[170]

Imagine that a website, BookzNtextz.info, which is hosted by Mega-Service-Provider, is disseminating a novel without the author's permission. In response, the author sends a letter to the registered agent of Mega-Service-Provider. She identifies her novel, Alice's Easily Infringed Masterpiece, and gives the URL to her own website where the book can be purchased and the URL to the claimed infringement, http://www.bookzntextz.info/AlicesEasilyInfringed/. Alice includes the talismanic phrases "the complaining party has a good

---

166. *See* Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc., 351 F.3d 1229, 1238 (D.C. Cir. 2003) ("Congress had no reason to foresee the application of § 512(h) to P2P file sharing, nor did they draft the DMCA broadly enough to reach the new technology when it came along."); *In re* Verizon Internet Servs., Inc, 240 F. Supp. 2d 24, 29 (D.D.C. 2003).

167. Recording Indus. Ass'n of Am., Inc., 351 F.3d at 1231.

168. *Id.* at 1236.

169. *Id.* at 1238 (quoting *Verizon Internet*, 240 F. Supp. 2d at 38).

170. 17 U.S.C. § 512(c)(3)(A)(i)–(vi) (2006). This copyright notification regime is far from ideal. The only statement made under penalty of perjury is the assertion of authority to act on behalf of an exclusive right holder. The notification leaves unsworn all allegations of infringement and identification. The notification is made to the service provider, not to a court, and it is not even required to be served on the alleged infringer.

faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law," and attesting "that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed."[171] Finally, Alice adds her contact information and signs the whole thing digitally or electronically.

To gain the protection of the DMCA safe harbor, Mega-Service-Provider, upon receiving the notice, expeditiously removes or disables access to the identified material.[172] Mega-Service-Provider also "takes reasonable steps promptly to notify the subscriber that it has removed or disabled access to the material."[173] If the subscriber counter notifies,[174] the service provider replaces the material or reinstates access ten to fourteen business days from receipt of the counter-notification.[175]

For the case of Alice's Easily Infringed Masterpiece, this rapid process works relatively well. It is lightweight: Alice can plug the results of her web searches into a form letter and obtain quick takedown of infringing copies. There are many spots where the process may deviate from the ideal, however. Alice may run her bots a bit too quickly,[176] sending notifications for Andy's book review of the Easily Infringed Masterpiece; she may be sloppy in completing the DMCA form, listing a root URL rather than the location of a specific infringing work (a problem if a copy is posted to the forums of Bob's Literary Criticism Realm, but the notification knocks out Bob's whole site); she may be wrong about her legal rights, sending a claim about Carrol's Critical Reviews because he used her title (not copyrighted) or quoted passages from her opening chapter (fair use); finally, she may be deliberately malicious, sending a takedown regarding Diane's Better Novel, perhaps after posting an excerpt from her text into the comment forum on that website.

Copyright claimants asserted unfounded claims before the DMCA as well, but the DMCA makes asserting such claims easier and the speech consequences more severe. This is so because service providers' incentives do not match those of their users. Thus, while the service providers who receive takedown notifications *could* review each one closely with legal counsel (pushing the bounds of "expeditious")

---

171. *Id.* § 512(c)(3)(A)(v)–(vi).
172. Pursuant to *id.* § 512 (c)(1)(A)(iii).
173. *Id.* § 512(g)(2)(A).
174. Pursuant to *id.* § 512(g)(3).
175. Pursuant to *id.* § 512(g)(2)(C).
176. Blake Reid's analysis of recent complaints to Google by the International Federation of the Phonographic Industry ("IFPI") suggests that if the agency were scanning twenty-four hours a day, seven days a week, it would be reviewing twenty URLs an hour — a pace likely kept only by bots (analysis on file with author).

206            *Harvard Journal of Law & Technology*            [Vol. 24

and verify the content at each claimed location in comparison with the claimed original, it is cheaper and easier just to take down each and every claimed infringement. They might notify alleged infringers promptly and respond to counter-notifications, or they might skip those extra steps, instead insulating themselves from subscribers' suits through their terms of service.[177] More likely, given the margins in the industry, they would do the latter for all but their highest-paying customers.[178]

Recall that if Bob wants to counter-notify, he must meet more stringent terms than did Alice for her initial notification. He must swear under penalty of perjury to his "good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled"; give an address where he consents to the jurisdiction of Federal District Court, or, if he is outside the United States, consent to jurisdiction in any judicial district in which the service provider may be found; and say he will accept service of process from the person who made the initial notification or that person's agent.[179]

Some of Alice's irritants may be hosted outside the United States or with uncooperative service providers. Still short of filing a lawsuit, she need not stop with one notice. She can send notifications to the service providers upstream of the offending hosts, the providers of aggregate hosting services or network connectivity to the sites hosting the allegedly infringing content. She can also notify search engines that their "information location tools" are referring users to allegedly infringing materials.[180] Any of these additional links in the chain between website and viewer may be more willing to act to remove material, disable access to it, or remove hyperlinks. Alternatively, the mere threat of an upstream attack may be enough to move the previously uncooperative service provider to cooperate.[181]

It is true that Alice could have made many of the same mistakes pre-DMCA, and the service providers could have been just as careful or careless in response to claims of infringement. But the DMCA

---

177. *See* Urban & Quilter, *supra* note 160 at 629.

178. *See* Beuscart & Mellet, *supra* note 67 (describing Web 2.0 service providers whose "technical and financial barriers to entry are low" and network externalities are strong, such that competition is to reach and maintain a critical mass of users).

179. 17 U.S.C. § 512(g)(3) (2006).

180. *Id.* § 512(d).

181. The threat of moving complaints to an "upstream" host can lend force to the ultimatum. Thus the Online Guitar Archive, OLGA.net, got a cease-and-desist letter from the National Music Publishers Association in July 2006 accompanied by a threatened DMCA notice: "Unless you remove all infringing material from your site voluntarily and within ten (10) days from the date of this notice, we will send you a notice, like that enclosed, in your capacity as an Internet Service Provider in accordance with the provisions of the Digital Millennium Copyright Act." In response, the site's operators pulled down all its guitar tablature files. *See* THE ON-LINE GUITAR ARCHIVE, http://www.olga.net/ (last visited Dec. 21, 2010).

changes the calculus of both parties even without changing the underlying rules for liability in its absence. For the claimant, it makes the first step easier. Since the DMCA requires service providers who want possible immunity to register agents and post conspicuous contact information, the process of contact-gathering is simpler — many service providers make this information far easier to find than their customer service contacts, for example.[182] Publicity surrounding the DMCA has advertised the usefulness of copyright claims for rapid takedown — often advertising it to those most likely to misuse it. For the provider, the DMCA's safe harbor offers a means of reducing risk.

The DMCA's choices present themselves to Alice, the claimant, well before filing a lawsuit. She need not hire a lawyer, pay a filing fee, or prepare for discovery. This situation makes it easier for her to stop actual infringement but also to err. Further, as we will see, the DMCA increases the error rate, not just the overall number of errors.[183]

It has become popular to talk about Internet and online service providers as gatekeepers who can be enlisted in an orderly scheme of law enforcement online.[184] Although the Internet multiplies the number of speakers and speaking opportunities, and their opportunities for lawlessness, Internet architecture funnels that speech through relatively few hosts and information conduits. While it might be efficient to stop unlawful speech by cutting it off at the level of these hosts and conduits, it is impossible to do so without stopping a large amount of lawful speech.

Along with the extra incentives for copyright claimants come new pressures on service providers. To see why the gatekeepers overreact, we have to look at the situation from a service provider's viewpoint. DMCA claimants send most of their takedown notifications to providers of hosting for "information residing on systems or networks at direction of users"[185] and providers of "information location tools,"[186] commonly interpreted to mean search engines. The hosting category includes the small web host who runs a computing facility and allows users to create websites; the provider of blog hosting; the social networking site that allows users to create profiles and upload media; bulletin boards and online fora; group news sites; and other similar entities. The DMCA gives them a set of procedures to follow to posi-

---

182. *Compare* GETHUMAN, http://gethuman.com/ (last visited Dec. 21, 2010) (relating accounts of the challenge of reaching customer service), *with Directory of Service Provider Agents for Notification of Claims of Infringement*, U.S. COPYRIGHT OFFICE, http://www.copyright.gov/onlinesp/list/a_agents.html (last visited Dec. 21, 2010).

183. In other words, the DMCA's error is not just an activity-level problem.

184. *See* Zittrain, *supra* note 61; DIRECTORATE FOR SCI., TECH. & INDUS., OECD, EXPERTS WORKSHOP ON INTERNET INTERMEDIARIES (2010), http://www.oecd.org/document/62/0,3343,en_2649_34223_44949886_1_1_1_37441,00.html.

185. 17 U.S.C. § 512(c) (2006).

186. *Id.* § 512(d)

tion themselves to respond to Alice's notification: They must register with the Copyright Office an agent to receive notifications of claimed infringement and make this agent's contact information accessible on their website.[187] They must further "[have] adopted and reasonably implemented, and inform[] subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers."[188] They are also bound not to interfere with "standard technical measures,"[189] but this provision has not yet proved meaningful.

In return, if the provider responds expeditiously to notifications of claimed infringement that follow the statutory form of § 512(c)(3), does not have actual knowledge of the infringement, and does not benefit financially from infringing activity it has the right and ability to control, it is immunized from liability on both ends — from the copyright claimant for any part in the alleged infringement, and from the poster for claimed wrongful takedown.

An obvious explanation for the high rate of takedown would present itself if service providers were likely to face liability if they ventured outside of the safe harbor. The prior law does not fully support that proposition, however. The DMCA is clear, further, that "[t]he failure of a service provider's conduct to qualify for limitation of liability under this section shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense."[190] As the legislative history explains, Congress left underlying principles of liability unchanged for a provider who opted out from, or failed to comply with, the safe harbor.[191] Under that prior law, liability was not a given; service providers had been held not to be direct or vicarious infringers based on their services' automatic copying of user-supplied material.[192] These providers' possible contributory liability was

---

187. *Id.* § 512(c)(2).
188. *Id.* § 512(i)(1)(A).
189. *Id.* § 512(i)(1)(B).
190. *Id.* § 512(l).
191. *See, e.g.*, S. REP. NO. 105–190, at 19 (1997) ("Rather than embarking upon a wholesale clarification of these doctrines [of contributory and vicarious liability], the Committee decided to leave current law in its evolving state and, instead, to create a series of 'safe harbors.'"). *Id* at 45 ("Section 512 does not require use of the notice and take-down procedure. . . . [T]he service provider is free to refuse to 'take down' the material or site, even after receiving a notification . . . in such a situation, the service provider's liability, if any, will be decided without reference to section 512(c).").
192. *See, e.g.*, Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distribs., 983 F. Supp. 1167 (N.D. Ill. 1997) (dismissing direct and vicarious infringement claims against service provider, and refusing summary judgment on contributory infringement); Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc., 907 F. Supp. 1361, 1377–78 (N.D. Cal. 1995) ("[T]he court is not convinced that Usenet servers are directly liable . . . . If Usenet

No. 1]        *DMCA and Chilling Effects On Free Speech*        209

deemed a question of fact, turning on the degree and timing of notice of alleged infringement, and on their own potential fair use defenses.[193]

Since then, we seem to have reached a scheme of liability on notice. Contributory infringement depends on knowingly materially assisting infringement,[194] and providing hosting to infringing material available for unauthorized download is argued to represent "material assistance."[195]

Absent the DMCA, therefore, service providers would likely not be held liable for infringements of which they were ignorant, nor would they be required to search out infringements after a generalized claim. Depending on circumstances, they could be held liable for contributory infringement if they continued to assist in the transmission of material after being specifically notified of its infringing character, but the specificity of that notice and what would be required to give actual knowledge of infringement might be greater than that required by § 512(c)(3)'s formula, which includes no proof beyond an assertion that the material claimed to have been copied was copyrighted and that its copying was unauthorized.[196]

Courts have applied the DMCA safe harbor protections to a variety of Internet sites that host user speech, including Google, Amazon.com, and eBay,[197] as well as to video hosting sites YouTube and Veoh.[198] Google, which receives and responds to notices complaining of links to allegedly infringing material, as a § 512(d) provider of "information location tools,"[199] faces even less likelihood of liability for those hyperlinks, but may consider its visibility as creating a larger potential risk.[200] With a goal of indexing all the world's information,

---

servers were responsible for screening all messages coming through their systems, this could have a serious chilling effect on what some say may turn out to be the best public forum for free speech yet devised."). By contrast, service providers had been found liable when they participated in the infringement and earned money directly from it. *See, e.g.*, Sega Enters. Ltd. v. MAPHIA, 948 F. Supp. 923 (N.D. Cal. 1996) (holding liable online bulletin board operators who specifically solicited copying of Sega video games and expressed the desire that Sega video game programs be placed on bulletin board for downloading purposes).

193. *See Marobie-FL*, 983 F. Supp. at 1178–79; *Netcom*, 907 F. Supp. at 1382–83.

194. *See* Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 535 U.S. 913 (2005); A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004 (9th Cir. 2001).

195. Note that the case for linking liability is even more attenuated. *See* Perfect 10 v. Google, Inc., 416 F. Supp. 2d 828 (C.D. Cal. 2006).

196. 17 U.S.C. § 512(c)(3) (2006).

197. *See Perfect 10*, 416 F. Supp. 2d 828; Corbis Corp. v. Amazon.com, Inc., 351 F. Supp. 2d 1090 (W.D. Wash. 2004); Hendrickson v. eBay, Inc., 165 F. Supp. 2d 1082 (C.D. Cal. 2001).

198. *See* Viacom Int'l Inc. v. YouTube, Inc., Nos. 07 Civ. 2103, 07 Civ. 3582, 2010 U.S. Dist. LEXIS 62829 (S.D.N.Y. June 23, 2010); Io Group, Inc. v. Veoh Network, Inc., 586 F. Supp. 2d 1132 (N.D. Cal. 2008).

199. 17 U.S.C. § 512(d) (2006).

200. Google has been sending the takedown notices it receives to Chilling Effects since 2003, and linking to ChillingEffects.org when results have been removed from a search.

Google will naturally index some information that others would not like to be found. Some complainants will almost certainly be determined and deep-pocketed enough to wage expensive litigation, even if the claims ultimately lack merit.[201]

### B. The Chill in Practice

In our non-ideal world, the notice-and-takedown regime has spawned many notices of claimed infringement and many takedowns of allegedly infringing material. In practice, along with expeditious removals of infringing material have come speedy takedowns of non-infringing speech. Additionally, many scenarios simply fall outside the core of copyright's policy justifications, and others are too close to the edge between infringement and fair use to be decided accurately by the summary procedures of a service provider reviewing a § 512(c) notice.

Occasionally, the DMCA has induced flat-out errors. The Recording Industry Association of America ("RIAA") sent a DMCA notice to Penn State's Department of Astronomy and Astrophysics in May 2003, accusing the university of unlawfully distributing songs by the musician Usher, and nearly forcing the department's servers offline during exam period. As it turned out, RIAA had mistakenly identified the combination of the word "Usher" (identifying faculty member Peter Usher) with an a cappella song performed by astronomers about gamma rays as an instance of infringement. In apologizing, RIAA noted that its "temporary employee" had made an error. RIAA admitted that it does not routinely require its "Internet copyright enforcers" to listen to the song that is allegedly infringing.[202] In the same period, RIAA admitted to several dozen additional errors in sending accusatory DMCA notices, all made within a single week. But RIAA has refused to provide additional details about these errors, professing concern that to do so would compromise the "privacy" of its employees and of the victims of its false accusations.[203] Sony Mu-

---

Google puts no conditions on the Chilling Effects publication or analysis of those notices. As of March 2010, Google receives more than a thousand DMCA takedown demands, many citing multiple URLs, each month. The majority of these notices request removal of links from the search index, invoking § 512(d), but a substantial number are § 512(c) notices regarding material Google hosts on its Blogger weblog service or in conjunction with other Google services. *See* CHILLING EFFECTS, http://www.chillingeffects.org (last visited Dec. 21, 2010).

201. Perfect 10, a purveyor of naked photographs and lawsuits, has filed thirty copyright lawsuits between January 1999 and September 2010 (PACER search on file with author).

202. *See* Declan McCullagh, *RIAA Apologizes for Threatening Letter*, CNET NEWS (May 12, 2003), http://news.cnet.com/2100-1025_3-1001095.html.

203. *See id.*

sic has been made to retract some notices sent to the recording artists who made the tracks in question and retained copyright therein.[204]

Likewise, the Internet Archive's historic Prelinger collection of public domain films earned a takedown from Universal Studios over its films' numerical file names. Universal sent a DMCA notice to the Internet Archive in connection with films 19571.mpg and 20571a.mpg, after Universal's bot apparently mistook public domain films on home economics for the copyrighted submarine movie "U-571."[205] Because the Internet Archive is a large enough collection to act as its own service provider, it was saved the trouble of explaining this to an upstream service provider who might not have grasped the distinction quickly enough to avoid a shutoff. In a similar case, Warner Brothers threatened a child whose Harry Potter book report wound up in a "shared" folder and was mistaken for the movie.[206]

The RIAA members' sound recordings and Universal's and Warner's movies are creative works entitled to the full protection of copyright. But the copyright sword against piracy is not supposed to be a blunderbuss. On the face of a DMCA § 512(c) notification,[207] there may be little to distinguish innocent from infringing speech, and the legal structure and market pressure give the service provider little incentive to investigate beyond the face of the notice.

Researchers at the University of Washington documented their experience receiving DMCA takedown demands for their networked laser printers, which were not offering for download any of the Iron Man or Indiana Jones movies for which they were accused.[208] Instead, the agents sending DMCA notices, and the university service provider passing them along, never verified that files were being offered from the IP address identified in a BitTorrent swarm.

Not all takedowns are commercial or entertainment-related. To those who see the First Amendment primarily as protection for the

---

204. *See* Sean Michaels, *Sony Music 'Mistakenly Removed' Bradford Cox Songs*, THE GUARDIAN (London), Nov. 30, 2010, http://www.guardian.co.uk/music/2010/nov/30/sony-music-bradford-cox-songs.

205. *See* *Universal Studios Stumbles on Internet Archive's Public Domain Films*, CHILLING EFFECTS (Feb. 27, 2003), http://www.chillingeffects.org/notice.cgi?NoticeID=595.

206. *See* Roy Mark, *Verizon Seeks Stay of RIAA Ruling*, INTERNET NEWS (Jan. 30, 2003), http://www.internetnews.com/bus-news/article.php/1577111.

207. 17 U.S.C. § 512(c) (2006).

208. *See* Michael Piatek, Tadayoshi Kohno & Arvind Krishnamurthy, *Challenges and Directions for Monitoring P2P File Sharing Networks — or — Why My Printer Received a DMCA Takedown Notice*, HOTSEC '08, http://www.usenix.org/event/hotsec08/tech/full_papers/piatek/piatek_html/ (last visited Dec. 21, 2010); Brad Stone, *The Inexact Science Behind D.M.C.A. Takedown Notices*, N.Y. TIMES BITS (June 5, 2008, 11:18 AM), http://bits.blogs.nytimes.com/2008/06/05/the-inexact-science-behind-dmca-takedown-notices/.

political discourse necessary for self governance,[209] a range of politically oriented takedowns should raise concern. Some, such as the presidential campaign videos described in the introduction,[210] or the Diebold email archives described below,[211] play out on a grand stage; others are more local.

The New York State College Republicans, amid a contested battle for control of the College Republicans organization, sent a takedown notice against the weblog "Musings of a New York College Republican," alleging that it copied several photographs and "engaged in 're-mote loading'" of several press releases.[212] The anonymous blogger had been critical of infighting in the College Republicans organization.[213] The senders of the demand requested identification of the anonymous blogger and threatened legal action if they did not receive it.[214] The New York State College Republicans sent the DMCA takedown notice even though "remote loading" is simply hyperlinking to a page on a different server — something that web pages do every day — and highly unlikely to be found to constitute copyright infringement. Indeed, "remote loading" is an alternative to copying the content to which you want to make reference.

A graphic designer sent a DMCA complaint when the conservative Arkansas Family Coalition weblog used an Arkansas Democrat's campaign logo to illustrate a post discussing ethics complaints regarding campaign contributions accepted by the candidate.[215] Although a political logo can be copyrighted like any other graphic design, there

---

209. *See generally* ALEXANDER MEIKLEJOHN, FREE SPEECH AND ITS RELATION TO SELF-GOVERNMENT (1948).

210. *See supra* Part I.

211. *See infra* Part IV.D. The Center for Democracy and Technology documents numerous copyright takedowns affecting political candidates in a recent report. *See* CTR. FOR DEMOCRACY & TECH., CAMPAIGN TAKEDOWN TROUBLES: HOW MERITLESS COPYRIGHT CLAIMS THREATEN ONLINE POLITICAL SPEECH (2010), http://www.cdt.org/files/pdfs/copyright_takedowns.pdf. Other large-scale examples include the National Organization for Marriage, whose video got a rare fair use review after DMCA takedown and was reposted before ten business days had elapsed. *See* Sam Bayard, *YouTube Restores National Organization for Marriage Video Outside DMCA Parameters, Cites Fair Use*, CITIZEN MEDIA LAW PROJECT (May 7, 2009), http://www.citmedialaw.org/blog/2009/youtube-restores-national-organization-marriage-video-outside-dmca-parameters-cites-fair-u.

212. *See NY College Republicans Complain About Critics*, CHILLING EFFECTS (July 22, 2005), http://www.chillingeffects.org/dmca512/notice.cgi?NoticeID=2174.

213. The original posts are unavailable, but some of the debate is visible in slightly later-archived posts. *See, e.g., Let's Do This*, MUSINGS OF A NEW YORK COLLEGE REPUBLICAN (Oct. 7, 2005, 2:08 AM), http://web.archive.org/web/20051215011122/http://nycr.blogspot.com/2005/10/lets-do-this.html (preserved at the Internet Archive).

214. *See id.*

215. *See Graphic Designer Complains of Use of Political Logo*, CHILLING EFFECTS (Oct. 7, 2005), http://www.chillingeffects.org/dmca512/notice.cgi?NoticeID=2455. The logo was originally included as a graphic in *Jimmy Lou Fisher Facing Ethics Complaint over Illegal Campaign Contributions*, Arkansas Family Coalition- ArkFam.com (Oct. 7, 2005), http://web.archive.org/web/20061029112839/arkansasfamilycoalition.blogspot.com/2005/10/jimmie-lou-fisher-facing-ethics.html (preserved at the Internet Archive).

is a strong argument that fair use permits commentary that uses a candidate's political logo to identify the candidate.

Photographer Leif Skoogfors sent numerous DMCA complaints when a photograph he had taken at a 1970 Vietnam peace rally, showing Jane Fonda in the foreground and John Kerry behind, appeared on anti-Kerry sites around the web.[216] It was debatable whether the image contradicted what Senator Kerry, then a presidential candidate, was claiming about his Vietnam-era opposition to the war or whether the image was being misrepresented and blown out of proportion. But even the photographer Skoogfors acknowledged, "Now the picture was the news."[217] People on both sides of the political discussion "quoted" the photograph to support their arguments. Yet when service providers received DMCA takedown notices, most removed the pictures.

Activists The Yes Men saw how far copyright could reach when they criticized the Dow Chemical Company by taking a copy of Dow's website and creating one at dow-chemical.com that apologized for chemical accidents at Bhopal. As The Yes Men designed, Dow then had to disavow the apology, a move The Yes Men took as a renewed opportunity for criticism.[218]

Dow further responded with a DMCA takedown complaint to Verio, the owner of the netblock in which the dow-chemical.com site was hosted, which stated that "[t]he Website displays numerous trademarks, images, texts and designs taken directly from Dow's website located at dow.com. This material is protected by copyright law and may not be reproduced, in whole or in part, without the express written authorization of Dow."[219] The Yes Men's hosting provider, New York service provider Thing.net, indicated it would not take down the material, but the target of Dow's letter was one level up the chain. Verio, provider of connectivity and network space to Thing.net, was not swayed by Thing.net's determination to stand by its custom-

---

216. *See Search for: "skoogfors,"* CHILLING EFFECTS, http://www.chillingeffects.org/search.cgi?search=skoogfors (last visited Dec. 21, 2010). It appears that the Skoogfors photograph was generally presented in its original form, with occasional labels marking the figures. Another photograph, circulated at the same time, was doctored to place Kerry and Fonda on the same podium. *See* Ken Light, Editorial, *Fonda, Kerry and Photo Fakery*, WASH. POST, Feb. 28, 2004, at A21. At the same time, it does not appear that Skoogfors was trying to get his photograph withdrawn from debate entirely — it continued to be available for licensing from Corbis. *See* Leif Skoogfors, *A Face in the Crowd*, THE DIGITAL JOURNALIST (Mar. 2004), http://www.digitaljournalist.org/issue0403/dis_skoogfors.html.

217. Skoogfors, *supra* note 216.

218. *See Dow Hijink*, THE YES MEN, http://web.archive.org/web/20050527011009/http://www.theyesmen.org/hijinks/dow/bhopal2002.shtml (last visited Dec. 21, 2010) (preserved at the Internet Archive).

219. *See* Letter from Gregory D. Phillips, Howard, Phillips & Andersen, to Verio, Inc. (Dec. 3, 2002), *available at* http://web.archive.org/web/20050511184502/www.theyesmen.org/hijinks/dow/Dow-Chemical_DMCAnotice.pdf (preserved at the Internet Archive).

ers. In the ensuing scuffle, Verio cut connectivity to all of Thing.net's customers for twelve hours.[220]

The Yes Men's parody[221] might or might not have crossed the line from parody to copyright infringement — as well as trademark infringement and false advertising — but nothing was alleged against the other digital artists who hosted sites with Thing.net. The Yes Men have engaged in several further online parodies and protests, prompting repeat uses of the DMCA.[222]

Further, if we do not presume that everyone in a political debate will act civilly — and one of the reasons for constitutional government and its procedures is precisely to restrain us when we act uncivilly — we should be wary of mechanisms that give one party the ability to shut down debate rather than participate in it. Especially in political debate, one often wants to quote from one's opponent. If every such quotation brings threat of a facially plausible copyright takedown, the scope of political debate is narrowed. When some of those threatened claims materialize, it is narrowed further.

The DMCA proves attractive to those looking to take down speech they find annoying — precisely the kind of speech that may be of most interest to political debate. The website cryptome.org ("Cryptome") has a history of publishing leaked documents, from the DeCSS DVD decryption code[223] to unredacted and incorrectly redacted versions of TSA screening documents.[224] Various companies and government agencies have requested that the site or its pages be taken down, but few of them have succeeded.[225] Recently, Cryptome has been collecting the surveillance price lists from various Internet com-

---

220. *See Routledge Just Says "Yes" to Dow: The Collaboration of a Progressive Academic Press and a Large Chemical Corporation*, THE YES MEN, http://theyesmen.org/dowtext/ (last visited Dec. 21, 2010).

221. After losing control of the dow-chemical.com domain, The Yes Men moved their spoof Dow site to http://dowethics.com/. *See id.*

222. *See, e.g.*, Wendy Davis, *ISP Takes Down Parody After Chamber of Commerce Complains*, MEDIAPOST (Oct. 25, 2009), http://www.mediapost.com/publications/?fa=Articles.showArticle&art_aid=116054; *NYT spoof*, DIAGONAL THOUGHTS (Nov. 12, 2008, 10:00 PM), http://www.diagonalthoughts.com/?p=397 (reporting on a New York Times parody website that was taken down after DeBeers complained of a fake advertisement on the site). The Yes Men maintain a list of their latest "hijinks" at http://theyesmen.org/hijinks.

223. *See MPAA Notice to Cryptome on DeCSS*, CRYPTOME, http://cryptome.org/dvd-mpaa-ccd.htm (last visited Dec. 21, 2010).

224. *See TSA Blows Smoke for Sensitive Screening Document*, CRYPTOME, http://cryptome.org/tsa-smoke/tsa-smoke.htm (last visited Dec. 21, 2010).

225. Yahoo sent a DMCA takedown notice directly to Cryptome after they published Yahoo's information price list. *See Yahoo Tries To Hide Snoop Service Price List*, ELEC. FRONTIER FOUND., http://www.eff.org/takedowns/yahoo-tries-hide-snoop-service-price-list (last visited Dec. 21, 2010); Kim Zetter, *Yahoo Issues Takedown Notice for Spying Price List*, WIRED THREAT LEVEL (Dec. 4, 2009, 5:00 PM), http://www.wired.com/threatlevel/2009/12/yahoo-spy-prices/.

panies.[226] Microsoft expressed its dissatisfaction to this practice in a DMCA notice to Cryptome's web host and domain name registrar, Network Solutions:

> Microsoft has received information that the domain listed above, which appears to be on servers under your control, is offering unlicensed copies of, or is engaged in other unauthorized activities relating to copyrighted works published by Microsoft.

> 1. Identification of copyrighted works:
> Copyrighted work(s):
> Microsoft Global Criminal Compliance Handbook[227]

Accordingly, Network Solutions notified Cryptome's proprietor, John Young, that it would have to disable the entire site for the ten-business-day period unless he removed the page. Young counter-notified but refused to remove the page, and so, despite his assertions of fair use, Network Solutions deactivated the entire site — the only way they believed they could comply with the DMCA.[228] After the buzz of publicity, so common an occurrence it has been named the "Streisand Effect,"[229] kicked in, Microsoft retracted its DMCA complaint, enabling Network Solutions to restore Cryptome.[230]

Other claims misinterpret the scope of copyright exclusivity. The Church of Scientology was a pioneer in using the DMCA to ask Google to de-index websites critical of the Church, on the grounds that the criticism on the websites quoted from Scientology texts.[231]

226. *See Online Spying Guides*, CRYPTOME, http://cryptome.org/isp-spy/online-spying.htm.

227. *See Microsoft Demands Takedown of Microsoft Spy Guide*, CRYPTOME, http://cryptome.org/0001/ms-spy-takedown.htm (last visited Dec. 21, 2010).

228. *See id.*

229. The Streisand Effect is named for a 2003 incident in which Barbra Streisand sued a California photographer for including aerial photographs of her Malibu house on his coastal survey website. Instead of removing the image, the photographer publicized the suit, drawing further attention to the photo. *See* Andy Greenberg, *The Streisand Effect*, FORBES, May 11, 2007, http://www.forbes.com/2007/05/10/streisand-digg-web-tech-cx_ag_0511streisand.html. Adelman, who maintained californiacoastline.org, obtained dismissal of the suit under California's anti-SLAPP law, and won attorneys' fees and costs. *See* Streisand v. Adelman, No. SC 077 257 (L.A. Sup. Ct. May 10, 2004) (order granting in part and denying in part plaintiff's motion to tax costs and defendants' motions for attorneys' fees), *available at* http://www.californiacoastline.org/streisand/fees-ruling.pdf.

230. *See* Chloe Albanesius, *Cryptome Restored After Microsoft DMCA Takedown*, PCMAG.COM, Feb. 25, 2010, http://www.pcmag.com/article2/0,2817,2360694,00.asp.

231. *See Google Asked To Delist Scientology Critics (#1)*, CHILLING EFFECTS (Mar. 8, 2002), http://www.chillingeffects.org/notice.cgi?NoticeID=232; *Takedown Demands*, CHILLING EFFECTS (Mar. 8, 2002); *see also* Matt Loney & Evan Hansen, *Google Pulls Anti-Scientology Links*, CNET NEWS (Mar. 21, 2002), http://news.com.com/2100-1023-865936.html (detailing use of DMCA in conflict between Church of Scientology and anti-Scientology website).

Quotation for the purpose of criticism and commentary is a specifically designated fair use,[232] highly likely to be found "transformative."[233]

Wal-Mart sent a § 512(h) subpoena, along with a § 512(c) notice, to a comparison-shopping website that allowed customers to post prices of items sold in stores, claiming incorrectly that its prices were copyrighted. Wal-Mart sought the identity of the user who had anonymously posted information about an upcoming sale. Other retailers, including Kmart, Jo-Ann Stores, OfficeMax, Best Buy, and Staples, also served § 512(c) notices on the website based on the same theory of copyrightable facts.[234] While they might have had trade secret misappropriation claims against those who leaked circulars before holiday sales (and, less plausibly, a claim that the websites should have known the information was misappropriated), asking a judge for a temporary restraining order would have required more time, money, and effort than simply sending DMCA notices to the service providers.

Finally, some claims use the DMCA as a battering ram, seemingly assuming that where text exists, so too does copyright infringement if one looks hard enough.

Mir Internet Marketing offers "full-service, cost-effective, end-to-end Internet marketing solutions," including search engine optimization.[235] Their service, in short, is to get clients' websites to appear in response to searches on favored keywords, aiming to maximize the number of searchers who click through to the clients' sites.[236] Mir and other optimizers have added another trick to their bags — DMCA takedowns against competitors. After all, removing competing pages from search engine results boosts the visibility of your remaining sites.

---

232. See 17 U.S.C. § 107 (2006) ("The fair use of a copyrighted work, including such use by reproduction in copies . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.").

233. *See* Campbell v. Acuff-Rose Music, 510 U.S. 569 (1994) (holding a music group's parody to be a form of criticism, likely fair use).

234. *See* Declan McCullagh, *Wal-mart Backs Away from DMCA Claim*, CNET NEWS (Dec. 5, 2002), http://news.cnet.com/2100-1023-976296; *Press Release: FatWallet Challenges Abusive DMCA Claims*, FATWALLET (Dec. 2, 2002, 4:25 PM), http://www.fatwallet.com/forums/messageview.cfm?catid=18&threadid=129657.

235. Mir Internet Marketing Homepage, http://www.internetmadeeasy.com/ (last visited Dec. 21, 2010).

236. The tactics of search engine optimizers vary. One tactic is to optimize the site structure for search engine crawlers by including common search terms in text and links. Another is to link to the site from other high-traffic pages (whether pages with real relevance or fake sites designed solely to generate "link rank"). An additional tactic is to "farm" links out through spam or on typo-sites. Finally, some search engine optimizers bury keywords in hidden text or "gateway pages." *See Search Engine Optimization*, WIKIPEDIA, http://en.wikipedia.org/wiki/Search_engine_optimization (last visited Dec. 21, 2010).

Mir has sent at least forty-eight separate takedown notices against hundreds of websites it claims infringe its copyrights, often based on a few duplicate phrases.[237] In a section of its website describing the DMCA takedown process, Mir (speaking through its SEO Logic division) says, "We consider removing violators to be part of our job in helping our clients to improve their search engine ranking."[238]

DMCA takedowns may target non-infringing as well as infringing uses. When competitors choose to "borrow" substantial text someone else has written rather than writing their own, they infringe copyright. Often, however, similarities reflect not direct copying but the relatively limited number of ways to describe a generic product or service.[239] For example, much of the text on many advertising sites is minimally creative recitation of fact. Also, dozens of the DMCA takedown notices between competitors in the Chilling Effects archives target insubstantial similarities.[240] Because there are only so many ways to describe a generic product or service, the uses of the copyrighted material indicated in the results of a search for that material are not necessarily infringing.

The chief concern of search engine optimizers is not to remedy the infringement, but to penalize competitors. Mir therefore recommends that copyright holders contact search engines and the site's service provider before contacting the allegedly infringing site's webmaster:

> Do not contact the owner or Webmaster of the site
> that is illegally using your content. . . . If you want to

---

237. *See Search for: "Mir Internet Marketing,"* CHILLING EFFECTS, http://www.chillingeffects.org/search.cgi?search=%22Mir+Internet+Marketing%22 (last visited Dec. 21, 2010).

238. *Search Engine Marketing FAQ: Copyright Infringement and DMCA*, SEO LOGIC, http://www.seologic.com/faq/copyright.php (last visited Dec. 21, 2010). Mir even advises clients that they can "see examples of our DMCA filings with Google, [by] visit[ing] ChillingEffects.org, where Google posts copies of all notices it receives." *Search Engine Marketing FAQ: Sending DMCA Notifications*, SEO LOGIC, http://www.seologic.com/faq/dmca-notifications.php (last visited Dec. 21, 2010).

239. The merger doctrine permits copying when there are so few ways of expressing an idea that protecting the expression would grant monopoly on the idea. *See, e.g.*, N.Y. Mercantile Exch., Inc. v. IntercontinentalExchange, Inc., 497 F.3d 109, 117 (2d Cir. 2007) (holding exchange's settlement prices merged with their ideas). The related doctrine of scenes a faire excuses the use of stock scenes or phrases "if the expression embodied in the work necessarily flows from a commonplace idea." Ets-Hokin v. Skyy Spirits, Inc., 225 F.3d 1068, 1082 (9th Cir. 2000) (discussing backlit photograph of vodka bottle against a plain background).

240. Takedown notices sent by competitors are compiled at *Competition*, CHILLING EFFECTS, http://www.chillingeffects.org/dmca512/keyword.cgi?KeywordID=36 (last visited Dec. 21, 2010). Because the letters themselves do not include the full text of the original website or the identity of the alleged infringer, and the sites' content may have changed since the letters were sent, after-the-fact comparison will not be foolproof. The same factors make it difficult for the hosting service provider or search engine to evaluate DMCA infringement claims.

> punish the Webmaster for copying your content, and have their site removed from the search engines, or even from the Internet entirely, then you should take the following steps . . .
>
> File notices of alleged infringement that comply with the Digital Millennium Copyright Act (DMCA) with each search engine or directory where the infringing site is listed. The Digital Millennium Copyright Act empowers you to send a notice to any directory or search engine that lists the offending site and demand that they remove any links to the offending site. Yes, you can make Google, Yahoo!, and all the others take the site out of their search results.[241]

This practice appears to have sprung up in direct response to the DMCA, specifically driven by § 512(d)'s instructions to providers of "information location tools."[242]

In the rush for page-views, some of those looking for advantage will skirt the law. What they want is precisely what the DMCA induces search engines to offer — rapid unquestioning takedown, for at least a short period of time. Copyright takedowns serve as tools in competitive scrambles for attention,[243] partnership disputes,[244] and disputes between independent contractors and their clients.[245]

### C. "Repeat Infringers"

When a number of music blogs disappeared from Google's Blogger service, where they were hosted, their authors found entire sites, sometimes including years of archives, deleted. The bloggers were notified that "Upon review of your account, we've noted that your blog has repeatedly violated Blogger's Terms of Service . . . [and]

---

241. *Search Engine Marketing FAQ: Copyright Infringement and DMCA*, SEO LOGIC, http://www.seologic.com/faq/copyright.php (last visited Dec. 21, 2010).

242. 17 U.S.C. § 512(d) (2006).

243. See, for example, the dispute between two makers of chef's jackets, Crooked Brook and Bragard, the former complaining about a quotation posted on the latter's website. *Crooked Brook Complains About Copied Chef Coat Text*, CHILLING EFFECTS (May 2, 2006), http://www.chillingeffects.org/notice.cgi?ID=1359.

244. Hosting companies have been asked to remove or disable access to web pages pursuant to the DMCA in disputes between former partners over ownership of jointly created content. *See, e.g.*, *Golden Gate Expeditions Complaint to Web Host*, CHILLING EFFECTS (Feb. 20, 2003), http://www.chillingeffects.org/dmca512/notice.cgi?NoticeID=572.

245. Google was asked to remove links to web pages pursuant to the DMCA in disputes between an independent contractor and its client over the ownership of a website the contractor designed but for which he alleged he was not paid. *Azalea Web Design Company Asks Google to Delist Client*, CHILLING EFFECTS (May 2, 2004), http://www.chillingeffects.org/dmca512/notice.cgi?NoticeID=1256.

we've been forced to remove your blog."[246] According to reports, the bloggers had run afoul of Google's "repeat infringer" policy[247] after their blogs were the subject of several complaints.[248] Pursuant to that policy, inspired by the DMCA's requirement,[249] Google opted to terminate their accounts, removing not only the allegedly infringing entries, but the entirety of the blogs' content.[250]

While some "blogs," on Blogger and elsewhere, appeared to be mere collections of links to newly released songs and albums, others, including some taken down in the "music blogocide,"[251] were written by music critics who linked to songs in order to enhance their commentary or to alert readers to new music.[252] Some blog authors asserted that they operated with the permission, or even the encouragement, of the artists or music labels whose work they posted.[253]

Copyright claimants urge that two or three takedown notices make someone a "repeat infringer" whose account must be terminated. In contrast, David Nimmer suggests that the provision should be construed strictly, to require "repeat infringer" sanctions only against those who have more than once been found liable for copyright infringement after legal proceedings.[254] Taking a middle course,

---

246. Sean Michaels, *Google Shuts Down Music Blogs Without Warning*, THE GUARDIAN (London), Feb. 11, 2010, http://www.guardian.co.uk/music/2010/feb/11/google-deletes-music-blogs.

247. *See Digital Millennium Copyright Act — Blogger*, GOOGLE, http://www.google.com/blogger_dmca.html (last visited Dec. 21, 2010) ("Many Google Services do not have account holders or subscribers. For Services that do, such as Blogger, Google will, in appropriate circumstances, terminate repeat infringers.").

248. *See* CHILLING EFFECTS, http://www.chillingeffects.org/ (a search for "irockcleveland" returns seven notices from IFPI between August 2009 and February 2010).

249. 17 U.S.C. § 512(i)(1)(A) (2006) states:

> The limitations on liability established by this section shall apply to a service provider only if the service provider (A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers.

250. *See* Michaels, *supra* note 246.

251. The tag "#Musicblogocide2k10" reached the trend charts on Twitter when Google removed many music blogs from Blogger. *See* Michaels, *supra* note 246.

252. See, for example, the relocated I ROCK CLEVELAND, http://blog.irockcleveland.com (last visited Dec. 21, 2010).

253. *See* Scott Jagow, *Google commits "Blogocide,"* SCRATCH PAD (Feb. 11, 2010, 1:15 PM), http://www.publicradio.org/columns/marketplace/scratchpad/2010/02/google_commits_blogocide.html (quoting the owner of music blog I Rock Cleveland as writing back to Google, "I assure you that everything I've posted for, let's say, the past two years, has either been provided by a promotional company, came directly from the record label, or came directly from the artist").

254. David Nimmer, *Repeat Infringers*, 52 J. COPYRIGHT SOC'Y U.S.A. 167, 195–98 (2005). Nimmer also notes that unless the imposition of strikes is discretionary rather than mandatory, all of the major motion picture studios would be ineligible for online posting

Google has chosen to remove a blog "when [it] receives multiple DMCA complaints about the same blog, and [has] no indication that the offending content is being used in an authorized manner."[255]

The due process afforded by the takedown and termination process is insufficient, particularly given the severity of the process. Many bloggers never realized that merely removing entries on which they had received complaints was not sufficient to clear their records. At least one of the February removals was reinstated after Google admitted that notifications of the prior DMCA complaints had failed to reach the blogger.[256] Many of the IFPI notices to Google in the Chilling Effects database[257] lack basic elements of the DMCA § 512(c)(3)(A) notification,[258] including "[i]dentification of the copyrighted work claimed to have been infringed,"[259] and "[i]dentification of the material that is claimed to be infringing,"[260] as they list only URLs to posts, not to the linked files.[261] It appears that IFPI claims that, as a U.K.-based organization, it need not meet the U.S. DMCA requirements, and that Google has chosen not to press the point.[262]

This Article does not claim that all of the above examples represent clear-cut cases of non-infringement. The uses are not necessarily fair and non-infringing; the senders of takedown notices are not nec-

---

accounts, since all have had multiple copyright infringement judgments rendered against them. *Id.* at 216–17.

255. Rick Klau, *A Quick Note About Music Blog Removals*, BLOGGER BUZZ (Feb. 10, 2010, 2:31 PM), http://buzz.blogger.com/2010/02/quick-note-about-music-blog-removals.html; *see also* Wendy Seltzer, *DMCA "Repeat Infringers": Scientology Critic's Account Reinstated after Counter-Notification*, CHILLING EFFECTS (June 6, 2008), http://www.chillingeffects.org/weather.cgi?WeatherID=605 (chronicling Scientology critic's experience with the DMCA and Google subsidiary YouTube).

256. *See* Klau, *supra* note 255; *Musicblogocide2k10: La Vie Continue*, MASALACISM (Feb. 12, 2010), http://www.masalacism.com/2010/02/musicblogocide2k10-la-vie-continue/.

257. *See Search for "IFPI,"* CHILLING EFFECTS, http://www.chillingeffects.org/search.cgi?q=IFPI (last visited Dec. 21, 2010) (listing notices).

258. *See* 17 U.S.C. § 512(c)(3)(A) (2006).

259. *Id.* § 512(c)(3)(A)(ii).

260. *Id.* § 512(c)(3)(A)(iii).

261. *See, e.g.*, *IFPI DMCA (Copyright) Complaint to Google*, CHILLING EFFECTS (Mar. 12, 2010), http://www.chillingeffects.org/dmca512c/notice.cgi?NoticeID=33815 ("We have learned that your service is hosting the above web sites on your network. *These sites are offering direct links to files* containing sound recordings for other users to download. The copyright in these sound recordings is owned or exclusively controlled by certain IFPI Represented Companies.") (emphasis added). According to the DMCA:

> [A] notification from a copyright owner or from a person authorized to act on behalf of the copyright owner that fails to comply substantially with the provisions of subparagraph (A) shall not be considered . . . in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent.

17 U.S.C. § 512(c)(3)(B)(i) (2006).

262. *See* Stelios Phili, *Reinvestigating Music Blogocide 2k10: Google is Less Evil than We Think*, POPSENSE (Feb. 22, 2010), http://www.popsense.com/2010/02/reinvestigating-music-blogocide-2k10.html.

essarily motivated by invidious purposes. The claim is rather that neither are they clear-cut cases of infringement. In equivocal cases, of which copyright has many, the benefit of the doubt should lie with the speaker. Instead, the summary process of takedown upon DMCA notice to a third party deprives parties, the public, and the law of an important opportunity to clarify.[263]

Nor does this Article claim that a majority of takedowns are improper.[264] It is likely that many people posting copyrighted music or movie files in their entirety have no non-infringing purpose and no objective other than avoiding payment for a commercially available work. Some posters of others' images and text will have no fair use or other defenses. At the same time, this Article has identified only a few of the many erroneous takedowns.[265] The argument here does not depend on proportions; the volume of infringement does not excuse a regime systematically vulnerable to speech-chilling errors.

Elsewhere, Rebecca Tushnet analogizes copyright restriction to a poll tax or literacy test setting discriminatory barriers to expression.[266] The DMCA notification and counter-notification regime, even if ultimately navigable, poses similar hurdles. As the Court said of booksellers in *Smith v. California*, "The [service provider's] self-censorship, compelled by the State, would be a censorship affecting the whole public, hardly less virulent for being privately administered."[267]

### D. Limited Warming?

The DMCA includes a provision, § 512(f), that allows the targets of improper takedowns to file suit against the takedown senders.[268] A

---

263. As this Article goes to press, another round of music blog takedowns has occurred, this time through the seizure of domain names by the department of Immigration and Customs Enforcement, working with the RIAA. Again, some bloggers assert that they acted with permission from copyright holders. *See* Ben Sisario, *Piracy Fight Shuts Down Music Blogs*, N.Y. Times, Dec. 14, 2010, at B1, *available at* http://www.nytimes.com/2010/12/14/business/media/14music.html.

264. I do note, following Urban and Quilter, that many ostensible DMCA notices demanding takedown do not comply with even the minimal requirements of § 512(c)(3). *See* Urban & Quilter, *supra* note 160, at 667–68 (finding a substantial percentage of notices suffered from substantive or formal defects).

265. Others are described at Chilling Effects and the EFF's "No Downtime for Free Speech" Campaign and Takedown Hall of Shame. *See No Downtime for Free Speech Campaign*, Elec. Frontier Found., http://www.eff.org/issues/ip-and-free-speech (last visited Dec. 21, 2010); *Takedown Hall of Shame*, Elec. Frontier Found., http://www.eff.org/takedowns (last visited Dec. 21, 2010).

266. *See* Library of Congress Rulemaking Hearing on Section 1201 (2009) (comments of Professor Rebecca Tushnet), *available at* http://www.copyright.gov/1201/hearings/2009/transcripts/1201-5-7-09.txt.

267. 361 U.S. 147, 153–54 (1959).

268. 17 U.S.C. § 512(f) (2006).

few cases under that provision have produced a limited warming effect.

In July 2003, an archive of email messages was leaked from Diebold, Inc., a manufacturer of electronic voting machines. The archive included communications among Diebold employees and contractors describing flaws, sham test messages, and use of uncertified code in electronic voting machines deployed around the country. In October, wanting to share the evidence with others — and to get help reviewing the thousands of messages in the archives for more examples — journalists and activists posted the archive online and invited others to search and mirror the collection. As quickly as mirror sites and search tools were built, Diebold responded with dozens of takedown notices alleging that the postings, and even sites linking to the postings, violated Diebold copyrights. Service providers, including colleges and universities, pulled the web pages. Thus, shortly before the November 2003 elections, many service providers silenced sites discussing voting security.[269]

The creativity in these e-mails was more in the fudged demonstrations and certifications they described than in the expression copyright protects.[270] If anything, the technical details of machine function and malfunction might be a subject for trade secret, rather than copyright. But because "the DMCA provides the rapid response, the rapid remedies that Congress had in mind,"[271] and a route through service providers and not individuals, Diebold chose to assert copyright infringement rather than trade secret misappropriation.

Two Swarthmore College students had their website disrupted just as they were planning a symposium on the security of electronic voting. Their college, which was hosting the student group's site,

---

269. *See* Declaration of Wendy Seltzer in Support of Plaintiffs' Application for Temporary Restraining Order at 4, Online Policy Group v. Diebold, Inc., 337 F. Supp. 2d 1195 (N.D. Cal. 2004) (No. C 03-4913 JF), *available at* http://www.eff.org/files/filenode/ OPG_v_Diebold/Seltzer.pdf; Kim Zetter, *E-Vote Protest Gains Momentum*, WIRED.COM (Oct. 29, 2003), http://www.wired.com/politics/law/news/2003/10/61002.

270. *See Targeting Diebold with Electronic Civil Disobedience*, WHY WAR?, http://why-war.com/features/2003/10/diebold.html (last visited Dec. 21, 2010). The emails stated:

> For a demonstration I suggest you fake it. Progam [sic] them both so they look the same, and then just do the upload fro [sic] the AV. That is what we did in the last AT/AV demo.
>
> . . . .
>
> I have become increasingly concerned about the apparent lack of concern over the practice of writing contracts to provide products and services which do not exist and then attempting to build these items on an unreasonable timetable with no written plan, little to no time for testing, and minimal resources. It also seems to be an accepted practice to exaggerate our progress and functionality to our customers and ourselves then make excuses at delivery time when these products and services do not meet expectations.

*Id.*

271. *Online Policy Group*, 337 F. Supp. 2d at 1204 n.15.

chose to follow the DMCA's takedown procedure when it received notice from Diebold, notwithstanding letters from the students' counsel.[272] Online Policy Group ("OPG"), a non-profit service provider, resisted the takedown demand aimed at a co-located IndyMedia website that linked to the Diebold archive, only to find its upstream service provider threatened with litigation for hosting the intransigent OPG.[273]

At this point, OPG, the Swarthmore students, and their pro bono counsel filed suit for DMCA misuse, claiming that Diebold's takedown notices "knowingly materially misrepresented" copyright infringement in violation of § 512(f).[274] After suit was filed, Diebold attempted to moot the lawsuit by withdrawing its threats,[275] perhaps because Diebold recognized its legal error and that litigation would only serve to bring more attention to the archives and their contents.

The district court granted summary judgment to the plaintiffs, finding that "[t]he email archive was posted or hyperlinked to for the purpose of informing the public about the problems associated with Diebold's electronic voting machines," which made at least a portion of the posting fair use, not infringement as alleged.[276]

> No reasonable copyright holder could have believed that the portions of the email archive discussing possible technical problems with Diebold's voting machines were protected by copyright, and there is no genuine issue of fact that Diebold knew — and indeed that it specifically intended — that its letters to OPG and Swarthmore would result in prevention of publication of that content. The misrepresentations were material in that they resulted in removal of the content from websites and the initiation of the present lawsuit. The fact that Diebold never actually brought suit against any alleged infringer suggests strongly that Diebold sought to use the DMCA's safe harbor provisions — which were designed to protect

---

272. *See id.* at 1198; Complaint at 13, *Online Policy Group*, 337 F. Supp. 2d 1195 (No. C 03-04913 JF), *available at* http://www.eff.org/legal/ISP_liability/OPG_v_Diebold/ complaint.php; Declaration of Vincent V. Carissimi Regarding Plaintiffs' Application for Preliminary Injunction at 2, *Online Policy Group*, 337 F. Supp. 2d 1195 (No. C 03-04913 JF), *available at* http://www.eff.org/files/filenode/OPG_v_Diebold/reply_ decl_carissimi.pdf.

273. *See Online Policy Group*, 337 F. Supp. 2d at 1198.

274. *See* Complaint at 13, *Online Policy Group*, 337 F. Supp. 2d 1195 (No. C 03-04913 JF), *available at* http://www.eff.org/legal/ISP_liability/OPG_v_Diebold/complaint.php. The author was a member of the Electronic Frontier Foundation legal team representing OPG. Stanford's Center for Internet & Society represented the Swarthmore students.

275. *See Online Policy Group,* 337 F. Supp. 2d at 1202.

276. *Id.* at 1203.

> [service providers], not copyright holders — as a
> sword to suppress publication of embarrassing con-
> tent rather than as a shield to protect its intellectual
> property.[277]

In the wake of this ruling, Diebold settled with the plaintiffs for $125,000.[278]

In the meantime, however, the DMCA had turned a copyright claim too weak to withstand summary judgment into an instrument of widespread takedown. Diebold's claims and the service providers' prompt resort to the safe harbor resulted in the removal of this non-infringing contribution to political debate from most places on the Internet. Even those who filed counter-notifications had their speech suppressed during critical pre-election days. For those without counsel, this first step, takedown, would likely also be the last.

In *Lenz v. Universal*,[279] the same court followed its *Online Privacy Group v. Diebold* ruling with a series of rulings bolstering § 512(f). Stephanie Lenz had posted a short video of her infant son dancing to Prince's "Let's Go Crazy," which could be heard faintly in the background. Universal sent YouTube a takedown that resulted in the video's removal. In addition to counter notifying, Lenz filed suit. The court held that consideration of possible fair use claims was a necessary part in the sending of a valid takedown: "The DMCA . . . requires copyright holders to make an initial review of the potentially infringing material prior to sending a takedown notice . . . . A consideration of the applicability of the fair use doctrine is simply part of that initial review."[280]

The *Lenz* court recognized the public speech interest involved in DMCA takedowns: "the unnecessary removal of non-infringing material causes significant injury to the public where time-sensitive or controversial subjects are involved and the counter-notification remedy does not sufficiently address these harms."[281] More recently, the court gave victims of abusive takedowns a legal interpretation that would help to vindicate that public interest, holding that 512(f) entitled the target of a misfired takedown to file suit even if the plaintiff's only damages were non-pecuniary.[282]

Still, the reach of 512(f) is limited. *Rossi v. Motion Picture Assoc. of Am.* cabins the applicability of this cause of action by emphasizing

---

277. *Id.* at 1204–05.

278. *See Online Policy Group v. Diebold*, ELEC. FRONTIER FOUND., https://www.eff.org/cases/online-policy-group-v-diebold (last visited Dec. 21, 2010).

279. Lenz v. Universal Music Corp., 572 F. Supp. 2d 1150 (N.D. Cal. 2008).

280. *Id.* at 1155.

281. *Id.* at 1156.

282. *See* Lenz v. Universal Music Corp., No. C 07-3783 JF, 2010 WL 702466 at *12 (N.D. Cal. Feb. 25, 2010).

the foundational requirement that misrepresentation be "knowing," not merely careless.[283] Thus, in *Rossi* a takedown that could be verified to be improper — no file was ever in fact linked from a page stating movies were available — was held insufficient to support a 512(f) claim on the basis that the accusation was in good faith, though wrong.

### E. Against Copyright Secondary Liability

The problems identified here are not due solely to the DMCA. The safe harbor amplifies features of the underlying copyright law — the risks to intermediary service providers of liability for the materials they host or reproduce for users — even as it offers service providers one way to mitigate those risks and provides copyright claimants a simple means of triggering secondary liability.

Much of the law and economics literature surrounding vicarious liability models a corporation or employer whose agent causes some tort harm. Where the direct-tortfeasor agent may be judgment-proof, the corporate principal is assigned liability to assure that the victim is compensated and to approach a socially optimal level of harm-prevention.[284] Even here, scholars note that indirect liability is more expensive than direct liability because it includes both monitoring and precautionary costs.[285]

In the case of online copyright, by contrast, while the service-provider-intermediary is asked to assume the risks of vicarious liability, as a principal, its *functional* role is that of agent for end-user posters and speakers. A service provider (or several) is a necessary party to the end-user's online communications, but it is the end-users' interests that drive the communication and our policy concerns. This mismatch fuels concerns that secondary liability for copyright infringement over-deters speech.[286] "Indirect liability has a significant

---

283. *See* 391 F.3d 1000, 1004–05 (9th Cir. 2004) (noting that "good faith" is a subjective standard and investigation to verify the accuracy of a DMCA claim is not required).

284. *See, e.g.*, Lewis A. Kornhauser, *An Economic Analysis of the Choice between Enterprise and Personal Liability for Accidents*, 70 Calif. L. Rev. 1345 (1982); Giuseppe Dari Mattiacci & Francesco Parisi, *The Cost of Delegated Control: Vicarious Liability, Secondary Liability and Mandatory Insurance*, 23 Int'l Rev. L. & Econ. 453 (2003); Alan O. Sykes, *The Economics of Vicarious Liability*, 93 Yale L.J. 1231 (1983); *see also* Mark A. Lemley & R. Anthony Reese, *Reducing Digital Copyright Infringement Without Restricting Innovation*, 56 Stan. L. Rev. 1345, 1366 (2004) ("Vicarious liability in copyright law can be traced back to the doctrine of respondeat superior and was initially used to hold employers liable for infringements committed by their employees.").

285. Mattiacci & Parisi, *supra* note 284, at 456.

286. *See* Lemley & Reese, *supra* note 284, at 1349–50 ("[W]hile courts can make decisions about direct infringement on a case-by-case basis, lawsuits based on indirect liability sweep together both socially beneficial and socially harmful uses of a program or service, either permitting both uses or condemning both."); Alfred C. Yen, *Third-Party Copyright Liability After Grokster*, 91 Minn. L. Rev. 184, 187 (2006) ("Third-party copyright liability

drawback, however, in that legal liability — even if carefully tailored — inevitably interferes with the legitimate use of implicated tools, services, and venues."[287]

Finally, consider recent scholarship that looks at service providers as "platform" providers in two-sided markets.[288] To the extent that service providers think of themselves as mediating between customers on multiple sides, and curating their platforms to maximize the profit and minimize hassle, we see further deviation from the neutral forum in which all, even the disagreeable, can speak. An Internet whose forums are all maintained by private, mostly-commercial actors is already far from a public square. Imposing liability risks on the forum hosts encloses it further.

## V. Reforming Copyright Takedown

As it now sits, the anchor for online speech is tenuous. Individual speakers lack security in the availability of hosting for their speech, and the public lacks assurance that it will be able to receive and maintain access to the full range of speech inputs to our ongoing conversations, be they scientific, literary, artistic, political, or merely fun. Copyright is emerging as the tool of choice for those who would disrupt online expression.

The uncertainty of underlying copyright law compounds the errors of the DMCA regime, pushing individuals toward self-censorship and their service providers to censorious takedown. The First Amendment requires us to correct these biases in substance and process. Following the recommendations of James Boyle,[289] I argue that

---

benefits society by encouraging individuals to stop others from infringing, but those benefits come at a price because third-party defendants cannot focus precautions solely on infringers.").

287. Douglas Lichtman & William Landes, *Indirect Liability for Copyright Infringement: An Economic Perspective*, 16 HARV. J.L. & TECH. 395, 409 (2003); *see also* Neal Kumar Katyal, *Criminal Law in Cyberspace*, 149 U. PA. L. REV. 1003, 1007–08 (2001).

288. *See, e.g.*, Kevin Boudreau & Andrei Hagiu, *Platform Rules: Multi-Sided Platforms as Regulators* (SSRN Working Paper Series, Sept. 18, 2008), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1269966; Jörg Claussen, Tobias Kretschmer & Philip Mayrhofer, *Private Regulation by Platform Operators — Implications for Usage Intensity* (SSRN Working Paper Series, May 5, 2010), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1599458.

289. *See* James Boyle, *A Politics of Intellectual Property: Environmentalism for the Net?*, 47 DUKE L.J. 87, 111 (1997) (identifying a tension between "information" and "innovation" views of intellectual property, and decrying the current tendency to over-propertize and over-protect). In the context of environmentalism, Boyle noted that:

> The environmental movement gained much of its persuasive power by pointing out that there were structural reasons that we were likely to make bad environmental decisions; a legal system based on a particular notion of what "private property" entailed, and an engineering or scientific system that treated the world as a simple, linearly related set of causes and effects. In both of these conceptual systems, the en-

copyright law must be assessed environmentally: what costs accompany the copyright incentive to creative expression?

Concentrating enforcement at service provider chokepoints, while the cheapest enforcement mechanism from a copyright-owner's perspective, imposes too much collateral cost on the speech environment. As it stands, copyright is not serving the cause of semiotic democracy or promoting human flourishing.[290] Moreover, the chilling effect analysis indicates that over-deterrence is a problem deeper than the DMCA notice-and-takedown regime; it is a problem endemic to copyright law and its secondary liabilities. As copyright expands in scope, time, and breadth, its erroneous application and the chill of secondary liability assume greater significance.

Instead, we should calibrate and limit service provider liability to support free exchange of ideas. The most speech-hospitable, least biasing regime, I argue, is that of common carriage. Common carriage requires service providers to carry traffic on non-discriminatory terms, guaranteeing all equal access to transit or forum. The non-intellectual property regime of Section 230 of the Communications Decency Act ("Section 230") moves partially in that direction.[291] While it does not require service providers to carry all traffic, it does eliminate their risk of liability for user-posted speech, apart from intellectual property and criminal claims.

Section 230 protects the providers of "interactive computer services" from most liability for the speech of their users.[292] To achieve the statutory purposes of enabling lawful speech by reducing disincentives on service providers, courts have interpreted the provision broadly.[293] As the Fourth Circuit put it in the early *Zeran* case, "law-

---

vironment actually *disappeared*; there was no place for it in the analysis.
*Id.*

290. *See* WILLIAM W. FISHER III, PROMISES TO KEEP 247 (2004); William Fisher, *Theories of Intellectual Property*, *in* NEW ESSAYS IN THE LEGAL AND POLITICAL THEORY OF PROPERTY 168, 188–89 (Stephen R. Munzer ed., 2001); William W. Fisher III, *Property and Contract on the Internet*, 73 CHI.-KENT L. REV. 1203, 1217 (1998) ("In an attractive society, all persons would be able to participate in the process of meaning-making. Instead of being merely passive consumers of cultural artifacts produced by others, they would be producers, helping to shape the world of ideas and symbols in which they live.").

291. 47 U.S.C. § 230 (2006). This statutory provision was enacted to address contradictory and speech-constricting rulings regarding liability for online defamation. *See* Zittrain, *supra* note 61, at 262.

292. *Id.* § 230(c)(1).

293. Overall, Congress passed the Communications Decency Act to encourage service providers to reduce online access to indecent material or content deemed "harmful to minors." Section 230 was intended to remove the disincentive to monitor and moderate user-generated content that arose from notice-based liability. *See* David Ardia, *Free Speech Savior or Shield for Scoundrels: An Empirical Study of Intermediary Immunity Under Section 230 of the Communications Decency Act*, 43 LOY. L.A. L. REV. 373, 409–11 (2010). The Supreme Court struck down the bulk of the Communications Decency Act, but left section 230 in place. *See* ACLU v. Reno, 521 U.S. 844 (1997).

suits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions — such as deciding whether to publish, withdraw, postpone or alter content — are barred."[294] Section 230 thus bars any non-intellectual property theory of liability that seeks to hold the host liable as speaker, publisher, or distributor of user-posted content. However, Section 230 specifically excludes intellectual property and criminal claims from its protections.[295]

Outside the realm of intellectual property, the Section 230 shield removes many of the explicit legal pressures from service providers to remove content. They can set their own terms of service — choosing to maintain "family-friendly" environments, attempting to build communities, or taking a hands-off, anything goes approach.

Common carriage would go a step further, mandating that service providers take *all* traffic while behaving as conduits. Service providers would then be affirmatively discouraged from removing lawful speech.[296] Common carriage is mandated in telecommunications for Title II "telecommunications services" — the telephone carriers are not liable for anything you might say or sing over the telephone, and forbidden from interfering with it.[297] Focus has been moving steadily away from common carriage, however, as the FCC has instead classified all Internet access services as "information service," with lesser access requirements than those imposed on common carriers.[298] The FCC's May 2010 "third way" proposal to "recognize the transmission component of broadband access service — and only this component — as a telecommunications service," would at least provide a substrate on which more neutral hosting services could be anchored.[299]

If common carriage for service providers is unlikely to be realized, we could still take service providers out of the loop for user-driven copyright infringement with brighter lines of protection.

---

294. Zeran v. Am. Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997).

295. *See* 47 U.S.C. § 230 (e)(1)–(2).

296. Some argue that common carriage rules would themselves impinge on the free speech of service providers. *See* Angela J. Campbell, *Publish or Carriage: Approaches to Analyzing the First Amendment Rights of Telephone Companies*, 70 N.C. L. Rev. 1071, 1132 (1992) (relating assertions by Bell Companies that "regulated utilities have First Amendment rights just like other citizens") If common carriage prohibited service providers from speaking or from hosting communities with more structured terms, that would be problematic, but common carriage is only a base layer. So long as that layer remains neutral, both service providers and their users at all subsequent levels are free to speak and to set terms.

297. *See* Jonathan E. Nuechterlein & Philip J. Weiser, Digital Crossroads: American Telecommunications Policy in the Internet Age 23 (2005).

298. *Id.* at 165–68.

299. *See* Julius Genachowski, FCC, The Third Way: A Narrowly Tailored Broadband Framework (May 6, 2010), *available at* http://www.broadband.gov/the-third-way-narrowly-tailored-broadband-framework-chairman-julius-genachowski.html.

Modifications to the DMCA could minimize the risks of error by confining the takedown remedy to the most easily identifiable and verifiable cases of infringement. This limitation could be achieved by narrowing the class of uses for which takedown was available, stiffening the identification requirements, and better balancing the burdens of claim and response.

Thus, we might release service providers from any liability where the claimed infringement was less than entire commercial appropriation of a copyrighted work.[300] If the duty to respond arose only on receipt of a notice that fully identified the claimed infringing work and pointed to a situation almost certain to be infringement, the service provider could cheaply compare the two, verify the complaint, and run a substantially smaller risk of erroneous takedown. Limiting takedowns to claimed commercial appropriation of entire works and requiring proof to be submitted along with the notification would enable service providers to make informed determinations and lessen the opportunities for abusive claims.

Substantial alterations to the structure of the DMCA would be necessary to correct the fundamental flaw that targets of notifications are presumed guilty, and punished with the loss of speech, before they can contest the charges. The focus of copyright law should be put back on the direct infringer, with claims redressed through damages rather than prior restraint. Even changes to the timing could help. Rather than "expeditious" takedown, content removal should be deferred until the poster has been notified and given an opportunity to respond.[301] Counter-notification would toll the takedown obligation immediately, eliminating the ten to fourteen business day downtime. Trimming the counter-notification requirements to match the minimal elements required for initial notice and eliminating the ten day holding period would help those who face erroneous takedown to recover quickly. Even if the counter-notification rate increased tenfold, it would be unlikely to come from the wholesale copyists and would still represent a tiny number compared to the takedowns.

Better balancing § 512(f) would entail a more minor fix. Currently, the sender of a takedown notice need only make a "good faith" declaration of infringement that is not "knowingly materially misleading."[302] He swears under penalty of perjury only that he acts on authority of a copyright owner.[303] Thus, so long as copyright holders don't send their bots out *intending* to err, their failure to validate the

---

300. While this would still fail under Rebecca Tushnet's argument that even entire copying may be protected speech, *see supra* note 87, it would relieve the pressures on fair use and greatly alleviate the burdens on speech short of full copying.

301. Urban and Quilter make a similar recommendation. *See* Urban & Quilter, *supra* note 160, at 688.

302. 17 U.S.C. § 512(f) (2006).

303. *Id.* § 512(c)(3)(A).

results of the scan or to check fair use defenses may be excused so long as it was in "good faith." The law should require greater diligence: declarations on penalty of perjury to match those required by the respondent, and perhaps even a bond against erroneous claims. If a poster can prove speech was wrongly removed, she should not have to engage in protracted litigation — the *Lenz* case has been running since the June 4, 2007 takedown of Lenz's video.[304] Strengthening the counter-suit provisions could encourage a plaintiffs' bar to take up these cases as private attorneys general. Stiffening the penalties against claimants who obtained takedowns through misrepresentation of infringement would encourage claimants to verify and support their claims of infringement or penalize them for failure to do so rather than allowing them to shift that burden to service providers and posters.

While the First Amendment information environment would be better served by reining in the copyright excesses of the DMCA and intermediary liability, the trend of policy is, regrettably, in the opposite direction.

Lessons from the errors and incentive problems surrounding copyright takedowns are particularly timely amid debate on the Anti-Counterfeiting Trade Agreement ("ACTA") and so-called "three strikes" proposals requiring service providers to disconnect allegedly infringing customers after repeated warnings or infringements.[305] Here too, copyright enforcement is put into private hands as injunctive relief, with even more serious impact on expression. Under these "graduated response" plans, service providers are required to impose on Internet users a series of increasing sanctions in response to notifications claiming copyright infringement: these may include warnings, fines or suspensions of service, and finally termination of Internet service.[306]

---

304. *See* Lenz v. Universal Music Corp., 572 F. Supp. 2d 1150, 1152 (N.D. Cal. 2008).

305. Although the negotiating parties assert that the ACTA documents and discussions are matters of national secrecy, some documents have leaked amid intense public pressure. Law Professor Michael Geist maintains excellent coverage and discussion of the issue. *See ACTA Posts*, MICHAEL GEIST, http://www.michaelgeist.ca/index.php?option=com_tags&task=view&tag=acta&Itemid=408 (last visited Dec. 21, 2010); *see also* Cecilia Kang, *Secret Internet Copyright Talks Raise Concerns*, POST TECH (Nov. 5, 2009, 7:15 PM), http://voices.washingtonpost.com/posttech/2009/11/secret_internet_copyright_talk.html.

"Three strikes" provisions that have been proposed or enacted in national law include France's HADOPI (passed, struck down by the constitutional court, and re-passed), New Zealand's Copyright (Infringing File Sharing) Amendment Bill (dropped), and the UK's Digital Economy Bill (as of March 20, passed the House of Lords). *See* Annemarie Bridy, *ACTA and the Specter of Graduated Response* (Am. Univ. Washington Coll. of Law, Program on Info. Justice & Intellecutal Prop. Research Paper, 2010), *available at* http://digitalcommons.wcl.american.edu/research/2/.

306. *See* Bridy, *supra* note 305; Peter K. Yu, *The Graduated Response*, 62 FLA. L. REV. 1373, 1379–80 (2010).

While it had been on entertainment company agendas for some time before, graduated response was first enacted in the French law on the distribution and protection of creative works on the Internet (Loi Favorisant la Diffusion et la Protection de la Création sur Internet, HADOPI).[307] Initially, the French Constitutional Court blocked enforcement of the law, finding that Internet accounts could be suspended only upon approval by a judge.[308] The bill was revised to require that a judge issue the suspensions, rather than the same HADOPI agency that sends warning letters. After two warnings, Internet users could face suspension of Internet access up to a year long.[309]

The UK Digital Economy Bill,[310] passed in a "wash-up" just before the change of Parliament in March 2010, gives copyright owners a notification process similar to that of the U.S. DMCA "if it *appears* to a copyright owner that a subscriber to an internet access service has infringed the owner's copyright by means of the service" or has allowed another to use the service to infringe.[311] The Digital Economy Bill draft differs from the DMCA in recommending an appeals process with independent oversight, although this occurs only if a subscriber complains.[312] The Secretary of State is given significant authority to rewrite the law, once passed; for example, "[t]he Secretary of State may at any time by order impose a technical obligation on [service providers]."[313] A wide-ranging group of public interest and political participants have expressed opposition.[314]

---

307. *See* Nicolas Jondet, 38th Annual TPRC Conference: The French Copyright Authority (HADOPI), the Graduated Response and the Disconnection of Illegal File-Sharers(Oct. 2010).

308. *See* Eric Pfanner, *France Approves Wide Crackdown on Net Piracy*, N.Y. TIMES (Oct. 22, 2009), http://www.nytimes.com/2009/10/23/technology/23net.html?_r=1.

309. *See* CODE DE LA PROPRIÉTÉ INTELLECTUELLE art. 335-7, *available at* http://www.legifrance.gouv.fr/affichCodeArticle.do?cidTexte=LEGITEXT000006069414&idArticle=LEGIARTI000006279194&dateTexte=&categorieLien=cid ("Lorsque l'infraction est commise au moyen d'un service de communication au public en ligne, les personnes coupables des infractions prévues aux articles L. 335-2, L. 335-3 et L. 335-4 peuvent en outre être condamnées à la peine complémentaire de suspension de l'accès à un service de communication au public en ligne pour une durée maximale d'un an, assortie de l'interdiction de souscrire pendant la même période un autre contrat portant sur un service de même nature auprès de tout opérateur.").

310. Digital Economy Bill, 2009–10, H.L. Bill [89], *available at* http://www.publications.parliament.uk/pa/ld200910/ldbills/001/10001.6-12.html#j161.

311. *Id.* cl. 124A(1) (emphasis added).

312. *Id.* cl. 124E(4).

313. *Id.* cl. 124H.

314. *See* Bobbie Johnson, *Rush To Pass Digital Bill Will 'Sidestep Democracy,'* THE GUARDIAN (London), Mar. 19, 2010, http://www.guardian.co.uk/technology/2010/mar/19/digital-bill-open-letter; *Open Letter: Wash-up Not Appropriate for Controversial Disconnection Proposals*, THE GUARDIAN (London), Mar. 19, 2010, http://www.guardian.co.uk/technology/2010/mar/19/digital-britain-file-sharing.

In proposals leaked from the secret negotiations around ACTA, it is clear that intermediary liability — and not safe harbors from it — is critical to the U.S. negotiations. A leaked EU memorandum states:

> "On the limitations from 3rd party liability: to bene-fit from safe-harbours, service providers need to put in place policies to deter unauthorised storage and transmission of IP infringing content (ex: clauses in customers' contracts allowing, *inter alia,* a graduated response). . . . This Section 3 should also contain 'broad' provisions regarding notice-and-takedown mechanisms."[315]

A recent draft provides for safe harbors with similar exceptions and takedown conditions as the U.S. DMCA. The proposition that service providers are responsible for their users' behavior or best situated to stop copyright infringements takes little account of the speech-chilling effect such enforcement power has.

The danger in these proposals is that intermediary liability or its notice-driven threat produces an information space skewed toward the commercial, popular, and bland. Instead of an open field for creative expression, political discourse, and dissent, intermediary liability will tend to constrain our choices as speakers and listeners. The space will favor the commercial speakers who can pay the service providers' extra costs of responding to complaints or indemnify them against future demands.

Popular mass content will find mirrors among fans who can keep it in circulation even as early posts are forced offline. Bland speech will face fewer challengers threatening to raise service providers' hosting costs. Meanwhile speech that is non-commercial, minority, and challenging lacks these advantages. It will be vulnerable to take-down upon threat, and it will find fewer supporters willing to repub-lish it. If its critical, parodic, or its opposition nature causes some to file DMCA takedown notices, even if unwarranted, this may be enough to bump the content offline and out of the public discourse. These errors in copyright's author-protective mechanisms, eroding the very purpose of the copyright law and the First Amendment, should send us back to look for better-tailored enforcement measures.[316]

---

315. ACTA — Internet Chapter (EC) No. 588/09 of 30 Sept. 2009, *available at* http://www.michaelgeist.ca/component/option,com_docman/task,doc_download/gid,26/.

316. *See* Lichtman & Landes, *supra* note 287, at 410. ("The core insight is that every mechanism for rewarding authors inevitably introduces some form of inefficiency, and thus the only way to determine the proper scope for indirect liability is to weigh its costs and benefits against the costs and benefits associated with other plausible mechanisms for re-warding authors.").