# EXHIBIT 18

**88 Geo. L.J. 1833**

**Georgetown Law Journal**
June, 2000

Alfred C. Yen [a1]

Copyright (c) 2000 by the Georgetown Law Journal Association; Alfred C. Yen

# INTERNET SERVICE PROVIDER LIABILITY FOR SUBSCRIBER COPYRIGHT INFRINGEMENT, ENTERPRISE LIABILITY, AND THE FIRST AMENDMENT

| | | |
|---|---|---|
| INTRODUCTION | | 1834 |
| I. | THE UNDERLYING LAW OF INTERNET SERVICE PROVIDER (ISP) LIABILITY FOR SUBSCRIBER INFRINGEMENT | 1838 |
| | A. DIRECT LIABILITY IN COPYRIGHT | 1840 |
| | B. VICARIOUS LIABILITY IN COPYRIGHT | 1843 |
| |    1. General Principles: The Distinction Between Landlords and Dance Hall Proprietors | 1844 |
| |    2. Cases Holding That ISPs Resemble Landlords: *Netcom* and *Marobie-FL* | 1845 |
| |    3. Vicarious Liability of ISPs and Enterprise Liability in Tort | 1848 |
| |       *a. Contrasting Approaches to Vicarious Liability: The Trade Show Cases* | 1848 |
| |       *b. Factual Distinctions Between ISPs and Trade Show Operators* | 1852 |
| |       *c. Borrowed Insights From Enterprise Liability in Torts* | 1856 |
| |          *i. Vicarious Liability Under Respondeat Superior* | 1858 |
| |          *ii. Strict Products Liability* | 1859 |
| |          *iii. Application of Borrowed Insights to Vicarious Liability of ISPs in Copyright* | 1862 |
| |    4. Vicarious Liability of ISPs and the First Amendment | 1865 |
| | C. CONTRIBUTORY LIABILITY IN COPYRIGHT | 1872 |
| | D. A SUMMARY OF THE UNDERLYING LAW | 1880 |
| II. | THE DIGITAL MILLENIUM COPYRIGHT ACT (DMCA) | 1881 |
| | A. THE DMCA'S PROVISIONS | 1881 |
| | B. EVALUATING THE DMCA | 1885 |
| CONCLUSION | | 1890 |

## *1834 INTRODUCTION

The Internet [1] is one of the Twentieth Century's most important innovations. The Internet's prompt, accurate, and inexpensive distribution of digital information means that practically anyone can receive or disseminate text, images, sound, software or data at the touch of a button. Indeed, a person with an ordinary personal computer and a modem can communicate with as many people as a major corporation with millions of dollars in resources. Now, more than ever before, practically anyone can influence the duplication and dissemination of information around the world.

These fascinating capabilities challenge the laws that govern the duplication and dissemination of information, particularly copyright law. If practically anyone can receive and send information, then practically anyone with access to a copyrighted work can duplicate it, adapt it, or disseminate it. Not surprisingly, commercial proprietors of copyrighted works (so-called "content providers") generally find the Internet threatening to their economic interests. Each duplication of a work arguably represents an infringement of copyright for which content providers should receive compensation. [2]

The Internet also offers content providers commercial opportunities that depend on close control over the access, duplication, and distribution of their works on the Internet. Consider a business that sells books, compact discs, or software through conventional means. Each copy sold requires that a physical copy be made and distributed to the customer. In addition, the seller often must maintain retail space and expend considerable funds on print or television marketing. The Internet can make this activity much

less expensive. Businesses **\*1835** can communicate easily with millions of customers through company web sites and email. Orders can be placed and received electronically. The Internet lowers costs by replacing expensive "real space" stores, copies, and communication with cheap, speedy, electronic equivalents.[3]

If anyone can make multiple copies of a work available on the Internet, content providers lose some of their ability to exploit these possibilities. From the perspective of content providers, even an innocent "single use" represents a meaningful threat. Hundreds or even thousands of people can easily access a personal web page or an email floating through cyberspace.[4] If, as content providers often contend, each of these copies represents an infringement for which the content provider should be paid, the Internet deprives content providers of present revenues and a lucrative future.

Of course, content providers are not idle in protecting their self-interest.[5] They complain when people make unauthorized use of copyrighted material on the Internet.[6] In more extreme cases, they sue.[7] However, aggressive copyright enforcement strategies may not be enough to achieve the content providers' objectives. Infringements occur because many Internet users are ignorant of copyright law.[8] Other users deliberately infringe and hope that they will not be discovered.[9] Even if content providers detect infringement, they often go uncompensated because the costs of pursuing compensation outweigh the expected recovery or because the infringer cannot be found. Understandably, content providers wish to deter infringements and ensure compensation for those infringements that do occur.

One controversial proposal for achieving these goals has been to hold Internet Service Providers (ISPs)[10] liable for copyright infringements committed by **\*1836** their subscribers.[11] The argument in favor of such liability claims that the risk of copyright infringement is a natural by-product of Internet service.[12] therefore, indicate that ISPs should internalize losses resulting from that risk as a cost of doing business. This will force ISPs to deter copyright infringement, raise compensation for copyright infringements that occur, and spread costs throughout the Internet-user community.[13] Moreover, three copyright doctrines offer plausible support for the general idea of ISP liability. First, the ISPs' ownership of the equipment that stores, makes, and transmits copies of copyrighted material may be enough to make ISPs directly liable as copyright infringers with or without a finding of liability against the user. Second, the relationship between an ISP and its customers may be close enough to make the ISP vicariously liable. Third, an ISP might face contributory liability if it knowingly provides Internet service to a subscriber who is committing copyright infringement.[14]

By contrast, the argument against such liability claims that ISPs are not responsible for their subscribers' behavior. Internet service does not necessarily imply copyright infringement; therefore, the decision to use the Internet this way and any legal responsibility properly rest with the subscriber. Moreover, the extension of ISP liability would give ISPs powerful incentives to protect **\*1837** their economic interests by removing subscribers' material from the Internet, even when a good case for copyright infringement does not exist. Such indiscriminate censorship conflicts with First Amendment principles and is too high a price to pay for the protection of copyright rights.[15] Courts therefore should refuse to extend ISP liability.[16]

Initial jousting over ISP liability has proven inconclusive. Although courts show an understandable reluctance to hold ISPs liable for the deliberate behavior of others, the few judicial opinions that exist are by no means conclusive.[17] Moreover, the Clinton Administration's Working Group on Intellectual Property Rights supported ISP liability in its so-called "White Paper,"[18] but academic commentary has been split.[19] Congress responded to pressure to clarify the law in 1998, when it addressed the issue of ISP liability in the Digital Millennium Copyright Act (DMCA).[20] However, the DMCA "solution" to the problem of ISP liability was odd. Instead of directly addressing the question, Congress deliberately left the law--with all of its ambiguities--unchanged. Congress then added a fairly complicated set of new procedures to the DMCA which provide ISPs safe harbors from liability as long as they adopt specified "good citizenship" policies including the termination of subscribers who commit copyright infringement and the removal of alleged infringing material from the Internet. In short, ISPs presently do not know if they are in fact liable for the behavior of their subscribers, but they do know that they can escape liability by cooperating with content providers who complain of copyright infringement.[21]

This article examines the two-tiered legal regime described above. Part I considers ISP liability in the absence of the DMCA. This is important because **\*1838** the DMCA deliberately avoids changing the underlying law. Furthermore, the DMCA's "good citizenship" requirements and limitations on service provider liability are fairly complicated. It is very conceivable that cases

Case 2:24-cv-02527-JAM-CKD     Document 47-19     Filed 03/07/25     Page 4 of 52

will arise in which the DMCA safe harbor provisions do not apply. This part describes the legal doctrines that arguably support ISP liability, and it contends that courts have sensibly interpreted these doctrines to avoid ISP liability unless an ISP knows of a particular subscriber's infringement and continues to provide Internet service to that subscriber. However, these decisions are few in number, and their continued vitality is uncertain. To further demonstrate the wisdom of the current cases, Part I goes on to explore the policy implications of enterprise liability in tort and First Amendment law. This exploration reveals that ISP liability beyond what courts already recognize would be inconsistent with well-accepted limitations on enterprise liability in tort and important free speech principles.

Part II analyzes the DMCA and its relationship to the underlying law. This part describes the DMCA's effect on both existing law and the behavior of ISPs. Although Congress must be credited for trying to curb copyright infringement while providing ISPs some relief from liability, the Act contains flaws. In particular, Congress's decision to leave the underlying law of ISP liability unchanged creates a complicated scheme that goes too far in encouraging ISPs to advance the interests of content providers by removing alleged copyright infringements from the Internet. As Part II will show, the DMCA's failure to clarify the underlying law leaves open the possibility that courts will impose broad ISP liability. This threat gives ISPs a very real incentive to take advantage of the DMCA's safe harbors by removing material from the Internet upon a mere formal allegation of copyright infringement. This incentive may make sense to those who believe that copyright infringement must be eliminated to make the Internet a viable tool for commerce. However, Part II shows that the DMCA actually exacerbates conflicts between copyright and the First Amendment because it gives ISPs incentives to remove speech (that is, material in the form of text, images, or sound) from the Internet even though no copyright infringement has been established. [22]

This article concludes by calling on courts to interpret copyright law and the DMCA in a way that appropriately balances society's interests in preventing copyright infringement and free speech. This includes clarifying and strengthening the sensible decisions that have already been rendered, and then linking these decisions to the DMCA in a way that curbs the DMCA's tendency to encourage the indiscriminate removal of speech from the Internet.

## I. THE UNDERLYING LAW OF INTERNET SERVICE PROVIDER (ISP) LIABILITY FOR SUBSCRIBER INFRINGEMENT

The Internet is a vast network of linked computers through which information is rapidly sent. [23] People who desire access to the Internet must find some way to **\*1839** connect to this network. Individuals or businesses can connect directly to the Internet. [24] However, such direct connections are expensive and generally remain the province of governments, large businesses, and universities. [25] Most individuals and smaller organizations, therefore, opt for an Internet subscription from an ISP. [26] This generally involves the payment of a flat monthly fee [27] in return for the ability to connect to the Internet through the ISP's computers, an email account, and hosting of the subscriber's Internet web pages on the ISP's computers. [28]

Although there are a number of subscriber activities that may give rise to ISP liability, the most common scenario involves a subscriber's unlicensed use of copyrighted material on his web site. [29] Such uses run a wide spectrum from a borrowed image of a cartoon character [30] to comprehensive collections of music recordings or software. [31] All of these uses allow others who view the web site to download copyrighted material. [32] Because the copyright laws reserve the right **\*1840** to reproduce or distribute copyrighted material to the copyright holder, [33] the subscriber and ISP *may* be liable for copyright infringement. [34]

This part considers three theories under which ISPs potentially face liability for their subscribers' copyright infringement: direct liability, vicarious liability, and contributory liability. This requires a description of existing law and the leading cases already decided in an Internet context. These cases generally stand for the proposition that ISPs that offer the basic service described above will not be held liable. [35] However, the relative paucity of decisions, alternate interpretations of case law, and debatable questions of public policy leave the continuing vitality of this proposition open to doubt. The discussion of vicarious liability is therefore bolstered here by a discussion of a closely related area of law--enterprise liability in tort. This part concludes with a discussion of the implications of vicarious liability and contributory liability for First Amendment concerns.

## A. DIRECT LIABILITY IN COPYRIGHT

A court could hold an ISP liable for its subscribers' behavior by concluding that an ISP directly commits copyright infringement simply by providing basic Internet service to an infringing subscriber. This outcome seems plausible because ISPs automatically and routinely reproduce and distribute copyrighted material in response to subscriber requests. Subscribers upload material to web pages by instructing the ISP's computer to make and store a copy of the uploaded material. The ISP's computer then makes copies of the material every time a person views the subscriber's web page and sends those copies through the Internet to the viewing party. In addition, whenever a subscriber downloads  **\*1841**  information from the Internet, her ISP receives copies of copyrighted material and sends that material on to the subscriber. [36]  All of this activity arguably infringes the copyright holder's exclusive rights of reproduction and distribution. [37] *Playboy Enterprises, Inc. v. Frena,* [38]  however, is the only case that supports this result. Subsequent case law and commentary have properly discredited it.

In *Frena,* the defendant, George Frena, operated a subscription computer bulletin board service (BBS). [39]  Frena's subscribers hooked up to the BBS by modem and, for a fee, could browse through various collections of photographs that were stored on Frena's computer. Subscribers were also free to upload and download material to and from the BBS. [40]  Playboy held the copyright to a number of the images stored on Frena's computer. Frena claimed that he had not uploaded any of Playboy's images to the BBS himself, and further stated that he removed those photographs from the BBS as soon as he became aware of them. Playboy nevertheless sued and successfully moved for summary judgment, claiming that Frena was liable for copyright infringement. [41]

The *Playboy* court held that the BBS computer's automatic copying, storage, and distribution of Playboy's images infringed Playboy's exclusive copyright rights. [42]  Moreover, the court specifically disregarded Frena's uncontradicted statement that he did not upload any of Playboy's images to the BBS himself and did not know that those images existed on the BBS: "It does not matter that Defendant Frena may have been unaware of the copyright infringement. Intent to infringe is not needed to find copyright infringement. Intent or knowledge is not an element of infringement, and thus even an innocent infringer is liable for infringement …." [43]

It is a small step to move from the *Frena* holding to a general rule that ISPs are directly liable in copyright for carrying out subscriber instructions. If a BBS operator becomes liable simply for passively accepting uploads from subscribers and sending copies of the uploads to other subscribers, then ISPs should be similarly liable. However, the interpretation of law that supports this result is problematic.

 **\*1842**  The *Frena* court correctly stated that neither intent nor knowledge is an element of a claim for copyright infringement. [44] If, however, the irrelevance of intent or knowledge means that any ISP who reproduces or distributes a work commits copyright infringement, even when that copying results from the passive execution of subscriber instructions, a practically unlimited scope of liability soon follows. Internet operation requires the passive reproduction and distribution of material. When an Internet user asks to see a file, the computer on which the file resides makes a copy of the file and sends it to the user. However, that file does not travel directly to the user. Instead, it generally goes through other computers hooked up to the Internet. Each of these computers makes at least a partial copy of the relevant file and sends it on toward its intended recipient. [45]  Thus, if *Frena* applies to ISPs, the owners of each computer through which an unauthorized copy of a copyrighted work travels would be directly liable for copyright infringement because each of these computer owners, like Frena, copied and sent a copyrighted file at the request of a third party.

Not surprisingly, other courts have found this result extreme and have refused to follow *Frena.* For example, in the leading case of *Religious Technology Center v. Netcom On-Line Communication Services, Inc.,* [46]  the Northern District of California considered a claim that the ISP Netcom was directly liable for duplicating and disseminating allegedly infringing postings made to the Internet by Dennis Erlich, a BBS user. [47]  The *Netcom* court specifically considered and rejected the *Frena* approach, writing:

> Plaintiffs' theory would create many separate acts of infringement and, carried to its natural extreme, would lead to unreasonable liability…. [P] laintiffs' theory further implicates a Usenet server that carries Erlich's message to other servers regardless of whether that server acts without any human intervention beyond the initial setting up of the system. It would also result in liability for every single Usenet server in the worldwide link of computers transmitting Erlich's message to every other computer. These parties, who are liable under plaintiffs' theory, do no more than operate or implement a system that is essential if Usenet messages are to be widely distributed. There

Case 2:24-cv-02527-JAM-CKD    Document 47-19    Filed 03/07/25    Page 6 of 52

is no need to construe the [Copyright] Act to make all of these parties infringers. Although copyright is a strict liability statute, there should still be some element of volition or causation which is lacking where a defendant's system is merely used to create a copy for a third party. [48]

**\*1843** Other courts have followed *Netcom's* repudiation of *Frena,* [49] as have a number of commentators. [50] Thus, even though *Frena* technically remains good law and no appellate review of the question has yet occurred, it is difficult to conclude that an ISP could or should be held directly liable in copyright for providing Internet service to subscribers who infringe.

## B. VICARIOUS LIABILITY IN COPYRIGHT

Although the Copyright Act does not expressly provide for vicarious liability, courts have consistently imposed vicarious liability when two factors exist--"the right and ability to supervise" the primary infringer and a "direct financial interest in the exploitation of copyrighted materials." [51] Vicarious liability in copyright differs from the tort doctrine of respondeat superior because it extends vicarious liability beyond the employer/employee or master/servant relationship. [52] Nevertheless, both doctrines share a common basis in enterprise liability, [53] which states that enterprises should internalize losses caused by their existence as a cost of doing business. This encourages enterprises to take precautions against relevant losses or raise compensation for victims by spreading those costs over a broad segment of society. [54] Indeed, it has been stated that **\*1844** the requirements of supervision and financial interest are simply ways of evaluating whether a defendant can spread losses and police conduct. [55]

The vicarious liability of ISPs for subscriber copyright infringement depends upon the interpretation given to the requirements of supervision and direct financial interest. Two contrasting approaches exist. In one, courts apply vicarious liability with restraint, making the vicarious copyright liability of ISPs very unlikely. In the other, courts apply vicarious liability more liberally, making the vicarious liability of ISPs seem plausible but not certain. So far, courts directly addressing the question of ISP vicarious liability have adopted a restrained approach that does not support such liability. However, the existence of the broader approach to vicarious copyright liability raises the distinct possibility that future courts will not agree with the two existing judicial decisions. This part argues that the trend restricting vicarious liability of ISPs is correct for two reasons. First, important factual differences distinguish ISPs from infringers in the cases that best support ISP vicarious liability. Second, holding ISPs vicariously liable for subscriber infringements requires adopting a version of enterprise liability that is more extreme than American courts and legislatures have been willing to accept in tort law, the area in which enterprise liability has been most influential. Accordingly, courts should not hold ISPs vicariously liable for their subscribers' misdeeds as long as ISPs remain in a basic Internet service provider relationship with their subscribers. [56]

### 1. General Principles: The Distinction Between Landlords and Dance Hall Proprietors

The best way to approach the potential vicarious copyright liability of ISPs is to keep in mind the two types of cases about which there is general consensus. Numerous opinions consider dance hall proprietors vicariously liable for copyright infringement committed by performers while excusing landlords from liability for the acts of their tenants. [57]

The so-called "dance hall cases" generally involve a club, concert hall, or other establishment that has hired a musical performer to play music without obtaining a license. Although the dance hall has hired the performer as an independent contractor, courts impose vicarious liability in this situation because **\*1845** the defendants satisfy the two-factor test. [58] Dance hall proprietors meet the test with respect to supervision because they control the premises where the infringing performance happens and could use that control to prevent infringement. [59] Dance hall proprietors meet the requirement of direct financial benefit because the dance hall proprietors receive payment in the form of admission from patrons who enjoy the infringing performances, thereby profiting directly from the act of infringement. [60]

By contrast, landlords exercise far less control over rented premises than dance hall proprietors do over their halls. Although landlords could arguably require lease provisions that prohibit copyright infringement, allow themselves the right to enter

premises for inspection, and penalize noncompliance, they lack sufficient ability to supervise their tenants. [61] In addition, landlords do not have the same financial interest in their tenants' copyright infringement as dance hall proprietors have in their performers' infringements. The fixed monthly rental that characterizes ordinary leases means that the tenant's infringement does not directly affect the landlord's profitability. [62]

## 2. Cases Holding That ISPs Resemble Landlords: *Netcom* and *Marobie-FL*

As of this writing, only two courts have considerred the question of ISP vicarious liability. Both concluded that ISPs are more like landlords than dance hall proprietors and, therefore, are not vicariously liable. [63] In the first of these **\*1846** cases, *Religious Technology Center v. Netcom On-Line Communication Services, Inc.,* [64] the plaintiffs Religious Technology Center and Bridge Publications, Inc. owned copyrights in the writings of L. Ron Hubbard, founder of the Church of Scientology. [65] The plaintiffs sued over a number of postings made to the Internet through a computer bulletin board service (BBS) [66] by Dennis Erlich, a former member of the Church of Scientology. [67] Erlich's postings, which were critical of the Church, sometimes contained excerpts from the plaintiffs' writings. [68] The plaintiffs contended that Erlich's postings infringed their copyrights, and they contacted both Thomas Klemesrud, the operator of the BBS, and Netcom, the ISP for the BBS, to demand that they terminate Erlich's Internet access. [69] When Klemesrud and Netcom refused to terminate that access, the plaintiffs sued, alleging direct, vicarious, and contributory theories of liability. [70] The plaintiffs moved for a preliminary injunction against Netcom and Klemesrud while Netcom and Klemesrud countered with motions for summary judgment and judgment on the pleadings respectively. [71] The court granted Klemesrud's motion on the issue of vicarious liability, leaving Netcom as the only defendant on that issue. [72]

A good understanding of *Netcom* depends in part on the technical relationship among Erlich, Klemesrud, and Netcom. In particular, it is important to realize that Erlich did not gain access to the Internet directly through Netcom. Instead, Erlich contracted with Klemesrud [73] for the right to post messages on Klemesrud's BBS. Klemesrud in turn arranged for access to the Internet through Netcom. Thus, whenever Erlich wanted to post a message on the Internet, he connected by modem to Klemesrud's computer, which would take Erlich's posting and store it. Klemesrud's computer would then automatically transmit Erlich's message to Netcom's computer, which would in turn circulate the message through the Internet. [74] The plaintiffs' claim against Netcom, therefore, involved infringement committed by a customer of Netcom's subscriber and not infringement committed by the subscriber itself.

The *Netcom* court analyzed Netcom's potential vicarious liability by assuming that Erlich's postings were in fact copyright infringements. [75] The success of Netcom's motion for summary judgment depended solely on whether triable **\*1847** issues of fact existed with respect to Netcom's ability to supervise Erlich and Netcom's financial interest in Erlich's infringement. The court found that although Netcom might have had the necessary ability to supervise, it did not have the necessary direct financial interest. It therefore held that Netcom could not be vicariously liable. [76]

On the issue of supervision, the court recognized Netcom's argument that screening messages for infringements might be overwhelmingly burdensome. [77] However, the plaintiffs' expert declared that easy software modifications would allow Netcom to identify postings that came from particular people or contained certain words. [78] The court also noted that Netcom had suspended subscribers who had engaged in commercial advertising, posting of obscenity, and "off-topic postings." [79] The court, therefore, concluded that Netcom might have had the ability to supervise Erlich. [80]

On the issue of financial interest, however, the court had no doubts, invoking the contrast between landlords who rent for a fixed fee and dance hall proprietors whose ticket sales depend on the music being performed:

> For example, a landlord who has the right and ability to supervise the tenant's activities is vicariously liable on the infringements of the tenant where the rental amount is proportional to the proceeds of the tenant's sales. However, where a defendant rents space or services on a fixed rental fee that does not depend on the nature of

the activity of the lessee, courts usually find no vicarious liability because there is no direct financial benefit from infringement. [81]

This reasoning applies directly to the standard relationship between ISP and subscriber, in which the ISP receives a flat monthly fee for Internet service. [82]

In the second case considering the issue of ISP vicarious liability, *Marobie-FL, Inc. v. National Association of Fire Equipment Distributors,* [83] the Northern District of Illinois reached the same result as *Netcom,* but on slightly different facts. The plaintiff Marobie owned copyright in clip art developed for use by the **\*1848** fire service industry. [84] The primary defendant, National Association of Fire Equipment Distributors (NAFED), had a web page on the Internet that resided on the server of its ISP, Northwest Nexus, Inc. Apparently NAFED, through its agent, somehow copied Marobie's copyrighted images onto NAFED's web page. This allowed those who accessed NAFED's web page to view or download the images. [85] Marobie sued NAFED for direct copyright infringement and Northwest for direct, vicarious, and contributory infringement. Northwest and Marobie both moved for summary judgment. [86]

*Marobie* could be distinguished from *Netcom* because the ISP Northwest was being sued for the direct behavior of its subscriber NAFED. By contrast, Netcom was sued for the behavior of Erlich, a customer of its subscriber Klemesrud. Netcom's lack of a formal relationship with Erlich might have affected the court's finding that Netcom's relationship with Erlich was too distant to justify vicarious liability. [87] By contrast, NAFED's status as Northwest's direct subscriber might have created a relationship close enough to justify vicarious liability. However, the *Marobie* court chose to follow *Netcom* closely, finding that a triable issue of fact existed concerning supervision and that the flat fee paid by NAFED to Northwest made a finding of direct financial interest impossible. [88] Thus, *Marobie* applied *Netcom*'s holding against vicarious liability to cases involving direct infringement by an ISP's subscriber.

*Netcom* and *Marobie* unquestionably establish a trend against the vicarious copyright liability of ISPs for subscriber infringement, at least when ISPs receive only a flat fee for Internet service. However, it would be a mistake to conclude that other courts would necessarily follow this result. First, because only two district courts have addressed the issue, the question of ISP vicarious liability remains open in most jurisdictions. Second, the federal executive branch has embraced vicarious liability as desirable policy. [89] Third, other vicarious copyright liability cases have not always shared *Netcom* and *Marobie*'s strict reading of "direct financial interest." [90] Indeed, some of these cases arguably support the vicarious copyright liability of ISPs.

### 3. Vicarious Liability of ISPs and Enterprise Liability in Tort

*a. Contrasting Approaches to Vicarious Liability: The Trade Show Cases.* Like *Netcom* and *Marobie,* many other cases resolve questions about vicarious **\*1849** copyright liability by asking whether the defendant more closely resembles a dance hall proprietor or a landlord. Interpretation of the distinction, however, is far from uniform. Two cases that nicely illustrate this problem are *Artists Music, Inc. v. Reed Publishing, Inc.* [91] and *Polygram International Publishing, Inc. v. Nevada/TIG, Inc.* [92] Indeed, the two cases make for a particularly interesting comparison because they were decided one month apart. Moreover, their contrasting attitudes towards vicarious copyright liability represent a general disagreement that can be found throughout the relevant case law. [93]

In *Artists Music,* the defendant Reed Publishing (Reed) sponsored a trade show for which it rented 45,000 square feet of convention space. In turn, Reed rented out booth space to 134 exhibitors. [94] Reed also collected admission fees from those who attended the show. [95] Some of the companies that rented booth space used copyrighted music as part of their displays without permission of the copyright holders. [96] When these unlicensed performances were discovered, the copyright holders sued claiming, among other things, that Reed was vicariously liable for the infringements committed by the show exhibitors. [97] Both parties moved for summary judgment on the issue of vicarious liability, and the court granted Reed's motion. [98]

In deciding for the defendant, the court addressed the questions of supervision and direct financial benefit and found "that the relationship between trade show sponsors and trade show exhibitors is the legal and functional equivalent of the relationship between landlords and tenants." [99]  On the issue of supervision, the court believed that Reed had only limited control over the exhibitors' behavior. [100]  The plaintiffs argued that Reed could have policed the exhibitors (presumably by hiring a person to monitor the use of copyrighted music). [101]  The court, however, considered such policing onerous and impractical because **\*1850**  "Reed would have had to hire several investigators with the expertise to identify music, to determine whether it was copyrighted, to determine whether the use was licensed, and finally to determine whether the use was a 'fair use.'" [102]

As for the issue of direct financial benefit, the court noted that "Reed's revenues from the show did not in any way depend on whether or not the exhibitors played any music whatsoever." [103]  The court specifically rejected the plaintiffs' argument that the use of music created ambiance that made the exhibits more effective, thereby supporting the show's financial success. Thus, the court concluded that no vicarious copyright liability existed. [104]

*Artists Music* offers a limited vision of vicarious copyright liability that is consistent with *Netcom* and *Marobie*. Such liability exists only if the defendant has a high degree of control over and a great deal of financial interest in the underlying infringement. *Artists Music,* therefore, takes the distinction between landlords and dance hall proprietors very seriously. According to *Artists Music,* "the right and ability to supervise" does not exist simply because the defendant *could* have done something to detect and prevent copyright infringement. Hence, arguments about speculative or impractical opportunities for supervision and control fail because landlords (like trade show operators and ISPs) could also go to speculative and impractical lengths in an effort to exert control over their tenants. After all, landlords could enter their tenants' premises on a daily, weekly, or monthly basis to check for the presence of infringing materials. However, such efforts are considered too extreme to satisfy the requirements for vicarious liability.

Similarly, direct financial interest does not exist unless copyright infringement directly affects the defendant's revenues through booth sales or admission fees. The argument that exhibitor copyright infringement necessarily benefits trade show organizers fails because landlords benefit in the same way when tenants infringe copyright. Both exhibitors and tenants save money by infringing. These savings make both groups more likely to pay the rent on time or accept rent increases. Therefore, it is in both the trade show operator's and the landlord's "financial interest" when exhibitors and tenants commit copyright infringement. The result is an opinion that recognizes fairly strong limits on the existence of vicarious copyright liability.

By contrast, *Polygram International Publishing v. Nevada / TIG, Inc.* offers a much broader conception of vicarious copyright liability in which a relatively attenuated showing of supervision and financial interest will support a finding of liability. Like *Artists Music, Polygram* concerned a trade show operator (Interface) against whom the plaintiffs made allegations of vicarious copyright liability for unlicensed use of music by the show's exhibitors. [105]  However, *Polygram* **\*1851**  reached precisely the opposite result despite using the same landlord/dance hall proprietor analysis. [106]  According to the *Polygram* court, three things demonstrated the defendant Interface's ability to supervise and control the exhibitors. First, Interface did exercise some control over exhibitors through tradeshow "Rules and Regulations" for the show which *could have* contained prohibitions against the use of copyrighted music. [107]  Second, Interface had employees who monitored the show for compliance with its Rules and Regulations. [108]  Third, the rules of the show allowed Interface to remove exhibitors who "detracted from the general character of the Exposition as a whole." [109]  The court rejected the precise argument that the *Artists Music* court found persuasive--the impracticality of policing exhibitors for the unlicensed use of music. [110]

As for the issue of direct financial interest, the *Polygram* court again accepted the very argument that failed in *Artists Music*-- that music enhanced the effectiveness of the show. The *Polygram* court started by recognizing the beneficial ambiance created by music. However, instead of separating the exhibitors' benefit from the financial interest of the trade show organizer, the court lumped the two together. [111]  Indeed, the court's analysis moved directly from the interest of exhibitors to the benefits derived by the show organizers without any consideration of whether those benefits directly affected revenues from booth rentals or admission fees:

Since communicating with attendees and cultivating their interest in one's products is the entire purpose for *exhibitors* at the trade show, I find that when music assists in this communication, it provides a financial benefit to the *show* of a kind that satisfies the financial benefit prong of the test for vicarious liability …. [112]

*Artists Music* and *Polygram* suggest that future courts could disagree profoundly about the vicarious copyright liability of ISPs. Those following the *Artists Music* approach will find no vicarious liability because the necessary levels of supervision and financial interest do not exist. Those courts will conclude that it is at least as difficult for an ISP to supervise its subscribers as it is for a trade show organizer to supervise its exhibitors. [113] In addition, ISPs generally receive fixed fees for their provision of Internet service. Under the *Artists Music* approach, this pattern of compensation does not constitute "a direct financial interest." Just as trade show owners escape vicarious liability, so **\*1852** would ISPs. [114]

By contrast, courts following *Polygram* may decide differently. After all, an ISP (like the *Polygram* trade show operator) could make copyright compliance part of its system rules and then monitor for violations. In addition, ISPs arguably benefit from the existence of copyright infringement on the Internet. Thousands of users desire Internet service precisely because it offers free access to copyrighted materials. Thus, ISPs have the same degree of financial interest in infringement on the Internet as trade show operators have in the success of their exhibitors. Vicarious copyright liability should therefore follow.

The foregoing shows that the viability of *Netcom* and *Marobie* ultimately may turn on whether future courts find *Polygram* persuasive. To be sure, the *Netcom* court took due regard of *Polygram* and rejected it. [115] However, the reasoning behind that rejection is shaky because the court simply cited *Artists Music* and stated that the plaintiff's cited cases were factually distinguishable without explaining what those distinctions were. [116] This leaves room for a future court to question *Netcom* unless persuasive reasons exist for rejecting *Polygram*. It is therefore important to examine the significance of factual distinctions that exist between ISPs and trade show operators as well as any theoretical or policy implications of extending vicarious copyright liability to cover ISPs.

*b. Factual Distinctions Between ISPs and Trade Show Operators.* Similarities do exist between ISPs and trade show operators. Both ISPs and trade show operators control space (computer disk space for ISPs, and arenas for trade show operators) that is divided up and rented to customers. [117] However, important differences also exist. ISPs have more difficulty supervising their subscribers than trade show operators have in supervising exhibitors, and ISPs have less financial interest in their subscribers' infringements than trade show operators have in their exhibitors' infringements.

Consider the task confronting an ISP that wants to supervise all its subscribers. As an initial matter, the sheer volume of web pages, emails, uploads and downloads guarantees a huge and expensive administrative task because a typical ISP can have many thousands of subscribers with web pages. Even if ISPs could examine just the web pages on their servers, deciding whether infringement exists is a significant problem because every web page contains potential copyright infringements. The texts, images, sounds, graphics, overall design, and downloadable files that compose web pages are all generally **\*1853** copyrightable. [118] Thus, an ISP that looks at a web page sees only the intellectual property of others with no way of ascertaining whether that intellectual property belongs to the creator of the web page, is in the public domain, or has been used with permission. By contrast, a trade show owner has only a few hundred booths to police and most of the exhibitors' behavior will not implicate copyright at all. [119]

Other distinctions exist between the financial interest of trade show operators and ISPs. Even if one accepts the *Polygram* notion that the ambiance of music promotes the quality of the exhibits, which in turn enhances the quality of the show and, therefore, the profits enjoyed by the trade show organizer, it is not at all clear that the same argument applies to ISPs. While it is safe to presume that the unlicensed use of copyrighted material benefits an ISP's subscribers, those benefits do not flow to an ISP in the way that they supposedly flow to a trade show organizer. Under *Polygram,* the trade show organizer enjoys the benefits of copyright infringement through increased admission sales. By contrast, it is difficult to see how an ISP benefits in the same way because ISPs do not ordinarily sell admission to their subscribers' web pages. [120] Even if one considered **\*1854** the sale of Internet service to future subscribers to be the equivalent of selling access to copyright infringements on the Internet, the link between subscriber copyright infringement and new subscribers is very attenuated because a person who desires access

to infringements existing on a particular ISP's network need not subscribe to that ISP's services to gain access. An Internet connection through practically any ISP will suffice. [121] In fact, any benefits that might flow to ISPs for hosting infringements on their networks may be mitigated by associated costs. Each visit or "hit" to a web site containing infringement (the cyberspace equivalent to a trade show attendee) actually costs the ISP money because its computers must respond to the requests sent by the visitor's computer. [122] In the case of particularly popular web sites, the associated costs to the ISP can be significant because a high volume of hits can paralyze a web server. [123] ISPs that intend to benefit from copyright infringement must therefore be prepared to expend significant resources to cope with increased computer traffic brought about by copyright infringement.

The persuasive significance of the foregoing factual distinctions depends on the understanding given to the differences between *Polygram* and *Artists Music*. On the one hand, it is possible that the trade show cases are at the limit of vicarious copyright liability's reach. If so, then perhaps the two courts simply disagreed about the merits of a close legal decision. This would further suggest that the factual distinctions outlined above make a great deal of difference because they would place ISPs beyond the limit of vicarious liability marked out by the trade show cases.

On the other hand, it is also possible that the trade show cases do not test the limits of vicarious copyright liability. If so, then the *Polygram* and *Artists Music* courts did not necessarily disagree over a close legal decision. Instead, they could have had profoundly different conceptions about enterprise liability and its implications for vicarious copyright liability.

Under this scenario, the *Artists Music* court might have believed that enterprise liability should be confined to a narrow set of facts, namely those closely analogous to the dance hall cases. Small factual distinctions between the dance hall cases and those of trade show operators and ISPs would therefore be enough to defeat vicarious copyright liability. By contrast, the *Polygram* court might have believed that enterprise liability should be liberally applied to any defendant with a remote chance of exerting control over copyright infringers while receiving financial benefits from which damages could be paid. Small **\*1855** factual distinctions between the dance hall cases and those of trade show operators and ISPs would therefore be insufficient to defeat vicarious liability.

It is impossible to know exactly what a court was thinking at the time of any particular decision. However, there is some evidence from which one could infer that the two courts reached different results because they had a fundamental disagreement over the nature of enterprise liability and its implications for vicarious copyright liability. As an initial matter, both courts rendered their opinions in the context of summary judgment motions. This suggests that the cases were "easy" ones over which reasonable jurors could not disagree. [124] In addition, the theoretical explanations for vicarious liability given by the courts differ radically.

The *Artists Music* court stated that "[t]he purpose of imposing vicarious liability is to punish one who unfairly reaps the benefits of another's infringing behavior." [125] This explanation does not suggest a court motivated by an expansive view of enterprise liability. Indeed, the use of the word "punish" suggests that vicarious liability requires some degree of fault on the defendant's part, a requirement inconsistent with the strict liability rationales generally associated with enterprise liability. [126]

By contrast, *Polygram* contained a fairly detailed exegesis of enterprise liability. The opinion directly tied its explanation of vicarious copyright liability to the goals of enterprise liability: the internalization of foreseeable losses caused by an enterprise for purposes of deterring future loss and providing compensation through cost spreading. Judge Keeton wrote:

> When an individual seeks to profit from an enterprise in which identifiable types of losses are expected to occur, it is ordinarily fair and reasonable to place responsibility for those losses on the person who profits, even if that person makes arrangements for others to perform the acts that foreseeably cause the losses. The law of vicarious liability treats the expected losses as simply another cost of doing business. The enterprise and the person profiting from it are better able than either the innocent injured plaintiff or the person whose act caused the loss to distribute the costs and to shift them to others who have profited from the enterprise. In addition, placing responsibility for the loss on the enterprise has the added benefit of creating a greater incentive for the enterprise to police its operations carefully to avoid unnecessary losses. [127]

This explanation is practically identical to the one given for the rise of enterprise liability in tort law. [128]

**\*1856** The foregoing shows that *Netcom* and *Marobie* will likely prove persuasive to judges who believe that enterprise liability has limited application in copyright law. However, judges who are receptive to the idea of broad enterprise liability--whether generally or only in copyright law--will find vicarious liability for ISPs quite plausible. It is therefore important to examine whether presently accepted notions of enterprise liability support the extension of vicarious copyright liability to ISPs.

*c. Borrowed Insights from Enterprise Liability in Tort.* The theory of enterprise liability is simple. Enterprises that create risk should bear the burden of that risk as a cost of doing business. [129] Such cost internalization is more than just fair. It encourages risk creators to take precautions against loss, it provides compensation for victims, and it spreads the costs among all who benefit from the risk-creating activity. [130] These principles are easily marshaled to make a case for ISP vicarious copyright liability. After all, ISPs create a risk that their users will commit copyright infringement. Vicarious liability would internalize those costs to ISPs, encouraging them to take precautions, raise compensation, and spread costs throughout the Internet user community that benefits from Internet copyright infringement. Indeed, it is easy to see how "right and ability to supervise" and "direct financial benefit" may be related to an ISP's ability to take precautions and raise compensation. As Judge Keeton wrote in *Polygram,*

> This background of policy justifications for vicarious liability serves to place in context the two elements of benefit and control derived from the previous case law by the court in Shapiro, Bernstein. By focusing on benefit received from and control over an enterprise, a court can evaluate the defendant's ability to spread losses and police the conduct within the enterprise, as well as the underlying fairness of holding the defendant liable. [131]

Yet a broad application of enterprise liability may be deeply problematic because enterprise liability easily becomes liability without limit. As George Priest noted, the principles supporting enterprise liability do not suggest any logical limit for their application. [132] Holding an enterprise liable for any loss it causes serves the goals of deterrence, compensation and cost spreading. If an enterprise causes a loss, then it can take precautions against the loss--even if it means going out of business. Imposing liability forces the enterprise to either prevent the loss or raise money to pay for the loss by charging more money to **\*1857** its customers. A truly robust system of enterprise liability, therefore, means holding enterprises liable for losses associated with their existence regardless of fault or the behavior of others who might also have prevented the loss.

Of course, the American legal system has always resisted this result by limiting the reach of enterprise liability with doctrines that assign responsibility to some, but not all, of the parties who cause losses in our society. These doctrines include the requirement of ultrahazardous or abnormally dangerous activity for strict liability, [133] the requirement of defect in strict products liability, [134] proximate causation, [135] and the independent contractor defense to vicarious liability. [136] The well-established acceptance of these doctrines shows that the American legal system meaningfully limits the reach of enterprise liability. It is not enough to establish that an enterprise could have taken precautions and is able to raise compensation by spreading losses. Something more is required.

The limited application of enterprise liability in tort law has much to offer any consideration of vicarious copyright liability for ISPs. Enterprise liability has many attractive features. It appeals to a sense of fairness and equity. It embodies a general belief that law should encourage productive behavior and discourage unjustified loss. Tort law is the area in which our legal system has given the most attention to enterprise liability. Tort law reveals how our society balances its intuitions about loss prevention, personal responsibility, compensation for losses, and spreading of loss. The theoretical connection between vicarious liability in copyright and enterprise liability in tort suggests that results drawn from tort law can and should inform how far courts should go in imposing vicarious liability in copyright.

Although a comprehensive treatment of enterprise liability in tort is beyond the scope of this article, it is possible to study the general contours of the rules that govern tort cases presenting problems similar to the problem of vicarious copyright liability for ISPs. ISPs undoubtedly increase the chances that copyright **\*1858** infringement will occur by providing Internet services. However, the provision of these services alone does not result in copyright infringement because no infringement occurs until a subscriber misuses her Internet service. Tort cases that involve allegations of enterprise liability against the defendant and third-party misuse therefore seem most likely to yield insights valuable to the question of vicarious copyright liability for ISPs.

Two types of cases with these characteristics are vicarious liability under respondeat superior and products liability cases in which a third party misuses a product's obvious and inherent characteristics to injure others. Respondeat superior shares with vicarious copyright liability the theory that the relationship between the defendant and a third party render the defendant responsible for harm caused by the third party. Products liability cases involving third party misuse, like ISP vicarious liability cases, involve harm that occurs only because a third party has behaved improperly.

*i. Vicarious Tort Liability Under Respondeat Superior.* Vicarious liability in tort, like its namesake in copyright, constitutes a form of enterprise liability that holds the defendant liable for the behavior of another. Courts justify its existence on the ground that vicariously liable defendants should bear the burden of losses they cause to others for reasons of deterrence, compensation, and cost spreading. [137] Such liability attaches regardless of how reasonably the vicariously liable defendant behaved. Thus, employers can be held liable for torts committed by their employees even if the employer has taken all reasonable precautions. [138]

The universal acceptance of vicarious liability in tort shows that enterprise liability is well established as a theory of liability. Judicial elaboration of that theory also reveals meaningful limits to the reach of enterprise liability. If courts applied enterprise liability in all cases that furthered its policies, then they would hold enterprises liable for all torts committed by anyone with whom they had some sort of contractual relationship. The contract itself would present the enterprise with the opportunity to impose requirements designed to minimize loss, and the imposition of liability would raise compensation and spread those losses that did occur. However, courts have consistently rejected invitations to extend vicarious liability in tort to such lengths. Instead, they have generally limited vicarious liability to the acts of an employee acting within the scope of his or her employment. [139] These limitations reflect a policy against applying **\*1859** enterprise liability in the absence of close control over an underlying tortious act taken on behalf of the vicariously liable defendant. Vicarious liability, therefore, does not ordinarily arise from the acts of independent contractors even though they may "work for" an enterprise. [140] Nor does vicarious liability apply to the acts of employees who commit intentional torts on their own behalf. [141]

*ii. Strict Products Liability.* The analogy between vicarious copyright liability for ISPs and strict products liability is also fairly obvious. Both share the idea that one who introduces risk through commerce should bear the costs associated with that risk, thereby serving the policies of enterprise liability. In strict products liability, those who manufacture or sell a product can take precautions against loss by controlling the design and manufacture of the relevant product and by providing warnings where appropriate. [142] Internalization of costs associated with product risk provides compensation for victims of loss and spreads those costs among the products' users. [143] Such reasoning about enterprise liability could lead courts to impose liability on manufacturers and sellers for all harm caused by their products. However, courts have consistently rejected this possibility by insisting that strict liability applies only to unreasonably dangerous products. [144] This requirement has prevented the imposition of enterprise **\*1860** liability in a number of cases where it might otherwise have made sense, especially in cases where a third party has misused the obvious and inherent aspects of a product to injure another.

For example, many plaintiffs have claimed that gun manufacturers should be held strictly liable for injuries that result from improper use. From an enterprise liability point of view, these claims have some merit. Gun manufacturers know that their products will maim and kill. Some of their products (particularly the so-called "Saturday Night Special" handgun) are designed to facilitate concealment, thereby increasing the chances that the gun will be used improperly in domestic disputes and robberies. [145] Moreover, experience sadly has taught that guns also maim and kill when used carelessly. [146] Gun manufacturers are presumably in a position to affect the magnitude of these risks, whether by changing designs to make concealment harder, adding safety devices, providing warnings, or even refusing to sell certain weapons at all. If these precautions are not taken, it is arguably fair to hold gun manufacturers liable so as to compensate victims and spread the loss among those who purchase guns.

Despite support for these arguments in law review commentary, [147] it is almost impossible to find a court willing to hold gun manufacturers generally liable for the damages caused by their weapons. [148] Although courts seem willing to find specific weapons defective because they lack safeties or have other peculiar design flaws, [149] the "overwhelming weight of **\*1861** authority" [150] states that the makers of guns--even "Saturday Night Specials"--are not strictly liable for injuries caused by those guns because guns are not generally defective. In so ruling, courts specifically have noted and rejected the imposition of broad enterprise liability and have declined to make gun manufacturers insurers for those who misuse their weapons. [151] Instead, they have relied on the so-called "open and obvious rule." That rule states:

> The law does not require that an article be accident-proof or incapable of doing harm. It would be totally unreasonable to require that a manufacturer warn or protect against every injury which may ensue from mishap and the use of his product …. A hammer is not a defective design because it may hurt the user if it slips. A manufacturer cannot manufacture a knife that will not cut or a hammer that will not mash a thumb or a stove that will not burn a finger. [152]

In short, guns are not defective because the risk they pose is part of their inherent function and one that can be minimized by proper use. Responsibility for injuries caused by guns therefore lies with users and not manufacturers and sellers. [153]

Similarly poignant results exist in cases involving the misuse of alcohol. Once again, those who make and sell alcohol know that their product is subject to tragic misuse, and they could reduce the associated risks by providing warnings or limiting sales of their products. Holding alcohol manufacturers, liquor stores, and taverns liable would raise compensation for victims and **\*1862** spread loss. Yet, as in gun cases, courts will not hold a manufacturer or seller of alcohol strictly liable for the mere production or sale of liquor. [154] The reasons for such rulings are similar to those given in gun cases. The *Restatement* states:

> In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use…. But a seller is not required to warn with respect to products, or ingredients in them, which are only dangerous, or potentially so, when consumed in excessive quantity, or over a long period of time, when the danger, or potentiality of danger, is generally known and recognized. Again the dangers of alcoholic beverages are an example …. [155]

Accordingly, liability against the sellers of alcohol exists only when circumstances indicate negligence or recklessness (such as the serving of liquor to a patron who is obviously drunk). [156]

*iii. Application of Borrowed Insights to Vicarious Liability of ISPs in Copyright.* The foregoing shows that vicarious copyright liability for ISPs would be inconsistent with well-accepted limitations on enterprise liability expressed in tort law. [157] Clearly, courts are aware of enterprise liability's general appeal, **\*1863** and they consistently reject invitations to make enterprises into insurers of all risks associated with their existence. The reasons for this refusal apply to the case of vicarious copyright liability for ISPs.

As an initial matter, the relationship between ISP and subscriber is not at all like the kind of relationship that gives rise to vicarious liability in tort. Vicarious tort liability arises only when the underlying tortfeasor is an "employee." It is difficult to see how an ISP's subscriber could even be considered an independent contractor, let alone an employee. In an employer/employee relationship of the kind that gives rise to vicarious tort liability, the employer pays the employee to carry out the employer's wishes. That quid pro quo is at the heart of the control that justifies the imposition of vicarious liability. By contrast, an ISP does not pay its subscribers to carry out the ISP's wishes. Rather, the subscriber pays the ISP to carry out the subscriber's specific instructions over what to post, read, or download. [158] To be sure, those who favor ISP vicarious copyright liability will argue that ISPs can control their subscribers by refusing to post infringing material on a subscriber's behalf. As noted earlier, however, such control is fleeting at best. [159] Indeed, the argument amounts to not much more than an assertion that an agent can control his principal by refusing to follow the principal's instructions. Such control is not sufficient to establish vicarious liability in tort because an agent is not his principal's principal. [160]

Furthermore, even if one concluded that the relationship between ISP and subscriber were close enough to create a quasi-employer/employee relationship, the actions of the subscriber are not "within the scope of his or her employment." This is because subscriber infringements generally do not further and are **\*1864** not intended to further the ISP's business objectives. [161]

The reasoning behind strict products liability leads to similar results. In those cases, courts will not impose liability in the absence of defect, and such findings are particularly unlikely in cases involving obvious dangers that can be minimized by proper use. With these results in mind, it is difficult to see how Internet service could be considered a defective product. Although Internet service is capable of misuse, those risks exist only when a user takes deliberate steps to commit copyright infringement. Moreover, Internet service that is unable to reproduce, download, upload, or distribute copyrighted material is practically useless because the Internet's primary method of operation requires the reproduction and distribution of information. [162]

The extreme nature of a contrary result can be seen in two ways. First, if the mere ability to affect user infringement, raise compensation, and spread loss is enough to impose enterprise liability, then practically all providers of information technology could be held vicariously liable for subscriber infringement. In particular, the makers of personal computers, operating system software, Internet browsers, modems, and computer chips are equally good candidates for the imposition of enterprise liability. After all, subscribers who commit copyright infringement on the Internet must use a personal computer (which is run by a chip) to connect with their service provider. Such users also must run their computers with an operating system, surf the Internet with a browser, and post material with a modem. Moreover, Microsoft (the dominant provider of personal computer operating systems, and coincidentally a major content provider) recently suffered bad publicity when users discovered that its Windows 98 software could be used to monitor users' behavior. [163] This suggests that the makers of software and chips could monitor potential infringement at least as easily as ISPs could. When combined with the fact that the same companies could raise compensation and spread loss, the case for their vicarious liability also becomes plausible. Of course, this article does not seriously advance such a result. Rather, this theory's plausibility provides evidence that extending vicarious copyright liability to ISPs is unwise and extreme.

Second, a comparison between the societal importance of personal injury and copyright also shows that vicarious copyright liability for ISPs would be **\*1865** extreme given the present contours of enterprise liability. As society is painfully aware, alcohol and guns cause untold amounts of death, injury, and human misery every year. [164] Society, therefore, has a very strong interest in deterring these losses and compensating the victims, yet that interest is not enough to overcome our skepticism about enterprise liability. Our willingness to tell those who have lost family members, their ability to work, or their health that they must bear those losses alone shows that enterprise liability is truly limited in its application. Imposing vicarious copyright liability on ISPs for subscriber infringement would put us in the odd position of doing more to deter copyright infringement and compensate copyright losses than we do for those who have suffered crippling physical injuries or the death of a loved one. [165] Therefore, *Netcom* and *Marobie* ought to be followed by future courts.


### 4. Vicarious Liability of ISPs and the First Amendment

The often underappreciated importance of First Amendment [166] considerations in copyright sheds additional light upon the wisdom of holding ISPs vicariously liable for their subscribers' copyright infringements. Many scholars have written about the relationship between copyright and the First Amendment. [167] The **\*1866** fundamental insight of each of these articles is the same: the existence of copyright implicates the First Amendment because the assertion of copyright rights implies the restriction of a person's speech. When an individual is told that she cannot use a work in her own writing, her freedom of speech has been curtailed.

Of course, copyright's effects on free speech do not mean that copyright law is in and of itself unconstitutional. The First Amendment permits certain restrictions on speech, especially when the restrictions promote important public interests and the restricted speech adds little to the free marketplace of ideas. For example, restrictions against false advertising promote the public interest in accurate information about goods and prevent innocent consumers from being cheated. At the same time, the speech being restricted (that is, the false advertising) does little to further the First Amendment's purposes. [168] Similar arguments also support restrictions on obscenity and child pornography, [169] the content of corporate prospectuses, [170] and libelous speech. [171]

These insights support the existence of copyright law. On one hand, copyright promotes society's interest in encouraging the production of creative works by securing rights that authors are fairly owed. [172] On the other hand, the restricted speech adds relatively little to the marketplace of ideas or individual self-realization because copyright infringement generally occurs when one person **\*1867** copies (that is, repeats) the expression of another. [173]

The constitutionality of copyright's existence does not mean that copyright is free from constitutional difficulty. Copyright's prohibitions affect far more than simple copying of one person's speech by another. People copy whenever they create new works because creativity necessarily involves mixing significant new expression with copied expression. [174] Courts will apply copyright to prevent the creation and dissemination of some of the works that result. [175] Copyright, therefore, achieves its public purpose at the cost of meaningful civil liberties.

Courts generally respond to this observation by claiming that copyright has internal limitations that obviate the need to worry about conflicts with the First Amendment. [176] For example, the "idea/expression dichotomy" restricts copyright to the expression of ideas and not ideas themselves. This allows creators to freely borrow ideas from a copyrighted work while preserving the work's expression of those ideas as the author's property. [177] The "fair use doctrine" similarly limits the reach of copyright by excusing, among other things, copying that is productive in nature and does not unduly harm the market for the copyrighted work. [178] Other doctrines such as the "useful article **\*1868** doctrine," [179] "substantial similarity," [180] and "originality" [181] work in similar ways.

These assertions unquestionably have merit, but they oversell the ability of copyright's internal limitations to resolve conflicts with the First Amendment. The doctrines that supposedly divide one person's copyright from another's free speech are extremely vague. Clear, consistent, and easily applicable definitions of a work's ideas, the limits of fair use, or any of the other above-referenced doctrines simply do not exist. [182] Perhaps the concepts and policies that motivate these doctrines are related to First Amendment concerns, but that is hardly enough to make thinking about the First Amendment unnecessary. [183] To the contrary, the relevant concepts and policies will likely have their desired effect only if courts explicitly keep the First Amendment in mind. Anything less could easily result in an unconstitutional construction of copyright law.

A clear understanding of the First Amendment and its relationship to copyright reveals that there are two ways in which the courts must take account of free speech. The first way is rather obvious. Courts should keep the importance of free speech in mind when drawing the line between copyright and free speech. Consider a case in which the defendant admits to copying from the plaintiff's work and further contends that no infringement exists because the two works are not substantially similar. [184] In such a case, a court would **\*1869** normally determine whether infringement exists by measuring the degree of similarity between the two works. If the First Amendment were ignored when making this determination, a court could simply look at the two works and decide that any recognizable similarity establishes infringement because borrowing from a copyrighted work implies the taking of another's property. [185] By contrast, due regard for the First Amendment recognizes that all authors borrow when expressing themselves, and that infringement based upon recognizable similarity alone is tantamount to declaring the process of authorship an infringement of copyright. Such a result would impose serious, unconstitutional burdens on free speech. The key issue in copyright, therefore, is drawing the line to maintain a workable balance between copyright interests of authors and free speech.

The second way in which courts must take the First Amendment into account is less obvious. Even if courts correctly define the line between copyright and free speech, the nature of that line must also be taken into account. This requirement arises because legal rules are not always clear. If legal rules were always clear, no problem would exist because the line between copyright and free speech would be precise and easy to follow. Courts could apply the standard without fear of error, and potential litigants (that is, authors and content providers) could conform their conduct to the law and resolve disputes without trouble. By contrast, vague legal rules make things much more difficult. Courts will make errors, and potential litigants will err when guessing whether courts will consider their contemplated behavior legal. In most situations, the legal system simply accepts these errors. Both pro-plaintiff and pro-defendant errors occur, and over the long run things even out. Courts therefore continue to draw the line as best they can and make no special adjustments to account for the errors that inevitably occur.

First Amendment cases, however, are different. The constitutional importance of free speech means that our legal system does not tolerate pro-speech and anti-speech errors equally. Instead, courts deliberately err on the side of protecting speech. The reason for this is simple. Cases which mistakenly silence a speaker are particularly troubling because they imply judicially sanctioned forfeiture of a very important constitutional right. By contrast, cases that mistakenly permit speech are less troubling because those errors, while unfortunate, are worth tolerating in order to make sure that all who legitimately claim **\*1870** free speech rights receive them. [186]

The Supreme Court's treatment of libel law exemplifies this preference for pro-speech errors. At common law, a libel plaintiff recovered if he could show that the defendant had made a false and defamatory statement [187] about the plaintiff. As a matter of First Amendment theory, the legal sanction against false statements was not problematic because false statements contributed little to the free marketplace of ideas. [188] A judicial system that could perfectly separate true statements from false statements would therefore have no First Amendment problems with common-law libel.

Of course, the perfect separation of truth from falsehood is impossible. Courts sitting in libel cases undoubtedly make mistakes, and this leaves those who make controversial statements in the difficult position of not knowing whether statements which they believe are true will actually be found true by courts. Writers and publishers of potentially libelous statements therefore face serious risk when threatened with libel litigation. As an initial matter, they can count on the considerable expense of litigation. In addition, they must consider the possibility of a significant damage award if a court disagrees about the falsity of their speech.

Risk averse publishers and writers accordingly may choose not to speak to avoid the dangers of libel litigation.

The Supreme Court dealt with these problems in a line of famous cases beginning with *New York Times v. Sullivan*. [189] In that case, the plaintiff Sullivan had successfully sued *The New York Times* over an advertisement that had appeared in the newspaper. [190] That advertisement, which supported the civil rights movement, claimed that police in Alabama had, among other things, arrested and assaulted Dr. Martin Luther King seven times. In fact, the advertisement was false because Dr. King had been arrested only four times. [191] Sullivan, who was the police commissioner of Montgomery, Alabama, sued for libel in Alabama state court and won. [192] The Supreme Court, however, reversed.

 **\*1871**  In reversing, the Court invoked the First Amendment and found that common-law libel created an unacceptable fear of damage awards among certain potential libel defendants. [193] The First Amendment required substantive changes in libel law to lessen the so-called "chilling effect" on free speech. This meant allowing the free publication of certain false and defamatory statements even though those statements were theoretically of no First Amendment value. The Court's reasoning reflects the idea that doubts about the legal propriety of silencing speech should generally be resolved in favor of speech. Pro-speech errors are preferred to anti-speech errors: "[E] rroneous statement[s] … must be protected if the freedoms of expression are to have the 'breathing space' that they 'need … to survive.'" [194] The Court then held that "public figures" could not recover in libel unless they proved by clear and convincing evidence that the defendant had published the libelous statement with "actual malice." [195] In *Gertz v. Robert Welch, Inc.,* [196] the Court extended this reasoning to plaintiffs who were not public figures, stating that they could not recover unless they proved that the defendants were at fault in publishing the defamatory statement. [197]

The Supreme Court's reasoning in libel law sheds light on how questions about the vicarious copyright liability of ISPs should be resolved. If ISPs are held liable for all of their subscribers' copyright infringements, they will have strong incentives to monitor their networks and remove infringements from them. Their attempts, however, to discover copyright infringement will be frustrated in three ways. First, the sheer volume of traffic on an ISP's network will make careful consideration of potential infringements a practical impossibility. Second, the ambiguity of copyright law [198] will make it impossible to determine accurately whether many potential infringements are, in fact, infringements. Third, even if the subscriber's behavior appears to be infringing, the ISP has no way of reliably knowing whether the subscriber has permission for the use or the copyright holder of the work in question objects.

These problems place ISPs in a quandary. If they monitor their networks, they will undoubtedly stumble across potential infringements, but they also will be forced to decide whether to remove those potential infringements without secure knowledge of whether such removal is appropriate. Like risk averse newspaper publishers, ISPs faced with this dilemma will likely resolve any doubts they have in favor of removing the material in question from the Internet because such action minimizes exposure to claims of infringement. Such behavior, however, implies resolving doubts about the silencing of speech against speech. *New York Times v. Sullivan* and its progeny clearly stand for the  **\*1872**  proposition that such an outcome is undesirable and unconstitutional. Courts facing this dilemma have two options.

First, courts could follow the lead of *New York Times v. Sullivan* and alter the substantive standards of the law in question. In libel, this meant reducing the claims plaintiffs could bring by adding the requirements of actual malice and fault to the basic cause of action. In copyright, this would mean reducing the claims copyright holders could bring, perhaps by narrowing the

definition of copyrightable subject matter or copyright infringement or by increasing the applicability of affirmative defenses like fair use. [199] This would reduce the chill associated with ISP vicarious liability because cases presently seen as potential infringements will become clear cases of free speech. ISPs would silence those engaging in free speech less often.

Second, courts could avoid putting ISPs in the position of having to police the behavior of their subscribers by refusing to impose liability. This would also greatly reduce the number of situations in which ISPs would silence subscriber speech. [200]

As noted earlier, courts unfortunately are generally reluctant to introduce First Amendment considerations when interpreting the basic outline of copyright law. [201] Moreover, courts likely will not succeed in making copyright law clear. [202] This suggests that the second option is the more pragmatic way of dealing with the problems identified here. Thus, from a First Amendment perspective, courts should reject vicarious liability for ISPs unless they revise the underlying law of copyright to reduce its chilling effect. [203]


## C. CONTRIBUTORY LIABILITY IN COPYRIGHT

Contributory liability is the third and most likely way in which an ISP might be held liable for subscriber copyright infringement. Like vicarious liability (with which it is often confused), contributory liability is a judge-made doctrine that supplements the apparent contours of the copyright statute. According to the courts, "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable  **\*1873**  as a 'contributory' infringer." [204] The requirements of knowledge and material contribution suggest three different scenarios under which an ISP might be found contributorily liable for subscriber copyright infringement.

In the first scenario, the mere provision of Internet service might create contributory liability. This is because a typical ISP has many subscribers and it is likely that some will commit copyright infringement. ISPs therefore "know" that their Internet service will be used to commit copyright infringement, and their provision of that service constitutes "material contribution." Supreme Court precedent, however, suggests that the level of knowledge associated with the provision of basic Internet service would not be enough to establish the knowledge required for contributory liability.

In *Sony Corp. of America v. Universal City Studios, Inc.,* [205] the plaintiffs-respondents were among the country's most prominent movie and television companies. Among other things, [206] the plaintiffs contended that Sony was contributorily liable for selling video tape recording machines to consumers who used the machines to commit alleged copyright infringements. The Court, however, rejected the plaintiffs' argument:

> Respondents argue that [*Kalem Co. v. Harper Bros.* [207] ] stands for the proposition that supplying the "means" to accomplish an infringing activity and encouraging that activity through advertisement are sufficient to establish liability for copyright infringement. This argument rests on a gross generalization that cannot withstand scrutiny…. Petitioners supply a piece of equipment that is generally capable of copying the entire range of programs that may be televised: those that are uncopyrighted, those that are copyrighted but may be copied without objection from the copyright holder, and those that the copyright holder would prefer not to have copied. The Betamax can be used to make authorized or unauthorized uses of copyrighted works, but the range of its potential use is much broader than the particular infringing use of the film Ben Hur involved in *Kalem. Kalem* does not support respondents' novel theory of liability. [208]

The Court went on to state that the mere provision of items "capable of substantial noninfringing uses" could not be the basis for contributory liability in copyright. [209]


*Sony* seems fully applicable to the provision of Internet service. To be sure, some subscribers will commit infringement with such service. The Internet,  **\*1874**  however, is also generally capable of being used without committing such infringement because users need only use copyrighted material that they own, obtain licenses, or restrict themselves to materials in the public

domain in order to avoid copyright problems. The requisite level of knowledge, therefore, makes the imposition of contributory liability for the simple provision of Internet services highly unlikely. [210]

In the second scenario, an ISP discovers or receives notice that a specific subscriber is actually committing infringement. For example, a content provider may send indisputable proof of infringement on a specific web page. Alternatively, an ISP may investigate why a particular page was generating enough traffic to crash the ISP's computers. Such an investigation may reveal that people were flocking to the site for free access to copyrighted works (such as music, photographs, or software). In these cases, the ISP would clearly know of its subscriber's copyright infringement and the only remaining question concerning liability would be whether continued provision of Internet service to the infringing subscriber would constitute material contribution. Existing case law indicates that this question would be answered affirmatively because courts consistently have stated that knowing provision of facilities necessary to the sale or distribution of infringing works is "material contribution" to another's copyright infringement. [211]

As was the case with vicarious liability, the leading contributory liability case is *Religious Technology Center v. Netcom On-Line Communication Services, Inc.* [212] In *Netcom,* the court refused to grant the defendant Netcom summary judgment on the issue of contributory liability. The court reached this conclusion **\*1875** because it believed that a triable issue of material fact existed with respect to the degree of knowledge that Netcom had about Erlich's underlying infringement. The court stated in dicta that Netcom's provision of Internet service after such knowledge, if proven, would create contributory liability. [213] The court wrote:

> Providing a service that allows for the automatic distribution of all Usenet postings, infringing and noninfringing, goes well beyond renting a premises to an infringer…. [I]t is fair, assuming Netcom is able to take simple measures to prevent further damage to plaintiffs' copyrighted works, to hold Netcom liable for contributory infringement where Netcom has knowledge of Erlich's infringing postings yet continues to aid in the accomplishment of Erlich's purpose of publicly distributing the postings. [214]

This result is supported by cases that hold that the following defendants satisfy contributory liability's requirement of material contribution: swap meet organizers who advertised a swap meet at which they rented booth space to vendors who sold counterfeit music recordings, [215] a service agency that packaged and mailed bootleg records, [216] and a BBS proprietor who allowed his BBS to be used for the uploading and downloading of infringing video games. [217]

The contrast between the legal results of the first and second scenarios sets the stage for the third. Consider a case in which the ISP receives information suggesting, but not conclusively demonstrating, that a subscriber is committing copyright infringement. This might occur when a content provider complains about a subscriber's behavior, but the complaint's allegations do not clearly establish copyright infringement. Alternatively, an ISP might investigate a content provider's complaint only to discover that the subscriber has arguably confined his borrowing to the public domain, avoided infringement, or engaged in fair use. [218] In these situations, the ISP would undoubtedly argue that anything short of subjective actual knowledge of subscriber infringement is not sufficient to support contributory liability. Content providers, however, would be quick to point out that this reading of the law might encourage ISPs to turn a willfully blind eye to subscriber infringement. [219] Accordingly, information creating a reasonable suspicion of subscriber infringement should be enough. Anything less would give ISPs the ability to ignore all but the most carefully drafted and well-supported complaints.

**\*1876** Courts have yet to provide an authoritative answer to the question posed by the third scenario. The only case to truly analyze this issue, *Religious Technology Center v. Netcom On-Line Communication Services, Inc.,* [220] appears to state that knowledge does not exist where the subscriber has "at least a colorable claim" of noninfringement. [221] However, the internal logic of the opinion, the peculiar facts of the case, and plausible counter-interpretations of the law leave open the question of how broadly the *Netcom* result should apply. It is therefore necessary to consider the merits of the *Netcom* result as well as other approaches to the problem.

As noted earlier, *Netcom* involved the plaintiff Religious Technology Center's (RTC) claim that postings by defendant Dennis Erlich infringed its copyrights in various writings of L. Ron Hubbard. RTC complained to its ISP, Netcom, and demanded that Netcom block Erlich's ability to post to the Internet. Netcom refused and failed even to look at Erlich's allegedly infringing

postings. RTC sued, claiming that Netcom was contributorily liable for Erlich's infringements. Netcom responded by moving for summary judgment, and RTC moved for a preliminary injunction. [222]

Netcom supported its motion by arguing that "its knowledge of the infringing nature of Erlich's postings was too equivocal given the difficulty in assessing whether the registrations were valid and whether Erlich's use was fair." [223] In other words, even though Netcom had been told what Erlich was doing, it did not know and could not accurately determine whether Erlich's behavior was in fact copyright infringement. RTC's notice, therefore, could not create knowledge sufficient to support contributory liability. RTC's response was quite simple: Netcom had knowledge of Erlich's infringing behavior immediately upon receiving RTC's complaint. [224]

Both of these arguments proved partially successful. The *Netcom* court denied Netcom's motion for summary judgment. [225] However, the court stopped well short of establishing the principle that RTC's complaint to Netcom necessarily established knowledge. [226] The court expressed a great deal of sympathy for Netcom's position:

> The court is more persuaded by the argument that it is beyond the ability of a BBS operator to quickly and fairly determine when a use is not infringement  **\*1877**  where there is at least a colorable claim of fair use. Where a BBS operator cannot reasonably verify a claim of infringement, either because of a possible fair use defense, the lack of copyright notices on the copies, or the copyright holder's failure to provide the necessary documentation to show that there is a likely infringement, the operator's lack of knowledge will be found reasonable and there will be no liability for contributory infringement for allowing the continued distribution of the works on its system. [227]

Indeed, the court went on to deny RTC's motion for a preliminary injunction against Netcom, stating that "there is little evidence that Netcom or Klemesrud knew or should have known that Erlich was engaged in copyright infringement of plaintiffs' works and was not entitled to a fair use defense." [228]


*Netcom* adopts a very cautious approach towards contributory liability. RTC's claim stood on the proposition that its complaint was sufficient to give Netcom knowledge of Erlich's infringement and that Netcom ignored RTC's demands for action at its peril. To be sure, the *Netcom* court left open the slim possibility that RTC would ultimately succeed, but it conditioned such success upon a showing that RTC's notice clearly established Erlich's infringement and eliminated defenses such as fair use. Indeed, the language "at least a colorable claim of fair use" implies that Netcom could not be considered a contributory infringer unless RTC produced very strong evidence of infringement.

ISPs can take some comfort from the *Netcom* decision. According to *Netcom,* content providers who want to pursue ISPs on a theory of contributory liability must first provide a complaint that outlines a strong case of infringement. The ISP's subsequent investigation of the facts must then confirm a similarly strong case. If either the complaint or investigation reveals a "colorable" claim of noninfringement, the ISP need not worry about contributory liability because the required knowledge does not exist.

At the same time, however, there are reasons to wonder about the strength of *Netcom's* conclusion and the amount of comfort that ISPs should take from it. As an initial matter, the court's denial of summary judgment suggests that the court was not truly serious about its requirement that no colorable claim of noninfringement exist. After all, defendant Erlich was a disgruntled former member of the church who used the Internet to criticize the church and its teachings. Such critical purpose lies at the heart of fair use. [229] Thus, the mere  **\*1878**  fact that Erlich's postings sometimes contained "substantial portions" of Hubbard's writings did not remove the "colorable" nature of Erlich's fair use claim. [230] Perhaps the nature of Erlich's use was so extreme as to remove any possibility of noninfringement. However, the court's failure to describe how this occurred--even if only enough to defeat Netcom's motion for summary judgment--left open the possibility that the court was not in fact prepared to fully implement its view of the law.

Furthermore, the court did not provide any authority that supported its construction of the law. The court appeared to think that it was unfair to hold an ISP liable for infringements that are difficult to identify. However, content providers would undoubtedly argue that the lenient standard proposed by *Netcom* allows ISPs to behave irresponsibly. If a "colorable" claim of noninfringement is enough to defeat contributory liability, ISPs will do nothing about copyright claims where "colorable"

assertions of noninfringement are raised. Significant numbers of those "colorable" assertions will of course prove unsuccessful in court. Copyright claimants, therefore, will ultimately win some cases but will suffer losses arising from infringements that could have been stopped by ISPs.

Content providers would probably prefer a rule that imputes knowledge to ISPs once ISPs receive information sufficient to prompt a reasonable person to inquire about the existence of subscriber infringement, even if a "colorable" claim of noninfringement exists. ISPs that failed to make that inquiry or concluded that no infringement exists would be held contributorily liable if the plaintiff were to prove underlying infringement in court. ISPs would therefore have incentives to police their networks more aggressively, cutting down on the number of ongoing infringements. This result is supported indirectly by key cases that focus on whether a contributorily liable defendant "should have known" about underlying direct infringement [231] and by Professor Paul Goldstein, who writes:

> Where the defendant's activities are relatively close to the directly infringing acts, the plaintiff may meet the knowledge requirement by showing that, **\*1879** although the defendant lacked actual knowledge of the infringement, he knew of facts that would have prompted a reasonable person to inquire into whether an infringement was occurring. [232]

The appeal of this attack against *Netcom* is undeniable. If copyright infringement is prohibited by law, legal rules that encourage ISPs to vigorously investigate and enforce copyright rights would seem eminently sensible and preferable to the *Netcom* standard. Surely there is little to be gained by allowing the unpermitted use of copyrighted material and much to be gained by preserving copyright's economic incentive for the creation of new works. However, as was the case with vicarious liability, due regard for copyright's often underappreciated effect on free speech supports the *Netcom* result.

Consider how an ISP will react to complaints of subscriber copyright infringement when information sufficient to cause a reasonable person to investigate establishes knowledge for purposes of contributory liability. If the complaint is at all credible, the ISP will likely investigate the subscriber's behavior because the ISP sensibly fears contributory liability. Should the resulting investigation satisfy the ISP that the subscriber's infringement is clear, then the ISP will almost certainly suspend service. [233] However, if the investigation reveals a plausible claim of noninfringement, then the ISP faces problems analogous to those faced in *New York Times v. Sullivan* because the ISP must weigh its convictions about the merits of the subscriber's defense against the threat of contributory liability and the cost of litigation. Indeed, the ambiguity of copyright's limiting doctrines often makes certainty about the outcome of a case practically impossible, thereby making almost any decision to support an ISP's subscriber seem risky. The risk averse ISP, therefore, will likely respond to notice of potential subscriber infringement by suspending Internet service. [234] **\*1880** By contrast, consider what would occur if the *Netcom* standard is used. As an initial matter, ISPs will investigate only well-supported complaints of infringement. Those investigations will in turn result in the suspension of Internet service only when they confirm the strength of the complaints because knowledge does not exist in the absence of a strong case for infringement.

The foregoing shows that the two proposed methods for defining knowledge for purposes of contributory copyright liability have very different free speech consequences, particularly in the kind of errors ISPs make. The *Netcom* standard implies that ISPs will sometimes mistakenly permit some cases of actual infringement. By contrast, the standard favored by content providers implies that ISPs will sometimes mistakenly act against subscribers who are not committing infringement and are exercising their rights of free speech. The *New York Times* case and its progeny make it quite clear which of these errors is to be preferred. [235] The *Netcom* standard is correct because it tends to avoid errors against free speech rights.

## D. A SUMMARY OF THE UNDERLYING LAW

Courts have begun to develop the law governing ISP liability for subscriber infringement along sensible lines, but there is no guarantee that those results will be followed in the future. It is quite unlikely that direct liability will be applied to ISPs, and the case for vicarious liability is also weak as long as ISPs receive a flat fee for Internet service and exercise little control over its subscribers' behavior. However, the doctrine of contributory liability would hold such ISPs liable if they acquired actual knowledge or the plaintiff established strong evidence of infringement.

If one accepts the reading of law offered here, it is fairly clear how an ISP ought to behave. As long as the ISP realizes no revenue from its subscribers' behavior, it can safely avoid monitoring that behavior on a day-to-day basis. If the ISP gains knowledge of infringement or facts that strongly indicate infringement (whether through a complaint, chance occurrence, or voluntary investigation), the ISP should investigate the possible infringement and suspend Internet service if the investigation confirms a strong case for infringement.

Of course, it is possible that future courts will not embrace the reading of law offered here. If that happens, ISPs may face liability for all of their subscribers' copyright infringements. Naturally, this possibility concerns ISPs as much as it intrigues content providers. Indeed, the prospect of such an outcome, however unlikely, probably influences risk averse ISPs to behave more defensively than the law actually requires. It is therefore possible that some ISPs are suspending **\*1881** Internet service to subscribers who have not clearly committed copyright infringement. This suggests that further clarification and strengthening of the law is necessary. The DMCA, to which this article now turns, represents Congress's attempts to provide the desired improvements.

## II. THE DIGITAL MILLENIUM COPYRIGHT ACT (DMCA)

### A. THE DMCA'S PROVISIONS

Title II of the DMCA, [236] now codified at section 512 of the Copyright Act, specifically addresses the issue of ISP liability for subscriber infringement. However, the DMCA's cumbersome and disorganized structure makes its provisions difficult to untangle. The DMCA affects ISP liability by insulating ISPs from liability as long as they comply with certain statutory requirements designed to facilitate content providers' efforts to protect their copyrighted material. [237] The statute clearly states that these safe harbors do not affect the viability of any other legal grounds on which ISPs might claim nonliability. [238] The DMCA, therefore, encourages ISPs to cooperate with content providers by offering insulation from potential copyright liability.

The DMCA's treatment of direct liability is fairly straightforward. The copyright code now relieves ISPs of monetary liability for their passive transmission, re-transmission, or temporary storage of material through or on their networks as long as ISPs meet certain basic requirements. [239] Such a result makes sense, especially given the extensive discrediting of *Frena*. [240]

The DMCA's treatment of vicarious or contributory liability is more complicated. Subscriber infringements that simply involve the temporary storage of material on an ISP's computers appear to be governed in the same manner as direct infringement. [241] Such activities might include browsing Internet web sites and emails not retained by the ISP. [242] However, subscriber behavior that results in the ISP's long-term storage of material, such as the hosting of a web page, is governed by a provision that eliminates liability for monetary relief if the service provider:

(A) (i) does not have actual knowledge that the material or an activity … is infringing;

**\*1882** (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, … [where] the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement as described in paragraph (3), [243] responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity. [244]

Unraveling the significance of this language takes work. One must first note the use of the conjunctive "and" to link subsections (A), (B), and (C). All three requirements must be satisfied for the safe harbor to apply. One must also note the provision's general--but not exact--correspondence to doctrines of contributory and vicarious copyright liability. Subsection (A) conditions nonliability upon an ISP's lack of "actual knowledge" or "aware[ness]" of facts that make infringement "apparent." [245] If the ISP gains such knowledge or awareness, no liability attaches as long as the ISP removes or disables access to the alleged infringement. This approximates contributory liability's requirement that an ISP have actual knowledge or knowledge of facts which clearly establish infringement. [246] Of course, if knowledge is suddenly obtained, contributory liability can be avoided by promptly withdrawing Internet service.

Subsection (B) adds the requirement that an ISP receive no direct financial benefit in cases where the ISP has the "right and ability to control" the infringing activity. [247] As this article has already discussed, vicarious liability cannot exist unless an ISP has "a direct financial interest" in the subscriber's infringement and the "right and ability to supervise" that activity. [248] If the ISP receives no direct financial benefit from infringing activity, no vicarious liability exists. Subsection (B), therefore, does no more than condition nonliability on the nonexistence of vicarious liability.

Subsection (C) adds a final requirement of disabling access upon receipt of a statutorily prescribed formal notice by an ISP's designated agent. [249] This echoes **1883** the proper application of contributory liability doctrine discussed with respect to subsection (A), but with one important difference. Subsection (C) equates formal notice with knowledge for purposes of preserving an ISP's safe harbor. If the ISP removes the alleged infringement from the Internet, its safe harbor is preserved as long as the other conditions are met. If no removal occurs, the safe harbor does not apply. [250]

The foregoing shows that the DMCA clearly offers ISPs safe harbor from vicarious or contributory liability for subscriber infringement. However, that assurance of nonliability applies largely in situations where ISPs face no liability in the first place. The statute appears to state that ISPs are not liable if they remove alleged infringements upon receipt of a formal complaint and are not otherwise vicariously or contributorily liable. This raises the further question of why any ISP would undergo the expense of complying with the DMCA's statutory requirements to shield itself from liability which does not exist. The answer, of course, is risk aversion.

As noted earlier, the correct application of direct, vicarious, and contributory liability to ISPs is reasonably clear, but courts have not yet rendered enough decisions to establish the scope of ISP liability beyond controversy. ISPs may believe that they are not subject to direct, vicarious, or contributory liability as long as they disable Internet service to subscribers who are clearly committing copyright infringement. However, their lawyers cannot give them ironclad assurances that courts will reliably rule that way. It therefore becomes rational to cooperate with those who accuse an ISP's subscribers of infringement in return for the certainty of the DMCA's safe harbors. The degree of cooperation required depends on which safe harbor is desired.

There are only two simple requirements for taking advantage of 17 U.S.C. § 512(a) that eliminate direct liability. First, ISPs must adopt policies for the termination of subscribers who are repeat infringers. [251] Second, ISPs must implement the technical measures that have been developed through industry consensus and are used by content providers to protect their works. [252]

Seventeen U.S.C. §512(c), which deals with vicarious and contributory liability for subscriber web pages, adds two more requirements. [253] First, ISPs that wish to take advantage of the safe harbor must designate an agent for receipt of statutorily prescribed formal complaints of copyright infringement. [254] Second, **1884** those ISPs must follow a prescribed method for handling those complaints. [255]

The prescriptions start with the handling of complaints from content providers who claim that a subscriber has committed copyright infringement. A careful reading of the DMCA reveals two situations in which an ISP must remove material from the Internet or lose its safe harbor. The first arises when an ISP gains "knowledge or awareness" of infringing activity. [256] This standard appears borrowed from contributory infringement. The second arises when an ISP receives a formal statutory complaint of infringement. [257] This requirement presumably applies even if the complaint meets statutory requirements but does not contain information sufficient to clearly establish the existence of infringement. [258]

The different triggers for the removal of allegedly infringing material create a question as to how ISPs are to treat complaints from content providers that do not conform to the statutory requirements. If these informal complaints create "knowledge or awareness" sufficient to trigger contributory infringement, content providers would have no reason to use the statutory form of notice because informal complaints would be enough to force an ISP to remove material for fear of losing its safe harbor. The DMCA, therefore, states that informal notice received from a copyright holder or its representative does not create "knowledge or awareness" of the sort that puts the ISP's safe harbor at risk. [259] However, the DMCA also requires ISPs to promptly contact content providers who send the ISP's designated agent nonconforming notices in order to facilitate receipt of a conforming notice. [260] Thus, content providers can put an ISP on notice that its safe harbor is in jeopardy by sending even nonconforming notice to the ISP's designated agent. The practical consequence is that ISPs will likely remove material from the Internet whenever a content provider complains to an ISP's designated agent.

The ISP's removal of material from the Internet is only the beginning of how complaints of infringement are to be handled. As noted earlier, ISPs run a small risk that their subscribers will sue them for wrongfully removing their material from the Internet. [261] The DMCA insulates ISPs from this potential liability as long as ISPs notify their subscribers that the material has been removed. [262] This notice in turn triggers an opportunity for the subscriber to file a formal counter-notice with the ISP's designated agent regarding the removal of her material from the Internet. [263] A condition of that response's validity includes the subscriber's **\*1885** submission to jurisdiction in a United States District Court. [264]

If the subscriber files the prescribed response and disputes the ISP's actions, more requirements arise. Initially, the ISP must provide the complainant with a copy of the subscriber's counternotice and inform the complainant that the ISP will restore the material in question in ten business days. [265] This in turn triggers an opportunity for the complainant to respond by filing "an action seeking a court order to restrain the subscriber" from infringing and giving notice of this action to the ISP's designated agent. [266] If the complainant does not so respond, then the ISP must restore the allegedly infringing material to the Internet in "not less than 10, nor more than 14 business days" of receiving the subscriber's counter notice. [267] If, however, the complainant does respond, the ISP must keep the material off the Internet. [268]

## B. EVALUATING THE DMCA

The significance of the DMCA's treatment of ISP liability for subscriber copyright infringement depends on how the DMCA affects ISP behavior. This is because ISPs can now choose the legal regime that governs liability for their subscribers' infringements. ISPs that ignore the DMCA's various requirements become subject to whatever liability copyright law already imposes. Presumably, they will act to reduce their exposure under that law. By contrast, ISPs that follow the DMCA's requirements will stop responding to existing law and largely escape liability. This means that the DMCA's significance depends on how many ISPs decide to take advantage of its safe harbors and the extent to which the DMCA's mandates vary from those of existing law.

As a general rule, ISPs will take advantage of the DMCA's safe harbors only when there is the possibility of liability under existing law. It therefore makes sense to compare the contours of the DMCA's safe harbors to existing doctrines of direct, vicarious, and contributory liability to see if the DMCA offers any meaningful relief from existing liability. Such a comparison reveals that the DMCA offers relatively little relief from liabilities that have already been imposed by courts, but it does offer meaningful relief from the contingency that future courts might decide not to follow the decisions that have already been rendered.

The case of direct liability offers a good illustration. As noted earlier, cases that directly imposed liability on ISPs such as *Playboy v. Frena Enterprises, Inc.* have been discredited in subsequent opinions and commentary.[269] ISPs, therefore, will probably conclude that they face relatively little exposure from **\*1886** direct liability, but they cannot be absolutely certain because *Frena* is still technically good law and could be followed by a future court. This suggests that risk averse ISPs will use the DMCA's safe harbors while other less risk averse ISPs will take their chances with existing law.

In the case of vicarious liability, a similar result follows. Existing case law appears headed away from the imposition of vicarious copyright liability against ISPs, and this development is consistent with limitations on the general application of enterprise liability in a torts context.[270] Moreover, the language of the DMCA appears to limit the safe harbor to situations in which vicarious liability would not exist anyway.[271] ISPs, therefore, would seem to have little reason to use the DMCA to escape vicarious liability unless they thought that courts would expand vicarious liability doctrine no longer to require the defendant's direct financial benefit or right and ability to control infringement.

The case of contributory liability, however, is somewhat different. As an initial matter, contributory liability is a meaningful risk for ISPs.[272] ISPs that actually know of infringement or that actually know facts from which infringement is clear would probably be held contributorily liable if they continued to provide the infringing subscriber Internet service. In addition, present law is not clear as to the degree of evidence necessary to create constructive knowledge on the part of ISPs that do not actually know of subscriber infringement. To be sure, *Netcom* indicated that the evidence must be strong, given its statement that ISPs lack knowledge unless the subscriber has no colorable claim of noninfringement.[273] However, there is no certainty that future courts will follow *Netcom* even in the face of constitutional First Amendment considerations.

The above-described risks imply that ISPs would endure some degree of inconvenience to ensure avoidance of contributory liability. Interestingly, a first inspection of the DMCA suggests that the DMCA process offers ISPs relatively little advantage. After all, ISPs that receive complaints under existing law avoid liability by disabling access to the alleged infringing material. The DMCA requires ISPs to do the same thing. However, further inspection reveals two valuable advantages to the DMCA process.

First, the DMCA offers ISPs more certainty about the ways in which complaining content providers can put ISPs at risk of contributory liability. Underlying law says nothing about how a content provider should put an ISP on notice. Accordingly, a detailed complaint hand-delivered to the ISP's sales agent at a shopping mall could conceivably be construed as giving the ISP actual knowledge. Such a possibility creates risk for ISPs because they have no control over the persons who will actually receive complaints. If those persons fail to act, liability could follow. By contrast, the DMCA provides that complaints not filed **\*1887** with the ISP's designated agent in accordance with the statutorily prescribed form do not create knowledge for purposes of waiving the safe harbor.[274] This means that ISPs that take advantage of the DMCA can gain control over the complaints they receive and still avoid liability.

Second, the DMCA offers ISPs protection against all monetary relief and not just contributory liability to the content provider. Under existing law, ISPs can avoid contributory liability by disabling access to allegedly infringing material, but they open the possibility that their subscribers or even aggrieved third parties might sue over wrongful removal of material from the Internet.[275] ISPs, therefore, have reason to use the DMCA's safe harbor to gain certain protection against suit from all quarters by disabling access to alleged infringing materials and then going through the process of notifying their subscribers, allowing an opportunity for response, restoring the material, and allowing a counter-response from the content provider.

The foregoing analysis shows that the DMCA will have its most significant effect over the way ISPs handle complaints from content providers about subscriber infringement. ISPs have plausible reasons to use the DMCA's safe harbors to escape uncertainty about the form and service of complaints and subscriber liability under existing law. This in turn gives content providers a concrete method for stopping copyright infringements discovered on the Internet. Content providers now know exactly to whom a complaint should be sent and exactly what the complaint should say. They further know that ISPs that receive such complaints are highly likely to respond to the complaint by disabling access to the alleged infringement. Even if the subscriber responds by arguing that the disabling should not have occurred, the content provider who desires relief pending litigation need only notify the ISP of the suit because the DMCA protects ISPs that keep alleged infringements off the Internet.[276] This has the effect of putting a meaningful burden on subscribers who still believe that their material has been removed incorrectly because they presumably now have the burden of making a motion to the court for relief.

Not surprisingly, the desirability of this outcome depends on the interests considered paramount. To the extent that society wants to protect the interests of content providers and ISPs, the DMCA's safe harbors make sense. Content providers now have a quick and inexpensive way to remove material that they believe is infringing. This arguably serves society's interest by making copyright rights more valuable and productive. Those who commit infringement on the Internet will cut into the content provider's profits for a shorter duration, thereby preserving copyright's incentive for the creation of new works. ISPs also will flourish because they need not fear liability for the acts of their **\*1888** subscribers. This in turn might make Internet access less expensive to future subscribers.

However, to the extent that society cares about the free speech implications of copyright, the DMCA's safe harbors are problematic. As noted earlier, copyright implies the restriction of free speech rights. Even if copyright's existence is justified overall, its enforcement can create incentives to silence communication that is not in fact infringement. That is why courts must not impute knowledge to ISPs for purposes of contributory infringement unless it is quite clear that infringement has occurred. ISPs will otherwise respond by treating all complaints of infringements as actual infringements, overzealously enforcing copyright and depriving subscribers of their free speech rights.

The DMCA's safe harbor scheme creates First Amendment problems in three ways. First, it ossifies and perpetuates ambiguities in existing law that encourage ISPs to indiscriminately remove material from the Internet. As noted earlier, a correct reading of contributory infringement exposes ISPs to liability only if the content provider's complaint establishes a strong case for copyright infringement. However, existing ambiguities in the law are large enough to make risk averse ISPs behave more defensively than necessary. These ISPs will remove material from the Internet even if no strong case for infringement exists. [277] If the DMCA did not exist, there would likely be future litigation in which courts could clarify and strengthen existing law, thereby reducing uncertainty and the need for ISPs to behave defensively. However, many ISPs will likely take advantage of the DMCA's safe harbors, thereby reducing the chances that courts will have the opportunity to clarify and strengthen existing law. This will tend to make incentives for indiscriminate removal of material from the Internet a permanent feature of the legal landscape. [278]

Second, the DMCA's safe harbor scheme increases the incentive for indiscriminate removal of material by protecting ISPs from actions by their subscribers. As noted earlier, ISPs that remove a subscriber's speech from the Internet run the small, but real, risk that the subscriber will sue. [279] The DMCA operates by providing risk averse ISPs complete protection from this problem. As long as ISPs remove material upon the formal request of content providers and follow DMCA procedures, subscribers are barred from recovery. This makes removing contested material from the Internet even more attractive than it already is. [280]

**\*1889** Third, the DMCA's safe harbor scheme exacerbates the effect of any mistaken action against speech by effectively circumventing the procedures that would normally protect a copyright defendant from unjustified curtailment of her free speech rights. As noted earlier, subscribers can deny the existence of infringement and thereby prompt ISPs to restore disputed material to the Internet in not less than ten nor more than fourteen business days. However, if the content provider files suit and gives notice of the suit to the ISP before restoration occurs, the ISP must keep the disputed material off of the Internet in order to maintain its safe harbor. As a practical matter, a content provider need only file a lawsuit to get an alleged copyright infringement removed from the Internet pending the outcome of litigation. This is tantamount to awarding the content provider a temporary restraining order and preliminary injunction without any hearing before a court or the posting of a bond. [281] Once again, if this happened only in clear cases of infringement, the First Amendment concerns might not be terribly large. However, ISPs will likely apply this very procedure to "statement of good faith" cases in which subscribers have not actually committed copyright infringement. Such a result is highly problematic because injunctions against speech are generally disfavored, especially before trial. [282]

## **\*1890** CONCLUSION

The Internet challenges our copyright system because it offers the fastest reproduction and distribution of information ever known. This capability magnifies the importance of copyright law because content providers have gained new opportunities to profit from their works. Unfortunately, those who make unauthorized use of copyrighted works can exploit those same opportunities. Content providers understandably perceive new threats to their economic interests, and they have responded with litigation and legislative initiatives designed to prevent unauthorized use of their works. The notion that ISPs should be held liable for their subscribers' copyright infringements is part of this response.

As of this writing, courts have not provided definitive answers to the questions raised by the prospect of ISP liability for subscriber infringement. The legal issues are complicated, plausible arguments exist on both sides of the issue, and comparatively few cases have been brought. However, as this article has shown, the law appears to be developing along the correct lines.

The uncertainty surrounding the question of ISP liability for subscriber infringement has no doubt proven frustrating for ISPs and content providers alike. Both need to know their rights and responsibilities, and the speed with which the Internet develops makes the deliberate pace of our legal system all the more vexing. Congress should therefore be given credit for addressing these issues in the DMCA.

However, the DMCA does not provide a truly satisfactory solution to the problem of ISP liability. To be sure, the DMCA gives ISPs a clear way to avoid liability, and it makes cooperation with content providers a precondition to such relief. At the same time, the DMCA suffers from a failure to understand how the DMCA and underlying law affect each other and an oversimplified conception of the stakes in copyright law. The result is a legal scheme that makes some degree of sense, but needs smoothing out to avoid problems with the First Amendment.

The basic problem arises from Congress's decision to leave the underlying law unchanged. In some ways such indecision is perfectly understandable. Congress might have been expressing confidence in the judiciary's ability to resolve important legal questions wisely. Moreover, the problem of ISP liability raised difficult issues, and significant commercial interests (that is, content providers and Internet service providers) preferred divergent outcomes. If those parties could be satisfied with legislation that avoided the tough issues, then so much the better; a legislative "win-win" might then exist. Indeed, one might argue that the DMCA's use of safe harbors cleverly sidesteps the tough issues posed by underlying law while encouraging ISPs to help content providers protect their copyrights. Unfortunately, neither of these contentions meets the **\*1891** basic criticism that Congress should have used the DMCA to clarify the underlying law governing ISP liability.

As an initial matter, congressional confidence in the judiciary suggests that Congress knows where the courts are going and approves. Yet if Congress knows the desired result already, it should codify that result. Alternatively, Congress might not have a strong conception of the desired result, but might simply trust the courts to decide wisely. However, if this is the case, the DMCA's safe harbors become problematic because extensive use of the safe harbors will make litigation less likely. Courts will get fewer opportunities to study the issues at stake and render wise decisions. The underlying law's ambiguity will persist, making it hard for ISPs to know whether they really need to incur the expense and trouble of complying with the DMCA's requirements or whether existing law poses no threat of liability. ISPs will become increasingly conservative and routinely comply with the DMCA's safe harbor because the certain cost of compliance is preferable to the unknown, yet potentially significant, costs imposed by underlying law. This result might seem desirable because it gives ISPs certain relief from liability while protecting the interests of content providers. However, as this article has demonstrated, the result leads to the overaggressive enforcement of copyright against subscribers who have in fact committed no infringement. This puts copyright in conflict with the First Amendment.

What is to be done? Ideally, Congress would pass legislation that addresses both the problems with underlying law and the DMCA. However, such a panacea seems unlikely, so courts will have to take responsibility for improving the law. Fortunately, the task seems manageable.

First and foremost, courts must clarify and strengthen the underlying law of ISP liability. Courts have already reached a number of sensible decisions, but the theoretical underpinnings for those results are still relatively undeveloped. This situation leaves good decisions vulnerable to future attack because strong rationales for their results are not well known. If courts put those strong rationales in place, later courts will be more likely to follow these good precedents and extend them appropriately.

The clarification and strengthening described above have beneficial effects beyond the sensible development of law. Clarification of the law makes it easier for ISPs and content providers to know their rights and responsibilities. As noted earlier, a major incentive for ISPs to comply with the DMCA's safe harbor requirements is the possibility of liability under unclear laws. Risk averse ISPs go to the expense of compliance because they prefer it to uncertain liability. This choice contributes to the overaggressive enforcement of copyright and risks conflict with the First Amendment. Of course, if the law becomes more clear, uncertain liability would pose less of a threat to ISPs. Clarity would decrease the use of the DMCA and unwarranted removal of material from the Internet and would therefore reduce copyright's conflict with the First Amendment.

**\*1892**  Second, courts must interpret the DMCA wisely and appreciate the Act's ability to encourage the indiscriminate removal of material from the Internet. As this article has shown, the DMCA runs afoul of the First Amendment because it encourages ISPs to resolve any doubts about a subscriber's behavior in favor of removing material from the Internet. This anti-speech bias runs directly counter to the First Amendment's mandate that doubts about the legal propriety of silencing speech should be resolved in favor of allowing speech. Additional First Amendment problems become apparent when one realizes that an ISP's removal of material under the DMCA is the equivalent of giving a content provider a temporary restraining order (TRO) and preliminary injunction without any of the normal hearings. To the extent that any such action is taken against subscriber activities that do not clearly constitute infringement, the First Amendment's distaste for preliminary injunctive relief in speech cases goes unheeded.

Courts can handle these problems by directly linking a proper interpretation of contributory infringement to the viability of the DMCA's safe harbor. Courts may conclude that an ISP's failure to remove material upon receipt of a statutory complaint destroys the ISP's safe harbor, but destruction of the safe harbor does not imply that liability follows. Because direct and vicarious liability do not apply to the basic provision of Internet services, contributory infringement is the only theory that can be used to hold an ISP liable. However, such liability arises only when the subscriber has no colorable claim of noninfringement. Thus, if the only evidence of a subscriber's infringement is a statutory complaint that does not clearly establish copyright infringement, no contributory liability is possible, and the loss of the safe harbor becomes irrelevant. ISPs need not remove material from the Internet unless the statutory complaint clearly shows infringement. This eliminates much of the uncertainty that leads to overaggressive enforcement of copyright, and it also limits the application of de facto TRO's and preliminary injunctions to cases where subscribers have clearly infringed and First Amendment concerns are diminished. [283]

The distinguished jurist Benjamin Kaplan once opined that copyright infringement is "the least dangerous of thefts." [284] The notion that ISPs should be held liable for their subscribers' infringements arises from the idea that copyright infringement is a very serious problem that needs to be stamped out ruthlessly. Courts have begun to develop the law in a manner that is consistent with Kaplan's assertion. Whatever the wrongs embodied in copyright infringement, they are not serious enough to warrant ISP liability unless knowing assistance in that infringement is present. The DMCA, however, threatens that development  **\*1893**  by encouraging ISPs to take an overly aggressive attitude against alleged infringers by offering the ISPs relief from uncertainties inherent in developing law. Hopefully, courts will use suggestions such as those made in this article to contain the DMCA's effects within constitutionally acceptable boundaries. Content providers will undoubtedly complain about this, but society as a whole ought not be overly concerned. A proper interpretation of copyright law leaves plenty of weapons available against the individuals who commit clear copyright infringement without dragging ISPs into the fray. Perhaps a few infringements will escape if courts restrain the incentives for enforcement created by the DMCA. That, however, is a reasonable price to pay in a society that values free speech.

## Footnotes

a1      Professor of Law, Boston College Law School. The author would like to thank Boston College Law School, the University of Arizona School of Law, Case Western Reserve University School of Law, the University of Cincinnati School of Law, the University of Georgia College of Law, the University of Indiana-Indianapolis School of Law, and the Vermont Law School for valuable feedback given during presentations before their faculties. Thanks are also owed to Mark Lemley and Michael Madison for their generous comments on an earlier draft, and to Erich Eisenegger, Michael Rutner, Ossie Borosh, Caroline Kwa, Theo Robins, and Jack Schecter for their valuable research assistance. Finally, the author wishes to express gratitude to Boston College Law School for support through its summer research grants.

1       The Internet is a large network of linked computers whose operators cooperate to allow information to pass among them. *See generally* Reno v. American Civil Liberties Union, 521 U.S. 844, 849-51 (1997) (describing the development and operation of the Internet); Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc., 907 F. Supp. 1361, 1365 (N.D. Cal. 1995) (same); PRESTON GRALLA, HOW THE INTERNET WORKS 5-7 (Millenium ed. 1999) (same); DANIEL J. KURLAND, THE 'NET, THE WEB, AND YOU 25-29 (1996) (same); DAVE SPERLING, DAVE SPERLING'S INTERNET GUIDE 2-3 (2d ed. 1998) (same). Those who desire access generally connect to the Internet

by using a modem to connect to a computer owned by an Internet Service Provider (ISP), who agrees to provide Internet access for a fee to the subscriber. *See* GRALLA, *supra,* at 49-55 (describing Internet connections).

[2]    *See* 17 U.S.C. § 106 (1994), *amended by* 17 U.S.C. § 106 (4)-(6) (Supp. IV 1998) (giving copyright holder the exclusive right to reproduce and distribute the copyrighted work).

[3]    *See* Lorrie Grant, *Ads Click for Net Retailers,* USA TODAY, Jan. 28, 1999, at 3B (containing statement of Jerry Kaplan, CEO of an Internet retailer, referring to cost advantages of doing business via the Internet "because we don't keep inventory, don't have a storefront, don't mail catalogs, and our order-taking process is done by computer").

[4]    *See* Marobie-FL, Inc. v. National Ass'n of Fire Equip. Distribs., 983 F. Supp. 1167, 1171 (N.D. Ill. 1997) (describing how defendant's uploading of plaintiff's copyrighted material to a web page made the files in question available for downloading by Internet users).

[5]    *See* Chas J. Hartman & Edward Stubenrauch, *I Want My MP3: New Technology Sparks* 1999 *Debate,* THE POST (May 27, 1999) ⟨http:// thepost.baker.ohiou.edu/archives2/052799/access01.html⟩ (describing efforts of the recording industry to stop Internet copyright infringement).

[6]    *See* Kelly McCullom, *How Aggressively Should Universities Enforce Copyright Law on Audio Files?,* CHRON. OF HIGHER EDUC., Nov. 19, 1999, at A59 (describing efforts of the recording industry to stop Internet copyright infringement on campuses).

[7]    *See* Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc., 907 F. Supp. 1361, 1365-66 (N.D. Cal. 1995) (stating that plaintiff contacted various parties to stop alleged copyright infringement before filing suit).

[8]    *See* McCullom, *supra* note 6 (describing the belief of students disciplined for copyright infringement that their actions were legal).

[9]    *See* Hartman & Stubenrauch, *supra* note 5 (describing the inability of copyright holders to detect most infringement on the Internet).

[10]    This article uses the term "Internet Service Provider" to signify a person or entity that provides customers basic access to the Internet. Such service generally consists of email, hosting of a web page, and the ability to "surf" the Internet. This article's analysis proceeds with the basic service described here in mind. In some cases, ISPs may provide subscribers with additional services such as web page authoring or assistance with business conducted over the Internet. Other service providers may provide customers with more limited services, like the simple uploading and downloading of files. The observations made about the potential copyright liability of ISPs may in many cases be applicable to those not offering basic service, but that is neither always nor necessarily the case. Much depends on the relationship between provider and subscriber and what the provider knows about its subscribers. *See infra* Part I.B. (describing the duties of ISPs under different theories of liability).

[11]    This article will refer to this sort of liability by using the shorthand "ISP liability" as a stand-in for "ISP liability for copyright infringement committed by subscribers." The most prominent supporter of ISP liability has been the Working Group on Intellectual Property Rights, which operated under President Clinton's Information Infrastructure Task Force. *See* WORKING GROUP ON INTELLECTUAL PROPERTY RIGHTS, INFORMATION INFRASTRUCTURE TASK FORCE, INTELLECTUAL PROPERTY AND THE NATIONAL INFORMATION INFRASTRUCTURE 1-6, 114-24 (1995) [hereinafter WORKING GROUP] (describing the Working Group and advocating ISP liability). For articles supporting ISP liability, see, for example, Jane C. Ginsburg, *Putting Cars on the "Information Superhighway": Authors, Exploiters, and Copyright in Cyberspace,* 95 COLUM. L. REV. 1466, 1492-95 (1995) (mildly supporting the idea of ISP vicarious copyright liability); I. Trotter Hardy, *The Proper Legal Regime for "Cyberspace",* 55 U. PITT. L. REV.

993, 1042-46 (1994) (advocating strict ISP liability); John Carmichael, Comment, *In Support of the White Paper: Why Online Service Providers Should Not Receive Immunity from Traditional Notions of Vicarious and Contributory Liability for Copyright Infringement,* 16 LOY. L.A. ENT. L.J. 759, 771-85 (1996) (advocating vicarious and contributory ISP liability); Kelly Tickle, Comment, *The Vicarious Liability of Electronic Bulletin Board Operators for the Copyright Infringement Occurring on Their Bulletin Boards,* 80 IOWA L. REV. 391, 416 (1995) (favoring limited ISP liability).

For arguments opposing liability, see, for example, Niva Elkin-Koren, *Copyright Law and Social Dialogue on the Information Superhighway: The Case Against Copyright Liability of Bulletin Board Operators,* 13 CARDOZO ARTS & ENT. L.J. 345, 399-410 (1995) (opposing ISP liability under existing copyright law).

12  *See infra* notes 129-32 and accompanying text for a description and discussion of enterprise liability.

13  *See* WORKING GROUP, supra note 11, at 117-18 (describing the unique ability of ISPs to spread costs among users).

14  *See infra* Part I.C.

15  *See infra* Part I.B.4 and notes 232-35 and accompanying text (discussing free speech, private censorship, and copyright).

16  Those against ISP liability sometimes point to cases that refuse to hold ISPs liable for libelous statements made by others. *See* Zeran v. America Online, Inc., 129 F.3d 327, 333-35 (4th Cir. 1997) (refusing to hold ISP liable for libelous statement posted to an America Online bulletin board); Blumenthal v. Drudge, 992 F. Supp. 44, 52-53 (D.D.C. 1998) (refusing to hold ISP liable for libelous story distributed over ISP's network). Although these results offer general support for the proposition that ISPs are not liable for the behavior of their subscribers, the specific basis for the decisions makes stronger conclusions impossible. Both *Zeran* and *Drudge* use section 230 of the Communications Decency Act of 1996 to absolve ISPs from liability for the libelous statements of others. That statute provides that "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1) (Supp. II 1996). This language might shield ISPs from liability for subscriber copyright infringement as well. However, 47 U.S.C.A. § 230(e)(2) specifically states, "Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property." 47 U.S.C.A. § 230(e)(2) (West Supp. 1999). Nevertheless, the general philosophy motivating these decisions--namely, that the liability against ISPs for subscriber libel would result in undesirable censorship on the Internet-- remains vitally important in assessing the desirability of ISP liability. *See* notes 198-203 and accompanying text.

17  *See infra* Part I.

18  *See* WORKING GROUP, *supra* note 11, at 114-24 (arguing that ISPs are in the best position to prevent copyright infringement and, therefore, must be held liable).

19  *See supra* note 11 (listing conflicting commentary).

20  17 U.S.C. §§ 1201-1332 (Supp. IV 1998).

21  *See infra* Part II.A (describing and discussing the "safe harbor" provisions of the DMCA).

22  *See infra* Part II.B.

23    *See* Reno v. American Civil Liberties Union, 521 U.S. 844, 849-53 (1997) (describing the development and operation of the Internet); Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc., 907 F. Supp. 1361, 1365 (N.D. Cal. 1995) (same); KURLAND, *supra* note 1, at 25-29 (same); SPERLING, *supra* note 1, at 2-3 (same).

24    *See* LEON SALVAIL ET AL., WEBMASTER'S GUIDE TO INTERNET SERVER CONNECTIVITY 20-25 (1996) (describing the advantages of direct connection).

25    *See Reno,* 521 U.S. at 849-53; KURLAND, *supra* note 1, at 201; SPERLING, *supra* note 1, at 5.

26    *See Reno,* 521 U.S. at 849-53; KURLAND, *supra* note 1, at 198-200; SPERLING, *supra* note 1, at 4.

27    Other pricing options include a charge for each minute connected to the ISP and a charge based upon the amount of traffic generated by the subscriber ("metered bandwidth"). *See, e.g.,* SALVAIL ET AL., *supra* note 24, at 137, 169, 204 (describing ISP fees); SPERLING, *supra* note 1, at 5 (listing fees for different ISPs); America Online, Inc., *AOL Pricing Plans* (visited Jan. 28, 2000) ‹http://www.aol.com/info/pricing.html›; EarthLink Network, Inc., *EarthLink Dial-Up Internet Access Plans* (visited Jan. 28, 2000) ‹http:// www.earthlink.net/home/access/›; EarthLink Network, Inc., *EarthLink Internet Access Plans* (visited Jan. 28, 2000) ‹http:// www.earthlink.net/business/access/›; Prodigy Communications Corp., *Prodigy Internet Price Plans* (visited Jan. 28, 2000) ‹http:// www.prodigy.com/pcom/ prodigy_internet/pi_index.html›.

28    "Hosting" the subscriber's web page means storing the information making up the web page on the ISP's computers and making that information available to those who "surf" the Internet. This in turn means duplicating the web pages and sending the relevant information to any person who requests it via the Internet. *See Reno,* 521 U.S. at 849-53; Marobie-FL, Inc. v. National Ass'n of Fire Equip. Distribs., 983 F. Supp. 1167, 1171-72 (N.D. Ill. 1997); SPERLING, *supra* note 1, at 49-50.

29    Other activities that might lead to copyright infringement include sending copyrighted material as an email attachment, downloading copyrighted material from other web pages, providing links to a web page that contains unauthorized copyrighted material, and framing or otherwise displaying a person's web page so as to alter its appearance. Each of these activities arguably constitutes copyright infringement because each activity requires either the duplication, distribution, or display of copyrighted material, and the copyright code reserves those rights to copyright holders. *See* 17 U.S.C. § 106 (1994), *amended by* 17 U.S.C. §§ 106(4)-(6) (Supp. IV 1998).

30    *See* Michael Leapman, *Trade Digest,* TIMES (LONDON), July 2, 1999, at 42 (describing copyright holder's attempts to prevent unauthorized use of the "Thomas the Tank Engine" cartoon character on web sites).

31    *See* Hartman & Stubenrauch, *supra* note 5 (describing the distribution of unauthorized duplicates of copyrighted music over the Internet); McCullom, *supra* note 6 (describing the distribution of unauthorized duplicates of copyrighted music by students at Carnegie Mellon University).

32    The Internet operates by making and sending copies of information from one computer to another. Material viewed on a subscriber's home page is generally stored on her ISP's computer. Internet users view the subscriber's home page by sending a request for the relevant files to the ISP's computer. That computer automatically responds by making a copy of the files stored by the subscriber and transmitting the files over the Internet to the requesting party. In many cases, those files also pass through intermediate computers on the Internet, each of which may make a copy of the files before transmitting them further along the network. Thus, the use of copyrighted material on a subscriber's web page necessarily implies making and distributing copies of that material. *See Marobie-FL,* 983 F. Supp. at 1171-72; GRALLA, *supra* note 1, at 5-15, 41-43.

33    *See* 17 U.S.C. § 106 (reserving rights of reproduction and distribution to copyright owner).

34    *See id.* § 501(a) (providing that anyone who violates a copyright holder's exclusive rights has committed copyright infringement). It is very much worth noting that subscribers "may" (and not "shall") be liable for reproducing or distributing copyrighted material over the Internet. Although the copyright code clearly reserves rights of distribution and reproduction to copyright holders, those rights are limited by other doctrines such as the "fair use" and the "idea/ expression dichotomy." These limitations mean that many unauthorized uses of copyrighted material are perfectly legal. *See id.* § 102(b) (prohibiting copyright protection for ideas); *id.* § 107 (excluding fair use from copyright infringement); Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 575-79 (1994) (stating that fair use depends on a careful balancing of four statutory factors in light of the overall purpose of copyright law); Baker v. Selden, 101 U.S. 99, 103 (1897) (explaining that copyright protects only an author's expression, and not his ideas). Thus, the mere fact that someone has used copyrighted material on a web page does not conclusively establish copyright infringement. This realization becomes vitally important in a proper understanding of the law governing ISP liability. *See infra* notes 177-203 and accompanying text.

35    ISPs that offer service that differs from the basic service may face greater exposure to liability, particularly ISPs that control the content of subscribers' web pages and realize revenue from infringements. *See infra* notes 51-90 and accompanying text.

36    *See supra* notes 1, 23-28, 32 and accompanying text (describing the operation of the Internet).

37    *See* 17 U.S.C. § 106 (reserving exclusive rights of reproduction and distribution to copyright holder).

38    839 F. Supp. 1552 (M.D. Fla. 1993).

39    *See id.* at 1554. A bulletin board service (BBS) stores and distributes files for its subscribers. Subscribers generally use a modem to connect to the BBS. Once connected, the subscriber can download files on the BBS computer or upload files that the subscriber wishes to leave for others to see. *See id.* (describing how Frena's BBS operated); Playboy Enters., Inc. v. Russ Hardenburgh, Inc., 982 F. Supp. 503, 505 (N.D. Ohio 1997); Religious Tech. Ctr. v. Netcom On-Line Communication Servs., 907 F. Supp. 1361, 1365-66 (N.D. Cal. 1995); KURLAND, *supra* note 1, at 19-20.

40    *See Frena,* 839 F. Supp. at 1554.

41    *See id.* Playboy also sued for trademark infringement, but the court's treatment of those issues is not relevant here. *See id.*

42    *See id.* at 1556-57.

43    *Id.* at 1559.

44    *See* Buck v. Jewell-La Salle Realty Co., 283 U.S. 191, 198-99 (1931); Shapiro, Bernstein & Co. v. H. L. Green Co., 316 F.2d 304, 308 (2d Cir. 1964) (discussing strict liability in copyright); Singer v. Citibank N.A., No. 91 Civ. 4453, 1993 WL 177801, at *5 (S.D.N.Y. May 21, 1993) (noting that copyright infringement is a tort that generally does not require scienter).

45    *See supra* notes 1, 23-28, 32 and accompanying text (describing the operation of the Internet).

[46]   907 F. Supp. 1361 (N.D. Cal. 1995). *Netcom* is the case which considers the issues relevant to this article most extensively. Accordingly, it is discussed throughout this article, particularly *infra* at notes 63-234 and accompanying text.

[47]   *See* 907 F. Supp. at 1365-67.

[48]   *Id.* at 1369-70.

[49]   *See* Marobie-FL, Inc. v. National Ass'n of Fire Equip. Distribs., 983 F. Supp. 1167, 1178 (N.D. Ill. 1997) (following *Netcom*); Sega Enters. v. MAPHIA, 948 F. Supp. 923, 931-32 n.5 (N.D. Cal. 1996) (following *Netcom* and explicitly removing any implication that an earlier opinion in the same case established liability for direct infringement).

[50]   *See* 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 12.04 [[A][3][e], at 12-98 (1999); Michael F. Morano, *Legislating in the Face of New Technology: Copyright Laws for the Digital Age,* 20 FORDHAM INT'L L.J. 1374, 1421 (1997) (criticizing direct copyright liability for ISPs); Bruce W. Sanford & Michael J. Lorenger, *Teaching an Old Dog New Tricks: The First Amendment in an Online World,* 28 CONN. L. REV. 1137, 1164 (1996) (describing the "tortured reasoning" of Playboy v. Frena); M. David Dobbins, Note, *Computer Bulletin Board Operator Liability for Users' Infringing Acts,* 94 MICH. L. REV. 217, 222-24 (1995) (arguing against the result in Playboy v. Frena).

[51]   Shapiro, Bernstein & Co. v. H.L. Green Co., 316 F.2d 304, 307 (2d Cir. 1964) (holding department store vicariously liable for copyright infringement of record sales concessionaire); *see* Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 261-64 (9th Cir. 1996) (holding operator of swap meet vicariously liable for copyright infringement of booth renters); Gershwin Publ'g Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159, 1162-63 (2d Cir. 1971) (holding manager liable for infringing performances by musician).

[52]   *See Shapiro,* 316 F.2d at 307; 2 PAUL GOLDSTEIN, COPYRIGHT: PRINCIPLES, LAW AND PRACTICE § 6.2 (2000).

[53]   *See Fonovisa,* 76 F.3d at 261-62 (noting connection between vicarious copyright liability and respondeat superior); Polygram Int'l Publ'g, Inc. v. Nevada/TIG, Inc., 855 F. Supp. 1314, 1325-26 (D. Mass. 1994) (discussing relationship of vicarious copyright liability, master/servant liability, and enterprise liability); Demetriades v. Kaufmann, 690 F. Supp. 289, 292 (S.D.N.Y. 1988) (referring to connection between vicarious copyright liability and respondeat superior).

[54]   *See* Richard A. Epstein, *Products Liability as an Insurance Market,* 14 J. LEGAL STUD. 645, 645 (1985); Gregory C. Keating, *The Idea of Fairness in the Law of Enterprise Liability,* 95 MICH. L. REV. 1266, 1267 (1997) (referring to strict liability in its enterprise liability form); George L. Priest, *The Invention of Enterprise Liability: A Critical History of the Intellectual Foundations of Modern Tort Law,* 14 J. LEGAL STUD. 461, 462-64 (1985) (relating the rise of strict liability to the rise of enterprise liability as a theory of tort law).

For additional readings about tort theory and enterprise liability, see Steven P. Croley & Jon D. Hanson, *What Liability Crisis? An Alternative Explanation for Recent Events in Products Liability,* 8 YALE J. ON REG. 1 (1991); George P. Fletcher, *Fairness and Utility in Tort Theory,* 85 HARV. L. REV. 537 (1972); Jon D. Hanson & Kyle D. Logue, *The First-Party Insurance Externality: An Economic Justification for Enterprise Liability,* 76 CORNELL L. REV. 129 (1990); Alan Schwartz, *The Case Against Strict Liability,* 60 FORDHAM L. REV. 819 (1992).

[55]   *See Polygram,* 855 F. Supp. at 1326.

56    *See supra* notes 23-28 and accompanying text (describing the basic ISP/subscriber relationship). For a discussion of how variations on a basic relationship might affect the existence of ISP liability, see *infra* note 82 and accompanying text.

57    *See* Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 438 n.18 (1984); *Fonovisa,* 76 F.3d at 262-63; *Shapiro,* 316 F.2d at 306-08; Banff Ltd. v. Limited, Inc., 869 F. Supp. 1103, 1108-09 (S.D.N.Y. 1994); *Polygram,* 855 F. Supp. at 1324-25.

58    *See* Famous Music Corp. v. Bay State Harness Racing and Breeding Ass'n, 554 F.2d 1213, 1214 (1st Cir. 1977) (holding racetrack vicariously liable for hiring infringer to supply music for customers); Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co., 36 F.2d 354 (7th Cir. 1929) (holding dance hall vicariously liable for hiring orchestra that played infringing music); KECA Music, Inc. v. Dingus McGee's Co., 432 F. Supp. 72 (W.D. Mo. 1977) (holding cocktail lounge vicariously liable for hiring performers who played infringing music for patrons).

59    *See Fonovisa,* 76 F.3d at 262 (explaining that dance hall proprietors are vicariously liable because they control the premises where infringement occurs).

60    *See id.* (explaining that dance hall proprietors have direct financial interest in infringement because audience pays to hear infringing performances).

61    *See* Artists Music, Inc. v. Reed Publ'g, Inc., 31 U.S.P.Q.2d 1623, 1626 (S.D.N.Y. 1994) (stating that landlords do not have sufficient ability to supervise to create vicarious liability in copyright).

62    *See Shapiro,* 316 F.2d at 307; Deutsch v. Arnold, 98 F.2d 686, 688 (2d Cir. 1938); *Artists Music,* 31 U.S.P.Q.2d at 1627; Vernon Music Corp. v. First Dev. Corp., No. 83-0645-MA, 1984 WL 8146, at *1 (D. Mass 1984). *Shapiro* is the leading case applying the distinction between landlords and dance hall proprietors. In *Shapiro,* the plaintiffs owned copyrights in a number of musical compositions. *See* 316 F.2d at 305. They sued defendant H.L. Green Co., Inc. for the sale of bootleg records in 23 Green department stores. Green defended by arguing that its concessionaire, Jalen Amusement Company, was solely liable for any infringements. The district court agreed and dismissed Green. *See id.* at 306.

    On appeal, the Second Circuit reversed. *See id.* In doing so, the court noted a number of important facts. Customers received Green company receipts, and all daily proceeds went into a Green cash register. *See id.* Green deducted a 10-12% commission before proceeds were returned to Jalen, and Green had the authority to discharge any Jalen employee. *See id.* In the court's opinion, these facts showed that Green controlled Jalen's activities and that Green had a direct financial interest in the infringing sales. *See id.* at 308. Green was therefore more like a dance hall proprietor than a landlord. *See id.*

63    *See* Marobie-FL Inc. v. National Ass'n of Fire Equip. Distribs., 983 F. Supp. 1167, 1179 (N.D. Ill. 1997); Religious Tech. Ctr. v. Netcom On-Line Communication Servs., 907 F. Supp. 1361, 1376 (N.D. Cal. 1995). It should be noted that both courts also left open the possibility of contributory infringement. For analysis of this issue, see *infra* notes 204-35 and accompanying text.

64    907 F. Supp. 1361.

65    *See id.* at 1365.

66    For an explanation of a BBS, see *supra* note 39.

67    *See Netcom,* 907 F. Supp. at 1365.

68      *See id.* at 1365-66.

69      *See id.* at 1366.

70      *See id.* at 1365-66.

71      *See id.*

72      *See id.* at 1382.

73      *See id.* at 1375 n.22.

74      *See id.* at 1367-68.

75      *See id.* at 1366 n.3.

76      *See id.* at 1375-77.

77      *See id.* at 1377.

78      *See id.*

79      *Id.* An "off-topic posting" is one which does not pertain to the specific subject matter of a particular BBS or other discussion list. For example, a posting about rock and roll music would likely be "off-topic" if it were posted to a list concerning the game of checkers.

80      *See id.*

81      *Id.* at 1376 (citation omitted).

82      ISPs that charge subscribers on a per minute connection basis or metered bandwidth basis, or those who place ads on subscriber web pages and receive revenue from advertising sales in proportion to the traffic on a given site, might have a direct financial interest in their subscribers' infringement because such infringement would imply greater use of the ISPs' service, for which the ISP would charge. However, this sort of billing arrangement would not imply that ISPs had the level of control necessary to establish vicarious liability.

83      983 F. Supp. 1167 (N.D. Ill. 1997).

84      *See id.* at 1171. Clip art consists of images sold on disks to users who incorporate those images in documents or other computer generated works. *See id.*

85      *See id.* at 1171-72.

86      *See id.* at 1172.

87      The *Netcom* court itself claimed that Erlich's indirect relationship to Netcom made no difference to its decision. *See Netcom,* 907 F. Supp. at 1376 n.22. Nevertheless, it seems odd to think that each layer of BBS or other computer operator between an infringer and an ISP would not make the necessary ability to supervise less and less likely.

88      *See Marobie-FL,* 983 F. Supp. at 1179.

89      *See* WORKING GROUP, *supra* note 12, at 114-24.

90      *See infra* note 93 and accompanying text.

91      31 U.S.P.Q.2d 1623 (S.D.N.Y. 1994).

92      855 F. Supp. 1314 (D. Mass. 1994).

93      Several courts have adopted the general approach of *Artists Music. See* Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 491 (1984) (holding that manufacturers of home videotape recorders were not vicariously or contributorily liable); Shapiro, Bernstein & Co. v. H.L. Green, Co., 316 F.2d 304, 306 (2d Cir. 1963) (holding owner of store that distributes bootleg records vicariously liable for copyright infringement); Banff Ltd. v. Limited, Inc., 869 F. Supp. 1103, 1111 (S.D.N.Y. 1994) (holding that parent corporation is not vicariously liable for infringement committed by subsidiary corporation).

     For courts adopting the general approach of *Polygram,* see Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 263 (9th Cir. 1995) (holding swap meet operator vicariously liable for infringement committed by booth renters); Broadcast Music, Inc. v. Hartmarx Corp., 9 U.S.P.Q.2d 1561, 1561 (N.D. Ill. 1988) (holding parent corporation vicariously liable for infringement committed by subsidiary corporation).

94      *See Artists Music,* 31 U.S.P.Q.2d at 1624.

95      *See id.*

96      *See id.* at 1624-25.

97      *See id.* at 1625-26.

98      *See id.* at 1625.

99      *Id.* at 1626.

100      *See id.* at 1626-28.

101      *See id.* at 1627-28.

102    *Id.* at 1627.

103    *Id.*

104    *See id.*

105    Polygram Int'l Publ'g v. Nevada/TIG, Inc., 855 F. Supp. 1314, 1317-18 (D. Mass. 1994).

106    *See id.* at 1324-33.

107    *See id.* at 1328.

108    *See id.* at 1328-29.

109    *Id.* at 1329.

110    *See id.*

111    *See id.* at 1330.

112    *Id.* at 1332 (emphases added).

113    *See infra* notes 117-19 and accompanying text.

114    *See* Artists Music, Inc. v. Reed Publ'g, Inc., 31 U.S.P.Q.2d 1623, 1627 (S.D.N.Y. 1994).

115    *See* Religious Tech. Ctr. v. Netcom On-Line Communication Servs., 907 F. Supp. 1361, 1367 (N.D. Cal. 1995).

116    *See id.* at 1376-77.

117    *See* Kenneth A. Walton, Note, *Is a Web Site Like a Flea Market Stall? How* Fonovisa v. Cherry Auction *Increases the Risk of Third Party Copyright Infringement Liability for Online Service Providers,* 199 HASTINGS COMM. & ENT. L.J. 921, 938-40 (1997) (analyzing similarities and differences between flea market operator and ISPs).

118    The copyright code extends copyright protection to all "original works of authorship." 17 U.S.C. § 102(a) (1994). This category of works specifically includes literary works, pictorial works, motion pictures, musical works, and other items commonly found on home pages. *See id.*

119    These observations significantly weaken the argument that vicarious liability for ISPs makes sense because ISPs are the cheapest cost avoiders when it comes to preventing copyright infringement. Content providers can identify copyright infringement on the Internet more easily than ISPs can because content providers already know which uses of their works are permitted.

Some may argue that technology will soon erase any difficulties faced by ISPs in monitoring subscriber behavior, and that it will become completely fair to require ISPs to identify and prevent their subscribers' infringements. It is, of

course, impossible to predict accurately what future technology will achieve, but two observations seem relevant. First, technology will also make it easier for content providers to monitor the use of their works on the Internet; therefore, the relative desirability of placing such burdens on ISPs may not change. *Cf. infra* note 163 and accompanying text (discussing technologies that could be used to monitor user behavior). Second, it is highly unlikely that technology will completely eliminate the problem of deciding whether any particular use of copyrighted material is permitted, uses only public domain material, or is fair use. These determinations often require human judgment, and it will likely be a very long time before computers can perform this function. *See* James Boyle, *Foucault in Cyberspace: Surveillance, Sovereignty, and Hardwired Censors,* 66 U. CIN. L. REV. 177, 198-99 at n.62 (1997) (expressing doubt about whether ISPs are the cheapest cost avoiders in preventing copyright infringement on the Internet).

It should also be noted here that the constitutional desirability of such monitoring is highly suspect. If ISPs have difficulty identifying copyright infringement, they will have to resolve their doubts one way or the other. Because ISPs would monitor for the purpose of avoiding liability for subscriber infringement, they would likely resolve those doubts in favor of removal. This, of course, would lead to widespread removal of material from the Internet even though the material in question was not actually infringing anyone's copyright. The resulting chill would raise serious conflicts with the First Amendment. *See infra* notes 167-203 and accompanying text (discussing First Amendment problems caused by ISP removal of material from the Internet).

120   Although web pages sometimes require payment before viewing, those fees are generally imposed at the option of the web page operator (that is, subscriber) and not the ISP. Of course, if the ISP shares in those revenues or receives advertising revenue based upon the number of "hits" to a subscriber's web site, it might well have a "direct financial interest" in any copyright infringement taking place at the web site. *See supra* note 82 and accompanying text.

121   *See* GRALLA, *supra* note 1, at 41-43.

122   *See supra* note 23, 28 for discussion of mechanism of ISP response to requests for materials.

123   *See* Neil Augenstein, *Starr Watchers Fear Internet Overload,* UNITED PRESS INT'L, Sept. 11, 1998, at 5 (reporting concerns that numerous Internet requests to see the Starr Report concerning President Clinton would slow down servers on the Internet); Gerry Blackwell, *Layin Pipe,* TORONTO STAR, Oct. 8, 1998, at J1 (mentioning Internet servers slowed by number of hits); Bob Ruggiero, *Geek Force,* HOUSTON PRESS, May 13, 1999, at C1 (noting that too many hits related to publicity associated with Star Wars caused server to crash).

124   *Cf.* FED. R. CIV. P. 56 (motion for summary judgment is appropriate when there is "no triable issue of material fact").

125   Artists Music, Inc., v. Reed Publ'g, Inc., 31 U.S.P.Q.2d 1623, 1626 (S.D.N.Y. 1994).

126   *See* Keating, *supra* note 54, at 1267; Priest, *supra* note 54, at 462-64.

127   Polygram Int'l Publ'g v. Nevada/TIG, Inc., 855 F. Supp. 1314, 1325 (D. Mass. 1994).

128   *See, e.g.,* Keating, *supra* note 54, at 1267-68 (discussing policy justifications of enterprise liability); Priest, *supra* note 54, at 462-64 (same).

129   *See Polygram,* 855 F. Supp. at 1325; Keating, *supra* note 54, at 1266-70; Priest, *supra* note 54, at 463.

130   *See Polygram,* 855 F. Supp. at 1325 (discussing fairness, deterrence, and insurance aspects of enterprise liability); Keating, *supra* note 54, at 1266-77 (same).

131 *Polygram,* 855 F. Supp. at 1326.

132 *See* Priest, *supra* note 54, at 527 ("The unavoidable implication of the three presuppositions of manufacturer power, manufacturer insurance, and internalization is absolute liability.").

133 *See, e.g.,* Indiana Harbor Belt R.R. Co. v. American Cyanimid Co., 916 F.2d 1174, 1181 (7th Cir. 1990) (shipping the chemical acrylonitrile not sufficiently dangerous to warrant strict liability); Erbrich Prods. Co. v. Wills, 509 N.E.2d 850, 856 (Ind. Ct. App. 1987) (using chlorine gas in production of bleach not an abnormally dangerous activity); RESTATEMENT (SECOND) OF TORTS § 519 (1977) (recognizing strict liability for abnormally dangerous activities).

134 *See, e.g.,* Cochran v. Brooke, 409 P.2d 904, 906 (Or. 1966) (holding that drug used to treat malaria was not defective when used to treat arthritis even though drug caused loss of vision); RESTATEMENT (SECOND) OF TORTS § 402A cmt. g (1965).

135 *See, e.g.,* Robinson v. Reed-Prentice Div. of Package Mach. Co., 403 N.E.2d 440, 441 (N.Y. 1980) (stating that modification to product after it leaves possession and control of manufacturer eliminates proximate cause with respect to manufacturer in strict liability suit); Boris v. Tops Mkts., Inc., 163 Misc. 2d 1088, 1091 (N.Y. Sup. Ct. 1995) (stating that inhaling of butane fumes constituted misuse sufficient to cut off proximate cause with respect to manufacturer and retailer of butane in products liability suit).

136 *See, e.g.,* Leaf River Forest Prods., Inc. v. Harrison, 392 So. 2d 1138, 1139 (Miss. 1981) (no vicarious liability for acts of independent contractor); Ross v. Texas One Partnership, 796 S.W.2d 206, 209 (Tex. App. 1990) (no vicarious liability for act of employee of independent contractor); RESTATEMENT (SECOND) OF TORTS § 409 (1965) (establishing independent contractor defense).

137 *See* Lisa M. v. Henry Mayo Newhall Mem'l Hosp., 907 P.2d 358, 366 (Cal. 1995); Huddleston by Huddleston v. Union Rural Elec. Ass'n, 841 P.2d 282, 287 (Colo. 1992); Bair v. Peck, 811 P.2d 1176, 1182 (Kan. 1991); Adams v. New York City Transit Auth., 666 N.E.2d 216, 218 (N.Y. 1996).

138 *See* Hinman v. Westinghouse Elec. Co., 471 P.2d 988, 990 (Cal. 1970) ("[The] proper basis of vicarious liability of the master is not his control or fault but the risks incident to his enterprise."); M.L. v. Magnuson, 531 N.W.2d 849, 856 n.3 (Minn. Ct. App. 1995) ("Respondeat superior imposes vicarious liability on an employer for all acts of its employees that occur within the scope of their employment, regardless of the employer's fault.").

139 *See, e.g., Lisa M.,* 907 P.2d at 360; Sauriolle v. O'Gorman, 163 A. 717, 719 (N.H. 1932); Cosgrove v. Lawrence, 522 A.2d 483, 484-85 (N.J. Sup. Ct. 1987); Antonen v. Swanson, 48 N.W.2d 161, 167 (S.D. 1951); Manuel v. Cassada, 59 S.E.2d 47, 50 (Va. 1950); RESTATEMENT (SECOND) OF AGENCY § 219 (1958).

140 *See* RESTATEMENT (SECOND) OF TORTS § 409 cmt. b (1965) (no vicarious liability for act of independent contractor because hiring party lacked control). There are, of course, many exceptions to the independent contractor defense in tort law. *See id.* §§ 410-429. Nevertheless, the exceptions do not eliminate the importance of the independent contractor defense because courts often refuse to hold employers of independent contractors vicariously liable. *See, e.g.,* Mahon v. City of Bethlehem, 898 F. Supp. 310, 314 (E.D. Pa. 1995); *Harrison,* 392 So. 2d at 1139; Kemp v. Bechtel Constr. Co., 720 P.2d 270, 275 (Mont. 1986); Wagner v. Continental Cas. Co., 421 N.W.2d 835, 836 (Wis. 1988).

141 In *Rodebush v. Oklahoma Nursing Homes, Ltd.,* 867 P.2d 1241 (Okla. 1993), the court stated:

As a general rule, it is not within the scope of an employee's employment to commit an assault upon a third person. However, this general rule does not apply when the act is one which is "fairly and naturally incident to the business," and is done "while the servant was engaged upon the master's business and be done, although mistakenly or ill advisedly,

with a view to further the master's interest, or from some impulse of emotion which naturally grew out of or was incident to the attempt to perform the master's business."

*Id.* at 1245 (citations omitted). *See also Lisa M.,* 907 P.2d at 361 (declining to find employer hospital vicariously liable because employee acted from motivations not associated with his employment); Weinberg v. Johnson, 518 A.2d 985, 988 (D.C. 1986) (declining to find employers vicariously liable for "'willful acts, intended by the agent only to further his own interest, not done for the [employer] [sic] at all'").

142    *See* Vandermark v. Ford Motor Co., 391 P.2d 168, 171-72 (Cal. 1964); Greenman v. Yuba Power Prods., Inc., 377 P.2d 897, 900 (Cal. 1963); Escola v. Coca-Cola Bottling Co., 150 P.2d 436, 440 (Cal. 1944) (concurring opinion); William L. Prosser, *The Assault upon the Citadel (Strict Liability to the Consumer),* 69 YALE L.J. 1099, 1120-22 (1960).

143    *See supra* notes 126-28 and accompanying text.

144    *See* RESTATEMENT (SECOND) OF TORTS § 402A (1965). The *Restatement* asserts:

One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

*Id.*

145    *Cf.* Kelley v. R.G. Indus., Inc., 497 A.2d 1143, 1153-54 (Md. 1985) (describing problems with "Saturday Night Specials").

146    *See* Raines v. Colt Indus., Inc., 757 F. Supp. 819, 822 (E.D. Mich. 1991) (plaintiff shot because of error concerning whether gun was loaded); Hammond v. Colt Indus. Operating Corp., 565 A.2d 558, 559 (Del. Super. Ct. 1989) (accidental shooting of plaintiff when gun twirled on finger of 13-year-old child).

147    *See, e.g.,* Paul R. Bonney, Note, *Manufacturers' Strict Liability for Handgun Injuries: An Economic Analysis,* 73 GEO. L.J. 1437, 1438 (1985); H. Todd Iveson, Note, *Manufacturers' Liability to Victims of Handgun Crime: A Common Law Approach,* 51 FORDHAM L. REV. 771, 773 (1983); Joi Gardner Pearson, Comment, *Make It, Market It, and You May Have to Pay for It: An Evaluation of Gun Manufacturer Liability for the Criminal Use of Uniquely Dangerous Firearms in Light of* In re 101 California Street, 1997 BYU L. REV. 131, 145 (1997); Andrew O. Smith, Comment, *The Manufacture and Distribution of Handguns as an Abnormally Dangerous Activity,* 54 U. CHI. L. REV. 369, 391-92 (1987).

148    The only case found is *Kelley,* 497 A.2d at 1159 (holding manufacturers of "Saturday Night Specials" liable). However, the result in *Kelley* was partially overturned by legislative action in 1988. *See* MD. CODE ANN., art. 27 § 36-I(h) (1988) (stating that a person or entity cannot be held strictly liable for injuries resulting from criminal use of a firearm). Moreover, other courts specifically have noted *Kelley* and have refused to follow it. *See, e.g.,* Armijo v. Ex Cam, Inc., 656 F. Supp. 771, 775 (D.N.M. 1987); Delahanty v. Hinckley, 686 F. Supp. 920, 927-28 (D.D.C. 1986); King v. R.G. Indus., Inc., 451 N.W.2d 874, 875 (Mich. Ct. App. 1990).

149    *See* Fortier v. Olin Corp., 840 F.2d 98, 99 (1st Cir. 1988) (holding manufacturer liable for defectively designed firing pin that caused "inertia firing" of rifle when hunter stumbled and fell); *Hammond,* 565 A.2d at 560 (denying summary judgment motion because triable issue of fact existed over whether gun without modern safety was defective).

150    *Delahanty,* 686 F. Supp. at 927.

Case 2:24-cv-02527-JAM-CKD    Document 47-19    Filed 03/07/25    Page 41 of 52

151   *See* Martin v. Harrington and Richardson, Inc., 743 F.2d 1200, 1204 (7th Cir. 1984); Wasylow v. Glock, Inc., 975 F. Supp. 370, 380-81 (D. Mass. 1996) ("It is the province of legislative or authorized administrative bodies, and not the judicial branch, to … transform firearm enterprises into insurers against misuse of their products.").

152   Fisher v. Johnson Milk Co., 174 N.W.2d 752, 753 (Mich. 1970), *cited with approval in* Raines v. Colt Indus., Inc., 757 F. Supp. 819, 824 (E.D. Mich. 1991); *see also* RESTATEMENT (SECOND) OF TORTS § 402A cmt. i (1965).

153   It is worth noting that plaintiffs have also tried holding gun manufacturers liable on an ultrahazardous activity theory. Those cases generally represent an effort to circumvent the problems with strict products liability actions discussed here, and they have been unsuccessful. *See* Copier v. Smith & Wesson Corp., 138 F.3d 833, 839 (10th Cir. 1998) (rejecting plaintiff's claim against gun manufacturer on theory of ultrahazardous activity and rejecting law review commentary favoring imposition of strict liability); Shipman v. Jennings Firearms, Inc., 791 F.2d 1532, 1534 (11th Cir. 1986) (finding that the manufacture and sale of rifles is not an ultrahazardous activity); *Martin,* 743 F.2d at 1203-04 (finding that the sale of handguns to the public is not an ultrahazardous activity); Addison v. Williams, 546 So. 2d 220, 223 (La. Ct. App. 1989) (same). More recently, some cities have had success suing gun manufacturers on the theory that the guns are defective or that the defendants marketed their products in a negligent or fraudulent way. *See* Lisa Gelhaus, *Brooklyn Jury Adds Momentum to Antigun Litigation,* 35 TRIAL 96, 96-98 (1999); David Kairys, *Legal Claims of Cities Against the Manufacturers of Handguns,* 71 TEMP. L. REV. 1, 12-15 (1998). Although these cases might appear to be exceptions to previous holdings in favor of gun manufacturers, it is important to note that the suits stand on something other than pure enterprise liability.

154   *See, e.g.,* Garrison v. Heublein, Inc., 673 F.2d 189, 190 (7th Cir. 1982) (manufacturer had no duty to warn plaintiff about dangers of alcohol); Maguire v. Pabst Brewing Co., 387 N.W.2d 565, 572 (Iowa 1986) (brewer of alcoholic beverage not liable for injuries caused by intoxicated driver); Pemberton v. American Distilled Spirits Co., 664 S.W.2d 690, 693 (Tenn. 1984) (retailer, wholesaler, and manufacturer not liable to father whose son died from alcohol overdose); Morris v. Adolph Coors Co., 735 S.W.2d 578, 584 (Tex. App. 1987) (alchohol manufacturer not liable for injury caused by intoxicated driver). For commentary, see Robert F. Cochran, Jr., *"Good Whiskey," Drunk Driving, and Innocent Bystanders: The Responsibility of Manufacturers of Alcohol and Other Dangerous Hedonic Products for Bystander Injury,* 45 S.C. L. REV. 269, 335 (1994) (arguing that enterprise liability principles support extension of strict liability against alcohol manufacturers). It is important to keep in mind that the discussion in the text concerns strict liability actions against alcohol manufacturers and not negligence claims. *See infra* note 156 (discussing how some states allow actions against those who serve liquor on a negligence or other fault basis).

155   RESTATEMENT (SECOND) OF TORTS § 402A cmt. j (1965). Several cases have cited section 402A with approval. *See Maguire,* 387 N.W.2d at 566; *Pemberton,* 664 S.W.2d at 692; *Morris,* 735 S.W.2d at 582.

156   A number of states allow plaintiffs to sue in negligence those who serve alcohol, with negligence typically shown by evidence that the patron was already drunk or that the sale was made in violation of liquor control laws, especially sale to minors. *See, e.g.,* Ontiveros v. Borak, 667 P.2d 200, 207-08 (Ariz. 1983); Ono v. Applegate, 612 P.2d 533, 539 (Haw. 1980); Algeria v. Payonk, 619 P.2d 135, 138 (Idaho 1980); Rappaport v. Nichols, 156 A.2d 1, 4 (N.J. 1959); Campbell v. Carpenter, 566 P.2d 893, 895 (Or. 1977). For a survey of various state approaches to liability for dispensing alcohol, see Daphne D. Sipes, *The Emergence of Civil Liability for Dispensing Alcohol: A Comparative Study,* 8 REV. LITIG. 1, 25-51 (1988).

157   Those who support broad application of enterprise liability against ISPs may point to cases involving the misuse of a product's hidden and incidental features as evidence of broad enterprise liability in tort. For example, courts are sometimes willing to find manufacturers of glue liable for injuries caused by individuals who sniff the glue, suffer hallucinations, and then injure bystanders. *See* Kelly v. M. Trigg Enters., Inc., 605 So. 2d 1185, 1187 (Ala. 1992) (denying summary judgment for maker of air freshener); Moran v. Faberge, Inc., 332 A.2d 11, 13 (Md. 1975) (upholding jury verdict against manufacturer of cologne which ignited when a plaintiff, age 17, poured the cologne on a candle to

produce a scent); Crowther v. Ross Chem. & Mfg. Co., 202 N.W.2d 577, 580 (Mich. Ct. App. 1972) (denying summary judgment for maker of model cement).

Although these cases do suggest the imposition of enterprise liability, the fact that they involve the misuse of hidden and incidental--as opposed to the obvious and inherent--features of a product make them less influential when considering vicarious liability for ISPs. It is reasonable to pin responsibility for misuse on third parties who appreciate the nature of their misuse. Someone who misuses a gun or alcohol knows exactly what she is doing. Similarly, a subscriber who uses Internet service to duplicate copyrighted material knows that he is duplicating that material. There is no need to warn the third party user about the nature of his use. By contrast, those sniffing glue may not have a full appreciation for the consequences, and it seems reasonable to ask manufacturers to provide appropriate warnings or other precautions.

158    Indeed, one could argue that an ISP is the agent for its subscribers, and that subscribers are vicariously liable for infringements committed by ISPs on their behalf. Although no such cases have been brought, the suggested result is far less counterintuitive than is holding ISPs liable for subscriber infringement. After all, if an ISP were to commit copyright infringement at the instruction of a subscriber, the idea that the injured party could sue the subscriber makes some degree of sense. *Cf.* 17 U.S.C. § 106 (1994) (reserving right to authorize duplication to copyright holder).

159    *See supra* note 119 and accompanying text.

160    Of course, this does not mean that agents do not face personal liability for torts they commit while within the scope of employment. The point is simply that vicarious liability is not applied to agents. It is only applied to their employers. This is important when considering vicarious copyright liability for ISPs because personal liability for the ISP (that is, direct infringement) has already been rejected by most courts. *See supra* notes 36-50 and accompanying text.

161    *See supra* notes 139-41 (citing cases that use furtherance of principal's business objective and intent to do so as factors in determining whether agent acted within scope of her employment).

162    *See supra* notes 23-28, 32 and accompanying text.

163    In the case of Microsoft, its Windows 98 operating system automatically created a unique identification number on every computer that uses it. *See* Hiawatha Bray, *Privacy Advocates Decry Digital 'Fingerprints', Step up Call for Federal Protection in Wake of Microsoft Disclosure,* THE BOSTON GLOBE, Mar. 9, 1999, at C1; *Tech Companies to Customers: Privacy is History,* USA TODAY, Mar. 12, 1999, at 14A. The number would then be sent to Microsoft when the user registered her software without the user's consent. *See* Bray, *supra,* at 2. Moreover, the identification was also placed in documents created with Microsoft applications such as Microsoft Word. *See id.* at 3. This meant that Microsoft would be able to identify the creator of particular electronic documents. *See id.* Microsoft has since taken remedial measures to remove this feature. *See id.* at 4.

164    *See* Kairys, *supra* note 153, at 1-2.

165    The relative importance of physical personal injury over simple property damage or economic harm is a common theme in tort law. For example, the amount of force justified by a claim of self-defense depends on whether human safety is involved. Thus, a homeowner cannot use a spring gun merely to ward off trespassers precisely because the risks that such devices pose to human safety outweigh an otherwise legitimate interest in property. *See* Katko v. Briney, 183 N.W.2d 657, 660 (Iowa 1971) (stating that property owner may not use deadly force to protect property absent a threat of death or serious bodily harm). The RESTATEMENT (SECOND) OF TORTS § 85 cmt. a (1965), states:

The value of human life and limb, not only to the individual concerned but also to society, so outweighs the interest of a possessor of land in excluding from it those whom he is not willing to admit, that a possessor of land has, as is stated in § 79, no privilege to use force intended or likely to cause death or serious harm against another whom the possessor

sees about to enter his premises or meddle with his chattel, unless the intrusion threatens death or serious bodily harm to the occupiers or users of the premises.

Similar values appear to be reflected in the exceptions to the independent contractor defense. *See id.* §§ 410-429. Many of these exceptions hold the hiring party vicariously liable for "physical harm" caused by the independent contractor and not simply "harm." *See id.* §§ 416-417, 423, 425, 427, 427A-B, 428.

Finally, one of the earliest and most influential advocates of enterprise liability, Fleming James, spoke of injury to persons (and not all injuries) when making his case: "Strict liability is to be preferred over a system of liability based on fault wherever you have an enterprise or activity, beneficial to many, which takes a more or less inevitable accident toll of human life and limb." Fleming James Jr., *General Products--Should Manufacturers Be Liable Without Negligence?,* 24 TENN. L. REV. 923, 923 (1957).

166   U.S. CONST. amend. I (providing that "Congress shall make no law … abridging the freedom of speech.").

167   *See, e.g.,* Robert C. Denicola, *Copyright and Free Speech: Constitutional Limitations on the Protection of Expression,* 67 CAL. L. REV. 283 (1979); Paul Goldstein, *Copyright and the First Amendment,* 70 COLUM. L. REV. 983 (1970); Mark A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions in Intellectual Property Cases,* 48 DUKE L.J. 147 (1998); Melville B. Nimmer, *Does Copyright Abridge the First Amendment Guarantees of Free Speech and Press?,* 17 UCLA L. REV. 1180 (1970); L. Ray Patterson, *Free Speech, Copyright, and Fair Use,* 40 VAND. L. REV. 1 (1987); Lionel S. Sobel, *Copyright and the First Amendment: A Gathering Storm?,* 19 COPYRIGHT L. SYMP. (ASCAP) 43 (1971); Alfred C. Yen, *A First Amendment Perspective on the Idea/Expression Dichotomy and Copyright in a Work's "Total Concept and Feel",* 38 EMORY L.J. 393 (1989); Diane Leenheer Zimmerman, *Information as Speech, Information as Goods: Some Thoughts on Marketplaces and the Bill of Rights,* 33 WM. & MARY L. REV. 665, 666 (1992) (discussing understatement of conflict between copyright and the First Amendment).

168   *See* Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771-72 (1976) (stating that false advertising not protected by the First Amendment); Gertz v. Robert Welch, Inc., 418 U.S. 323, 340 (1974) (stating that false statements have no constitutional value because they do not advance social debate); Konigsberg v. State Bar of Cal., 366 U.S. 36, 49 n.10 (1961) (listing false advertising among forms of speech not protected by First Amendment).

169   *See* R.A.V. v. City of St. Paul, 505 U.S. 377, 399 (1992) (stating principle that First Amendment does not protect speech which does not advance First Amendment interests); Osborne v. Ohio, 495 U.S. 103, 109-11 (1990) (discussing the state interest in protecting children from exploitation that justifies regulation of child pornography); New York v. Ferber, 458 U.S. 747, 756-58 (1982) (same); Paris Adult Theatre I v. Slaton, 413 U.S. 49, 67 (1973) (permitting regulation of obscene material); Miller v. California, 413 U.S. 15, 24 (1973) (allowing regulation of obscene materials that lack "serious literary, artistic, political, or scientific value").

170   *See* Securities and Exch. Comm'n v. Wall St. Transcript Corp., 422 F.2d 1371, 1379 (2d Cir. 1970) (listing securities regulation as an example of a limitation on the right to communicate information). *See generally* Symposium, *The First Amendment and Federal Securities Regulation,* 20 CONN. L. REV. 261 (1988) (providing various perspectives on free speech and securities regulation).

171   For further discussion of libel law, see *infra* notes 187-97 and accompanying text.

172   *See* U.S. CONST. art. I, § 8, cl. 8 ("The Congress shall have Power … [t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries…."); Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 429 (1984) (noting copyright's operation as incentive for creativity); Mazer v. Stein, 347 U.S. 201, 219 (1954) (noting that copyright encourages individual effort).

173    *See* 1 NIMMER & NIMMER, *supra* note 50, § 1.10[D], at 1-95; Lemley & Volokh, *supra* note 167, at 166 (noting argument that literal copiers do not originate speech).

174    *See* Emerson v. Davies, 8 F. Cas. 615, 619 (C.C.D. Mass. 1845) (No. 4,436) ("Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before.").

175    *See* Castle Rock Entertainment, Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132, 138-46 (2d Cir. 1998) (finding that trivia book devoted to quiz about facts from the Seinfeld television series was infringement and rejecting fair use defense); Rogers v. Koons, 960 F.2d 301, 307-08 (2d Cir. 1992) (finding infringement when postmodern artist Jeff Koons based a larger-than-life sculpture on a postcard photograph for purposes of illustrating the banality of everyday images); Salinger v. Random House, Inc., 811 F.2d 90, 99-100 (2d Cir.) (finding infringement and no fair use when biographer of J.D. Salinger paraphrased unpublished letters written by Salinger), *supplemented and reh'g denied*, 818 F.2d 252 (2d Cir. 1987); Roth Greeting Cards v. United Card Co., 429 F.2d 1106, 1110-11 (9th Cir. 1970) (finding infringement where defendant's greeting cards drew inspiration from plaintiff's greeting cards despite new artwork and restriction of borrowing to simple public domain phrases); Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 56 (2d Cir. 1936) (comparing two works based on real life events and finding copyright infringement despite dissimilarities).

176    *See* Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 556-60 (1985) (noting the economic incentive function of copyright law and discussing the function of internal limitations that eliminate conflicts with the First Amendment); New York Times Co. v. United States, 403 U.S. 713, 726 n.* (Brennan, J., concurring) (government violates First Amendment rights when it seeks to supress ideas, but "copyright laws … protect only the form of expression and not the ideas expressed"). Even the *Netcom* court rejected the First Amendment as irrelevant, thereby overlooking critical support for its decision. *See* Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc., 907 F. Supp. 1361, 1377 (N.D. Cal. 1995). For an article analyzing some of the First Amendment implications of *Netcom,* see Stephen Fraser, *The Conflict Between the First Amendment and Copyright Law and its Impact on the Internet,* 16 CARDOZO ARTS & ENT. L.J. 1, 36-50 (1998).

177    *See* 17 U.S.C. § 102(b) (1994) ("In no case does copyright protection for an original work of authorship extend to any idea …."); Baker v. Selden, 101 U.S. 99, 102-03 (1879) (copyright does not give the author of a book an exclusive property in processes or methods described therein); Nichols v. Universal Pictures Corp., 45 F.2d 119 (2d Cir. 1930) (holding that playwright acquires no property right in his ideas by virtue of copyright).

178    17 U.S.C. § 107(4) (Supp. IV 1998) (making effect on the market for the original work a factor in fair use analysis); *see also* Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579 (1994) (noting importance of transformative borrowing in deciding fair use); *Harper & Row,* 471 U.S. at 567-69 (deciding that proposed fair use was not fair in part because defendant's use supplanted the copyrighted original in the marketplace).

179    *See* Brandir Int'l, Inc. v. Cascade Pac. Lumber Co., 834 F.2d 1142, 1146-47 (2d Cir. 1987) (denying copyright to plaintiff's bicycle rack because its function of holding bicycles could not be separated from its aesthetic components); Carol Barnhart Inc. v. Economy Cover Corp., 773 F.2d 411, 417 (2d Cir. 1985) (denying copyright to plaintiff's mannequins because they were useful articles whose function was to display clothing).

180    *See* Warner Bros. Inc., v. American Broad. Co., 720 F.2d 231, 239-40 (2d Cir. 1983) (requiring "substantial similarity" as prerequisite to copyright infringement); Arnstein v. Porter, 154 F.2d 464, 468-69 (2d Cir. 1946) ("In some cases the similarities between the plaintiff's and defendant's work are so extensive and striking as, without more, both to justify an inference of copying and to prove improper appropriation.").

181    *See* 17 U.S.C. § 102(a) (1994) (limiting copyright to "original works of authorship"); Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340 (1991).

182    *See* Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 475 (1984) (Blackmun, J., dissenting) (calling fair use determination "'the most troublesome in the whole law of copyright."'"); *Nichols,* 45 F.2d at 121 (Hand, J.) (stating that "[n]obody has ever been able to fix that boundary [between idea and expression], and nobody ever can"); Amy B. Cohen, *Copyright Law and the Myth of Objectivity: The Idea-Expression Dichotomy and the Inevitability of Artistic Value Judgments,* 66 IND. L.J. 175, 210-29 (1990) (analyzing how assessments of artistic value affect the application of the idea/expression dichotomy in determining copyright infringement); Alfred C. Yen, *Copyright Opinions and Aesthetic Theory,* 71 S. CAL. L. REV. 247, 266-97 (1998) (analyzing conflicts in doctrines of originality, useful article doctrine, and substantial similarity); Yen, *supra* note 167, at 398-407 (analyzing ambiguity of idea/expression dichotomy).

183    *See generally* Neil Weinstock Netanel, *Copyright and a Democratic Civil Society,* 106 YALE L.J. 283, 303-04 (1996) (contending that copyright doctrine is only "sporadically effective in protecting First Amendment values"); Yen, *supra* note 167, at 395-98 (arguing that the idea/expression dichotomy as presently interpreted does not adequately address First Amendment concerns).

184    Even if a defendant has copied from a plaintiff's copyrighted work, no infringement exists unless the two works are "substantially similar." This degree of similarity marks the line between permissible borrowing and improper appropriation. *See Warner Bros.,* 720 F.2d at 239-40 (requiring "substantial similarity" as prerequisite to copyright infringement); *Arnstein,* 154 F.2d at 468 (explaining importance of "substantial similarity").

185    Consider cases such as *Ideal Toy Corp. v. Fab-Lu Ltd.,* 360 F.2d 1021 (2d Cir. 1966) and *Steinberg v. Columbia Pictures Industries, Inc.,* 663 F. Supp. 706, 711 (S.D.N.Y. 1987), which state that substantial similarity exists when "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Ideal Toy Corp.,* 360 F.2d at 1022. This statement of substantial similarity amounts to nothing more than saying that substantial similarity exists when there has been copying from the copyrighted work.

186    *See* New York Times v. Sullivan, 376 U.S. 254, 279-81 (1964) (identifying the "chilling effect" of laws that silence speakers through the risk of judicial error and incorporating constitutionally required substantive standards to reduce the chilling effect of libel laws); Frederick Schauer, *Fear, Risk and the First Amendment: Unraveling the "Chilling Effect,"* 58 B.U. L. REV. 685 (1978) (describing how courts reduce the chilling effect of libel law); Eugene Volokh & Brett McDonnell, *Freedom of Speech and Independent Judgment Review in Copyright Cases,* 107 YALE L.J. 2431, 2465-66 (1998) (arguing that free speech rights deserve special protection from mistaken curtailment).

187    A defamatory statement is one that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." RESTATEMENT (SECOND) OF TORTS § 559 (1977).

188    *See* Gertz v. Robert Welch, Inc., 418 U.S. 323, 340 (1974) (stating that false statements have no constitutional value because they do not advance public debate).

189    376 U.S. 254. For additional cases in this line of precedent, see Hustler Magazine v. Falwell, 485 U.S. 46 (1988); *Gertz,* 418 U.S. 323; Curtis Publ'g Co. v. Butts, 388 U.S. 130 (1967).

190    *See New York Times,* 376 U.S. at 256.

191    *See id.* at 257-59.

192    *See id.* at 256.

193   *See id.* at 279.

194   *Id.* at 271-72.

195   *See id.* at 279-80.

196   418 U.S. 323 (1974).

197   *Id.* at 347.

198   *See supra* note 182 and accompanying text.

199   *See* Volokh & McDonnell, *supra* note 186, at 2467-70 (suggesting how changes in copyright law might reduce First Amendment problems); Yen, *supra* note 167, at 433-36 (discussing how copyright liability creates a chilling effect against individual speakers and suggesting that the doctrine of the idea/expression dichotomy should be interpreted to reduce the number of cases in which copyright owners can bring plausible claims of infringement that chill the free speech of others).

200   The most likely scenario under which ISPs would have the obligation to act would be the handling of complaints about copyright infringement received from content providers. *See infra* Part II.c.

201   *See supra* notes 176-81 and accompanying text.

202   *See supra* note 182 and accompanying text (referring to ambiguities in copyright law).

203   *See* Zeran v. America Online, Inc., 129 F.3d 327, 330-31 (4th Cir. 1997) (discussing chill against free speech if ISPs monitor subscriber postings for defamatory content). Of course, the revision of copyright law suggested here does not affect the observations earlier made about vicarious liability and enterprise liability.

204   Gershwin Publ'g Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159, 1162 (2d Cir. 1971); *see also* Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc., 907 F. Supp 1361, 1371 (N.D. Cal. 1995); Demetriades v. Kaufmann, 690 F. Supp. 289, 293 (S.D.N.Y. 1988).

205   464 U.S. 417 (1984).

206   The *Sony* plaintiffs also argued that the home use of video recorders constituted infringement. *See id.* at 420. The Court, however, held that such use was fair use. *See id.* at 456.

207   222 U.S. 55 (1911).

208   *Sony,* 464 U.S. at 436-37.

209   *Id.* at 442.

210    The Court also wrote:

If vicarious liability is to be imposed on petitioners in this case, it must rest on the fact that they have sold equipment with constructive knowledge of the fact that their customers may use that equipment to make unauthorized copies of copyrighted material. There is no precedent in the law of copyright for the imposition of vicarious liability on such a theory.

*Id.* at 439. Although this passage ostensibly refers to the doctrine of vicarious liability, its reasoning reflects contributory liability because the Court discusses knowledge, which is an element of contributory liability, but not vicarious liability. *See supra* notes 51-53 (discussing elements of vicarious liability); *see also* Matthew Bender & Co., Inc. v. West Publ'g Co., 158 F.3d 693, 706-07 (2d Cir. 1998), *cert. denied,* 119 S.Ct. 2039 (1999) (holding that defendants who provided "star pagination" in case reports were not contributory infringers because their case reports were capable of substantial noninfringing uses); Vault Corp. v. Quaid Software Ltd., 847 F.2d 255, 262 (5th Cir. 1988) (holding that maker of software that made copying from locked disks possible was not contributorily liable because software had substantial noninfringing use).

211    *See* Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 264 (9th Cir. 1996) (providing space, utilities, parking, advertising, plumbing, and customers constitutes material contribution for purposes of contributory infringement); Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc., 907 F. Supp. 1361, 1375 (N.D. Cal. 1995) (providing service that allows distribution of infringing material is material contribution for purposes of contributory liability); Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc., 256 F. Supp. 399, 404-05 (S.D.N.Y. 1966) (refusing summary judgment for agencies that facilitated mailing and radio advertising of infringing material).

212    907 F. Supp. 1361 (N.D. Cal. 1995). For the factual background of *Netcom,* see *supra* notes 64-71 and accompanying text.

213    *See Netcom,* 907 F. Supp. at 1375.

214    *Id.*

215    *See Fonovisa,* 76 F.3d at 264.

216    *See Screen Gems,* 256 F. Supp. at 404; *see also* Sony v. Universal Pictures, 464 U.S. 417, 438 n.18 (1984) (citing *Screen Gems* with approval).

217    *See* Sega Enters., Ltd. v. MAPHIA, 948 F. Supp. 923, 933 (N.D. Cal. 1996).

218    *See* 17 U.S.C. § 102(b) (1994) (enumerating areas not subject to copyright protection); *id.* § 107 (1994) (codifying the fair use doctrine); Nichols v. Universal Pictures Corp., 45 F.2d 119, 122 (2d Cir. 1930) (allowing the borrowing of ideas).

219    *Cf.* WORKING GROUP, *supra* note 11, at 122-23 (arguing in favor of legal rules designed to force ISPs to take responsibility for subscriber infringements).

220    907 F. Supp. 1361 (N.D. Cal. 1995); *see also* Marobie-FL, Inc. v. National Ass'n of Fire Equip. Distribs., 983 F. Supp. 1167, 1177-78 (N.D. Ill. 1997) (following *Netcom* without conducting significant analysis of the underlying law).

221    *Netcom,* 907 F. Supp. at 1374.

222    *See id.* at 1366-75.

223    *Id.* at 1373.

224    *See id.*

225    *See id.* at 1374-75; *see also Marobie-FL,* 983 F. Supp. at 1178-79 (refusing to grant summary judgment to ISP on issue of contributory infringement).

226    *See Netcom,* 907 F. Supp. at 1374 ("[A] mere unsupported allegation of infringement by a copyright owner may not automatically put a defendant on notice of infringing activity ….").

227    *Id.* at 1374.

228    *Id.* at 1383.

229    The copyright code explicitly mentions "criticism" as one of the indicia of fair use. *See* 17 U.S.C. § 107 (1994); Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579 (1994) ("We thus line up with the courts that have held that parody, like other comment or criticism, may claim fair use under § 107."). Such language alone suggests that substantial quotation for purposes of criticizing the plaintiff's texts or the teachings of scientology *colorably* merits fair use treatment. Indeed, at least one court has found that extensive use of L. Ron Hubbard's writings was a fair use when used in a work criticizing Hubbard; this finding, however, was criticized by the court of appeals. *See* New Era Publications Int'l, APS v. Henry Holt & Co., Inc., 695 F. Supp. 1493, 1507-08 (S.D.N.Y. 1988), *aff'd on other grounds,* 873 F.2d 576 (2d Cir. 1989).

230    *See Netcom,* 907 F. Supp. at 1366 n.3 (stating that Erlich copied "substantial portions" of plaintiff's works). Parodies offer an analogy to Erlich's use because parodists often appropriate the entire tune of a song being parodied. Such use is sometimes considered "fair" because parodists are allowed to borrow at least as much as is reasonably necessary to conjure up the target of parody in the listener's mind. *See* Fisher v. Dees, 794 F.2d 432, 438-39 (9th Cir. 1986) (discussing contours of "the so-called 'conjure-up' test"); Berlin v. E.C. Publications, Inc., 329 F.2d 541, 545 (2d Cir. 1964) (allowing parodist to appropriate amount of original work necessary "to 'recall or conjure-up' the object of his satire"). Thus, Erlich's use of an entire Scientology writing might be fair as long as it was reasonably necessary for Erlich to post the original in order for his readers to understand his criticism.

231    *See* Casella v. Morris, 820 F.2d 362, 365 (11th Cir. 1987) (citing *Gershwin* language regarding knowledge of underlying infringement); Gershwin Publ'g Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159, 1162 (2d Cir. 1971) (citing *Screen Gems*); Sega Enters. Ltd. v. Sabella, No. C 93-04260 CW, 1996 WL 780560, at *8 (N.D. Cal. Dec. 18, 1996) (citing *Casella*); Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc., 256 F. Supp. 399, 403-04 (S.D.N.Y. 1966) (discussing relevance of advertising agency's constructive knowledge of infringement).

232    GOLDSTEIN, *supra* note 52, § 6.1 (footnote omitted). If Goldstein's language is taken literally, ISPs that fail to investigate a complaint could be deemed to have knowledge of underlying subscriber infringement. Thus, if a court ultimately finds that the subscriber's uninvestigated behavior constitutes infringement, the ISP would be contributorily liable even if the case for underlying infringement were extremely controversial. This result would effectively make ISPs responsible for any infringement committed by subscribers after receiving information that would reasonably prompt an inquiry. Indeed, an ISP that made such inquiry and reasonably concluded that infringement had not occurred might still be contributorily liable if a court later disagreed.

233    Although the text refers to the "suspension" of Internet service, it should be understood that the ISP's options include measures short of completely denying Internet services to the subscriber. For example, the ISP might disable access to the allegedly offending page or remove material from the page by deleting the appropriate files from its computer.

234    An ISP might consider the possibility that subscribers will sue if the ISP suspends Internet service. This possibility is real, but it carries far less danger for ISPs. First, ISPs could write protection against such contingencies into their standard Internet service agreements. Second, subscribers are often (though not always) less likely to sue than content providers. This is because the most likely source of complaints about infringement will likely come from holders of significant copyrights who are combing the Internet to protect their rights. Such complainants will likely see the costs of litigation as part of a budget earmarked for copyright enforcement. By contrast, subscribers are more likely to be individuals or smaller businesses who are not planning on copyright litigation. They will be reluctant to spend money on legal fees. Third, even if the subscriber turns out to be a business with resources, it may prove easier to capitulate to the content provider's demands for the same reason that ISPs would tend to do so. After all, subscribers who fight their ISPs will also wind up fighting the content provider, with all of the same costs of litigation and uncertainty of result. Fourth, subscribers who find their Internet service suspended may find moving to another ISP easier than suing.

235    *See supra* notes 189-203 and accompanying text.

236    17 U.S.C. § 512 (Supp. IV 1998).

237    *See id.* §§ 512(a)-(d), (f), (g), (i); *see also infra* notes 245-68 and accompanying text.

238    *See* 17 U.S.C. § 512(l).

239    *See id.* § 512(a). For a description of the basic requirements, see *infra* notes 245-68 and accompanying text.

240    *See supra* notes 46-50 and accompanying text.

241    This result follows because the relevant provision guards against liability for both transmission and temporary storage of otherwise infringing material. *See* 17 U.S.C. § 512(a).

242    Some ISPs keep copies of subscriber emails and their attachments. If they do so, their storage might fall outside the provision's limitation to "intermediate and transient storage of that material in the course of such transmitting, routing or providing connections ...." *Id.*

243    This is a reference to a statutorily prescribed complaint by which a content provider formally informs an ISP about alleged infringement on the ISP's system. Further description of the notice is provided *infra* at note 250.

244    17 U.S.C. §§ 512(c)(1)(A)-(C).

245    *Id.* §§ 512(c)(1)(A)(i)-(ii).

246    *See supra* notes 204-35 and accompanying text (discussing knowledge of defendant and contributory infringement).

247    17 U.S.C. § 512 (c)(1)(B).

248    *See supra* notes 51-52 and accompanying text (discussing requirements for vicarious liability in copyright).

249    *See* 17 U.S.C. § 512(c)(1)(C).

250    The statutory requirements for this formal notice include the signature of a person authorized to act on behalf of the copyright owner, identification of the copyrighted work allegedly infringed, identification of the infringing material, contact information for the complaining party, a good faith statement that the complained of use is not permitted by the copyright owner or by law, and a statement under penalty of perjury that the complaining party has the authority to enforce the rights in question. *See id.* § 512(c)(3)(A).

251    *See id.* § 512(i)(1)(A).

252    *See id.* § 512(i)(1)(B).

253    The provisions of 17 U.S.C. § 512(i) are prerequisites for any relief under 17 U.S.C. § 512.

254    *See id.* § 512(c)(2).

255    *See id.* §§ 512(c)(1)(C), (c)(3)(B)(ii), (d)(3), (f).

256    *Id.* § 512(c)(1)(A)(iii).

257    *See id.* § 512(c)(1)(C).

258    *See id.* (referring to "material that is *claimed* to be infringing") (emphasis added).

259    *Id.* § 512(c)(3)(B)(i).

260    *See id.* § 512(c)(3)(B)(ii).

261    *See supra* note 234.

262    *See* 17 U.S.C. §§ 512(g)(1), (g)(2)(A).

263    *See id.* § 512(g)(2)(B). The form of the notice is prescribed in 17 U.S.C. § 512(g)(3).

264    *See id.* § 512(g)(3)(D).

265    *See id.* § 512(g)(2)(B).

266    *See id.* § 512(g)(2)(C).

267  *Id.*

268  *See id.*

269  *See supra* notes 46-50 and accompanying text.

270  *See supra* notes 51-203 and accompanying text (discussing contours of vicarious liability in copyright).

271  *See supra* notes 245-50 and accompanying text.

272  *See supra* notes 204-34 and accompanying text.

273  *See supra* note 227 and accompanying text.

274  *See* 17 U.S.C. § 512(c)(3)(B) (Supp. IV 1998).

275  Such liability is admittedly not terribly serious in most cases. *See supra* note 234. Nevertheless, the risk of suit is identifiable and one against which risk averse ISPs might find it is worth gaining protection.

276  *See* 17 U.S.C. §§ 512(g)(1)-(2).

277  *See supra* note 260 and accompanying text.

278  Some may argue that the DMCA alleviates the problem of indiscriminately removing speech from the Internet by providing for penalties against those who make knowingly false representations about the existence of infringement. *See* 17 U.S.C. § 512(f). This argument misses the mark because "knowing" misrepresentations do not include statements that are made in good faith but incorrect about the existence of infringement. Indeed, copyright's ambiguity assures that many statements of infringement can be made in good faith, even though a court may find that no infringement actually exists.

279  *See supra* note 234.

280  This article contrasts the interests of content providers and Internet users in order to describe clearly the issues at stake. It is not at all clear, however, that the DMCA's emphasis on enforcing copyrights will even consistently serve the interests of content providers. This is because content providers themselves use the Internet to distribute their works, and such use will only increase in the years to come. Content providers, therefore, may discover that the very provisions designed to enforce their copyrights will instead frustrate their efforts to profit from the Internet.

  At present, it is quite common for famous movie makers, song writers, and recording artists to face charges that their latest hits are in fact copied from an unknown plaintiff's copyrighted work. *See, e.g.,* Selle v. Gibb, 741 F.2d 896, 898 (7th Cir. 1984) (alleging that the Bee Gees' hit song "How Deep is Your Love" infringed plaintiff's song "Let It End"); Litchfield v. Spielberg, 736 F.2d 1352, 1354 (9th Cir. 1984) (alleging that Stephen Spielberg's hit movie "E.T. - The Extra Terrestrial" infringed plaintiff's "Lokey from Maldemar"); Arnstein v. Porter, 154 F.2d 464, 467 (2d Cir. 1946) (alleging that various songs written by Cole Porter infringed plaintiff's songs). In the not-so-distant future, when many movies and songs will be distributed over the Internet, content providers distributing the hits of the future could be stopped cold by plaintiffs who believe in good faith that their works have been infringed. Such plaintiffs need only serve a formal complaint upon the proper ISP and removal of the hit movie or song will likely follow. If, as is often the case,

the plaintiff fails in his suit, the content providers themselves will still have lost their free speech rights (not to mention considerable revenue) for the period of time between the formal complaint and satisfactory resolution of the case.

281    *See* 17 U.S.C. § 502 (1994) (authorizing courts to issue temporary injunctions in copyright cases); FED. R. CIV. P. 65 (b) (requiring "specific facts shown by affidavit or by the verified complaint" as prerequisite to issuance of temporary restraining order); *id.* 65(c) (requiring posting of security for preliminary injunctive relief); Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999) (setting out four factor test for granting preliminary injunction); Shaffer v. Globe Protection, Inc., 721 F.2d 1121, 1123 (7th Cir. 1983) (same); 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2948 (2d ed. 1995) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."), *quoted in* Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Lemley & Volokh, *supra* note 167, at 154-65 (discussing and describing law concerning preliminary injunctive relief in copyright cases, and contending that courts grant such relief too freely).

282    This argument is made in great detail with respect to injunctions and copyright in general by Professors Mark A. Lemley and Eugene Volokh. *See* Lemley & Volokh, *supra* note 167. Professors Lemley and Volokh persuasively contend that although courts traditionally grant preliminary injunctive relief in copyright cases, such a practice is inconsistent with First Amendment jurisprudence in other analogous areas. *See id.* at 182-97. Accordingly, they conclude that preliminary injunctive relief should be given in copyright cases only when the case for infringement has been made by clear and convincing evidence. *See id.* at 215-16. This is a standard far stronger than requiring a statement of "good faith belief" and the filing of a complaint.

283    *See supra* note 282 and accompanying text (discussing situations in which First Amendment concerns diminish upon a clear showing of copyright infringement).

284    BENJAMIN KAPLAN, AN UNHURRIED VIEW OF COPYRIGHT 78 (1967) (quoting Voltaire, *Dictionaire Philosophique, in* 42 OEUVRES COMPLETES DE VOLTAIRE 321 (Imprimerie de la Societe Litteraire-Typographique ed., 1784)).

88 GEOLJ 1833

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.