# EXHIBIT 20



THE PRESS CLAUSE: THE FORGOTTEN FIRST AMENDMENT

A Report from the Floyd Abrams Institute for Freedom of Expression

*Floyd Abrams,[*] Sandra Baron,[**] Lee Levine,[***] Jacob M. Schriner-Briggs[****] & Isaac Barnes May[*****]*

I.   Introduction .................................................................................................. 563
II.  The Press: Importance and Challenges ............................................................ 566
     A.  The Press Matters ...................................................................................... 566
     B.  Legal and Political Challenges .................................................................. 568
          1.  Legal Challenges ................................................................................ 569
          2.  Political Challenges ............................................................................ 581
     C.  Economic Challenges ................................................................................ 582

[*] Senior counsel at Cahill Gordon & Reindel LLP and founder of the Abrams Institute for Freedom of Expression, Yale Law School.

[**] Senior Fellow, Information Society Project and Abrams Institute for Freedom of Expression, Yale Law School.

[***] Retired practitioner at Levine Sullivan Koch & Schulz LLP and Ballard Spahr LLP; retired Adjunct Professor of Law, Georgetown University Law Center.

[****] Visiting Assistant Professor, Chicago-Kent College of Law; J.D., Yale Law School, 2021.

[*****] Resident Fellow, Information Society Project and Abrams Institute for Freedom of Expression, Yale Law School.

The Abrams Institute wishes to thank the Stanton Foundation and its Director, Elisabeth Allison, for its funding and the Yale Law School Information Society Project (ISP) for housing it. Specific thanks are owed to Professor Jack Balkin of Yale Law School, founder and director of the ISP, and to Chinmayi Arun, Heather Branch, and Natasha Rentas of the ISP for helping administer the Project behind the scenes. Thanks to the institutions that hosted the Project's workshops: Ballard Spahr LLP, the UC Berkeley School of Law, and Dentons. A debt of gratitude is also owed to the staff of the *Journal of Free Speech Law*, notably Professor Eugene Volokh, for their thorough editing. And last, thanks to the numerous scholars, lawyers, journalists, and editors who contributed their time, energy, and thoughts in support of an invigorated Press Clause. They are identified in Appendix A of this Report.

III.  The Constitutional Status Quo ........................................................ 584

IV.  Revitalizing the Press Clause .......................................................... 589

    A.  Constitutional Interpretation and the First Amendment ................. 589

        1.  Originalism ........................................................................ 590

        2.  Traditionalism ................................................................... 594

        3.  Living Constitutionalism .................................................. 596

    B.  Historical Arguments .................................................................... 596

        1.  Seditious Libel and the Historical Role of American Printers .. 597

        2.  The Press Clause: Pre- and Post-Ratification ........................... 611

        3.  Republican Precepts ......................................................... 614

        4.  Making Historical Arguments ........................................... 615

    C.  Functional Arguments ................................................................... 620

        1.  The Press-as-Proxy ........................................................... 620

        2.  The Checking Value .......................................................... 622

        3.  Informing Public Discourse and Convening the Public Square .................................................................................. 622

    D.  Precedential Arguments ................................................................ 624

        1.  Judicial Language: Recognizing Press Functions ...................... 625

        2.  Judicial Action: Treating the Press Differently......................... 632

    E.  Analogical Arguments and the Free Exercise Clause .......................... 634

V.  What Might the Press Clause Do? ...................................................... 635

    A.  Access........................................................................................ 636

    B.  Newsgathering Conduct ................................................................ 637

    C.  Editorial Autonomy ..................................................................... 641

    D.  Publication.................................................................................. 642

    E.  Economic Viability....................................................................... 644

VI.  Defining the Press.......................................................................... 645

    A.  The Institutional Approach ............................................................ 647

    B.  The Functional Approach............................................................... 648

    C.  Toward a Multi-Factor Test ........................................................... 651

VII.  Conclusion ........................................................................................... 653

Appendix A. List of Workshop Participants ............................................ 655

## I.    INTRODUCTION

From the earliest days of our nation, there was a shared sense that freedom of the press was an essential precondition for life in a newly liberated country. James Madison's first draft of what ultimately became the First Amendment reflected that sentiment. Introduced to the First Congress on June 8, 1789, it asserted that "[the] people shall not be deprived of their right to speak, to write, or to publish their sentiments; and the freedom of the press, as one of the great bulwarks of liberty, shall be inviolable."[1]

The proposition that freedom of the press was an inviolable right was repeated in varying but wholly consistent language in the widest range of state constitutions of that time. Typical articulations were those of the Georgia Constitution of 1777 (declaring that the freedom of the press was to "remain inviolate forever"); the Massachusetts Constitution of 1780 ("the liberty of the press is essential to the security of freedom in a state: it ought not, therefore, to be restrained in this Commonwealth"); and the Pennsylvania Constitution of 1790 ("the printing presses shall be free to every person who undertakes to examine the proceedings of the legislature, or any part of government: And no law shall ever be made to restrain the right thereof").[2]

Ultimately, the language of the First Amendment was redrafted in its current form,[3] with freedom of the press specifically identified as requiring constitutional protection. The American press has, as a result, received broad protections against prior and subsequent restraints developed through twentieth-century jurisprudence. Cases such as *Bridges v. California*,[4] *New York Times v. Sullivan*,[5] and *New*

---

[1] *See* David A. Anderson, *The Origins of the Press Clause*, 30 UCLA. L. REV. 455, 478 (1983).

[2] *See* GA. CONST. art. LXI (1777); MASS. CONST. pt. I, art. XVI (1780); PA. CONST. art. IX, § 7 (1790).

[3] U.S. CONST. amend. I ("Congress shall make no law . . . abridging the freedom of speech, or of the press").

[4] 314 U.S. 252 (1941).

[5] 376 U.S. 254 (1964).

*Journal of Free Speech Law*                      [2024

*York Times v. United States*[6] provide legal protections for the press that are unheard of in other democratic nations.[7] At the same time, however, the Supreme Court has yet to recognize unique protections for the press needed for journalists to best perform their role in a democratic society. This is particularly troubling at a time when journalism in the United States faces an array of unique and increasingly dire challenges.

These challenges come in various forms. Influential political figures wantonly place the press in their rhetorical crosshairs, decrying it, as a whole, as "enemies of the people."[8] Local governments utilize their powers to undermine newsrooms[9] while the federal government jails journalists for protecting the confidentiality of their sources.[10] Reporters covering political protests in both 2020 and 2024 have been assaulted, arrested, and confined.[11] At a structural level, all but the most finan-

---

[6] 403 U.S. 713 (1971).

[7] *See, e.g.,* Alex Gray, *Freedom of Speech: Which Country Has the Most?*, WORLD ECON. F. (Nov. 8, 2016), https://perma.cc/NY7H-QLDV.

[8] *See, e.g.,* Stephanie Sugars, *From Fake News to Enemy of the People: An Anatomy of Trump's Tweets*, COMM. TO PROTECT JOURNALISTS (Jan. 30, 2019), https://perma.cc/L5BM-44H4; MARVIN KALB, ENEMY OF THE PEOPLE: TRUMP'S WAR ON THE PRESS, THE NEW MCCARTHYISM, AND THE THREAT TO AMERICAN DEMOCRACY (2018); *see also* Ken Bensinger, *DeSantis, Aiming at a Favorite Foil, Wants to Roll Back Press Freedom*, N.Y. TIMES (Feb. 10, 2023); David Freelander, *Why Republicans Stopped Talking to the Press*, N.Y. MAG. (July 25, 2022).

[9] *See* Praveena Somasundarum, *Kansas Newspaper Publisher Sues Over Police Raid, Claiming Retaliation*, WASH. POST (Apr. 3, 2024).

[10] *See Journalists Jailed or Fined for Refusing to Identify Confidential Sources, as of 2019*, REPORTERS COMM. FOR FREEDOM OF THE PRESS, https://perma.cc/RN6K-W6CM.

[11] *See, e.g., New Report: A Record Breaking Number of Journalists Arrested in the U.S. This Year*, FREEDOM OF THE PRESS FOUND., https://perma.cc/5KGP-QKUA (verifying 144 "arrests or detainments of journalists in 2020"); Richard Pullin, *Record Number of Journalists Imprisoned in 2020—Report*, REUTERS (Dec. 15, 2020), https://perma.cc/R8YE-ZKFV ("While no journalists were in prison in the United States as of Dec. 1, 110 were arrested or charged in 2020, many while covering demonstrations against police violence, the CPJ said."); William Melhado, *Misdemeanor Charges Filed Against Photojournalist Arrested at UT-Austin Protest*, TEXAS TRIB. (Apr. 26, 2024), https://perma.cc/2TS5-94FB; *Dartmouth College: Student Journalists Arrested Covering Campus Protest*, FOUND. FOR INDIV. RIGHTS & EXPRESSION, https://perma.cc/82NC-89BB.

cially successful news outlets are hemorrhaging jobs as countless others shutter entirely.[12] Over one-half of U.S. counties have no or limited access to local news,[13] an acute symptom of the news industry's looming economic insolvency.[14] Adding profound insult to these injuries, public trust in news institutions currently sits at record lows.[15]

These trends are troubling for reasons beyond the interests of those directly affected by them. The work that journalists do—most notably gathering and disseminating newsworthy information, acting as a check on the government, and convening the public square[16]—is both reflective of, and integral to, functional self-government. The press matters, not just for those who carry out the work of journalism but for a democratic society that is necessarily reliant upon the press to inform its decision-making and to hold power to account.

In the fall of 2022, the Abrams Institute for Freedom of Expression at Yale Law School commenced an effort, funded by a grant from the Stanton Foundation, to explore whether the Press Clause could and should be read as a more diligent protector of press freedom (the "Project"). Adopting the title *The Press Clause: The Forgotten First Amendment*, the Project convened five workshops that brought legal scholars and practitioners from around the United States together to discuss topics at the intersection of journalism and the First Amendment.

Together, the workshops explored three major questions. First, what are the strongest constitutional arguments in support of interpreting the Press Clause so as to give it meaning independent of the Speech Clause? Second, what could an invig-

---

[12] *See* PENELOPE MUSE ABERNATHY & SARAH STONBELY, NORTHWESTERN MEDILL LOCAL NEWS INIT., THE STATE OF LOCAL NEWS: THE 2023 REPORT 10 (Nov. 16, 2023), https://perma.cc/D3NA-STFK (outlining how the U.S. has lost nearly two-thirds of newspaper journalism jobs since 2005 as well as approximately 2,900 newspapers in the same time period).

[13] *Id.* ("There are 203 counties without any local news outlet and 1,558 counties served with only one remaining local news source, invariably a weekly newspaper.").

[14] *See generally* MARTHA MINOW, SAVING THE NEWS: WHY THE CONSTITUTION CALLS FOR GOVERNMENT ACTION TO PRESERVE FREEDOM OF SPEECH (2021).

[15] *See, e.g.,* Lydia Saad, *Historically Low Faith in U.S. Institutions Continues*, GALLUP (July 6, 2023), https://perma.cc/9EHU-6U66.

[16] For more on "press functions," see *infra* Parts II.A and IV.C.

orated Press Clause actually provide journalists—that is, what rights and protections might it generate? And third, how should "the press" be defined for purposes of allocating those rights?

This Report builds on the ideas generated in the workshops to present the Project's central arguments. It should be of interest to several constituencies, including scholars and policymakers developing related research agendas, media lawyers and other legal practitioners formulating litigation strategies that incorporate press rights, judges responsible for adjudicating such claims, and any person concerned with the decline of the press. From this introduction, the Report proceeds in six additional parts.

Part II details both the press's importance and some of the legal, political, and economic challenges it faces. Part III provides an assessment of the constitutional status quo. While a number of Supreme Court decisions have protected press freedom, the Court has yet to provide the press with unique protection beyond that which all speakers who set forth their views in printed form receive. The Press Clause itself has effectively been treated as having no independent meaning or impact. Part IV presents a series of arguments against this status quo and in favor of an invigorated Press Clause. These arguments are overlapping and mutually reinforcing but, for ease of reference, are grouped into "historical," "functional," "precedential," and "analogical" categories.[17] With these arguments in hand, Part V discusses what a Press Clause jurisprudence could and should provide the press. Part VI addresses the issue of defining the press for purposes of partitioning the rights emanating from an active Press Clause. Part VII provides a brief conclusion.

## II.    THE PRESS: IMPORTANCE AND CHALLENGES

### A.    *The Press Matters*

This Report, like the work of the Project itself, starts from the premise that the press matters. Journalists, as well as the institutions that support, oversee, and refine their work, engage in activities of social, political, and, we submit, constitutional importance. This is true on both theoretical and empirical grounds. Theoretically, the press is what Professor Vicki Jackson has termed a "knowledge institution," an "ongoing entity" that takes as its central purpose the production and dis-

---

[17] *See infra* Parts IV.B–E.

semination of knowledge through the "independent application of disciplinary criteria geared towards the search for truth."[18] Knowledge institutions are of special importance in democracies, where the people must be adequately informed in order to intelligently exercise their sovereign power over public officials.[19]

The connected beliefs that transparency and accountability matter in a self-governing society and that a free press facilitates both featured prominently in Founding-era thought.[20] In 1977, Professor Vince Blasi gave these ideas their canonical scholarly treatment, connecting them to the drafting and ratification of the First Amendment and referring to them as the Amendment's "checking value."[21] The responsibility of journalists to scrutinize powerful actors and relay their findings to the public is just one of several "press functions" legal scholars have identified,[22] and each provides an independent theoretical justification for recognizing the press's democratic role and paying it appropriate constitutional solicitude.

Empirical evidence further supports the press's theoretical significance. A 2016 Pew Research study found that those who consistently vote in local elections also demonstrate disproportionate appreciation for, and consumption of, local news.[23] Several studies have found a positive correlation between local journalism and voter

-----

[18] Vicki C. Jackson, *Knowledge Institutions in Constitutional Democracy: Reflections on 'the Press'*, 14 J. MEDIA L. 275, 280 (2022); *see also* PAUL HORWITZ, FIRST AMENDMENT INSTITUTIONS 161 (2013) (describing how the press is "essentially a professional enterprise" that brings to the table "a rich store of experience, expertise, and institutional self-knowledge," which allows it to "make significant contributions to the infrastructure of public discourse").

[19] Jackson, *supra* note 18, at 279 ("[K]nowledge institutions—of which the press is a part—are essential to constitutional democracy.").

[20] *See, e.g.*, James Madison, *Madison's Report on the Virginia Resolutions*, *reprinted in* 4 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 546, 570 (Jonathan Elliot ed., 1836) (arguing that the press deserves respect in its function of "canvassing the merits" of those seeking public office).

[21] *See* Vincent Blasi, *The Checking Value in First Amendment Theory*, 1977 AM. BAR FOUND. RSCH. J. 521.

[22] *See infra* Part IV.C.

[23] *See* Michael Barthel, Jesse Holcomb, Jessica Mahone & Amy Mitchell, *Civic Engagement Strongly Tied to Local News Habits*, PEW RSCH. CTR. (Nov. 3, 2016), https://perma.cc/32RG-YVFS.

*Journal of Free Speech Law*                    [2024

turnout.[24] It is thus no surprise that when local journalism declines, so does electoral participation.[25] The disappearance of local newspapers, moreover, corresponds with increased political polarization.[26] Perhaps most tellingly, when newspapers close, both corporate misconduct and the cost of local government increase.[27] The press matters for many reasons; these are but some of them. The indisputable point is that the press plays a vital role in a self-governing society. When the press is weakened, so is democratic government. These realities raise the stakes and highlight the need for a more robust set of constitutional press protections.

### B.    *Legal and Political Challenges*

The press is a particularly vulnerable institution because, even in the best of times, its freedom and vitality rest atop a fragile foundation.[28] Press protections are constituted and effectuated by institutional and civic norms as much as by the law itself.[29] Unfortunately, press-favoring norms and law alike are already deeply limited or beginning to erode.[30] A robust Press Clause jurisprudence could be marshaled as a response to these downward trends. Before detailing the potential of the

---

[24] *See, e.g.*, Christopher Chapp & Peter Aehl, *Newspapers and Political Participation: The Relationship Between Ballot Rolloff and Local Newspaper Circulation*, 42 NEWSPAPER RSCH. J. 235 (2021); David Hughes, *Does Local Journalism Stimulate Voter Participation in State Supreme Court Elections?*, 8 J.L. & CTS. 95 (2020); Esther Thorson, Scott Swafford & Eunjin (Anna) Kim, *Newspaper News Exposure Predicts Political Participation*, 38 NEWSPAPER RSCH. J. 231 (2017).

[25] *See* Danny Hayes & Jennifer L. Lawless, *The Decline of Local News and Its Effects: New Evidence from Longitudinal Data*, 80 J. POL. 332 (2017).

[26] *See* Joshua P. Darr, Matthew P. Hitt & Johanna L. Dunaway, *Newspaper Closures Polarize Voting Behavior*, 68 J. COMM. 1007 (2018).

[27] *See* Jonas Heese, Gerardo Pérez-Cavazos & Caspar David Peter, *When the Local Newspaper Leaves Town: The Effects of Local Newspaper Closures on Corporate Misconduct*, 145 J. FIN. ECON. 445 (2022); Pengjie Gao, Chang Lee & Dermot Murphy, *Financing Dies in Darkness? The Impact of Newspaper Closures on Public Finance*, 135 J. FIN. ECON. 445 (2020); Kriston Capps, *The Hidden Costs of Losing Your City's Newspaper*, BLOOMBERG (Mar. 30, 2018), https://perma.cc/4YXG-LRQZ.

[28] RonNell Andersen Jones & Sonja R. West, *The Fragility of the Free American Press*, 112 NW. U. L. REV. ONLINE 47 (2017).

[29] *Id.* at 51–55.

[30] *See generally* Christina Koningisor & Lyrissa Barnett Lidsky, *First Amendment Disequilibrium*, 110 VA. L. REV. 1 (2024); Jones & West, *supra* note 28.

Constitution to bolster the press,[31] it is worth examining the legal and political challenges the institution faces.

### 1.  Legal Challenges

The press's legal challenges can be grouped into at least four categories: limitations on access to sources of information; limitations on newsgathering activities; encroachments on editorial autonomy; and post-publication liability. Each of these categories embraces activities vital to the exercise of the press's core democratic functions, and while the precise scope of enhanced protections relevant to each would have to be developed through litigation and evolving jurisprudence, the status quo of no or minimal constitutional protection is unacceptable. The Press Clause can anchor a departure from that status quo, providing stronger access, newsgathering, editorial, and publication rights and thereby facilitating journalistic activities that further the press's democratic mission.

### a.  Access

The ability of journalists to access sources of information is indispensable to their core democratic functions. Without proximity to newsworthy persons, documents, processes, proceedings, and events, the press's ability to check abuses of power or otherwise keep the public abreast of important information is nipped in the bud.[32] Access can refer specifically to the First Amendment right of access to governmental records and processes. It can also more broadly entail access to any location where newsworthy events are unfolding and/or where the government is exercising its power as well as to documents and records that memorialize them.[33] Whether one takes a specific or broad understanding of the access right, there are serious legal problems with which press advocates must contend.

In the First Amendment context, the existing access right was primarily developed through four Supreme Court decisions: *Richmond Newspapers, Inc. v. Virginia*;[34] *Globe Newspaper Co. v. Superior Court*;[35] *Press-Enterprise Co. v. Superior*

---

[31] *See infra* Part V.

[32] *See infra* Part IV.B.

[33] *See* Amy Jordan, *The Right of Access: Is There a Better Fit than the First Amendment?*, 57 Vand. L. Rev. 1349, 1370–72 (2019).

[34] 448 U.S. 555 (1980) (plurality opinion).

[35] 457 U.S. 596 (1982).

570                    *Journal of Free Speech Law*                    [2024

*Court ("Press-Enterprise I")*;[36] and *Press-Enterprise Co. v. Superior Court ("Press-Enterprise II")*.[37] Taken together, *Richmond Newspapers* and its progeny established a test for determining whether the First Amendment access right obtains in a given set of circumstances. Referred to as the "history and logic" or "experience and logic" test, the Court has held that there is a First Amendment right of access to a given judicial proceeding or related record if (1) there is a history of access to the proceeding in question and (2) access is beneficial to the functioning of that proceeding as well as to democratic self-government.[38]

Before *Richmond Newspapers*, the Court had consistently denied that the press, attempting to conduct interviews with inmates, had a constitutional right of access to prisons. In cases like *Pell v. Procunier*,[39] *Saxbe v. Washington Post*,[40] and *Houchins v. KQED*,[41] the Court held that policies that prohibit "any personal interviews between newsmen and individually designated . . . prison inmates"[42] were constitutional so long as they did not "place the press in any less advantageous position than the public generally."[43] On the Court's view, while the Constitution prohibited government from "interfering in any way with a free press," it did not "require government to accord the press special access."[44]

*Richmond Newspapers*, deviating from the prison access cases insofar as it located a right of access in the First Amendment,[45] left lower courts broad discretion to determine how far beyond access to criminal trials the right would apply. The

---

[36] 464 U.S. 501 (1984).

[37] 478 U.S. 1 (1986).

[38] *See, e.g.*, Press-Enterprise Co. v. Superior Ct., 478 U.S. 1, 8–10 (1986).

[39] 417 U.S. 817 (1974).

[40] 417 U.S. 843 (1974).

[41] 438 U.S. 1 (1978) (plurality opinion).

[42] *Saxbe*, 417 U.S. at 844.

[43] *Id.* at 849.

[44] *Id.* at 834.

[45] Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 575 (1980) (plurality opinion) ("In guaranteeing freedoms such as those of speech and press, the First Amendment can be read as protecting the right of everyone to attend trials so as to give meaning to those explicit guarantees.").

Second, Fourth, Sixth, and Ninth Circuits have broadened the right of access beyond the context of criminal proceedings.[46] Reaching divergent conclusions, the Sixth Circuit has held that there is a First Amendment right of access to executive branch deportation hearings[47] and the Third Circuit has held that there is not.[48]

This patchwork approach is itself a legal problem—the nature and scope of a constitutional right should not differ from jurisdiction to jurisdiction.[49] More importantly, taking a limited approach to access circumscribes the kind of First Amendment claims journalists can make in pursuit of information, restricting in turn the ability of the public to stay informed.

Beyond the specific confines of the access right as articulated through First Amendment doctrine, there are broader access issues still. In order for the greater public to gain knowledge about newsworthy events—political protests offer a timely example[50]—journalists with the training and resources to contextualize and widely disseminate reporting on important events must be permitted to stay on-scene, police dispersal orders and curfews notwithstanding. Yet members of the press have too often been assaulted and arrested by the police during protests

---

[46] *See, e.g.*, NYCLU v. N.Y.C. Transit Auth., 684 F.3d 286, 299 (2d Cir. 2012) ("In extending the right of public access from the criminal trial to its components and on to civil trials, the Supreme Court and the circuits have emphasized the importance of access to public participation and to government accountability—values, the courts have emphasized, that are central to democracy."); United States *ex rel.* Oberg v. Nelnet, Inc., 105 F.4th 161, 170–71 (4th Cir. 2024) ("It is well settled that the public and press have a qualified right of access to judicial documents and records filed in civil and criminal proceedings." (quoting Doe v. Pub. Citizen, 749 F.3d 246, 265 (4th Cir. 2014))); Detroit Free Press v. Ashcroft, 303 F.3d 681, 695 (6th Cir. 2002) ("We note that outside of the trial phases of criminal proceedings, many cases have consistently applied the two-part 'experience and logic' test articulated in *Richmond Newspapers* and its progeny."); Leigh v. Salazar, 677 F.3d 892, 899 (9th Cir. 2012) ("Many other courts have applied the *Press-Enterprise II* framework to evaluate attempts to access a wide range of civil and administrative government activities").

[47] *Detroit Free Press*, 303 F.3d 681.

[48] N.J. Media. Grp., Inc. v. Ashcroft, 308 F.3d 198 (3d Cir. 2002).

[49] *Cf.* El Vocero de P.R. v. Puerto Rico, 508 U.S. 147, 150 (1993) ("[T]he 'experience' test of *Globe Newspaper* does not look to the particular practice of any one jurisdiction, but instead to the experience in that *type* or *kind* of hearing throughout the United States.") (cleaned up).

[50] *See* sources cited *supra* note 12; *see also* Tyler Valeska, *A Press Clause Right to Cover Protests*, 65 WASH. U. J.L. & POL'Y 151 (2021); Peter Jacobs, Comment, *Protests, the Press, and First Amendment Rights Before and After the "Floyd Caselaw"*, 24 U. PA. J. CONST. L. 591 (2022).

simply for being on-scene and reporting the news.[51] This limitation on the press's access to newsworthy information is illustrative of the broader problem: If journalists cannot legally observe and report on events of public concern, the public will be denied that information, unduly limiting its ability to make the informed decisions that are at the heart of self-governance.[52]

### b.  Newsgathering

Beyond restrictions on their access to newsworthy information, journalists face potential liability for engaging in the act of newsgathering itself.[53] Liability for engaging in newsgathering activities—such as entering locations in which newsworthy events are unfolding, recording interviews or conversations, soliciting and receiving newsworthy information from sources, and going undercover to collect newsworthy information—restricts the press's ability to gather and report information to the public. Without some freedom to engage in these activities, the press is severely hampered in its ability to report on matters of public concern and check the exercise of power by government or influential private actors.

Liability for engaging in newsgathering tends to be imposed by laws of general applicability, and the Supreme Court has held that imposing such burdens on journalists are permissible so long as they are "incidental."[54] Though this language

---

[51] *See* sources cited *supra* note 11.

[52] *Cf.* Cox Broad. Corp. v. Cohn, 420 U.S. 469, 495 ("[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations."); RonNell Andersen Jones, *Press Speakers and the First Amendment Rights of Listeners*, 90 U. COLO. L. REV. 499, 540 (2019) ("Another critically important way that the institutional press speaker acts as proxy is by representing listeners in the invocation of the listeners' First Amendment rights of access.").

[53] Newsgathering and access, while often analytically distinct, sometimes overlap. In the protest context, for example, a right of access to cover unfolding events even in the face of dispersal orders and curfews can also be understood as a newsgathering right. Recording conversations or engaging in undercover investigations, on the other hand, are more clearly distinct from access.

[54] Cohen v. Cowles Media Co., 501 U.S. 663, 669 (1991) ("[G]enerally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news."); *see also* Associated Press v. NLRB, 301 U.S. 103, 133 (1937) ("The publisher of a newspaper has no special immunity from the application of general laws."); Branzburg v. Hayes, 408 U.S. 665, 682 (1972) ("[T]he First Amendment does not invalidate

would appear to provide the government with something less than carte blanche authority to regulate newsgathering, courts have rejected First Amendment challenges to a panoply of laws (statutory and judge-made alike) that impose liability (both civil and criminal) on journalists based on their newsgathering activities and limit their ability to seek out information.

In *Cohen v. Cowles Media Co.*, in the course of holding that the First Amendment did not prohibit Minnesota from enforcing its common law doctrine of promissory estoppel against a journalist who had broken a promise of confidentiality to a source, the Supreme Court announced that a "law of general applicability," like the common law of promissory estoppel, is constitutional when applied to journalists engaged in newsgathering activities, at least when the burden on the journalist of doing so is "incidental."[55]

To date, lower courts have largely read *Cohen*'s reference to "incidental" burdens out of the decision. In *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, for example, the Fourth Circuit held that the First Amendment does not immunize undercover reporters from tort liability for surreptitious actions taken in pursuit of newsgathering.[56] Such cases demonstrate that, under the constitutional status quo, contract and tort law can impinge on the newsgathering activities of journalists in a wide array of circumstances.

To be clear, the suggestion is not that journalists should be permitted to breach contracts, commit torts, or otherwise break the law at will, but rather that the First Amendment should insulate certain, specified newsgathering activities against liability because society's interest in newsworthy information can and should sometimes trump its interest in the application of otherwise generally applicable laws. One way for the Court to strike an appropriate balance between these competing

---

every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability.").

[55] 501 U.S. at 670 ("There can be little doubt that the Minnesota doctrine of promissory estoppel is a law of general applicability. It does not target or single out the press. Rather, insofar as we are advised, the doctrine is generally applicable to the daily transactions of all the citizens of Minnesota. The First Amendment does not forbid its application to the press.").

[56] *See* Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505, 520 (4th Cir. 1999); *accord* Alan K. Chen, *The Long Shadow of Food Lion*, KNIGHT FIRST AMEND. INST. (May 31, 2024), https://perma.cc/MVT3-9TR7; David Logan, *Masked Media: Judges, Juries, and the Law of Surreptitious Newsgathering*, 83 IOWA L. REV. 161 (1997) (arguing against tort immunity for newsgathering).

*Journal of Free Speech Law*                        [2024

considerations would be to elaborate what an "incidental" burden on newsgathering is, as opposed to a non-incidental or direct burden.[57]

The Supreme Court has also rejected calls for a First Amendment-based reporter's privilege, holding in *Branzburg v. Hayes* that, at least in the context of criminal grand jury subpoenas, the press does not possess a constitutional privilege against disclosing the identity of confidential sources.[58] This decision, much like the Court's access cases, yielded a variety of approaches in the lower courts, some more protective of the press and its sources than others.[59] These discrepancies matter.[60] The fact that the press lacks a uniformly strong reporter's privilege has per-

---

[57] *See Cohen*, 501 U.S. at 669.

[58] 408 U.S. at 683–86.

[59] For instance, in *United States v. Sterling*, 724 F.3d 482, 492–99 (4th Cir. 2013), the Fourth Circuit interpreted *Branzburg* to hold that the press did not possess a privilege against disclosing confidential sources in the criminal context absent a showing of government harassment or bad faith, *id.* at 497, but reasserted that, in the civil context, a reporter may shield sources unless an adverse litigant demonstrates that the information is relevant, that it cannot be obtained by alternative means, and that there is a compelling interest in obtaining it, *id.* at 496–97 (citing LaRouche v. Nat'l Broad. Co., 780 F.2d 1134, 1139 (4th Cir. 1986)). This balancing test is derived from the Stewart dissent in *Branzburg. See* 408 U.S. at 743 (Stewart, J., dissenting).

Other circuits have taken different approaches to the civil-criminal distinction. *See* Miller v. Transam. Press, Inc., 621 F.2d 721, 725, *modified*, 628 F.2d 932 (5th Cir. 1980) (providing stronger reporter's privilege in civil context); Zerilli v. Smith, 656 F.2d 705, 711–12 (D.C. Cir. 1981) (same); United States v. Caporale, 806 F.2d 1487, 1504 (11th Cir. 1986) (providing journalist heightened source protection in criminal context); United States v. Burke, 700 F.2d 70, 77 (2d Cir. 1983) ("We see no legally-principled reason for drawing a distinction between civil and criminal cases when considering whether the reporter's interest in confidentiality should yield to the moving party's need for probative evidence."); *accord* Christina Koningisor, *The De Facto Reporter's Privilege*, 127 YALE L.J. 1176, 1198 (2018) ("The courts also disagree on how to read the various opinions in *Branzburg*."). For a helpful resource on the reporter's privilege across jurisdictions, see *Reporter's Privilege Compendium*, REPORTERS COMM. FOR FREEDOM OF THE PRESS, https://perma.cc/Q2BM-DUS3.

[60] For these reasons, the U.S. Department of Justice's decision to, by and large, cease subpoenaing journalists is a praiseworthy approach. *See Policy Regarding Obtaining Information from or Records of Members of the News Media; and Regarding Questioning, Arresting, or Charging Members of the News Media*, 87 FED. REG. 66239 (Nov. 3, 2022).

mitted has permitted the federal government, and state governments in less protective districts, to subpoena and even jail journalists for refusing to divulge the identity of confidential sources.[61]

Journalists theoretically can also be prosecuted under wiretap statutes and the Espionage Act for the unlawful acquisition or possession of information. With regard to the former, the Supreme Court held in *Bartnicki v. Vopper* that a radio host could legally disseminate an audio recording obtained in violation of the federal and Pennsylvania's wiretap statute because (1) the host did not participate in the illegal acquisition himself, (2) he otherwise acquired it lawfully, and (3) the subject matter of the recording related to issues of public concern.[62]

The *Bartnicki* decision left open important questions affecting the rights and protections of journalists. As Professor Erik Ugland and Christina Mazzeo have explained, *Bartnicki* failed to clarify several key issues. "When," they ask,

> do journalists become so closely involved with their sources that they forfeit *Bartnicki* protection? In what circumstances do journalists obtain information unlawfully? What constitutes a matter of "public concern"? Finally, who is a journalist, or more precisely, what types of defendants are eligible for First Amendment protections in these situations?[63]

In the wake of this uncertainty, lower courts have adopted a variety of approaches, some less protective of newsgathering activity than others.[64]

---

[61] *See Journalists Jailed or Fined*, *supra* note 10.

[62] 532 U.S. 514, 525 (2001); *see also* Smith v. Daily Mail Pub. Co., 443 U.S. 97, 104 (1979) ("*If the information is lawfully obtained,* as it was here, the state may not punish its publication except when necessary to further an interest more substantial than is present here.") (emphasis added).

[63] *See* Erik Ugland & Christina Mazzeo, *Hacks, Leaks, and Data Dumps: The Right to Publish Illegally Acquired Information Twenty Years After* Bartnicki v. Vopper, 96 WASH. L. REV. 139, 142 (2021); *see Bartnicki*, 532 U.S. at 525 n.8 (affording First Amendment-based protection to both media and non-media respondents) (citing New York Times Co. v. Sullivan, 376 U.S. 254, 265–66 (1964); First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 777 (1978)).

[64] *See* Ugland & Mazzeo, *supra* note 63, at 160–93 (detailing differences in how courts of various jurisdictions have characterized the three conditions for overcoming criminal liability established by *Bartnicki*); *id.* at 160–61 ("The analysis here reveals that courts are deeply divided about the meaning of every element of the *Bartnicki* test. There is a circuit split over the extent to which a publisher can interact with a source before effectively becoming a primary participant in the illegal acquisition of information. Courts are also divided about the relevance of legal prohibitions on receiving or possessing certain information, with some courts effectively treating certain types of information as contraband and creating legal risks for journalists for merely requesting non-public

Finally, the ever-present danger of the Espionage Act[65] being applied to journalists who seek and obtain classified information the release of which does not pose danger (or where the value to society is greater than the danger) is significant. While there remain arguments as to whether Julian Assange could or should be considered part of "the press," as well as whether at least some of the putatively "newsgathering" conduct in which he allegedly engaged would divest him of the protections of an invigorated Press Clause in any event, the single charge to which he pled guilty was crafted in a broad enough manner so as to arguably encompass newsgathering activities for which the press should receive constitutional protection.[66]

These legal challenges to newsgathering are illustrative rather than exhaustive,[67] yet they underpin a central point: The current legal landscape poses a variety of challenges to journalists attempting to report news of public significance.

---

records, even when those records are newsworthy and ultimately furnished by the government. There is also some lingering confusion about how to assess the newsworthiness of a publication and whether courts should focus on the newsworthiness of particular facts or the newsworthiness of the broader context.").

[65] 18 U.S.C. § 793(e).

[66] Assange recently pled guilty to "a single felony count of illegally obtaining and disclosing national security material" in exchange for his release. *See* Glenn Thrush & Megan Specia, *Assange Agrees to Plead Guilty in Exchange for Release, Ending Standoff with U.S.*, N.Y. TIMES (June 25, 2024). For analysis of the initial indictment, see KNIGHT FIRST AMEN. INST., *Testimony of Jameel Jaffer in Julian Assange Extradition Proceeding* ¶ 3, https://perma.cc/UJ7H-2JCQ; Floyd Abrams, *Don't Cry for Julian Assange*, WALL ST. J. (Dec. 8, 2011); Richard J. Tofel, *Don't Weep for the Extradition of Julian Assange*, SECOND ROUGH DRAFT (Jan. 6, 2022), https://perma.cc/84NM-FX4Q; Seth Stern, *Is Julian Assange a 'Journalist'? Here's Why It Doesn't Matter*, FREEDOM OF THE PRESS FOUND. (Oct. 20, 2023), https://perma.cc/BKH2-HVGQ.

For analysis of the plea agreement, see Charlie Savage, *Assange's Plea Deal Sets a Chilling Precedent, but It Could Have Been Worse*, N.Y. TIMES (June 25, 2024); Erik Wemple, *Assange Plea Deal Blemishes Biden Record*, WASH. POST (June 27, 2024).

[67] Statutes that regulate the flying of drones capable of photography and videography can impede basic newsgathering practices. *But see* Nat'l Press Photographers Ass'n v. McCraw, 90 F.4th 770, 787–88 (5th Cir. 2024) ("The operation of a drone is not inherently expressive—nor is it expressive to fly a drone 400 feet over a prison, sports venue, or critical infrastructure facility. And nothing in the No-Fly provisions has *anything* to do with speech or expression. These are flight restrictions, not speech restrictions."). And "ag-gag" statutes restrict the ability of people to report on factory farming practices and, as such, impinge newsgathering. *See* CTR. FOR CONST. RTS., AG-GAG ACROSS AMERICA 2 (2017), https://perma.cc/J9QZ-A782 ("[A]g-gag laws vary, but all include one or more

#### c.  Editorial Autonomy

Editorial autonomy encompasses the freedom to decide what to publish and what not to.[68] It also entails freedom from intrusion into the internal processes of editorial decision-making.[69] These twin freedoms enable the press to assess news-worthiness and present relevant information in a useful, accessible way, enabling the public to stay informed and use that information at the ballot box.

The first aspect of editorial autonomy is well-protected under current First Amendment doctrine. As the Supreme Court explained in *Miami Herald Publishing Co. v. Tornillo*,

> A newspaper is more than a passive receptacle or conduit for news, comment, and advertising. The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.[70]

The *Tornillo* holding offers robust protection for the autonomy of news media to decide what they will and will not publish. Unfortunately, the Court did not expressly ground its decision in the Press Clause, and its subsequent decisions have not offered commensurate protection for the internal processes that yield those editorial choices.

In *Zurcher v. Stanford Daily*, the Court permitted a police search of a campus newsroom.[71] And in *Herbert v. Lando*,[72] the Court granted a defamation plaintiff's discovery request for editorial records and sworn testimony from journalists about their editorial decision-making. Contrasting its decision in *Herbert* with that in *Tornillo*, the Court explained that "holdings that neither a State nor the Federal

---

of three key elements: (1) prohibiting documentation of agricultural practices; (2) prohibiting misrepresentations in job applications utilized to gain access to closed facilities; and (3) requiring immediate reporting of illegal animal cruelty").

[68] Miami Herald Publ'g Co. v. Tornillo, 418 U.S. 241, 258 (1974).

[69] *See* Herbert v. Lando, 441 U.S. 153, 170–72 (1979) (declining to extend First Amendment protections to "the internal communications occurring during the editorial process").

[70] 418 U.S. at 258.

[71] 436 U.S. 547 (1978).

[72] 441 U.S. 153 (1979).

Government may dictate what must or must not be printed neither expressly nor impliedly suggest that the editorial process is immune from any inquiry whatsoever."[73] Put differently, while news outlets maintain autonomy in the realm of deciding what is fit to print, their editorial work products—notes, drafts, internal correspondence, and the like—are not immune from government-sanctioned seizure, inspection, and inquiry.[74]

As with *Cohen*'s referenced limitation of its holding to "incidental" restraints, there is some hope to be drawn from the Supreme Court's decisions in this area. In *Zurcher*, the Court made clear that "[w]here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'"[75] More promising still, Congress responded to *Zurcher* by passing the Privacy Protection Act of 1980,[76] a law that prohibited law enforcement "from searching for or seizing information from people who disseminate information to the public."[77] An invigorated Press Clause could expand and constitutionalize these kinds of editorial protections.[78]

#### d.   Publication

In the current legal landscape, the Speech Clause provides meaningful post-publication protection for the press. This is vital because even the most robust access, newsgathering, and editorial freedoms would mean little if the press was not

---

[73] *Id.* at 168; *see also* Zurcher v. Stanford Daily, 436 U.S. 547, 565 (1978) ("Further, the prior cases do no more than insist that the courts apply the warrant requirements with particular exactitude when First Amendment interests would be endangered by the search. As we see it, no more than this is required where the warrant requested is for the seizure of criminal evidence reasonably believed to be on the premises occupied by a newspaper.").

[74] *See, e.g.*, Steven Lee Myers & Benjamin Mullin, *Raid of Small Kansas Newspaper Raises Free Press Concerns*, N.Y. TIMES (Aug. 14, 2023).

[75] 436 U.S. at 564 (quoting Stanford v. Texas, 379 U.S. 476, 485 (1965)).

[76] Pub. L. No. 96-440, 94 Stat. 1879 (codified as amended at 42 U.S.C. §§ 2000aa–2000aa-12).

[77] *See* Elizabeth B. Uzelac, *Reviving the Privacy Protection Act of 1980*, 107 NW. U. L. REV. 1437, 1439 (2015).

[78] Also relevant is the Fourth Amendment's third-party doctrine, under which information willfully turned over to a third party is not protected from government searches. *See, e.g.*, United States v. Miller, 425 U.S. 435 (1976). An invigorated Press Clause could work to protect information gathered during the press's investigative and editorial processes from government searches even when that information—including, for instance, cellphone and credit card records—has been provided to third parties.

protected from costly, even existentially threatening civil or criminal liability for publishing the newsworthy information it acquires. Without post-publication protections deterring lawsuits against the press, news organizations would be hesitant to report on the resource-rich and litigious in American society, whether in the private or public sector.

Emblematic of the necessary "breathing space" that the First Amendment has carved out in the context of post-publication liability is the Supreme Court's watershed decision in *New York Times v. Sullivan*.[79] *Sullivan* held that public officials suing for defamation must plead and prove "actual malice" before liability can be imposed on publishers for their allegedly defamatory statements.[80] This relatively higher bar to liability has been extended to cases involving "public figure" defamation plaintiffs[81] and to related torts like false light and intentional infliction of emotional distress.[82]

---

[79] 376 U.S. 254 (1964).

[80] *Id.* at 279–82.

[81] In the defamation context, "public official" and "public figure" are terms of art that have been elaborated in the courts. *See, e.g., id.* (concluding that public officials suing for defamation must satisfy the actual malice standard); Gertz v. Robert Welch, Inc., 418 U.S. 323, 336 (1974) (noting that, in *Curtis Publ'g Co. v. Butts*, 388 U.S. 130 (1967), a "majority of the Court agreed with Mr. Chief Justice Warren's conclusion that the *New York Times* test should apply to criticism of 'public figures' as well as 'public officials'"). The actual malice standard applies to all defamation (and related) claims brought by public officials and public figures irrespective of whether they have filed suit against the press.

[82] *See* Time, Inc. v. Hill, 385 U.S. 374, 387–88 (1967) ("We hold that the constitutional protections for speech and press preclude the application of the New York statute to redress false reports of matters of public interest in the absence of proof that the defendant published the report with knowledge of its falsity or in reckless disregard of the truth."); Cantrell v. Forest City Publ'g Co., 419 U.S. 245, 249 (1974) (questioning whether the actual malice standard applies in false light suits brought by private persons); Snyder v. Phelps, 562 U.S. 443, 451 (2011) (extending First Amendment protection to defendants in intentional infliction cases brought by private persons); Hustler Mag., Inc. v. Falwell, 485 U.S. 46 (1988) (applying actual malice standard in an intentional infliction suit brought by a public figure). Even the heightened protections emanating from cases like *Hustler* do not always deter the resource-rich from filing retaliating lawsuits. Such "strategic lawsuits against public participation" designed to deter or punish speech are addressed by state anti-SLAPP laws. *See infra* note 436 and accompanying text. An invigorated Press Clause could either support or obligate the passage of a federal anti-SLAPP law, or otherwise encourage courts to do more to limit costs imposed on defamation defendants facing demonstrably unmeritorious lawsuits.

In recent years, some political figures and even some Supreme Court Justices have questioned *Sullivan*'s key protections.[83] Thus, while press freedom to publish without subsequent punishment remains strong (at least in the libel law context), protection is under threat. A robust Press Clause could reinforce *Sullivan*'s core democratic logic, maintaining a broad sphere of freedom to report on and criticize powerful figures without fear of crippling litigation costs and damage awards.[84]

---

[83] Both Donald Trump and Ron DeSantis have, directly or indirectly, attacked the central holding of *Sullivan. See* Hadas Gold, *Donald Trump: We're Going to 'Open up' Libel Laws*, POLITICO (Feb. 26, 2016), https://perma.cc/H4XW-7EN5; Press Release, Ron DeSantis, 46th Governor of Fla., Governor Ron DeSantis Hosts Roundtable Discussion on Legacy Media Defamation Practices (Feb. 7, 2023), https://perma.cc/U67S-9YJR.

Justice Clarence Thomas has characterized *Sullivan* as a "policy-driven decision[] masquerading as constitutional law," asserting that the Court "made little effort to ground [*Sullivan*] in the original meaning of the Constitution" and insisting that the "States are perfectly capable of striking an acceptable balance between encouraging robust public discourse and providing a meaningful remedy for reputational harm." *See* McKee v. Cosby, 139 S. Ct. 675, 676, 682 (2019) (Thomas, J., concurring in denial of certiorari). And Justice Neil Gorsuch has lamented that social, economic, and technological developments have converted *Sullivan*'s actual malice rule "into an ironclad subsidy for the publication of falsehoods by means and on a scale previously unimaginable." Berisha v. Lawson, 141 S. Ct. 2424, 2428 (2021) (Gorsuch, J., dissenting from denial of certiorari). During her time as a law professor, Justice Elena Kagan questioned subsequent invocations of *Sullivan* to support a broad constitutionalizaton of modern defamation law. Elena Kagan, *A Libel Story:* Sullivan *Then and Now*, 18 L. & SOC. INQUIRY 197, 199, 205, 215 (1993). Once on the bench, Justice Kagan has embraced the rationale and extended the holding of *Sullivan. See* Counterman v. Colorado, 600 U.S. 66, 76 (2023).

These aspersions from politicians and Justices against *Sullivan*'s merits have occurred in conjunction with an animated academic debate over the same. *Compare, e.g.*, Daniel E. Rauch, *Defamation as Democracy Tort*, 172 U. PA. L. REV. 1453 (2024), *and* David McGowan, *A Bipartisan Case Against* New York Times v. Sullivan, 1 J. FREE SPEECH L. 509 (2022), *and* David A. Logan, *Rescuing Our Democracy by Rethinking* New York Times Co. v. Sullivan, 81 OHIO ST. L.J. 759 (2020), *with, e.g.*, RonNell Andersen Jones, *Defamation, Disinformation, and the Press Function*, 3 J. FREE SPEECH L. 103 (2023), *and* Matthew L. Schafer, *In Defense:* New York Times v. Sullivan, 82 LA. L. REV. 81 (2021).

And practitioners have likewise spoken in defense of *Sullivan. See* MEDIA L. RES. CTR., *NEW YORK TIMES V. SULLIVAN:* THE CASE FOR PRESERVING AN ESSENTIAL PRECEDENT (Mar. 2022), https://perma.cc/2BEV-F36V.

[84] *See* Harry Kalven Jr., *The* New York Times *Case: A Note on "The Central Meaning of the First Amendment"*, 1964 SUP. CT. REV. 191, 208 ("The Court did not simply, in the face of an awkward

### 2. Political Challenges

Apart from these legal challenges, the institutional press faces an increasingly hostile political environment. Former President Donald J. Trump has abandoned pro-press norms, denying journalists access to campaign events, stonewalling members of the presidential press pool, launching caustic rhetorical attacks at journalists, and threatening to remake libel law so as to increase press liability.[85] Adverse actions vis-a-vis the press are not unique to Republican officeholders; President Barack Obama's administration invoked the Espionage Act against journalistic sources at record rates.[86]

It is perhaps no coincidence that journalists increasingly face verbal threats and even physical attacks by state and non-state actors alike, harms that fall disproportionately on women and non-white journalists.[87] Trust in the press is at record lows and, as a more general matter, civic life in the United States is experiencing a period of what researchers have termed "truth decay," a phenomenon marked by diminishing trust in traditional institutional authorities and rising preference for partisan opinion and analysis over fact-intensive reporting.[88]

---

history, definitively put to rest the status of the Sedition Act. More important, it found in the controversy over seditious libel the clue to 'the central meaning of the First Amendment.' The choice of language was unusually apt. The Amendment has a 'central meaning'—a core of protection of speech without which democracy cannot function, without which, in Madison's phrase, 'the censorial power' would be in the Government over the people and not 'in the people over the Government.' This is not the whole meaning of the Amendment. There are other freedoms protected by it. But at the center there is no doubt what speech is being protected and no doubt why it is being protected. The theory of the freedom of speech clause was put right side up for the first time.").

[85] *See* Jones & West, *supra* note 28, at 584–93.

[86] *See* Peter Sterne, *Obama Used the Espionage Act to Put a Record Number of Reporters' Sources in Jail, and Trump Could Be Even Worse*, FREEDOM OF THE PRESS FOUND. (June 21, 2017), https://perma.cc/L64K-JGEF.

[87] *See generally* Erin C. Carroll, *Obstruction of Journalism*, 99 DEN. L. REV. 407 (2022).

[88] *See* JENNIFER KAVANAGH & MICHAEL D. RICH, RAND CORP., TRUTH DECAY: AN INITIAL EXPLORATION OF THE DIMINISHING ROLE OF FACTS AND ANALYSIS IN AMERICAN PUBLIC LIFE 3 (2018), https://perma.cc/CHD5-EL7H; *see also* Megan Brenan, *Americans' Trust in Media Remains Near Record Low*, GALLUP (Oct. 18, 2022), https://perma.cc/ZP7Y-T2Z9; *but see* Kirsten Eddy, *Most Americans Say a Free Press Is Highly Important to Society*, PEW RSCH. CTR. (Apr. 23, 2024), https://perma.cc/72TT-9V2S.

### C.    *Economic Challenges*

Legal and political hindrances are not the only obstacles the press faces. The business model for news, and especially local news, is failing. The advent of the internet, a revolutionary technological development, allowed emergent online entities to compete with newspapers, magazines, and television broadcasts for the public's attention. Suddenly, "all the things people had once depended on newspapers" and other traditional news organizations for "were online and free."[89] Would-be subscribers, now supplied with an abundance of easily accessible, free, or otherwise "cheap" online information,[90] were no longer interested in paying for printed news and likewise drew away from traditional broadcast operations, which sell advertising at a price largely based on viewership.[91]

New content options provided by the internet offered advertisers additional venues for the placement of advertisements as well as a greater ability to target and reach potential customers. Moreover, the creation of new options for the publication of classified advertising specifically destroyed this once-substantial source of revenue for newspapers.[92]

These economic transformations significantly diminished the news industry's key revenue streams and triggered its ongoing market collapse.[93] Matters have only gotten worse with the rise of tech platforms. In 2022 alone, digital ad sales

---

[89] *See* Jeremy Littau, *Media's Fatal Flaw: Ignoring the Mistakes of Newspapers*, WIRED (Jan. 30, 2019), https://perma.cc/52N4-XRGZ.

[90] *See* Eugene Volokh, *Cheap Speech and What It Will Do*, 104 YALE L.J. 1805, 1807 (1995) ("Cheap speech will mean that far more speakers—rich and poor, popular and not, banal and avant garde—will be able to make their work available to all.").

[91] *See* Ryan Chittum, *Reader Revenue and the Great Newspaper Ad Bubble*, COLUM. JOURNALISM REV. (May 28, 2014), https://perma.cc/CRV6-USN4; Jordan Valinsky, *For the First Time, Cable and Broadcast Makes Up Less than Half of TV Viewing*, CNN (Aug. 15, 2023), https://perma.cc/W5GA-KFRH.

[92] *See* John Reinan, *How Craigslist Killed the Newspapers' Golden Goose*, MINNPOST (Feb. 3, 2014), https://perma.cc/CXZ7-ES8V.

[93] *See generally* VICTOR PICKARD, DEMOCRACY WITHOUT JOURNALISM? CONFRONTING THE MIS-INFORMATION SOCIETY (2020); Martha Minow, *The Changing Ecosystem of News and Challenges for Freedom of the Press*, 64 LOY. L. REV. 499 (2018); Luke Morgan, *The Broken Branch: Capitalism, the Constitution, and the Press*, 125 PENN ST. L. REV. 1 (2020).

amounted to over $200 billion,[94] 76.8% of which was captured by only ten companies.[95] Revenues that previously flowed to local newspapers and other media outlets are now largely consumed by corporations like Alphabet and Meta, which together accounted for "nearly 60% of the U.S. internet advertising market" in 2018.[96] More recent estimates suggest that the top five companies alone will account for over 66% of digital advertising revenue by 2025.[97]

As advertising revenues have diverted from media organizations to tech platforms, local news outlets have shuttered, and even some of the country's most prominent papers are shedding jobs.[98] There is limited access to local news in over half of the counties in the United States.[99] The country is losing an average of two-and-a-half newspapers per week. There are now approximately 1,200 dailies,[100] a figure drastically down from the 1,854 in operation in 1947.[101] By the end of 2024, "the country will have lost a third of its newspapers since 2005."[102] And as newspapers have vanished, so have journalism jobs. In the last two decades, the U.S. has lost "almost two-thirds of its newspaper journalists."[103] These economic challenges, much like the legal and political challenges outlined above, are urgent.

---

[94] *See* PwC & IAB, Internet Advertising Revenue Report 4 (Apr. 2023), https://perma.cc/F9ZR-GTFN.

[95] *Id*. at 14.

[96] *See* Sheila Dang, *Google, Facebook Have Tight Grip on Growing U.S. Online Ad Market: Report*, Reuters (June 5, 2019), https://perma.cc/82SF-ST4J.

[97] *Share of Ad-Selling Companies in Digital Advertising Revenue in the United States from 2020 to 2025*, Statista, https://perma.cc/AQ35-V767.

[98] *See, e.g.*, Kierra Frazier, *Over 500 Journalists Were Laid Off in January 2024 Alone*, Politico (Feb. 1, 2024), https://perma.cc/RS5V-8BSU; David Folkenflik, *A Look at the Wave of Layoffs Hitting the News Industry*, NPR (Jan. 23, 2024), https://perma.cc/XDW6-LUAE.

[99] *See* Abernathy, *supra* note 12, at 10.

[100] *Id*.

[101] *See Local Monopoly in the Daily Newspaper Industry*, 61 Yale L.J. 948, 949 n.12 (1952).

[102] *See* Abernathy, *supra* note 12, at 9.

[103] *See id*. at 10. The rise of large language models, like tech platforms before them, also threatens the economic livelihood of news outlets. *See* Paige Hagy, *Group Representing the New York Times and 2,200 Others Just Dropped a Scathing 77-Page White Paper on ChatGPT and LLMs Being an Illegal Ripoff*, Fortune (Oct. 31, 2023). The crux of the issue here is that LLMs train on material copyrighted by news organizations and are developing the capability to "report" the news themselves.

While legal obstacles constrain the press's ability to fulfill its democratic functions, economic insolvency threatens its very existence.

To maintain U.S. journalism and foster its creation and dissemination of knowledge, these problems must be addressed. Though the Constitution might play a positive role in doing so, the Supreme Court has declined to interpret or employ it in furtherance of those ends. Under the constitutional status quo, the Press Clause is all but non-existent. Part III describes this situation in more detail. Part IV then provides a series of arguments in favor of moving beyond it.

### III.    THE CONSTITUTIONAL STATUS QUO

The Supreme Court has never said, let alone held, that the Press Clause lacks meaning. Yet while the Court has repeatedly recognized the importance of the press—including by praising its institutional role as a democratic watchdog and public educator—it has done so almost exclusively through dicta.[104] During much of the twentieth century, the Court declined to grant the press any distinct rights or privileges even while celebrating its importance.[105] More recently, one must search diligently to find even pro forma acknowledgements by the Court of the value of a free press.[106]

To be sure, the Court's Speech Clause jurisprudence has afforded genuine protection to the press, and a handful of Supreme Court justices have articulated a vision of the Press Clause beyond its contemporary status as "mere surplusage."[107]

---

[104] *See* RonNell Andersen Jones, *The Dangers of Press Clause Dicta*, 48 GA. L. REV. 706 (2014). As scholars have noted, however, the fact that the Court has not *expressly* held that the press deserves distinct constitutional treatment is distinct from whether courts *in fact* treat the press differently. There is good reason to believe they do. *See, e.g.*, C. Edwin Baker, *The Independent Significance of the Press Clause under Existing Law*, 35 HOFSTRA L. REV. 955 (2007); Sonja R. West, *The Stealth Press Clause*, 48 GA. L. REV. 729 (2014).

[105] *See, e.g.*, David A. Anderson, *Freedom of the Press*, 80 TEX. L. REV. 429, 430 (2002) ("But as a matter of positive law, the Press Clause actually plays a rather minor role in protecting the freedom of the press. Most of the freedoms the press receives from the First Amendment are no different from the freedoms everyone enjoys under the Speech Clause.").

[106] *See* RonNell Andersen Jones, *What the Supreme Court Thinks of the Press and Why It Matters*, 66 ALA. L. REV. 253 (2014); RonNell Andersen Jones & Sonja R. West, *The U.S. Supreme Court's Characterizations of the Press: An Empirical Study*, 100 N.C. L. REV. 375 (2022).

[107] Marbury v. Madison, 5 U.S. 137, 174 (1803). *Marbury's* canon against surplusage notes that "it cannot be presumed that any clause in the Constitution is intended to be without effect, and therefore such construction is inadmissible unless the words require it." *Id.*

Justice Potter Stewart delivered celebrated remarks in defense of the proposition that the Press Clause is "a *structural* provision of the Constitution."[108] And Justice Lewis Powell understood the Constitution as "specifically select[ing] the press . . . to play an important role in the discussion of public affairs."[109] These strands of thought, later expanded in the work of, among others, Floyd Abrams and Professor Sonja West, assert that the press *is* different from individual speakers, that it serves particular democratic functions, and that it should be granted constitutional consideration as such.[110]

This structural view of the Press Clause has not yet won the day at the Supreme Court. The Court has continued to analyze First Amendment questions, including those that directly implicate the news media, under the Speech Clause,[111] leaving the Press Clause unremarked upon and unused. Both the occasional Supreme Court decision[112] and individual justices writing separately—particularly Chief Justice Warren Burger, Justice Anthony Kennedy, and Justice Antonin Scalia—have endorsed a narrow interpretation of press freedom. Building on these opinions, scholars, most notably Eugene Volokh, have fleshed out the details.[113] For these jurists and scholars, "freedom of the press" means nothing more than the freedom to publish and disseminate one's expression through communications technologies.

---

[108] *See* Potter Stewart, *"Or of the Press"*, 26 HASTINGS L.J. 631, 633 (1975).

[109] *See* Saxbe v. Washington Post Co., 417 U.S. 843, 863 (1974) (Powell, J., dissenting).

[110] *See, e.g.*, Floyd Abrams, *The Press Is Different: Reflections on Justice Stewart and the Autonomous Press*, 7 HOFSTRA L. REV. 563 (1979); Sonja R. West, *Awakening the Press Clause*, 58 UCLA L. REV. 1025 (2011).

[111] *See, e.g.*, Citizens United v. FEC, 558 U.S. 310, 352–53 (2010) (striking down the Bipartisan Campaign Reform Act's media exemption as unconstitutional under the Speech Clause of the First Amendment).

[112] *See* Branzburg v. Hayes, 408 U.S. 665, 704–05 (1972) ("Freedom of the press is a 'fundamental personal right' which 'is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. . . . The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion.'" (quoting Lovell v. City of Griffin, 303 U.S. 444, 450, 452 (1938))).

[113] *See* Eugene Volokh, *Freedom for the Press as an Industry, or for the Press as a Technology? From the Framing to Today*, 160 U. PA. L. REV. 459 (2012); *see also* Michael W. McConnell, *Reconsidering Citizens United as a Press Clause Case*, 123 YALE L.J. 412 (2013); Ashutosh Bhagwat, *Producing Speech*, 56 WM. & MARY L. REV. 1029, 1053 (2015).

*Journal of Free Speech Law*                    [2024

With regard to the Court, First Amendment jurisprudence around campaign finance regulation has provided occasion for certain justices to weigh in on what the Press Clause originally meant. In *First National Bank of Boston v. Bellotti*, the Court considered the constitutionality of a Massachusetts statute that criminalized corporate independent expenditures in the context of ballot referenda.[114] The law did not exempt the press from its regulations, and the Court struck it down on Speech Clause grounds. The "press does not have a monopoly on either the First Amendment or the ability to enlighten," the Court explained, and because the Massachusetts law impinged on universal First Amendment interests, it was unconstitutional irrespective of whether it contained a press exemption.[115]

Chief Justice Burger, joining the *Bellotti* majority, wrote a separate concurrence. He lamented the "difficulty, and perhaps impossibility" of distinguishing media from non-media corporations.[116] Media corporations "have amassed vast wealth and power and conduct many activities, some directly related—and some not—to their publishing and broadcasting activities."[117] Thus, "no factual distinction" could "justify government restraints on the right of appellants to express their views without, at the same time, opening the door to similar restraints on media conglomerates."[118]

From these practical concerns, Chief Justice Burger turned to the Constitution. First, he argued that "the history of the [Press] Clause does not suggest that the authors contemplated a 'special' or 'institutional' privilege" for the press.[119] Instead, he insisted, the Clause focused "on the liberty to disseminate expression broadly."[120] Second, he argued that efforts to define the press—whether "undertaken by legislature, court, or administrative agency"—were reminiscent of "the abhorrent licensing system of Tudor and Stuart England" that the First Amendment was "intended to ban."[121] Having rejected the contention that the press

---

[114] 435 U.S. 765, 775–76 (1978).

[115] *Id.* at 781–82.

[116] *Id.* at 796 (Burger, C.J., concurring).

[117] *Id.*

[118] *Id.* at 797.

[119] *Id.*

[120] *Id.* at 800.

[121] *Id.* at 801.

should be treated differently from other individual or institutional actors, he warned that the "evolution of traditional newspapers into modern corporate conglomerates . . . suggests the need for caution in limiting the First Amendment rights of corporations as such."[122]

Chief Justice Burger's words on these questions were not the last. In *Austin v. Michigan Chamber of Commerce*, the Court upheld a Michigan law banning corporate campaign expenditures because "the unique state-conferred corporate structure that facilitates the amassing of large treasuries" warranted doing so.[123] The law at issue exempted from regulation any "expenditure by a broadcasting station, newspaper, magazine, or other periodical or publication for any news story, commentary, or editorial in support of or opposition to a candidate for elective office."[124] Upholding the law, the Court rejected Chief Justice Burger's practical concerns, explaining that, while media corporations "enjoy the same state-conferred benefits" as any other corporation, they "differ significantly . . . in that their resources are devoted to the collection of information and its dissemination to the public."[125] Citing *Bellotti,* the Court added that, while "the press' unique societal role may not entitle the press to greater protection under the Constitution, it does provide a compelling reason for the State to exempt media corporations from the scope of political expenditure limitations."[126] Yet the Court nevertheless recognized the press was meaningfully different from other corporate actors, recognizing a "valid distinction . . . between corporations that are part of the media industry and other corporations that are not involved in the regular business of imparting news to the public."[127]

---

[122] *Id.* at 802.

[123] 494 U.S. 652, 659 (1990).

[124] *Id.* at 667 (quotation marks and citation omitted).

[125] *Id.* The Court said further that it has "consistently recognized the unique role that the press plays in 'informing and educating the public, offering criticism, and providing a forum for discussion and debate'" and that "'the press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve.'" *Id.* at 667–68 (citations omitted) (first quoting First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 781 (1978); and then quoting Mills v. Alabama, 384 U.S. 214, 219 (1966)).

[126] *Id.* at 668 (citation omitted).

[127] *Id.*

*Journal of Free Speech Law*                    [2024

Justice Kennedy dissented. He argued that "[a]ll corporations communicate with the public to some degree" and that, as such, there was "no permissible basis under the First Amendment" to "make this unsupported distinction among corporate speakers."[128] Justice Kennedy's opposition to the distinction between media and non-media corporations was a specific iteration of the more general view that the First Amendment prohibits "discriminat[ion] on the basis of the speaker's identity,"[129] a rationale that would command a majority of the Court in *Citizens United v. Federal Election Commission*.[130]

In *Citizens United*, the Court struck down the Bipartisan Campaign Reform Act of 2002 ("BCRA")[131] as violative of the First Amendment.[132] Overruling *Austin*, the Court held that BCRA's media exemption was unconstitutional because it "exempts some corporations but covers others, even though both have the need or the motive to communicate their views,"[133] a differential treatment favoring media corporations that the Court said could not "be squared with the First Amendment."[134]

Justices Scalia and Stevens wrote separate opinions in which they engaged in a debate over the Press Clause. Justice Scalia argued that it was "passing strange to interpret the phrase 'the freedom of speech, or of the press' to mean, not everyone's right to speak or publish, but rather everyone's right to speak or the institutional press's right to publish."[135] Justice Stevens responded that such a view read the Press Clause out of the Constitution and instead championed an institutionalist interpretation akin to Justice Stewart's.[136]

Two years after the *Citizens United* decision, Professor Eugene Volokh published a widely cited article arguing that the Press Clause originally enshrined only a universal, individual right to disseminate one's views using communications

---

[128] 494 U.S. at 713 (Kennedy, J., dissenting).

[129] *Id.* at 699.

[130] 558 U.S. 310 (2010).

[131] Federal Election Campaign Act of 1971, Pub. L. No. 92-225, 86 Stat. 3 (1972) (codified as amended at 52 U.S.C. §§ 30101–30126, 30141–30145).

[132] 558 U.S. at 365.

[133] *Id.* at 352.

[134] *Id.* at 353.

[135] 558 U.S. at 390 n.6 (Scalia, J., concurring).

[136] 558 U.S. at 423 & n.57 (Stevens, J., concurring in part and dissenting in part).

technology.[137] In Volokh's account, "the press" in "freedom of the press" referred to the *printing* press and, therefore, the Press Clause protected no more and no less than an individual's right to publish their expression.[138] Irrespective of its merits, this argument helps explain why the Court has rendered the Press Clause surplus to constitutional requirements—because the Speech Clause has been interpreted as doing the work the Press Clause was originally intended to, the latter has become a modern nullity.[139]

It is against this backdrop that the Project was commenced. In what follows, the Report presents several varieties or "modalities"[140] of argument that support moving toward a Press Clause capable of doing its own constitutional work. In light of the rolling crises U.S. journalism faces, this undertaking is an urgent one.

## IV.    REVITALIZING THE PRESS CLAUSE

### A.    *Constitutional Interpretation and the First Amendment*

Any debate over the meaning of a given constitutional provision implicates broader questions of constitutional interpretation. Jurists (and scholars) commonly apply one or more established interpretive approaches—including those often referred to as originalism, traditionalism, and living constitutionalism—to explain or justify their conclusions.

Of the four argument types presented below—historical, functional, precedential, and analogical—all fit within the frameworks of originalism and living constitutionalism. Moreover, historical arguments can also fit within a traditionalist framework. Before moving to the arguments themselves, it is worth discussing the

---

[137] *See generally* Volokh, *supra* note 113.

[138] *Id.* at 463.

[139] *See, e.g.*, West, *supra* note 110, at 1028.

[140] "Modalities" refer to forms of constitutional argument which include, but are not limited to, arguments from text, history, purpose, ethos, and consequences. The most famous account of modalities is Philip Bobbit's. *See* PHILIP BOBBITT, CONSTITUTIONAL INTERPRETATION 12–13 (1991) (identifying six "modalities" of constitutional argument). Other prominent scholars have produced separate accounts. *See* Richard H. Fallon, *A Constructivist Coherence Theory of Constitutional Interpretation*, 100 HARV. L. REV. 1189, 1194–1209 (1987) (outlining five "categories" of constitutional argument); Jack M. Balkin, *Arguing About the Constitution: The Topics in Constitutional Interpretation*, 33 CONST. COMMENT. 145, 182–84 (2018) (charting eleven "topics" of constitutional argument).

*Journal of Free Speech Law*                [2024

theories of interpretation that might frame them. Doing so will clarify how arguments from history, function, precedent, and analogy may effectively support an invigorated Press Clause across these disparate theoretical frameworks.

### 1. Originalism

"Originalism" refers to a family of interpretive theories which assert that "the discoverable public meaning of the Constitution at the time of its initial adoption should be regarded as authoritative for purposes of later constitutional interpretation."[141] There is disagreement within originalism over how to determine the Constitution's original meaning. Some originalists turn to the original intentions of the Framers and ratifiers.[142] Others look to the original public meaning of the Constitution's text.[143] And still others apply their own idiosyncratic views, referring to "original legal methods" or "original law" to glean what the Constitution means and thereby requires.[144]

To the extent originalists agree that the Constitution's original meaning constrains the authority of today's constitutional decision-makers,[145] the degree to which original meaning can be determined directly informs the degree to which modern interpreters can push constitutional doctrine in novel directions. If an originalist method purports to discover an especially clear original meaning, that

---

[141] Keith E. Whittington, *Originalism: A Critical Introduction*, 82 FORDHAM L. REV. 375, 377 (2013).

[142] *See, e.g.*, Larry Alexander & Saikrishna Prakash, *"Is That English You're Speaking?" Why Intention Free Interpretation Is an Impossibility*, 41 SAN DIEGO L. REV. 967 (2004); Richard S. Kay, *Adherence to the Original Intentions in Constitutional Adjudication: Three Objections and Responses*, 82 NW. U. L. REV. 226 (1988).

[143] *See, e.g.*, Keith E. Whittington, *The New Originalism*, 2 GEO. J.L. & PUB. POL'Y 599 (2004); Randy E. Barnett & Evan D. Bernick, *The Letter and the Spirit: A Unified Theory of Originalism*, 107 GEO. L.J. 1 (2018); Lawrence B. Solum, *Originalism and Constitutional Construction*, 82 FORDHAM L. REV. 453 (2013).

[144] *See* John O. McGinnis & Michael B. Rappaport, *Original Methods Originalism: A New Theory of Interpretation and the Case Against Construction*, 103 NW. U. L. REV. 751 (2009); John O. McGinnis & Michael B. Rappaport, *The Power of Interpretation: Minimizing the Construction Zone*, 96 NOTRE DAME L. REV. 919 (2021); William Baude & Stephen E. Sachs, *Grounding Originalism,* 113 NW. U. L. REV. 1455 (2019).

[145] *See, e.g.*, Lawrence B. Solum, *Construction and Constraint: Discussion of Living Originalism*, 7 JERUSALEM REV. LEGAL STUD. 17, 21–23 (2013).

meaning will govern a broader range of constitutional disputes than will a comparatively vague one. Conversely, a vague original meaning will leave more questions unanswered, allowing interpreters to apply the Constitution to circumstances beyond the text's contemplation.

Many originalists, including and especially those who look to the original public meaning of the Constitution's text, have endorsed the distinction between constitutional *interpretation* and constitutional *construction*. Interpretation seeks to discern the communicative content of the text—its semantic meaning—while construction determines and implements its legal effect.[146]

This distinction is neither remarkable nor controversial when the text's communicative content clearly resolves a given legal dispute.[147] In such cases, the text governs, and the analysis proceeds no further. If the meaning of the text is vague, however, it is constitutional construction, not interpretation, that takes on the most consequential role.[148] Cases in which constitutional text does little to resolve disputes arising under it are adjudicated within what Professor Lawrence Solum has termed the "construction zone."[149] The more indeterminate or "thin" the text's meaning, the more robust or "thick" its corresponding construction zone.

In the construction zone, constitutional adjudication is a normative rather than descriptive exercise.[150] The question for constitutional decision-makers is no longer "what does the text mean?" but "absent clear textual meaning, what ought

---

[146] Solum, *supra* note 143, at 455–58.

[147] For instance, Article II Section 1 provides that, as a qualification for office, the President of the United States must be at least thirty-five years old. *See* U.S. CONST. art. II, § 1, cl. 5. This text is straightforward to interpret, and it would likely resolve most if not all constitutional disputes arising under it.

[148] Jack M. Balkin, *The New Originalism and the Uses of History*, 82 FORDHAM L. REV. 641, 645 (2013) ("it matters whether the Constitution uses hard-wired rules, which leave relatively little discretion for practical reasoning by later generations, or standards or principles, which require considerable practical reasoning to apply, and therefore delegate comparatively more to future generations to develop and work out over time").

[149] Solum, *supra* note 143, at 469–72.

[150] *See* KEITH WHITTINGTON, CONSTITUTIONAL CONSTRUCTION: DIVIDED POWERS AND CONSTITUTIONAL MEANING 208 (1999) ("Constructions constantly add a denser web of values, institutions, procedures, and rights to the general framework established by the constitutional text and made clear by interpretation."); Solum, *supra* note 143, at 472–73; Whittington, *supra* note 143, at 612.

we do?"[151] This shift from the descriptive to the normative opens the door to a broader range of constitutional possibilities. Indeed, the gulf between what interpreters can determine about the Constitution's original meaning and the demands of many modern constitutional questions is a foundational element of Professor Jack Balkin's "framework originalism."[152] Balkin, endorsing the interpretation-construction distinction, has argued that the Constitution "creates a basic framework or plan for politics that is not complete at the outset but must be filled out by later generations."[153] This intergenerational work of constitutional construction allows for dynamic interplay between courts, legislatures, and the people in elaborating and carrying out the Constitution's fundamental principles over time.[154]

On a theory like framework originalism, or any originalist approach that accepts the distinction between interpretation and construction, one can make a variety of arguments in support of an invigorated Press Clause. This is because the text of the Press Clause is vague.[155] "Freedom of the press," like "freedom of speech" or "due process of law," is a legal principle, and the nature and extent of its applications have been contested throughout U.S. history.[156]

---

[151] *Accord* Randy E. Barnett, *Interpretation and Construction*, 34 Harv. J.L. & Pub. Pol'y 65, 66 (2011) ("It cannot be overstressed that the activity of determining semantic meaning . . . is *empirical*, not normative."); *id.* at 70 ("Unless there is something in the text that favors one construction over the other, it is not originalism that is doing the work when one selects a theory of construction to employ when original meaning runs out, but one's underlying normative commitments.").

[152] Jack M. Balkin, Living Originalism 3, 20–21 (2011).

[153] Balkin, *supra* note 148, at 645.

[154] Balkin, *supra* note 152, at 17.

[155] *See* Jack M. Balkin, *Constitutional Interpretation and Change in the United States: The Official and the Unofficial*, 14 Jus Politicum 1, 2 (2015) (pointing out that constitutional "principles," like those established by the First Amendment, employ "abstract and vague terms" that "do not always apply conclusively, but may be balanced against other considerations"); Amy Barrett, *Introduction*, 27 Const. Comment. 1 (2010) ("When the original public meaning of the text establishes a broad principle rather than a specific legal rule, interpretation alone cannot settle a dispute. In that event, the need for construction arises. The First Amendment is a classic example.").

[156] The Sedition Act of 1798, passed seven years after the First Amendment's ratification, prompted debate over the scope of First Amendment protection. *See generally* Wendell Bird, Criminal Dissent: Prosecutions Under the Alien and Sedition Acts of 1798 (2020). So too with the Sedition Act of 1918 and the Smith Act of 1940. *See generally* Geoffrey R. Stone, Perilous Times: Free Speech in Wartime from the Sedition Act of 1798 to the War on Terrorism (2004). Today the Speech Clause is primarily understood as enshrining negative liberties, which

Beyond the text, the record of potentially probative evidence around the First Amendment's drafting and ratification—evidence that might shed light on what constitutional work the text was originally intended to do—is sparse.[157] For these reasons, the Press Clause's semantic meaning is often unable to resolve constitutional disputes on its own terms. This reality yields a thick construction zone in which First Amendment doctrine is dynamically built and reconfigured rather than statically interpreted.

Scholars have expressed different views about which norms should govern constitutional construction,[158] but the bottom line is that even a committed originalist can make a broad range of constitutional arguments in support of an invigorated Press Clause. These arguments can draw on evidence from before, during, and shortly after the Founding (what the Project and this Report refer to as "historical" arguments). They can point to the favorable consequences that would follow from

---

limit government action, but this has not always been the case. *See, e.g.*, Genevieve Lakier, *The First Amendment's Real Lochner Problem*, 87 U. CHI. L. REV. 1243 (2020); Kathleen M. Sullivan, *Two Concepts of Freedom of Speech*, 124 HARV. L. REV. 143 (2010). And so on.

[157] *See, e.g.*, LEONARD W. LEVY, EMERGENCE OF A FREE PRESS 266 (1985) ("More complex than it appears, the [Press Clause] had several meanings and did not necessarily mean what it said or say what it meant. Its meaning was surely not self-evident."); STONE, *supra* note 156, at 42 (contending that the Press Clause expressed an "aspiration, to be given meaning over time"); Anderson, *supra* note 1, at 486 ("The legislative history of the press clause is, of course, inconclusive, not only in the sense that history is always inconclusive, but also because the Framers simply did not articulate what they meant by 'freedom of the press.'"); Blasi, *supra* note 21, at 536 n.60 ("The debates in Congress on the Bill of Rights contain virtually nothing on the values thought to underlie the freedoms of speech, press, and assembly."); Jud Campbell, *Natural Rights and the First Amendment*, 127 YALE L.J. 246, 249 (2017) ("After a century of academic debate, however, the meanings of speech and press freedoms at the Founding remain remarkably hazy."); Thomas I. Emerson, *Colonial Intentions and Current Realities of the First Amendment*, 125 U. PA. L. REV. 737, 737 (1977) ("It is by no means clear exactly what the colonists had in mind, or just what they expected from the guarantee of freedom of speech, press, assembly, and petition."). For discussion of some of the limited evidence that does exist, see *infra* Part IV.B.2.

[158] Randy Barnett and Evan Bernick take a narrow view of what is permissible in the construction zone. *See, e.g.*, Barnett & Bernick, *supra* note 143, at 35. But, prior to her appointment to the Supreme Court, Justice Amy Coney Barrett observed more generally that "insofar as constructing constitutional doctrine requires consideration of factors other than the text, it invites reliance upon some of the interpretive modalities that originalism had traditionally been understood to de-emphasize or even exclude." Barrett, *supra* note 155, at 3. These modalities as they relate to the Press Clause are discussed further *infra* Part IV.B.4.

an invigorated Press Clause ("functional" arguments). They can point to judicial precedent and the reasoning that supports it ("precedential" arguments). And they can point to other provisions of the Constitution and their attendant doctrines as appropriate analogies for understanding the Press Clause ("analogical" arguments). No matter what kind of evidence one employs, the basic takeaway is that originalism is a workable theory for framing the various arguments made throughout the Project and this Report, a direct consequence of the Press Clause's robust construction zone.

## 2.  Traditionalism

Traditionalism takes as its core premise that "political and cultural practices of substantial duration" play a presumptive role in "informing constitutional meaning."[159] In Professor Marc DeGirolami's account, the Constitution's text remains a trump card. Longstanding traditions are authoritative as interpretive resources only if they are "consistent with constitutional text."[160] But this does not limit the role tradition can play when the text is vague. As DeGirolami writes, "reliance on enduring practices simply is one of the ways in which we come to understand the meaning of unclear text."[161] A tradition's duration and continuity—the length of time across which the practice has been performed and the extent to which it has been performed consistently—increase its interpretive force.[162]

Traditionalism has greatly influenced modern First Amendment doctrine. Two of the doctrinal tests the Supreme Court has endorsed—the "history and tradition" analysis it employs when determining the bounds of First Amendment coverage[163]

---

[159] Marc O. DeGirolami, *The Traditions of American Constitutional Law*, 95 NOTRE DAME L. REV. 1123, 1125 (2020) [hereinafter DeGirolami, *Traditions*]. This is the primary way in which traditionalism diverges from originalism—though some forms of originalism look to historical practice to determine meaning, others exclude it in favor of, say, original public meaning or authorial intent. *See* Marc O. DeGirolami, *First Amendment Traditionalism*, 97 WASH. U. L. REV. 1653, 1656 (2020).

[160] DeGirolami, *Traditions*, *supra* note 159, at 1125.

[161] *Id.* at 1133.

[162] *Id.* at 1125.

[163] *See* United States v. Stevens, 559 U.S. 460, 470 (2010); Brown v. Ent. Merchs. Ass'n, 564 U.S. 786, 790–91 (2011); United States v. Alvarez, 567 U.S. 709, 717 (2012).

and the "history and logic" test it has adopted in the First Amendment right of access context[164]—are traditionalist rather than originalist. They look to past practices rather than the original meaning of the Constitution's text, focused not on what "freedom of speech" or "freedom of the press" linguistically meant at the Founding but rather on what the people and the government *have in fact done* throughout history.[165] Simply, traditionalism endorses the proposition that "we do what we mean, and we mean what we do."[166]

Because traditionalism relies on the duration and continuity of a political or cultural practice in order to determine that practice's interpretive authority, purely consequentialist arguments—*i.e.*, those that focus on the positive contemporary effects of press functions—are a poor fit. So, too, are analogical arguments. The ways in which the Court has adjudicated one set of questions is not, under a traditionalist approach, helpful for adjudicating a separate, even if analogous, set of questions. Precedential arguments, understood as referring to the precedent of the courts rather than Congress or the President, are also of little relevance to a traditionalist inquiry.[167] Historical arguments, however, have immense traditionalist force. The practices of printers in exposing governmental oppression or the endorsement of republican precepts by the country's political institutions, both of which have remarkable historical pedigree, can shed light on the kinds of activity the Press Clause was meant to protect.

---

[164] *See supra* notes 34–38 and accompanying text.

[165] The Court's decision in *New York Times v. Sullivan* employed traditionalism to sweep the crime of seditious libel into the dustbin of history. *See* New York Times Co. v. Sullivan, 376 U.S. 254, 276 (1964) ("Although the Sedition Act was never tested in this Court, the attack upon its validity has carried the day in the court of history.").

[166] DeGirolami, *First Amendment Traditionalism*, *supra* note 159, at 1655.

[167] DeGirolami, *Traditions*, *supra* note 159, at 1125 ("What is of interest are political and cultural practices, not judicial precedents or doctrines. Distinguishing the former from the latter marks the difference between traditionalist and precedential interpretation.").

This Report focuses primarily on how the Court has treated the press. *See infra* Part IV.D. Whether the historical relationship between the political branches and the "Fourth Estate" can underpin strong traditionalist arguments in favor of invigorated Press Clause is worth future consideration. *See* Thomas Carlyle, *The Hero as Man of Letters. Johnson, Rousseau, Burns.*, *in* On Heroes, Hero-Worship, and the Heroic in History 138, 147 (Henry David Gray ed., Longmans, Green, and Co. 1906) (1841) ("Burke said there were Three Estates in Parliament; but, in the Reporters' Gallery yonder, there sat a *Fourth Estate* more important far than they all.").

*Journal of Free Speech Law*                [2024

### 3. Living Constitutionalism

Living constitutionalism refers to constitutional approaches that endorse the proposition that constitutional meaning can, does, and should change outside the Constitution's formal amendment process.[168] In sketching the contours of the "great debate" between originalism and living constitutionalism, Professor Lawrence Solum has identified eleven iterations of the latter.[169]

As a general matter, however, living constitutionalists "do not believe that the original meaning always has priority over other ostensible modalities of constitutional adjudication … even as many non-originalist theories allow the original meaning to play *some* role in adjudication."[170] It is indisputable that living constitutionalism permits the broadest spectrum of constitutional argument because it is not constrained by original meaning but instead insists that the Constitution "should change in response to changing circumstances and values."[171] By its very nature, all of the evidence and argument forms presented below—historical, functional, precedential, and analogical—are relevant to a living constitutionalist approach to the Press Clause.

### B.    Historical Arguments

The rise of originalism and traditionalism have placed history at the forefront of current debates over constitutional interpretation.[172] Whether framed by an originalist, traditionalist, or other interpretive method, there is ample evidence that "freedom of the press" can and should play a much more significant role in constitutional doctrine than it currently does. This Report, presenting a variety of germane scholarly work, emphasizes that the orthodox understanding of the Clause's

---

[168] *See* Lawrence B. Solum, *Originalism Versus Living Constitutionalism: The Conceptual Structure of the Great Debate*, 113 Nw. U. L. Rev. 1243, 1276 (2019); *accord* David A. Strauss, *The Irrelevance of Constitutional Amendments*, 114 Harv. L. Rev. 1457 (2001).

[169] *See* Solum, *supra* note 168, at 1276. These are constitutional pluralism, moral readings, common law constitutionalism, popular constitutionalism, extranational constitutionalism, multiple meanings, super-legislature, Thayerianism, constitutional anti-theory, constitutional rejectionism, and contemporary ratification theory. *See id.*

[170] J. Joel Alicea, *Liberalism and Disagreement in American Constitutional Theory*, 107 Va. L. Rev. 1711, 1722 (2021).

[171] *See* Solum, *supra* note 168, at 1276.

[172] *See generally* Jack M. Balkin, Memory and Authority: The Uses of History in Constitutional Interpretation (2024).

historical foundation, as set forth in the work of Leonard Levy and Eugene Volokh,[173] is unnecessarily blinkered. Rather than a mere repository of the negative liberty to publish one's sentiments free from prior restraint, history also supports the idea that the Press Clause can and should do more.

This section is divided into four subparts. The first discusses the relationship between eighteenth-century understandings of freedom of the press and the crime of seditious libel before turning to the actual practices of eighteenth-century printers as a source of evidence about the original meaning, purposes, and effects of press freedom. The second assesses the drafting, ratification, and post-ratification history of the First Amendment itself. The third elaborates on the ideological backdrop of these historical events, situating the freedom of the press and its intellectual development within the broader context of republican ideology. The fourth synthesizes this evidence to sketch out several historical arguments for an invigorated Press Clause.

**1.  Seditious Libel and the Historical Role of American Printers**

In 1960, Leonard Levy published *Legacy of Suppression: Freedom of Speech and Press in Early American History*. There he argued, against the prevailing wisdom of the preceding decades,[174] that the First Amendment's Framers did not believe in broad speech and press rights and that, on the contrary, the "libertarian theory from the time of Milton to the ratification of the First Amendment substantially accepted the right of the state to suppress seditious libel."[175]

---

[173] *See* LEVY, *supra* note 157 (arguing throughout that the Press Clause did little more than constitutionalize a ban on press licensing); LEONARD W. LEVY, LEGACY OF SUPPRESSION: FREEDOM OF SPEECH AND PRESS IN EARLY AMERICA HISTORY iv (1960).

[174] *See, e.g.*, Zechariah Chafee Jr., *Freedom of Speech*, 17 NEW REPUBLIC 66, 67 (Nov. 16, 1918) (arguing that the First Amendment banned subsequent punishments as well as prior restraints); Zechariah Chafee Jr., *Freedom of Speech in War Time*, 32 HARV. L. REV. 932, 947 (1919); Alexander Meiklejohn, *The First Amendment Is an Absolute*, 1961 SUP. CT. REV. 245; *accord* Matthew L. Schafer, *An American Freedom: The Intelligentsia and Freedom of the Press After Blackstone*, 127 PENN ST. L. REV. 455, 466–67 (2023); Robert Post, *Writing the Dissent in* Abrams, 51 SETON HALL L. REV. 21 (2020).

[175] *See* LEVY, *supra* note 173, at iv. Seditious libel refers to "the crime whose core is criticism of government or its officers, which is assumed to have a 'tendency' to breach the peace by producing disaffection toward rulers." WENDELL BIRD, THE REVOLUTION IN FREEDOMS OF PRESS AND SPEECH: FROM BLACKSTONE TO THE FIRST AMENDMENT AND FOX'S LIBEL ACT 1 n.3 (2020). *See also*

Levy's provocative thesis engendered significant criticism, especially from Professor David Anderson.[176] Levy took these and other critiques into consideration when, twenty-five years later, he published a revision of his earlier work under the new title *Emergence of a Free Press*. There Levy recognized that his "original interest lay with law and theory" and that he had "paid little attention to press practices."[177] When he belatedly turned to how revolutionary printers actually behaved, Levy forthrightly conceded that

> [s]ome states gave written constitutional protection to freedom of the press after Independence, others did not. *Whether they did or did not, their presses operated as if the law of seditious libel did not exist.* To one whose prime concern was law and theory, a legacy of suppression came into focus; to one who looks at newspaper judgments on public men and measures, the revolutionary controversy spurred an expanding legacy of liberty.[178]

Levy's focus on the mere existence of seditious libel and other subsequent punishments rather than their sparse application—on the "concept of crime" rather than on "crime-rate statistics," to borrow his metaphor[179]—led him to conclude in 1985, much like he had in 1960, that the "immediate history of the drafting and adoption of the First Amendment's freedom of speech and press clause does not suggest an intent to institute broad reform."[180]

---

Philip A. Hamburger, *The Development of the Law of Seditious Libel and the Control of the Press*, 37 STAN. L. REV. 661 (1985).

[176] *See generally* Anderson, *supra* note 1; David A. Anderson, *Levy vs. Levy*, 84 MICH. L. REV. 777 (1986).

[177] LEVY, *supra* note 157, at x.

[178] *Id.* (emphasis added). This wide chasm between theory and practice did not inspire Levy to depart from his formalistic approach. *See id.* at xv ("My acknowledgment that the press of the new nation functioned as if the law of criminal libel hardly mattered is not entirely graceful. I refuse to *prove* the existence of unfettered press practices by giving illustrations of savage press criticisms of government policies or vicious character assassinations of American politicians. I am not intent on measuring the degree of freedom that Americans enjoyed. I am interested, to use an analogy, in defining the concept of crime, and therefore do not find crime-rate statistics to be helpful.").

[179] LEVY, *supra* note 157, at xv.

[180] *Id.* at 220.

This conclusion, like his first, sparked criticism.[181] Indeed, the debate between "Blackstonian"[182] scholars like Levy who believe the Press Clause did nothing more than ban prior restraints[183] and libertarian or "Madisonian"[184] scholars who take a broader view of the First Amendment's original meaning and legal effects[185] remains ongoing more than sixty years after *Legacy of Suppression.*

This disagreement is especially important considering the extent to which Levy's work has captured the imagination of Supreme Court justices. *Legacy of Suppression* has been cited by the Court nine times,[186] and the Blackstonian conception

---

[181] *See, e.g.,* BIRD, *supra* note 175; WENDELL BIRD, PRESS AND SPEECH UNDER ASSAULT: THE EARLY SUPREME COURT JUSTICES, THE SEDITION ACT OF 1798, AND THE CAMPAIGN AGAINST DISSENT (2016); JEFFERY A. SMITH, PRINTERS AND PRESS FREEDOM: THE IDEOLOGY OF EARLY AMERICAN JOURNALISM (1988); David M. Rabban, *The Ahistorical Historian: Leonard Levy on Freedom of Expression in Early American History*, 37 STAN. L. REV. 795 (1985).

[182] *See* 4 WILLIAM BLACKSTONE, COMMENTARIES *152 ("The liberty of the press is indeed essential to the nature of a free state: but this consists in laying no previous restraints upon publications, and not in freedom from censure for criminal matter when published.").

[183] Levy is the most prominent Blackstonian, but there are numerous others. *See, e.g.,* PHILLIP I. BLUMBERG, REPRESSIVE JURISPRUDENCE IN THE EARLY AMERICAN REPUBLIC: THE FIRST AMENDMENT AND THE LEGACY OF ENGLISH LAW (2010); Phillip B. Kurland, *The Original Understanding of the Freedom of the Press Provision of the First Amendment*, 55 MISS. L.J. 224, 233–35 (1985).

[184] The decision to classify the broad view of the First Amendment as "Madisonian" draws from Bird. *See* BIRD, *supra* note 175, at 54 ("Beginning with decisions in the 1930s, Blackstone's decline and Madison's rise began in the Supreme Court, as freedoms of press and speech were designated fundamental rights and freedoms and preferred freedoms.").

[185] *See, e.g.,* ZECHARIAH CHAFEE, FREE SPEECH IN THE UNITED STATES (1941); JOHN C. MILLER, CRISIS IN FREEDOM: THE ALIEN AND SEDITION ACTS (1952); Irving Brant, *Seditious Libel: Myth and Reality*, 39 N.Y.U. L. REV. 1 (1964); Matthew L. Schafer, *"The Press": A Response to Professor Volokh*, https://perma.cc/PJV2-SJLY.

[186] *See* Citizens United v. FEC, 558 U.S. 310 (2010); Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry, 494 U.S. 558 (1990); Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979); First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765 (1978); Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974); Curtis Publ'g Co. v. Butts, 388 U.S. 130 (1967); Time, Inc. v. Hill, 385 U.S. 374 (1967); New York Times Co. v. Sullivan, 376 U.S. 254 (1964); Braden v. United States, 365 U.S. 431 (1961).

*Journal of Free Speech Law*    [2024]

of the First Amendment that Levy popularized has formed the basis of contemporary calls to overturn *New York Times Co. v. Sullivan*.[187] Advocates of a more powerful Press Clause must therefore deal with Levy's views if they are to push the First Amendment in a more press-protective direction. Fortunately, they can and have done so.

Scholars responding to the Blackstonian thesis have taken at least three tacks. The first argues that the thesis is wrong on its own terms. Those making this argument, most prominently David Anderson[188] and Wendell Bird,[189] contend simply and forcefully that historical evidence actually supports the conclusion that Founding Era thinkers understood that press freedom should not be viewed in the constricted manner articulated by Blackstone but far more broadly than being limited to freedom from prior restraints.

The second argues that the Blackstonian thesis ignores the First Amendment's greater historical and theoretical context. These scholars, including David Rabban,[190] Jeffery Smith,[191] and Matthew Schafer,[192] have demonstrated that the republican ideology internalized by the Founding Era and post-ratification American "intelligentsia" demanded a broader press freedom than Blackstone's. In comparison, Levy's hyper-fixation on the purely formal question of whether seditious libel existed as a crime shears the First Amendment from the political principles that animated its ratification and thereby impoverishes its meaning.

The third contends that the actual practices of American printers belie the suggestion that they were under threat of seditious libel prosecutions. Indeed, eight-

---

[187] This is most notably the case for Justice Thomas, who has argued that the First Amendment was not historically understood to permit defamation of public officials. *See, e.g.*, Schafer, *supra* note 83, at 88.

[188] *See* Anderson, *supra* note 1.

[189] *See* BIRD, *supra* note 175, at 182 ("Blackstone was widely viewed as a tool of the administration, or illiberal traditionalism, as his views on government were challenged by many Whigs.") (citing, *inter alia*, the writings of Philip Furneaux, Jeremy Bentham, and "Junius").

[190] *See* Rabban, *supra* note 181.

[191] *See* Smith, *supra* note 181.

[192] *See* Schafer, *supra* note 174, at 457 ("reliance on Blackstone—a monarchist who hated the colonists and their fight for freedom—is misplaced because early U.S. commentators rejected Blackstone's views on liberty and libel"); Schafer, *supra* note 83.

eenth-century printing practices and ideology are deeply informative, not just because they buck the Blackstonian thesis but because they illuminate printing traditions that might inform the First Amendment's meaning more generally.

This section discusses the historical relationship between the crime of seditious libel and the First Amendment. Then, apart from legal formalisms, it assesses how eighteenth-century printers behaved in practice. These topics shed light not just on the debate between Blackstonian and Madisonian scholars but on the meaning of freedom of the press more broadly.

### a.    Seditious Libel and Press Freedom before the First Amendment

Of all the scholars who have challenged the Blackstonian thesis, none is more prolific or persuasive than Wendell Bird. Bird has marshaled reams of evidence that a "broad understanding of freedoms of press and speech had been the prevalent and then dominant publicly expressed view for a generation before 1798, in both England and America."[193]

Before canvassing some of Bird's evidence, it is worth comparing his methodology to Levy's. As Bird himself makes clear, Levy based his study "almost entirely on American publications" with "no British newspapers and surprisingly few British books and pamphlets," a serious omission considering that, in the "future United States, the majority of books and pamphlets came from British publishers . . . in every year during 1710–1775."[194]

In contrast to Levy's approach, Bird conducted a "content search of the most complete British and American collections" of "books and pamphlets" and "newspapers and other periodicals" for the period of 1700–1791, with a particular eye toward discussion of liberty of press and speech and "seditious libel in relation those freedoms."[195] Simply, Bird's inquiry was much more thorough than Levy's, and the resulting fuller view of the evidence prompted him to conclude that the Blackstonian thesis "was more and more inaccurate in describing published views

---

[193] *See* Bird, *supra* note 175, at 6.

[194] *Id.* at 103; *see also id.* at 130 n.151 (Levy limited his evidence to "six British authors for the period 1720–1735" and "did not consider British newspapers at all"); *id.* at 153 (Levy's Blackstonian thesis is "contrary to the forty-five sources cited above from the 1730s, 1740s, and 1750s that variously characterized seditious libel itself, seditious libel prosecutions, or components of them as inconsistent with liberty of press or speech"); *id.* at 213–16.

[195] *Id.* at 70 & n.278.

of freedoms of press and speech as the eighteenth century drew onward, and as more publications were considered, except in British royal court decisions and parliamentary debates."[196]

On the British side, the major figures Bird cited in support of his conclusion included:

- *Cato*. The pseudonym of radical Whigs John Trenchard and Thomas Gordon, "Cato" published a series of essays in the 1720s that endorsed strong press and speech rights as "essential to free government" and repudiated the English ministry's censorious use of seditious libel prosecutions.[197] In the American colonies, "*Cato's Letters* on freedom of speech (and press) and on libels enjoyed a resurged of reprinting and popularity during 1769–1776."[198]

- *Thomas Hayter*. A "bishop and later privy councilor," Hayter wrote in 1755 what Bird deemed the "best known pamphlet of the mid-century on the press."[199] There Hayter connected the freedom of the press to its checking function and warned against the practice of retaliatory seditious libel prosecutions.[200]

- *John Wilkes*. "[P]ublisher of the *North Briton* newspaper and member of the House of Commons," John Wilkes was prosecuted for seditious libel between 1763 and 1768.[201] He fled England before being convicted in absentia and expelled from Parliament. Upon his return, Wilkes challenged "Parliament's prohibition of news reporting of its proceedings on the basis

---

[196] *Id.* at 71.

[197] *See* Thomas Gordon, *Of Freedom of Speech: That the Same is Inseparable from Publick Liberty* (February 4, 1720), *reprinted in* 1 JOHN TRENCHARD & THOMAS GORDON, CATO'S LETTERS: OR, ESSAYS ON LIBERTY, CIVIL AND RELIGIOUS, AND OTHER IMPORTANT SUBJECTS 110–17 (Ronald Hamowy ed., Liberty Fund 1995) (1733); *see also* BIRD, *supra* note 175, at 126–28; SMITH, *supra* note 181, at 63.

[198] BIRD, *supra* note 175, at 292.

[199] *Id.* at 147.

[200] *Id.*

[201] *Id.* at 156.

of freedom of the press."[202] His positions on press freedom and the American cause more generally made him "equally well known and much more widely admired" in the American colonies than in England.[203] Indeed, Wilkes' defense of freedom against the English ministry "brought continued commentary in colonial newspapers . . . which typically paired Wilkes with liberty of the press."[204]

- *Junius.* Using a pseudonym, "Junius" wrote letters in which he criticized the English monarchy and ministry for mistreatment of the American colonies.[205] The author could not be located so those who printed the letters were prosecuted for seditious libel in 1770. One such printer, Henry Sampson Woodfall, invoked "liberty of the press" in his defense and argued that government actions must be subject to public evaluation.[206] More generally, in England from 1760 to 1780, a "steady stream of books and pamphlets described seditious libel as a restraint on press and speech."[207]

- *Thomas Erskine.* When the Dean of St. Asaph, William Davies Shipley, published a pamphlet critical of Parliament, he was prosecuted for seditious libel, the leading such case of the 1780s.[208] Thomas Erskine served as defense counsel and, in 1784, offered "the most thoughtful and eloquent of English courtroom arguments for freedom of the press."[209]

---

[202] *Id.* at 158.

[203] *Id.*

[204] *Id.* at 279; *accord* BERNARD BAILYN, THE IDEOLOGICAL ORIGINS OF THE AMERICAN REVOLUTION 110 (3d ed. 2017) ("John Wilkes's career was crucial to the colonists' understanding of what was happening to them; his fate, the colonists came to believe, was intimately involved with their own."); SMITH, *supra* note 181, at 23 ("As the reading public of England and America was provided with fresh and conclusive evidence that the ruling [English] oligarchy was oppressive and corrupt, the cause of Wilkes was celebrated in toasts and popular demonstrations through the nation.").

[205] BIRD, *supra* note 175, at 159.

[206] *Id.* at 160.

[207] *Id.* at 162.

[208] *Id.* at 196.

[209] *Id.* at 199.

Although Shipley was not a printer (and Woodfall's defense did not address whether "Junius" should enjoy the same protections he advocated for himself), the point we are making here is a different one. As Bird has demonstrated, Levy's conception of freedom of the press (as encompassing

These are some of the more notable examples showing that freedom of the press was understood to be more substantive than simply meaning the absence of prior restraint. After canvassing reams of British writings on press freedom and seditious libel published between the 1720s and 1780s, Bird ultimately concluded that

> a broad understanding of liberties of press and speech changed from being a minority position early in that century to being the majority position expressed in British writings on the subject by 1763, and grew even stronger by 1776–1780 when most revolutionary American declarations of rights were adopted that generally protected freedom of the press, and by 1789–1791 when America's Bill of Rights was proposed and ratified.[210]

Contrary to Levy's thesis that the colonial understanding of press freedom was almost exclusively Blackstonian, Bird demonstrated that Blackstone's view was a minority view, adopted by royal judges and coming "in the midst of the colonial crisis, when new British rulings and laws were viewed negatively with suspicion by a growing British coterie besides the radical Whigs, and in the American colonies."[211]

More directly, Bird concluded that Levy's claim—that press rights followed the Blackstonian model until the very end of the eighteenth century—was "false with regard to British books, pamphlets, newspapers, and magazines," making it "false in regard to America as well" because British publications constituted over half of what Americans read at the time.[212]

Bird supported his argument not only with countless pages of British sources but also with major colonial writings and events predating the Constitution and Bill of Rights. These included:

- *The Zenger Trial.* In 1735, John Peter Zenger, the printer of the *New-York Weekly Journal*, faced a seditious libel prosecution for printing letters that

---

only the freedom from prior restraint) is incorrect. Having established that the "freedom of the press" includes more than the prohibition of prior restraints, in the pages that follow, we turn to making the case that the Press Clause was understood at the Founding (and should be understood now) to provide particular protections for printers and those performing analogous functions through the use of the printing press (and their contemporary descendants) beyond those available to other speakers.

[210] Bird, *supra* note 175, at 215–16.

[211] *Id.* at 216.

[212] *Id.* at 218.

criticized William Cosby, the royal governor of New York.[213] After a first grand jury refused to indict and a second averred that it could not identify the author or publisher of the writings at issue, Cosby "had the attorney general issue an information charging Zenger."[214] Zenger's defense counsel, Andrew Hamilton, urged truth as a defense and insisted that a jury, not the presiding judge, should determine guilt or innocence.[215] The jury acquitted Zenger, the "audience gave three cheers,"[216] and the aspects of Hamilton's argument concerning freedom of the press—specifically, that it was a liberty "of exposing and opposing arbitrary power . . . by speaking and writing truth"—was "widely circulated in newspapers."[217] Indeed, the Zenger Trial, while not overruling the common law, "inspired American juries to refuse to indict and convict people charged with political crimes."[218]

- *The McDougall Case.* In 1770, Alexander McDougall was charged with seditious libel for publishing a "handbill upbraiding the [colony's] assembly for paying to quarter British troops and supporting British measures."[219] The case was well known through the colonies, and "typical commentary" condemned the prosecution as a restraint on press freedom.[220]

---

[213] *Id.* at 225.

[214] *Id.* at 226.

[215] *Id.* at 227.

[216] *Id.*

[217] *Id.* at 227–28.

[218] *Id.* at 228. *See also, e.g.*, Morgan, *supra* note 93, at 28 ("Zenger's acquittal—and Hamilton's closing argument—were no mere flash in the plan. Reports of the acquittal were 'widely read and frequently reprinted,' and made people throughout the colonies 'exult both in liberty and the relationship of liberty of the press to liberty itself.'" (quoting LEVY, EMERGENCE, *supra* note 157, at 37)); SMITH, *supra* note 181, at 75 ("At Zenger's trial, Andrew Hamilton repeatedly scorned Star Chamber law as dangerous and arbitrary.").

[219] BIRD, THE REVOLUTION, *supra* note 175, at 288–89.

[220] *Id.* at 290.

*Journal of Free Speech Law*    [2024]

- *The Address to the Inhabitants of Quebec.* In 1774, the First Continental Congress wrote an "Address to the Inhabitants of Quebec," seeking to garner support for the revolutionary cause.[221] There it characterized the "freedom of press" as an essential condition of freedom more broadly, arguing that, through its exercise, "oppressive officers are shamed or intimidated, into more honourable and just modes of conducting affairs."[222]

In the aggregate, this copious evidence strongly suggests that, in the decades leading up to the drafting and ratification of the First Amendment, public thinkers in both England and the American colonies understood freedom of the press as entailing more than a mere prohibition on prior restraints. In fact, both English Whigs and the American revolutionaries they inspired consistently acknowledged and celebrated the checking value of press freedom. This evidence, political and legal writings predating not just the U.S. Constitution but also the revolutionary constitutions of the states, is not the only evidence that supports a broad eighteenth-century understanding of press freedom.

### b.  Eighteenth-Century Printing Practices

With regard to seditious libel, printers acted as if there was no such thing. Both Levy and Bird have acknowledged this.[223] At bottom, it is simply implausible to say

---

[221] Anderson, *supra* note 1, at 463 ("The Continental Congress, hoping to make allies of the settlers in Quebec, approved a declaration explaining to the northern neighbors the goals of the American Endeavor.").

[222] *See* BIRD, *supra* note 175, at 293. David Anderson notes that the Quebec Address did not limit the "freedom of the press" to the checking value but also included "broader intellectual and cultural objectives" and, separately, that it "said nothing about freedom of speech" even while it venerated freedom of the press. *See* Anderson, *supra* note 1, at 464.

As we explain further in the sections that follow, the mere fact that printers published and disseminated the work of others (such as theologians and scientists) as well as their own, and that the information so published was valuable, does not automatically lead to the conclusion that both printer and author enjoyed (or should enjoy) exactly the same protections. Printers were in the business of disseminating such information on a regular basis, which made them the prime target for legal retaliation (as the Address suggests), a point that was not lost on the Founding generation and ought to contribute to our understanding of what the "freedom of the press" should mean.

[223] BIRD, THE REVOLUTION, *supra* note 175, at 238 ("Another indication that the broad concept of freedoms of press and speech was widely known was that press practice (as opposed to theory) was robust in acting as if that freedom was broad and as if restraint was illegal."); LEVY, EMERGENCE, *supra* note 157, at x.

that the First Amendment was strictly Blackstonian. It is even less believable to say, as Levy had, that virtually all available evidence, at least until the very end of the eighteenth century, supported the Blackstonian thesis.[224]

Of course, demonstrating that the Press Clause did more than ban prior restraints does not itself shed light on what the Clause actually did. For this, one can look to printing practices more generally; to evidence surrounding the drafting and ratification of the state and U.S. Constitutions; and to the republican principles that animated and inspired the Founding generation. The remainder of this section addresses these topics and then synthesizes them, sketching the contours of historical arguments supporting an invigorated Press Clause and examining Eugene Volokh's "press-as-technology" thesis.

Eighteenth-century printers, historian Joseph Adelman has explained, "played a crucial role in the formation and shaping of political rhetoric during the American Revolution."[225] This is a similar conclusion to that drawn by Bernard Bailyn, whose *Ideological Origins of the American Revolution* won both the Pulitzer and Bancroft Prizes.[226] As Bailyn notes at the outset of that book, the "leaders of the American Revolution . . . wrote easily and amply," and "newspapers, of which by 1775 there were thirty-eight in the mainland colonies, were crowded with columns of arguments and counter-arguments appearing as letters, official documents, extracts of speeches, and sermons."[227]

Importantly, printers did not conduct themselves as neutral conduits for transmitting any and all third-party communications. They instead exerted "enormous control over the political content" of their newspapers.[228] Moreover, newspapers contained a good deal more information obtained by the printers than just political content. Newspapers were a critical component of the printers' livelihoods, providing a steady income from subscriptions and advertising, and allowing printers to advertise their operations. Most printed weekly, relying on fresh information

---

[224] *See, e.g.*, Wendell Bird, *Liberties of Press and Speech: 'Evidence Does Not Exist to Contradict the . . . Blackstonian Sense' in Late 18th Century England?*, 36 OXFORD J. LEGAL STUD. 1 (2016).

[225] *See* JOSEPH A. ADELMAN, REVOLUTIONARY NETWORKS: THE BUSINESS AND POLITICS OF PRINTING THE NEWS 1763–1789, at 3 (2019).

[226] *See* BAILYN, *supra* note 204.

[227] *Id.* at 1.

[228] ADELMAN, *supra* note 225, at 5.

gleaned from a variety of sources cultivated by the individual printer, who was "in almost all cases also the newspaper's editor and publisher."[229] They learned to obtain, edit, and disseminate information widely and they cultivated sources including "stories from other newspapers," "oral reports," "letters from friends and associates," and "government officials, prominent merchants and ship captains, and other well-placed political sources not only within their localities but from around the colonies and across the Atlantic Ocean."[230]

"Printers, then, stood at the convergence point for both political news and commercial information that had their fullest expression in the newspapers they printed."[231] The "typical newspaper" of the time included "news items, advertisements and notices, government proclamations, announcements and essays," as well as "correspondence and other reports not only from the town in which the newspaper was printed but also from Europe and elsewhere in America."[232] In formatting, arranging, and producing newspapers, eighteenth-century printers were not simple laborers or "meer mechanics."[233] Some were among the most renowned members of their communities.[234] As Professor Sonja West has shown, "[e]arly American printing . . . was a precious commodity available to certain groups and the product of hardship, skill and scarce resources."[235]

Over the course of the eighteenth century, printers developed a distinct ideology through which they understood their work and their greater role in the body politic. Much of this ideology was inherited from the writings of radical Whigs and other British opposition figures. Taking Cato as a primary inspiration, printers argued that "the people required recourse to the press in order to expose the corrupt action of the government whenever it threatened the people's liberty."[236] In the decades before the colonial crisis, printers framed this role neutrally: They "sought

---

[229] *Id.*

[230] *Id.*

[231] *Id.*

[232] *Id.*

[233] *Id.* at 21.

[234] *Id.* Benjamin Franklin is the most prominent such example. *See* SMITH, *supra* note 181, at 108–23.

[235] Sonja R. West, *The "Press," Then & Now*, 77 OHIO ST. L.J. 49, 72 (2016).

[236] ADELMAN, *supra* note 225, at 46.

to make themselves the indispensable arbiters of public debate in colonial America."[237]

In the wake of the Stamp Act of 1765, however, the press's feigned neutrality began to give way. The Act, a tax on paper (among other items), put printers in a precarious economic position.[238] Even when they balanced their commercial interests against personal politics—not all printers were Patriots—colonists opposed to the Act relied on the press to call for its repeal.[239] Printers aligned with this view portrayed protests against the Act as "theatrical performances devoid of violence and full of unity" in order to shape public perception.[240] When the Act was repealed in 1766, printers "reacted with joy."[241] This step toward open politicization began to change the self-understanding of printers more fundamentally.[242] Printers came to approach their trade "with a deep sense of public purpose."[243] They "challenged the British tax on paper by claiming a special place in the new republic and arguing that the tax burdened their ability to inform the people of public events and check abuses by the government."[244]

As the colonial crisis deepened and tensions built toward war, printers "played a vital role in amplifying the circulation of the news to their reading publics."[245] Indeed, the middle of the eighteenth century saw exponential growth in the number of colonial newspapers: "[I]n the decades leading up the Revolutionary War, the

---

[237] *Id.* at 50; *see also* SMITH, *supra* note 178, at 35 ("In America, where both *Cato's Letters* and Milton's works were highly regarded, colonial journalists used the [marketplace of ideas] proposition to justify publishing controversial material."). Printers likely insisted on their own neutrality for commercial reasons. *See, e.g.*, ADELMAN, *supra* note 225, at 50 ("A broad base of support that cut across factions within a community was helpful not only for a printer's access to information but also as a buttress against controversy and difficult financial times.").

[238] ADELMAN, *supra* note 225, at 55.

[239] BIRD, THE REVOLUTION, *supra* note 175, at 251.

[240] ADELMAN, *supra* note 225, at 55.

[241] *Id.* at 79.

[242] West, *supra* note 235, at 80.

[243] *Id.* at 82.

[244] *Id.* at 81.

[245] ADELMAN, *supra* note 225, at 134.

number of newspapers in the colonies grew more than twice as fast as the population, and in the decades that followed the war, it was four times as fast."[246] For Patriot printers in particular, political and economic interests coincided and prompted efforts "to generate anti-imperial public opinion to solidify resistance" and "portray the colonies as unified" so as to "lend an aura of inevitability to their cause."[247] These and other press practices are especially important to making the case that freedom of the press was a "customary right" which "developed from the bowels of the print culture itself."[248]

Finally, printers played an indispensable role in the very formation of the Republic. The debates over the Constitution and its ratification played out in the press. As Professor Adelman writes, the "publication of the proposed Constitution opened up fundamental debates about the future of the United States."[249] Printers "opened the pages of their newspapers to dozens of news articles tracking the state conventions and essays debating the merits of the Constitution."[250]

In sum, printers published about matters of public concern as if seditious libel did not exist; they partook in a specific craft that required the cultivation of skills,

---

[246] West, *supra* note 235, at 82.

[247] ADELMAN, *supra* note 225, at 137.

[248] Kevin F. O'Neill & Patrick J. Charles, *Saving the Press Clause from Ruin: The Customary Origins of a "Free Press" as Interface to the Present and Future*, 2012 UTAH L. REV. 1691, 1703. If O'Neill and Charles are correct—that the Press Clause should be understood as enshrining a right that "developed much earlier" than ratification "through intellectual discourse and customary practice," *id.* at 1695—then what members of the printing industry *actually did* during the eighteenth century is particularly informative for understanding the content of the First Amendment's press right. Against this backdrop, Matthew Schafer's work documenting eighteenth-century assertions of the reporter's privilege, already valuable on its own terms, is even more salient for understanding both what "freedom of the press" may have meant for printers of the era and what it should mean today. *See* Matthew Schafer, *As Original as Apple Pie: The Reporter's Privilege at America's Founding*, MEDIUM (May 11, 2024), https://perma.cc/XT2S-TC9B ("I am in the midst of pouring [sic] over thousands of references to press freedom in Founding-era newspapers in hopes of better understanding what press freedom looked like at the Founding. There are some early returns, and they relate to whether the Founding generation understood liberty of the press to encompass a reporter's privilege.").

[249] ADELMAN, *supra* note 225, at 197.

[250] *Id.*

resources, and information inputs; they voiced and facilitated opposition to the imposition of British duties, most notoriously the Stamp Act; they multiplied leading up to the Revolution and, though the war slowed the printing trade, grew even faster afterward; and they facilitated national debate over the merits of the Constitution.

### 2.  The Press Clause: Pre- and Post-Ratification

After declaring independence in 1776, the Continental Congress urged the states to establish their own independent governments, and most crafted their own constitutions.[251] Of the eleven constitutions adopted,[252] "nine included provisions on freedom of the press, all phrased in general terms."[253] These press protections often invoked the indispensable, structural role played by a free press, and characterized press freedom in broader language than had Blackstone.[254]

The Virginia Declaration of Rights declared that "freedom of the Press is one of the greatest bulwarks of liberty, and can never be restrained but by despotick Governments."[255] The North Carolina Declaration of Rights stated that "the freedom of the press is one of the great bulwarks of liberty, and therefore ought never to be restrained."[256] The Massachusetts Constitutional Convention declared in 1780 that the "liberty of the press is essential to the security of freedom in a state: it ought not, therefore, be restrained in this Commonwealth." New Hampshire copied this last model verbatim in 1783.[257]

Perhaps most notably, the Pennsylvania Constitution included two press clauses. It made clear in its Declaration of Rights that "the people have a right to freedom of speech, and of writing, and publishing their sentiments; therefore the freedom of the press ought not to be restrained."[258] And it separately noted, in its "Plan or Frame of Government," that the "printing presses shall be free to every

---

[251] *See* Anderson, *supra* note 1, at 464 n.53.

[252] Connecticut and Rhode Island both hewed to their original colonial charters. *Id.*

[253] *Id.* at 464.

[254] Bird, The Revolution, *supra* note 175, at 40–41.

[255] Anderson, *supra* note 1, at 464.

[256] *Id.* at 464 & n.56.

[257] *Id.* at 465.

[258] *Id.*

person who undertakes to examine the proceedings of the legislature, or any part of government."[259]

It was against the backdrop of these provisions that the First Amendment's Press Clause was proposed and ratified over a decade later. James Madison, the First Amendment's primary drafter, initially viewed a bill of rights as superfluous.[260] Ultimately swayed to the contrary by the likes of Thomas Jefferson,[261] Madison urged Congress to adopt a bill of rights that initially included not one but two amendments concerning press freedom.

The first provided that "[n]o State shall violate the equal rights of conscience, or the freedom of the press, or the trial by jury in criminal cases."[262] This is to say, well over a century before the First Amendment's incorporation through the Fourteenth Amendment's Due Process Clause,[263] Madison sought to bar the states from violating freedom of the press. In fact, he referred to this amendment as "the most important on the whole list."[264] His proposal was approved in the House[265] but rejected by the Senate—there is no record of the Senate's deliberations.[266]

The second, which eventually became the modern Press Clause, read: "The people shall not be deprived of their right to speak, to write, or to publish their sentiments; and the freedom of the press, as one of the great bulwarks of liberty, shall be inviolable."[267] This text, unedited, made it out of the House and to the Senate.

There, a senator, identity and motive unknown, moved to alter the language such that it protected freedom of the press "in as ample a manner as hath at any

---

[259] *Id.*

[260] For discussion on this point and surrounding historical debates, see LEVY, EMERGENCE, *supra* note 157, at 220–81.

[261] *See* Anderson, *supra* note 1, at 476–77.

[262] *Id.* at 484.

[263] *See, e.g.,* Gitlow v. New York, 268 U.S. 652 (1925).

[264] *See* Anderson, *supra* note 1, at 484.

[265] *Id.* at 483.

[266] *Id.*

[267] *Id.* at 478.

time been secured by the common law."[268] This proposal was rejected.[269] Ultimately, after a series of textual tweaks, the text of the First Amendment as it currently exists was sent back to the House and passed by Congress for consideration by the states.[270] The First Amendment was ratified in 1791. There are no records of the debates within the state ratifying conventions.[271]

Two events in the near-immediate wake of the First Amendment's ratification warrant mention. First, Congress passed the Post Office Act of 1792, which gifted newspapers increased access to postal services and significantly decreased their postal rates.[272] Professor Genevieve Lakier, examining the congressional debates around the Post Office Act, has noted that no one thought the Act was "required by the First Amendment,"[273] though there was clear belief among the congressmen supporting it that the dissemination of newspapers was vital for the political health and development of the young republic.[274] Indeed, the first Congress held newspapers in such high regard that the postal rates it secured for them were not extended to other printed material such as books, pamphlets, magazines, mercantile advertisements, and personal letters.[275]

Second, in 1798, the Fifth Congress passed the Sedition Act, a law that punished seditious libel while incorporating the lessons from Zenger—truth could serve as a

---

[268] *Id.* at 480.

[269] *Id.* This amendment could have "frozen" Blackstone's "crabbed view of press freedom" into the Constitution. *Id.* at 481. Though there is no record of the debate over it, assuming there was any, Madison did not believe freedom of the press was protected under the "British constitution"—that is, Madison did not subscribe to Blackstone's conception of the press right. *See, e.g.*, BIRD, THE REVOLUTION, *supra* note 175, at 41; SMITH, *supra* note 181, at 69.

[270] *See* Anderson, *supra* note 1, at 482.

[271] *Id.* at 486.

[272] *See* Genevieve Lakier, *The Non-First Amendment Law of Freedom of Speech*, 134 HARV. L. REV. 2299, 2310 (2021).

[273] *Id.* at 2312.

[274] *Id.* at 2311 ("Supporters justified the changes that the Post Office Act made to federal postal policy by arguing that they were necessary to create the rich information environment that a democratic society required.").

[275] *See* Anuj C. Desai, *The Transformation of Statutes into Constitutional Law: How Early Post Office Policy Shaped Modern First Amendment Doctrine*, 58 HASTINGS L.J. 671, 693 (2007).

defense and guilt or innocence would be determined by juries.[276] Notwithstanding this relative softening of seditious libel vis-à-vis the crime's English formulation, the Sedition Act criminalized dissent and must be reckoned with. On this score, three points are worth note.

First, the Sedition Act, despite being passed just nine years after the First Amendment's ratification, is less probative of the Founders' intent than might be intuited. Of the "ninety-five senators and representatives who served in the First Congress, only eighteen remained when the Sedition Act was enacted in July 1798, and of those only ten voted 'aye.'"[277] Second, Madison, the First Amendment's primary drafter, opposed the Sedition Act not just on pragmatic or moral grounds but on constitutional ones.[278] Third and finally, the Act did not emerge from a place of constitutional contemplation but from one of political contempt. It was a product of President John Adams's Federalist Party and a powerful weapon wielded against republican printers.[279] After his electoral victory the law lapsed and President Jefferson pardoned those who were convicted under it.[280]

### 3.  Republican Precepts

The Constitution's Framers, whether they ultimately joined the Republican or Federalist parties, were "small-r" republicans, and their ideology was commensurate with a broad, not narrow, freedom of the press. The Founders took their cues not from Blackstone but from England's radical Whigs.[281] Though the intellectual connection between the Framers and English opposition figures like Cato, Wilkes, and Junius has already been explored, a more general consideration of republican ideology is helpful because it contextualizes the events previously described and helps clarify the ways in which history supports legal arguments for an invigorated Press Clause.

---

[276] *See* BIRD, *supra* note 156, at 257.

[277] *See* Anderson, *supra* note 1, at 517.

[278] *See Madison's Report, supra* note 20.

[279] *See* Anderson, *supra* note 1, at 515–16.

[280] *See* New York Times Co. v. Sullivan, 376 U.S. 254, 276 (1964); STONE, *supra* note 156, at 71–73.

[281] *See, e.g.*, Schafer, *supra* note 174, at 457; BIRD, *supra* note 175, at 182.

The republican ideology adopted by the Founding generation was a "pragmatic mix of both republican and liberal themes."[282] It included commitments to the public good,[283] civic equality,[284] anti-corruption,[285] and self-rule through representative and responsive government.[286] It inspired the drafters and ratifiers of the First Amendment "to expand the protection for freedom of expression well beyond the narrow boundaries of the English common law."[287] And the basic idea that the press facilitates transparency and accountability, allowing the people to evaluate the character and views of those who seek public office,[288] explains why eighteenth-century thinkers, printers, and political figures so frequently acknowledged and venerated the structural role of a free press.

### 4.  Making Historical Arguments

From this historical evidence, there are originalist, traditionalist, and living constitutionalist arguments to be made in favor of an invigorated Press Clause. As has been demonstrated, gathering and disseminating newsworthy information, facilitating open political debate, and checking the government—press functions that are incompatible with a heavy-handed regime of seditious libel[289]—were central to the work and self-understanding of printers and the Founders, as well as to

---

[282] *See* Jack M. Balkin, *Which Republican Constitution?*, 32 Const. Comment. 31, 45 (2017).

[283] *See* Gordon S. Wood, The Creation of the American Republic, 1776–1787, at 53–56 (2d ed. 1998).

[284] *See* Balkin, *supra* note 282, at 34 ("The egalitarian version of republicanism" argues that the state "should create the conditions for a broad base of middle-class voters who are financially independent" and can, therefore, "rule themselves."). Civic equality animates the republican conception of freedom-as-non-domination found in contemporary political philosophy. *See* Philip Pettit, On the People's Terms: A Republican Theory and Model of Democracy (2012).

[285] *See* Balkin, *supra* note 282, at 49 ("Corruption is the central enemy of republics, and it is a feature of both individuals and political systems.").

[286] *See* Akhil Reed Amar, *The Central Meaning of Republican Government: Popular Sovereignty, Majority Rule, and the Denominator Problem*, 65 U. Colo. L. Rev. 749, 759–60 (1994); *see also generally* Francesca L. Procaccini, *Reconstructing State Republics*, 89 Fordham L. Rev. 2157 (2021).

[287] *See* Rabban, *supra* note 181, at 796.

[288] *See Madison's Report, supra* note 20, at 570.

[289] *See* Rabban, *supra* note 181, at 796 ("Levy fails to recognize that it was possible for the framers of the first amendment, influenced by republican political theory, to expand the protection for freedom of expression well beyond the narrow boundaries of the English common law while retaining some conception of seditious libel.").

the Constitution's underlying political commitments. These facts suggest a stronger regime of press protections and, at the same time, cut against notions that the Press Clause can or should do no more than protect an individual's right to publish their sentiments.[290] To be clear, these universal publication rights are protected under the Speech Clause, and it is appropriate that they are. But the Press Clause, lest it wither away as mere constitutional surplusage, should be allowed to do more.

On an originalist account, recall that the Press Clause announces a principle—vague language that yields a robust construction zone. In the construction zone, even a committed, original-public-meaning originalist can entertain several "modalities" or "topics" of constitutional argument,[291] including those grounded in the Constitution's structure and purposes, as well as those invoking practical consequences, judicial precedent, political convention, customs, natural law, national ethos, political tradition, and honored authority.[292] It is through these kinds of arguments that the historical evidence can, under an originalist framework, be brought to bear on the Press Clause. The words and actions of the Framers and eighteenth-century printers, set against the ideological backdrop of republicanism, make clear that the freedom of the press plays a structural role in the system of self-government that the Constitution established.[293]

The Constitution's structure and purpose—establishing a republican government under which the people govern themselves—are greatly benefitted by a free and vibrant press capable of disseminating knowledge and checking the government. Invigorating the Press Clause benefits self-government; ignoring it leads to dire consequences.[294] The nation's customs and political traditions, including the longstanding practices of printers, demonstrate acceptance and celebration of an

---

[290] *See generally* Volokh, *supra* note 113.

[291] *See supra* note 140.

[292] *See* Balkin, *supra* note 140, at 183–84.

[293] *See* Jack M. Balkin, *Republicanism and the Constitution of Opportunity*, 94 TEX. L. REV. 1427, 1427 (2016) ("a commitment to a republican political economy follows from the constitutional text and from basic constitutional commitments to republican government").

[294] *See infra* Part IV.C.

active press that gathers news, convenes the public square, and holds power to account. And many honored authorities, from Cato to Madison to Jefferson, understood the structural importance of an active and independent press.

Traditionalism can ground similar arguments. Both traditionalist arguments and originalist arguments in the construction zone depend on textual vagueness; that is, both accept that when the text is clear, it governs. Yet traditionalist and originalist arguments differ when the text is vague. Faced with an open-textured constitutional provision, originalist arguments for or against a given constitutional construction are normative, focused on how constitutional law *should* develop.[295] Traditionalist arguments, by comparison, are descriptive, focused on what past practices *in fact were*.[296] A past practice of significant duration and continuity can inform constitutional meaning. Thus, the actual practices of printers in gathering and disseminating news, checking the government, and providing a forum for public debate would, on a traditionalist account, inform how the Press Clause should be interpreted today.

With these understandings, the Press Clause cannot reasonably be construed as merely protecting the individual's right to publish their views. Professor Eugene Volokh, however, has written a particularly influential article.[297] It canvasses a selection of cases, treatises, newspaper articles, books, pamphlets, and dictionaries and concludes that, for one to argue that the Press Clause did more than protect an individual's right to use the press, they must "look to sources other than text, original meaning, tradition, and precedent" for support.[298] We find Volokh's view of the Press Clause unpersuasive for two main reasons.

First, both the quantity and quality of Volokh's evidence is limited. In an article examining and responding to Volokh's thesis, Matthew Schafer has extensively indexed these evidentiary shortcomings. Volokh cites 117 sources from between 1700 and 1850. Of these, "[e]ighty-one post-dated the ratification of the Press Clause,"

---

[295] *See supra* notes 150–157 and accompanying text (describing the interpretation-construction distinction and the role of normative argument in original-public-meaning originalism when the Constitution's text is vague).

[296] *See supra* notes 159–166 and accompanying text.

[297] *See generally* Volokh, *supra* note 113.

[298] *Id*. at 465.

fifty-one "by a decade or more."[299] Compounding the problem, Volokh fails to adequately account for the views expressed in newspapers themselves—from "1700 to 1791 when the States ratified the First Amendment, Volokh cited just five newspaper articles."[300] This, Schafer suggests, is because Volokh underestimated the extent to which the printing industry mattered to the Founders. As he writes, the

> early American newspaper industry, while nascent, was far from the feeble creature Volokh supposed it to be. On the contrary, newspapers were the leading printed medium in the eighteenth century and hugely influential. Further, while Volokh attempted to diminish the importance of the printer early on, printers were early journalists who were understood by the public as a special class of professionals who were the chief defenders of press freedom.[301]

All told, Schafer argues that "Volokh's article suffers from hard-to-ignore evidentiary issues that undercut his thesis."[302]

Sonja West has also levied a persuasive critique of Volokh's choice of evidence. As she explains, arguments over the Press Clause's meaning, including those made by Volokh, have tended to focus "on press freedom as seen from the top down."[303] West departs from this norm and instead conducts a "'bottom up' exploration of early America's lived experiences with the press—including both the technology of the printing press and how that technology functioned in society."[304]

This focus on actual press practices is commensurate with the observation made by Patrick J. Charles and Professor Kevin Francis O'Neill that the Press Clause enshrined a customary right, the nature and extent of which developed through a century of "intellectual discourse and customary practice."[305] It leads

---

[299] *See* Schafer, *supra* note 185, at 18.

[300] *Id.* at 23.

[301] *Id.* at 5.

[302] *Id.* at 24.

[303] West, *supra* note 235, at 71.

[304] *Id.* at 71–72.

[305] Charles & O'Neill, *supra* note 248, at 1703.

West to conclude that "freedom of the press quite clearly had a job to do—to defend and protect the people and the republic."[306] It was not, as Volokh would seem to have it, "discussed as a matter of individual expressive value."[307]

Apart from the question of the nature and extent of his historical evidence, Volokh also failed to specify or follow a historical methodology. As Schafer observes, "Volokh's research question was a historical one,"[308] yet his article "contained no discussion of a methodology."[309] He "did not explain what he canvassed or how, and he did not explain how he chose what evidence to include and what to exclude. He also provided no explanation of how he analyzed the sources he did collect."[310] The article was, as Charles and O'Neill had argued previously, "not historical, even in the most basic sense."[311]

Second, the way Volokh frames the question—whether the Press Clause referred to the press as a technology or the press as an industry—establishes a false dichotomy. Volokh has defended this choice by arguing that these two options "are the most plausible-seeming alternative meanings of the constitutional text" and "seem to be what various Justices in both *Citizens United* and earlier cases identified as the alternative meanings."[312] But even if this were so, the dichotomy omits a clear conceptual alternative—that the Press Clause can, should, and did protect certain *functions* and that those functions, carried out by printers during the eighteenth century, are today most frequently and capably carried out by the institutional press or "press-as-industry."[313]

All told, available historical evidence supports a structural reading of the Press Clause, one in which the First Amendment ensures that functions indispensable to self-government—checking the government, gathering and disseminating news-

---

[306] West, *supra* note 235, at 67.

[307] *Id.*

[308] *See* Schafer, *supra* note 185, at 24.

[309] *Id.* at 25.

[310] *Id.* at 27.

[311] Charles & O'Neill, *supra* note 248, at 1697.

[312] *See* Eugene Volokh, *Unradical: "Freedom of the Press" as the Freedom of All to Use Mass Communications Technology*, 97 Iowa L. Rev. 1275, 1275 (2012).

[313] *See* Schafer, *supra* note 185, at 10–14 (describing this conceptual omission).

worthy information, and contributing to public discourse—are promoted and protected. The Founding generation clearly valued these functions and cherished the freedom of the press because of them. Those values can and should be actualized through the Press Clause.

## C.    *Functional Arguments*

"Functional" arguments refer to the indispensable functions served by a free and vibrant press.[314] They are not mutually exclusive with historical arguments. As demonstrated above, the checking value, one of the press's most important and celebrated functions, has a strong historical foundation entirely independent of the desirable political effects it produces in the present. Functional arguments also considerably overlap with precedential arguments—as demonstrated below, the Supreme Court has frequently identified and celebrated the structural roles played by the press.[315] This section identifies three primary press functions and focuses on the contemporary benefits they offer to a self-governing society.

### 1.    The Press-as-Proxy

The concept of the "press-as-proxy," most recently elaborated in the work of Professor RonNell Andersen Jones, is a fundamentally practical proposition.[316] In a political system in which the people govern themselves, they must be informed in order to intelligently exercise their political power.[317] Yet prevailing realities con-

---

[314] *Cf.* SMITH, *supra* note 181, at 3 ("With remarkable uniformity but only a little use of history, some scholars have identified certain 'underlying principles' or 'values' embedded in the press clause of the First Amendment. These . . . include the discovery of truth, the maintenance of democratic processes, and the facilitation of necessary change and personal fulfillment.").

[315] *See infra* Part IV.D.

[316] *See* Jones, *supra* note 52.

[317] *See generally* ALEXANDER MEIKLEJOHN, FREE SPEECH AND ITS RELATION TO SELF-GOVERNMENT (The Lawbook Exchange 2014) (1948). The courts have repeatedly connected the First Amendment to democracy. *See, e.g.*, Whitney v. California, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring) ("free speech and assembly" are "functions essential to effective democracy"); Thomas v. Collins, 323 U.S. 516, 530 (1945) (referring to "indispensable democratic freedoms secured by the First Amendment"); United States v. Robel, 389 U.S. 258, 268 (1967) (noting the "basic position of First Amendment rights in our democratic fabric"); Elrod v. Burns, 427 U.S. 347, 357 (1976); Herbert v. Lando, 441 U.S. 153, 187 (1979) (Brennan, J., concurring in part and dissenting in part) (gesturing broadly to "the various senses in which the First Amendment serves democratic values");

strain the people, obstructing their ability to access vital information. Governmental institutions have only limited space available for public observation of trials and meetings.[318] Statutory transparency mechanisms like the Freedom of Information Act[319] are difficult to wield and tend to disproportionately benefit corporate requesters.[320] Making matters worse, many Americans are economically precarious, poor or otherwise living paycheck to paycheck.[321] Simply, not everyone has the time or resources to make democracy their full-time job. It is therefore necessary for a subset of the greater public to "stand in" for the whole, investigate matters of public interest, and report back what it finds.[322] This relationship between printers and the public at large has a pedigree that dates back to the Founding.[323]

The relationship also facilitates effective self-government, a paramount First Amendment value.[324] It can work as a response to concerns that additional press

---

McDonald v. Smith, 472 U.S. 479, 479 (1985) (discussing the "ideals of liberty and democracy that resulted in the First Amendment freedoms to speak, publish, and assemble"); United States v. United Foods, Inc., 533 U.S. 405, 426 (2001) (Breyer, J., dissenting) (alluding to "the First Amendment's concern with democratic self-government"); Barr v. Am. Ass'n of Pol. Consultants, Inc., 140 S. Ct. 2335, 2361 (2020) (Breyer, J., concurring in part and dissenting in part) ("this Court is to apply the First Amendment consistently with the democratic values embodied with that Amendment").

[318] *See generally* Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980) (plurality opinion).

[319] 5 U.S.C. § 552 (2012).

[320] *See* David Pozen, *Freedom of Information Beyond the Freedom of Information Act*, 165 U. PA. L. REV. 1097 (2017).

[321] THOMAS PIKETTY, CAPITAL IN THE TWENTY-FIRST CENTURY (2014); DANIEL MARKOVITS, THE MERITOCRACY TRAP: HOW AMERICA'S FOUNDATIONAL MYTH FEEDS INEQUALITY, DISMANTLES THE MIDDLE CLASS, AND DEVOURS THE ELITE (2019); MATTHEW DESMOND, POVERTY, BY AMERICA (2023).

[322] *See* Sonja R. West, *Press Exceptionalism*, 127 HARV. L. REV. 2434, 2444–45 (2014).

[323] *See* West, *supra* note 235, at 76.

[324] The seminal statement of this view is MEIKLEJOHN, *supra* note 317. "Neo-Meiklejohnian" approaches can be found in, *e.g.*, CASS R. SUNSTEIN, DEMOCRACY AND THE PROBLEM OF FREE SPEECH (1993); OWEN M. FISS, THE IRONY OF FREE SPEECH (1996). Arguments that link the First Amendment to self-government but criticize the Meiklejohnian view can be found in, *e.g.*, Robert C. Post, *Meiklejohn's Mistake: Individual Autonomy and the Reform of Public Discourse*, 64 U. COLO. L. REV. 1109 (1993); Jack M. Balkin, *Cultural Democracy and the First Amendment*, 110 NW. U. L. REV. 1053 (2016).

protections may "encourage hubris" among journalists.[325] Conceived as a proxy for the people, the press should receive constitutional protections that facilitate its reporting—not to increase its standing, esteem, or self-regard, but because better reporting benefits everyone, enabling the people to govern themselves intelligently.

### 2. The Checking Value

The press's checking value and its relationship to self-government is straightforward. The value holds that "professional critics are necessary to check government misconduct" and that the greater public, informed by these critics, will serve as "the ultimate judge of the behavior of public officials."[326] Professor Vincent Blasi makes an extended argument that the checking value is concerned primarily with public rather than private malfeasance. The "abuse of official power is an especially serious evil—more serious than the abuse of private power, even by institutions such as large corporations which can affect the lives of millions of people."[327] Some scholars have differed with this view, contending that the press can and should check private malfeasance as well.[328]

The checking value has substantial historical and precedential pedigree. It frequently appears in eighteenth-century justifications for a broad freedom of the press. And, as demonstrated below, it has been repeatedly celebrated by the Supreme Court. When exercised by the press, the checking function has produced immense benefits. Economist James Hamilton has estimated that specific investigative efforts by local journalists have produced millions of dollars in positive externalities by rooting out government corruption and sparking political reform.[329]

### 3. Informing Public Discourse and Convening the Public Square

Apart from checking the government, the press routinely serves at least two additional functions that benefit democratic self-government. First, through its

---

[325] *See, e.g.*, Anthony Lewis, *A Preferred Position for Journalism?*, 7 HOFSTRA L. REV. 595, 609 (1979).

[326] *Id.* at 542.

[327] *Id.* at 538.

[328] *See, e.g.*, Adam Cohen, *The Media that Need Citizens: The First Amendment and the Fifth Estate*, 85 S. CAL. L. REV. 1, 32–35 (2011).

[329] *See* James T. Hamilton, *Accountability Journalism: A Cost-Benefit Analysis*, NIEMAN REPS. (July 22, 2016), https://perma.cc/HAG2-AJLK; *see generally* JAMES T. HAMILTON, DEMOCRACY'S DETECTIVES: THE ECONOMICS OF INVESTIGATIVE JOURNALISM (2016).

gathering and dissemination of newsworthy information, the press meaningfully contributes to and spurs public discourse. And, in exercising its editorial discretion to prioritize issues of public concern, the press convenes the metaphorical public square, helping guide the development of democratic agendas that structure public discourse.

The first function is straightforward. As Professor Robert Post has argued, the First Amendment is primarily concerned with protecting expression that aids in the formation of public opinion.[330] As further examined in the next section, the Court has acknowledged the ways in which the press does this: It "inform[s] the citizenry of public events and occurrence."[331] It "gather[s] and report[s] the news."[332] It addresses "the public need for information and education with respect to the issues of the time."[333] When the press disseminates these newsworthy facts, it does so through the exercise of "editorial control and judgment."[334] This function—gathering and disseminating newsworthy information—is necessary for a democracy to thrive.

The second function is a bit more complicated. Before the press can report on matters of public concern, it must first decide what it will and will not cover. In exercising this editorial discretion, the press necessarily focuses the public's attention on some issues rather than on others and, in doing so, acts as a "convener and facilitator of community conversation and deliberation."[335]

Professor RonNell Andersen Jones has described the ways in which the press structures public discourse. It does so by "informing, contextualizing, storytelling, discussing, educating, investigating, and researching."[336] The press collates "news,

---

[330] *See* Robert C. Post, Democracy, Expertise, Academic Freedom: A First Amendment Jurisprudence for the Modern State 3–25 (2012).

[331] Estes v. Texas, 281 U.S. 532, 539 (1965).

[332] Cohen v. Cowles Media Co., 501 U.S. 663, 669 (1991).

[333] Thornhill v. Alabama, 310 U.S. 88, 102 (1940).

[334] Miami Herald Publ'g Co. v. Tornillo, 418 U.S. 241, 258 (1974).

[335] *See* Erin C. Carroll, *Beyond the Watchdog: Using Law to Build Trust in the Press*, 3 J. Free Speech L. 57, 65 (2023).

[336] *See* Jones, *supra* note 52, at 520–21.

information, and opinion for listeners who benefit from that curation."[337] Cura-tion, in turn, involves "sifting, prioritizing, and branding" information, activities that "work together to help the institutional press speaker create an identity and help the listener better make autonomous choices about what to hear."[338]

The press's role as dialogue builder is likewise emphasized by Professor David Anderson, who has argued that the "press creates communities in which demo-cratic dialogue can occur."[339] It does this through its willingness to "sift, select, and package the news," creating "a community among people who share the outlet's conception of news sufficiently to subscribe, tune in, or click."[340] When the press produces and disseminates information on the basis of its editorial discretion, it necessarily makes judgments about newsworthiness. This decision-making con-tributes to the formation of democratic agendas, the topics around which public discourse converges.

Debates over what government should do help constitute the government's agenda. So long as government acts—that is, pursues official action on one set of issues rather than another—it acts consistent with a particular agenda.[341] In a de-mocracy, that agenda ideally "corresponds to that of the people and whether the people in their plurality can contest and/or change it."[342] Whether agendas are set through democratic or undemocratic means, they are inevitably set. It is impera-tive, then, to assess who sets them and how. Thus, a crucial press function is its contribution to democratic agendas through the exercise of editorial discretion.

### D.    *Precedential Arguments*

Although the Supreme Court has yet to articulate a specifically designated Press Clause jurisprudence, it has nonetheless identified its elements in many of its deci-sions. Scholars have described myriad ways in which the Court has treated the press

---

[337] *Id.* at 529.

[338] *Id.* at 531.

[339] *See* David A. Anderson, *The Press and Democratic Dialogue*, 127 HARV. L. REV. F. 331, 332 (2014).

[340] *Id.* at 333.

[341] *See* Daniel Carpenter, *Agenda Democracy*, 26 ANN. REV. POL. SCI. 193, 199 (2023) ("I define an agenda as that subset, among a set of items, to which public institutional action and/or public political activity is restricted").

[342] *Id.* at 202.

as a unique institution even when it has declined to ground such treatment in the Press Clause expressly.[343] Lower courts have done so as well.[344]

This section provides several representative examples of cases in which the Supreme Court has both acknowledged and protected the press's structural roles, Supreme Court decisions that have treated the press preferentially and lower court decisions that have done the same. To be sure, these rulings do not expressly hold that the Press Clause is a source of independent rights. But they do acknowledge the unique role of the press in terms that press advocates can and should invoke in support of a robust Press Clause.

### 1.   Judicial Language: Recognizing Press Functions

Though it has rarely done so in recent years,[345] the Supreme Court has long recognized the structural role of the press in a wide variety of First Amendment majority and plurality decisions. While non-press actors sometimes perform similar functions to those undertaken by the press, and receive legal protections when they do so, the press's core mission is to perform such functions on a regular basis. This section provides a chronological sampling of twelve representative instances in which the Court has, at least implicitly, recognized as much.

---

[343] *See, e.g.*, West, *supra* note 110, at 1028; Erik Ugland, *Demarcating the Right to Gather News: A Sequential Interpretation of the First Amendment*, 3 DUKE J. CONST. L. & PUB. POL'Y 113, 127 (2008); Anderson, *supra* note 105, at 492 (2002); Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 STAN. L. REV. 927, 927 (1992).

[344] *See, e.g.*, Donald J. Trump v. Mary L. Trump, 189 N.Y.S.3d 430 (Sup. Ct. 2023) (concluding that New York anti-SLAPP law prohibits tortious interference claims designed to chill speech); Highland Cap. Mgmt., L.P. v. Dow Jones & Co., Inc., 178 A.D.3d 572, 574 (2019) ("The tortious interference with contractual relations claim was properly dismissed. Defendants' conduct as alleged in the complaint was incidental to the lawful and constitutionally protected process of news gathering and reporting."); Huggins v. Povitch, No. 131164/94, 1996 WL 515498, *9 (N.Y. Sup. Ct. Apr. 19, 1996) ("The Court agrees that a broadcaster whose motive and conduct is intended to foster public awareness or debate cannot be found to have engaged in the wrongful or improper conduct required to sustain a claim for interference with contractual relations."); *see also* cases cited *infra* notes 375–377.

[345] *See* sources cited *supra* note 106. For every reference to the rights of the "lonely pamphleteer" in Supreme Court opinions, *see, e.g.*, Branzburg v. Hayes, 408 U.S. 665, 704 (1972), there are multiple cases in which the Court has recognized the constitutional significance of the core functions performed by the institutional press as set out in this section.

- *Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697 (1931). In *Near*, the Supreme Court examined whether a Minnesota law permitting the prior restraint of newspapers, magazines, or other periodicals found to be "obscene, lewd, and lascivious" or "malicious, scandalous, and defamatory" violated the First Amendment.[346] Holding that it did, the Court held that "the liberty of the press and of speech" is "safeguarded by the due process clause of the Fourteenth Amendment," acknowledging both rights rather than merely the latter.[347] It then explained that, while the "liberty of the press" historically meant "principally although not exclusively immunity from previous censorship," the press right "had broadened with the exigencies of the colonial period and with the efforts to secure freedom from oppressive administration."[348] The Court observed explicitly that freedom of the press "was especially cherished for the immunity it afforded from previous restraint of the publication of censure of public officials and charges of official misconduct."[349] *Near* invoked the checking value, recognized a special role for the press, and repudiated the idea that freedom of the press consisted solely of an immunity from prior restraint.

- *Grosjean v. American Press Co.*, 297 U.S. 233 (1936). In *Grosjean*, the Court struck down a Louisiana law imposing a 2% tax on the gross receipts of "any newspaper, magazine, periodical or publication whatever having a circulation of more than 20,000 copies per week."[350] In doing so, it held that the "mere exemption from previous censorship" embodied in the Blackstonian conception of a "free press" was, as early as the eighteenth century, "recognized as too narrow a view of the liberty of the press"[351] and that a "free press stands as one of the great interpreters between the government and the people."[352] *Grosjean* invoked the press's contribution to public discourse.

---

[346] 283 U.S. at 702.

[347] *Id.* at 707.

[348] *Id.* at 716–17.

[349] *Id.* at 717.

[350] 297 U.S. at 240.

[351] *Id.* at 246.

[352] *Id.* at 250.

- *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). The Court in *Sullivan* established the "actual malice" standard for defamation suits brought by public officials;[353] announced the incompatibility of the Sedition Act with the First Amendment, at least in the "court of history;"[354] and, quoting Madison, emphasized that "'the press has exerted a freedom in canvassing the merits and measures of public men," reaffirming his view that the "right of free public discussion of the stewardship of public officials" is "a fundamental principle of the American form of government."[355] *Sullivan* invoked both the checking value and the press's contribution to public discourse.[356]

- *Estes v. Texas*, 381 U.S. 532 (1965). In *Estes*, the Court assessed whether a criminal defendant was "deprived of his right under the Fourteenth Amendment to due process by the televising and broadcasting of his trial."[357] Holding that he was, the Court nevertheless acknowledged that the "free press has been a mighty catalyst in awakening corruption among public affairs, exposing corruption among public officers and employees

---

[353] New York Times Co. v. Sullivan, 376 U.S. 254, 279–82 (1964).

[354] *Id.* at 276.

[355] *Id.* at 275 (quoting *Madison's Report*, *supra* note 20, at 575).

[356] The publication before the Court in *Sullivan* was a paid advertisement in a newspaper, not a news report, and the defendants included not just a newspaper but also individuals who lent their names to the advertisement as well. Nevertheless, the Court's decision was expressly motivated by its view that the First Amendment requires protection for the institutional press in defamation cases precisely because, unlike individual speakers, it performs a constitutionally protected function on an ongoing basis and is therefore uniquely susceptible to governmentally imposed sanctions. *See, e.g., Sullivan*, 376 U.S. at 266 ("Any other conclusion would discourage newspapers from carrying 'editorial advertisements' of this type, and so might shut off an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities—who wish to exercise their freedom of speech even though they are not members of the press"); *id.* at 278 ("Whether or not a newspaper can survive a succession of such judgments, the pall of fear and timidity upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive.").

[357] 381 U.S. at 535.

and generally informing the citizenry of public events and occurrences, including court proceedings."[358] *Estes* invoked the checking value, the press's contribution to public discourse, and the press as proxy.

- *Mills v. Alabama*, 384 U.S. 214 (1966). The Court in *Mills* held that an Alabama law that made it "a crime for the editor of a daily newspaper to write and publish an editorial on election day"[359] violated the "constitutionally guaranteed freedom of the press."[360] The *Mills* Court emphasized that the press mediates the relationship between the people and their representatives in government. The "press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people who they were selected to serve."[361] Thus, the "[s]uppression of the right of the press to praise or criticize governmental agents and to clamor and contend for or against change . . . muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free."[362] *Mills* invoked both the checking value and the press's contribution to public discourse.

- *Sheppard v. Maxwell*, 384 U.S. 333 (1966). In *Sheppard*, the Court held that a criminal defendant's due process rights were violated by "the massive, pervasive and prejudicial publicity that attended his prosecution."[363] It nonetheless recognized that a "responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries."[364] And it went further still, explaining that the "press does not simply publish information about trials

---

[358] *Id.* at 539.

[359] *Mills*, 384 U.S. at 215.

[360] *Id.* at 219.

[361] *Id.*

[362] *Id.*

[363] *Sheppard*, 384 U.S. at 335.

[364] *Id.* at 350.

but guards against the miscarriage of justice by subjecting the police, pros-ecutors, and judicial processes to extensive public scrutiny and criti-cism."[365] *Sheppard* invoked the checking value and the press as proxy.

- *Time, Inc. v. Hill*, 385 U.S. 374 (1967). The Court in *Hill* held that actions brought pursuant to a New York statute prohibiting "the use in advertising or to promote the sale of goods, of another's name, portrait or picture with-out his consent"[366] must satisfy a liability standard of "knowing or reckless falsity."[367] The Court explained that the press's "constitutional guarantees" were "not for the benefit of the press so much as for the benefit of all of us. A broadly defined freedom of the press assures the maintenance of our po-litical system and an open society."[368] *Hill* invoked the press's contribution to public discourse and alluded to the press as proxy.

- *New York Times Co. v. United States*, 403 U.S. 713 (1971). Holding that the United States could not enjoin the *New York Times* and *Washington Post* from publishing the Pentagon Papers, the Court in a per curiam decision reaffirmed that prior restraints are presumptively unconstitutional.[369] In his separate opinion, Justice Black discussed the freedom of the press and his explanation of why the First Amendment did so is worth quoting at length. Invoking the checking value, he wrote that

> [i]n the First Amendment the Founding Fathers gave the free press the pro-tection it must have to fulfill its essential role in our democracy. The press was to serve the governed, not the governors. The Government's power to censor the press was abolished so that the press would remain forever free to censure the Government. The press was protected so that it could bare the secrets of government and inform the people. Only a free and unrestrained press can effectively expose deception in government. And paramount among the responsibilities of a free press is the duty to prevent any part of the government from deceiving the people and sending them off to distant lands to die of foreign fevers and foreign shot and shell. In my view, far from

---

[365] *Id.*

[366] 385 U.S. at 381.

[367] *Id.* at 397. This is the "actual malice" standard established by New York Times Co. v. Sulli-van, 376 U.S. 254, 279–83 (1964).

[368] 385 U.S. at 389.

[369] 403 U.S. at 714.

deserving condemnation for their courageous reporting, the New York Times, the Washington Post, and other newspapers should be commended for serving the purpose that the Founding Fathers saw so clearly. In revealing the workings of government that led to the Vietnam war, the newspapers nobly did precisely that which the Founders hoped and trusted they would do.[370]

- *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974). In *Tornillo*, the Court struck down a Florida law "granting a political candidate a right to equal space to reply to criticism and attacks on his record by a newspaper" as a violation of "the guarantees of a free press."[371] In reaching its decision, the Court held that the freedom of the press included the "free discussion of government affairs,"[372] drawing on both the checking value and the press's contribution to public discourse. In his opinion for the Court, Chief Justice Burger emphasized that the role newspaper editors play in editorial decisionmaking is protected by the First Amendment,[373] while, in his concurring opinion, Justice White expressly asserted that the First Amendment prohibits governmental control of the institutional press.[374]

---

[370] *Id.* at 717 (Black, J., concurring).

[371] 418 U.S. at 243.

[372] *Id.* at 257.

[373] *Id.* at 258 ("The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.").

[374] *Id.* at 259 (White, J., concurring) ("A newspaper or magazine is not a public utility subject to 'reasonable' governmental regulation in matters affecting the exercise of journalistic judgment as to what shall be printed. We have learned, and continue to learn, from what we view as the unhappy experiences of other nations where government has been allowed to meddle in the internal editorial affairs of newspapers. Regardless of how beneficent-sounding the purposes of controlling the press might be, we prefer 'the power of reason as applied through public discussion' and remain intensely skeptical about those measures that would allow government to insinuate itself into the editorial rooms of this Nation's press." (citations omitted)).

Most recently, in *Moody v. NetChoice,* the Court called *Tornillo a* "seminal case." 144 S. Ct. 2383, 2400 (2024). Drawing on precedents developed since 1974, it extended the protections in *Tornillo* to apply to parties beyond the traditional press, including all private speakers, when they perform analogous editorial functions. Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal., 475 U.S.

- *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975). The Court in *Cox Broadcasting* held that a Georgia statute criminalizing the publication of a rape victim's name unconstitutionally limited "expression" protected by the First Amendment. [375] In doing so, it balanced "claims of privacy" against "those of the free press."[376] It decided for the latter, invoking the press as proxy, the checking value, and the press's contribution to public discourse:

  > [I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally. [377]

- *Nebraska Press Association v. Stuart*, 427 U.S. 539 (1976). The Court in *Nebraska Press Association* struck down a prior restraint issued by a trial judge in a criminal case. [378] In doing so, it reaffirmed that "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights," harms that "can be particularly great

---

1 (1986); Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622 (1994); Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557 (1995); Moody v. NetChoice, 144 S. Ct. 2383, 2403 (2024) ("[T]he core teaching elaborated in the above-summarized decisions: The government may not, in supposed pursuit of better expressive balance, alter a private speaker's own editorial choices about the mix of speech it wants to convey."); *id.* at 2405 ("Like the editors, cable operators, and parade organizers this Court has previously considered, the major social-media platforms are in the business, *when curating their feeds*, of combining 'multifarious voices' to create a distinctive expressive offering.") (emphasis added) (citation omitted).

[375] 420 U.S. at 495.

[376] *Id.* at 491.

[377] *Id.* at 491–92.

[378] 427 U.S. at 539–40.

when the prior restraint falls upon the communication of news and commentary on current events."[379] Here the Court drew on the checking value and the press's contribution to public discourse.

- *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983). In *Minneapolis Star*, the Court struck down a special tax on paper and ink products that effectively "singled out the press for special treatment."[380] In so holding, the Court warned that when "the State singles out the press" for negative treatment, "the political constraints that prevent a legislature from passing crippling taxes generally are weakened," allowing states to "check critical comment by the press, undercutting the basic assumption of our political system that the press will often serve as an important restraint on government."[381] *Minneapolis Star* invoked the checking value.

Such reasoning and the precedents they undergird should be extremely powerful in urging lower federal courts, state courts, and perhaps the Supreme Court itself to hold that, properly construed, the Press Clause affords the press broad protection. The contrary position—that the Press Clause should be given no independent meaning at all—is a conclusion that no court should reach.

### 2.  Judicial Action: Treating the Press Differently

Legal scholars, specifically Professors C. Edwin Baker and Sonja West,[382] have identified several areas of law in which the Supreme Court has treated the press differently from other entities and individuals.[383] In other words, even as some of the Court's jurisprudence has seemed to all but collapse speech and press protec-

---

[379] *Id.* at 559.

[380] 460 U.S. at 582.

[381] *Id.* at 585.

[382] *See* Baker, *supra* note 104; West, *supra* note 104.

[383] Professor Baker's article in particular endorses the idea that the Press Clause aimed "to protect a Fourth Estate or, more expansively, to protect media entities because of their instrumental contribution to democracy and a free society." Baker, *supra* note 104, at 956. From this premise, he also examines how the press is in fact treated differently in, *e.g.*, the areas of copyright, *id.* at 973–76; privacy and information policy, *id.* at 987–90; and commercial speech, *id.* at 1004–08.

tions, its actual resolution of legal disputes demonstrates that the Court well understands the press's unique importance. These include cases concerning taxation,[384] editorial discretion,[385] and prior restraint.[386]

In the lower courts, the press has also been treated differently than the general public even if courts have not attributed that differential treatment to deeper constitutional principles. For example, courts have rejected otherwise unobjectionable claims of tortious interference with contract because the allegedly unlawful conduct at issue involved newsgathering.[387] Some (though not all) lower courts tasked with deciding "right to record" cases have upheld the right to record in public on the basis of newsgathering freedom.[388] These cases illustrate that additional protection

---

[384] West, *supra* note 104, at 737 ("In a series of cases, the Court held that taxation of the press receives unique First Amendment protection."); Baker, *supra* note 104, at 1008 ("Government authority to tax media businesses is unabashedly limited in ways that its authority to tax other businesses clearly is not."); *accord* Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue, 460 U.S. 575, 586 (1983).

[385] West, *supra* note 104, at 740 ("these cases involve media defendants and regulations explicitly aimed at the media"); *accord* Miami Herald Publ'g Co. v. Tornillo, 418 U.S. 241, 256 (1974) (holding that the government cannot compel "a newspaper to print what it would not otherwise print"); CBS, Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 95, 118 (1973) (stating that the First Amendment protects the "journalistic judgment of priorities and newsworthiness").

[386] West, *supra* note 104, at 742 ("Much like with taxation, the Court has also expressed concern for prior restraints on the press."); Baker, *supra* note 104, at 997–99; *accord* Near v. Minnesota, 283 U.S. 697 (1931) (no prior restraint on press); Lowe v. SEC, 472 U.S. 181 (1985) (prior restraint constitutional as applied by SEC to securities advisors).

[387] *See, e.g.*, *supra* note 344 and accompanying text.

[388] *See, e.g.*, ACLU of Ill. v. Alvarez, 679 F.3d 583, 595–97 (7th Cir. 2012) (holding that the "act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording" and thus, because there is "no fixed First Amendment line between the act of creating speech and the speech itself," "[a]udio recording is entitled to First Amendment protection"); Turner v. Driver, 848 F.3d 678, 688 (5th Cir. 2017) (holding that newsgathering is entitled to First Amendment protection); Fields v. City of Philadelphia, 862 F.3d 353, 359 (10th Cir. 2017) ("Accordingly, recording police activity in public falls squarely within the First Amendment right of access to information. As no doubt the press has this right, so does the public."); Project Veritas Action Fund v. Rollins, 982 F.3d 813, 835–36 (1st Cir. 2020) (applying intermediate scrutiny to government ban on covert recording of police officers because such recording is constitutionally-protected newsgathering); PETA, Inc. v. N.C. Farm Bureau Fed'n, Inc., 60 F.4th 815, 829–30 (4th Cir. 2023) (holding that the First Amendment protects both "newsgathering and publishing activities," including

for the press in particular circumstances is hardly anathema to the First Amendment and may assist in laying the groundwork for more direct holdings to that effect.

### E.    Analogical Arguments and the Free Exercise Clause

Recent developments in the Supreme Court's Free Exercise Clause jurisprudence are instructive for crafting analogous Press Clause protections. The Court has recently embraced what scholars have called the "most-favored-nation" approach to free exercise.[389] The Court recently expanded this multifaceted doctrine[390] in *Fulton v. City of Philadelphia* where it held that "[a] law . . . lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way."[391] Put differently, if a law permits secular activity that harms the asserted interest underlying that law but prohibits analogous religious activity, the law has treated religious activity unfairly and has thereby violated the Free Exercise Clause.

The Court also held that it is presumptively unconstitutional for government officials to retain discretion to grant individualized exemptions from neutral laws of general applicability, because such a system "invites the government to decide which reasons for not complying with [its] policy are worthy of solicitude."[392]

Analogous arguments in support of more robust press protections are compelling. The press, like religion, is difficult yet not impossible to define.[393] The press,

---

undercover recording); Price v. Garland, 45 F.4th 1059, 1075 (D.C. Cir. 2022) (concluding that "regulations governing filmmaking on government-controlled property need only be 'reasonable'" and that statute's exemption for newsgathering activities is not suspect because, "[c]onsidering the centrality of the unimpeded functioning of the news media to the health of the Republic, an exception for 'news-gathering' is certainly reasonable").

[389] *See, e.g.*, Andrew Koppelman, *The Increasingly Dangerous Variants of the "Most-Favored-Nation" Theory of Religious Liberty*, 108 Iowa L. Rev. 2237 (2023).

[390] *Id.* at 2256 (identifying seven variants of the most-favored-nation approach).

[391] 593 U.S. 522, 534 (2021) (cleaned up).

[392] *See* Fulton v. City of Philadelphia, 593 U.S. 522, 537 (2021) (cleaned up).

[393] *See infra* Part VI.B. We do not address the relationship between the "most-favored-nation" approach and the Speech Clause here, though it is plausible that this doctrine should be applicable in a speech context. This would mean that if a law limited speech but allowed other kinds of conduct or provided for discretionary exemption, it would not be generally applicable and might violate the speech clause. However, it is easier to envision how the doctrine adapts to the Press Clause than to the Speech Clause. The analogy between "press" and "religion" is more exact than that between

like religion, is protected by the First Amendment. If the Court can identify "religious exemptions" as against "secular exemptions" from laws of general applicability, it is capable of identifying exemptions for the press as against exemptions for the general public. There is no valid basis for protecting one First Amendment freedom but refraining from protecting another.

Simply put, an argument by analogy would assert that (1) laws of general applicability that limit newsgathering must, if they grant exemptions for conduct other than newsgathering, also grant analogous newsgathering exemptions and (2) when laws of general applicability that limit newsgathering include a system of individualized exemptions granted at the discretion of government officials, those laws presumptively violate the Press Clause.[394]

## V.    WHAT MIGHT THE PRESS CLAUSE DO?

Part IV set out evidence and arguments that support the development of a robust Press Clause. This Part discusses some ideas as to what such a Press Clause could actually accomplish. Starting with the most commensurate with conventional constitutional wisdom and ending with the most different from it,[395] an invigorated Press Clause could, at a high level of generality, work as a source of (1)

---

"speech" and "religion," as the concepts of press and religion cover both institutional parties and kinds of conduct. Many laws that prohibited speech but allowed other conduct would also be found unconstitutional on other grounds, leaving limited practical use for "most-favored-nation" arguments. How the doctrine would function when applied to speech requires further analysis and consideration.

[394] *See generally* Tim Tai, *The Most-Favored-Nation Press Clause* (working paper on file with authors).

[395] The First Amendment is traditionally thought to bestow negative, not positive, rights. Negative rights limit government action while positive rights compel it. Negative rights consist in freedom *from* something, positive rights freedom *to* something. The distinction between negative and positive liberty is often attributed to Isaiah Berlin. *See* ISAIAH BERLIN, *Two Concepts of Liberty*, *in* THE PROPER STUDY OF MANKIND: AN ANTHOLOGY OF ESSAYS 191 (1997). Courts typically understand the Bill of Rights generally and First Amendment specifically in negative rather than positive terms. *See, e.g.*, Wis. Educ. Ass'n Council v. Walker, 705 F.3d 640, 645 (7th Cir. 2013) ("The Bill of Rights enshrines negative liberties. It directs what government may not do to its citizens, rather than what it must do for them."); Pahls v. Thomas, 718 F.3d 1210, 1239 (10th Cir. 2013) ("The First Amendment does not impose upon public officials an affirmative duty to ensure a balanced presentation of competing viewpoints. To the contrary, freedom of speech is a negative liberty."); *accord* Helen Norton, *Reinvigorating the Press Clause Through Negative Theory*, KNIGHT FIRST AMEND. INST. (Dec. 6, 2023), https://perma.cc/78CX-BC2H. *But see* Red Lion Broad. Corp. v. FCC, 395 U.S.

constitutional protection for the press against adverse government action, (2) constitutional authority for the political branches to pass legislation that benefits the press, and (3) constitutional obligation for the political branches to pass said legislation. Whether applying one of these approaches or all of them, a meaningful Press Clause jurisprudence could aid the press on issues of access, newsgathering, editorial autonomy, publication, and economic viability. This Part examines each of these areas in turn. While many of these conceptualizations suggest ways that an invigorated Press Clause might cause the Supreme Court to revisit and rethink past decisions, it is also just as valuable to think about how the concepts being discussed in this Report could be used to address issues as they arise in the lower courts, administrative areas, and even state court proceedings.

### A.    Access

On access issues, a robust Press Clause could:

- Prompt the courts to expand the First Amendment right of access beyond judicial proceedings[396] and loosen the "history" prong of the "history and logic" test.[397] Certain lower court decisions have already endorsed these understandings; an invigorated Press Clause, appreciating the social and political importance of information access and dissemination, could move the Supreme Court to universalize them.

- Prompt courts and other governmental entities to exempt the press from curfews, dispersal orders, and other time, place, and manner restrictions so as to facilitate reporting on unfolding matters of public concern. The Supreme Court has already held that, to be consistent with the First Amendment, time, place, and manner restrictions must be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information" at issue.[398] A robust

---

367, 390 (1969) (concluding that the public has positive rights to "receive suitable access to social, political, esthetic, moral, and other ideas and experiences").

[396] *See supra* note 45.

[397] NYCLU v. N.Y.C. Transit Auth., 684 F.3d 286, 298–99 (2d Cir. 2012) ("The Supreme Court has not specified how courts should determine whether the experience and logic test applies to administrative proceedings. But we have good reason to think that this determination does not involve asking whether the proceedings in question have a history of openness dating back to the Founding.").

[398] *See, e.g.,* Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984).

Press Clause could obligate the government to exclude the press from curfews, dispersal orders, and the like lest those restrictions be struck down as insufficiently tailored. It could, and should, obligate courts to take into consideration the functions of the press, distinct from non-press actors, in evaluating whether a given order meets the demands of "narrow tailoring."

- Prompt courts and other public bodies to disclose records and open processes to public inspection before formal access requests are made[399] and permit fuller *in camera* review of allegedly classified documents to reduce government opacity.[400]

- Prompt the courts to adopt the rationale in Justice Potter Stewart's concurrence in *Richmond Newspapers*: When there is only limited access to a given government proceeding, space must be reserved for members of the press.[401]

### B.    Newsgathering Conduct

On newsgathering issues, an invigorated Press Clause could:

- Prompt courts to recalibrate the relationship between laws of general applicability and newsgathering rights. The Supreme Court has held that generally applicable laws may "incidentally" impact the ability of the press to gather the news without violating the First Amendment,[402] but has not articulated the standard for distinguishing direct burdens from incidental ones. Under the status quo, the law can seriously hinder newsgathering—

---

[399] *See* Pozen, *supra* note 320, at 1148–55.

[400] *See* Ian MacDougall, Note, *CIPA Creep: The Classified Information Procedures Act and Its Drift into Civil National Security Litigation*, 45 Colum. Hum. Rts. L. Rev. 668 (2014).

[401] Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 600 n.3 (1980) (Stewart, J., concurring) (arguing that, when not all who wish to attend a trial may do so due to practical restrictions, "the press must be assured access").

[402] *See* Cohen v. Cowles Media Co., 501 U.S. 663, 669 (1991) ("generally applicable laws do not offend the First Amendment simply because their enforcement against the press *has incidental effects* on its ability to gather and report the news") (emphasis added); *see also* Associated Press v. NLRB, 301 U.S. 103, 133 (1937) ("The publisher of a newspaper has no special immunity from the application of general laws."); Branzburg v. Hayes, 408 U.S. 665, 682 (1972) ("the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability").

*Journal of Free Speech Law* [2024]

including through common law contract doctrines,[403] tort claims,[404] drone regulations,[405] "ag-gag" laws,[406] and more. A robust Press Clause could constitutionalize these issues and implement several approaches that more strongly protect newsgathering:

- o First, courts, by reaffirming that newsgathering is a fundamental press right, could grant additional due process protections before any law can be applied in a way that limits that right. Under the Supreme Court's due process jurisprudence, if a fundamental right is at risk, the government must provide more process to the rights-holder.[407] The Court has previously held that First Amendment rights deserve particularly rigorous due process protections.[408] Understanding press freedom as a fundamental right could place

---

[403] *See Cohen*, 501 U.S. 663.

[404] *See* Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505 (4th Cir. 1999).

[405] Nat'l Press Photographers Ass'n v. McCraw, 90 F.4th 770, 787–88 (5th Cir. 2024) ("The operation of a drone is not inherently expressive—nor is it expressive to fly a drone 400 feet over a prison, sports venue, or critical infrastructure facility. And nothing in the No-Fly provisions has *anything* to do with speech or expression. These are flight restrictions, not speech restrictions.").

[406] *See* CTR. FOR CONST. RTS., *supra* note 67, at 2 ("[A]g-gag laws vary, but all include one or more of three key elements: (1) prohibiting documentation of agricultural practices; (2) prohibiting misrepresentations in job applications utilized to gain access to closed facilities; and (3) requiring immediate reporting of illegal animal cruelty").

[407] *See, e.g.*, Goldberg v. Kelly, 397 U.S. 254, 268 (1970); Mathews v. Eldridge, 424 U.S. 319, 334–335 (1976); Lassiter v. Dep't of Soc. Servs. of Durham Cnty., 452 U.S. 18, 24 (1981).

[408] *See, e.g.*, Marcus v. Search Warrants of Property at 104 East Tenth St., 367 U.S. 717, 731 (1961) ("It follows that, under the Fourteenth Amendment, a State is not free to adopt whatever procedures it pleases for dealing with obscenity as here involved without regard to the possible consequences for constitutionally protected speech."); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 66 (1963) ("[T]he Fourteenth Amendment requires that regulation by the States of obscenity conform to procedures that will ensure against the curtailment of constitutionally protected expression, which is often separated from obscenity only by a dim and uncertain line. . . . Our insistence that regulations of obscenity scrupulously embody the most rigorous procedural safeguards is therefore but a special instance of the larger principle that the freedoms of expression must be ringed about with adequate bulwarks.") (citations omitted); Freedman v. Maryland, 380 U.S. 51, 58 (1965) ("The teaching of our cases is that, because only a judicial determination in an adversary proceeding en-

greater obligations on government to provide additional process before it infringes on newsgathering. Thus, for example, the Press Clause could be held to require that journalists be permitted to appeal judicial orders requiring them to divulge the identities of confidential sources without first subjecting themselves to a finding of contempt. Similarly, the Court might be compelled to revisit its holding in *Zurcher* and hold instead that the Press Clause requires that the press receive prior notice and an opportunity to be heard before its newsrooms can be subject to search.[409]

○ Second, the courts could adopt a regime similar to that created in its Free Exercise jurisprudence, as we discuss in Part IV.E of this Report.[410]

• Prompt the Supreme Court to revisit its decision in *Branzburg v. Hayes*,[411] and/or persuade lower federal and state courts to adopt more press-protective positions on reporter's privilege. Under the status quo, the reporter's privilege against disclosing confidential sources exists as a patchwork of protections that differ by jurisdiction at both the federal and state levels.[412]

○ An invigorated Press Clause could provide grounds for formally adopting Justice Powell's *Branzburg* concurrence in which he stressed that a "newsman" who is "called upon to give information bearing only a remote and tenuous relationship to the subject of [a government] investigation" or who believes "that his testimony implicates confidential source relationships without a legitimate need of law enforcement" must be permitted to move to quash a subpoena on First Amendment grounds.[413] Such a motion, Powell urged, "should be judged on its facts by the striking of a proper

---

sures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint."); Shuttlesworth v. City of Birmingham, 394 U.S. 147, 153 (1969); Henry P. Monaghan, *First Amendment "Due Process"*, 83 HARV. L. REV. 518 (1970).

[409] Zurcher v. Stanford Daily, 436 U.S. 547 (1978).

[410] *See infra* Part IV.E.

[411] 408 U.S. 665 (1972).

[412] *See Reporter's Privilege Compendium*, REPORTERS COMM. FOR FREEDOM OF THE PRESS, https://perma.cc/S2NW-5Q7L.

[413] 408 U.S. at 710 (Powell, J., concurring).

balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct."[414]

    o  Alternatively, an invigorated Press Clause could support adopting Justice Stewart's *Branzburg* dissent, which would require the government to demonstrate that (1) the "information sought is clearly relevant to a precisely defined subject of government inquiry," (2) it is "reasonable to think the witness in question has that information," and (3) "there is not any means of obtaining the information less destructive of First Amendment liberties" before it can compel the press to disclose confidential sources and information.[415]

- Encourage Congress to pass a federal shield law such as the Protect Reporters from Exploitative State Spying ("PRESS") Act, recently proposed in the House and Senate.[416] The Act prohibits a "Federal entity" from compelling a "covered journalist to disclose protected information" unless the government can demonstrate, by a preponderance of the evidence, that disclosure "is necessary to prevent, or to identify any perpetrator of, an act of terrorism against the United States" or that disclosure "is necessary to prevent a threat of imminent violence, significant bodily harm, or death, including specified offenses against a minor."[417]

---

[414] *Id.*

[415] *Id.* at 740 (Stewart, J., dissenting).

[416] *See* CONGRESSMAN JAMIE RASKIN, *Raskin, Kiley Introduce Press Act to Protect Reporters' First Amendment Rights Against Government Surveillance* (June 21, 2023), https://perma.cc/NSR6-Z5ZN; SENATOR RON WYDEN, *Wyden, Lee and Durbin Introduce PRESS Act to Protect Reporters' First Amendment Rights Against Government Surveillance* (June 21, 2023), https://perma.cc/E7CB-HTDR.

[417] Protect Reporters from Exploitative State Spying Act of 2023, H.R. 4250, 118th Cong. (2023), https://perma.cc/FJ7V-V6D6.

- Lead the Department of Justice to adopt guidelines, as it has done under the Biden Administration, that provide journalists insulation against Department investigations[418] and lead other federal agencies, including Immigration and Customs Enforcement[419] and the Securities and Exchange Commission, to do the same.[420]

- Prompt the courts to construe the Supreme Court's decision in *Bartnicki v. Vopper* consistent with the recommendations of Professor Erik Ugland and Christina Mazzeo.[421] Invoking the Press Clause as they suggest, courts could reaffirm the principle that when one "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order";[422] impose no liability for the mere possession of newsworthy information, including under the Espionage Act;[423] and embrace an inclusive, contextual conception of "public concern" such that the publication of newsworthy information is not wrongfully excluded from First Amendment protection.[424]

### C.    Editorial Autonomy

On issues of editorial autonomy, an invigorated Press Clause could:

---

[418] *Policy Regarding Obtaining Information from or Records of Members of the News Media; and Regarding Questioning, Arresting, or Charging Members of the News Media*, 87 FED. REG. 66239 (Nov. 3, 2022).

[419] Hamed Aleaziz, *ICE Is Creating a New Policy for Subpoenaing Reporters After Trying to Force BuzzFeed News to Turn Over Information*, BUZZFEED NEWS (Mar. 21, 2022), https://perma.cc/C5BM-2FVM ("After Congress demanded changes, ICE officials will now have to get approval from senior leaders before issuing an administrative subpoena to members of the media.").

[420] Andrew Goudsward, *SEC, Covington End Legal Fight Over Client Names, but Dispute Isn't Over*, REUTERS (Sept. 18, 2023), https://perma.cc/C9JY-565A.

[421] *See* Ugland & Mazzeo, *supra* note 63, at 193–206.

[422] Smith v. Daily Mail Publ'g, 443 U.S. 97, 103 (1979).

[423] Ugland & Mazzeo, *supra* note 63, at 203–04 ("Absent a compelling government interest, laws like the Espionage Act and the Driver's Privacy Protection Act should be struck down to the extent they are designed to, or have the effect of, halting the flow of newsworthy information. If laws either explicitly or effectively prohibit the receipt or possession of newsworthy information by non-custodians, those provisions should be strictly scrutinized and, in most cases, struck down.").

[424] *Id.* at 204–06.

- Build on the Supreme Court's reaffirmation of *Tornillo* in the *NetChoice* cases by leading courts generally to recognize that editorial autonomy is especially crucial for the press and is deserving of unique protections under the Press Clause separate, apart from and in addition to those afforded to tech platforms and others under the Speech Clause.[425]

- Prompt the Court to revisit cases like *Herbert*[426] and *Zurcher*.[427] Specifically, a robust Press Clause would demand a sphere of editorial autonomy beyond the choice to publish or not publish that would afford the work product and internal communications that precede such decisions—including drafts, notes, communications, unused footage, and the like—a privilege from compelled disclosure analogous to that which protects the identities of journalists' confidential sources.

### D. Publication

On publication issues, an engaged Press Clause could:

- Prompt the Supreme Court to reaffirm *Sullivan* yet again in light of recent efforts to overrule and otherwise delegitimize it.[428]

- Prompt the courts to constitutionalize and bolster the fair report privilege recognized at common law. This privilege provides that "publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported."[429] An expanded fair report privilege would protect reporting not just on government proceedings and records,

---

[425] Moody v. NetChoice, 144 S. Ct. 2383 (2024).

[426] 441 U.S. 153 (1979).

[427] 436 U.S. 547 (1978).

[428] *See supra* note 83. In its 2023 decision in *Counterman v. Colorado*, the Supreme Court appeared to do just that, albeit neither in the context of a defamation action nor in the name of the Press Clause. *See* 600 U.S. 66, 76 (2023) (reaffirming the actual malice standard as responsive to the "fear of 'self-censorship'—the worry that without such a subjective mental-state requirement, the uncertainties and expense of litigation will deter speakers from making even truthful statements"); *see also* Lee Levine & Matthew L. Schafer, *A Resounding Reaffirmation of Times v. Sullivan*, WALL ST. J. (June 28, 2023).

[429] *See* RESTATEMENT (SECOND) OF TORTS § 611 (1977).

but on government investigations as well. As a matter of constitutional law, the press should be able to accurately report on what the government is doing or saying even when (1) such reporting may repeat defamatory statements and (2) the underlying governmental activity has not yet resulted in an official document, statement, or proceeding, so long as the report is "fair and accurate" within the meaning of well-established precedent construing the fair report privilege.[430]

- Prompt courts to cap damages in defamation actions adverse to the press and, in cases that are not controlled by *Sullivan*, constitutionalize a liability standard higher than negligence. New York's gross irresponsibility standard is one possible model the Court could follow.[431]

- Lead Congress to pass a federal anti-SLAPP law so as to ensure that litigation is not used as a tool to stifle publication on issues of public concern.[432]

- Prompt the Supreme Court to revisit cases, such as *Keeton v. Hustler Magazine*[433] and *Calder v. Jones*,[434] that hold the press is not entitled to procedural protections in defamation and related content-based litigation that are not available to non-press litigants. Similarly, prompt the lower courts to revitalize the "preference for summary judgment" that was generally

---

[430] *See, e.g.,* Glob. Relief Found. v. New York Times Co., 390 F.3d 973, 987 (7th Cir. 2004) ("We reject [Global Relief Foundation's] argument that these media defendants must be able to prove the truth of the government's charges before reporting on the investigation itself.").

[431] *See* Chapadeu v. Utica Observer-Dispatch, 38 N.Y.2d 196, 199 (1975) ("We now hold that within the limits imposed by the Supreme Court where the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.").

[432] *See Understanding Anti-SLAPP Laws*, REPORTERS COMM. FOR FREEDOM OF THE PRESS, https://perma.cc/RQB3-KCN7 ("Short for strategic lawsuits against public participation, SLAPPs have become an all-too-common tool for intimidating and silencing criticism through expensive, baseless legal proceedings. Anti-SLAPP laws are meant to provide a remedy to SLAPP suits.").

[433] 465 U.S. 770 (1984).

[434] 465 U.S. 783 (1984).

*Journal of Free Speech Law*                    [2024

recognized in defamation actions against the press[435] before the *dicta* in "footnote nine" in Chief Justice Burger's decision for the Court in *Hutchinson v. Proxmire*.[436]

### E.    Economic Viability

On issues of economic viability,[437] an invigorated Press Clause could:

- Lead Congress to subsidize journalism, and especially local journalism. The United States currently lags behind the rest of the Global North in public financing of news media.[438] Such a subsidy could take many forms, including expenditures made available to the states in the form of grants and the creation of a federal agency charged with reviewing applications.[439] The government could also directly create and fund its own public media entities while imbuing them with editorial independence.[440]

---

[435] *See, e.g.*, Washington Post Co. v. Keogh, 365 F.2d 965, 968 (D.C. Cir. 1966); Perry v. Columbia Broad. Sys., Inc., 499 F.2d 797, 802 (7th Cir. 1974); Cervantes v. Time, Inc., 464 F.2d 986, 995 (8th Cir. 1972).

[436] 443 U.S. 111, 120 n.9 (1979) ("Considering the nuances of the issues raised here, we are constrained to express some doubt about the so-called 'rule.' The proof of 'actual malice' calls a defendant's state of mind into question, New York Times Co. v. Sullivan, 376 U.S. 254 (1964), and does not readily lend itself to summary disposition. See 10 C. Wright & A. Miller, Federal Practice and Procedure § 2730, pp. 590–592 (1973). Cf. Herbert v. Lando, 441 U.S. 153 (1979). In the present posture of the case, however, the propriety of dealing with such complex issues by summary judgment is not before us.").

[437] On the relationship between the press's economic challenges and the First Amendment, Professor Martha Minow's work is especially comprehensive—this Report owes a debt to her scholarship. *See* MINOW, *supra* note 14; Minow, *supra* note 93. Other helpful work includes STEPHEN GILLERS, JOURNALISM UNDER FIRE: PROTECTING THE FUTURE OF INVESTIGATIVE REPORTING (2018); Erin C. Carroll, *Platforms and the Fall of the Fourth Estate: Looking Beyond the First Amendment to Protect Watchdog Journalism*, 79 MD. L. REV. 529 (2020); Morgan, *supra* note 93; PICKARD, *supra* note 93.

[438] PICKARD, *supra* note 93, at 137 ("In its paltry support of pubic media, the United States is in a league of its own.").

[439] Kyle Langvardt, *Structuring a Subsidy for Local Journalism*, 3 J. FREE SPEECH L. 297 (2023); GILLERS, *supra* note 437, at 164–66 (proposing creation of a "national endowment for investigative journalism").

[440] *See* Langvardt, *supra* note 439, at 203 ("The United States has its own public options—the Corporation for Public Broadcasting, Radio Free Europe/Asia, Stars and Stripes, and so on."); Turner v. U.S. Agency for Glob. Media, 502 F. Supp. 3d 333, 375–76 (D.D.C. 2020).

- Provide constitutional support for Congress to compel payment from tech platforms to news media. As Professor Martha Minow has explained, the journalists and news media entities that create the content shared across social media "do not get a share" of the advertising revenue their stories generate "other than for their direct partnerships with the platforms."[441] In a similar vein, a bill recently introduced in Congress would permit press entities to collectively bargain with tech platforms over compensation for their reporting.[442] An invigorated Press Clause could bolster such an arrangement, reaffirming its validity against legal challenge.

- Lead Congress to create tax incentives for nongovernmental actors to philanthropically fund journalism.[443]

## VI.   DEFINING THE PRESS

Parts IV and V of this Report respectively discuss interpretive arguments in favor of a robust Press Clause and the potential rights and benefits that could flow from it. This Part addresses the question of how to define the press—who should be eligible to benefit from the rights and privileges emanating from an invigorated Press Clause?

As an initial matter, the answer cannot be "everyone." As Professor Sonja West has argued, the more broadly press rights are distributed, "the less likely it is that these protections will materialize."[444] A world in which every person could refuse to testify before a grand jury or claim exemptions from laws of general applicability would be untenable. More importantly, it would flout the very rationale for an active Press Clause: The performance of core functions that benefit and facilitate democratic self-government should receive constitutional recognition and respect.[445]

---

[441] *Id.* at 550.

[442] Journalism Competition and Preservation Act of 2023, S. 1094, 118th Cong. (2021).

[443] Minow, *supra* note 93, at 554–55; TONY PROSCIO, REVSON FOUND., OUT OF PRINT: THE CASE FOR PHILANTHROPIC SUPPORT FOR LOCAL JOURNALISM IN A TIME OF MARKET UPHEAVAL (Jan. 31, 2018), https://perma.cc/CS99-G8XW.

[444] West, *supra* note 110, at 1056.

[445] *See* Baker, *supra* note 104, at 1017 n.247 ("The unusual nature of this approach reflects, and can be justified, on the ground that while most rights are for the benefit of individuals and hence it violates their right if they are improperly denied the right, press rights exist to benefit the amorphous

*Journal of Free Speech Law*                [2024

Yet if only a select group should receive the protections of the Press Clause, who should constitute that group? The supposed intractability of this question is one of the justifications the Supreme Court has offered for refusing to ground press protections in the Press Clause.[446] But the question is hardly an impossible one to answer. As Floyd Abrams has observed, "[i]n the great preponderance of cases, a court has little difficulty knowing a journalist when it sees one."[447]

The idea that a constitutional right would only apply to certain people or certain situations is not a constitutional problem as some have argued it is.[448] The Sixth Amendment right to counsel[449] is not available to those who have not been charged with a requisite crime—some rights are contingent, triggered by certain circumstances and irrelevant in others. If someone is behaving in ways that are in tension with or unrelated to press functions, they have no claim to press rights.

Moreover, press rights can be understood as benefiting the entire public, not just to the individuals or institutions that can claim them. This understanding, conceptualizing press rights as akin to the "rights of listeners,"[450] responds directly to the concern that "special rights" for the press and press alone are undesirable. An understanding of press rights as benefiting the public at large not only distinguishes those rights from the rights all individuals have under the Speech Clause but also recognizes the functions that the press plays in our democratic society discussed above.

Part VI.A and VI.B describe the two major approaches that scholars have adopted when seeking to define the press. The first, discussed in Part VI.A, is a comparatively formal approach that focuses on the nature of institutions in determining who (or what) is and is not "the press." The second, discussed in Part VI.B, is a comparatively functional approach that focuses on the actions of individuals or

---

public and as long as the rights are given adequate scope to provide this benefit, individual claimants have no grounds to object if excluded.").

[446] *See, e.g.*, Branzburg v. Hayes, 408 U.S. 665, 703–05 (1972).

[447] *See* Abrams, *supra* note 110, at 580; *see also* Baker, *supra* note 104, at 959 ("[D]efinitional problems related to special treatment of the press are more apparent than real").

[448] *See, e.g.*, Lewis, *supra* note 325, at 609; William W. Van Alstyne, *The Hazards to the Press of Claiming a "Preferred Position"*, 28 HASTINGS L.J. 761, 768–69 (1977); David Lange, *The Speech and Press Clauses*, 23 UCLA L. REV. 77, 77 (1975).

[449] *See* Gideon v. Wainwright, 372 U.S. 335 (1963).

[450] *See generally* Jones, *supra* note 52.

entities engaged in press-like activity. Finally, Part VI.C addresses the multifactor definitional approach that began to take shape over the course of the Project.

### A.        *The Institutional Approach*

The institutional approach starts from the premise that the existence of institutions themselves is a social fact worthy of constitutional consideration.[451] The persistence and role of a given institution, the characteristics that make it distinct, are suggestive of that institution's potential to serve socially desirable and constitutionally relevant functions. As Professor Frederick Schauer has argued, a "certain number of existing social institutions in general, even if not in every particular, serve functions that the First Amendment deems especially important."[452]

The press can be and, we submit, should be understood as an institution worthy of such First Amendment recognition. As Professor Paul Horwitz explains, the press—specifically the "old," legacy press—is "identifiable and long established; it is a major part of the infrastructure of public discourse; it follows its own norms, practices, and self-regulatory standards; and it is fully (if imperfectly) capable of acting autonomously."[453] It is, Horwitz continues, "essentially a professional enterprise" that brings to the table "a rich store of experience, expertise, and institutional self-knowledge" that allows it to "make significant contributions to the infrastructure of public discourse."[454] These factors distinguish it from at least some of the citizen journalists, bloggers, and internet commentators comprising the "new" media.[455]

---

[451] *See* Frederick Schauer, *Towards an Institutional First Amendment*, 89 MINN. L. REV. 1256, 1259 (2005) ("Yet however strong this temptation towards institutional blindness, there are good reasons to resist it. As documented and theorized by people such as Niklas Luhmann, advanced societies are experiencing a growing institutional self-reproduction and consequent institutional differentiation.").

[452] *Id.* at 1274; *see also id.* at 1274 n.88 ("[V]arious institutions may reflect one or more of the First Amendment's background purposes"). Professor Vicki Jackson has separately identified qualities of institutions that set them apart from individuals. *See* Jackson, *supra* note 18, at 280 (noting that knowledge institutions "have identifiable leadership and some degree of legal personality" and "enjoy some degree of autonomy from outside non-disciplinary pressure in applying their disciplinary standards").

[453] HORWITZ, *supra* note 18, at 146.

[454] *Id.* at 161.

[455] *See, e.g.*, Cohen, *supra* note 328, at 15–18.

An institutionalist approach to defining the press holds that the determinative question for courts will not be whether a given claimant is sufficiently "press-like" or was behaving in a sufficiently press-like way as to warrant constitutional solicitude. Instead, the question is whether a given claimant is itself a member of the institutional press.[456] If an individual actor has a sufficient nexus to an institution properly viewed as journalistic, that ends the definitional inquiry—that individual is part of the press and will accordingly receive press protections.

### B.    *The Functional Approach*

Contrasted with the institutional approach is the "functional approach" to defining the press. Functionalist analysis, like the "functional" arguments made above, focuses on what the press *does*.[457] As Sonja West has noted, those properly considered part of the press serve "unique constitutional functions" that include "gathering newsworthy information, disseminating it to the public, and serving as a check on the government and powerful people."[458] West acknowledges that "occasional public commentators" can serve press functions in isolated circumstances, but contends that the press "has a commitment to these roles that reaches far beyond sporadic or ineffective efforts."[459]

---

[456] *See* Schauer, *supra* note 451, at 1274 ("An institutional First Amendment would thus move the inquiry away from direct application of the underlying values of the First Amendment to the conduct at issue and towards the mediating determination of whether the conduct at issue was or was not the conduct of one of these institutions.").

For a slightly different approach, see HORWITZ, *supra* note 18, at 154 ("An institutional treatment of the press would have both categorical and functional aspects. A court would be more willing to begin and end its inquiry categorically, simply by asking whether the institution at issue was 'the press.' When the answer was yes, it would begin with the assumption that the institution's decisions about how to gather the news and what to publish were insulated from further judicial scrutiny."); *id.* at 155 ("But a functional inquiry, whether implicit or explicit, would still help define the boundaries of the press's institutional autonomy. For the most part, the press does not act as the press, exercising its unique institutional role, when it deals with questions such as whether it must be subject to the same rules of collective bargaining that cover other unionized workplaces. But when a decision by the press implicates the core institutional functions that make it an important part of our social infrastructure, its institutional autonomy should be triggered. Courts should decline to second-guess such decisions, even where generally applicable laws are at issue.").

[457] *See* Baker, *supra* note 104, at 1017 n.247.

[458] *See* West, *supra* note 322, at 2444.

[459] *Id.*

More specifically, West notes that the press "has knowledge, often specialized knowledge, about the subject matter at issue," "places news stories in context locally, nationally, or over time," "strives to convey important information in a timely manner," "has accountability to its audience and gives attention to professional standards or ethics," and "devotes time and money to investigating and reporting the news."[460] These are qualities that other people or institutions may sometimes exhibit, but "repeat-player specialists will do the most valuable work."[461] Ultimately, West looks to the factors employed by the Supreme Court in applying the Free Exercise Clause's "ministerial exception" to certain employment laws, outlined below, as inspiration for identifying the press.

In *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*,[462] the Court held that it would violate the Free Exercise Clause for the government to regulate the hiring decisions of religious organizations in selecting their ministers.[463] Determining that the Clause demanded a "ministerial exception" to federal employment protections, the Court articulated several factors for considering whether someone was, in fact, a minister and could thereby qualify for the ministerial exception.

The Court first made clear that it would not "adopt a rigid formula for deciding when an employee qualifies as a minister."[464] Rather, it looked to functional guidelines, including the fact that Hosanna-Tabor had held the person they hired out as a minister;[465] she had held herself out as a minister;[466] she had "a significant degree of religious training followed by a formal process of commissioning;" and her job entailed "ministerial responsibilities" like leading services and leading students in devotional exercises.[467]

---

[460] *Id.*

[461] *Id.* at 2445.

[462] 565 U.S. 171 (2012).

[463] *Id.* at 188–89.

[464] *Id.* at 190.

[465] *Id.* at 191.

[466] *Id.* at 191–92.

[467] *Id.* at 191.

Drawing on *Hosanna-Tabor*, West observed that "subsets of constitutional actors exist and can be identified."[468] And, analogizing from the Court's non-rigid, functional approach, she argued that courts can and should adopt a similar approach to defining the press, focusing on factors like "recognition by others as the press," "holding oneself out as the press," "training, education, or experience," and "regularity of publication and established audience."[469] This is a quintessentially functional approach to defining the press, and West is not the only scholar to take such a view.[470]

Governmental entities defining the press have often relied upon an at least partially functional approach. Professor Richard Hasen, examining "172 laws, rules, and procedures that different government entities have used to define the press,"[471] found that "the most common aim appears to be identifying people whose profession is journalism: those who gather, report, and disseminate news as their (full or part-time) jobs."[472] This finding is consistent with several notable cases in which federal courts have adopted at least partially functional approaches without difficulty.[473]

---

[468] *See* West, *supra* note 322, at 2455.

[469] *Id.* at 2456. For a critique of this approach, see RonNell Andersen Jones, *Press Definition and the Religion Analogy*, 127 Harv. L. Rev. F. 362 (2014).

[470] *See, e.g.*, Erik Ugland & Jennifer Henderson, *Who Is a Journalist and Why Does It Matter? Disentangling the Legal and Ethical Arguments*, 22 J. Mass Media Ethics 241, 247 (2007) (proposing an "egalitarian" definition "in which all citizens are equally equipped and equally free to serve as newsgathering watchdogs").

[471] *See* Richard L. Hasen, *From Bloggers in Pajamas to the Gateway Pundit: How Government Entities Do and Should Identify Professional Journalists for Access and Protection*, Knight First Amend. Inst. (July 16, 2024), https://perma.cc/9L4M-HGE9.

[472] *Id.* at 18.

[473] *See, e.g.*, von Bulow by Auersperg v. von Bulow, 811 F.2d 136, 144 (2d Cir. 1987); Shoen v. Shoen, 5 F.3d 1289, 1293 (9th Cir. 1993) (concluding that eligibility for reporter's privilege turned on whether (1) the person claiming the privilege gathered "news for dissemination to the public" and whether (2) the intent to disseminate to the public existed at the "'inception of the newsgathering process"); *In re* Scott Paper Co. Securities Litigation, 145 F.R.D. 366, 370 (E.D. Pa. 1992) ("We believe that the Supreme Court would be likely to hold, if squarely faced with the issue, that the investment newsletters involved there would also be protected by the free press clause of the First Amendment.").

### C.    Toward a Multi-Factor Test

Over the course of the Project, it became clear that neither the institutionalist nor functional approach could stand alone. A strict institutionalist approach would risk being both underinclusive and overinclusive: underinclusive because it might exclude people clearly engaged in journalistic activity but who lack requisite institutional affiliation, overinclusive because it might include people clearly not engaged in journalistic activity but who possess requisite institutional affiliation.

Likewise, a strict functional approach would also risk both under- and over-inclusivity: underinclusive because it might employ a list of criteria that hews too closely to the activities of established institutional actors,[474] overinclusive because it might employ a list of criteria so broad as to encompass "anyone who gathers or disseminates information to the public."[475]

In light of this problem, workshop participants began to formulate a multi-factor test that would appropriately incorporate institutional and functional considerations. Before proceeding to that test, five observations from workshop conversations are worth noting.

First, at least some factors might be more important and receive more weight depending on the legal context and specific rights at issue. For instance, when assessing a reporter's privilege claim, a relatively functional analysis might make more sense than it would when allocating limited seats in a courtroom or legislative gallery—there, institutional considerations, including formal affiliation and audience size, might matter more.

Second, any individual or institution seeking to qualify for protection under the Press Clause must have been engaged in the activities with a concurrent goal of publicly disseminating the information obtained. Arguments in favor of press protections, in other words, must not be pretextual or serve as a retroactive justification for the conduct at issue—the individual or institution claiming to be "the press" should have as its primary purpose obtaining and providing truthful information to the public consistent with one or more press functions.[476]

---

[474] *See* Mary-Rose Papandrea, *Citizen Journalism and the Reporter's Privilege*, 91 MINN. L. REV. 515, 583 (2007).

[475] West, *supra* note 322, at 2454.

[476] *See supra* Part IV.B.

Third, there might be some situations in which the government can be charged with the initial responsibility of defining those it would treat as press and outlining the specific matters for which the definition would apply—*e.g.*, carving out space for the press in meetings, exempting it from curfews and dispersal orders, limiting authorization for subpoenas, and so on. Once the government has proffered its own definition, press actors can challenge it in court as unreasonable, discriminatory, or otherwise improper.

This approach would ensure that *some* actors receive immediate legal protection and recognition while both (1) avoiding the problem of having to articulate a comprehensive, universal definition of the press across government and (2) preserving the ability of those excluded from a given governmental designation to challenge their omission in court.

Fourth, granting specific rights to the press, however defined, might result in more active judicial evaluation of how the press behaves. Were the Press Clause interpreted to afford broader press rights than are available under the Speech Clause, it might be seen as appropriate for courts to evaluate the availability of protection under a standard akin to England's "responsible journalism" construct.[477] Criteria employed in a potential Press Clause test might include whether the press took appropriate steps to verify its information, the urgency of the subject matter it covered, whether the article captured the gist of competing parties' points of view or sought comment from them, and the general circumstances surrounding publication.[478] This arrangement would conceptualize the Press Clause as a "quid-pro-quo" in which the press receives additional rights so long as it makes good-faith efforts to exercise those rights in a manner that serves its democratic functions.

Fifth, and finally, the notion that defining the press is akin to "licensing it," a view expressed by Chief Justice Burger in his *Bellotti* concurrence,[479] is conceptually mistaken. Granting additional rights to specified individual or institutional actors does not restrict the universal rights to publish free of prior restraint. More generally, acknowledging that the Constitution singles out certain people and practices for distinct treatment is not problematic—no one could plausibly argue that

---

[477] *See, e.g.*, Catherine Spratt, *A New Day in the U.K.*, REPORTERS COMM. FOR FREEDOM PRESS (2007), https://perma.cc/MPX3-NQ6Y.

[478] *Id.*

[479] First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 801 (1978) (Burger, C.J., concurring).

when a court protects a particular religious practice under the Free Exercise Clause, it thereby "licenses" religion.[480]

With these observations made, criteria worth considering when determining whether a person or entity does or does not qualify for Press Clause protection include:

- The rights claimant is a member of a news organization;

- The rights claimant has a standing history of news reporting;

- The rights claimant has a sizeable audience;

- The rights claimant exercises editorial independence, especially from the subjects of their work;

- The rights claimant subjects their work to an editorial process as a means of quality control;

- The rights claimant adheres to professional standards and ethics;

- The rights claimant holds itself out as the press;

- The rights claimant is a human or, as in the case of entities, consists of humans;

- The rights claimant has training, education, or experience as a journalist; and

- The rights claimant is earning a living, or endeavoring to do so, from press activities.

These factors aim to constructively blend functional and institutional considerations and help legal decision-makers ensure that the press is properly considered and its functions protected.

## VII.    CONCLUSION

In 1787, Thomas Jefferson wrote to Edward Carrington, a fellow Virginia statesman. In his letter he remarked that the "basis of our governments being the opinion of the people, the very first object should be to keep that right; and were it left to me to decide whether we should have a government without newspapers, or

---

[480] *See* Abrams, *supra* note 110, at 580–81.

newspapers without a government, I should not hesitate a moment to prefer the latter."[481]

Sent four years after the Revolutionary War and four years before the First Amendment's ratification, this letter speaks to the same fundamental values that animated *The Press Clause: The Forgotten First Amendment*. The press is an indispensable element of any society that aspires toward self-government. As the Court admonished in *Grosjean v. American Press Company*, to fetter the press "is to fetter ourselves."[482]

Today the press is in peril. It faces legal restrictions on its access, newsgathering, editorial, and publication rights. It is the target of increasingly demagogic political rhetoric and subject to political harassment. And its economic model is profoundly challenged—local journalism is dying as newspapers shutter and jobs disappear at astonishing rates. Without urgent action, Jefferson's government without newspapers lurks not as a warning but as a real possibility.

With support from the Stanton Foundation and the Information Society Project at Yale Law School, the Project has endeavored to push back against these downward trends. Bringing scholars and practitioners together, it explored the Press Clause's potential to drive constitutional solutions. Along the way, it discovered that history is replete with the words and actions of people who too believed that the press matters, that the press delivers measurable benefits to the communities in which its reporters live and work, and that, though the Supreme Court has failed to breathe life into the Press Clause, there is potential in its precedent to strive for more.

An invigorated Press Clause will not come about on its own. The collective work of academics, lawyers, activists, and everyday citizens is required. The primary aim of this Report is to aid those groups by providing resources for carrying out the legal and political movements required to secure a brighter future for the press. The vitality of democratic self-government, of the republic established by our Constitution, demands nothing less.

---

[481] Letter from Thomas Jefferson to Edward Carrington (Jan. 16, 1787), *in* 11 PAPERS OF THOMAS JEFFERSON 48, 49 (Julian P. Boyd ed., 1995).

[482] 297 U.S. 233, 250 (1936).

APPENDIX A. LIST OF WORKSHOP PARTICIPANTS

The following participated in the workshops that helped shape the ideas and direction of this Report. We are grateful for their assistance and insights. The affiliations listed are for identification purposes only.

| | |
|---|---|
| Floyd Abrams | Cahill Gordon & Reindel LLP |
| Joseph M. Adelman | Framingham University |
| RonNell Andersen Jones | University of Utah School of Law |
| David S. Ardia | University of North Carolina School of Law |
| Jack M. Balkin | Yale Law School |
| Sandra Baron | Yale Law School |
| Seth D. Berlin | Ballard Spahr LLP |
| Fabio B. Bertoni | New Yorker Magazine |
| Erik Bierbauer | NBCUniversal Media, LLC |
| Vincent Blasi | Columbia Law School |
| David Bralow | First Look Institute |
| Bruce D. Brown | Reporters Committee for Freedom of the Press |
| Jay Ward Brown | Ballard Spahr LLP |
| Erin Carroll | Georgetown University Law Center |
| Erwin Chemerinsky | University of California Berkeley School of Law |
| Dale Cohen | UCLA School of Law |
| Jay Conti | Dow Jones & Company, Inc. |
| Tom Curley | Gannett Co., Inc. |
| Lucy Dalglish | Merrill College of Journalism, University of Maryland |
| Jonathan R. Donnellan | The Hearst Corporation |
| Samuel Fifer | Dentons |
| Jacob P. Goldstein | Dow Jones & Company, Inc. |
| John C. Greiner | Faruki PLL |
| Paul Horwitz | University of Alabama School of Law |
| Vicki C. Jackson | Harvard Law School |
| Jean-Paul Jassy | Jassy Vick Carolan LLP |

| | |
|---|---|
| Bruce E. H. Johnson | Davis Wright Tremaine LLP |
| Jane E. Kirtley | Silha Center for the Study of Media Ethics and Law, University of Minnesota |
| Heidi Kitrosser | Northwestern Pritzker School of Law |
| Christina Koningisor | University of California College of the Law, San Francisco |
| Tom S. Leatherbury | Southern Methodist University Dedman School of Law |
| Lee Levine | Ballard Spahr LLP (ret.) |
| Lyrissa Barnett Lidsky | University of Florida Levin College of Law |
| Adam Liptak | The New York Times |
| David Loy | First Amendment Coalition |
| Rachel Matteo-Boehm | Bryan Cave Leighton Paisner LLP |
| David McCraw | The New York Times |
| Ashley Messenger | National Public Radio |
| Martha Minow | Harvard Law School |
| Leonard M. Niehoff | University of Michigan Law School |
| Helen Norton | University of Colorado Law School |
| Lynn Oberlander | Ballard Spahr LLP |
| Mary-Rose Papandrea | University of North Carolina School of Law |
| Francesca L. Procaccini | Vanderbilt Law School |
| Gabe Rottman | Reporters Committee for Freedom of the Press |
| Kelli L. Sager | Davis Wright Tremaine LLP |
| Matthew L. Schafer | Paramount Global |
| Jacob M. Schriner-Briggs | Yale Law School |
| David A. Schulz | Yale Law School |
| Susan Seager | University of California, Irvine School of Law |
| Amanda Shanor | Wharton School, University of Pennsylvania |
| Brian Sher | Bryan Cave Leighton Paisner LLP |
| Jeffery A. Smith | University of Wisconsin-Milwaukee (Ret.) |

| Paul M. Smith | Georgetown University Law Center |
| Stephen D. Solomon | Arthur L. Carter Journalism Institute, New York University |
| Geoffrey R. Stone | University of Chicago Law School |
| Charles D. Tobin | Ballard Spahr LLP |
| Richard Tofel | Gallatin Advisory LLC |
| Katie Townsend | Reporters Committee for Freedom of the Press |
| Erik Ugland | Marquette University, Diedrich College of Communication |
| Leita Walker | Ballard Spahr LLP |
| Stephen Wermiel | Washington College of Law, American University |
| Sonja R. West | University of Georgia School of Law |
| Steven D. Zansberg | Zansberg Beylkin LLC |