# EXHIBIT 21

AB 2839
Page 1

Date of Hearing: April 30, 2024

ASSEMBLY COMMITTEE ON JUDICIARY
Ash Kalra, Chair
AB 2839 (Pellerin) – As Amended April 11, 2024

As Proposed to be Amended

**SUBJECT**: ELECTIONS: DECEPTIVE MEDIA IN ADVERTISEMENTS

**KEY ISSUE**: SHOULD CALIFORNIA PROHIBIT THE DISTRIBUTION OF CAMPAIGN ADVERTISEMENTS THAT CONTAIN MATERIALLY DECEPTIVE AND FAKE IMAGES, AUDIO, AND VIDEO?

**SYNOPSIS**

*Artificial intelligence technology presents a myriad of opportunities to better humanity. From predictive analytics in healthcare settings, to making workplaces more efficient, to making travel safer for all Americans, the benefits of artificial intelligence seem endless. However, there is a dark side to these technological advancements. Artificial intelligence can now produce lifelike, yet fake, images, video, and audio. Particularly troubling these fake images, video, and audio can be manipulated to influence American elections by portraying candidates as saying things they did not, impugning the credibility of election officials, and generally undermining public faith in the electoral process.*

*This bill seeks to protect the integrity of California's electoral process by prohibiting the distribution of campaign advertisements and other election communications that contain materially deceptive and digitally altered or created images, audio, and video within specified time periods surrounding an election. The measure would limit the prohibition to content that was intentionally manipulated then disseminated by a person who knew it was false or recklessly ignored the veracity of the content. The bill exempts from its prohibitions media companies who republish the content, so long as the republication is conducted in a limited manner and subject to various disclaimers. The measure also clarifies that the prohibition only applies 120 days in advance of an election and concludes 60 days after Election Day.*

*This bill is sponsored by the California Initiative for Technology & Democracy and is supported by a coalition of labor, legal aid and environmental organizations. The proponents of this bill highlight the growing use of and threat posed by disinformation related to elections. They note that fake content developed utilizing artificial technology can generate exceedingly lifelike content that average users may not be able to deem fake. This measure is opposed by the Electronic Frontier Foundation who question the measure's constitutionality, especially provisions related to the republication of content. This measure was previously heard and approved by the Committee on Elections by a vote of 6-1.*

**SUMMARY**: Prohibits the distribution of campaign advertisements and other election communications that contain materially deceptive and digitally altered or created images, audio, and video within specified time periods surrounding an election. Specifically, **this bill**:

1) Prohibits a person, committee, or other entity from knowingly distributing, with the intent to influence an election or solicit funds for a candidate or campaign, an advertisement or other

election communication containing a materially deceptive and digitally altered or digitally created image or audio or video file of any of the following:

    a) A candidate portrayed as doing or saying something that the candidate did not do or say;

    b) An officer holding an election or conducting a canvass portrayed as doing or saying something in connection with the election that the officer holding an election or conducting a canvass did not do or say;

    c) An elected official portrayed as doing or saying something in connection with the election that the elected official did not do or say; or

    d) A voting machine, ballot, voting site, or other elections-related property or equipment portrayed in a materially false way.

2) Provides, notwithstanding the prohibition in 1), a candidate may portray themselves as doing or saying something that the candidate did not do or say, but only if the image or audio or video file includes a disclosure stating "This ____ has been manipulated." and complies with the following requirements:

    a) The blank in the disclosure states whether or not the media is an image, audio, or video;

    b) For visual media the text of the disclosure is in a size that is easily readable by the average viewer and no smaller than the largest font size of other text appearing in the visual media, as specified; and

    c) For media that consists of audio only, the disclosure must read in a clearly spoken manner and in a pitch that can be easily heard by the average listener, at the beginning of the audio, at the end of the audio, or in two minute intervals, as specified.

3) Provides that the prohibition in 1) only applies during the following time periods:

    a) One hundred twenty days before any election; and

    b) Sixty days after the election, as specified.

4) Authorizes the recipient of a materially deceptive and digitally altered or digitally created image or audio or video file distributed in violation of this, as well as a candidate or committee participating in the election, or officer holding an election or conducting a canvass to seek injunctive or other equitable relief prohibiting the distribution of the materially deceptive and digitally altered or digitally created image or audio or video file.

5) Provides that in addition to the injunctive or equitable relief provided in 4) a plaintiff may also seek general or special damages against the person, committee, or other entity that distributed the materially deceptive and digitally altered or digitally created image or audio or video file in violation of this bill.

6) Provides that a prevailing party in an action brought pursuant to 4) or 5) is entitled to reasonable attorney's fees and costs.

7) Provides that in any action brought pursuant to 4) or 5) the plaintiff bears the burden of establishing the violation through clear and convincing evidence.

8) Provides that this bill does not apply to a radio or television broadcasting station, including a cable or satellite television operator, programmer, or producer, that broadcasts any materially deceptive and digitally altered or digitally created image or audio or video file prohibited by this bill as part of a bona fide newscast, news interview, news documentary, or on-the-spot coverage of bona fide news events, if the broadcast clearly acknowledges through content or a disclosure, in a manner that can be easily heard or read by the average listener or viewer, that the materially deceptive audio or visual media does not accurately represent any actual event, occurrence, appearance, speech, or expressive conduct.

9) Provides that this bill not apply to a regularly published newspaper, magazine, or other periodical of general circulation, including an internet or electronic publication, that routinely carries news and commentary of general interest, and that publishes any materially deceptive and digitally altered or digitally created image or audio or video file prohibited by this bill, if the publication clearly states that the materially deceptive and digitally altered or digitally created image or audio or video file does not accurately represent any actual event, occurrence, appearance, speech, or expressive conduct.

10) Defines "advertisement" to mean any general or public communication that is authorized or paid for the purpose of supporting or opposing a candidate for elective office or a ballot measure and that is broadcast by or through television, radio, telephone, or text, or disseminated by print media, including billboards, video billboards or screens, and other similar types of advertising.

11) Defines "artificial intelligence" to mean an engineered or machine-based system that varies in its level of autonomy and that can, for explicit or implicit objectives, infer from the input it receives how to generate outputs that can influence physical or virtual environments.

12) Defines "committee" to mean any person or combination thereof who does any of the following:

   a) Receives contributions totaling two thousand dollars ($2,000) or more in a calendar year;

   b) Makes independent expenditures totaling one thousand dollars ($1,000) or more in a calendar year; or

   c) Makes contributions totaling ten thousand dollars ($10,000) or more in a calendar year to or at the behest of candidates or committees.

13) Defines "election communication" to mean any general or public communication not covered under "advertisement" that is broadcast by or through television, radio, telephone, or text, or disseminated by print media, including billboards, video billboards or screens, and other similar types of communications, that concerns any of the following:

   a) A candidate for office or ballot measure;

   b) Voting or refraining from voting in an election;

    c) The canvass of the vote.

14) Defines "materially deceptive and digitally modified or created image or audio or video file" to mean an image or an audio or video file that has been intentionally manipulated in a manner such that all of the following conditions are met:

   a) The image or audio or video file is the product of digital manipulation, artificial intelligence, that appears authentic, but contains a false portrayal of specified actors or items; and

   b) The person, committee, or other entity distributed the image or audio or video file knowing the portrayal of the candidate for elective office, the elected official, the elections official, or the voting machine, ballot, voting site, or other elections property or equipment was false or with a reckless disregard for the true portrayal of the candidate, the elected official, the elections official, or the voting machine, ballot, voting site, or other elections property or equipment.

15) Provides that "materially deceptive and digitally modified or created image or audio or video file" does not include any image or audio or video file that contains only minor modifications that do not lead to significant changes to the perceived contents or meaning of the content, as specified.

16) Defines for the purpose of 14) a "false portrayal of the candidate for elective office, an elected official, an elections official, or a voting machine, ballot, voting site, or other elections property or equipment" to mean the image or audio or video file would cause a reasonable person to believe that the content is authentic and to have a fundamentally different understanding or impression of the expressive content of the image or audio or video file than that person would have if the person were hearing or seeing the authentic version of the image or audio or video file.

17) Defines "officers holding an election or conducting a canvass" to include, but be not limited to, the Secretary of State as the chief elections officer, and their staff, as it relates to performance of any of their duties related to administering the provisions of the Elections Code, and elections officials and their staff, including temporary workers and poll workers, and members of a precinct board, in their performance of any duty related to assisting with holding an election or conducting a canvass.

18) Defines "recipient" to include a person who views, hears, or otherwise perceives an image or audio or video file that was initially distributed in violation of this bill.

19) Provides that the provisions of this bill apply regardless of the language in which the advertisement or solicitation was provided.

20) Provides that actions to enforce this bill are to be placed on a judicial calendar in the order of their date of filing and are to be given precedence.

21) Adopts numerous findings and declarations about election security, the state's compelling interest in election security, and that this measure is narrowly tailored to achieve the state's interest.

22) Adopts a severability clause.

**EXISTING LAW**:

1) Prohibits, until January 1, 2027, a person, committee, or other entity from distributing, with actual malice, materially deceptive audio or visual media of the candidate with the intent to injure the candidate's reputation or to deceive a voter into voting for or against the candidate, within 60 days of an election in which the candidate will appear on the ballot. (Elections Code Section 20010 (a).)

2) Exempts from the prohibition of 1) any audio or visual media that includes a disclosure stating: "This _____ has been manipulated." (Elections Code Section 20010 (b).)

3) Authorizes a candidate for office who's voice of likeness was utilized in violation of 1) to seek injunctive or other equitable relief prohibiting the distribution of audio or visual media in violation. (Elections Code Section 20010 (c)(1).)

4) Defines for the purpose of 1), "materially deceptive audio or visual media" to mean an image or an audio or video recording of a candidate's appearance, speech, or conduct that has been intentionally manipulated in a manner such that both of the following conditions are met:

   a) The image or audio or video recording would falsely appear to a reasonable person to be authentic; and

   b) The image or audio or video recording would cause a reasonable person to have a fundamentally different understanding or impression of the expressive content of the image or audio or video recording than that person would have if the person were hearing or seeing the unaltered, original version of the image or audio or video recording. (Elections Code Section 20010 (e).)

5) Exempts from the prohibition of 1) audio or visual media that constitutes satire or parody. (Elections Code Section 20010 (d).)

6) Prohibits a candidate or committee on their behalf from representing, in connection with an election campaign, either orally or in campaign material, that the candidate has the support of a committee or organization that includes as part of its name the name or any variation upon the name of a qualified political party with which the candidate is not affiliated, together with the words "county committee," "central committee," "county," or any other term that might tend to mislead the voters into believing that the candidate has the support of that party's county central committee or state central committee, when that is not the case. (Elections Code Section 20007.)

7) Requires any paid political advertisement that refers to an election or to any candidate for state or local elective office and that is contained in or distributed with a newspaper, to bear on each surface or page thereof, in type or lettering at least half as large as the type or lettering of the advertisement or in 10-point roman type, whichever is larger, the words "Paid Political Advertisement." (Elections Code Section 20008.)

8) Provides that any person who in any manner interferes with the officers holding an election or conducting a canvass, as to prevent the election or canvass from being fairly held and

lawfully conducted, or with the voters lawfully exercising their rights of voting at an election, is punishable by imprisonment for 16 months or two or three years. (Elections Code Section 18502.)

9) Prohibits the following conduct within 100 feet of the entrance to a building that contains a polling place or an outdoor site, including a curbside voting area, at which a voter may cast or drop off a ballot:

   a) Soliciting a vote or speaking to a voter on the subject of marking the voter's ballot;

   b) Placing a sign relating to voters' qualifications or speak to a voter on the subject of the voter's qualifications, except as specified;

   c) Photographing, video recording, or otherwise recording a voter entering or exiting a polling place; or

   d) Obstructing ingress, egress, or parking. (Elections Code Section 18541.)

**FISCAL EFFECT**: As currently in print this bill is keyed non-fiscal.

**COMMENTS**: As more Americans turn away from traditional news sources, the market for online election-related content is growing. Unfortunately, without traditional media outlets serving as gatekeepers of information, the amount of blatantly false or misleading election-related content appearing on the internet is growing significantly. Given American's propensity to dabble in conspiracy theories and take at face value information provided on the internet, this fake election-related content can have profound and troubling impacts on our democracy. Seeking to protect California voters from the proliferation of fake election content, this bill would prohibit the distribution of campaign advertisements and other election communications that contain materially deceptive and digitally altered or created images, audio, and video within specified time periods surrounding an election. In support of this measure, the author states:

> Those trying to influence elections—conspiracy theorists, foreign states, online trolls, and even campaigns themselves—have already started creating and distributing deepfake images, audio, and video content in the United States and around the world. This generative AI-fueled disinformation can affect voter behavior and undermine faith in our elections.
>
> Entering the 2024 election, millions of voters will not know what images, audio, or video they can trust, and their faith in election integrity and our democracy will be significantly diminished. AB 2839 will protect our democracy by limiting the spread of harmful disinformation and deepfakes used in political campaign ads including mailers, television, radio, and robocalls.

***The risk of false information in electioneering is as old as American democracy.*** The use of questionable tactics to win an election are as old as America's democracy. The election of 1800 between John Adams and Thomas Jefferson features a panoply of disgusting and unfounded attacks traded between the two candidates. Indeed, paraphrasing the actual terms used by each side, Jefferson's camp accused Adams of being a woman while Adams camp accused Jefferson of being non-white. (Kerwin Stewart, *Founding Fathers' dirty campaign,* CNN (2008) available at: https://www.cnn.com/2008/LIVING/wayoflife/08/22/mf.campaign.slurs.slogans/.) Indeed, some of the handbills containing these attacks were so believable it is reported that America's

first First Lady, Martha Washington, once said of Jefferson that he was, "one of the most detestable of mankind." (*Ibid*.) As technology has improved so have the attacks and the tactics used to disseminate campaign-related falsehoods.

In the highly contested election of 1876 between Rutherford B. Hayes and Samuel J. Tilden, campaign operatives worked with friendly newspapers to accuse each side of "stealing" the election. (Ronald G. Shafer, *The ugliest presidential election in history: Fraud, voter intimidation and a backroom deal,* The Washington Post (Nov. 24, 2020) available at: https://www.washingtonpost.com/history/2020/11/24/rutherford-hayes-fraud-election-trump/.) The television era made spreading falsehoods much easier. It's been determined that in the contentious election of 1960, President Kennedy knowingly spread falsehoods about the state of America's missile deterrence systems. (Daniel Bush, *The history of lies on the campaign trail*, PBS Newshour (Dec. 4, 2015) available at: https://www.pbs.org/newshour/politics/the-history-of-lies-on-the-campaign-trail.) Notoriously, Richard Nixon utilized television and attacks on the press to hide his involvement in the Watergate break-in in the lead up to the 1972 Presidential campaign. (*Ibid*.) Perhaps most confounding of all of the historic election mistruths broadcast by candidates, Gerald Ford, at the height of the Cold War, once tried to contend that the Soviet Union did not have significant influence in Eastern Europe in a bid to "win" a televised debate with Jimmy Carter. (*Ibid.*)

With the social media-driven misinformation campaign surrounding the 2016 election, and the outright lies about the integrity of the 2020 election, fear about the use of technology to manipulate elections is growing and legitimate. In fact, signs of manipulation are already evidence in the 2024 Presidential election. During the recent New Hampshire Presidential Primary, one study suggested that between 5,000 and 20,000 New Hampshire residents received artificially generated phone calls, impersonating President Biden, that told them not to vote in the state's primary. (Adam Edelman, *States turn their attention to regulating AI and deepfakes as 2024 kicks off*, NBC News, (Jan. 22, 2024) available at: www.nbcnews.com/politics/states-turn-attention-regulating-ai-deepfakes-2024-rcna135122.) As the United States faces an incredibly contentious rematch between President Joe Biden and Donald Trump, one can only imagine that the threat of fake online content designed to influence the election will grow.

***California's historic efforts to maintain election integrity.*** Dating back to California's founding, state law has sought to protect election integrity. The First Session of the California State Legislature created penalties for election misconduct, including for "deceiving [an elector] and causing him to vote for a different person for any office than such elector desired or intended to vote for" (Chap. 38, Stats. 1850). Modern election law recognizes the myriad of tools parties can utilize to impact elections. State law already prohibits the distribution or dissemination of misleading information about election logistics including polling places and the date of elections. Additionally, the law prohibits misusing government seals on election information, coercing peoples vote, electioneering within a set distance of polling places, maliciously distributing fake election materials.

***This bill*** recognizes the significant threat that emerging technologies and misinformation pose to the integrity of future elections. To that end, this bill prohibits the distribution of campaign advertisements and other election communications that contain materially deceptive and digitally altered or created images, audio, and video 120 days before and 60 days after an election. The bill generally limits the prohibition to the distribution of fake video, audio, or imagines of candidates, election officials, elected officials, or election machinery, as specified. Most notably,

the bill is limited only to false election information that is disseminated in the form of materially deceptive and digitally modified or created image or audio or video files. This term is defined as, "a file that is intentionally manipulated in a manner such that a reasonable person would believe the image, video, or audio to be authentic and that the information was distributed with the knowledge of the files inaccuracy or reckless disregard for the truth underlying the accuracy of the image, video, or audio files." The measure, generally, exempts from the prohibition of this bill news media that republish the false content for the purpose of a newsworthy story on the false image, video or audio. Finally, the measure adopts numerous definitions and makes various findings and declarations.

***By limiting the dissemination of speech related to elections, this measure implicates the First Amendment and the broad protections it provides to political speech.*** By prohibiting the dissemination of false election information this measure represents a government-imposed restriction on speech, thus implicating the First Amendment to the United States Constitution. The First Amendment provides that "Congress shall make no law . . . prohibiting the freedom of speech." As interpreted by the courts and incorporated against the states by the due process clause of the 14th Amendment, the First Amendment prevents any government entity (not just Congress) from enacting any law or adopting any policy that burdens freedom of speech. In addition, Article I, Section 2 of the California Constitution guarantees to every person the freedom to "speak, write, and publish his or her sentiments on all subjects, being responsible for the abuse of this right." Moreover, the First Amendment not only protects the right to speak, as a logical corollary it protects the "right to receive information and ideas." (*Stanley v Georgia* (1969) 394 U.S. 557, 564.)

This bill implicates both the right to speak about elections, as well as the right to receive information regarding them. Furthermore, given that this bill implicates political speech, it is almost certainly going to be subject to the most exacting legal review afforded to restrictions on speech. Indeed, the First Amendment affords the "broadest protection" to the "discussion of public issues" and "political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." (*McIntyre v Ohio Election Commission* (1997) 514 U.S. 334.) It is difficult to imagine any content more related to "political expression" and "discussion of public issues" than content about candidates and elections. Notably, however, the Supreme Court has also held that there is "no constitutional value in false statements of fact." (*Gertz v. Robert Welch, Inc*. (1974) 418 U.S. 323.) Nonetheless, while false statements have little constitutional value, the modern Supreme Court has argued that the remedy for false speech is more true speech, and false speech tends to call forth true speech. (*United States v Alvarez* (2012) 567 U.S. 709.)

This bill firmly falls somewhere in this constitutional spectrum. Looking at the case law, it is clear that this measure, as a prior restriction on speech, would be subject to strict scrutiny. (See, e.g. *Frisby v. Schultz* (1988) 487 U.S. 474.) To overcome this level of scrutiny, the government must demonstrate that it has a *compelling interest* in regulating the speech and its restrictions are *narrowly tailored* to meet that goal. It would appear obvious, especially in light of the fact that California has regulated the integrity of elections since its inception, that the government has a compelling interest in protecting election integrity. Thus, it must be determined whether this bill is sufficiently narrowly tailored. Proponents of this bill argue that this measure is narrowly tailored in that its prohibitions are limited to 120 days prior to and 60 days after an election. Further, the proponents note that the bill specifically targets artificially doctored images, audio, and video of specific figures integral to the election process. They argue, for example, that any

person would still be free to post a video of themselves speaking falsehoods about candidates so long as the video were not altered in any way. Furthermore, the proponents of this bill note that it mirrors the holding in *New York Times v. Sullivan*, which authorized some prior restraints.

When examining this bill in light of the *New York Times v. Sullivan* holding, several key aspects of that decision are notable. First, the court held that, "even a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error.'" (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279 *internal citations omitted.*) However, that decision also provided fewer speech protections to falsehoods, even those about public officials, made with *actual malice*. (*Ibid.*) The proponents of this measure contend that it meets the *New York Times v. Sullivan* standard because it is limited only to false statements that are intentionally made, "knowing the portrayal of the candidate for elective office, the elected official, the elections official, or the voting machine, ballot, voting site, or other elections property or equipment was false or with a reckless disregard for the true portrayal of the candidate, the elected official, the elections official, or the voting machine, ballot, voting site, or other elections property or equipment." Finally, it should be noted that the enforcement provisions of this bill adopt a "clear and convincing evidence" standard which is a higher standard of proof than typically applies to civil actions like the one proposed by this measure.

The constitutional questions posed by this bill present an exceedingly difficult decision for this Committee. It does appear that the prohibitions proposed by this bill, at least as applied to the original content creator, are as narrowly tailored as possible and certainly implicate a compelling government interest. Furthermore, the adoption of the malice-like intent standard further narrows the bill. However, the Committee cannot ignore the longstanding preference of the courts to protect all forms of speech. Moreover, the current Supreme Court has demonstrated a willingness to greatly expand the scope of speech rights, especially when the speaker's views align with the court's majority. (See, e.g. *Citizens United v. Federal Election Commission* (2010) 558 U.S. 310.) Thus, while this bill is certainly designed to provide the greatest chance of withstanding constitutional review, it is almost guaranteed to be the subject of litigation.

***Proposed amendments seek to make this bill as narrowly tailored as possible.*** As noted above, this measure will almost certainly be the target of immediate litigation should it be signed into law. Seeking to further buttress this measure, to bring terminology into alignment with other bills involving artificial intelligence technology, and clarify various terms, the author is proposing several amendments. First, the author wishes to make findings to indicate that this bill is designed to be as narrowly tailored as possible. Those amendments would amend the findings section of the bill to read:

> (4) In order to ensure California elections are free and fair, California must, for a limited time before and after elections, prevent the use of deepfakes and disinformation meant to prevent voters from voting and deceive voters based on fraudulent content. ***The provisions of this bill are narrowly tailored to advance California's compelling interest in protecting free and fair elections.***

It should be noted that while these findings are helpful, a court is not compelled to following the Legislature's judgment on this matter.

Secondly, the author proposes to further refine the definition of "materially deceptive and digitally modified or created image or audio or video file." Accordingly, that rather lengthy and detailed definition will now read:

> "Materially deceptive and digitally modified or created image or audio or video file" means an image or an audio or video file that has been intentionally manipulated in a manner such that all of the following conditions are met:
>
> (i) The image or audio or video file is the product of digital manipulation, artificial intelligence, ~~or machine learning, including deep learning techniques, that merges, combines, replaces, or superimposes content onto an image or an audio or video file, creating an image or an audio or video~~ file that appears authentic, *that appears authentic, but contains a false portrayal of any of the following:*
> *(I) A candidate for elective office,*
> *(II) An elected official,*
> *(III) Elections official,*
> *(IV) Voting machine,*
> *(V) Ballots,*
> *(VI) Voting sites,*
> *(VII) Other property or equipment related to an election, or elections process*. ~~or generates an inauthentic image or an audio or video file that appears authentic.~~
> ~~(ii) (I) The image or audio or video file represents a false portrayal of a candidate for elective office, an elected official, an elections official, or a voting machine, ballot, voting site, or other elections property or equipment.~~
> *(ii)* ~~(II)~~ For the purposes of this clause, "a false portrayal of the candidate for elective office, an elected official, an elections official, or a voting machine, ballot, voting site, or other elections property or equipment" means the image or audio or video file would cause a reasonable person *to believe that the content is authentic and* to have a fundamentally different understanding or impression of the expressive content of the image or audio or video file than that person would have if the person were hearing or seeing the *authentic* ~~unaltered, original~~ version of the image or audio or video file.
> (iii) The person, committee, or other entity distributed the image or audio or video file knowing the portrayal of the candidate for elective office, the elected official, the elections official, or the voting machine, ballot, voting site, or other elections property or equipment was false or with a reckless disregard for the true portrayal of the candidate, the elected official, the elections official, or the voting machine, ballot, voting site, or other elections property or equipment. This clause is presumed when an image or audio or video file has been intentionally manipulated to represent a false portrayal of the candidate for elective office, the elected official, the elections official, or the voting machine, ballot, voting site, or other elections property or equipment, but may be rebutted.

Finally, in consultation with the Committee on Privacy and Consumer Protection, the author is proposing to add the Privacy Committee's new standard definition of artificial intelligence to this bill to promote consistency in the codes. That definition will now read:

> *(2) "Artificial intelligence" means an engineered or machine-based system that varies in its level of autonomy and that can, for explicit or implicit objectives, infer from the input it receives how to generate outputs that can influence physical or virtual environments.*

*Additional policy considerations.* Should this measure advance, the author and the proponents may wish to consider three additional policy considerations. First, in opposition to this measure the Electronic Frontier Foundation objects to the restriction on media outlets republishing the false information. *The author may wish to consider working with the opposition to see if this section can be further narrowed or refined* to avoid potential litigation and further defend the bill against First Amendment scrutiny. Secondly, the bill applies to false images, audio, and video of elected officials, candidates, and election officials but omits *former* elected officials. Thus, for example, should an artificially generated video of former President Barack Obama speaking poorly of his Vice President, now-President Joe Biden, be created it would not be covered by this measure. While this omission would arguably expand a bill seeking to be as narrowly tailored as possible, it may be a worthwhile type of false speech to regulate. Finally, the author may wish to consider expanding the 60-day post-election timeline. For example, the 2024 election is set for Tuesday November 5, 2024. Should Congress meet on January 6, 2025 to certify the election that date would be *outside* the 60-day window. Thus, a bad actor would have several days to flood the internet with artificially generated content related to the election. Furthermore, the President will not be inaugurated until January 20, 2025. The author may wish to consider expanding the post-election prohibitions until all elected officials are sworn into office.

**ARGUMENTS IN SUPPORT**: This bill is sponsored by the California Initiative for Technology & Democracy and is supported by a coalition of labor, legal aid and environmental organizations. In support of this bill the California Initiative for Technology & Democracy writes:

> California is entering its first-ever generative artificial intelligence (AI) election, in which disinformation powered by generative AI and social media will pollute our information ecosystems like never before. In a few clicks, bad actors such as conspiracy theorists, foreign states, online trolls, and unscrupulous campaigns have the power to create false images, video, and audio to deceive and manipulate voters.
>
> These deepfakes could include depictions of a candidate accepting a bribe, a fake video of an elections official "caught on tape" saying that voting machines are not secure, or an artificial robocall in the Governor's voice incorrectly telling millions of Californians their voting site has changed. The technology is widely available, provided for little to no cost, and rapidly improving in its ability to produce realistic deepfakes. This AI-fueled disinformation can skew specific election results by deceiving voters or impacting voter turnout, call results into question, and more generally undermine faith in our elections, their security, and democratic systems.
>
> This problem is not a hypothetical future but a real and present danger to democracy. Generative AI has been used in various ways – most of them deeply deceptive – to influence national elections in Slovakia, Bangladesh, Argentina, Pakistan, and elsewhere, including in our own country. In New Hampshire's 2024 presidential primary election, an AI-generated deepfake robocall of President Biden was used to dissuade voters from voting in the primary. Just this month, a supporter of former President Trump created a deepfake image depicting Trump with Black Americans, trying to influence Black voters to support Trump.
>
> In order to help ensure California elections are free and fair, AB 2839 would prevent the use of the most potentially harmful offline deepfakes close to an election. Specifically, the bill would ban the distribution of specified digitally generated or manipulated communications

that portray a candidate, an elected official, or elections official as doing or saying something that they did not do or say, or specified election equipment and voting sites in a materially false way, within 120 days before an election and, for those regarding election officials or voting systems, within 60 days after the election through offline means such as robocalls, mailers, television advertisements. AB 2839 would address significant deficiencies of current law by removing potential disinformation from the information ecosystem and expanding coverage to additional key election-related subjects beyond just candidates. In short, AB 2839 ensures deepfake-free campaigning close to Election Day, when voter attention is highest.

*ARGUMENTS IN OPPOSITION*: This measure is opposed by the Electronic Frontier Foundation. They note:

> We respectfully oppose A.B. 2839, which not only bans the distribution of materially deceptive or altered content in relation to an election, but also places burdens on those unconnected to the creation of the content but who distribute it (internet websites, newspapers, etc.) regardless of whether they know of the prohibited manipulation. We recognize the complex issues raised by potentially harmful artificially generated election content. However, this bill's "exceptions" for only some types of republishers, and by requiring them to publish a disclaimer, does not reflect the full First Amendment protection due the republication of speech pertaining to matters of public interest by those not connected with the creation of the offending material.
>
> The First Amendment requires this distinction between those who create synthetic media and those not directly involved in it. The Fourth Circuit relied on this distinction in striking down a Maryland law that extended the reach of campaign finance law to include 'online platforms,' thus imposing disclosure requirements on them when they ran online ads.12 AB 2389, as written, suffers from the same constitutional defect.
>
> By extending beyond the direct publishers of the content and toward re-publishers, A.B. 2839 burdens and holding liable re-publishers of content in a manner that has been found unconstitutional. For these reason, we must oppose A.B. 2839.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

AFSCME AFL-CIO  
Asian Americans Advancing Justice - Asian Law Caucus  
Asian Americans and Pacific Islanders for Civic Empowerment  
Asian Law Alliance  
Bay Rising  
California Clean Money Campaign  
California Initiative for Technology & Democracy, a Project of California Common CAUSE  
Campaign Legal Center  
Chinese Progressive Association  
Courage California  
Disability Rights California  
Hmong Innovating Politics  
Indivisible CA Statestrong

Inland Empire United
League of Women Voters of California
NextGen California
Partnership for The Advancement of New Americans
SEIU California
TechEquity Collaborative
The Partnership for The Advancement of New Americans
Verified Voting
Voices for Progress Education Fund

**Support If Amended**

California Chamber of Commerce
Computer and Communications Industry Association
Software & Information Industry Association
TechNet

**Oppose**

Electronic Frontier Foundation

**Analysis Prepared by**:  Nicholas Liedtke / JUD. / (916) 319-2334