# EXHIBIT 22

**SENATE JUDICIARY COMMITTEE**
**Senator Thomas Umberg, Chair**
2023-2024  Regular  Session

AB 2839 (Pellerin)
Version: June 24, 2024
Hearing Date: July 2, 2024
Fiscal: No
Urgency: No
CK

## SUBJECT

Elections:  deceptive media in advertisements

## DIGEST

This bill prohibits a person, committee, or other entity from knowingly distributing an advertisement or other election communication that contains materially deceptive content, as defined and specified, with malice, except as provided, within 120 days of a California election, and in specified cases, 60 days thereafter.

## EXECUTIVE SUMMARY

Certain forms of media – audio recordings, video recordings, and still images – can be powerful evidence of what truly took place. While such media have always been susceptible to some degree of manipulation, until recently, fakes were relatively easy to detect. The rapid advancement of AI technology, specifically the wide-scale introduction of generative AI models, has made it drastically cheaper and easier to produce synthetic content – audio, images, text, and video recordings that are not real, but that are so realistic that they are virtually impossible to distinguish from authentic content, including so-called "deepfakes." In the context of election campaigns, such deepfakes can be weaponized to deceive voters into thinking that a candidate said or did something which the candidate did not. A series of bills currently pending before this Committee attempt to address these issues. In an attempt to prevent deepfakes and other materially deceptive content from altering elections, this bill prohibits the knowing distribution, with malice, of advertisements containing material deceptive content of specified material, including specified portrayals of candidates, elections officials, and elections property or equipment.

Supporters of the bill include the League of Women Voters of California and the California Broadcasters Association. It is opposed by several groups, including the Electronic Frontier Foundation and the Motion Picture Association. The bill passed out of the Senate Elections and Constitutional Amendments Committee on a 6 to 0 vote.

## **PROPOSED CHANGES TO THE LAW**

Existing law:

1) Provides that "Congress shall make no law… abridging the freedom of speech..." (U.S. Const., amend. 1.)

2) Applies the First Amendment to the states through operation of the Fourteenth Amendment. (*Gitlow v. New York* (1925) 268 U.S. 652; *NAACP v. Alabama* (1925) 357 U.S. 449.)

3) Provides that no provider or user of an interactive computer service shall be treated for liability purposes as the publisher or speaker of any information provided by another information content provider. (47 U.S.C. § 230.)

4) Defines "materially deceptive audio or visual media" as an image or an audio or video recording of a candidate's appearance, speech, or conduct that has been intentionally manipulated in a manner such that both of the following conditions are met:
   a. The image or audio or video recording would falsely appear to a reasonable person to be authentic.
   b. The image or audio or video recording would cause a reasonable person to have a fundamentally different understanding or impression of the expressive content of the image or audio or video recording than that person would have if the person were hearing or seeing the unaltered, original version of the image or audio or video recording. (Elec. Code § 20010(e).)

5) Prohibits a person, committee, or other entity from distributing with actual malice materially deceptive audio or visual media of a candidate with the intent to injure the candidate's reputation or to deceive a voter into voting for or against the candidate within 60 days of an election at which a candidate for elective office will appear on the ballot, unless specified conditions are met. (Elec. Code § 20010(a).)

6) Exempts audio or visual media that includes a disclosure stating: "This _____ has been manipulated." Requires the blank in the disclosure to be filled with a term that most accurately describes the media, as specified. Requires the following disclosures for visual and audio-only media:
   a. For visual media, the text of the disclosure shall appear in a size that is easily readable by the average viewer and no smaller than the largest font size of other text appearing in the visual media. If the visual media does not include any other text, then the disclosure shall appear in a size that is

      easily readable by the average viewer. Requires, for visual media that is video, the disclosure to be displayed throughout the duration of the video.
    b. For audio-only media, the disclosure shall be read in the clearly spoken manner and in a pitch that can be easily heard by the average listener, at the beginning of the audio, at the end of the audio, and, if the audio is greater than two minutes in length, interspersed within the audio at intervals of not greater than two minutes each. (Elec. Code § 20010(b).)

7) Permits a candidate for elective office whose voice or likeness appears in a materially deceptive audio or visual media distributed in violation of the above provisions, to seek injunctive or other equitable relief prohibiting the distribution of the audio or visual media in violation. (Elec. Code § 20010(c)(1).)

8) Permits a candidate for elective office whose voice or likeness appears in materially deceptive audio or visual media distributed in violation of the provisions of this bill to bring an action for general or special damages against the person, committee, or other entity that distributed the materially deceptive audio or visual media, as specified. Requires the plaintiff to bear the burden of establishing the violation through clear and convincing evidence in any civil action alleging a violation, as specified. (Elec. Code § 21101(c)(2).)

This bill:

1) Prohibits a person, committee, or other entity, during the time period of 120 days before an election to, in some specified instances, 60 days after the election in California from knowingly distributing, with malice, an advertisement or other election communication containing materially deceptive content of any of the following:
    a) A candidate for any federal, state, or local elected office in California portrayed as doing or saying something that the candidate did not do or say if the content is reasonably likely to harm the reputation or electoral prospects of a candidate.
    b) An elections official portrayed as doing or saying something in connection with an election in California that the elections official did not do or say if the content is reasonably likely to falsely undermine confidence in the outcome of one or more election contests.
    c) An elected official portrayed as doing or saying something in connection with an election in California that the elected official did not do or say if the content is reasonably likely to harm the reputation or electoral prospects of a candidate or is reasonably likely to falsely undermine confidence in the outcome of one or more election contests.
    d) A voting machine, ballot, voting site, or other property or equipment related to an election in California portrayed in a materially false way if

    the content is reasonably likely to falsely undermine confidence in the outcome of one or more election contests.

2) Authorizes, notwithstanding the above, a candidate to portray themselves as doing or saying something that the candidate did not do or say, if the content includes a disclosure stating "This [category of content] has been manipulated." and complies with the following requirements:
   a) For visual media, the text of the disclosure shall appear in a size that is easily readable by the average viewer and no smaller than the largest font size of other text appearing in the visual media. If the visual media does not include any other text, the disclosure shall appear in a size that is easily readable by the average viewer. For visual media that is video, the disclosure shall appear for the duration of the video.
   b) If the media consists of audio only, the disclosure shall be read in a clearly spoken manner and in a pitch that can be easily heard by the average listener, at the beginning of the audio, at the end of the audio, and, if the audio is greater than two minutes in length, interspersed within the audio at intervals of not greater than two minutes each.

3) Authorizes a recipient of materially deceptive content distributed in violation hereof, a candidate or committee participating in the election, or an elections official to seek injunctive or other equitable relief prohibiting the distribution of the violative content. The court shall also award a prevailing plaintiff reasonable attorney's fees and costs. Such an action is entitled to precedence in accordance with Section 35 of the Code of Civil Procedure. The bill further authorizes such parties to bring an action for general or special damages against the person, committee, or other entity that distributed the materially deceptive content in violation hereof. The court shall also award a prevailing party reasonable attorney's fees and costs.

4) Requires plaintiffs in the actions outlined above to establish violations by clear and convincing evidence.

5) Provides a list of exemptions from these provisions, including satire or parody, news publications, and a radio or television broadcasting station when it is paid to broadcast materially deceptive content or when it is broadcasting the content as part of a news program and the content is acknowledged to be materially deceptive.

6) Defines the relevant terms, including:

   a) "Advertisement" means any general or public communication that is authorized or paid for the purpose of supporting or opposing a candidate for elective office in California or a ballot measure that appears on a

> California ballot and that is broadcast by or through television, radio, telephone, or text, or disseminated by print media, including billboards, video billboards or screens, and other similar types of advertising.
> b) "Deepfake" means audio or visual media that is digitally created or modified such that it would falsely appear to a reasonable person to be an authentic record of the actual speech or conduct of the individual depicted in the media.
> c) "Malice" means the person, committee, or other entity distributed the audio or visual media knowing the materially deceptive content was false or with a reckless disregard for the truth.
> d) "Materially deceptive content" means audio or visual media that is intentionally digitally created or modified, which includes deepfakes, such that the content would falsely appear to a reasonable person to be an authentic record of the content depicted in the media.

7) Requires actions brought pursuant hereto to be placed on the court calendar in the order of their date of filing and to be given precedence.

8) Includes findings and declarations and a severability clause.

## COMMENTS

1. <u>Blurring reality: AI-generated content</u>

Generative AI is a type of artificial intelligence that can create new content, including text, images, code, or music, by learning from existing data. Generative AI models can produce realistic and novel artifacts that resemble the data they were trained on, but do not copy it. For example, generative AI can write a poem, draw a picture, or compose a song based on a given prompt or theme. Generative AI enables users to quickly generate new content based on a variety of inputs. Generative AI models use neural networks to identify the patterns and structures within existing data to generate new and original content.

The world has been in awe of the powers of this generative AI since the widespread introduction of AI systems such as ChatGPT. However, the capabilities of these advanced systems leads to a blurring between reality and fiction. The Brookings Institution lays out the issue:

> Over the last year, generative AI tools have made the jump from research prototype to commercial product. Generative AI models like OpenAI's ChatGPT and Google's Gemini can now generate realistic text and images that are often indistinguishable from human-authored content, with generative AI for audio and video not far behind. Given these advances, it's no longer surprising to see AI-generated images of public figures go

> viral or AI-generated reviews and comments on digital platforms. As such, generative AI models are raising concerns about the credibility of digital content and the ease of producing harmful content going forward.
>
> Against the backdrop of such technological advances, civil society and policymakers have taken increasing interest in ways to distinguish AI-generated content from human-authored content.[1]

One expert at the Copenhagen Institute for Future Studies estimates that should large generative-AI models run amok, up to 99 percent of the internet's content could be AI-generated by 2025 to 2030.[2] The problematic applications are seemingly infinite, whether it be deepfakes to blackmail or shame victims, false impersonations to commit fraud, or other nefarious purposes. Infamously, in January of this year, Taylor Swift was the victim of sexually explicit, nonconsensual deepfake images using AI that were widely spread across social media platforms.[3] Perhaps more disturbingly, a trend has emerged in schools of students creating such images: "At schools across the country, people have used deepfake technology combined with real images of female students to create fraudulent images of nude bodies. The deepfake images can be produced using a cellphone."[4] As more of the population becomes aware of the potential to realistically fake images, video, and text, some will use the skepticism that creates to challenge the authenticity of real content, a phenomena coined the "liar's dividend."[5]

Relevant here, AI and specifically generative AI can spread misinformation regarding elections with ease, both in California and across the world:

> Artificial intelligence is supercharging the threat of election disinformation worldwide, making it easy for anyone with a smartphone and a devious imagination to create fake – but convincing – content aimed at fooling voters.

---

[1] Siddarth Srinivasan, *Detecting AI fingerprints: A guide to watermarking and beyond* (January 4, 2024) Brookings Institution, https://www.brookings.edu/articles/detecting-ai-fingerprints-a-guide-to-watermarking-and-beyond/#:~:text=Google%20also%20recently%20announced%20SynthID,model%20to%20detect%20the%20watermark. All internet citations are current as of June 22, 2024.

[2] Lonnie Lee Hood, *Experts Say That Soon, Almost The Entire Internet Could Be Generated by AI* (March 4, 2022) The Byte, https://futurism.com/the-byte/ai-internet-generation.

[3] Brian Contreras, *Tougher AI Policies Could Protect Taylor Swift – And Everyone Else – From Deepfakes* (February 8, 2024) Scientific American, https://www.scientificamerican.com/article/tougher-ai-policies-could-protect-taylor-swift-and-everyone-else-from-deepfakes/.

[4] Hannah Fry, Laguna Beach High School investigates 'inappropriate' AI-generated images of students (April 2, 2024) Los Angeles Times, https://www.latimes.com/california/story/2024-04-02/laguna-beach-high-school-investigating-creation-of-ai-generated-images-of-students.

[5] Bobby Chesney & Danielle Citron, *Deep Fakes: A Looming Challenge for Privacy, Democracy, and National Security* (July 14, 2018) 107 California Law Review 1753 (2019), https://ssrn.com/abstract=3213954.

> It marks a quantum leap from a few years ago, when creating phony photos, videos or audio clips required teams of people with time, technical skill and money. Now, using free and low-cost generative artificial intelligence services from companies like Google and OpenAI, anyone can create high-quality "deepfakes" with just a simple text prompt.
>
> A wave of AI deepfakes tied to elections in Europe and Asia has coursed through social media for months, serving as a warning for more than 50 countries heading to the polls this year.
>
> "You don't need to look far to see some people ... being clearly confused as to whether something is real or not," said Henry Ajder, a leading expert in generative AI based in Cambridge, England.
>
> The question is no longer whether AI deepfakes could affect elections, but how influential they will be, said Ajder, who runs a consulting firm called Latent Space Advisory.
>
> As the U.S. presidential race heats up, FBI Director Christopher Wray recently warned about the growing threat, saying generative AI makes it easy for "foreign adversaries to engage in malign influence."[6]

On that last note, in February of this year, voters in New Hampshire received robocalls that are purported to have used an AI voice resembling President Joe Biden advising them against voting in the presidential primary and saving their vote for the November general election.[7] The examples are endless:

> Former President Donald Trump, who is running in 2024, has shared AI-generated content with his followers on social media. A manipulated video of CNN host Anderson Cooper that Trump shared on his Truth Social platform on Friday, which distorted Cooper's reaction to the CNN town hall this past week with Trump, was created using an AI voice-cloning tool.
>
> A dystopian campaign ad released last month by the Republican National Committee offers another glimpse of this digitally manipulated future. The online ad, which came after President Joe Biden announced his reelection campaign, and starts with a strange, slightly warped image of

---

[6] Ali Swenson & Kelvin Chan, *Election disinformation takes a big leap with AI being used to deceive worldwide* (March 14, 2024) Associated Press, https://apnews.com/article/artificial-intelligence-elections-disinformation-chatgpt-bc283e7426402f0b4baa7df280a4c3fd.

[7] Em Steck & Andrew Kaczynski, *Fake Joe Biden robocall urges New Hampshire voters not to vote in Tuesday's Democratic primary* (January 22, 2024) CNN, https://www.cnn.com/2024/01/22/politics/fake-joe-biden-robocall/index.html.

> Biden and the text "What if the weakest president we've ever had was re-elected?"
>
> A series of AI-generated images follows: Taiwan under attack; boarded up storefronts in the United States as the economy crumbles; soldiers and armored military vehicles patrolling local streets as tattooed criminals and waves of immigrants create panic.
>
> "An AI-generated look into the country's possible future if Joe Biden is re-elected in 2024," reads the ad's description from the RNC.
>
> The RNC acknowledged its use of AI, but others, including nefarious political campaigns and foreign adversaries, will not, said Petko Stoyanov, global chief technology officer at Forcepoint, a cybersecurity company based in Austin, Texas. Stoyanov predicted that groups looking to meddle with U.S. democracy will employ AI and synthetic media as a way to erode trust.[8]

Legislatures across the country are pushing legislation that would address this looming threat.

2. <u>Materially deceptive content in political advertisements</u>

This bill takes aim at "materially deceptive content" in elections communications. "Materially deceptive content" means audio or visual media that is intentionally digitally created or modified, such that the content would falsely appear to a reasonable person to be an authentic record of the content depicted in the media, including deepfakes. The bill prohibits any person, committee, or entity from knowingly distributing such advertisements or elections communications with this deceptive content when it portrays the following:

- A candidate for any federal, state, or local elected office in California portrayed as doing or saying something that the candidate did not do or say if the content is reasonably likely to harm the reputation or electoral prospects of a candidate.
- An elected official portrayed as doing or saying something in connection with an election in California that the elected official did not do or say if the content is reasonably likely to harm the reputation or electoral prospects of a candidate or is reasonably likely to falsely undermine confidence in the outcome of one or more election contests.

---

[8] David Klepper & Ali Swenson, *AI-generated disinformation poses threat of misleading voters in 2024 election* (May 14, 2023) PBS News, https://www.pbs.org/newshour/politics/ai-generated-disinformation-poses-threat-of-misleading-voters-in-2024-election.

- An elections official portrayed as doing or saying something in connection with an election in California that the elections official did not do or say if the content is reasonably likely to falsely undermine confidence in the outcome of one or more election contests.
- A voting machine, ballot, voting site, or other property or equipment related to an election in California portrayed in a materially false way if the content is reasonably likely to falsely undermine confidence in the outcome of one or more election contests.

The bill provides one exception from these prohibitions. It provides that a candidate may portray themselves as doing or saying something that the candidate did not do or say, if the content includes a clear disclosure, as specified, that states "This [category of content] has been manipulated." Concerns have been raised that this could be read as providing explicit legal authority for candidates to possibly engage in deceptive advertising or elections communications. The author has agreed to an amendment that instead clarifies that such portrayals are not subject to the provisions of this bill.

Recent amendments require this to be done with malice to amount to a violation. These prohibitions only apply 120 days before an election in California and, for the latter two categories, applies through 60 days after the election. These timelines limit the scope to periods when the outcome of the election, or the confidence in the election itself, is most vulnerable to such content.

Anyone receiving such advertisements or elections communications, any candidate or committee participating in the election, and any elections official are all given standing to seek injunctive relief to prohibit further distribution, with such actions given precedence in the courts. Prevailing plaintiffs are also entitled to reasonable attorney's fees and costs. In addition, such parties shall also have standing to bring an action for damages and fees and costs against a party in violation. Plaintiffs in these actions are required to establish violations by clear and convincing evidence.

According to the author:

> Those trying to influence elections—conspiracy theorists, foreign states, online trolls, and even campaigns themselves—have already started creating and distributing deepfake images, audio, and video content in the United States and around the world. This generative AI-fueled disinformation can affect voter behavior and undermine faith in our elections.
>
> Entering the 2024 election, millions of voters will not know what images, audio, or video they can trust, and their faith in election integrity and our democracy will be significantly diminished. AB 2839 will protect our democracy by limiting the spread of harmful disinformation and

>   deepfakes used in political campaign ads including mailers, television, radio, and robocalls.

3. <u>Constitutional implications</u>

As the bill prohibits certain forms of speech, it implicates the protections of the First Amendment of the United States Constitution, applied to the states by the Fourteenth Amendment. The First Amendment provides that "Congress shall make no law . . . prohibiting the freedom of speech." As interpreted by the courts, the First Amendment prevents the government from enacting any law or adopting any policy that burdens freedom of speech. In addition, Article I, Section 2 of the California Constitution guarantees to every person the freedom to "speak, write, and publish his or her sentiments on all subjects, being responsible for the abuse of this right." Moreover, the First Amendment not only protects the right to speak, as a logical corollary it protects the "right to receive information and ideas."[9] California courts have been clear that political expression in the context of campaigns of any manner should be given wide latitude:

>   Hyperbole, distortion, invective, and tirades are as much a part of American politics as kissing babies and distributing bumper stickers and pot holders. Political mischief has been part of the American political scene since, at least, 1800.
>
>   In any election, public calumny of candidates is all too common. "Once an individual decides to enter the political wars, he subjects himself to this kind of treatment. . . . [D]eeply ingrained in our political history is a tradition of free-wheeling, irresponsible, bare knuckled, Pier 6, political brawls." To endure the animadversion, brickbats and skullduggery of a given campaign, a politician must be possessed with the skin of a rhinoceros. Harry Truman cautioned would-be solons with sage advice about the heat in the kitchen.
>
>   Nevertheless, political campaigns are one of the most exhilarating phenomena of our democracy. They bring out the best and the worst in us. They allow candidates and their supporters to express the most noble and, lamentably, the most vile sentiments. They can be fractious and unruly, but what they yield is invaluable: an opportunity to criticize and comment upon government and the issues of the day.
>
>   The candidate who finds himself or herself the victim of misconduct is not without a remedy. Those campaign tactics which go beyond the pale are sanctionable under FPPC laws.

---

[9] *Stanley v Georgia* (1969) 394 U.S. 557, 564. Internal citations omitted

> It is abhorrent that many political campaigns are mean-spirited affairs that shower the voters with invective instead of insight. The elimination from political campaigns of opprobrium, deception and exaggeration would shed more light on the substantive issues, resulting in a more informed electorate. It would encourage more able people to seek public office. But to ensure the preservation of a citizen's right of free expression, we must allow wide latitude.[10]

The United States Supreme Court has emphasized the extraordinary protection afforded to political speech:

> Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Although First Amendment protections are not confined to "the exposition of ideas," "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs,… of course includ[ing] discussions of candidates…." This no more than reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. As the Court observed in *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971), "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."[11]

This protection does not end where the truth of the speech does. "Although false statements of fact, by themselves, have no constitutional value, constitutional protection is not withheld from all such statements."[12] For instance, in the seminal opinion in *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279-80, the court found the Constitution requires a rule that "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not. The Supreme Court has expounded on this principle, providing nuance based on the knowledge of the speaker:

---

[10] *Beilenson v. Superior Court* (1996) 44 Cal. App. 4th 944, 954-55. Internal citations omitted.
[11] *Buckley v. Valeo* (1976) 424 U.S. 1, 14-15. Internal citations omitted.
[12] *People v. Stanistreet* (2002) 29 Cal. 4th 497, 505.

> Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned. And since ". . . erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive' . . . ," only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions. For speech concerning public affairs is more than self-expression; it is the essence of self-government. The First and Fourteenth Amendments embody our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."
>
> The use of calculated falsehood, however, would put a different cast on the constitutional question. Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published about a public official, should enjoy a like immunity. At the time the First Amendment was adopted, as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration. That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . ." Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.[13]

This bill implicates both the right to speak about elections, as well as the right to receive information regarding them. "Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."[14]
However, this bill's language narrowly tailors the prohibitions in the bill to that speech afforded the least constitutional protection. "Materially deceptive content" requires that

---

[13] *Garrison v. Louisiana* (1964) 379 U.S. 64, 74-75. Internal citations omitted.
[14] *Citizens United v. FEC* (2010) 558 U.S. 310, 340. Internal citations omitted. It should be noted that while not controversial for the principle cited herein, this opinion is widely criticized for further tilting political influence toward wealthy donors and corporations.

it was intentionally created or altered such that the content falsely appears to be authentic. The bill requires the person, committee, or entity to knowingly distribute such material with malice, which means the person, committee, or other entity distributed the content knowing the materially deceptive content was false or with a reckless disregard for the truth. This mirrors the test laid out in *New York Times v. Sullivan*. In addition, many of the relevant cases stress that the level of burden placed on a defendant to defend their political speech is a factor to consider. For instance, the following was stated in *New York Times v. Sullivan*:

> A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions -- and to do so on pain of libel judgments virtually unlimited in amount -- leads to a comparable "self-censorship." Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars.[15]

Responsive to this consideration, the bill requires a plaintiff bringing a claim pursuant to this bill, to prove the above factors by clear and convincing evidence.

Ultimately, this bill prohibits the knowing distribution of deceptive content with malice only at key points in the election cycle with an extremely compelling goal of safeguarding our democracy. Although, as with most restrictions on political speech, this bill may face legal challenge, it is arguably narrowly tailored to serve this compelling government interest to avoid improperly impinging on the constitutional guarantees of the First Amendment.

4. <u>Stakeholder positions</u>

A coalition of groups in support, including SEIU California and NextGen California, write:

> California is entering its first-ever generative artificial intelligence (AI) election, in which disinformation powered by generative AI will pollute our information ecosystems like never before. In a few clicks, using current technology, bad actors now have the power to create a false image of a candidate accepting a bribe, a fake video of an elections official "caught on tape" saying that voting machines are not secure, or a robocall of "Governor Newsom" incorrectly telling millions of Californians their voting site has changed. . . .

---

[15] *N.Y. Times Co. v. Sullivan*, at 279.

> AB 2839 seeks to solve these problems by preventing the use of deepfakes and disinformation -- targeting candidates, elected officials, and elections officials -- in political communications, and does so in a narrowly tailored way that is consistent with the First Amendment.

Writing in an oppose position, the Electronic Frontier Foundation argues the bill should be narrowed to focus on the direct publishers:

> We respectfully oppose your bill A.B. 2839, which not only bans the distribution of materially deceptive or altered content in relation to an election, but also places burdens on those unconnected to the creation of the content but who distribute it (internet websites, newspapers, etc.) regardless of whether they know of the prohibited manipulation. We recognize the complex issues raised by potentially harmful artificially generated election content. However, this bill's "exceptions" for only some types of republishers, and by requiring them to publish a disclaimer, does not reflect the full First Amendment protection due the republication of speech pertaining to matters of public interest by those not connected with the creation of the offending material.
>
> The First Amendment requires this distinction between those who create synthetic media and those not directly involved in it. The Fourth Circuit relied on this distinction in striking down a Maryland law that extended the reach of campaign finance law to include 'online platforms,' thus imposing disclosure requirements on them when they ran online ads. AB 2389, as written, suffers from the same constitutional defect.
>
> By extending beyond the direct publishers of the content and toward re-publishers, A.B. 2839 burdens and holding liable re-publishers of content in a manner that has been found unconstitutional.

## **SUPPORT**

AFSCME California
Bay Rising
California Broadcasters Association
Catalyst California
Center for Countering Digital Hate
Chinese Progressive Association
City and County of San Francisco Board of Supervisors
Disability Rights California
Indivisible CA Statestrong
League of Women Voters of California
Move (mobilize, Organize, Vote, Empower) the Valley

NextGen California
Northern California Recycling Association
Partnership for the Advancement of New Americans
SEIU California
Youth Power Project

## OPPOSITION

Directv Group, INC.
Dish Network, LLC
Electronic Frontier Foundation
Motion Picture Association
Streaming Innovation Alliance

## RELATED LEGISLATION

Pending Legislation:

SB 942 (Becker, 2024) establishes the California AI Transparency Act, requiring covered providers to create and make freely available an AI detection tool to detect content as AI-generated and to include disclosures in content generated by the provider's system. SB 942 is currently in the Assembly Judiciary Committee.

SB 970 (Ashby, 2024) ensures that media manipulated or generated by artificial intelligence (AI) technology is incorporated into the right of publicity law and criminal false impersonation statutes. The bill requires those providing access to such technology to provide a warning to consumers about liability for misuse. SB 970 was held on suspense in the Senate Appropriations Committee.

AB 2355 (Wendy Carrillo, 2024) requires committees that create, publish, or distribute a political advertisement that contains any image, audio, or video that is generated or substantially altered using artificial intelligence to include a disclosure in the advertisement disclosing that the content has been so altered. AB 2355 is currently in this Committee.

AB 2655 (Berman, 2024) establishes the Defending Democracy from Deepfake Deception Act of 2024, which requires a large online platform to block the posting or sending of materially deceptive and digitally modified or created content related to elections, during specified periods before and after an election. It requires these platforms to label certain additional content inauthentic, fake, or false during specified periods before and after an election and to provide mechanisms to report content. AB 2655 is currently in this Committee.

AB 2930 (Bauer-Kahan, 2024) requires, among other things, a deployer and a developer of an automated decision tool to perform an impact assessment for any automated decision tool the deployer uses that includes, among other things, a statement of the purpose of the automated decision tool and its intended benefits, uses, and deployment contexts. AB 2930 requires a deployer to, at or before the time an automated decision tool is used to make a consequential decision, notify any natural person that is the subject of the consequential decision that an automated decision tool is being used to make, or be a substantial factor in making, the consequential decision and to provide that person with, among other things, a statement of the purpose of the automated decision tool. AB 2930 is currently in this Committee.

AB 3211 (Wicks, 2024) establishes the California Provenance, Authenticity and Watermarking Standards Act, which requires a generative AI system provider to take certain actions to assist in the disclosure of provenance data to mitigate harms caused by inauthentic content, including placing imperceptible and maximally indelible watermarks containing provenance data into content created by an AI system that the generative AI system provider makes available. AB 3211 also requires a large online platform, as defined, to, among other things, use labels to prominently disclose the provenance data found in watermarks or digital signatures in content distributed to users on its platforms, as specified. AB 3211 is currently in the Senate Appropriations Committee.

Prior Legislation: AB 730 (Berman, Ch. 493, Stats. 2019) prohibited the use of deepfakes depicting a candidate for office within 60 days of the election unless the deepfake is accompanied by a prominent notice that the content of the audio, video, or image has been manipulated. Additionally, AB 730 authorized a candidate who was falsely depicted in a deepfake to seek rapid injunctive relief against further publication and distribution of the deepfake.

**PRIOR VOTES:**

Senate Elections and Constitutional Amendments Committee (Ayes 6, Noes 0)
Assembly Floor (Ayes 59, Noes 4)
Assembly Appropriations Committee (Ayes 11, Noes 3)
Assembly Judiciary Committee (Ayes 8, Noes 2)
Assembly Elections Committee (Ayes 6, Noes 1)
**************