1  ROB BONTA
   Attorney General of California
2  ANYA M. BINSACCA, State Bar No. 189613
   Supervising Deputy Attorney General
3  KRISTIN A. LISKA, State Bar No. 315994
   Deputy Attorney General
4    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
5    Telephone:  (415) 510-3916
     Fax:  (415) 703-5480
6    E-mail:  Kristin.Liska@doj.ca.gov
   *Attorneys for Defendants*

7

8              IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10                  SACRAMENTO DIVISION

11

12  **CHRISTOPHER KOHLS, et al.,**          Case No. 2:24-cv-02527-JAM-CKD

13                            Plaintiffs,

14        **v.**                            **DEFENDANTS' MEMORANDUM OF
                                            POINTS AND AUTHORITIES IN**
15  **ROB BONTA, in His Official Capacity as**  **SUPPORT OF MOTION FOR**
   **Attorney General of the State of California,**  **SUMMARY JUDGMENT ON**
16  **and SHIRLEY N. WEBER, in Her Official**  **ASSEMBLY BILL 2839**
   **Capacity as California Secretary of State,**
17
                             Defendants.    Date:        August 5, 2025
18                                          Time:        1:00 p.m.
                                            Dept:        6
19                                          Judge:       The Honorable John A.
                                                         Mendez
20                                          Trial Date:  Not Scheduled
                                            Action Filed: 9/17/2024
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................... 1

Background ............................................................................................................ 2

    A.    The Growing Dangers of Political Deepfakes ........................................... 2

    B.    Assembly Bill 2839 ................................................................................... 4

    C.    Procedural History .................................................................................... 7

Legal Standard ...................................................................................................... 9

Argument .............................................................................................................. 9

    I.    AB 2839 Is Valid Under the First Amendment and California's Free Speech Clause .......................................................................................... 9

        A.    AB 2839 Is Not Facially Invalid Under the First Amendment ................. 10

        B.    AB 2839 Is Not Invalid as Applied ........................................................... 14

            1.    AB 2839 Furthers Compelling Interests in Electoral Integrity and Prevents Fraud on Voters ....................................... 14

            2.    AB 2839 Is Narrowly Tailored to Further These Interests ........... 17

            3.    AB 2839's Labeling Safe Harbor Is Not Invalid as Applied ........ 20

    II.    AB 2839 Is Not Unduly Vague ................................................................... 22

Conclusion ............................................................................................................ 24

# TABLE OF AUTHORITIES

**Page**

CASES

*Agency for Int'l Dev. v. Alliance for Open Society Int'l*
    591 U.S. 430 (2020) ................................................................................................. 14

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986) ................................................................................................... 9

*Animal Legal Defense Fund v. Wasden*
    878 F.3d 1184 (9th Cir. 2018) ................................................................................. 13

*Beeman v. Anthem Prescription Management, LLC*
    58 Cal. 4th 329 (2013) ............................................................................................... 9

*Berger v. City of Seattle*
    569 F.3d 1029 (9th Cir. 2009) ................................................................................. 17

*Burson v. Freeman*
    504 U.S. 191 (1992) ................................................................................................. 16

*Cal. Teachers Ass'n v. State Bd. of Educ.*
    271 F.3d 1141 (9th Cir. 2001) ................................................................................. 22

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986) ................................................................................................... 9

*City of Austin v. Reagan Nat'l Advertising of Austin, LLC*
    596 U.S. 61 (2022) ................................................................................................... 10

*Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Ltd.*
    109 F.3d 1394 (9th Cir. 1997) ................................................................................. 23

*Eu v. S.F. Cnty. Democratic Cent. Comm.*
    489 U.S. 214 (1989) ................................................................................................. 16

*Farah v. Esquire Magazine*
    736 F.3d 528 (D.C. Cir. 2013) ........................................................................... 12, 23

*FCC v. Fox Tel. Stations, Inc.*
    567 U.S. 239 (2012) ................................................................................................. 22

*Federal Elections Commission v. Cruz*
    596 U.S. 289 (2022) ................................................................................................. 15

*Fontana v. Haskin*
    262 F.3d 871 (9th Cir. 2001) ..................................................................................... 9

ii

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3
4
*Hill v. Colorado*
    530 U.S. 703 (2000) .................................................................................................... 22

5
*Illinois ex rel. Madigan v. Telemarking Associates, Inc.*
    538 U.S. 600 (2003) .................................................................................................... 13

6
7
*John Doe No. 1 v. Reed*
    561 U.S. 186 (2010) .................................................................................................... 16

8
9
*Knievel v. ESPN*
    393 F.3d 1068 (9th Cir. 2005) ............................................................................. 12, 23

10
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
    475 U.S. 574 (1986) ...................................................................................................... 9

11
12
*McIntyre v. Ohio Elections Comm'n*
    514 U.S. 334 (1995) ............................................................................................. 16, 17

13
14
*Milkovich v. Lorain Journal Co.*
    497 U.S. 1 (1990) ............................................................................................ 12, 13, 19

15
*Moody v. NetChoice, LLC*
    603 U.S. 707 (2024) ................................................................................. 10, 11, 12, 14

16
17
*NetChoice, LLC v. Bonta*
    113 F.4th 1101 (9th Cir. 2024) .................................................................................. 10

18
19
*Project Veritas v. Schmidt*
    125 F.4th 929 (9th Cir. 2025) ............................................................................... 12, 13

20
*Smith v. Helzer*
    95 F.4th 1207 (9th Cir. 2024) .............................................................................. 20, 21

21
22
*Twitter, Inc. v. Garland*
    61 F.4th 686 (9th Cir. 2023) ...................................................................................... 10

23
24
*United States v. Jae Gab Kim*
    449 F.3d 933 (9th Cir. 2006) ...................................................................................... 23

25
*United States v. Swisher*
    811 F.3d 229 (9th Cir. 2016) ...................................................................................... 10

26
27
*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*
    455 U.S. 489 (1982) .................................................................................................... 23

28

iii

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

**STATUTES**

4

2024 Cal. Stats., Chapter 261 (AB 2655) ................................................................ 1, 5, 8, 9

5

2024 Cal. Stats., Chapter 262 (AB 2839) ..................................................................... *passim*

6

California Elections Code

7
    § 20012(a)(1) ......................................................................................................... 5

8
    § 20012(a)(2) .................................................................................................... 4, 15

    § 20012(a)(3) .................................................................................................... 5, 15

    § 20012(a)(4) .................................................................................................... 5, 15

9
    § 20012(b)(1) ..................................................................................................... *passim*

10
    § 20012(b)(1)(A) ............................................................................................. 12, 17

    § 20012(b)(1)(A)(i) .............................................................................................. 6

11
    § 20012(b)(1)(B) ................................................................................................. 18

    § 20012(b)(1)(C) ................................................................................................. 18

12
    § 20012(b)(1)(D) ................................................................................................. 18

    § 20012(b)(2) ....................................................................................................... 6

13
    § 20012(b)(3) .................................................................................................... 7, 17

    § 20012(b)(4) ....................................................................................................... 7

14
    § 20012(c) ............................................................................................................ 6

15
    § 20012(d)(1) ....................................................................................................... 7

    § 20012(d)(2) ....................................................................................................... 7

16
    § 20012(d)(3) ....................................................................................................... 7

    § 20012(e) ............................................................................................................ 7

17
    § 20012(f)(1) ........................................................................................................ 5

18
    § 20012(f)(5) ........................................................................................................ 5

    § 20012(f)(7) .................................................................................................... 13, 19

19
    § 20012(f)(8)(A) .................................................................................... 5, 11, 17, 23

    § 20012(f)(8)(B) ............................................................................................... 6, 18

20
    § 20012(f)(9) ....................................................................................................... 7

    § 20012(h) ............................................................................................................ 7

21

22

**CONSTITUTIONAL PROVISIONS**

23

United States Constitution

    First Amendment ................................................................................................ *passim*

24
    Fourteenth Amendment ..................................................................................... 1, 2

25

**COURT RULES**

26

Federal Rules of Civil Procedure

27
    Rule 56 ................................................................................................................ 9

28

iv

1

## TABLE OF AUTHORITIES
**(continued)**

2

**Page**

3

**OTHER AUTHORITIES**

4

Ali Swenson, *A Parody Ad Shared by Elon Musk Clones Kamala Harris' Voice*,
AP (July 29, 2024), https://apnews.com/article/parody-ad-ai-harris-musk-x-
misleading-3a5df582f911a808d34f68b766aa3b8e# ............................................................. 22

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

In January 2024, shortly before the Democratic presidential primary election, thousands of voters in New Hampshire received a surprising call: former President Joe Biden urged them not to vote in the primary.  The call appeared to come from a local New Hampshire number belonging to the former New Hampshire Democratic Party chair.  But the call was not from former President Biden.  Rather, it was a deepfake—a digitally created audio file imitating former President Biden's voice—paid for by a political consultant.  The incident garnered national attention and generated concerns about the impact of deepfakes and digitally created media on elections.  And this incident is but one example of the many deepfakes that circulated in the lead-up to the 2024 presidential election.

Motivated by concerns over such deepfakes and their threat to electoral integrity, the California Legislature enacted Assembly Bill 2839 (AB 2839) along with a companion statute, Assembly Bill 2655.  AB 2839 prohibits the knowing distribution, with malice, of materially deceptive content depicting specific subjects that might cause specific harms, namely content that: (1) depicts a candidate doing or saying something that the candidate did not do or say and that is reasonably likely to harm the candidate's reputation or electoral prospects, (2) depicts an elected official or elections official doing or saying something in connection with an election in California that the official did not do or say and that is reasonably likely to falsely undermine confidence in electoral outcomes, or (3) depicts election equipment in a materially false way that is reasonably likely to undermine confidence in electoral outcomes.  AB 2839 focuses on a specific subset of knowing falsehoods that pose a high risk to electoral integrity.  Its prohibitions apply only the 120 days before an election and, for content other than that depicting a candidate, the 60 days after an election.  The Legislature concluded that these prohibitions are narrowly tailored to further the State's compelling interest in free and fair elections.

Plaintiffs Christopher Kohls, The Babylon Bee, and Kelly Chang Rickert challenge AB 2839 as a violation of the First and Fourteenth Amendments.  They contend that the statute prohibits political commentary and discussion.  But AB 2839, by its clear language, does not generally prohibit parody or satire.  Only manipulated content that purports to be an authentic

1

1    record of actual events falls within the scope of AB 2839. Nor does AB 2839 raise concerns

2    about the government seeking to become an arbiter of truth. After all, the content that falls within

3    the scope of AB 2839 is clearly false: media intentionally created or manipulated to show a

4    person saying or doing something that person indisputably did not do or say.

5        At its core, AB 2839 is not about silencing political critique or shutting down political

6    debate. Rather, it is an attempt to solve a difficult and novel issue that poses a growing threat to

7    free and fair elections: intentionally altered digital content that portrays something that did not

8    happen as if it did occur and that is meant to deceive and manipulate voters. While the First

9    Amendment provides some protection for falsity, both the Supreme Court and the Ninth Circuit

10   have long recognized that it does not protect all lies. Rather, States may permissibly regulate

11   specific intentional falsehoods that cause specific tangible harms, which AB 2839 does.

12       Nor is AB 2839 impermissibly vague. It clearly delineates the media that falls within its

13   scope: media that has been intentionally digitally created or modified and that shows specified

14   content. Moreover, AB 2839 only applies to the knowing and malicious distribution of such

15   content, providing protection from inadvertent or negligent distribution and tracking the line

16   drawn by the First Amendment in defamation cases. A reasonable person can act secure in their

17   knowledge of whether a piece of media has been digitally created or modified and whether it

18   depicts the specific content subject to AB 2839. The statute is thus not unconstitutional under the

19   Fourteenth Amendment either. Given the lack of material facts in dispute and the

20   constitutionality of AB 2839 as a matter of law, this Court should award judgment to defendants

21   on all claims related to AB 2839.

22                              **BACKGROUND**

23       **A.    The Growing Dangers of Political Deepfakes**

24       A "deepfake" is a digitally manipulated piece of media, often showing a person doing or

25   saying something that person did not in fact do or say, that depicts something as having occurred

26   that did not, in fact, occur. Alvarez Decl. ¶ 8. With advances in modern technology, especially in

27   artificial intelligence (AI), deepfakes have become easier to make. Alvarez Decl. ¶¶ 8-9, 18-19,

28   30-32, 48. Today's modern AI can create highly sophisticated deepfakes that can be incredibly

                                      2

1    realistic and believable to viewers, often leaving viewers unable to know if a particular piece of

2    media is a depiction of real or fake events. Alvarez Decl. ¶¶ 18-19, 30-32, 48-49, 52. AI

3    generation models are freely available online for download or use and can create highly realistic

4    deepfakes in a matter of seconds. Alvarez Decl. ¶ 19. With the ability to utilize large data sets

5    and quickly generate improved deepfakes, actors can also now target deepfakes to specific

6    audiences—a tactic that increases the effectiveness of a deepfake in misleading or confusing

7    viewers. Alvarez Decl. ¶¶ 28-29.

8         Deepfakes pose a new and growing problem in the political realm, particularly with respect

9    to elections and electoral integrity. Research has long shown that visual depictions and content

10   are influential on voters and their decisions about whether and who to vote for. Alvarez Decl.

11   ¶ 11. Their influential nature has led actors to manipulate visual content to create desired impacts

12   on viewers. Alvarez Decl. ¶¶ 6, 47. With respect to political deepfakes specifically, research

13   indicates they can impact voters' behaviors, including the decision about whether to abstain from

14   voting altogether. Alvarez Decl. ¶¶ 11-16. They do this in part by sowing confusion or

15   uncertainty and by generating distrust in political institutions and electoral outcomes. Alvarez

16   Decl. ¶¶ 12-13, 15. They may also impact voters' perceptions of candidates. Alvarez Decl. ¶ 14.

17   And they may spread misinformation about the electoral process or outcomes leading to

18   harassment of elections officials and workers or impairment of the electoral process. Alvarez

19   Decl. ¶¶ 13, 16-17.

20        These concerns about the detrimental impact of political deepfakes are not merely

21   hypothetical. Tangible examples of such political deepfakes already exist. In 2023, a political

22   commentator posted a digitally created video of former President Biden allegedly announcing the

23   beginning of World War III and the return of the draft; at least one viewer asked whether the

24   video was real or fake. Liska Decl., Ex. 14 & 15. That same year, deepfake images of then-

25   former President Donald Trump being arrested circulated online. Liska Decl., Ex. 16. During the

26   2024 Republican primary season, the campaign for presidential candidate Ron DeSantis posted

27   deepfake images that allegedly showed then-former President Trump embracing Dr. Anthony

28   Fauci. Liska Decl., Ex. 17. And shortly before the 2024 New Hampshire primary, a political

3

1    consultant paid to have robocalls made to Democratic primary voters that claimed to be from

2    former President Biden and sought to dissuade voters from casting ballots in the primary election.

3    Liska Decl., Ex. 18 & 19.  Nor have deepfakes vanished since the election: more recently, a

4    deepfake purporting to show President Trump kissing Elon Musk's feet was posted on television

5    screens in the cafeteria of the headquarters of the Department of Housing and Urban

6    Development.  Alvarez Decl. ¶ 21.  One online database that started collecting examples of

7    political deepfakes in 2023 now has over 800 examples of political deepfakes—a likely

8    underestimate of the number that have been disseminated online.  Alvarez Decl. ¶ 10.[1]

9        Online, political deepfakes can spread rapidly, often outpacing the spread of truthful

10   information.  Alvarez Decl. ¶¶ 25-28, 49.  As novel content meant to evoke strong emotional

11   responses, political deepfakes can go viral, obtaining hundreds of millions of views.  Alvarez

12   Decl. ¶ 25.  Their spread can be hard to detect due to the fragmented nature of the online social

13   media ecosystem and the spread of such material through closed communications channels such

14   as encrypted messaging, private social media groups, and personal content delivery systems.

15   Alvarez Decl. ¶ 26.  Moreover, deepfakes are "sticky"—they continue to impact viewers even

16   when the viewers know that their contents are fake.  Alvarez Decl. ¶¶ 22-24, 28-29, 53.  Research

17   has shown across studies that synthetically induced beliefs, such as those from political

18   deepfakes, are resistant to subsequent correction or modification.  Alvarez Decl. ¶¶ 24, 39, 53.

19   And the concerning risks of political deepfakes are further amplified by foreign actors' use of

20   deepfakes to interfere in American politics.  Alvarez Decl. ¶ 35-37.

21       **B.    Assembly Bill 2839**

22       With modern technology, the California Legislature found, "bad actors now have the power

23   to create a false image of a candidate accepting a bribe, or a fake video of an elections official

24   'caught on tape' saying that voting machines are not secure, or generate an artificial robocall in

25   the Governor's voice telling millions of Californians their voting site has changed."  Cal. Elec.

26   Code § 20012(a)(2).  Indeed, the Legislature found, "candidates and parties are already creating

27

28   _____

[1] This database can be found at https://airtable.com/appOU03dlKuBdbmty/shrEkrIYINbrc
KQ3z/tbleGYjNLn2D4Xfzs.  As of March 7, 2025, it had close to 1000 entries.

4

Defs.' Mem. P. & A. Supp. Mot. Summ. J. on AB 2839 (2:24-cv-02527-JAM-CKD)

1    and distributing deepfake images and audio and video content." *Id.* § 20012(a)(3).  Thus,

2    "[v]oters will not know what images, audio, or video they can trust."  *Id.* § 20012(a)(1).

3         The Legislature recognized that California has a "compelling interest in protecting free and

4    fair elections."  Cal. Elec. Code § 20012(a)(4).  It found that "[i]n order to ensure California

5    elections are free and fair, California must, for a limited time before and after elections, prevent

6    the use of deepfakes and disinformation meant to prevent voters from voting and deceive voters

7    based on fraudulent content."  *Id.*  Deepfakes and similar deceptive media "can skew election

8    results . . . and undermine trust in the ballot counting process."  *Id.* § 20012(a)(3).  To address

9    these serious concerns, the Legislature enacted Assembly Bill 2839 (AB 2839) as well as a

10    companion statute, Assembly Bill 2655 (AB 2655).

11         AB 2839 imposes a limited restriction on posting certain especially harmful deepfakes

12    around an election.  Specifically, AB 2839 prohibits the distribution, with malice, of an

13    "advertisement or other election communication containing" specified "materially deceptive

14    content."  Cal. Elec. Code § 20012(b)(1).  The statute defines an "advertisement" as "any general

15    or public communication that is authorized or paid for the purpose of supporting or opposing a

16    candidate for elective office in California or a ballot measure that appears on a ballot issued in

17    California."  Cal. Elec. Code § 20012(f)(1).  In turn, an "election communication" is defined as

18    "any general or public communication not covered under 'advertisement' . . . that concerns"

19    either (1) "[a] candidate for office or ballot measure," (2) "[v]oting or refraining from voting in an

20    election," or (3) "[t]he canvass of the vote."  *Id.* § 20012(f)(5).

21         Under AB 2839, "materially deceptive content" is defined as "audio or visual media that is

22    intentionally digitally created or modified . . . such that the content would falsely appear to a

23    reasonable person to be an authentic record of the content depicted in the media."  Cal Elec. Code

24    § 20012(f)(8)(A).  In other words, "materially deceptive content" is that which a reasonable

25    person would believe shows the depicted person doing or saying something that they *actually* did

26    or said.  If a reasonable viewer would understand that a piece of media is not meant as an accurate

27    portrayal of real events—such as a Saturday Night Live sketch or a video news segment on the

28    satirical website the *Onion*—then that piece of media is not "materially deceptive content" and

5

1   does not fall within the scope of AB 2839.  The statute is also clear that "materially deceptive

2   content" does not include "any audio or visual media that contains only minor modifications that

3   do not significantly change the perceived contents or meaning of the content" such as "changes to

4   brightness or contrast of images" or "removal of background noise in audio." *Id.*

5   § 20012(f)(8)(B).

6       To fall within the scope of AB 2839, the materially deceptive content must portray one of

7   the specified subjects: (1) "[a] candidate for any federal, state, or local elected office in California

8   portrayed as doing or saying something that the candidate did not do or say if the content is

9   reasonably likely to harm the reputation or electoral prospects of a candidate";[2] (2) "[a]n elections

10  official portrayed as doing or saying something in connection with an election in California that

11  the elections official did not do or say if the content is reasonably likely to falsely undermine

12  confidence in the outcome of one or more election contests"; (3) "[a]n elected official portrayed

13  as doing or saying something in connection with an election in California that the elected official

14  did not do or say if the content is reasonably likely to falsely undermine confidence in the

15  outcome of one or more election contests"; or (4) "[a] voting machine, ballot, voting site, or other

16  property or equipment related to an election in California portrayed in a materially false way if

17  the content is reasonably likely to falsely undermine confidence in the outcome of one or more

18  election contests."  Cal. Elec. Code § 20012(b)(1).  These restrictions apply for the 120 days

19  before any election in California; for depictions of an elections official or election equipment, this

20  period is extended for 60 days after the election.  *Id.* § 20012(c).

21      AB 2839's prohibition is further calibrated by including safe harbors that permit the

22  distribution with a disclosure of certain deepfakes in situations less likely to cause the harms that

23  AB 2839 is meant to prevent.  First, AB 2839 "does not apply to a candidate portraying

24  themselves as doing or saying something that the candidate did not do or say if the content

25  includes a disclosure."  Cal. Elec. Code § 20012(b)(2).  Second, it does not apply to broadcasting

26

27  [2] AB 2839 clarifies that a "'candidate for any federal, state, or local elected office in California' includes any person running for the office of President of the United States or Vice President of the United States who seeks to or will appear on a ballot in California."  Cal. Elec.

28  Code § 20012(b)(1)(A)(i).

6

1  stations, newspapers, magazines, or similar periodicals that distribute the material with a

2  disclosure as part of news reporting or publishing.  *Id.* § 20012(e).  Third, while AB 2839 does

3  not generally apply to satire or parody, it categorically protects such content by creating a

4  labeling safe harbor:  AB 2839 does not apply to material "that constitutes satire or parody if the

5  communication includes a disclosure."  *Id.* § 20012(b)(3).  For materially deceptive content

6  falling within one of these safe harbors, AB 2839 separately prohibits any person, committee, or

7  other entity from removing the required disclosure or knowingly republishing the content without

8  the disclosure.  *Id.* § 20012(b)(4).

9      The statute permits a "recipient of materially deceptive content distributed in violation of

10  this [statute], candidate, or committee participating in the election, or elections official" to bring

11  suit seeking injunctive relief prohibiting distribution of the materially deceptive content.  Cal.

12  Elec. Code § 20012(d)(1).  Such a suit may also seek general or special damages against the

13  person, committee, or entity that distributed or republished the materially deceptive content.  *Id.*

14  § 20012(d)(2).  A "recipient" is defined to include "a person who views, hears, or otherwise

15  perceives an image or audio or video file that was initially distributed in violation" of the statute.

16  *Id.* § 20012(f)(9).  In any civil action to enforce AB 2839, "the plaintiff shall bear the burden of

17  establishing the violation through clear and convincing evidence."  *Id.* § 20012(d)(3).  Finally,

18  AB 2839 contains a severability clause.  *Id.* § 20012(h).

19      **C.    Procedural History**

20      Two of the four consolidated actions here challenge AB 2839: the *Kohls* matter and the

21  *Babylon Bee* matter.  With respect to plaintiff Christopher Kohls, his verified complaint states

22  that he "creates humorous content commenting on and satirizing political figures" under the

23  screenname "Mr. Reagan."  *Kohls* Compl. [ECF No. 1] ¶¶ 4-5.  His posts include a video

24  "parodying candidate Kamala Harris's first presidential campaign ad" that contained digitally

25  created audio purporting to be former Vice President Harris interspersed with actual audio of

26  speeches given by the former Vice President.  *Id.* ¶¶ 6, 32-33.  Per the complaint, Kohls's video

27  attracted widespread attention when it was reposted by Elon Musk and received over 100 million

28  views.  *Id.* ¶ 8.  On September 17, 2024—the day that AB 2839 was signed by the Governor—

7

Defs.' Mem. P. & A. Supp. Mot. Summ. J. on AB 2839 (2:24-cv-02527-JAM-CKD)

1    Kohls filed suit against Attorney General Rob Bonta and Secretary of State Shirley N. Weber, in

2    their official capacities, challenging AB 2839 and its companion bill, AB 2655.  *Id.* ¶¶ 18-19.  His

3    complaint contends that AB 2839 violates the First Amendment facially and as applied and is

4    unconstitutionally vague.  *Id.* ¶¶ 109-194.  Kohls seeks a permanent injunction of the statute as

5    well as declaratory relief.  *Id.* ¶¶ 195-197.

6          For its part, plaintiff The Babylon Bee is a Florida company that publishes satirical news

7    articles, photographs, and videos on its own website and on other social media accounts.  *Babylon*

8    *Bee* Compl. [ECF No. 21] ¶¶ 10-12, 41, 43.  These include satirical articles, photographs, and

9    videos regarding political subjects.  *Id.* ¶¶ 47, 52-54, 57-58, 60-62.  The Babylon Bee has millions

10   of followers and subscribers across its website and social media accounts, including Californians.

11   *Id.* ¶¶ 11-12, 42, 44-46.  Plaintiff Kelly Chang Rickert is a California resident who publishes

12   about topics such as politics, elections, and culture on her own blog and on social media accounts.

13   *Id.* ¶ 13, 110, 116, 119.  The Babylon Bee and Rickert also brought suit against Attorney General

14   Rob Bonta and Secretary of State Shirley N. Weber, in their official capacities, challenging both

15   AB 2839 and AB 2655.  *Id.* ¶¶ 14-15.  They similarly contend that AB 2839 violates the First

16   Amendment facially and as applied and that it is unduly vague in violation of the Fourteenth

17   Amendment's due process clause.  *Id.* ¶¶ 305-394.  Like Kohls, they seek a declaration of AB

18   2839's invalidity and a permanent injunction against its enforcement.  *Id.*, Prayer for Relief.

19         Immediately after filing suit, plaintiff Kohls filed a motion for a preliminary injunction.

20   Because Assembly Bill 2839 included an urgency clause and took immediate effect, the motion

21   was briefed on an expedited schedule.  This Court granted the motion 14 days after it was filed.

22   *See* Order Granting Pl.'s Mot. Prelim. Inj. [ECF No. 14].  It held that Kohls was likely to succeed

23   on his First Amendment challenge to AB 2839.  *Id.* at 3.  While acknowledging that "California

24   has a valid interest in protecting the integrity and reliability of the electoral process," this Court

25   held that AB 2839 was likely not narrowly tailored to further this interest.  *Id.*  Much of this

26   Court's analysis focused on concerns over AB 2839 "bulldoz[ing] over the longstanding tradition

27   of critique, parody, and satire protected by the First Amendment."  *Id.* at 12.  This Court noted

28   that "[o]ther statutory causes of action such as privacy torts, copyright infringement, or

8

1  defamation already provide recourse to public figures or private individuals whose reputations

2  may be afflicted" by media covered by AB 2839.  *Id.*  And it noted that counterspeech or a

3  labeling requirement might be less restrictive ways to further the State's interest.  *Id.* at 12-13.

4         Following the grant of a preliminary injunction on AB 2839, the *Kohls* action was

5  consolidated with three other actions challenging AB 2839 and its companion statute AB 2655,

6  including *The Babylon Bee* action.  The parties in the four consolidated cases negotiated a

7  schedule for briefing cross-motions for summary judgement on both statutes.

8                                    **LEGAL STANDARD**

9         Under Federal Rule of Civil Procedure 56, the Court may award summary judgment if there

10  are no material disputes of facts and the moving party demonstrates it is entitled to judgment as a

11  matter of law.  A fact is "material" if it would impact the outcome of the case.  *Anderson v.*

12  *Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986).  The moving party has the burden of

13  demonstrating there are no material facts in dispute.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

14  (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the

15  nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith*

16  *Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  In determining whether there are any

17  material facts in dispute, the court must "view[ ] the evidence in the light most favorable to the

18  nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001).  The Court does not

19  engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences

20  from the facts.  *Anderson*, 477 U.S. at 255.

21                                      **ARGUMENT**

22  **I.  AB 2839 IS VALID UNDER THE FIRST AMENDMENT AND CALIFORNIA'S FREE**
        **SPEECH CLAUSE**
23

24         Plaintiffs first contend that AB 2839 is invalid under the First Amendment and the

25  California Constitution's analogous protection for speech.[3]  The First Amendment provides that

26  _____
           [3] Because the analysis of plaintiffs' claims under the California Constitution is materially
27  the same here as under the First Amendment, *see Beeman v. Anthem Prescription Management,*
    *LLC*, 58 Cal. 4th 329, 341 (2013), this memorandum will focus on the First Amendment.
    Plaintiffs claims under the California Constitution fail for the same reasons their claims under the
28  First Amendment fail.

                                              9

1    the government "shall make no law . . . abridging the freedom of speech."  U.S. Const., amend. I.

2    When analyzing the constitutionality of a law regulating speech, the court must determine

3    "whether the enactment is content-based or content-neutral."  *United States v. Swisher*, 811 F.3d

4    229, 311 (9th Cir. 2016) (en banc).  A law is content-based if it "'applies to particular speech

5    because of the topic discussed or the idea or message expressed.'"  *City of Austin v. Reagan Nat'l*

6    *Advertising of Austin, LLC*, 596 U.S. 61, 69 (2022) (citation omitted).  A content-based law is

7    subject to strict scrutiny and "is justified only if the government demonstrates that [the law] is

8    narrowly tailored to serve a compelling state interest."  *Twitter, Inc. v. Garland*, 61 F.4th 686, 698

9    (9th Cir. 2023).

10    Since AB 2839 regulates speech on the basis of content, it is subject to strict scrutiny under

11    the First Amendment.  While strict scrutiny is a demanding standard, it is not an insurmountable

12    one.  AB 2839 is narrowly tailored to further the State's compelling interests in electoral integrity

13    and preventing fraud on voters and, therefore, is one of the rare statutes that meets that standard.

14    **A.    AB 2839 Is Not Facially Invalid Under the First Amendment**

15    Plaintiffs Kohls, Babylon Bee, and Rickert first challenge AB 2839 as facially invalid.  As

16    the Supreme Court has articulated, a facial challenge under the First Amendment faces a different

17    standard than an as-applied one.  "For a host of good reasons, courts usually handle constitutional

18    claims case by case, not en masse," and facial challenges are "hard to win."  *Moody v. NetChoice,*

19    *LLC*, 603 U.S. 707, 723 (2024).  In the First Amendment context, to prevail on a facial challenge,

20    the plaintiff must establish that the "law's unconstitutional applications substantially outweigh its

21    constitutional ones."  *Id.* at 724.  "As *Moody* clarified, a First Amendment facial challenge has

22    two parts: first, the courts must 'assess the state laws' scope'; and second, the courts must 'decide

23    which of the laws' applications violate the First Amendment, and . . . measure them against the

24    rest.'"  *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1115-1116 (9th Cir. 2024) (alteration in

25    original) (quoting *Moody*, 603 U.S. at 724).  For the first part, a court determines "[w]hat

26    activities, by what actors, . . . the laws prohibit or otherwise regulate[.]"  *Moody*, 603 U.S. at 724.

27    For the second part, a court "decide[s] which of the laws' applications violate the First

28    Amendment" and "measure[s] them against the rest."  *Id.* at 725.  Throughout this analysis, a

10

1    plaintiff must "carry its burden" to establish that the standard for a facial challenge is met.  *Id.* at

2    744.

3        The first step of the analysis under *Moody* is thus to determine the full scope of the

4    challenged law's applications.  In ruling that plaintiff Kohls was likely to meet the standard for a

5    facial challenge to AB 2839 when granting a preliminary injunction, this Court's analysis focused

6    primarily on the application of AB 2839 to satire and parody.  But AB 2839, by its plain

7    language, does not generally prohibit the distribution of parody or satire.  To fall within AB

8    2839's scope, media must meet the definition of "materially deceptive content."  This definition

9    requires that the media "would falsely appear to a reasonable person to be an authentic record of

10    the content depicted in the media."  Cal. Elec. Code § 20012(f)(8)(A).  In other words, to fall

11    within the scope of AB 2893, a reasonable person would have to believe that the media shows the

12    depicted person saying or doing something that they *actually* did or said. Thus, AB 2839 would

13    not apply to a video swapping President Trump's face onto the body of Superman in a movie clip,

14    a digitally created painting of former Vice President Harris crossing the Delaware River in

15    George Washington's place, or an edited video of Governor Gavin Newsom taking the first step

16    on the moon in Neil Armstrong's place.  A reasonable person would not believe that President

17    Trump is actually Superman, former Vice President Harris actually crossed the Delaware River

18    during the Revolutionary War, or Governor Newsom actually took the first step on the moon—

19    meaning no reasonable viewer would believe that such modified content is an "authentic record"

20    of what it depicts as having occurred.

21        Parody and satire may be literally false, but they are not meant to be taken as literally true.

22    This is because parody and satire are not intended to imply that their contents depict actual events

23    or that they should be taken at their word.  A reasonable viewer of a Saturday Night Live sketch

24    that shows "the President" saying or doing something does not believe the sketch is meant to

25    convey that the President actually said or did that thing.  So, too, does a reasonable reader of the

26    satirical website the *Onion* understand that a news report about the President is not meant to

27    convey something that the President actually said or did.  In the typical case, a parody or satire

28    would thus fall outside the scope of AB 2839 by not meeting the definition of "materially

1    deceptive content": it does not purport to be an authentic record of its content.

2         In this way, the definition of "materially deceptive content" tracks the line drawn under the

3    First Amendment for when satire or parody can be actionable as defamation.  The Supreme Court

4    has recognized that "[d]espite its literal falsity, satirical speech enjoys First Amendment

5    protection." *Farah v. Esquire Magazine*, 736 F.3d 528, 536 (D.C. Cir. 2013).  Satirical speech "is

6    not actionable [for defamation] if it 'cannot reasonably be interpreted as stating actual facts about

7    an individual.'" *Id.* (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)); *see also*

8    *Knievel v. ESPN*, 393 F.3d 1068, 1073-1074 (9th Cir. 2005).  So, too, under AB 2839: satirical

9    media is not prohibited if the media is not reasonably interpreted as depicting something that

10   actually occurred.  Moreover, that some people might fall for a parody or satire does not, standing

11   alone, bring that media within the scope of AB 2839.  As in the context of defamation cases,

12   "[t]he test . . . is not whether some readers were misled, but whether the hypothetical reasonable

13   reader could be." *Farah*, 736 F.3d at 537.  If a reasonable person would recognize that a piece of

14   media is parody or satire—and that it does not purport to be an authentic record of the events it

15   records—then that piece of media does not meet the statutory definition for "materially deceptive

16   content" and falls outside the scope of AB 2839 altogether.

17        But even if AB 2839 does apply to the occasional parody or satire, it also encompasses

18   intentional falsehoods that are meant to deceive viewers and manipulate voters to change their

19   voting behavior.  In analyzing a facial challenge, a court "do[es] not confine [its] facial

20   overbreadth analysis to the 'heartland applications' alleged by the [plaintiffs]; instead [it] must

21   'address the full range of activities' that the statute covers." *Project Veritas v. Schmidt*, 125 F.4th

22   929, 961 (9th Cir. 2025) (en banc) (quoting *Moody*, 603 U.S. at 724-726).

23        This is particularly important here, where many of AB 2839's applications do not involve

24   protected parody or satire, but rather involve speech the State may permissibly regulate.  As one

25   example, AB 2839 prohibits the distribution of materially deceptive media portraying a candidate

26   doing or saying something the candidate did not do or say that damages a candidate's electoral

27   chances or reputation.  Cal. Elec. Code § 20012(b)(1)(A).  Such applications include defamatory

28   content.  The First Amendment allows States to regulate knowing or reckless falsehoods that are

                                    12

1   defamatory.  *See, e.g.*, *Milkovich*, 497 U.S. at 14-15.  AB 2839 requires that materially deceptive

2   content be distributed with malice, Cal. Elec. Code § 20012(b)(1), (f)(7), consistent with the

3   requirements of the First Amendment in defamation cases.  These applications of AB 2839 to

4   defamatory content are therefore not unconstitutional.

5       So, too, are many other applications of AB 2839.  For instance, the Ninth Circuit has held

6   that "a false statement made in association with legally cognizable harm or for the purpose of

7   material gain is not protected" by the First Amendment.  *Animal Legal Defense Fund v. Wasden*,

8   878 F.3d 1184, 1199 (9th Cir. 2018), *abrogated on other grounds by Project Veritas*, 125 F.4th at

9   948.  In *Animal Legal Defense Fund*, the Ninth Circuit upheld an Idaho statute that criminalized

10  obtaining records from an agricultural facility by misrepresentation and knowingly obtaining

11  employment at an agricultural production facility by misrepresentation with the intent to cause

12  injury to the facility.  *Id.* at 1199-1201.  With respect to the first prohibition, "false statements

13  made to actually acquire agricultural production facility records inflict a property harm upon the

14  owner, and may also bestow a material gain on the acquirer."  *Id.* at 1199.  The court held that

15  that section therefore "does not regulate constitutionally protected speech, and does not run afoul

16  of the First Amendment."  *Id.* at 1200.  With respect to the second prohibition, the court explained

17  that the statute prohibited "lie[s] made for material gain," which similarly fell within the scope of

18  falsehoods that States could permissibly regulate.  *Id.* at 1201.

19      Applications of AB 2839 include media that may be regulated under *Animal Legal Defense

20  Fund*.  For one, AB 2839 covers materially deceptive media distributed with the intent of

21  fraudulently misleading voters to trick them into voting for a particular candidate—which are

22  intentional, knowing falsehoods that cause tangible harm and can be regulated permissibly under

23  the First Amendment just like other kinds of fraud, *see, e.g.*, *Illinois ex rel. Madigan v.

24  Telemarking Associates, Inc.*, 538 U.S. 600, 612 (2003) ("[T]he First Amendment does not shield

25  fraud.").  And AB 2839 covers media that has been distributed by an opposing candidate to harm

26  an opponent and mislead voters into voting for the distributing candidate, an application that

27  clearly involves material gain for the distributing candidate in the form of more votes and

28  increased odds of electoral victory.

13

Defs.' Mem. P. & A. Supp. Mot. Summ. J. on AB 2839 (2:24-cv-02527-JAM-CKD)

1    Other applications of AB 2839 are also likely constitutional.  For instance, the State

2    certainly has a strong interest in applying AB 2839 to deepfakes from foreign actors intended to

3    undermine democratic elections in California, *see* Alvarez Decl. ¶¶ 35-37 (discussing deepfakes

4    from foreign actors)—to the extent such foreign actors could even state a claim under the First

5    Amendment, *see Agency for Int'l Dev. v. Alliance for Open Society Int'l*, 591 U.S. 430, 436

6    (2020) (holding no First Amendment right implicated by regulations of foreign activities of

7    foreign entities).  And it has a similarly strong interest in applying AB 2839 to specific deepfakes

8    related to the voting process itself, like the robocalls purportedly from former President Biden

9    discouraging voting in the New Hampshire primary election.  All of these applications are far

10   afield from the political commentary or satire that plaintiffs wish to post—and all such

11   applications must be considered when conducting the facial analysis under *Moody*.

12   At the second step of the analysis under *Moody*, plaintiffs must show that the

13   unconstitutional applications of AB 2839 substantially outweigh the constitutional ones.

14   Plaintiffs cannot make that showing here.  Critically, AB 2839 does not generally apply to parody

15   or satire because such content, by not purporting to depict events that actually occurred, does not

16   meet the definition of "materially deceptive content."  Rather, the majority of AB 2839's

17   applications will involve other kinds of content such as falsehoods meant to fraudulently sway

18   voters.  Given the full range of applications of AB 2839—most of which will not implicate this

19   Court's concerns about regulating political commentary, as the examples above illustrate—

20   plaintiffs have not and cannot show that the unconstitutional applications of AB 2938 (insofar as

21   there are any) *substantially* outweigh the constitutional ones.  This Court should therefore award

22   defendants judgment on plaintiffs' facial challenge.

23   **B.    AB 2839 Is Not Invalid as Applied**

24   Plaintiffs further challenge AB 2839 as applied to their activities.  This claim fails too.  AB

25   2839 meets strict scrutiny: it is narrowly tailored to further a compelling state interest.

26   **1.    AB 2839 Furthers Compelling Interests in Electoral Integrity and
         Prevents Fraud on Voters**

27

28   AB 2839 clearly delineates the interests it seeks to serve.  The Legislature stated that the

14

1   State has a "compelling interest in protecting free and fair elections." Cal. Elec. Code

2   § 20012(a)(4). It found that fake images or audio or video content undermine this interest: they

3   "can skew election results" and "undermine trust in the ballot counting process." *Id.*

4   § 20012(a)(3). With currently available technology, "[v]oters will not know what images, audio,

5   or video they can trust" and may be deceived by content created by "bad actors," such as "a false

6   image of a candidate accepting a bribe, or a fake video of an elections official 'caught on tape'

7   saying that voting machines are not secure." *Id.* § 20012(a)(2), (a)(3). Such manipulated content

8   can "prevent voters from voting and deceive voters based on fraudulent content." *Id.*

9   § 20012(a)(4).

10          The legislative history echoes these legislative findings: the purposes behind AB 2839 are

11   to protect electoral integrity and prevent fraudulent voter deception. For instance, the analysis for

12   the Assembly Committee on Elections states that the bill "targets deceptive content that could

13   undermine trust in elections" and focuses on "communications posing the greatest threat to

14   election integrity." Liska Decl., Ex. 1, p. 9; *see also id.*, Ex. 2, p. 8; *id.*, Ex. 3, p. 3. The analysis

15   for the Senate Committee on Elections and Constitutional Amendments similarly notes that the

16   statute "targets deceptive content that could undermine trust in elections, prevent voters from

17   voting, and distort the electoral process." Liska Decl., Ex. 4, p. 5; *see also id.*, Ex. 6, p. 7-8.

18          That the category of deepfakes regulated by AB 2839 implicates these interests is not

19   simply theoretical. As even a cursory online search reveals, the problem of political deepfakes is

20   far from "an anticipated harm" or "'mere conjecture,'" *Federal Elections Commission v. Cruz*,

21   596 U.S. 289, 307 (2022) (citation omitted). The Legislature expressly found that "bad actors

22   now have the power to create" deepfakes, and that "[i]n the lead-up to the 2024 presidential

23   election, candidates and parties are already creating and distributing deepfake images and audio

24   and video content." Cal. Elec. Code § 20012(a)(2), (a)(3). The legislative history referenced

25   actual examples of deepfakes that could have deceived voters and impaired free and fair elections,

26   such as the robocalls allegedly from former President Biden before the 2024 New Hampshire

27   primary that explicitly encouraged voters not to go to the polls. *E.g.*, Liska Decl., Ex. 1, p. 7, Ex.

28   6, p. 7; *see also* Liska Decl. Ex. 14-19. And research and studies confirm what the legislative

                                                    15

1   findings detail: political deepfakes have proliferated online and can influence voters' behavior,

2   choices, and trust in the electoral process or electoral outcomes.  Alvarez Decl. ¶ 10-17, 21.

3       That these political deepfakes pose a risk to democracy is also not merely theoretical.  A

4   voter who decides not to go to the polls because they received a fake call allegedly from President

5   Trump or Governor Newsom telling them not to vote can hardly be said to have freely and

6   knowingly exercised their right to vote.  So, too, the voter who changes their mind about which

7   candidate to vote for because of a deepfake video purporting to show President Trump or

8   Governor Newsom accepting a bribe or committing a heinous crime.  Deepfakes online may also

9   alter voters' behavior by sowing confusion that can lead to voters abstaining from voting

10  altogether.  Alvarez Decl. ¶ 10-17.  And those who encounter materially deceptive content about

11  the voting process may find their confidence in the electoral process undermined erroneously—

12  especially if the fraudulent content is a government official allegedly telling voters to doubt

13  electoral outcomes.  Avarez Decl. ¶ 10-17.  The kind of deepfakes that AB 2839 prohibits pose a

14  risk to the State's interests in electoral integrity and preventing fraud on voters.

15      These interests in safeguarding free and fair elections and preventing voter deception

16  through fraud are indeed compelling, as this Court nodded towards in its ruling on the preliminary

17  injunction.  *See* Order Granting Pl.'s Mot. Prelim. Inj. at 11.  The U.S. Supreme Court has

18  recognized that "[a] State indisputably has a compelling interest in preserving the integrity of its

19  election process."  *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989).  And "a

20  State has a compelling interesting in protecting voters from confusion and undue influence."

21  *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality op.).  "In other words, [the Court] has

22  recognized that a State has a compelling interest in ensuring that an individual's right to vote is

23  not undermined by fraud in the election process."  *Id.*  Indeed, as the Supreme Court has

24  explained, the "state interest in preventing fraud and libel" "carries special weight during election

25  campaigns when false statements, if credited, may have serious adverse consequences for the

26  public at large."  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 349 (1995); *see also John*

27  *Doe No. 1 v. Reed*, 561 U.S. 186, 197 (2010) ("The State's interest is particularly strong with

28  respect to efforts to root out fraud, which not only may produce fraudulent outcomes, but has a

16

1  systemic effect as well: It 'drives honest citizens out of the democratic process and breeds distrust

2  of our government.'" (citation omitted)); *Berger v. City of Seattle*, 569 F.3d 1029, 1052 (9th Cir.

3  2009) (reducing election fraud and protecting electoral integrity are interests "the Supreme Court

4  has found compelling in a First Amendment context").  As Justice Scalia observed, "[n]o

5  justification for regulation is more compelling than protection of the electoral process.  Other

6  rights, even the most basic, are illusory if the right to vote is undermined."  *McIntyre*, 514 U.S. at

7  379 (Scalia, J., dissenting) (quotation marks and citation omitted).  The interests that AB 2839

8  serves are indisputably compelling.

9                     **2.    AB 2839 Is Narrowly Tailored to Further These Interests**

10        AB 2839 is narrowly tailored to further these compelling interests in protecting electoral

11  integrity and preventing fraud on voters.  The statute is targeted to a specific set of materially

12  deceptive content that poses the greatest risk to the State's interests.  And its method of

13  regulation—preventing the posting of such content—advances this interest in a way that

14  alternatives fail to.

15        This narrow tailoring begins with the scope of media that AB 2839 regulates.  As discussed

16  above, AB 2839 does not generally apply to parody or satire because such content will not meet

17  the definition of "materially deceptive content."  *See supra* at 12.  And the statute further protects

18  satire and parody by creating a labeling safe harbor that categorically protects such content: the

19  knowing distribution of materially deceptive media does not violate AB 2839 if that media has

20  been modified for satire or parody and includes a disclaimer stating so.  *See* Cal. Elec. Code

21  § 20012(b)(3).  Thus, if a speaker is concerned about whether a purported parody or satire falls

22  within the scope of AB 2839, they can avoid liability by simply affixing a disclaimer to the media

23  noting that the media has been manipulated for purposes of satire or parody.  Even in borderline

24  cases, a parodist or satirist can speak freely under AB 2839 if the disclaimer is affixed.

25        The scope of media that AB 2839 does regulate is further narrowly defined to target

26  particularly problematic content.  First, to fall within the scope of AB 2839, the media must have

27  been intentionally *digitally* created or modified.  Cal. Elec. Code § 20012(b)(1)(A), (f)(8)(A).

28  Media that has been manually created, such as a letter to the editor or a blog post written by a

                                                        17

1  person, a photograph taken by a person, or a video recording of an interview taken by a person, is

2  not regulated by AB 2839.  And for media that has been digitally modified, such media would not

3  fall within the scope of AB 2839 if the only modifications are "minor" ones "that do not

4  significantly change the perceived contents or meaning of the content" such as "changes to

5  brightness or contrast of images, removal of background noise in audio, and other minor changes

6  that do not impact the content of the audio or visual media."  *Id.* § 20012(f)(8)(B).

7          Second, materially deceptive content falls within the scope of AB 2839 only if it depicts

8  one of several specified subjects: (1) a candidate saying or doing something that the candidate did

9  not say or do and that is reasonably likely to harm the candidate's reputation or electoral

10  prospects, (2) an elections official or elected official saying or doing something in connection

11  with an election that the official did not say or do and that is reasonably likely to falsely

12  undermine confidence in the outcome of an election, or (3) voting equipment portrayed in a

13  materially false way that is reasonably likely to falsely undermine confidence in the outcome of

14  an election.  Cal. Elec. Code § 20012(b)(1).  Any truthful content—such as content that only

15  depicts a candidate doing or saying something they did in fact do or say—is outside of AB 2839's

16  scope.

17          AB 2839 is targeted to specific kinds of materially deceptive content that are likely to

18  impose harms on democracy.  Indeed, the legislative history itself states that AB 2839 was

19  targeted to content that presents the "greatest threat" to electoral integrity.  Liska Decl., Ex. 1, p.

20  7.  With respect to a candidate, what a candidate personally says or does is likely to have the

21  biggest impact on a voter's decision about whether to vote for that candidate.  After all, one of the

22  best predictors of future behavior is what a person has said or done in the past.  Thus false

23  depictions of a candidate doing or saying something they did not do or say may have an outsized

24  impact on voters compared to other deepfakes or misinformation.  The other category of media

25  that AB 2839 regulates relates to electoral integrity, specifically portrayals of elected officials or

26  elections officials doing or saying something they did not do or say or false portrayals of elections

27  equipment that would undermine confidence in the outcome of an election.  Cal. Elec. Code

28  § 20012(b)(1)(B)-(D).  Here, too, AB 2839 focuses on the materially deceptive content likeliest to

18

1    cause the biggest harm.  A person is more likely to believe what an elections official or elected

2    official does or says regarding an election.  For instance, a robocall alleged to have come from an

3    elections official such as a County Registrar or the Secretary of State that claims voting places

4    have changed is more likely to impact the recipient than a post by a random stranger online.  In

5    this way, AB 2839 focuses its regulations on specific deepfakes most likely to cause harm to the

6    interests it furthers.

7         Moreover, AB 2839 is further circumscribed by its mens rea and temporality requirements.

8    To fall within AB 2839's prohibitions, a person must knowingly distribute the relevant materially

9    deceptive content *and* they must do so with malice—that is, with knowledge of falsity or reckless

10   disregard for the truth.  Cal. Elec. Code § 20012(b)(1), (f)(7).  The malice requirement under AB

11   2839 tracks the requirement that the Supreme Court has found the First Amendment imposes on

12   regulations of defamatory content involving public figures.  *E.g.*, *Milkovich*, 497 U.S. at 14-15.  A

13   person who shares materially deceptive content accidentally, negligently, or unintentionally faces

14   no liability under AB 2839.  Rather, the statute only covers those who are aware of the falsehoods

15   they spread.  And AB 2839's prohibitions only apply during the period of time 120 days before

16   an election until 60 days after the election, the period of time when the risk that voters may be

17   fraudulently swayed or electoral integrity fraudulently undermined is at its highest.  Indeed, close

18   in time to an election a voter may not have a chance to learn that a deepfake contains a false

19   portrayal of events before casting a vote or otherwise acting.  In sum, AB 2839 only applies when

20   a person has (1) knowingly; (2) with malice; (3) distributed content regarding a candidate, ballot

21   measure, voting or refraining from voting, or the canvass of the vote; (4) that has been

22   intentionally digitally created or manipulated; (5) that would falsely appear to a reasonable person

23   to be an authentic record of the events it claims to depict; (6) that includes a candidate, elections

24   official, or elected official doing or saying something they did not do or say or depicts election

25   equipment in a materially false manner; (7) that would be reasonably likely to cause specified

26   harms to electoral integrity; and (8) that is distributed in the period right around an election.

27        Finally, the manner that AB 2839 employs—preventing the dissemination of materially

28   deceptive media—is narrowly tailored.  Alternatives to blocking, such as counterspeech, are not

19

1   effective alternatives to the unique problems posed by political deepfakes. This is largely because

2   political deepfakes are "sticky". Alvarez Decl. ¶¶ 22, 39, 53. In other words, political deepfakes

3   continue to impact a viewer even if they have been debunked or demonstrated as false. Alvarez

4   Decl. ¶¶ 22, 39, 53. Such stickiness stems in part from the highly realistic nature of political

5   deepfakes in light of modern technology as well as the effectiveness of political deepfakes

6   targeted to mislead specific audiences. Alvarez Decl. ¶¶ 22-25. Thus, counterspeech such as

7   labeling or debunking cannot undo the harm caused by a viewer's exposure to political deepfakes.

8          Nor is it even possible for the government to effectively mitigate the harms of political

9   deepfakes through counterspeech such as debunking or pre-bunking (that is, warning viewers in

10  advance about a deepfake). Deepfakes spread rapidly and virally online, and their spread can

11  outpace that of truthful content such as debunking information. Alvarez Decl. ¶¶ 25-26. And it is

12  hardly feasible for the government to identify, detect, and debunk—or predict and pre-bunk—

13  every political deepfake online given the fragmented nature of the online social media landscape

14  and the spread of deepfakes along communications networks such as encrypted networks or

15  private social media groups that are inaccessible to government officials. Alvarez Decl. ¶¶ 26,

16  30-34, 39-40.

17         Similarly, existing causes of action, such as defamation law, do not adequately address the

18  harms that AB 2839 seeks to prevent, especially with respect to content that undermines

19  confidence in electoral outcomes or electoral integrity rather than only impacts a candidate's

20  reputation. Ultimately, the only effective way to prevent deepfakes that pose a grave risk to

21  electoral integrity and voter fraud from spreading is to prevent them from being distributed

22  altogether. AB 2839 is thus narrowly tailored to further the government's compelling interests.

23         **3.    AB 2839's Labeling Safe Harbor Is Not Invalid as Applied**

24         Plaintiffs further contend that AB 2839's labeling safe harbor for parody and satire

25  independently violates the First Amendment. The Ninth Circuit has held that "'regulations

26  directed only at the disclosure of political speech' . . . are subject to exacting scrutiny, which is a

27  'somewhat less rigorous judicial review' than strict scrutiny." *Smith v. Helzer*, 95 F.4th 1207,

28  1214 (9th Cir.) (citation omitted), *cert. denied* (2024). This standard requires "that the

20

1    government show that it has (1) a sufficiently important interest (2) to which the challenged

2    regulations are substantially related and narrowly tailored." *Id.* "Unlike strict scrutiny, however,

3    'exacting scrutiny does not require that disclosure regimes be the least restrictive means of

4    achieving their ends.'" *Id.* at 1215 (citation omitted). Rather, it requires "'a fit that is not

5    necessarily perfect, but reasonable; that represents not necessarily the single best disposition but

6    one whose scope is in proportion to the interest served.'" *Id.* (citation omitted). AB 2839's safe

7    harbor for satire or parody meets this standard.

8         First, as discussed more above, AB 2839's prohibitions serve interests that are important—

9    indeed, compelling. *See supra* at 14-17. Its safe harbor for parody and satire—which do not even

10    fall within the scope of AB 2839 generally to begin with—serves the same interest: ensuring that

11    voters are aware that content has been manipulated, thereby reducing the risk of voters believing

12    the content depicts actual events that occurred. This helps maintain electoral integrity and

13    prevent fraud from influencing electoral outcomes.

14         Second, the safe harbor is substantially related and narrowly tailored to this interest. For

15    one, satire and parody are not generally covered by AB 2839, as discussed above. *See supra* at

16    11-12. Thus in the usual case, a poster of satire and parody will not face liability under AB 2839

17    even if they post content without a label. Instead, the labeling requirement serves as an

18    *additional* protection for satire and parody. It ensures that in a borderline case or if a poster is

19    concerned about facing liability, there is an additional means of protection: applying a factual

20    disclosure to the content itself stating that it has been manipulated for purposes of parody or

21    satire. And if a poster elects to use a label, the label is not likely to impair the poster's message;

22    after all, parody or satire is not meant to be taken literally as a depiction of actual events. Indeed,

23    the point of a parody or satire usually requires the viewer to *realize* that it is meant as parody or

24    satire.

25         Moreover, requiring a label on the media itself is critical in helping ensure that voters are

26    not misled by accident. Plaintiff Kohls's own July video demonstrates this. While Kohls states

27    that he titled the video as a "parody" and explained it had been manipulated, Elon Musk's post

28

21

Defs.' Mem. P. & A. Supp. Mot. Summ. J. on AB 2839 (2:24-cv-02527-JAM-CKD)

1  sharing the video *nowhere* mentioned that it was parody or that it had been digitally altered.[4]  A

2  voter who encountered the video from Elon Musk's post would have had no express notice that

3  the video was supposed to be a parody, defeating the purpose of the label.  In contrast, had there

4  been a disclosure on the video itself, a post sharing the video would have included that disclosure,

5  thereby ensuring that voters who encountered the video in shared posts were similarly informed

6  of its parody nature and that the content had been manipulated.  Ultimately, allowing parody or

7  satire—which is already generally outside the scope of AB 2839—to categorically fall outside the

8  scope of AB 2839 if the media includes a noncontroversial, factual statement that it has been

9  manipulated for purposes of parody or satire is properly tailored to further the State's compelling

10  interests in electoral integrity and in free and fair elections.

11  **II.    AB 2839 IS NOT UNDULY VAGUE**

12       Finally, plaintiffs argue that AB 2839 is unconstitutionally vague.  Not so.  A statute is

13  unconstitutionally vague in violation of the Due Process Clause only if it "'fails to provide a

14  person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it

15  authorizes or encourages seriously discriminatory enforcement.'"  *FCC v. Fox Tel. Stations, Inc.*,

16  567 U.S. 239, 253 (2012) (citation omitted).  Mere "uncertainty at a statute's margins will not

17  warrant facial invalidation if it is clear what the statute proscribes 'in the majority of its intended

18  applications.'"  *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001)

19  (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)).

20       AB 2839 gives fair notice of what it proscribes.  It restricts the knowing and malicious

21  distribution of certain election advertisements or communications that contain materially

22  deceptive content likely to cause tangible harms.  Specifically, the relevant piece of media must

23  have been intentionally digitally created or modified, and it must show a specified type of

24  content.  *See* Cal. Elec. Code § 20012(b)(1).  A reasonable person can easily tell if (1) they have

25  digitally created or altered a piece of media and (2) if the piece of media depicts one of the

26  required types of content.

---

27       [4] Ali Swenson, *A Parody Ad Shared by Elon Musk Clones Kamala Harris' Voice*, AP
(July 29, 2024), https://apnews.com/article/parody-ad-ai-harris-musk-x-misleading-

28  3a5df582f911a808d34f68b766aa3b8e# (last accessed Sept. 23, 2024).

1    Moreover, AB 2839 contains a mens rea requirement that provides further clarity. AB

2    2839 only applies to content that is distributed "knowingly" and "with malice." Cal. Elec. Code

3    § 20012(b)(1). Thus, to face liability under AB 2839, a person must know that the media has

4    been digitally manipulated and that it contains false content. This further mitigates any risk of

5    vagueness—"especially with respect to the adequacy of notice to the complainant that his conduct

6    is proscribed." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499

7    (1982). After all, "a person of ordinary intelligence" can easily "base his behavior on his factual

8    knowledge of the situation at hand and thereby avoid violating the law." *United States v. Jae Gab*

9    *Kim*, 449 F.3d 933, 943 (9th Cir. 2006).

10    Finally, the definition of "materially deceptive content" is not itself unduly vague. As

11    discussed above, the language in that definition—that a reasonable person would believe the

12    content is an accurate depiction of the events it depicts, Cal. Elec. Code § 20012(f)(8)(A)—tracks

13    the distinction drawn in defamation cases between actionable falsehoods that are statements of

14    facts and those that are statements of opinion, parody, or satire protected under the First

15    Amendment. *See, e.g.*, *Farah*, 738 F.3d at 539 (concluding that a reasonable reader of satirical

16    news article would not believe it contained actual facts); *Knievel*, 393 F.3d at 1078 (concluding

17    that a reasonable reader of satirical photo caption would not take it as literal truth). Courts are

18    also adept at determining whether a piece of media is meant as a parody or satire—rather than as

19    literal truth—when analyzing copyright claims under the Lanham Act. *See, e.g.*, *Dr. Seuss*

20    *Enterprises, L.P. v. Penguin Books USA, Ltd.*, 109 F.3d 1394, 1401 (9th Cir. 1997) (addressing

21    whether work that allegedly infringed copyright was parody). The distinction drawn by the

22    definition of "materially deceptive media" is grounded in existing legal principles and far from

23    unconstitutionally vague.

24    On the whole, AB 2839 is clear in what it prohibits: the knowing and malicious

25    distribution of intentionally digitally created or modified media depicting specified content. A

26    reasonable person can understand what conduct the statue prohibits. It is therefore

27    constitutionally valid under due process principles.

28

1

**CONCLUSION**

2        For the foregoing reasons, this Court should conclude that there are no genuine issues of

3 material fact and award judgment to defendants on all claims related to AB 2839.

4

5 Dated:  March 7, 2025                    Respectfully submitted,

6                                      ROB BONTA
Attorney General of California
7                                      ANYA M. BINSACCA
Supervising Deputy Attorney General
8

9

10                                  */s/ Kristin A. Liska*

11                                    KRISTIN A. LISKA
Deputy Attorney General
12                                    *Attorneys for Defendants*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24