1  ROB BONTA
   Attorney General of California
2  ANYA M. BINSACCA, State Bar No. 189613
   Supervising Deputy Attorney General
3  KRISTIN A. LISKA, State Bar No. 315994
   Deputy Attorney General
4    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
5    Telephone:  (415) 510-3916
     Fax:  (415) 703-5480
6    E-mail:  Kristin.Liska@doj.ca.gov
   *Attorneys for Defendants*

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10                    SACRAMENTO DIVISION

11

12  **CHRISTOPHER KOHLS, et al.,**              Case No. 2:24-cv-02527-JAM-CKD

13                              Plaintiffs,

14        **v.**                                **DEFENDANTS' MEMORANDUM OF**
                                                **POINTS AND AUTHORITIES IN**
15  **ROB BONTA, in His Official Capacity as**  **SUPPORT OF MOTION FOR**
    **Attorney General of the State of California,**  **SUMMARY JUDGMENT ON AB 2655**
16  **and SHIRLEY N. WEBER, in Her Official**
    **Capacity as California Secretary of State,**
17
                                                Date:        August 5, 2025
18                              Defendants.     Time:        1:00 p.m.
                                                Dept:        6
19                                              Judge:       The Honorable John A.
                                                             Mendez
20                                              Trial Date:  Not Scheduled
                                                Action Filed: 9/17/2024
21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

Introduction ............................................................................................................... 1

Background ................................................................................................................ 2

      A.    The Growing Dangers of Political Deepfakes ............................ 2

      B.    Assembly Bill 2655 ................................................................... 4

      C.    Procedural History ................................................................... 9

Legal Standard ........................................................................................................ 11

Argument ................................................................................................................ 11

    I.    AB 2655 Does Not Violate the First Amendment or California's Free Speech Clause .......................................................................... 11

      A.    AB 2655 Is Not Facially Invalid ............................................ 12

      B.    AB 2655 Is Not Invalid As-Applied ...................................... 16

          1.    AB 2655 Furthers Compelling Interests in Electoral Integrity and Preventing Fraud on Voters .................................... 17

          2.    AB 2655 Is Narrowly Tailored to Further These Interests .......... 19

    II.    AB 2655 Is Not Unconstitutionally Vague ........................................ 25

    III.    AB 2655 Is Not Preempted by Section 230 ........................................ 28

Conclusion ............................................................................................................. 32

**TABLE OF AUTHORITIES**

**Page**

CASES

*A.B. v. Salesforce, Inc.*
  123 F.4th 788 (5th Cir. 2024) ........................................................................................ 31

*Agency for International Development v. Alliance for Open Society International*
  591 U.S. 430 (2020) ........................................................................................................ 15

*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242 (1986) ........................................................................................................ 11

*Anderson v. TikTok, Inc.*
  116 F.4th 180 (3d Cir. 2024) .................................................................................... 30, 31

*Animal Legal Defense Fund v. Wasden*
  878 F.3d 1184 (9th Cir. 2018) ................................................................................... 14, 15

*Barnes v. Yahoo! Inc.*
  570 F.3d 1096 (9th Cir. 2009) ........................................................................................ 30

*Beeman v. Anthem Prescription Management, LLC*
  58 Cal. 4th 329 (2013) .................................................................................................... 12

*Berger v. City of Seattle*
  569 F.3d 1029 (9th Cir. 2009) ........................................................................................ 19

*Burson v. Freeman*
  504 U.S. 191 (1992) ........................................................................................................ 18

*Cal. Teachers Ass'n v. State Bd. of Educ.*
  271 F.3d 1141 (9th Cir. 2001) ........................................................................................ 25

*Calise v. Meta Platforms, Inc.*
  103 F.4th 732 (9th Cir. 2024) .............................................................................. 28, 29, 30

*Celotex Corp. v. Catrett*
  477 U.S. 317 (1986) ........................................................................................................ 11

*City of Austin v. Reagan Nat'l Advertising of Austin, LLC*
  596 U.S. 61 (2022) .......................................................................................................... 11

*Doe Through Roe v. Snap, Inc.*
  144 S. Ct. 2493 (2024) .................................................................................................... 31

*Doe v. Internet Brands, Inc.*
  824 F.3d 846 (9th Cir. 2016) .......................................................................................... 28

1

### TABLE OF AUTHORITIES
**(continued)**

2

**Page**

3

*Eu v. S.F. Cnty. Democratic Cent. Comm.*
    489 U.S. 214 (1989) ............................................................................................... 18

4

5

*Fair Housing Council of San Fernando Valley v. Roommates.com, Inc.*
    512 F.3d 1152 (9th Cir. 2008) ................................................................................ 30

6

*Farah v. Esquire Magazine*
    736 F.3d 528 (D.C. Cir. 2013) ............................................................................... 14

7

8

*FCC v. Fox Tel. Stations, Inc.*
    567 U.S. 239 (2012) ............................................................................................... 25

9

*Federal Election Commission v. Cruz*
    596 U.S. 289 (2022) ............................................................................................... 17

10

11

*Fontana v. Haskin*
    262 F.3d 871 (9th Cir. 2001) ................................................................................. 11

12

13

*Hill v. Colorado*
    530 U.S. 703 (2000) ................................................................................... 25, 27, 28

14

*Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*
    538 U.S. 600 (2003) ............................................................................................... 15

15

16

*John Doe No. 1 v. Reed*
    561 U.S. 186 (2010) ............................................................................................... 19

17

18

*Knievel v. ESPN*
    393 F.3d 1068 (9th Cir. 2005) ............................................................................... 14

19

*Lemmon v. Snap, Inc.*
    995 F.3d 1085 (9th Cir. 2021) ............................................................................... 30

20

21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
    475 U.S. 574 (1986) ............................................................................................... 11

22

23

*McIntyre v. Ohio Elections Comm'n*
    514 U.S. 334 (1995) ............................................................................................... 19

24

*Milkovich v. Lorain Journal Co.*
    497 U.S. 1 (1990) ............................................................................................. 14, 26

25

26

*Moody v. NetChoice, LLC*
    603 U.S. 707 (2024) ......................................................................................... 12, 16

27

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

*NetChoice, LLC v. Bonta*
    113 F.4th 1101 (9th Cir. 2024)............................................................. 12

*Project Veritas v. Schmidt*
    125 F.4th 929 (9th Cir. 2025)......................................................... 12, 15

*Smith v. Helzer*
    95 F.4th 1207 (9th Cir. 2024)............................................................. 24

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*
    1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)................................. 29

*Taniguchi v. Kan Pac. Saipan, Ltd.*
    566 U.S. 560 (2012).......................................................................... 25

*Twitter, Inc. v. Garland*
    61 F.4th 686 (9th Cir. 2023)............................................................... 11

*United States v. Jae Gab Kim*
    449 F.3d 933 (9th Cir. 2006).............................................................. 26

*United States v. Swisher*
    811 F.3d 229 (9th Cir. 2016).............................................................. 11

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*
    455 U.S. 489 (1982).......................................................................... 26

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    First Amendment...................................................................... *passim*
    Fourteenth Amendment........................................................... 1, 10, 28

**STATUTES**

United States Code, Title 47
    § 230(c)(1)................................................................................ *passim*
    § 230(e)(3)....................................................................................... 28

2024 Cal. Stats., Chapter 261 (AB 2655) ..................................... *passim*

2024 Cal. Stats., Chapter 262 (AB 2839) ..................................... *passim*

1

### TABLE OF AUTHORITIES
**(continued)**

2

**Page**

3

California Elections Code

4

§ 20511(a) ............................................................................................................. 4, 17

§ 20511(b) ............................................................................................................. 4, 17

5

§ 20511(c) ......................................................................................................... 4, 5, 17

§ 20511(e) ......................................................................................................... 4, 5, 17

6

§ 20512(a) ........................................................................................................... 7, 26

§ 20512(e) ........................................................................................................... 7, 26

7

§ 20512(h) ................................................................................................................. 5

§ 20512(i)(1) .......................................................................................... 7, 13, 19, 26

8

§ 20512(i)(2) ....................................................................................................... 7, 20

9

§ 20513(a) ................................................................................................................. 5

§ 20513(a)(1) ........................................................................................................... 20

10

§ 20513(a)(2) ............................................................................................... 6, 21, 27

§ 20513(a)(2)(A) ..................................................................................................... 14

11

§ 20513(a)(4) ............................................................................................. 14, 20, 27

§ 20513(b) ................................................................................................................. 5

12

§ 20513(c) ................................................................................................... 6, 23, 27

§ 20513(d)(1) ............................................................................................................. 6

13

§ 20513(e) ................................................................................................... 6, 20, 22

§ 20513(e)(2) ............................................................................................................. 6

14

§ 20514(a) ..................................................................................................... 6, 24

§ 20514(a)(1) ............................................................................................. 14, 20, 26

15

§ 20514(a)(1)(A) ....................................................................................................... 7

§ 20514(a)(1)(B) ....................................................................................................... 7

16

§ 20514(a)(2) ........................................................................................................... 26

§ 20514(a)(3) ............................................................................................. 14, 20, 26

17

§ 20514(b) ................................................................................................................. 7

§ 20514(d) ................................................................................................................. 6

18

§ 20514(e)(1) ............................................................................................................. 7

§ 20514(e)(2) ..................................................................................................... 7, 24

19

§ 20515(a) ......................................................................................................... 5, 24

§ 20515(b) ......................................................................................................... 8, 28

20

§ 20516 ............................................................................................................. 8, 28

§ 20518(a) ................................................................................................................. 9

21

§ 20518(b) ................................................................................................................. 9

§ 20519(a) ................................................................................................................. 8

22

§ 20519(b)(1) ............................................................................................................. 8

§ 20519(b)(2) ............................................................................................................. 8

23

§ 20519(c) ......................................................................................... 8, 13, 16, 19

§ 20520 ..................................................................................................................... 9

24

25

26

27

28

## TABLE OF AUTHORITIES
### (continued)

**Page**

**COURT RULES**

Federal Rules of Civil Procedure
 Rule 56 ................................................................................................................. 11

**OTHER AUTHORITIES**

*Liability*, Black's Law Dictionary (12th ed. 2024) ........................................................ 28

Defs.' Mem. P. & A. Supp. Mot. Summ. J. on AB 2655 (2:24-cv-02527-JAM-CKD)

**INTRODUCTION**

Motivated by concerns over political deepfakes online and their threat to electoral integrity, the California Legislature enacted Assembly Bill 2655 (AB 2655) along with a companion statute, Assembly Bill 2839.  AB 2655 imposes regulations on large online platforms with more than 1,000,000 California users.  It requires these platforms to create a way for users to report certain materially deceptive content.  The platform is then required to remove specified materially deceptive content that is most likely to fraudulently mislead voters and undermine electoral integrity during the period of time 120 days before an election through 60 days after the election; it is required to affix a label stating that the content has been manipulated on a broader category of materially deceptive content related to elections in the period of time six months before an election through 60 days after the election.  The Legislature concluded that these regulations are narrowly tailored to further the State's compelling interest in free and fair elections.

Plaintiffs in these four consolidated actions challenge AB 2655 as a violation of the First and Fourteenth Amendments and as preempted by section 230 of the Communications Decency Act.  Their complaints focus on the importance of political commentary and discussion around elections and on the platforms' own expressive rights to moderate the content they host.  But AB 2655 is not about silencing government criticism or shutting down political debate; it is an attempt to solve a novel and growing threat to free and fair elections.  AB 2655, by its clear language, does not prohibit parody or satire.  Nor does AB 2655 raise concerns about the government seeking to become an arbiter of truth.  Only manipulated content that purports to be an authentic record of actual events—that is, indisputably false content—falls within the scope of AB 2655.  At its core, AB 2655 is about specific kinds of demonstrably false, intentionally created digital content—distributed with malice—that can pose tangible harms to electoral integrity.  In other words, it is about media that is *meant to deceive and manipulate voters* by showing them false depictions of allegedly true events.  While the First Amendment provides some protection for falsity, both the Supreme Court and the Ninth Circuit have long recognized that it does not protect all lies.  Rather, States may permissibly regulate specific intentional falsehoods that cause specific tangible harms, which AB 2655 does.

1

Nor is AB 2655 impermissibly vague. It clearly delineates the media that falls within its scope and the action that a platform must take with respect to that media. Moreover, AB 2655 only applies when a platform knows that such content falls within the scope of AB 2655 and only requires a platform to act once it has received a report about such content. A platform can thus act secure in its knowledge about what reports it has received and what content it knows meets the requirements of AB 2655; it has no independent obligation to proactively monitor for or seek out such content to remove or label under AB 2655. And because AB 2655 is a regulation of a platform's own expressive activity—as the platform plaintiffs themselves contend—it does not treat a platform as a publisher and is not preempted by section 230(c). Given the lack of material facts in dispute and the constitutionality of AB 2655 as a matter of law, this Court should award judgment to defendants on all claims related to AB 2655.

## BACKGROUND

### A.    The Growing Dangers of Political Deepfakes

A "deepfake" is a digitally manipulated piece of media, often showing a person doing or saying something that person did not in fact do or say, that depicts something as having occurred that did not, in fact, occur. Alvarez Decl. ¶ 8. With advances in modern technology, especially in artificial intelligence (AI), deepfakes have become easier to make. Alvarez Decl. ¶¶ 8-9, 18-19, 30-32, 48. Today's modern AI can create highly sophisticated deepfakes that can be incredibly realistic and believable to viewers, often leaving viewers unable to know if a particular piece of media is a depiction of real or fake events. Alvarez Decl. ¶¶ 18-19, 30-32, 48-49, 52. AI generation models are freely available online for download or use and can create highly realistic deepfakes in a matter of seconds. Alvarez Decl. ¶ 19. With the ability to utilize large data sets and quickly generate improved deepfakes, actors can also now target deepfakes to specific audiences—a tactic that increases the effectiveness of a deepfake in misleading or confusing viewers. Alvarez Decl. ¶¶ 28-29.

Deepfakes pose a new and growing problem in the political realm, particularly with respect to elections and electoral integrity. Research has long shown that visual depictions and content

2

1  are influential on voters and their decisions about whether and who to vote for.  Alvarez Decl.

2  ¶ 11.  Their influential nature has led actors to manipulate visual content to create desired impacts

3  on viewers.  Alvarez Decl. ¶¶ 6, 47.  With respect to political deepfakes specifically, research

4  indicates they can impact voters' behaviors, including the decision about whether to abstain from

5  voting altogether.  Alvarez Decl. ¶¶ 11-16.  They do this in part by sowing confusion or

6  uncertainty and by generating distrust in political institutions and electoral outcomes.  Alvarez

7  Decl. ¶¶ 12-13, 15.  They may also impact voters' perceptions of candidates.  Alvarez Decl. ¶ 14.

8  And they may spread misinformation about the electoral process or outcomes leading to

9  harassment of elections officials and workers or impairment of the electoral process.  Alvarez

10  Decl. ¶¶ 13, 16-17.

11          These concerns about the detrimental impact of political deepfakes are not merely

12  hypothetical.  Tangible examples of such political deepfakes already exist.  In 2023, a political

13  commentator posted a digitally created video of former President Biden allegedly announcing the

14  beginning of World War III and the return of the draft; at least one viewer asked whether the

15  video was real or fake.  Liska Decl., Ex. 14 & 15.  That same year, deepfake images of then-

16  former President Donald Trump being arrested circulated online.  Liska Decl., Ex. 16.  During the

17  2024 Republican primary season, the campaign for presidential candidate Ron DeSantis posted

18  deepfake images that allegedly showed then-former President Trump embracing Dr. Anthony

19  Fauci.  Liska Decl., Ex. 17.  And shortly before the 2024 New Hampshire primary, a political

20  consultant paid to have robocalls made to Democratic primary voters that claimed to be from

21  former President Biden and sought to dissuade voters from casting ballots in the primary election.

22  Liska Decl., Ex. 18 & 19.  Nor have deepfakes vanished since the election: more recently, a

23  deepfake purporting to show President Trump kissing Elon Musk's feet was posted on television

24  screens in the cafeteria of the headquarters of the Department of Housing and Urban

25  Development.  Alvarez Decl. ¶ 21.  One online database that started collecting examples of

26

27

28

1    political deepfakes in 2023 now has over 800 examples of political deepfakes—a likely

2    underestimate of the number that have been disseminated online.  Alvarez Decl. ¶ 10.[1]

3         Online, political deepfakes can spread rapidly, often outpacing the spread of truthful

4    information.  Alvarez Decl. ¶¶ 25-28, 49.  As novel content meant to evoke strong emotional

5    responses, political deepfakes can go viral, obtaining hundreds of millions of views.  Alvarez

6    Decl. ¶ 25.  Their spread can be hard to detect due to the fragmented nature of the online social

7    media ecosystem and the spread of such material through closed communications channels such

8    as encrypted messaging, private social media groups, and personal content delivery systems.

9    Alvarez Decl. ¶ 26.  Moreover, deepfakes are "sticky"—they continue to impact viewers even

10   when the viewers know that their contents are fake.  Alvarez Decl. ¶¶ 22-24, 28-29, 53.  Research

11   has shown across studies that synthetically induced beliefs, such as those from political

12   deepfakes, are resistant to subsequent correction or modification.  Alvarez Decl. ¶¶ 24, 39, 53.

13   And the concerning risks of political deepfakes are further amplified by foreign actors' use of

14   deepfakes to interfere in American politics.  Alvarez Decl. ¶ 35-37.

15       **B.    Assembly Bill 2655**

16       As the California Legislature observed, "bad actors now have the power to create a false

17   image of a candidate accepting a bribe, or a fake video of an elections official 'caught on tape'

18   saying that voting machines are not secure, or generate the Governor's voice telling millions of

19   Californians their voting site has changed."  Cal. Elec. Code § 20511(b).  Indeed, the Legislature

20   found, "candidates and parties are already creating and distributing deepfake images and audio

21   and video content."  *Id.* § 20511(c).  Thus, "[v]oters will not know what images, audio, or video

22   they can trust."  *Id.* § 20511(a).

23       As the Legislature recognized, California has a "compelling interest in protecting free and

24   fair elections."  Cal. Elec. Code § 20511(e).  The Legislature found that "[i]n order to ensure

25   California elections are free and fair, California must, for a limited time before and after

26   elections, prevent the use of deepfakes and disinformation meant to prevent voters from voting

27

28
---
[1] This database can be found at https://airtable.com/appOU03dlKuBdbmty/shrEkrIYINbrc KQ3z/tbleGYjNLn2D4Xfzs.  As of March 7, 2025, it had close to 1000 entries.

4

Defs.' Mem. P. & A. Supp. Mot. Summ. J. on AB 2655 (2:24-cv-02527-JAM-CKD)

and deceive voters based on fraudulent content." *Id.* Deepfakes and similar deceptive media "can skew election results" and "undermine trust in the ballot counting process." *Id.* § 20511(c). To address these serious concerns, the Legislature enacted Assembly Bill 2655 (AB 2655) as well as a companion statute, Assembly Bill 2839 (AB 2839).

While AB 2839 is intended to directly regulate the posting of political deepfakes, AB 2655 regulates online platforms. The statute applies to any "large online platform," defined as "a public-facing internet website, web application, or digital application, including a social media platform, . . . video sharing platform, advertising network, or search engine that had at least 1,000,000 California users during the preceding 12 months." Cal. Elec. Code § 20512(h). The bill imposes three main requirements on online platforms.

First, AB 2655 requires that online platforms create a way for California residents to report content that is subject to AB 2655's regulations. Specifically, online platforms are required to "provide an easily accessible way for California residents to report to that platform content that should be removed . . . or labeled" under AB 2655. Cal. Elec. Code § 20515(a). The platform "shall respond to the person who made the report within 36 hours of the report, describing any action taken or not taken by the large online platform with respect to the content." *Id.* This is the "Reporting Requirement."

Second, AB 2655 requires online platforms to remove certain political deepfakes posted on their platforms. Online platforms "shall develop and implement procedures for the use of state-of-the-art techniques to identify and remove materially deceptive content" if the following requirements are met: (1) the content is reported to the online platform through the required reporting mechanism, (2) the materially deceptive content covers certain specified subjects, (3) the content is posted during the specified window of time around an election, and (4) the "large online platform knows or acts with reckless disregard for the fact that the content meets the requirements of this section." Cal. Elec. Code § 20513(a). The online platform must remove a post upon determining that it meets the requirements for removal, "but no later than 72 hours after a report is made." *Id.* § 20513(b). In addition, the platform "shall identify, using state-of-the-art techniques, and remove . . . any identical or substantially similar materially deceptive content" to

5

1  content removed pursuant to AB 2655 upon discovering or being alerted to such content.  *Id.*

2  § 20513(c).  This is the "Blocking Requirement."

3      For the Blocking Requirement to apply, the materially deceptive content must depict one of

4  the following: (1) "[a] candidate for elective office portrayed as doing or saying something that

5  the candidate did not do or say that is reasonably likely to harm the reputation or electoral

6  prospects of a candidate"; (2) "[a]n elections official portrayed as doing or saying something in

7  connection with the performance of their elections-related duties that the elections official did not

8  do or say and that is reasonably likely to falsely undermine confidence in the outcome of one or

9  more election contests"; or (3) "[a]n elected official portrayed as doing or saying something that

10  influences an election in California that the elected official did not do or say and that is

11  reasonably likely to falsely undermine confidence in the outcome of one or more election

12  contests."  *Id.* § 20513(a)(2).  It also must be posted within the time period of 120 days before an

13  election in California.  *Id.* § 20513(e).  For content depicting elections officials, this period of

14  time is extended until 60 days after the election.  *Id.* § 20513(e)(2).  Finally, the Blocking

15  Requirement does not apply to content posted by a candidate that "portrays [that candidate] doing

16  or saying something that the candidate did not do or say" and that includes a disclosure stating

17  that the media has been manipulated.  *Id.* § 20513(d)(1).

18      Third, AB 2655 requires online platforms to label certain political deepfakes.  Specifically,

19  online platforms "shall develop and implement procedures for the use of state-of-the-art

20  techniques to identify materially deceptive content and for labeling such content" if all of the

21  following requirements are met: (1) the content is reported to the online platform through the

22  required reporting mechanism, (2) the content's subject matter is covered by the Blocking

23  Requirement but the content is posted outside the time window for the Blocking Requirement or

24  appears in an advertisement or election communication not covered by the Blocking

25  Requirement, and (3) the platform "knows or acts with reckless disregard for the fact that the

26  materially deceptive content meets the requirements of this section."  Cal. Elec. Code § 20514(a).

27  The required label "shall permit users to click or tap on it for additional explanation about the

28  materially deceptive content in an easy-to-understand format."  *Id.* § 20514(d).  As with the

6

1    Blocking Requirement, the platform must label the content as soon as it determines the

2    requirements are met, "but no later than 72 hours after a report is made." *Id.* § 20514(b).

3    However, unlike with the Blocking Requirement, there is no requirement for the platform to

4    identify identical or substantially similar content to label.  This is the "Labeling Requirement."

5        The Labeling Requirement applies to content that is covered by the Blocking Requirement

6    but posted outside the temporal window of that requirement. Cal. Elec. Code § 20514(a)(1)(A).

7    It also applies to content "within an advertisement or election communication" that is not subject

8    to the Blocking Requirement.  *Id.* § 20514(a)(1)(B).  AB 2655 defines an "advertisement" as "any

9    general or public communication that a large online platform knows is authorized or paid for with

10   the purpose of supporting or opposing a candidate for elective office" and an "election

11   communication" as "a general or public communication that is not an 'advertisement' and that

12   concerns any of the following:" (1) "[a] candidate for elective office," (2) "[v]oting or refraining

13   from voting in an election in California," (3) "[t]he canvass of the vote for an election in

14   California,"(4) "[v]oting machines, ballots, voting sites, or other property or equipment related to

15   an election in California," (5) "[p]roceedings of the electoral college in California." *Id.*

16   § 20512(a), (e).  The Labeling Requirement applies during the period of time six months prior to

17   an election. *Id.* § 20514(e)(1).  For content that "depicts or pertains to elections officials, the

18   electoral college process, a voting machine, ballot, voting site, or other equipment related to an

19   election, or the canvass of the vote," this period of time is extended through 60 days after the

20   election. *Id.* § 20514(e)(2).

21       Both the Blocking Requirement and the Labeling Requirement apply only to "materially

22   deceptive content."  The statute defines "materially deceptive content" as "audio or visual media

23   that is digitally created or modified, and that includes, but is not limited to, deepfakes and the

24   outputs of chatbots, such that it would falsely appear to a reasonable person to be an authentic

25   record of the content depicted in the media." Cal. Elec. Code § 20512(i)(1).  This does not

26   include "any audio or visual media that contains only minor modifications that do not

27   significantly change the perceived contents or meaning of the content" such as "changes to the

28   brightness or contrast of images" or "removal of background noise in audio." *Id.* § 20512(i)(2).

7

1    AB 2655 recognizes four exceptions from the Blocking and Labeling Requirements.  First,

2    the law does not apply to "[a] regularly published online newspaper, magazine, or other

3    periodical of general circulation that routinely carries news and commentary of general interest

4    and that publishes any materially deceptive content . . . if the publication contains a clear

5    disclosure that the materially deceptive content does not accurately represent any actual event,

6    occurrence, appearance, speech or expressive conduct." Cal. Elec. Code § 20519(a).  Second, it

7    does not apply to "[a] broadcasting station that broadcasts any materially deceptive content . . . as

8    part of a bona fide newscast, news interview, news documentary, commentary of general interest,

9    or on-the-spot coverage of bona fide news events, if the broadcast clearly acknowledges . . . that

10   the materially deceptive content does not accurately represent any actual event, occurrence,

11   appearance, speech, or expressive content." *Id.* § 20519(b)(1).  Third, the law does not apply to

12   "[a] broadcasting station when it is paid to broadcast materially deceptive content" if either "[t]he

13   broadcasting station can show that it has prohibition and disclaimer requirements that are

14   consistent with the requirements of [AB 2655] and that it has provided those prohibition and

15   disclaimer requirements to each person or entity that purchased the advertisement" or "[f]ederal

16   law requires the broadcasting station to air advertisements from legally qualified candidates or

17   prohibits the broadcasting station from censoring or altering the message." *Id.* § 20519(b)(2).

18   Fourth, the law does not apply to "[m]aterially deceptive content that constitutes satire or

19   parody." *Id.* § 20519(c).

20       AB 2655 permits a "candidate for elective office, elected official, or elections official who

21   has made a report to a large online platform . . . and who either has not received a response within

22   36 hours or disagrees with the response, action taken, or failure by the large online platform to

23   take action within 72 hours" to "seek injunctive or other equitable relief" enforcing the Blocking

24   or Labeling Requirements.  Cal. Elec. Code § 20515(b).  The plaintiff "shall bear the burden of

25   establishing the violation through clear and convincing evidence." *Id.*  The law also allows the

26   Attorney General or any district or city attorney to "seek injunctive or other equitable relief

27   against any large online platform to compel the removal of specific content . . . , labeling of

28   specific content . . ., or compliance with the reporting process." *Id.* § 20516.  AB 2655 does not

8

1  authorize any actions to recover damages.

2      AB 2655 makes clear that it "does not preclude a large online platform from blocking,

3  removing, or labeling any materially deceptive content outside of the time periods specified" in

4  the Blocking and Labeling Requirement. Cal. Elec. Code § 20518(a). It also "does not preclude

5  any online platform not subject to this chapter from blocking, removing, or labeling any

6  materially deceptive content." *Id.* § 20518(b). Finally, AB 2655 contains a severability clause.

7  *Id.* § 20520.

8      **C.    Procedural History**

9      All four of these consolidated actions challenge AB 2655. The first action was filed by

10  plaintiff Christopher Kohls. According to his verified complaint, plaintiff Christopher Kohls

11  "creates humorous content commenting on and satirizing political figures" under the screenname

12  "Mr. Reagan," including a video "parodying candidate Kamala Harris's first presidential

13  campaign ad." *Kohls* Compl. [ECF No. 1] ¶ 5. This video contained digitally created audio

14  purporting to be former Vice President Harris interspersed with actual audio of speeches given by

15  the former Vice President. *Id.* ¶¶ 6, 32-33. Per the complaint, Kohls's video attracted widespread

16  attention when it was reposted by Elon Musk and received over 100 million views. *Id.* ¶ 8.

17  Plaintiff filed suit against Attorney General Rob Bonta and Secretary of State Shirley N. Weber,

18  in their official capacities, challenging AB 2655 along with its companion bill, AB 2839. *Id.*

19  ¶¶ 18-19. He contends that AB 2655 violates the First Amendment facially and as applied and is

20  unconstitutionally vague. *Id.* ¶¶ 109-194. Kohls seeks a permanent injunction of both statutes as

21  well as declaratory relief. *Id.* ¶¶ 195-197.

22      The second suit filed was brought by The Babylon Bee and Kelly Chang Rickert.

23  According to its verified complaint, plaintiff The Babylon Bee is a Florida company that

24  publishes satirical news articles, photographs, and videos on its own website and its other social

25  media accounts. *Babylon Bee* Compl. [ECF No. 21] ¶¶ 10-12, 41, 43. These include satirical

26  articles, photographs, and videos regarding political subjects. *Id.* ¶¶ 47, 52-54, 57-58, 60-62. The

27  Babylon Bee has millions of followers and subscribers across its website and social media

28

9

Defs.' Mem. P. & A. Supp. Mot. Summ. J. on AB 2655 (2:24-cv-02527-JAM-CKD)

accounts, including Californians.  *Id.* ¶¶ 11-12, 42, 44-46.  For her part, plaintiff Kelly Chang

Rickert is a California resident who publishes about topics such as politics, elections, and culture

on her own blog and on social media accounts.  *Id.* ¶¶ 13, 110, 116, 119.  The two brought suit

against Attorney General Rob Bonta and Secretary of State Shirley N. Weber, in their official

capacities, challenging AB 2655 and its companion bill, AB 2839.  *Id.* ¶¶ 14-15.  They contend

that AB 2655 violates the First Amendment facially and as applied and is unduly vague in

violation of the Fourteenth Amendment's due process clause.  *Id.* ¶¶ 305-394.  They seek a

declaration of the statutes' invalidity and a permanent injunction against their enforcement.  *Id.*,

Prayer for Relief.

The third action filed was brought by Rumble Inc. and Rumble Canada Inc.  Rumble

Canada is the owner and operator of Rumble, an online video-sharing platform where users can

upload, view, and comment on videos.  *Rumble* Compl. [ECF No. 33] ¶¶ 9-10, 19-20.  The

Rumble plaintiffs brought suit against Attorney General Rob Bonta and Secretary of State Shirley

N. Weber, in their official capacities, challenging AB 2655.  *Id.* ¶¶ 11-12.  They contend that AB

2655 violates the First Amendment as applied and facially, is preempted by Section 230 of the

Communications Decency Act, and is void for vagueness under the Fourteenth Amendment.  *Id.*

¶¶ 109-152.  They seek a declaration of the statue's invalidity and a permanent injunction against

its enforcement.  *Id.*, Prayer for Relief.

The fourth and final suit was brought by X Corp.  Plaintiff X Corp. operates the X service,

a social media platform that permits users to post and distribute content for other users to view

and interact with.  *X Corp.* Compl. [ECF No. 38] ¶ 21.  It brought suit against Attorney General

Rob Bonta and Secretary of State Shirley N. Weber, in their official capacities, challenging AB

2655.  *Id.* ¶¶ 23-24.  X Corp. contends that AB 2655 violates the First Amendment facially and as

applied.  *Id.* ¶¶ 96-113.  It also contends that AB 2655 is preempted by Section 230 of the

Communications Decency Act and is unduly vague under the Fourteenth Amendment.  *Id.*

¶¶ 114-145.  It seeks a declaration of the statute's invalidity and a permanent injunction against

its enforcement.  *Id.*, Prayer for Relief.

1    All four actions have been related and consolidated.  The parties have also negotiated a

2    limited stay of enforcement for AB 2655 that currently runs through June 28, 2025.  Following

3    consolidation, the parties negotiated a schedule for cross-motions for summary judgment.

4                                    **LEGAL STANDARD**

5            Under Federal Rule of Civil Procedure 56, the Court may award summary judgment if there

6    are no material disputes of fact and the moving party demonstrates it is entitled to judgment as a

7    matter of law.  A fact is "material" if it would impact the outcome of the case.  *Anderson v.*

8    *Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986).  The moving party has the burden of

9    demonstrating there are no material facts in dispute.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

10   (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the

11   nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith*

12   *Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  In determining whether there are any

13   material facts in dispute, the court must "view[ ] the evidence in the light most favorable to the

14   nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001).  The Court does not

15   engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences

16   from the facts.  *Anderson*, 477 U.S. at 255.

17                                        **ARGUMENT**

18   **I.    AB 2655 DOES NOT VIOLATE THE FIRST AMENDMENT OR CALIFORNIA'S FREE**

19   **SPEECH CLAUSE**

20           All plaintiffs contend that AB 2655 violates the First Amendment.  The First Amendment

21   provides that the government "shall make no law . . . abridging the freedom of speech."  U.S.

22   Const., amend I.  If a law regulates expressive activity, the court must determine "whether the

23   enactment is content-based or content-neutral."  *United States v. Swisher*, 811 F.3d 229, 311 (9th

24   Cir. 2016) (en banc).  A law is content-based if it "'applies to particular speech because of the

25   topic discussed or the idea or message expressed.'"  *City of Austin v. Reagan Nat'l Advertising of*

26   *Austin, LLC*, 596 U.S. 61, 69 (2022) (citation omitted).  A content-based law is subject to strict

27   scrutiny and "is justified only if the government demonstrates that [the law] is narrowly tailored

28   to serve a compelling state interest."  *Twitter, Inc. v. Garland*, 61 F.4th 686, 698 (9th Cir. 2023).

11

Defs.' Mem. P. & A. Supp. Mot. Summ. J. on AB 2655 (2:24-cv-02527-JAM-CKD)

1    Plaintiffs contend that AB 2655 violates the First Amendment facially and as-applied.

2    These claims all fail as a matter of law.[2]

3        **A.    AB 2655 Is Not Facially Invalid**

4    Plaintiffs first contend that AB 2655 is facially invalid.  As the Supreme Court has

5    articulated, a facial challenge under the First Amendment faces a different standard than an as-

6    applied one.  "For a host of good reasons, courts usually handle constitutional claims case by

7    case, not en masse," and facial challenges are "hard to win."  *Moody v. NetChoice, LLC*, 603 U.S.

8    707, 723 (2024).  In the First Amendment context, to prevail on a facial challenge, the plaintiff

9    must establish that the "law's unconstitutional applications substantially outweigh its

10   constitutional ones."  *Id.* at 724  "As *Moody* clarified, a First Amendment facial challenge has two

11   parts: first, the courts must 'assess the state laws' scope'; and second, the courts must 'decide

12   which of the laws' applications violate the First Amendment, and . . . measure them against the

13   rest.'"  *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1115-1116 (9th Cir. 2024) (alteration in

14   original) (quoting *Moody*, 603 U.S. at 724).  For the first part, a court determines "[w]hat

15   activities, by what actors, . . . the laws prohibit or otherwise regulate[.]"  *Moody*, 603 U.S. at 724.

16   For the second part, a court "decide[s] which of the laws' applications violate the First

17   Amendment" and "measure[s] them against the rest."  *Id.* at 725  Throughout this analysis, a

18   plaintiff must "carry its burden" to establish that the standard for a facial challenge is met.  *Id.* at

19   744.

20       The first step in analyzing a facial claim is to consider the full range of applications for the

21   challenged statute.  In this analysis, a court does not "confine [its] facial overbreadth analysis to

22   the 'heartland applications' alleged by the [plaintiffs]; instead [it] must 'address the full range of

23   activities' that the statute covers."  *Project Veritas v. Schmidt*, 125 F.4th 929, 961 (9th Cir. 2025)

24   (en banc) (quoting *Moody*, 603 U.S. at 724-726).  In considering plaintiffs' facial challenge to AB

25   2655, the Court must therefore consider the full range of applications that the statute has.

26   _____

27       [2] Several plaintiffs also contend AB 2655 violates the California Constitution's analogous free speech clause.  Since the analysis of that claim is materially the same as the First Amendment claim here, *see Beeman v. Anthem Prescription Management, LLC*, 58 Cal. 4th 329,

28   341 (2013), such claims fail for the same reasons as plaintiffs' First Amendment claims.

1      Notably, this full range of applications does not include parodies or satire.  First, AB 2655

2  expressly does not apply to "[m]aterially deceptive content that constitutes satire or parody."  Cal.

3  Elec. Code § 20519(c).  Second, the definition of "materially deceptive content" itself generally

4  excludes parody and satire from AB 2655 in the first place.  AB 2655 defines "materially

5  deceptive content" as content that "would falsely appear to a reasonable person to be an authentic

6  record of the content depicted in the media."  *Id.* § 20512(i)(1).  In other words, to fall within the

7  scope of AB 2655's regulations, a reasonable person would have to believe that the reported

8  media shows the depicted person saying or doing something that they *actually* did or said.  Thus,

9  AB 2655 would not apply to a video swapping President Trump's face onto the body of

10  Superman in a movie clip, a digitally created painting of former Vice President Harris crossing

11  the Delaware River in George Washington's place, or an edited video of Governor Gavin

12  Newsom taking the first step on the moon in Neil Armstrong's place.  A reasonable person would

13  not believe that President Trump is actually Superman, former Vice President Harris actually

14  crossed the Delaware River during the Revolutionary War, or Governor Newsom actually took

15  the first step on the moon—meaning no reasonable viewer would believe that such modified

16  content is an "authentic record" of what it depicts as having occurred.

17      Parody and satire may be literally false, but they are not meant to be taken as literally true.

18  This is because parody and satire are not intended to imply that their contents depict actual events

19  or that they should be taken at their word.  A reasonable viewer of a Saturday Night Live sketch

20  that shows "the President" saying or doing something does not believe the sketch is meant to

21  convey that the President actually said or did that thing.  So, too, does a reasonable reader of the

22  satirical website the *Onion* understand that a news report about the President is not meant to

23  convey something that the President actually said or did.  In the typical case, a parody or satire

24  would thus fall outside the scope of AB 2655's regulated media altogether by not meeting the

25  definition of "materially deceptive content": it does not purport to be an authentic record of its

26  content.

27      In this way, the definition of "materially deceptive content" perfectly tracks the line drawn

28  under the First Amendment for when satire or parody can be actionable as defamation.  The

13

Defs.' Mem. P. & A. Supp. Mot. Summ. J. on AB 2655 (2:24-cv-02527-JAM-CKD)

1    Supreme Court has recognized that "[d]espite its literal falsity, satirical speech enjoys First

2    Amendment protection." *Farah v. Esquire Magazine*, 736 F.3d 528, 536 (D.C. Cir. 2013).

3    Satirical speech "is not actionable [for defamation] if it 'cannot reasonably be interpreted as

4    stating actual facts about an individual.'" *Id.* (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S.

5    1, 20 (1990)); *see also Knievel v. ESPN*, 393 F.3d 1068, 1073-1074 (9th Cir. 2005). So, too,

6    under AB 2655: media is not required to be removed or labeled if  it is not reasonably interpreted

7    as depicting something that actually occurred. Moreover, that some people might fall for a

8    parody and satire does not, standing alone, bring it inside the scope of AB 2655's regulations. As

9    in the context of defamation cases, "[t]he test . . . is not whether some readers were misled, but

10   whether the hypothetical reasonable reader could be." *Farah*, 736 F.3d at 537. If a reasonable

11   person would recognize that a piece of media is parody or satire—and that it does not purport to

12   be an authentic record of the events it records—then that piece of media does not meet the

13   statutory definition for "materially deceptive content" and falls outside the scope of AB 2655's

14   regulations altogether.

15       Instead of silencing parody, satire, or political commentary, the majority of AB 2655's

16   applications involve labeling or removing content that States may permissibly regulate. As one

17   example, AB 2655 applies to materially deceptive media portraying a candidate doing or saying

18   something the candidate did not do or say that damages a candidate's electoral chances or

19   reputation. Cal. Elec. Code §§ 20513(a)(2)(A), 20514(a)(1). Such applications cover defamatory

20   content. The First Amendment allows States to regulate knowing or reckless falsehoods that are

21   defamatory. *See, e.g.*, *Milkovich*, 497 U.S. at 14-15. AB 2655 requires that a platform have

22   knowledge of the falsity of the media or act with reckless disregard for its falsity, *id.*

23   § 20513(a)(4), 20514(a)(3), tracking the standard for defamation under the First Amendment.

24   Thus applications of AB 2655 to defamatory content are constitutional under the First

25   Amendment.

26       So, too, are many other applications of AB 2655. For instance, the Ninth Circuit has held

27   that "a false statement made in association with legally cognizable harm or for the purpose of

28   material gain is not protected" by the First Amendment. *Animal Legal Defense Fund v. Wasden*,

14

Defs.' Mem. P. &. A. Supp. Mot. Summ. J. on AB 2655 (2:24-cv-02527-JAM-CKD)

878 F.3d 1184, 1199 (9th Cir. 2018), *abrogated on other grounds by*, *Project Veritas*, 125 F.4th at 948.  In *Animal Legal Defense Fund*, the Ninth Circuit upheld an Idaho statute that criminalized obtaining records from an agricultural facility by misrepresentation and knowingly obtaining employment at an agricultural production facility by misrepresentation with the intent to cause injury to the facility.  *Id.* at 1199-1201.  With respect to the first prohibition, "false statements made to actually acquire agricultural production facility records inflict a property harm upon the owner, and may also bestow a material gain on the acquirer."  *Id.* at 1199.  The court held that that section therefore "does not regulate constitutionally protected speech, and does not run afoul of the First Amendment."  *Id.* at 1200.  With respect to the second prohibition, the court explained that the statute prohibited "lie[s] made for material gain," and similarly fell within the scope of falsehoods that States could permissibly regulate.  *Id.* at 1201.

AB 2655 also applies to media that may be regulated under *Animal Legal Defense Fund*.  For one, AB 2655 applies to materially deceptive media distributed with the intent of fraudulently misleading voters to trick them into voting for a particular candidate—which are intentional, knowing falsehoods that cause tangible harm and can be regulated permissibly under the First Amendment just like other kinds of fraud, *see, e.g.*, *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud.").  And AB 2655 applies to media that has been distributed by an opposing candidate to harm an opponent and mislead voters into voting for the distributing candidate, an application that clearly involves material gain for the distributing candidate in the form of more votes and a greater change of electoral victory.

Other applications of AB 2655 are also likely constitutional.  For instance, the State certainly has a strong interest in applying AB 2655 to deepfakes from foreign actors intended to undermine democratic elections in California, *see* Alvarez Decl. ¶¶ 35-37 (discussing deepfakes from foreign actors)—to the extent such foreign actors could even state a claim under the First Amendment, *see Agency for International Development v. Alliance for Open Society International*, 591 U.S. 430, 436 (2020) (no First Amendment right implicated by regulations of foreign activities of foreign entities).  And it has a similarly strong interest in applying AB 2655

15

Defs.' Mem. P. & A. Supp. Mot. Summ. J. on AB 2655 (2:24-cv-02527-JAM-CKD)

1   to specific deepfakes about the voting process itself, such as a posted video or audio purporting to

2   show a high-ranking official (e.g., former President Biden) telling voters not to cast votes in a

3   primary election.  All of these applications are far afield from the political commentary or satire

4   that plaintiffs wish to post or host—and all such applications must be considered when

5   conducting the analysis under *Moody*.

6        At the second step of the analysis under *Moody*, plaintiffs must show that the

7   unconstitutional applications of AB 2839 substantially outweigh the constitutional ones.

8   Plaintiffs cannot make that showing here.  Critically, AB 2655 does not generally apply to parody

9   or satire since such content does not meet the definition of "materially deceptive content" by not

10  purporting to depict events that actually occurred.  *See supra* at 13-14.  Even if an occasional

11  parody or satire might meet the definition of "materially deceptive content," it is *still* not subject

12  to AB 2655 because the statute expressly exempts satire or parody.  Cal. Elec. Code § 20519(c).

13  Instead, AB 2655 primarily applies to intentional falsehoods encompassing defamatory content,

14  content meant to defraud voters into changing their votes, and media meant to sow false doubts

15  and discord about the electoral process.  Given the full range of applications of AB 2655,

16  plaintiffs have not and cannot show that the unconstitutional applications of AB 2655 (insofar as

17  there are any) *substantially* outweigh the constitutional ones.  This Court should therefore award

18  defendants judgment on plaintiffs' facial challenge.

19       **B.    AB 2655 Is Not Invalid As-Applied**

20       Plaintiffs also challenge AB 2655 as applied.  Defendants do not dispute that AB 2655

21  implicates the expressive activity of online platforms such as plaintiffs The Babylon Bee, X

22  Corp., and Rumble Canada; under *Moody*, 603 U.S. at 727, platforms have an expressive interest

23  in the expressive "selection, ordering, and labeling of third party posts."  Nor do defendants

24  dispute that AB 2655 regulates on the basis of content and is subject to strict scrutiny.  But while

25  strict scrutiny is a demanding standard, it is not an insurmountable one.  AB 2655 meets that

26  standard.

27

28

### 1. AB 2655 Furthers Compelling Interests in Electoral Integrity and Preventing Fraud on Voters

AB 2655 clearly delineates the interests it seeks to serve.  The Legislature stated that the State has a "compelling interest in protecting free and fair elections."  Cal. Elec. Code § 20511(e).  It found that fake images or audio or video content undermine this interest: they "can skew election results" and "undermine trust in the ballot counting process."  *Id.* § 20511(c).  With current available technology, "[v]oters will not know what images, audio, or video they can trust" and may be deceived by content created by "bad actors," such as "a false image of a candidate accepting a bribe, or a fake video of an elections official 'caught on tape' saying that voting machines are not secure."  *Id.* § 20511(a), (b).  Such manipulated content can "prevent voters from voting and deceive voters based on fraudulent content."  *Id.* § 20511(e).

The legislative history echoes these legislative findings: the purposes behind AB 2655 are to protect electoral integrity and prevent fraudulent voter deception.  For instance, the analysis for the Assembly Committee on Elections states that the bill "will ensure that online platforms restrict the spread of election-related deceptive deepfakes meant to prevent voters from voting or to deceive them based on fraudulent content."  Liska Decl., Ex. 8, p. 5.  The analysis by the Senate Committee on Elections and Constitutional Amendments similarly stated that AB 2655 "targets deceptive content that could undermine the public's trust in elections, prevent voters from voting, and distort the electoral process."  Liska Decl., Ex. 10, p. 5.

That the category of deepfakes the Blocking and Labeling Requirements regulate implicates these interests is not simply theoretical.  As even a cursory online search reveals, the problem of political deepfakes is far from "an anticipated harm" or "'mere conjecture,'" *Federal Election Commission v. Cruz*, 596 U.S. 289, 307 (2022) (citation omitted).  The Legislature expressly found that "bad actors now have the power to create" deepfakes, and that "[i]n the lead-up to the 2024 presidential election, candidates and parties are already creating and distributing deepfake images and audio and video content."  Cal. Elec. Code § 20511(b), (c).  The legislative history referenced actual examples of deepfakes that could have deceived voters and impaired free and fair elections, such as the robocalls allegedly from former President Biden before the 2024 New

17

Defs.' Mem. P. & A. Supp. Mot. Summ. J. on AB 2655 (2:24-cv-02527-JAM-CKD)

1   Hampshire primary that explicitly encouraged voters not to go to the polls.  Liska Decl., Ex. 8, p.

2   6-7; Ex. 11, p. 8-9; *see also* Liska Decl., Ex. 14-19.  And research and studies confirm what the

3   legislative findings detail: political deepfakes have proliferated online and can influence voters'

4   behavior, choices, and trust in the electoral process and electoral outcomes.  Alvarez Decl. ¶¶ 10-

5   17, 21.

6          That these political deepfakes pose a risk to democracy is also not merely theoretical.  A

7   voter who decides not to show up to the polls because they saw a deepfake video allegedly of

8   President Trump or Governor Newsom telling them not to vote can hardly be said to have freely

9   and knowingly exercised their right to vote.  So, too, the voter who changes their mind about

10  which candidate to vote for because of a deepfake video purporting to show President Trump or

11  Governor Newsom accepting a bribe or committing a heinous crime.  Deepfakes online may alter

12  voters' behavior and sow confusion that can lead voters to refrain from voting altogether.

13  Alvarez Decl. ¶¶ 10-17.  And those who encounter materially deceptive content about the voting

14  process may find their confidence in the electoral process undermined erroneously—especially if

15  the fraudulent content is a government official allegedly telling voters to doubt electoral

16  outcomes.  Alvarez Decl. ¶¶ 10-17.  The kind of deepfakes that AB 2655 requires to be blocked

17  or labeled pose a risk to the State's interests in electoral integrity and preventing fraud on voters.

18         These interests in safeguarding free and fair elections and preventing voter deception

19  through fraud are indeed compelling, as this Court nodded towards in its ruling on the preliminary

20  injunction of AB 2839, *see* Order Granting Pl.'s Mot. Prelim. Inj. [ECF No. 14] at 11.  The U.S.

21  Supreme Court has recognized that "[a] State indisputably has a compelling interest in preserving

22  the integrity of its election process." *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214,

23  231 (1989).  And "a State has a compelling interest in protecting voters from confusion and undue

24  influence." *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality op.).  "In other words, [the

25  Court] has recognized that a State has a compelling interest in ensuring that an individual's right

26  to vote is not undermined by fraud in the election process." *Id.*  Indeed, as the Supreme Court has

27  explained, the "state interest in preventing fraud and libel" "carries special weight during election

28  campaigns when false statements, if credited, may have serious adverse consequences for the

18

1    public at large." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 349 (1995); *see also John*

2    *Doe No. 1 v. Reed*, 561 U.S. 186, 197 (2010) ("The State's interest is particularly strong with

3    respect to efforts to root out fraud, which not only may produce fraudulent outcomes, but has a

4    systemic effect as well: It 'drives honest citizens out of the democratic process and breeds distrust

5    of our government.'" (citation omitted)); *Berger v. City of Seattle*, 569 F.3d 1029, 1052 (9th Cir.

6    2009) (reducing election fraud and protecting electoral integrity are interests "the Supreme Court

7    has found compelling in a First Amendment context").  As Justice Scalia observed, "[n]o

8    justification for regulation is more compelling than protection of the electoral process.  Other

9    rights, even the most basic, are illusory if the right to vote is undermined." *McIntyre*, 514 U.S. at

10   379 (Scalia, J., dissenting) (quotation marks and citation omitted).  The interests that AB 2655

11   serves are indisputably compelling.

12              **2.    AB 2655 Is Narrowly Tailored to Further These Interests**

13          AB 2655 is narrowly tailored to serve these interests.  The Blocking Requirement and the

14   Labeling Requirement are calibrated to further the State's interests in a narrowly tailored way and

15   work together to balance respecting freedom of speech with protecting electoral integrity and

16   safeguarding voters from fraud.

17          First, AB 2655 is tailored in the limited scope of the content it regulates.  AB 2655 only

18   regulates content that constitutes "materially deceptive content."  This definition does not

19   generally encompass parody or satire, as discussed above, *see supra* at 13-14—and AB 2655

20   expressly exempts from coverage the rare piece of parody or satire that might potentially

21   constitute "materially deceptive content," Cal. Elec. Code § 20519(c).  Furthermore, "materially

22   deceptive content" is defined to include only content that is digitally created or modified.  *Id.*

23   § 20512(i)(1).  Media that has been manually created without digital modifications—such as a

24   post on X or the Babylon Bee written by a person or a blog post written by plaintiff Rickert—are

25   not regulated by AB 2655.  Nor is any digitally modified content that only contains "minor"

26   modifications "that do not significantly change the perceived contents or meaning of the content"

27

28

1    such as "changes to brightness or contrast of images" or "removal of background noise in audio."

2    *Id.* § 20512(i)(2).

3        Second, AB 2655 is tailored through its mens rea requirement. For both the Blocking

4    Requirement and the Labeling Requirement, a platform is only required to act when it "knows or

5    acts with reckless disregard for the fact that the content meets the requirements of [each] section."

6    Cal. Elec. Code §§ 20513(a)(4), 20514(a)(3). This is a clear mens rea standard that limits a

7    platform's requirement to restrict expressive activity solely to situations where it knows or acts

8    with reckless disregard for the fact that a particular piece of media is materially deceptive content.

9    A platform has no obligation to act if it lacks knowledge that a piece of media is materially

10   deceptive content or in good faith believes that a piece of media is not materially deceptive

11   content.

12       Third, both the Blocking and Labeling Requirement do not require any affirmative action

13   by an online platform; rather, both requirements only come into play once a platform receives a

14   report regarding content on its platform subject to AB 2655. With respect to the Labeling

15   Requirement, a platform is required to label media only if it receives a report that that media

16   meets the requirements of AB 2655 to be labeled. Cal. Elec. Code § 20514(a)(1). With respect to

17   the Blocking Requirement, a platform is required to act only if: (1) it receives a report that a piece

18   of media meets the requirements of AB 2655 to be removed, or (2) it discovers or is alerted that a

19   piece of media is identical or substantially similar to a piece of media it has already removed

20   following a report. *Id.* § 20513(a)(1), (e). Thus, AB 2655 does not require an online platform to

21   affirmatively look for and proactively remove or label *any* content.

22       This was an intentional choice by the California Legislature to limit the burden that AB

23   2655 imposes on platforms and their expressive activity. An earlier version of AB 2655 did

24   include the requirement for online platforms to proactively monitor for materially deceptive

25   content. The Legislature amended the statute to remove that requirement to lessen the burden on

26   online platforms, choosing instead to require platforms to act only in response to reports. Liska

27   Decl., Ex. 13, p. 2-3. Requiring a platform to solely act when it receives a report—or, for the

28   Blocking Requirement only, when it discovers or is alerted to media identical to media it has

20

1    already removed under AB 2655 after a report—limits AB 2655's intrusion on a platform's

2    exercise of editorial discretion as well as the intrusion on users' own speech.

3         Finally, AB 2655 is tailored through the scope of the Labeling Requirement and the

4    Blocking Requirement, both individually and together.  The two requirements work in tandem as

5    a sliding scale that calibrates the burden on expressive activity in response to the degree of harm

6    posed by the category of content each regulation applies to and the temporal window during

7    which it is operative.  The Blocking Requirement involves a greater intrusion on speech by

8    requiring a platform to remove content, but applies during a narrower temporal window and to a

9    narrower category of speech posing the greatest risk to the State's interest in electoral integrity

10   and preventing fraud on voters.  Meanwhile, the Labeling Requirement involves a lesser

11   restriction on expression—only requiring a factual label noting media has been manipulated

12   rather than requiring the media be removed altogether—but applies during a broader temporal

13   window and to a broader category of speech that poses a lower (but still great) risk to the State's

14   interests.

15        Starting with the Blocking Requirement, AB 2655 requires a platform to remove content

16   following a report only if it is materially deceptive content that depicts one of three specified

17   subjects: (1) a "candidate doing or saying something the candidate did not do or say and that is

18   reasonably likely to harm the reputation or electoral prospects of a candidate," (2) an "elections

19   official portrayed as doing or saying something in connection with the performance of their

20   elections-related duties that the elections official did not do or say and that is reasonably likely to

21   undermine confidence in the outcome of one or more election contests," or (3) an "elected official

22   portrayed as doing or saying something that influences an election in California that the elected

23   official did not do or say and that is reasonably likely to falsely undermine confidence in the

24   outcome of one or more election contests."  Cal. Elec. Code § 20513(a)(2).

25        The Blocking Requirement is therefore targeted towards content that poses the greatest risk

26   of harm to the State's interests in electoral integrity and preventing voter fraud.  With respect to a

27   candidate, what a candidate personally says or does is likely to have the biggest impact on a

28   voter's decision-making process.  After all, one of the best predictors of future behavior is what a

21

1    person has said or done in the past.  Thus false depictions of a candidate doing or saying

2    something they did not do or say may have an outsized impact on voters compared to other types

3    of deepfakes or misinformation.  The other category of media that the Blocking Regulation

4    regulates relates to electoral integrity, specifically portrayals of elected officials or elections

5    officials doing or saying something they did not do or say that would undermine confidence in the

6    outcome of an election.  Here, too, the Blocking Regulation focuses on materially deceptive

7    content likeliest to cause the greatest harm.  A person is more likely to believe what an elections

8    official or elected official does or says regarding an election.  For instance, a video allegedly

9    depicting an elections official such as a County Registrar or the Secretary of State that claims

10   voting places have changed is more likely to impact the recipient than a post of a random stranger

11   online saying the same thing.  In this way, the Blocking Restriction focuses its regulations on

12   specific deepfakes most likely to cause harm to the interests it furthers.

13        And the Blocking Requirement is further tailored by the temporal requirement it includes.

14   The requirement to remove content only applies during the period of time 120 days prior to an

15   election and, for content depicting an elected official or elections official, during the 60-day

16   period of time following an election.  Cal. Elec. Code § 20513(e).  It is tailored, then, to apply

17   during the period when materially deceptive content will have the greatest impact on the State's

18   interests: the immediate lead-up to an election when voters may be casting their votes or making

19   their decision about who to vote for and in the immediate period after an election while results are

20   being certified.

21        The Blocking Requirement is narrowly tailored by requiring removal of media posing the

22   greatest harm to the State's interests during the window of time when it will have the greatest

23   impact on those interests.  Alternatives to blocking, such as counterspeech, are not effective

24   alternatives to the unique problems posed by political deepfakes.  This is largely because political

25   deepfakes are "sticky".  Alvarez Decl. ¶¶ 22, 39, 53.  In other words, political deepfakes continue

26   to impact a viewer even if they have been debunked or demonstrated as false.  Alvarez Decl.

27   ¶¶ 22, 39, 53. Such stickiness stems in part from the highly realistic nature of political deepfakes

28   in light of modern technology as well as the effectiveness of political deepfakes targeted to

22

Defs.' Mem. P. & A. Supp. Mot. Summ. J. on AB 2655 (2:24-cv-02527-JAM-CKD)

1    mislead specific audiences.  Alvarez Decl. ¶¶ 22-25.  Thus, counterspeech such as labeling or

2    debunking cannot undo the harm caused by a viewer's exposure to political deepfakes.

3          Nor is it even possible for the government to effectively mitigate the harms of political

4    deepfakes through counterspeech such as debunking or pre-bunking (that is, warning viewers in

5    advance about a deepfake).  Deepfakes spread rapidly and virally online, and their spread can

6    outpace that of truthful content such as debunking information.  Alvarez Decl. ¶¶ 25-26.  And it is

7    hardly feasible for the government to identify, detect, and debunk—or predict and pre-bunk—

8    every political deepfake online given the fragmented nature of the online social media landscape

9    and the spread of deepfakes along communications networks such as encrypted networks or

10   private social media groups that are inaccessible to government officials.  Alvarez Decl. ¶¶ 26,

11   30-34, 39-40.  Similarly, existing causes of action, such as defamation law, do not adequately

12   address the harms that AB 2655 seeks to prevent, especially with respect to content that

13   undermines confidence in electoral outcomes or electoral integrity rather than only impacts a

14   candidate's reputation.  Given the great risk of harm from the material subject to the Blocking

15   Requirement during its operative window, its requirement to remove such material following a

16   report is narrowly tailored.

17         The same holds true for the other part of the Blocking Requirement.  Under the Blocking

18   Requirement, a platform is also required to identify and remove "any identical or substantially

19   similar materially deceptive content that the platform had previously removed" under AB 2655

20   "upon discovering or being alerted to the posting or reposting of" such material.  Cal. Elec. Code

21   § 20513(c).  This requirement only comes into play once a platform has knowledge—through

22   report or discovery—of materially deceptive content identical to that which it has already

23   removed under AB 2655.  It would clearly significantly undermine the State's interest if only one

24   version of a post—which may have been reposted thousands or hundreds of thousands of times—

25   is removed; such a game of whack-a-mole would hardly prevent the damage to electoral integrity

26   or the fraud on voters that AB 2655 seeks to avoid.  This aspect of the Blocking Requirement is

27   also narrowly tailored.

28

23

Defs.' Mem. P. & A. Supp. Mot. Summ. J. on AB 2655 (2:24-cv-02527-JAM-CKD)

1    So, too, is the Labeling Requirement.  In contrast to the Blocking Requirement, this part of

2    AB 2655 does not require a platform to remove any content.  Instead, it requires a platform to

3    affix a label to certain materially deceptive content that notes that the content has been

4    manipulated.  Cal. Elec. Code § 20514(a).  The Labeling Requirement applies to content subject

5    to the Blocking Requirement outside the temporal window that requirement is active and to other

6    materially deceptive content that appears in an advertisement or election communication not

7    subject to the Blocking Requirement.  *Id.*  It applies during the period of time six months before

8    an election.  *Id.* § 20514(e)(2)  For content involving elections officials; the electoral college

9    process; a voting machine, ballot, voting site, or other election equipment; or the canvass of the

10   vote, this window of time extends to 60 days after an election.  *Id.*

11   The Labeling Requirement involves a lesser intrusion on a platform's or user's expressive

12   activity the Blocking Requirement does.  It solely requires that the media include a disclaimer

13   that states that it has been manipulated—a factual, noncontroversial statement that prevents

14   viewers from being deceived or misled.  Indeed, the Ninth Circuit has applied a lower standard

15   for disclosures in political speech, reflecting the lesser intrusion that disclosure involves.  *See,*

16   *e.g.*, *Smith v. Helzer*, 95 F.4th 1207, 1214 (9th Cir.) (applying only exacting scrutiny to political

17   speech disclosure requirements), *cert. denied*, 145 S. Ct. 567 (2024).  This lesser intrusion reflects

18   that the content that falls within the scope of the Labeling Requirement still poses a serious risk of

19   harm to the State's interest, but to a lesser degree than the content subject to the Blocking

20   Requirement.  And it makes the Labeling Requirement narrowly tailored as well.

21   Taken as a whole, AB 2655 is therefore narrowly tailored.  The Reporting Requirement

22   serves as a means for the other two requirements to function with less burden on platforms—since

23   reporting triggers the other obligations—and poses little incursion on expressive activity on its

24   own.  A platform merely needs to respond to a report with factual information: what it has done in

25   response.  Cal. Elec. Code § 20515(a).  And requiring platforms to take action to help limit the

26   spread of deepfakes is itself necessary to further the State's interests.  As research has indicated,

27   political deepfakes have proliferated on online platforms.  Alvarez Decl. ¶¶ 8-9.  It is impossible

28   for the State, let alone the average person, to stay up-to-date and aware of which content is a false

24

1    portrayal of purportedly real events and which content is an accurate portrayal of real events.

2    Requiring the online platforms that host such content to remove or label harmful political

3    deepfakes is necessary to ensure that voters are not fraudulently misled and electoral integrity is

4    not undermined.  AB 2655 is therefore narrowly tailored to further the State's compelling interest

5    and does not violate the First Amendment.

6    **II.    AB 2655 IS NOT UNCONSTITUTIONALLY VAGUE**

7        Plaintiffs further argue that AB 2839 is unconstitutionally vague.  Not so.  A statute is

8    unconstitutionally vague in violation of the Due Process Clause only if it "'fails to provide a

9    person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it

10   authorizes or encourages seriously discriminatory enforcement.'"  *FCC v. Fox Tel. Stations, Inc.*,

11   567 U.S. 239, 253 (2012) (citation omitted).  Mere "uncertainty at a statute's margins will not

12   warrant facial invalidation if it is clear what the statute proscribes 'in the vast majority of its

13   intended applications.'"  *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir.

14   2001) (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)).  When a statute uses a term that it

15   does not define, words are given their ordinary meaning.  *See, e.g.*, *Taniguchi v. Kan Pac. Saipan*,

16   *Ltd.*, 566 U.S. 560, 566 (2012).  Each of AB 2655's requirements meet this standard.

17       First, AB 2655's Reporting Requirement.  AB 2655 requires an online platform to "provide

18   an easily accessible way for California residents to report" content subject to the Blocking or

19   Labeling Requirement.  An online platform can clearly understand what is required here.  Indeed,

20   plaintiff X Corp. already has a method for individuals to report posts that violate its terms of

21   service or constitute copyright infringement, as does plaintiff Rumble.  *See* Liska Decl. Ex. 20,

22   21.  And plaintiff The Babylon Bee provides a method for users to report alleged copyright

23   infringement.  *See* Liska Decl., Ex. 22.  Given that these three plaintiffs already provide some

24   means for users to report content for review, they can easily figure out what is required to comply

25   with the Reporting Requirement of AB 2655, as can any reasonable platform.

26       Nor is the Labeling Requirement unduly vague.  AB 2655 only requires a platform to label

27   materially deceptive content that *is reported to it*; there is no affirmative obligation on a platform

28

25

Defs.' Mem. P. & A. Supp. Mot. Summ. J. on AB 2655 (2:24-cv-02527-JAM-CKD)

1    to proactively monitor or seek out all materially deceptive content for labeling.  *See* Cal. Elec.

2    Code § 20514(a)(1).  Thus, a platform knows that it need not act unless and until it receives a

3    report that content should be labeled under AB 2655.  Furthermore, AB 2655 only requires

4    content be labeled when the platform "knows or acts with reckless disregard for the fact that the

5    materially deceptive content meets the requirements" for labeling.  *Id.* § 20514(a)(3).  This mens

6    rea requirement tracks the same standard that applies for defamation and libel under the First

7    Amendment.  *See, e.g.*, *Milkovich*, 497 U.S. at 14-15.  A mens rea requirement such as this

8    further mitigates any risk of vagueness—"especially with respect to the adequacy of notice to the

9    complainant that his conduct is proscribed." *Village of Hoffman Estates v. Flipside, Hoffman*

10   *Estates, Inc.*, 455 U.S. 489, 499 (1982).  An online platform can easily "base [its] behavior on

11   [its] factual knowledge of the situation at hand and thereby avoid violating the law." *United*

12   *States v. Jae Gab Kim*, 449 F.3d 933, 943 (9th Cir. 2006).

13           And the Labeling Requirement is sufficiently clear with respect to the scope of content that

14   is required to be labeled.  The statute only requires labeling for materially deceptive content that

15   is within the scope of the Blocking Requirement but posted outside the temporal window for that

16   requirement or that appears within an advertisement or election communication not subject to the

17   Blocking Requirement.  Cal. Elec. Code § 20514(a)(2).  AB 2655 provides a clear definition of

18   what constitutes an "advertisement": a communication the platform "knows is authorized or paid

19   for with the purpose of supporting or opposing a candidate for elective office." *Id.* § 20512(a).

20   Here, again, the definition is predicated on a platform's knowledge, allowing it to act in

21   accordance with the facts it has at hand.  AB 2655 also provides a clear definition of "election

22   communication": a communication that concerns several specified subjects such as candidates for

23   elective office or voting in an election in California.  *Id.* § 20512(e).

24           Finally, the definition of "materially deceptive content" is not unduly vague.  Such content

25   is defined as "audio or visual media that is digitally created or modified . . . such that it would

26   falsely appear to a reasonable person to be an authentic record of the content depicted in the

27   media." *Id.* § 20512(i)(1).  As discussed above, *see supra* at 13-14, this distinction tracks the line

28   drawn under the First Amendment for when parody or satire can be actionable as defamation.

26

Defs.' Mem. P. & A. Supp. Mot. Summ. J. on AB 2655 (2:24-cv-02527-JAM-CKD)

1   And since the Labeling Requirement applies only when an online platform knows or has reason to

2   know the content meets the definition of "materially deceptive content," a platform is not subject

3   to suit when it lacks the requisite awareness that a piece of media has been digitally manipulated.

4   In light of the statutory definitions and their specificity, the Labeling Requirement is not

5   unconstitutionally vague.

6       Nor is the Blocking Requirement.  If anything, this requirement is even clearer than the

7   Labeling Requirement in that it only requires blocking specified categories of "materially

8   deceptive content" that are detailed in the statutory text.  Cal. Elec. Code § 20513(a)(2).  And as

9   with the Labeling Requirement, the Blocking Requirement does not impose any freewheeling

10  obligation to seek out or proactively monitor for materially deceptive content.  Rather, the

11  obligations of the Blocking Requirement are triggered under two circumstances: (1) if a report is

12  made that content should be blocked; or (2) if a platform discovers the posting or reposting of

13  identical or substantially similar material to media that has already been removed following a

14  report.  *Id.* § 20513(c).  In neither situation is the platform required to take any preemptive

15  affirmative action; it is only required to act *after* it receives a report or discovers media identical

16  to that already removed (e.g., a further report of a removed post).

17      Moreover, as with the Labeling Requirement, a platform is only required to remove content

18  when it "knows or acts with reckless disregard for the fact that the content meets the requirements

19  of this section."  Cal. Elec. Code § 20513(a)(4).  This mens rea requirement similarly tracks the

20  line drawn by the First Amendment in defamation cases and protects an online platform from suit

21  when it has no knowledge of any materially deceptive content or when it acts negligently with

22  respect to such content.  Once more, a platform can base its actions on the knowledge it has—

23  providing it with sufficient clarity and notice about whether its actions will expose it to liability

24  under AB 2655.

25      Overall, AB 2655 is clear regarding the scope of conduct it regulates.  While there may be

26  hypothetical cases at the margins that can be dreamed up, a statute is not vague when it is "clear

27  what the [statute] as a whole prohibits."  *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (citation

28  omitted).  After all, "because we are '[c]ondemned to the use of words, we can never expect

27

1    mathematical certainty from our language.'" *Id.* (citation omitted) (alteration in original).  AB

2    2655 provides more than sufficient clarity to survive scrutiny under the Fourteenth Amendment.

3    **III.    AB 2655 IS NOT PREEMPTED BY SECTION 230**

4         Finally, plaintiffs contend that AB 2655 is preempted by Section 230 of the

5    Communications Decency Act.  It is not.  Section 230(c)(1) provides that "[n]o provider or user

6    of an interactive computer service shall be treated as the publisher or speaker of any information

7    provided by another information content provider."  47 U.S.C. § 230(c)(1).  It expressly preempts

8    "inconsistent" state laws.  *Id.* § 230(e)(3).  The Ninth Circuit follows a three-part test to determine

9    whether a claim is preempted by Section 230.  *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 738

10   (9th Cir. 2024).  Under this approach, Section 230 preempts claims against "(1) a provider or user

11   of an interactive computer service, (2) whom a plaintiff seeks to treat . . .  as a publisher or

12   speaker (3) of information provided by another information content provider."  *Id.* (citation

13   omitted).

14        AB 2655 is not preempted by Section 230(c)(1) or Section 230(e) for two reasons.  First,

15   AB 2655 does not impose any liability on regulated platforms.  As the Ninth Circuit has stated,

16   section 230 "protects websites *from liability* for material posted on the website by someone else."

17   *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016) (emphasis added).  "Liability" is

18   typically defined as "[a] financial or pecuniary obligation in a specified amount."  *Liability*,

19   Black's Law Dictionary (12th ed. 2024).

20        AB 2655 does not impose any liability on platforms under this traditional definition.  The

21   statute permits a candidate, elected official, or elections official who made a report to a platform

22   to file suit for injunctive or other equitable relief against the platform to compel the removal or

23   labeling of the specific content.  Cal. Elec. Code § 20515(b).  It also allows the Attorney General

24   or a district or city attorney to seek injunctive or other equitable relief against a platform for the

25   removal or labeling of specific content or for compliance with the reporting requirement.  *Id.*

26   § 20516.  In neither circumstance may a plaintiff recover monetary damages against a platform.

27   Indeed, a plaintiff cannot even recover attorney's fees—the Legislature expressly amended the

28

28

1  statute to remove any entitlement to such recovery to ensure that AB 2655 does not impose any

2  liability on a platform.  *See* Liska Decl., Ex. 11, p. 13.  Because AB 2655 does not impose any

3  liability on a platform, it is not preempted by section 230.

4      Second, AB 2655 does not fall within the scope of section 230's preemption because it does

5  not treat platforms as a publisher or speaker of information provided by another, and thus fails the

6  second prong of the *Barnes* test.  Rather than seeking to hold platforms accountable for *another's*

7  speech, AB 2655 regulates a platform's *own* expression.  That is not treating a platform as a

8  publisher under section 230 and AB 2655 is therefore not an "inconsistent" state law.

9      The Ninth Circuit recently addressed what it means to treat a platform as a "publisher" in

10  *Calise*.  As the Ninth Circuit explained, statutory interpretation begins with the statutory text.

11  103 F.4th at 738.  And courts "presume that when Congress uses 'common-law terms,' it

12  intended to incorporate their 'well-settled meaning[s].'"  *Id.* (alteration in original) (citation

13  omitted).  Section 230's "key word—publisher—has a well-defined meaning at common law."

14  *Id.*  Under the common law a publisher "can bear tort liability for anything that it communicates,

15  even negligently, to a third party."  *Id.* at 739.  Thus, a publisher is treated differently than a

16  distributor, "who usually cannot be held liable for repeating unlawful content, such as

17  advertisements, unless they knew or had reason to know that content was unlawful."  *Id.*

18      Section 230 was intended to provide platforms "immunity from some civil and criminal

19  claims."  *Calise*, 103 F.4th at 739.  Congress enacted the law in response to a ruling from a New

20  York state court, *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct.

21  May 24, 1995).  In *Stratton Oakmont*, the state court "treated [defendant], an internet service

22  provider, as if it were the 'publisher,' rather than a mere 'distributor,' of a libelous message

23  posted by a third party."  *Calise*, 103 F.4th at 739.  It did so "because [defendant] was voluntarily

24  removing some messages as offensive."  *Id.*  Thus, the defendant's "content moderation opened

25  [it] up to liability for all messages on its site."  *Id.*  This ruling "created a perverse incentive not to

26  moderate any offensive content."  *Id.*  If a platform did decide to engage in content moderation,

27  under *Stratton Oakmont* that platform faced potentially massive liability for all the content it

28  posted; the only way to avoid that risk was to refrain from engaging in any content moderation

29

1    whatsoever.  In response to this all-or-nothing dilemma, Congress enacted section 230 "to bring

2    traditional 'distributor' immunity online." *Calise*, 103 F.4th at 739.  Section 230 was designed

3    "both to help the internet grow and to encourage internet companies to monitor and remove

4    offensive content without fear that they would 'thereby becom[e] liable for all defamatory or

5    otherwise unlawful messages that they didn't edit or delete.'" *Id.* (citations omitted) (alteration in

6    original).

7         But section 230's "immunity is not limitless." *Calise*, 103 F.4th at 739.  The Ninth Circuit

8    has repeatedly stated that section 230 does not provide "general immunity from liability deriving

9    from third-party content." *Barnes v. Yahoo! Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009).  Nor was

10   section 230 "meant to create a lawless no-man's-land on the Internet." *Fair Housing Council of

11   San Fernando Valley v. Roommates.com, Inc.*, 512 F.3d 1152, 1164 (9th Cir. 2008).  Thus, "it is

12   not enough that a claim, including its underlying facts, stems from third-party content for § 230

13   immunity to apply." *Calise*, 103 F.4th at 742.  Indeed, in *Calise* the Ninth Circuit rejected the

14   defendant's proposed "'but-for' test: if Plaintiffs' claims hinge on publishing-related activity,

15   then § 230(c)(1) bars that claim." *Id.*

16        Therefore, a State is not wholly powerless under section 230 to regulate online platforms

17   that engage in content moderation.  Rather, what a State cannot do is impose *publisher liability*

18   upon an online platform that performs content moderation.  Put another way, section 230 prevents

19   a State from imposing liability upon a platform *for another's speech*.  But it does not foreclose a

20   State from regulating the platform's *own actions*.  *See, e.g.*, *Lemmon v. Snap, Inc.*, 995 F.3d 1085,

21   1087 (9th Cir. 2021) (section 230 did not bar action against company predicated on its own

22   conduct in designing content filter).

23        The Third Circuit recognized this in its recent ruling in *Anderson v. TikTok, Inc.*, 116 F.4th

24   180 (3d Cir. 2024).  There, the Third Circuit held that section 230 did not bar a claim against the

25   online platform TikTok contending that TikTok's algorithm recommending specific content to the

26   plaintiffs' minor child had led to her death.  *Id.* at 184.  The court explained that the Supreme

27   Court has held that "platforms engage in protected first-party speech under the First Amendment

28   when they curate compilations of others' content." *Id.*  "[I]t follows that doing so amounts to

30

Defs.' Mem. P. & A. Supp. Mot. Summ. J. on AB 2655 (2:24-cv-02527-JAM-CKD)

first-party speech under § 230, too." *Id.* Since the "basis of [plaintiff's] lawsuit—i.e., TikTok's

recommendations via its . . . algorithm—is TikTok's own expressive activity," section 230 did

not bar the suit. *Id.*; *see also A.B. v. Salesforce, Inc.*, 123 F.4th 788, 795 (5th Cir. 2024)

("[P]roviders of interactive computer services may be held liable for speech or conduct 'that is

properly attributable to them.'" (citation omitted)).

The same logic holds true here. AB 2655 imposes on a platform's own expressive activities

by requiring them to remove or label certain content. Indeed, that is the very crux of the First

Amendment argument raised by the plaintiffs in this case: the platform plaintiffs here expressly

contend that *their* First Amendment expressive activities are infringed upon because AB 2655

interferes with their ability to exercise editorial discretion regarding what content to show a user.

By requiring certain content be removed or labeled—particularly in the absence of any risk of

financial damages for failing to comply—AB 2655 does not seek to hold platforms liable for the

speech of another any more than a law prohibiting newspapers from publishing ads with nudity

seeks to hold newspapers liable for another's speech. In both instances, the statute regulates the

speaker's own expressive activity—which section 230 does *not* prohibit.

To hold otherwise would allow platforms to have their cake under the First Amendment and

eat it too under section 230. "In the platforms' world, they are fully responsible for their websites

when it results in constitutional protections, but the moment that responsibility could lead to

liability, they can disclaim any obligations and enjoy greater protections from suit than nearly

other industry." *Doe Through Roe v. Snap, Inc.*, 144 S. Ct. 2493, 2494 (2024) (Thomas, J.,

dissenting from denial of certiorari). But that is not the world section 230 creates. It is not a "get

out of jail free" card that liberates platforms from any or all government regulation that touches

upon the content they host. Rather, Congress enacted section 230 to prevent platforms from

being forced to give up content moderation altogether lest they face insurmountable monetary

damages from thousands of defamation suits. Direct regulation of a platform's *own expression*—

which AB 2655 does by requiring certain posts be removed or labeled without creating a risk of

monetary damages—does not risk throttling the growth of the internet. It is instead a

commonsense way for the State to address a problem that risks grave harm to society: the online

31

Defs.' Mem. P. & A. Supp. Mot. Summ. J. on AB 2655 (2:24-cv-02527-JAM-CKD)

1  proliferation of political deepfakes that can mislead or defraud voters and undermine electoral

2  integrity.  Section 230 does not leave the State powerless to address this problem through the

3  regulation of those who elect to leave such content on their platforms.  AB 2655 does not treat

4  platforms as a publisher and it is not preempted by section 230.

5  **CONCLUSION**

6       For the foregoing reasons, there are no genuine disputes of material fact, and defendants are

7  entitled to judgment as a matter of law.  This Court should therefore enter judgment for

8  defendants on all claims.

9

10 Dated:  March 7, 2025                              Respectfully submitted,

11                                                    ROB BONTA
                                                      Attorney General of California
12                                                    ANYA M. BINSACCA
                                                      Supervising Deputy Attorney General
13

14

15                                                     */s/ Kristin A. Liska*
                                                      _____
16                                                    KRISTIN A. LISKA
                                                      Deputy Attorney General
17                                                    *Attorneys for Defendants*

18

19

20

21

22

23

24

25

26

27

28