Alan Butler (SBN 281291)
butler@epic.org
ELECTRONIC PRIVACY INFORMATION CENTER
1519 New Hampshire Avenue NW
Washington, DC 20036
Tel: 202.483.1140

Mason A. Kortz*
mkortz@law.harvard.edu
HARVARD CYBERLAW CLINIC
1557 Massachusetts Ave., 4th Floor
Cambridge, MA 02138
Tel: (617) 495-2845

* Admitted *Pro Hac Vice*

*Attorneys for Amicus Curiae Electronic Privacy Information Center*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

|  |  |
|---|---|
| **CHRISTOPHER KOHLS, et al.,**<br><br>*Plaintiffs,*<br><br>v.<br><br>**ROBERT A. BONTA, et al.,**<br><br>*Defendants.* | Case No. 2:24-cv-02527-JAM-CKD<br><br>Judge: Hon. John A. Mendez |

## BRIEF OF *AMICUS CURIAE* THE ELECTRONIC PRIVACY INFORMATION CENTER IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ASSEMBLY BILL 2839

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................2

TABLE OF AUTHORITIES ..........................................................................................3

STATEMENT OF INTEREST OF AMICUS CURIAE ...............................................5

ARGUMENT ..................................................................................................................6

    I.  THE COURT MUST ASSESS THE CONSTITUTIONALITY OF EACH OF AB 2839'S POTENTIAL APPLICATIONS. ...................................................................................7

    II.  AB 2839 CONSTITUTIONALLY REGULATES FORMS OF INTENTIONAL, FALSE, AND HARMFUL SPEECH BEYOND DEFAMATION AND FRAUD. ..............................11

        A. Application of AB 2839 to deceptive portrayals of officials and elected officials is analogous to prohibitions on impersonation of government officials. ....................12

        B. Application of AB 2839 to deceptive portrayals of candidates and elected officials is analogous to laws against misappropriation of name or likeness. ...........................14

        C. Other applications of AB 2839 comport with the general principles articulated in *Alvarez*. ...................................................................................................................16

    III. COUNTER SPEECH IS NOT A SUFFICIENT REMEDY FOR SOME FORMS OF FALSE SPEECH COVERED BY AB 2839 .....................................................................................17

        A. Counter speech is less effective when false speech cannot readily be distinguished from the truth. ..................................................................................................19

        B. Counter speech cannot keep pace with the speed and scale at which digital election misinformation spreads. ......................................................................................20

        C. Platform design features like engagement-maximizing algorithms inhibit counter speech from reaching audiences. ...............................................................................22

CONCLUSION ............................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Abrams v. United States*, 250 U.S. 616 (1919) ...........................................................19, 20, 21, 22

*Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184 (9th Cir. 2018) .........................................16

*Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288 (1936) ...........................................................8

*Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989).........................................8

*Berisha v. Lawson*, 141 S. Ct. 2424 (2021) ...........................................................................21

*California Redevelopment Assn. v. Matosantos*, 53 Cal. 4th 231 (2011) ..................................10

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)..............................................13

*Hinish v. Meier & Frank Co.*, 113 P.2d 438 (Or. 1941) ..........................................................15

*Hoffman v. Cap. Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001)...........................................15

*Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988) .................................................................18

*Minn. Voters All. v. Mansky*, 585 U.S. 1 (2018) ....................................................................13

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ........................................................... passim

*NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024)....................................................9, 10

*Newcombe v. Adolf Coors Co.*, 157 F.3d 686 (9th Cir. 1998)..................................................14

*People v. Morera-Munoz*, 5 Cal. App. 5th 838 (2016) ........................................................12, 17

*Sabri v. United States*, 541 U.S. 600 (2004) .........................................................................8

*Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020)..........................................9

*State v. Hinkle*, 229 P. 317 (Wash. 1924) ...........................................................................15

*United States v. Alvarez*, 567 U.S. 709 (2012) .............................................................. passim

*United States v. Bonin*, 932 F.3d 523 (7th Cir. 2019)..............................................................13

*United States v. Tomsha-Miguel*, 766 F.3d 1041 (9th Cir. 2014)..........................................12, 17

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008)............................8, 9

*Whitney v. California*, 274 U.S. 357 (1927) ................................................................19, 21, 22

*Yeager v. Cingular Wireless LLC*, 673 F. Supp. 2d 1089 (E.D. Cal. 2009) ...............................15

EPIC'S *AMICUS CURIAE* BRIEF

**Statutes**

52 U.S.C. § 30124 ..........................................................................................14

Cal. Elec. Code § 20012 ............................................................................ passim

**Other Authorities**

Arvind Narayanan, *Understanding Social Media Recommendation Algorithms*, KNIGHT FIRST
    AMEND. INST. (Mar. 9, 2023).........................................................................23

Chengcheng Shao et al., *The Spread of Low-Credibility Content by Social Bots,* NATURE
    COMMC'NS 9, 47878 (2018)...........................................................................22

Christine Bateup, *The Dialogic Promise: Assessing the Normative Potential of Theories of
    Constitutional Dialogue*, 71 BROOK. L. REV. 1109 (2006) .....................................11

David Lazer et al., *The Science of Fake News*, 359 SCIENCE 1094 (2015)................................24

Evan Chiacchiaro, Note, *Generative AI and Electoral Communications*, 9 GEO. L. TECH. REV.
    166 (2025) ....................................................................................................10

Hunt Allcott & Matthew Gentzkow, *Social Media and Fake News in the 2016 Election*, 31 J.
    ECON. PERSPECTIVES 2 (2017) ........................................................................21

James J. Brudney & Ethan J. Leib, *Statutory Interpretation as "Interbranch Dialogue"?*, 66
    UCLA L. REV. 346 (2019) ...............................................................................10

Nils C Köbis, et al., *Fooled Twice: People Cannot Detect Deepfakes But Think They Can*, 24
    ISCIENCE, no. 11, 2021 .....................................................................................20

Philip M. Napoli, *What If More Speech Is No Longer the Solution? First Amendment Theory
    Meets Fake News and the Filter Bubble*, 70 FED. COMM. L.J. 55 (2018)...................20, 22, 23

Restatement (Second) of Torts (1977) ........................................................................14

*Social Media and News Fact Sheet*, PEW RSCH. CTR. (Sept. 17, 2024).......................................23

Soroush Vosoughi et al., *The Spread of True and False News Online*, 359 SCIENCE 1146 (2018)
    ..................................................................................................................22

Zoë Richards & Brandy Zadrozny, *Viral Video of Ripped-Up Pennsylvania Ballots is Fake and
    Russian-Made, Intelligence Agencies Say*, NBC NEWS (Oct. 25, 2024) .................................22

## STATEMENT OF INTEREST OF AMICUS CURIAE

The Electronic Privacy Information Center ("EPIC") is a public interest research center in Washington, D.C., established in 1994 to focus public attention on emerging privacy and civil liberties issues. EPIC regularly participates as *amicus* in cases concerning the First Amendment implications of platform regulation, *see* EPIC, *The First Amendment* (2024),[1] and was an organizational plaintiff in both *Reno v. ACLU*, 521 U.S. 844 (1997), and *Ashcroft v. ACLU*, 542 U.S. 656 (2004). *Amicus* is wary of regulations that would censor online speech, especially core political speech. But *amicus* also recognizes the threat that intentional falsehoods pose to a free, fair, and trustworthy democratic process, especially in the months around an election. Election misinformation harms not only candidates who are deprived of the ability to compete on the merits of their positions, it also leads to disenfranchisement of individuals who are misled as to the timing, procedures, or issues at stake in an election. *Amicus* has decades of experience evaluating state and federal legislative proposals to regulate online communications. *Amicus*'s ultimate interest here is in ensuring that the Court's decision about AB 2839 is based on a detailed review of the constitutionality of each of the statute's possible applications.[2]

---

[1] https://epic.org/issues/platform-accountability-governance/the-first-amendment-and-platform-regulation/

[2] Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, *amicus curiae* states that it does not have a parent corporation, nor does any publicly held corporation own ten percent or more of its stock. *Amicus curiae* further certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no person—other than the *amicus* or its counsel—contributed money that was intended to fund the preparation or submission of this brief.

**ARGUMENT**

California Assembly Bill 2839 ("AB 2839") represents the state legislature's attempt to balance two of our country's most cherished ideals: free speech and fair elections. On a motion for preliminary injunction, this Court held that California did not give enough weight to the former because (1) AB 2839's prohibitions did not resemble other forms of permissible regulations of false speech, Order Granting Pl.'s Mot. Prelim. Inj. (ECF. No. 14) at 7–10 [hereinafter "Order"], and (2) AB 2839 was not narrowly tailored, *id.* at 10–14. The parties' cross-motions for summary judgement, however, require more extensive analysis. With regard to the facial challenge to AB 2839, the Court must decide whether the Plaintiffs have met the heavy burden of showing that "the law's unconstitutional applications substantially outweigh its constitutional ones." *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024).

*Amicus* contends that they have not. A facial challenge under the First Amendment requires the court to consider *all* applications of a statute—not just those put forward by the Plaintiffs—and determine the constitutionality of each one. Facial challenges are disfavored precisely because they can negate a duly enacted law based on speculation. Here, there are a host of applications that Plaintiffs have not discussed, let alone argued to be unconstitutional. The Court should not invalidate AB 2839 on such a cursory showing. But even if the Court holds that AB 2839 fails constitutional review, the Court cannot stop there. It must consider whether it can excise the offending provisions of the statute and thereby bring the remaining text within the bounds of the First Amendment. This exhaustive case-by-case and provision-by-provision analysis is not only required by precedent; it is also essential to the dialogue between the courts and the legislature.

*Amicus* offers two observations to aid the Court in its review of AB 2839's lawful applications. First, AB 2839 has numerous applications that strongly resemble, if not outright

mirror, other permissible prohibitions on intentional, false, and harmful speech. Although the parties largely focus on analogies to defamation, many of AB 2839's applications can be fairly described as prohibitions on impersonation of a government official, misappropriation of a person's likeness, or other false statements that cause a cognizable legal harm. Second, with regard to those applications that are not analogous to existing prohibitions on false speech, counter speech is not always a sufficient remedy. While "more speech" has traditionally been the preferred response to injurious speech, that preference is qualified by practicality. In the modern world, mis- and disinformation[3] are difficult to identify, lies travel further and faster than truth, and algorithms shield viewers from alternative points of view.

For these reasons, *amicus* respectfully asks this Court to deny the Plaintiffs' Motion for Summary Judgment and grant the Defendant's Motion for Summary Judgment as to AB 2839.

## I.    THE COURT MUST ASSESS THE CONSTITUTIONALITY OF EACH OF AB 2839'S POTENTIAL APPLICATIONS.

Supreme Court precedent makes clear that facial challenges to statutes are disfavored for a plethora of reasons. *See Moody*, 603 U.S. at 744. As an initial matter, facial challenges require a court to undertake the onerous task of assessing a statute's "full range of applications—the constitutionally impermissible and permissible both" to determine whether the number of "the law's unconstitutional applications substantially outweigh [the number of] its constitutional ones." *Id.* at 724–26; *see also id.* at 745 (Barrett, J., concurring) (describing facial review of online speech regulations as "a daunting, if not impossible, task"). Second, because facial challenges are all-or-nothing propositions, they are "disfavored" as a mode of constitutional review, "[e]ven in the First Amendment context." *Id.* at 744. The process of imagining all possible

---

[3] *Amicus* uses "misinformation" to refer to false statements generally and "disinformation" to refer to false statement made with intent to deceive or knowledge of their falsity.

applications of a statute means that "[c]laims of facial invalidity often rest on speculation." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). Premising constitutional review on hypotheticals, rather than actual applications of a law, may lead to "premature interpretation of statutes on the basis of factually barebones records." *Sabri v. United States*, 541 U.S. 600, 609 (2004) (internal quotation marks and brackets omitted). Finally, wholesale negation of a statute implicates separation of powers principles and public participation in the democratic process. Indeed, "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 451. Conversely, the cost of denying a poorly supported facial challenge is bearable: Plaintiffs remain free to bring as-applied challenges to vindicate their rights and obtain relief. *See Moody*, 603 U.S. at 745–48 (Barrett, J., concurring) (explaining that plaintiffs "would be better served by bringing a First Amendment challenge as applied to" specific online services).[4]

Plaintiffs' facial challenge to AB 2839 exemplifies the concerns with striking down duly enacted laws based on hypotheticals. The Court's adjudication will depend almost entirely on speculation about the statute's applications because AB 2839 has never been enforced. Indeed, the Court's order granting the preliminary injunction and both parties' motions for summary judgment are replete with competing forecasts as to how AB 2839 could be applied. *See* Order at 8–9; Pls. Mem. in Support of Mot. for Summ. J. on AB 2839 at 14–15 (ECF No. 45-1) [hereinafter

---

[4] To the extent Plaintiffs challenge AB 2839 as applied to their speech, *amicus* expresses no opinion on the merits. *Amicus* does note, however, "the usual judicial practice" is to resolve the as-applied challenge first, before considering "wholesale attacks upon state and federal laws" such as overbreadth. *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484–85 (1989). Not only does an as-applied challenge require less speculation, but it is also less likely to result in "a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (quoting *Liverpool, N.Y. & P.S.S. Co. v. Emigration Comm'rs*, 113 U.S. 33, 39 (1885)).

"Pls. Mem."]; Defs. Mem. in Support of Mot. for Summ. J. on AB 2839 at 13–14 (ECF No. 49-1) [hereinafter "Defs. Mem."]. Furthermore, AB 2839 was strongly endorsed by the legislature: it passed 32-to-6 in the Senate and 63-to-8 in the Assembly. AB 2839, 2024-2025 Reg. Sess. (Ca. 2024). Accordingly, it is imperative that the Court conduct an in-depth review of the many applications of AB 2839 and determine to what extent it may be "implemented in a manner consistent with the Constitution" to avoid any unnecessary legislation from the courtroom. *Wash. State Grange*, 552 U.S. at 451.

*Amicus* believes that, on a more fulsome review, the Court will find that AB 2839 is not facially invalid. *See infra* Sections II, III. If, however, the Court holds that AB 2839 cannot stand as written, each discrete provision of AB 2839 must be assessed for severability before the entirety of the law is stricken. Under the severability doctrine, courts must confront constitutional defects by trying first to "sever[] any problematic portions" of the regulation before declaring it entirely invalid. *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 234 (2020) (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508 (2010)). So long as the unconstitutional portions of the text are "grammatically, functionally, and volitionally severable" from the remainder, constitutional defects in one portion of a statute render only that portion invalid. *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1124 (9th Cir. 2024) (internal quotation marks omitted). With regard to California statutes in particular, "the presence of a severability clause in a statutory scheme that contains an invalid provision 'normally calls for sustaining the valid part of the enactment.'" *Garcia v. City of Los Angeles*, 11 F.4th 1113, 1120 (9th Cir. 2021) (quoting *Cal Redevelopment Assn. v. Matosantos*, 53 Cal. 4th 231, 270 (Cal. 2011)).

Here, each of the central prohibitions in AB 2839—governing candidates, elections officials, elected officials, and voting machines—stands on its own, Cal. Elec. Code § 20012(b)(1)(A–C), as do the two disclosure requirements, *id.* § 20012(b)(2–3). Each one is

"distinct and separate" and, most importantly, no single provision is "necessary to the measure's operation and purpose." *NetChoice*, 113 F.4th at 1125. All four core prohibitions serve a distinct purpose and would form a complete, coherent statute even in the absence of the other provisions. The labeling requirements are meaningful so long as even one of the prohibitions stands; conversely, none of the prohibitions would be rendered inoperative by removing labeling requirements. Moreover, AB 2839 contains an express severability clause. Cal. Elec. Code § 20012(h). This strongly suggests that the California legislature, even upon "knowing that only [some of the prohibitions] would be valid, would have preferred that . . . to nothing." *California Redevelopment Assn. v. Matosantos*, 53 Cal. 4th 231, 273 (2011).

In assessing AB 2839's facial validity, as well as in any subsequent severability analysis, *amicus* urges the Court to err on the side of specificity. *See Moody*, 603 U.S. at 749 (Jackson, J., concurring in part) (instructing courts to "carefully parse" laws subject to facial challenge). Not only is this the governing legal standard, but it is also an essential and well-established part of the dialogue between the courts and the legislature. *See* James J. Brudney & Ethan J. Leib, *Statutory Interpretation as "Interbranch Dialogue"?*, 66 UCLA L. REV. 346, 373 (2019) (finding that "7.8 percent of the [Supreme] Court's majority opinions in statutory decisions during the 1986-2000 terms" included "strong invitations" for Congress to revise the relevant law). For example, a court might encourage the legislature "to supplant [the court's] interpretation by changing policy" or commission research on "the best course regarding a complex technical issue." *Id.* at 374.

AB 2839 is not the first law that attempts to balance the vital concerns of free speech and fair elections, nor will it likely be the last. *See* Evan Chiacchiaro, Note, *Generative AI and Electoral Communications*, 9 GEO. L. TECH. REV. 166, 186 (2025) (identifying fourteen states with "laws designed to address the risk of deepfakes being used to sway an election"). To the

extent this Court finds merit in the Plaintiffs' facial challenge, it should provide guidance for future legislatures on how to devise statutes that effectively protect both the significant state interest in fair elections and the ideals behind the First Amendment. By precisely identifying the constitutional and unconstitutional applications and provisions of AB 2839, this Court can discharge its duty while also "increas[ing] the space available for democratic deliberation and choice." Christine Bateup, *The Dialogic Promise: Assessing the Normative Potential of Theories of Constitutional Dialogue*, 71 BROOK. L. REV. 1109, 1129 (2006).

## II. AB 2839 CONSTITUTIONALLY REGULATES FORMS OF INTENTIONAL, FALSE, AND HARMFUL SPEECH BEYOND DEFAMATION AND FRAUD.

Defendants analogize AB 2839 to defamation and fraud, noting that many foreseeable applications of the statute legitimately restrict defamatory or fraudulent speech. Defs. Mem. at 12–13. The Court previously found this analogy insufficient, noting that the text of the law "extends beyond the legal standard for defamation." Order at 6. However, the analysis should not stop there. Facial challenges demand more from plaintiffs than identifying applications beyond defamation and fraud: plaintiffs must show that those applications are unconstitutional. *Moody*, 603 U.S. at 725. Here, Plaintiffs have ignored applications of AB 2839 that fall outside the scope of defamation or fraud, but within other categories of regulation with a "historical foundation in the Court's free speech tradition." *United States v. Alvarez*, 567 U.S. 709, 718 (2012).

*Amicus* identifies two categories of unprotected false speech that account for many of AB 2839's applications to non-defamatory, non-fraudulent speech: impersonation of a government official and misappropriation of a person's likeness. Many hypotheticals raised by Plaintiffs fall into one of these categories; many more comport with the more general rule that prohibitions on false speech with "clear limiting principle[s]" survive constitutional review. *Id.* at 723; *see also id.* at 736 (Breyer, J., concurring) (noting that "virtually all" constitutional prohibitions on speech contain limitations that "narrow the statute to a subset of lies where

specific harm is more likely to occur"). Because Plaintiffs have not shown that the potential unconstitutional applications of AB 2839 outweigh the constitutional ones, *amicus* respectfully urges the Court to reject their facial challenge.

> ### A. Application of AB 2839 to deceptive portrayals of officials and elected officials is analogous to prohibitions on impersonation of government officials.

In *Alvarez*, the Supreme Court identified "[s]tatutes . . . that prohibit impersonating a Government officer" as a permissible form of regulation under the First Amendment. *Alvarez*, 567 U.S. at 721. The Court observed that such statutes regulate speech not just because it is false, but because the falsity endangers "the integrity of Government processes" and "the general good repute and dignity of . . . government . . . service itself." *Id.* (quoting *United States v. Lepowitch*, 318 U.S. 702, 704 (1943)). State and federal courts in California have followed this reasoning to uphold laws regulating speech that would disrupt a fundamental government process. *See, e.g.*, *United States v. Tomsha-Miguel*, 766 F.3d 1041, 1048 (9th Cir. 2014) (giving "great weight" to the argument in *Alvarez* that a prohibition on the impersonation of a federal officer "is a permissible restriction on free speech"); *People v. Morera-Munoz*, 5 Cal. App. 5th 838, 854 (2016) (upholding criminalization of false statements to police, where such speech "does not target falsity alone" (internal citations omitted)).

AB 2839 prohibits, among other things, materially deceptive communications that portray an elections official or elected official "doing or saying something . . . that the . . . official did not do or say." Cal. Elec. Code § 20012(b)(1)(B–C). Some, perhaps most, such portrayals could take the form of impersonations of government officials—for example, videos or text purporting to be from a government office and containing disinformation about the process of voting or results of an election. Given the strong endorsement in *Alvarez*, the application of AB 2839 to direct impersonations is very likely constitutional. *See Tomsha-Miguel*, 766 F.3d at 1049 (holding

federal anti-impersonation statute facially constitutional under intermediate scrutiny); *United States v. Bonin*, 932 F.3d 523, 536 (7th Cir. 2019) (holding federal anti-impersonation statute facially constitutional under strict scrutiny).

Even when applied to speech that does not explicitly assume a government official's identity, the relevant provisions of AB 2839 still require a deceptive "portrayal" of an elections or elected official. *See* Cal. Elec. Code § 20012(b)(1)(B–C). In other words, for liability to attach, the communication in question must at least *use* the identity of the official in a misleading way. This "pseudo-impersonation" imposes the same harm as direct impersonation of a government officer: it undermines the integrity of the electoral process. A video falsely depicting an elections official giving incorrect information about the timing or mechanics of an election could cost voters one of their most fundamental rights. *See Minn. Voters All. v. Mansky*, 585 U.S. 1, 18 n.4 (2018) (expressing "no[] doubt that the State may prohibit messages intended to mislead voters about voting requirements and procedures"). Likewise, a fabricated clip of an elected official grossly mischaracterizing a ballot measure could cause confusion and undermine confidence in the measure, the official, or the electoral system as a whole. Even political messages can be regulated in the interest of election integrity, where such regulation would "provide the electorate with information[,] insure that the voters are fully informed[, and] avoid confusion." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 368 (2010) (internal quotations and citations omitted) (upholding disclaimers on electioneering communications).

Prohibitions on deceptively using the government's authority to promulgate falsehoods are a canonical example of a permissible regulation of intentional, false, harmful speech. *Alvarez*, 567 U.S. at 721. To the extent AB 2839 regulates communications that leverage an elected or elections official's status to spread disinformation, it is well within the bounds of the First Amendment.

### B.    Application of AB 2839 to deceptive portrayals of candidates and elected officials is analogous to laws against misappropriation of name or likeness.

The *Alvarez* Court also recognized that, "[w]here false claims are made to . . . secure moneys or other valuable considerations . . . it is well established that the Government may restrict speech without affronting the First Amendment." *Alvarez*, 567 U.S. at 723. This includes speech that amounts to unlawful appropriation of a person's name or likeness. Unlawful appropriation of name or likeness, or misappropriation, occurs when an individual "appropriates to his own use or benefit the name or likeness of another." Restatement (Second) of Torts § 652C (1977). Although misappropriation most often applies to commercial speech for financial gain, neither commerciality nor pecuniary benefit are strictly required. *See id.* cmt. B; *see also Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 692 (9th Cir. 1998) (explaining that the common law tort of misappropriation includes "the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise" (internal quotations omitted)).

AB 2839, as applied to deceptive portrayals of candidates and elected officials, strongly resembles the tort of misappropriation. Using another person's name or likeness for personal gain through the political system is a type of appropriation for personal gain. Federal law recognizes that bad actors can disrupt the electoral process by trading on another person's reputation. *See* 52 U.S.C. § 30124 (prohibiting candidates and campaigns from falsely "speaking or writing or otherwise acting for or on behalf of any other candidate" in a damaging manner). The personal benefits of such misrepresentations are many, like monetary or ideological gain. Perhaps the most obvious is that, by harming an opponent's chances for election, a candidate stands to gain an elected position, along with its attendant rights and powers. *Cf. Alvarez*, 567 U.S. at 723 (noting that attempts to obtain employment through fraud are not protected by the First Amendment). Misappropriation can also involve fabricated endorsements of people or positions. Courts have recognized that states can, consistent with the First Amendment, hold individuals liable for this

type of political misappropriation. *See, e.g.*, *Hinish v. Meier & Frank Co.*, 113 P.2d 438, 448 (Or. 1941) (imposing liability where defendant business falsely signed plaintiff's name to letter urging veto of regulatory act); *State v. Hinkle*, 229 P. 317, 319 (Wash. 1924) (issuing injunction where defendant political party falsely implied plaintiff candidate's endorsement of party).

The analogy to misappropriation is bolstered by the fact that AB 2839 tracks the limitations courts have imposed to prevent tort law from treading on protected speech. In cases of misappropriation involving non-commercial speech about a public figure, the First Amendment requires the plaintiff to prove "actual malice" through "clear and convincing evidence." *Hoffman v. Cap. Cities/ABC, Inc.*, 255 F.3d 1180, 1186 (9th Cir. 2001) (internal quotation omitted). AB 2839 explicitly includes both of these requirements as well. *See* Cal. Elec. Code § 20012(d)(3) & (f)(7). Thus, while AB 2839 sweeps more broadly that common law misappropriation in some ways—for example, in terms of the individuals who may bring suit—its applications serve the same purpose: to balance "the right to be protected from unauthorized publicity . . . against the public interest in the dissemination of news and information consistent with the democratic processes." *Yeager v. Cingular Wireless LLC*, 673 F. Supp. 2d 1089, 1096 (E.D. Cal. 2009) (quoting *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 409 (2001)).

The political process is premised on the ability for candidates to speak for themselves and thereby persuade voters. While candidates may use a variety of tactics, from rhetoric to reason, they may not use another person's likeness to fabricate deceptive statements. To the extent that AB 2839 prohibits the politically motivated distribution of materially deceptive depictions of another person created, it is a permissible regulation of speech.

### C.    Other applications of AB 2839 comport with the general principles articulated in *Alvarez*.

Many applications of AB 2839 are directly analogous to defamation, fraud, impersonation of a government official, misappropriation, and possibly other historical categories of permissible content-based restrictions identified in *Alvarez*. *See Alvarez*, 567 U.S. at 717–18. However, even where AB 2839 extends beyond these enumerated categories, the general principles articulated in *Alvarez* are relevant for determining whether specific applications of the law are constitutional. As the Ninth Circuit has recognized, *Alvarez* stands for the more general proposition that "false speech" may be regulated if it is "made for the purpose of material gain or material advantage, or [it] inflicts a legally cognizable harm." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1194 (9th Cir. 2018) (quoting *Alvarez*, 567 U.S. at 723, 719) (internal quotation marks omitted).

Take, for example, perjury. Although it is unlikely that many applications of AB 2839 will involve statements made under oath, the Court's justification for the "unquestioned constitutionality of perjury statutes" is still instructive. *Alvarez*, 567 U.S. at 720–21 (quoting *United States v. Grayson*, 438 U.S. 41, 54 (1978)). Perjury can—and must—be prohibited because it "undermines the function and province of the law and threatens the integrity of judgments that are the basis of the legal system." *Id.* (citing *United States v. Dunnigan*, 507 U.S. 87, 97 (1993)). Likewise, deliberate election disinformation undermines the function of elections and threatens the integrity of the processes that are the basis of our form of government. Just as perjured testimony is "at war with justice," *id.* at 720, intentional, false, harmful statements about elections are at war with democracy. In this way, AB 2839 does not prohibit false statements "simply because [they] are false," but rather because they run the risk of causing a specific harm to our democratic process. *Id.*

Moreover, AB 2839 is, in some ways, narrower than other statutes that have been deemed constitutional. This avoids a fatal flaw identified in *Alvarez*: the "proposition that false statements

falling within its purview are unprotected when made to *any* person, at *any* time, in *any* context." *Morera-Munoz*, 5 Cal. App. 5th at 852 (citing *Alvarez*, 567 U.S. at 720). The prohibition in AB 2839 requires both materiality and *mens rea*, *see* Cal. Elec. Code § 20012(b)(1), requirements that courts have gone so far as to read into other statutes to save them. *See Tomsha-Miguel*, 766 F.3d at 1049 (reading intent to defraud into federal anti-impersonation statute); *Morera-Munoz*, 5 Cal. App. 5th at 857 (reading materiality requirement into state statute criminalizing false statements to police). Similarly, the prohibitions in AB 2839 apply only during a specific time period. *See* Cal. Elec. Code § 20012(c) (defining 120-to-180-day blackout period). Finally, all applications of AB 2839 require a finding that the communication is "reasonably likely" to cause a specific harm. *See* Cal. Elec. Code § 20012(b)(1)(A–D). This serves to "narrow the statute to a subset of lies where specific harm is more likely to occur." *Alvarez*, 567 U.S. at 736 (Breyer, J., concurring). The prohibition of statements "limited to a specific setting . . . where a false statement is offered for a particular purpose . . . [are] akin to the categories of false speech that the plurality reaffirmed the government could criminalize without running afoul of the First Amendment." *Morera-Munoz*, 5 Cal. App. 5th at 854.

In summary, many of AB 2839's foreseeable applications fall under well-established permissible regulations of speech. Many more fit within the *Alvarez* Court's general framework of targeting specific forms of speech that injure important public processes. *Amicus* respectfully urges the Court to take this into consideration as it reviews the full scope of the law.

**III.    COUNTER SPEECH IS NOT A SUFFICIENT REMEDY FOR SOME FORMS OF FALSE SPEECH COVERED BY AB 2839.**

In granting a preliminary injunction against the enforcement of AB 2839, the Court concluded that the statute was not narrowly tailored because "counter speech is a less restrictive alternative." Order at 3. The Court relied on the principle that, in a healthy marketplace of ideas,

1   "the remedy to be applied [to false speech] is more speech, not enforced silence." *Id.* at 12

2   (quoting *Whitney v. California*, 274 U.S. 357, 377 (1927)). While counter speech is an important

3   and desirable way to combat falsehood, some intentional falsehoods are so injurious to the public

4   welfare and so difficult to rebut that counter speech is not a sufficient response. Thus, while courts

5   have frequently expressed a preference for counter speech, they have also recognized that it is

6   only appropriate in select, fact-specific circumstances. *Compare Alvarez*, 567 U.S. at 726

7   (describing how the "[t]he facts of this case indicate that the dynamics of free speech, of

8   counterspeech, of refutation, can overcome the lie"), *with Hustler Mag., Inc. v. Falwell*, 485 U.S.

9   46, 52 (1988) ("False statements of fact . . . interfere with the truth-seeking function of the

10  marketplace of ideas, and they cause damage to an individual's reputation that cannot easily be

11  repaired by counterspeech[.]"). In the context of a facial challenge to a statute, a court must

12  discern whether these circumstances are present for each distinct application of the law when

13  deciding whether the law is properly tailored to that application.

14      Such an analysis would reveal that a significant amount of the speech encompassed by

15  AB 2839 consists of falsehoods that cannot be adequately combatted by counter speech alone.

16  Deepfakes and other technologically-mediated falsehoods have the potential to render truth and

17  falsity indistinguishable, creating an environment where audiences are unable to evaluate the

18  trustworthiness of information. Moreover, the speed and scale at which misinformation spreads

19  mean the corrective effects of an open exchange of ideas may be realized only after harm is done,

20  if at all. Finally, engagement-maximizing algorithms, by their very nature, bar audiences from

21  exposure to speech that is contrary to their viewpoints.

22      Perhaps some of the content AB 2839 regulates will advance falsehoods that can be

23  quickly dismissed by readily available counter speech from a government website or trusted news

24  source. *See Alvarez*, 567 U.S. at 729. But it is not at all clear that these applications "substantially

outweigh" those where counter speech would not be effective. *See Moody*, 603 U.S. at 724. Although the marketplace of ideas and counter speech continue to have a vital role to play in the twenty-first century, *amicus* encourages the Court to reject Plaintiffs' facial challenge because they have not demonstrated that the unconstitutional applications of AB 2839 substantially outweigh the constitutional ones.

> **A.    Counter speech is less effective when false speech cannot readily be distinguished from the truth.**

The judicial preference for counter speech assumes that participants in the marketplace of ideas are capable of eventually discerning truth from falsity. In his seminal 1919 dissent, Justice Holmes wrote "[t]hat the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). The following decade, Justice Brandeis argued that advancement of truth over falsity is at the very core of the First Amendment. *See Whitney*, 274 U.S. at 375 (Brandeis, J., concurring) (explaining how freedom of expression assists in the "discovery and spread of political truth"). As this Court observed, the ideal of "an uninhibited marketplace of ideas in which truth will ultimately prevail" on its own merits has become a cherished principle of law. *See* Opinion at 11 (quoting *McCullen v. Coakley*, 573 U.S. 464, 476 (2014)).

Courts have recognized that for counter speech to be effective, there must be some basis for distinguishing truth and falsity. For example, the *Alvarez* Court observed that the government could create a public list of Congressional Medal of Honor recipients, making it "easy to verify and expose false claims." *Alvarez*, 567 U.S. at 729; *see also id.* at 738 (Breyer, J., concurring) (noting that an "accurate, publicly available register of military awards, easily obtainable by political opponents, may well adequately protect the integrity of an award."). This led the Court to hold that, with respect to the specific falsity at hand, "the dynamics of free speech, of counterspeech, of refutation, can overcome the lie." *Id.* at 726. Implicit in this holding is the

concept that, in other cases, truth and falsity are not always competing on equal footing, and the dynamics of speech and counter speech may counsel otherwise.

This Court cannot ignore how modern technology has changed these dynamics in this specific context. AB 2839 recognizes this impact by identifying deepfakes, defined as media that "would falsely appear to a reasonable person to be an authentic record of . . . actual speech or conduct," as a special concern. Cal. Elec. Code § 20012(f)(4). Viewers of deepfake videos not only struggle to ascertain which videos have been fabricated, but they also overestimate their ability to do so. *See* Nils C Köbis, et al., *Fooled Twice: People Cannot Detect Deepfakes But Think They Can*, 24 ISCIENCE, no. 11, 2021, at 8. Moreover, even if a viewer suspects a video is manipulated, they may lack the tools to assess its authenticity. Unlike Alvarez's lie about receiving a Congressional Medal of Honor, deepfakes cannot necessarily be verified against a trusted source. An analogous resource—a government database of everything every candidate, elected official, or elections official in the state of California had ever done or said—would be both technically impossible and legally suspect. Instead, a skeptical viewer must seek out their own corroborating evidence—which could just as easily be manipulated itself. *See* Philip M. Napoli, *What If More Speech Is No Longer the Solution? First Amendment Theory Meets Fake News and the Filter Bubble*, 70 FED. COMM. L.J. 55, 70–73 (2018) (noting that "[f]ake news . . . is far less costly to produce" than original reporting).

### B. Counter speech cannot keep pace with the speed and scale at which digital election misinformation spreads.

Modern technology has also dramatically altered the speed with which information—and misinformation—can be shared. The facts of *Abrams* reveal the extent to which society has transformed since Justice Holmes inserted the marketplace analogy into First Amendment jurisprudence. In *Abrams*, the defendants conspired to circulate leaflets adverse to the country's military efforts in World War I. *Abrams*, 250 U.S. at 617. To share their allegedly incendiary

1    views, Abrams and his co-conspirators purchased a printer, worked through the night to prepare

2    the leaflets, and manually distributed them. *See id.* When all was said and done, defendants

3    managed to disseminate approximately 5,000 circulars, "some by throwing them from a window

4    of a building where one of the defendants was employed." *Id.* at 618. Given these facts, it is no

5    wonder Justice Holmes saw the opportunity for other speakers to outcompete Abrams. Eight

6    years later, Justice Brandeis similarly qualified his argument for counter speech on the

7    opportunity for responsive discourse, reasoning that, "*[i]f there be time* to expose through

8    discussion the falsehood and fallacies . . . the remedy to be applied is more speech." *See Whitney*,

9    274 U.S. at 377 (Brandeis, J. concurring) (emphasis added)). Thus, even a century ago, the

10   judicial preference for counter speech hinged on an opportunity for truthful speech to engage with

11   falsity.

12        Communication looks much different today. Instead of throwing circulars out of a

13   window, those who wish to spread information to global audiences can do so with the click of a

14   button. *See Berisha v. Lawson*, 141 S. Ct. 2424, 2427–28 (2021) (Gorsuch, J., dissenting)

15   (explaining how "[b]ack then building printing presses and amassing newspaper distribution

16   networks demanded significant investment and expertise" but that "today virtually anyone in this

17   country can publish virtually anything for immediate consumption virtually anywhere in the

18   world."); Hunt Allcott & Matthew Gentzkow, *Social Media and Fake News in the 2016 Election*,

19   31 J. Econ. Perspectives 2 (2017) (estimating as many as 760 million total visits to fake election

20   stories in the leadup to the 2016 election). Last year, a foreign-manufactured video falsely

21   depicting the destruction of election ballots "attracted hundreds of thousands of views from a

22   single post" within hours. Zoë Richards & Brandy Zadrozny, *Viral video of ripped-up*

23   *Pennsylvania ballots is fake and Russian-made, intelligence agencies say*, NBC News (Oct. 25,

24

2024).[5] When one further considers the role of bots as spreaders of low-credibility content, *see* Chengcheng Shao et al., *The Spread of Low-Credibility Content by Social Bots,* NATURE COMMC'NS 9, 47878 (2018), it is clear that the dissemination of falsehoods is cheaper, faster, and farther reaching than the age when the marketplace of ideas and counter speech paradigms were first articulated.

The marketplace analogy might still hold if truthful information benefited from the same acceleration. Unfortunately, a recent MIT study showed that falsities are "70% more likely to be retweeted than the truth[,]" and they reach their first 1,500 viewers six times faster than accurate content. Soroush Vosoughi et al., *The Spread of True and False News Online*, 359 SCIENCE 1146, 1149 (2018). When misinformation spreads so rapidly, and in such high volumes, there may simply not be time for truth to win out against falsity in an unrestricted marketplace of ideas. *See supra* Napoli, at 85–86 (arguing that there is less opportunity to rely upon counter speech to counteract false news today than in Brandeis's era). In the period up to an election, or between an election and the seating of the winners, "the dynamics of free speech [and] refutation," *Alvarez*, 567 U.S. at 726, can be distorted such that counter speech alone is not sufficient to protect the government's interest in maintaining election integrity.

C. **Platform design features like engagement-maximizing algorithms inhibit counter speech from reaching audiences.**

Finally, for counter speech to have its intended remedial effect, it must reach those audiences that have been misled. This is inherent in Justice Holmes's concept of "free trade in ideas," *Abrams*, 250 U.S. at 630 (Holmes, J., dissenting), as well as Justice Brandeis's "process of education [and] discussion," *Whitney*, 274 U.S. at 377 (Brandeis, J., concurring). Similarly, Justice Kennedy's plurality opinion in *Alvarez* promoted counter speech as a cure to false speech

---

[5] https://www.nbcnews.com/politics/2024-election/viral-video-ripped-pennsylvania-ballots-fake-russian-made-intelligence-rcna177404 [https://perma.cc/VP9C-DAV5]

within "open, dynamic, [and] rational discourse." U.S. 709 at 132. These cases recognize that counter speech can only serve as a remedy to the extent that it can readily enter the market.

Again, the realities of modern communication technology affect this calculus. More than half of Americans at least occasionally get their news from social media, and a quarter do so "often." *See Social Media and News Fact Sheet*, PEW RSCH. CTR. (Sept. 17, 2024).[6] However, the algorithms used by social media platforms to promote or demote content do not always act with respect for the truth. For these platforms, engagement is profit. Accordingly, many use engagement-maximizing algorithms to identify and promote content similar to that which the viewer (or similar users) has interacted with before. *See* Arvind Narayanan, *Understanding Social Media Recommendation Algorithms* at 22–24, KNIGHT FIRST AMEND. INST. (Mar. 9, 2023).[7] An unfortunate side effect of engagement maximization is high-performing "viral" content is more likely to contain misinformation, along with other harmful content. *Id.* at 31. While social media platforms have tried to adjust their algorithms to limit the spread of certain kinds of content, their commitment to engagement-maximization has led to the failure of these efforts. *See id.* at 33 (explaining how Facebook's attempts to fix its recommendation algorithm backfired).

Algorithms that prioritize absolute engagement numbers over other variables, such as cross-political engagement, contribute to a "filter bubble phenomenon" where users are exposed to content that confirms their worldview while limiting user exposure to competing viewpoints. *See supra* Napoli, at 77–79 (describing diminished effect of given algorithmic resistance to contradictory views reaching social media users). This reinforces the general human tendency to prioritize self-validating information over truth, making social media users even less likely to

---

[6] https://www.pewresearch.org/journalism/fact-sheet/social-media-and-news-fact-sheet/ [https://perma.cc/DF8Y-TQ2X]

[7] https://knightcolumbia.org/content/understanding-social-media-recommendation-algorithms [https://perma.cc/7XHM-EDXH]

actively engage with sources that undermine these desires. *See* David Lazer et al., *The Science of Fake News*, 359 SCIENCE 1094, 1095 (2015) ("Individuals tend not to question the credibility of information unless it violates their preconceptions or they are incentivized to do so. Otherwise, they may accept information uncritically."). Ultimately, by determining the content in users' feeds through behavioral profiling, social media platforms have undermined the hope of an "efficient" or "rational" marketplace of ideas as posited by the Supreme Court. *Alvarez* U.S. 709 at 132. As with any market failure, this suggests that a new approach is needed.

* * *

To succeed on their Motion for Summary Judgment, Plaintiffs must provide sufficient information for the Court to identify the full scope of AB 2839's applications, categorize these applications as constitutional or unconstitutional, and weighing the two sets against each other. That burden "is the price of [Plaintiffs'] decision" to challenge AB 2839 as a whole. *Moody*, 603 U.S. at 744. Instead, Plaintiffs identify only a handful of applications, most of which closely resemble categories of constitutionally permitted regulations, require something more than counter speech to address, or both. As a detailed review of the scope of AB 2839 will reveal, Plaintiffs have not met this high standard.

## CONCLUSION

For the reasons stated above, *amicus* respectfully requests that the Court deny Plaintiffs' Motion for Summary Judgment and grant Defendants' Motion for Summary Judgment with regard to AB 2839.

Dated: April 22, 2025                    Respectfully submitted,

                                         /s/ Alan Butler

                                         Alan Butler (SBN 281291)
                                         butler@epic.org
                                         ELECTRONIC PRIVACY INFORMATION CENTER
                                         1519 New Hampshire Avenue NW
                                         Washington, DC 20036
                                         Tel: 202.483.1140

                                         Mason A. Kortz*
                                         mkortz@law.harvard.edu
                                         HARVARD CYBERLAW CLINIC
                                         1557 Massachusetts Ave., 4th Floor
                                         Cambridge, MA 02138
                                         Tel: (617) 495-2845

                                         * Admitted *Pro Hac Vice*

                                         *Attorneys for Amicus Curiae Electronic Privacy Information Center*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on April 22, 2025, the foregoing **Proposed Brief of**

*Amicus Curiae* **the Electronic Privacy Information Center in Support of Defendant's**

**Motion for Summary Judgment on Assembly Bill 2839** was filed with the Clerk of the U.S.

District Court for the Eastern District of California using the Court's CM/ECF system.

Dated: April 22, 2025

/s/ Mason A. Kortz
_____

Mason A. Kortz*
mkortz@law.harvard.edu
HARVARD CYBERLAW CLINIC
1557 Massachusetts Ave., 4th Floor
Cambridge, MA 02138
Tel: 617.495.2845

* Admitted *Pro Hac Vice*