Megan P. McAllen (Cal. Bar No. 281830)
  mmcallen@campaignlegalcenter.org
Elizabeth D. Shimek*
  eshimek@campaignlegalcenter.org
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
(202) 736-2200

*Pro Hac Vice forthcoming

Attorney for Amicus Curiae

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| Christopher Kohls, et al., ) | |
| ) | |
|     Plaintiffs, ) | Case No. 2:24-cv-02527-JAM-CKD |
| ) | |
|     v. ) | **Brief of Campaign Legal Center as *Amicus Curiae* in Support of Defendants' Motion for Summary Judgment** |
| ) | |
| ROB BONTA, in His Official Capacity as ) Attorney General of the State of California, ) and SHIRLEY N. WEBER, in Her Official ) Capacity as California Secretary of State, ) | |
| ) | Date:       August 5, 2025 |
| ) | Time:      1:00 p.m. |
| ) | Dept:      6 |
|     Respondents and Defendants. ) | Judge:    The Honorable John A. Mendez |
| ) | Trial Date:  Not Scheduled |
| ) | Action Filed: 9/17/2024 |
| ) | |

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE..................................................................................1

SUMMARY OF ARGUMENT .......................................................................................1

ARGUMENT ................................................................................................................3

I.  The challenged law targets a rapidly evolving threat to free and fair elections.........................3

   A.  Deepfakes and deceptive synthetic media pose novel risks in the electoral context. ..................................................................................................3

   B.  Jurisdictions nationwide have recognized the threat posed by political deepfakes and similar deceptive media—and, like California, have taken steps to safeguard their elections. ..............................................................8

II.  The governmental interest in ensuring an informed electorate is well established and supports tailored regulations of deepfakes and similar deceptive media in elections...............13

   A.  The Supreme Court has long recognized that laws enabling citizens to cast informed votes are crucial to a functioning democracy. ....................................14

   B.  The government's informational interest supports both a ban on fraudulent AI-generated election ads and disclaimer requirements...........................................15

CONCLUSION ...........................................................................................................19

1

**TABLE OF AUTHORITIES**

2

**Cases:**                                                                                                      **Page**

3

*Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021) ........................................ 18

4

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ........................................................................ 14-15

5

*Buckley v. Valeo*, 424 U.S. 1 (1976) ........................................................................2, 13-14, 15

*Burson v. Freeman*, 504 U.S. 191 (1992) .................................................................................... 16

6

*California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088 (9th Cir. 2003) ............................ 15

7

*Citizens United v. FEC*, 558 U.S. 310 (2010)........................................................................ 2, 14

8

*Ex Parte Stafford*, No. PD-0310-23, 2024 WL 4031614 (Tex. Crim. App. Sept. 4, 2024).......... 13

9

*Family PAC v. McKenna*, 685 F.3d 800 (9th Cir. 2012) ............................................................ 15

10

*First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) ............................................ 15-16

11

*Gaspee Project v. Mederos*, 13 F.4th 79 (1st Cir. 2021) ............................................................ 18

12

*Human Life of Washington, Inc. v. Brumsickle*, 624 F.3d 990 (9th Cir. 2010) .......................... 15

13

*Knox v. Service Employees International Union, Local 1000*, 567 U.S. 298 (2012) .................. 15

14

*Kohls v. Ellison*, No. 24-cv-3754-LMP/DLM, 2025 WL 66765 (D. Minn. Jan. 10, 2025)............ 4

*McConnell v. FEC*, 540 U.S. 93 (2003).................................................................................. 14

15

*Minnesota Voters Alliance v. Mansky*, 585 U.S. 1 (2018) ............................................................. 3

16

*No on E v. Chiu*, 85 F.4th 493 (9th Cir. 2023).................................................................... 17, 18

17

*United States v. Hansen*, 599 U.S. 762 (2023) ............................................................................ 14

18

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) ................................. 3

19

**Statutes and Regulations:**

20

2025 Mont. Laws S.B.25 (enacted May 8, 2025; to be codified at Mont. Code Ann. Tit. 13,

21

    Ch. 35)................................................................................................................................ 8

22

2025 N.D. Laws H.B. 1167 (enacted Apr. 11, 2025; to be codified at N.D. Cent. Code Ann.

    § 16.1-10)..................................................................................................................... 8, 11

23

Ala. Code § 17-5-16.1 .................................................................................................................. 8

24

Ariz. Rev. Stat. Ann. § 16-1024 .................................................................................................. 8

25

Cal. Elec. Code § 20012.............................................................................................................. 1

26

Cal. Elec. Code § 20012(a)(4)................................................................................................... 14

27

Cal. Elec. Code § 20012(b)(2)(B)(i) ......................................................................................... 18

28

Cal. Elec. Code § 20512.............................................................................................................. 1

Colo. Rev. Stat. §§ 1-46-101–106 .................................................................. 8

Del. Code Ann. tit. 15, § 5145 ...................................................................... 8

Fla. Stat. § 106.145 ........................................................................... 8, 9, 11

Fla. Stat. § 106.145(2) ................................................................................. 9

Haw. Rev. Stat. § 11-304 ............................................................................. 8

Haw. Rev. Stat. § 11-303 ............................................................................. 8

Idaho Code § 67-6602(7)(a) ......................................................................... 8

Idaho Code § 67-6628A ............................................................................... 8

Ind. Code § 3-9-8-3 (1) ............................................................................... 8

Ind. Code §§ 3-9-8-1–6 ............................................................................... 8

Ky. Rev. Stat. Ann. § 117.322 (West 2025) ................................................ 8

Mich. Comp. Laws § 168.932f .................................................................. 8, 9

Mich. Comp. Laws § 168.932f(1)(a) .......................................................... 10

Mich. Comp. Laws § 168.932f(1)(b) .......................................................... 10

Mich. Comp. Laws § 168.932f(1)(c) .......................................................... 10

Mich. Comp. Laws § 168.932f(1)(d) .......................................................... 11

Mich. Comp. Laws § 168.932f(2) ............................................................... 11

Mich. Comp. Laws § 168.932f(4) ............................................................... 11

Mich. Comp. Laws § 168.932f(4)–(9) ......................................................... 11

Minn. Stat. § 609.771, subd. 2 ............................................................... 9, 10

Minn. Stat. § 609.771 .................................................................................. 8

Minn. Stat. § 609.771, subd. 2(a) .............................................................. 10

Minn. Stat. § 609.771, subd. 2(a)(3) ........................................................... 9

Minn. Stat. § 609.771, subd. 2(b) .............................................................. 10

Miss. Code Ann. § 97-13-47 ........................................................................ 8

N.H. Rev. Stat. Ann. § 507:8-j ................................................................. 6, 8

N.H. Rev. Stat. Ann. § 638:26-a ............................................................... 6, 8

N.H. Rev. Stat. Ann. § 664:14-c ............................................................... 6, 8

N.M. Stat. Ann. § 1-19-26.8 ........................................................................ 8

N.Y. Assemb. B. A8808C, pt. MM, subpt. B, 2023–2024 Leg., Reg. Sess. (N.Y. 2024) ................ 8

Or. Rev. Stat. § Ch. 62, § 1 ........................................................................................... 8

S.D. Codified Laws § 12-26-32 (effective July 1, 2025) ................................... 8, 9, 12

S.D. Codified Laws § 12-26-35 (effective July 1, 2025) ............................................ 12

S.D. Codified Laws § 12-26-37 (effective July 1, 2025) ................................... 8, 9, 12

S.D. Codified Laws § 12-26-32–37 (effective July 1, 2025) ............................. 8, 9, 12

Tex. Elec. Code Ann. § 255.004 ............................................................................. 8, 13

Tex. Elec. Code Ann. § 255.004(d) ............................................................................ 13

Tex. Elec. Code Ann. § 255.004(e) ............................................................................ 13

Utah Code Ann. § 20A-11-1104(2)(a) (West 2024) ..................................................... 9

Utah Code Ann. § 20A-11-1104 (West 2024) .......................................................... 8, 9

Wash. Rev. Code § 42.62.030 ................................................................................... 8, 9

Wash. Rev. Code § 42.62.020 ................................................................................... 8, 9

Wash. Rev. Code § 42.62.020(2) ................................................................................ 12

Wash. Rev. Code § 42.62.020(3) ................................................................................ 12

Wash. Rev. Code § 42.62.020(4) ................................................................................ 12

Wis. Stat. § 11.1303(2) ............................................................................................ 9, 11

Wis. Stat. § 11.1303(2)(m) ...................................................................................... 9, 11

**Other Authorities:**

Adam Wren, *An Indiana senator faked an ad. Now what?*, Politico (Oct. 1, 2024),
    https://www.politico.com/newsletters/digital-future-daily/2024/10/01/mike-braun-
    mccormick-fake-ai-ad-00181901 ...................................................................... 7, 8

Alex Seitz-Wald, *A New Orleans magician says a Democratic operative paid him to make
    the fake Biden robocall*, NBC News (Feb. 23, 2024), https://www.nbcnews.com/
    politics/2024-election/biden-robocall-new-hampshire-strategist-rcna139760 ........................ 5

Catherine Belton, *American creating deepfakes targeting Harris works with Russian intel,
    documents show*, Wash. Post (Oct. 23, 2024), https://www.washingtonpost.com/
    world/2024/10/23/dougan-russian-disinformation-harris ........................................................... 6

Doc Louallen, *Fake Biden robocall prompts state probe, ratchets up concerns about AI in
    2024 election*, USA Today (Jan. 24, 2024), https://www.usatoday.com/story/news/
    politics/2024/01/24/fake-biden-robocall-investigation/72343944007 ...................................... 5

H.B. 1432, Reg. Sess. (N.H. 2024), https://gc.nh.gov/bill_status/legacy/bs2016/billText.
    aspx?id=1239&txtFormat=html&sy=2024 .............................................................................. 6

H.B. 1596, Reg. Sess. (N.H. 2024), https://gc.nh.gov/bill_status/legacy/bs2016/billText.aspx?id=1392&txtFormat=html&sy=2024 ........................................................... 6

H.B. 1860, 104th Gen. Assemb., Reg. Sess. (Ill. 2025), https://ilga.gov/legislation/BillStatus.asp?DocNum=1860&GAID=18&DocTypeID=HB&SessionID=114&GA=104 ........................................................................................................................... 7

H.B. 3303, 104th Gen. Assemb., Reg. Sess. (Ill. 2025), https://ilga.gov/legislation/BillStatus.asp?DocNum=3303&GAID=18&DocTypeID=HB&SessionID=114&GA=104 ........................................................................................................................... 7

H.B. 366, 89th Leg. (Tex. 2025), *available at* https://capitol.texas.gov/BillLookup/History.aspx?LegSess=89R&Bill=HB366 ........................................................... 13

H.B. 401, 89th Leg. (Tex. 2024) ........................................................................................ 13

H.B. 4644, 103rd Gen. Assemb., Reg. Sess. (Ill. 2024), https://ilga.gov/legislation/BillStatus.asp?DocTypeID=HB&DocNum=4644&GAID=17&SessionID=112&LegID=152116 ........................................................................................................ 7

H.B. 4933, 103rd Gen. Assemb., Reg. Sess. (Ill. 2024), https://ilga.gov/legislation/BillStatus.asp?DocNum=4933&GAID=17&DocTypeID=HB&LegId=152834&SessionID=112&GA=103 ............................................................................................ 7

H.B. 556, 89th Leg. (Tex. 2024) ........................................................................................ 13

Jeongyoon Han, *New Hampshire is investigating a robocall that was made to sound like Biden*, NPR (Jan. 22, 2024), https://www.npr.org/2024/01/22/1226129926/nh-primary-biden-ai-robocall ......................................................................................................... 5

Josh A. Goldstein & Andrew Lohn, *Deepfakes, Elections, and Shrinking the Liar's Dividend*, Brennan Center for Justice (Jan 23, 2024), https://www.brennancenter.org/our-work/research-reports/deepfakes-elections-and-shrinking-liars-dividend ........................ 4

Kevin Collier & Scott Wong, *Fake Biden robocall telling Democrats not to vote is likely an AI-generated deepfake*, NBC News (Jan. 22, 2024), https://www.nbcnews.com/tech/misinformation/joe-biden-new-hampshire-robocall-fake-voice-deep-ai-primary-rcna135120 ...................................................................................................................... 5

Letter re: CLC Support for AB 2839 (Pellerin), Relating to Election (Apr. 4, 2024), https://campaignlegal.org/sites/default/files/2024-04/CLC%20Letter%20-%20Support%20CA%20AB%202839%20%284.4.24%29.pdf .................................................................... 1

Megan Hickey, *Vallas campaign condemns deepfake video posted to Twitter*, CBS News Chicago (Feb. 27, 2023), https://www.cbsnews.com/chicago/news/vallas-campaign-deepfake-video/ ................................................................................................................ 7

Olivia Richardson, *New Hampshire law requires more transparency in AI-generated political ads*, N.H. Business Review (Aug. 8, 2024), https://www.nhbr.com/new-

hampshire-law-requires-more-transparency-in-ai-generated-political-ads/ ............................ 6

Pranshu Verma, Rekha Tenjarla & Bishop Sand, *AI is spawning a flood of fake Trump and Harris voices. Here's how to tell if they're real*, Wash. Post (Oct. 16, 2024), https://www.washingtonpost.com/technology/interactive/2024/ai-voice-detection-trump-harris-deepfake-election ................................................ 5

Reuters Staff, *Fact check: "Drunk" Nancy Pelosi video is manipulated*, Reuters (Aug. 3, 2020), https://www.reuters.com/article/uk-factcheck-nancypelosi-manipulated/fact-check-drunknancy-pelosi-video-is-manipulated-idUSKCN24Z2BI ........................... 5

S.B. 150, 104th Gen. Assemb., Reg. Sess. (Ill. 2025), https://ilga.gov/legislation/BillStatus.asp?DocNum=150&GAID=18&DocTypeID=SB&SessionID=114&GA=104 ....................................... 7

S.B. 1742, 103rd Gen. Assemb., Reg. Sess. (Ill. 2023) , https://ilga.gov/legislation/BillStatus.asp?DocNum=1742&GAID=17&DocTypeID=SB&SessionID=112&GA=103 ........................................ 7

S.B. 228, 89th Leg. (Tex. 2024) ............................................................. 13

S.B. 893, 89th Leg. (Tex. 2025), *available at* https://capitol.texas.gov/BillLookup/History.aspx?LegSess=89R&Bill=SB893 .................................. 13

Sasha Issenberg, *Why Kamala Harris and Donald Trump Don't Need to Worry About Deepfakes*, Politico (Oct. 27, 2024), https://www.politico.com/news/magazine/2024/10/27/2024-elections-deepfakes-00184863. ............................. 7

Shannon Bond, *A Political Consultant faces charges and fines for Biden deepfake robocalls*, NPR (May 23, 2024), https://www.npr.org/2024/05/23/nx-s1-4977582/fcc-ai-deepfake-robocall-biden-new-hampshire-political-operative ............................. 6

Shannon Bond, A*I fakes raise election risks as lawmakers and tech companies scramble to catch up*, NPR (Feb. 8, 2024), https://www.npr.org/2024/02/08/1229641751/ai-deepfakes-election-risks-lawmakers-tech-companies-artificial-intelligence ..................... 4

Stuart A. Thompson, *Making Deepfakes Gets Cheaper and Easier Thanks to A.I.*, N.Y. Times (Mar. 12, 2023), https://www.nytimes.com/2023/03/12/technology/deepfakes-cheapfakes-videos-ai.html ................................. 4

World Economic Forum, The Global Risks Report 2024, https://www3.weforum.org/docs/WEF_The_Global_Risks_Report_2024.pdf ..................... 4

**INTEREST OF AMICUS CURIAE**

Campaign Legal Center ("CLC") is a nonpartisan, nonprofit organization working to create a fair, transparent democracy accessible to all voters, including by supporting effective campaign finance and public disclosure laws.[1]

CLC submits this amicus brief to address plaintiffs' challenge to AB 2839, Cal. Elec. Code § 20012, et seq.,[2] and to provide a nationwide perspective on state and federal attempts to regulate deceptive synthetic media portrayals of political candidates, election officials, and election processes, as well as an explanation of the important governmental interests these laws advance. CLC has in the past supported versions of the California legislation under challenge in this case. *See* Letter re: CLC Support for AB 2839 (Pellerin), Relating to Election (Apr. 4, 2024), https://campaignlegal.org/sites/default/files/2024-04/CLC%20Letter%20-%20Support%20CA%20AB%202839%20%284.4.24%29.pdf.

**SUMMARY OF ARGUMENT**

With the advent of widely available artificial intelligence ("AI") technology comes a potential revolution in how voters will experience campaign advertising, as well as new threats to the free and fair functioning of our democracy.

AI and equivalent technologies provide political operatives—and now average citizens—with the means to produce low-cost campaign ads featuring digitally generated fake audio and video of candidates that appear "real" yet fraudulently misrepresent what candidates say and do (i.e.,

---

[1]    Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, amicus curiae states that it does not have a parent corporation, nor does any publicly held corporation own ten percent or more of its stock. Amicus curiae further certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no person—other than the amicus or its counsel—contributed money that was intended to fund the preparation or submission of this brief.

[2]    CLC does not here address the parallel challenge to AB 2655, *see* Cal. Elec. Code § 20512, et seq., although both Acts advance similar governmental interests.

"deepfakes"). As AI technology becomes more sophisticated, even well-informed voters may struggle to distinguish between authentic campaign messages and fraudulent, AI-generated content. This undermines the electorate's ability to make informed voting decisions—a foundational principle of representative government.

In response, Congress and legislatures across the country are developing, considering, and enacting laws to address the problems arising from this technology.[3] These include bans on the use of digital technologies to create false or fraudulent depictions of candidates and officeholders, as well as requirements for on-ad disclaimers disclosing the use of AI in political messages. More than twenty states have enacted statutes addressing political deepfakes and other deceptive synthetic media portrayals of political candidates or election processes. *See infra* note 20.

Amicus urges the Court to recognize the need to afford legislatures flexibility to craft responsive and forward-looking policy solutions to address the effects of this rapidly evolving technology on elections. Part I of this submission outlines both the increasing misuse of AI to create fraudulent deepfakes to influence the outcome of elections and the spectrum of state measures that have been enacted to combat this growing problem. Part II argues that a ban on fraudulent campaign ads like California's advances not only the government's interest in protecting the integrity of elections, but also its compelling informational interest in ensuring that voters have credible, useful data on which they can "make informed choices" in elections. *Buckley v. Valeo*, 424 U.S. 1, 14-15 (1976) (per curiam). As the U.S. Supreme Court has repeatedly recognized, "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S.

---

[3]  CLC has also offered support for several federal measures seeking to regulate the use of AI in election ads, such as the Protect Elections from Deceptive AI Act, S. 2770, 118th Cong. (2023); AI Transparency in Elections Act of 2024, S. 3875, 118th Cong. (2024); Preparing Election Administrators for AI Act, S. 3897, 118th Cong. (2024).

2

310, 339 (2010).

As this Court assesses the challenge to AB 2839, it should consider the many other jurisdictions that have implemented similar restrictions on deepfakes and deceptive synthetic media in the electoral context, and the shared concerns that animated them. That so many states have already acted to restrict or regulate political deepfakes in the few years that such technology has been widely available reinforces the critical need to protect our elections from AI-powered deceptive messaging. While aspects of the Act may benefit from further refinement, the law has a "plainly legitimate sweep," *see Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008), and plaintiffs provide no justification for the sweeping facial invalidation that they demand.

For these reasons, CLC respectfully requests that the Court deny plaintiffs' motion for summary judgment and grant defendants' motion for summary judgment with regard to AB 2839.

## ARGUMENT

## I.    The challenged law targets a rapidly evolving threat to free and fair elections.

Like California, states across the country have recognized the harmful effects of political deepfakes and taken steps to alleviate them. "That broadly shared judgment is entitled to respect." *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 16 (2018). A survey of these emerging state laws—and some of the episodes that animated them—confirms that California's concerns about its capacity to preserve free and fair elections in the face of this technological upheaval are well founded.

### A.  Deepfakes and deceptive synthetic media pose novel risks in the electoral context.

Deceptive political advertising is not a new phenomenon. But the advent of AI poses a particularly acute threat—especially in the electoral context—due to its unprecedented ability to create realistic false content, as well as the ease with which it enables bad actors to produce media

that intentionally distorts reality to mislead voters.

With the ready availability of AI-powered tools, what once might have required a niche skill set or special software can now be accomplished with only a few clicks of a mouse.[4] As a Minnesota district court recently observed, "the means of spreading false political speech today would be unrecognizable to the Americans of 20 years ago, let alone 200 years ago. . . . [R]apid advances in technology now allow individuals to spread false political speech much more easily and much more convincingly." *Kohls v. Ellison*, No. 24-cv-3754-LMP/DLM, 2025 WL 66765, at *1 (D. Minn. Jan. 10, 2025).

The problem is one of global dimension. Election-related deepfakes, whether AI-generated or otherwise, are being used to spread mis- and disinformation in elections around the world, not just in the United States.[5] These tools make it easier to "amplify" existing efforts to spread distrust in our electoral systems, institutions, and democratic governance.[6] In its 2024 Global Risks Report, the World Economic Forum cited false information, including "imposter, manipulated, and fabricated content," as one of the greatest risks to elections and democratic processes in countries around the world.[7]

---

[4]    *See, e.g.*, Stuart A. Thompson, *Making Deepfakes Gets Cheaper and Easier Thanks to A.I.*, N.Y. Times (Mar. 12, 2023), https://www.nytimes.com/2023/03/12/technology/deepfakes-cheapfakes-videos-ai.html; Shannon Bond, A*I fakes raise election risks as lawmakers and tech companies scramble to catch up*, NPR (Feb. 8, 2024), https://www.npr.org/2024/02/08/1229641751/ai-deepfakes-election-risks-lawmakers-tech-companies-artificial-intelligence; World Economic Forum, The Global Risks Report 2024, https://www3.weforum.org/docs/WEF_The_Global_Risks_Report_2024.pdf.

[5]    Shannon Bond, *AI fakes raise election risks as lawmakers and tech companies scramble to catch up*, NPR (Feb. 8, 2024), https://www.npr.org/2024/02/08/1229641751/ai-deepfakes-election-risks-lawmakers-tech-companies-artificial-intelligence.

[6]    *Id. See also, e.g.*, Josh A. Goldstein & Andrew Lohn, *Deepfakes, Elections, and Shrinking the Liar's Dividend*, Brennan Center for Justice (Jan. 23, 2024), https://www.brennancenter.org/our-work/research-reports/deepfakes-elections-and-shrinking-liars-dividend.

[7]    World Economic Forum, The Global Risks Report 2024, at 18-19, https://www3.weforum.org/docs/WEF_The_Global_Risks_Report_2024.pdf.

**CAMPAIGN LEGAL CENTER'S AMICUS CURIAE BRIEF**

Publicly available generative AI tools have already been used in the U.S. to create deceptively realistic false content, including political deepfakes, to mislead the public regarding candidate positions and to spread disinformation about election processes. The 2024 election cycle is replete with examples illustrating the scale of this problem.[8] In October 2024, fake voice clips purporting to be recordings of presidential candidates Donald J. Trump and Kamala Harris were so prevalent that the Washington Post published an interactive story seeking to teach voters how to distinguish fabricated audio from real, unmanipulated content.[9]

The most prominent example of a presidential deepfake in the 2024 cycle occurred shortly before the New Hampshire presidential primary, when thousands of voters received a robocall using what purported to be then-President and presidential candidate Joseph R. Biden's voice telling them not to vote in the presidential primary election.[10] It was later revealed that Steve Kramer, a political consultant, had paid $150 to have AI used to create the fake audio.[11] The scandal prompted the

---

[8]   In an earlier episode that garnered significant media attention, a May 2019 video of Representative Nancy Pelosi had been "significantly slowed down" to make her appear drunk and slurring her words. Reuters Staff, *Fact check: "Drunk" Nancy Pelosi video is manipulated*, Reuters (Aug. 3, 2020), https://www.reuters.com/article/uk-factcheck-nancypelosi-manipulated/fact-check-drunknancy-pelosi-video-is-manipulated-idUSKCN24Z2BI.

[9]   Pranshu Verma, Rekha Tenjarla & Bishop Sand, *AI is spawning a flood of fake Trump and Harris voices. Here's how to tell if they're real*, Wash. Post (Oct. 16, 2024), https://www.washingtonpost.com/technology/interactive/2024/ai-voice-detection-trump-harris-deepfake-election.

[10]   Kevin Collier and Scott Wong, *Fake Biden robocall telling Democrats not to vote is likely an AI-generated deepfake*, NBC News (Jan. 22, 2024), https://www.nbcnews.com/tech/misinformation/joe-biden-new-hampshire-robocall-fake-voice-deep-ai-primary-rcna135120; Jeongyoon Han, *New Hampshire is investigating a robocall that was made to sound like Biden*, NPR (Jan. 22, 2024), https://www.npr.org/2024/01/22/1226129926/nh-primary-biden-ai-robocall; Doc Louallen, *Fake Biden robocall prompts state probe, ratchets up concerns about AI in 2024 election*, USA Today (Jan. 24, 2024), https://www.usatoday.com/story/news/politics/2024/01/24/fake-biden-robocall-investigation/72343944007.

[11]   Alex Seitz-Wald, *A New Orleans magician says a Democratic operative paid him to make the fake Biden robocall*, NBC News (Feb. 23, 2024), https://www.nbcnews.com/politics/2024-election/biden-robocall-new-hampshire-strategist-rcna139760. While voter suppression is illegal

---

New Hampshire legislature to introduce legislation addressing the issue of deceptive deepfakes of candidates created with AI, which was enacted in summer 2024.[12]

Recent events have also validated the concern that AI may provide foreign governments with new tools to sow division among American voters and undermine our process of self-governance. For example, during the 2024 election cycle, the GRU, Russia's military intelligence service, reportedly paid John Mark Dougan, the operator of several fake news websites, to produce viral deepfake videos and misinformation targeting Kamala Harris's campaign. These included a deepfake audio supposedly from Barack Obama suggesting that the Democrats had ordered the July assassination attempt against Donald Trump, and a viral hoax video in which an AI-generated persona claiming to be a former student of Vice-Presidential candidate Tim Walz accused Walz of abuse at the high school where he taught.[13]

While deepfakes and other deceptive synthetic media featuring federal candidates grab national attention, state and local candidates with fewer resources often struggle even more to

---

in New Hampshire and Mr. Kramer faces criminal charges for both voter suppression and impersonating a candidate, New Hampshire law did not prohibit Mr. Kramer from creating or distributing a deepfake to the public generally. *See* Shannon Bond, *A Political Consultant faces charges and fines for Biden deepfake robocalls*, NPR (May 23, 2024), https://www.npr.org/2024/05/23/nx-s1-4977582/fcc-ai-deepfake-robocall-biden-new-hampshire-political-operative.

[12]  Olivia Richardson, *New Hampshire law requires more transparency in AI-generated political ads*, N.H. Business Review (Aug. 8, 2024), https://www.nhbr.com/new-hampshire-law-requires-more-transparency-in-ai-generated-political-ads/; N.H. Rev. Stat. Ann. §§ 507:8-j, 638:26-a, 664:14-c; H.B. 1596, Reg. Sess. (N.H. 2024), https://gc.nh.gov/bill_status/legacy/bs2016/billText.aspx?id=1392&txtFormat=html&sy=2024 (requires disclosure of deceptive AI used in political advertising); H.B. 1432, Reg. Sess. (N.H. 2024), https://gc.nh.gov/bill_status/legacy/bs2016/billText.aspx?id=1239&txtFormat=html&sy=2024 (no deepfakes "for the purpose of embarrassing, harassing, entrapping, defaming, extorting, or otherwise causing any financial or reputational harm to the identifiable person.").

[13]  Catherine Belton, *American creating deepfakes targeting Harris works with Russian intel, documents show*, Wash. Post (Oct. 23, 2024), https://www.washingtonpost.com/world/2024/10/23/dougan-russian-disinformation-harris.

CAMPAIGN LEGAL CENTER'S AMICUS CURIAE BRIEF

address deepfakes and "get the word out" to their electorate about an ad's inauthenticity.[14] For example, Paul Vallas, a 2023 Chicago mayoral candidate, was the subject of a deceptive audio clip anonymously distributed online weeks before the election; this AI-generated ad depicted Vallas making a statement to the effect of "back in my day, cops would kill 17 or 18 people and 'nobody would bat an eye.'" The video was viewed thousands of times before it was eventually deleted.[15] While many states have enacted laws that might have helped to address this issue, *see infra* note 20, neither the state of Illinois nor the City of Chicago have yet enacted legislation to address election deepfakes.[16]

In contrast, Indiana's state law addressing digitally manipulated political ads had a clear impact in the 2024 gubernatorial race. In that race, then-Senator (now Governor) Mike Braun ran an ad depicting his opponent as "standing at a podium while her supporters hoist signs declaring 'NO GAS STOVES!'"—an image that was digitally altered to show a message that never existed.[17]

---

[14] Sasha Issenberg, *Why Kamala Harris and Donald Trump Don't Need to Worry About Deepfakes*, Politico (Oct. 27, 2024), https://www.politico.com/news/magazine/2024/10/27/2024-elections-deepfakes-00184863.

[15] Megan Hickey, *Vallas campaign condemns deepfake video posted to Twitter*, CBS News Chicago (Feb. 27, 2023), https://www.cbsnews.com/chicago/news/vallas-campaign-deepfake-video/.

[16] Illinois bills proposed include H.B. 4644, 103rd Gen. Assemb., Reg. Sess. (Ill. 2024), https://ilga.gov/legislation/BillStatus.asp?DocTypeID=HB&DocNum=4644&GAID=17&SessionID=112&LegID=152116; H.B. 4933, 103rd Gen. Assemb., Reg. Sess. (Ill. 2024), https://ilga.gov/legislation/BillStatus.asp?DocNum=4933&GAID=17&DocTypeID=HB&LegId=152834&SessionID=112&GA=103; S.B. 1742, 103rd Gen. Assemb., Reg. Sess. (Ill. 2023), https://ilga.gov/legislation/BillStatus.asp?DocNum=1742&GAID=17&DocTypeID=SB&SessionID=112&GA=103; S.B. 150, 104th Gen. Assemb., Reg. Sess. (Ill. 2025), https://ilga.gov/legislation/BillStatus.asp?DocNum=150&GAID=18&DocTypeID=SB&SessionID=114&GA=104; H.B. 1860, 104th Gen. Assemb., Reg. Sess. (Ill. 2025), https://ilga.gov/legislation/BillStatus.asp?DocNum=1860&GAID=18&DocTypeID=HB&SessionID=114&GA=104; H.B. 3303, 104th Gen. Assemb., Reg. Sess. (Ill. 2025), https://ilga.gov/legislation/BillStatus.asp?DocNum=3303&GAID=18&DocTypeID=HB&SessionID=114&GA=104.

[17] Adam Wren, *An Indiana senator faked an ad. Now what?*, Politico (Oct. 1, 2024), https://www.politico.com/newsletters/digital-future-daily/2024/10/01/mike-braun-mccormick-fake-ai-ad-00181901.

Just a few months before, Indiana had enacted a law, *see* Ind. Code §§ 3-9-8-1 through 3-9-8-6, prohibiting "fabricated media" in campaign communications without a disclaimer. *Id*. In Indiana, fabricated media is a broad category, including media that "conveys a materially inaccurate depiction of the individual's speech, appearance, or conduct" that has been altered without the individual's consent, where a reasonable person would not be able to recognize that the recording had been altered. Ind. Code § 3-9-8-3(1). Braun's ad did not include the required disclaimer; after the press began to inquire about the ad, it was pulled and replaced with a new version featuring the required disclaimer.[18] Public pressure led to compliance with the law, and the campaign even touted this compliance as a positive, first-of-its-kind action in Indiana.[19]

**B. Jurisdictions nationwide have recognized the threat posed by political deepfakes and similar deceptive media—and, like California, have taken steps to safeguard their elections.**

Like California, New Hampshire, and Indiana, states across the country have recognized the danger posed by deepfakes and synthetic media in the electoral context, and a near majority have enacted legislation seeking to address deceptive depictions of candidates and election-related misinformation.

More than twenty other states have enacted statutes addressing the problem of deepfakes and other deceptive synthetic media portrayals of political candidates.[20] The laws typically take

---

[18]  Wren, *supra* note 17.

[19]  Wren, *supra* note 17.

[20]  *See, e.g.*, Ala. Code § 17-5-16.1; Ariz. Rev. Stat. Ann. § 16-1024; Colo. Rev. Stat. §§ 1-46-101 to 1-46-106; Del. Code Ann. tit. 15, § 5145; Fla. Stat. § 106.145; Haw. Rev. Stat. §§ 11-303, 11-304; Idaho Code § 67-6628A; Ind. Code §§ 3-9-8-1 through 3-9-8-6; Ky. Rev. Stat. Ann. § 117.322 (West 2025); Mich. Comp. Laws § 168.932f; Minn. Stat. § 609.771; Miss. Code Ann. § 97-13-47; 2025 Mont. Laws S.B.25 (enacted May 8, 2025; to be codified at Mont. Code Ann. Tit. 13, Ch. 35); N.H. Rev. Stat. Ann. §§ 507:8-j, 638:26-a, 664:14-c; N.M. Stat. Ann. § 1-19-26.8; N.Y. Assemb. B. A8808C, pt. MM, subpt. B, 2023–2024 Leg., Reg. Sess. (N.Y. 2024); 2025 N.D. Laws H.B. 1167 (enacted Apr. 11, 2025; to be codified at N.D. Cent. Code Ann. § 16.1-10); Or. Rev. Stat. Ch. 62, § 1; S.D. Codified Laws §§ 12-26-32 through 12-26-37 (effective July 1, 2025); Tex. Elec. Code Ann. § 255.004; Utah Code Ann. § 20A-11-1104 (West 2024); Wash. Rev. Code

---

two forms: (1) prohibitions on the knowing distribution of deepfakes depicting candidates or other content closely related to elections and (2) on-ad disclaimers or other disclosure regarding the synthetic, deceptive, or manipulated nature of the content.[21] Many limit the window for application of these prohibitions to the period immediately preceding the election at which the candidate or party is on the ballot.[22] Others only regulate paid communications, or those made by candidates or political committees.[23] And still other states eschew direct regulation of these communications, instead providing candidates and other individuals depicted in deepfakes or synthetic media with the ability to seek an injunction or damages in court for false or inaccurate depictions of themselves, alongside a safe harbor for communications that include a disclaimer about the manipulated nature of the content.[24]

At one end of the regulatory spectrum, for example, Minnesota's law prohibits the

---

§§ 42.62.020, 42.62.030; Wis. Stat. § 11.1303(2), (2m).

[21]  *See, e.g.*, Minn. Stat. § 609.771, subd. 2 (prohibiting knowing dissemination of a nonconsensual deepfake depicting a candidate); Del. Code Ann. tit. 15, § 5145; Mich. Comp. Laws § 168.932f; N.M. Stat. Ann. § 1-19-26.8 (prohibiting dissemination unless the depiction includes a disclaimer); Fla. Stat. § 106.145; Utah Code Ann. § 20A-11-1104 (West 2024); Wis. Stat. § 11.1303(2), (2m) (requiring AI-generated content or synthetic media depicting a candidate to include a disclaimer).

[22]  *See, e.g.*, Minn. Stat. § 609.771, subd. 2(a)(3) (prohibiting dissemination of a deepfake within ninety days of a political party's nominating convention or after the start of the absentee voting period for a presidential nominating primary, state or local primary, special, or general election); Mich. Comp. Laws § 168.932f(1)(b) (prohibiting distribution of "materially deceptive media" within ninety days of an election); Idaho Code §§ 67-6602(7)(a), 67-6628A (governing only communications that fall under the definition of electioneering communications, which are limited to the thirty days prior to a primary election and sixty days prior to a general election).

[23]  *See, e.g.*, Fla. Stat. § 106.145(2) (regulating only paid political advertisements and electioneering communications); Wis. Stat. § 11.1303(2), (2m) (regulating only paid express or issue advocacy communications by candidates, political parties, PACs, or other committees); Utah Code Ann. § 20A-11-1104(2)(a) (West 2024) (regulating only communications paid for by candidates, PACs, political issues committees, political parties, or other persons "using a contribution").

[24]  *See, e.g.*, Idaho Code § 67-6628A; S.D. Codified Laws §§ 12-26-32 through 12-26-37 (effective July 1, 2025); Wash. Rev. Code §§ 42.62.020, 42.62.030.

dissemination of "deep fakes" within the absentee voting period and in the 90 days prior to a party's nominating convention. *See* Minn. Stat. § 609.771, subd. 2.[25] The statute defines "deep fake" as "any video recording, motion-picture film, sound recording, electronic image, or photograph, or any technological representation of speech or conduct substantially derivative thereof" that is "so realistic that a reasonable person would believe it depicts speech or conduct of an individual who did not in fact engage in such speech or conduct," where the production of the representation was "substantially dependent on technical means," rather than based on another person's ability to impersonate the depicted individual via physical or verbal means. Minn. Stat. § 609.771, subd. 1(c). Such content is only prohibited if it is created without the consent of a depicted individual and with the intent to injure a candidate or influence an election's result. *Id.* § 609.771, subd. 2(a). Minnesota's prohibition applies when a person disseminates a deepfake or enters a contract to disseminate a deepfake, or if a person "knows or acts with reckless disregard" about whether content they disseminate is a deepfake, excepting broadcasters that disseminate deepfake content produced by a candidate where that dissemination is required by federal law. *Id.* § 609.771, subd. 2(b).

Michigan likewise prohibits the distribution of "materially deceptive media" if: the person distributing the media knows that it "falsely represents a depicted individual," Mich. Comp. Laws § 168.932f(1)(a); the distribution occurs within 90 days before an election, *id.* § 168.932f(1)(b); the distributor intends to "harm the reputation or electoral prospects of a candidate in an election, and the distribution is reasonably likely to cause that result," *id.* § 168.932f(1)(c); and the person "intends the distribution to change the voting behavior of electors in an election by deceiving the

---

[25]    Minnesota's deepfake prohibition is currently under legal challenge from two of the plaintiffs in this case. *See Kohls v. Ellison*, No. 24-cv-3754-LMP/DLM (D. Minn.) and *X Corp. v. Ellison*, No. 25-cv-01649 (D. Minn.).

electors into incorrectly believing that the depicted individual in fact engaged in the speech or conduct depicted, and the distribution is reasonably likely to cause that result," *id.* § 168.932f(1)(d). However, Michigan's law also lifts that prohibition if the media includes a disclaimer stating that "the [media] has been manipulated by technical means and depicts speech or conduct that did not occur," provided the disclaimer satisfies certain format requirements. *Id.* § 168.932f(2). Finally, Michigan authorizes certain parties—*i.e.*, "the attorney general, a depicted individual, a candidate for office who has been injured or is likely to be injured by the materially deceptive media, or any organization that represents the interests of voters likely to be deceived by the materially deceptive media," *id.* § 168.932f(4)—to seek permanent injunctive relief against violators of the law. *See id.* § 168.932f(4)-(9).

In states like North Dakota, Florida, and Wisconsin, by contrast, disclaimer requirements provide the primary means of regulating synthetic election-related media. North Dakota's recently enacted law requires a disclaimer stating that content was "generated by artificial intelligence" on any ad, communication, or other "action taken for a political purpose" containing images, graphics, video, audio, text, or other digital content that "visually or audibly impersonate[s] a human" and was created in whole or in part with artificial intelligence. 2025 N.D. Laws H.B. 1167 (enacted Apr. 11, 2025; to be codified at N.D. Cent. Code Ann. § 16.1-10).

Florida likewise requires any political advertisement, electioneering communication, or "miscellaneous advertisement of a political nature" that contains content created in whole or in part by "generative artificial intelligence" to include a disclaimer. Fla. Stat. § 106.145. Like Florida, Wisconsin has also enacted a disclaimer requirement and limited its application to certain paid campaign communications containing synthetic media. *See* Wis. Stat. § 11.1303(2), (2m).

The remedies and enforcement mechanism set forth in state AI measures also differ. In Washington state, candidates have the option to pursue injunctive relief and bring a civil action for

damages against the sponsor of electioneering communications that include deceptive "synthetic media" depictions of the candidate. Wash. Rev. Code § 42.62.020(2), (3). The statute creates an affirmative defense for any electioneering communication that includes a disclaimer stating "This (image/video/audio) has been manipulated," provided the disclaimer is "in a size easily readable by the average viewer" and, as relevant, appears for the duration of video media or is read in a clearly spoken at the beginning and end of audio-only media (or at least every two minutes, for longer audio communications). Wash. Rev. Code § 42.62.020(4).

South Dakota recently enacted a law similar to Washington's, that prohibits the dissemination of a deepfake[26] with the intent to injure a candidate; creates a personal cause of action for the individual or candidate depicted; and includes an affirmative defense where the content includes a disclaimer stating that "This (image/video/audio) has been manipulated or generated by artificial intelligence." S.D. Codified Laws § 12-26-37 (effective July 1, 2025). Notably, South Dakota also includes a more expansive list of parties who may seek injunctive relief to stop the distribution of a deepfake, including the attorney general and "a candidate who is injured or likely to be injured by the dissemination of a deepfake," rather than only the person depicted. S.D. Codified Laws § 12-26-35 (effective July 1, 2025).

As this brief survey illustrates, states have responded to the problem of political deepfakes in a range of ways, even as there is clearly widespread consensus about the gravity of the problem and the need for regulatory action. Further, as the technology continues to evolve, states must continue to update and refine their deepfake laws to address emerging challenges. For example, Texas was one of the first states to address the issue of deepfakes in 2019—prior to the widespread

---

[26] Deepfake is defined as "any image, audio recording, or video recording created or manipulated with the use of artificial intelligence or other digital technology that is so realistic, a reasonable person would believe it depicts the speech or conduct of an actual individual who did not in fact engage in the speech or conduct." S.D. Codified Laws § 12-26-32 (effective July 1, 2025).

availability of generative AI tools.[27] Texas prohibited the creation and publication or distribution

of a "deep fake video" (defined as "a video, created with the intent to deceive, that appears to depict

a real person performing an action that did not occur in reality") within thirty days of an election.

Tex. Elec. Code Ann. § 255.004(d) and (e). Over the years, Texas legislators have continued to

introduce bills on the topic, including multiple bills introduced in 2024 and in 2025.[28] The 2025

bills—HB 366 and SB 893—have each been passed in their respective chambers and have crossed

over, as of the time of writing this brief.[29]

**II. The governmental interest in ensuring an informed electorate is well established and supports tailored regulation of deepfakes and similar deceptive media in elections.**

    As the short history of deceptive synthetic media in U.S. elections demonstrates, AI-

powered deepfakes and similar political advertising have the potential to sow voter confusion,

facilitate the rampant spread of election-related misinformation, and undermine trust in the

democratic process.

    The state defendants argue that the laws are justified by California's interest in protecting

the integrity of its elections and preventing fraud. ECF No. 49-1 at 14-17. Amicus agrees. But these

laws also advance the same important transparency interest that the Supreme Court has long

recognized justifies campaign finance disclosure laws: to ensure voters can "make informed choices

---

[27]  *See* Tex. Elec. Code Ann. § 255.004(d), (e). While § 255.004(b), which prohibited a person from "knowingly represent[ing] in a campaign communication that the communication emanates from a source other than its true source" "with intent to injure a candidate or influence the result of an election," was declared unconstitutional in *Ex Parte Stafford*, No. PD-0310-23, 2024 WL 4031614 (Tex. Crim. App. Sept. 4, 2024), the portions of the statute addressing deepfakes remain in effect.

[28]  *See, e.g.*, H.B. 401, 89th Leg. (Tex. 2024); H.B. 556, 89th Leg. (Tex. 2024); S.B. 228, 89th Leg. (Tex. 2024).

[29]  *See* H.B. 366, 89th Leg. (Tex. 2025), *available at* https://capitol.texas.gov/BillLookup/History.aspx?LegSess=89R&Bill=HB366; S.B. 893, 89th Leg. (Tex. 2025), *available at* https://capitol.texas.gov/BillLookup/History.aspx?LegSess=89R&Bill=SB893.

among candidates for office." *Buckley*, 424 U.S. at 14-15.

AB 2839 is a proportionate response to the magnitude of the problem and is justified by important governmental interests. At a minimum, the law certainly does not warrant the "strong medicine" of facial invalidation that plaintiffs seek. *United States v. Hansen*, 599 U.S. 762, 770 (2023). Limiting the dissemination of deliberately deceptive, harmful speech about state candidates and elections officials during the critical pre-election period "protect[s] free and fair elections," Cal. Elec. Code § 20012(a)(4), and ensures that these powerful new technologies do not destabilize citizens' ability to cast informed and meaningful votes.

**A. The Supreme Court has long recognized that laws enabling citizens to cast informed votes are crucial to a functioning democracy.**

To meaningfully participate in the democratic process, voters must be able to evaluate the credibility and reliability of electoral messages and the underlying motivations of the people paying for them. Plaintiffs focus only on their putative right to use AI to make misleading or satirical depictions of various candidates, but they completely "ignore[] the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace." *McConnell v. FEC*, 540 U.S. 93, 197 (2003) (citation omitted), *overruled in part on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010). As the Supreme Court explained in *Citizens United*:

> With the advent of the Internet, prompt disclosure of expenditures can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions and supporters. . . . The First Amendment protects political speech; and disclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way.

558 U.S. at 370-71 (citations and quotation marks omitted). So too do measures that shine a light on AI-generated election advertising provide the public with critical information—*i.e.*, more speech—about the campaign messages they see, and thereby promote the values and principles that underlie the First Amendment. Indeed, "[t]here can be no question about the legitimacy of the

14

1    State's interest in fostering informed and educated expressions of the popular will in a general

2    election." *Anderson v. Celebrezze*, 460 U.S. 780, 796 (1983).

3        The right to free speech was designed to enable self-government, ensure responsive

4    officeholders, and prevent the corruption of democratic processes. *See Knox v. Serv. Emps. Int'l*

5    *Union, Local 1000*, 567 U.S. 298, 308 (2012) ("Our cases have often noted the close connection

6    between our Nation's commitment to self-government and the rights protected by the First

7

8    Amendment."). Properly understood, disclosure laws, including the disclaimer provisions in AB

9    2839, enhance, rather than constrain, the free speech necessary to sustain our democracy. "In a

10   republic where the people are sovereign, the ability of the citizenry to make informed choices [in

11   elections] is essential." *Buckley*, 424 U.S. at 14-15.

12

13       Indeed, the Ninth Circuit too has "repeatedly recognized an important (and even

14   compelling) informational interest" in requiring transparency in campaign advertising. *Family PAC*

15   *v. McKenna*, 685 F.3d 800, 806 (9th Cir. 2012). "Providing information to the electorate is vital to

16   the efficient functioning of the marketplace of ideas, and thus to advancing the democratic

17   objectives underlying the First Amendment." *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d

18   990, 1005 (9th Cir. 2010); *see also Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1105

19   (9th Cir. 2003) (noting that in the "cacophony of political communications through which

20

21   California voters must pick out meaningful and accurate messages . . . being able to evaluate who

22   is doing the talking is of great importance"). As precedents of both the Supreme Court and this

23   Circuit have recognized, voters need full and accurate information about the campaign messages

24   they see in order to meaningfully participate in the electoral process.

25   **B. The government's informational interest supports both a ban on fraudulent AI-**
         **generated election ads and disclaimer requirements.**
26

27       "[T]he people in our democracy are entrusted with the responsibility for judging and

28   evaluating the relative merits of conflicting arguments." *First Nat'l Bank of Boston v. Bellotti*, 435

15

U.S. 765, 791 (1978). But the ability of AI to create an extremely convincing yet imperceptibly false alternative reality poses a serious threat to the voting public's ability to properly "judge" and "evaluate" political messages seeking to influence their voting decisions—a First Amendment interest recognized by the Supreme Court.

Likewise, as the Supreme Court has also recognized, there is a "compelling interest in protecting voters from confusion and undue influence." *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion). Left unchecked, the proliferation of deepfakes and similarly deceptive synthetic media in elections could facilitate a political landscape where electoral ads are increasingly used for manipulation: to misrepresent who is speaking and what is being said.

The state's well-established interest in fostering an informed electorate thus supports restrictions on the misuse of AI to create false or fraudulent campaign communications. A ban on deceptive campaign ads like California's buttresses citizens' confidence that the persons "speaking" on behalf of a candidate are authentic, not an AI fabrication, and allows voters to rely on campaign ads in assessing candidates and ballot measures. A ban thus advances not only the government's interest in protecting the integrity of elections, ECF No. 49-1 at 14-17, but also its important informational interest in ensuring that voters have credible, useful information on which they can base their voting decisions.

Without laws like California's, the use of generative AI in elections can interfere with voters' ability to meaningfully evaluate the candidates vying to represent them, while also impeding the ability of candidates and political parties to effectively communicate their messages to voters. If voters are unable to trust that what they are seeing is authentic, then they could be easily misled about a candidate's positions or actions, and might ultimately lose trust in the democratic process that the First Amendment is meant to protect. *Burson*, 504 U.S. at 199 ("[T]he right to vote freely for the candidate of one's choice is of the essence of a democratic society.") (internal quotation

marks omitted). And as citizens' mistrust of the informational environment grows, it becomes easier for "domestic or international actors . . . [to] deliberately try[] to sow chaos through misinformation or disinformation" or "at minimum cause doubt and confusion." Evan Chiacchiaro, *Generative AI and Electoral Communications*, 9 Geo. L. Tech. Rev. 166, 181 (2025).

An AI disclaimer requirement similarly—and more directly—furthers the government's informational interest. A disclaimer puts voters on notice that the content they are seeing or hearing was created or substantially altered using AI, allowing them to evaluate that content with the requisite skepticism regarding the authenticity of what is being depicted. An AI disclaimer requirement essentially requires an ad's sponsors to "stand by" their use of AI, heightening the public's ability to decide for themselves whether the ad can be relied on to influence their decisionmaking. In the absence of such regulation, voters will be denied vital information that could help them evaluate whether what they are seeing and hearing in campaign ads is authentic and real, which fundamentally threatens their ability to cast an informed vote and meaningfully participate in our democracy.

Although plaintiffs argue that the disclaimer requirement unconstitutionally "compels" speech, ECF No. 45-1 at 19-22, no court has so viewed an informational disclaimer requirement for electoral ads, nor applied strict scrutiny on this basis. Indeed, the Ninth Circuit recently rejected a similar argument in *No on E v. Chiu*, and upheld a disclaimer requirement that would have required the plaintiff group to devote 35% of a printed campaign ad to information about the ad's sponsor and top donors. 85 F.4th 493, 507 (9th Cir. 2023), *cert. denied sub nom. No on E, San*

*Franciscans v. Chiu*, No. 23-926, 2024 WL 4426534 (U.S. Oct. 7, 2024).[30] As other Circuits have found, the "election-related context implicated here is alone sufficient to distinguish" a campaign ad disclaimer from instances of unconstitutional compelled speech. *Gaspee Project v. Mederos*, 13 F.4th 79, 95 (1st Cir. 2021) (rejecting an "attempt to analogize" Rhode Island's top-five contributor disclaimer requirement to the compelled speech regulations that have elicited strict scrutiny), *cert. denied*, 142 S. Ct. 2647 (2022). So too should the Court here reject plaintiffs' attempt to heighten the exacting scrutiny that applies to electoral disclaimer requirements, *see Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021), and affirm, as the Ninth Circuit has, that California's disclaimer requirement "allows citizens to make informed choices in the political marketplace." *No on E*, 85 F.4th at 505.

---

[30]  Insofar as specific elements of the disclaimer—such as the font size, Cal. Elec. Code § 20012(b)(2)(B)(i)—are deemed burdensome, this court can construe the law to allow a disclaimer of no more than a designated percentage of the ad. *See, e.g.*, *Yes on Prop B v. City & Cnty. of S.F.*, 440 F. Supp. 3d 1049, 1055 (N.D. Cal.) (limiting application of San Francisco's top donor disclaimer to no more than 40% of advertisement).

1

**CONCLUSION**

2

  For the foregoing reasons, amicus respectfully requests that the Court deny plaintiffs'

3

motion for summary judgment and grant defendants' motion for summary judgment with regard to

4

AB 2839.

5

6

7

**Dated: June 6, 2025**         Respectfully submitted,

8

/s/ Megan P. McAllen

9

Megan P. McAllen (Cal. Bar No. 281830)
 mmcallen@campaignlegalcenter.org
Elizabeth D. Shimek*

10

 eshimek@campaignlegalcenter.org

11

CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400

12

Washington, D.C. 20005
(202) 736-2200

13

*Pro Hac Vice* forthcoming

14

*Attorneys for Amicus Curiae*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CAMPAIGN LEGAL CENTER'S AMICUS CURIAE BRIEF**

1

**CERTIFICATE OF SERVICE**

2

        I hereby certify that on June 6, 2025, I caused a true and correct copy of the foregoing

3

document to be served upon all counsel of record registered with the Court's ECF system, by

4

electronic service via the Court's ECF transmission facilities.

5

6

7                                                    /s/ Megan P. McAllen
                                                    _____

8                                                    Megan P. McAllen (Cal. Bar No. 281830)
                                                        mmcallen@campaignlegalcenter.org

9                                                    CAMPAIGN LEGAL CENTER
                                                    1101 14th St. NW, Suite 400

10                                                   Washington, D.C. 20005
                                                    (202) 736-2200

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CAMPAIGN LEGAL CENTER'S AMICUS CURIAE BRIEF**