1   Brian R. Chavez-Ochoa (CA Bar No. 190289)*
    brianr@chavezochoalaw.com
2   Chavez-Ochoa Law Offices, Inc.
3   4 Jean Street, Suite 4
    Valley Springs, CA 95252
4   Telephone: (209) 772-3013

5   Johannes Widmalm-Delphonse (VA Bar No. 96040)**
6   jwidmalmdelphonse@adflegal.org
    Alliance Defending Freedom
7   44180 Riverside Parkway
    Lansdowne, VA 20176
8   Telephone: (571) 707-4655
9   Facsimile: (571) 707-4656

10  Jonathan A. Scruggs (AZ Bar No. 030505)**
    jscruggs@ADFlegal.org
11  Alliance Defending Freedom
12  15100 N. 90th Street
    Scottsdale, AZ 85260
13  Telephone: (480) 444-0020
    Facsimile: (480) 444-0028
14
15  *Counsel for The Babylon Bee, LLC
    and Kelly Chang Rickert*
16
    * Local Counsel
17  **Admitted pro hac vice

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

Christoper Kohls, et al.,

                        *Plaintiffs*,

v.

Rob Bonta, et al.,

                        *Defendants*.

Case No. 2:24-cv-02527-JAM-CKD

**Response in Opposition to Defendants' Motion for Summary Judgment, and in Support of Plaintiffs' Motion for Summary Judgment, on AB 2839**

**Judge:** John A. Mendez

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

ARGUMENT ....................................................................................................... 2

I.    AB 2839 infringes on Plaintiffs' free-speech rights, facially and as applied .... 2

    A.    AB 2839 regulates core political speech like satire and parody ............. 3

    B.    The law facially regulates based on content and viewpoint,
         triggering strict scrutiny ............................................................... 7

    C.    The disclaimer requirement triggers strict scrutiny because it
         compels speech ........................................................................ 10

    D.    AB 2839 fails strict scrutiny ........................................................ 12

         1.    AB 2839 flunks narrow tailoring ........................................ 12

         2.    AB 2839 fails to advance a compelling state interest ............. 21

II.   AB 2839 is overbroad and vague ................................................................ 26

    A.    AB 2839 is overbroad ................................................................ 26

    B.    AB 2839 is vague ...................................................................... 28

III.  No part of AB 2839 is severable ................................................................ 29

CONCLUSION ................................................................................................. 30

# TABLE OF AUTHORITIES

## *Cases*

*281 Care Committee v. Arneson,*
766 F.3d 774 (8th Cir. 2014) ...................................................... 11, 20, 21, 22

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023) ...................................................................................... 13

*44 Liquormart, Inc. v. Rhode Island,*
517 U.S. 484 (1996) ...................................................................................... 16

*Alaska Right To Life Commission v. Miles,*
441 F.3d 773 (9th Cir. 2006) ........................................................................ 11

*American Amusement Machine Association v. Kendrick,*
244 F.3d 572 (7th Cir. 2001) .................................................................. 17, 18

*American Beverage Association v. City & County of San Francisco,*
916 F.3d 749 (9th Cir. 2019) ........................................................................ 13

*Americans for Prosperity Foundation v. Bonta,*
594 U.S. 595 (2021) ........................................................................................ 8

*Animal Legal Defense Fund v. Wasden,*
878 F.3d 1184 (9th Cir. 2018) ................................................... 5, 15, 27, 28

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett,*
564 U.S. 721 (2011) ........................................................................................ 8

*Artichoke Joe's California Grand Casino v. Norton,*
353 F.3d 712 (9th Cir. 2003) ........................................................................ 29

*Ashcroft v. Free Speech Coalition,*
535 U.S. 234 (2002) ................................................................................. 7, 26

*Brown v. Entertainment Merchants Association,*
564 U.S. 786 (2011) .............................................. 6, 13, 18, 19, 20, 23, 24

*Brown v. Hartlage,*
456 U.S. 45 (1982) ........................................................................................ 20

*Buckley v. Valeo,*
424 U.S. 1 (1976) .......................................................................................... 25

*Bullfrog Films, Inc. v. Wick,*
  847 F.2d 502 (9th Cir. 1988) ................................................................ 29

*California Pro-Life Council, Inc. v. Getman,*
  328 F.3d 1088 (9th Cir. 2003) .............................................................. 10

*Chaker v. Crogan,*
  428 F.3d 1215 (9th Cir. 2005) ........................................................ 13, 22

*Citizens United v. Federal Election Commission,*
  558 U.S. 310 (2010) ....................................................................... 11, 25

*City of Chicago v. Morales,*
  527 U.S. 41 (1999) ................................................................................ 14

*City of Houston v. Hill,*
  482 U.S. 451 (1987) .............................................................................. 26

*Cohen v. California,*
  403 U.S. 15 (1971) .................................................................................. 7

*Commonwealth v. Lucas,*
  34 N.E.3d 1242 (Mass. 2015) ............................................................... 11

*Consolidated Edison Co. of New York v. Public Service Commission of New York,*
  447 U.S. 530 (1980) .............................................................................. 24

*Eu v. San Francisco County Democratic Center Commission,*
  489 U.S. 214 (1989) ........................................................................ 21, 22

*Federal Election Commission v. Ted Cruz for Senate,*
  596 U.S. 289 (2022) .......................................................................... 2, 24

*Forsyth County v. Nationalist Movement,*
  505 U.S. 123 (1992) ......................................................................... 7, 12

*Grimmett v. Freeman,*
  59 F.4th 689 (4th Cir. 2023) .................................................................. 9

*Human Life of Washington Inc. v. Brumsickle,*
  624 F.3d 990 (9th Cir. 2010) ............................................................... 10

*Iancu v. Brunetti,*
  588 U.S. 388 (2019) .......................................................................... 1, 8

*IMDb.com Inc. v. Becerra,*
  962 F.3d 1111 (9th Cir. 2020) ........................................................ 19, 20

iii

*Interactive Digital Software Association v. St. Louis County*,
    329 F.3d 954 (8th Cir. 2003) .................................................................. 20

*Knievel v. ESPN*,
    393 F.3d 1068 (9th Cir. 2005) ................................................... 4, 28, 29

*Kohls v. Bonta*,
    752 F. Supp. 3d 1187 (E.D. Cal. 2024) ........................... 1, 3, 5, 8, 11, 29

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ................................................................................ 29

*Lewis v. City of New Orleans*,
    415 U.S. 130 (1974) ................................................................................ 26

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ..................................................................... 14, 17, 18

*McCutcheon v. Federal Election Commission*,
    572 U.S. 185 (2014) .................................................................................. 6

*McIntyre v. Ohio Elections Commission*,
    514 U.S. 334 (1995) ......................................................................... 10, 18

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ........................................................ 7, 8, 13, 25, 28

*National Institute of Family & Life Advocates. v. Becerra*,
    585 U.S. 755 (2018) ......................................................................... 10, 17

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ........................................................................... 9, 21

*Ramos v. Louisiana*,
    590 U.S. 83 (2020) .................................................................................... 6

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) .................................................................................. 7

*Rickert v. State, Public Disclosure Commission*,
    168 P.3d 826 (Wash. 2007) ......................................................... 12, 13, 25

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
    487 U.S. 781 (1988) ......................................................................... 10, 14

*San Francisco County Democratic Center Commission v. Eu*,
    826 F.2d 814 (9th Cir. 1987) ......................................................... 20, 22

Reply in Support of Plaintiffs' Motion for Summary Judgment Against AB 2839

*Santiago v. Rumsfeld,*
    425 F.3d 549 (9th Cir. 2005) ...................................................................... 29

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) .................................................................................... 11

*Thomas v. Collins,*
    323 U.S. 516 (1945) .................................................................................... 25

*Tollis Inc. v. County of San Diego,*
    505 F.3d 935 (9th Cir. 2007) ...................................................................... 30

*Turner Broadcasting System, Inc. v. Federal Communications Commission,*
    512 U.S. 622 (1994) .................................................................................... 11

*United States v. Alvarez,*
    567 U.S. 709 (2012) ...................................... 5, 6, 11, 20, 23, 24, 26

*United States v. Bonin,*
    932 F.3d 523 (7th Cir. 2019) ........................................................................ 5

*United States v. Hansen,*
    599 U.S. 762 (2023) ...................................................................................... 7

*United States v. Jae Gab Kim,*
    449 F.3d 933 (9th Cir. 2006) ................................................................ 14, 28

*United States v. Tan Duc Nguyen,*
    673 F.3d 1259 (9th Cir. 2012) .............................................................. 15, 26

*United States v. Tomsha-Miguel,*
    766 F.3d 1041 (9th Cir. 2014) ................................................................ 5, 6

*United States v. Williams,*
    553 U.S. 285 (2008) .................................................................................... 28

*Video Software Dealers Association v. Schwarzenegger,*
    556 F.3d 950 (9th Cir. 2009) ...................................................................... 23

*Washington Post v. McManus,*
    944 F. 3d 506 (4th Cir. 2019) .................................................................... 11

*X Corp. v. Bonta,*
    116 F.4th 888 (9th Cir. 2024) ................................................................ 9, 10

v

***Statutes***

California Election Code § 18573 ................................................................ 15

California Election Code § 20012 ..................................................... 1, 3, 29

National Defense Authorization Act for Fiscal Year 2017,
    Pub. L. 114–328, div. A, title XII, §1287, Dec. 23, 2016, 130 Stat. 2546 .............. 15

New Hampshire Revised Statutes § 659.40 III ........................................... 15

Reply in Support of Plaintiffs' Motion for Summary Judgment Against AB 2839

### INTRODUCTION

California imagines itself a sentry at the gates: fictitious speech is in the public discourse, and voters don't "know what … they can trust." Cal. Elec. Code § 20012(a)(1). So it tries to shield citizens from speech about elections and politicians to prevent harms to democracy. But the First Amendment entrusts the people—not the state—to police political truth. *Kohls v. Bonta*, 752 F. Supp. 3d 1187, 1196 (E.D. Cal. 2024). New technologies and forms of communication don't require us to abandon enduring constitutional freedoms.

Seeing things differently, the State's motion treats speech that's not literally true as an intruder left unprotected by the First Amendment. But that position ignores decades of Supreme Court precedent and would expand the boundaries of government power beyond recognition. AB 2839 is not limited to speech that inflicts legally cognizable harms. *Id.* at 1193–94. It uses vague terms like "materially deceptive" that give the State and anyone else unbridled discretion to file complaints. Cal. Elec. Code § 20012(d)(1). And it explicitly targets speech like satire and parody long protected by the First Amendment. *Id.* § 20012(b)(3).

The State is no neutral guardian either. Its statute bars speech portraying only *some* subjects related to candidates and elections, expressing only *some* viewpoints, and coming from only *some* arbitrarily chosen speakers. California concedes this type of content- and viewpoint-based restriction triggers strict scrutiny, yet it skips straight to overbreadth. *Contra Iancu v. Brunetti*, 588 U.S. 388, 398–99 (2019). But speech prohibitions that facially target certain views trigger no less than strict scrutiny. So California must overcome this heavy burden, even setting aside the law's problematic overbreadth.

Although the State argues that digitally created or altered content poses novel challenges, it offers mere speculation that such content is uniquely persuasive or harmful. California's own expert—R. Michael Alvarez—even concedes that the

Reply in Support of Plaintiffs' Motion for Summary Judgment Against AB 2839

research "is limited" and the "effects of political deepfakes on voter trust and confidence … are understudied." Decl. of R. Michael Alvarez Supp. Defs.' Mot. S.J. ("Alvarez") ¶¶ 14, 16, Doc. 49-3. The Court has "never accepted mere conjecture as adequate to carry a First Amendment burden." *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 307 (2022) (cleaned up). Given this record, California falls far short of showing that AB 2839's censorship of political speech accomplishes anything at all, particularly when options like counterspeech and educational campaigns can be effective while still respecting constitutional rights.

In this conflict between state censorship and private freedom, the First Amendment favors the latter. It trusts that truth emerges through open discourse and that private citizens should judge speech for themselves. A law "protecting" citizens from political speech betrays that principle for a dark paternalism that aggrandizes state power to determine political "truth." This Court should enter a permanent injunction against enforcement of California's law.

## ARGUMENT

### I.    AB 2839 infringes on Plaintiffs' free-speech rights, facially and as applied.

California concedes that its law triggers strict scrutiny but focuses mostly on overbreadth in defense. That is the wrong approach. AB 2839 targets core political speech like satire and parody, facially regulates speech based on content and viewpoint, and compels speech. This makes the law at least presumptively unconstitutional on its face. And California fails to carry its heavy burden to overcome that presumption, dismissing less-restrictive alternatives it has never tried and failing to prove the alleged harmful effects it seeks to curtail. For these reasons, AB 2839 facially violates the First Amendment and the California Constitution, whether or not the statute is overbroad.

2

**A.    AB 2839 regulates core political speech like satire and parody.**

Throughout its brief, California disputes that AB 2839 regulates protected speech, analogizing the law to unprotected categories like defamation and fraud. But that's wrong. *Kohls*, 752 F. Supp. 3d at 1193–95. AB 2839 regulates core political speech, as the State's failed analogies to historically unprotected categories readily demonstrate. *Id.* at 1195–96.

1. AB 2839 applies to speech about politics, including much satire and parody. Corrected Pls.' Mem. Supp. S.J. Against AB 2839 ("Pls.' MSJ") § I.A., Doc. 74-1. Start with the text. "Materially deceptive content" means content that "would falsely appear to a reasonable person to be an authentic record of the content depicted." Cal. Elec. Code § 20012(f)(8). So the content need only "appear … to be … authentic." *Id.* A reasonable person need not *believe* it's authentic. *Contra* Defs.' Mem. Points and Auths. Supp. Mot. S.J. on AB 2839 ("Defs.' MSJ") 11, Doc. 49-1. This sweeps up speech like satire and parody because of its "proximity to the original." Statement of Undisputed Facts Supp. Pls.' Mots. S.J. ("PSUF") ¶ 12, Doc. 47. California itself cites images like "President Donald Trump getting gang-tackled by riot-gear-clad New York City police officers" as examples of nefarious deepfakes—images identical or similar to the ones Rickert wanted to post during the 2024 election. *Compare* Decl. of Kristin A. Liska Supp. Defs.' Mot. S.J. ("Liska"), Ex. 16, Doc 49-4, *with* PSUF ¶ 89, *and* Decl. of Kelly Chang Rickert Supp. Pls.' Mot. S.J. ¶ 31, Doc. 47-30.

California tries to buttress the statute's text by arguing it prohibits only content that "purport[s] to be an authentic record of its content." Defs.' MSJ 12. But the law doesn't say anything about "purporting," or having the "specious appearance of being, intending, or claiming" to be authentic.[1] Instead, it focuses on

---

[1] *Purport*, Merriam-Webster, https://merriam-webster.com/dictionary/purport.

Reply in Support of Plaintiffs' Motion for Summary Judgment Against AB 2839

1    superficial appearances rather than intentional deception. That's why everyone

2    agrees that the law covers Christopher Kohls's Harris Parody Video. *E.g.*, Defs.'

3    MSJ 21–22. That video has all the aesthetic trappings of authenticity—the AI-

4    generated voice of Kamala Harris along with the tone and production quality of a

5    campaign ad—but never intends to deceive. *See* Pls.' MSJ 30; PSUF ¶ 57. Such

6    undisputed coverage of the law contrasts sharply with California's examples that

7    don't even *appear* authentic because they are facially absurd. Defs.' MSJ 11

8    (recounting examples of Trump as Superman and Harris in colonial-era paintings).

9        Such application shows how far AB 2839 strays from defamation law. *Contra*

10   Defs.' MSJ 12. In that context, courts draw the same distinction between the

11   surface-level meaning of words and the actual meaning in context. In *Knievel v.*

12   *ESPN*, for example, the legendary stuntman sued a magazine for referring to him

13   as a "pimp." 393 F.3d 1068, 1074 (9th Cir. 2005). The Ninth Circuit acknowledged

14   that the term could be defamatory when "read in isolation" but held it was clearly

15   an "attempt at humor" protected by the First Amendment. *Id.* at 1078. Here, too,

16   context is "paramount." *Id.* at 1075. AB 2839 ignores this principle and fixates on

17   the appearance of authenticity even when the content "cannot reasonably be

18   interpreted literally in … context." *Id.* at 1078.

19       The disclaimer requirement confirms that satire and parody are ground zero

20   in California's campaign to "defend" democracy from its own citizens. California

21   calls it a "safe harbor" rather than a requirement. Defs.' MSJ 17. But parody and

22   satire don't need disclaimers to receive constitutional protection. Pls.' MSJ 20. Yet

23   before enacting AB 2839, California removed the explicit carve-out protecting such

24   speech and put the onus on speakers to include a disclaimer. PSUF ¶¶ 162–63. That

25   decision shows that the disclaimer is not a "safe harbor" but California's

26   precondition for receiving First Amendment protections. Defs.' MSJ 17.

27       2. Next, California tries to shoehorn protected political expression into

28

                                        4

narrow categories of historically unprotected speech, like defamation and fraud. *Id.* 13–14. Amicus similarly analogizes to laws against impersonating government officials and misappropriating someone's image and likeness. Br. Amicus Curiae Elec. Privacy Info. Ctr. Supp. Defs.' Mot. S.J. on AB 2839 ("Amicus") 12–15, Doc. 72. But as Amicus concedes, "AB 2839 sweeps more broadly." *Id.* at 15; *accord Kohls*, 752 F. Supp. 3d at 1193 (AB 2839 "extends beyond" defamation).

   One difference is that these unprotected categories require legally cognizable harms. *Id.* at 1194 (citing examples from *United States v. Alvarez*, 567 U.S. 709, 719–22 (2012), including impersonation of government officers). That's why analogies to speech "fraudulently misleading voters" don't work. *Contra* Defs.' MSJ 13. *See* Pls.' MSJ 14 (explaining this). Or Amicus's analogy to common-law protections for a person's image and likeness. *See* Amicus 14–15 (explaining that misappropriation results in "personal gain" of some sort). Or laws against impersonating government officials. *See United States v. Tomsha-Miguel,* 766 F.3d 1041, 1048–49 (9th Cir. 2014) (holding federal law against impersonating government official "criminalizes conduct" and requires "intent to deceive"); *see also United States v. Bonin*, 932 F.3d 523, 536 (7th Cir. 2019) (holding same law prohibits "more than mere lies").

   California argues that lies "meant to deceive viewers and manipulate voters to change their voting behavior" cause the sorts of legally cognizable harms described in *Alvarez*. Defs.' MSJ 12. But intent to "deceive and manipulate" alone isn't sufficient. Xavier Alvarez lied about receiving the Congressional Medal of Honor in an "attempt to gain respect." *Alvarez*, 567 U.S. at 714 (protecting this lie). And journalists sometimes lie to make "undercover investigation[s] of agricultural operations." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1189 (9th Cir. 2018) (same). The First Amendment draws the line at tangible, historically cognizable harm. *Kohls*, 752 F. Supp. 3d at 1194. Moreover, AB 2839 covers speech that is not

1    literally true *regardless* of whether it intends to deceive or manipulate, sweeping up

2    much satire and parody. AB 2839 does not care whether speech causes a legally

3    cognizable harm or not.

4         In California's distinguishable analogs, the government also targets

5    "interest[s] … unrelated to the suppression of free expression," like the harmful

6    "conduct" of impersonating an officer. *Tomsha-Miguel*, 766 F.3d at 1048–49 ("the

7    government's interests are concerned solely with the act of impersonation itself, not

8    the content of the impersonation"). Or the reliance and "actual injury" from fraud.

9    Pls.' MSJ 14. Or the personal gains from misappropriation. Amicus 14–15. These

10    permissible regulations do "not prevent the expression of any particular message or

11    viewpoint." *Tomsha-Miguel*, 766 F.3d at 1048 (cleaned up). AB 2839, by contrast,

12    targets only speech based on content and viewpoint.

13         Another difference is that AB 2839 deputizes anyone with internet access to

14    file a complaint. Pls.' MSJ 14 (explaining this); *see also* Amicus 15 ("AB 2839 sweeps

15    more broadly tha[n] common law misappropriation … in terms of …who may bring

16    suit[.]"). Instead of giving a cause of action to the party who was injured or whose

17    likeness was purloined, California's law incorrectly and prophylactically assumes

18    certain content causes harm and then crowdsources censorship for maximum effect.

19         California and Amicus's position boils down to a "free-floating test" for First

20    Amendment protections "based on an ad hoc balancing of relative social costs and

21    benefits." *Alvarez*, 567 U.S. at 717 (cleaned up). That is a "startling and dangerous"

22    request. *Id.* And it is one that that the Supreme Court has rejected time and again.

23    *E.g.*, *Brown v. Ent. Merchs. Ass'n,* 564 U.S. 786, 792 (2011) ("*EMA*"); *United States*

24    *v. Stevens*, 559 U.S. 460, 470 (2010); *McCutcheon v. FEC*, 572 U.S. 185, 206 (2014).

25    Like other guarantees of the Bill of Rights, the First Amendment isn't "suggesting

26    fruitful topics for future cost-benefit analyses." *Ramos v. Louisiana*, 590 U.S. 83,

27    100 (2020). It guarantees free speech "in the hope that [it] will ultimately produce a

28

Reply in Support of Plaintiffs' Motion for Summary Judgment Against AB 2839

1   more capable citizenry and more perfect polity." *Cohen v. California*, 403 U.S. 15, 24

2   (1971). Empowering anyone to suppress political speech in the absence of legally

3   cognizable harm is fundamentally at odds with our free-speech traditions.

### B.   The law facially regulates based on content and viewpoint, triggering strict scrutiny.

6   California concedes that AB 2839 regulates speech based on content,

7   triggering strict scrutiny. Defs.' MSJ 10. Yet it argues that facial invalidation

8   requires Plaintiffs to prove that the law is overbroad. *Id.*; *see also* Amicus 7–8. But

9   that's wrong. When a law *facially* targets speech and discriminates based on its

10  content, strict scrutiny applies to the face of the law. *Reed v. Town of Gilbert*, 576

11  U.S. 155, 165 (2015) ("A law that is content based on its face is subject to strict

12  scrutiny regardless...."). When it *facially* targets speech and discriminates based on

13  its viewpoint, strict scrutiny may not even be enough—such laws are nearly void *per

14  se*. Pls.' MSJ 17. So AB 2839 triggers at least strict scrutiny, regardless of whether

15  it's also overbroad (as discussed below, it is).

16  California relies primarily on *Moody v. NetChoice, LLC* to suggest that facial

17  challenges always require an analysis of overbreadth. 603 U.S. 707 (2024); Defs.'

18  MSJ 10. But *Moody* never declares that overbreadth challenges exhaust the

19  universe of facial challenges. Overbreadth is a tool to scrutinize a law's scope. *See

20  id.* at 724–25, 740 ("In the usual First Amendment case, [courts] must decide

21  whether to apply strict or intermediate scrutiny."*)*. For example, some laws target

22  unprotected speech. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 246 (2002)

23  (obscenity). Some laws target a "great deal of nonexpressive conduct." *See United

24  States v. Hansen*, 599 U.S. 762, 782 (2023) (law against encouraging or inducing

25  illegal immigration). In cases like these, overbreadth review properly safeguards

26  against laws that "sweep[] too broadly" and risk chilling a substantial amount of

27  protected speech." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 129 (1992)

28

1  (explaining discretion-filled laws may be overbroad because "every application

2  creates an impermissible risk of suppression of ideas").

3       *Moody* was an overbreadth case because it raised a facial challenge to a law

4  "dealing with a broad swath of varied platforms and functions." 603 U.S. at 745

5  (Barrett, J., concurring); *see also id.* at 787 (Alito, J., concurring in the judgment)

6  (suggesting remand was necessary to discern whether the laws covered "primarily

7  non-expressive conduct" like "*carry[ing]* messages instead of *curating* them"

8  (internal quotation omitted)). Thus, the Supreme Court remanded for full

9  consideration of the laws' applicability to services like "direct messaging," "events

10 management," "online marketplace," "financial exchanges" or even "ride-sharing"

11 some of which may not even implicate the platforms' free expression rights. *Id.* at

12 724–25.

13      This case presents a different problem. AB 2839 applies *only* to speech and

14 *only* speech about political candidates, elected officials, and elections—speech that

15 receives the "fullest" First Amendment protection. *Ariz. Free Enter. Club's Freedom

16 Club PAC v. Bennett*, 564 U.S. 721, 734 (2011). So this case is not about a statute

17 that strays too far at the margins. Rather, it's about a statute rotten at its core.

18 That makes the overbreadth analysis redundant. *See, e.g.*, *Ams. for Prosperity

19 Found. v. Bonta*, 594 U.S. 595, 615 (2021) (holding donor disclosure law "fail[ed]

20 exacting scrutiny" and was overbroad because constitutional flaws were

21 "categorical" and "present in every case"). And it explains why this Court already

22 facially enjoined AB 2839 on its face under heightened scrutiny. *Kohls*, 752 F. Supp.

23 3d at 1196; *see also id.* at 1193 ("At face value, AB 2839 does much more than

24 punish potential defamatory statements….").

25      When, as here, a challenged law restricts pure speech by the topics discussed

26 or viewpoint expressed, it cannot be "salvage[d] by…constitutionally permissible

27 applications." *Iancu*, 588 U.S. at 398. In fact, a law that regulates speech "based on

28

1  the ideas or opinions it conveys" fails even when the law is *not* overbroad and even

2  when the law regulates *only* unprotected speech. *Id.* at 393.

3      *R.A.V. v. City of St. Paul* explains. 505 U.S. 377 (1992). There, the Court

4  struck down a ban on bias-motivated cross burnings because the law protected

5  groups based on "race, color, creed, religion or gender," while allowing "abusive

6  invective" on other bases (like "political affiliation, union membership, or

7  homosexuality"). *Id.* at 391. Such targeting triggered and failed strict scrutiny even

8  though the law regulated only unprotected "fighting words." *Id.* at 381 (holding it

9  was "unnecessary to consider" law's overbreadth).

10      *Iancu* similarly held that when a law "distinguishes between … ideas," it's

11  facially invalid regardless of overbreadth. 588 U.S. at 394. There, the Court struck

12  down a ban on "immoral or scandalous" trademarks because marks aligned with

13  "conventional moral standards" were allowed while marks "hostile to them" were

14  not. *Id.* This viewpoint bias "ended the matter," regardless of whether "Congress

15  could have captured some of the same speech through a viewpoint-neutral

16  statute[.]" *Id.* at 399 (rejecting government's invocation of overbreadth).

17      Said differently, a law that discriminates facially discriminates in each

18  application. *Id.* at 395 ("The facial viewpoint bias … results in viewpoint-

19  discriminatory application."). It "raise[s] the same First Amendment issues" "in

20  every application." *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024) (holding

21  facial challenge appropriate because reporting requirements on "the face of the law"

22  applied the same way to affected social media companies). The Fourth Circuit

23  recently applied this reasoning to invalidate an election law criminalizing libel *only*

24  against political candidates and *only* "calculated or intended to affect the chances of

25  such candidate for nomination or election." *Grimmett v. Freeman*, 59 F.4th 689, 694

26  (4th Cir. 2023). These "impermissible content-based distinctions" ran "headlong into

27  *R.A.V.*" *Id.*

28

1    AB 2839 also facially distinguishes between certain subjects, viewpoints, and

2    speakers. These distinctions are bugs that infect the entire statute. So analogies to

3    defamation, fraud, impersonating a government official, or misappropriation, can't

4    save California here. *Contra* Amicus 12–13. No application-by-application

5    overbreadth analysis is needed because California's law has no legitimate sweep.

6    This Court should proceed to strict scrutiny and invalidate the law on its face. *See*

7    *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 585 U.S. 755, 766 (2018)

8    (explaining content-based laws trigger strict scrutiny).

9
10   **C.    The disclaimer requirement triggers strict scrutiny because it**
         **compels speech.**

11       While California tacitly concedes that the disclaimer requirement compels

12   speech, it argues that the law requires merely "the disclosure of political speech"

13   triggering "exacting" scrutiny. Defs.' MSJ 20–21. But California offers no argument

14   or authority for this *ipse dixit*. In fact, transparency laws that compel speech still

15   trigger strict scrutiny. *NIFLA*, 585 U.S. at 766 (licensing notices); *Riley v. Nat'l*

16   *Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797 (1988) ("compelled statements of

17   'fact'" for fundraisers); *X Corp.*, 116 F.4th at 902 ("Even a pure 'transparency'

18   measure, if it compels non-commercial speech, is subject to strict scrutiny" (citing

19   *Riley*, 487 U.S. at 796–97)).

20       Campaign finance cases are distinguishable for at least three reasons. **First**,

21   political disclosure cases involve "campaign-related *expenditures and contributions*."

22   *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1104 (9th Cir. 2003). In other

23   words, they allow "the public to 'follow the money.'" *Hum. Life of Wash. Inc. v.*

24   *Brumsickle*, 624 F.3d 990, 997 (9th Cir. 2010). But this case is about pure political

25   speech, akin to Mrs. McIntyre's anonymous leaflets. *McIntyre v. Ohio Elections*

26   *Comm'n*, 514 U.S. 334, 355 (1995). Political donations are a form of speech, but

27   courts have not held they receive the same level of protection as pure political

28

10

advocacy. *Getman*, 328 F.3d at 1104 (interpreting *McIntyre* this way); *Alaska Right To Life Comm. v. Miles*, 441 F.3d 773, 788 (9th Cir. 2006) (explaining that under *McIntyre* "proscribing the *content* of an election communication is … subject to traditional strict scrutiny").

**Second**, AB 2839's compelled disclaimer doesn't inform voters about "the person or group who is speaking." *Citizens United v. FEC*, 558 U.S. 310, 368 (2010). Instead, it "compel[s] speakers to utter … a particular message," making it "subject to the same rigorous scrutiny" as other content-based laws. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). Refereeing "acceptable and unacceptable content based on its purported truth or falsity … is an archetypal content-based regulation that our constitution considers dubious and subject to strict scrutiny." *Kohls*, 752 F. Supp. 3d at 1195; *see also Alaska Right To Life*, 441 F.3d at 788 ("[P]roscribing the *content* of an election communication is… subject to traditional strict scrutiny.).

**Third**, a "key premise" of campaign-finance laws is that they "may burden the ability to speak, [but] they … do not prevent anyone from speaking." *Wash. Post v. McManus*, 944 F. 3d 506, 516 (4th Cir. 2019) (quoting *Citizens United*, 558 U.S. at 366). Yet the effect of AB 2839's disclaimer requirement is to prevent much speech. For example, AB 2839's subjective criteria and roving enforcement authority provide more grist for California's censorship mill by encouraging malicious complaints and selective prosecutions. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (law allowing "any person" to file a complaint encouraged malicious complaints); *281 Care Comm. v. Arneson*, 766 F.3d 774, 792 (8th Cir. 2014) (same); *Commonwealth v. Lucas*, 34 N.E.3d 1242, 1256–57 (Mass. 2015) (same); *see also Alvarez*, 567 U.S. at 736 (Breyer, J., concurring) (explaining that "the risk of censorious selectivity by prosecutors is … high" when a law permits the prosecution of lies "in political contexts"). And as already explained, AB 2839 favors certain viewpoints and speakers over others, while mandating onerous disclosure

11

Reply in Support of Plaintiffs' Motion for Summary Judgment Against AB 2839

1  requirements that make Plaintiffs' content unintelligible and much less funny.

2  PSUF ¶¶ 192–96.

3      There's no First Amendment exception for satirists and parodists forced to

4  attach warning labels to their messages. Unlike the anti-corruption interest

5  undergirding campaign finance laws, California's only interest here is to identify

6  attempts at humor. AB 2839's speech compulsion triggers strict scrutiny just like

7  the law's speech restrictions.

8      **D.    AB 2839 fails strict scrutiny.**

9          **1.    AB 2839 flunks narrow tailoring.**

10      a. In defending its law as narrowly tailored, California first argues that the

11  law applies only to "particularly problematic content." Defs.' MSJ 17. But as already

12  explained, it covers things like satire, parody, exaggeration, and hyperbole. Pls.'

13  MSJ 32–33. It even applies to media containing a montage of "truthful content," like

14  Kohls' parody campaign ad of Joe Biden gaffes. *Contra* Defs.' MSJ 18; *see* Pls.' MSJ

15  32; PSUF ¶ 60. Plus, when a law employs vague terms, "every application creates

16  an impermissible risk of suppression of ideas." *Forsyth*, 505 U.S. at 129. California

17  "naively assumes that the government is capable of correctly and consistently

18  negotiating the thin line between fact and opinion in political speech." *Rickert v.*

19  *State, Pub. Disclosure Comm'n*, 168 P.3d 826, 829 (Wash. 2007). So regardless of the

20  law's "true" scope, it will chill substantial amounts of speech. Pls.' MSJ 38

21  (explaining unbridled discretion).

22      There's nothing "particularly problematic" about digitally created content

23  either. *Contra* Defs.' MSJ 17. Plaintiffs' expert Christopher Lucas is a political

24  science professor who studies political communication, data science, and statistical

25  methodology and has published research on political deepfakes. Decl. of Christopher

26  D. Lucas, Ph.D. ("Lucas") ¶ 2. He explains that digitally created content like

27  "deepfakes are no more persuasive or better at deceiving people than traditional

28

---

media" like text. ¶¶ 2, 15. Novel mediums of speech have equal claim to First Amendment protection. *E.g.*, *Moody*, 603 U.S. at 734 (social media feeds); *303 Creative LLC v. Elenis*, 600 U.S. 570, 587–89 (2023) (websites); *EMA*, 564 U.S. at 790 (videogames).

Nor does California present any proof, even *post hoc* proof, that speech about candidates is "likeliest to cause the biggest harm." Defs.' MSJ 18–19. Modified content portraying popular celebrities may have a greater impact on voters than posts about political candidates themselves. *See* Pls.' MSJ 28, 37. The law fails to regulate other comparable content, too, such as false content likely to undermine election confidence that does not reference a covered subject (like a candidate or elected official). *Id.* at 27–29. And it puts less onerous restrictions on broadcasters and candidates speaking about themselves. *Id.* at 29. California's indifference to "speech [that] implicates the very same concerns as the regulated speech" means that less-restrictive alternatives are sufficient for California's interests. *Chaker v. Crogan*, 428 F.3d 1215, 1223–27 (9th Cir. 2005) (invalidating law prohibiting false speech that was "critical" but not "supportive" of police officers); *Rickert*, 168 P.3d at 831 (same logic applied to invalidate elections law).

California also argues that the disclaimer requirement is a less-restrictive alternative. Defs.' MSJ 17, 21–22. But this requirement "impair[s]" Plaintiffs' speech in at least two ways. *Contra id.* at 21. First, Plaintiffs have already explained how the size and duration requirements "drown[] out" their messages. Pls.' MSJ 21. Plaintiffs cannot "speak freely" if they're required to add text that obscures their entire videos. *Contra* Defs.' MSJ 17, 21; PSUF ¶¶ 191–92. A "government-compelled disclosure that imposes an undue burden fails for that reason alone," even under exacting scrutiny and even when the warning "is factually accurate and noncontroversial." *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 757 (9th Cir. 2019) (*en banc*).

**Second**, the disclaimer alters the content of Plaintiffs' messages. Pls.' MSJ 19–20. California argues this is no big deal because Plaintiffs should already convey that their content is satire. Defs.' MSJ 21. But courts "presume that speakers, not the government, know best both what they want to say and how to say it." *Riley*, 487 U.S. at 790–91. For example, Kohls includes a parody label on his initial videos' publications, but not in the videos themselves or on republication. *See* PSUF ¶ 58. And neither The Bee nor Rickert want to include any label. *Id.* ¶ 191. The Bee believes the disclaimer deprives satire and parody of its "rhetorical power" that comes from making the audience do a "double-take." *Id.* ¶¶ 10–11; Decl. of Seth Dillon Supp. Pls.' Mots. S.J. ¶ 90, Doc 47-32. For these reasons, AB 2839 is a burden on Plaintiffs' speech, not a "safe harbor." *Contra* Defs.' MSJ 21.

California argues that the law is "further circumscribed by its mens rea and temporality requirements." *Id.* at 19. But those terms don't cure the subjectivity permeating the statute. After all, Plaintiffs "are aware" that their parody campaign ads and satirical articles are literally false. *Id.* But they still have to evaluate vague terms like "falsely appear[s] … authentic" and "reasonably likely to harm … electoral prospects" to figure out what types of content are prohibited. Pls.' MSJ § II (explaining vagueness); *cf. City of Chicago v. Morales*, 527 U.S. 41, 62 (1999) (holding restriction on loitering with "no apparent purpose" was "inherently subjective"). An ordinary citizen can't "base his behavior on his factual knowledge" to "avoid violating the law." *United States v. Jae Gab Kim*, 449 F.3d 933, 943 (9th Cir. 2006).

b. California has other options. *See* Pls.' MSJ § I.D.1. And it must show "that it considered different methods that other jurisdictions have found effective." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014).

Rather than prohibiting knowing distribution of literally false content, it could require proof of specific intent to cause a legally cognizable harm. *See Wasden*,

14

878 F.3d at 1198 (suggesting similar narrowing). For example, New Hampshire has a law prohibiting "voter suppression by knowingly attempting to prevent … another person from voting … based on fraudulent, deceptive, misleading, or spurious grounds or information." NH Rev. Stat. § 659.40 III. That law, together with a federal statute prohibiting "spoofing," led to charges against the New Hampshire robocaller that California warns about, proving California has less-restrictive options to choose from without unnecessarily censoring harmless memes. *See* Defs.' MSJ 3–4, 14; Liska, Exs. 18, 19.

Instead of hypothesizing about speculative harms, California could write a statute targeting legally cognizable harms like fraud. Pls.' MSJ 24. In fact, it has already done that. *See* Cal. Elec. Code § 18573 (prohibiting defrauding any voter "by deceiving and causing him or her to vote for a different person for any office than he or she intended or desired to vote for"); *see also United States v. Tan Duc Nguyen*, 673 F.3d 1259, 1264–66 (9th Cir. 2012) (discussing three sections of the California Election Code dealing with voting interference, coercion, and intimidation that only implicate unprotected speech). That would likely already cover the New Hampshire robocaller—assuming someone was defrauded, coerced, or intimidated. Or, it could set up a taskforce to "counter foreign state and non-state propaganda and disinformation efforts aimed at undermining United States" elections. Nat'l Def. Authorization Act for Fiscal Year 2017, Pub. L. 114–328, div. A, title XII, §1287, Dec. 23, 2016, 130 Stat. 2546.

California could encourage alternatives that are already working in the free market. Professor Ayers—Plaintiffs' expert and an adjunct associate professor at the University of California, San Diego—points to the effectiveness of counterspeech like community notes on X and Facebook. Decl. of John W. Ayers, Ph.D. ("Ayers"), ¶¶ 8–14. Research shows that community notes are accurate, *id.* ¶ 9–10, reduce the spread of misinformation, *id.* ¶ 11, are viewed as more trustworthy than

---

"misinformation flags," *id.* ¶ 13, and are scalable because they crowdsource identification, labeling, and sourcing rather than relying on censorship, *id.* ¶¶ 14–16. And they have the added benefit of engaging citizens to think critically and reflect, *id.* ¶ 22, giving "the clearer perception and livelier impression of truth[] produced by its collision with error," John Stuart Mill, On Liberty 76 (1859).

The Political Deepfakes Incidents Database shows that counterspeech works. *See* Defs.' MSJ 4. California and its expert cite this database to seemingly suggest that nefarious content is proliferating online. *See* Alvarez ¶ 10. Regardless, it shows the effectiveness of market-based alternatives like community notes. *See generally* Ayers ¶¶ 53–82. As Ayers notes, 94% of the databases' content either 1) did not violate the law, or 2) was labeled or refuted by counterspeech like community notes and comments. *Id.* ¶ 55. Looking at content in the database appearing on X, for example, nearly *all* content that violated the law triggered some sort of counterspeech. *Id.* ¶¶ 74–80. California could start its own fact-checking team to help improve these marketplace alternatives instead of sitting on its hands and complaining they don't work.

California should also engage in educational campaigns to improve digital and media literacy. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507 (1996). That would likely be *more* effective (and would definitely be more constitutional) than censoring speech. "Research … shows that promoting digital and media literacy and improving political knowledge can effectively combat misinformation through deepfakes." Lucas ¶ 30; *see also* Liska, Ex. 16 at 164 (citing news article quoting "experts" opining that "the best way to combat visual misinformation is better public awareness and education"). This includes "teaching the importance of source credibility, editorial standards, and the differences between reputable journalism and sensationalist content." Lucas ¶ 30. It additionally avoids giving citizens a "false sense of security" from expecting every fake video to have a

1    prescribed disclaimer attached to it. *Id.* ¶ 23.

2        Alvarez agrees: "with strengthened media literacy skills … people can be

3    more likely to identify political deepfakes and less likely to believe that they are

4    accurate[.]" *Id.* ¶ 40. His only objection is that this "would require a large

5    investment of resources." *Id.* But "[t]he First Amendment does not permit the State

6    to sacrifice speech for efficiency." *NIFLA*, 585 U.S. at 775 (holding "public-

7    information campaign" was less-restrictive alternative and suggesting "California

8    spent insufficient resources on the advertising campaign"). California fails to show

9    "that it seriously undertook to address the problem with less intrusive tools readily

10   available to it." *McCullen*, 573 U.S. at 494.

11       c. California argues that alternatives like counterspeech won't work because

12   political deepfakes are "sticky" and this type of misinformation spreads too quickly

13   for governments to counteract it. Defs.' MSJ 20. But California offers nothing but

14   speculation that alternatives won't work.

15       Start with the "stickiness" claim. California relies on the declaration of

16   Professor R. Michael Alvarez to suggest that "pre-bunking" and "debunking" won't

17   work once a fake video or image takes root. *Id.* But Alvarez relied primarily on

18   studies looking only at "textual misinformation" to opine on the effects of AI-

19   generated content. Lucas ¶¶ 12–13; *see also* Ayers ¶ 47 (explaining that Alvarez

20   produced "no direct evidence" that deepfakes "produce unique and durable effects

21   beyond … other forms of misinformation"). And studies about one medium of speech

22   don't necessarily tell you anything about an entirely different medium. *See Am.*

23   *Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 578 (7th Cir. 2001) (rejecting

24   reliance on extrapolation from earlier psychological studies about video games).

25       Further, Alvarez doesn't claim that the stickiness is immutable. He

26   speculates only that deepfakes "*may* generate durable impacts." Alvarez ¶ 24

27   (emphasis added). And he acknowledges that different types of pre- or de-bunking

28

Reply in Support of Plaintiffs' Motion for Summary Judgment Against AB 2839

1    "can be effective" and "are promising methods for countering misinformation." *Id.*

2    ¶¶ 38–39. Alvarez's main objection is only that "it is not clear … how these methods

3    could be deployed at a very large scale" in the state of California. *Id.* ¶ 39.

4          That's a concession that California has no clue whether less-restrictive

5    alternatives would work. If information is unavailable, that is California's problem,

6    not Plaintiffs'. *McCullen*, 573 U.S. at 495. In fact, Plaintiffs have offered evidence

7    that alternatives like "Community Notes and Grok are already … scalable solutions

8    being adopted" in the real world." Ayers ¶¶ 50–51. Regardless, California "bears the

9    risk of uncertainty," *EMA*, 564 U.S. at 799–800, so California must do its homework

10   before burdening constitutional rights. And if California does not have evidence to

11   disprove counterspeech and educational campaigns as viable alternatives, whether

12   because of costs or anything else, it cannot sustain its burden here.

13         California similarly fails to show that misinformation spreads too quickly for

14   alternatives like counterspeech to work. Like the statute in *McIntyre*, AB 2839

15   "applies not only to [speech] distributed on the eve of an election, when the

16   opportunity for reply is limited, but also to [that] distributed months in advance."

17   514 U.S. at 352. Alvarez again relies on a study about textual misinformation to

18   argue that "false information propagates 'farther, faster, deeper, and more broadly'

19   than truthful content." Alvarez ¶ 25, *see* Lucas ¶ 13. But these sorts of apples-to-

20   oranges comparisons provide little help for California here. *Kendrick*, 244 F.3d at

21   578. Nor does Alvarez claim that the rapid nature of online communication renders

22   less-restrictive alternatives unworkable. *E.g.*, Alvarez ¶ 27 (calling automated bot

23   propagation systems "particularly challenging"). If anything, Alvarez bolsters the

24   case for education campaigns because he concedes that "[p]olitical deepfakes are

25   difficult to detect, both by humans and by artificial intelligence." *Id.* ¶ 52. And

26   California offers no evidence that its speech ban meaningfully improves detection or

27   identification. That undermines any claim that suppression is more effective than

28

Reply in Support of Plaintiffs' Motion for Summary Judgment Against AB 2839

1   open debate. If detection remains elusive, there's little reason to believe censorship
2   will succeed. Media literacy education is the solution. Lucas ¶ 30.

3       Moreover, California's argument rests on a flawed premise: that deepfakes
4   and other digitally altered content pose "unique problems" due to their alleged
5   stickiness and rapid transmission online. Defs.' MSJ 20. *EMA*, striking down
6   California's ban on selling violent videogames to minors, is helpful. 564 U.S. 786
7   (2011). The Court assumed violent games affected "children's feelings of
8   aggression," but found "those effects [were] both small and indistinguishable from
9   effects produced by other media." *Id.* at 800–01. Effects from violent games were
10  "about the same" as effects from violent television shows. *Id.* at 801. "California …
11  (wisely) declined to restrict Saturday morning cartoons," but instead "singled out
12  the purveyors of video games for disfavored treatment" with "no persuasive reason
13  why." *Id.* at 801–02.

14      California's evidence here fails for the same reasons. As Lucas explains,
15  digitally created or altered content is not uniquely harmful compared to other forms
16  of misinformation. Lucas ¶ 15. The few studies on deepfakes show only that the
17  "persuasive and credibility advantages … are modest, at best." *Id.* ¶ 19. Lucas's
18  study sits at the forefront of that research. In fact, Alvarez cited it to argue that the
19  "presentation of misinformation in the form of a political deepfake is *about as*
20  *deceptive* as presentation of the same misinformation in text or audio form." Alvarez
21  ¶ 15 (emphasis added) (citing Barari et al. (2024)). So Alvarez seems to agree with
22  Lucas: "the consensus … is that deepfakes are not considerably more credible nor
23  more affectively appealing than traditional forms of misinformation." Lucas ¶ 15.

24      That makes AB 2839 "wildly underinclusive." *EMA*, 564 U.S. at 802; *see also*
25  *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1127 (9th Cir. 2020). On one particular
26  topic, AB 2839 singles out only one form of misinformation (digitally created) that is
27  "no more persuasive or better at deceiving people than traditional media." Lucas

28

Reply in Support of Plaintiffs' Motion for Summary Judgment Against AB 2839

1    ¶ 15. It fails to regulate countless other forms of equally harmful misinformation

2    communicated through written words, spoken words, or analog technologies. And

3    that's in addition to its other "inexplicable gaps in enforcement." Pls.' MSJ 28. It's

4    likely "wise[]" that California declines to regulate in these other areas. *EMA*, 564

5    U.S. at 801 (making this point); *see Alvarez*, 567 U.S. at 722–23 (condemning the

6    "suppress[ion] [of] all false statements on this one subject in almost limitless times

7    and settings"). But that just goes to show that what's sufficient for other forms of

8    misinformation is sufficient here too. "This malady means that the statute is not

9    narrowly tailored, and thus, is unconstitutional." *IMDB.com*, 962 F.3d at 1127.

10       In short, deepfakes don't present "novel" difficulties justifying novel

11   constitutional burdens. *See Interactive Digit. Software Ass'n v. St. Louis Cnty.*, 329

12   F.3d 954, 957 (8th Cir. 2003) (speech "in a novel medium is of no legal consequence"

13   to First Amendment rights); *cf. EMA*, 564 U.S. at 798 (rejecting argument that

14   violent video games pose "special problems" because interactivity in art was

15   "nothing new"). Instead, California should apply the constitutional default:

16   counterspeech. That "is the ordinary course in a free society." *Alvarez*, 567 U.S. at

17   727; *Brown v. Hartlage*, 456 U.S. 45, 61 (1982) ("The preferred First Amendment

18   remedy [is] more speech, not enforced silence[.] (cleaned up)); *281 Care Comm.,* 766

19   F.3d at 793 ("counterspeech is the tried and true buffer and elixir").

20       Citizens aren't helpless in the digital age either. California and Amicus warn

21   about the rapid pace of technological change and content that can be launched at

22   "the click of a button," Amicus 20–21. But technological advances also allow citizens

23   to more easily fact-check stories, compare sources, and share corrections (via helpful

24   tools like Community Notes), also at "the click of a button." Courts presume citizens

25   will use those tools, not that they're helpless without the state's oversight. AB 2839

26   is built "upon a lack of trust in the ability of voters to think and act for themselves."

27   *E.g.*, *S.F. Cnty. Democratic Cent. Comm. v. Eu*, 826 F.2d 814, 836 (9th Cir. 1987),

28

Reply in Support of Plaintiffs' Motion for Summary Judgment Against AB 2839

1    *aff'd*, 489 U.S. 214 (1989).

2        "[D]eepfakes are part of a broader ecosystem of potential misinformation, not

3    a uniquely destructive force." Lucas ¶ 34. Evidence from both experts shows that

4    "building resilience through education, transparency, and trust rather than relying

5    on limiting exposure" is both more effective and consistent with our democratic

6    norms. *Id.*; *see* Alvarez ¶ 40. California should try other approaches before insisting

7    that the First Amendment get out of its way.

8                    **2.    AB 2839 fails to advance a compelling state interest.**

9        California asserts that AB 2839 promotes "free and fair elections." Defs.'

10    MSJ 15. While that interest is compelling in the abstract, the question here is

11    whether AB 2839 substantially advances this interest. *281 Care Comm.*, 766 F.3d at

12    785 (explaining that whether a law advances a compelling state interest depends on

13    factors like "the impact of the regulation itself"). AB 2839 does not substantially

14    advance California's asserted interest for at least four reasons.

15        **First**, however compelling California's interests might be, its response

16    "cannot consist of selective limitations upon speech." *R.A.V.*, 505 U.S. at 392; Pls.'

17    MSJ 26–27. As already explained, targeting "deceptive content that could

18    undermine trust in elections" is one thing; targeting speech portraying *only* certain

19    subjects, expressing *only* certain viewpoints, and giving special treatment to *only*

20    certain speakers, is something else entirely. Pls.' MSJ 27. This sort of selectivity

21    reveals that the State "seek[s] to handicap the expression of particular ideas."

22    *R.A.V.*, 505 U.S. at 394. That is anathema to the First Amendment even when the

23    state's interests "are compelling" and even when a law "can be said to

24    promotethem." *Id.* at 395.

25        **Second**, Courts reject California's "'highly paternalistic approach' [of]

26    limiting what people may hear." *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S.

27

28

Reply in Support of Plaintiffs' Motion for Summary Judgment Against AB 2839

214, 223 (1989). In *Eu*, California prohibited political party committees from endorsing primary candidates to ostensibly protect voters "from confusion and undue influence when they vote in primaries." 826 F.2d at 835. But this gave "voters too little credit." *Id.* at 836. The Ninth Circuit had "greater faith in the ability of individual voters to inform themselves" and to decide who ought to be the party nominee. *Id.*

Here, too, California's "claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism." *Id.* (cleaned up). California could have written a statute targeting legally cognizable electoral harms, like "fraud and corruption." *Eu*, 489 U.S. at 229. But instead of safeguarding the right to vote, AB 2839 "goes beyond" to "[d]irectly regulat[e] what is said or distributed during an election." *281 Care Committee*, 766 F.3d at 787. It worries that certain messages might "deceive[]" voters, "prevent" citizens from voting, or undermine their trust in elections. Defs.' MSJ 15. But free and open debate doesn't "pose a risk to democracy." *Contra id.* at 22. It sustains democracy. Poking fun at politicians and "critici[zing] [the] government is at the very center of the constitutionally protected area of free discussion." *Chaker*, 428 F.3d at 1227 (cleaned up). "California's ban on" certain political speech "is a form of paternalism that is inconsistent with the First Amendment." *Eu*, 826 F.2d at 836.

California could learn from the proverb about giving a man a fish versus teaching him to fish for himself. California wants citizens to depend on it for accurate information. But our democracy gives citizens "the responsibility for evaluating the relative merits of conflicting arguments and the source and credibility of the advocate." *Id.* (cleaned up). And even labeling requirements could backfire by conditioning Californians to expect disclaimers, even though AB 2839 is unlikely to deter many of the bad actors that California warns about. Lucas ¶ 26;

Reply in Support of Plaintiffs' Motion for Summary Judgment Against AB 2839

*see*, Alvarez ¶¶ 35–36 (discussing foreign states like China and Russia); *see Alvarez*, 567 U.S. at 728 ("[S]uppression of speech by the government can make exposure of falsity more difficult, not less so."). "[A] genuine sense of security is not [really] achievable ...." Lucas ¶ 23. Better to educate citizens to have a healthy dose of skepticism while improving their media literacy and ability to identify credible sources.

**Third**, California has failed to show that digitally created or modified content causes any harms justifying burdens on First Amendment rights. Again, *EMA* is instructive. To justify its ban on the sale of violent video games to minors, California cited studies showing violent games were "significantly linked to increases in aggressive behaviour." *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 963 (9th Cir. 2009), *aff'd sub nom. EMA*, 564 U.S. 786. But evidence of "correlation" wasn't enough because it did "not prove that violent video games *cause* minors to *act* aggressively." *EMA*, 564 U.S. at 800.

There's no proof of causation here either. California frets that the most nefarious content "*can* influence voters[]," "*could* undermine trust in elections," or "*may* ... alter voters' behavior." Defs.' MSJ 15–16 (emphasis added). Amicus similarly speculates that false content "*could* cost voters," "*could* cause confusion," and "there *may* ... not be time for truth to win." Amicus 13, 22 (emphasis added). Alvarez does not say anything different. He recognizes that problems from "political deepfakes" "*may be* profound," they "*might* affect a viewer," "*can* introduce uncertainty," "*can* sow confusion," "*can* change subsequent behavior," etc. *Id.* ¶¶ 9, 11, 12 (emphasis added). He acknowledges that the research is nascent, "the effects of political deepfakes on voter trust and confidence in elections are understudied," and "engagement with election fraud conspiracy" theories online "is *associated* with lower turnout in elections." *Id.* ¶ 16 (emphasis added); *see also* Ayers ¶¶ 26–27, 32, 35–36 (describing other shortcomings in Alvarez's declaration). In short, California

has failed to do anything more than "simply posit the existence of the disease sought to be cured." *Ted Cruz for Senate*, 596 U.S. at 307 (cleaned up).

This type of "speculation of harm does not constitute a compelling state interest." *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 543 (1980). As Lucas explains, concerns about deepfakes as a novel and dangerous technology are "speculative." Lucas ¶ 7. The literature on this topic "is relatively new," and claims "that political deepfakes will be more effective than existing forms of misinformation … remain[] an open empirical question." *Id.* ¶ 14. At most, California offers flawed evidence of correlation, not causation, and that is categorically insufficient to carry the State's burden here. *EMA*, 564 U.S. at 800; *Alvarez*, 567 U.S. at 725 (requiring "direct causal link").

It's telling that neither California nor Amicus cites a single instance of "fraudulent voter deception" from fake content that has ever occurred in California elections. Defs.' MSJ 15. Instead, California cites examples of deceptive content disseminated in places like New Hampshire, Florida, even Slovakia and Bangladesh. *See id.* at 3–4; Liska, Exs. 1, 17–19 at 8, 167–76. But it doesn't even argue—much less prove—that voters were misled in these far-flung locales or in California. And that's in addition to the fact that existing criminal and civil laws were sufficient to address the robocalls in New Hampshire. *Supra* 15.

**Fourth**, at the heart of the state's theory is a convenient fiction: that outlawing lies will eliminate them. But California provides no evidence of that. Alvarez cites studies suggesting that labels are "effective" and "can diminish the credibility and believability of online misinformation." Alvarez ¶ 41. But this assumes AB 2839 will deter bad actors and lead to consistent fact-checking. There's no evidence that AB 2839 will discourage nefarious actors like foreign governments from continuing to publish fake content online. *E.g.*, *id.* ¶ 35 (citing threat from "Russia, Iran and China"). There's no evidence that California or anyone else can

24

consistently and effectively identify "materially deceptive content" at scale. Lucas ¶¶ 25–27; Alvarez ¶ 42 (conceding that "detection in the real world is a difficult problem").

This leaves California speculating about what its law might achieve. It posits that deepfakes can decrease voters' confidence in elections. Alvarez ¶¶ 12–14, 16; *see also* Lucas ¶¶ 18–19. Yet a ban can only counter this "if voters and the public trust that they will not encounter deepfakes at all." Lucas ¶ 22. California offers no proof that censorship is effective. And it ignores the deeper danger of asking citizens to outsource their judgment to the government. Lucas ¶¶ 22–23.

Moreover, the state has no "duty" and no "right … to protect the public against false doctrine." *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring)). After all, the First Amendment guarantees freedom, not enlightenment. The government cannot engineer the public discourse "to advance its own vision of ideological balance." *Moody*, 603 U.S. at 741; *Buckley v. Valeo*, 424 U.S. 1, 48–49 (1976) (the government may not "restrict the speech of some elements of our society in order to enhance the relative voice of others"). That's why the Supreme Court has repeatedly rejected governmental attempts to shield citizens from speech it deems false. *Alvarez*, 567 U.S. at 729 ("Only a weak society needs government protection or intervention before it pursues its resolve to preserve the truth."); *Citizens United*, 558 U.S. at 356 ("[C]ommand[ing] where a person may get his or her information or what distrusted source he or she may not hear" is "censorship to control thought."); *see also Rickert*, 168 P.3d at 829 (state's ability "to determine truth and falsity in political debate, [is] a proposition fundamentally at odds with … the First Amendment") (cleaned up). California may wish to transform platforms like Rumble and X into a modern-day Lyceum, but it does not have the means or the constitutional license to do so.

1    **II.    AB 2839 is overbroad and vague.**

2        While AB 2839 fails strict scrutiny on its face, the law is overbroad too. It

3    covers a substantial amount of protected speech, while its vague terms give the

4    state too much power and speakers too little notice of what's prohibited.

5    **A.    AB 2839 is overbroad.**

6        California first attempts to narrow the law's scope. Defs.' MSJ 11–12. But it

7    fails for the reasons already given above. *Supra* § I.A. The law's plain text applies to

8    protected speech, including much satire, parody, and harmless memes. *Id.* In fact, it

9    often applies to parody because parody mimics real people and events. PSUF ¶ 10.

10   And California studiously avoids explaining whether Plaintiffs' many examples of

11   satirical content are prohibited or not. *E.g.*, *id.* ¶¶ 21, 26, 58–60; *see also* V. Compl.

12   ¶¶ 54–60, 131, Doc. 21 (reciting many of the same satirical posts that likely qualify

13   as "materially deceptive"). Instead, it offers up examples that don't appear

14   authentic and so don't violate the law. Defs.' MSJ 12. California can't have it both

15   ways—never defending the law's broad reach while never explaining (or denying)

16   whether it covers the protected speech that Plaintiffs want to engage in.

17       As already explained, the law far exceeds the boundaries of historically

18   unprotected speech categories. *Supra* § I.A. This shows that AB 2839's sweep is

19   overbroad, not that it's mostly constitutional. *See*, *e.g.*, *Alvarez*, 567 U.S. at 717;

20   *Ashcroft*, 535 U.S. at 246, 256 (law targeting child pornography overbroad because

21   it captured more than obscenity); *Lewis v. City of New Orleans*, 415 U.S. 130, 134

22   (1974) (law prohibiting cursing or obscene language against police was overbroad

23   because it captured more than fighting words). After all, these narrower categories

24   just prove that the State has less-restrictive alternatives to choose from. *See Tan*

25   *Duc Nguyen*, 673 F.3d at 1266 (upholding election statutes that don't exceed the

26   scope of "true threats"); *cf. also City of Houston v. Hill*, 482 U.S. 451, 465 (1987)

27   (finding ordinance overbroad, in part because it was "not narrowly tailored to

28

prohibit only disorderly conduct or fighting words").

That's the lesson from *Wasden*, where Idaho prohibited journalists from making misrepresentations to gain entry to agricultural facilities. 878 F.3d at 1194–98; Pls.' MSJ 14–15 (citing this case). A law that "punishes speech where there is no fraud, no gain, and no valuable consideration[,]" isn't constitutional because it's broad enough to cover some types of sanctionable conduct as well. *Wasden,* 878 F.3d at 1197. If Idaho's "real concern" were sanctionable conduct like trespassing, it already had less-restrictive trespass laws to enforce that interest. *Id.* at 1196. And the *Wasden* court upheld other provisions of the same law prohibiting lies that achieved legally cognizable harm in the form of material gains for the speaker. *Id.* at 1199–201.

AB 2839 is like the misrepresentation clause and very unlike the clauses targeting criminal conduct for material gains. *Contra* Defs.' MSJ 13. Here too, a speaker need not "actually acquire" any benefit to violate AB 2839. *Wasden*, 878 F.3d at 1199. Here too, AB 2839 is "targeted at speech" and certain speakers. *Id.* at 1195. Here too, AB 2839 is "not 'actually necessary'" because if fraud or defamation was the "real concern," California could just rely on its existing statutes prohibiting fraud and defamation. *Id.* at 1196–97.

California's other putative applications are even less likely. Foreign bad actors likely don't care about California's laws because they reside outside its jurisdiction. *See* Defs.' MSJ 14 (arguing "the State certainly has a strong interest in applying AB 2839 to deepfakes from foreign actors"). And if California's existing laws against fraud weren't sufficient to protect against robocallers spreading misinformation about voting procedures or locations, it could write a law like New Hampshire's to address this threat. *Supra* 15; *see also* Pls.' MSJ 24 (explaining less-restrictive options targeting legally cognizable harms).

"The hazard" is that California's law punishes "innocent behavior." *Wasden*,

878 F.3d at 1195. After all, AB 2839 aims at speech about politics and elections. These are not merely the statute's "heartland applications" that "should have just that weight in the facial analysis." *Moody*, 603 U.S. at 726. Virtually every application stifles political speech. Measuring the statute's unconstitutional scope "relative" to its constitutional applications, the law is substantially overbroad. *United States v. Williams*, 553 U.S. 285, 292 (2008) (explaining overbreadth must be "substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep").

### B. AB 2839 is vague.

AB 2839's subjective terms and unchecked discretion obscure the law's reach and leave ordinary citizens guessing about what types of content violates the law. *See Jae Gab Kim*, 449 F.3d at 943 (explaining a law is vague when citizens can't act based on "factual knowledge" to "avoid violating the law").

Defendants argue that "materially deceptive" is not vague because it "tracks the distinction drawn in defamation cases between actionable falsehoods" and protected statements of opinion or jest. Defs.' MSJ 23. As already explained, that is incorrect. In defamation, a statement must be capable of a defamatory meaning, i.e., "reasonably interpreted as a representation of fact." *Knievel*, 393 F.3d at 1075 (citation omitted). But AB 2839 doesn't care whether content is reasonably interpreted as "accurate" or "authentic." *Contra* Defs.' MSJ 23 *(*arguing the law requires that "a reasonable person would believe the content is an accurate depiction of the events it depicts"). It's sufficient for content to *appear* accurate or authentic. *Supra* § I.A (explaining this), *see* Pls.' MSJ 35–36.

AB 2839's mens rea requirement does nothing to cure this subjectivity. Plaintiffs know their content is literally false, just like ESPN knew (or should have known) that Evel Knievel wasn't a "pimp." *Knievel*, 393 F.3d at 1071. But AB 2839

embraces Knievel's erroneous theory of liability: that superficial appearances and meanings "in isolation" are sufficient. *Id.* at 1074.

Then there are other vague terms like "likely to harm … electoral prospects," "likely to falsely undermine confidence" in an election, and "minor" modifications. Pls.' MSJ 36–38. Speakers could hazard to guess what all of these terms mean, "but one could never be confident that [others] would agree." *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 513 (9th Cir. 1988). *Anyone* has discretion to decide what types of content violate the law. Pls.' MSJ 38 (explaining unbridled discretion). And that carries massive "potential for arbitrarily suppressing First Amendment liberties." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (holding law requiring production of "credible and reliable" identification during *Terry* stops was vague).

## III.    No part of AB 2839 is severable.

Amicus argue that this Court should sever the statute. Amicus 9. The "general rule" is that amicus cannot make "arguments not raised by the parties." *Santiago v. Rumsfeld*, 425 F.3d 549, 552 n.1 (9th Cir. 2005); *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 719 (9th Cir. 2003). And California did not make a severability argument here.

Nor should the Court sever AB 2839. California law allows severance when a statutory provision is "functionally and volitionally separable," remains coherent, and the "remainder of the statute is complete in itself." *Kohls*, 752 F. Supp. 3d at 1198–99 (internal quotation omitted). But when a law's central purpose is to target speech and discriminate against ideas, no set of judicial scissors can separate the valid from the invalid.

Here, *all* of the "four core provisions" (Amicus 10) in § 20012(b)(1)(A)–(D) discriminate based on the topics discussed and the viewpoint expressed. *Supra* § I.B. That makes each of these provisions presumptively unconstitutional, and

Reply in Support of Plaintiffs' Motion for Summary Judgment Against AB 2839

1   neither California nor Amicus identify which provisions can individually survive

2   strict scrutiny, nor do they offer any argument that they should.

3       "[S]everance is inappropriate if the remainder of the statute would still be

4   unconstitutional," *Tollis Inc. v. Cnty. of San Diego*, 505 F.3d 935, 943 (9th Cir.

5   2007). No part of the statute is severable, so this Court should enjoin the entire law.

6                           **CONCLUSION**

7       This Court should facially enjoin AB 2839 and enter summary judgment for

8   Plaintiffs.

9

10  DATED:     June 6, 2025

11                                  *s/ Johannes Widmalm-Delphonse*
                                    Johannes Widmalm-Delphonse
12                                  VA Bar No. 96040
                                    Alliance Defending Freedom
13                                  44180 Riverside Parkway
                                    Lansdowne, VA 20176
14                                  Telephone: (571) 707-4655
                                    jwidmalmdelphonse@adflegal.org
15
16                                  Jonathan A. Scruggs
17                                  AZ Bar No. 030505
                                    Alliance Defending Freedom
18                                  15100 N. 90th Street
                                    Scottsdale, AZ 85260
19                                  Telephone: (480) 444-0020
                                    Facsimile: (480) 444-0028
20                                  jscruggs@ADFlegal.org
21
22                                  Brian R. Chavez-Ochoa
                                    CA Bar No. 190289
23                                  Chavez-Ochoa Law Offices, Inc.
24                                  4 Jean Street, Suite 4
                                    Valley Springs, CA 95252
25                                  Telephone: (209) 772-3013
                                    brianr@chavezochoalaw.com
26
27                                  *Counsel for Plaintiffs The Babylon*
                                    *Bee, LLC and Kelly Chang Rickert*
28
                                    30

**PROOF OF SERVICE**

I hereby certify that I filed a true and accurate copy of the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sends an electronic notification to all counsel of record.

DATED this 6th day of June, 2025

<u>*s/ Johannes Widmalm-Delphonse*</u>
Johannes Widmalm-Delphonse
*Counsel for Plaintiffs The Babylon Bee, LLC and Kelly Chang Rickert*

Reply in Support of Plaintiffs' Motion for Summary Judgment Against AB 2839