1  ROB BONTA
   Attorney General of California
2  ANYA M. BINSACCA, State Bar No. 189613
   Supervising Deputy Attorney General
3  KRISTIN A. LISKA, State Bar No. 315994
   Deputy Attorney General
4    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
5    Telephone:  (415) 510-3916
     Fax:  (415) 703-5480
6    E-mail:  Kristin.Liska@doj.ca.gov
   *Attorneys for Defendants*
7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10                    SACRAMENTO DIVISION

11

12  **CHRISTOPHER KOHLS, ET AL.,**          Case No. 2:24-cv-02527-JAM-CKD

13                            Plaintiffs,

14         v.                              **DEFENDANTS' OPPOSITION TO
                                           PLAINTIFFS' MOTION FOR**
15  **ROB BONTA, ET AL.,**                 **SUMMARY JUDGMENT ON AB 2839**

16                            Defendants.   Date:        August 5, 2025
                                           Time:        1:00 p.m.
17                                         Dept:        6
                                           Judge:       The Honorable John A.
18                                                      Mendez
                                           Trial Date:  Not scheduled
19                                         Action Filed: 9/17/2024

20

21

22

23

24

25

26

27

28

---

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................................... 1

Background ..................................................................................................................... 3

Legal Standard .............................................................................................................. 4

Argument ....................................................................................................................... 4

    I.     AB 2839 Does Not Violate the First Amendment ................................... 6

         A.    AB 2839 Does Not Generally Apply to Speech Not Taken as
Literally True Such as Parody and Satire .................................... 6

         B.    Plaintiffs Do Not Carry Their Burden on a Facial Challenge to AB
2839 ................................................................................................. 12

         C.    AB 2839 Is Narrowly Tailored .................................................. 15

              1.     Plaintiffs' Proffered Alternatives Would Not Further the
State's Compelling Interest .......................................... 16

              2.     AB 2839 Is Not Fatally Overinclusive or Underinclusive ........... 18

         D.    The Law's Safe Harbor Is Not Unconstitutional ...................................... 23

    II.    AB 2839 Is Not Unconstitutionally Vague .......................................... 25

    III.   Any Unconstitutional Parts of AB 2839 Are Severable ...................................... 28

Conclusion ..................................................................................................................... 29

1

## TABLE OF AUTHORITIES

2

**Page**

3 **CASES**

4 *Anderson v. Liberty Lobby, Inc.*
5     477 U.S. 242 (1986) ............................................................................................. 4

6 *Animal Legal Def. Fund v. Kelly*
     9 F.4th 1219 (10th Cir. 2021) ............................................................................. 5
7

*Arce v. Douglas*
8     793 F.3d 968 (9th Cir. 2015) ............................................................................. 25

9 *Bluman v. Fed. Election Comm'n*
     800 F. Supp. 2d 281 (D.D.C. 2011) ................................................................... 14
10

*Brown v. Kemp*
11     86 F.4th 745 (7th Cir. 2023) ............................................................................... 5

12
*Brownmark Films, LLC v. Comedy Partners*
13     682 F.3d 687 (7th Cir. 2012) ............................................................................... 9

14 *California Redevelopment Ass'n v. Matosantos*
     53 Cal. 4th 231 (2011) .................................................................................. 24, 28
15

*Campbell v. Acuff-Rose Music, Inc.*
16     510 U.S. 569 (1994) ............................................................................................ 9

17 *Celotex Corp. v. Catrett*
     477 U.S. 317 (1986) ............................................................................................ 4
18

*Chula Vista Citizens for Jobs & Fair Competition v. Norris*
19     782 F.3d 520 (9th Cir. 2015) ............................................................................. 23

20
*Cliff Notes, Inc. v. Bantam Doubleday Dell Pub. Group*
21     886 F.2d 490 (2d Cir. 1989) ............................................................................... 9

22 *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*
23     109 F.3d 1394 (9th Cir. 1997) ....................................................................... 9, 11

24 *Farah v. Esquire Magazine*
     736 F.3d 528 (D.C. Cir. 2013) ................................................................ 7, 8, 9, 10
25

*Fontana v. Haskin*
26     262 F.3d 871 (9th Cir. 2001) ............................................................................... 4

27 *Grimmett v. Freeman*
28     59 F.4th 689 (4th Cir. 2023) ......................................................................... 18, 19

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*Hill v. Colorado*

4
  530 U.S. 703 (2000) ............................................................................. 25, 26

*Holder v. Humanitarian Law Project*

5
  561 U.S. 1 (2010) ..................................................................................... 27

6

*Jennings v. Rodriguez*

7
  583 U.S. 281 (2018) ................................................................................. 12

8

*Johnson v. United States*
  576 U.S. 591 (2015) ................................................................................. 26

9

*Knievel v. ESPN*

10
  393 F.3d 1068 (9th Cir. 2005) ................................................................. 8, 9

11

*L.L. Bean, Inc. v. Drake Publishers, Inc.*

12
  811 F.2d 26 (1st Cir. 1987) ......................................................................... 9

13

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*
  507 F.3d 252 (4th Cir. 2007) ....................................................................... 9

14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*

15
  475 U.S. 574 (1986) ..................................................................................... 4

16

*Milkovich v. Lorain Journal, Co.*

17
  497 U.S. 1 (1990) ......................................................................................... 8

18

*Moody v. NetChoice, LLC*

19
  603 U.S. 707 (2024) ................................................................... 5, 12, 13, 15

*Nash v. United States*

20
  229 U.S. 373 (1913) ................................................................................... 26

21

*Nat'l Ass'n for Gun Rts., Inc. v. Mangan*

22
  933 F.3d 1102 (9th Cir. 2019) ................................................................... 23

23

*NetChoice, LLC v. Bonta*
  113 F.4th 1101 (9th Cir. 2024) ..................................................... 12, 13, 15

24

*NetChoice, LLC v. Fitch*

25
  134 F.4th 799 (5th Cir. 2025) ................................................................... 15

26

*OPAWL – Bldg. AAPI Feminist Leadership v. Yost*

27
  118 F.4th 770 (6th Cir. 2024) ................................................................... 14

28

# TABLE OF AUTHORITIES
### (continued)

Page

*People for the Ethical Treatment of Animals v. Doughney*
  263 F.3d 359 (4th Cir. 2001)..................................................................................... 7

*People v. Gutierrez*
  58 Cal. 4th 1354 (2014) ........................................................................................... 12

*Quintano v. Mercury Cas. Co.*
  11 Cal. 4th 1049 (1995) ........................................................................................... 11

*Rickert v. State*
  168 P.3d 826 (Wash. 2007)....................................................................................... 18

*Skidgel v. California Unemployment Ins. Appeals Bd.*
  12 Cal. 5th 1 (2021) ................................................................................................... 6

*Suntrust Bank v. Houghton Mifflin Co.*
  268 F.3d 1257 (11th Cir. 2001)............................................................................ 9, 11

*Susan B. Anthony List v. Driehaus*
  814 F.3d 466 (6th Cir. 2016)............................................................................. 18, 20

*Twitter, Inc. v. Garland*
  61 F.4th 686 (9th Cir. 2023).................................................................................... 15

*United States v. Jae Gab Kim*
  449 F.3d 933 (9th Cir. 2006).................................................................................... 27

*Utah Lighthouse Ministry v. Found. For Apologetic Information & Research*
  527 F.3d 1045 (10th Cir. 2008)................................................................................. 9

*Vivid Ent., LLC v. Fielding*
  774 F.3d 566 (9th Cir. 2014)............................................................................. 24, 28

*Waln v. Dysart Sch. Dist.*
  54 F.4th 1152 (9th Cir. 2022).................................................................................... 5

*Williams-Yulee v. Fla. Bar*
  575 U.S. 433 (2015).................................................................................................. 19

**STATUTES**

United States Code, Title 47
  § 230........................................................................................................................ 21

iv

# TABLE OF AUTHORITIES
### (continued)

**Page**

2024 Cal. Stats., Chapter 261 (Assembly Bill 2655) ....................................................... 1

2024 Cal. Stats., Chapter 262 (Assembly Bill 2839) ............................................... *passim*

California Elections Code
    § 20012(a) ................................................................................................................. 2
    § 20012(a)(1) ............................................................................................................ 3
    § 20012(a)(2) ............................................................................................................ 3
    § 20012(a)(4) ..................................................................................................... 3, 20
    § 20012(b)(1) ..................................................................................... 3, 21, 26, 27
    § 20012(b)(1)(A) .............................................................................................. *passim*
    § 20012(b)(1)(B) ................................................................................. 4, 17, 19, 27
    § 20012(b)(1)(C) ................................................................................. 4, 17, 19, 27
    § 20012(b)(1)(D) ...................................................................................... 4, 17, 27
    § 20012(b)(2) ...................................................................................................... 21, 22
    § 20012(b)(3) ................................................................................................... *passim*
    § 20012(e)(1) ........................................................................................................ 21
    § 20012(e)(3) ........................................................................................................ 21
    § 20012(e)(4) ........................................................................................................ 21
    § 20012(f)(8)(A) ............................................................................................... *passim*
    § 20012(f)(8)(B) ............................................................................................... 26, 27
    § 20012(h) ........................................................................................................ 24, 28

CONSTITUTIONAL PROVISIONS

United States Constitution
    First Amendment.......................................................................................... *passim*

COURT RULES

Federal Rules of Civil Procedure
    Rule 56 ................................................................................................................. 4

OTHER AUTHORITIES

"Authentic," Collins Dictionary,
    https://www.collinsdictionary.com/us/dictionary/english/authentic ....................... 7

"Authentic," Merriam-Webster Dictionary, https://www.merriam-
    webster.com/dictionary/authentic ........................................................................ 7

"Authenticate," Black's Law Dictionary (12th ed. 2024)............................................ 7

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

Dep't of Treasury, "Treasury Sanctions Entities in Iran and Russia That Attempted
to Interfere in the U.S. 2024 Election," (Dec. 31, 2024),

4

https://home.treasury.gov/news/press-releases/jy2766 ................................................. 14

5

"Fraud," Black's Law Dictionary (12th ed. 2024) ........................................................ 13

6

Huo Jingnan, "Foreign Influence Efforts Reached a Fever Pitch During the 2024
    Election," NPR.com (Nov. 12, 2024), https://www.npr.org/2024/11/09/nx-s1-

7

    5181965/2024-election-foreign-influence-russia-china-iran .................................... 14

8

"Record," Black's Law Dictionary (12th ed. 2024) ......................................................... 7

9

"Record," Merriam-Webster Dictionary, https://www.merriam-

10

    webster.com/dictionary/recorded ............................................................................. 7

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

With the rise of technology, it is possible to create ever more sophisticated "deepfakes," digitally manipulated audio or visual media that typically depicts a person doing or saying something they did not do or say.  As deepfakes and similar digitally manipulated media become more sophisticated and easier to make, it becomes more difficult for the average viewer to discern which media shows something that truly did occur and which media shows something that indisputably did not.  And that makes it possible for malicious actors to use deepfakes and digitally manipulated media for nefarious purposes: deceiving and fraudulently manipulating voters in whether to vote and whom to vote for, creating unfounded doubts about the integrity and outcomes of elections, and undermining free and fair elections that form the basic cornerstone of democracy.

The California Legislature was understandably concerned about this possibility.  It passed Assembly Bill 2839 (AB 2839), along with its companion Assembly Bill 2655, to address those concerns.  As the Legislature found in passing these statutes, such concerns are not merely hypothetical: deepfakes with the potential to intentionally deceive voters and twist faith in electoral outcomes *already exist*.  In seeking to address these concerns, the Legislature was cognizant of the First Amendment and its protection of free speech.  It sought to create a regulation of deepfakes that have the potential to deceive voters and harm outcomes that was consonant with First Amendment principles and narrowly tailored to serving the State's compelling interest in preserving free and fair elections.

AB 2839 reflects that effort to minimize the burden on speech and target the precise speech creating the evils the law seeks to remedy.  The law only regulates intentionally manipulated media that depicts specific subjects and that is provably false: a candidate, elected official, or elections official doing or saying something they did not do or say or a materially false depiction of elections equipment.  It only regulates such media if it is reasonably likely to cause the harms that AB 2839 is concerned about, specifically impairing a candidate's reputation or electoral chances or falsely undermining confidence in electoral outcomes.  It only regulates such media if the media is distributed with knowledge of falsity or reckless disregard for truth, in accordance

1

1    with longstanding First Amendment principles in the defamation context.  It only regulates such

2    media during a temporal window around elections.  And it only regulates such media if a

3    reasonable person would believe it shows an accurate account of true events; that is, media that a

4    reasonable person would perceive as an authentic record of its content.

5         The language of and intent behind AB 2839 are worlds apart from the specter of censorship

6    that plaintiffs cast it as.  Plaintiffs Christopher Kohls, The Babylon Bee, and Kelly Chang Rickert

7    portray AB 2839 as an attempt to shut down legitimate criticism and critique, but their arguments

8    are detached from the statute's words and devoid of reference to the Legislature's intent.

9    Nowhere in the statute's language or legislative history is there a hint that the Legislature meant

10   to silence legitimate debate.  Rather, the Legislature was clear that its concern was intentionally

11   created deepfakes, spread with awareness of their falsity, that were likely to mislead voters,

12   manipulate voting behavior and choices, and sow confusion and uncertainty about an election and

13   its outcome.  The Legislature said as much in the codified factual findings of AB 2839.  *See*

14   *generally* Cal. Elec. Code § 20012(a).  And it said as much throughout the legislative history.

15   *See, e.g.*, Liska Decl., Ex. 1, p. 7-8; Ex. 2, p. 19-21; Ex. 4, p. 37.

16        As defendants explain in their motion for summary judgment, AB 2839 does not violate the

17   First Amendment and is not unconstitutionally vague.  Plaintiffs' arguments to the contrary are

18   unavailing.  With respect to the First Amendment, AB 2839 is a rare statute that can withstand

19   strict scrutiny.  The law is narrowly tailored to furthering the State's compelling interest in

20   preventing fraud on voters, preserving electoral integrity, and maintaining free and fair elections.

21   Critically, contrary to plaintiffs' arguments otherwise, AB 2839 does not generally apply to

22   speech not taken as literally true such as parody, satire, hypotheticals, or hyperbole because such

23   speech will not ordinarily meet the definition of "materially deceptive content" so as to fall within

24   the scope of AB 2839.  Instead, the statute only applies to content a reasonable person would

25   believe is a true account of actual events—distinguishing speech not taken as literally true from

26   other speech in a line analogous to that drawn by courts in other areas of law involving speech

27   such as defamation and trademark law.  And AB 2839 law is also not unconstitutionally vague.

28

1    This Court should thus deny plaintiffs' motion for summary judgment on AB 2839 and grant

2    defendants' motion.

3                                    **BACKGROUND**

4        In light of the previous briefing submitted to this Court, defendants will provide only a brief

5    background discussion in this opposition.  A more detailed discussion of political deepfakes, the

6    language and purpose of AB 2839, and this matter's procedural history can be found in

7    Defendants' Memorandum of Points and Authorities in Support of Motion for Summary

8    Judgment on Assembly Bill 2839 ("Defs.' AB 2839 Mem.") on pages 2 through 9.

9        The California Legislature passed Assembly Bill 2839 (AB 2839) "to ensure California

10   elections are free and fair."  Cal. Elec. Code § 20012(a)(4).  The Legislature noted growing

11   concerns about the use of "deepfakes" during elections—digitally manipulated media that has

12   been manipulated to show someone doing or saying something they did not do or say, *see* Alvarez

13   Decl. ¶ 8.  With modern technology, "bad actors now have the power to create a false image of a

14   candidate accepting a bribe, or a fake video of an elections official 'caught on tape' saying that

15   voting machines are not secure, or . . . an artificial robocall in the Governor's voice telling

16   millions of Californians their voting site has changed."  Cal. Elec. Code § 20012(a)(2).  "Voters

17   will not know what images, audio, or video they can trust."  *Id.* § 20012(a)(1).  The dissemination

18   of such media can "skew election results" and "undermine trust in the ballot counting process."

19   *Id.* § 20012(a)(4).

20       To combat this growing societal problem, AB 2839 prohibits, during a window of time

21   before and after an election, the knowing distribution, with malice, of an advertisement or

22   election communication containing specified materially deceptive content.  Cal. Elec. Code

23   § 20012(b)(1).  The statute defines "materially deceptive content" as "audio or visual media that

24   is intentionally digitally created or modified . . . such that the content would falsely appear to a

25   reasonable person to be an authentic record of the content depicted in the media."  *Id.*

26   § 20012(f)(8)(A).  To fall within the scope of AB 2839, the materially deceptive content must

27   depict: a candidate saying or doing something they did not do or say that is reasonably likely to

28   undermine their reputation or electoral prospects; an elected official or elections official doing or

                                              3

1    saying something they did not do or say that is reasonably likely to falsely undermine confidence

2    in electoral outcomes; or voting equipment in a materially false way that is reasonably likely to

3    falsely undermine confidence in electoral outcomes.  *Id.* § 20012(b)(1)(A)-(D).

4          Plaintiffs Christopher Kohls, Kelly Chang Rickert, and the Babylon Bee wish to post

5    content they characterize as parody or satire that they contend falls within the scope of AB 2839's

6    prohibitions.  Defs.' AB 2839 Mem. at 17-18.  They have brought suit against defendants

7    Attorney General Rob Bonta and Secretary of State Shirley N. Weber, in their official capacities,

8    contending that AB 2839 is a violation of the First Amendment and is unconstitutionally vague.

9    *Id.*  The parties have now cross-moved for summary judgment.

10                              **LEGAL STANDARD**

11          Under Federal Rule of Civil Procedure 56, the Court may award summary judgment if there

12   are no material disputes of fact and the moving party demonstrates it is entitled to judgment as a

13   matter of law.  A fact is "material" if it would impact the outcome of the case.  *Anderson v.*

14   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party has the burden of

15   demonstrating there are no material facts in dispute.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

16   (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the

17   nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith*

18   *Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  In determining whether there are any

19   material facts in dispute, the court must "view[ ] the evidence in the light most favorable to the

20   nonmoving party."  *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001).  The Court does not

21   engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences

22   from the facts.  *Anderson*, 477 U.S. at 255.

23                                **ARGUMENT**

24          In their motion for summary judgment on AB 2839, plaintiffs argue first that AB 2839

25   regulates political speech and is thus subject to—and fails—strict scrutiny.  Defendants do not

26   dispute that AB 2839 is a content-based regulation of speech subject to strict scrutiny.[1]  However,

27   ───────────────────────

       [1] Plaintiffs also contend that AB 2839 is viewpoint-based and thus automatically invalid.
28   *See* Pls.' AB 2839 Mem. at 17, 22.  Defendants disagree that AB 2839 is viewpoint-based,

                                                              (continued…)

                                         4

1  they do disagree with plaintiffs on several important grounds.  First, plaintiffs err in their

2  argument that AB 2839 generally regulates satire or parody.  Plaintiffs contend that AB 2839

3  "covers satire and parody by explicitly requiring such speech to include a disclaimer."  Pls.'

4  Mem. Supp. Mot. Summ. J. Against AB 2839 ("Pls.' AB 2839 Mem.") at 12.  But this ignores the

5  plain language of the statute.  AB 2839 only applies to "materially deceptive content," which

6  requires that the manipulated media "falsely appear to a reasonable person to be an authentic

7  record of the content depicted in the media." Cal. Elec. Code § 20012(f)(8)(A).  Parody and

8  satire—along with similar speech such as hyperbole, hypotheticals, or counterfactuals—does not

9  typically "appear to a reasonable person to be an authentic record of the content depicted."

10 Indeed, as plaintiffs themselves explain, "a 'reasonable person' understands that a satire or parody

11 cannot 'reasonably [be] interpreted as stating actual facts.'" Pls.' AB 2839 Mem. at 12 (alteration

12 in original).  Parody and satire, along with similar speech that is not taken as literally true,

13 therefore do not ordinarily meet the statutory definition of "materially deceptive media" and

14 typically fall outside AB 2839 altogether.

15     Second, plaintiffs have not carried their burden on a facial First Amendment challenge

16 under *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024).  Just like the plaintiffs in *Moody*, plaintiffs

17 here have "treated [AB 2839] as having certain heartland applications"—namely, parody and

18 satire—"and mostly confined their battle to that terrain." *Id.* at 724.  But in adjudicating a facial

19 challenge to a statute, a court must "address the full range of activities the law[] cover[s], and

20 measure the constitutional against the unconstitutional applications." *Id.* Plaintiffs have not

21 addressed the full range of AB 2839's applications, let alone shown that the unconstitutional

22 applications of the law (if any) outweigh the constitutional ones.

23     Third, plaintiffs further err in contending that AB 2839 does not withstand strict scrutiny.

24 Plaintiffs do not dispute that California has a compelling interest in protecting free and fair

25 because it does not single out a particular side of a debate.  In any event, the Ninth Circuit has

26 stated that "[v]iewpoint based restrictions on speech are subject to strict scrutiny." *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1162 (9th Cir. 2022); *see also, e.g.*, *Brown v. Kemp*, 86 F.4th 745, 783 (7th Cir. 2023) (applying strict scrutiny to viewpoint-based law); *Animal Legal Def.*

27 *Fund v. Kelly*, 9 F.4th 1219, 1236 (10th Cir. 2021) (same).  The cases cited by plaintiffs do not

28 hold that a viewpoint-based restriction that does meet strict scrutiny would nonetheless be unconstitutional under the First Amendment.

1    elections.  *See* Defs.' AB 2839 Mem. at 14-17.  Instead, they argue that the law is not properly

2    tailored to further that interest.  Not so.  AB 2839 is properly tailored to address the specific

3    harms that animated its passage, harms plaintiffs' proposed less restrictive alternatives would not

4    remedy at all.

5         Finally, plaintiffs contend AB 2839 is unconstitutionally vague.  It is not, as defendants

6    explained in their motion for summary judgment.  *See* Defs.' AB 2839 Mem. at 22-23.  Plaintiffs'

7    arguments to the contrary raised in their own motion are unavailing.

8    **I.    AB 2839 DOES NOT VIOLATE THE FIRST AMENDMENT**

9         **A.    AB 2839 Does Not Generally Apply to Speech Not Taken as Literally True
              Such as Parody and Satire**

10

11        In challenging AB 2839 on First Amendment grounds, plaintiffs' arguments center on their

12   contention that the law applies to parody and satire.  *See, e.g.*, Pls.' AB 2839 Mem. at 1-2.  They

13   claim that AB 2839 "covers satire and parody by explicitly requiring such speech to include a

14   disclaimer."  *Id.* at 12.  Thus, their arguments focus on the importance of parody and satire and

15   historical protections for such speech specifically.  *E.g.*, *id.* at 12-13.  This Court's ruling in

16   issuing a preliminary injunction of AB 2839 similarly focused on AB 2839's purported coverage

17   of satire and parody.  *E.g.*, Order Granting Pl.'s Mot. Prelim. Inj. [ECF No. 14] at 11-12.  But the

18   statutory text is clear that, on the contrary, it generally does not apply to speech not taken as

19   literally true, such as parody and satire.

20        California courts interpreting statutes "begin by examining the statutory language, giving it

21   a plain and commonsense meaning."  *Skidgel v. California Unemployment Ins. Appeals Bd.*, 12

22   Cal. 5th 1, 14 (2021) (citation omitted).  Of course, courts do not "consider the statutory language

23   in isolation" but rather "look to the entire substance of the statutes in order to determine their

24   scope and purpose."  *Id.* (citation omitted).  When "the statutory language is unambiguous, then

25   its plain meaning controls."  *Id.* (citation omitted).  Only if "the language supports more than one

26   reasonable construction" do courts look to "extrinsic aids, including the ostensible objects to be

27   achieved and the legislative history."  *Id.* (citation omitted).

28

1    The text of AB 2839 is unambiguous: speech that is not taken as literally true—like parody,

2    satire, hyperbole, or counterfactuals—generally does not fall within its scope.  This is because

3    such speech will typically fail to meet the definition of "materially deceptive content."  To

4    constitute "materially deceptive content" under AB 2839, the relevant media must "falsely appear

5    to a reasonable person to be an authentic record of the content depicted in the media," Cal. Elec.

6    Code § 20012(f)(8)(A), not—contrary to plaintiffs' argument that pulls the statutory words out of

7    context—simply media that "only 'falsely appear . . . authentic' *in some respect*," Pls.' AB 2839

8    Mem. at 12 (emphasis in original).  The ordinary meaning of "authentic" is something that is real

9    or true and not false or an imitation.[2]  In turn, the ordinary meaning of "record" is something that

10   preserves or details past events.[3]  An "authentic record" is therefore one that provides a true

11   account of real past events.  In other words, materially deceptive content is only that which a

12   reasonable person would believe depicts events that *actually happened*—that is, speech taken as

13   literally true.

14   Satire and parody are precisely the opposite: records of something that *did not* happen and

15   that the media does not contend did happen.  For instance, "[a] parody 'conveys two

16   simultaneous—and contradictory—messages: that it is the original, but also that it is *not* the

17   original and is instead a parody."  *People for the Ethical Treatment of Animals v. Doughney*, 263

18   F.3d 359, 366 (4th Cir. 2001) (citation omitted).  It is this juxtaposition—"layering fiction upon

19   fact," *Farah v. Esquire Magazine*, 736 F.3d 528, 537 (D.C. Cir. 2013)—that makes satire and

20   parody work.  And it works precisely because the average viewer understands that the parody or

---

21

22   [2] *See, e.g.*, "Authentic," Merriam-Webster Dictionary, https://www.merriam-
     webster.com/dictionary/authentic (defining "authentic" as "not false or imitation: real, actual,"
23   "worthy of acceptance or belief as conforming to or based on fact," "conforming to an original so
     as to reproduce essential features," and "made or done the same was as an original") (last
24   accessed June 6, 2025); "Authentic," Collins Dictionary,
     https://www.collinsdictionary.com/us/dictionary/english/authentic (defining "authentic" as
     "genuine" and "reliable and accurate") (last accessed June 6, 2025); *see also* "Authenticate,"
25   Black's Law Dictionary (12th ed. 2024) (defining "authenticate" as "[t]o prove the genuineness
     of (a thing); to show (something) to be true or real").
26   [3] *See, e.g.*, "Record," Black's Law Dictionary (12th ed. 2024) (defining "record" as
     "documentary account of past events, usually designed to memorialize those events"); "Record,"
27   Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/recorded (defining
     "record" as "the state or fact of being recorded" or "something that recalls or relates past events")
28   (last accessed June 6, 2025).

1    satire *is fiction and not fact*, even if reaching that understanding requires some pause for

2    reflection.

3         Plaintiffs themselves agree that this is precisely how satire and parody work.  "[S]atire and

4    parody make audiences do a double-take by believing that they are seeing a serious rendering of

5    an original, and then allowing them to laugh at their own gullibility when they realize they are

6    really viewing satire or parody."  Dillon Decl. ¶ 16.  "To do this effectively, satire and parody

7    leverage the expectations that are created in people when they see something that, at first glance,

8    *suggests authenticity* and then juxtapose that realism with the satirical form."  *Id.* ¶ 18 (emphasis

9    added).  When it comes to satire and parody, "a reasonable person understands that [they] aren't

10   meant to be taken literally."  Pls.' AB 2839 Mem. at 15.  In other words, satires and parody

11   *suggest authenticity*, but they are *not authentic*—and they work because a reasonable viewer

12   understands precisely that.  At the end of the day, a reasonable person does not usually perceive a

13   satire or parody as a true account of real events—and thus would not perceive a satire or parody

14   as an authentic record of its contents.  Parody and satire, along with similar speech not taken as

15   literally true, will therefore generally not constitute "materially deceptive content."

16        In drawing a line between what a reasonable viewer takes as literally true (and thus within

17   its scope) and what a reasonable viewer would not take literally (and thus outside its scope), AB

18   2839 follows a line drawn throughout speech jurisprudence.  Courts in multiple contexts

19   distinguish speech not literally true such as parody or satire from other forms of speech.

20   Consider, for instance, defamation law.  Under the First Amendment, "liability for defamation

21   arises only if, at a minimum, a defendant's statement 'reasonably implies false and defamatory

22   facts.'"  *Farah*, 736 F.3d at 534 (quoting *Milkovich v. Lorain Journal, Co.*, 497 U.S. 1, 20

23   (1990)).  Thus "[w]here a defendant's statement 'cannot be construed as representations of fact,'

24   there can be no defamation."  *Id.* (citation omitted).  Consequently, "[d]espite its literal falsity,"

25   satire or parody "is not actionable if it 'cannot reasonably be interpreted as stating actual facts

26   about an individual.'"  *Id.* at 536 (quoting *Milkovich*, 497 U.S. at 20); *see also Knievel v. ESPN*,

27   393 F.3d 1068, 1074 (9th Cir. 2005).  This determination turns on "what a reasonable reader

28   would have understood."  *Farah*, 736 F.3d at 536.  When a reasonable viewer would not

1    understand a purported parody or satire "to be conveying 'real news' about the subject, it is not

2    actionable under defamation law.  *Id.* at 537; *see also Knievel*, 393 F.3d at 1078 (post not

3    actionable where reasonable viewer "would have certainly interpreted the photograph and

4    caption, in the context in which they were published, as an attempt at humor").

5        Then there is trademark law.  Courts have rejected claims for violations of federal

6    trademark law when the allegedly infringing mark is a parody mark.  *See, e.g.*, *L.L. Bean, Inc. v.*

7    *Drake Publishers, Inc.*, 811 F.2d 26, 33 (1st Cir. 1987).  When determining whether an allegedly

8    infringing mark constitutes a parody mark, courts look to whether a consumer is "likely to be

9    confused as to the source, sponsorship, or approval," that is, whether a customer will take the

10   allegedly infringing mark to be the original mark.  *Dr. Seuss Enterprises, L.P. v. Penguin Books*

11   *USA, Inc.*, 109 F.3d 1394, 1405 (9th Cir. 1997); *see also, e.g.*, *Utah Lighthouse Ministry v.*

12   *Found. For Apologetic Information & Research*, 527 F.3d 1045, 1057 (10th Cir. 2008) ("[A]n

13   unsuccessful parody—one that creates a likelihood of confusion—is not protected from an

14   infringement suit.").  Thus, where a "consumer would likely be put on notice from the first" that a

15   mark was a parody and not an original, there is no copyright claim.  *Cliff Notes, Inc. v. Bantam*

16   *Doubleday Dell Pub. Group*, 886 F.2d 490, 497 (2d Cir. 1989); *see also Louis Vuitton Malletier*

17   *S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 260 (4th Cir. 2007) (holding no infringement by

18   dog toy parodies of trademark for handbag company where the dog toys clearly "communicate[d]

19   that it is not the [trademarked] product" and consumers were not likely to confuse the two).

20       Finally, there is copyright law.  Courts have recognized in adjudicating copyright claims

21   that parodies are protected as fair use and do not constitute copyright infringement.  *Campbell v.*

22   *Acuff-Rose Music, Inc.*, 510 U.S. 569, 574 (1994).  When a work claims to be a parody, "the

23   threshold question . . . is whether a parodic character may be reasonably perceived."  *Id.* at 582.

24   In other words, courts determine whether the allegedly infringing work "aim[s] to comment upon

25   or criticize a prior work by appropriating elements of the original in creating a new artistic . . .

26   work."  *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1268-69 (11th Cir. 2001); *see*

27   *also, e.g.*, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 693 (7th Cir. 2012) (parody

28

1    work was meant "to comment on and critique the social phenomenon that is the 'viral video'" and

2    not to substitute for original work).

3        As the above examples indicate, courts have long distinguished speech not taken as literally

4    true from other kinds of speech.  In drawing that distinguishing line, courts have typically focused

5    on how the speech is understood by a reasonable viewer—such as whether a reasonable viewer

6    will be deceived by a purported satire or parody and believe it to be something authentic.  That is

7    precisely the line that AB 2839 tracks: materially deceptive content is only that which a

8    reasonable person would believe to be an accurate recording of events that truly occurred.  And

9    just as in the context of defamation suits or copyright suits, this turns on "what a reasonable

10   reader would have understood."  *Farah*, 736 F.3d at 536.  Such a determination is "more

11   informed by an assessment of [the average person's] well-considered view than by her immediate

12   yet transitory reaction."  *Id.*  The test "is not whether some actual readers were misled, but

13   whether the hypothetical reasonable reader could be (after time for reflection)."  *Id.*  This is a

14   standard courts are more than capable of administering—and, indeed, do administer when

15   adjudicating defamation and trademark infringement claims.

16       That AB 2839 also includes a safe harbor for parody or satire does not alter the plain

17   language of the statute, contrary to plaintiffs' contention otherwise.  *See* Pls.' AB 2839 Mem. at

18   12.  AB 2839 states that it "does not apply to an advertisement or other election communication

19   containing materially deceptive content that constitutes satire or parody if the communication

20   includes a disclosure."  Cal. Elec. Code § 20012(b)(3).  For one, this safe harbor does not alter the

21   definition of "materially deceptive content" or the plain meaning of that definition's language.

22   Whether AB 2839 includes a safe harbor or not, parody and satire will generally not be

23   "materially deceptive content" because they ordinarily will not meet the definitional requirement

24   for a reasonable viewer to perceive them as an authentic record of their contents.

25       Rather, the safe harbor reflects the simple reality that there can be disagreement about

26   whether a piece of media constitutes satire or parody.  It is entirely possible that an author may

27   intend their work to be a parody and satire but miss the mark, placing it instead within the scope

28   of "materially deceptive content."  Such a problem is not unique to AB 2839.  It arises in other

1  legal contexts where the distinction between parody or satire and other works is relevant.  *See,*

2  *e.g.*, *Dr. Seuss*, 109 F.3d at 1401-03 (holding purported parody work was not protected parody

3  under copyright law).  As in those contexts, what matters for AB 2839 is not what a work is

4  labeled, but rather whether it meets the legal definition of "materially deceptive content."  *See,*

5  *e.g.*, *Suntrust Bank*, 268 F.3d at 1273 n.27 (author "may label their book a 'parody,' or a 'novel,'

6  or whatever they like, and that fact would be largely irrelevant to [court's] work" in determining

7  whether work was protected parody under copyright law).  What the safe harbor in AB 2839 does

8  is provide *additional* protection for parody or satire.  It allows an author who intends their work

9  to be parody and satire to ensure their work is not subject to AB 2839 by including a disclosure.

10  This added layer of assurance for the aspiring parodist or satirist does not alter the definition of

11  "materially deceptive content" or the fact that parody and satire will generally fall outside the

12  scope of that definition.

13      Plaintiffs' reference to the role that Kohls's video of Kamala Harris purportedly played in

14  the law's passage also does not indicate that parody and satire are generally covered by AB 2839.

15  *See* Pls.' AB 2839 Mem. at 3-4.  For one, California courts have repeatedly cautioned "that the

16  statements of an individual legislator, including the author of a bill, are generally not considered

17  in construing a statute, as the court's task is to ascertain the intent of the Legislature as a whole,"

18  adopting a piece of legislation."  *Quintano v. Mercury Cas. Co.*, 11 Cal. 4th 1049, 1062 (1995).

19  That rationale applies even more to statements by the *Governor*, who is not part of the Legislature

20  and thus does not shed much light on the Legislature's intent, if any.  In any event, none of that

21  chronology at all indicates that AB 2839 was meant to generally cover parody or satire.  Rather, it

22  merely reflects a disagreement over whether Kohls's Kamala Harris video ad *is* a parody—

23  whether it is something a reasonable person would understand was meant as a joke or whether a

24  reasonable person would believe it depicts true events.  Critics of the ad did not wish to ban it

25  because it was satirical or poking fun at Kamala Harris, but because they believed that a

26  reasonable person *would* be deceived by it.  *See* Kohls Decl., ¶¶ 16-17.

27      At most, this extrinsic evidence injects a level of uncertainty into the meaning of

28  "materially deceptive content."  To the extent, this Court believes there is such uncertainty, the

1  canon of constitutional avoidance counsels against construing the statute to generally reach

2  speech not taken as literally true such as satire and parody.  Both California and federal courts

3  apply the canon of constitutional avoidance.  Under this principle of statutory construction, where

4  a statute "is susceptible of two constructions, one of which will render it constitutional and the

5  other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions,

6  the court will adopt the construction which . . . will render it valid in its entirety, or free from

7  doubt as to its constitutionality."  *People v. Gutierrez*, 58 Cal. 4th 1354, 1373 (2014) (citation

8  omitted); *see also, e.g.*, *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018).  As discussed above,

9  AB 2839 is (at a minimum) reasonably construed as not generally covering satire or parody.

10 Should the Court find the language at all ambiguous, it should adopt the interpretation of the

11 definition of "materially deceptive content" laid out here.  Under such a reading, the statute would

12 not generally cover parody or satire, and thus would avoid any of the constitutional concerns

13 raised if it did do so.

14    **B.    Plaintiffs Do Not Carry Their Burden on a Facial Challenge to AB 2839**

15    Plaintiffs bring a facial First Amendment challenge to AB 2839.  *See* Pls.' AB 2839 Mem.

16 at 2.  As the Supreme Court has stated, "that decision comes at a cost."  *Moody v. NetChoice,*

17 *LLC*, 603 U.S. 707, 723 (2024).  "For a host of good reasons, courts usually handle constitutional

18 claims case by case, not en masse."  *Id.*  The Supreme Court has "therefore made facial

19 challenges hard to win."  *Id.*  In the First Amendment context, a law is facially invalid "only if the

20 law's unconstitutional applications substantially outweigh its constitutional ones."  *Id.* at 724.

21 This standard imposes a two-part analysis: "first, the courts must 'assess the state laws' scope';

22 and second, the courts must 'decide which of the laws' applications violate the First Amendment,

23 and . . . measure them against the rest.'"  *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1115-16 (9th

24 Cir. 2024) (quoting *Moody*, 603 U.S. at 725) (alteration in original).[4]

25    "[N]either parties nor courts can disregard the requisite inquiry into how a law works in all

26 of its applications" when adjudicating a facial First Amendment challenge.  *Moody*, 603 U.S. at

27    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
          [4] The standard for facial challenges thus tracks the overbreadth standard.  *See* Pls.' AB
28 2839 Mem. at 30.  Any overbreadth challenge that exists independent of plaintiffs' facial
   challenge fails for the same reason their facial challenge fails.

744.  But that is precisely what plaintiffs do here.  Replicating the error of the parties in *Moody*

and in the Ninth Circuit's recent *NetChoice* ruling, plaintiffs here "treated [AB 2839] as having

certain heartland applications"—specifically, to parody and satire—"and mostly confined their

battle to that terrain."  *Id.* at 724.  Indeed, plaintiffs' brief is replete with references to parody and

satire falling within the scope of AB 2839.  *E.g.*, Pls.' AB 2839 Mem. at 1, 5, 12, 13,14, 18, 20,

29.  Even if that were correct (it is not, *see supra* at 6-12), "the focus on whether and how [AB

2839] may impact [satire or parody] without considering any other potential applications, treats

[plaintiffs'] challenges 'more like as-applied claims than like facial ones.'"  *NetChoice*, 113 F.4th

at 1123 (quoting *Moody*, 603 U.S. at 724).  Instead, a court "must evaluate the full scope of the

law's coverage" and "then decide which of the law's applications are constitutionally permissible

and which are not," before "weigh[ing] the one against the other."  *Moody*, 603 U.S. at 744.  "The

need for [plaintiffs] to carry [their] burden on those issues is the price of [their] decision to

challenge [AB 2839] as a whole."  *Id.*

Plaintiffs fail to carry that burden.  Their focus on AB 2839's application to parody or satire

ignores the full scope of applications of the statute, many of may well be constitutional.  For

instance, consider the application of AB 2839 to materially deceptive content that would also

constitute defamation.  *See* Defs.' AB 2839 Mem. at 12-13.  AB 2839 covers materially deceptive

content depicting a candidate doing or saying something they did not do or say that is reasonably

likely to harm the reputation or electoral prospects of the candidate.  *See* Cal. Elec. Code

§ 20012(b)(1)(A).  To the extent the materially deceptive content does cause such reputational

harm, it may constitute defamation or libel under California law.  As plaintiffs themselves

recognize, the State can permissibly regulate defamation under the First Amendment.  *See* Pls.'

AB 2839 Mem. at 13.  Such applications of AB 2839 would thus be constitutional.

Consider, too, the application of AB 2839 to content that would constitute fraud or

attempted fraud—another type of speech that the State can regulate under the First Amendment,

as plaintiffs note, *see* Pls.' AB 2839 Mem. at 13.  Fraud is typically defined as "[a] knowing

misrepresentation or knowing concealment of a material fact made to induce another to act to his

or her detriment."  "Fraud," Black's Law Dictionary (12th ed. 2024).  Some applications of AB

1    2839 involve conduct that meets this definition, as when someone knowingly posts materially

2    deceptive content with the purpose of deceiving a voter to change their voting behavior.  *See*

3    Defs.' AB 2839 Mem. at 13.  Such applications of AB 2839 would also be constitutional.

4         Or consider the application of AB 2839 to materially deceptive content posted by malicious

5    foreign actors.  It is clear that foreign governments are engaging in campaigns meant to influence

6    politics in the United States that involve spreading falsehoods.  *See* Alvarez Decl. ¶¶ 35-37.

7    Indeed, the U.S. government in December 2024 sanctioned several foreign entities for their

8    targeted misinformation campaigns during the 2024 election, including the use of digitally

9    manipulated media content.[5]  Some of what these foreign actors have used in the past (and will no

10   doubt continue to use in the future) constitutes materially deceptive content under AB 2839.[6]

11   Clearly, the State has a compelling interest in keeping foreign actors from purposefully

12   manipulating its voters for a foreign power's gain.  "[T]he government may bar foreign

13   citizens . . . from participating in the campaign process that seeks to influence how voters will

14   cast their ballots in the elections.  Those limitations on the activities of foreign citizens are . . . all

15   'part of the sovereign's obligation to preserve the basic conception of a political community.'"

16   *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011) (three-judge court)

17   (Kavanaugh, J.), *summarily aff'd*, 565 U.S. 1104 (2012).  In light of States' "significant leeway in

18   protecting their democratic processes from the influence of noncitizens," *OPAWL – Bldg. AAPI*

19   *Feminist Leadership v. Yost* 118 F.4th 770, 777 (6th Cir. 2024), applications of AB 2839 to posts

20   by foreigners—especially those acting at the behest of foreign powers trying to influence the

21   outcomes of elections in California for their own gain—will pass constitutional muster.

22        As the above examples illustrate, AB 2839 applies in a broad variety of contexts.  *See also*

23   Br. of *Amicus Curiae* Electronic Privacy Information Center at 12-17 (discussing constitutional

24

25   [5] *See* Dep't of Treasury, "Treasury Sanctions Entities in Iran and Russia That Attempted to Interfere in the U.S. 2024 Election," (Dec. 31, 2024), https://home.treasury.gov/news/press-releases/jy2766 (last accessed June 6, 2025).

26   [6] For instance, the news reported that during the 2024 election cycle, digitally altered

27   videos linked to foreign operatives were posted online, including videos falsely showing ballots being destroyed.  *See, e.g.*, Huo Jingnan, "Foreign Influence Efforts Reached a Fever Pitch During the 2024 Election," NPR.com (Nov. 12, 2024), https://www.npr.org/2024/11/09/nx-s1-5181965/2024-election-foreign-influence-russia-china-iran (last accessed June 6, 2025).

28

1   applications of AB 2839 analogous to prohibitions on impersonating government officials or

2   misappropriating names or likenesses, among others).  Yet plaintiffs' brief is silent as to

3   applications of AB 2839 beyond parody and satire—which is not generally covered by the statute

4   to begin with, *see supra* at 6-12.  Nowhere do plaintiffs grapple with other applications of AB

5   2839, thereby failing to establish "[w]hat activities, by what actors" AB 2839 "prohibit[s] or

6   otherwise regulate[s]." *Moody*, 603 U.S. at 724.  Nowhere do plaintiffs provide a record

7   establishing "whether a substantial majority of [AB 2839's] applications are likely to fail First

8   Amendment scrutiny." *NetChoice*, 113 F.4th at 1124.  And nowhere do plaintiffs "weigh

9   violative applications of the Act against non-violative ones." *NetChoice, LLC v. Fitch*, 134 F.4th

10  799, 809 (5th Cir. 2025).  By failing to do so, plaintiffs have wholly failed to carry their burden

11  on a facial First Amendment challenge to AB 2839.

12      **C.    AB 2839 Is Narrowly Tailored**

13          Notwithstanding plaintiffs' failure to properly litigate a facial First Amendment challenge,

14  AB 2839 is constitutional because it meets the requirements of strict scrutiny.  A law subject to

15  strict scrutiny "is justified only if the government demonstrates that [the law] is narrowly tailored

16  to serve a compelling state interest." *Twitter, Inc. v. Garland*, 61 F.4th 686, 698 (9th Cir. 2023).

17  In their motion, plaintiffs do not dispute that the State has a compelling interest in free and fair

18  elections.  For good reason: courts have been clear that a State has a compelling interest in

19  preventing fraud in the electoral context and in preserving free and fair elections.  *See* Defs.' AB

20  2839 Mem. at 14-17; *see also* Br. of *Amicus* Campaign Legal Center at 13-18.

21          AB 2839 is narrowly tailored to furthering this compelling interest.  *See* Defs.' AB 2839

22  Mem. at 17-20.  AB 2839 only applies when a person has (1) knowingly; (2) with malice; (3)

23  distributed content regarding a candidate, ballot measure, voting or refraining from voting, or the

24  canvass of the vote; (4) that has been intentionally digitally created or manipulated; (5) that would

25  falsely appear to a reasonable person to be an authentic record of the events it claims to depict;

26  (6) that depicts a candidate, elections official, or elected official doing or saying something they

27  did not do or say or depicts election equipment in a materially false manner; (7) that would be

28  reasonably likely to cause specified harms to electoral integrity; and (8) that is distributed in the

1   period right around an election. *See id.* at 19. AB 2839 regulates a narrow band of speech that

2   poses the greatest risk of the harms the Legislature sought to remedy—a band of speech that does

3   not generally include parody or satire, *see supra* at 6-12. And it requires the removal of such

4   speech because deepfakes are sticky, lingering with viewers even if they have been debunked or

5   demonstrated as false. *See* Defs.' AB 2839 Mem. at 19-20; Alvarez Decl. ¶¶ 22-25, 39, 53.

6   Other alternatives such as prebunking or debunking would also be ineffective. *See* Defs.' AB

7   2839 Mem. at 19-20; Alvarez Decl. ¶¶ 25-26, 30-34, 39-40.

8        Plaintiff's arguments to the contrary are unavailing. First, plaintiffs point to a list of

9   proffered less-restrictive alternatives. But none of those alternatives would actually further the

10  State's compelling interest in safeguarding elections, let alone do so nearly as adequately.

11  Second, plaintiffs contend the law is over- and underinclusive. Not so. The Legislature's choice

12  to regulate only a narrow band of speech, distributed with specific mens rea at specific times

13  around an election, reflects a desire to narrowly tailor the law, not shoddy draftsmanship. Indeed,

14  as plaintiffs themselves highlight, the Legislature was acutely aware of the First Amendment

15  implications of regulating in this space and sought to craft a law that was narrowly tailored to

16  further its undisputedly compelling interest. It did so successfully.

17        1.    **Plaintiffs' Proffered Alternatives Would Not Further the State's Compelling Interest**

18

19        In arguing that AB 2839 fails narrow tailoring, plaintiffs first focus on proposed less

20  restrictive alternatives. But none of the alternatives they point to would adequately serve the

21  State's interest here. First, plaintiffs contend the State could use counterspeech as an alternative.

22  It is true that counterspeech is often a viable alternative to deceptive speech. That does not make

23  it a viable one here. Rather, the nature of materially deceptive content renders counterspeech not

24  viable. As defendants explained in their own motion for summary judgment, deepfakes are

25  "sticky"—they linger in their effects on a viewer even after the viewer *knows* the content is false

26  or manipulated. *See* Defs.' AB 2839 Mem. at 19-20; Alvarez Decl. ¶¶ 22-25, 39, 53. Nor is it

27  remotely plausible that the government could realistically seek to debunk or prebunk every

28  deepfake posted around an election; such content spreads virally, often faster than the truth, and

1    can be hard to find in a fragmented yet expansive online ecosystem.  *See* Defs.' AB 2839 Mem. at

2    20; Alvarez Decl. ¶¶ 25-26, 30-34, 39-40; *see also* Br. of *Amicus* Electronic Privacy Information

3    Center at 17-24.  Given the unique nature of materially deceptive content within the scope of AB

4    2839 and the significant dangers of deceiving voters and undermining such elections that such

5    content causes, counterspeech is not a viable less-restrictive alternative here.

6        Second, plaintiffs contend that AB 2839 could be limited to only false speech that causes

7    "legally cognizable harms," such as speech that "actually dupes citizens into voting for the

8    'wrong' candidate."  Pls.' AB 2839 Mem. at 24.  There is a critical flaw in this argument: it

9    would require the State to wait until a voter has been tricked before it can take action.  At that

10   point, the harm the State is seeking to prevent—voters being misled by fraudulent speech—has

11   occurred.  Nor is there any way that that harm could be remedied after the fact.  Once the voter

12   has cast their vote and the election is over, there is no way to change that vote or redo the entire

13   election.  At that point, the precise concerns animating AB 2839 have already happened.  The

14   whole purpose of AB 2839 is to prevent voters from being fraudulently manipulated when casting

15   their votes and injecting doubt and uncertainty that undermines the electoral process.  Waiting

16   until *after* that harm has occurred to take action that will not even *remedy* the harm that has now

17   occurred in no way serves the State's interests.

18       Third, plaintiffs contend that the statute should be limited to "factual statements that are

19   provably false."  Pls.' AB 2839 Mem. at 24.  But AB 2839 *is* so limited.  It only applies to

20   materially deceptive content that involves a candidate, elected official, or elections official doing

21   or saying something they did not do or say or to materially false portrayals of elections

22   equipment.  *See* Cal. Elec. Code § 20012(b)(1)(A)-(D).  Whether a person said or did something

23   is a "factual statement" that is "provably false"—the person either did or said the thing or they did

24   not.  So, too, are materially false portrayals of elections equipment provably false images.  It can

25   be proven factually false if a manipulated image purports to show a ballot that does not list a

26   particular candidate or that allegedly arrived pre-filled, for instance.  And AB 2839 is limited to

27   statements of fact by the definition of "materially deceptive content," which does not generally

28   reach speech not taken as literally true.  *See supra* at 6-12.

17

1    Fourth, plaintiffs contend California could limit who can bring an enforcement action.  Pls.'

2  AB 2839 Mem. at 25.  But that change would not alter *how much speech* is regulated by AB

3  2839.  Regardless of who can bring an enforcement action, AB 2839 would regulate precisely the

4  same amount of speech.  Changes to the scope of enforcement authority are therefore not *less*

5  *speech-restrictive* alternatives to begin with.

6    Fifth, plaintiffs point to other laws that could be better enforced, such as privacy torts,

7  copyright infringement, or defamation.  Pls.' AB 2839 Mem. at 25.  But privacy torts and

8  defamation exist to protect an individual's reputation or privacy; they do not ensure electoral

9  integrity.  And as with plaintiffs' other proposal, using such laws would require the State to wait

10  until *after* harms have occurred to take action.  But cast votes cannot be recast.  And the harm to

11  the voters and the general public caused by intentionally deceptive content infecting the electoral

12  process cannot be undone simply because a depicted individual could bring a tort suit seeking

13  money damages for their individual reputational or privacy harms.  All of plaintiffs' proffered

14  alternatives are irrelevant or would fail to remedy the harms that led to AB 2839's passage.  None

15  of them serve to safeguard electoral integrity and protect free and fair elections as AB 2839 does.

16  None of them establish that AB 2839 is not narrowly tailored.

17    **2.    AB 2839 Is Not Fatally Overinclusive or Underinclusive**

18    Plaintiffs also argue that AB 2839 is fatally over- and underinclusive.  Not so.  First,

19  plaintiffs reference cases they contend show the law is invalid.  But the cases that plaintiffs cite

20  only highlight how narrow AB 2839 is.  For instance, *Grimmett v. Freeman*, 59 F.4th 689 (4th

21  Cir. 2023), involved a statute that criminalized *any* derogatory statement about a candidate—

22  including, the Fourth Circuit held, "truthful derogatory statements so long as the speaker acts 'in

23  reckless disregard of [a statement's] truth or falsity.'"  *Id.* at 692 (alteration in original).  Both

24  *Susan B. Anthony List v. Driehaus*, 814 F.3d 466 (6th Cir. 2016) and *Rickert v. State*, 168 P.3d

25  826 (Wash. 2007), involved prohibitions on *all* false statements about a candidate—"including

26  non-material statements" that were unlikely to impact an election, *Susan B. Anthony List*, 814

27  F.3d at 475; *see also Rickert*, 168 P.3d at 852.  In contrast to these laws, AB 2839 does not apply

28  to all false statements—or even all false and defamatory statements—*about* a candidate.  It only

18

1    applies to depictions *of* a candidate (or elected or elections official) doing or saying something

2    they did not do or say.  *See* Cal. Elec. Code § 20012(b)(1)(A)-(C).  And it only applies to such

3    depictions that have a likelihood of impacting an election, since AB 2839 only applies to content

4    that is reasonably likely either to impair a candidate's reputation or electoral chances or to falsely

5    undermine confidence in the election.  *See id.*  And it only applies to *false* statements, unlike in

6    *Grimmett*, since content that is not taken as literally true is outside the scope of AB 2839

7    altogether, *see supra* at 6-12.

8        Plaintiffs' other arguments contending AB 2839 is over- or underinclusive are also

9    unavailing.  As a threshold matter, "the First Amendment imposes no freestanding

10   'underinclusiveness limitation.'"  *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015) (citation

11   omitted).  As the Supreme Court has explained, "[a] State need not address all aspects of a

12   problem in one fell swoop; policymakers may focus on their most pressing concerns."  *Id.*  Courts

13   "have accordingly upheld laws—even under strict scrutiny—that conceivably could have

14   restricted even greater amounts of speech in service of their stated interests.  *Id.*  That the

15   California Legislature sought to circumscribe the amount of speech it chose to regulate speaks to

16   AB 2839's narrow tailoring, not undermines it.

17       After all, much of the other speech that plaintiffs cite as excluded from AB 2839's reach

18   does not implicate the concerns that animated the law.  For instance, plaintiffs note the fact that

19   AB 2839 does not apply to "'businesspeople, celebrities, purely private citizens, or even

20   government officials' who are not candidates for office or speaking about the election."  Pls.' AB

21   2839 Mem. at 27.  And they note that AB 2839 "prohibits quasi-defamatory statements only

22   against political candidates."  *Id.*  But the chance that a deepfake of a movie star engaging in

23   sexual activities or of a businessperson criticizing their consumers will manipulate voters or

24   undermine electoral integrity is slim to none—in sharp contrast to the specific categories of

25   manipulated content that AB 2839 does apply to.  So, too, with quasi-defamatory statements

26   about non-candidates.  Quasi-defamatory statements about one's boss, next-door neighbor, or in-

27   laws who are not campaigning for office are not even remotely likely to mislead voters or

28   manipulate electoral outcomes.  That AB 2839 does not reach such speech is logical given there is

19

1   no nexus between that speech and the compelling interest that AB 2839 serves.  On the contrary,

2   if AB 2839 *did* reach such speech, it would raise serious *over*inclusiveness concerns.  *Cf. Susan*

3   *B. Anthony List*, 714 F.3d at 475 ("Penalizing non-material statements, particularly those made

4   outside the political arena, is not narrowly tailored to preserve fair elections.").

5          Plaintiffs' arguments about other election-related speech that AB 2839 does not reach even

6   further underscores that AB 2839 is narrowly tailored.  As plaintiffs note, AB 2839 "focus[es] on

7   deceptive content portraying only political candidates, elected officials, election officials, ballots,

8   or voting mechanisms."  Pls.' AB 2839 Mem. at 28.  It does not reach other "election-related

9   deepfakes" such as false celebrity endorsements.  *Id.*  This is a virtue of AB 2839, not a vice.  The

10  Legislature was acutely aware of the First Amendment implications of AB 2839.  *E.g.*, Liska

11  Decl., Ex. 2, p. 21; Ex. 4, p. 38.  And it thus sought to ensure the statute was narrowly tailored.

12  *See* Cal. Elec. Code § 20012(a)(4).  Part of how it did so was by targeting content that posed a

13  clear and heightened risk of harm to electoral integrity—clearly false depictions of candidates

14  themselves, clearly false depictions of elected or elections officials relevant to elections, and

15  clearly false portrayals of elections equipment itself.  For instance, a candidate's *own* words and

16  actions are likely to have a greater influence on a voter's choice about whether and whom to vote

17  for than what others say about them.  As the saying goes, one's past behavior is the best predictor

18  of one's future behavior.  Similarly, voters are more likely to trust what an official has to say

19  about the safety and integrity of an election, especially if that official is an elections official

20  tasked with running the election.  As one tangible example, a voter is far more likely to believe

21  the election has been rescheduled or polling places have been moved if they hear that in a faked

22  robocall of Governor Newsom than one of Taylor Swift or the new Pope Leo XIV.  The

23  Legislature should not be faulted for seeking to circumscribe the reach of AB 2839 and, in so

24  doing, focusing specifically on a narrow band of speech raising the greatest risk to electoral

25  integrity.  That choice certainly does not render AB 2839 constitutionally flawed.

26         Plaintiffs' arguments about overinclusion, on the other hand, start from the erroneous

27  premise that AB 2839 sweeps in speech that it does not.  They focus on supposed applications of

28  the law to parody or satire, to hyperbole, or to speech that wouldn't be materially harmful.  *E.g.*,

1   Pls.' AB 2839 Mem. at 31-33.  But to constitute "materially deceptive content," the media must

2   "falsely appear to a reasonable person to be an authentic record of the content depicted in the

3   media."  Cal. Elec. Code § 20012(f)(8)(A).  This requires that the reasonable viewer must believe

4   that the media accurately depicts true events.  Parody, satire, or hyperbole, by their very

5   definition, are speech that a reasonable person does *not* believe are accurate depictions of true

6   events.  They therefore are not within the scope of AB 2839 in general.  *See supra* at 6-12.  Nor

7   does AB 2839 apply to statements that pose no or little risk of harm to a candidate's reputation or

8   electoral changes or to an election's integrity; it only applies to manipulated media that is

9   *reasonably likely* to cause such harms.  *See* Cal. Elec. Code § 20012(b)(1).

10      Nor do the exemptions in the law that plaintiffs highlight indicate the law fails narrow

11   tailoring, since all of these exemptions allow for *more* speech that helps *further* the Legislature's

12   interest in preventing voters being deceived and elections being manipulated.[7]  The exemption for

13   news media only allows them to broadcast materially deceptive content "as part of a bona fide

14   newscast, news interview, news documentary, commentary of general interest, or on-the-spot

15   coverage of bona fide news events" and only if the broadcast "clearly acknowledges through

16   content or a disclosure . . . that the materially deceptive content does not accurately represent any

17   actual event, occurrence, appearance, speech, or expressive conduct."  Cal. Elec. Code

18   § 20012(e)(1); *see also id.* § 20012(e)(3) (exemption for news media that "routinely carries news

19   and commentary of general interest" and publishes materially deceptive content with a

20   disclosure).  The purpose of AB 2839 is to ensure that voters are not deceived and misled in ways

21   that inject fraud and uncertainty into the electoral process.  The news exemption allows the media

22   and press to report on material deepfakes, which helps to *inform* voters rather than *deceive* them.

23   A news report that shows a deepfake while warning viewers that it is faked mitigates the chance a

24

---

25   [7] Plaintiffs contend the law wholesale exempts "interactive computer service[s]."  Pls.'
     AB 2839 Mem. at 28.  Not so.  The clause that plaintiffs cite states in full that AB 2839 "does not
26   impose liability on an interactive computer service, as defined in Section 230(f)(2) of Title 47 of
     the United States Code."  Cal. Elec. Code § 20012(e)(4).  This clause does not *exempt* interactive
27   computer services.  That is clear from comparing its language to that in the news exemptions and
     the candidate exemption.  *Cf. id.* § 20012(b)(2), (b)(3), (e)(1), (e)(3) (stating law "does not apply"
     in certain contexts).  Rather, this clause simply codifies the Legislature's conclusion that AB
28   2839 is not preempted under 47 U.S.C. § 230.

1    voter will be misled or deceived by intentionally manipulated content—furthering the

2    Legislature's compelling interest.

3        The same holds true of the exemption for political candidates.  As with the news

4    exemption, the candidate exemption allows for distribution with a required disclosure

5    acknowledging the media has been manipulated.  Cal. Elec. Code § 20012(b)(2).  For one, it is

6    highly unlikely that a candidate would wish to share content within the scope of AB 2839 about

7    themselves to begin with; after all, such content must show them saying or doing something they

8    did not do or say that is reasonably likely to undermine *their own* reputation or electoral

9    prospects.  *See id.* § 20012(b)(1)(A).  And when a candidate does share such content, it is likely

10   to be shared for the purpose of ensuring voters are aware the depiction is fake—a purpose further

11   ensured by the requirement to include a disclosure.  A candidate who shares materially deceptive

12   content for the purpose of ensuring voters know it is false similarly helps ensure that voters are

13   not misled and deceived by such content and that elections remain free and fair.  In that way, this

14   exemption also helps further the State's compelling interest.

15       In the end, in crafting AB 2839 the Legislature sought protect the First Amendment by

16   narrowly tailoring the statute to further its compelling interest in protecting free and fair elections

17   and avoiding voter fraud and deception.  It did so successfully.  It did so by not generally

18   regulating false statements, in contrast to statutes struck down in other cases plaintiffs cite.  It did

19   so by confining AB 2839's reach to manipulated audio or visual media depicting specified

20   subjects that is reasonably likely to cause the harms AB 2839 meant to address.  It did so by

21   defining "materially deceptive content" to generally exclude parody, satire, or other hyperbolic

22   speech that a reasonable person would not be deceived by; that is, speech that is not an authentic

23   record of its contents.  It did so by only regulating distribution by those who act with knowledge

24   of falsity or reckless disregard for the truth.  It did so by only regulating distribution in a temporal

25   window around the election.  And it did so by only including exceptions that further the

26   Legislature's purpose, not undermine it.  None of the speech within the scope of AB 2839 fails to

27   advance the Legislature's purpose, and the Legislature's decision not to include more speech

28

1    reflects narrow tailoring rather than undermining it.  While strict scrutiny may be a high bar, it is

2    not an insurmountable one.  AB 2839 is one of the rare statutes that meets that bar.

3        **D.    The Law's Safe Harbor Is Not Unconstitutional**

4        Plaintiffs further challenge the safe harbor for parody and satire.  As explained above, AB

5    2839 does not generally regulate parody and satire.  *See supra* at 6-12.  It further protects such

6    speech by including an optional safe harbor: parody and satire that might constitute materially

7    deceptive content within the scope of AB 2839 will still be protected if the media includes a

8    disclosure.  Cal. Elec. Code § 20012(b)(3).  This disclosure is purely factual: it simply must state

9    that the media has been manipulated for purposes of satire or parody.  *Id.*

10       Courts apply a different standard to "regulations directed only at *disclosure* of political

11   speech" than at other regulations of such speech.  *Nat'l Ass'n for Gun Rts., Inc. v. Mangan*, 933

12   F.3d 1102, 1112 (9th Cir. 2019); *see also, e.g.*, *Chula Vista Citizens for Jobs & Fair Competition*

13   *v. Norris*, 782 F.3d 520, 536 (9th Cir. 2015) (en banc).  Under this less rigorous "exacting

14   scrutiny" standard, the government need only "show that the challenged laws are 'substantially

15   related to a sufficiently important governmental interest.'"  *Nat'l Ass'n for Gun Rights*, 933 F.3d

16   at 1112 (citation omitted).

17       That standard is met by the safe harbor.  As with AB 2839 overall, the safe harbor furthers

18   the State's compelling interest in preventing fraud on voters and protecting electoral integrity.

19   *See supra* at 15.  And it is clearly substantially related to that interest: ensuring voters know a

20   video has been manipulated and does not portray real events helps mitigate the risk of voters

21   being deceived or electoral integrity being undermined.  In addition, since the disclosure is on the

22   piece of media itself, the disclosure will remain on it for future viewers to see if that media is

23   shared.  *See* Defs.' AB 2839 Mem. at 20-22.

24       In arguing to the contrary, plaintiffs do not contend that including a factual disclosure will

25   make parody or satire inefficient.  On the contrary, plaintiffs acknowledge that parody and satire

26   work because a reasonable viewer is *not* deceived and understands the media does not portray a

27   real event.  *See supra* at 8.  Instead, plaintiffs contend the disclosure option is too burdensome

28   because the font size for the disclosure is too large.  *See* Pls.' AB 2839 Mem. at 30.  The safe

1  harbor does require the font of a disclosure on a visual piece of media be as large as other text in

2  the media to qualify for the safe harbor's protection.  *See* Cal. Elec. Code § 20012(b)(3).  But that

3  does not necessarily mean the safe harbor's disclosure is too burdensome categorically.  For

4  instance, in the image on page 30 of plaintiffs' memorandum on AB 2839, it would be possible to

5  reduce the font size of "criticize" to include the warning in a smaller font that does not take up the

6  full screen.  There is no indication that plaintiffs' message would be at all impaired by such a

7  change, let alone that the font size requirement for the safe harbor to apply is too onerous in

8  general.

9      But even if the font size requirement is too onerous—and plaintiffs identify no other issues

10  with the safe harbor than that—the proper remedy would be to sever that portion of AB 2839.

11  Federal courts apply California law when analyzing severability.  *Vivid Ent., LLC v. Fielding*, 774

12  F.3d 566, 574 (9th Cir. 2014).  California courts apply a three-part test to determine severability:

13  the invalid part of the law "must be grammatically, functionally, and volitionally separable."

14  *California Redevelopment Ass'n v. Matosantos*, 53 Cal. 4th 231, 271 (2011) (citation omitted).

15  "Grammatical separability, also known as mechanical separability, depends on whether the

16  invalid parts 'can be removed as a whole without affecting the wording' or coherence of what

17  remains."  *Id.* (citation omitted).  "Functional separability depends on whether 'the remainder of

18  the statute is complete in itself.'"  *Id.* (citation omitted).  "Volitional separability depends on

19  whether the remainder 'would have been adopted by the legislative body had the latter foreseen

20  the partial invalidation of the statute.'"  *Id.* (citation omitted).  The presence of a severability

21  clause "establishes a presumption in favor of severance." *Id.* at 270.

22      AB 2839 contains a severability clause, establishing a presumption in favor of severability.

23  Cal. Elec. Code § 20012(h).  The font size requirement also meets the three requirements of

24  severability.  First, it is grammatically separable.  The Court could excise this requirement by

25  removing the last sentence in subsection (b)(3), which reads "The disclosure shall comply with

26  the requirements set forth in subparagraphs (A) and (B) of paragraph (2)," *see id.* § 20012(b)(3).

27  The remainder of the safe harbor provision would be clear and understandable grammatically.

28  This language is also functionally separable, since the safe harbor would remain in effect even

1   without the font size requirement; a parody or satire would solely need to include a disclosure to

2   fall within the scope of the safe harbor (to the extent the parody or satire fell within AB 2839 to

3   begin with, *see supra* at 6-12). Finally, volitional separability is also met. For one, the

4   severability clause indicates the Legislature's intent to regulate to the maximum extent

5   permissible in this arena. For another, the purposes of AB 2839 and the safe harbor provision

6   would still be served even if the last sentence of subsection (b)(3) is removed. Because a

7   disclosure would still be required, the overall purpose of the safe harbor—permitting parody or

8   satire while ensuring voters are not misled—would still be furthered even without a font size

9   requirement. Thus, to the extent the Court believes requiring a disclosure be a specific font size

10  to qualify for the safe harbor renders the safe harbor unconstitutional, it should sever that portion

11  of the safe harbor and leave the remainder of that provision, and AB 2839, intact.

12  ## II.    AB 2839 IS NOT UNCONSTITUTIONALLY VAGUE

13       In addition to a First Amendment claim, plaintiffs contend that AB 2839 is

14  unconstitutionally vague. A statute is impermissibly vague when it "fails to provide a reasonable

15  opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and

16  discriminatory enforcement." *Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (citation

17  omitted). But this standard "does not require 'impossible standards of clarity.'" *Id.* (citation

18  omitted). Rather, a statute must simply "give sufficient notice as to what conduct is prohibited."

19  *Id.* Although there may be cases at the margin that can be dreamed up, a statute is not vague

20  when it is "clear what the [statute] as a whole prohibits." *Hill v. Colorado*, 530 U.S. 703, 733

21  (2000) (citation omitted). After all, "because we are '[c]ondemned to the use of words, we can

22  never expect mathematical certainty from our language.'" *Id.* (citation omitted) (alteration in

23  original).

24       In their motion for summary judgment, defendants articulated how AB 2839 clearly

25  delineates the conduct it regulates. *See* Defs.' AB 2839 Mem. at 22-24. Plaintiffs' arguments to

26  the contrary do not establish that AB 2839 is unconstitutionally vague. First, plaintiffs argue that

27  the definition of "materially deceptive content" is unclear, because it only requires that media

28  falsely appear authentic "in some respect." Pls.' AB 2839 Mem. at 35. But as explained above,

1   that is not the case. *See supra* at 6-12. Instead, the definition of "materially deceptive content"

2   requires that the media "falsely appear to a reasonable person to be an authentic record of the

3   content depicted in the media." Cal. Elec. Code § 20012(f)(8)(A). This requires that a reasonable

4   person believe the content accurately depicts real events. *See supra* at 6-12. Thus, AB 2839

5   draws a line akin to that drawn in other areas of the law, such as defamation and trademark law

6   (which both distinguish satire and parody from other speech). *See supra* at 8-11. AB 2839's

7   definition of "materially deceptive content" is no more vague than any other area of law that

8   draws such a line.

9        Next, plaintiffs highlight that media within the scope of AB 2839 must be "reasonably

10   likely to harm" a candidate's reputation or electoral prospects or "reasonably likely to falsely

11   undermine confidence" in an election's outcome. Cal. Elec. Code § 20012(b)(1). But that a law

12   may involve "the application of a qualitative standard . . . to real world conduct" does not make it

13   vague. *Johnson v. United States*, 576 U.S. 591, 604 (2015). As the Supreme Court has observed,

14   "the law is full of instances where a man's fate depends on his estimating rightly . . . some matter

15   of degree." *Id.* at 605 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)) (alteration in

16   original). AB 2839 is no different from the multitude of laws that require a person to estimate

17   what a reasonable person might say or do. And plaintiffs ignore the large swaths of speech where

18   applying that standard will be clear. A deepfake showing a candidate accepting a bribe, beating

19   their child, or bragging about lying to voters will clearly fall within the scope of AB 2839. So,

20   too, a deepfake showing an elections official discussing how they rigged the election or a picture

21   of a doctored ballot pre-filled for a voter. That there may be hard hypotheticals at the margins

22   that can be imagined does not render a law unconstitutionally vague: "speculation about possible

23   vagueness in hypothetical situations not before the Court will not support a facial attack on a

24   statute when it is surely valid 'in the vast majority of its intended applications.'" *Hill*, 530 U.S. at

25   733 (citation omitted).

26        Plaintiffs also contend that AB 2839's definition of "materially deceptive content" is vague

27   because it clarifies that such content does not include audio or visual media that "contains only

28   minor modifications that do not significantly change the perceived contents or meaning of the

1   contents."  Cal. Elec. Code § 20012(f)(8)(B).  Plaintiffs ignore the guidance that the definition

2   provides: it specifically provides "changes to brightness or contrast of images" and "removal of

3   background noise" as examples of the kind of changes that will not make audio or visual media

4   materially deceptive content.  *Id.*  Their argument again rests on dreaming up hypotheticals at the

5   margin and ignoring the clarity of the law in the majority of its applications.

6       At bottom, plaintiffs' arguments that AB 2839 is vague depend upon pulling statutory

7   language out of context and proffering extreme hypotheticals.  They also rely on examples that

8   fall outside the scope of the statute in general, such as satire and parody.  And they reference

9   examples that don't fall within AB 2839 at all—a video ad with voiceover attacking a candidate's

10  voting record, *see* Pls.' AB 2839 Mem. at 38, does not *depict* a candidate doing or saying

11  something they did not do or say and thus does not fall within the scope of AB 2839 to begin

12  with.  So, too, does a video with "12 Minutes of Democrats Denying Election Results" that

13  includes unedited audio of actual statements from elected officials, *not* officials saying something

14  they did not say.  *Cf. id.* at 37.

15      Moreover, plaintiffs ignore the many aspects of AB 2839 that enhance the statute's clarity.

16  This includes that the statute specifies the precise subject matter within its scope—not general

17  "deceptive" or "misleading" speech, *see* Pls.' AB 2839 Mem. at 39, but specifically audio or

18  visual media that depicts a candidate, elected official, or elections official doing or saying

19  something they did not do or say or that falsely depicts elections equipment, Cal. Elec. Code

20  § 20012(b)(1)(A)-(D).  It includes AB 2839's mens rea requirement: that someone who

21  distributes audio or visual media act with knowledge of falsity or reckless disregard for truth.  *Id.*

22  § 20012(b)(1).  Such a requirement "further reduces any potential for vagueness," *Holder v.*

23  *Humanitarian Law Project*, 561 U.S. 1, 21 (2010), since "a person of ordinary intelligence can

24  base his behavior on his factual knowledge of the situation at hand and thereby avoid violating

25  the law," *United States v. Jae Gab Kim*, 449 F.3d 933, 943 (9th Cir. 2006).  And it includes that

26  AB 2839 provides a safe harbor for parody and satire as an extra guarantee of protection.  If a

27  speaker is uncertain whether a piece of media meant to be satire or parody falls within the

28  definition of "materially deceptive content," they can add a disclosure and speak without fear.

27

1    AB 2839 is abundantly clear with respect to the scope of the conduct it regulates.  It more than

2    suffices to pass muster under the Constitution.

3    **III.    ANY UNCONSTITUTIONAL PARTS OF AB 2839 ARE SEVERABLE**

4         As defendants explain above, AB 2839 is constitutional on the whole.  However, to the

5    extent that the Court finds otherwise and believes part of it is unconstitutional—such as only the

6    optional safe harbor or one category of content within AB 2839's scope—the Court should sever

7    the unconstitutional portion of the statute.  Federal courts apply California law when analyzing

8    severability.  *Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 574 (9th Cir. 2014).  California courts

9    apply a three-part test to determine severability: the invalid part of the law "must be

10   grammatically, functionally, and volitionally separable."  *California Redevelopment Ass'n v.*

11   *Matosantos*, 53 Cal. 4th 231, 271 (2011) (citation omitted).  "Grammatical separability, also

12   known as mechanical separability, depends on whether the invalid parts 'can be removed as a

13   whole without affecting the wording' or coherence of what remains."  *Id.* (citation omitted).

14   "Functional separability depends on whether 'the remainder of the statute is complete in itself.'"

15   *Id.* (citation omitted).  "Volitional separability depends on whether the remainder 'would have

16   been adopted by the legislative body had the latter foreseen the partial invalidation of the

17   statute.'"  *Id.* (citation omitted).  The presence of a severability clause "establishes a presumption

18   in favor of severance." *Id.* at 270.  In light of AB 2839's severability clause, *see* Cal. Elec. Code

19   § 20012(h), this Court should severe any unconstitutional aspects of AB 2839 and uphold the

20   remainder of the statute.

21   ///

22   ///

23   ///

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the foregoing reasons, this Court should deny plaintiffs' motion for summary judgment on AB 2839 and grant defendants' motion instead.

Dated:  June 6, 2025                                              Respectfully submitted,

ROB BONTA
Attorney General of California
ANYA M. BINSACCA
Supervising Deputy Attorney General


*/s/ Kristin Liska*

KRISTIN A. LISKA
Deputy Attorney General
*Attorneys for Defendants*

Defendants' Opposition on AB 2839 (2:24-cv-02527-JAM-CKD)

# CERTIFICATE OF SERVICE

Case Name:     ***Kohls, Christopher, et al. v. Rob Bonta, et al.***
Case No.:      **2:24-cv-02527-JAM-CKD**

I hereby certify that on <u>June 6, 2025</u>, I electronically filed the following document with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON AB 2839**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished electronically by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

This declaration was executed on <u>June 6, 2025</u>, at San Francisco, California.


| | |
|---|---|
| Vanessa Jordan | *Vanessa Jordan* |
| Declarant | Signature |