1  ROB BONTA
   Attorney General of California
2  ANYA M. BINSACCA, State Bar No. 189613
   Supervising Deputy Attorney General
3  KRISTIN A. LISKA, State Bar No. 315994
   Deputy Attorney General
4    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
5    Telephone:  (415) 510-3916
     Fax:  (415) 703-5480
6    E-mail:  Kristin.Liska@doj.ca.gov
   *Attorneys for Defendants*
7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10                    SACRAMENTO DIVISION

11

12  **CHRISTOPHER KOHLS, ET AL.,**          Case No. 2:24-cv-02527-JAM-CKD

13                          Plaintiffs,

14      v.                                  **DEFENDANTS' OPPOSITION TO**
                                            **PLAINTIFFS' MOTION FOR**
15  **ROB BONTA, ET AL.,**                   **SUMMARY JUDGMENT ON AB 2655**

16                          Defendants.     Date:        August 5, 2025
                                            Time:        1:00 p.m.
17                                          Dept:        6
                                            Judge:       The Honorable John A.
18                                                       Mendez
                                            Trial Date:  Not scheduled
19                                          Action Filed: 9/17/2024

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................................................. 1

Background ............................................................................................................................... 2

Legal Standard ......................................................................................................................... 6

Argument .................................................................................................................................. 6

    I.      AB 2655 Does Not Violate the First Amendment ................................................. 6

            A.     AB 2655 Does Not Generally Apply to Media Not Taken as Literally True, Such as Hyperbole, Satire, and Parody ............................. 8

            B.     Plaintiffs Do Not Carry Their Burden on a Facial Challenge to AB 2655 ................................................................................................................ 11

            C.     AB 2655 Is Narrowly Tailored ................................................................ 14

            D.     AB 2655 Is Not an Impermissible Prior Restraint ................................... 18

            E.     AB 2655 Does Not Violate Freedom of the Press ................................... 20

    II.     AB 2655 is Not Unconstitutionally Vague ........................................................ 21

    III.    AB 2655 Is Not Preempted by Section 230 ....................................................... 26

            A.     AB 2655 Is Not Preempted Under Section 230(c)(1) ............................. 26

            B.     AB 2655 Is Not Preempted Under Section 230(c)(2)(B) ......................... 28

    IV.    Any Unconstitutional Aspects of AB 2655 Are Severable ................................. 29

Conclusion .............................................................................................................................. 30

# TABLE OF AUTHORITIES

**Page**

CASES

*A.B. v. Salesforce, Inc.*
   123 F.4th 788 (5th Cir. 2024) ................................................................................. 28

*Alexander v. United States*
   509 U.S. 544 (1993) ............................................................................... 18, 19, 20

*Am. Soc'y of Journalists & Authors, Inc. v. Bonta*
   15 F.4th 954 (9th Cir. 2021) ................................................................................. 21

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986) ............................................................................................. 6

*Anderson v. TikTok, Inc.*
   116 F.4th 180 (3d Cir. 2024) ............................................................................... 27

*Animal Legal Def. Fund v. Kelly*
   9 F.4th 1219 (10th Cir. 2021) ................................................................................. 7

*Arce v. Douglas*
   793 F.3d 968 (9th Cir. 2015) ............................................................................... 21

*Barnes v. Yahoo! Inc.*
   570 F.3d 1096 (9th Cir. 2009) ............................................................................. 27

*Bluman v. Fed. Election Comm'n*
   800 F. Supp. 2d 281 (D.D.C. 2011) .................................................................... 13

*Brown v. Kemp*
   86 F.4th 745 (7th Cir. 2023) ................................................................................. 7

*Brownmark Films, LLC v. Comedy Partners*
   682 F.3d 687 (7th Cir. 2012) ............................................................................... 10

*California Redevelopment Ass'n v. Matosantos*
   53 Cal. 4th 231 (2011) ................................................................................. 29, 30

*Calise v. Meta Platforms, Inc.*
   103 F.4th 732 (9th Cir. 2024) ....................................................................... 26, 27

*Campbell v. Acuff-Rose Music, Inc.*
   510 U.S. 569 (1994) ........................................................................................... 10

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986) ............................................................................................. 6

ii

1

## TABLE OF AUTHORITIES
### (continued)

2
**Page**

3    *Cliff Notes, Inc. v. Bantam Doubleday Dell Pub. Group*
4        886 F.2d 490 (2d Cir. 1989) ........................................................................ 10

5    *Doe Through Roe v. Snap*
        144 S. Ct. 2493 (2024) ............................................................................... 27
6
    *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*
7        109 F.3d 1394 (9th Cir. 1997) ............................................................... 10, 11

8    *Enigma Software Grp., USA, LLC v. Malwarebytes, Inc.*
        946 F.3d 1040 (9th Cir. 2019) ............................................................... 28, 29
9
    *Fair Housing Council of San Fernando Valley v. Roommates.com, Inc.*
10        512 F.3d 1152 (9th Cir. 2008) .................................................................... 27

11   *Farah v. Esquire Magazine*
12        736 F.3d 528 (D.C. Cir. 2013) ................................................................ 9, 11

13   *Fontana v. Haskin*
        262 F.3d 871 (9th Cir. 2001) ....................................................................... 6
14
    *Garcia v. Google, Inc.*
15        766 F.3d 929 (9th Cir. 2014) ...................................................................... 19

16   *Garcia v. Google, Inc.*
17        786 F.3d 733 (9th Cir. 2015) ................................................................. 19, 20

18   *Hill v. Colorado*
        530 U.S. 703 (2000) .............................................................................. 21, 24
19
    *Holder v. Humanitarian Law Project*
20        561 U.S. 1 (2010) ................................................................................. 22, 25

21   *In re Alphabet, Inc. Sec. Litig.*
22        1 F.4th 687 (9th Cir. 2021) ......................................................................... 24

23   *In re Dan Farr Prods.*
        874 F.3d 590 (9th Cir. 2017) ...................................................................... 19
24
    *Isaksen v. Mazu Publ'g Co.*
25        2005 WL 8176605 (E.D. Cal. Mar. 29, 2005) ............................................ 19

26   *Johnson v. United States*
27        576 U.S. 591 (2015) ................................................................................... 23

28

iii

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Knievel v. ESPN*
   393 F.3d 1068 (9th Cir. 2005) ................................................................................. 9

4

5

*Koala v. Khosla*
   931 F.3d 887 (9th Cir. 2019) ................................................................................... 20

6

*L.L. Bean, Inc. v. Drake Publishers, Inc.*
   811 F.2d 26 (1st Cir. 1987) ..................................................................................... 9

7

8

*Leathers v. Medlock*
   499 U.S. 439 (1991) ................................................................................................ 21

9

*Lemmon v. Snap, Inc.*
   995 F.3d 1085 (9th Cir. 2021) ................................................................................. 26

10

11

*Long Beach Area Peace Network v. City of Long Beach*
   574 F.3d 1011 (9th Cir. 2009) ................................................................................. 18

12

13

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*
   507 F.3d 252 (4th Cir. 2007) ................................................................................... 10

14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
   475 U.S. 574 (1986) ................................................................................................ 6

15

16

*Milkovich v. Lorain Journal Co.*
   497 U.S. 1 (1990) .................................................................................................... 9

17

18

*Minneapolis Star & Trib. Co. v. Minn. Com'r of Revenue*
   460 U.S. 575 (1983) ................................................................................................ 20

19

*Moody v. NetChoice*
   603 U.S. 707 (2024) ...................................................................................... 7, 11, 12, 14

20

21

*Nash v. United States*
   229 U.S. 373 (1913) ................................................................................................ 23

22

23

*Near v. Minnesota ex rel. Olson*
   283 U.S. 697 (1930) ................................................................................................ 20

24

*NetChoice, LLC v. Bonta*
   113 F.4th 1101 (9th Cir. 2024) ................................................................................ 12, 14

25

26

*NetChoice, LLC v. Fitch*
   134 F.4th 799 (5th Cir. 2025) .................................................................................. 14

27

28

iv

# TABLE OF AUTHORITIES
### (continued)

**Page**

*OPAWL – Bldg. AAPI Feminist Leadership v. Yost*
    118 F.4th 770 (6th Cir. 2024)..................................................... 13

*Skidgel v. California Unemployment Ins. Appeals Bd.*
    12 Cal. 5th 1 (2021) ................................................................. 8

*Suntrust Bank v. Houghton Mifflin Co.*
    268 F.3d 1257 (11th Cir. 2001)............................................ 10, 11

*Twitter, Inc. v. Garland*
    61 F.4th 686 (9th Cir. 2023)................................................... 14

*United States v. Jae Gab Kim*
    449 F.3d 933 (9th Cir. 2006).................................................. 22

*Utah Lighthouse Ministry v. Found. For Apologetic Information & Research*
    527 F.3d 1045 (10th Cir. 2008)............................................... 10

*Vance v. Universal Amusement Co.*
    445 U.S. 308 (1980) ............................................................... 20

*Vivid Ent., LLC v. Fielding*
    774 F.3d 566 (9th Cir. 2014).................................................. 29

*Waln v. Dysart Sch. Dist.*
    54 F.4th 1152 (9th Cir. 2022)................................................... 7

*Williams-Yulee v. Fla. Bar*
    575 U.S. 433 (2015) ............................................................... 16

*Zango, Inc. v. Kaspersky Lab, Inc.*
    568 F.3d 1169 (9th Cir. 2009)................................................ 28

**FEDERAL STATUTES**

United States Code, Title 20
    § 1161*l*(c)(1)......................................................................... 22

United States Code, Title 33
    § 467n(a) .............................................................................. 22

United States Code, Title 47
    § 230.............................................................................. *passim*
    § 230(c)(1)............................................................................. 26
    § 230(c)(2)......................................................................... 28, 29
    § 230(c)(2)(B) .................................................................... 28, 29

v

1

## TABLE OF AUTHORITIES
### (continued)

2
**Page**

3  **CALIFORNIA STATUTES**

4  2024 Cal. Stats., Chapter 261 (Assembly Bill 2655) ............................................................ *passim*

5  2024 Cal. Stats., Chapter 262 (Assembly Bill 2839) ............................................................ *passim*

6  California Code of Civil Procedure

7  § 35(a) ............................................................................................................................ 5

8  California Elections Code

9  § 20511 ........................................................................................................................... 2
   § 20511(a) ...................................................................................................................... 3
   § 20511(b) ...................................................................................................................... 3
10  § 20511(c) ...................................................................................................................... 3
   § 20511(e) ...................................................................................................................... 3
11  § 20512(i)(1) ............................................................................................................... 3, 8
   § 20512(i)(2) ................................................................................................................ 24
12  § 20512(h) ................................................................................................................ 3, 21
   § 20513(a) ..................................................................................................................... 18
13  § 20513(a)(1) .................................................................................................................. 3
   § 20513(a)(2) .................................................................................................................. 4
14  § 20513(a)(2)(A) ..................................................................................................... 12, 17
15  § 20513(a)(3) .................................................................................................................. 4
   § 20513(a)(4) .................................................................................................................. 4
16  § 20513(c) ...................................................................................................................... 4
   § 20513(d)(1) ............................................................................................................... 17
17  § 20513(e) ...................................................................................................................... 4
   § 20514(a)(1) .................................................................................................................. 4
18  § 20514(a)(2) .................................................................................................................. 5
19  § 20514(a)(3) .................................................................................................................. 5
   § 20514(c) ...................................................................................................................... 5
20  § 20514(d) ...................................................................................................................... 5
   § 20514(e) ...................................................................................................................... 5
21  § 20515(a) ................................................................................................................. 3, 18
22  § 20515(b) ................................................................................................................. 5, 26
   § 20516 ...................................................................................................................... 5, 26
23  § 20519(a) ............................................................................................................... 17, 21
   § 20519(b)(1) .......................................................................................................... 17, 21
24  § 20520 ......................................................................................................................... 30

25  **MARYLAND STATUTES**

26  Md. Code, Tax-Prop. § 9-228(a) ........................................................................................ 22
27

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

VIRGINIA STATUTES

Va. Code § 62.1-44.19:15(A)(1) ............................................... 22

CONSTITUTIONAL PROVISIONS

United States Constitution
  First Amendment.................................................................................. *passim*

COURT RULES

Federal Rules of Civil Procedure
  Rule 56 ......................................................................................... 6

OTHER AUTHORITIES

"Authenticate," Black's Law Dictionary (12th ed. 2024)............................... 8

"Authentic," Collins Dictionary,
  https://www.collinsdictionary.com/us/dictionary/english/authentic...................... 8

"Authentic," Merriam-Webster Dictionary, https://www.merriam-
  webster.com/dictionary/authentic ...................................... 8

Dep't of Treasury, "Treasury Sanctions Entities in Iran and Russia That Attempted
  to Interfere in the U.S. 2024 Election," (Dec. 31, 2024),
  https://home.treasury.gov/news/press-releases/jy2766 ........................... 13

"Fraud," Black's Law Dictionary (12th ed. 2024)..................................... 13

Huo Jingnan, "Foreign Influence Efforts Reached a Fever Pitch During the 2024
  Election," NPR.com (Nov. 12, 2024), https://www.npr.org/2024/11/09/nx-s1-
  5181965/2024-election-foreign-influence-russia-china-iran ........................ 13

"Liability," Black's Law Dictionary (12th ed. 2024) ................................. 26

"Record," Black's Law Dictionary (12th ed. 2024)..................................... 9

"Record," Merriam-Webster Dictionary, https://www.merriam-
  webster.com/dictionary/recorded .................................... 9

"State-of-the-art," Cambridge Dictionary,
  https://dictionary.cambridge.org/us/dictionary/english/state-of-the-art................. 22

"State-of-the-art," Collins Dictionary,
  https://www.collinsdictionary.com/us/dictionary/english/state-of-the-art.............. 22

# INTRODUCTION

With the rise of technology, it is possible to create ever more sophisticated "deepfakes," digitally manipulated audio or visual media that typically depicts a person doing or saying something they did not do or say. As deepfakes and similar digitally manipulated media become more sophisticated and easier to make, it becomes more difficult for the average viewer to discern which media shows something that truly did occur and which media shows something that indisputably did not. This makes it possible for malicious actors to use deepfakes and digitally manipulated media for nefarious purposes: deceiving and fraudulently manipulating voters in whether to vote and whom to vote for, creating unfounded doubts about the integrity and outcomes of elections, and undermining free and fair elections that form the basic cornerstone of democracy. The wide spread of such deepfakes via large online platforms amplifies these problems and the risks posed to elections.

The California Legislature passed Assembly Bill 2655 (AB 2655), along with its companion Assembly Bill 2839, to address this growing problem. As the Legislature found in passing these statutes, concerns about political deepfakes are not merely hypothetical: deepfakes with the potential to intentionally deceive voters and twist faith in electoral outcomes *already exist*. In seeking to address these concerns, the Legislature was cognizant of the First Amendment and its protection of free speech. It sought to regulate deepfakes that have the potential to harm electoral integrity in a way consonant with First Amendment principles and narrowly tailored to serving the State's compelling interest in preserving free and fair elections.

While AB 2839 is targeted towards those who distribute materially deceptive content, AB 2655 is focused on addressing the viral spread of such media via online platforms. The law applies to large online platforms—those with over 1,000,000 users in California annually—and imposes three main requirements. First, it requires such platforms to create a means for users to report to the platform materially deceptive content subject to AB 2655. Second, during the 120-day window before an election, it requires platforms to remove the most dangerous such content—specifically, only content depicting a candidate, elected official, or elections official doing or saying something they did not do or say that is reasonably likely to cause the harms

1   animating AB 2655.  Third, during the 6-month period leading up to an election, it requires

2   platforms to label other materially deceptive content related to elections with a label noting the

3   content has been manipulated.

4       At its core, AB 2655 is not about censorship and silencing dissenting voices.  Nowhere in

5   the statue's language or legislative history is there a hint that the Legislature meant to silence

6   legitimate debate.  Rather, the Legislature was clear that its concern was intentionally created

7   deepfakes, spread with awareness of their falsity, that were likely to mislead voters, manipulate

8   voting behavior and choices, and sow confusion and uncertainty about an election and its

9   outcome.  The Legislature said as much in the codified factual findings of AB 2655.  *See*

10  *generally* Cal. Elec. Code § 20511.  And it said as much throughout the legislative history.

11      As defendants explain in their motion for summary judgment, AB 2655 does not violate the

12  First Amendment, is not unconstitutionally vague, and is not preempted by Section 230 of the

13  Communications Decency Act.  Plaintiffs' arguments to the contrary are unavailing.  With respect

14  to the First Amendment, AB 2655 is a rare statute that meets strict scrutiny: it is narrowly tailored

15  to further the State's compelling interest in preventing fraud on voters, preserving electoral

16  integrity, and maintaining free and fair elections.  Of note, and contrary to plaintiffs' arguments

17  otherwise, AB 2655 does not generally apply to speech not literally taken as true, such as parody,

18  satire, hyperbole, or hypotheticals—such speech will typically not meet the definition of

19  "materially deceptive content" so as to fall within AB 2655's scope.  The law is also not invalid

20  under plaintiffs' other First Amendment theories, unconstitutionally vague, or preempted by

21  Section 230.  This Court should thus deny plaintiffs' motion for summary judgment on AB 2655

22  and grant defendants' motion.

23                              **BACKGROUND**

24      In light of the previous briefing submitted to this Court, defendants will provide only a brief

25  background discussion in this opposition.  A more detailed description of political deepfakes, the

26  statutory scheme, and this matter's procedural history can be found in Defendants' Memorandum

27  of Points and Authorities in Support of Motion for Summary Judgment on Assembly Bill 2655

28  ("Defs.' AB 2655 Mem.") on pages 2 through 11.

2

1    The California Legislature passed Assembly Bill 2655 (AB 2655) "to ensure California

2    elections are free and fair." Cal. Elec. Code § 20511(e). The Legislature noted growing concerns

3    about the use of "deepfakes" during elections—media that has been digitally manipulated to show

4    someone doing or saying something they did not do or say, *see* Alvarez Decl. ¶ 8. With the rise

5    of digitally manipulated media facilitated by modern technology, "bad actors now have the power

6    to create a false image of a candidate accepting a bribe, or a fake video of an elections official

7    'caught on tape' saying that voting machines are not secure, or to generate the Governor's voice

8    telling millions of Californians their voting site has changed." Cal. Elec. Code § 20511(b).

9    "Voters will not know what images, audio, or video they can trust." *Id.* § 20511(a). The

10    dissemination of such media "to millions of Californians in seconds" can "skew election results"

11    and "undermine trust in the ballot counting process." *Id.* § 20511(c).

12    To combat this growing societal problem, AB 2655 imposes three regulations on a "large

13    online platform," defined as "a public-facing website, web application, or digital application,

14    including a social media platform . . ., video sharing platform, advertising network, or search

15    engine" with at least 1,000,000 California users in the preceding year. Cal. Elec. Code

16    § 20512(h). The law applies to "materially deceptive content," defined as "audio or visual media

17    that is digitally created or modified" such that it "would falsely appear to a reasonable person to

18    be an authentic record of the content depicted in the media." *Id.* § 20512(i)(1).

19    *The Reporting Requirement*: First, large online platforms must "provide an easily

20    accessible way for California residents to report to that platform content that should be

21    removed . . . or labeled" under AB 2655. Cal. Elec. Code § 20515(a). The platform "shall

22    respond to the person who made the report within 36 hours of the report, describing any action

23    taken or not taken by the large online platform" with respect to the reported content. *Id.*

24    *The Blocking Requirement*: Second, a large online platform "shall develop and implement

25    procedures for the use of state-of-the-art techniques to identify and remove materially deceptive

26    content" that meets all of the following requirements:

27    (1) The materially deceptive content is reported to the platform via the means created to

28    comply with the Reporting requirement, Cal. Elec. Code § 20513(a)(1);

(2) The materially deceptive content depicts:

    (a) A candidate for office doing or saying something they did not do or say that is reasonably likely to harm the candidate's reputation or electoral prospects,

    (b) An elections official doing or saying something they did not do or say in connection with their elections-related duties that is reasonably likely to falsely undermine confidence in an election's outcome,

    (c) An elected official saying or doing something they did not say or do that influences an election in California and that is reasonably likely to falsely undermine confidence in an election's outcome, *id.* § 20513(a)(2);

(3) The material is posted during the period of time 120 days before an election through the day of the election, and, for material showing an elections official, the period of time 60 days after an election *id.* § 20513(a)(3), (e); and

(4) The platform knows or acts with reckless disregard for the fact the materially deceptive content meets the requirements of this section, *id.* § 20513(a)(4).

Of note, the main part of the Blocking Requirement only applies once a platform has received a report regarding materially deceptive content; *it imposes no affirmative obligation on the platform to seek out and identify materially deceptive content*.  The same holds true for the other part of the Blocking Requirement, which requires a platform to "identify, using state-of-the-art techniques, and remove, *upon discovering or being alerted to* the posting or reposting of, any identical or substantially similar materially deceptive content that the platform had previously removed" under AB 2655.  Cal. Elec. Code § 20513(c) (emphasis added).

    *The Labeling Requirement*:  Finally, AB 2655 requires a large online platform to "develop and implement procedures for the use of state-of-the-art techniques to identify materially deceptive content and for labeling such content" if all of the following requirements are met:

(1) The materially deceptive content is reported to the platform via the means created to comply with the Reporting Requirement, Cal. Elec. Code § 20514(a)(1);

1        (2) The materially deceptive content is either content within the scope of the Blocking

2        Requirement but posted outside that requirement's temporal window or is within the scope

3        of AB 2655 but not subject to the Blocking Requirement, *id.* § 20514(a)(2);

4        (3) The platform knows or acts with reckless disregard for the fact that the materially

5        deceptive content meets the requirements of this section, *id.* § 20514(a)(3); and

6        (4) The material is posted in the period of time six months before an election and, for

7        material that depicts or pertains to elections officials, the electoral college process, a voting

8        machine, ballot, voting site, other election equipment, or the canvass of the vote, the period

9        of time 60 days after the election, *id.* § 20514(e).

10 Under the Labeling Requirement, for materially deceptive content that meets all the requirements

11 above, the online platform must add a label stating that the audio, image, or video has been

12 manipulated and is not authentic. Cal. Elec. Code § 20514(c). The label shall allow users to click

13 on it for additional explanation about the content and shall be in an easy-to-understand format.

14 *Id.* § 20514(d). As with the Blocking Requirement, the Labeling Requirement imposes no

15 obligation on a platform to seek out and identify content that should be labeled, but rather only to

16 act in response to receiving a report.

17     *Enforcement Aspects*: AB 2655 allows enforcement in two circumstances. First, a

18 candidate, elected official, or elections official who has reported content to the platform may

19 bring suit. Cal. Elec. Code § 20515(b). The suit may only seek injunctive or other equitable

20 relief to compel removal, labeling, or compliance with the Reporting Requirement, and the

21 plaintiff bears the burden of establishing the violation through clear and convincing evidence. *Id.*

22 Second, the Attorney General or a district or city attorney may seek enforcement. *Id.* § 20516.

23 Such a suit is also limited to injunctive or other equitable relief to compel removal, labeling, or

24 compliance with the Reporting Requirement, and the plaintiff here also bears the burden of

25 establishing the violation through clear and convincing evidence. *Id.* Any suits brought to

26 enforce AB 2655 are entitled to precedence. *Id.* §§ 20515(b), 20516; *see also* Cal. Code. Civ.

27 Pro. § 35(a).

28

1    Plaintiffs in these four consolidated actions are a mix of online platforms (X Corp. and the

2    Rumble plaintiffs) or media creators (Christopher Kohls, Kelly Chang Rickert, and the Babylon

3    Bee). *See* Defs.' AB 2655 Mem. at 9-10. They have brought suit against Attorney General Rob

4    Bonta and Secretary of State Shirley N. Weber, in their official capacities, and challenge AB

5    2655 as a violation of the First Amendment, as unconstitutionally vague, and as preempted by

6    Section 230 of the Communications Decency Act. *See id.* The parties have now filed cross-

7    motions for summary judgment.

8                                       **LEGAL STANDARD**

9    Under Federal Rule of Civil Procedure 56, the Court may award summary judgment if there

10   are no material disputes of fact and the moving party demonstrates it is entitled to judgment as a

11   matter of law. A fact is "material" if it would impact the outcome of the case. *Anderson v.*

12   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the burden of

13   demonstrating there are no material facts in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

14   (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the

15   nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith*

16   *Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). In determining whether there are any

17   material facts in dispute, the court must "view[ ] the evidence in the light most favorable to the

18   nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not

19   engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences

20   from the facts. *Anderson*, 477 U.S. at 255.

21                                          **ARGUMENT**

22   In their motion for summary judgment on AB 2655, plaintiffs challenge the statute on three

23   grounds: as a violation of the First Amendment, as unconstitutionally vague, and as preempted.

24   AB 2655 is not invalid under any of these theories.

25   **I.    AB 2655 DOES NOT VIOLATE THE FIRST AMENDMENT**

26   Defendants do not dispute that AB 2655 implicates the free speech First Amendment rights

27   of covered platforms or of users who post on such platforms. Nor do defendants dispute that AB

28

                                                    6

1   2655 is a content-based statute that triggers strict scrutiny.[1]  Nonetheless, plaintiffs' First

2   Amendment challenge to AB 2655 fails.

3       *First*, plaintiffs' challenge to AB 2655 begins from a mistaken interpretation of the statute.

4   Plaintiffs contend the statute reaches "beyond prohibiting actually false speech" to other speech

5   such as hyperbole.  Pls.' Mem. P. & A. Supp. Mot. Summ. J. Against AB 2655 ("Pls.' AB 2655

6   Mem.") at 14.  Not so.  AB 2655 does not generally reach speech not taken as literally true, such

7   as hyperbole, satire, parody, or hypotheticals.  This follows from AB 2655's plain language,

8   specifically its definition of "materially deceptive content."

9       *Second*, plaintiffs fail to carry their burden under *Moody v. NetChoice*, 603 U.S. 707

10  (2024), to establish a facial challenge to AB 2655.  In their analysis of overbreadth and a facial

11  claim, plaintiffs fail to establish the full range of applications of AB 2655, which includes

12  constitutionally permissible applications such as to media constituting fraud or defamation or to

13  media posted by malicious foreign actors.  Nor have plaintiffs demonstrated that any

14  unconstitutional applications substantially outweigh such constitutional ones.

15      *Third*, AB 2655 withstands strict scrutiny.  It is narrowly tailored to further the State's

16  compelling interest in protecting free and fair elections, preventing fraud on voters, and

17  preserving electoral integrity.

18      *Fourth*, AB 2655 is not an impermissible prior restraint.  The statute does not prohibit any

19  speech *in advance*, but rather solely regulates speech that has *already occurred*.

20      *Fifth*, AB 2655 does not violate the Free Press Clause.  The law does not single out the

21  press for any additional burdens, but rather provides an exemption for the press—the exact

22  opposite of targeting the press for additional burdens.

23

24  _____

    [1] Plaintiffs also contend that AB 2655 is viewpoint-based and thus automatically invalid.
25  *See* Pls.' AB 2655 Mem. at 29-30.  Defendants disagree that AB 2655 is viewpoint-based,
    because it does not single out a particular side of a debate.  In any event, the Ninth Circuit has
26  stated that "viewpoint based restrictions on speech are subject to strict scrutiny."  *Waln v. Dysart
    Sch. Dist.*, 54 F.4th 1152, 1162 (9th Cir. 2022); *see also, e.g.*, *Brown v. Kemp*, 86 F.4th 745, 783
27  (7th Cir. 2023) (applying strict scrutiny to viewpoint-based law); *Animal Legal Def. Fund v.
    Kelly*, 9 F.4th 1219, 1236 (10th Cir. 2021) (same).  The cases cited by plaintiffs do not hold that a
    viewpoint-based restriction that does meet strict scrutiny would nonetheless be unconstitutional
28  under the First Amendment.

**A.    AB 2655 Does Not Generally Apply to Media Not Taken as Literally True, Such as Hyperbole, Satire, and Parody**

Plaintiffs begin their description of AB 2655 and its impact by contending that it "extends beyond prohibiting actually false speech." Pls.' AB 2655 Mem. at 14. But in starting from this premise, plaintiffs operate from an erroneous reading of the statute's plain language. On the contrary, AB 2655 does not generally reach content that a reasonable viewer would not interpret as depicting true events, such as parody, satire, or hyperbole.

California courts interpreting statutes "begin by examining the statutory language, giving it a plain and commonsense meaning." *Skidgel v. California Unemployment Ins. Appeals Bd.*, 12 Cal. 5th 1, 14 (2021) (citation omitted). Of course, courts do not "consider the statutory language in isolation" but rather "look to the entire substance of the statutes in order to determine their scope and purpose." *Id.* (citation omitted). When "the statutory language is unambiguous, then its plain meaning controls." *Id.* (citation omitted). Only if "the language supports more than one reasonable construction" do courts look to "extrinsic aids, including the ostensible objects to be achieved and the legislative history." *Id.* (citation omitted).

The text of AB 2655 is unambiguous: speech that is not taken as literally true—like parody, satire, hyperbole, or counterfactuals—generally does not fall within its scope. This is because such speech will typically fail to meet the definition of "materially deceptive content." To constitute "materially deceptive content" under AB 2655, the relevant media must "falsely appear to a reasonable person to be an authentic record of the content depicted in the media." Cal. Elec. Code § 20512(i)(1). The ordinary meaning of "authentic" is something that is real or true and not false or an imitation.[2] In turn, the ordinary meaning of "record" is something that preserves or

---

[2] *See, e.g.*, "Authentic," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/authentic (defining "authentic" as "not false or imitation: real, actual," "worthy of acceptance or belief as conforming to or based on fact," "conforming to an original so as to reproduce essential features," and "made or done the same was as an original") (last accessed June 6, 2025); "Authentic," Collins Dictionary, https://www.collinsdictionary.com/us/dictionary/english/authentic (defining "authentic" as "genuine" and "reliable and accurate") (last accessed June 6, 2025); *see also* "Authenticate," Black's Law Dictionary (12th ed. 2024) (defining "authenticate" as "[t]o prove the genuineness of (a thing); to show (something) to be true or real").

1    details past events.[3]  An "authentic record" is therefore one that provides a true account of real

2    past events.  In other words, materially deceptive content is only that which a reasonable person

3    would believe depicts events that *actually happened*—that is, speech taken as literally true.

4        In drawing a line between what a reasonable viewer takes as literally true (and thus within

5    its scope) and what a reasonable viewer would not take literally (and thus outside its scope), AB

6    2655 follows a line drawn throughout speech jurisprudence.  Courts in multiple contexts

7    distinguish speech not literally true such as parody or satire from other forms of speech.

8    Consider, for instance, defamation law.  Under the First Amendment, "liability for defamation

9    arises only if, at a minimum, a defendant's statement 'reasonably implies false and defamatory

10    facts.'"  *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (quoting *Milkovich v.*

11    *Lorain Journal Co.*, 497 U.S. 1, 20 (1990)).  Thus "[w]here a defendant's statement 'cannot be

12    construed as representations of fact,' there can be no defamation."  *Id.* (citation omitted).

13    Consequently, "[d]espite its literal falsity," satire or parody "is not actionable if it 'cannot

14    reasonably be interpreted as stating actual facts about an individual.'"  *Id.* at 536 (quoting

15    *Milkovich*, 497 U.S. at 20); *see also Knievel v. ESPN*, 393 F.3d 1068, 1074 (9th Cir. 2005.  This

16    determination turns on "what a reasonable reader would have understood."  *Farah*, 736 F.3d at

17    536.  When a reasonable viewer would not understand a purported parody or satire "to be

18    conveying 'real news' about the subject, it is not actionable under defamation law.  *Id.* at 537; *see*

19    *also Knievel*, 393 F.3d at 1078 (post not actionable where reasonable viewer "would have

20    certainly interpreted the photograph and caption, in the context in which they were published, as

21    an attempt at humor").

22        Then there is trademark law.  Courts have rejected claims for violations of federal

23    trademark law when the allegedly infringing mark is a parody mark.  *See, e.g.*, *L.L. Bean, Inc. v.*

24    *Drake Publishers, Inc.*, 811 F.2d 26, 33 (1st Cir. 1987).  When determining whether an allegedly

25    infringing mark constitutes a parody mark, courts look to whether a consumer is "likely to be

26    _____

    [3] *ee, e.g.*, "Record," Black's Law Dictionary (12th ed. 2024) (defining "record" as

27    "documentary account of past events, usually designed to memorialize those events"); "Record,"
    Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/recorded (defining

28    "record" as "the state or fact of being recorded" or "something that recalls or relates past events")
    (last accessed June 6, 2025).

1   confused as to the source, sponsorship, or approval," that is, whether a customer will take the

2   allegedly infringing mark to be the original mark.  *Dr. Seuss Enterprises, L.P. v. Penguin Books*

3   *USA, Inc.*, 109 F.3d 1394, 1405 (9th Cir. 1997); *see also, e.g.*, *Utah Lighthouse Ministry v.*

4   *Found. For Apologetic Information & Research*, 527 F.3d 1045, 1057 (10th Cir. 2008) ("[A]n

5   unsuccessful parody—one that creates a likelihood of confusion—is not protected from an

6   infringement suit.").  Thus, where a "consumer would likely be put on notice from the first" that a

7   mark was a parody and not an original, there is no copyright claim.  *Cliff Notes, Inc. v. Bantam*

8   *Doubleday Dell Pub. Group*, 886 F.2d 490, 497 (2d Cir. 1989); *see also Louis Vuitton Malletier*

9   *S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 260 (4th Cir. 2007) (holding no infringement of

10  trademark for handbag company by dog toy parodies where the dog toys clearly "communicate[d]

11  that it is not the [trademarked] product" and consumers were not likely to confuse the two).

12       Finally, there is copyright law.  Courts have recognized in adjudicating copyright claims

13  that parodies are protected as fair use and do not constitute copyright infringement.  *Campbell v.*

14  *Acuff-Rose Music, Inc.*, 510 U.S. 569, 574 (1994).  When a work claims to be a parody, "the

15  threshold question . . . is whether a parodic character may be reasonably perceived."  *Id.* at 582.

16  In other words, courts determine whether the allegedly infringing work "aim[s] to comment upon

17  or criticize a prior work by appropriating elements of the original in creating a new artistic . . .

18  work."  *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1268-69 (11th Cir. 2001); *see*

19  *also, e.g.*, *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 693 (7th Cir. 2012) (parody

20  work was meant "to comment on and critique the social phenomenon that is the 'viral video'" and

21  not to substitute for original work).

22       As the above examples indicate, courts have long distinguished speech not taken as literally

23  true from other kinds of speech.  In drawing that distinguishing line, courts have typically focused

24  on how the speech is understood by a reasonable viewer—such as whether a reasonable viewer

25  will be deceived by the purported satire or parody and believe it to be something authentic.  That

26  is precisely the line that AB 2655 tracks: materially deceptive content is only that which a

27  reasonable person would believe to be an accurate recording of events that truly occurred.  And

28  just as in the context of defamation suits or copyright suits, this turns on "what a reasonable

1   reader would have understood." *Farah*, 736 F.3d at 536.  Such a determination is "more

2   informed by an assessment of [the average person's] well-considered view than by her immediate

3   yet transitory reaction." *Id.*  The test "is not whether some actual readers were misled, but

4   whether the hypothetical reasonable reader could be (after time for reflection)." *Id.*  This is a

5   standard courts are more than capable of administering—and, indeed, do administer when

6   adjudicating defamation and trademark infringement claims.

7          That AB 2655 also includes an exemption for materially deceptive content that constitutes

8   satire or parody does not change that.  Rather, the exemption reflects the simple reality that there

9   can be disagreement about whether a purported satire or parody is likely to be understood as such

10  by a reasonable person—or whether a reasonable person would be deceived instead.  It is entirely

11  possible that an author may intend their work to be a parody and satire but miss the mark, placing

12  it instead within the scope of "materially deceptive content."  Such a problem is not unique to AB

13  2655.  It arises in other legal contexts where the distinction between parody or satire and other

14  works is relevant.  *See, e.g.*, *Dr. Seuss*, 109 F.3d at 1401-03 (holding purported parody work was

15  not protected parody under copyright law).  As in those contexts, what matters for AB 2655 is not

16  what a work is labeled, but rather whether it meets the legal definition of "materially deceptive

17  content."  *See, e.g.*, *Suntrust Bank*, 268 F.3d at 1273 n.27 (author "may label their book a

18  'parody,' or a 'novel,' or whatever they like, and that fact would be largely irrelevant to [court's]

19  work" in determining whether work was protected parody under copyright law).  What AB

20  2655's exemption thus does is provide additional protection for purported satire or parody that

21  still falls within the scope of AB 2655.  It certainly does not indicate that other forms of speech

22  not meant to be taken literally true—such as hyperbole, counterfactuals, or hypotheticals—are

23  within the scope of AB 2655.  In light of the plain language of "materially deceptive content,"

24  such speech is not.

25       **B.    Plaintiffs Do Not Carry Their Burden on a Facial Challenge to AB 2655**

26          Plaintiffs bring a facial First Amendment challenge to AB 2655.  As the Supreme Court has

27  stated, "that decision comes at a cost."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).

28  "For a host of good reasons, courts usually handle constitutional claims case by case, not en

1    masse." *Id.*  The Supreme Court has "therefore made facial challenges hard to win." *Id.*  In the

2    First Amendment context, a law is facially invalid "only if the law's unconstitutional applications

3    substantially outweigh its constitutional ones." *Id.* at 724.  This standard imposes a two-part

4    analysis: "first, the courts must 'assess the state laws' scope'; and second, the courts must 'decide

5    which of the laws' applications violate the First Amendment, and . . . measure them against the

6    rest.'" *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1115-16 (9th Cir. 2024) (quoting *Moody*, 603

7    U.S. at 725) (alteration in original).[4]

8         "[N]either parties nor courts can disregard the requisite inquiry into how a law works in all

9    of its applications" in a facial First Amendment challenge.  *Moody*, 603 U.S. at 744.  Instead, the

10    court "must evaluate the full scope of the law's coverage" and "then decide which of the law's

11    applications are constitutionally permissible and which are not," before "weigh[ing] the one

12    against the other." *Id.*  "The need for [plaintiffs] to carry [their] burden on those issues is the

13    price of [their] decision to challenge [AB 2839] as a whole." *Id.*

14         Plaintiffs fail to carry that burden.  Nowhere do plaintiffs establish the full range of

15    applications of AB 2655, let alone whether such applications would be constitutional or

16    unconstitutional.  For instance, consider the application of AB 2655 to materially deceptive

17    content that would also constitute defamation.  *See* Defs.' AB 2655 Mem. at 14.  AB 2655 covers

18    materially deceptive content depicting a candidate doing or saying something they did not do or

19    say that is reasonably likely to harm the reputation or electoral prospects of the candidate.  *See*

20    Cal. Elec. Code § 20513(a)(2)(A).  To the extent the materially deceptive content does cause such

21    reputational harm, it may constitute defamation or libel under California law.  Such applications

22    of AB 2655 would thus be constitutional.

23         Consider, too, the application of AB 2655 to content that would constitute fraud or

24    attempted fraud—another type of speech that the State can regulate under the First Amendment,

25    as plaintiffs note, *see* Pls.' AB 2655 Mem. at 34.  Fraud is typically defined as "[a] knowing

26    misrepresentation or knowing concealment of a material fact made to induce another to act to his

---

27    ⁴ The standard for facial challenges thus tracks the overbreadth standard.  *See* Pls.' AB
     2655 Mem. at 39.  Any overbreadth challenge that exists independent of plaintiffs' facial
28    challenge fails for the same reason their facial challenge fails.

1    or her detriment." "Fraud," Black's Law Dictionary (12th ed. 2024). Some applications of AB

2    2655 involve conduct that meets this definition, as when someone knowingly posts materially

3    deceptive content with the purpose of deceiving a voter to change their voting behavior. *See*

4    Defs.' AB 2655 Mem. at 14-15. Such applications of AB 2655 would also be constitutional.

5           Or consider the application of AB 2655 to materially deceptive content posted by malicious

6    foreign actors. It is clear that foreign governments are engaging in campaigns meant to influence

7    politics in the United States that involve spreading falsehoods. *See* Alvarez Decl. ¶¶ 35-37.

8    Indeed, the U.S. government in December 2024 sanctioned several companies for their targeted

9    misinformation campaigns during the 2024 election, including the use of digitally manipulated

10   media content.[5] Some of what these foreign actors have used in the past (and will no doubt

11   continue to use in the future) constitutes materially deceptive content under AB 2655.[6] Clearly,

12   the State has a compelling interest in keeping foreign actors from purposefully manipulating its

13   voters. "[T]he government may bar foreign citizens . . . from participating in the campaign

14   process that seeks to influence how voters will cast their ballots in the elections. Those

15   limitations on the activities of foreign citizens are . . . all 'part of the sovereign's obligation to

16   preserve the basic conception of a political community.'" *Bluman v. Fed. Election Comm'n*, 800

17   F. Supp. 2d 281, 288 (D.D.C. 2011) (three-judge court) (Kavanaugh, J.), *summarily aff'd*, 565

18   U.S. 1104 (2012). In light of the States' "significant leeway in protecting their democratic

19   processes from the influence of noncitizens," *OPAWL – Bldg. AAPI Feminist Leadership v. Yost*

20   118 F.4th 770, 777 (6th Cir. 2024), applications of AB 2655 to posts by foreigners—especially

21   those acting at the behest of malicious foreign powers—will likely pass constitutional muster.

22          As the above examples illustrate, AB 2655 applies in a broad variety of contexts. *See also*

23   Br. of *Amicus Curiae* Electronic Privacy Information Center at 12-17 (discussing constitutional

24

25          [5] *See* Dep't of Treasury, "Treasury Sanctions Entities in Iran and Russia That Attempted to Interfere in the U.S. 2024 Election," (Dec. 31, 2024), https://home.treasury.gov/news/press-releases/jy2766 (last accessed June 6, 2025).

26          [6] For instance, the news reported that during the 2024 election cycle, digitally altered

27   videos linked to foreign operatives were posted online, including videos falsely showing ballots being destroyed. *See, e.g.*, Huo Jingnan, "Foreign Influence Efforts Reached a Fever Pitch During the 2024 Election," NPR.com (Nov. 12, 2024), https://www.npr.org/2024/11/09/nx-s1-5181965/2024-election-foreign-influence-russia-china-iran (last accessed June 6, 2025).

28

1    applications of sister statute AB 2839's similar language that are analogous to prohibiting speech

2    impersonating government officials or misappropriating names or likenesses, among others).  Yet

3    plaintiffs' brief is silent as to this full range of applications of AB 2655.  Nowhere do plaintiffs

4    grapple with all applications of AB 2655, thereby failing to establish "[w]hat activities, by what

5    actors" AB 2655 "prohibit[s] or otherwise regulate[s]."  *Moody*, 603 U.S. at 707.  Nowhere do

6    plaintiffs provide a record establishing "whether a substantial majority of [AB 2655's]

7    applications are likely to fail First Amendment scrutiny."  *NetChoice*, 113 F.4th at 1124.  And

8    nowhere do plaintiffs "weigh violative applications of the Act against non-violative ones."

9    *NetChoice, LLC v. Fitch*, 134 F.4th 799, 809 (5th Cir. 2025).  By failing to do so, plaintiffs have

10   wholly failed to carry their burden on a facial First Amendment challenge to AB 2655.

11       **C.    AB 2655 Is Narrowly Tailored**

12       Plaintiffs further contend that AB 2655 fails strict scrutiny.  A law subject to strict scrutiny

13   "is justified only if the government demonstrates that [the law] is narrowly tailored to serve a

14   compelling state interest."  *Twitter, Inc. v. Garland*, 61 F.4th 686, 698 (9th Cir. 2023).  Plaintiffs

15   do not seriously dispute that the State has a compelling interest in protecting free and fair

16   elections.  *See* Pls.' AB 2655 Mem. at 30.  For good reason: courts have been clear that a State

17   has a compelling interest in preventing fraud in elections and in preserving free and fair elections.

18   *See* Defs.' AB 2655 Mem. at 16-19; *see also* Br. of *Amicus* Campaign Legal Center at 13-18.

19       AB 2655 is narrowly tailored to further that compelling interest.  As defendants explain in

20   their motion for summary judgment, the Blocking and Labeling Requirements work in tandem to

21   properly calibrate the intrusion on speech to the risk of harm to the State's interest.  *See* Defs.'

22   AB 2655 Mem. at 19-25.  The Blocking Requirement imposes a greater intrusion on speech by

23   requiring removal of a narrow band of materially deceptive content that poses the greatest risk of

24   harm, namely depictions of a candidate, elected official, or elections official saying or doing

25   something they did not say or do that is reasonably likely to cause the harms animating AB 2655.

26   *See id.* at 21-22.  In turn, the Labeling Requirement imposes a lesser intrusion on speech by only

27   requiring a factual, non-controversial label on speech rather than removal and applies to the wider

28   band of speech regulated by AB 2655.  *See id.* at 24.  Moreover, both requirements are tailored by

14

1  the temporal windows in which they apply (again, a narrower window for the Blocking

2  Requirement than for the Labeling Requirement) and by their mens rea requirement—that the

3  platform know or act with reckless disregard for the fact that the materially deceptive content falls

4  within the scope of AB 2655.  *See id.* at 20.  Finally, AB 2655 is narrowly tailored by the

5  Legislature's intentional choice not to impose any affirmative obligations on platforms but rather

6  only to require action when a platform receives a report that materially deceptive content falls

7  within the scope of AB 2655.  *See id.* at 20-21.

8          Plaintiffs' arguments to the contrary are unavailing.  First, plaintiffs proffer several

9  allegedly less-restrictive alternatives.  But none of these alternatives would serve the States'

10  proffered interests.  Start with existing laws.  *See* Pls.' AB 2655 Mem. at 30-31.  Privacy torts and

11  defamation exist to protect an individual's reputation or privacy; they do not ensure electoral

12  integrity.  And by the time such laws could be used, the harm the State is seeking to prevent—

13  voters being misled by fraudulent speech—has occurred.  There is no way that that harm could be

14  remedied after the fact by a tort or privacy suit.  Once a voter has cast their vote and the election

15  is over, there is no way to change that vote or redo the entire election.  The whole purpose of AB

16  2839 is to prevent voters from being fraudulently manipulated when casting their votes and the

17  concomitant doubt and uncertainty that injects to undermine the electoral process.  Waiting until

18  *after* that harm has occurred to take action that will not even *remedy* the harm that has now

19  occurred in no way serves the State's interests.

20          Next, counterspeech.  It is true that counterspeech is often a viable alternative to deceptive

21  speech.  That does not make it viable here.  Rather, the nature of the materially deceptive content

22  subject to AB 2655 renders counterspeech ineffective.  As defendants explained in their own

23  motion for summary judgment, deepfakes are "sticky"—they linger in their effects on a viewer

24  even after the viewer *knows* the content is false or manipulated.  *See* Defs.' AB 2655 Mem. at 22-

25  23; Alvarez Decl. ¶¶ 22-25, 39, 53.  Nor is it remotely plausible that the government could

26  realistically seek to debunk or prebunk every deepfake posted around an election; such content

27  spreads virally, often faster than the truth, and can be hard to find in a fragmented yet expansive

28  social media world online.  *See* Defs.' AB 2655 Mem. at 22-23; Alvarez Decl. ¶¶ 25-26, 30-34,

15

1    39-40; *see also* Br. of *Amicus* Electronic Privacy Information Center at 17-22.  Given the unique

2    nature of the materially deceptive content within the scope of AB 2655 and the significant

3    dangers of deceiving voters and undermining such elections that content causes, counterspeech is

4    not a viable less-restrictive alternative in this case.

5            Finally, plaintiffs point to actions already undertaken by platforms as possible alternatives,

6    such as X's "Community Notes" feature.  Many of these suffer the same limitation as

7    counterspeech: they do not address the stickiness of political deepfakes or their rapid spread vis-

8    à-vis the truth.  And there are reasons to doubt that the decentralized nature of the online world

9    will provide an effective counter to political deepfakes in the absence of clear, centralized

10   regulation.  *See* Alvarez Decl. ¶¶ 27, 33; *cf.* Br. of *Amicus* Electronic Privacy Information Center

11   at 22-24 (explaining how platforms' use of algorithms can exacerbate the spread of deepfakes).

12   In any event, relying on voluntary action from third parties such as platforms is not a less-

13   restrictive alternative *the government* can take.  It is no answer to the growing threat of political

14   deepfakes to say that the State should simply wait and see if third parties willingly undertake

15   actions to mitigate that problem on their own.  Plaintiffs point to no cases suggesting that such

16   hopeful inactivity is a viable less-restrictive alternative.

17           In addition to pointing to proffered alternatives (all of which would be insufficient to

18   further the State's interest), plaintiffs contend that AB 2655 is underinclusive.  Pls.' AB 2655

19   Mem. at 31.  Not so.  As a threshold matter, "the First Amendment imposes no freestanding

20   'underinclusiveness limitation.'"  *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015) (citation

21   omitted).  As the Supreme Court has explained, "[a] State need not address all aspects of a

22   problem in one fell swoop; policymakers may focus on their most pressing concerns."  *Id.*  Courts

23   "have accordingly upheld laws—even under strict scrutiny—that conceivably could have

24   restricted even greater amounts of speech in service of their stated interests."  *Id.*  That the

25   California Legislature sought to circumscribe the speech subject to AB 2655 speaks to the law's

26   narrow tailoring, not undermines it.

27           Plaintiffs primarily contend that AB 2655 is underinclusive in light of its exemptions

28   (which functionally only apply to the Blocking Requirement, not the Labeling Requirement).  AB

1    2655, like its sister statute AB 2839, contains two relevant exemptions: a news media exemption

2    and a candidate exemption.  Neither undermines AB 2655's tailoring because both exemptions

3    allow for more speech when it furthers the State's interests.  The exemption for news media only

4    allows them to broadcast materially deceptive content "as part of a bona fide newscast, news

5    interview, news documentary, commentary of general interest, or on-the-spot coverage of bona

6    fide news events" and only if the broadcast "clearly acknowledges through content or a disclosure

7    . . . that the materially deceptive content does not accurately represent any actual event,

8    occurrence, appearance, speech, or expressive conduct."  Cal. Elec. Code § 20519(b)(1); *see also

9    id.* § 20519(a) (exemption for news media that "routinely carries news and commentary of

10   general interest" and publishes materially deceptive content with a disclosure).  The purpose of

11   AB 2655 is to ensure that voters are not deceived in ways that inject fraud and uncertainty into

12   the electoral process.  The news exemption allows the media and press to report on material

13   deepfakes, which helps to *inform* voters rather than *deceive* them thereby—furthering the State's

14   compelling interest.

15         The same holds true of the exemption for political candidates.  As with the news

16   exemption, the candidate exemption allows for distribution with a required disclosure

17   acknowledging the media has been manipulated.  Cal. Elec. Code § 20513(d)(1).  For one, it is

18   highly unlikely that a candidate would wish to share content within the scope of AB 2655 about

19   themselves to begin with; after all, such content must show them saying or doing something they

20   did not do or say that is reasonably likely to undermine *their own* reputation or electoral

21   prospects.  *See id.* § 20513(a)(2)(A).  And when a candidate does share such content, it is likely to

22   be shared for the purpose of ensuring voters are aware the depiction is fake—a purpose further

23   ensured by the requirement to include a disclosure.  A candidate who shares materially deceptive

24   content to ensure voters know it is false similarly helps ensure that voters are not deceived by

25   such content and that elections remain free and fair.  In that way, this exemption also helps further

26   the State's compelling interest.  Neither indicates that AB 2655 is not narrowly tailored.

27         In the end, in crafting AB 2655 the Legislature sought to protect the First Amendment

28   rights of platforms and their users by narrowly tailoring the statute to further its compelling

1   interest in protecting free and fair elections and avoiding voter fraud and deception.  It did so by

2   confining AB 2655's reach to manipulated audio or visual media rather than textual media or

3   other forms of writing.  It did so by defining "materially deceptive content" to generally exclude

4   parody, satire, or other hyperbolic speech that a reasonable person would not take as literally true.

5   It did so by requiring platforms to act only following a report and when they know that media

6   falls within the scope of AB 2655.  It did so by only regulating distribution in a temporal window

7   around the election.  And it did so by only including exceptions that further the Legislature's

8   purpose, not undermine it.  None of the speech within the scope of AB 2655 fails to advance the

9   Legislature's purpose, and its decision not to include more speech reflects narrow tailoring rather

10  than undermining it.  While strict scrutiny may be a high bar, it is not an insurmountable one.  AB

11  2655 is one of the rare statutes that meets that bar.

12          **D.    AB 2655 Is Not an Impermissible Prior Restraint**

13          Next, plaintiffs contend that AB 2655 violates the First Amendment as a prior restraint.

14  "The term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain

15  communications when issued in advance of the time that such communications are to occur.'"

16  *Alexander v. United States*, 509 U.S. 544, 550 (1993) (citation omitted).  The question for a court

17  is thus "'whether the challenged regulation *authorizes* suppression of speech in advance of its

18  expression.'"  *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1023 (9th

19  Cir. 2009) (emphasis in original) (citation omitted).

20          AB 2655 is not a prior restraint.  Rather, the statute is premised on the fact that speech has

21  *already occurred*.  It requires platforms to create a means to report "content that should be

22  removed . . . or labeled," i.e., content *already posted* on the platform.  Cal. Elec. Code § 20515(a).

23  And platforms are then required to *remove* content that has been posted if such content meet all

24  the criteria of the Blocking Requirement.  *See id.* § 20513(a).  (The Labeling Requirement, in

25  contrast, does not require blocking or removing *any* speech.)  Nowhere does AB 2655 require that

26  posts be pre-screened, reviewed in advance, or otherwise blocked *prior to* posting; it only

27  involves taking down posts that have been made.  It is not akin to the requirement to obtain a

28  permit before holding a demonstration.  *See, e.g.*, *Long Beach Area Peace Network*, 574 F.3d at

18

1    1023 (requirement to submit written application to hold demonstration constituted prior restraint).

2    Nor is it akin to a court order prohibiting speech that has not yet occurred. *See, e.g., In re Dan*

3    *Farr Prods.*, 874 F.3d 590, 593 (9th Cir. 2017) (per curium) (court order prohibiting attorney

4    from commenting on specific topics constituted prior restraint). It is, instead, like any other law

5    that regulates speech that has already occurred.

6        The language that plaintiffs cite from *Garcia v. Google, Inc.*, 786 F.3d 733, 747 (9th Cir.

7    2015) (en banc), is not to the contrary. Plaintiffs cite the en banc Ninth Circuit's statement in

8    *Garcia* that the "panel's takedown order [under review] of a film of substantial interest to the

9    public is a classic prior restraint of speech." *Garcia*, 786 F.3d at 747; *see* Pls.' AB 2655 Mem. at

10   33. But this language does not have the expansive meaning that plaintiffs ascribe to it. For one,

11   the order at issue in *Garcia* affirmatively blocked future speech: it required Google "to take all

12   reasonable steps to *prevent* further uploads" of the film at issue. *See Garcia v. Google, Inc.*, 766

13   F.3d 929, 940 n.8 (9th Cir. 2014) (emphasis added), *on reh'g en banc, Garcia*, 786 F.3d 733; *see*

14   *also Isaksen v. Mazu Publ'g Co.*, 2005 WL 8176605, at *2 (E.D. Cal. Mar. 29, 2005) (requested

15   preliminary injunction would prohibit defendants from making certain statements). For another,

16   the case did not even concern prior restraints or similar issues: it was a copyright lawsuit and the

17   analysis focused on the likelihood the plaintiff would prevail on her copyright claim. *See Garcia*,

18   786 F.3d at 744 (holding plaintiff did not make the showing required for a mandatory preliminary

19   injunction in copyright suit). The quoted language plaintiffs rely on comes from a short portion at

20   the end of the substantive analysis that discusses the panel's order and that was not necessary to

21   reach the en banc court's holding on the copyright claims.

22       Finally, the language quoted from *Garcia* cites to *Alexander* for the principle that a court's

23   takedown order is a classic prior restraint of speech, and *Alexander* is clear that it is referring to

24   court orders that prohibit *future* speech. There, the Court stated that the term "prior restraint is

25   used 'to describe administrative and judicial orders *forbidding* certain communications *when*

26   *issued in advance of the time that such communications* are to occur.'" *Alexander*, 509 U.S. at

27   550 (second emphasis added; first emphasis in original) (citation omitted). It explained that

28   "[t]emporary restraining orders and permanent injunctions—*i.e.*, court orders that actually forbid

19

1    speech activities—are classic examples of prior restraints." *Id.*  As examples, *Alexander* cited to

2    cases that involved court orders forbidding future speech, such as a court order that "perpetually

3    enjoined" a newspaper "from producing any 'future malicious, scandalous or defamatory'

4    publication," *id.* (quoting *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 706 (1930)), and a court

5    order that "prohibit[ed] the future exhibition of films that have not yet been found to be obscene,"

6    *id.* (discussing *Vance v. Universal Amusement Co.*, 445 U.S. 308, 311 (1980) (per curiam)).

7    Ultimately, the Court held that the order at issue in *Alexander* was not a prior restraint because it

8    did not "*forbid* petitioner from engaging in any expressive activities in the future" or "require him

9    to obtain prior approval for any expressive activities." *Id.* at 550-551.  Unlike the orders in the

10   other cases discussed, the order in *Alexander* "impose[d] no legal impediment to—no prior

11   restraint on—petitioner's ability to engage in any expressive activity he chooses." *Id.* at 551.

12       The decision in *Alexander* provides no basis to conclude that a law requiring speech be

13   removed *after* posting—but that does not affirmatively *block* any speech from being posted in

14   advance—constitutes a prior restraint.  Nor does *Garcia*, particularly given that the order under

15   review there did, in fact, prohibit future speech by requiring Google take affirmative steps to

16   prevent the reupload of a film.  AB 2655, in contrast to the cases highlighted in *Alexander* and

17   precisely like the order under review in *Alexander*, does not forbid any speech that has not yet

18   occurred and imposes no legal barrier to future expressive activity.  It is thus not a prior restraint.

19       **E.    AB 2655 Does Not Violate Freedom of the Press**

20       Next, plaintiffs contend that AB 2655 violates freedom of the press under the First

21   Amendment.  A regulation draws scrutiny under the Free Press Clause when it "single[s] out the

22   press for special treatment" or "targets a small group" of press institutions.  *Minneapolis Star &*

23   *Trib. Co. v. Minn. Com'r of Revenue*, 460 U.S. 575, 582, 591 (1983) (proscribing a tax levied on

24   large newspapers).  When the regulation at issue is not a tax but instead some other form of direct

25   economic burden, the Ninth Circuit has recognized the validity of Free Press Clause claims only

26   when there has been a showing of censorious intent aimed at the press.  *E.g.*, *Koala v. Khosla*,

27   931 F.3d 887, 899 (9th Cir. 2019) ("[W]here a complaint alleges that the state singled out the

28   press by withholding a subsidy in response to disfavored speech, the complaint alleges a viable

1   Free Press Clause cause of action.").  Regulations which "do not single out the press as an

2   institution" do not give rise to Free Press Clause claims.  *Am. Soc'y of Journalists & Authors, Inc.*

3   *v. Bonta*, 15 F.4th 954, 963 (9th Cir. 2021); *see also Leathers v. Medlock*, 499 U.S. 439, 447

4   (1991) ("The tax does not single out the press and does not therefore threaten to hinder the press

5   as a watchdog of government activity.").

6          Here, AB 2655's definition of "large online platforms" subject to its regulations includes

7   entities such as "web application[s]," "advertising network[s]," and "search engine[s]," which

8   bear no resemblance to press outlets.  Cal. Elec. Code § 20512(h).  The definition of "large online

9   platforms" does not "single out" the press as an institution for any responsibility under AB 2655,

10  nor does it impose a tax or withhold a subsidy.  Indeed, rather than singling out the press for

11  special burdens, AB 2655 expressly *exempts* press members: it does not apply to press members

12  that broadcast covered materially deceptive content with a disclaimer.  Cal. Elec. Code

13  § 20519(a), (b)(1); *see also supra* at 17.  It would be anomalous if a law that singled out the press

14  for *protections* also simultaneously singled out the press for special *burdens* as required to state a

15  Free Press Clause claim.  Plaintiffs' such claim therefore fails.

16  **II.    AB 2655 IS NOT UNCONSTITUTIONALLY VAGUE**

17         Plaintiffs further contend that AB 2655 is unconstitutionally vague.  A statute is

18  impermissibly vague when it "fails to provide a reasonable opportunity to know what conduct is

19  prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement."  *Arce v.*

20  *Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (citation omitted).  But this standard "does not

21  require 'impossible standards of clarity.'"  *Id.* (citation omitted).  Rather, a statute must simply

22  "give sufficient notice as to what conduct is prohibited."  *Id.*  Although there may be cases at the

23  margin that can be dreamed up, a statute is not vague when it is "clear what the [statute] as a

24  whole prohibits."  *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (citation omitted).  After all,

25  "because we are '[c]ondemned to the use of words, we can never expect mathematical certainty

26  from our language.'"  *Id.* (citation omitted) (alteration in original).

27         As defendants explain in their own motion for summary judgment, AB 2655 meets this

28  standard.  *See* Defs.' AB 2655 Mem. at 25-28.  Each of the law's three regulatory requirements

are clear in the scope of conduct they regulate: to create a means for California residents to report content within the scope of AB 2655, remove specified content during a specified time period, and label specified content during a specified time window. *Id.* at 25-27. AB 2655 imposes no affirmative requirements on platforms to seek out and locate the content within its scope; rather, a platform must only act once content has been *reported to it* (or, for the Blocking Requirement only, when it is aware of posted content substantially akin to that it previously removed). *Id.* at 26-27. And AB 2655 only applies when a company *knows* that the content is subject to AB 2655's requirements. *Id.* Such a mens rea requirement "further reduces any potential for vagueness," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 21 (2010), since "a person of ordinary intelligence" can "base his behavior on his factual knowledge of the situation at hand and thereby avoid violating the law," *United States v. Jae Gab Kim*, 449 F.3d 933, 943 (9th Cir. 2006).

Plaintiffs' contrary arguments are not persuasive. First, plaintiffs contend the meaning of "state-of-the-art" in AB 2655 is vague. Not so. The plain meaning of "state-of-the-art" is cutting-edge, most modern, or most advanced.[7] Indeed, the term is not uncommon in federal and state statutes. *See, e.g.*, 20 U.S.C. § 1161*l*(c)(1) (federal grants for higher education institutions to "[d]evlop[e] and implement[] a state-of-the-art emergency communications system"); 33 U.S.C. § 467n(a) (recovery of costs resulting from "changes in state-of-the-art design or construction criteria" for dams); Md. Code, Tax-Prop. § 9-228(a) (tax credit for renovation to "meet state-of-the-art communications and utility standards"); Va. Code § 62.1-44.19:15(A)(1) (expanded pollutant discharge elimination system must "install state-of-the-art nutrient removal technology"). It is certainly far from unconstitutionally vague. AB 2655's requirement to employ "state-of-the-art techniques" is not vague.

---

[7] *See, e.g.*, "State-of-the-art," Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/state-of-the-art (defining "state-of-the-art" as "very modern and using the most recent ideas and methods") (last accessed June 6, 2025); "State-of-the-art," Collins Dictionary, https://www.collinsdictionary.com/us/dictionary/english/state-of-the-art (defining "state-of-the-art" as "best available because it has been made using the most modern techniques and technology") (last accessed June 6, 2025).

Second, plaintiffs contend that the definition of "materially deceptive content" is vague because it "doesn't target false content as such." Pls.' AB 2655 Mem. at 40. But as explained above, the language has a clear meaning: materially deceptive content is such that a reasonable person would believe it is an accurate depiction of true events—and thereby does not reach speech a reasonable person would not take as literally true. *See supra* at 8-11. This is an objective, workable standard grounded in a reasonable person's understanding of the content at issue after a moment of consideration. Courts routinely draw similar lines grounded on a reasonable person's understanding or perception of a statement. *See supra* at 9-10 (similar question in defamation, copyright, and trademark law); *infra* at 23-24 (similar question in fraud cases). AB 2655's definition of "materially deceptive content" is not unconstitutionally vague.

Third, plaintiffs highlight the exemption that AB 2655 has for parody and satire, contending that the law "provides no guidance as to what constitutes satire or parody." Pls.' AB 2655 Mem. at 40. But again, courts routinely address whether a work constitutes satire or parody. *See supra* at 9-10. True, there may be debate about what those terms mean and whether a particular work constitutes a satire or parody. But that does not make AB 2655 any vaguer than copyright law's fair use protection for satire and parody, trademark law's protection for parody marks, or defamation's protection for statements of opinion, all of which require similar analyses. *See supra* at 9-10. It certainly does not make AB 2655 unconstitutionally vague.

Fourth, plaintiffs contend AB 2655 is vague because the Blocking Requirement only applies to content reasonably likely to harm a candidate's electoral prospects or reputation or to undermine confidence in an election's outcome. Pls.' AB 2655 Mem. at 41. But that a law may involve "the application of a qualitative standard . . . to real world conduct" does not make it vague. *Johnson v. United States*, 576 U.S. 591, 604 (2015). As the Supreme Court has observed, "the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree." *Id.* at 605 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)) (alteration in original). AB 2655 is no different from the multitude of laws that require a person to estimate what impact something may have on a reasonable person. For instance, in analyzing fraud claims the question of materiality turns on the impact the allegedly fraudulent statement would have on a

23

1    reasonable person.  *See, e.g.*, *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021)

2    (omission is material in securities fraud case where it would have altered decision of "reasonable

3    investor").  Moreover, plaintiffs ignore the large swaths of speech where applying that standard

4    will be clear.  A deepfake showing a candidate accepting a bribe, beating their child, or bragging

5    about lying to voters will clearly fall within the scope of AB 2655, for instance.  So, too, a

6    deepfake showing an elections official discussing how they rigged the election or a picture of a

7    doctored ballot pre-filled for a voter.  That there may be hard hypotheticals at the margins that

8    can be imagined does not render a law unconstitutionally vague: "speculation about possible

9    vagueness in hypothetical situations not before the Court will not support a facial attack on a

10   statute when it is surely valid 'in the vast majority of its intended applications.'"  *Hill*, 530 U.S. at

11   733.

12   Fifth, plaintiffs contend that AB 2655 is vague because the definition of "materially

13   deceptive content" clarifies that such content does not include audio or visual media that

14   "contains only minor modifications that do not significantly change the perceived contents or

15   meaning of the contents."  Cal. Elec. Code § 20512(i)(2).  Plaintiffs ignore the guidance that the

16   definition provides: it specifically lists "changes to brightness or contrast of images" and

17   "removal of background noise" as examples of the kind of changes that will not make audio or

18   visual media materially deceptive content.  *Id.*  And plaintiffs err in contending the law imposes a

19   subjective standard: rather, the question of whether a modification significantly changes the

20   perceived content or its meaning would center on how a reasonable person would perceive the

21   change, which is an objective standard and one common to the law, as noted above, *see supra* at

22   23.

23   Finally, plaintiffs contend the law is vague because it is "'next to impossible'" for a

24   platform "to make these determinations as to every candidate for elective office, elections official,

25   and elected official."  Pls.' AB 2655 Mem. at 41.  But this contention proceeds from an erroneous

26   conception of the law.  Plaintiffs appear to conceive of AB 2655 as requiring an affirmative effort

27   to review materials and find ones that violate AB 2655.  Not so.  Instead, the law only requires

28   action once there is a *report*.  Thus, plaintiffs will only need to consult the *reported media* and

1    determine if that particular piece of media falls within the scope of AB 2655's Blocking

2    Requirement or Labeling Requirement.  As plaintiffs' own numbers show, only a fraction of posts

3    ever result in a report.  *See id.* at 42 (noting 942 million posts on X worldwide on November 5-6,

4    2024, yet only 224 million reports during the six-month period around elections in the European

5    Union and India in 2024).  And many of the posts reported will be easy to screen for AB 2655's

6    applicability.  For instance, it will be easy for platforms to determine if a post concerns an

7    election *in California* rather than an election in another state or another country.  It will be easy

8    for a platform to determine if a post contains audio or visual media, which falls within AB 2655,

9    rather than only text, which would not fall within AB 2655.  It will be easy to determine if a post

10    was made in the relevant temporal window when AB 2655's Blocking and Labeling

11    Requirements apply.  And it will be easy to determine if a piece of media depicts a candidate,

12    elections official, or elected official in California so as to fall within the scope of the Blocking

13    Requirement.  AB 2655 is not vague because it would require a platform make such analyses.

14        At bottom, plaintiffs' arguments that AB 2655 is vague depend upon pulling statutory

15    language out of context and proffering extreme hypotheticals.  They also rely on examples that

16    fall outside the scope of the statute in general, such as satire and parody.  Contrary to plaintiffs'

17    portrayal, AB 2655 is not unconstitutionally vague.  It imposes only objective standards that rely

18    on a reasonable person's understanding—as many other laws and statutes do.  It includes

19    elements that mitigate any potential vagueness, including that AB 2655 only requires platforms

20    act upon receiving a report of content within its scope and only when they know that the content

21    meets the requirements to be blocked or labeled.  It thus does not expose a good faith actor who

22    makes a mistake to any form of sanction.  Plaintiffs may wish that AB 2655 gave them perfect

23    clarity.  "But 'perfect clarity and precise guidance have never been required even of regulations

24    that restrict expressive activity.'"  *Holder*, 561 U.S. at 19 (citation omitted).  Rather, a statute

25    need only provide "a person of ordinary intelligence fair notice of what is prohibited."  *Id.* at 20

26    (citation omitted).  AB 2655 does so.

27

28

**III.    AB 2655 IS NOT PREEMPTED BY SECTION 230**

Finally, plaintiffs contend that AB 2655 is preempted by section 230 of the Communications Decency Act.  It is not.

**A.    AB 2655 Is Not Preempted Under Section 230(c)(1)**

Section 230(c)(1) of the Communications Decency Act provides that "[n]o publisher or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  The Ninth Circuit, as with its sister circuits, applies a three-part test to determine whether a claim is preempted by Section 230(c)(1).  *E.g.*, *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 738 (9th Cir. 2024).  Under this test, Section 230(c)(1) preempts claims against "(1) a provider or user of an interactive computer service, (2) whom a plaintiff seeks to treat . . . as a publisher or speaker (3) of information provided by another information content provider."  *Id.* (citation omitted).

First, AB 2655 is not preempted because it does not impose *liability* on online platforms.  *See* Defs.' AB 2655 Mem. at 28.  A law imposes "liability" when it imposes a "financial or pecuniary obligation in a specified amount."  "Liability," Black's Law Dictionary (12th ed. 2024).  AB 2655 does no such thing.  Rather, it only allows for injunctive or other equitable relief.  *See* Cal. Elec. Code §§ 20515(b), 20516.  Indeed, the Legislature was clear that AB 2655 was not meant to impose any financial obligations on a company, going as far as to amend the law to remove any right to recover attorneys' fees to ensure no liability was created.  *See* Defs.' AB 2655 Mem. at 28-29.

Second, AB 2655 is not preempted because it does not treat platforms as publishers or speakers of information provided by another.  *See* Defs.' AB 2655 Mem. at 28-32.  As defendants explained in their own motion for summary judgment, AB 2655 is a regulation of a platform's *own* expression.  Indeed, plaintiffs themselves recognize as much.  They argue that AB 2655 triggers First Amendment scrutiny precisely because it "infringes the constitutionally protected content-moderation speech rights of covered platforms."  Pls.' AB 2655 Mem. at 24.

Caselaw is clear that Section 230 does not prevent the government from holding a platform liable for *their own* conduct.  *See, e.g.*, *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir.

26

2021) (section 230 did not bar action against company predicated on its own conduct in designing

content filter).  As the Third Circuit recently explained, "platforms engage in protected first-party

speech under the First Amendment when they curate compilations of others' content via their

expressive algorithms." *Anderson v. TikTok, Inc.*, 116 F.4th 180, 184 (3d Cir. 2024).  "[I]t

follows that doing so amounts to first-party speech under § 230, too." *Id.*  By directly controlling

a platform's exercise of editorial discretion, AB 2655 is a regulation of a platform's own conduct.

It no more treats platforms as a publisher than a law prohibiting distributing or selling books with

images of nude children would treat Barnes and Noble as a publisher.  And at the common law a

distributor could still be held liable "for repeating unlawful content, such as advertisements"

when "they knew or had reason to know that the content was unlawful." *Calise*, 103 F.4th at 739.

AB 2655 only requires content to be removed or labeled when the platform *knows* that content is

within the scope of AB 2655.  It does not treat a platform as a publisher under the common law.

　　　　To hold otherwise would immunize platforms from *any* direct government regulation that

touches on their content-moderation choices—including prohibitions against hosting content such

as child pornography or advertisements for illegal products.  "In the platforms' world, they are

fully responsible for their websites when it results in constitutional protections, but the moment

that responsibility could lead to liability, they disclaim any obligations and enjoy greater

protections from suit than nearly any other industry." *Doe Through Roe v. Snap*, 144 S. Ct. 2493,

2494 (2024) (Thomas, J., dissenting from denial of certiorari).  But Section 230 is not a "get-out-

of-jail-free card." *Id.*  It "was not meant to create a lawless no-man's-land on the Internet." *Fair

Housing Council of San Fernando Valley v. Roommates.com, Inc.*, 512 F.3d 1152, 1164 (9th Cir.

2008) (en banc).  And it does not provide "general immunity from liability deriving from third-

party content." *Barnes v. Yahoo! Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009).  Its scope does not

reach laws such as AB 2655 that seek to directly regulate a platform's own conduct.

　　　　Plaintiffs' arguments to the contrary are not persuasive.  They contend that AB 2655 is

preempted because the "alleged duty violated derives from an entity's conduct as a 'publisher,'

including 'reviewing, editing, and deciding whether to publish or withdraw from publication

third-party content.'" Pls.' AB 2655 Mem. at 37 (citation omitted).  Not so.  The alleged duty

1    here is a *statutory one* unrelated to an entity's status as a publisher.  Whether or not an entity

2    chooses to engage in content moderation, an online platform is required to adhere to AB 2655.

3    The law nowhere limits its reach to platforms that *already* do content moderation; it applies to *all*

4    "large online platforms" without respect to their content-moderation policies or choices.  True, a

5    platform may need to review and remove or label content under AB 2655.  "But that is not

6    because of the publisher's unique functions." *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 798 (5th

7    Cir. 2024).  "Rather it is because a publisher"—like every other online platform subject to AB

8    2655—"owes a statutory duty to the public" to follow applicable laws.  *Id.*  That obligation in no

9    way turns on whether a platform is (or is not) a publisher.  In sum, there is nothing in the

10   language or history of section 230 that suggests it was meant to preempt laws such as AB 2655.

11       **B.    AB 2655 Is Not Preempted Under Section 230(c)(2)(B)**

12       Plaintiffs also contend that AB 2839 is preempted under section 230(c)(2)(B).  Not so.

13   Section 230(c)(2) provides that "[n]o provider or user of an interactive computer service shall be

14   held liable on account of – (A) any action voluntarily taken in good faith to restrict access to or

15   availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy,

16   excessively violent, harassing, or otherwise objectionable . . .; or (B) any action taken to enable or

17   make available to information content providers or others the technical means to restrict access to

18   [such] material."  47 U.S.C. § 230(c)(2).  These provisions were meant to "remov[e] disincentives

19   for the development of software that filters out objectionable or inappropriate material." *Zango,*

20   *Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1174 (9th Cir. 2009).

21       Section 230(c)(2)(B) "immunizes from suit a provider of interactive computer software that

22   makes available software that filters or screens material that the user or the provider deems

23   objectionable." *Zango,* 568 F.3d at 1173 (emphasis removed).  It "covers actions taken to enable

24   or make available to others the technical means to restrict access to objectionable material." *Id.* at

25   1174-75 (emphasis removed).  AB 2655 does not impose liability on such actions.  The statute

26   has nothing to do with providing the technical means of blocking or restricting access to certain

27   material.  Nor does it have anything to do with facilitating "user control over what information

28   they receive." *Enigma Software Grp., USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1051 (9th

Cir. 2019). On the contrary, AB 2655 *removes* a user or provider's ability to determine whether to remove or label content within its scope. The Ninth Circuit has been clear that section 230(c)(2) does not "give providers unbridled discretion to block online content." *Id.* Section 230(c)(2)(B)'s immunity simply does not reach a statute that is directed at what content a platform may host, not what technology it uses or lets customers use to decide what content to see.

Plaintiffs' argument to the contrary is not persuasive. They contend that AB 2655 does implicate section 230(c)(2)(B) because "a platform's attempt to comply with the Reporting Requirement *is* an action to make available the technical means to restrict access to objectionable content." Pls.' AB 2655 Mem. at 38. Not in the least. Requiring that a platform have a means for a person to report to the platform that certain content must be removed or labeled *by that platform* is not at all akin to allowing users to employ anti-spam email filters, obscenity-blocking software, or anti-script extensions on a browser. As plaintiffs themselves say, AB 2655 is a regulation of the expressive choices platforms make regarding what content to host. It is not a regulation of any decision regarding employing or making available the technical means to block objectionable content. It is thus not preempted by Section 230(c)(2)(B).

## IV.   ANY UNCONSTITUTIONAL ASPECTS OF AB 2655 ARE SEVERABLE

As defendants explain above, AB 2655 is constitutional on the whole. However, to the extent that the Court finds otherwise and believes part of it is unconstitutional—such as only the Labeling Requirement or only the Blocking Requirement—the Court should sever the unconstitutional portion of the statute. Federal courts apply California law when analyzing severability. *Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 574 (9th Cir. 2014). California courts apply a three-part test to determine severability: the invalid part of the law "must be grammatically, functionally, and volitionally separable." *California Redevelopment Ass'n v. Matosantos*, 53 Cal. 4th 231, 271 (2011) (citation omitted). "Grammatical separability, also known as mechanical separability, depends on whether the invalid parts 'can be removed as a whole without affecting the wording' or coherence of what remains." *Id.* (citation omitted). "Functional separability depends on whether 'the remainder of the statute is complete in itself.'"

1    *Id.* (citation omitted).  "Volitional separability depends on whether the remainder 'would have

2    been adopted by the legislative body had the latter foreseen the partial invalidation of the

3    statute.'"  *Id.* (citation omitted).  The presence of a severability clause "establishes a presumption

4    in favor of severance." *Id.* at 270.

5        AB 2655 includes a severability clause, creating a presumption of severance.  Cal. Elec.

6    Code § 20520.  The three distinct requirements also meet the criteria for severability.  Since the

7    Reporting Requirement, Blocking Requirement, and Labeling Requirement are each in distinct

8    sections of the Elections Code, they are grammatically separable from one another.  Additionally,

9    the Blocking and Labeling Requirements are capable of being independently enforced apart from

10   the others, meeting the requirement for functional separability.  Finally, in light of the

11   Legislature's factual findings and the inclusion of a severability clause, it is clear the Legislature

12   would have chosen to regulate in this space to the maximum extent constitutional.  This

13   establishes volitional separability.  Thus, to the extent any part of AB 2655 is unconstitutional,

14   this Court should sever that portion and uphold the validity of the remainder of AB 2655.

## CONCLUSION

16       For the foregoing reasons, this Court should deny plaintiffs' motion for summary judgment

17   on AB 2655 and grant defendants' motion instead.  At a minimum, the Court should sever any

18   unconstitutional portions and uphold the remainder of AB 2655.[8]

20   Dated:  June 6, 2025                    Respectfully submitted,

21                                          ROB BONTA
                                            Attorney General of California
22                                          ANYA M. BINSACCA
                                            Supervising Deputy Attorney General

24                                          */s/ Kristin Liska*

25                                          KRISTIN A. LISKA
                                            Deputy Attorney General
26                                          *Attorneys for Defendants*

28   [8] The Attorney General would like to acknowledge the contribution of law student
     Nicholas Lindseth (Yale '27) to this brief.

# CERTIFICATE OF SERVICE

Case Name:    ***Kohls, Christopher, et al. v. Rob Bonta, et al.***
Case No.:      **2:24-cv-02527-JAM-CKD**

I hereby certify that on <u>June 6, 2025</u>, I electronically filed the following document with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON AB 2655**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished electronically by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

This declaration was executed on <u>June 6, 2025</u>, at San Francisco, California.

|  |  |
|---|---|
| Vanessa Jordan | *Vanessa Jordan* |
| Declarant | Signature |